FILED by __PG__ D.C.

DEC 1 0 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

|  |  |
|---|---|
| OLUWAMUYIWA AWODIYA, <br> *Plaintiff,* <br><br> -v- <br><br> ROSS UNIVERSITY SCHOOL OF MEDICINE, SCHOOL OF VETERINARY MEDICINE LIMITED <br> *Defendant.* | ) ) ) ) ) ) ) ) ) ) ) |

Case No.   0:18-cv-60482-KMM

Hon. Chief Judge: K. Michael Moore
Magistrate Judge: Alicia O. Valle

## PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiff Oluwamuyiwa Awodiya ("Plaintiff"), in proper person, hereby submits his Second Motion for Partial Summary Judgment ("Motion").

Plaintiff brings this Motion against Ross University School of Medicine, School of Veterinary Medicine Limited ("RUSM") in whole or in part on his failure to accommodate claims (under 42 U.S.C. § 12182; 29 U.S.C. § 794; 34 C.F.R. § 104), breach of fiduciary duty claim, fraudulent misrepresentation claims (inducement and omission), and negligent misrepresentation claim.

## Terms

The term "ADA" refers to Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182.

The term "RA" refers to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

The term "ADHD" refers to Attention Deficit Disorder Without Mention of Hyperactivity.

The term "Anxiety Disorder" refers to Anxiety State, Unspecified.

The term "OCD" refers to Obsessive Compulsive Disorder.

The term "Mental Impairments" refers to (i) Attention Deficit Disorder Without Mention of Hyperactivity, (ii) Anxiety State, Unspecified, and (iii) Obsessive Compulsive Disorder.

The term "NBME CBSE" or "COMP" refers to NBME Comprehensive Basic Sciences Examination.

The term "ROI Agreement" refers to the Release of Information Consent Agreement attached as Exhibit SJ-07.

The citation term "Admis. No." refers individually to each request in RUSM's responses to Plaintiff's request for admissions attached as Exhibit SJ-08.

The citation term "Sharma Dep." refers to Davendranand Sharma's deposition transcript attached as Exhibit SJ-21.

The citation term "Hayse Dep." refers to Bryan Hayse's deposition transcript attached as Exhibit SJ-22.

The citation term "Fulton Dep." refers to Matthew Stewart-Fulton's deposition transcript attached as Exhibit SJ-23.

## Table of Contents

**Introduction** ............................................................................................................. 1

**Standard of Review** ................................................................................................. 1

**Argument** ................................................................................................................. 1

I.    FAILURE TO ACCOMMODATE CLAIMS ............................................................... 1

    A.    Legal Framework. ................................................................................ 1

    B.    Plaintiff is Disabled. ............................................................................ 2

        i.    "Concentrating" is a Major Life Activity. ................................... 3

        ii.    Plaintiff's Mental Impairments Substantially Limits Concentration. ......... 3

    C.    Plaintiff is an 'Otherwise Qualified' Individual. ................................. 5

    D.    Plaintiff Requested an Accommodation. ............................................. 6

        i.    Months Before Plaintiff's NBME CBSE Attempts. ................................... 6

        ii.    After Plaintiff's NBME CBSE Attempts. The Grievance Process. .......... 10

    E.    In the Alternative, Plaintiff's Need for an Accommodation was Obvious. .......... 11

    F.    A Reasonable Accommodation Existed. .............................................. 13

    G.    RUSM Failed to Provide a Reasonable Accommodation. ..................... 13

II.    BREACH OF FIDUCIARY DUTY CLAIM ............................................................. 13

    A.    The RUSM Counseling Center had a Fiduciary Duty to Plaintiff. ....................... 13

III.    FRAUDULENT INDUCEMENT/OMISSION AND NEGLIGENT MISREPRESENTATION CLAIMS ... 14

    A.    RUSM Made a False Statement Regarding a Material Fact; and/or RUSM Misrepresented a Material Fact. ............................................................ 15

        i.    The ADA-Statement. ............................................................... 15

        ii.    The ADA-Statement is False and/or Misrepresented. ............... 16

        iii.    The ADA-Statement is Material. .............................................. 16

    B.    RUSM had Knowledge that the ADA-Statement is False; and/or Made the Representation Without Knowledge as to its Truth or Falsity, or RUSM Ought to have Known of its Falsity. ... 18

    C.    RUSM Intended for Prospective Students in the U.S. to Rely on the ADA-Statement. ... 19

    D.    RUSM Omitted a Material Fact that it had a Duty to Disclose to Prospective Students. ... 19

    E.    Plaintiff was Consequently Injured Acting in Reliance on the ADA-Statement and/or Injury Resulted to Plaintiff Acting in Justifiable Reliance on the ADA-Statement. ... 19

        i.    Plaintiff's Reliance and Consequent Injury. ............................. 20

ii.    Justifiable Reliance. .................................................................................. 20

**Conclusion** ..................................................................................................................... **20**

## Table of Authorities

<u>Cases</u>

*Adigun v. Express Scripts, Inc.*, No. 17-15225, (11th Cir. Aug. 7, 2018) ...................................... 6

*Alboniga v. Sch. Bd. of Broward Cnty.*, 87 F. Supp. 3d 1319, (S.D. Fla. 2015).............................. 2

*Bagwell v. Morgan Cnty. Comm'n*, No. 15-15274, (11th Cir. Jan. 18, 2017).............................. 13

*Bank of Am., N.A. v. Grec Homes IX, LLC*, CASE NO. 13-21718-CIV-ALTONAGA/Simonton,

(S.D. Fla. Jan. 23, 2014) ............................................................................................................ 15

*Boudreau v. Bethesda Found. of Neb.*, Civil Action No. 1:14-cv-03451-CMA-CBS, (D. Colo. Jan.

27, 2016) .................................................................................................................................... 10

*Brady v. Wal-Mart*, 531 F.3d 127, (2d Cir. 2008) ........................................................................ 12

*Butler v. Yusem*, 44 So. 3d 102, (Fla. 2010) ................................................................................. 20

*Doe v. Evans*, 814 So. 2d 370, (Fla. 2002) ................................................................................... 14

*Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, (11th Cir. 1997) ..................................................... 3

*Gracey v. Eaker*, 837 So. 2d 348, (Fla. 2002) ............................................................................. 13

*Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, (11th Cir. 2016) ................................................... 6, 17

*J.A.M. v. Nova Se. Univ., Inc.*, Case No. 0:15-cv-60248-KMM, (S.D. Fla. Aug. 12, 2015)...... 1, 2

*McCullum ex rel. DF & TF v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, (11th Cir. 2014)

.................................................................................................................................................. 12

*McLean v. Abington Mem'l Hosp.*, CIVIL ACTION NO. 15-671, (E.D. Pa. Sep. 15, 2015) ...... 10

*Moore v. Hexacomb Corp.*, 670 F. Supp. 2d 621, (W.D. Mich. 2009).......................................... 10

*Nattiel v. Fla. Dep't of Corr.*, CASE NO. 1:15-cv-00150-WTH-GRJ, (N.D. Fla. Nov. 27, 2017)

.................................................................................................................................................. 12

*Pope v. ABF Freight Sys., Inc.*, NO. 3:17-cv-564, (W.D.N.C. Jul. 24, 2018)................................. 3

*Robertson v. Las Animas*, 500 F.3d 1185, (10th Cir. 2007) ........................................................ 12

*Sessoms v. Trs. of the Univ. of Pa.*, No. 17-2369, (3d Cir. Jun. 20, 2018) ...................................... 6

*Tsavaris v. Pfizer, Inc.*, Case No. 1:15-cv-21826-KMM, (S.D. Fla. Feb. 1, 2016) ...................... 15

*U.S. v. Hialeah Housing Authority*, 418 Fed. Appx. 872, (11th Cir. 2011) .................................... 6

*Wachovia Insurance Services, Inc. v. Toomey*, 994 So. 2d 980, (Fla. 2008) ................................ 14

*ZC Insurance Co. v. Brooks*, 847 So. 2d 547, (Fla. Dist. Ct. App. 2003) ...................................... 19

## Statutes

42 U.S.C. § 12102 ............................................................................................................... 2, 3

42 U.S.C. § 12181 ................................................................................................................ 16

42 U.S.C. § 12182 ................................................................................................................ 18

## Other Authorities

Pattern Jury Instructions, Civil Cases, Eleventh Circuit, § 4.12, (2018 revision) .......................... 6

## Regulations

34 C.F.R. § 104 ............................................................................................................. 2, 3, 18

## INTRODUCTION

In May of 2014, Plaintiff became a medical student at RUSM. After passing his first four semesters in Dominica, he failed his fifth semester in December of 2015. When Plaintiff failed that semester, RUSM suspected, tested, and confirmed Plaintiff's concentration/attention limitations. Plaintiff informed RUSM numerous times that he needed extended testing time, but RUSM allows its faculty to be deliberately indifferent to disabled students in need of an accommodation. Contrary to what RUSM advertised to prospective students, RUSM did not have a policy—or required in any fashion—for its faculty to comply with the ADA in Dominica.

## STANDARD OF REVIEW

"A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief— that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

## ARGUMENT

### I.   Failure to Accommodate Claims

"To state a failure to accommodate claim, it must be shown that the plaintiff (1) is disabled, (2) is an 'otherwise qualified' individual, and (3) was discriminated against by way of the defendant's failure to provide a reasonable accommodation." *J.A.M. v. Nova Se. Univ., Inc.*, Case No. 0:15-cv-60248-KMM, at *8 (S.D. Fla. Aug. 12, 2015).

### A.   Legal Framework.

1

Since 34 C.F.R. § 104.4 effectuates the RA and because the RA and Title III of the ADA both prohibit discrimination on the basis of disability by an institution of higher education, these claims will be discussed together as a failure to accommodate claim. "No qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives Federal financial assistance." 34 C.F.R. § 104.4(a). "The purpose of this part is to effectuate section 504 of the Rehabilitation Act of 1973, which is designed to eliminate discrimination on the basis of handicap in any program or activity receiving Federal financial assistance." 34 C.F.R. § 104.1.

"Both the ADA and the RA prohibit discrimination on the basis of disability by an institution of higher education. ... Because both statutes generally impose the same legal requirements, the Court will discuss the ADA and RA claims together, relying on cases construing those statutes interchangeably, unless a distinction is relevant." *J.A.M.*, Case No. 0:15-cv-60248-KMM, at *5-6. "[T]he only material difference between the rights and remedies afforded plaintiffs under Title II and Section 504 lies in their respective *causation* requirements, but that this difference was *immaterial* where the plaintiff's claims are based on a failure to make reasonable accommodations for disabled individuals." *Alboniga v. Sch. Bd. of Broward Cnty.*, 87 F. Supp. 3d 1319, 1332 (S.D. Fla. 2015) (emphasis added) (citing *Bennett–Nelson v. La. Bd. of Regents,* 431 F.3d 448, 454 (5th Cir.2005)).

### B.   Plaintiff is Disabled.

A disabled or handicapped person is any person who (i) has a "physical or mental impairment" which "substantially limits one or more major life activities," (ii) has a "record of" such an impairment, or (iii) is "regarded as" having such an impairment. 42 U.S.C. § 12102(1); *accord* 34 C.F.R. § 104.3(j)(1).

2

"However, for a failure to accommodate claim, an individual must show that he has a disability within the 'actual disability' prong or the 'record of' prong[.]" *Pope v. ABF Freight Sys., Inc.*, NO. 3:17-cv-564, at *6-7 (W.D.N.C. Jul. 24, 2018). "Has a record of such an impairment means has a *history of*, or has been *misclassified as having*, a mental or physical impairment that substantially limits one or more major life activities." 34 C.F.R. § 104.3(j)(2)(iii) (emphasis omitted and added). Plaintiff's Mental Impairments are so well documented and detailed that he satisfies both the 'actual disability' and the 'record of' prongs.

### i.   "Concentrating" is a Major Life Activity.

By statute, "major life activities include ... concentrating[1]..." 42 U.S.C. § 12102(2)(A). Since only one major life activity is required to be disabled, Plaintiff does not find it necessary to argue all other possible major life activities in this Motion.

### ii.   Plaintiff's Mental Impairments Substantially Limits Concentration.

"[M]ental impairment means ... any mental or psychological disorder." 34 C.F.R. § 104.3(j)(2)(i). Plaintiff was diagnosed with the following mental disorders, ADHD, Anxiety Disorder, and OCD. Each of these Mental Impairments substantially limit the same major life activity, concentration; and consequently, his ability to complete exams in the standard time allotted. "The ADA defines 'discrimination' to include 'not making reasonable accommodations to the known physical or mental **limitations** of an otherwise qualified individual with a disability." *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1224 (11th Cir. 1997) (emphasis added) (quoting 42 U.S.C. § 12112 (b)(5)(A)).

**Diagnostic tests**. After Plaintiff took multiple diagnostic tests between December 2015 through January 2016 his treating professionals stated, (1) Plaintiff's "Conners CPT3 computer

---

[1] Plaintiff may use the term "concentration" interchangeably with "attention."

3

testing results [] states that the scores are 'associated with a very high likelihood of having a disorder' such as ADHD." Ex. SJ-01; (2) "The TOVA was administered. The results are not within normal limits and the overall pattern of performance suggests an attention problem, including ADHD." Ex. SJ-02; and (3) "The CAARS was also administered. The results indicated ADHD predominantly Inattentive presentation." *Id.* Plaintiff's Conners CPT3, TOVA, and CAARS all reached the same conclusion about Plaintiff's concentration problems.

**Medical record notes** by Plaintiff's treating professionals. On December 30, 2015, Dr. Mauricio's medical note about Plaintiff reads:

> The patient reports the following concerns related to attention/concentration:
>
> [F]requently fails to give close attention to details or makes careless mistakes at work or in school[.]
>
> [C]onstantly has difficulty sustaining attention to tasks at work or in school[.]
>
> [I]ntermittently doesn't seem to listen when spoken to directly[.]
>
> [F]requently does not follow through on instructions or fails to finish work or duties[.]
>
> [C]onstantly has difficulty with tasks requiring persistence or organization (schoolwork or job duties)[.]
>
> [C]onstantly Has [*sic*] problems with procrastination/avoidance of tasks.
>
> [C]onstantly distracted by noise or activity.
>
> [C]onstantly is forgetful in daily activities, e.g., difficulty remembering appointments or obligations[.]
>
> [I]ntermittently finds it hard to follow conversations, even when being spoken to directly[.]

Ex. SJ-03, at 3. On June 17, 2016, Dr. Mauricio's medical note about Plaintiff reads:

> [H]ave not been on time for anything in the last couple of months, continuous missing events, study maybe 3 hours a day or less, don't feel a "focus" effect/ don't feel anything, stupid things distract [him]

4

> from main subject[]. He reports that he continues to be "always late", forgetting all his appointments…

*Id.* at 18.

Denise H. Unterman's (Plaintiff's psychotherapist) medical note reads, "[a]nxiety dating

to at least [high school]." Ex. SJ-04, at 35. Ms. Unterman's medical note further reads:

> [O]nset of anxious feelings in HS w/ worsening in college around exams when he started pulling out his eyelashes and chin hairs. […] [S]truggling w/ completing exams due to compulsively checking that he has completed previous answers. […] [H]e's very worried about undermining his score by not completing the exam in the time allowed.. He pulls his eyelashes to the point where he no longer has any.

*Id.* Ms. Unterman's goal for Plaintiff reads:

> Goal I: Anxiety Reduce [*sic*] the overall leve[l], frequency and intensity of the anxiety so that daily functioning is not impaired.

*Id.* at 36.

**RUSM counseling records** indicate that Plaintiff experienced "running out of time" on his

exams. Ex. SJ-05. These records also show that "towards the end" of exams, Plaintiff would "los[e]

his momentum and just circle questions without really thinking of the answers." Ex. SJ-06.

## C. Plaintiff is an 'Otherwise Qualified' Individual.

RUSM admitted that Plaintiff is an otherwise qualified individual. Paragraph 86 of the

Complaint [ECF No. 47] reads:

> Plaintiff is otherwise qualified to participate in RUSM's curriculum and is able to participate in said program with reasonable accommodations in place.

Compl. ¶ 86.

RUSM admitted to the allegation in its Answer and Affirmative Defenses [ECF No. 58]

("Answer") as follows:

> In response to paragraph 86, RUSM admits the allegations.

5

Answer ¶ 87.

### D.     Plaintiff Requested an Accommodation.

The determination of whether a request for accommodation has been made, is a legal conclusion. "However stated, a plaintiff can be said to have made a request for accommodation when the defendant has 'enough information to know of both the disability and desire for an accommodation.'" *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1226 (11th Cir. 2016) (quoting *Conneen v. MBNA Am. Bank, N.A.,* 334 F.3d 318, 332 (3d Cir.2003) (internal quotation marks omitted)). "[A] plaintiff 'need not use magic words,' but 'should provide enough information about his or her limitations and desires to suggest at least the possibility that reasonable accommodation may be found ....'" *Adigun v. Express Scripts, Inc.*, No. 17-15225, at *4-5 (11th Cir. Aug. 7, 2018) (brackets omitted) (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999)); *accord U.S. v. Hialeah Housing Authority*, 418 Fed. Appx. 872, 876 (11th Cir. 2011). "[A]ccommodation request need not be formal, be in writing, or invoke any particular 'magic words[.]'" *Sessoms v. Trs. of the Univ. of Pa.*, No. 17-2369, at *8 (3d Cir. Jun. 20, 2018). The term "request" is a legal concept.

"Put another way, the third and fourth elements require [Plaintiff] to prove that [he] informed [RUSM] of both the substantial limitations [his] disability created and the need for an accommodation." Pattern Jury Instructions, Civil Cases, Eleventh Circuit, § 4.12, p. 7 (2018 revision).

### i.     Months Before Plaintiff's NBME CBSE Attempts.

After Plaintiff failed his fifth semester in December 2015, he executed a ROI Agreement with the RUSM Counseling Center. Ex. SJ-07; Answer ¶ 17. When Plaintiff signed the ROI Agreement, he verbally asked Dr. Sharma and Mr. Cuffy to tell RUSM administration (1) that he needed extended testing time for a suspected attention problem that needed to be diagnosed and

(2) that he needed an earlier flight home to help him emotionally with failing the semester. Awodiya Decl. ¶ 3.

The ROI Agreement states that Plaintiff "authorize[d] RUSM Counseling Center" to discuss his "confidential information" with "RUSM Administration" for the purpose "to provide information relevant to academic accommodations" and authorized them to do so with "ongoing communication." Ex. SJ-07. "RUSM admits that this would have permitted the Counseling Center, including the psychiatrist treating Plaintiff, to discuss his ADHD with the school's Accommodations Coordinator[.]" Answer ¶ 17.

**Dr. Sharma** is RUSM's "professor of behavior sciences and consultant psychiatrist for health services." Sharma Dep. 7:23-24. Dr. Sharma admitted that he has "helped other students to get test accommodations at Ross University." *Id.* 27:1-3. Although he may not make the final decision, Dr. Sharma stated that he is the one who makes the requests for accommodations for students. In Dr. Sharma's own words, he stated, "I'm the one -- or the doctors make the request for accommodation, which is time-and-a-half. You get extra time. We actually put it we want the student to get the accommodation[.]" *Id.* 37:17-21.

Dr. Sharma admitted that he noticed Plaintiff's attention/concentration symptoms, including, constantly has difficulty sustaining attention to tasks, constantly has difficulty with tasks requiring persistence or organization, constantly distracted by noise or activity, and constantly forgetful in daily activities. Sharma Dep. 12:9-21. Dr. Sharma stated, "what I saw was evidence of ADHD that required, you know, testing and confirmation." *Id.* 13:1-3. Dr. Sharma admitted that he noticed Plaintiff's symptoms in "December 2015." *Id.* 13:19-24. Dr. Sharma further admitted that he noticed Plaintiff's symptoms to the "extent" that Dr. Sharma "recommended an assessment for the ADHD," when Plaintiff signed the ROI Agreement "for the release of information relative

7

to academic accommodations." *Id.* 73:1-8. Dr. Sharma further admitted that Plaintiff's "ADHD symptoms that [he] observed in December 2015" were "relevant to academic accommodations." *Id.* 74:13-22.

Dr. Sharma admitted that he was "informed that [P]laintiff was running out of time on his exams." Sharma Dep. 23:7-9. Dr. Sharma further admitted that he believed that "[P]laintiff's ADHD, specific to him, was significantly limiting his ability to complete his exams in the time allowed." *Id.* 20:19-22. Dr. Sharma also stated that Plaintiff told him that he was continuing to "r[u]n out of time" on his exams even though he passed them in March 2016. *Id.* 18:24-19:7. Dr. Sharma further stated, "did I prescribe the stimulant [Ritalin] because the student needed extra time? That is part of the problem that ADHD has, that it causes the student to take longer. So the medication would help that. So, yes, that's correct." *Id.* 39:14-19. Then Dr. Sharma admitted that Plaintiff told him that he was still running out of time on his exams despite the medication. *Id.* 40:24-41:7.

**Dr. Hayse** has served as the Associate Dean of Student Affairs at RUSM. Ex. SJ-09. His "[a]reas of oversight include ... academic accommodations." *Id.* Dr. Hayse was responsible for making the "final decision" on academic accommodations. Hayse Dep. 23:22-24:8. Plaintiff also informed Dr. Hayse of his limitations and the need for extended testing time. On the same day that Plaintiff signed the ROI Agreement in December 2015, he had a joint meeting with Dr. Sharma and Mr. Cuffy about failing the semester. Ex. SJ-10. Dr. Sharma's counseling note reads, "[f]elt he was treated unfairly because he failed by one point ... [h]e wanted to speak to the Dean about changing his grade." *Id.* at 1. The same counseling note also reads, "[i]s trying to see if he can have his grade changed. EMt [*sic*] with student affairs." *Id.* at 2.

8

The next day Plaintiff met with Dr. Hayse in Student Affairs. Plaintiff asked Dr. Hayse if he could retake his exams with extended testing time because the RUSM Counseling Center suspected an attention problem that needed to be diagnosed. Awodiya Decl. ¶ 4. Dr. Hayse told Plaintiff that he could accommodate Plaintiff for future exams but not for exams that Plaintiff had already taken. *Id.* ¶ 5. Dr. Hayse told Plaintiff that he would contact Mr. Cuffy about the suspected attention problem so that Plaintiff could receive extended testing time for future exams. *Id.* ¶ 6.

**Mr. Cuffy** is a counselor at RUSM. Admis. No. 48. Mr. Cuffy's counseling note reads, "[Plaintiff] returned to office after talking to Dr. Hayes [*sic*] in Student Affairs regarding his academic situation. I subsequently received an email from Dr. Hayes [*sic*] requesting that we talk at some point re: the client. After the meeting with Dr. Hayes, [*sic*] the client was very disappointed but stable." Ex. SJ-11. Another counseling note three days later by Mr. Cuffy reads, "[a]fter exhausting all avenues of getting his grades changed, he is at the point where he is accepting to come back here in January to repeat semester 5." Ex. SJ-12.

When Plaintiff returned to Dominica to repeat his fifth semester in January 2016, Plaintiff provided the RUSM Counseling Center with an assessment of his ADHD that was performed by Dr. Mauricio in the United States. Mr. Cuffy clinically assessed Plaintiff with ADHD and Anxiety Disorder. Answer ¶¶ 14-15. Mr. Cuffy's counseling note reads, "[Plaintiff] was assessed in the U.S. for ADHD; he provided us with a copy of the results which are scanned in his file. ... Clinical assessment: Academic problems; repeating semester 5." Ex. SJ-13. *See also* diagnostic tests and medical record notes *supra* pp. 3-4. Mr. Cuffy's counseling notes also reads, "that towards the end of the exam [Plaintiff] lost his momentum and just circle questions without really thinking of the answers." Ex. SJ-06.

Dr. Sharma, Dr. Hayse, and Mr. Cuffy were each informed of Plaintiff's limitations and the need for an accommodation.

### ii. After Plaintiff's NBME CBSE Attempts. The Grievance Process.

In 2017, the RUSM Promotions Committee recommended Plaintiff for dismissal because of his performance on his NBME CBSE attempts. Dean Owen denied Plaintiff the opportunity to continue despite being informed by Plaintiff's mental health providers that Plaintiff suffers from a disability that adversely affects his academic performance.

"[S]omeone other than the disabled person may request an accommodation on behalf of the disabled person." *Moore v. Hexacomb Corp.*, 670 F. Supp. 2d 621, 629 (W.D. Mich. 2009). "[A] family member, friend, health professional, or other representative may request a reasonable accommodation on behalf of an individual with a disability." *Id.* at 629-630 (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999)); *accord McLean v. Abington Mem'l Hosp.*, CIVIL ACTION NO. 15-671, at *15 (E.D. Pa. Sep. 15, 2015); *Boudreau v. Bethesda Found. of Neb.*, Civil Action No. 1:14-cv-03451-CMA-CBS, at *10 n.2 (D. Colo. Jan. 27, 2016).

On June 1, 2017, the RUSM Promotions Committee instructed Plaintiff to email an appeal letter to Dean Owen at PromotionAppeals@RossU.edu "[i]f additional information has become available or if you believe university procedure wasn't followed." Ex. SJ-14.

On June 12, 2017, Plaintiff's independent psychiatrist and psychotherapist informed Dean Owen that Plaintiff's mental impairment had adversely affected his academic performance in medical school. Ex. SJ-15. Plaintiff's psychiatrist and psychotherapist sent an email to Dean Owen which states:

> We are writing on behalf of [Plaintiff], a student in your program.
>
> We have been treating Mr. Awodiya for the past several months for ADHD and Obsessive Compulsive Disorder. He has had

> symptoms of the latter for the past 4-6 years but did not understand the nature of the diagnosis until recently. We believe that the **anxiety and checking rituals inherent to this condition** have been **adversely affecting his academic performance** in medical school.

*Id.* (emphasis added).

On June 13, 2017, RUSM confirmed that it received Plaintiff's appeal letter to Dean Owen.

Ex. SJ-16. Plaintiff's appeal letter to Dean Owen stated:

> [M]y objective is to keep this letter relevant to how **OCD has influenced my academic performance**.
>
> ....
>
> My biggest challenge with OCD is the **extreme anxiety** and urges that overwhelm me. ... Honestly, I don't fully understand everything about my OCD yet, but sometimes there isn't a solution to sooth my anxiety. Therefore, when I can't identify why I feel the way I do, I get hopelessly overwhelmed. Sometimes the solution is not even logical, like pulling out my eyelashes.
>
> I'm the student who **never finished an exam on time**. I was **compelled to back track my answers just to make sure they didn't disappear 5 seconds after I went to the next question**. ... These are just some of the ways that OCD has influenced my academic performance.
>
> ... I cannot tell you that I can fix this overnight, but I can tell you that progress can be made.

Ex. SJ-17 (emphasis added).

On June 29, 2017, Dean Owen sent a letter to Plaintiff which states that he "carefully reviewed [Plaintiff's] academic record, [Plaintiff's] **appeal** of the Student **Promotions Committee's recommendation for dismissal**, and [Plaintiff's] pre-matriculation credentials." Ex. SJ-18 (emphasis added). Dean Owen still decided to dismiss Plaintiff. *Id.*

### E.     In the Alternative, Plaintiff's Need for an Accommodation was Obvious.

Even if RUSM could somehow create a question of fact as to whether Plaintiff made a "request" for an accommodation, a request is not required when Plaintiff's need for an

accommodation was obvious. The same facts already set forth above, support this alternative as well.

"[T]he entity will know of the individual's need for an accommodation because it is obvious." *McCullum ex rel. DF & TF v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014) (quoting *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir.2007)). "Whether the public entity's knowledge derives from an individual's request for an accommodation or an individual's obvious need for an accommodation, the critical component of the entity's knowledge is that it is aware not just that the individual is disabled, but that the individual's disability affects his ability to receive the benefits of the entity's services." *Robertson v. Las Animas*, 500 F.3d 1185, 1197 n.10 (10th Cir. 2007).

"[A] disabled person's failure to expressly 'request' an accommodation [] is not fatal to an ADA claim where the defendant otherwise had knowledge of an individual's disability and needs but took no action. A specific demand may be unnecessary where the need for an accommodation is obvious." *Nattiel v. Fla. Dep't of Corr.*, CASE NO. 1:15-cv-00150-WTH-GRJ, at *2 (N.D. Fla. Nov. 27, 2017) (second bracket added) (quoting *McCoy v. Texas Dep't of Criminal Justice*, 2006 WL 2331055 at *7 (S.D. Tex 2006)).

"Application of this general rule [that a request for accommodation is a prerequisite to liability for failure to accommodate] is not warranted, however, where the disability is obvious or otherwise known to the employer without notice from the employee." *Brady v. Wal-Mart*, 531 F.3d 127, 135 (2d Cir. 2008) (brackets in original) (quoting *Felix v. New York City Transit Authority*, 154 F.Supp.2d 640 (S.D.N.Y. 2001)). "[W]hen an employer has independent knowledge of an employee's disability[,] [t]he rule requiring a request for accommodation [does not apply] in such circumstances." *Id*. (last bracket in original). "A requirement that such an

employee ask for accommodation would be tantamount to nullifying the statutory mandate of accommodation for one entire class of disabled (as that term is used in the ADA) employees. We therefore hold that an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious — which is to say, if the employer knew or reasonably should have known that the employee was disabled." *Id.*

"Lastly, the regulations governing the ADA provide that, to determine the appropriate reasonable accommodation, an employer may need to initiate an informal, interactive process with the individual with a disability in need of an accommodation to identify the person's limitations and potential reasonable accommodations." *Bagwell v. Morgan Cnty. Comm'n*, No. 15-15274, at *7 (11th Cir. Jan. 18, 2017) (quotation marks omitted).

### F.      A Reasonable Accommodation Existed.

RUSM admits "that extended testing time for the NBME CBSE is a reasonable accommodation for disabled students that need extended testing time." Admis. No. 58.

### G.      RUSM Failed to Provide a Reasonable Accommodation.

RUSM admits "that RUSM did not provide Plaintiff with extended testing time for the NBME CBSE." Admis. No. 16.

## II.      Breach of Fiduciary Duty Claim

The RUSM Counseling Center had an ongoing duty to provide RUSM administration with confidential information reposed by Plaintiff, if the information was relevant to academic accommodations.

"The elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002).

### A.      The RUSM Counseling Center had a Fiduciary Duty to Plaintiff.

13

"The counselor-counselee relationship has been characterized as a fiduciary one." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002). "Fiduciary relationships usually arise in one of four situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties[.]" *Wachovia Insurance Services, Inc. v. Toomey*, 994 So. 2d 980, 998 n.7 (Fla. 2008) (alterations omitted).

As stated above, Plaintiff verbally asked Dr. Sharma and Mr. Cuffy, to communicate with RUSM administration on his behalf. *See supra* pp. 6-7. The RUSM Counseling Center's fiduciary duty is outlined, in *writing*, in the joint ROI Agreement. Restated here, the ROI Agreement states that Plaintiff "authorize[d] RUSM Counseling Center" to discuss his "confidential information" with "RUSM Administration" for the purpose "**to provide information <u>relevant</u> to academic <u>accommodations</u>**" and authorized them to do so with "<u>**ongoing** communication</u>." Ex. SJ-07 (emphasis added). "RUSM admits that this would have permitted the Counseling Center, including the psychiatrist treating Plaintiff, to discuss his ADHD with the school's Accommodations Coordinator[.]" Answer ¶ 17.

### III.    Fraudulent Inducement/Omission and Negligent Misrepresentation Claims

RUSM falsely advertised to prospective students that the university required its faculty "to comply" with the Americans with Disabilities Act in Dominica. RUSM admitted that the advertisement was intended for prospective students but used the phrase "as applicable" to exclude these same students from the purported "policy" or requirement that it advertised to have.

"To state a claim for fraudulent inducement pursuant to Florida law, [Plaintiff] must allege four elements: '(1) a false statement regarding a material fact; (2) the statement maker's knowledge

14

that the representation is false; (3) intent that the representation induces another's reliance; and (4) consequent injury to the party acting in reliance." *Bank of Am., N.A. v. Grec Homes IX, LLC*, CASE NO. 13-21718-CIV-ALTONAGA/Simonton, at *11 (S.D. Fla. Jan. 23, 2014) (quoting *Thompkins v. Lil' Joe Records, Inc.,* 476 F.3d 1294, 1315 (11th Cir. 2007) (citations omitted)).

"A plaintiff may establish negligent misrepresentation by proving (1) a misrepresentation of a material fact; (2) the representor made the representation without knowledge as to its truth or falsity, or under circumstances in which the representor ought to have known of its falsity; (3) the representor intended to induce another to act on the misrepresentation; and (4) injury resulted to the party acting in justifiable reliance on the misrepresentation." *Tsavaris v. Pfizer, Inc.*, Case No. 1:15-cv-21826-KMM, at *9 (S.D. Fla. Feb. 1, 2016) (quoting *Souran v. Travelers Ins. Co.,* 982 F.2d 1497, 1503 (11th Cir. 1993) (citation omitted).

## A. RUSM Made a False Statement Regarding a Material Fact; and/or RUSM Misrepresented a Material Fact.

### i. The ADA-Statement.

Paragraph 106 of the Complaint reads, "[c]ontinuously between 2012 and 2018, and before Plaintiff applied and enrolled into RUSM's medical degree program, RUSM published a statement in its Admission Requirements section of its website" stating:

> It is the **policy** and practice **of the University to comply** with the Americans with Disabilities Act **as applicable** and practical **in Dominica**.

Compl. ¶ 106 (emphasis added) (hereinafter referred to as the "**ADA-Statement**"); *See also* Ex. SJ-19, at 3 (the ADA-Statement as it appeared on October 31, 2012).

RUSM did not deny and therefore admitted the allegation of the ADA-Statement in its Answer, as it reads:

> In response to paragraph 106, RUSM states that the website speaks for itself and RUSM denies any allegations inconsistent therewith.

Answer ¶ 107.

### ii.  The ADA-Statement is False and/or Misrepresented.

First, RUSM did not have a policy instructing its faculty "to comply" with the Americans with Disabilities Act in Dominica. Second, RUSM believed or took the position that Title III of the Americans with Disabilities Act was not applicable in Dominica and then used this malicious belief to elude the compliance that it advertised to prospective students.

Title I of the Americans with Disabilities Act is only applicable to employees. 42 U.S.C. § 12112(a). Title II of the Americans with Disabilities Act is only applicable to public entities. 42 U.S.C. § 12132. In contrast, Title III of the Americans with Disabilities Act is applicable to private entities including "postgraduate private school[s]." 42 U.S.C. § 12181(7)(J). RUSM is a "private, for-profit medical school." Answer ¶ 2.

Dr. Hayse—who made the final decision and oversaw the academic accommodations process—had no knowledge of any imposed compliance with the ADA nor the RA in Dominica. Hayse Dep. 14:11-18. In fact, Dr. Hayse even went as far as to say that they were not "beholden to" the ADA, rather, they just used it as a "guideline." Hayse Dep. 10:14-17. *See also* Admis. No. 29 (RUSM admitting that the school "is not required to comply with Title III of the ADA in Dominica").

### iii.  The ADA-Statement is Material.

Even though RUSM's main campus location in Dominica was required to comply with Title IV, HEA statutes and regulations—including the RA—in exchange to receive Federal financial assistance, *see* Pl.'s Second Motion for Judicial Notice [ECF No. 89], RUSM also did not have a policy or requirement instructing its faculty to comply with the RA in Dominica, Hayse Dep. 14:11-18, 10:14-11:6, 11:17-21.

16

Since RUSM did not have a policy—or required in any fashion—for its faculty to comply with either Title III of the Americans with Disabilities Act or the RA, it perpetuated discrimination by providing its faculty the option to be deliberately indifferent to the *known* limitations of disabled students who needed reasonable accommodations in Dominica.

In addition to ignoring the known needs and limitations of disabled students, RUSM blindly adheres to its own formalisms[2] about the manner of requests for accommodations which are actually just administrative methods used to perpetuate discrimination of disabled students by refusing to provide reasonable accommodations for oral requests, by requiring magic words to get accommodations, and by refusing to offer (or investigate) a reasonable accommodation after someone else—other than the disabled student—informed RUSM faculty of the disabled student's limitations and need for an accommodation.

Taking depositions, Plaintiff asked Dr. Sharma if students need to expressly "say" the word "accommodations" in order to get accommodations, Dr. Sharma answered, "[y]es, they have to." Sharma Dep. 29:7-18. In this example, the magic word here is "accommodations." Dr. Sharma further stated:

> I can only send the documentation to the accommodations office, what we have, and they would receive accommodation.
>
> ... You have -- you have good documentation, in my opinion. Other students may have had one less test done, but still with a good diagnostic report of ADHD. So they would be given accommodations.

Sharma Dep. 27:13-23. In addition to requiring magic words, Dr. Sharma explained that nobody can request for accommodations on a student's behalf, stating:

---

[2] "[W]hat matters is not 'formalisms about the manner of the request,' but that the employer has notice of the employee's disability and wish to be accommodated." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1226 (11th Cir. 2016) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir.1999)).

> Nobody can apply for accommodation. Not the student's mother, the student's father, not the student's psychiatrist, the student's counselor. Nobody can apply for accommodations. Only the student, and it has to be done in writing. … Nobody else, mother, faculty, the dean, the **president of the USA**.
>
> ….
>
> The dean cannot ask for the accommodation on the student's behalf. … It doesn't matter. Nobody. Nobody can ask for the accommodation. Only the student.

Sharma Dep. 43:12-16, 43:21-24 (emphasis added), 44:4-9. *See also* Sharma Dep. 44:24-45:9.

RUSM's formalisms are at odds with the text of the ADA and RA regulations, stating:

> An individual or entity shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods of administration— (i) that have the effect of discriminating on the basis of disability; or (ii) that perpetuate the discrimination of others who are subject to common administrative control.

42 U.S.C. § 12182(b)(D); *accord* 34 C.F.R. §§ 104.4(b)(1)(v), (b)(4).

**B.      RUSM had Knowledge that the ADA-Statement is False; and/or Made the Representation Without Knowledge as to its Truth or Falsity, or RUSM Ought to have Known of its Falsity.**

Mr. Stewart-Fulton is one of the accommodation coordinators at RUSM. Answer ¶ 17.

Taking his deposition, Plaintiff asked Mr. Stewart-Fulton if "faculty at RUSM" was required "to comply" with Title III of the ADA and the RA. Fulton Dep. 31:14-21. Mr. Stewart-Fulton answered, "[i]n reference to when you were enrolled and the campus was located on Dominica, we were not required to comply with the ADA." *Id.* 32:1-4. He further answered that they simply "abided by the spirit" of the ADA and the RA. *Id.* 32:5-7. Mr. Stewart-Fulton further admitted that there was no policy "to comply" and therefore was not required to comply with the ADA and RA in Dominica. *Id.* 32:12-19. These admissions are consistent with Dr. Hayse's testimony. *See supra* p. 16.

## C.   RUSM Intended for Prospective Students in the U.S. to Rely on the ADA-Statement.

RUSM distinctly wanted *prospective* students to leave the U.S. to attend its school in Dominica. RUSM "focus their marketing efforts on attracting highly qualified, primarily U.S. and Canadian applicants[.]" Ex. SJ-20, at 19 (Form 10-K SEC filing for the 2012 fiscal year). "RUSM admits that it published information **for** prospective students on its website, including in the Admissions Requirements section." Answer ¶ 106 (emphasis added). The ADA-Statement was in the Admissions Requirements section. *See supra* p. 15.

## D.   RUSM Omitted a Material Fact that it had a Duty to Disclose to Prospective Students.

"Florida law recognizes that fraud can occur by omission, and places a duty on one who undertakes to disclose material information to disclose that information fully." *ZC Insurance Co. v. Brooks*, 847 So. 2d 547, 551 (Fla. Dist. Ct. App. 2003).

RUSM materially omitted that it believed or took the position that no part of the ADA was applicable to the prospective students once they became students in Dominica and/or therefore did not have any policy directing its faculty to comply with the ADA in Dominica. RUSM made deliberate efforts to attract prospective students to leave the U.S. to attend its medical school in Dominica. It advertised to these prospective students that it was the "policy" of the school "to comply" with the Americans with Disabilities Act as applicable in Dominica. But, as evidenced by Dr. Hayse's and Mr. Stewart-fulton's testimony, RUSM in fact did not have a compliance policy nor did they feel obligated to comply with the ADA in Dominica. *Supra*. RUSM had a duty to advise prospective students that its faculty was not "beholden to" the ADA, *supra* p. 16, and that they only "abided by the spirit" of the ADA, *supra* p. 18.

## E.   Plaintiff was Consequently Injured Acting in Reliance on the ADA-Statement and/or Injury Resulted to Plaintiff Acting in Justifiable Reliance on the ADA-Statement.

19

### i.   Plaintiff's Reliance and Consequent Injury.

Plaintiff had "serious concerns about attending a medical school ... located in a less developed nation than the U.S." Awodiya Decl. ¶ 9. "The ADA-Statement about RUSM's ADA compliance was one of the most important factors in [Plaintiff's] decision to leave the U.S. to become a student at RUSM in Dominica." Awodiya Decl. ¶ 14-15; *Id.* ¶ 10-12. Consequently, Plaintiff was denied the benefits and equal enjoyment of RUSM's medical program that was advertised by the ADA-Statement because RUSM refused to require its faculty to comply with the ADA in Dominica and therefore allowed compliance to be optional and for its faculty to be deliberately indifferent to Plaintiff's disability and needs.

### ii.   Justifiable Reliance.[3]

Plaintiff was justified in relying on RUSM's ADA-Statement because he was a layperson with minimal knowledge of law and had no reason to suspect that the information was being misrepresented. In fact, Plaintiff "thought the ADA-Statement was only applicable to U.S. students, as opposed to non-U.S. students, because of the word 'Americans' in 'Americans with Disabilities Act.'" Awodiya Decl. ¶ 16. "[Plaintiff] didn't know that the ADA had different divisions or parts and that geographical applicability could differ among any parts of the ADA." *Id.* ¶ 18.

### CONCLUSION

Plaintiff Oluwamuyiwa Awodiya respectfully requests that the Court enter an Order (i) granting summary judgment in favor of the Plaintiff, in whole or in part on each claim herein; (ii) stating any material fact that is not genuinely in dispute and treating the fact as established in this case; and/or (iii) granting Plaintiff such other and further relief as the Court deems just and proper.

---

[3] "Justifiable reliance is not a necessary element of fraudulent misrepresentation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).

20

DATED this 7th day of December, 2018:

Respectfully submitted,

By: Oluwamuyiwa Awodiya, *pro se* litigant
15005 Dahlia Dr.
Bowie, MD 20721
(240) 602-1836
Plaintiff, in Proper Person

## CERTIFICATE OF SERVICE

I do hereby certify that on this 7th day of December, 2018, I have caused a true and

correct copy of (i) PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY

JUDGMENT, (ii) DECLARATION OF OLUWAMUYIWA AWODIYA IN SUPPORT OF

PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT, and (iii)

PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S

SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT by mailing a copy to the Court,

where the Court's CM/ECF system will send notification to the following:

**Ryan Roman**
Akerman Senterfitt
Suntrust International Center
1 SE 3rd Avenue
25th Floor
Miami, FL 33131-1714
305-374-5600
Fax: 305-374-5095
Email:
ryan.roman@akerman.com

**Octavia Monique Green**
Akerman LLP
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, FL 33131
(305) 982-5670
Email:
octavia.green@akerman.com

By: Oluwamuyiwa Awodiya, *pro se* litigant

1



PRIOR
★ MAI
EXPRI

OUR FASTEST SERV

U.S. POSTAGE PAID
PME 2-Day
BOWIE, MD
20715
DEC 08, 18
AMOUNT
**$24.70**

1007    33128-1801    R2304M115731-05

**UNITED STATES** | **PRIORITY**
**POSTAL SERVICE** | **MAIL**
| **EXPRESS™**

USPS INSPECTED

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)    PHONE: 240 602-1836
Oluwamuyiwa Awodiya
15005 Dahlia Dr.
Bowie, MD 20721

TO: (PLEASE PRINT)    PHONE:
Wilkie D. Ferguson, Jr. U.S. Courthouse
400 North Miami Avenue, Room 8N09
Miami, FL 33128

ZIP + 4® (U.S. ADDRESSES ONLY)
3 3 1 2 8 -

- For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
- $100.00 insurance included.

**ORIGIN (POSTAL SERVICE USE ONLY)**

PO ZIP Code: 20716
Date Accepted (MM/DD/YY): 12/8/15
Time Accepted: 10:17 AM
Weight: 1 lb. 10.00

Scheduled Delivery Date (MM/DD/YY): 12/10/18
Scheduled Delivery Time: ☐ 10:30 AM ☐ 12 NOON
10:30 AM Delivery Fee: $
Sunday/Holiday Premium Fee: $
Acceptance Employee Initials:

Postage: $24.70
COD Fee: $
Return Receipt Fee: $
Live Animal Transportation Fee: $
Total Postage & Fees: $ 24.70

**DELIVERY (POSTAL SERVICE USE ONLY)**

Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature
Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature

LABEL 11-B, JANUARY 2014    PSN 7690-02-000-9996    3-ADDRESSEE COPY

WHEN USED INTERNA
A CUSTOMS DECL
LABEL MAY BE RE

**EMS**

EP13F July 2013   OD: 12.5 x 9.5

P S 1 0 0 0 1 0 0 0 0 0 6

* **Money Back Guarantee to U.S., select APO/FPO/DPO, and select International destinations. See DMM and IMM at pe.usps.com for complete details.**

‡ **Money Back Guarantee for U.S. destinations only.**

# VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE



**UNITED STATE**
**POSTAL SERVIC**

# **<u>Exhibit SJ-01</u>**

(Dr. Earl John Mauricio's January 5, 2016 email to Plaintiff)

**Member name:** Oluwamuyiwa O. Awodiya
**Date of birth** ▮▮▮▮▮▮
**Gender:** Male
**Primary care physician:** ENARUNA MAE TYCHUS MD, M.D.
**Date printed:** 9/13/2018

To:
Oluwamuyiwa O. Awodiya

From:
EARL JOHN D MAURICIO MD, M.D.

Received:
1/5/2016  4:23 PM EST

Note:

Cannot reply to an expired message

Dear Mr. Miwa,

I received your Conners CPT3 computer testing results which states that the scores are "associated with a very high likelihood of having a disorder" such as ADHD. You may request a copy of your test results via medical records or by contacting the Northwest DC clinic where you had the test done, at 202 419 6950.

Sincerely,
Earl Mauricio MD

Certain content delivered by MyChart®, licensed from Epic Systems Corporation, © 1999 to 2017, patents pending.

# Exhibit SJ-02

(McMillan Cuffy's Counseling Note dated 1-18-2016)

**Name:**   Oluwamuyiwa O   **DOB:** ███████   **Student ID:** ███████
            Awodiya (M)

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                          Note Date: 01/18/2016 11:18 AM
[5597]
Pt. Phone:                   DOB: ████████ (Age 23)

**Summary of note:** Attention Deficit Disorder Without Mention Of Hyperactivity
**Allergies:** No Entry
**Current Medications:** Ambien 5mg Tablet, Wellbutrin XL 300mg Extended-Release Tablet
**Semester:** Semester 5

**Progress:**
**Followup**

Session content: The TOVA was administered. The results are not within normal limits and the overall pattern of performance suggests an attention problem, including ADHD.  The CAARS was also administered.  The results indicated ADHD predominantly Inattentive presentation.

Clinical assessment: ADHD predominantly Inattentive presention without hyperactivity

**Assessment:**
1)Attention Deficit Disorder Without Mention Of Hyperactivity - F90.9, 314.00

**Plan:**
Counseling 1 Hour (F90.9)
*Referral Orders:* Referral To Psychiatry (F90.9)

Signed by: McMillan Cuffy on Jan/18/2016 11:18 AM

*Locked by: McMillan Cuffy on Jan/18/2016 11:18 AM*

1 of 1

This document has been signed electronically.

RUSM 000149

# Exhibit SJ-03

(Dr. Earl John Mauricio's medical notes)

**Oluwamuyiwa O Awodiya**
**12/30/2015 4:30 PM   Office Visit**
MRN: ▉▉▉▉▉

Description: **23 year old male**
Provider: **EARL JOHN D MAURICIO MD**

Encounter #: **210281061**
Center: **LARGO**

Department: **Psychiatry Largo**

## Visit Summary

### PCP and Center

| Primary Care Provider | Phone | Center |
|---|---|---|
| Enaruna Mae (M.D.) Tychus, M.D. | 301-618-5500 | LARGO |

### Registration
Non- EpicCare Patient

### Reason for Visit
**ATTENTION DEFICIT**
▉▉▉▉▉▉▉▉

### Diagnoses

| | Codes | Comments |
|---|---|---|
| ▉▉▉▉▉▉▉▉▉▉▉ | ▉▉▉ | |

## Progress Notes

**Mauricio, Earl John D (M.D.) at 12/30/2015  4:34 PM**

Status:  Signed
**\*\*Sensitive Note\*\***

*Initial Psychiatric Evaluation 12/30/2015*
*Length of Session: 40-50  minutes*
*Type of Service: Individual*

### Identifying Information:
Oluwamuyiw "Miwa" O Awodiya is a 23 yr old Black single male who presented today for psychiatric evaluation, as referred by nurse triage/ call center on x 12/30/15 which noted- "requests evaluation or treatment for ADHD; disposition of BH - appoint w psychiatry suggested".

### Chief Complaint: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ the even more primary reason is that they think that i should be on a stimulant, um they did half the test, and i think it was a card test, and it showed that i was inattentive and stuff like that, so since i have to come back in April to the states (to take the steps/ usmle exams), i thought it would be wise to have you guys handle that instead of them, so that there would be no interruption in my treatment"; school counseling said they are going to put me on a stimulant; they said i was inattentive;

### History of Present Illness/ Presenting Issues: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Awodiya, Oluwamuyiwa O
MRN: ▉▉▉▉▉

Page 2

**Progress Notes (continued)**

Mauricio, Earl John D (M.D.) at 12/30/2015  4:34 PM (continued)

He adds, "and for the inattentiveness, i guess the therapist caught when i was going through the questions... they have always been there, ▮▮▮▮, i just never thought it was a problem, um, so the inattentiveness i think goes back to high school".

; the inattentiveness, since i was younger i somehow reasoned within my head, so i kinda ignored it so much that i don't notice it".

He expressed general ambivalence/ hesitation regarding psychotropic meds, saying that he does not want to take wellbutrin (although he reports that he continues to take it), and that he had stopped taking his prn xanax and prn ativan since he arrived from the Caribbean for his christmas break from med school on x 121815. He is returning back to med school on x 1/8/16. He wonders if he can manage his ▮▮▮▮ and inattentive/cognitive via counseling/ psychotherapy which he plans to pursue while he is in the carribean/ dominica.

The patient reports the following concerns related to attention/concentration:
frequently fails to give close attention to details or makes careless mistakes at work or in school
constantly has difficulty sustaining attention to tasks at work or in school
intermittently doesn't seem to listen when spoken to directly
frequently does not follow through on instructions or fails to finish work or duties
constantly has difficulty with tasks requiring persistence or organization (schoolwork or job duties)
constantly  Has problems with procrastination/avoidance of tasks.
constantly distracted by noise or activity.
constantly is forgetful in daily activities, e.g., difficulty remembering appointments or obligations,

intermittently finds it hard to follow conversations, even when being spoken to directly;
Finds it   somewhat difficult waiting for turn appropriate or not interrupting others. constantly notes problems with psychomotor/internal sense of restlessness.

Childhood academic performance was Poor.
does report history of behavioral problems as a child-

.

does not have a history of special education programming as a child.
Current job/school performance is Poor- i have to repeat the semester.

*Adult ADHD Self-Report Scale Symptom Checklist:*

Awodiya, Oluwamuyiwa O
MRN: ▮▮▮▮

**Progress Notes (continued)**

Mauricio, Earl John D (M.D.) at 12/30/2015  4:34 PM (continued)

1) Patient has trouble wrapping up the final details of a project once the challenging parts have been done:  Somewhat

2) Patient has difficulty getting things in order when having to do a task that requires organization:  Quite a bit

3) When there is a task that requires a lot of thought, Patient avoids or delays getting started:  Very much

4) Patient  has problems remembering appointments or obligations:
Very much- if i don't put in my phone i'd forget it

5) Patient fidgets or squirms with hands or feet when required to sit for long periods of time:  Quite a bit

6) Patient feels overly active and compelled to do things, as if driven by a motor:  Not at all
Part A:  4/6

7) Patient  makes careless mistakes when having to work on a boring or difficult project:  Very much

8) Patient has difficulty keeping attention when doing boring or repetitive work:  Very much

9) Patient has difficulty concentrating on what people say even when being directly spoken to:  Quite a bit

10) Patient  misplaces or has difficulty finding things at home or work:  Quite a bit

11) Patient isdistracted by activity or noise:  Very much

12) Patient leaves their seat in meetings or other situations in which people are expected to remain seated:  Not at all

13) Patient feels restless or fidgety:  Quite a bit

14) Patient  has difficulty unwinding and relaxing when they have alone time:  A little bit

15) Patient finds him/herself talking too much in social situations:  A little bit

16) Patient  finds him/herself finishing the sentences of other people:  Not at all

17) Patient has difficulty waiting his/ her turn in situations when taking turns is required:  Not at all

18) Patient  interrupts others when they are busy:  Not at all
Part B:  6/12

(-) mania, hypomania, psychosis, panic attacks, anxiety, obsessions, compulsions,

| | |
|---|---|
| Little interest or pleasure in doing things? | 2 - MORE THAN HALF THE DAYS |
| Feeling down, depressed, or hopeless? | 3 - NEARLY EVERY DAY |
| Trouble falling or staying asleep, or sleeping too much? | 3 - NEARLY EVERY DAY |
| Feeling tired or having little energy? | 3 - NEARLY EVERY DAY |
| Poor appetite or overeating? | 1 - SEVERAL DAYS |
| Feeling bad about yourself? or that you are a failure or have let yourself or your family down? | 3 - NEARLY EVERY DAY |
| Trouble concentrating on | 3 - NEARLY EVERY DAY |

Awodiya, Oluwamuyiwa O
MRN▮▮▮▮▮▮

 **KAISER PERMANENTE.**

**Oluwamuyiwa O Awodiya**
**6/17/2016 1:50 PM  Office Visit**
**MRN:** ▮▮▮▮▮▮

Encounter #: **217821994**
Center: **LARGO**

Description: **23 year old male**
Provider: **EARL JOHN D MAURICIO MD**
Department: **Psychiatry Largo**

## Visit Summary

### PCP and Center

| Primary Care Provider | Phone | Center |
|---|---|---|
| Enaruna Mae (M.D.) Tychus, M.D. | 301-618-5500 | LARGO |

### Registration
Non- EpicCare Patient

### Reason for Visit
**ATTENTION DEFICIT**

### Diagnoses

| | Codes | Comments |
|---|---|---|
| **ADHD** - Primary | F90.9 | |

## Progress Notes

### Mauricio, Earl John D (M.D.) at 6/17/2016 4:04 PM
Status:  Signed
**Sensitive Note**

### Medication Management Visit
Time: 20 min

**S**: Pt seen today for follow-up, symptoms assessment and medication review.  Chart and history reviewed.  Pt reports maintaining medication compliance, tolerability and overall continued dissatisfaction with his ritalin medication, which he noted in written detail as follows ("i'm pretty sure it's the ritalin"- Pros- legs stops shaking, excessively, no muscle cramps, helps resist biting lip/skin, makes me want to leave the house (may be the bupropion), don't interrupt people when they are talking; Cons- immediately put to sleep/ drowsy/ tired, have not been on time for anything in the last couple of months, continuous missing events, study maybe 3 hours a day or less, don't feel a "focus" effect/ don't feel anything, stupid things distract me from main subject).  He reports that he continues to be "always late", forgetting all his appointments, and that the higher dosage of ritalin causes increased paradoxical sedation, as he had previously described in prior visits ("i went down to 5mg of ritalin, but the higher dosage made me more sleepy").  He was given advice and psychoeducation regarding emplying behavioral management techniques/ cbt, to include attending the adhd support group, along with discussing other psychotropic medication options such as adderall, for which he is agreeable/ wanting to try.  Otherwise he has no further complaints, noting that he is continuing to struggle with studying for his medical licensure exams coming up in about x

Awodiya, Oluwamuyiwa O
MRN: ▮▮▮▮▮▮

**Progress Notes (continued)**

<u>Mauricio, Earl John D (M.D.) at 6/17/2016  4:04 PM (continued)</u>

a couple of weeks.

| | |
|---|---|
| Little interest or pleasure in doing things? | 0 - NOT AT ALL |
| Feeling down, depressed, or hopeless? | 2 - MORE THAN HALF THE DAYS |
| Trouble falling or staying asleep, or sleeping too much? | 3 - NEARLY EVERY DAY |
| Feeling tired or having little energy? | 3 - NEARLY EVERY DAY |
| Poor appetite or overeating? | 0 - NOT AT ALL |
| Feeling bad about yourself? or that you are a failure or have let yourself or your family down? | 3 - NEARLY EVERY DAY |
| Trouble concentrating on things, such as reading the newspaper or watching television? | 3 - NEARLY EVERY DAY |
| Moving/speaking slowly so others could notice or being fidgety/restless/moving more than usual? | 0 - NOT AT ALL |
| Thoughts that you would be better off dead,  or of hurting yourself in some way? | 0 - NOT AT ALL |
| PHQ 9 Total Score | 14 |
| Depression severity | C) 10 -14 MODERATE |
| How hard have these problems made it for you to work, tend to things at home, or get along with others? | VERY DIFFICULT |

**Past psych medications:** (+) ritalin,

**Current Meds:**ritalin 15mg qd; wellbutrin sr 300mg qd; xanax about 0.25mg prn (not taking); ativan 01mg qhs prn (not taking);
Other meds:█████, Methylphenidate, █████, and buPROPion

**Patient Active Problem List**
Diagnosis
• ADHD
████████████████████████████████████████

Awodiya, Oluwamuyiwa O
MRN:█████

# **Exhibit SJ-04**

(Denise H. Unterman's medical notes)

 **KAISER PERMANENTE**®

**Oluwamuyiwa O Awodiya**
**4/18/2017 3:45 PM   Office Visit**
MRN: ▮▮▮▮▮▮

Description: **24 year old male**
Provider: **DENISE HAGLEY UNTERMAN LCSW**

Encounter #: **235065077**
Center: **LARGO**

Department: **Psychothe-Adlt Largo**

## Visit Summary

### PCP and Center

| Primary Care Provider | Phone | Center |
|---|---|---|
| Enaruna Mae (M.D.) Tychus, M.D. | 301-618-5500 | LARGO |

### Registration
Non- EpicCare Patient

### Reason for Visit
**ANXIETY**

### Diagnoses

| | Codes | Comments |
|---|---|---|
| **TRICHOTILLOMANIA**   - Primary | F63.3 | |
| **OBSESSIVE COMPULSIVE DISORDER** | F42.9 | |

## Progress Notes

**Unterman, Denise H (L.C.S.W.), L.C.S.W. at 4/18/2017  3:45 PM**
Status:  Signed
\*\*Sensitive Note\*\*

Psychotherapy New Evaluation - Confidential

Pt asked to be called Mee-wah.  He said good-naturedly, "I give everyone 10 free passes to get my name right!'

S:  Chief Complaint: Pt has been pulling his eyelashes out and struggles to complete exams due to compulsive checking behavior.
     Symptoms Checklist for Major Depressive Episode

This SmartLink has not been configured with any valid records.

This SmartLink has not been configured with any valid records.

**Mental Status Exam:**
appearance: attire/dress is appropriate , eye contact is good, hygiene is good
behavior: normal, collaborative, engaged

Awodiya, Oluwamuyiwa O
MRN▮▮▮▮▮▮

**Progress Notes (continued)**

Unterman, Denise H (L.C.S.W.), L.C.S.W. at 4/18/2017  3:45 PM (continued)
mood: normal, stable, w/ full affective range
speech: normal in RTV
thought content: denies suicidal ideation, plan, or intent, denies homicidal
ideation, plan, or intent
thought process: coherent, logical, relevant
delusions: negative
hallucinations: negative
insight: good
judgment: good


HPI:  Pt reports onset of anxious feelings in HS w/ worsening in college around exams when he started pulling out his eyelashes and chin hairs.  Initially he used his fingers but now uses tweezers for greater precision.  Currently in 2nd year of medical school at Ross University where's he's doing well but struggling w/ completing exams due to compulsively checking that he has completed previous answers.  Also, when he's confident that he knows an answer, he nonetheless selects one that "sounds more complicated" because he "can't believe the easy one is right".  Board exams are coming up in a few months and he's very worried about undermining his score by not completing the exam in the time allowed..  He pulls his eyelashes to the point where he no longer has any.  He's researched his Sxs and is his today to "find out if something's wrong w/ me and what can be done."  I shared his dx, explained trichotillomania and the difference between compulsive traits and compulsive personality disorder.  We explored self-esteem issues, whether he considers himself intelligent, and wondered together why he might not trust himself to know exams answers.  He expressed relief at talking about his, admitting that he's always viewed himself as "stupid" because his mother frequently told him that he was growing up.  His thought process is along the lines of, "If I think I know the answer, it couldn't possibly be right."   I described CBT and shared some strategies that he can try between now and his next visit, which he wants to hold off on till after his exam as he's consumed w/ studying.  Also, he didn't want to go to another site w/ earlier availability.

Psychiatric History: Anxiety dating to at least HS
Family Psychiatric History; Not obtained
Social History:  Pt is one of 2 children of Nigerian descent.  Raised by his mother.  Sister is also in medical school.  He'll be residing w/ his mother for the next 2 years while doing clinical rotations in Maryland.
Substance Abuse History: Denied
Tobacco Use:
History
Smoking Status
 • Never Smoker
Smokeless Tobacco
 • Not on file


 Medical History (incl. Meds.):Patient Active Problem List:
ADHD

Awodiya, Oluwamuyiwa O
MRN: ▮▮▮▮▮▮

**Progress Notes (continued)**

**Unterman, Denise H (L.C.S.W.), L.C.S.W. at 4/18/2017 3:45 PM (continued)**



Current Outpatient Prescriptions:
• DEXTROAMPHETAMINE-AMPHETAMINE 15 mg Oral Tab, Take 1 tablet by mouth 2 times a day, Disp: 60, Rfl: 0
• buPROPion 300 mg Oral 24hr SR Tab, Take 1 tablet by mouth daily, Disp: 90, Rfl: 1

O: General Appearance/Interview Behavior: Slender, friendly, good sense of humor, very bright, candid, intellectually curious
    Suicidal/Homicidal/Violent Ideation: Denied

A: DSM IV Axis I: Trichotillomania
            Axis II: Compulsive Behaviors
            Axis III: See medical Hx
            Axis IV: compulsive Sxs
            Axis V (current/best in last year): 80

Is patient being considered for referral to Case Management Services?: no
(If yes, use current case management referral protocol).
Dual diagnosis?: no



P: We discussed the diagnosis, the reasonable options and following treatment plan.
Goal I: Anxiety Reduce the overall lever, frequency and intensity of the anxiety so that daily functioning is not impaired.

Anticipated achievement date: TBD

Additional Recommendation/Interventions: CBT to begin in June. Continue MM for ADHD.
Follow-up Appointment: 6/2/17 w/ Denise Unterman, LCSW-C

Electronically signed by Unterman, Denise H (L.C.S.W.), L.C.S.W.,4/20/2017 1:20 PM

**Medications**

**Infusion Orders**

Awodiya, Oluwamuyiwa O
MRN: █████

# **Exhibit SJ-05**

(Davendra Sharma's Counseling Note dated 3-11-2016)

**Name:**   Oluwamuyiwa O    **DOB:** ▇▇▇▇▇▇   **Student ID:** ▇▇▇▇▇▇
            Awodiya (M)

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                          Note Date: 03/11/2016 09:05 AM
[5597]
Pt. Phone:                    DOB: ▇▇▇▇▇ (Age 23)

**Summary of note:** Anxiety State, Unspecified, Relationship Distress With Spouse or Intimate Partner
**Allergies:** No Entry
**Current Medications:** Ritalin 10mg Tablet, Ambien 5mg Tablet, Wellbutrin XL 300mg Extended-Release
Tablet, Diclofenac Sodium 75mg Delayed-Release Tablet, Losartan Potassium 25mg Tablet
**Semester:** Semester 5

**Progress:**



Despit running out of time passed his exams

Stopped his relationship with his facebook friend

Still talking to the All Saints girl

She visits his apratment

Seems to like him.Feels it has no future.

Mother is fine and is supportive

MSE

Mood is fine

*- Entered by Davendra Sharma on Mar-11-2016 09:05 AM*

**Assessment:**
1)Anxiety State, Unspecified - F41.9, 300.00
2)Relationship Distress With Spouse or Intimate Partner - V61.10

Stable
*- Entered by Davendra Sharma on Mar-11-2016 09:05 AM*

**Plan:**
*RX:* Ritalin 10mg Tablet (F41.9) Take 1 Tablet  As Directed Qty 90. No Refills.
Ritalin 5mg Tablet (F41.9) Take 1 Tablet  As Directed Qty 90. No Refills.

He has welbutrin 300 mg

For ritalin 15 mg tid
*- Entered by Davendra Sharma on Mar-11-2016 09:05 AM*

1 of 2

This document has been signed electronically.

RUSM 000132

# <u>Exhibit SJ-06</u>

(McMillan Cuffy's Counseling Note dated 3-11-2016)

**Name:** Oluwamuyiwa O Awodiya (M)  **DOB:** ▬▬▬  **Student ID:** ▬▬▬

**Diagnosis:**

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                     Note Date: 03/11/2016 02:27 PM
[5597]
Pt. Phone:                          DOB: ▬▬▬ (Age 23)

**Summary of note:** Academic or Educational Problem, Other Problem Related to Psychosocial Circumstances
**Allergies:** No Entry
**Current Medications:** Ritalin 5mg Tablet, Ritalin 10mg Tablet, Ambien 5mg Tablet, Wellbutrin XL 300mg Extended-Release Tablet
**Semester:** Semester 5

**Progress:**
**Followup**

Session content: Client reported that although he passed,  he did not do as well on mini 2. He said that towards the end of the exam he lost his momentum and just circle questions without really thinking of the answers.  He further reported that he blocked off his Ex on FB but was hoping that she would reach out and inquire why he took her off his list of friends her but she did not.  He further admitted that he has had the urge to go back and befriend her but did not because it would be too awkward and was not prepared to have this conversation why he blocked her off his fb.  He admitted during the session that having female friends as part of his social network/support system is very important to him  and makes him functional and the opposite is true for him; that when he does not have female friends he does not perform at his best.  He requested two more sessions before the semester ends.

Clinical assessment: Academic difficulty

**Assessment:**
1)Academic or Educational Problem - V62.3
2)Other Problem Related to Psychosocial Circumstances - V62.89

**Plan:**
Counseling 1 Hour (V62.3)

Signed by: McMillan Cuffy on Mar/11/2016 02:27 PM

*Locked by: McMillan Cuffy on Mar/11/2016 02:27 PM*

1 of 1

This document has been signed electronically.

# **Exhibit SJ-07**

(Release of Information Consent Agreement)



# ROSS UNIVERSITY

**Department of Behavioral Sciences – Counseling Center**

222 2455

**Consent to Release Confidential Information**

| RELEASE OF INFORMATION CONSENT |
|---|
| ☐ **Introduction**: By signing this form, you are authorizing the Ross University School of Medicine's (RUSM) Counseling Center to release otherwise confidential psychological information to one or more people whom you designate. Please read carefully. If you have any questions about signing this document and/or would like a copy of this form, please ask and we will provide you this information. Please understand that you may end this Agreement at any time. |
| ☐ **I authorize the RUSM Counseling Center to: (Check all that pertain)**<br>☒ Discuss otherwise confidential information pertaining to my treatment<br>☐ Transmit a copy of my otherwise confidential health record<br>☐ Transmit a letter or treatment summary containing my otherwise confidential information |
| ☐ **I authorize the release of the information specified above to:**<br>To: RUSM Administration<br>Street Address:<br>City, State and Zip Code: |
| ☐ **This information is released for the following purpose(s):**<br>☒ To facilitate treatment planning<br>☒ To provide information relevant to academic accommodations and/or medical leave of absence<br>☐ Other: |
| ☐ **If you have authorized us to discuss confidential information, specify the period during which we may communicate with the person(s) listed above, by checking the appropriate box below:**<br>☒ I authorize ongoing communication unless I revoke this consent.<br>☐ I authorize communication only until _____ (specify date). |
| ☐ **Other restrictions or limitations on information to be released:**<br>**Specify:**<br>☒ No other limitations. |
| ☐ **Statement of Acknowledgement**:<br>I understand that I do not have to agree to release confidential information, and that I may withdraw this consent at any time except insofar as action has already been taken in reliance thereupon. A facsimile of this form will be regarded as valid as the original. |

| | | |
|---|---|---|
| *Munyina Anydya* | *Olunamuyiwa Anodya* | 12/9/15 |
| Signature of Client | Client Printed Name | Date |
| | *McMillan Gillford* | 12/9/15 |
| Signature of Counselor | Counselor Printed Name | Date |

RUSM 000168

# <u>Exhibit SJ-08</u>

(Defendant's Responses to Plaintiff's Requests for Admission)
Hereinafter, each Request No. are individually an "Admission No."

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO: 0:18-CV-60482-KMM**

OLUWAMUYIWA AWODIYA,

        Plaintiff,

    v.

ROSS UNIVERSITY SCHOOL OF
MEDICINE,

        Defendant.

_____

### RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION

Defendant ROSS UNIVERSITY SCHOOL OF MEDICINE, by and through its attorneys

Seyfarth Shaw LLP, hereby submits its Response To Plaintiff's First Set of Requests for

Admission.

### REQUEST FOR ADMISSION NO. 1:

Admit that the formal legal name of the organization that operates RUSM is Ross
University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited.

### RESPONSE TO NO. 1:

Denied. The entity that operates Ross University School of Medicine (RUSM) is Ross

University School of Medicine, School of Veterinary Medicine Limited, a Dominican entity

different from Ross University School of Medicine, School of Veterinary Medicine (St. Kitts)

Limited, which is a Kittitian entity that operates Ross University School of Veterinary Medicine.

### REQUEST FOR ADMISSION NO. 2:

Admit that RUSM receives United States federal financial assistance through federal
student aid.

**RESPONSE TO NO. 15:**

Defendant objects to this request because it appears to assume facts not in evidence,

including that Plaintiff was disabled, required accommodations to his disability(ies) during tests,

and requested such accommodations from RUSM. Subject to and without waiving that objection,

Defendant notes that it permitted Plaintiff to take the NBME CBSE a fifth time and denies

Request No. 15.

**REQUEST FOR ADMISSION NO. 16:**

Admit that RUSM did not provide Plaintiff with extended testing time for the NBME
CBSE.

**RESPONSE TO NO. 16:**

Admitted.

**REQUEST FOR ADMISSION NO. 17:**

Admit that extended testing time was an available accommodation for the NBME CBSE
exam. (See attached Exhibit 10 at page 2).

**RESPONSE TO NO. 17:**

Defendant admits that extended testing time for the NBME CBSE is an accommodation

sometimes provided to disabled students taking the exam and that Page 2 of Exhibit 10

references this possible accommodation. To the extent that Request No. 17 requests an admission

of anything else, it is objectionable because it is ambiguous, and Defendant is therefore unable to

admit or deny the assertion.

**REQUEST FOR ADMISSION NO. 18:**

Admit that the decision to provide students with test accommodations for the NBME
CBSE is made by RUSM. (See attached Exhibit 10 at page 2).

**RESPONSE TO NO. 18:**

Defendant admits that RUSM, not the NBME, is the entity that determines whether its

students require accommodations to a disability when taking the NBME CBSE and that this is

6

**REQUEST FOR ADMISSION NO. 25:**

Admit that Ross University School of Medicine and Ross University School of Veterinary Medicine are registered as the same corporation.

**RESPONSE TO NO. 25:**

Denied.

**REQUEST FOR ADMISSION NO. 26:**

Admit that RUSM asserts that "Title III of the Americans with Disabilities Act of 1990 ("ADA") does not extend to conduct occurring outside the United States, and it follows that it does not extend to the Defendant's activities in Dominica." (See Dkt. No. 30).

**RESPONSE TO NO. 26:**

Admitted.

**REQUEST FOR ADMISSION NO. 27:**

Admit that Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited with Adtalem Global Health, Inc., asserted that Title III of the ADA is applicable only in the United States and its territories. (See Galligan v. Adtalem Global Education, Inc. et al). (See also Archut v. Ross Univ. Sch. of Veterinary Med., CIVIL ACTION NO. 10-1681 (MLC) (D.N.J. Nov. 19, 2012)).

**RESPONSE TO NO. 27:**

Admitted.

**REQUEST FOR ADMISSION NO. 28:**

Admit that RUSM made the following statement on the admission requirements page of the RUSM website "It is the policy and practice of the University to comply with the Americans with Disabilities Act as applicable and practical in Dominica."

**RESPONSE TO NO. 28:**

Admitted.

**REQUEST FOR ADMISSION NO. 29:**

Admit that it is false that RUSM will comply with the Americans with Disabilities Act in Dominica.

**RESPONSE TO NO. 29:**

Defendant objects to this Request because it is ambiguous (in that there are multiple

provisions in the ADA, some of which apply outside the United States under some circumstances

and some of which do not) and also apparently premised on the legal fallacy that Title III of the

ADA applies in Dominica. Subject to that objection, Defendant admits that RUSM is not

required to comply with Title III of the ADA in Dominica but also denies that it is "false" that its

conduct in Dominica would comply with the ADA if the statute were to apply there.

**REQUEST FOR ADMISSION NO. 30:**

Admit that it is false that the Americans with Disabilities Act is applicable to RUSM in
Dominica.

**RESPONSE TO NO. 30:**

Defendant objects to this Request because it is ambiguous (in that there are multiple

provisions in the ADA, some of which apply outside the United States under some circumstances

and some of which do not). Subject to this objection, Defendant admits that Title III of the ADA

does not apply to RUSM in Dominica.

**REQUEST FOR ADMISSION NO. 31:**

Admit that RUSM made a false statement regarding a material fact posted on the
admission requirements page of the RUSM website.

**RESPONSE TO NO. 31:**

Denied.

**REQUEST FOR ADMISSION NO. 32:**

Admit that RUSM had knowledge that the representation of the applicability and
compliance with the Americans with Disabilities Act in Dominica was false.

**RESPONSE TO NO. 32:**

Denied.

10

46502448v.1

DATED: June 8, 2018

Respectfully submitted,

ROSS UNIVERSITY SCHOOL OF
MEDICINE

By: _Christina Forte Meddin_

Christina Forte Meddin
cmeddin@seyfarth.com
Brian Stolzenbach
bstolzenbach@seyfarth.com

SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, GA  30309-3958
Telephone:     (404) 885-1500
Facsimile:      (404) 892-7056

Attorneys for Defendant

46502448v.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 0:18-CV-60482-KMM

OLUWAMUYIWA AWODIYA,

        Plaintiff,

   v.

ROSS UNIVERSITY SCHOOL OF
MEDICINE,

        Defendant.

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## SECOND SET OF REQUESTS FOR ADMISSION

Defendant, ROSS UNIVERSITY SCHOOL OF MEDICINE, by and through its attorneys, Seyfarth Shaw LLP, and in response to Plaintiff's Second Set of Requests for Admission, states as follows:

### Preliminary Objection

Defendant objects to Plaintiff's Instructions 1-4, 14, and 18 to the extent they seek to impose more or different requirements than the applicable Federal Rule(s) of Civil Procedure and Local Rule(s) of the Court. Defendant will answer in accordance with those rules and not Plaintiff's Instructions.

Defendant objects to Plaintiff's Definitions 10 and 15 because they create ambiguity and may seek to impose requirements on Defendant that are inconsistent with applicable rules. Defendant will interpret the terms "you" and "your" to refer to Defendant and the term "its," when referring to Defendant, as Defendant alone.

Defendant will interpret the terms identified in Instruction 15 in accordance with standard English usage.

**REQUEST NO. 48:**

Admit that McMillan Cuffy is a counselor at RUSM.

**RESPONSE:**

Defendant admits that Mr. Cuffy is counselor who provides counseling services to RUSM students through the RUSM Counseling Center. To the extent the Request seeks the admission of anything more or different, Defendant denies the Request.

**REQUEST NO. 49:**

Admit that Dr. Davendranand Sharma is a psychiatrist at RUSM.

**RESPONSE:**

Denied.

**REQUEST NO. 50:**

Admit that Dr. Davendra Sharma is a professor at RUSM.

**RESPONSE:**

Admitted.

**REQUEST NO. 51:**

Admit that Dr. Davendra Sharma had knowledge of Plaintiff's ADHD. (See attached Exhibit 8.)

**RESPONSE:**

Admitted.

**REQUEST NO. 52:**

Admit that Plaintiff's Conners CPT3 Assessment Report was furnished by Plaintiff to the RUSM Counseling Center in January 2016.

2

**RESPONSE:**

Admitted.

**REQUEST NO. 58:**

Admit that extended testing time for the NBME CBSE is a reasonable accommodation for some disabled students that need extended testing time.

**RESPONSE:**

Admitted.

**REQUEST NO. 59:**

Admit that RUSM intended for prospective students to rely on the following statement posted on the Admissions Requirements page of the RUSM website: "It is the policy and practice of the University to comply with the Americans with Disabilities Act as applicable and practical in Dominica. No qualified individual with a disability will be denied access to or participation in services, programs, or activities of Ross University School of Medicine."

**RESPONSE:**

Defendant admits that its current website contains this statement, but

Defendant is without knowledge or information sufficient to admit or deny that the

website contained the same statement when Plaintiff applied to RUSM.

**REQUEST NO. 60:**

Admit that in 2015, the first-attempt residency attainment rate for RUSM students was 88%. (See *Institutional Outcomes* at https://medical.rossu.edu/student-consumer-information.html).

**RESPONSE:**

Admitted.

**REQUEST NO. 61:**

Admit that 91% of RUSM 2014-2015 graduates attained residency placements by July 1, 2016 after single or multiple USMLE exam attempts or residency placement attempts. (See *Institutional Outcomes* at https://medical.rossu.edu/student-consumer-information.html)[.]

**4**

DATED:  June 13, 2018

Respectfully submitted,

ROSS UNIVERSITY SCHOOL OF
MEDICINE

By:   */s/ Christina Forte Meddin*
Christina Forte Meddin
cmeddin@seyfarth.com
Brian Stolzenbach
bstolzenbach@seyfarth.com

SEYFARTH SHAW LLP
1075 Peachtree Street, N.E., Suite 2500
Atlanta, GA 30309-3958
Telephone:   (404) 885-1500
Facsimile:   (404) 892-7056

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

OLUWAMUYIWA AWODIYA,

        CASE NO. 0:18-cv-60482-KMM-AOV

     Plaintiff,

v.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

     Defendant.

_____/

## DEFENDANT'S RESPONSES AND OBJECTIONS TO
## PLAINTIFF'S THIRD REQUESTS FOR ADMISSION

Defendant Ross University School of Medicine, School of Veterinary Medicine Limited

("RUSM"), by counsel, hereby files its responses and objections to the Third Requests for

Admissions served by plaintiff Oluwamuyiwa Awodiya ("Plaintiff").

## RESPONSES AND OBJECTIONS

### Request No. 79

Admit that Devendra Sharma was a psychiatrist at RUSM.

### Response:

Admitted.

### Request No. 80

Admit that William Owens is the Dean and Chancellor of RUSM.

### Response:

Admitted.

### Request No. 81

Admit that Bryan Hayse is an Associate Dean at RUSM.

**Response:**

 Admitted.

**Request No. 82**

 Admit that Matthew Stewart-Fulton is an Accommodations Coordinator at RUSM.

**Response:**

 Admitted.

**Request No. 83**

 Admit that Davendra Sharma had knowledge of Plaintiff's "Anxiety State, Unspecified."

**Response:**

 RUSM admits that, on March 11, 2016, Dr. Sharma assessed Plaintiff with "Anxiety State, Unspecified- F41.9, 300.00."

**Request No. 84**

 Admit that William Owen had knowledge of Plaintiff's ADHD.

**Response:**

 RUSM admits that, on June 12, 2017, an email was sent from Dr. Denise H. Unterman and Dr. Earl John Mauricio to promotionsappeals@rossu.edu, advising Dr. Owen that Dr. Unterman and Dr. Mauricio had been treating Plaintiff "for the past several months for ADHD and Obsessive Compulsive Disorder."

**Request No. 85**

 Admit that William Owen had knowledge of Plaintiff's OCD.

**Response:**

 RUSM admits that, on June 12, 2017, an email was sent from Dr. Denise H. Unterman and Dr. Earl John Mauricio to promotionsappeals@rossu.edu, advising Dr. Owen that Dr. Unterman

46726449;4

Dated: November 7, 2018

Respectfully submitted,

**AKERMAN LLP**
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, Florida 33131
Telephone: (305) 374-5600
Facsimile:  (305) 374-5095

By: *s/Ryan Roman*
Michael C. Marsh
Florida Bar No. 0072796
michael.marsh@akerman.com
simone.tobie@akerman.com
Ryan Roman
Florida Bar. No. 0025509
ryan.roman@akerman.com
dorothy.matheis@akerman.com
Octavia M. Green
Florida Bar No. 119179
octavia.green@akerman.com
simone.tobie@akerman.com

8

# **Exhibit SJ-09**

(Dr. Bryan Hayse's faculty profile)



**ROSS UNIVERSITY**
SCHOOL OF MEDICINE

Alumni    Current Students    Gainful Employment    Student Consumer Info

**ADMISSIONS      MD PROGRAM      STUDENT LIFE      ABOUT**




🏠   MD Program   Faculty   BryanHayse

# BRYAN  HAYSE

### ASSOCIATE DEAN, MEDICAL SCIENCES

Dr. C. Bryan Hayse has served as the Associate Dean, Medical Sciences Student Affairs at Ross University School of Medicine since 2015. Areas of oversight include academic advising, student-faculty mentoring, student professionalism and integrity, academic accommodations, counseling and psychological services, campus life, new and continuing student orientation, housing, and campus level financial aid, immigration, and registrar services. Throughout his career Dr. Hayse has worked in close partnership with faculty, fellow administrators, and students to establish several student centered initiatives focused on enhancing overall academic and personal development by empowering students to achieve life-long goals.

Dr. Hayse earned his bachelor's and master's degrees in science from Murray State University and doctorate in higher education leadership and policy from Vanderbilt University. Prior to arriving at RUSM, Dr. Hayse served in a variety of student affairs and faculty roles at Young Harris College, GA; Belmont University, TN; Centenary College of Louisiana; and Murray State University, KY.

**CONTACT INFORMATION**

**Bryan Hayse | Student Affairs**
Phone: 865-338-5719
bryanhayse@rossu.edu

   **AREAS OF EXPERTISE**

Student Affairs, Academic Advising, Student Conduct and Professionalism, Student Orientation and Transition, Residence Life and Housing,

   **EDUCATION**


**ROSS UNIVERSITY**
SCHOOL OF MEDICINE

**2300 SW 145TH AVENUE, SUITE 200, MIRAMAR, FL 33027 ADMISSIONS: +855-MD-ROSSU EMAIL: ADMISSIONS@ROSSU.EDU**


f    🐦    📷    ▶    𝓟    🔔

**CONTACT ROSS      REQUEST INFORMATION      EMPLOYMENT      PRIVACY POLICY**

Academic Catalog | Student Handbook

© 2018 Ross University School of Medicine. All rights reserved.

# <u>Exhibit SJ-10</u>

(Davendra Sharma's Counseling Note dated 12-09-2015)

**Name:** Oluwamuyiwa O Awodiya (M)  **DOB:** ▮▮▮▮▮▮  **Student ID:** ▮▮▮▮▮▮

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                    Note Date: 12/09/2015 04:29 PM
[5597]
Pt. Phone:                    DOB: ▮▮▮▮▮▮ (Age 23)

**Summary of note:** Academic or Educational Problem, Adjustment Disorders - With mixed anxiety and depressed mood
**Allergies:** No Entry
**Current Medications:** Diclofenac Sodium 75mg Delayed-Release Tablet, Losartan Potassium 25mg Tablet
**Semester:** Semester 1, Semester 5

**Progress:**
Saw Mr. Cuffy after he received a faliling grade for semester 5 and felt hopeless entertaining thoughts of ending his life.

I was called in to see him by Mr Cuffy

He admitted to feeling very sad about the failure.

He did not have a clear intent to self harm but felt the thoughts kept coming back to him about not living.

Felt he was treated unfairly because he failed by one point

No past repeats.

Additional stressors.

Poor relationship with his mother with whom he lives and feels she is closer to his sister but does not give him any emotional support.

Has abetter relationship with his father, who is separated from patient's mother.

Sister at Ross but they have a poor relationhsip as she does not understand him

He had a "relationship break up" this semester because the girl who has passed and is leaving had three affairs including one where he saw her going with a male student to his place to sleep over. When he had confronted her she said that she was going to go with the other student to spend the night.

He seems ambivalent about her as he says she does not understand why she does what she did.

He wanted to speak to the Dean about changing his grade.

He was advised to speak to the chair of promotions and student services.

At the end of the session yesterday he claimed to not have any intent to harm himself.

1 of 3

This document has been signed electronically.

RUSM 000125

**Name:**  Oluwamuyiwa O    **DOB:** ▮▮▮▮▮    **Student ID:** ▮▮▮▮▮▮
Awodiya (M)

**Diagnosis:**

---

Did not want his mother involved.

Was feeling sad but not severely depressed

Was not psychotic.

Was not suicidal or homicidal.

Came for follow with the counselor and myself today:

 Is trying to see if he can have his grade changed. EMt with student affairs

Also will write to appeal for promotion.

Tried to get his mother on the phone and left a message for her to call

Called Ryan Didier to see if we can gt him out earlier

MSE

He feels lonely

Denies wanting to harm himself but does not like the thoughts of sadness.

Feels sad about what has happened.

Claims Mum is supporitve and wants him to appeal. Makes him feel btter but she does not want him to repeat.

no delusions

No hallucinations

Mood seems better at the end of our session which Mr Cuffy sat in.

*- Entered by Davendra Sharma on Dec-09-2015 04:29 PM*

**Assessment:**
1)Academic or Educational Problem - V62.3
2)Adjustment Disorders - With mixed anxiety and depressed mood - 309.28

 Still adjusting to the reality of his failure
*- Entered by Davendra Sharma on Dec-09-2015 04:29 PM*

**Plan:**
to follow up daily

Spoke to Ryan about getting his Liat flight changed to Saturday to get him home

Left message for mother to call me on my cell or the counselor.

Need to talk to her with Miwa to let her know of the plan for him to repeat the semester.

2 of 3

This document has been signed electronically.

RUSM 000126

**Name:** Oluwamuyiwa O **DOB:** ███████ **Student ID:** ████████
Awodiya (M)

**Diagnosis:**

---

lorazepam 0.5 mg nocte and prn.

Spoke with his mother who is supportive of him coming home earlier.

Dear Ryan

Thanks for agreeing to help as much as you can to have Mr. Awodiya get to San Juan on Saturday instead of his schedule 19th departure date.

He does not have the resources to make the flight change and would also need to have the South West ticket changed to return to Maryland.

I greatly appreciate your help as it is hard for him to be here and seeing his colleagues study for the Comp. when he knows he may have to repeat and the impact on his emotional health has been pretty bad.

This plan which his mother is aware of, for him to return earlier, would be of great value in his clinical care developed for him.

Regards

Dr. Sharma
*- Entered by Davendra Sharma on Dec-09-2015 04:29 PM*
Signed by: Davendra Sharma on Dec/09/2015 04:29 PM

***Locked by: Davendra Sharma on Dec/09/2015 04:29 PM***

This document has been signed electronically.

RUSM 000127

# **<u>Exhibit SJ-11</u>**

(McMillan Cuffy's Counseling Note dated 12-10-2015)

| **Name:** | Oluwamuyiwa O Awodiya (M) | **DOB:** | 6/20/1992 | **Student ID:** | ▮▮▮▮▮▮ |

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                     Note Date: 12/10/2015 09:27 AM
[5597]
Pt. Phone:                     DOB: 06/20/1992 (Age 23)

**Summary of note:** At 4:00 p.m, client was seen again with the consulting psychiatrist.  He was prescribed meds and part of his plan was to get him back home sooner than his scheduled 12/19/15 flight.  Dr. Sharma engaged Mr. Didier to assist with flight arrangements to get
**Allergies:** No Entry
**Current Medications:** No Entry
**Semester:** Semester 5

**Intake:**

**Subjective:**

**Objective:**

# Counseling Crisis Note

Contact start time:
Contact end time:

Referral Source:

Presenting Concerns:   Client returned to office after talking to Dr. Hayes in Student Affairs regarding his academic situation.  I subsequently received an email from Dr. Hayes requesting that we talk at some point re: the client.   After the meeting with Dr. Hayes, the client was very disappointed but stable.

Self harm/Suicide/Homicide Screen:  self harm ideation present

Treatment/Interventions: Supportive-Expressive Psychotherapy, cognitive coping techniques, feeling identification, safety planning, support, comments Using a CBT appraoch

Impressions/recommendations:  adjustment disorder with mixed emotions.

**Assessment:**
1)Academic or Educational Problem - V62.3
2)Adjustment Disorders - With mixed anxiety and depressed mood - 309.28

**Plan:**
Counseling Crisis (V62.3)

Signed by: McMillan Cuffy on Dec/10/2015 09:27 AM

*Locked by: McMillan Cuffy on Dec/10/2015 09:27 AM*

1 of 2

This document has been signed electronically.

RUSM 000141

# Exhibit SJ-12

(McMillan Cuffy's Counseling Note dated 12-13-2015)

**Name:** Oluwamuyiwa O Awodiya (M)  **DOB:** ██████  **Student ID:** ██████

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                              Note Date: 12/13/2015 03:28 PM
[5597]
Pt. Phone:                    DOB: ██████ (Age 23)

**Summary of note:** Academic or Educational Problem, Persistent Depressive Disorder (Dysthymia)
**Allergies:** No Entry
**Current Medications:** No Entry
**Semester:** Semester 5

**Progress:**
**Followup**

Progress since last session: less severe symptoms

Session content: Client was seen on Friday for a follow up visit.  His mom made flight reservations for him on LIAT to fly back on Sunday 12/13/15 but the hold on the ticket expired.  He has agreed to stay on the island until his original flight on 12/19/12. However, he is stable and doing well.  He denied having thoughts of harming himself.  After exhausting all avenues of getting his grades changed, he is at the point where he is accepting to come back here in January to repeat semester 5.

Clinical assessment: Minor depessive episode.

Overall Impression: stable
Appearance: casual
Attention and Concentration: good
Interpersonal: cooperative
Mood: depressed
Affect: sad
Thought process: normal
Judgment: fair

Suicide/self-harm risk: no risk
Insight: adequate
Reaction to session: cooperative
Additional Comments: Client will continue checking in with counseling on a daily basisi until he leaves the island.

**Assessment:**
1)Academic or Educational Problem - V62.3
2)Persistent Depressive Disorder (Dysthymia) - 300.4

1 of 2

This document has been signed electronically.

**Name:**   Oluwamuyiwa O   **DOB:**   ███████   **Student ID:** ████████
Awodiya (M)

**Diagnosis:**

---

**Plan:**
Counseling 20 - 30 Minutes (V62.3)

Signed by: McMillan Cuffy on Dec/13/2015 03:28 PM

*Locked by: McMillan Cuffy on Dec/13/2015 03:28 PM*

This document has been signed electronically.

RUSM 000146

## **<u>Exhibit SJ-13</u>**

(McMillan Cuffy's Counseling Note Dated 1-11-2016)

**Name:** Oluwamuyiwa O Awodiya (M)   **DOB:** ▮▮▮▮▮   **Student ID:** ▮▮▮▮▮

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                    Note Date: 01/11/2016 11:10 AM
[5597]
Pt. Phone:                         DOB: ▮▮▮▮▮ (Age 23)

**Summary of note:** see client in one wk
**Allergies:** No Entry
**Current Medications:** No Entry
**Semester:** Semester 5

**Progress:**
**Followup**

Session content: Client is stable and doing well.  He reported that he is on buproprion and doing very well.  Client was assessed in the U.S. for ADHD;  he provided us with a copy of the results which are scanned in his file.  He is scheduled to take the TOVA next week.  He was advised to do an EKG and is also scheduled to see the psychiatrist next week.

Clinical assessment: Academic problems;  repeating semester 5.

Overall Impression: stable
Appearance: appropriate
Attention and Concentration: good
Interpersonal: cooperative
Mood: normal/stable
Affect: bright
Thought process: normal
Judgment: good

Suicide/self-harm risk: no risk
Insight: good
Reaction to session: active/eager

**Assessment:**
1)Academic or Educational Problem - V62.3

**Plan:**
Counseling 1 Hour (V62.3)
**Referral Orders:** Referral To Medical Clinic (V62.3)

Signed by: McMillan Cuffy on Jan/11/2016 11:10 AM

1 of 2

This document has been signed electronically.

# <u>Exhibit SJ-14</u>

(RUSM's Promotions Committee June 1, 2017 letter)

**Ross University**
**School of Medicine** | Office of the Registrar
2300 SW. 145ᵗʰ Ave., Suite 200
Miramar, FL. 33027
Phone 754-208-4591
Fax 732-509-4820
Registrar@RossU.edu



**ROSS UNIVERSITY**
**SCHOOL OF MEDICINE**

June 1, 2017

Oluwamuyiwa Awodiya
15005 Dahlia Drive
Bowie, MD 201721

Dear Oluwamuyiwa:

The Ross University School of Medicine Student Promotions Committee – Foundations of Medicine Sub-committee has reviewed your letter of appeal and academic history. After careful consideration, I regret to inform you the academic dismissal on April 13, 2017, is upheld.

If additional information has become available or if you believe university procedure wasn't followed, you may appeal this decision by submitting an appeal to the Dean. Appeal letters must state the reason for the appeal and be emailed to Dean Owen at PromotionAppeals@RossU.edu within 15 calendar days of the date on this notification letter, June 16, 2017. The Dean or his designee will make a final decision on each appeal within 15 calendar days of the Dean's receipt of the written appeal. Please refer to the RUSM Student Handbook for additional information regarding the appeals process.

Please be advised that if you are a recipient of federal student loans, RUSM must inform your lender(s) that you have not attended RUSM since the last day you attended classes. The impact of your status on your federal student loans will depend on your specific situation, applicable regulations and the terms and conditions of your loan(s). Please visit www.studentloans.gov to complete your exit interview as required by federal regulations.

Should you have questions or need additional assistance, please contact the Office of the Registrar at Registrar@RossU.edu.

Sincerely,

Niels Larsen, PhD
Professor, Department of Physiology and Biochemistry
Chair, Student Promotions Committee-Foundations of Medicine Sub-committee

cc:      Academic & Student Affairs
         Academic & Student Operations
         Student Finance
         Registrar

RUSM 000070

# **Exhibit SJ-15**

(Plaintiff's psychiatrist and psychotherapist's June 12, 2017 email to Dean Owen)

--------------- Original Message ---------------

From: [denise.h.unterman@kp.org]

Sent: 6/12/2017 1:47 PM

To: promotionappeals@rossu.edu

Subject: Oluwanuyiw Awodiya, Student I.D ▇▇▇▇▇▇

William F. Owen, M.D.

Dean, Ross University Medical School

Dear Dean Owen:

We are writing on behalf of Oluwanuyiw Awodiya, a student in your program.
We have been treating Mr. Awodiya for the past several months for ADHD
and Obsessive Compulsive Disorder.  He has had symptoms of  the latter for
the past 4-6 years but did not understand the nature of the diagnosis
until recently.  We believe that the anxiety and checking rituals inherent
to this condition have been adversely affecting his academic performance
in medical school.  Mr. Awodiya is currently in CBT therapy and is
acquiring strategies for managing his symptoms.  He is considering
psychotropic medication, as well.  He is very engaged in and committed to
treatment, dedicated to the pursuit of a career in medicine, and we hope
that his high level of motivation will be considered in the appeal
process.

Sincerely,

Denise H. Unterman, LCSW-C

Adult Psychotherapist

Earl John Mauricio, M.D.

Adult Psychiatrist

# **Exhibit SJ-16**

(RUSM's June 13, 2017 email to Plaintiff)

# Question Received: SubjectAppeal Dismissal Case #02149780

### Student Services <studentservices@rossu.edu>

Tue 6/13/2017 9:57 AM

To Awodiya, Oluwamuyiwa <OluwamuyiwaAwodiya@students.rossu.edu>;

Thank you for your inquiry.

Your question for Case #02149780 has been received.

Case Details:
 Status: New
 Subject: Appeal Dismissal
 Department: Registrar
 Department Email: PromotionAppeals@rossu.edu
 Category 1: Promotion Appeals
 Category 2: General
 Date Created: 6/13/2017
 Last Updated: 6/13/2017

-------------------------------------------------------------

Dear Dean Owen,

This email contains my appeal letter. As well as 4 screenshots of my NBMEs that I mentioned in the letter.

My psychotherapist and psychiatrist stated that they have sent a separate letter to you as well.

Sincerely,

Oluwamuyiwa Awodiya

█████████

-------------------------------------------------------------

If you have any additional questions pertaining to this case you may either reply to this email or login to myRoss and navigate to askRoss.

ref:_00D80cFjT._5008011Pi7n:ref

# **Exhibit SJ-17**

(Plaintiff's Appeal Letter to Dean Owen)

Dear Dr. Owen,

Thank you and bless you for taking the time from your busy day to read my appeal letter. I am Oluwamuyiwa Awodiya and the purpose of this letter is to seek one more chance to take the NBME comp exam.

This year I was diagnosed with OCD. This finding for me was like a miracle. Not because I'm glad to have it, but because it explains so many parts of my life, financially, socially, and academically. There is something satisfying about knowing that I can take steps towards improving my quality of life, instead of feeling hopeless. Although OCD affects numerous aspects of my life, my objective is to keep this letter relevant to how OCD has influenced my academic performance.

I want to start by answering some questions that you may have, before I dive into my experience with my recent diagnoses. Why has the OCD started to affect me now? This has most certainly been something I have been dealing with since before I even knew what OCD really was, realistically for the last 6 years. Why have I waited so long to get help? Well if you look at my name, it may be obvious that I come from a very cultured family. Although I was born in America, my family is very Nigerian. Getting help for any emotional or behavioral imbalances would not look good for me and would likely be an embarrassment to my family. Honestly, I had rather try and deal with my "weird" feelings by myself than to risk people seeing me as crazy.

My biggest challenge with OCD is the extreme anxiety and urges that overwhelm me. I wish my anxiety was as easy as just washing my hands a million times but it's not that simple. Honestly, I don't fully understand everything about my OCD yet, but sometimes there isn't a solution to sooth my anxiety. Therefore, when I can't identify why I feel the way I do, I get hopelessly overwhelmed. Sometimes the solution is not even logical, like pulling out my eyelashes. I really do not like to explain my OCD, simply because it is one of the hardest things to convey; and even harder for many people to understand.

I'm the student who never finished an exam on time. I was compelled to back track my answers just to make sure they didn't disappear 5 seconds after I went to the next question. I had rather pick a wrong answer because of the fear that it may actually be the right answer. These are just some of the ways that OCD has influenced my academic performance.

Ever since I was diagnosed almost 2 months ago, I have been working extremely hard to improve myself now that I know what this is, what this was, and what I'm up against. I cannot tell you that I can fix this overnight, but I can tell you that progress can be made.

I have not and will not be fighting this challenge by myself. I am getting enormous help from my psychotherapist Denise H Unterman, (L.C.S.W.) and psychiatrist Earl J Mauricio, MD. I have already started CBT and will continue to do so **indefinitely**. They will also send a letter directly to you on my behalf.

The progress so far has been noticeable. I took my last COMP exam on March 30th, 2017 and my score was a 60. The day before my COMP, March 29th, 2017, I took a paid NBME online (form 13) and scored a 58% (84 incorrect answers). Knowing the high validity of these exams, I knew the exam indicated that I would fail COMP again. A month after my diagnose and getting help with my OCD I took another paid NBME online (form 15) and improved quite a bit. On April 25th, 2017, I scored a 67.5% (65 incorrect answers). I did not include this into my last appeal because I did not know how the promotion committee would feel about a borderline passing score, even if I significantly improved. Four days ago, June 8th, 2017, I took another paid NBME online (form 17) and scored a 72% (56 incorrect answers). These exams were taken under standard (timed) pace. I hope that these monthly increases in my score can adequately display that I can beat my OCD and continue to improve. I just need one more chance to take COMP to prove that I can do it.

Along with this letter, I will include the screenshots of each of my NBME exams mentioned above. I recorded myself taking NBME form 15 but the video was about 5 hours long so it cannot be emailed. But it is available if needed. The letter from my psychotherapist and psychiatrist will come directly from them.

I promise Dean Owen, that I will not let you down if I am granted one more chance to take COMP. I will continue my therapy for the rest of my medical career; and I promise that I will not let my OCD handicap me now or in the future ever again.


Sincerely, thank you and God bless you,

Oluwamuyiwa Awodiya

# <u>Exhibit SJ-18</u>

(Dean Owen's June 29, 2017 letter to Plaintiff)



**ROSS UNIVERSITY**
SCHOOL OF MEDICINE

**William F. Owen, Jr. MD, FACP**
*Dean and Chancellor*
2300 SW 145ᵗʰ Avenue, Suite 200, Miramar, FL 33027
(t) 754-208-4743
(f) 754-208-4744
WOwen@RossU.edu

June 29, 2017

Oluwamuyiwa Awodiya
15005 Dahlia Drive
Bowie, MD 201721

Dear Oluwamuyiwa:

I have carefully reviewed your academic record, your appeal of the Student Promotions Committee's recommendation for dismissal, and your pre-matriculation credentials. I concur with the Promotion Committee's decision to dismiss you from Ross University School of Medicine effective April 13, 2017.

I hope you do not let this detour keep you from achieving your goal of helping people in need.

Sincerely,

William F. Owen, Jr., MD, FACP
Dean and Chancellor

Cc:   Sandra Herrin, University Registrar
      Gary Belotzerkovsky, Associate Dean, Academic & Student Operations
      Jennifer Dennis, Senior Director of Student Finance
      Danielle McDonald, Assistant Director of Clinical Student Conduct and Development
      Dr. Vijay Rajput, Associate Dean, Academic & Student Affairs

# **Exhibit SJ-19**

(RUSM's Admissions Requirements section of its website)

# Internet Archive Collection Report

**Page Title**

Admissions Requirements

**URL**

http://www.rossu.edu/medical-school/admissions/getstarted.cfm

**Original Collection/Capture Location**

https://web.archive.org/web/20121031221133/http://www.rossu.edu/medical-school/admissions/getstarted.cfm

**Collection Date**

October 31, 2012 22:11:33 UTC

**Collected by**

Internet Archive (Wayback Machine)

**Accessed by**

Oluwamuyiwa Awodiya

**Accessed Date**

June 3, 2018 at 6:02PM EST

 ROSS UNIVERSITY
SCHOOL OF MEDICINE



Home / Admissions / Admissions Requirements

## Medical School Admissions Requirements

The Admissions Committee of the faculty gives serious consideration to all candidates showing the potential to meet the rigorous academic requirements of a highly structured curriculum. To be considered for admission to Ross University, our Admissions Committee will look at a variety of factors in determining suitability for our program including:

- Undergraduate cumulative GPA
- GPA in required pre-medical course work
- Performance in advanced biology and chemistry courses
- Competitiveness of undergraduate school and curriculum
- Graduate work and records
- MCAT scores
- Personal essay
- Pre-med committee evaluations
- Letters of recommendation from academic and/or professional references
- Extracurricular activities and accomplishments
- Work history and professional or volunteer experiences
- Personal qualities
- Personal interview



Applicants who have completed their undergraduate studies in countries having an educational system different from that of the United States or Canada will be evaluated on their merits but will be expected to have completed a pre-medical curriculum comparable to that described above.

### The Personal Interview

Ross University strongly believes in the value of a personal interview with prospective students. Applicants whose credentials are judged to be indicative of the potential for successful completion of the prescribed medical school curriculum will be invited for an interview, generally within two to four weeks after initial application materials have been received. The interview helps assess your overall personal and academic background, maturity, adaptability, character, aptitude, and most importantly, your motivation to become a doctor; however, applicants are advised that being granted an interview is not a guarantee of acceptance, though it does play a significant part in the decision by the Admissions Committee.

### MCAT

Ross University requires all scores for the Medical College Admission Test (MCAT) to be submitted by the applicant prior to the interview. Ross University's MCAT institutional code number is 906. To learn more about the MCAT visit www.aamc.org/students/mcat/. Inquiries concerning application test dates, and locations for the MCAT should be directed to:

Medical College Admission Test Registration
The American College Testing Program
PO Box 4056
Iowa City, IA 52243
319-337-1357

### Pre-requisites

Ross University requires at least 90 credits of college work, but strongly recommends that the applicant complete four years in a liberal arts college before entering medical school. Pre-requisite courses cannot be more than 10 years old. The coursework should include the following prerequisite courses:

### Inorganic or General Chemistry
Two semesters of Inorganic or General Chemistry (eight semester hours) with laboratories

### Organic Chemistry
Two semesters of Organic Chemistry (eight semester hours) with laboratories

### General Biology or Zoology
Two semesters of Biology or Zoology (eight semester hours) with

Web Page 2

Welcome to Admissions
Contact Admissions
Apply to Ross
Attend an Information Seminar
Request Information
Admissions Requirements
International Students
Transfer Applicants
Meet Some Ross Students
Tuition and Fees
Financial Aid Information
Application and Deposit Fees
Scholarships
Partnerships

Two semesters of Biology or Zoology (eight semester hours) with laboratories

**Physics**
Two semesters of Physics (eight semester hours) with laboratories

**Mathematics**
(College-level, preferably to include Calculus or Statistics)
One semester of Mathematics (three semester hours)

**English**
Two semesters of English (six semester hours)
Canadian students may satisfy the English requirements using 2 semesters of University humanities where essays composed at least 40% of the overall mark; those holding a grade 13 English credit in Ontario; International Baccalaureate English and Advanced Placement English

**Application Checklist**
All letters of recommendation and transcripts must be mailed to Ross University, Office of Admissions, 630 US Highway 1, North Brunswick, NJ 08902-3311. A complete application consists of the following documents:

- A completed Ross University School of Medicine application.

- Official transcript(s) from each college and/or professional school attended (transcripts must include the required minimum of 90 credits, and all prerequisite courses must be either completed or in progress). Degree-granting transcripts must contain a graduation date.

- Two official letters of recommendation, which become the property of Ross University. One academic letter from a pre-medical professor acquainted with the applicant's academic ability or a recommendation from a college pre-health advisory committee; one from a physician acquainted with the applicant's health care work experience, if applicable. All letters must be on proper letterhead with contact information included, and sent directly from the recommender to the Ross University Admissions Office.

- Medical College Admission Test (MCAT) scores.

- Official report of scores from the TOEFL, if applicable.

- A passport-sized-photo (optional).

- $100.00 USD application fee (non-refundable).

**Notification**
Persons whose applications are incomplete, or whose qualifications are not acceptable, will be so notified. The Admissions Committee's decision is communicated by letter to the applicant after the interview.

**Application Deadline**
Since we operate under rolling admissions, there are no application deadlines. We continue to accept applications for each semester until all seats are filled. In the event that all seats are filled before an applicant receives a decision, the application is automatically considered for the next available semester.

**Policy on Non-discrimination**
The University does not discriminate on the basis of race, color, national origin, gender, religion, disability, or age in admission to, access to, treatment in, or employment in its programs and activities. It is the policy and practice of the University to comply with the Americans with Disabilities Act as applicable and practical in Dominica. No qualified individual with a disability will be denied access to or participation in services, programs, or activities of Ross University.





| School of Medicine | Admissions | Students | Contact Information |
|---|---|---|---|
| Curriculum | Apply | Academic Calendar | Toll Free: 855-MD-ROSSU |
| Academic Catalog | Information Seminar | Student Handbook | Email: Admissions@RossU.edu |
| Accreditation | Request Viewbook | Housing | |
| Clinical Affiliations | Tuition and Fees | MyRoss Login | Office Address: 630 US Highway 1 |
| Life on Dominica | Financial Aid | Student Services | North Brunswick, New Jersey 08902 |
| | Admissions Criteria | Library | |
| | | Ross Book Store | Contact Ross |
| | | Ross Online Store | Careers at Ross |
| | | | Site Map |

# **Exhibit SJ-20**

(Excerpts of Adtalem's [formally known as Devry] 2012 Annual Report)

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Form 10-K

(Mark One)

☑     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended: June 30, 2012**

**OR**

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission file number: 1-13988**

# DeVry Inc.
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **DELAWARE** | **36-3150143** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3005 HIGHLAND PARKWAY** | **60515** |
| **DOWNERS GROVE, ILLINOIS** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

**Registrant's telephone number; including area code:**
**(630) 515-7700**

**Securities registered pursuant to section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered: |
|---|---|
| Common Stock $0.01 Par Value | NYSE, CSE |
| Common Stock Purchase Rights | NYSE |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☑   No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐   No ☑

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐   No ☑

State the aggregate market value of the voting and non-voting common equity held by nonaffiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the Registrant's most recently completed second fiscal quarter.  Shares of common stock held directly or controlled by each director and executive officer have been excluded.
December 31, 2011 - $2,600,610,356

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date.
August 24, 2012 — 64,123,380 shares of Common Stock, $0.01 par value

## DOCUMENTS INCORPORATED BY REFERENCE

Certain portions of the Registrant's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on November 7, 2012, are incorporated into Part III of this Form 10-K to the extent stated herein.

### *DeVry Medical International*

DeVry Medical International operates three institutions:
- Ross University School of Medicine confers the Doctor of Medicine (M.D.) degree;
- Ross University School of Veterinary Medicine confers the Doctor of Veterinary Medicine (D.V.M.) degree; and
- American University of the Caribbean School of Medicine confers the Doctor of Medicine (M.D.) degree.

Together, the three schools had 5,944 students enrolled in the May 2012 semester.

*Ross University School of Medicine*

Since 1978, Ross University School of Medicine has been providing high quality medical education to prospective physicians. Ross University School of Medicine has graduated over 9,200 physicians during its three decades of service, and these graduates practice medicine in the US, Canada and Puerto Rico. The mission of Ross University School of Medicine is to prepare highly dedicated students to become effective, successful physicians. Ross University School of Medicine accomplishes this by focusing on imparting the knowledge, skills, and values required for its students to establish a successful and satisfying career as a physician.

Ross medical students complete a four-semester (approximately 16 months) Foundations of Medicine curriculum in modern classrooms and laboratories at a campus located in Dominica. The four semesters are followed by a one-semester course entitled Advanced Introduction to Clinical Medicine at the Dominica campus, the Ross clinical location in Miami or at an affiliated hospital facility in Saginaw, Michigan. After students successfully complete Step 1 of the U.S. Medical Licensing Examination™, which assesses whether medical school students understand and can apply scientific concepts that are basic to the practice of medicine, they complete the remainder of the 10-semester program by participating in clinical rotations under Ross University direction, and conducted at 75 affiliated teaching hospitals or medical centers affiliated with accredited medical education programs in the United States.

Ross' medical educational program is comparable to the educational programs offered at U.S. medical schools. Ross' program consists of three academic semesters per year — beginning in January, May and September — which allows the medical students to complete their basic science instruction in less time than they would at a U.S. medical school. The program prepares students for general medical practice and provides the foundation for postgraduate specialty training, which is primarily received in the United States.

*Ross University School of Veterinary Medicine*

Since its founding in 1982, Ross University School of Veterinary Medicine has graduated more than 2,900 veterinarians. The mission of Ross University School of Veterinary Medicine is to prepare highly dedicated students to become effective, successful veterinarians in the United States.

Ross veterinary students complete a seven-semester pre-clinical curriculum in a technologically advanced campus in St. Kitts. This program is structured to provide a veterinary education that is comparable to educational programs at U.S. veterinary schools. After completing their pre-clinical curriculum, Ross veterinary students enter a clinical clerkship lasting approximately 48 weeks under Ross University direction at one of 22 affiliated U.S. Colleges of Veterinary Medicine. At both the Medical and Veterinary schools, students are introduced to clinical experiences and clinical skills early in their respective curriculums.

*American University of the Caribbean School of Medicine*

On August 3, 2011, DeVry acquired the American University of the Caribbean School of Medicine ("AUC") which was founded in 1978. AUC confers the Doctor of Medicine degree and its campus is located in the country of St. Maarten. Over 4,500 graduates have received AUC M.D. degrees and are licensed and practicing medicine throughout the world.

AUC medical students complete a two-year basic sciences program taught at AUC's St. Maarten campus, followed by two years of clinical sciences taught at affiliated hospitals in the United States and England. AUC's educational program is comparable to the educational programs offered at U.S. medical schools.
The acquisition of AUC was consistent with DeVry's growth and diversification strategy, increasing its presence in high quality medical and healthcare education and expanding its academic offerings at the post-baccalaureate level. DeVry was attracted to AUC because of its highly regarded faculty, commitment to academic excellence, and an accomplished network of alumni. In addition, AUC has strong partnerships with residency placement hospitals across the United States.

***Medical and Healthcare***

*DeVry Medical International*



The Ross University School of Medicine and Ross University School of Veterinary Medicine focus their marketing efforts on attracting highly qualified, primarily U.S. and Canadian applicants, with the motivation and requisite academic ability to complete their educational programs and pass the United States Medical Licensing Exam and the North American Veterinary Licensure Examination, respectively. Each institution's marketing effort includes direct e-mail marketing, webinars, visits to undergraduate campuses to meet students and their pre-med/pre-vet advisors, targeted direct mail campaigns, information seminars in 40 major markets throughout the United States, Canada, and Puerto Rico, alumni referrals, a national undergraduate poster campaign, radio advertisements in select markets and print ads in major magazines and newspapers.

Ross University School of Medicine and Ross University School of Veterinary Medicine each employ regional admissions representatives in 12 cities throughout the U.S. and in Ontario, Canada, who seek out and pursue students interested in our two programs. Senior Associate Directors of Admission and Associate Directors of Admission recruit, interview, admit, and enroll all new students to each of our three entering cohorts. The successful applicant must have all prerequisite sciences (with labs), mathematics, and English courses as dictated by the admissions committee of both the medical and veterinary schools. All candidates for admission must interview with an associate director and all admission decisions are made by the admissions committees of the medical and veterinary schools.

AUC focuses its marketing efforts on attracting highly qualified, primarily U.S. applicants, with the motivation and ability to complete their medical programs and pass the applicable licensure examinations. Approximately one-third of AUC's applicants come from referrals, with the remainder primarily from general advertising, including print and Internet media, AUC's website and visits by admissions advisors to U.S. undergraduate institutions. AUC employs admissions advisors who are located at AUC's administrative offices in Coral Gables, Florida and remotely throughout the United States and Toronto, Canada.

*Chamberlain College of Nursing*

Chamberlain utilizes varied marketing approaches to generate interest from potential students. Chamberlain recruiters visit Arizona, Illinois, Indiana, Missouri, Ohio, Florida, Texas, Georgia and Washington, D.C. metro area high schools, employ targeted direct mail, cultivate alumni referrals and participate in information seminars and career fairs. Chamberlain holds open house events to attract local prospective students, and advertises on the Internet, in healthcare career publications, in newspapers, and on the radio. Chamberlain's extensive informational website generates nearly one-third of all prospective student applications.

Chamberlain employs regional admissions representatives who arrange for student interviews and campus tours. Admission requirements include a high school diploma or GED; minimum cumulative grade point average requirements vary depending upon the program. Applicants to the pre-licensure programs must pass the Chamberlain standard pre-admission exam to be eligible for admission. Admissions decisions are made by an admissions committee.

*Carrington College and Carrington College California*

Carrington College and Carrington College California each utilize varied marketing approaches to generate interest from potential students. Admissions advisors visit high schools in Arizona, California, New Mexico, Nevada, Oregon, Washington and Idaho. Each institution also conducts local advertising campaigns using broadcast media, print media, targeted direct mail and the internet. In addition, each institution holds open house events for local prospective students, cultivates alumni referrals, and participates in information seminars and career fairs.

***Becker Professional Education***

Becker Professional Education markets its courses directly to potential students and to selected employers, primarily the large global, national and regional public accounting firms. Alumni referrals, direct mail, print advertising, e-mail, digital and social media advertising and a network of student representatives at colleges and universities across the country also generate new students for Becker's review courses. The Becker web-site is another source of information for interested applicants.

Becker Professional Education has relationships with more than 2,000 public accounting firms, corporations, government agencies and universities. Becker delivers its CPA review courses on about 100 college campuses, recruiting students attending those institutions. Becker also is the preferred provider of CPA review for most of the country's largest public accounting firms, partnering with 99 of the top 100 public accounting firms, including each of the Big 4 Firms.

## <u>Exhibit SJ-21</u>

(Excerpts of Davendra Sharma's deposition transcript)

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 0:18-cv-60482-KMM


OLUWAMUYIWA AWODIYA,

             Plaintiff,

vs.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

             Defendant.
_____/


                         350 E. Las Olas Blvd.
                         Fort Lauderdale, Florida
                         October 16, 2018
                         12:59 p.m.



THE DEPOSITION OF


DAVENDRANAND SHARMA



Taken on Behalf of the Plaintiff

Pursuant to Notice of Taking Deposition

Commencing at 12:59 p.m.

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

## Page 2

1   APPEARANCES:
2
    On behalf of Plaintiff:
3
    15005 Dahlia Drive
4   Bowie, MD 20721
    (240)602-1836
5   BY: OLUWAMUYIWA AWODIYA, PRO SE, ESQ.
6
    On behalf of Defendant:
7
    AKERMAN, SENTERFITT
8   1 SE 3rd Avenue, 25th Floor
    Miami, FL 33131-1714
9   (305)374-5600
    ryan.roman@akerman.com
10  BY: RYAN ROMAN, ESQ.
         -and-
11       OCTAVIA GREEN, ESQ.
12
13  ALSO PRESENT:
14  VALARIE BOMAR, ESQ.
    ADTALEM GLOBAL EDUCATION
15
16  REPORTED BY:
17  KELLY A. ESPOSITO
    ALPHA & OMEGA REPORTING SERVICES, INC.
18  1776 E. Sunrise Boulevard, First Floor
    Ft. Lauderdale, FL 33304
19  954.523.6422
           * * * * *
20
21       STIPULATIONS
22       It is stipulated and agreed by and between
23  counsel for the respective parties that:
24       Reading and subscription of the deposition
25  by the witness are not waived.

## Page 3

1           I N D E X
2
    Examination                 Page
3
4   Direct    By Mr. Awodiya:      4
    Cross     By Mr. Roman:       75
5   Redirect  By Mr. Awodiya:     83
6         PLAINTIFF EXHIBITS
7   No.                         Page
8   DE-01    Counseling Note dated    8
             12.14.15
9   DE-02    Doctor's Note dated 12.30.15  9
    DE-03    Counseling Note dated    17
10           2.12.16
    DE-04    Counseling Note dated    18
11           3.11.16
    DE-05    Release of Information   30
12           Consent
    DE-06    Counseling Note dated    70
13           12.9.15
14        DEFENSE EXHIBITS
15  No.                         Page
16  DE-07    Counseling Note dated 4.5.16  79
17
18
19
20
21
22
23
24
25

## Page 4

1   Thereupon:
2           DAVENDRANAND SHARMA
3    a witness named in the notice heretofore filed,
4   being of lawful age and having been first duly
5   sworn, testified on his oath as follows:
6       THE WITNESS:  I so swear.
7           DIRECT EXAMINATION
8   BY MR. AWODIYA:
9       Q.  Hello.  Please state your name your full
10  name for the record.
11      A.  Davendranand Sharma.
12      Q.  Thank you.
13          May I refer to you as Dr. Sharma?
14      A.  Sure.
15      Q.  Dr. Sharma, my name is Oluwamuyiwa
16  Awodiya, and I'm the plaintiff in this case against
17  Ross University School of Medicine.
18          During this deposition, I will in most
19  part refer to myself as "plaintiff" as "Muyiwa" or
20  as "Awodiya".
21          For the record, do you understand that if
22  I say, "plaintiff, Muyiwa" or "Awodiya," that I am
23  refer to myself?
24      A.  Yes.
25      Q.  Additionally, let me tell you some ground

## Page 5

1   rules for this deposition.  And if you have any
2   questions, you can ask me.  First, you are under
3   oath and have sworn to tell the truth.  The effect
4   of that oath is the same as if you were testifying
5   in court.  If you have a question that you don't
6   understand, tell me you don't understand it, and
7   I'll rephrase it as often as necessary, so you're
8   comfortable that you understand the question you're
9   answering.
10      A.  Yes.
11      Q.  It's also very important that you answer
12  my questions through spoken word, not through facial
13  expressions or gestures.  Please refrain from
14  answering questions with sounds like uh, uh-huh,
15  uh-uh, or words that may not get transcribed
16  accurately.  You must actually say a word.  If you
17  mean yes, say yes, not uh-huh.
18          Also, please allow any questions and any
19  objections to be fully stated before you speak.  The
20  court reporter cannot take down more than one person
21  speaking at the same time.  Otherwise, the record
22  will be jumbled and the questions and answers will
23  be disjointed.  Ross lawyers -- Ross University's
24  lawyers may make objections to questions that I ask
25  you.  They are objections for the judge to consider

                              2  (Pages 2 to 5)

15eb13da-d2c1-4023-bda4-c358c06300a0

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 6

1    later.  You are still required to answer the
2    question unless you are instructed not to by their
3    lawyers.
4            Everything that is said is being taken
5    down by the court reporter verbatim.  You have an
6    opportunity to read the deposition transcript and
7    make corrections you believe are necessary.  If you
8    make changes in your testimony that are inconsistent
9    with the answers given during the deposition, I will
10   be entitled to comment on those discrepancies at
11   trial to question your truthfulness.
12           Do not guess when providing responses.
13   Instead, please provide your best estimate based on
14   your recollection.  If you need to take a break at
15   any time, please let me know.  All I ask is that we
16   do not take a break while there's a question
17   pending.
18           Are you here today under the influence of
19   any medication or suffering from any physical,
20   mental, or emotional condition that would affect
21   your ability to hear my questions or to give
22   truthful answers?
23       A.  No.
24       Q.  Okay.  Dr. Sharma, when did you first hear
25   about this lawsuit?

Page 7

1        A.  I think it was an e-mail that came around
2    April 2016 from Ross University's attorneys office
3    saying that you --
4            MR. ROMAN:  Hold on one second.  I'm just
5    going to object to the extent that your
6    testimony would call for any disclosure of
7    attorney/client communication.  Any
8    communication you had with an attorney for
9    Ross, I'll object on the basis of privilege,
10   and I'll instruct you not to answer those
11   questions.  You can testify about when you
12   talked to certain people, who you talked to,
13   but not the substance of communications with
14   lawyers.
15           THE WITNESS:  Sure.  I understand.
16           So April 2016.
17   BY MR. AWODIYA:
18       Q.  How long have you been working for Ross
19   University?
20       A.  From 1993.
21       Q.  And what is your job position at Ross
22   University?
23       A.  I'm a professor of behavior sciences and
24   consultant psychiatrist for health services.
25       Q.  I'm going to show you this document marked

Page 8

1    Exhibit DE-01.
2            (Thereupon, the referred-to document was
3            marked by the court reporter for
4            Identification as Plaintiff's Exhibit
5            DE-01.)
6    BY MR. AWODIYA:
7        Q.  Can you confirm that this is your
8    counseling note for plaintiff dated December 14th,
9    2015?
10       A.  Yes.
11       Q.  In this counseling note, you put "Academic
12   or educational problem" next to "Summary of note;"
13   is that correct?
14       A.  Yes.
15       Q.  In the same counseling note, you also
16   wrote that you started screening plaintiff for ADHD;
17   is that also correct?
18           It should be under "Plan."
19       A.  Yes.
20       Q.  Did you screen plaintiff for ADHD because
21   he informed you that he needed extended testing time
22   for his exams?
23       A.  No.
24       Q.  Then why did you screen plaintiff for
25   ADHD?

Page 9

1        A.  Because he was having academic problems.
2        Q.  What type of academic problems?
3        A.  Problems with passing his exams, as far as
4    I remember.
5        Q.  Did he tell you why he was having problems
6    passing his exams?
7        A.  Going into memory bank, you know, but if I
8    remember the situation, it was about not performing
9    at your best -- the plaintiff's best.
10       Q.  When plaintiff returned to Dominica in
11   January 2016 after the winter break, did he give you
12   documents about his ADHD that was assessed in
13   Maryland?
14       A.  Not that I recall.
15       Q.  Not that you recall?
16       A.  Yeah.  Not that -- it may have been given
17   to the counseling center, but --
18       Q.  Please see Exhibit DE-02.
19           (Thereupon, the referred-to document was
20           marked by the court reporter for
21           Identification as Plaintiff's Exhibit
22           DE-02.)
23   BY MR. AWODIYA:
24       Q.  And please take time to read that in it's
25   entirety, if you can.

3   (Pages 6 to 9)

15eb13da-d2c1-4023-bda4-c358c06300a0

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

---

Page 10

1      MR. ROMAN: And I'll just make an
2  objection for the record that I don't believe
3  this is a document we've seen yet in this case.
4  So I'll just make that objection. And I also
5  see there are redactions to certain portions.
6  So we would want the opportunity to see an
7  unredacted version so that we understand fully
8  what this document represents.
9      THE WITNESS: Is there a page 3? Oh,
10  here. Page 3. I got it. Good.
11  BY MR. AWODIYA:
12   Q. You've read it?
13   A. Uh-huh.
14   Q. Okay. Do you remember receiving this
15  document when plaintiff returned back in
16  January 2016?
17   A. No.
18   Q. No?
19      Can you read out the date on the top of
20  this document?
21   A. 30th of December, 2015.
22   Q. And this is during the Christmas break,
23  right?
24   A. Yeah.
25   Q. On this document it says, "School

---

Page 11

1  counseling said that they are going to put me on a
2  stimulant; they said I was inattentive."
3   A. School counseling said they are going to
4  put you on?
5   Q. A stimulant.
6   A. Yes. Yes.
7   Q. "They said I was inattentive."
8   A. Yes.
9   Q. Is that an accurate statement?
10   A. Yes.
11   Q. So before I went to break, you told
12  plaintiff that you thought he was inattentive?
13   A. Yes.
14   Q. On the document that says, "page 3" --
15   A. Uh-huh.
16   Q. -- can you read where it says, "He is
17  returning back to med school"?
18   A. Okay. I read it.
19   Q. Okay. What it reads is -- it says, "He is
20  returning back to med school on January 8th, 2016."
21   A. Uh-huh.
22   Q. "He wonders if he can manage his,"
23  redacted, "and inattentive/cognitive via
24  counseling/psychotherapy which he plans to pursue
25  while he is in the Caribbean/Dominica."

---

Page 12

1   A. Yes, I see it.
2   Q. Under that it says, "The patient reports
3  the following concerns related to his
4  attention/concentration."
5      Now, under here are numerous ways that the
6  doctor has noted plaintiff's symptoms.
7      Do you -- is that a correct statement?
8   A. Yes.
9   Q. This document also says, "Constantly has
10  difficulty sustaining attention to task at work or
11  in school." It says, "Constantly has difficulty
12  with tasks requiring persistence or organization.
13  Constantly distracted by noise or activity.
14  Constantly forgetful in daily activities, for
15  example, difficulty remembering appointments or
16  obligations."
17      Did you notice any of these symptoms in
18  plaintiff?
19   A. When? When I first saw you?
20   Q. In any of your counseling sessions.
21   A. Yes.
22   Q. So would you agree that you observed that
23  plaintiff's ADHD affected his ability to perform
24  well on his exams?
25   A. Well, remember, we didn't diagnosis you

---

Page 13

1  with ADHD in December. So what I saw was evidence
2  of ADHD that required, you know, testing and
3  confirmation.
4   Q. And what was that evidence?
5   A. The symptoms you just went through, this
6  list that is there.
7   Q. Okay. So just to be clear, you noticed
8  that plaintiff was experiencing these symptoms on
9  page 3 of Exhibit DE-02?
10   A. Yes. The symptoms you listed.
11   Q. The symptoms --
12   A. From "The patient reported following
13  concerns" to "difficulty remembering appointment or
14  obligations."
15      MR. ROMAN: I'll just object, because I'm
16  not sure it's clear what time frame we're
17  talking about at this point.
18  BY MR. AWODIYA:
19   Q. When did you notice these symptoms?
20   A. I think from the first time I saw the
21  plaintiff, though, it wasn't for primarily academic
22  problems.
23   Q. Was this December 2015?
24   A. December 2015.
25      Are we finished with this one?

4  (Pages 10 to 13)

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 14

1  Q. One more question on that document.
2  If you noticed those symptoms, why are
3 they not listed in your counseling records?
4  A. In which counseling records?
5  Q. The counseling records that Ross produced,
6 it didn't mention anything of what you witnessed.
7 It just kind of – it makes it seem – in my
8 opinion, it makes it seem as if you – the school
9 arrived to ADHD randomly or the diagnosis was just a
10 diagnosis. There was no investigation into it.
11  From your – from – from your – from
12 Exhibit DE-01 –
13  A. Wait. Wait. Sorry. It's confusing.
14 It's like three questions going. You're saying –
15 remind me of the first question. You say, why was
16 it not – let me clarify.
17  Why was it not picked up in your initial
18 meeting or at some point we did not report it as a
19 problem?
20  Q. Let me rephrase.
21  A. Okay.
22  Q. If you noticed that plaintiff was
23 experiencing these symptoms –
24  A. Uh-huh.
25  Q. – when you first met him in

Page 15

1 December 2015, why are they not listed inside of
2 your counseling notes --
3  A. I gotcha.
4  Q. – in December 2015?
5  A. So I don't know, because I have to look at
6 those notes. Are you talking about this set or all
7 the notes?
8  Okay. If we're talking about this set,
9 then it actually has assessment of academic
10 problems. That was not the primary problem that the
11 person – that the plaintiff was referred to me for.
12 That was not the primary problem I was supposed to
13 deal with. And the person had already been seen by
14 the counselors. I wasn't the primary person. I was
15 the specialist to help the plaintiff with depressive
16 issues related to his break up – romantic break up.
17  Q. I understand.
18  A. With concerns about other problems, like
19 self-harm, and so on. So that was my primary duty,
20 to help the plaintiff with those problems. In the
21 meeting with the plaintiff, I recognized there were
22 other problems –
23  Q. Thank you.
24  A. – with academics.
25  Q. Thank you.

Page 16

1  Okay.
2  A. All right?
3  Just to be clear to your question as to
4 why we did not do anything, we actually recommended
5 assessment for ADHD in December while the plaintiff
6 was going back home to recover from the emotional
7 breakup situation.
8  Going too fast?
9  THE COURT REPORTER: You're awesome.
10  THE WITNESS: You're awesome typing fast.
11 Off the record.
12  So we actually started a process of
13 helping the plaintiff with the academic
14 problems, as we helped the plaintiff with the
15 relationship problem. And I think we did help
16 with that.
17  And then, we started testing the patient
18 for ADHD. And then, we also have the plaintiff
19 going home early. So I think the university
20 did show responsibility for picking up the
21 diagnosis that was not made throughout the
22 plaintiff's life until he was in his 20s when
23 he came to Ross.
24  So that's the story I would support for
25 the plaintiff.

Page 17

1  Q. Thank you. Thank you very much.
2  Please see Exhibit DE-03.
3  (Thereupon, the referred-to document was
4  marked by the court reporter for
5  Identification as Plaintiff's Exhibit
6  DE-03.)
7 BY MR. AWODIYA:
8  Q. What is the date on this document?
9  A. 12th of February, 2016.
10  Q. On that day, did plaintiff tell you that
11 his ADHD was adversely affecting his ability to
12 complete his exams?
13  A. There's nothing in the record. I wouldn't
14 remember that, but it's not documented that what you
15 said was what you told me.
16  Q. Let's refer to parts of this document to
17 see if it can help you recall. In this document, is
18 it correct that it says – next to "Summary of
19 Note," you put "Attention Deficit Disorder Without
20 Mention of Hyperactivity"?
21  A. Yes.
22  Q. Does it also say that plaintiff "did not
23 feel right for the last mini"?
24  A. Yes.
25  Q. What is the connection between those two?

5 (Pages 14 to 17)

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 18

1    Why is it summarized as attention deficit
2  disorder without mention of hyperactivity, and then,
3  mentions his mini?
4    A.  So the summary means that you have now
5  carried a new diagnosis or a diagnosis of attention
6  deficit that's been confirmed.  "Did not feel right
7  for the last mini" would be probably what you were
8  saying in your words.  So you would more know what
9  you meant by that, you know.  If you asked for my
10  interpretation, it could be many things, like you
11  were not feeling well prepared, you didn't study
12  enough, you know.  So it's just speculation.  But
13  those would be what you said, "did not feel right."
14    Q.  Okay.  Please see Exhibit DE-04.
15    (Thereupon, the referred-to document was
16    marked by the court reporter for
17    Identification as Plaintiff's Exhibit
18    DE-04.)
19  BY MR. AWODIYA:
20    Q.  Is this your counseling note for
21  plaintiff?
22    A.  Yes.
23    Q.  And what's the date on this document?
24    A.  11th of March, 2016.
25    Q.  Did plaintiff tell you that he was running

Page 19

1  out of time to complete his exams in the time
2  allowed?
3    A.  It says, "Despite running out of time
4  passed his exams."
5    So that would be, most likely, a notation
6  to what you said, that you ran out of time, but you
7  passed.
8    Q.  On this day, did plaintiff – did
9  plaintiff ask for extended testing time?
10    A.  Nothing recorded here about asking for
11  extra time.
12    Q.  Do you recall?
13    A.  No.
14    Q.  On the same counseling note, you put
15  "Anxiety State, Unspecified," and you prescribed
16  more Ritalin; is that correct?
17    A.  Correct.
18    Q.  Okay.  So this document states that
19  plaintiff was running out of time and you added a
20  new diagnosis to your notes?
21    A.  Uh-huh.
22    Q.  And gave him more Ritalin?
23    A.  Uh-huh.
24    Q.  On that date, did you believe that both
25  plaintiff's ADHD and anxiety significantly limited

Page 20

1  his ability to complete his exams in the time
2  allowed?
3    A.  From this note, I can't say that.  What
4  the note is pointing to is that you had a
5  diagnosis – the plaintiff had a diagnosis of ADHD,
6  was started on stimulant meds in February, is coming
7  for a follow-up, and is continuing with his
8  stimulant meds along with the Wellbutrin.  It
9  doesn't have anything about the plaintiff asking for
10  extra time.
11    Q.  Considering all of your counseling notes
12  and the symptoms you observed of plaintiff's
13  attention and concentration, did you believe that
14  his ADHD and anxiety significantly limited his
15  ability to complete his exams in the time allowed?
16    A.  I would agree ADHD in itself can affect
17  academic performance, and it's recorded here that
18  you were running out of time.
19    Q.  Do you believe that plaintiff's ADHD,
20  specific to him, was significantly limiting his
21  ability to complete his exams in the time allowed?
22    A.  Yes.
23    Q.  Did you also believe that he needed
24  extended testing time?
25    A.  I wouldn't be able to interpret that.  I

Page 21

1  believe that everybody is entitled to extra time,
2  according to the regulations of the school, that has
3  the diagnosis of ADHD.  It's a disability that
4  allows students apply to the Office of
5  Accommodations for extra time.  It's in the
6  student's handbook.
7    Q.  So based on the school's policy and
8  plaintiff's counseling sessions with you, you
9  believed that he needed extended testing time?
10    MR. ROMAN: I'll just object.  I believe
11    that misstates the prior testimony.
12    THE WITNESS: Sorry?
13    MR. ROMAN: I just objected for the
14    record, because I thought it misstated the
15    prior testimony.
16    You can answer, if you understand the
17    question.
18  BY MR. AWODIYA:
19    Q.  Let me rephrase.
20    A.  That's okay.  Because – repeat what you
21  said there.  Sorry.
22    Q.  Based on your counseling sessions with the
23  plaintiff, and based on the school policies, do you
24  believe that plaintiff needed extended testing time?
25    A.  The thing is, it's not my belief that I

6  (Pages 18 to 21)

15eb13da-d2c1-4023-bda4-c358c06300a0

Page 22

1    can talk to. I can only treat the plaintiff and get
2    him better with his ADHD. The need for extra time
3    is not my determination. It is available, according
4    to the regulations of the university. It is the
5    student, who has the diagnosis, who needs to request
6    it, if he thinks that he needs extra time, because
7    not every student with a diagnosis of ADHD requests
8    extra time. So we can only advise a student that
9    accommodations are available, if they reach to the
10   accommodation office and request it. You
11   understand?
12        It's not for me to tell the student, who
13   has ADHD, that they must, because they need it, they
14   should go. You understand?
15        It is my duty to let the student know that
16   there is regulations that provide extra time if they
17   request it.
18        Q. So let me ask you this.
19        A. Uh-huh.
20        Q. Is it correct that you're trying to say
21   that the school would act independently in relation
22   to your own belief of the student's need?
23        A. No, it's not my belief of the student's
24   need for extra time, you know. It's the student's
25   need for, one, treatment, and need -- the student

Page 23

1    has to need the extra time. It is not for me to
2    know that they would need it, because many students
3    do not ask for extra time for one reason or the
4    other.
5        Q. What language do you think -- let me
6    rephrase.
7        You were informed that plaintiff was
8    running out of time on his exams, correct?
9        A. Yes. It's there.
10        Q. And you also noticed that -- that his
11   ADHD -- let me rephrase.
12        Connect the symptoms you saw plaintiff
13   experiencing with his ADHD with him running out of
14   time, because to me it seems like that is the
15   plaintiff informing --
16        A. Okay. Let me -- they're all connected.
17   Symptoms lead to diagnosis of ADHD. ADHD has with
18   it problems in managing time. That is why ADHD is
19   afforded extra time by the Office of Accommodations,
20   which considers it a disability, all right,
21   according to the American Disability Act.
22        It's a condition, which we support
23   students, who have ADHD, for extra time.
24        Does that help you?
25        So we have no problem with a student

Page 24

1    requesting accommodations for extra time.
2        Q. Okay. I think I understand.
3        So let me ask you this. If a student
4    doesn't request an accommodation, but the school
5    notices that he needs an accommodation, do you think
6    the school is liable?
7        MR. ROMAN: Objection to the extent it
8    calls for a legal conclusion since Dr. Sharma
9    is not a lawyer.
10   BY MR. AWODIYA:
11        Q. Let me rephrase.
12        If you notice that a student needs an
13   accommodation, but he doesn't request an
14   accommodation --
15        I'm going to come back to it. I lost my
16   train of thought a little bit.
17        A. You want a break? I could use an extra
18   cup of coffee.
19        MR. AWODIYA: Let's take a break and go
20   off the record.
21        (Whereupon, a break was taken from 1:33 to
22   1:40 p.m.)
23   BY MR. AWODIYA:
24        Q. Did plaintiff tell you that -- let me
25   rephrase.

Page 25

1        Did plaintiff tell you that Matthew
2    Stewart-Fulton denied plaintiff's request for
3    accommodation?
4        A. I don't recall that.
5        Q. Do you know why plaintiff never received
6    test accommodations from Ross University?
7        A. Our counseling center record that I have
8    in my documentation, in my notation, doesn't show
9    that the plaintiff applied for accommodation.
10        Q. So outside of the documents, you don't
11   remember any conversations with plaintiff?
12        A. I remember a conversation recently about
13   the deposition here. Prior to that, I believe there
14   was a conversation about getting the documentation
15   you wanted from the -- our counseling center, and we
16   directed you to Shannon Evans in Knoxville.
17        Q. In Dominica you don't remember any of the
18   conversations you had with plaintiff?
19        A. Like what?
20        I mean -- about applying for
21   accommodation?
22        Are you saying I don't remember any of the
23   conversations?
24        Q. Well, because a couple of times you said,
25   it's not in the document, it's not in the counseling

7  (Pages 22 to 25)

15eb13da-d2c1-4023-bda4-c358c06300a0

Page 26

1    record, and therefore, you can't recall.
2         Do you recall any information that was not
3    in the documents?
4         A.  I recall a lot of -- your history, your
5    medical history, your concerns about your emotions,
6    your relationship difficulties, your problems with
7    passing the exams.  I recall a lot of those.  But
8    specific words or conversations, I don't.  I
9    certainly don't remember you specifically saying you
10   applied for accommodation.
11        Q.  Okay.  Let's go to the relationship thing.
12        Is it correct that you believe plaintiff's
13   relationship problems caused him anxiety?
14        A.  Yes.
15        Q.  Do you believe that that anxiety -- at
16   that time, in Dominica, did you believe that his
17   anxiety was also affecting his exams in addition to
18   the ADHD?
19        A.  Yes.
20        Q.  Do you think that his anxiety contributed
21   to him running out of time on his exams in Dominica?
22        A.  It could.  It's just speculation, because
23   it's one of the factors that can affect academic
24   performance.  Sure, it could have affected
25   performance.

Page 27

1         Q.  Have you helped other students to get test
2    accommodations at Ross University?
3         A.  Yes.
4         Q.  Compared to plaintiff, have other students
5    with less documentation of ADHD received
6    accommodations at Ross University?
7         A.  There have been students with the
8    diagnosis -- they may have less documentation, but
9    everyone has the diagnosis adequately diagnosed,
10   including you.
11        Q.  When you say, "may have less," less in
12   what aspect?
13        A.  Accommodation is not my portfolio.  I can
14   only send the documentation to the accommodations
15   office, what we have, and they would receive
16   accommodation.  So based on the accommodations
17   office assessment that all the documents are in
18   place.
19        So your question is relating to yourself.
20   You have -- you have good documentation, in my
21   opinion.  Other students may have had one less test
22   done, but still with a good diagnostic report of
23   ADHD.  So they would be given accommodations.
24        But they have to fulfill the accommodation
25   office's -- accommodation is not my portfolio.  We

Page 28

1    don't give it from the clinic, from the counseling
2    services.
3         Q.  But you would give information to --
4         A.  Yes.  We pass the records.
5         Q.  And so, how would you help these students?
6         Would you recommend, based on their
7    documentation and the symptoms you observed, that
8    they get testing accommodations?
9         A.  Part of the counseling intake and the
10   screening for ADHD is every student is advised that
11   accommodation is available and that they have to
12   apply for it if they want it.  We don't encourage.
13   We don't force.  We just say to the students, "It's
14   your option.  It's available."
15        Not every student wants it.  Some -- not
16   every student would want accommodation despite
17   having the diagnosis of ADHD, which can give them
18   the accommodations.
19        Q.  If a student wanted accommodations, and
20   you passed along the information to Ross University
21   administration, would you recommend in those
22   situations that they get academic accommodations?
23        A.  Absolutely, yes.
24        Q.  So if a student came to you and said he
25   was running out of time, do you think that -- if the

Page 29

1    student told the academic -- if the student told the
2    accommodation coordinator he was running out of time
3    on his exams, would that constitute informing him
4    the need of more time on his exams?
5         A.  If the student told the accommodations
6    office.
7         Q.  Yes.  The point I'm trying to express here
8    is that students don't necessarily know the specific
9    language, according to the ADA or to the
10   Rehabilitation Act, what constitutes a request.
11   They simply may say that they need help some way,
12   that I'm running out of time on exams, I'm not
13   completing exams.
14        A.  Uh-huh.  I understand.
15        Q.  Does a student need to expressly request
16   and say "accommodations" in order to get
17   accommodations?
18        A.  Yes, they have to.  It's always done by
19   the counseling service part of our process when we
20   make the diagnosis of ADHD.  It's called "standards
21   practice" or "best practices."
22        Every person who is diagnosed with ADHD is
23   guided to the student handbook that there is
24   accommodations available.  The process is very
25   straightforward.  They need to go to the

8  (Pages 26 to 29)

15eb13da-d2c1-4023-bda4-c358c06300a0

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 30

1   accommodations office, and then, that -- what
2   happens then is, they're interviewed by the
3   accommodations officer. That is not for us. He
4   does it -- he or she does an interview of the
5   student. And if he's satisfied that there's
6   evidence of a disability, the student shows him the
7   fact that they have a diagnosis of ADHD, the student
8   then makes the accommodation request on the form
9   that the accommodations office has, and the student
10  would ask us to submit his or her records to --
11  that's the process.
12      Q.  So once they ask you to submit their
13  documents --
14      A.  Yes.
15      Q.  -- to --
16      A.  The accommodations office.
17      Q.  That is when the obligation is triggered?
18      A.  Yes. That's when we can only release the
19  student's records; only after that process is
20  completed, the process which I just outlined, where
21  the student is the one that must make the request.
22      Q.  Please see Exhibit DE-05.
23          (Thereupon, the referred-to document was
24          marked by the court reporter for
25          Identification as Plaintiff's Exhibit

Page 31

1       DE-05.)
2   BY MR. AWODIYA:
3       Q.  Is this the document you were talking
4   about?
5       A.  This is the document about release of
6   information. The document about requesting
7   accommodations is not this document. This Exhibit,
8   DE-05, is not the request for accommodation.
9       Q.  But this is the document for the
10  counseling center to send the information?
11      A.  That's correct.
12      Q.  Okay. Did you send any of plaintiff's
13  information to Ross University's administrators?
14      A.  Not me. I didn't send anything.
15      Q.  Do you know if anyone else did?
16      A.  I wouldn't know for sure, but I believe a
17  request was made for the release of your
18  accommodation [sic], but this was not in that time.
19  This was more recently when the plaintiff had left
20  the university and returned to the U.S. for the
21  comprehensive shelf.
22      Q.  Is it correct that the document for the
23  release --
24      A.  Uh-huh.
25      Q.  -- to Ross University administration was

Page 32

1   agreed upon in December 2015?
2       A.  No. There's no evidence that there was a
3   document requesting accommodation.
4       Q.  Not requesting accommodation.
5           Requesting that the counseling center send
6   the documentation --
7       A.  No, there is no -- there's no evidence of
8   a request for sending a record.
9       Q.  -- in December 2015.
10      A.  There's a request for sending information
11  about the plaintiff's return to the U.S. for
12  emotional support in December 2015. We received --
13  in December 2015, as far as my records show, my
14  recollection, there's no request for release for
15  accommodations. You understand?
16      Q.  Can you please read on that form what it
17  says under "This information is released for the
18  following purpose"?
19      A.  "To facilitate treatment planning" and "to
20  provide information relevant to accommodations or
21  medical leave of absence."
22      Q.  Under that --
23      A.  And then, there is "Other" not ticked.
24          So the boxes are ticked for "facilitate
25  treatment planning" and "to provide information

Page 33

1   relevant to accommodation academic accommodation
2   and/or medical leave of absence."
3       Q.  Under that, what is the next box checked?
4       A.  "I authorize ongoing communication unless
5   I revoke this consent."
6       Q.  Did you not feel that there was an ongoing
7   obligation?
8       A.  For?
9       Q.  The purpose of this document for academic
10  accommodations -- for information relevant to
11  academic accommodations?
12      A.  No. I said it just now. No. This
13  document was done in the context of the plaintiff
14  needing to return to the USA early, because the
15  plaintiff had emotional crisis and there were
16  concerns about the patient's safety. So the
17  counseling service, including myself, and the
18  university administrator supported the plaintiff
19  returning early, and that involved changing the
20  plaintiff's return ticket which the plaintiff
21  couldn't afford at this time.
22          So I wrote to the university's
23  administrative director asking them to support the
24  student, to return him early, because the
25  plaintiff's mother was very worried about the

9  (Pages 30 to 33)

15eb13da-d2c1-4023-bda4-c358c06300a0

Page 34

1  plaintiff.
2       So this document was signed for that
3  purpose, so we can give information about the
4  plaintiff's emotional health and request an early
5  return.  This document was not for releasing
6  information about accommodation, because there was
7  no request for accommodations from me in
8  December 2015.
9       To make it more clear, there was no
10  diagnosis at that time.  It was just at the start of
11  preliminary testing, screening for ADHD.  So there
12  was no way documents could have been sent to support
13  accommodations for ADHD, because the diagnosis was
14  not made.  It makes no sense.
15       Q.  So when the diagnosis was made and
16  plaintiff did not revoke his consent, would that not
17  be considered ongoing?
18       A.  Ongoing to what?
19       Q.  Well, you said the documents didn't exist
20  at that time.
21       A.  The diagnosis didn't exist.
22       Q.  But the diagnosis existed after the winter
23  break?
24       A.  Yes.  Yes.
25       Q.  Why weren't those records sent?

Page 35

1       A.  Because, as I said, we do not release
2  information unless we request -- we receive a
3  request either from the student, who has the
4  diagnosis, and that has to be in writing, not a
5  verbal request, or it has to come from the
6  accommodations office in writing under a protected
7  e-mail that the -- that they are going through the
8  process of supporting a request for accommodation.
9  There was no request made for accommodations.  So
10  that's why I said, there's no request.  We cannot
11  give out information to the accommodations office.
12  Then we would be sued for giving information beyond
13  the scope.  The scope of this document was only to
14  get the plaintiff back home early.
15       Q.  Give me one second.  I had something and
16  it's coming back to me.
17       A.  Take your time.
18       Q.  Oh.  You said that a request has to be in
19  writing?
20       A.  Yes.
21       Q.  What if it's oral?
22       A.  No.
23       Q.  It doesn't count?
24       A.  It doesn't count to the accommodations
25  office, as far as I know, and that's their -- that's

Page 36

1  their portfolio.  I can only say, from my
2  experience, a verbal request is not a request for
3  accommodations.
4       Q.  Would you say that when the diagnosis was
5  made --
6       A.  Uh-huh.
7       Q.  -- and after you observed all the
8  symptoms, that Ross University had possession of all
9  the necessary documents of plaintiff's ADHD and the
10  symptoms of his ADHD?
11       A.  Yeah, we had -- we had made a diagnosis.
12  The diagnosis was done, and we accepted, and the
13  student was -- the plaintiff was being treated.
14       Q.  Earlier you said that students with less
15  documentation have received -- you said earlier
16  students with less documentation of ADHD have
17  received accommodation action compared to plaintiff.
18       A.  Uh-huh.
19       Q.  Do you think that is fair?
20       MR. ROMAN:  I'll just object as to vague
21  as to what "fair" means.
22  BY MR. AWODIYA:
23       Q.  Let me rephrase.
24       Do you think that plaintiff was treated
25  equally?

Page 37

1       A.  Well, I don't think there was a question
2  of equal treatment, if the plaintiff didn't apply
3  for accommodations.  If the plaintiff had applied
4  and did not get it, I would say, seems something is
5  not right.  We would have to look at why that was
6  not given.  And that's not my portfolio.  I can only
7  say that the documentation that the plaintiff had
8  appeared to me to be adequate for accommodations.
9       Q.  So you believe that plaintiff had adequate
10  documentation of his ADHD to get test
11  accommodations?
12       A.  That's me.  I believe that.  Again, that
13  doesn't mean the plaintiff would get accommodations,
14  because the final say is the accommodations office.
15  It doesn't mean that I believe it's correct.  The
16  accommodations office have their own regulations,
17  and they could override my request, because I'm the
18  one -- or the doctors make the request for
19  accommodation, which is time-and-a-half.  You get
20  extra time.  We actually put it we want the student
21  to get the accommodation, but that doesn't mean they
22  get it.
23       Q.  So even though you think that plaintiff
24  needs extra time, it's out of your hands as to
25  whether he gets extra time for his exams?

10 (Pages 34 to 37)

15eb13da-d2c1-4023-bda4-c358c06300a0

Page 38

1      A.  No.  I go back to that question, and I
2   hope you can understand.  I cannot determine whether
3   you need or the plaintiff needs.  The plaintiff has
4   to determine that.  Many students do not ask for
5   accommodation with the diagnosis.
6      Q.  So why did you prescribe him Ritalin?
7      A.  Because that's my duty, to treat the
8   condition.  So I'll give you an example.  A student
9   may have the diagnosis, is on treatment, the
10  performance is much better, the student chooses not
11  to apply for accommodation.
12     Q.  So if the student --
13     A.  Which was the plaintiff's case.
14     Q.  In plaintiff's case?
15     A.  Medication helped the plaintiff to perform
16  better, do well on the exams.  So the question about
17  if I if felt there was a need for extra time does
18  not arise.  It does not arise, because it is not me
19  that can say the plaintiff needs the extra time.
20  It's the plaintiff, especially after receiving
21  treatment, that determines I would also like to get
22  extra time.
23     Q.  Did you feel -- at that time, in Dominica,
24  is it correct to say that you believed that his ADHD
25  significantly limited his ability to complete exams

Page 39

1   on time and that's why you prescribed the Ritalin?
2      A.  That's a very long question.  Do you mind
3   going back over it, because I'm not sure which one
4   I'm answering to?
5      Q.  No problem.  Let me rephrase it.
6         Did you prescribe the Ritalin to plaintiff
7   because his ADHD significantly limited his ability
8   to complete his exams on time?
9      A.  So I -- let me answer -- it's two
10  questions in one.  Maybe you could split it up.
11        So did I prescribe the treatment for the
12  ADHD?  Yes.  I treat ADHD with stimulant medication
13  primarily.
14        The second part of the question, did I
15  prescribe the stimulant because the student needed
16  extra time?  That is part of the problem that ADHD
17  has, that it causes the student to take longer.  So
18  the medication would help that.  So, yes, that's
19  correct.
20        And by helping the student to be better,
21  the need for extra time is often curtailed.
22     Q.  So are you trying to say that because of
23  medication it takes the question of required
24  extended testing time out of the equation?
25        Let me rephrase.

Page 40

1         In relation to plaintiff, are you saying
2   that -- I forgot it.  Sorry.  I lost the second half
3   of that --
4      A.  Thought?
5      Q.  Of the thought, yeah.
6      A.  Take your time, because --
7      Q.  I can't get it back.
8      A.  Do you want a break again?
9      Q.  No, I don't think a break will help.  Let
10  me just go back to my --
11        So is it correct to say that even if you
12  observed that plaintiff needed extended testing
13  time, that's not your role?
14        Your role is to treat it with medication?
15        MR. ROMAN:  I'll just object.  I believe
16     it misstates prior testimony.
17        THE WITNESS:  Yes.  Yes.  It's the same
18     thing we went over.  I can't determine the
19     need.  It's not my opinion about that.  The
20     patient -- the person has to determine if they
21     feel, despite medication, they still want extra
22     time.  It's not my determination.
23  BY MR. AWODIYA:
24     Q.  Is it correct that plaintiff was on
25  Ritalin in February 2016?

Page 41

1      A.  Correct.
2      Q.  Is it also correct that plaintiff told you
3   that he was running out of time on his exams a month
4   later, in March 2016?
5      A.  It's recorded.  We have it recorded, yeah.
6      Q.  That's a yes?
7      A.  Yes.
8      Q.  Do you know if Ross University's
9   faculty -- do you know if Ross University's faculty
10  handbook contains any information related to
11  accommodating disabled students?
12     A.  Faculty handbook or student handbook?
13     Q.  Faculty.
14     A.  I don't recall reading into the faculty
15  handbook.  So I can't answer that question.  I know
16  the student handbook has it.  It's not relevant for
17  the faculty handbook to have it.  It's a student
18  issue, not the faculty that applies for it.
19     Q.  If plaintiff informed another professor at
20  RUSM that he needed accommodations --
21     A.  Uh-huh.
22     Q.  -- is that enough to trigger the inquiry
23  into whether he needs an accommodation?
24     A.  I can't answer that, because that's not --
25  that's speculating on my part.  I don't know what

11  (Pages 38 to 41)

15eb13da-d2c1-4023-bda4-c358c06300a0

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 42

1    would lead to this — what did you call it, the
2    process?
3        Q.  The inquiry.
4        A.  The inquiry, yeah.
5        Q.  Let me rephrase.
6        A.  The only thing I know leads to
7    accommodation is the student has to apply for it.
8        Q.  I just want to clarify something. Are you
9    saying that the student informing the school of the
10   need for accommodations is different than requesting
11   an accommodation?
12       A.  They're both the same thing. So the
13   request or the informing the school has to be
14   specifically to the accommodations officer and has
15   to be done in writing.
16       Q.  So only him can be informed of the need?
17       A.  Only the student can make the request for
18   accommodation to the accommodations office.
19       Q.  So if the student requested accommodations
20   from other faculty, he's liable for not getting
21   accommodations?
22           MR. ROMAN:  I'll just object to two
23       things. One, I think it calls for a legal
24       conclusion, in terms of some of the language,
25       and also, it's been asked and answered.

Page 43

1    BY MR. AWODIYA:
2        Q.  Let me rephrase.
3            If plaintiff informed the dean —
4        A.  Uh-huh.
5        Q.  — that he needed accommodations for his
6    ADHD, would that be enough?
7        A.  Enough to get accommodations?
8        Q.  To put the school on notice.
9        A.  On notice for?
10       Q.  That he need an accommodation.
11       A.  It's not enough. The student can inform
12   anybody. Nobody can apply for accommodation. Not
13   the student's mother, the student's father, not the
14   student's psychiatrist, the student's counselor.
15   Nobody can apply for accommodations. Only the
16   student, and it has to be done in writing. It has
17   to be done through a process where they go and get
18   interviewed by the accommodations officer. The
19   officer will now be satisfied that they have a
20   proper diagnosis made. Then start the process.
21   Nobody else, mother, faculty, the dean, the
22   president of the USA. You know, it's
23   confidentiality.
24       Q.  Is it still confidential if you told the
25   dean himself or if —

Page 44

1        A.  If the student told the dean, that's his
2    prerogative.
3        Q.  So then, it wouldn't be confidential?
4        A.  The dean cannot ask for the accommodation
5    on the student's behalf.
6        Q.  The dean is not part of the counseling
7    center.
8        A.  It doesn't matter. Nobody. Nobody can
9    ask for the accommodation. Only the student.
10       Q.  So if the student tells the dean, he can't
11   tell anyone else?
12       A.  No. Unless the student gives him
13   permission in writing.
14       Q.  Is that why you didn't inform the
15   accommodations coordinator that he might need
16   accommodations?
17       A.  We've been over that. I cannot do that.
18   It's not me to say the student needs it. The
19   student is the one to say, I need it. I want it.
20   When the student makes the request, the proper
21   documentation is in place, the student gets the
22   accommodation. It's not a difficult thing to
23   understand.
24       Q.  And his psychiatrist can't inform the
25   school?

Page 45

1        A.  No. Unless the student writes to say,
2    please release by medical records. I have applied
3    for accommodation.
4        Q.  A third party psychiatrist. Let's say
5    someone at Kaiser Permanente told the dean that his
6    disability was affecting his academic performance.
7    The dean is still not obligated to accommodate the
8    student?
9        A.  No.
10       Q.  Thank you.
11           I understand it fully. Thank you very
12   much.
13           And just to clarify, on Exhibit DE-05,
14   even though it says, "ongoing communication," you do
15   not consider it ongoing communication?
16       A.  You've got to clarify what you mean by
17   that. If it's ongoing — this allows us to provide
18   accommodation for a future request. If the student
19   says, release my — release records, because I've
20   applied for accommodation, yes, it's been signed, so
21   the student doesn't have to go through this form
22   again.
23       Q.  He doesn't have to go through the form
24   again?
25       A.  It has a limitation period. I'm trying to

12 (Pages 42 to 45)

15eb13da-d2c1-4023-bda4-c358c06300a

Page 70

1     MR. ROMAN: Would this be helpful,
2  Mr. Awodiya? This is the December 9th notes.
3  I don't know if that's what you're reading off
4  of now. This appears at least to be the first
5  visit. We've seen the December 12th.
6     MR. AWODIYA: This is enough. Can you
7  please read the first sentence?
8     MR. ROMAN: And we'll mark this one as
9  DE-06. Is that all right?
10     MR. AWODIYA: We can do that.
11     (Thereupon, the referred-to document was
12     marked by the court reporter for
13     Identification as Plaintiff's Exhibit
14     DE-06.)
15     THE WITNESS: Uh-huh.
16  BY MR. AWODIYA:
17     Q. Could you read the first line under
18  "Progress"?
19     A. I read it, yes.
20     Q. Can you –
21     A. "Saw Mr. Cuffy after he received a failing
22  grade for semester 5 and felt hopeless entertaining
23  thoughts of ending his life."
24     Q. And is it correct that this document also
25  says, "Felt he was treated unfairly because he

Page 71

1  failed by one point"?
2     A. Where do you see that? Where is that?
3     Q. It's about four or five lines down.
4     A. Oh, yes. Yes, yes. Good.
5     Q. And then, also says, "He wanted to speak
6  to the dean about changing his grade."
7     A. Yes.
8     Q. It also says, "He was advised to speak to
9  the chair of promotions and student services."
10     A. Yes. Good. Sounds like good advice.
11     Q. So –
12     A. Yes.
13     Q. – what was the reason of your first
14  encounter with plaintiff?
15     A. Emotional problems. So now there's a
16  failing grade, which I didn't remember.
17     Q. Let me rephrase.
18     Did his relationship set the basis for
19  your first encounter with plaintiff?
20     A. Look, your emotional problems was the
21  reason that the student was referred to me. Whether
22  it was because the underlying relationship was a
23  factor, that he failed was a factor, the situation
24  was, there was an emotional crisis.
25     Q. Why did he want to talk with the dean

Page 72

1  about changing his grade?
2     A. Because he's upset about not passing,
3  obviously, I presume. Correct?
4     Q. And you also noted in December he was
5  showing symptoms of ADHD?
6     A. Sure.
7     Q. When he signed the form for relevant
8  accommodations, do you not think that was relevant?
9     A. Not – what wasn't relevant?
10     Q. His symptoms of ADHD and him failing the
11  semester by one point.
12     A. That's two things you're asking. Not
13  failing the semester – and what was the other one?
14  I can't answer to both the questions. So which one
15  you want?
16     So what was relevant? What are you
17  talking about?
18     Q. I'm sorry. Let me start over. I forgot
19  what I asked you. I was saying something about – I
20  was saying something about – oh. He was upset
21  about failing the semester.
22     A. Uh-huh.
23     Q. He went in to speak to the dean about
24  changing his grade.
25     A. Yes.

Page 73

1     Q. And you noticed symptoms of ADHD –
2     A. Yes.
3     Q. – to the extent that you recommended an
4  assessment for the ADHD.
5     A. Yes. We went over that.
6     Q. And he signed the form for the release of
7  information relative to academic accommodations.
8     A. Yes.
9     Q. If you noticed these things –
10     A. Yes.
11     Q. – at that time –
12     A. Uh-huh.
13     Q. – how is that not relevant?
14     A. To what?
15     Q. Academic accommodations.
16     A. There's no relevance – this form was done
17  for – for the emotional crisis to get the student
18  back home.
19     Relevance for academic accommodation can
20  only come in place if there is a request. We went
21  over this over and over. Yes, yes, I would support
22  academic accommodation 100 percent, 1,000 percent,
23  100,000 percent if a request is made. I cannot send
24  details of a diagnosis to anybody unless there's a
25  request to send it and for a purpose. It's not my

19  (Pages 70 to 73)

15eb13da-d2c1-4023-bda4-c358c06300a0

Page 74

1    opinion. It is what the plaintiff wants.
2         He wants accommodation, put it in writing.
3    It's done. It's granted. The university does not
4    deny students accommodation once documentation is
5    adequate.
6         Q.  I don't want to dive back into the form.
7         A.  That's what I'm saying. Yeah. I think
8    we've been over this and over this.
9         Q.  I was just asking about the information
10   being relevant to academic accommodations.
11        So let me ask you this.
12        A.  Yes.
13        Q.  His ADHD symptoms that you observed in
14   December 2015 --
15        A.  Uh-huh.
16        Q.  -- do you consider it relevant to academic
17   accommodations?
18        A.  Yes. Yes. We went over that. And the
19   diagnosis was correctly made, that there was ADHD
20   that the student had for a long time and did not get
21   treated for, and then, comes to me first time, gets
22   a diagnosis, and is treated for it. So that's it.
23   Student was helped. The student performed well.
24   Whether repeating the semester helped, the student
25   performed well. The student left Dominica in good

Page 75

1    spirits in April, went off to do the comp, right?
2    That's my recollection.
3         Q.  (Nod in the positive.)
4         A.  Student did not apply for accommodation or
5    request to give out documents for accommodation.
6    That's it.
7         MR. AWODIYA:  I think we're good.
8         MR. ROMAN:  We'll take a short break, and
9    I'll have some questions, and then, we'll wrap
10   it up. Let's take a quick break, and then,
11   we'll come back in.
12        (Whereupon, a break was taken from 3:17 to
13   3:24 p.m.)
14        CROSS-EXAMINATION
15   BY MR. ROMAN:
16        Q.  Good afternoon, Dr. Sharma. As you know,
17   we've met before. My name is Ryan Roman. I'm one
18   of the attorneys representing Ross University.
19        I'd like to start by showing you -- and I
20   only have a quick set of questions on the medical
21   notes, some of which we've gone through today, and I
22   think only one of which we haven't shown you today.
23        Starting with Exhibit 06, do you have that
24   in front of you still? That was the most recent one
25   we used from December 9, 2015. Let me just write

Page 76

1    the exhibit number on it so we don't get too
2    confused.
3         A.  Uh-huh.
4         Q.  This is the December 9th, 2015 note.
5         Are these your notes from your appointment
6    with Mr. Awodiya on December 9, 2015?
7         A.  Yes.
8         Q.  And were these notes taken at or around
9    the time of that appointment?
10        A.  Yes.
11        Q.  Are these record that are kept by the
12   counseling center in the ordinary course of it's
13   business?
14        A.  Yes.
15        Q.  Okay. On that particular document, I want
16   to draw your attention to a paragraph towards the
17   bottom of that page. It starts with, "He had a
18   relationship break up."
19        Do you see that paragraph?
20        A.  Yes.
21        Q.  Take a moment to review that paragraph and
22   just let me know when you're finished.
23        A.  Yes.
24        Q.  Would -- so does this -- the notes from
25   this meeting on December 9th, 2015, does that

Page 77

1    include any information you obtained from
2    Mr. Awodiya about relationship issues?
3         A.  Yes.
4         Q.  And would that paragraph reflect the
5    information you learned?
6         A.  That's correct.
7         Q.  Okay. Do you see in this set of notes --
8    this December 9th, 2015 set of notes, any reference
9    to ADHD?
10        A.  No.
11        Q.  At this time, on December 9, 2015, had
12   Mr. Awodiya been diagnosed with ADHD?
13        A.  No.
14        Q.  All right. Do you recall when the
15   diagnosis was actually made?
16        A.  The actual making of it, I think, was in
17   February 2016.
18        Q.  And if I turn your attention to Exhibit
19   03, which is in that pile in front of you, I'll ask
20   if that is the appointment you're thinking of?
21        A.  Yes, that's correct.
22        Q.  Okay. All right. Next I'd like to turn
23   your attention to Exhibit 01.
24        A.  Yes.
25        Q.  And are these your notes from a meeting

20  (Pages 74 to 77)

15eb13da-d2c1-4023-bda4-c358c06300a

Case 0:18-cv-60482-RKA   Document 102   Entered on FLSD Docket 12/11/2018   Page 109 of 123

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

## Page 102

1  also the same diagnosis that we make. So that's not
2  uncommon that people sometimes seek a second
3  opinion. The plaintiff would know what was in his
4  mind when he chose to go to the other doctor. We
5  didn't recommend that the plaintiff go and see
6  somebody else, if that's what you're thinking.
7      Q.  Can you read back his statement earlier in
8  the deposition where he says -- I can pull it up
9  exactly for you.
10      (Whereupon, the requested testimony was
11      read back by the court reporter.)
12      THE WITNESS:  That's true.  What's the
13  problem?  Not with a doctor in the USA.  We
14  recommended assessment, which was started in
15  our counseling center.
16  BY MR. AWODIYA:
17      Q.  So wouldn't it make the U.S. doctors the
18  second opinion?
19      A.  I don't know anything about U.S. doctor.
20  That statement that you just read is that we
21  started -- recommended that -- based on my seeing
22  your ADHD symptoms, we started the process in
23  Dominica, which was done.  You had the -- the
24  plaintiff had the Conners done.  There was no
25  recommendation for going to see another doctor in

## Page 103

1  the USA.
2      Having said that, we don't say no either.
3  It's good.  It was good.  It was done and the
4  diagnosis was made by two psychiatrists.  Wonderful.
5  So there's no doubt that there is an ADHD diagnosis,
6  which should have -- that's it.  Which was treated
7  by me in Dominica.
8      Q.  Perfect.  Perfect.
9      A.  Yes.  I agree.
10      MR. AWODIYA:  I don't have anything else.
11      THE COURT REPORTER:  Read or waive?
12      MR. ROMAN:  We'll read.
13      THE COURT REPORTER:  Are you ordering
14  these transcripts?
15      MR. ROMAN:  Of course.
16      THE COURT REPORTER:  How do you want it?
17      MR. ROMAN:  I think we'll just do a
18  regular order.  I'll let you know if that
19  changes.
20      (Deposition concluded at 4:01 p.m.)



1      CERTIFICATE OF OATH
2
   STATE OF FLORIDA  )
3
   COUNTY OF BROWARD  )
4
5      I, the undersigned authority, certify that
   DAVENDRANAND SHARMA personally appeared before me
   and was duly sworn.
6      WITNESS my hand and official seal this
   29th day of October, 2018.
7
8
9      KELLY A. ESPOSITO
       Notary Public, State of Florida
10      My Commission No. GG248978
       Expires: 9/3/2022
11  + + + + + + + + + + + + + + + + +
12      CERTIFICATE
13  STATE OF FLORIDA  )
   COUNTY OF BROWARD  )
14
15      I, KELLY A. ESPOSITO, do hereby certify
   that I was authorized to and did stenographically
16  report the foregoing deposition of DAVENDRANAND
   SHARMA; that a review of the transcript was
17  requested; and that the transcript is a true record
   of my stenographic notes.
18      I FURTHER CERTIFY that I am not a
   relative, employee, attorney, or counsel of any of
19  the parties, nor am I a relative or employee of any
   of the parties' attorney or counsel connected with
20  the action, nor am I financially interested in the
   action.
21      Dated this 29th day of October, 2018.
22
       Kelly A. Esposito
23      KELLY A. ESPOSITO
24
25

1      ALPHA & OMEGA REPORTING SERVICES, INC.
       1776 EAST SUNRISE BOULEVARD, FIRST FLOOR
2      FORT LAUDERDALE, FLORIDA 33304
       954.523.6422
3
   Ryan Roman, Esq.
4  1 SE 3rd AVenue, 25th Floor
   Miami, Florida 33131
5
6
   Re: Oluwamuyiwa Awodiya v. Ross University School of
7  Medicine
   Case No. 0:18-cv-60482-KMM
8
9
10  Mr. Roman:
11      Enclosed please find your copy of the
   deposition of Oluwamuyiwa Awodiya, which was taken
12  on October 16, 2018, in the above-entitled case.
   Also attached are forms of Affidavit and an Errata
13  Sheet to be completed by the deponent when reading
   your copy of the deposition. These forms are
14  self-explanatory.
15      After the deponent has completed these
   forms, please return them to me at the above address
16  for inclusion in the original transcript.
17      Thank you for your cooperation,
18
19
20      Kelly A. Esposito
       Kelly A. Esposito
21
22
23
24
25

27  (Pages 102 to 105)

# <u>Exhibit SJ-22</u>

(Excerpts of Bryan Hayse's deposition transcript)

Page 1

1              UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF FLORIDA

3

4   OLUWAMUYIWA AWODIYA,

5            Plaintiff

6   vs.                          CASE NO.
                                 0:18-cv-60482-KMM

7   ROSS UNIVERSITY SCHOOL OF

    MEDICINE, SCHOOL OF

8   VETERINARY MEDICINE LIMITED,

9            Defendant.

10

    ``````````````````````````````

11

12

13        VIDEO-CONFERENCED DEPOSITION OF

14                 BRYAN HAYSE

15

16              NOVEMBER 5, 2018

17                 3:07 P.M.

18

19        ROSS UNIVERSITY SCOOL OF MEDICINE

20            KNOXVILLE, TENNESSEE

21

22

23

24        Deborah West, LCR-314 (TN), CLR

25

Page 2

1   APPEARANCES OF COUNSEL
2 (Teleconference Appearance)
3 On behalf of the Plaintiff:
4    PRO SE
     Oluwamuyiwa Awodiya
5    15005 Dahlia Drive
     Bowie, Maryland  20721
6
   On behalf of the Defendants:
7
     Ryan Roman, Esquire
8    Akerman LLP
     Three Brickell City Centre
9    98 Southeast Seventh Street
     Miami, Florida  33131
10   ryan.roman@akerman.com
11 On behalf of Adtalem Global Education:
12   Valarie Bomar
     VP, Senior Associate General Counsel
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1       INDEX OF EXAMINATION
2                          Page
3 WITNESS: BRYAN HAYSE
4 Examination
5 By Mr. Awodiya              5
6 By Mr. Roman               37
7
8
9
10       INDEX TO EXHIBITS
11                         Page
12 Exhibit Number 1,
       Student handbook 2015-2016      39
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1           STIPULATION
2       The deposition of BRYAN HAYSE, called as a
3 witness by the Plaintiff, pursuant to all
4 applicable rules on the 5th day of November, 2018,
5 at the offices of Ross University School of
6 Medicine, Knoxville, Tennessee, before Deborah
7 West, Licensed Court Reporter and Notary Public in
8 and for the State of Tennessee.
9       It being agreed that Deborah West, a Tennessee
10 Licensed Court Reporter may report the deposition
11 in machine shorthand, afterwards reducing the same
12 to typewritten form.
13      It being further agreed that all formalities
14 as to notice, caption, certificate, transmission,
15 et cetera, are expressly waived, EXCLUDING the
16 reading of the completed deposition by the witness,
17 and the signature of the witness.
18
19
20
21
22
23
24
25

Page 5

1 (3:07 P.M.)
2           BRYAN HAYSE,
3 having been first duly sworn, was examined and
4 testified as follows:
5           EXAMINATION
6 BY MR. AWODIYA:
7     Q    Please state your name for the
8 record.
9     A    Christopher Bryan Hayse.
10    Q    Dr. Hayse, my name is Oluwamuyiwa
11 Awodiya and I am the plaintiff in this case against
12 Ross University School of Medicine.
13         During this deposition I will in
14 most part refer to myself as plaintiff.  For the
15 record, do you understand that if I say plaintiff
16 that I am referring to myself?
17    A    I do.
18    Q    Additionally, let me tell you some
19 ground rules for the deposition and if you have any
20 questions, you can ask me.
21         First, you are under oath and have
22 sworn to tell the truth.  The effect of that oath
23 is the same as if you were testifying in court.
24         If I ask you a question that you
25 don't understand, tell me you don't understand it

2 (Pages 2 - 5)

Page 6

1 and I will rephrase it as often as necessary so
2 you're comfortable that you understand the question
3 you're answering. It's also very important that
4 you answer my questions through spoken word, not
5 through facial expressions or gestures.
6        Please refrain from answering
7 questions with sounds like uh-huh or uh-huh or
8 words that may not get transcribed accurately. You
9 must actually say a word. If you mean yes, say
10 yes, not uh-huh.
11        Also, please allow any questions and
12 objections to be fully stated before you speak.
13 The court reporter cannot take down more than one
14 person speaking at the same time. Otherwise, the
15 record will be jumbled and the questions and
16 answers will be disjointed.
17        Ross lawyers may make objections to
18 questions that I ask you. They are objections for
19 the judge to consider later. You are still
20 required to answer the question unless they
21 instruct you not to.
22        Everything that is said is being
23 taken down by the court reporter verbatim. You
24 will have an opportunity to read the deposition
25 transcript and make corrections you believe are

Page 7

1 necessary.
2        If you make changes in your
3 testimony that are inconsistent with the answers
4 given during the deposition, I will be entitled to
5 comment on those discrepancies at trial to question
6 your truthfulness.
7        Do not guess when providing your
8 responses. Instead, please provide your best
9 estimate based on your recollection. If you need
10 to take a break at any time, please let me know.
11 All I ask is we not take a break while there is a
12 question pending.
13        Are you here today under the
14 influence of any medication or suffering from any
15 physical, mental, or emotional condition that would
16 affect your ability to hear my questions or to give
17 truthful answers?
18    A    I am not.
19    Q    When did you first hear about this
20 lawsuit?
21    A    Earlier this semester. I don't know
22 that I can recall a specific date.
23    Q    When did this semester start?
24    A    In September.
25    Q    Do you remember ever seeing

Page 8

1 plaintiff in December of 2015?
2    A    I do.
3    Q    Can you tell me about your encounter
4 with him?
5    A    I can. I vaguely remember meeting
6 with plaintiff, and I don't recall what the meeting
7 was about. Since the lawsuit has come to my
8 attention, I was shown documents that were from
9 Mr. Cuffy referring to mine and your, plaintiff's
10 meeting, which jogged my memory from it.
11        So that's all I remember from this
12 meeting. I don't remember specifics. I remember
13 meeting after December, but I don't remember the
14 specifics of the December meeting.
15    Q    You said the document has jogged
16 your memory. Do you know what it caused you to
17 remember?
18    A    Only that my memory that you and I
19 met in January was inaccurate and that you and I
20 had met previously in December.
21    Q    What is your position at Ross
22 University?
23    A    I am currently the Associate Dean
24 for Medical Science Student Affairs.
25    Q    As part of that position, have you

Page 9

1 ever handled accommodations?
2    A    Rephrase.
3    Q    Have you ever played any role in a
4 student getting academic accommodations?
5    A    Yes is the quick answer.
6    Q    Can you describe it to me?
7    A    Yes. For the most part in the
8 process I am -- Mr. Stewart-Fulton, who I believe
9 you spoke with previously, is the chief officer
10 over accommodations for the Medical Sciences for
11 the first five semesters.
12        In my role I supervise
13 Mr. Stewart-Fulton, so he and I have conversations
14 about pending applications as he has questions
15 about them or just to get typical updates as a
16 supervisor would, as well as within the process I
17 oversee, if anybody appeals an accommodation that
18 he has made, I would be the one that would review
19 the appeal of that person.
20    Q    Is Mr. Stewart-Fulton required to
21 comply with Title III of the Americans with
22 Disability Act?
23        MR. ROMAN: I would object to the
24        extent it calls for a legal conclusion,
25        but you're welcome to answer the

3 (Pages 6 - 9)

Page 10

1    question.
2        THE WITNESS: Yeah. I would say as
3    far as the ADA is concerned, you know, we
4    comply with, and our policies are built
5    around having accommodations made for the
6    USMLE and around the USMLE processes and
7    policies.
8        Because at the end of the day we
9    want to make sure our students have
10   proper documentation to be at the best
11   stage to get accommodations from USMLE
12   when they get to step one and beyond.
13       Although what we do does not
14   determine that necessarily. So I would
15   say that what we do is uses ADA as
16   guideline, but we are not necessarily
17   beholden to.
18 BY MR. AWODIYA:
19       Q    Do you know if it's required to
20 comply with Section 504 of the Rehabilitation Act?
21       MR. ROMAN: Same objection, but you
22   can answer.
23       THE WITNESS: Is that the same
24   question?
25

Page 11

1 BY MR. AWODIYA:
2        Q    No. Section 504 of the
3 Rehabilitation Act is a different law than Title
4 III.
5        A    Yes, I apologize. Same answer to
6 the previous question. I apologize, I missed that
7 piece.
8        Q    Do you know if Ross is required to
9 comply with any U.S. laws in Dominica?
10       MR. ROMAN: Same objection. It
11   calls for a legal conclusion. You can
12   answer if you know.
13       THE WITNESS: I would say I will
14   refrain from answering because that is a
15   very wide-open question.
16 BY MR. AWODIYA:
17       Q    Are you aware of any contract
18 between Ross University in the United States that
19 states that they must comply with U.S. laws, some
20 U.S. laws in Dominica?
21       A    I am not aware of any such contract.
22       Q    If a violation to the Americans with
23 Disability Act occurred, could the student -- is
24 there any authority outside of Ross that the
25 student could go to?

Page 12

1        A    I am unsure. I would have to refer
2 to our legal counsel to ask that question if it
3 were to.
4        Q    Do you know -- like, do you -- has
5 anyone, not on a legal matter, more so as to a
6 procedure matter, is there a procedure for students
7 to report discrimination?
8        A    Yes. So to report discrimination, a
9 student would contact our office and we would refer
10 them to our Title III coordinator or a manager of a
11 person, depending on what the allegations were.
12       Q    Is RUSM required to comply with
13 Title IX in Dominica?
14       MR. ROMAN: Same objection. It
15   calls for a legal conclusion. You can
16   answer if you know.
17       THE WITNESS: I would seek counsel's
18   advice in compliance of the question, but
19   by the spirit of it we tried to abide by
20   it.
21 BY MR. AWODIYA:
22       Q    Okay. Just state for the record,
23 Ross lawyers are not -- their objections are not
24 advice. Their objections are for the judge to
25 consider later. Unless they ask you not to answer

Page 13

1 a question, you can go ahead and answer a question.
2        A    Uh-huh.
3        MR. ROMAN: Just to respond for the
4    record, I think Dr. Hayse did answer that
5    question. It's just that his answer is
6    he would talk to Ross lawyers. I don't
7    think he was talking about me.
8        THE WITNESS: Correct. That is
9    correct. So we have a relationship with
10   our legal team. So anything that comes
11   to us that might be a legal matter, I
12   always refer to them to ask advice before
13   responding because I don't have a legal
14   background.
15       So I want to make sure that the
16   advice I give to a student or anybody
17   coming forward that I give the correct
18   advice to get them through the process
19   for whatever reason.
20 BY MR. AWODIYA:
21       Q    I see. For the record, I
22 wasn't saying that you weren't answering. It was
23 more about the advice part.
24       Let me clarify a little bit about
25 the legal situation. When I asked if they are

4 (Pages 10 - 13)

Page 14

1  required to comply, I mean does Ross require their
2  employees to comply, not if they're legally
3  required to comply.  I am asking if Ross, the
4  entity, requires their employees to comply with the
5  American with Disability Act.
6      A    I am not sure I understand the
7  question.
8      Q    It was a little long.  Let me make
9  it shorter.
10     A    Yeah.
11     Q    Does Ross University itself require
12 its employees and faculties to comply with Title
13 III of the American with Disability Act in
14 Dominica?
15     A    Not to my knowledge.
16     Q    Is that also correct for Section 504
17 of the Rehabilitation Act?
18     A    That is correct.
19     Q    Okay.  I am not going to keep you
20 long, because there's not much -- it's just I want
21 to go to the counseling documents just to see if we
22 can jog your memory a little bit about our
23 interaction.
24         Counsel, can you hand Dr. Hayse both
25 the counseling documents, the one labeled RUSM

Page 15

1  000141 and 144?
2          MR. ROMAN:  Yes.  We can use the
3      same composite exhibit called Fulton 1
4      which has those two pages as the first
5      two pages of the exhibit.
6  BY MR. AWODIYA:
7      Q    Okay.  Dr. Hayse, do you see in this
8  document where it says, "Client returned to office
9  after talking to Dr. Hayse"?
10     A    I do.
11     Q    "And student affairs regarding his
12 academic situation"?
13     A    I do.
14     Q    Do you remember what the academic
15 situation was?
16     A    Unfortunately, I don't.
17     Q    Do you know why plaintiff would have
18 been disappointed after he left your office?
19     A    I do not.
20     Q    Did plaintiff tell you that he was
21 having some type of attention problem?
22     A    I don't recall.
23     Q    Same document.  It says that
24 Mr. Cuffy received an email from you requesting
25 that you talk at some point about the plaintiff.

Page 16

1          Do you remember why you sent that
2  email to Mr. Cuffy?
3      A    No, unfortunately I do not remember.
4      Q    Do you remember if you and Mr. Cuffy
5  followed up after this email?
6      A    I do not remember.
7      Q    Would you have only sent that email
8  at the request of the student?
9      A    No.
10     Q    Is there any possible reason why you
11 would send an email to Mr. Cuffy regarding a
12 student?
13     A    Typically if I reach out to
14 counseling or Mr. Cuffy, in this case, it would be
15 if I referred a student to counseling, would be one
16 reason, or if counseling had asked me to see
17 somebody or had, I guess, opened the door to a
18 meeting with a student beforehand.
19         So that would be two examples of why
20 I would have reached back out, either to say I have
21 seen the student at your direction or to say I have
22 met with the student you have asked me to speak
23 with.
24     Q    I don't know if Ross has one of the
25 documents, but I think they can fact check.  In one

Page 17

1  of the counseling documents, Dr. Sharma states that
2  plaintiff wanted to see you because of his grade
3  for our encounter in December of 2015.
4          Does that job your memory?
5      A    It does not.
6      Q    Do you have any reasons specific to
7  grades and academic situations as to why you would
8  send an email to the counseling center?
9      A    I do not have any specific criteria
10 for that, no.
11     Q    Would you be able to speak to
12 Mr. Cuffy about a student without a release of
13 information form?
14     A    I would.  I could speak to him.  He
15 might not be able to speak to me.
16     Q    So having a discussion about a
17 student, a release of information agreement would
18 need to be signed?
19     A    No.  From my side, a student is
20 protected under FERPA on my side going by that.  So
21 if I were to discuss a student that I had a meeting
22 with a counsel or anybody else with a need-to-know
23 basis, that I could do.
24         However, within counseling there is
25 much stricter guidelines that counselors go by.  So

5 (Pages 14 - 17)

Page 18

1 Cuffy would have to have that release of
2 information to discuss detailed information with
3 me.
4      Q   Okay.  So the answer was a little
5 long.  Can you let me ask you this:  Is there any
6 topic you can talk about with the counseling center
7 about a plaintiff -- I mean, about a student?
8      A   Yes.
9      Q   Without a release of information
10 agreement?  Sorry, that was my fault.
11      A   That's okay.  I cut you off.  Yes, I
12 could talk to them about anything that I feel is
13 appropriate that's relevant to their duties as a
14 counselor or their duties within RUSM.
15      Q   Can you give me examples of this
16 duty?
17      A   Yeah.  So if a student -- if I were
18 to meet with a student about, let's say, grades,
19 you mentioned grades earlier, a concern about
20 grades, I could reach out to, depending on what the
21 specific concern was or why a student was
22 struggling, I might reach out to counseling, a
23 counselor, or the counseling office in general, and
24 say I met with this student and they are struggling
25 because of grades and mentioned these things, I

Page 19

1 think it would be good for you to reach out to them
2 and have a conversation with them.
3          I might also reach out to the Center
4 for Teaching and Learning, to the director there or
5 one of the faculty in the Center for Teaching and
6 Learning, and say the same thing.
7          If a student is struggling with
8 grades, they mention biochemistry or a lack of
9 being able to study, this might be a topic of
10 conversation I have with that student.  Because I
11 felt that it would be educationally relevant to
12 reach out to them.
13          Where it is not appropriate is if I
14 just reach out to somebody just to tell them
15 something that wasn't relevant to their job
16 necessarily.
17      Q   I understand.  So that would make
18 sense.  I understand what you mean by duty.  But
19 why would you ask him to contact you?  If it was
20 about his duty, is it safe to say you would have
21 put it in the email going to him more as like a
22 one-way communication?
23      A   It's hard to tell what I was
24 thinking that long ago.  It might be that I was
25 busy and knew I needed to connect and knew it would

Page 20

1 be quicker to have the conversation over the phone.
2 There are a number of reasons that I might have
3 said contact me to talk more about this.
4      Q   Is there anything that you think
5 would jog your memory even more?
6      A   I don't believe so, outside of a
7 recording of our conversation.
8      Q   From these two documents, it seems
9 that plaintiff saw you more than once.  Do you know
10 why he might have gone to the counseling center and
11 then saw you again and then gone back to the
12 counseling center?
13      A   I do not.
14      Q   Do you know who Mr. Didier is?
15      A   Spell it.
16      Q   It's on the first document right
17 next to Dr. Sharma engaged Mr. Didier?
18      A   Mr. Didier.
19      Q   Who is he?
20      A   He's the campus executive for the
21 then Dominica campus.
22      Q   Does he still work with RUSM?
23      A   He does.
24      Q   Is there any reason why his name is
25 not listed on the faculty website of Ross?

Page 21

1      A   I don't have an answer to that.
2      Q   Does he handle academic
3 accommodations?
4      A   He does not.
5      Q   Does he handle medical leaves?
6      A   He does not.
7      Q   So what does he do?
8      A   He oversees the operational aspects
9 of the Dominica campus.  So he has security reports
10 in to him, finance and accounting reports in to
11 him, the gym ultimately reports in to him,
12 housekeeping reports in to him.  Maintenance
13 reports in to him.
14          There is probably an area -- oh,
15 supply chain reports in to him.  There is probably
16 an area I am forgetting.  But mostly the
17 operational aspects of the institution.
18      Q   Okay.  Can you -- you said earlier
19 that you supervised Mr. Stewart-Fulton?
20      A   Correct.
21      Q   Can you tell me a little bit about
22 the academic accommodations process?
23      A   Certainly.  So any student who comes
24 to our office seeking academic accommodations,
25 anybody in our office refers that student to speak

6 (Pages 18 - 21)

Page 22

1  with Mr. Stewart-Fulton to get more details and to
2  get the application to do so and talk through the
3  requirements.
4          And then once those documents are
5  turned in, anything that has been asked for,
6  whether it is documentation from a physician or a
7  narrative from the student, et cetera, that is then
8  reviewed by Mr. Stewart-Fulton as well as other
9  accommodations colleagues within the organization.
10          And then a decision is made and then
11 given to the student, or if other documentation is
12 needed or questions were had, that he would
13 facilitate that process. And he also reaches out
14 to any faculty members who oversee areas wherein a
15 student would receive those accommodations.
16          So, for instance, if a student were
17 to get extra time for an exam, Mr. Stewart-Fulton
18 would reach out to Dr. Paul Abney and the exam
19 center staff to let them know.
20          COURT REPORTER: I lost you.
21          THE WITNESS: Those who oversee the
22          exam center and let them know that an
23          accommodation has been approved. And so
24          the student would start -- and the date
25          in which that student would start

Page 23

1          receiving that accommodation, as an
2          example.
3  BY MR. AWODIYA:
4          Q    When you said "come to our office,"
5  who do you mean "our"?
6          A    Thank you. Yes. So the student
7  affairs office. So still kind of referring to
8  Dominica -- because that's the last time we had an
9  actual office with everybody there -- walk into
10 student affairs.
11          There is a receptionist there. Or
12 any time that somebody is speaking to me as an
13 academic adviser, the chief of student affairs
14 office are there, or just talking to anybody else
15 in that division, if somebody happens to come up
16 about -- if a student asks about academic
17 accommodations, that might be an orientation
18 session or a one-or-one conversation, we would
19 refer then to Mr. Stewart-Fulton given his
20 expertise in that area that the rest of us don't
21 necessarily have.
22          Q    Have you ever at any point in your
23 position at Ross been responsible for making the
24 final decision on academic accommodations?
25          A    When I first arrived, the process

Page 24

1  was laid out where the conduct -- the academic
2  accommodations coordinator would make
3  recommendations to the associate dean, which would
4  be me. And then that policy was changed at some
5  point in the 2016 early academic year, I don't
6  remember exactly when that change was made.
7          So prior to that change, the
8  referral would come to me for the final decision.
9  And then I would review that, that accommodation
10 with Mr. Stewart-Fulton and sign off on. And then
11 since that time, it has been moved to where
12 Mr. Stewart-Fulton along with Ms. Jeanie Robertson,
13 who also oversees the accommodations for the
14 clinical side, the two then work in collaboration
15 to make any type of decisions regarding academic
16 accommodations.
17          Q    That was a very thorough answer. I
18 want to make sure I don't forget anything. So the
19 policies, where were the policies located for
20 academic accommodations?
21          A    In the student handbook as well as
22 the academic catalog.
23          Q    Does RUSM deny oral requests for
24 academic accommodations?
25          A    All academic accommodations must be

Page 25

1  in written form.
2          Q    Can a student's family member write
3  the request for academic accommodations on behalf
4  of the student?
5          A    I have never been asked that
6  question, and my initial answer would be no to
7  that.
8          Q    Do you have a reason for that being
9  your initial answer?
10          A    Yeah. I have not thought about that
11 before. I would say that no, it would have to come
12 from the student. But like I say, I never have
13 been asked that before so I have not put much
14 thought into it.
15          But I would say at this point my
16 answer would be no, it would have to come directly
17 from the student.
18          Q    Policy-wise is there anything
19 preventing somebody's family member from requesting
20 academic accommodations for a student?
21          A    Again, I have not been asked. I
22 would have to review the policy to see if we have
23 anything specific pertaining to that. I will add
24 to that, I can't think of any other example where a
25 student's family member or anybody other than the

7 (Pages 22 - 25)

Page 41

1                    REPORTER CERTIFICATE

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4        I, Deborah West, Licensed Court Reporter, LCR

5    #314, in and for the State of Tennessee, do hereby

6    certify that the deposition of Bryan Hayse, was

7    reported by me and that the foregoing transcript,

8    pages 1 through 41, inclusive, is a true and

9    accurate record to the best of my knowledge, skills

10   and ability.

11            I further certify that I am not related

12   to, nor an employee or counsel of any of the

13   parties to the action as defined under T.C.A

14   Section 24-9-136, nor am I financially interested

15   in the outcome of this case.

16        In witness thereof, I have hereunto set my

17   hand on this the 17th day of November, 2018.  The

18   witness HAS NOT waived signature.

19

20

21                    *Deborah P West*

22                    _____

                      Deborah West, LCR 314 TN

23                    Expiration:  6/30/2020

24

25

# <u>Exhibit SJ-23</u>

(Excerpts of Matthew Stewart-Fulton's deposition transcript)

Page 1

1              UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF FLORIDA

3

4   OLUWAMUYIWA AWODIYA,

5          Plaintiff

6   vs.                          CASE NO.
                                 0:18-cv-60482-KMM

7   ROSS UNIVERSITY SCHOOL OF

    MEDICINE, SCHOOL OF

8   VETERINARY MEDICINE LIMITED,

9          Defendant.

10

    `````````````````````````````

11

12

13         VIDEO-CONFERENCED DEPOSITION OF

14              MATTHEW STEWART-FULTON

15

16              NOVEMBER 5, 2018

17                 1:06 P.M.

18

19         ROSS UNIVERSITY SCOOL OF MEDICINE

20              KNOXVILLE, TENNESSEE

21

22

23

24         Deborah West, LCR-314 (TN), CLR

25

Page 2

```
 1        APPEARANCES OF COUNSEL
 2  (Teleconference Appearance)
 3  On behalf of the Plaintiff:
 4     PRO SE
        Oluwamuyiwa Awodiya
 5     15005 Dahlia Drive
        Bowie, Maryland 20721
 6
     On behalf of the Defendants:
 7
        Ryan Roman, Esquire
 8     Akerman LLP
        Three Brickell City Centre
 9     98 Southeast Seventh Street
        Miami, Florida 33131
10     ryan.roman@akerman.com
11  On behalf of Adtalem Global Education:
12     Valarie Bomar
        VP, Senior Associate General Counsel
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1         INDEX OF EXAMINATION
 2                        Page
 3  WITNESS: MATTHEW STEWART-FULTON
 4  Examination
 5  By Mr. Awodiya            5, 40
 6  By Mr. Roman              36
 7
 8
 9
10
11        INDEX TO EXHIBITS
12                        Page
13  Exhibit Number 1
        Bates RUSM 141, 142, 183, 242-243,
14      326, 371-372          36
15  Exhibit Number 2
        Bates RUSM 179-182     37
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1             STIPULATION
 2        The deposition of MATTHEW STEWART-FULTON,
 3  called as a witness by the Plaintiff, pursuant to
 4  all applicable rules on the 5th day of November,
 5  2018, at the offices of Ross University School of
 6  Medicine, Knoxville, Tennessee, before Deborah
 7  West, Licensed Court Reporter and Notary Public in
 8  and for the State of Tennessee.
 9        It being agreed that Deborah West, a Tennessee
10  Licensed Court Reporter may report the deposition
11  in machine shorthand, afterwards reducing the same
12  to typewritten form.
13        It being further agreed that all formalities
14  as to notice, caption, certificate, transmission,
15  et cetera, are expressly waived, EXCLUDING the
16  reading of the completed deposition by the witness,
17  and the signature of the witness.
18
19
20
21
22
23
24
25
```

Page 5

```
 1  (1:06 P.M.)
 2           MATTHEW STEWART-FULTON,
 3  called as a witness and having been first duly
 4  sworn, was examined and testified as follows:
 5            EXAMINATION
 6  BY MR. AWODIYA:
 7      Q    Please state your full name for the
 8  record.
 9      A    Matthew John Stewart-Fulton.
10      Q    May I call you Mr. Fulton or what
11  would you prefer to be called?
12      A    Please call me Matthew.
13      Q    Matthew. Okay. Matthew, my name is
14  Oluwamuyiwa Awodiya, and I am the plaintiff in this
15  case against Ross University School of Medicine.
16        During this deposition I will, in
17  most part, refer to myself as plaintiff. For the
18  record, do you understand that if I say plaintiff
19  that I am referring to myself?
20      A    I do.
21      Q    Additionally, let me tell you some
22  ground rules for this deposition and if you have
23  any questions you can ask me.
24        First, you are under oath and have
25  sworn to tell the truth. The effect of that truth
```

2 (Pages 2 - 5)

Page 30

1 documentation from that student's record with the
2 counseling center.
3     Q    How do you personally know that?
4     A    Because that is what the counseling
5 center advised me when I took on this role.
6     Q    Can that process occur before the
7 student actually comes to you and submits another
8 request for academic accommodations?
9     A    I don't understand what you mean by
10 another request in relation to the information
11 release.
12     Q    If the student first requests that
13 the counseling center send the documentation -- let
14 me rephrase.
15         Can the student have the
16 documentation sent over to the accommodations
17 coordinator before the student goes to the
18 accommodations coordinator to ask for a request?
19     A    Yes, they can.
20     Q    Okay.  Were you contacted on behalf
21 of plaintiffs by the counseling center at any
22 point?
23     A    Not to my recollection.
24     Q    Would you remember if you were?
25     A    It's possible.  But I don't remember

Page 31

1 all the contacts that I have had from the
2 counseling center.
3     Q    So is it correct that you can
4 neither confirm nor deny whether you received
5 communication from the counseling center on behalf
6 of plaintiff?
7     A    I do not have in my records any
8 documentation from the counseling center regarding
9 the plaintiff.
10     Q    What about phone calls?
11     A    I don't recall if I had any phone
12 calls with the counseling center about the
13 plaintiff.
14     Q    Is faculty at RUSM required to
15 comply with Title III of the Americans with
16 Disabilities Act?
17     A    Are you referring to the ADA?
18     Q    Yes.
19     A    No.
20     Q    Are they required to comply with
21 Section 504 of the Rehabilitation Act?
22         MR. ROMAN:  I will object to this
23     and the last question to the extent it
24     calls for a legal conclusion.  If the
25     witness can answer, he may do so.

Page 32

1         THE WITNESS:  In reference to when
2     you were enrolled and the campus was
3     located on Dominica, we were not required
4     to comply with the ADA.  Although in the
5     interest of supporting our students, we
6     abided by the spirit of the ADA and
7     Section 504 of the Rehabilitation Act to
8     provide appropriate accommodations within
9     the process that was defined in the
10     student handbook.
11 BY MR. AWODIYA:
12     Q    So just to clarify, there is no
13 policy that requires faculty to comply with those
14 laws you just stated?
15     A    That's my recollection based on
16 what's in the student handbook.
17     Q    So you, yourself, are not required
18 to comply with those laws in Dominica?
19     A    That is my understanding.
20     Q    Where did you get your knowledge
21 about what is required from Title III of the
22 Americans with Disabilities Act?
23     A    From review of the Americans with
24 Disabilities Act and Section 504 of the
25 Rehabilitation Act.  From consultation with the

Page 33

1 hiring manager who brought me into this position.
2 And consultation with, at the time, the DeVry legal
3 office.
4     Q    But they did not tell you that you
5 were required to comply with those laws?
6         MR. ROMAN:  I will object, for the
7     record, to the extent it calls for any
8     communications you had with DeVry's legal
9     counsel that would be covered by
10     attorney-client privilege and I would
11     instruct you not to answer.
12         To the extent you have spoken with
13     any of the other folks you described or
14     anyone else, you may answer the question.
15         THE WITNESS:  The answer, I think,
16     ultimately goes back to the legal office,
17     so I will not answer any further on that.
18 BY MR. AWODIYA:
19     Q    Has anyone that is not in the legal
20 office of Ross University tell you that you -- let
21 me rephrase.
22         Is it correct to say that you were
23 never told that you had to comply with those laws?
24     A    That conversation goes back to the
25 conversation with the legal office.

9 (Pages 30 - 33)

Page 55

1                    REPORTER CERTIFICATE

2     STATE OF TENNESSEE

3     COUNTY OF KNOX

4          I, Deborah West, Licensed Court Reporter, LCR

5     #314, in and for the State of Tennessee, do hereby

6     certify that the deposition of MATTHEW

7     STEWART-FULTON was reported by me and that the

8     foregoing transcript, pages 1 through 55,

9     inclusive, is a true and accurate record to the

10    best of my knowledge, skills and ability.

11              I further certify that I am not related

12    to, nor an employee or counsel of any of the

13    parties to the action as defined under T.C.A

14    Section 24-9-136, nor am I financially interested

15    in the outcome of this case.

16         In witness thereof, I have hereunto set my

17    hand on this the 17th day of November, 2018.  The

18    witness HAS NOT waived signature.

19

20

21                    *Deborah P West*

22                    _____

                      Deborah West, LCR 314 TN

23                    Expiration:  6/30/2020

24

25