# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

OLUWAMUYIWA AWODIYA,                    CASE NO. 0:18-cv-60482-KMM-AOV

      Plaintiff,

v.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

      Defendant.

_____/

## DECLARATION OF RYAN ROMAN IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Ryan Roman, declare as follows:

1.     I am a partner with the law firm of Akerman LLP, which represents Defendant Ross University School of Medicine, School of Veterinary Medicine Limited ("RUSM") in this matter.

2.     I have personal knowledge of the facts set forth herein and if called as a witness, I could and would competently testify thereto.

3.     I submit this declaration in support of RUSM's Opposition to Plaintiff's Second Motion for Partial Summary Judgment [ECF No. 102].

4.     Attached hereto as Exhibit 1 are excerpts from the Deposition Transcript of Oluwamuyiwa Awodiya, dated December 5, 2018.

5.     Attached hereto as Exhibit 2 is a true and correct copy of Plaintiff's Amended Responses and Objections to Defendant's First Set of Interrogatories.

6.     Attached hereto as Exhibit 3 are excerpts from the Deposition Transcript of Dr. Davendranand Sharma, October 16, 2018.

7.     Attached hereto as Exhibit 4 are excerpts from the Deposition Transcript of

McMillian Cuffy, December 4, 2018.

8.     Attached hereto as Exhibit 5 are excerpts from the Deposition Transcript of Matthew Stewart-Fulton, dated November 5, 2018.

9.     Attached hereto as Exhibit 6 is a copy of the Safety Plan executed by Plaintiff on December 8, 2015.

10.     Attached hereto as Exhibit 7 are excerpts from the Deposition Transcript of Bryan Hayse, dated November 5, 2018.

11.     Attached hereto as Exhibit 8 is a true and correct copy of Plaintiff's transcript from Ross University School of Medicine.

12.     Attached hereto as Exhibit 9 is a true and correct copy of RUSM's Counseling Note dated October 28, 2015.

13.     Attached hereto as Exhibit 10 is a true and correct copy of RUSM's Counseling Note dated November 5, 2015.

14.     Attached hereto as Exhibit 11 is a true and correct copy of RUSM's Counseling Note dated December 8, 2015.

15.     Attached hereto as Exhibit 12 is a true and correct copy of RUSM's Counseling Note dated December 11, 2015.

16.     Attached hereto as Exhibit 13 is a true and correct copy of RUSM's Counseling Note dated December 14, 2015.

17.     Attached hereto as Exhibit 14 is a true and correct copy of RUSM's Student Handbook.

47343072;1

18.     Attached hereto as Exhibit 15 are true and correct copies of Plaintiff's COMP Exam Testing Results.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 21, 2018.

_____

Ryan Roman

47343072;1

# Exhibit 1

Page 1

1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
2
3             CASE NO. 0:18-cv-60482-KMM-AOV
4
OLUWAMUYIWA AWODIYA,
5
             Plaintiff,
6
vs.
7
ROSS UNIVERSITY SCHOOL OF
8  MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,
9
             Defendant.
10 _____/
11
12
13                          Suite 1600
                            350 East Las Olas Boulevard
14                          Fort Lauderdale, Florida  33301
                            Wednesday, 10:19 A.M.-6:23 P.M.
15                          December 5, 2018
16
17      VIDEOTAPE DEPOSITION OF OLUWAMUYIWA AWODIYA
18
19     Taken before Carla D. Smith, RPR, RMR, Notary Public
20  in and for the State of Florida at Large, pursuant to
21  Notice of taking Deposition in the above cause.
22
23
24
25

Page 20

1   wasn't hyper.  I didn't know that you could still have

2   ADHD just inattentive type.  I wasn't -- my perception

3   of ADHD was hyper little kids.  I have no idea it had

4   actually to do with concentration.  I thought it had

5   everything to do with like hyper, like too much sugar

6   type of thing.  So yeah, I still -- I don't know how to

7   describe it as well as the doctors have described it.  I

8   just say regular things that just affect me and they

9   just come to whatever conclusion that they come to.

10       Q.    And your diagnosis that you received for ADHD

11  was ADHD without mention of hyperactivity, is that

12  correct?

13       A.    That's what -- what's it called, Ross wrote.

14       Q.    And do you have any reason to question that

15  diagnosis?

16       A.    Of attention deficit disorder without mention

17  of hyperactivity?

18       Q.    Correct.

19       A.    No.

20       Q.    Has any other doctor outside of Ross made

21  that same diagnosis?

22       A.    They put ADHD.  They didn't spell it out.

23       Q.    And which doctor was that?

24       A.    Dr. Mauricio.

25       Q.    With regards to the OCD diagnosis, were you

1    ever diagnosed with OCD prior to let's say January 1,

2    2016?

3        A.    Was I diagnosed prior to January 1st, 2016?

4        Q.    Correct.

5        A.    I think I wasn't diagnosed until 2017.

6        Q.    So let's take January 1, 2017 just as a date

7    to say before January 1, 2017, had you ever been

8    diagnosed with OCD?

9        A.    Before January 1st, 2017?

10       Q.    Correct.

11       A.    I think I was diagnosed with OCD at the

12   beginning of 2017 so...

13       Q.    That was the first time you received an OCD

14   diagnosis, correct?

15       A.    Yeah.  I haven't received -- first time I saw

16   anyone for any mental health type of problems was in

17   December 2015.  Prior to that, I had no concept of

18   mental health problems.  I had no -- my knowledge was

19   just like a typical public from what you see on TV.  I

20   never -- never knew this whole world of stuff kind of

21   was out there.  So yeah, no, I didn't --

22            Wait, what was the question?

23       Q.    Whether you had been diagnosed with OCD prior

24   to January 1 of 2017?

25       A.    I think --I think yeah.  I think one of the

Page 39

1    I think.  Yeah, I took some PG classes and then began my

2    freshman -- what I consider my freshman year at Morgan.

3    I don't know credit wise I think I was like a late

4    freshman type because I came in with some other grades.

5          Q.    When you say PG, that's Prince George

6    Community College?

7          A.    Yes.

8          Q.    You graduated Morgan State in three years,

9    right?

10         A.    Yes.

11         Q.    When you were at Morgan State, did you ever

12   receive any extra testing time so you could finish

13   exams?

14         A.    Officially or unofficially?

15         Q.    Either way.

16         A.    Either way?  Yes.

17         Q.    Do you recall in what courses?

18         A.    It would be random.  There is no like set

19   subject it would happen.  It would happen in anything;

20   biology, chemistry, math, English.  I really struggled

21   in classes that are very word based.  Yeah, word-based

22   classes.  What am I saying word based?

23         Classes that require you to read a lot of

24   like books and stuff in preparation for a test.  Those

25   classes I kind of had to get really creative because

```
 1    student there.
 2          Q.    What's a student portal?
 3          A.    What's a student portal?
 4          Q.    Do you recall what that student portal was?
 5          A.    It had hundreds of links.  I know like once
 6    you clicked on one link it had other links, other links
 7    in there.  What I know is that we were only directed to
 8    go to student portal for video classes and that it would
 9    like also connect us to our like -- I think WebSys that
10    they call it?  What does Ross call it, My Ross or
11    something like that.  It will like have links and it
12    will contain log-ins for us so that we would only need
13    like one log-in and then it would log us in to like
14    other websites.
15          Q.    And were you familiar with the student
16    handbook?
17          A.    With the student handbook; which one?
18          Q.    Ross' student handbook that was in existence
19    in -- at the time you were -- let's say December 2015?
20          A.    What do you mean "familiar"?
21          Q.    Had you seen the student handbook at that
22    time?
23          A.    I've seen it at some point.
24          Q.    Did you see it before December 2015?
25          A.    Probably when I like first -- yeah, I might
```

Page 81

1    have -- I might have -- I might have looked into it when

2    I was first a student there.  So I don't --

3              What was the question?

4         Q.   Had you reviewed the student handbook prior

5    to December 2015?

6         A.   Reviewed the handbook prior to December -- in

7    its entirety?

8         Q.   Yes.

9         A.   In its entirety, I did not sit down there and

10   read the entire handbook.

11        Q.   What is the purpose of a student handbook as

12   far as you know?

13        A.   It's a handbook for students.

14        Q.   What information does it usually contain for

15   students?

16        A.   I don't know how many pages it is.  It must

17   be like -- it's a bunch of pages.  It contains a lot of

18   stuff in there.  It's -- I can't sit here and list

19   everything down.

20        Q.   Does it include information about request for

21   accommodations?

22        A.   Yes.

23        Q.   Had you reviewed that section prior to

24   December 2015?

25        A.   Prior to December 2015?

```
 1              THE WITNESS:  Yes.
 2   BY MR. ROMAN:
 3        Q.    After that contact from the counseling
 4   center, you went into the counseling center and met with
 5   Mr. Cuffy, correct?
 6        A.    Yes.
 7        Q.    And do you recall a safety plan that you
 8   signed with Ross University?
 9        A.    Uh-huh.
10        Q.    I'm going to show you what we'll mark as
11   Exhibit 2.
12              And is this the safety plan that you signed
13   with Ross on December 8, 2015?
14        A.    Yep.
15              (Thereupon, the document/item referred to was
16   marked for identification as Exhibit 2.)
17        Q.    And is that your handwriting in the middle?
18        A.    Yes.
19        Q.    Okay.  And is that your signature at the
20   bottom?
21        A.    Yes.
22        Q.    Was this --
23              Do you recall whether December 8th, 2015 was
24   the day you first got the call from the counseling
25   center asking you to come in?
```

Page 105

1    But it was one December assessment that Dr. Mauricio

2    did.  And then there was a diagnostic test as well that

3    I gave to the school.

4         Q.    Did Dr. Mauricio make a diagnosis of ADHD in

5    December of 2015?

6         A.    He needed -- no, he needed my --

7               In December 2015?

8         Q.    Correct.

9         A.    No, he needed my CARS to come back.  Not my

10   CARS, sorry.  He needed my Conners to come back.  So

11   that was the last diagnostic test that he wanted.  He

12   did all the other stuff, the assessment part but then he

13   wanted -- before he could confirm it I guess that's like

14   protocol.  I don't know what it is, you know, but before

15   he could ultimately confirm it, he wanted a diagnostic

16   test, diagnostic computer test done as well, which that

17   one came back right before I went back to Dominica,

18   which I was able to get -- to get to the counseling

19   center.

20        Q.    With regards to Mr. Stewart-Fulton, did you

21   meet with him?

22        A.    Yes.

23        Q.    And how many times did you meet with him?

24        A.    I think once.

25        Q.    And during that meeting, did you make any

Page 122

1              Based on your response, I can conclude then

2    that Mr. Stewart-Fulton never gave you this document,

3    correct?

4         A.    No.  Didn't know this existed.

5         Q.    And do you know whether this document was

6    contained in the student portal?

7         A.    I have no idea.  This was -- if it did exist,

8    I didn't know it existed.

9         Q.    Did anyone ever tell you about this document?

10        A.    No.

11        Q.    In this document on page 3 it asks a student

12   who is submitting this form to attach a two-page

13   personal statement describing your disability and its

14   impact on your daily life and educational functioning.

15             Did you ever submit a personal statement like

16   that to anyone in the dean of student affairs office?

17        A.    Nobody asked me to.

18        Q.    And so you never did submit anything like

19   that, correct?

20        A.    Nobody asked me to.

21        Q.    Okay.  Sorry I also want to ask that question

22   though.  So nobody asked you to.  Can I then conclude

23   from that, that you never submitted a two-page personal

24   statement?

25        A.    A two-page statement?

1    regards to getting accommodations for the step exams.

2    But the decision for step exams is by NBME.

3         Q.    You took the Step 1 exam, correct?

4         A.    Yes.

5         Q.    And you took it through Windsor University,

6    is that right?

7         A.    Correct.

8         Q.    And you passed the Step 1 exam with a score

9    of 211?

10        A.    Yes.

11        Q.    Did you get any extended testing time on the

12   Step 1 exam?

13        A.    No, I did not.

14        Q.    Did you request any extended testing time on

15   the Step 1 exam?

16        A.    No, I did not.

17        Q.    Why not?

18        A.    Because Mr. Stewart-Fulton told me that I was

19   like not -- I was not the type of person that would get

20   it.  I mean they told me no.  So I never -- again,

21   didn't think I was wronged.  Thought what he was saying

22   was valid.  After that, I just didn't suspect anything

23   else was wrong.  Like I knew I needed it but I just

24   thought that I was one of the -- I was just one of

25   the --

Page 148

```
 1   said something about --
 2        Q.    Well, I'm asking -- let me ask this.
 3              Earlier you said that until the litigation
 4   you didn't know anything about the ADA.  You were going
 5   to bring a breach of contract claim.  You didn't think
 6   about the ADA until you read something about it.
 7              Now, when it's convenient, you're saying when
 8   I applied I cared very much about the ADA.  That was one
 9   of the key statements I focused on and relied upon in
10   coming to Ross.  It just seems a little inconsistent.
11        A.    What you're saying is incorrect.
12        Q.    Okay.  Explain to me why I'm wrong.
13        A.    Pre-litigation or my preparations for
14   litigation, I didn't know what the ADA requirements,
15   obligations, the actual substance of the Americans with
16   Disability Act was.  I didn't know what I was
17   technically entitled to as a matter of law.
18              I wasn't a lawyer.  I didn't know how to look
19   up case law.  I didn't know how to look up -- to be
20   perfectly honest, I don't even -- I don't even know if
21   the normal citizens or if it's just me but I don't
22   really -- until this lawsuit I realized I didn't know
23   any laws.  I didn't know what a statute was.  I just
24   knew basic law stuff like for moral reasons like don't
25   steal and stuff like that or from like TV.
```

Page 149

```
 1            So the Americans with Disability Act I knew
 2   of it but I didn't know what -- beneath that I didn't
 3   know what was actually technically required.  I just
 4   knew that it was some type of thing that stopped
 5   discrimination from disabled people.  And that was my
 6   interpretation of it when I saw it on the website that
 7   the Americans with Disability Act will prevent
 8   discrimination against Americans.
 9        Q.    When you enrolled at Ross, did you believe
10   you were disabled in anyway?
11        A.    No.  When I enrolled, no.
12              When I enrolled in what, 2014?
13        Q.    That's correct?
14        A.    Yeah, no.  I didn't believe I was disabled.
15        Q.    Did you apply to any U.S. medical schools?
16        A.    I graduated undergrad in 2013.  Then I went
17   the rest of 2013 finished.  So I had applications and
18   everything -- no, no.  So the problem was with -- I had
19   applications and stuff done but I didn't follow -- two
20   things prevented me from going all the way around to the
21   next cycle.
22              First, I missed a previous cycle.  So I was
23   considering whether I should wait to go to the next
24   cycle because Ross had the rolling admission.  So when I
25   had graduated in 2013 in order to start the next fall
```

Page 199

1    the requirements.

2        Q.    Was there any additional classroom time

3    before taking the fifth exam?

4        A.    Yeah, I took a prep course at some point.  I

5    remember taking a prep course in something.

6        Q.    We'll mark this the next exhibit.  Sorry.

7              You can put some of those aside if you want.

8        A.    Yes.

9              (Thereupon, the document/item referred to was

10   marked for identification as Exhibit 12.)

11       Q.    I'm showing you a letter dated October 28,

12   2016 from Sandra Herrin to you.  Do you recall receiving

13   this letter?

14       A.    I think so.

15       Q.    And you were --

16             You were dismissed after the fourth attempt

17   to take the CBSE exam, correct?

18       A.    I guess you would call it a tentative

19   dismissal or --

20       Q.    Well, you appealed, right, and then you were

21   readmitted?

22       A.    Uh-huh.

23       Q.    Okay.  So ultimately you were readmitted

24   after this but it appears, according to the letter, they

25   reference a dismissal for failure to pass the NBME CBSE

1    in four consecutive attempts.

2            Do you see that?

3        A.   Yes.  I'm sorry, you asked me if --

4        Q.   If this was the dismissal for failing to past

5    the CBSE exam in four consecutive attempts, right?

6        A.   Yes.

7        Q.   Okay.  And then I'm going to show you next

8    what we'll mark as Exhibit 13.  And this appears to be

9    an appeal that you submitted.  I'll just ask you to take

10   a look and tell me if that's what this document is?

11       A.   Correct.

12            (Thereupon, the document/item referred to was

13   marked for identification as Exhibit 13.)

14       Q.   Okay.  And it says under "Reason for Appeal"

15   on the first page.  It says "Failure to pass the

16   NBME" -- I'm sorry.

17            It says "Check the reasons you were

18   dismissed:"  And that says "Failure to pass the NBME

19   CBSE in three or more attempts", correct?

20       A.   Correct.

21       Q.   And when we turn to your statement, your

22   statement talks about financial stress or financial

23   issues that you are experiencing at that time, is that

24   correct?

25       A.   The document says that.

1    stuff.  This is the only thing that would kind of make

2    this make sense as to why I was doing so many things.

3         Q.    There is no reference to ADHD in this, right?

4         A.    No, there is not.

5         Q.    And there is no mention of needing additional

6    testing time, right?

7         A.    No, because I didn't know that this was an

8    ADHD thing.  But now looking at it, it had to -- I

9    didn't know that this behavior was because of ADHD.

10   This is -- this is classic -- not only was I driving, I

11   was still studying and I put a tablet in my car to study

12   while I drive.  That's just too much going on.  It's --

13   it's -- that's just not concentrating on something.

14        Q.    All right.  Your appeal to be reinstated to

15   Ross after the failing the fourth time was granted,

16   right?  You were permitted to re-enroll at Ross?

17        A.    Yes.

18        Q.    And you were permitted to take the CBSE exam

19   for a fifth attempt, correct?

20        A.    Yes.

21        Q.    Do you recall you mentioned that there was

22   some sort of a review course that you took.

23              Do you recall a six-week review course?

24        A.    I'm sorry.  Can you repeat that?

25        Q.    Do you recall a six-week review course that

Page 207

1    you took prior to the fifth attempt?

2         A.    Vaguely.  I remember -- vaguely.  I remember

3    certain events around that time.  I definitely enrolled

4    and paid for a class, a review course.  I think that was

5    one of the conditions or something like that.  I think

6    it was Becker or something like that.  I can't -- I

7    can't remember.

8         Q.    The fifth time you took the CBSE exam, you

9    did not obtain a passing score, correct?

10        A.    No.

11        Q.    And you were then dismissed from Ross

12   University School of Medicine, is that correct?

13        A.    Yes.

14        Q.    You appealed that decision, correct?

15        A.    Ross used inconsistent language.  I don't

16   know if they considered it recommended for dismissal or

17   if it's dismissed at that moment.  So I -- I don't know

18   when they consider you actually dismissed.  I'm assuming

19   it's when it's finalized.

20        Q.    You submitted a document that's called an

21   "Academic Dismissal Appeal", correct?

22        A.    Yes.

23        Q.    All right.  We'll mark this one as the next

24   Exhibit 14.

25             Can I check if that one has any highlighting

Page 209

1    over the word limit that I was allowed.  So I had to

2    somehow take sentences out of this appeal.

3         Q.    Okay.  You'll agree anything you removed Ross

4    would not have seen, right?

5         A.    Would not have seen.

6         Q.    If you deleted it, it would not have gone,

7    that portion you deleted would not have gone to Ross to

8    review, right?

9         A.    Right.

10        Q.    So what they got, what they saw is the

11   information that's contained in Awodiya 14, right?

12        A.    Right.

13        Q.    So why don't we take a look then at the

14   written statement that starts at the bottom of the first

15   page and then continues on to the next page.

16             Do you want to take a moment to review that?

17        A.    Okay.  I read it.

18        Q.    There is no mention of extra testing time in

19   this submissions, right?

20        A.    No.

21        Q.    And you drafted this written statement,

22   right?

23        A.    Yes.

24        Q.    What is the isotretinoin?  It looks like a

25   medication that's referenced.

1   administered those sessions that you reference here?

2        A.    I think -- I actually technically don't know

3   what they label as cognitive behavior therapy, but I

4   think I was referencing just general mental health

5   meetings.  But I don't know technically like

6   cognitive -- it's therapy.  But it's like mental therapy

7   for like behavioral.  It's -- I don't know.  That type

8   of thing.  It's just like therapy.  So I think I was

9   referencing just psychiatric mental health like

10  appointments.

11       Q.    Would that have been Dr. Mauricio and

12  Dr. Unterman at that point in time?

13       A.    I think that would fall under that.  But

14  technically it's -- it's -- I don't know if everyone

15  would label it the same.

16       Q.    I guess my question is, is there any other

17  doctor that these sessions would be a reference to other

18  than?

19       A.    No.

20       Q.    In response to this appeal that we just

21  looked at, the school did not allow you to be readmitted

22  at that time, correct?

23       A.    No.

24       Q.    They upheld the dismissal, is that right?

25       A.    The Promotions Committee?

Page 212

1      Q.      Correct.

2      A.      Yes.

3      Q.      And you were notified of that decision,

4   correct?

5      A.      Yes, yes.

6      Q.      I'll mark next as Exhibit 15?

7              I believe this is a document that you showed

8   to Dr. Owen yesterday.  It appears to be your appeal

9   letter to Dr. Owen following the decision of the

10  promotion committee?

11     A.      I'm sorry.  Can you repeat that?

12             (Thereupon, the document/item referred to was

13  marked for identification as Exhibit 15.)

14     Q.      Yes.  This appears to be an appeal letter

15  that you submitted to Dean Owen following your receipt

16  of the student Promotion Committee's letter upholding

17  your dismissal.

18             Does that appear to be what this is?

19     A.      This is not an appeal letter.  This is not

20  even my e-mail.  This is a e-mail from the student

21  service center -- Student Services to me telling me they

22  had received it.

23     Q.      If you go midway down the page, does that

24  appear to be forwarding an e-mail from you to Dean Owen?

25     A.      Why can't we just use the original e-mail?

Page 214

```
 1        Q.     Where is that?

 2        A.     The fourth bubble.

 3        Q.     Okay.  You say in that paragraph that "These

 4   are just some of the ways that OCD has influenced my

 5   academic performance."

 6               I think we discussed this earlier.  Your OCD

 7   diagnosis was in 2017, right?

 8        A.     The diagnosis itself, yes.

 9        Q.     Okay.  There is no mention in this letter of

10   ADHD, correct?

11        A.     The psychiatrists and them mentioned ADHD in

12   a separate --

13        Q.     But this letter.  In this appeal letter, is

14   there any reference to ADHD?

15        A.     In this appeal letter, no.

16        Q.     And in this letter you say, "Although I was

17   born in America, my family is very Nigerian.  Getting

18   help for any emotional or behavioral imbalances would

19   not look good for me and would likely be an

20   embarrassment to my family.  Honestly, I would rather

21   try and deal with my weird feelings by myself than to

22   risk people seeing me as crazy."

23               Did you feel that way at the time that you

24   sent this letter to Dean Owen?

25        A.     At the time that I sent this letter?
```

Page 242

1   marked for identification as Exhibit 21.)

2        Q.    Yes.   It looks like it's the remainder after

3   the prior exhibit, which only goes through Spring 2012?

4        A.    Okay.   I would like to label this

5   confidential.   It has my Social Security number on it.

6        Q.    Sure.

7        Does that appear --

8        The GPA 3.45, does that seem to be what your

9   recollection is as to your GPA from undergrad?

10       A.    Yeah.

11       MR. ROMAN:   All right.   Thank you very much

12   for your time, Mr. Awodiya.   I don't have anymore

13   questions for you at this time and thank you very

14   much.   Have a great day.

15       THE WITNESS:   Thank you.

16       MR. ROMAN:   All right.   We'll go off the

17   record.

18       THE VIDEOGRAPHER:   We're now going off the

19   video record.   It's 6:23.

20    (This deposition was concluded at 6:23 P.M.)

21

22

23

24

25

# Exhibit 2

# UNITED STATES DISTRICT COURT

for the
Southern District of Florida

| | | |
|---|---|---|
| OLUWAMUYIWA AWODIYA, | ) | Case No.   0:18-cv-60482-KMM |
| *Plaintiff,* | ) | |
| | ) | |
| **-v-** | ) | |
| | ) | Hon. Chief Judge: K. Michael Moore |
| | ) | Magistrate Judge: Barry S. Seltzer |
| ROSS UNIVERSITY SCHOOL OF | ) | |
| MEDICINE, SCHOOL OF | ) | |
| VETERINARY MEDICINE LIMITED | ) | |
| *Defendant.* | ) | |

## PLAINTIFF'S AMENDED RESPONSES AND OBJECTIONS

## TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff Oluwamuyiwa Awodiya ("Plaintiff"), in proper person, hereby serves his responses and objections to Defendant's First Set of Interrogatories filed by Ross University School of Medicine, School of Veterinary Medicine Limited ("RUSM" or "Defendant").

## PRELIMINARY STATEMENT

These responses are made solely for the purpose of this action. These responses are subject to all applicable objections as to competence, relevance, materiality, and admissibility, as well as to any and all other objections on any grounds that would require the exclusion of any statement herein if this document was introduced in Court. All objections and grounds for such objections are expressly reserved and may be interposed at the time of any motion, hearing or trial.

The following responses are given without prejudice to Plaintiff's right to produce or rely on subsequently discovered information, facts, or documents. The responses contained herein are made in a good faith effort to comply with the provisions of the Federal Rules of Civil Procedure

1

but are in no way deemed to prejudice Plaintiff with respect to further discovery, research, and analysis.

Plaintiff reserves the right to provide information or documents that may come to his attention and become available in the future and to use such information or documents at any hearing or proceeding related to this action. Plaintiff further reserves the right to submit any information and documentation provided by RUSM. Plaintiff also reserves the right to amend or supplement these responses in the event that RUSM later asserts a different interpretation of an Interrogatory which is accepted by Plaintiff.

## OBJECTIONS TO DEFINITIONS

Plaintiff objects to Definition 1 as overbroad to the extent it requests information not within his possession, custody or control. Plaintiff responds on his own behalf and will only information or documents in his possession, custody or control.

Plaintiff objects to Definition 3 as overbroad in substance, not relevant to Plaintiff's claims or Defendant's defenses, and ask for privileged information. Plaintiff will only interpret the term "mental impairments" to mean (i) Attention Deficit Disorder Without Mention of Hyperactivity, (ii) Anxiety State, Unspecified, and (iii) Obsessive Compulsive Disorder.

## SPECIFIC RESPONSES AND OBJECTIONS

### Interrogatory No. 1:

State the name, address, telephone number, place of employment, and job title of any person who has, claims to have, or whom you believe may have knowledge or information pertaining to any fact, defense, or injury alleged in any pleading filed in this proceeding or that you intend to file in this proceeding. In your response, please state the specific nature and substance of the knowledge that you believe the person(s) identified in your response may have.

**RESPONSE**: Plaintiff states the following individuals have knowledge of facts relevant to Plaintiff's claims and Defendant's defenses:

Plaintiff: his request for accommodations for his disabilities from RUSM, the information he relied upon when enrolling into RUSM, his interactions and communications with RUSM, and his mitigation efforts, as well as the other information found in his Complaint.

Denise H. Unterman, LCSW-C: Plaintiff's OCD, anxiety impairment, and emotional distress caused by both RUSM's dismissal and failure to accommodate his disabilities. Adult psychotherapist at Kaiser Permanente located in Largo, MD.

Earl John Mauricio, M.D: Plaintiff's ADHD. Adult psychiatrist at Kaiser Permanente located in Largo, MD.

RUSM employees and all other people previously disclosed in this action.

**Interrogatory No. 2:**

Please identify all communications, whether oral or written, that you, or anyone acting on your behalf, have had with RUSM or any of its employees, agents, members, managers, or owners regarding the subject matter of your Third Amended Complaint, and describe in detail the content of each such communication. In your response, please include the date(s) these communications occurred, the location(s) of these communications, the substance of such communications and the name of any individuals with knowledge of same.

**RESPONSE**: Plaintiff refers RUSM to the documents produced in response to Defendant's First Request for Production, to the documents produced in response to Plaintiff's Request for Production of Documents, and to ECF No. 59.

**Interrogatory No. 3:**

Please identify any doctors, counselors or other treating physicians who you have visited during the relevant time period and anyone who has diagnosed and/or treated you for any mental impairment. In your answer, please include the name, address and contact information for anyone with knowledge of same.

**RESPONSE**: *See* Plaintiff's Response to Interrogatories Nos. 1 and 2.

**Interrogatory No. 4:**

Please identify all mental impairments or any other illness, impairment or disability that you are alleging is relevant to the claims in this action, including in your answer (i) the date on which a diagnosis was made regarding that impairment, illness or disability, (ii) the identity of the person that made the diagnosis, (iii) when you first began experiencing symptoms pertaining to that impairment, illness or disability, (iv) the date on which you ceased experiencing any of those symptoms, (v) any medication you take for each impairment, illness or disability (whether prescribed or otherwise), (vi) the dosage of each such medication, and (vii) the date on which you took each medication.

**RESPONSE**: Plaintiff's mental impairments consist of both attention/concentration impairments and anxiety disorders. Plaintiff's attention impairment was diagnosed as Attention Deficit Disorder Without Mention of Hyperactivity by Mr. Cuffy of RUSM on January 18, 2016. Dr. Mauricio also diagnosed Plaintiff with ADHD in 2016. Plaintiff's anxiety disorder was first diagnosed as "Anxiety State, Unspecified" by Mr. Cuffy on February 17, 2016. Plaintiff's anxiety disorder was diagnosed again but as Obsessive-Compulsive Disorder by Ms. Unterman on April 18, 2017. Plaintiff does not know when he "first began experiencing symptoms" per se. Plaintiff continues to experience symptoms of said disabilities which are active and ongoing. In regard to medication, Plaintiff objects to the rest of the subparts of Interrogatory No. 4 as they

4

are unduly burdensome, not proportional to the needs of the case, overbroad in substance, not relevant to Plaintiff's claims or Defendant's defenses, and seeks information that is not reasonably calculated to lead to the discovery of admissible evidence because "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." 42 U.S.C. § 12102(4)(E)(i).

**Interrogatory No. 5:**

Regardless of time period, please identify each medical school or other institution you have applied to, including in your answer the date on which you applied, the date on which you received a response from the school and the outcome of the application process. Please include in your response all schools you applied to both prior to your enrollment at RUSM and after your dismissal from RUSM.

**RESPONSE**: Plaintiff objects to this Interrogatory to the extent that it calls for information outside the relevant time period and is unduly burdensome to the extent that it calls for "all schools" regardless of time period. Subject to and without waiving these objections, Plaintiff identifies the following medical schools that he applied to or tried to apply to after his dismissal from RUSM:

- University of Maryland School of Medicine; Plaintiff was ineligible because "[y]ou must also be in good standing and eligible for promotion at your medical school [RUSM]."

- George Washington University Medical School; "Must be in good standing and be eligible to reenter medical school, if your education has been interrupted."

- Howard University College of Medicine; Plaintiff was ineligible because this school required that he be in "good standing" at previous medical school.

- Eastern Virginia Medical School; Plaintiff was ineligible because only applicants "in good standing can be considered."

- Florida State University College of Medicine; Will only consider "students in good standing" at previous medical school.

- University of South Florida College of Medicine; "An applicant who is, for any reason, on probation or not in good academic standing at the school from which transfer is sought will not be accepted for transfer to our college."

- Xavier University School of Medicine; School refused to respond to Plaintiff after his many attempts to contact their admissions department.

- Saint James School of Medicine; "The applicant must be in good academic standing" at previous medical school.

- Saba University School of Medicine; Plaintiff was ineligible because Plaintiff "must be in good academic standing" at previous medical school.

- Medical University of the Americas; Plaintiff was ineligible because Plaintiff "must be in good academic standing" at previous medical school.

- Windsor University School of Medicine; Plaintiff's conditional acceptance was cancelled because a "[l]etter of good standing is required from the previous school [RUSM]."

- St. George's University; "Unfortunately based on your dismissal by another medical school there are no options available to you at SGU."

**Interrogatory No. 6:**

Describe all efforts you have made to obtain employment or other work for compensation since your dismissal from RUSM, including in your answer (i) the name of each employer you

6

contacted, (ii) the employer's contact information, including address, (iii) the date on which you contacted the employer, (iv) whether you were offered a position with the employer, (v) the salary or hourly wage offered, (vi) the approximate number of hours per week you would be expected to work (if hourly), and (vii) any other benefits, including but not limited to paid vacation time, health benefits, stock options or other benefits offered as part of the employment. For all jobs identified in your response, please state whether you accepted employment with that employer and, if so, the dates of employment, your job title(s), and the actual salary and benefits received by you.

**RESPONSE**: Plaintiff refers RUSM to the documents produced in response to Defendant's First Request for Production.

**Interrogatory No. 7:**

For each impairment, illness or disability identified in response to Interrogatory No. 4, above, please state whether you requested an accommodation for that impairment, illness or disability from RUSM, including in your response (i) the name of the RUSM employee, officer or agent from whom you requested the accommodation, (ii) the location where the request was made, (iii) the precise nature of the accommodation you requested, (iv) the date on which you requested the accommodation, (v) the name of any other individual who has personal knowledge of your request, (vi) and the outcome of the request for accommodation.

**RESPONSE**: Plaintiff objects to Interrogatory No. 7 to the extent that it calls for a legal conclusion. Plaintiff refers RUSM to the documents produced in response to Defendant's First Request for Production and to documents at ECF No. 59.

**Interrogatory No. 8:**

Please identify all communications, whether oral or written, that you, or anyone acting on your behalf, have had with the National Board of Medical Examiners or any of its employees, agents, members, managers, or owners. In your response, please include the date(s) these communications occurred, the location(s) of these communications, the substance of such communications and the name of any individuals with knowledge of same.

**RESPONSE**: Plaintiff objects to RUSM's Interrogatory No. 8 on the grounds that it does not identify the information to be produced with reasonable particularity. Plaintiff is willing to discuss an appropriate narrowing of this Interrogatory with RUSM. Plaintiff further objects to the extent that it calls for privileged work product information.

**Interrogatory No. 9:**

Please describe in detail all of the damages you are seeking in this action. In your response, please include the manner in which the category of damages is calculated and the name and contact information of any individual with knowledge of same.

**RESPONSE**: Plaintiff objects to this Interrogatory on the grounds that it is vague and ambiguous as to the term "in detail." Plaintiff also notes that if "physical damages" means non-mental, non-emotional, non-monetary bodily harm, for example a broken leg, then Plaintiff is not seeking damages for this type of "physical damages." Subject to and without waiving the objection, Plaintiff provides the following categories of damages:

- **Lost Earning Capacity:**
  - Average salary with bachelor's degree: <u>$63,342</u>. Bureau of Labor Statistics Data, U.S. Bureau of Labor Statistics, https://data.bls.gov/timeseries/LEU0252919100 (Accessed on October 23, 2018).

- o Annual wage for a physician: <u>$211,390</u>. 29-1069 Physicians and Surgeons, All Other, U.S. Department of Labor, Bureau of Labor Statistics, https://www.bls.gov/oes/current/oes291069.htm (Last Modified March 30, 2018).

- o For a 26-year-old male, his expected years to work are <u>41 years</u>. Retirement & Survivors Benefits: Life Expectancy Calculator, Social Security, https://www.ssa.gov/cgi-bin/longevity.cgi (Accessed on October 23, 2018).

Total lost earning capacity: 41 x ($211,390 - $63,342) = **$6,069,968.00**

- **Emotional Distress as Compensatory Damages:**

  Half the total lost earning capacity = **$3,034,984**

- **Loans Purposed for RUSM's Cost of Attendance:**

  Calculated from Award History in myRoss = **$207,917**

- **Punitive Damages for Fraud/Misrepresentation Claims:**

  **1% of Adtalem's net worth** based on its reported cash equivalent of its total assets.

- **Punitive Damages for Breach of Fiduciary Duty Claim:**

  **1% of Adtalem's net worth** based on its reported cash equivalent of its total assets.

<u>**Interrogatory No. 10:**</u>

Describe all income, including but not limited to, wages, salaries, loan proceeds and welfare or disability benefits that you have received since your dismissal from RUSM. In your response, please provide the amounts received for each source of income, the date on which the

9

amounts were received, the name of each source of income, and the time period during which you received the income from each source. Also, please provide the name and contact information of any individual with knowledge of same.

**RESPONSE**: *See* Plaintiff's Response to Interrogatory No. 6.

**<u>Interrogatory No. 11:</u>**

Please describe with specificity how much you have paid in tuition, fees or other monies as a result of your enrollment at RUSM. In your response, please provide (i) subtotals for each category, (ii) state how much you borrowed, (iii) state how much is due and owing to RUSM or any loan provider or other source of funding, (iv) state how much interest paid to date, and (v) state how much interest is still owed. Also, please provide the name and contact information of any individual with knowledge of same.

**RESPONSE**: Plaintiff refers RUSM to the documents produced in response to Defendant's First Request for Production.

## CERTIFICATION

I certify that the foregoing statements made by me are true and correct based upon my personal knowledge and belief. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DATED this 25th day of October, 2018:

Respectfully submitted,

*/s/Oluwamuyiwa Awodiya*

By: Oluwamuyiwa Awodiya, *pro se* litigant
15005 Dahlia Dr.
Bowie, MD 20721
(240) 602-1836
Plaintiff, in Proper Person

## CERTIFICATE OF SERVICE

I do hereby certify that on this 25th day of October, 2018, I have caused a true and correct copy of the foregoing by emailing a copy to:

Ryan Roman
Akerman Senterfitt
Suntrust International Center
1 SE 3rd Avenue
25th Floor
Miami, FL 33131-1714
305-374-5600
Fax: 305-374-5095
Email: ryan.roman@akerman.com

*/s/Oluwamuyiwa Awodiya*

By: Oluwamuyiwa Awodiya, *pro se* litigant

# Exhibit 3

Case 0:18-cv-60482-RKA   Document 107-2   Entered on FLSD Docket 12/21/2018   Page 39 of 241

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.     Davendranand Sharma

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 0:18-cv-60482-KMM


OLUWAMUYIWA AWODIYA,

            Plaintiff,

vs.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

            Defendant.
_____/


                         350 E. Las Olas Blvd.
                         Fort Lauderdale, Florida
                         October 16, 2018
                         12:59 p.m.



            _____

            THE DEPOSITION OF


            DAVENDRANAND SHARMA


       _____

       Taken on Behalf of the Plaintiff

    Pursuant to Notice of Taking Deposition

        Commencing at 12:59 p.m.

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 8

1   Exhibit DE-01.

2                  (Thereupon, the referred-to document was

3                  marked by the court reporter for

4                  Identification as Plaintiff's Exhibit

5                  DE-01.)

6   BY MR. AWODIYA:

7        Q.   Can you confirm that this is your

8   counseling note for plaintiff dated December 14th,

9   2015?

10       A.   Yes.

11       Q.   In this counseling note, you put "Academic

12  or educational problem" next to "Summary of note;"

13  is that correct?

14       A.   Yes.

15       Q.   In the same counseling note, you also

16  wrote that you started screening plaintiff for ADHD;

17  is that also correct?

18                  It should be under "Plan."

19       A.   Yes.

20       Q.   Did you screen plaintiff for ADHD because

21  he informed you that he needed extended testing time

22  for his exams?

23       A.   No.

24       Q.   Then why did you screen plaintiff for

25  ADHD?

10/16/2018       Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.       Davendranand Sharma

Page 12

1       A.   Yes, I see it.

2       Q.   Under that it says, "The patient reports

3   the following concerns related to his

4   attention/concentration."

5            Now, under here are numerous ways that the

6   doctor has noted plaintiff's symptoms.

7            Do you -- is that a correct statement?

8       A.   Yes.

9       Q.   This document also says, "Constantly has

10   difficulty sustaining attention to task at work or

11   in school."  It says, "Constantly has difficulty

12   with tasks requiring persistence or organization.

13   Constantly distracted by noise or activity.

14   Constantly forgetful in daily activities, for

15   example, difficulty remembering appointments or

16   obligations."

17            Did you notice any of these symptoms in

18   plaintiff?

19       A.   When?  When I first saw you?

20       Q.   In any of your counseling sessions.

21       A.   Yes.

22       Q.   So would you agree that you observed that

23   plaintiff's ADHD affected his ability to perform

24   well on his exams?

25       A.   Well, remember, we didn't diagnosis you

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 13

1   with ADHD in December.  So what I saw was evidence

2   of ADHD that required, you know, testing and

3   confirmation.

4        Q.   And what was that evidence?

5        A.   The symptoms you just went through, this

6   list that is there.

7        Q.   Okay.  So just to be clear, you noticed

8   that plaintiff was experiencing these symptoms on

9   page 3 of Exhibit DE-02?

10       A.   Yes.  The symptoms you listed.

11       Q.   The symptoms --

12       A.   From "The patient reported following

13  concerns" to "difficulty remembering appointment or

14  obligations."

15            MR. ROMAN:  I'll just object, because I'm

16       not sure it's clear what time frame we're

17       talking about at this point.

18  BY MR. AWODIYA:

19       Q.   When did you notice these symptoms?

20       A.   I think from the first time I saw the

21  plaintiff, though, it wasn't for primarily academic

22  problems.

23       Q.   Was this December 2015?

24       A.   December 2015.

25            Are we finished with this one?

Page 29

1    student told the academic -- if the student told the

2    accommodation coordinator he was running out of time

3    on his exams, would that constitute informing him

4    the need of more time on his exams?

5        A.   If the student told the accommodations

6    office.

7        Q.   Yes.  The point I'm trying to express here

8    is that students don't necessarily know the specific

9    language, according to the ADA or to the

10   Rehabilitation Act, what constitutes a request.

11   They simply may say that they need help some way,

12   that I'm running out of time on exams, I'm not

13   completing exams.

14       A.   Uh-huh.  I understand.

15       Q.   Does a student need to expressly request

16   and say "accommodations" in order to get

17   accommodations?

18       A.   Yes, they have to.  It's always done by

19   the counseling service part of our process when we

20   make the diagnosis of ADHD.  It's called "standards

21   practice" or "best practices."

22            Every person who is diagnosed with ADHD is

23   guided to the student handbook that there is

24   accommodations available.  The process is very

25   straightforward.  They need to go to the

Page 31

1            DE-05.)

2   BY MR. AWODIYA:

3       Q.   Is this the document you were talking

4   about?

5       A.   This is the document about release of

6   information.  The document about requesting

7   accommodations is not this document.  This Exhibit,

8   DE-05, is not the request for accommodation.

9       Q.   But this is the document for the

10  counseling center to send the information?

11      A.   That's correct.

12      Q.   Okay.  Did you send any of plaintiff's

13  information to Ross University's administrators?

14      A.   Not me.  I didn't send anything.

15      Q.   Do you know if anyone else did?

16      A.   I wouldn't know for sure, but I believe a

17  request was made for the release of your

18  accommodation [sic], but this was not in that time.

19  This was more recently when the plaintiff had left

20  the university and returned to the U.S. for the

21  comprehensive shelf.

22      Q.   Is it correct that the document for the

23  release --

24      A.   Uh-huh.

25      Q.   -- to Ross University administration was

Page 32

1     agreed upon in December 2015?

2          A.   No.  There's no evidence that there was a

3     document requesting accommodation.

4          Q.   Not requesting accommodation.

5               Requesting that the counseling center send

6     the documentation --

7          A.   No, there is no -- there's no evidence of

8     a request for sending a record.

9          Q.   -- in December 2015.

10         A.   There's a request for sending information

11    about the plaintiff's return to the U.S. for

12    emotional support in December 2015.  We received --

13    in December 2015, as far as my records show, my

14    recollection, there's no request for release for

15    accommodations.  You understand?

16         Q.   Can you please read on that form what it

17    says under "This information is released for the

18    following purpose"?

19         A.   "To facilitate treatment planning" and "to

20    provide information relevant to accommodations or

21    medical leave of absence."

22         Q.   Under that --

23         A.   And then, there is "Other" not ticked.

24              So the boxes are ticked for "facilitate

25    treatment planning" and "to provide information

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

Page 33

1    relevant to accommodation academic accommodation

2    and/or medical leave of absence."

3          Q.   Under that, what is the next box checked?

4          A.   "I authorize ongoing communication unless

5    I revoke this consent."

6          Q.   Did you not feel that there was an ongoing

7    obligation?

8          A.   For?

9          Q.   The purpose of this document for academic

10   accommodations -- for information relevant to

11   academic accommodations?

12         A.   No.   I said it just now.   No.   This

13   document was done in the context of the plaintiff

14   needing to return to the USA early, because the

15   plaintiff had emotional crisis and there were

16   concerns about the patient's safety.   So the

17   counseling service, including myself, and the

18   university administrator supported the plaintiff

19   returning early, and that involved changing the

20   plaintiff's return ticket which the plaintiff

21   couldn't afford at this time.

22              So I wrote to the university's

23   administrative director asking them to support the

24   student, to return him early, because the

25   plaintiff's mother was very worried about the

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 34

1   plaintiff.

2              So this document was signed for that

3   purpose, so we can give information about the

4   plaintiff's emotional health and request an early

5   return.  This document was not for releasing

6   information about accommodation, because there was

7   no request for accommodations from me in

8   December 2015.

9              To make it more clear, there was no

10  diagnosis at that time.  It was just at the start of

11  preliminary testing, screening for ADHD.  So there

12  was no way documents could have been sent to support

13  accommodations for ADHD, because the diagnosis was

14  not made.  It makes no sense.

15       Q.   So when the diagnosis was made and

16  plaintiff did not revoke his consent, would that not

17  be considered ongoing?

18       A.   Ongoing to what?

19       Q.   Well, you said the documents didn't exist

20  at that time.

21       A.   The diagnosis didn't exist.

22       Q.   But the diagnosis existed after the winter

23  break?

24       A.   Yes.  Yes.

25       Q.   Why weren't those records sent?

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

Page 35

1        A.    Because, as I said, we do not release

2    information unless we request -- we receive a

3    request either from the student, who has the

4    diagnosis, and that has to be in writing, not a

5    verbal request, or it has to come from the

6    accommodations office in writing under a protected

7    e-mail that the -- that they are going through the

8    process of supporting a request for accommodation.

9    There was no request made for accommodations.  So

10   that's why I said, there's no request.  We cannot

11   give out information to the accommodations office.

12   Then we would be sued for giving information beyond

13   the scope.  The scope of this document was only to

14   get the plaintiff back home early.

15        Q.    Give me one second.  I had something and

16   it's coming back to me.

17        A.    Take your time.

18        Q.    Oh.  You said that a request has to be in

19   writing?

20        A.    Yes.

21        Q.    What if it's oral?

22        A.    No.

23        Q.    It doesn't count?

24        A.    It doesn't count to the accommodations

25   office, as far as I know, and that's their -- that's

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 37

1      A.   Well, I don't think there was a question

2   of equal treatment, if the plaintiff didn't apply

3   for accommodations.  If the plaintiff had applied

4   and did not get it, I would say, seems something is

5   not right.  We would have to look at why that was

6   not given.  And that's not my portfolio.  I can only

7   say that the documentation that the plaintiff had

8   appeared to me to be adequate for accommodations.

9      Q.   So you believe that plaintiff had adequate

10   documentation of his ADHD to get test

11   accommodations?

12      A.   That's me.  I believe that.  Again, that

13   doesn't mean the plaintiff would get accommodations,

14   because the final say is the accommodations office.

15   It doesn't mean that I believe it's correct.  The

16   accommodations office have their own regulations,

17   and they could override my request, because I'm the

18   one -- or the doctors make the request for

19   accommodation, which is time-and-a-half.  You get

20   extra time.  We actually put it we want the student

21   to get the accommodation, but that doesn't mean they

22   get it.

23      Q.   So even though you think that plaintiff

24   needs extra time, it's out of your hands as to

25   whether he gets extra time for his exams?

Page 46

1    see how long it is.  Does it have it here?  I think

2    it's a year.

3           So the signing of this document is a way

4    for the student to make life easier in the future so

5    they don't have to come back and do another one.  So

6    this is -- if, for example, they want to see a

7    psychiatrist in the USA, they would sign the form so

8    we can release the medical records.  But we don't

9    release medical records until we get a specific

10   request saying, I want accommodations.  Please

11   release my records.  And I've already signed a

12   release of information form.  Then, we release.  You

13   got it?

14           We don't hold it back.  It's the

15   plaintiff's right to get their records.  As you see,

16   this document is signed only to Ross administration.

17   So this one was about getting an early flight back

18   home.  So it was Ross administration.  It's not Ross

19   accommodations office.  It's two different entities.

20   It was to administration to deal with a flight back

21   home, and the accommodations would be --

22           You see to this piece here, Item No. 3 --

23   Box No. 3?  Then, if the student, the plaintiff

24   wants their doctor in the USA to get the

25   accommodations -- or medical records, then they will

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 57

1    accommodations office.  This agreement was done so

2    we can release information to administration to get

3    the plaintiff back home early, which was done.

4         Q.   That's not in the agreement.

5         A.   Which agreement.

6         Q.   That agreement, the release of information

7    consent agreement.

8         A.   It's in the medical records that this

9    whole process was being done to support -- this one

10   with this Exhibit DE-05 was done in the medical

11   records, time-related, to show that this release of

12   specific information was to get the plaintiff back

13   home early due to concerns about the plaintiff's

14   emotional health.  There was nothing about

15   accommodations requested by the student for release.

16   There was no ADHD diagnosis, as I said, before.

17        Q.   Let's focus on that.  Someone who knows

18   nothing about this case, sees this agreement, the

19   release of information consent agreement, Exhibit

20   DE-05.

21        A.   Uh-huh.

22        Q.   No one knows nothing about this case, and

23   they see this document, how would they know that a

24   student needs to do an additional request?

25        A.   They wouldn't know, because they wouldn't

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

Page 73

1          Q.    And you noticed symptoms of ADHD --

2          A.    Yes.

3          Q.    -- to the extent that you recommended an

4    assessment for the ADHD.

5          A.    Yes.  We went over that.

6          Q.    And he signed the form for the release of

7    information relative to academic accommodations.

8          A.    Yes.

9          Q.    If you noticed these things --

10         A.    Yes.

11         Q.    -- at that time --

12         A.    Uh-huh.

13         Q.    -- how is that not relevant?

14         A.    To what?

15         Q.    Academic accommodations.

16         A.    There's no relevance -- this form was done

17   for -- for the emotional crisis to get the student

18   back home.

19              Relevance for academic accommodation can

20   only come in place if there is a request.  We went

21   over this over and over.  Yes, yes, I would support

22   academic accommodation 100 percent, 1,000 percent,

23   100,000 percent if a request is made.  I cannot send

24   details of a diagnosis to anybody unless there's a

25   request to send it and for a purpose.  It's not my

15eb13da-d2c1-4023-bda4-c358c06300a6

Page  74

1    opinion.   It is what the plaintiff wants.

2              He wants accommodation, put it in writing.

3    It's done.   It's granted.   The university does not

4    deny students accommodation once documentation is

5    adequate.

6         Q.   I don't want to dive back into the form.

7         A.   That's what I'm saying.  Yeah.  I think

8    we've been over this and over this.

9         Q.   I was just asking about the information

10   being relevant to academic accommodations.

11             So let me ask you this.

12        A.   Yes.

13        Q.   His ADHD symptoms that you observed in

14   December 2015 --

15        A.   Uh-huh.

16        Q.   -- do you consider it relevant to academic

17   accommodations?

18        A.   Yes.  Yes.  We went over that.  And the

19   diagnosis was correctly made, that there was ADHD

20   that the student had for a long time and did not get

21   treated for, and then, comes to me first time, gets

22   a diagnosis, and is treated for it.  So that's it.

23   Student was helped.  The student performed well.

24   Whether repeating the semester helped, the student

25   performed well.  The student left Dominica in good

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 75

1   spirits in April, went off to do the comp, right?

2   That's my recollection.

3        Q.   (Nod in the positive.)

4        A.   Student did not apply for accommodation or

5   request to give out documents for accommodation.

6   That's it.

7             MR. AWODIYA:  I think we're good.

8             MR. ROMAN:  We'll take a short break, and

9        I'll have some questions, and then, we'll wrap

10       it up.  Let's take a quick break, and then,

11       we'll come back in.

12            (Whereupon, a break was taken from 3:17 to

13            3:24 p.m.)

14                 CROSS-EXAMINATION

15   BY MR. ROMAN:

16       Q.   Good afternoon, Dr. Sharma.  As you know,

17   we've met before.  My name is Ryan Roman.  I'm one

18   of the attorneys representing Ross University.

19            I'd like to start by showing you -- and I

20   only have a quick set of questions on the medical

21   notes, some of which we've gone through today, and I

22   think only one of which we haven't shown you today.

23            Starting with Exhibit 06, do you have that

24   in front of you still?  That was the most recent one

25   we used from December 9, 2015.  Let me just write

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 77

1    include any information you obtained from

2    Mr. Awodiya about relationship issues?

3         A.   Yes.

4         Q.   And would that paragraph reflect the

5    information you learned?

6         A.   That's correct.

7         Q.   Okay.  Do you see in this set of notes --

8    this December 9th, 2015 set of notes, any reference

9    to ADHD?

10        A.   No.

11        Q.   At this time, on December 9, 2015, had

12   Mr. Awodiya been diagnosed with ADHD?

13        A.   No.

14        Q.   All right.  Do you recall when the

15   diagnosis was actually made?

16        A.   The actual making of it, I think, was in

17   February 2016.

18        Q.   And if I turn your attention to Exhibit

19   03, which is in that pile in front of you, I'll ask

20   if that is the appointment you're thinking of?

21        A.   Yes, that's correct.

22        Q.   Okay.  All right.  Next I'd like to turn

23   your attention to Exhibit 01.

24        A.   Yes.

25        Q.   And are these your notes from a meeting

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

Page 80

```
 1        A.    Yes.

 2        Q.    And are these records that are kept in the

 3   ordinary course of business --

 4        A.    Yes.

 5        Q.    -- by the counseling center?

 6        A.    Yes.

 7        Q.    Did Mr. Awodiya ever ask you for an

 8   accommodation?

 9        A.    No.

10        Q.    Did Mr. Awodiya ever ask you to request an

11   accommodation on his behalf?

12        A.    No.

13        Q.    Did you ever agree with Mr. Awodiya that

14   you would request an accommodation on his behalf?

15        A.    No.

16        Q.    Did you ever speak with Matthew

17   Stewart-Fulton about Mr. Awodiya getting an

18   accommodation?

19        A.    No.

20        Q.    When a student signs a release of their

21   records for the purpose of requesting an

22   accommodation, does the counseling center at Ross

23   immediately share the students information at that

24   time?

25        A.    No.
```

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

Page 81

1        Q.   Do you automatically share the student

2   information just because a release is signed?

3        A.   No.

4        Q.   Are you aware of any reasons why a student

5   might not want an accommodation even though they may

6   be entitled to one?

7        A.   Just repeat that question.

8        Q.   Sure.   Are you aware of any reasons why a

9   student might not want an accommodation, even if

10  they are entitled to one?

11       A.   Oh.   General reasons.

12       Q.   Any reasons that you can think of?

13       A.   Yes, yes.   It's quite, actually, common

14  that students, in my experience, would not want the

15  accommodations.

16            One, they're now identified as having a

17  disability.   They're placed in special accommodation

18  rooms that are noise free.   So other students are

19  able to see them, and they tend to be embarrassed

20  about the conditions.   So they're seen as disabled

21  by their colleagues and friends.   So often they feel

22  shy about it.

23            The other reason is, they improve well in

24  treatment and perform much better at a normal --

25  well, at a good academic level, and so, they don't

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 82

1   see the need for it.  And I think also there's -- my

2   experience, like the big reasons are sort of

3   cultural.  The request for accommodation involves

4   getting information from family members and school

5   teachers from back home -- back from their home

6   school, and they tend to be shy about their family

7   knowing that they have this condition, because often

8   the families would have been the one who were not

9   taking them for the diagnosis despite academic

10  problems earlier.  Those are the three big reasons

11  in my experience.

12        Q.   If you had received a request from the

13  accommodations office for information relating to

14  Mr. Awodiya, can you walk us through the process of

15  what you would have done in response to that

16  request?

17        A.   Yes.  Once we get a request from the

18  accommodations office, we would prepare a

19  document -- a detailed document that has the

20  diagnostic instruments used; the cards, for example.

21  We would submit that document with an interpretation

22  of the results pointing to things like severity of

23  the condition.  We would emphasize that, despite

24  treatment, the student is also struggling with time

25  for the exams.  So it would be in the student's

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 88

1        A.    Uh-huh.

2        Q.    -- the symptoms of those --

3        A.    Uh-huh.

4        Q.    -- the diagnosis, and how it affects the

5    exam, and they requested accommodations, but refused

6    to go to his family --

7        A.    Yes.

8        Q.    -- that student would not get

9    accommodations?

10        A.    Like I said, would not.  They may not get,

11    because the accommodation process is not from me.  I

12    can't talk for them, but it is likely they may not

13    get accommodations.

14        Q.    So how do you know it's required?

15        A.    Because I know generally what the

16    accommodations office requires.  From us, they

17    require the student's diagnosis, but they would also

18    require other documentation that they determine is

19    relevant.

20        Q.    Help me understand.  You say, "may --

21        A.    Uh-huh.

22        Q.    -- require," and then, you say, "require."

23        A.    No, no, no.  I said, they would require --

24    they would require additional documentation.  And

25    when they have all this documentation in place, they

15eb13da-d2c1-4023-bda4-c358c06300a6

# Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 0:18-cv-60482-KMM


OLUWAMUYIWA AWODIYA,

                  Plaintiff,

vs.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

                  Defendant.
_____/


                         350 E. Las Olas Blvd.
                         Fort Lauderdale, Florida
                         December 4, 2018
                         1:27 p.m.


          _____
          THE VIDEOTAPED DEPOSITION OF


                  MCMILLAN CUFFY


          _____
               Taken on Behalf of the Plaintiff

          Pursuant to Notice of Taking Deposition

               Commencing at 1:27 p.m.

4e42ed13-6299-4742-80d7-435c57c10785

Page 36

1        I don't want you to talking over each other.

2   BY MR. AWODIYA:

3        Q.   Do you have any document?

4        A.   Of?

5        Q.   Of plaintiff asking for you to speak to

6   Mr. Didier.

7        A.   We have release of information that the

8   client signed -- the plaintiff signed.

9        Q.   That was all that was needed?

10       A.   For?

11       Q.   For you to discuss about plaintiff to

12   Mr. Didier?

13       A.   A release of information would authorize

14   that, yes.

15       Q.   There's nothing else needed?

16       A.   A release of information from the

17   plaintiff would authorize that.

18       Q.   Hmm.  Okay.

19            What else did plaintiff ask?

20       A.   Excuse me?

21       Q.   What else did he ask in December 2015?

22       A.   I can't remember off my head.

23       Q.   Don't remember him asking for anything

24   else?

25       A.   In December 2015?

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 39

1    might be appropriate, such as extended testing time

2    or a separate room?

3         A.    Yes, based on what -- based on the

4    student's mental health condition or -- yes, we

5    would.  On that letter, we would state that, yes.

6         Q.    Any counselor can do that?

7         A.    A mental health counselor, yes, in the

8    counseling center.

9         Q.    I have a bunch of questions for you then.

10             Do you remember all the documents that

11   plaintiff gave you in January 2016 about his ADHD?

12        A.    From my recollection, the plaintiff

13   presented one document to me when he returned from

14   the U.S.  It was, I think, a Conners.

15        Q.    From your recollection?

16        A.    Yes.

17        Q.    Was it in an envelope?  Was it --

18        A.    I can't recall the specifics.

19        Q.    Did he tell you the name of his

20   psychiatrist in the U.S.?

21        A.    No, I don't think he did.  At least, I

22   can't remember.

23        Q.    So what did you do after he gave you the

24   ADHD assessment?

25        A.    If my memory serves me right, the document

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 82

1          A.    Yes, I would.

2          Q.    Do you have any reason to think you would

3    not have followed your standard practice here?

4          A.    No, I don't.

5          Q.    Do you request accommodations for a

6    student?

7          A.    No, I don't.

8          Q.    And when a student presents with ADHD, do

9    you automatically send out support for

10   accommodations even where a request has not been

11   made?

12         A.    No.

13         Q.    And would the same answer be true for

14   other mental impairments other than ADHD?

15         A.    Yes.

16         Q.    In your experience, do all students want

17   an accommodation for a disability?

18         A.    No.

19         Q.    So some choose not to seek an

20   accommodation?

21         A.    Some choose not to.

22         Q.    Did you receive a request from the

23   accommodations office for information pertaining to

24   Mr. Awodiya?

25         A.    No.

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 83

1      Q.    Had you gotten such a request, would you

2    have supported it?

3      A.    Yes, I would.

4      Q.    Moving on to another topic, are your

5    counseling notes the best evidence of what was

6    discussed at a counseling session with Mr. Awodiya?

7      A.    Yes, it is.

8      Q.    Okay.  I'd like to go through with you

9    each of those notes and ask you just a short series

10   of questions.  I'll begin with what we've marked as

11   Exhibit Cuffy 1, which is the December 8th, 2015

12   notes.

13     A.    Yes.

14     Q.    Okay.  Take a look at that document.

15           What is that document?

16     A.    So this is a suicide assessment.

17     Q.    And who's the author of these notes?

18     A.    I am.

19     Q.    And when is this dated?

20     A.    8th of December, 2015.

21     Q.    Are these notes taken at or around the

22   time of the counseling session with Mr. Awodiya?

23     A.    Yes, it is.

24     Q.    Is this a document that's maintained by

25   Ross University in the normal course of it's

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 87

1          A.    That's on the 10th of December, 2015.

2          Q.    And did you prepare it?

3          A.    Yes.

4          Q.    Are these notes taken at or around the

5     time of this counseling session with Mr. Awodiya?

6          A.    Yes, it would be.

7          Q.    And is this a document that is maintained

8     by Ross in the normal course of business?

9          A.    Yes, it is.

10          Q.    Do you have any reason to believe that

11     this document has been altered in any way?

12          A.    No.

13          Q.    And in these notes, do you see any mention

14     of a request for an accommodation?

15          A.    No, I don't.

16          Q.    Do you see any mention of a request for

17     extended testing time?

18          A.    No, I'm not.

19          MR. ROMAN:  Okay.  We're going to next

20     mark this exhibit.  Is this Cuffy 8?

21          THE COURT REPORTER:  (Nod in the

22     positive.)

23          (Thereupon, the referred-to document was

24          marked by the court reporter for

25          Identification as Defendant's Exhibit 8.)

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

```
                                                         Page 88
 1              THE WITNESS:  Thank you.
 2              THE COURT REPORTER:  Uh-huh.
 3   BY MR. ROMAN:
 4       Q.   Once you've had an opportunity to review,
 5   I'll just ask you to describe what that document is.
 6       A.   Okay.
 7       Q.   What is this document?
 8       A.   This is a follow-up meeting, which speaks
 9   of -- it's a follow-up meeting.  Follow-up.
10       Q.   On what date?
11       A.   It's on the 11th of December, 2015.
12       Q.   And who prepared it?
13       A.   I prepared it.
14       Q.   And are these notes taken at or around the
15   time of the counseling session with Mr. Awodiya?
16       A.   Yes, it would be.
17       Q.   Is this a document that's maintained by
18   Ross University in the normal course of it's
19   business?
20       A.   Yes.
21       Q.   Do you have any reason to believe that
22   this document has been altered in any way?
23       A.   No.
24       Q.   And in these notes, do you see any mention
25   of a request for an accommodation?
```

4e42ed13-6299-4742-80d7-435c57c10785

Page 89

1        A.    No.

2        Q.    Do you see any mention of a request for

3    extended testing time?

4        A.    No.

5        Q.    The next one, if we go back to Cuffy 6,

6    which is the grouping of multiple counseling notes,

7    we're going to look at what's the first page on your

8    version, which is the December 13, 2015 notes.

9        A.    First page?

10        Q.    I believe so.

11        A.    What date?

12        Q.    If that's December 13th.

13        A.    Yes.

14        Q.    Okay.  And who -- did you prepare this

15    document?

16        A.    For some reason, I did not see where it

17    was locked [sic].  Maybe part of that was not --

18        Q.    If you turn one more page behind that, do

19    you have 146 at the bottom?  A page that says,

20    "146"?  It looks likes yours is out of order.

21        A.    Okay.  It's out of order.  Okay.  That's

22    it, yeah.

23        Q.    Okay.  So from that, can you tell who is

24    the author?

25        A.    I am the author, yes.

4e42ed13-6299-4742-80d7-435c57c10785

Page 90

1          Q.    And are these notes taken at or around the

2     time of the counseling session with Mr. Awodiya?

3          A.    Yes.

4          Q.    Is this a document that's maintained by

5     Ross in the normal course of it's business?

6          A.    Yes, it is.

7          Q.    And do you have any reason to believe that

8     the document has been altered in any way?

9          A.    No, I don't.

10         Q.    Do you see any mention of a request for an

11    accommodation in this document?

12         A.    No, I don't.

13         Q.    Do you see any mention of a request for

14    extended testing time in this document?

15         A.    No, I don't.

16         Q.    Next, in that same exhibit, if you turn to

17    the January 11th note, 2016.

18         A.    Yes.

19         Q.    And are you the author of this document?

20         A.    Yes, I am.

21         Q.    Are these notes taken at or around the

22    time of the counseling session with Mr. Awodiya?

23         A.    Yes, it is.

24         Q.    Is this a document that's maintained by

25    Ross in the normal course of it's business?

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 92

1      Q.    If you look at your bottom line, where it

2    says, "Signed by McMillan Cuffy," does it --

3      A.    January -- signed, January 18th, 2016.

4      Q.    And would these notes have been taken at

5    or around the time that the referral was being made?

6      A.    Yes, it would be.

7      Q.    Is this a document that's maintained by

8    Ross in the normal course of it's business?

9      A.    Yes, it is.

10     Q.    And do you have any reason to believe it's

11   been altered in any way?

12     A.    No, I don't.

13     Q.    In this document, is there any mention of

14   a request for an accommodation?

15     A.    No, there isn't.

16     Q.    And is there any mention of a request for

17   extended testing time?

18     A.    No, there isn't.

19     Q.    Next I'd like to turn your attention back

20   to Exhibit 6, which is still in front of you, and

21   I'm looking at the January 18, 2016 notes.

22           And who prepared these notes?

23     A.    I was the one.

24     Q.    And were these notes taken at or around

25   the time of the counseling session with Mr. Awodiya?

4e42ed13-6299-4742-80d7-435c57c10785

Page 103

1      Q.   And is that your signature at the bottom?

2      A.   Yes, it is.

3      Q.   What was going on at the time this form

4  was signed?

5      A.   So the -- the plaintiff having expressed

6  thoughts of self-harm, and having had signed that

7  safety plan, again, per our standard procedure,

8  would be to have the -- or request that the client

9  signs a release of information.  And it's a request.

10  They don't have to.  But what that does, as you see,

11  if you were to look at the third bullet point, "I

12  authorize the release of information to:  Ross

13  administration."  So the plaintiff here has now

14  given me authority to speak to Ross administration

15  and discuss confidential information.  So,

16  basically, that's what that form is.

17          THE COURT REPORTER:  I'm sorry?

18          THE WITNESS:  Basically that's what that

19      form is.

20          Sorry.

21  BY MR. ROMAN:

22      Q.   If you look to the section beneath the one

23  you just read from, where it says, "This information

24  is released for the following purposes" --

25      A.   Yes.

4e42ed13-6299-4742-80d7-435c57c10785

Page 104

1     Q.   And you'll see that there are two boxes

2     checked.

3     A.   Yes.

4     Q.   The second box says, "To provide

5     information relevant to academic accommodations

6     and/or medical leave of absence."

7          Do you see that?

8     A.   Yes, I do.

9     Q.   Was there a request for academic

10    accommodations at that time?

11    A.   No, there wasn't.

12    Q.   Was there discussion of any early leave

13    from the island?

14    A.   Yes, there was.

15    Q.   Do you know what this release of

16    information consent form was to be used for?

17    A.   That form specifically was to discuss with

18    Mr. Didier about the ticket -- purchasing the

19    ticket, because there was the conversation about him

20    leaving the island -- the plaintiff leaving the

21    island before his original date, the 19th, I think

22    it was, of December, and that documentation --

23    that -- that document would give us the authority to

24    speak to administration about anything relating to

25    the case at the time.

4e42ed13-6299-4742-80d7-435c57c10785

# Exhibit 5

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF FLORIDA

3

4    OLUWAMUYIWA AWODIYA,

5           Plaintiff

6    vs.                          CASE NO.

                                  0:18-cv-60482-KMM

7    ROSS UNIVERSITY SCHOOL OF

     MEDICINE, SCHOOL OF

8    VETERINARY MEDICINE LIMITED,

9           Defendant.

10

     ```````````````````````````

11

12

13          VIDEO-CONFERENCED DEPOSITION OF

14              MATTHEW STEWART-FULTON

15

16              NOVEMBER 5, 2018

17                1:06 P.M.

18

19       ROSS UNIVERSITY SCOOL OF MEDICINE

20            KNOXVILLE, TENNESSEE

21

22

23

24       Deborah West, LCR-314 (TN), CLR

25

Page 8

```
 1            Q     Okay.  What is your job position at
 2    Ross University?
 3            A     Would you like my job title?  What
 4    specifically would you like to know?
 5            Q     We can start with your job title.
 6            A     My job title is assistant director
 7    for student conduct and integrity in academic
 8    accommodations.
 9            Q     In regard to academic
10    accommodations, what is your role as an academic
11    accommodations coordinator?
12            A     I manage the accommodations process.
13            Q     Who makes the final determination --
14            A     I'm sorry, you got cut off.
15            Q     Who makes the final determination?
16            A     I make the final determination.
17            Q     Has it always been like that?
18            A     In the time that I have been working
19    in this role, it has.
20            Q     Do you ever remember meeting the
21    plaintiff in person?
22            A     I do not.
23            Q     Just to be clear, you do not
24    remember --
25                  (Reporter clarification.)
```

```
 1    BY MR. AWODIYA:
 2          Q     You do not remember seeing the
 3    plaintiff in your office for any reason?
 4          A     I do not recall meeting the
 5    plaintiff.
 6          Q     Can a family member of a student
 7    request for accommodations on behalf of the
 8    student?
 9          A     No.
10          Q     Why is that?
11          A     Our process states that the student
12    requesting accommodations is the one who has to
13    make the request and submit the application.
14          Q     And that's what it says in the
15    student handbook?
16          A     That's correct.
17          Q     Give me one second.
18          A     No worries.
19          Q     Can any other faculty request
20    accommodations on behalf of the student?
21          A     No, they cannot.
22          Q     Can any other faculty recommend
23    accommodations for the student?
24          A     Yes, they can.
25          Q     How do you handle recommendations
```

1  all the contacts that I have had from the

2  counseling center.

3          Q      So is it correct that you can

4  neither confirm nor deny whether you received

5  communication from the counseling center on behalf

6  of plaintiff?

7          A      I do not have in my records any

8  documentation from the counseling center regarding

9  the plaintiff.

10         Q      What about phone calls?

11         A      I don't recall if I had any phone

12  calls with the counseling center about the

13  plaintiff.

14         Q      Is faculty at RUSM required to

15  comply with Title III of the Americans with

16  Disabilities Act?

17         A      Are you referring to the ADA?

18         Q      Yes.

19         A      No.

20         Q      Are they required to comply with

21  Section 504 of the Rehabilitation Act?

22                MR. ROMAN:   I will object to this

23                and the last question to the extent it

24                calls for a legal conclusion.  If the

25                witness can answer, he may do so.

1              THE WITNESS:   In reference to when

2         you were enrolled and the campus was

3         located on Dominica, we were not required

4         to comply with the ADA.   Although in the

5         interest of supporting our students, we

6         abided by the spirit of the ADA and

7         Section 504 of the Rehabilitation Act to

8         provide appropriate accommodations within

9         the process that was defined in the

10        student handbook.

11   BY MR. AWODIYA:

12        Q     So just to clarify, there is no

13   policy that requires faculty to comply with those

14   laws you just stated?

15        A     That's my recollection based on

16   what's in the student handbook.

17        Q     So you, yourself, are not required

18   to comply with those laws in Dominica?

19        A     That is my understanding.

20        Q     Where did you get your knowledge

21   about what is required from Title III of the

22   Americans with Disabilities Act?

23        A     From review of the Americans with

24   Disabilities Act and Section 504 of the

25   Rehabilitation Act.   From consultation with the

Page 39

1          Q       Did Mr. Awodiya ever submit this

2    packet of information to you?

3          A       I do not have a record of this in my

4    files.

5          Q       If one had been submitted by

6    Mr. Awodiya, would it have been kept in your files?

7          A       It would have, yes.

8          Q       Earlier in the direct in the

9    examination by Mr. Awodiya, you were asked

10   questions regarding what we have marked as

11   Composite Exhibit Fulton 1.  I am going to put that

12   back in front of you.

13               In particular, I would like for you

14   to turn to the student handbook excerpt which is --

15   sorry, the academic catalog excerpt, which is pages

16   RUSM 183 is the first page and then it skips to

17   242.  Do you see that?

18         A       Yes, sir.

19         Q       On page 242 under the Foundations of

20   Medicine header, do you see that?

21         A       I do.

22         Q       Can you take a moment to review that

23   section?

24         A       All right.

25         Q       What is this section advising

# Exhibit 6

# ROSS UNIVERSITY

Department of Behavioral Sciences – Counseling Center

**INDIVIDUAL SAFETY PLAN**

| SAFETY PLAN |
|---|
| ☑ I agree that I will not attempt to cause harm or injury to myself or engage in an activity with the intention of causing harm or injury to myself. |
| ☑ I agree I will not attempt to kill myself, or engage in an activity with the intention of killing myself. |
| ☑ I agree I will not drive a vehicle if I am upset, angry or having thoughts of harming or killing myself. |
| ☑ I agree to participate in my mental health treatment, including medication (if indicated), medication management and regularly scheduled counseling appointments. |
| ☑ I agree I will not use alcohol or non-prescription medications or illegal drugs. |
| ☑ I do not have a fire arm in my home, nor do I have access to a fire arm. |
| ☑ If I am having thoughts of suicide or feeling like I want to harm myself I will: |

1) Remind myself that _there is life after repeating_ and _family mom & dad_
deeply care for me and love me.

2) Call the following numbers: Ross Emergency 235-9111,
24-Hour Mental Health On-Call 275-1385

☑ I agree to call the following professionals for help and support when needed: _Dr. Cuffy_

_____

_____

☑ If all other steps have failed to keep me safe, I agree I will call Ross Security at 235-5387 and ask to be taken to the nearest hospital or emergency room and ask for assistance.

☐ _____

_____

_____

| Oluyinka Awodiya | Oluwamuyiwa Awodiya | 12/8/15 |
|---|---|---|
| Signature of Client | Client Printed Name | Date |
| | Dr. Man-Cuffy, M.Sc | 12/8/15 |
| Signature of Counselor | Counselor Printed Name | Date |

RUSM 000169

# Exhibit 7

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF FLORIDA

3

4    OLUWAMUYIWA AWODIYA,

5           Plaintiff

6    vs.                          CASE NO.

                                  0:18-cv-60482-KMM

7    ROSS UNIVERSITY SCHOOL OF

     MEDICINE, SCHOOL OF

8    VETERINARY MEDICINE LIMITED,

9           Defendant.

10

     ``````````````````````````

11

12

13          VIDEO-CONFERENCED DEPOSITION OF

14                   BRYAN HAYSE

15

16              NOVEMBER 5, 2018

17                 3:07 P.M.

18

19       ROSS UNIVERSITY SCOOL OF MEDICINE

20            KNOXVILLE, TENNESSEE

21

22

23

24       Deborah West, LCR-314 (TN), CLR

25

1    necessary.

2              If you make changes in your

3    testimony that are inconsistent with the answers

4    given during the deposition, I will be entitled to

5    comment on those discrepancies at trial to question

6    your truthfulness.

7              Do not guess when providing your

8    responses.  Instead, please provide your best

9    estimate based on your recollection.  If you need

10   to take a break at any time, please let me know.

11   All I ask is we not take a break while there is a

12   question pending.

13             Are you here today under the

14   influence of any medication or suffering from any

15   physical, mental, or emotional condition that would

16   affect your ability to hear my questions or to give

17   truthful answers?

18        A    I am not.

19        Q    When did you first hear about this

20   lawsuit?

21        A    Earlier this semester.  I don't know

22   that I can recall a specific date.

23        Q    When did this semester start?

24        A    In September.

25        Q    Do you remember ever seeing

Page 8

1    plaintiff in December of 2015?

2              A     I do.

3              Q     Can you tell me about your encounter

4    with him?

5              A     I can.  I vaguely remember meeting

6    with plaintiff, and I don't recall what the meeting

7    was about.  Since the lawsuit has come to my

8    attention, I was shown documents that were from

9    Mr. Cuffy referring to mine and your, plaintiff's

10   meeting, which jogged my memory from it.

11             So that's all I remember from this

12   meeting.  I don't remember specifics.  I remember

13   meeting after December, but I don't remember the

14   specifics of the December meeting.

15             Q     You said the document has jogged

16   your memory.  Do you know what it caused you to

17   remember?

18             A     Only that my memory that you and I

19   met in January was inaccurate and that you and I

20   had met previously in December.

21             Q     What is your position at Ross

22   University?

23             A     I am currently the Associate Dean

24   for Medical Science Student Affairs.

25             Q     As part of that position, have you

1    question.

2         THE WITNESS:  Yeah.  I would say as

3    far as the ADA is concerned, you know, we

4    comply with, and our policies are built

5    around having accommodations made for the

6    USMLE and around the USMLE processes and

7    policies.

8         Because at the end of the day we

9    want to make sure our students have

10    proper documentation to be at the best

11    stage to get accommodations from USMLE

12    when they get to step one and beyond.

13         Although what we do does not

14    determine that necessarily.  So I would

15    say that what we do is uses ADA as

16    guideline, but we are not necessarily

17    beholden to.

18  BY MR. AWODIYA:

19       Q    Do you know if it's required to

20  comply with Section 504 of the Rehabilitation Act?

21         MR. ROMAN:  Same objection, but you

22    can answer.

23         THE WITNESS:  Is that the same

24    question?

25

Page 15

1    000141 and 144?

2                MR. ROMAN:  Yes.  We can use the

3          same composite exhibit called Fulton 1

4          which has those two pages as the first

5          two pages of the exhibit.

6    BY MR. AWODIYA:

7          Q     Okay.  Dr. Hayse, do you see in this

8    document where it says, "Client returned to office

9    after talking to Dr. Hayse"?

10         A     I do.

11         Q     "And student affairs regarding his

12   academic situation"?

13         A     I do.

14         Q     Do you remember what the academic

15   situation was?

16         A     Unfortunately, I don't.

17         Q     Do you know why plaintiff would have

18   been disappointed after he left your office?

19         A     I do not.

20         Q     Did plaintiff tell you that he was

21   having some type of attention problem?

22         A     I don't recall.

23         Q     Same document.  It says that

24   Mr. Cuffy received an email from you requesting

25   that you talk at some point about the plaintiff.

# Exhibit 8

# Ross University

## SCHOOL OF MEDICINE
### PORTSMOUTH, DOMINICA
### WEST INDIES

Date Printed:   5/21/18
Official Transcript

---

**Name:** Awodiya, Oluwamuyiwa
**Student ID:** @00259355
**SSN / SIN:** ▬▬▬
**Matriculation Date: 05/12/2014**
**Date of Birth:** ▬▬▬
**Program of Study:** Doctor of Medicine

| Course | Course Title | Grade | Credit |
|--------|-------------|-------|--------|

### Basic Science

#### Summer 2014 — 5/12/14 - 8/22/14

| Course | | Course Title | Grade | Credit |
|--------|---|-------------|-------|--------|
| MIOB | 1101 | Foundations of Medicine I | P | 13.00 |
| MCLM | 1102 | Clinical Skills I | P | 2.00 |

| | Earned Credits | GPA QP | QP Credits | GPA |
|--|----------------|--------|------------|-----|
| Semester: | 15 | 0 | 0 | 0.00 |
| Cumulative: | 15 | 0 | 0 | |

#### Fall 2014 — 9/08/14 - 12/19/14

| Course | | Course Title | Grade | Credit |
|--------|---|-------------|-------|--------|
| MIOB | 1201 | Foundations of Medicine 2 | C+ | 10.00 |
| MCLM | 1203 | Clinical Skills 2 | A | 4.00 |

| | Earned Credits | GPA QP | QP Credits | GPA |
|--|----------------|--------|------------|-----|
| Semester: | 14 | 41 | 14 | 2.92 |
| Cumulative: | 29 | 41 | 14 | 2.92 |

#### Spring 2015 — 1/12/15 - 4/24/15

| Course | | Course Title | Grade | Credit |
|--------|---|-------------|-------|--------|
| MIOB | 2303 | Foundations of Medicine 3 | C | 10.00 |
| MCLM | 2304 | Clinical Skills 3 | B+ | 2.00 |

| | Earned Credits | GPA QP | QP Credits | GPA |
|--|----------------|--------|------------|-----|
| Semester: | 12 | 27 | 12 | 2.25 |
| Cumulative: | 41 | 68 | 26 | 2.61 |

#### Summer 2015 — 5/11/15 - 8/21/15

| Course | | Course Title | Grade | Credit |
|--------|---|-------------|-------|--------|
| MIOB | 2404 | Foundations of Medicine 4 | C | 9.00 |
| MCLM | 2405 | Clinical Skills 4 | A | 2.00 |

| | Earned Credits | GPA QP | QP Credits | GPA |
|--|----------------|--------|------------|-----|

| | | | | |
|--|--|--|--|--|
| Semester: | 11 | 26 | 11 | 2.36 |
| Cumulative: | 52 | 94 | 37 | 2.54 |

#### Fall 2015 — 9/07/15 - 12/18/15

| Course | | Course Title | Grade | Credit |
|--------|---|-------------|-------|--------|
| MIOB | 2501 | Foundations of Medicine 5 | R | 0.00 |
| MCLM | 2502 | Clinical Skills 5 | A | 2.00 |

| | Earned Credits | GPA QP | QP Credits | GPA |
|--|----------------|--------|------------|-----|
| Semester: | 2 | 8 | 2 | 4.00 |
| Cumulative: | 54 | 102 | 39 | 2.61 |

#### Spring 2016 — 1/11/16 - 4/22/16

| Course | | Course Title | Grade | Credit |
|--------|---|-------------|-------|--------|
| MIOB | 2501 | Foundations of Medicine 5 | B | 10.00 |
| MCLM | 2502 | Clinical Skills 5 | B+ | 2.00 |
| MDBS | 2503 | Essential Lifelong Learning 5 | P | 3.00 |

| | Earned Credits | GPA QP | QP Credits | GPA |
|--|----------------|--------|------------|-----|
| Semester: | 15 | 37 | 12 | 3.08 |
| Cumulative: | 69 | 139 | 51 | 2.72 |

**Total Attempted Credit Hours:** 79
**Total Earned Credit Hours:** 69
No Entries Below This Line

---

**Comments:**   04/13/2017-Dismissed-LDA: 04/22/2016
**Enrollment Status as of 5/21/18: Dismissed**

RUSM 000032

# Exhibit 9

**Name:**    Oluwamuyiwa O    **DOB:**  ████████    **Student ID:**  ████████
            Awodiya (M)

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)          Note Date: 10/28/2015 02:55 PM
[5597]
Pt. Phone:          DOB: ████████ (Age 23)

**Summary of note:** Relationship Distress With Spouse or Intimate Partner
**Allergies:** No Entry
**Current Medications:** No Entry
**Semester:** Semester 1

**Progress:**

# Counseling Psychosocial Intake

## PERSONAL INFORMATION/DEMOGRAPHICS

Age:  23 yr
Gender:  male
Race/Ethnicity: other "Black"
International student:
Religous/Spiritual Preference or Affiliation:   No Preference
Relationship Status single Just broke up w/ gf of 6 months
Sexual Orientation: heterosexual

## PRESENTING PROBLEM

Presenting Problem:   "I'm having a problem with a certain someone." In relationship since 4th semester with student at RUSM. She was in relationship and broke up. She "cheated" on him 2 x's. He just found out about second time 3 days ago. He went to the Health Clinic at 3 am today due to distress from hypertension. Dr.Samuel refered to Counseling via on-call..

Referral Source:  Health Clinic

Academic performance:  Good, passing. Reports last mini was his worst grade at RUSM.

Study patterns/ habits:  Good. Recently disrupted by rx.

Current stressors:  (indicate severity) other Interpersonal romantic relationship.

## PREVIOUS MENTAL HEALTH AND PSYCHIATRIC HISTORY

Previous Mental Health and Psychiatric History:   None

Previous Diagnosis:   None

Previous Psychotropic Medications:   None

## MENTAL HEALTH/PSYCHOSOCIAL STATUS

This document has been signed electronically.

RUSM 000159

**Name:**     Oluwamuyiwa O      **DOB:**          ███████          **Student ID:**    ███████
              Awodiya (M)

**Diagnosis:**

---

Current Diagnosis: None

Current Medications:   None

History of Psychosis (auditory or visual hallucinations, or delusions):    No

History of assault: no

History of childhood abuse: no

History of traumatic event(s): no

History of past loss: no

**SELF HARM/SUICIDE/HOMICIDE SCREEN**

Self harm/Suicide/Homicide screen  no thoughts of harm to self, no history of self-injurious behavior, no history of suicidal ideation, no thoughts of harm to others

**FAMILY MENTAL HEALTH HISTORY**

Family Mental Health History:   None

**PAST MEDICAL HISTORY**

Overall Health:   Good, 7/8 on 1 - 10 scale, 10 being highest.

Diagnosis:   Hypertension.

Medications:   Losartan ( since Sept. 2015)

Surgeries:   None

Medication Allergies:   None

Allergies: None

**WELLNESS INVENTORY**

Living Situation off campus, alone

Social health concerns/problems:   avoiding social contact Stays in apt. Reports sometimes he does not leave apt for weeks. Orders food delivered.

Sleep disturbance:

Sleep disturbance: frequent awakening thru night Last couple of days..

Exercise:   Bench press 2 X's week.

Stress Management:   "I don't usually get stressed or angry." Just recently since trouble w/ gf.

Coping strategies used by client: "I tell myself it does not matter or ignore the issue." Stays in apt. and focuses on studies. Limits social interaction.

2 of  5

**Name:** Oluwamuyiwa O Awodiya (M)    **DOB:** ▮▮▮▮    **Student ID:** ▮▮▮▮

**Diagnosis:**

---

Protective Factors premorbid intelligence/education Clt finished college in 3 years.

**FAMILY/SOCIAL/CULTURAL**

Family/Social/Cultural  (Parents/living or deceased/occupation; Siblings; Place of birth) Parents never married. Mother used to yell at father and hit him. Father ignored and did not react. Did not leave the house much while growing up. "I am very happy just staying at home." Grew up in MD. Parents from Nigeria. 1 younger sister.  1 younger brother. He does not share personal issues with parents. Likes to manage himself. Has never told parents about girlfriend.

**EDUCATION HISTORY**

Education History (Primary/MS/HS [any learning or behavioral issues]; Undergrad/Grad/etc./Institution/Major) Morgan State Univ.

**DEVELOPMENTAL HISTORY**

Developmental History:  Non remarkable.

**EMPLOYMENT HISTORY**

Employment/military (type of work/hours worked per week): Tutor in college for 1 year.

Extracurricular Activity (hobbies, organized sports, clubs, student government, etc.): TV series. Use to play basketball, but not this semester.

**LEGAL HISTORY**

Legal History:   none

Confrontational incidents: no

**SUBSTANCE USE HISTORY**

Alcohol use (select all that apply and provide all relevant details):   never

Substance use:  caffeine Drinks sodas

**REVIEW OF SYMPTOMS**

Anger issues:
Anger: no.
Appetite:

Appetite: no change.
Weight change: none
Concentration/thought difficulty (if so, please provide details):

Concentration/thought difficulty: moderate.
Crying episodes:

Crying episodes: no.
Depressed/sad mood:

3 of 5

This document has been signed electronically.

RUSM 000161

**Name:**     Oluwamuyiwa O     **DOB:**  ███████          **Student ID:** ███████
              Awodiya (M)

**Diagnosis:**

---

Depressed/sad mood: severe Severe according to BDI-II. Clt reported all symptoms are very recent in last week..
Diminished self-esteem:

Diminished self-esteem: yes, moderate.
Cutting/self-injury: no
Disordered eating behaviors:
Fatigue/decreased energy:

Fatigue/decreased energy: yes Reports he has always lacked engery..
Guilty feelings present:

Guilty feelings present: no.
Impulse/activity concerns:

Impulse/activity concerns: no.
Irritability/aggression:

Irritability/aggression: no.
Mood swings:

Mood swings:  no.
Panic attacks:

Panic attacks: yes, mild One panic attack since break up, primarily shortness of breath, increased anxiety, could not think, heart pounding..


**MENTAL STATUS**

Mental Status:   Within normal limits.

**PERSONAL STRENGTHS/ACCOMPLISHMENTS**

Personal Strengths:  1. Humility, 2. Understanding 3. Compassionate

Accomplishments: (What you are most proud of accomplishing, either personal or professional.) Getting into medical school and completing college in 3 years.

Social support resources: friends

**ASSESSMENT/PLAN**

Client Goals for Treatment/ Counseling:   Wants objective prespective on situation with gf. "I'm in the middle of it and need guidance and feedback."

Initial Clinical Impressions:   Clt was referred by Dr. Samuel at Heatlh clinic. He told her he had tried to get into counseling this week but there were no appointments available. He told me that he wanted to come to counseling but decided not to. Client suffering from grief and confusion regarding finding out gf cheated on him for the second time in 6 months. They are offically broken up but he wants to get back together with her.

Risk Factors physical health comorbidity

Prognosis fair

This document has been signed electronically.

RUSM 000162

**Name:**      Oluwamuyiwa O    **DOB:**                    **Student ID:**   
Awodiya (M)
**Diagnosis:**

---

Treatment Plan/Referrals:   Clt suggested individual counseling and offered couples therapy.


**Assessment:**
1)Relationship Distress With Spouse or Intimate Partner - V61.10


**Plan:**
Counseling Crisis (V61.10)

RTC in 1 week. Clt will call to schedule.
  *- Entered by Laura Cobb on Oct-28-2015 04:03 PM*
Signed by: Laura Cobb on Oct/28/2015 04:03 PM

***Locked by: Laura Cobb on Oct/28/2015 04:03 PM***

This document has been signed electronically.

RUSM 000163

# Exhibit 10

| Name: | Oluwamuyiwa O Awodiya (M) | DOB: | ⬛⬛⬛ | Student ID: | ⬛⬛⬛ |

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                          Note Date: 11/05/2015 02:15 PM
[5597]
Pt. Phone:                          DOB: ⬛⬛⬛ (Age 23)

**Summary of note:** Relationship Distress With Spouse or Intimate Partner
**Allergies:** No Entry
**Current Medications:** No Entry
**Semester:** Semester 1, Semester 5

**Subjective:**
Reports being happier, better able to study, less anxiety. Still seeing gf, they talk, text and study toghether. "I was not able to not talk to her." Has gone out to parties, realizes other girls are attracted to him. Wants to try to maintain rx w/ gf and asked for advice as how to do that given that she has lied numerous times to him.

He found out from friends that gf has lied about how many times she slept w/ other man. He reports the "went to the extreme of buying a cell phone and giving to a friend to use as an alibi when seeing other man.

Clt reports gf first told him she was pregant and took a test to verify, then later said she lied and did not take the test. He reports being confused and asked cln for advice.

Gf has medical condition AIP, was hospitalized in Roseau and had to repeat 4th sem.
  *- Entered by Laura Cobb on Nov-05-2015 03:17 PM*

**Objective:**
Cln prompted client to reflect on why he still wanted to be with gf after numerous lies as he reports this conflicts with his values. Cln prompted client to set clear expectations w/ gf.
  *- Entered by Laura Cobb on Nov-05-2015 03:17 PM*

**Assessment:**
1)Relationship Distress With Spouse or Intimate Partner - V61.10

Client is struggling with denial that his gf could have lied to him to this extent. He feels that she will change her behavior for him.
  *- Entered by Laura Cobb on Nov-05-2015 03:17 PM*

**Plan:**
Counseling 1 Hour (V61.10)

RTC in 1 week
  *- Entered by Laura Cobb on Nov-05-2015 03:17 PM*
  Signed by: Laura Cobb on Nov/05/2015 03:17 PM

***Locked by: Laura Cobb on Nov/05/2015 03:17 PM***

1 of 2

This document has been signed electronically.

RUSM 000136

**Name:** Oluwamuyiwa O Awodiya (M)   **DOB:** ▮▮▮▮   **Student ID:** ▮▮▮▮

**Diagnosis:**

This document has been signed electronically.

RUSM 000137

# Exhibit 11

**Name:** Oluwamuyiwa O **DOB:** ▮▮▮▮▮ **Student ID:** ▮▮▮▮▮
Awodiya (M)
**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                    Note Date: 12/08/2015 08:44 AM
[5597]
Pt. Phone:                  DOB: ▮▮▮▮▮▮ (Age 23)

**Summary of note:** Client admitted to thoughts of self harm but denied being suicidal or having a plan. He was seen by the consulting psychiatrist. Safety plan signed. Follow up appointments set up with the psychiatrist and counselor. Client to check in daily.
**Allergies:** No Entry
**Current Medications:** No Entry
**Semester:** Semester 1, Semester 5

**Progress:**
# Suicide Assessment

**Risk Factors: Suicidal behavior**
Do you have a history of suicide ideations? No
Do you have a history of suicide attempts? No
Are you having any self-harm ideations presently? Yes
Are you having any suicidal ideations presently? No
Have you had any aborted suicide attempts? No

**Current/past psychiatric disorders:**
Do you have any feelings of depressed/sad mood? Yes
Do you have any feelings of anxiety/panic Yes
Do you have a history of psychosis (auditory/visual hallucinations/delusions) No
Do you use alcohol or any other substance? No
Have you tried to cut down your alcohol/substance use?
Do you feel guilty about your alcohol/substance use?
Do you feel angry when people talk to you about your alcohol/substance use?
Do you feel that you need to have alcohol/substance to start your day?
Cluster B personality disorders & conduct disorders
Do you have difficulty controlling your anger? No
Do you experience significant mood changes?No
Do you plan ahead, or do you make decisions on the spot? plan ahead
Do you feel strong urges to do things that are hard to resist? No

**Key symptoms**
Do you have sleep difficulties?Yes Initial & middle insomnia
Have you lost interest in activities that you previously enjoyed? Yes
Have you felt down, depressed or hopeless recently? Yes

**Family history:**
Does anyone in your family have a history of suicide attempts? No
Does anyone in your family have a history of psychiatric disorder? No

**Precipitants/stressors/interpersonal**

1 of 3

This document has been signed electronically.

RUSM 000138

**Name:** Oluwamuyiwa O Awodiya (M)  **DOB:** ███████  **Student ID:** ███████

**Diagnosis:**

___

Do you have any current stressors? Yes Academics, relationship
Do you have a mental health/psychiatric diagnosis? No
Are you presently using any psychotropic medication? No
Are you presently experiencing any psychosocial issues? Yes relationship issues
do you have a history of any form of abuse or assault? No
Have you experienced any traumatic events? No
Have you recently had a significant change in your treatment (provider, medication, recent hospitalization)? No
Have you experienced any significant loss? No  except for his girlfriend
Are you experiencing any guilt feelings? No
Have you had a change in your treatment? (inpatient discharge, provider, treatment type or medication change) No

**Misc. Factors**
Do you have access to firearms?  No
Internal: ability to cope with stress, religious beliefs, frutration tolerance
External: responsibility to children or pets, + therapeutic relationships, social supports

**Suicide Inquiry**
Ideation: Obtain information regarding frequency, intensity, duration, impact in last 48 hours, past month and worst ever. This morning he reported having intense  frightening thoughts of harming himself which went on for about 45 mins. These thoughts are as a result of a call that he received from Student Affairs informing him that he failed he was one point shy of the mps for his class.  he did very well on the NBME exam with a grade of 80% but did poorly on at least 2 of his minis which resulted in his over all gade being 65% whereas the mps for semester 5C was 66%.
Do you have a history of suicide ideations?  Yes He admitted having similar thoughts around mini 1 of this semester when he found out that his girlfriend was being unfaithful.
Are you having any self-harm ideations presently?  Yes
Are you having any suicidal ideations presently?  No
Behaviors:  None
Plan:  None
Do you have a history of suicide attempts?  No
Have you had any aborted suicide attempts? No
Intent: Extent to which patient expects to carry out the plan:  NO plan, Degree of ambivalence regarding plan:  He does not have a plan, Reasons to live:  The life that I want, being a doctor and to have a loving wife & kids.
Do you have or have you ever engaged in any self-injurious behaviors?  No

**Risk level/Intervention**
Assessment of risk level based on clinical judgment:  Client contemplated harming himself but does not have a plan.
Reassessment as patient or environmental circumstances change.

**Assessment:**
1)Academic or Educational Problem - V62.3
2)Adjustment Disorders - With mixed anxiety and depressed mood - 309.28

**Plan:**
Counseling Crisis (V62.3)
*Referral Orders:* Referral To Psychiatry (V62.3)

Signed by: McMillan Cuffy on Dec/08/2015 10:50 AM

2 of 3

This document has been signed electronically.

**Name:**  Oluwamuyiwa O   **DOB:**  ⬛⬛⬛⬛   **Student ID:**  ⬛⬛⬛⬛
Awodiya (M)

**Diagnosis:**

---

*Locked by: McMillan Cuffy on Dec/08/2015 10:50 AM*

This document has been signed electronically.

RUSM 000140

# Exhibit 12

**Name:**     Oluwamuyiwa O     **DOB:** ▉▉▉▉▉         **Student ID:** ▉▉▉▉▉
             Awodiya (M)

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                    Note Date: 12/11/2015 07:48 AM
[5597]
Pt. Phone:                    DOB: ▉▉▉▉▉ (Age 23)

**Summary of note:** Client will meet with the consulting psychiatrist and myself today.
**Allergies:** No Entry
**Current Medications:** No Entry
**Semester:** Semester 5

**Progress:**
**Followup**

Progress since last session: less severe symptoms

Session content: CLient stopped by yesterday afternoon after meeting with Dr. Hayes at Student Affairs. He came out of the meeting feeling disappointed but denied having negative thoughts or thoughts of self harm.  Later that evening,  I reached out to the student informing him that through the office of the Executive Director, an airline ticket could be purchased to get him home today (Friday, 12/11/15) but he sais that he couldn't leave just yet since he had not yet packed and moved his belongings in storage since he had already informed his landlord that he was leaving.  The plan now is that he will leave the island on Saturday, 12/19/15 which was his original date of departure but that he will continue to check in with Counseling on a daily basis which is part of his safety plan.

Clinical assessment: Adjustment disorder with mixed moods.

Overall Impression: stable

Suicide/self-harm risk: low

**Assessment:**
1)Adjustment Disorders - With mixed anxiety and depressed mood - 309.28

**Plan:**
Counseling Crisis (309.28)

Signed by: McMillan Cuffy on Dec/11/2015 07:48 AM

*Locked by: McMillan Cuffy on Dec/11/2015 07:48 AM*

1 of  1

This document has been signed electronically.

# Exhibit 13

**Name:** Oluwamuyiwa O Awodiya (M)   **DOB:** ███████   **Student ID:** ███████

**Diagnosis:**

---

**RUSM Counseling Center**
**P.O. Box 266**
**Roseau, DM 11111**
**(767)255-6553**

Oluwamuyiwa O Awodiya (M)                    Note Date: 12/14/2015 01:23 PM
[5597]
Pt. Phone:                    DOB: ███████ (Age 23)

**Summary of note:** Academic or Educational Problem, Persistent Depressive Disorder (Dysthymia)
**Allergies:** No Entry
**Current Medications:** Diclofenac Sodium 75mg Delayed-Release Tablet, Losartan Potassium 25mg Tablet
**Semester:** Semester 5

**Progress:**
Feeling a bit down today.

Not suicidal

Felt sad after former gf promised him a day and then said she was too busy. He was hopeful that they would have a physical relationship and felt let down.

Feels lonely and wishes he could go home

Agreed to try welbutrin and will review tomorow.
 *- Entered by Davendra Sharma on Dec-14-2015 01:23 PM*

**Assessment:**
1)Academic or Educational Problem - V62.3
2)Persistent Depressive Disorder (Dysthymia) - 300.4

Stable though slightly depressed
 *- Entered by Davendra Sharma on Dec-14-2015 01:23 PM*

**Plan:**
Add welbutrin 150 mg as a trial for ADHD screening
 *- Entered by Davendra Sharma on Dec-14-2015 01:23 PM*
 Signed by: Davendra Sharma on Dec/14/2015 01:23 PM

*Locked by: Davendra Sharma on Dec/14/2015 01:23 PM*

1 of 1

# Exhibit 14



# *STUDENT HANDBOOK*

# **2015 – 2016**

**January 1, 2016**

© 2016 Ross University School of Medicine.  All rights reserved.

RUSM 000326

# Contents

DEAN'S MESSAGE ....................................................................................................................................4

USING THE STUDENT HANDBOOK ..........................................................................................................4

PROFESSIONALISM AND CONDUCT .........................................................................................................5

    STANDARDS OF EXPECTED CONDUCT AND BEHAVIOR ......................................................................6

    RUSM TECHNICAL STANDARDS ..........................................................................................................7

    AMA ETHICAL PRINCIPLES ..................................................................................................................8

    HONOR CODE ......................................................................................................................................9

    CODE OF CONDUCT ...........................................................................................................................10

ACADEMIC ...........................................................................................................................................11

    CURRICULUM OVERVIEW ..................................................................................................................17

    STUDENT GRADING AND PROMOTIONS POLICIES ............................................................................21

    ACADEMIC STANDING & PROGRESS .................................................................................................26

    EXAMINATIONS .................................................................................................................................28

    USMLE STEP 1 EXAM ........................................................................................................................30

    USMLE STEP 2 EXAMS ......................................................................................................................31

    COMMENCEMENT ............................................................................................................................34

    LICENSURE TO PRACTICE MEDICINE .................................................................................................34

    ACADEMIC DISCIPLINARY ACTIONS ..................................................................................................35

POLICIES AND ADMINISTRATIVE PROCEDURES .....................................................................................38

    ACCOMMODATIONS FOR STUDENTS WITH DISABILITIES .................................................................46

    ALCOHOL AND SUBSTANCE ABUSE POLICY ......................................................................................48

    APPEALS ...........................................................................................................................................51

    ATTENDANCE ....................................................................................................................................52

    BLOODBORNE PATHOGENS EXPOSURE POLICY ................................................................................54

    CAMPUS LIFE – INTRAMURALS, CLUBS AND ORGANIZATIONS, AND STUDENT LEADERS ...................57

    CLINICAL CLERKSHIPS AND ELECTIVES IN NEW YORK .......................................................................58

    CODE OF CONDUCT ...........................................................................................................................59

    COMMITMENT TO NON-DISCRIMINATION AND NON-HARASSMENT ................................................67

    CONTACT INFORMATION ..................................................................................................................69

    COURSE EVALUATIONS POLICY .........................................................................................................70

    DOMINICA CAMPUS STUDY SPACE POLICY ......................................................................................71

    DOMINICA PRINTING POLICY ............................................................................................................76

    DOMINICA SMOKING POLICY ...........................................................................................................78

    DOMINICA STUDENT CENTER FOOD AND DRINK POLICY ..................................................................79

    DOMINICA STUDENT GUEST PASS POLICY .......................................................................................81

    FACILITIES .........................................................................................................................................83

FINANCIAL AID, STUDENT LOAN DEFERMENT, TUITION PAYMENTS AND REFUNDS ............................................... 84

HEALTH DOCUMENTATION ..................................................................................................... 86

HONOR CODE VIOLATIONS AND SANCTIONS ............................................................................... 87

HOUSING IN DOMINICA ......................................................................................................... 89

IMMIGRATION ...................................................................................................................... 90

LIBRARY AND LEARNING RESOURCE CENTER IN DOMINICA ........................................................... 91

LIFE IN DOMINICA ................................................................................................................ 92

PETS IN DOMINICA ............................................................................................................... 94

PHOTOGRAPHY AND VIDEO IMAGING POLICY ........................................................................... 95

PREPARING FOR DEPARTURE FROM DOMINICA .......................................................................... 96

PRIVACY RIGHTS AND FERPA NOTIFICATION ............................................................................. 97

READMISSION TO RUSM ......................................................................................................... 99

REGISTRATION AND OTHER REGISTRAR SERVICES ...................................................................... 100

RELIGIOUS OBSERVANCES ..................................................................................................... 103

SANCTIONS ........................................................................................................................ 104

SECURITY IN DOMINICA ........................................................................................................ 108

SEVEN YEAR POLICY ............................................................................................................. 109

SEXUAL OFFENSES ............................................................................................................... 110

SPECIAL GRADUATION DATE REQUEST POLICY .......................................................................... 118

STUDENT GOVERNMENT ASSOCIATION ................................................................................... 119

NBME SUBJECT CLERKSHIP EXAM POLICY ................................................................................. 120

RUSM 000328

4

## DEAN'S MESSAGE

There has never been a greater need for the skilled, caring and knowledgeable physicians. We at Ross University School of Medicine (RUSM) are part of a proud and noble tradition helping to meet that need. Over the past five years, RUSM has had more graduates placed in U.S. residency programs than any other school in the world. Our aspiring physicians come here to do what it takes to learn, to persevere, and to succeed in improving themselves and the future care of their patients. We attract an impressively credentialed faculty and staff that are similarly motivated. We welcome you as you begin this new chapter in your lives, and are excited to have you join our community.

Joseph A. Flaherty, MD
Dean and Chancellor, Ross University School of Medicine

## USING THE STUDENT HANDBOOK

### Overview
This Student Handbook is effective as of January 1, 2016. Its contents apply to all students, including those on semester break, Approved Absence (AA) or Temporary Withdrawal, and those visiting other medical schools or clinical affiliates. As these policies govern your time as a student at RUSM, we expect you to be familiar with the content of both this Student Handbook and the Academic Catalog. Any student who receives financial aid should also read the *Financial Planning Guide*, since only general aspects of financial aid are included here.

### Current Policies
Please be aware that this edition of the Student Handbook supersedes all prior editions, online or in hard copy. From time to time, updates to policies will be made to both the Student Handbook and Academic Catalog. RUSM reserves the right to change the rules, regulations, course offerings, degree requirements, academic calendar, and other material contained in this Student Handbook or the Academic Catalog at any time. We will make every attempt to notify students in advance of significant changes in policy, but we recommend you refer to these documents frequently. It is the student's responsibility to keep current on all University policy.

5

# PROFESSIONALISM AND CONDUCT

RUSM 000330

# STANDARDS OF EXPECTED CONDUCT AND BEHAVIOR

## Purpose

RUSM respects the strong work ethic and vision that motivates students to join our school. We know the commitment required to navigate the road ahead of you, and recognize the crucial role that a safe, productive academic environment plays in the pursuit of a medical career. We have established this Code of Conduct to promote a healthy learning environment, and expect you to become familiar with the code, through study and through close observation of these ethics in action among your colleagues and teachers.

Use this as a professional tool to guide you in beginning your career as a trusted member of the medical community. As with physicians, RUSM students are expected to display the highest standards of ethical and professional behavior. This extends to all aspects of your life, requiring conduct that displays honesty, maturity and respect for others. The Dean and the Dean's designees developed and enforce these policies and procedures both to promote an atmosphere conducive to active learning, and to preserve the educational mission of RUSM.

By applying, accepting admission, enrolling in and attending classes at RUSM or using the many services at your disposal, you indicate your acceptance of these standards of conduct. Adherence to the Code of Conduct, together with the Honor Code, the Technical Standards, and the AMA Guidelines in effect at any time, will contribute to your credibility and success as a medical professional and are essential to your successful completion of the RUSM program.

Not only students, but their guests, partners, family members, and former students granted temporary access and any person authorized to act on a student's behalf, are also required to comply with the Code of Conduct. Students, partners, family members, former students with temporary access or their guests or agents who fail to do so will be subject to disciplinary action. Students are responsible for their guests, partners, family members or agents and their compliance with the Code of Conduct and all policies set forth in this Student Handbook and on the RUSM student Portal, as well as all other published RUSM policies. Students may be held accountable for the actions of their partners, family members, guests or agents.

These standards of conduct govern your actions at all times during your educational career with RUSM, regardless of when or where such conduct occurs. These standards apply to student conduct occurring on or off campus and during periods of active enrollment, semester break, AA, emergency or short-term personal leaves or while suspended or withdrawn from RUSM.  There are several sets of standards you will be expected to meet throughout your tenure as a medical student and during your career as a physician; students must also be capable of meeting all levels of proficiency and ethical conduct defined in the following standards.

- **Technical Standards:** These define a basic level of proficiency in medical science and application that students are required to obtain during their schooling in order to demonstrate a capacity to serve competently as a physician.
- **American Medical Association Code of Ethics:** The AMA Code of Ethics defines the essentials of honorable behavior for the physician.  RUSM relies on the AMA Code of Ethics, among other sources, when evaluating whether a student's conduct befits that expected of a medical professional and, thus, students should familiarize themselves with the AMA Code of Ethics.
- **Honor Code:** The Honor Code and Constitution developed by members of the Student Government Association (SGA) is accompanied by a mandatory pledge by each student and other members of the RUSM community to conduct themselves honorably at all times and in all dealings with others.
- **Code of Conduct:**  The Code of Conduct is set forth below.

Knowing and following these standards will provide a basis of understanding the capabilities, character and demeanor of the qualified, ethical physician. Any behavior in conflict with the tenets of these documents may result in disciplinary action (see Sanctions listed in the Policies and Administrative Procedures section of this Student Handbook).  In addition to taking appropriate disciplinary measures, RUSM also may report illegal or criminal conduct to appropriate law enforcement authorities.

## RUSM TECHNICAL STANDARDS

**Qualifications for Doctor of Medicine Degree Candidates**

**Introduction**
The Liaison Committee on Medical Education has recommended that all medical schools develop technical standards to assist them in determining whether applicants for admission to the School of Medicine or candidates seeking the degree of Doctor of Medicine are qualified to pursue a career in medicine. This document, *Qualifications for Doctor of Medicine Degree Candidates*, contains RUSM technical standards, based on guidelines produced by the Association of American Medical Colleges. This document is also published in the Student Handbook distributed to all matriculating candidates. All applicants who reach the interview stage will be required to read the Technical Standards and to sign a copy of this document to indicate that they understand the Technical Standards. The signed form is kept as a permanent part of the record of all matriculating candidates.

**Technical Standards**

Medicine is a physically and mentally demanding profession in which practitioners are asked to place the interests of their patients above their own, which requires commitment to a life of service, and dedication to continuous learning. RUSM has a responsibility to society to train physicians who are prepared to care for their patients with critical judgment, broadly based knowledge, and well-honed technical skills. The abilities that physicians must possess to practice safely are reflected in the technical standards that follow. Thus, applicants and candidates must be able to meet these standards and successfully complete all identified requirements to be admitted to RUSM, to progress through the curriculum and ultimately, to receive the degree of Doctor of Medicine. Candidates for the degree of Doctor of Medicine must be capable of performing in the following defined areas: Observation, Communication, Motor, Strength and Mobility, Cognitive and Social.

**A. Observation**

Candidates must be able, with or without reasonable accommodation, to observe and participate in experiments. In order to make proper clinical decisions, candidates must be able to accomplish the following, with or without accommodation: (i) observe a patient accurately using all necessary senses, (ii) acquire information from written documents, films, slides or videos, and (iii) interpret X-ray and other graphic images, and digital or analog representations of physiologic phenomena, such as EKGs.

**B. Communication**

Candidates must be able to accomplish the following, with or without reasonable accommodation: (i) communicate effectively, sensitively and rapidly with patients and members of the health care team (both verbal (spoken)and written), (ii) understand and convey information essential for the safe and effective care of patients in a clear unambiguous and rapid fashion in emergency situations, and (iii) relate information to and receive information from patients in caring and confidential manner. Candidates must be fluent in English.

**C. Motor**

Candidates must possess the motor skills necessary to themselves accomplish the following, with or without reasonable accommodation: (i) perform palpation, percussion, auscultation, and other diagnostic maneuvers, (ii) perform basic laboratory tests (urinalysis, CBC, etc.), (iii) carry out diagnostic procedures (proctoscopy, venopuncture, paracentesis, etc.) and (iv) provide general care and emergency treatment to patients. Examples of emergency treatment reasonably required of physicians are cardiopulmonary resuscitation, the administration of intravenous medication, application of pressure to stop bleeding, the opening of obstructed airways, the suturing of simple wounds, and the performance of simple obstetrical maneuvers.

**D. Strength and Mobility**

Candidates must have sufficient posture, balance, flexibility, mobility, strength and endurance, with or without reasonable accommodation, for necessary standing, sitting, and participating in the laboratory, classroom and clinical centers. They must have sufficient personal dexterity to perform examinations and procedures as required on their clinical rotations.

**E. Cognitive**

In order to solve clinical problems effectively, candidates must be able to measure, calculate, reason, analyze, integrate and synthesize in a timely fashion. In addition, they must be able to comprehend three-dimensional relationships and to understand the spatial relationships of structures.

**G. Social**

Candidates must demonstrate throughout their medical education compassion, integrity, concern for others, necessary and appropriate interpersonal skills, interest and motivation. Candidates must possess the emotional health required for the full utilization of their intellectual abilities, for the exercise of good judgment, for the prompt completion of all responsibilities attendant to the diagnosis and care of patients, for the development of effective relationships with patients and for effective functioning as a member of the health care team. Candidates must be able to tolerate physically taxing workloads and function effectively under stress. They must be able to adapt to changing environments, display flexibility and learn to function in the face of uncertainties inherent in the clinical problems of patients.


# AMA ETHICAL PRINCIPLES


## American Medical Association Principles of Medical Ethics Preamble

The medical profession has long subscribed to a body of ethical statements developed primarily for the benefit of the patient. As a member of this profession, a physician must recognize responsibility to patients first and foremost, as well as to society, to other health professionals, and to self. The following Principles adopted by the American Medical Association are not laws, but standards of conduct which define the essentials of honorable behavior for the physician.

Principles of medical ethics:

1.  A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.

RUSM 000333

9

2.   A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.

3.   A physician shall respect the law and also recognize a responsibility to seek changes in those requirements which are contrary to the best interests of the patient.

4.   A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.

5.   A physician shall continue to study, apply, and advance scientific knowledge, maintain a commitment to medical education, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.

6.   A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care.

7.   A physician shall recognize a responsibility to participate in activities contributing to the improvement of the community and the betterment of public health.

8.   A physician shall, while caring for a patient, regard responsibility to the patient as paramount.

9.   A physician shall support access to medical care for all people.

*Adopted June 1957; revised June 1980; revised June 2001*

## HONOR CODE

**The Concept of Honor at RUSM**

The Honor System at RUSM is a deeply cherished obligation founded upon the personal integrity of each individual member of the RUSM community. It requires that all members of this community conduct themselves honorably at all times and in all dealings with others. This shared commitment to high ethical standards creates an atmosphere of trust and respect vital to the unique sense of community, which characterizes the institution.

Authority for the maintenance and operation of the Honor Code is delegated directly by the Board of Trustees to the students through the Dean, with concurrence of the faculty. It is the students who are responsible for determining when a breach of honor has been committed, and it is they who are entrusted with enforcing the system. Accordingly, every member of the student body has the responsibility, not only for understanding the provisions of the Honor Code, but also for maintaining at all times the highest possible degree of personal integrity. Moreover, every student must realize that acceptance of admission to RUSM includes the explicit agreement to abide by the provisions of the Honor Code.

The presence of the Honor Code and its provisions does not in any way abridge or subrogate the responsibilities of the faculty in monitoring the student body in all areas herein identified, and in bringing actions through previously adopted mechanisms if incidents occur which are not brought to the attention of RUSM by the Honor Council.

**THE HONOR CODE**

The Honor Code applies to every student who is enrolled at RUSM. Accordingly, every student shall be required to verify acceptance of the Honor System by signing the following Honor Pledge:

> "As a student at RUSM, I, (student name), do hereby accept the Honor System. I have received the Student Handbook and am fully aware of the Honor Code and Constitution and Student Code of Conduct contained within. I agree to read and become familiar with the Honor Code and Constitution and the Student Code of Conduct.
>
> Accordingly, I resolve to refrain from conducting myself in a manner that is unbecoming of a medical professional. I acknowledge that, in support of the Honor System, it is my responsibility to report any violations of the Honor Code or Student Code of Conduct. I understand that with any violation of the Honor Code or Student Code of Conduct, a plea of ignorance will not be acceptable, and the violation may result in my permanent dismissal from RUSM.
>
> I pledge that I shall endeavor at all times to create a spirit of honor of my chosen profession by upholding the Honor System myself and helping others to do the same."

Registration as a student at RUSM is not complete until signed verification of the Honor Pledge is on file, and no grades can be recorded until this is done. If the Pledge is not signed by the end of the fourth week of the semester, the student's matriculation may be cancelled and all fees paid will be forfeited in accordance with the withdrawal policy described in the Academic Catalog. The ultimate responsibility for signing the Honor Pledge rests with each individual student. On the first day of classes each semester, students receive a link to the Student Handbook and this pledge by incorporation. The Honor Council President will contact administration in instances where this electronic document delivery does not occur.

## CODE OF CONDUCT

The RUSM Code of Conduct can be found in the Policies and Administrative Procedures section of this Student Handbook.

We recognize that the vast majority of our students and administration work honorably together in compliance with these standards of conduct. However, should a student or RUSM colleague ever feel threatened, or witness conduct contrary to these standards, we have established policies to assist you in appropriately addressing these concerns. The process for filing a complaint is detailed in the Policies & Administrative Procedures Section of this Student Handbook.

11

# ACADEMIC

RUSM 000336

12

## TERMINOLOGY

The following terms are used throughout this Student Handbook. These are relevant in the guidelines that govern your progress as a student at RUSM, prior to joining a residency program. The Dean of RUSM determines these guidelines, with assistance from RUSM's Promotions Committee and other faculty committees.

Following the terms, we have provided you with a list of acronyms and associated website links. This will be a convenient reference for you, as you navigate the many aspects and programs involved in your academic success.

### Definitions of Academic Terms

**Academic Amnesty/Grade Replacement:** Students completing semester one in May 2013 and beyond will be able to replace failing (F/NP) grades in their GPA after repeating the course and receiving a passing grade.

**Academic Probation**: A student on academic probation must improve his or her academic performance during a specified timeframe or be subject to dismissal and/or loss of Title IV funding.

**Administrative Withdraw**: The discharge of a student from RUSM due to failing to comply with academic requirements.

**Approved Absence**:  A student in good academic standing who wishes to temporarily interrupt his or her studies (AA).

**Core Clerkship:** A required clinical course that introduces students to the discipline and to develop their expertise and knowledge base (i.e. Internal Medicine, Family Medicine, Obstetrics/Gynecology, Pediatrics, Psychiatry or Surgery).

**Dismissal**: The discharge of a student from RUSM.

**Dismissal Appeal**: A student may appeal a decision resulting in dismissal. If this appeal is approved and the student returns to matriculation, he or she is then put on academic probation for a defined period of time (e.g., the following enrolled semester). The student must improve academic performance during this timeframe as specified in the approval or be subject to dismissal.

**Elective Clerkship:** A clinical course that varies in duration and specialty. Students select elective clerkships to develop and expand their knowledge in a specialty and/or improve their expertise in cores.

**Emergency Leave of Absence**: A period during which a student is temporarily excused from classes during a semester for up to two weeks.

**Gap Disclosure**: A brief summary submitted by the student describing the period(s) of temporary withdrawal (non-enrollment) that is longer than four weeks in duration.

**Good Standing**: A student maintains good standing by complying with all academic policies and procedures, and by remaining current with financial obligations. For students not in good standing, RUSM reserves the right to withhold services, transcripts, grades and certifications.

**Independent Study**: A required period of time without active enrollment to allow students to prepare for remediation of exams.

**Promotion**: A student's advancement to the next level in his or her academic program.

**Satisfactory Academic Progress (SAP)**: Satisfactory academic progress indicates that a student has met degree requirements to acceptable levels within a specified time period. Your SAP standing is important during academic evaluation and determination of eligibility for financial aid. Students who do not meet SAP requirements are subject to dismissal and/or loss of Title IV funding.

**Timeframes:** If you began first semester prior to May 2013, to maintain SAP, you must complete the Foundations of Medicine portion of the curriculum within 75 instructional weeks (five semesters) or fewer, and complete the clinical portion within 135 instructional weeks; you have 210 instructional weeks to finish the entire program. If you began first semester in May 2013 or after, to maintain SAP, you must complete the Foundations of Medicine portion of the curriculum within 90 instructional weeks (six semesters) or fewer, and complete the clinical portion within 135 instructional weeks; you have 225 instructional weeks to finish the entire program.

**Short-Term Personal Leave of Absence**: A period during which a student is temporarily excused due to extraordinary personal circumstances for up to one week.

**Temporary Withdraw**: A period during which a student is not currently enrolled for more than four weeks.

**Withdrawal**: A student initiated request to discharge him/her from RUSM.

## Academic Acronyms

The field of medicine is full of acronyms. The chart below serves as a convenient reference for you in navigating through medical education. You'll notice that this chart also includes links to websites that offer further information.

| Acronyms | | Application |
|---|---|---|
| **AA** | Approved Absence | A student who wishes to temporarily interrupt his or her studies may apply for an Approved Absence (AA). |
| **AAMC** | Association of American Medical Colleges | The AAMC is a not-for-profit association representing all 141 accredited U.S. and 17 accredited Canadian medical schools; nearly 400 major teaching hospitals and health systems, including 51 Department of Veterans Affairs medical centers; and 90 academic and scientific societies.<br><br>www.aamc.org |
| **ACGME** | Accreditation Council for Graduate Medical Education | ACGME is a private professional organization responsible for the accreditation of about 9,200 residency education programs in the U.S.<br><br>www.acgme.org |

| AICM | Advanced Introduction to Clinical Medicine | A course that all students are required to take after completing Foundations of Medicine (replaced with the Internal Medicine Foundations course). |
|------|------|------|
| AMA | American Medical Association | Unites physicians nationwide to address the most important professional and public health issues.www.ama-assn.org |
| CBSE | Comprehensive Basic Science Exam | The National Board of Medical Examiners Comprehensive Basic Science Exam (a.k.a. COMP).  This exam is taken at the end of the Foundations of Medicine curriculum. |
| CCSE | Comprehensive Clinical Science Exam | The National Board of Medical Examiners Comprehensive Clinical Science Exam. This exam is taken prior to sitting for the USMLE Step 2 CK and CS exams. |
| CK (USMLE Step 2 CK) | Clinical Knowledge | A portion of the USMLE® Test, Step 2 CK focuses on the principles of clinical science deemed important for the practice of medicine under supervision in postgraduate training.<br><br>http://www.usmle.org/step-2-ck/. |
| CS  (USMLE Step 2 CS) | Clinical Skills | A portion of the USMLE Test, Step 2 CS measures students' and graduates' ability to gather information from patients, perform physical examinations, and communicate their findings to patients and colleagues.<br><br>www.usmle.org/step-2-ck/ |
| XCD | Eastern Caribbean Dollars (Currency) | Dominican currency sometimes referred to as EC. |
| ECFMG | Educational Commission for Foreign Medical Graduates® | Assesses the readiness of international medical graduates to enter fellowship or residency programs in the U.S. that are accredited by the ACGME.<br><br>www.ecfmg.org |
| ED | Department of Education | U.S. Agency that promotes student achievement and preparation for global competitiveness.<br><br>www.ed.gov/index.jhtml |

| | | |
|---|---|---|
| **ERAS** | Electronic Residency Application Service® | Electronic Residency Application Service® (ERAS) is a service that transmits applications, letters of recommendation (LoRs), Medical Student Performance Evaluations (MSPEs), medical school transcripts, USMLE transcripts, COMLEX transcripts, and other supporting credentials from applicants and their Designated Dean's Office to program directors. ERAS consists of MyERAS, Dean's Office Workstation (DWS), Program Director's Workstation (PDWS), and ERAS Post Office.<br><br>https://www.aamc.org/services/eras/ |
| **FERPA** | Family Educational Rights and Privacy Act | Federal law that protects the privacy of student education records.<br><br>www.ed.gov |
| **FSMB** | Federation of State Medical Boards (Step 3) | Test offered to students who have graduated from medical school. The Step 3 test helps students attain licensure.<br><br>www.fsmb.org/ |
| **GPA** | Grade Point Average | Numeric representation of a student's academic performance. |
| **IMF** | Internal Medicine Foundations | The first required clinical clerkship. |
| **IMG** | International Medical Graduate | Graduate of an international medical school. |
| **LCME** | Liaison Committee on Medical Education | The accrediting authority for medical education programs leading to an M.D. degree in U.S. and Canadian medical schools.<br><br>www.lcme.org |
| **LOE** | Letter of Eligibility | One form of the NYSED application pack. The LOE is for students who wish to complete non-affiliated clerkships in the state of NY. |
| **MD** | Doctor of Medicine | Medical school graduate. |
| **MMR** | Measles, Mumps, Rubella | Three titers that are required for clearance into IMF and clinical |
| **MPS** | Minimum Passing Score | Lowest score required in order to pass a certain test or exam. |
| **MSPE** | Medical School Performance | Comprehensive evaluation letter that documents a student's medical school performance. |

RUSM 000340

| | Evaluation/Dean's Letter | |
|---|---|---|
| NBME | National Board of Medical Examiners® | Provides online services for students and graduates of U.S. and Canadian medical schools, including application for USMLE Step 1, Step 2 CK, Step 2 CS, provision of score documents, certificates and/or confirmation letters. www.nbme.org |
| NRMP | National Resident Matching Program® | NRMP facilitates the placement of applicants for postgraduate medical training positions into residency programs at teaching hospitals throughout the United States.<br><br>http://www.nrmp.org |
| NYSED | New York State Education Department | NYSED is the governing body of the state of NY that approves IMG students to rotate within the state of NY. |
| OASIS | Online Applicant Status and Information System | Provides general information and the status of items related to ECFMG Certification.  https://oasis2.ecfmg.org |
| RUSM | Ross University School of Medicine | www.rossu.edu |
| SAP | Satisfactory Academic Progress | SAP represents an acceptable level of performance in meeting degree requirements within specified time periods. It is used in both academic evaluation and in determination of financial aid eligibility. Students maintain SAP at RUSM by meeting the requirements listed under the Promotions Policies section of this Student Handbook. |
| SCE | NBME Subject Clerkship Exams | An exam RUSM students must take at the end of each required core clerkship. |
| SGA | Student Government Association | Association on the medical school campus that focuses on increasing the quality of campus life for RUSM students. |
| USMLE | U.S. Medical Licensing Examination® | Exam that medical doctors are required to pass before being permitted to practice medicine in the U.S.<br><br>www.usmle.org |

RUSM 000341

## CURRICULUM OVERVIEW

The Doctor of Medicine (MD) degree is awarded upon successful completion of the following:

- Foundations of Medicine curriculum
- Clinical Science curriculum (including Advanced Introduction to Clinical Medicine (AICM)/Internal Medicine Foundations(IMF))
- United States Medical Licensing Examination® (USMLE) Step 1
- USMLE Step 2 Clinical Knowledge (CK)
- USMLE Step 2 Clinical Skills (CS)

To be eligible for graduation*, students must successfully complete all coursework and USMLE requirements within seven calendar years of their matriculation date. If at any point it becomes clear that a student is unable to meet all graduation requirements within seven years, he/she will be subject to dismissal.

*Students graduating after January 1, 2017 may do so on one of three graduation dates each academic year: 11/30, 03/31 and 04/30.  Requests for special graduation dates will be reviewed on a case-by-case basis.  See the Special Graduate Date Request policy in the Policies and Administrative Procedures Section of this Student Handbook.

The MD degree program is designed to meet the core competencies established by the Accreditation Council for Graduate Medical Education (ACGME). ACGME competencies are discussed throughout the program, and will be identified as applying to the following categories of competency:

- Patient care
- Medical knowledge
- Practice-based learning and improvement
- System-based practice
- Professionalism
- Interpersonal skills and communication

RUSM is currently adopting changes in the Foundations of Medicine curriculum; not all changes will affect every student currently enrolled. There follows a brief overview of the Foundations of Medicine and Clinical Science curricula and associated programs in this context. Both curricula are covered in more detail further in this section.

**Foundations of Medicine Overview**

The Foundations of Medicine curriculum is designed to:

- Offer an in-depth, comprehensive program of biomedical sciences for medical practitioners.
- Provide supporting patient case correlations and clinical competency experience.
- Present a physical diagnosis course to prepare students for clinical clerkships.

For students entering the program in May 2013 and beyond, two tracks are offered for completion of the Foundations of Medicine curriculum.

- **Standard Accelerated Curriculum:** This offers completion of the same prescribed coursework within four semesters

18

- **Ross+**: This offers completion of the prescribed coursework within five semesters.

The first semester for the Standard Accelerated Curriculum and the Ross+ Curriculum are identical. Beginning in January 2016, first semester (FM01) students who have earned a 70% on their first attempt at semester 1 or 75% on their second attempt at semester 1 may remain in the four-semester Standard Accelerated Curriculum. Students earning less than 70% (or 75% for repeaters) in FM01 will be enrolled in the five semester Ross+ curriculum for the remainder of the Foundations of Medicine curriculum. Students must requalify for the Standard Accelerated Program each semester with the MPS.   Once in the Ross+ curriculum, students may not change tracks; however, students in the Standard Accelerated Curriculum may choose to move to the Ross+ curriculum for subsequent semesters at will. This policy will be rolled in with each class and will achieve full implementation by January 2017. Students who enrolled prior to January 2016 and are repeating first semester in January 2016 will be subject to this policy.

**Passing Courses:** Students who began first semester in May 2013 or after are required to **pass all courses** in a semester to maintain Satisfactory Academic Progress (SAP). Should a student fail one course in a semester, the student must repeat the entire semester (regardless of performance in other courses). A student will not be allowed to proceed with subsequent semesters until the student has successfully completed each prior semester's study. A student who repeats is required to have a signed appeal and Academic Plan on file outlining the requirements of satisfactory academic performance and the consequences of failure to meet the plan. Please note that no semester may be repeated more than once.

**Grade Point Average:**
Students must maintain a cumulative grade point average (GPA) of 2.00 or higher for advancement to Internal Medicine Foundations (IMF). If a student earns a cumulative GPA of 1.99 or lower, the Promotions Committee will carefully review the student's complete academic record and either permit the student to begin IMF on academic probation or recommend the student for dismissal. If the student is permitted to advance to IMF, RUSM must develop an academic plan outlining the specific steps the student must take in order to achieve a cumulative GPA of 2.00 upon completion of the term.

**Clinical Sciences Curriculum Overview**
The Clinical Sciences curriculum consists of 90 weeks of clinical training, although students may be granted additional time upon request and with the permission of the dean.

This study begins with the first clerkship, Internal Medicine Foundations (IMF). IMF trains students in taking medical histories and making physical diagnostics, and enhances critical thinking and problem-solving skills. IMF is six weeks in duration and is offered six times during each academic year at the Miramar campus. Taking USMLE Step 1 is a prerequisite for taking IMF.

Students are required to submit their USMLE Step 1 sitting date to the Office of the Registrar 30 days prior to the start of the IMF session. Students failing to do so are subject to administrative withdrawal. A student who falsely submits a USMLE Step 1 sitting date and/or fails to sit for Step 1 prior to IMF will be subject to disciplinary action. If a student fails USMLE Step 1, he/she will be allowed to complete IMF but will be placed into Temporary Withdraw (TW) until he/she passes USMLE Step 1 and begins clinical clerkships and electives.

The balance of the Clinical Sciences curriculum consists of required clerkships and electives.  During this phase, students receive hands-on training in patient care while rotating through various medical specialties with teaching hospitals and other approved healthcare facilities in the U.S. In addition to clerkships and electives, students are required to pass the USMLE Step 2 Clinical Knowledge (CK) and the USMLE Step 2 Clinical Skills (CS) to pass this phase of training.

Students beginning in core clerkship tracks after January 1, 2015 **must complete their entire core clerkship track prior to completing any elective rotations**.  Once students begin a track, they may not exit the track for any reason until all six core clerkships are completed.   Upon completion of IMF, and prior to starting core clerkships, students may request permission to complete up to eight weeks of special elective clerkships.  Students should contact their clinical advisor for more information.

Students who are <u>not</u> in a tracked program after January 1, 2015, or students who are in a core clerkship track beginning after January 1, 2015 where only five cores are offered, may complete **one*** elective clerkship (up to four weeks) before completing their final core clerkship(s).  Once a student begins her/his first core clerkship, the student must complete all six core clerkships within 60-weeks of the start date of the first core clerkship.

*Elective clerkships that are part of the General Surgery 12 week core will not be counted as this one elective clerkship.

The total number of clinical credit hours required for graduation will remain unchanged, however, the distribution of the required clerkships and electives are dependent on when the student successfully completes IMF and the required core Surgery clerkship as outlined in the tables below:

**Clinical Science Curriculum Requirements Effective May 1, 2014:**

| **For students who completed AICM prior to 2/25/2012 and completed their Required Core Clerkship in Surgery and Surgery Elective by 4/30/2014.** |
|---|
| |
| **Advanced Introduction to Clinical Medicine (12 weeks)** |
| |
| **Required Core Clerkships (48 weeks)** |
| Internal Medicine – 12 weeks |
| Surgery – 12 weeks |
| Pediatrics – 6 weeks |
| Psychiatry – 6 weeks |
| Obstetrics/Gynecology – 6 weeks |
| Family Medicine – 6 weeks |
| |
| **Electives (30 weeks) – must include:** |
| Surgery Electives (minimum 4 weeks) |
| Medicine Electives (minimum 8 weeks) |
| |
| **Total: 90 Weeks** |

| **For students who completed AICM from 2/25/2012 thru 8/31/2014 and have completed their Required Core Clerkship in Surgery and Surgery Elective by 4/30/2014** |
|---|
| |
| **Advanced Introduction to Clinical Medicine (9 weeks)** |
| |
| **Required Core Clerkships(48 weeks)** |
| Internal Medicine – 12 weeks |
| Surgery – 12 weeks |

| Pediatrics – 6 weeks |
| Psychiatry – 6 weeks |
| Obstetrics/Gynecology – 6 weeks |
| Family Medicine – 6 weeks |
| |
| **Electives (33 weeks) – must include:** |
| Surgery Electives (minimum 4 weeks) |
| Medicine Electives (minimum 8 weeks) |
| |
| **Total: 90 Weeks** |

| **For students who completed AICM from 2/25/2012 thru 8/31/2014 and have completed their Required Core Clerkship in Surgery by 8/31/14 but have _NOT_ completed a Surgery Elective** |
| **Advanced Introduction to Clinical Medicine (9 weeks)** |
| |
| **Required Core Clerkship Clerkships (44 – 48 weeks – depending on duration of Surgery Core Clerkship*)** |
| Internal Medicine – 12 weeks |
| Surgery – 8-12 weeks* |
| Pediatrics – 6 weeks |
| Psychiatry – 6 weeks |
| Obstetrics/Gynecology – 6 weeks |
| Family Medicine – 6 weeks |
| |
| **Electives (33-37 weeks depending on duration of Surgery Core Clerkship) – must include:** |
| Medicine Electives (minimum 8 weeks) |
| |
| **Total: 90 Weeks** |

| **For students who complete IMF on or after 9/1/2014** |
| **Internal Medicine Foundations (6 weeks)** |
| |
| **Required Core Clerkship Clerkships (44 weeks)** |
| Internal Medicine – 12 weeks |
| Surgery – 8 weeks |
| Pediatrics – 6 weeks |
| Psychiatry – 6 weeks |
| Obstetrics/Gynecology – 6 weeks |
| Family Medicine – 6 weeks |
| |
| **Electives (40 weeks) – must include:** |
| Medicine Electives (minimum 8 weeks) |

RUSM 000345

| 10 weeks of direct ACGME electives (example: Cardiology elective must have a fellowship in Cardiology) |
| --- |
| |
| **Total: 90 Weeks** |

**Timeframes:** To maintain SAP, students must complete the Foundations of Medicine portion of the curriculum within 90 instructional weeks (six semesters) or fewer, and complete the clinical portion within 135 instructional weeks; and have 225 instructional weeks to finish the entire program. Students have seven (7) years from the date of their matriculation to complete all degree requirements, including passing all USMLE Step exams.

## STUDENT GRADING AND PROMOTIONS POLICIES

**Grading Policies for Foundations of Medicine Semesters**
Grades in the semester 1-5 Foundations of Medicine courses are determined by the Minimum Passing Score (MPS) as calculated by the faculty using the Hofstee method.  In addition to using MPS to calculate the final grade, minimum performance levels (MPLs), found in the course syllabus, will be determined for each discipline block within the semester.  Students must achieve the MPL for each discipline block to be eligible to pass the course. All grades are posted on myRoss at the end of each semester.

**Grades**
For coursework begun during or after the January 2012 semester, grades are interpreted and GPAs are determined as follows:

| Letter Grade | Numerical Percentage Range | Quality points per credit hour |
| --- | --- | --- |
| A | 85-100 | 4.00 |
| B+ | 80-84 | 3.50 |
| B | 75-79 | 3.00 |
| C+ | 71-74 | 2.50 |
| C | 70 | 2.00 |
| F | Fail (below MPS) | 0.00 |
| HP | High Pass | 0.00 |
| P | Pass | 0.00 |
| NP | No Pass | 0.00 |
| W* | Withdrawn Before Interim Exams | 0.00 |
| WP* | Withdrawn Passing | 0.00 |
| WF* | Withdrawn Failing | 0.00 |
| I | Incomplete | 0.00 |
| R | Course repeated in subsequent semester | |
| UP | Unsatisfactory Progress | |

*Withdrawal from a single course during a semester is not permitted. However, if a student withdraws from the term, a grade may be given for any courses that have been fully completed.*

22

Starting in May 2013, students completing semester one, will receive one of three grades: High Pass, Pass or Fail. Grades for the first semester do not count toward the cumulative GPA. Courses in remaining semesters will receive an A, B+, B, C+, C or F grade and will impact the cumulative GPA.

All students must have a minimum cumulative GPA of 2.00 in order to advance to IMF. Students with a cumulative GPA lower than 2.00 are subject to dismissal.

**Academic Amnesty/Grade replacement policy:**
Students completing semester one in May 2013 and beyond will be able to replace failing (F/NP) grades in their GPA after repeating the course and receiving a passing grade. The course with the F or NP grade will be removed from the GPA calculation, but the attempted hours will still count in the calculation of Satisfactory Academic Progress (SAP).

**Recognition of Exemplary Grades**
Students earning exemplary grades are recognized as follows:

- **Dean's Honor Roll:** Students who earn a High Pass in Foundations of Medicine and a Pass in Clinical Skills of Semester 1 qualify for the Dean's Honor Roll.

- **Dean's List:** During foundational science semesters, students who have maintained a 3.50 GPA in two successive Foundations of Medicine semesters qualify for the Dean's list. They remain on the Dean's list as long as they maintain a 3.50 GPA each semester. The Dean's list is posted at the beginning of each semester, as soon as grades are available. Semester 2 students are eligible to be on the Dean's List if they have a 3.50 GPA for semester 2 and earned a HP during semester 1.

- **Distinguished Scholar:** Students maintaining a 4.00 GPA during the Foundations of Medicine semesters are designated as Distinguished Scholars.

- **Graduation with Honors:** Honors designees are published in the commencement program, and will be printed on those graduates' diplomas. To be eligible for Honors status, students must do the following:

  - Be a student in good standing,
  - Have not received an UP, NP, F, WF, or R in any course,
  - Have a 3.00 cumulative GPA through the Foundations of Medicine semesters,
  - Have passed USMLE Step 1 with a score of 210 or higher,
  - Have passed USMLE Step 2 CK with a score of 200 or higher, (for students who completed first semester prior to May 2013) or with a score of 220 or higher (for students who completed first semester after May 2013),
  - Passed USMLE Step 1, USMLE Step 2 CK, and/or CS in no more than 1 attempt, and
  - Meet one of the following combined Foundations of Medicine and Clinical Sciences cumulative GPA requirements:

    - 3.50 – 3.59 Honors
    - 3.60 – 3.79 High Honors
    - 3.80 – 4.00 Highest Honors
    - Transfer students who did not complete the Foundations of Medicine curriculum at RUSM must have maintained the RUSM grade point averages listed above plus earned a score of at least 230 on USMLE Step 1.

RUSM 000347

## Promotion Policies: Foundations of Medicine Semesters

Students who receive passing grades and are otherwise in good standing are promoted to the next semester. Students who fail any semester for the first time will be allowed to repeat the failed semester on Academic Probation. Students failing two semesters will be recommended for dismissal.

Students who have been dismissed have the right to appeal a dismissal. If a student successfully appeals a dismissal and is allowed to return, the student will be placed on Academic Probation for the next semester.

**Repeating, Return from Approved Absences and Readmitted:**
- Students who began first semester before May 2013 are required to pass all blocks in a semester to maintain SAP.
- Students who began first semester in May 2013 or after are required to pass all courses in a semester to maintain SAP.

**Failing Grades: Foundations of Medicine**
Should a student fail one course in a semester, the student must repeat the entire semester (regardless of performance in other blocks or courses) and will be enrolled in the Essentials of Lifelong Learning Skills (ELLS) course.

Students repeating a semester will be placed on Academic Probation.

Students will not be allowed to proceed with subsequent semesters until they have successfully completed each prior semester's study.

Students who repeat are required to have an Academic Plan on file with the Office of the Registrar outlining the requirements of satisfactory academic performance signed by the student and the Associate Dean of Student Affairs or the Senior Associate Dean of Student Affairs. Please note that no semester may be repeated more than once.

1) A student repeating the previous semester will be enrolled in Foundations of Medicine, Clinical Skills and ELLS.

2) Students who are returning from an AA and have successfully passed the previous semester will be enrolled in Foundations of Medicine and Clinical Skills.

3) Students returning after being readmitted due to failing two semesters or successfully appealing their dismissal will be enrolled in Foundations of Medicine, Clinical Skills and ELLS.

4) Students who withdrew with W/WP and were readmitted will be enrolled in Foundations of Medicine and Clinical Skills.

5) For students who withdrew with a WF and were readmitted will be enrolled in Foundations of Medicine, Clinical Skills and ELLS.

**Grade Appeal Policy for Foundations of Medicine**
Students who wish to appeal a grade in a Foundations of Medicine course must submit their appeal to the Course Director.  Appeals must be submitted within 15 calendar days of receipt of the grade notification.

24

The student may appeal the decision of the Course Director to the Associate Dean of Student Affairs by submitting, within 15 days of the decision, a concise written statement of appeal based on one or more of the following reasons:

- There is new evidence that was unavailable at the time of the original investigation that would affect the outcome of the original decision.
- There were procedural irregularities in the process that affected the outcome.
- The grade was not reasonable based on the evidence compiled during the investigation.


## Promotion Policies: Clinical Science Semesters

### Clinical Sciences Clerkship Eligibility

In order to be eligible to begin the remainder of the clinical core clerkships, students must meet all of the following prerequisites:

- Successfully complete all the requirements of the Foundations of Medicine curriculum;
- Pass the USMLE Step 1;
- Successfully complete the IMF (previously AICM) clerkship;
- Approved Health Clearance; and
- Pass background checks.

### Clinical Sciences Clerkships

Passing the USMLE Step 1 and IMF clerkship are required for continuation into the remaining clerkships. Students who have completed these steps may begin clerkships at any time during this period. Beyond this timeframe, students who have not resumed clinical training enter their grace period or repayment status on their student loans and must be reported as withdrawn, for most purposes, to outside agencies.

For students who completed AICM prior to September 2014, RUSM requires 57 instructional weeks of core clerkships (including 9 weeks of AICM) and 33 instructional weeks of electives, for a total of 90 instructional weeks of clinical training.

For students beginning IMF on or after September 2014, RUSM requires 50 weeks instructional weeks of core clerkships (including 6 weeks of IMF) and 40 instructional weeks of electives, for a total of 90 instructional weeks of clinical training.

The entire clinical segment, currently 90 instructional weeks, must be successfully completed within 135 instructional weeks of attendance. Students must take all core clerkships at clinical sites affiliated with RUSM.

***Note:*** *These requirements may be subject to change in the future depending on regulatory and other academic requirements.*


### Clinical Sciences Grading

Students must take and pass all required and elective clinical clerkships. Each of the six core clerkships provides curricular guidelines that students must follow. At the conclusion of the core clerkship, students must pass the appropriate NBME Subject Clerkship Examination (SCE). The SCE policy can be found in the Policies and Administrative Procedures section of this Student Handbook – page 126.

Letter grades are assigned at the conclusion of each clerkship. The final grade for a clinical core clerkship is based on the following:

| Final Clinical Core Clerkship Grade Calculation | Percent of Final Grade |
|---|---|
| *Clinical Clerkship Evaluation* | 70% |
| Subject Clerkship Exam | 25% |
| eCollege® and E*Value™ | 5% |
| | 100% |

Please also note the following:

- If a student fails an elective clerkship, that student must successfully repeat the same number of weeks as the failed elective.
- Students who receive two F or R grades during the Clinical Sciences (IMF, core clerkships, or electives) are subject to dismissal.


**Clinical Grade Appeals**

Students may appeal a clinical evaluation grade within 30 days of the grade being posted.  Appeals must be written and submitted via email to the Graduate Medical Education (GME) coordinator and copied to GradeAppeals@RossU.edu.  The appeal must include the student's name, ID #, copy of the evaluation, and a concise written statement of the rationale for the appeal.  The clinical preceptor will investigate, as appropriate, and decide to change or uphold the original grade.

The student may appeal the decision of the clinical preceptor to the Senior Associate Dean of Student Affairs by submitting, within 30 days of the decision, a grade appeal form and a concise written statement of appeal based on one or more of the following reasons:

- There is new evidence that was unavailable at the time of the original investigation that would affect the outcome of the original decision.
- There were procedural irregularities in the process that affected the outcome.
- The grade was not reasonable based on the evidence compiled during the investigation.

The decision of the Senior Associate Dean of Student Affairs, or his/her designee, on the appeal is final.

Grade Appeal forms can be found on the student portal.


**Failing Grades: Clinical Sciences**

A student receiving an F in any portion of the Clinical Sciences curriculum will be subject to review by Senior Associate Dean of Student Affairs. Students on Academic/Financial Aid Probation may be allowed to continue clinical clerkships at the discretion of Senior Associate Dean of Student Affairs.  Students will be subject to additional tuition expense if they exceed the 92 weeks covered by the standard tuition rates.


If a student is dismissed for unsatisfactory progress and successfully appeals, he/she may be allowed to repeat the semester on probation. However, including instructional weeks of repeated semesters, maximum timeframe limits for entire completion of the curriculum must not be exceeded.

## ACADEMIC STANDING & PROGRESS

**Good Standing and Satisfactory Academic Progress**

**Good Standing:** Students maintain good standing by displaying SAP as defined below, complying with all other academic rules and regulations, and by remaining current with financial obligations. RUSM reserves the right to withhold services, transcripts and certifications from students who are not in good standing.

**Satisfactory Academic Progress:** SAP represents an acceptable level of performance in meeting degree requirements within specified time periods. It is used in both academic evaluation and in determination of financial aid eligibility. Students maintain SAP by meeting the requirements listed under the Promotions Policies.

SAP is evaluated at the end of the student's academic year (normally two semesters) according to the following criteria:

- **Qualitative and Quantitative Measures**
  At the end of each semester, each student's academic progress is evaluated by RUSM. This evaluation involves two metrics, one quantitative and one qualitative.
  - The quantitative measure evaluates the student's Pace of Progression (PoP) through the medical education program with the maximum timeframe. The PoP is calculated by dividing the cumulative course credits or clinical weeks that the student has successfully completed by the cumulative course credits or clinical weeks that the student has attempted.
  - Students in their first academic year are subject to a pace of progression rate of 50%. Students in their 2nd year or higher are subject to a pace of progression of 67%. Please note that courses with a grade of W, WP, WF, R and I are not counted in the cumulative GPA but are counted in the total attempted credits. Transfer credits accepted will count as attempted and completed credits for the calculation.
  - The qualitative measure evaluates the student's cumulative GPA. Students are required to maintain a 2.00 cumulative GPA in order to meet the qualitative measure at the time of review.
  - Students completing semester one in May 2013 or later, may receive academic amnesty for NP and F grades that are repeated and passed.  Classes that are replaced as part of academic amnesty are counted in the quantitative measures (PoP) but are not counted in the qualitative measure (cumulative GPA).
  - Students repeating semester one will not have a calculated GPA at the end of the academic year. SAP will only be measured based on the progression rate as specified above.

- **Failure to meet the SAP criteria**
  **Academic and Financial Aid Probation**
  If the results of the SAP evaluation indicate that a student has not met either one of the qualitative or quantitative measures, the student will be notified in writing that he/she is not eligible for federal financial aid and is subject to dismissal from RUSM. A student receiving such notification may appeal the determination and request reinstatement on academic/financial aid probation and will be issued an academic plan based on RUSM's guidelines.

  - Students making an appeal must submit a written statement including information on why he/she failed to make SAP and what changes will be made that will allow him/her to demonstrate SAP at the next evaluation (i.e. student habits, unusual circumstances encountered, etc.).
  - Students should submit their appeal to PromotionAppeals@RossU.edu.
  - If the student appeals the adverse SAP determination and Senior Associate Dean of Student Affairs or his/her designee determines that the student should be able to make

SAP during the subsequent(s) term(s) of enrollment and meet RUSM's SAP standards as stated in the academic plan developed for that student, that if followed, will ensure that the student is able to meet RUSM's SAP standards by a specific point in time, then RUSM may place the student on academic/financial aid probation.

- A student whose appeal is approved and is reinstated on academic/financial aid probation may receive federal financial aid for an additional term of enrollment or timeframe as stated on the academic plan. While a student is on academic/financial aid probation, RUSM will require the student to fulfill specific terms and conditions in accordance with the academic plan, such as engaging in certain recommended RUSM activities designed to improve performance.
- At the end of the one term of enrollment while on academic/financial aid probation, in order to remain enrolled at RUSM and qualify for future federal financial aid funds, the student must meet RUSM's SAP standards OR must meet the requirements of the academic plan developed by RUSM.
- A student on academic/financial aid probation may still be dismissed if he/she fulfills the criteria for academic dismissal (See Academic Disciplinary Actions section of this Student Handbook)
- Special Note: Students that fail a semester and repeat it will have not earned a GPA for the academic year as all of the courses are Pass/Fail courses. These students will not be considered to be failing the quantitative component (GPA). These specific sets of students are expected to have a GPA of 0.0.
- Students withdrawing in the second half of the academic year will not be measured for SAP until they complete the 2nd full semester. A full academic year history is needed to evaluate SAP criteria.

**Academic Progress Standards for Clinical Students**

In addition to the SAP criteria above, the following are additional required criteria for measuring good academic standing for students in the clinical phases of their training:

- Passing the National Board of Medical Examiners (NBME) Comprehensive Basic Science Examination (CBSE) in no more than three consecutive attempts and within the prescribed timeframe for each attempt.
- Taking the USMLE Step 1 within six months of becoming eligible.
- Passing the USMLE Step 1 in no more than six attempts.
- Passing all clinical core NBME Subject Clerkship Exams (see page 124)
- Taking the USMLE Step 2 CK within six months of completing the required clinical core clerkships.
- Taking the USMLE Step 2 CS within one (1) year of completing the required clinical core clerkships.
- Passing the USMLE Step 2 CK and CS in no more than six attempts.

**Maximum Timeframe for SAP**

Students who completed their first semester prior to May 2013 must complete the entire MD program in a maximum of 210 instructional weeks of attendance. Students who completed their first semester on or after June 2013 must complete the entire MD program in a maximum of 225 weeks. Any student who does not complete the program within the appropriate timeframe will no longer be eligible to receive federal financial aid. Once it becomes mathematically impossible for a student to complete within the maximum timeframe, the student will be dismissed.

**Note:** This refers to actual attendance in regular or remedial semesters, as well as actual instructional weeks of attendance in the clinical training segment. It does not include the following:

- Periods when the student is on an AA for preparation and time needed to schedule and take the USMLE Steps 1, 2 CK and 2 CS (See **Absences, Withdrawals and Deferrals**.); or
- The time of regularly scheduled breaks between semesters; or
- While pending assignment to a scheduled clinical clerkship; or
- A semester during which an AA is taken, or in which the student withdraws prior to the end of week two of the semester, will not be counted toward the limit for meeting the above requirements.

Students who do not meet the standards for SAP are subject to dismissal. However, under very unusual circumstances, the Student Promotions Committee may determine, on an individual basis, that a student may continue at RUSM for one semester (on Probationary status).

**Probation**
Students may be placed on academic probation for academic issues. Academic Probation is based on both course work and professional behavior, and is recommended by the Promotions Committee to the Dean. Academic Probation may be imposed in any semester, including clinical semesters.

RUSM grants professional degrees, and thus professional behavior is as important as academic performance. Students may also be placed on Non-Academic Probation for professionalism or behavioral problems, upon recommendation of the Grievance Committee or Honor Council to the Senior Associate Dean of Student Affairs. Non-Academic Probation is based on a student's behavior which does not meet one or more of the requirements in this Student Handbook (See **Code of Conduct**), and can be imposed in any semester, including the clinical semesters.

## EXAMINATIONS

***Foundations of Medicine Examinations***

**Locations of Exams**
All examinations in the Foundations of Medicine semesters are taken on the Portsmouth campus, except clinical practical examinations, which may be given in the Princess Margaret Hospital or other RUSM approved settings.

**Examination Protocol**
All students must bring their official RUSM identification card to all exams, and be at their assigned locations 15 minutes prior to the beginning of an examination. Students arriving at the examination location without ID or once the proctor has begun giving instructions will be denied entry to the exam and will receive a mark of zero on the examination.

If a student suspects a fellow student of cheating during an exam, the student should discreetly alert an exam proctor. A student found cheating on an examination receives a grade of zero for that examination, and is subject to dismissal from RUSM. No bags, books, electronic devices, or cellular phones may be brought into the examination room.

During electronic examinations, if there are unavoidable human/technical difficulties that occur, the Executive Chief Proctor may offer student(s) a choice of accepting the results of the exam(s) or immediately retaking the exam. Make-up exams are not conducted after scheduled exam dates; therefore, student(s) who choose to re-test will re-test immediately upon conclusion of the scheduled exam and after a 15 minute supervised break.

**Mid-term and Final Examinations Scheduling**

Students are required to complete all exams as scheduled. There are no make-up exams. A student may be excused from one mid-term examination per semester in an emergency. In the case of a single approved absence from a mid-term examination, the student's score on their Final exam will be substituted for the missed mid-term exam. In cases where there are multiple sections on the Final exam, the student's score on the entire Final exam will be substituted. Students who are unable to complete all mid-term exams, with the exception of a single approved absence, may be administratively withdrawn. The student will receive a grade at the time of withdrawal which is based on a percentage of the weighted exams which the student has completed before withdrawal. Students with a cumulative weighted score of 70%, or higher, will receive a WP. Below 70% will receive a WF. RUSM will not modify exam group assignments, for either written or clinical exams, to accommodate a student's travel off the island. Do not book a flight on the same day as your exam.

In order to be excused from a mid-term examination, the student must present valid documentation prior to the exam describing the nature of the emergency to the Associate Dean of Student Affairs, or his/her designee, and must include appropriate supporting documentation. Approval is at the discretion of the Associate Dean, or his/her designee. A mid-term examination missed without prior approval will be assigned a grade of zero. (See exceptions in **Attendance** section)

Final examinations must be taken on schedule; failure to do so could result in a failing grade for the course.  On the rare occasion a student is excused from taking a final examination, a grade of I will be assigned and the exam must be taken at the end of the following semester. The I grade will revert to an F if the incomplete exam is not made up by the end of the following semester. The student will not be eligible for promotion until after the incomplete has been rectified.

**NBME CBSE**
The NBME CBSE or "COMP" exam has proven to be a good predictor of student performance on the USMLE Step 1 exam. In an effort to assess the readiness of RUSM students to pass the Step 1 on their 'first attempt', RUSM requires that students first pass the NBME CBSE. Students are required to take the CBSE at the end of their final Foundations of Medicine semester. Students must obtain a passing score, as determined by the Dean, prior to being certified to take USMLE Step 1. Students are given three opportunities to obtain a passing grade on the NBME CBSE and must pass: (1) within no more than three consecutive attempts, (attempt dates are pre-established by the Office of the Registrar and are determined based on the date of the first attempt, a scheduled exam that a student does not take is considered an attempt) and (2) within six months of becoming eligible. Any student failing to pass the CBSE within three attempts is subject to review by the Promotions Committee-Foundations of Medicine. The Promotions Committee-Foundations of Medicine will then conduct a careful review of the student's entire academic record, and either grant a student an additional opportunity to take the NBME CBSE.

***Clinical Sciences Exams***

**NBME SCE**
Students must pass the SCE at the conclusion of each core clerkship.  (See the SCE policy in the **Policies and Administrative Procedures** section)  Scores of 75 or above on SCE will be noted on the MSPE.

A student must pass at least five (5) subject clerkship examinations to be eligible to sit for the NBME CCSE. Students will not be scheduled for the NBME CCSE until successful completion of five (5) core clerkships, including passing each SCE exam.

Please refer to page 126 regarding the SCE policy for core clerkships.

**NBME CCSE**

*Overview:*
Students are required to sit for the NBME CCSE to be eligible to sit for the USMLE Step 2 CK. This is a formative exam to gauge a student's readiness for USMLE Step 2 and to prepare every student to score his/her best possible score.  The examination will be provided at no cost to students unless the student is a no-show or fails to cancel/reschedule within the time frame indicated by the Office of the Registrar.

*Eligibility:*
RUSM Students are eligible to sit for the NBME CCSE after receiving passing scores on five (5) core NBME SCEs. Students are encouraged to complete all clinical core clerkships prior to sitting for USMLE Step 2 CK.

Students who fail the NBME CCSE exam a second time may sit for the USMLE Step 2 CK, RUSM **strongly recommends** that they obtain academic counseling before so doing.

## USMLE STEP 1 EXAM

*Overview*
USMLE Step 1 assesses fluency in basic medical science. Students must sit for USMLE Step 1 to start IMF. Students must pass USMLE Step 1 in order to continue the core clinical clerkships portion of the curriculum.

*Eligibility*
In order take USMLE Step 1, you must be ECFMG verified by the Office of the Registrar. Eligibility for verification includes the following:
1)  Enrollment as a full-time student in good standing;
2)  Have met all financial obligations; students with a Bursar hold will not be certified or verified;
3)  Passed all courses in the Foundations of Medicine curriculum;
4)  Passed NBME CBSE; and
5)  Submitted a completed ECFMG Form 186 to the Office of the Registrar. Applications and forms are available on the ECFMG website: www.ecfmg.org.

*Timeframe*
Students must sit for the USMLE Step 1 exam for the first time within six (6) months of passing the CBSE and pass within six attempts. *No extensions will be granted to this rule.* Students who fail to sit for their first attempt by this deadline will be Administratively Withdrawn from RUSM*.*

Students must pass USMLE Step 1 in a maximum of six attempts in order to receive the MD degree. Failure to pass the test within six attempts will result in dismissal. Students who are dismissed or withdrawn (personally or administratively) will have their ECFMG status revoked. If the student is reinstated or readmitted, he/she will need to reapply to ECFMG and register for a new exam.

*Enrollment in IMF on or after September 1, 2014*
Students scheduled to begin IMF must sit for the USMLE Step 1 before starting IMF. Students may defer IMF to allow remediation of the NBME CBSE or to prepare to sit for Step 1.  Once a student passes the CBSE, he/she must sit for USMLE Step 1 within six (6) months, regardless if the student is deferring IMF.

*Step 1 Failures*
Students who fail USMLE Step 1 will be required to sit for their retake within six (6) months of their prior exam attempt. Any student who fails to sit for their USMLE Step 1 retake by this deadline will be administratively withdrawn from RUSM. Please note that all USMLE scores (pass or fails) must be submitted to the Office of the Registrar within 30 days of receipt. Students who fail to submit their score reports are subject to Administrative Withdrawal. Students must submit their failing USMLE Step Score report to Registrar prior to being verified for the retake. Students who fail USMLE Step 1 while enrolled in IMF will be allowed to complete IMF but will be placed in a Temporary Withdraw (TW) status until he/she passes USMLE Step 1 and begin clinical clerkships.

Students have up to six (6) attempts to pass USMLE Step 1, however these attempts must be in accordance with the requirement for the student to complete his/her degree requirements within seven (7) years of matriculation. If it is determined that the student will not be able to complete his/her degree requirements within the seven year timeframe, he/she will be dismissed from RUSM.

Students who are dismissed or withdrawn (personally or administratively) will have their ECFMG status revoked.  If the student is reinstated or readmitted, he/she will need to reapply to ECFMG and register for a new exam.

## USMLE STEP 2 EXAMS

**ECFMG Certification & Verification for the USMLE Step 2 CK and USMLE Step 2 CS**

RUSM will automatically verify a student as eligible to sit for the USMLE Step 2 CK or CS as soon as all eligibility criteria are met.  As a convenience to students, RUSM will permit students to register and be verified for the USMLE Step 2 CK and CS prior to completing the eligibility requirements simply to help facilitate a students' ability to obtain a sitting window for Step exams.  Formal requests to be verified before meeting all eligibility criteria must be submitted on the "RUSM Step 2CK and/or CS Verification Agreement" form, which is provided once a student speaks with his/her advisor.  Please note that all students, regardless of whether they are verified early or not, **are still required to follow the eligibility policies and may not sit for a Step examination until meeting all eligibility requirements**.  **Sitting for any Step exam prior to meeting all RUSM eligibility requirements is a violation of RUSM academic policy and will be considered a conduct violation that is not appealable.**  Conduct violations are reported on MSPEs and will be reported to state licensing agencies.

If a student requests early verification and is unable to sit for an examination in that window for any reason (fails a SCE, repeats a clerkship, needs additional time to study, etc), the students is responsible for any costs associated with moving the window or rescheduling the Step exam.  Additionally, any student who fails a SCE must immediately contact his/her advisor to see how the failure impacts the student's ability to progress in the curriculum.


**USMLE Step 2 CK**

*Overview*
USMLE Step 2 CK assesses the application of medical knowledge and clinical science in the care of patients. It specifically emphasizes health promotion and disease prevention. Step 2 CK is taken in a student's clerkship years following completion of required clinical training.

*Eligibility*
Students are eligible to sit for the USMLE Step 2 CK after:
- Receiving passing scores on five (5) core NBME SCEs **AND**
- Receiving a passing score on the first attempt at the NBME CCSE or taking the NBME CCSE twice.

*Timeframe*
Students must sit for USMLE Step 2 CK within six (6) months of passing all six (6) SCEs.   Students who fail to sit for their first attempt by this deadline will be Administratively Withdrawn from RUSM**.**

Students must pass USMLE Step 2 CK in a maximum of six (6) attempts in order to receive the MD degree. Students may request an AA for a period of up to ten weeks to prepare for USMLE Step 2 CK. Failure to pass the test within six attempts will result in dismissal.
Students who are dismissed or withdrawn (personally or administratively) will have their ECFMG status revoked.  If the student is reinstated or readmitted, he/she will need to reapply to ECFMG and register for a new exam.

*USMLE Step 2 CK Failures*
Students who fail USMLE Step 2 CK will be required to sit for their retake within one (1) year of their prior exam attempt. Any student who fails to sit for their USMLE Step 2 CK retake by this deadline will be administratively withdrawn from RUSM.  Students must submit their failing USMLE Step Score report to Office of the Registrar prior to being verified for the retake. Students have up to six attempts to pass USMLE Step 2 CK, however these attempts must be in accordance with the requirement for the student to complete his/her degree requirements within seven (7) years of matriculation.

If it is determined that the student will not be able to complete his/her degree requirements within the seven (7) year timeframe, he/she will be dismissed from RUSM. Students who are dismissed or withdrawn (personally or

administratively) will have their ECFMG status revoked.  If the student is reinstated or readmitted, he/she will need to reapply to ECFMG and register for a new exam.

**USMLE Step 2 CS**

*Overview*
USMLE Step 2 CS assesses your ability to obtain a relevant medical history, perform a proper physical examination in a clinical setting, and compose a competent written record of the experience. It also evaluates your ability to communicate effectively using the English language. The USMLE Step 2 CS is taken during the clinical clerkship portion of your medical studies.

*Eligibility*
Students are eligible to sit for the USMLE Step 2 CS after:

- Receiving passing scores on five (5) core NBME SCEs **AND**
- Completing one of the following
  - Becker Professional Education Mock CS Review
  - RUSM Mock CS Review
  - Ambulatory Care Competencies Elective at the Center for Haitian Studies

*Timeframe*
Students must sit for USMLE Step 2 CS within one (1) year of passing all six (6) SCEs.   Students who fail to sit for their first attempt by this deadline will be Administratively Withdrawn from RUSM**.**

Students must pass the USMLE Step 2 CS in a maximum of six attempts in order to receive the MD degree. Students may request an AA for a period of up to ten weeks to prepare for the USMLE Step 2 CS. Failure to pass the test within six attempts will result in dismissal.

Students who are dismissed or administratively withdrawn will have their ECFMG status revoked.  Students who are reinstated or readmitted will need to reapply to ECFMG.

*Step 2 CS Failures*
Students who fail USMLE Step 2 CS will be required to sit for their retake within one (1) year of their prior exam attempt. Any student who fails to sit for his/her USMLE Step 2 retake by this deadline will be administratively withdrawn from RUSM.

Students must submit their failing USMLE Step Score report to Office of the Registrar prior to being verified for the retake. Students have up to six (6) attempts to pass USMLE Step 2 CS; however these attempts must be in accordance with the requirement for the student to complete his/her degree requirements within seven (7) years of matriculation.

If it is determined that the student will not be able to complete their degree requirements within the seven year timeframe, he/she will be dismissed from RUSM. Students who are dismissed or withdrawn (personally or administratively) will have their ECFMG status revoked.   If the student is reinstated or readmitted, he/she will need to reapply to ECFMG and register for a new exam.

**USMLE Score Reports**
Students must submit USMLE Step 1, Step 2 CK, and Step 2 CS score reports to the Office of the Registrar – Exam Administration (ExamAdministration@RossU.edu) within 30 days of receiving exam results. For those seeking to start a clinical clerkship after IMF, score reports need to be submitted 30 days prior to the start of the clerkship.

RUSM 000358

Students who fail to submit their USMLE Step score reports within 30 days of receipt will be Administratively Withdrawn.

## COMMENCEMENT

Unless otherwise excluded pursuant to this Student Handbook, a student may participate in commencement if the student:

1. Has completed all degree requirements and will have a degree conferred between 11/30 thru 5/31 of the academic year;
2. Has completed all degree requirements (including USMLE Step 2 CK and CS) other than the completion of clerkships ending 6/30 of the current academic year; and
3. Did not participate in commencement for the academic year their degree was conferred but successfully matched into a residency program in the current academic year.

## LICENSURE TO PRACTICE MEDICINE

RUSM graduates must be certified by the ECFMG to practice medicine in the United States. Steps to certification include graduation from a school listed in the International Medical Education Directory (IMED) and successful completion of Step 1 and Step 2 of the USMLE.

You will take the USMLE Steps 1 and 2 during your time at RUSM. Step 1 is a test assessing the application of basic medical sciences in patient care. USMLE Step 2 consists of two examinations: a CK exam and a CS exam. Prior to sitting for these exams, you must apply and be ECFMG certified by the Office of the Registrar.

RUSM graduates must also pass the USMLE Step 3 test to be licensed to practice medicine in the United States. Students may sit for the USMLE Step 3 test following graduation, during residency, or upon conclusion of residency, depending on state board requirements. More information may be obtained from the ECFMG at:

> 3624 Market Street
> Philadelphia, Pennsylvania 19104–2685
> Telephone: (215) 386–5900
> Fax: (215) 387–9196
> www.ecfmg.org

RUSM does not control state licensing requirements, and graduation from RUSM alone does not ensure that you may be licensed to practice medicine in every state.  While RUSM will assist students with state licensure during school and after graduation, students are ultimately responsible for knowing and ensuring that they meet the licensing requirements of each state in which they may wish to practice.

RUSM may be called upon by State Medical Boards, ECFMG, Federation Credentials Verification Service, Government Agencies, and Employers to report unusual circumstances that may have occurred during the course of your medical education.  These include but are not limited to:

- academic and/or disciplinary probation;
- disciplinary action due to unprofessional conduct/behavior;

- the subject of negative reports for behavioral reasons or an investigation by the medical school or parent university and;
- limitations or special requirements imposed on the individual because of questions of academic incompetence, disciplinary problems, or any other reason.

## ACADEMIC DISCIPLINARY ACTIONS

**Academic Probation**

The Academic Probationary status of a student is determined by the Student Promotions Committee. Students are placed on Academic Probation under the following circumstances:

- When repeating a Foundations of Medicine semester;
- When cumulative GPA is below 2.00;
- When taking an AA with 1 or more WFs;
- After readmission with 1 or more WFs earned during the last attempted term;
- After readmission with a previous cumulative GPA under 2.0;
- After failing a clinical clerkship;
- Remediation of a core clerkship
- After successfully appealing a dismissal.

Students will be removed from Academic Probation if, at the end of the next semester, they pass all courses and their cumulative GPA is 2.00 or higher and/or successfully remediated a SCE**.**

Academic Probation has important financial aid consequences, which are explained in the Office of Student Finance publication, "Financial Planning Guide" available on the www.RossU.edu website.

Students must clear any academic deficiency and should have a cumulative GPA of 2.00 or higher by the end of the pre-clinical curriculum to advance to clinical training.

**Administrative Withdrawal**

Students are subject to Administrative Withdrawal if they:

- Do not register for Foundations of Medicine and IMF semesters by the prescribed deadline determined by the Office of the Registrar;
- Do not return to campus to check-in during the designated check-in period prior to the start of the semester. Check-in period is determined by the Office of the Registrar;
- Fail to report to a clinical clerkship on the first day of the clerkship (for IMF and clinical clerkships);
- Do not return at the time specified at the end of an AA without prior approval or take an unauthorized leave;
- Do not sit the NBME CBSE within three consecutive attempts (or fourth attempt if granted);
- Do not sit for their first attempt of the USMLE Step 1 within six months of becoming eligible;
- Do not sit for their retake of USMLE Step 1 within six (6) months of prior attempt;
- Do not sit for their SCE during designated exam window;
- Do not sit for their first attempt of the USMLE Step 2 CK within six (6) months after completing their core clinical clerkship;
- Do not sit for their retake of USMLE Step 2 CK within one (1) year of prior attempt;

- Do not sit for their first attempt of the USMLE Step 2 CS within one (1) year after completing their core clinical clerkship;
- Do not sit for their retake of USMLE Step 2 CS within one (1) year of prior attempt;
- Do not submit USMLE Step results within 30 days of receipt;
- Do not submit sitting dates for Step exams within 30 days of being verified with ECFMG by the Office of the Registrar;
- Do not submit missing file documentation within one semester of being admitted, including but not limited to transcripts, letters of recommendations and immigration documents;
- Do not submit required health documents prior to starting IMF; or
- Failure to meet the conditions of their readmission.

A student who is Administratively Withdrawn will be reported as withdrawn effective the last date of any academically related activity or the date the institution determined the change in status. The withdrawal date will be reported to the U.S. Department of Education which will cause the student's loans to enter repayment status, in accordance with the terms and conditions of the loans.  Please consult with the Office of Student Finance to determine the impact on individual loan repayment.

**Academic Dismissal**
Students are subject to Academic Dismissal based on the following:

- Failing any course or semester upon two attempts;
- Failure of remedial courses;
- Student is, or will be, unable to complete the Foundations of Medicine curriculum in no more than 75 instructional weeks (five semesters) for students who completed their first semester prior to May 2013. Students who complete their first semester after May 2013 must complete their Foundations of Medicine curriculum in 90 instructional weeks (six semesters). The Promotions Committee may make an exception based on academic progress or mitigating circumstances.
- Failure to achieve a cumulative GPA of 2.00 or above by the completion of the Foundations of Medicine curriculum;
- Failure to pass the NBME CBSE in three consecutive attempts;
- Failure to pass the USMLE Step 1 or Step 2 CK or CS in six (6) attempts;
- Failure to pass any SCE in four (4) attempts;
- Failure of two clinical clerkships (including IMF);
- Failure of a clinical clerkship where a grade of R was awarded for the same clerkship;
- Failure to abide by RUSM policies;
- Student demonstrates the inability to meet the RUSM's technical standards;
- Failure to meet the conditions of their reinstatement on appeal; or
- Failure to complete all required degree requirements within seven (7) years of matriculation or as otherwise noted on reacceptance or reinstatement.

Students may also be dismissed for non-academic reasons or professionalism concerns pursuant to the Code of Conduct. (See **Code of Conduct** section in this Student Handbook).

**Appeals Process for Academic Dismissal**: **Foundations of Medicine**
First Appeal:  Any student dismissed from the Foundations of Medicine curriculum may appeal the dismissal to the Student Promotions Committee – Foundations of Medicine Subcommittee. Academic Dismissal Appeal form and letter should be emailed to PromotionAppeals@RossU.edu  and the Office of the Registrar (Registrar@RossU.edu) and must be made within 15 calendar days of the date on the dismissal notification letter. The appeal will be heard by the Student Promotions Committee – Foundations of Medicine Subcommittee, which will then make an official decision to uphold or overturn the dismissal.

Second Appeal:  In cases of procedural irregularity, inappropriate decisions, or where additional data has become available that was not considered by the Student Promotions Committee – Foundations of Medicine Subcommittee, a final appeal may be made to the Dean of RUSM. Academic Dismissal Appeal form and letter must be emailed to the Dean at PromotionAppeals@Rossu.edu and the Office of the Registrar (Registrar@RossU.edu) within 15 calendar days of the date on the decision letter from the Student Promotions Committee – Foundations of Medicine Subcommittee and specifically address the rationale for the appeal.  The Dean will respond within 15 calendar days of receipt of the appeal. The Dean's decision is final.

A student who successfully appeals a dismissal decision will be reinstated for the semester subsequent to the semester in which the decision regarding the appeal is made. For example, a student who is dismissed at the end of the September 2015 term, and is allowed to return, would be on inactive status for the January 2016 term and then resume his/her studies during the May 2016 term if his/her appeal is granted.

For a student who successfully appealed a dismissal for failure to pass the NBME CBSE will be notified of the conditions of reinstatement and provided a deadline to sit for the exam. Requests to change the conditions of the reinstatement are not granted, including an extension to sit for the exam.  Students who are unable to meet the condition of their reinstatement have the option to withdraw.  Failure to meet the condition of the reinstatement will result in a dismissal from RUSM.

**Appeals Process for Academic Dismissal**: **Clinical Sciences**
First Appeal:  Any student dismissed from the Clinical Science curriculum may appeal the dismissal to the Student Promotions Committee – Clinical Sciences Subcommittee. Academic Dismissal Appeal form and letter should be emailed PromotionAppeals@RossU.edu and the Office of the Registrar (Registrar@RossU.edu) and must be made within 15 calendar days of the date on the dismissal notification letter. The appeal will be heard by the Student Promotions Committee – Clinical Science Subcommittee, which will then make an official decision to uphold or overturn the dismissal.

Second Appeal:  In cases of procedural irregularity, inappropriate decisions, or where additional data has become available that was not considered by the Student Promotions Committee – Clinical Sciences Subcommittee, a final appeal may be made to the Dean of RUSM. Academic  Dismissal Appeal form and  letter must be emailed to the Dean via PromotionAppeals@Rossu.edu  and the Office of the Registrar (Registrar@RossU.edu) within 15 calendar days of the date on the decision letter from the Student Promotions Committee – Clinical Sciences Subcommittee and specially address the rationale for the appeal.  The Dean will respond within 15 calendar days of receipt of the appeal. The Dean's decision is final.

Academic Dismissal Appeal Form may be found on the student portal.

RUSM 000362

38

# POLICIES AND ADMINISTRATIVE PROCEDURES

RUSM 000363

## ABSENCES, WITHDRAWALS AND DEFERRALS

The RUSM curriculum is designed to offer a series of integrated learning experiences that build upon one another. Interruptions to this educational schedule, therefore, create undesirable breaks in the continuous learning process. Interruptions are of concern to medical licensure boards, and they can also affect financial aid eligibility and loan repayment status. Therefore, absences are approved only under extraordinary, well-documented circumstances.

The profession of medicine demands a great deal of time and attention; many components of the medical education program cannot be made up or remediated. You will frequently be required to make tough choices concerning the competing demands of educational and personal interests. Prior to submitting a request for an absence, you should carefully consider your priorities in terms of successfully completing your RUSM MD degree. Typically, excused absences will only be granted if you have a significant, unavoidable conflict and can make up the missed activity or make alternate arrangements for the activity. Students are advised to consult with the Office of Student Affairs, as appropriate, to discuss plans for any interruption of their studies.

In certain circumstances (i.e. academic difficulty, course or USMLE failure, failure to meet technical or professional standards), students may be placed on leave of absence by the medical school.

**Approved Absence (AA): Foundations of Medicine**

The instructional weeks of the Foundations of Medicine curriculum are scheduled three times per calendar year with short breaks between semesters. Outside of these scheduled breaks, Emergency Leaves of Absence (ELOA) and Short-Term Personal Leaves (STPL), students must be continuously enrolled. A student who wishes to temporarily interrupt his/her studies may apply for an AA. To qualify for an AA, the student must meet the criteria established below:

An AA must be requested in writing on the standard form (posted on myRoss), stating specific reasons and return date, and must be approved by the Associate Dean of Student Affairs, or her/his designee.

An AA may commence during a semester (to continue until the end of the semester) or between semesters (to cover a period of time equal to one semester). When applying for an AA, the student must indicate when he/she intends to resume studies, which must be at the beginning of a subsequent semester. An AA may not exceed 180 days under any circumstances, including vacations.

The student must notify the Office of the Registrar if he/she is unable to resume courses/clinical clerkships at the end of the AA. Notifications must be received prior to the end of the AA. Students who provide advanced notification will be placed in a Temporary Withdraw (TW) status. If the student does not resume his/her course/clinical clerkship schedule on the date indicated on his/her application without advanced notification to the Office of the Registrar, he/she will be administratively withdrawn retroactive to the date of his/her last academically related event before the AA.

The student should be in good academic standing at the time of his/her application for an AA. The student may not be on academic probation, retaking the NBME CBSE and or failing at the time of application. Students who are retaking the NBME CBSE will be placed in a Temporary Withdraw (TW) status after the end of the vacation period to continue preparation for their remediation. The Associate Dean for Student Affairs, or his/her designee, will meet with the student to discuss the reasons for the application, ramifications of the proposed absence and review the student's academic standing at the time of the application. Students who are repeating a semester are on academic probation and are thus not eligible to take an AA.

In certain unusual situations, students may request an AA following a short period of unacceptable academic performance. The student must indicate the reason for the absence on his/her application. Acceptable reasons for an AA may include, but are not limited to, any of the following: personal or family medical emergency, other personal or family emergency, or legal or financial hardship. In addition to providing a written explanation at the time of application, the student may be asked to provide additional documentation. In Dominica, the Associate Dean of Student Affairs, or his/ her designee, will review the student's application, meet with the student as necessary to understand the situation and discuss ramifications of the absence with the student. During the Foundations of Medicine segment, the Associate Dean of Student Affairs together with the Senior Associate Dean of Student Affairs will approve or deny the request for an AA. During the Clinical Sciences segment, the Assistant Dean for Clinical Student Affairs makes the determination.

Students are only eligible for an AA after successfully completing one full semester at RUSM.

Students may not have more than one AA within a 12-month period.

Students must confirm with the Office of the Registrar their intent to return eight weeks prior to their scheduled return date, unless otherwise approved at the time of their application. Failure to do so may result in the student's administrative withdrawal. Students who are approved for an absence for medical reasons must supply satisfactory documentation of fitness from a healthcare professional. The documentation must substantiate to RUSM's satisfaction that the student is able to comply with RUSM's Technical Standards and is fit to return to classes.

Students who are granted an AA during a semester will be reported as not enrolled to all lenders until returning to courses the following semester. Students are subject to individual lenders' loan repayment policies. Once a student returns to classes, he/she must submit a deferment form/enrollment letter to lender(s) to be placed into in-school deferment status with the lender(s).

Students who are granted an AA during a semester will receive W, WF or WP grades for that semester and must repeat the semester upon their return. In such situations the student will not be charged twice for the same semester.

A student who takes an AA prior to completing 60% of the semester, as determined by his or her withdrawal date or date of his or her last academically related event, will receive a partial tuition credit during the interrupted semester and the remainder of the tuition waiver will be applied in the semester in which he/she returns.

A student who takes an AA after completing 60% of the semester will not receive tuition credit for the interrupted semester but will receive a full tuition waiver for the semester in which he or she returns. Students will be responsible for covering any costs associated with an increase in tuition.

A student who is not actively enrolled for financial aid purposes will be withdrawn, effective the last academically related activity or the date the institution determined the change in status. (Note the effect of this on financial aid obligations; see *Financial Planning Guide*.)

Please note that all gaps of enrollment longer than 31 calendar days in duration (with the exception of scheduled breaks), including AA and TWs, are reported in the MSPE submitted to the NRMP.

All students returning from an AA must follow the standard registration and check-in procedures prior to the start of the semester, being certain that the Office of the Registrar and the Office of Student Affairs are notified of their presence on campus to resume study and must pursue the curriculum then in effect. Students are subject to all policies that are in force at that time and must pay the current tuition and fees. Similarly, students who defer their

enrollment or are readmitted or reinstated to RUSM after any period of absence are also subject to all policies, tuition, and fees then in effect.

Students who were failing one or more courses at the time of withdrawal will also be on financial aid probation, and will not receive funds to continue if they are still on academic probation in the succeeding semester.

**Approved Absence (AA): Clinical Sciences**
During the clinical clerkship phase, an AA may be taken only:

- Before IMF – request must be received 30 calendar days prior to the start of IMF. Students must be in good academic standing (cumulative GPA of 2.0 or higher) and have passed the NBME CBSE;
- After completion of IMF and before the start of clinical clerkships, for up to 10 weeks and to 180 calendar days; and
- During clinical clerkships (for up to 10 calendar weeks) to study for USMLE Step 2 CK or CS if a clinical clerkship scheduled at the end of the absence.

At the end of a clinical segment or clerkship the student must return to resume clinical clerkships at the time specified or be subject to Administrative Withdraw.  Students must notify the Office of the Registrar prior to the end of the AA if they are not returning to start clerkships. These students will be placed in a TW status.

Students may not have more than one AA within a 12-month period.

Students must confirm with the Office of the Registrar their intent to return eight weeks prior to their scheduled return date, unless otherwise approved at the time of their application. Failure to do so may result in the student's administrative withdrawal. Students who are approved for an absence for medical reasons must supply satisfactory documentation of fitness from a healthcare professional. The documentation must substantiate to RUSM's satisfaction that the student is able to comply with RUSM's Technical Standards and is fit to return to classes.

Students who are granted an AA during a semester will be reported as not enrolled to all lenders until returning to courses the following semester. Students are subject to individual lenders' loan repayment policies. Once a student returns to classes, he or she must submit a deferment form/enrollment letter to their lender to be placed back into in-school deferment status with that lender.

A student who is not actively enrolled for financial aid purposes will be withdrawn, effective the last academically related activity or the date the institution determined the change in status. (Note the effect of this on financial aid obligations; see *Financial Planning Guide*.)

Please note that all gaps of enrollment longer than 31 calendar days in duration (with the exception of scheduled breaks), including AA and TWs, are reported in the MSPE submitted to the NRMP.

**Short-Term Personal Leave (STPL): Foundations of Medicine**
The  Associate Dean of Student Affairs or his/her designee will consider petitions for excused absences via a STPL for reasons that are not addressed by the exceptions listed in the section on attendance.

> Petitions for permission to miss or reschedule a required exercise (other than exams), on the basis of extraordinary personal circumstances (those that are not included in the three exceptions listed in the attendance policy), are considered by the Associate Dean of Student Affairs or his/her designee. The petitioning process begins by submitting a STPL request form. These forms are available on myRoss. The request form must be submitted in advance of the start date of the requested leave.

Students should understand that the profession of medicine is one that demands a great deal of time and attention. There are components of the medical education program that cannot be made up or remediated. Students will frequently be required to make tough choices concerning the competing demands of educational and personal interests. Prior to submitting a request for a STPL, students should give careful consideration to the priorities required for successful completion of the RUSM medical degree. Typically, excused absences will only be granted if the student has a significant, unavoidable conflict and the missed activity can be made up.

Students on a STPL may not miss more than one week (7 calendar days). Students who experience difficulty returning to Dominica (for travel or other reasons) and cannot return within this timeframe will not be allowed to resume their academic work in the same semester. Students who miss more than one week will be required to convert their leave to an AA and will need to resume their studies during a subsequent term.

**Short-Term Personal Leave (STPL): Clinical Sciences**
STPL is generally not available during Clinical Sciences curriculum, as activities are generally not rescheduled. However, the Department of Clinical Medicine (DCM) may reschedule students for Clinical Sciences activities missed due to excused absences in the rare circumstances when doing so does not impede or impair curriculum delivery or compromise the department's record keeping, as determined by the department chair.

**Emergency Leaves of Absence (ELOA): Foundations of Medicine**
On occasion, students may need to interrupt their enrollment during a semester for unavoidable, non-academic reasons. With the approval of the Associate Dean of Student Affairs, or her/his designee, a student may be temporarily excused from classes during a semester due to documented emergency circumstances. These include severe illness or major injury to the student, or a similar emergency or death in the student's immediate family. If an emergency leave of absence is granted, the following conditions apply:

- *Documentation*. Documentation of the emergency is required for ELOA approval. If the student does not provide documentation, the ELOA may be nullified and the student's absence will no longer be considered excused.

- *Timeframe*. If the student is able to return within two weeks (14 calendars days) of such an emergency and complete all coursework for that semester, his or her absence will be treated as an ELOA and will have no effect on enrollment status.

- *Frequency and SAP*. For students on ELOA, the interrupted portion of the semester will not be counted when determining time limits for SAP. No more than one ELOA will be granted per semester.

- *Conversion to Approved Absence*. Students must return from an ELOA or have applied for and been granted an AA within the two-week timeframe. Those who do not return within this period will be administratively withdrawn.

**Emergency Leaves of Absence (ELOA): Clinical Sciences**
On occasion, students may need to interrupt their enrollment during a semester for unavoidable, non-academic reasons. With the approval of the Senior Associate Dean of Student Affairs and the Assistant Dean of Clinical Student Affairs, or her/his designee, a student may be temporarily excused from clinical clerkships during a semester due to documented emergency circumstances. These include severe illness or major injury to the student, or a similar emergency or death in the student's immediate family. If an ELOA is granted, the following conditions apply:

- *Documentation*. Documentation of the emergency is required for ELOA approval. If the student does not provide documentation, the ELOA may be nullified and the student's absence will no longer be considered excused.

- *Timeframe*. If the student is able to return within two weeks of such an emergency and complete all coursework for that semester, his or her absence will be treated as an ELOA and will have no effect on enrollment status.

- *Frequency and SAP*. For students on ELOA, the interrupted portion of the semester will not be counted when determining time limits for SAP. No more than one ELOA will be granted per semester.

- *Conversion to Approved Absence*. Students must return from an ELOA or have applied for and been granted an AA within the two-week timeframe. Those who do not return within this period will be administratively withdrawn.

**Temporary Withdrawal (TW)**
Students who completed Foundations of Medicine curriculum are subject to TW for absences longer than 31 calendar days in duration (scheduled breaks between semesters do not apply). Students who fail to return after an AA will be subject to AW. Students who have not returned from an AA but have notified the Office of the Registrar will be moved to a TW status effective their withdrawal date or the date of their last academically related event. Notifications must be received prior to the end of the AA.

Enrollment gaps longer than 31 calendar days in duration (with the exception of scheduled breaks), including AAs and TWs, are reported in the MSPE submitted to the ECFMG.

Students who are in a TW status in order to sit for the NBME CBSE or USMLE Step Exams must submit an examination sitting date within 30 days of being verified by the Office of the Registrar or be subject to AW.

Students in TW status who have not completed all degree requirements within seven (7) years of matriculation will be subject to dismissal. Students in an AA or TW status are reported as not enrolled to student loan lenders.

Please speak with the Office of Financial Aid regarding the impact on financial aid.

**Unauthorized Absences**
Except when granted an ELOA as outlined above, students who leave during a semester or a scheduled clinical clerkship will be administratively withdrawn.

Students wishing to return to RUSM after an unauthorized absence must apply for readmission. Applications for readmission will be reviewed by the Readmission Committee to determine if the student is eligible for readmission, and if so under what conditions (such as academic probation).  (See instructions for reapplying in the **Policies and Administrative Procedures** section)

*Exception for Clinical Clerkship Breaks*: Due to scheduling constraints between clinical clerkships (and external institutions' procedures), brief breaks in study may occur. Such breaks, if less than 31 calendar days (including weekends) in duration beginning **after** the last day of the student's previous clerkships, will have no impact on the student's enrollment status. The *Financial Planning Guide* offers information about the loan disbursement policy for longer gaps in study.

**Student Withdrawals**

Students may voluntarily withdraw from enrollment. They must then apply for readmission if they wish to return to RUSM, and will be subject to the tuition policy for withdrawals and loan refund federal policy (See **Tuition Refund Policy for Withdrawals** section). Readmission is not guaranteed but applications will be reviewed by the Readmission Committee. Readmitted students will typically be subject to all academic policies and tuition and fees in effect at the time of re-enrollment, without any "grandfathering" provisions based on their original admission. See additional readmission information in the Policies and Administrative Procedures section of this Student Handbook.  Student withdrawals are governed by the following policies:

- *Application for Withdrawal*. Students in Foundations of Medicine may not withdraw from a single course during a semester; they must withdraw completely from RUSM. Within the Foundations of Medicine curriculum, students may begin the withdrawal process by completing an Application for Withdrawal form available at myRoss. They must then obtain all required clearances and approvals. For students in Clinical Sciences, students may request to withdraw by submitting a request via "askRoss" and must be approved by the Assistant Dean for Clinical Student Affairs.

- *Transcripts*. Students withdrawing from RUSM will receive W (if no exams were taken), WP or WF on their transcripts depending on whether they were passing or failing a course or clinical clerkship at the time of their withdrawal (See **Student Grading and Promotions** section). All approved withdrawals must then be submitted to the Office of the Registrar.

- *Refunds*. Refunds, if required, will be determined by the last academically-related activity (See **Tuition Refund Policy for Withdrawals** section)

- *Readmission with WF*. Students who receive WF in any course or clinical clerkship at the time of withdrawal will be reviewed by the Readmission Committee to determine whether they are eligible for readmission.

    - Students who were failing one or more Foundations of Medicines courses at the time of withdrawal will be put on academic probation if they are readmitted and will be required to take the ELLS course.

**Deferrals**

Prior to the start of classes, students admitted to a specific semester may request to defer their admission to a subsequent semester. The following policies apply to deferrals:

Deferrals are not guaranteed, and are granted on a case-by-case basis depending on class size and seat availability. Due to a high volume of applicants, deferrals are generally not permitted into the September semester. Students must provide a valid reason for deferring, such as an employment obligation, academic commitment, personal injury/illness, financial hardship or travel/immigration issues. In some cases, supporting documentation may be required.

Deferred admission may be requested for up to one year from your acceptance date and is granted on a one-time basis. If you cannot attend the semester to which you have deferred into, you will be required to reapply.

Requests are reviewed as received and may take up to 30 days before a decision is made. The RUSM Admissions Office will notify you via email of your deferral decision and will also send a letter of confirmation to your mailing address.

45

In order to finalize a deferral, a $1,000 nonrefundable deferral fee must be submitted. Please note that the deferral fee will be applied to your first semester's tuition if you start class by the deferral date. Failure to start class by the deferral date will cause you to lose your seat in the class without future reconsiderations or deferrals.

Students planning to matriculate to another institution during the deferral period will be required to submit an official transcript for all coursework completed during that time. Your admission may be subject to re-review pending the receipt of all transcripts and/or test scores.

If your request is denied, you have the option to remain in your current term or reapply for a future term.

**Disciplinary Dismissals**
RUSM may implement disciplinary actions for non-academic infractions that may result in suspension or dismissal. Students may be put on an involuntary withdrawal, temporary suspension, or dismissed from RUSM for poor academic performance, violations of the Honor Code, or for disruptive or unprofessional behavior (See the **Code of Conduct and Disciplinary Actions** section).

As a general RUSM policy, students who are dismissed will not be considered for readmission. Dismissal of this kind during an academic semester does not warrant reduction of tuition and fees.

## ACCOMMODATIONS FOR STUDENTS WITH DISABILITIES

The RUSM curriculum represents a core curriculum essential to all physicians. Therefore, RUSM expects that each student admitted will be capable of completing the full curriculum of required courses, clerkships, and electives under the established RUSM policies within seven (7) years of matriculation. All students and applicants must be capable of meeting the RUSM Technical Standards (as outlined in the **Professionalism and Conduct** section) with or without reasonable accommodation, at each stage of their medical education. Our goal at RUSM is to provide equal opportunity without undermining the integrity of any course, clerkship, or program. Requests for accommodation should be made as soon as the need is known and within the guidelines described here. Requests are processed in Foundations of Medicine and Clinical Sciences by the appropriate Accommodation Coordinator in the Office for Student Affairs.

**Application**

*Foundations of Medicine* Requests for accommodation during the foundational science portion of the curriculum should be submitted in writing to the Accommodations Coordinator for Foundations of Medicine.

*Internal Medicine Foundations (IMF)*
It is the student's responsibility to ensure that all accommodation requests and materials are up to date prior to commencing IMF and/or Clinical Sciences. Requests for accommodation during the clinical portion of the curriculum should be submitted to the Director of Office of Consultation and Support Services for IMF/Clinical Sciences. Accommodations that were received during the Foundations of Medicine curriculum will be taken into consideration but cannot ensure similar accommodations in the Clinical Sciences curriculum (see **Clinical Sciences** section).

*Clinical Sciences*
Although RUSM may have granted a student's request for accommodations during the Foundations of Medicine curriculum, this in no way assures that the same accommodations requested will be deemed reasonable in the context of IMF/Clinical Sciences. The Director of Office of Consultation and Support Services is available to advise and assist RUSM students with the accommodation request processes of the clinical training institutions, but has no role in the outcome of such requests.

**Timeframe**
For recently-admitted students, requests for accommodation should be submitted within 30 days of acceptance. When the need for an accommodation arises after a student has begun medical studies, please allow at least four (4) weeks once all documentation has been received by the Accommodations Coordinator for Foundations of Medicine or the Director of Office of Consultation and Support Services for IMF/Clinical Sciences to allow time for an evaluation of the request and documentation. RUSM will make all reasonable efforts to review such requests in a timely manner, but cannot guarantee the disposition of requests prior to any specific examination or phase of the curriculum.

**Responsibility**
To qualify for accommodation, a student must identify him/herself to the Accommodation Coordinator for Foundations of Medicine or the Director of Office of Consultation and Support Services for IMF/Clinical Sciences, declare the disability or suspected disability in writing, and request accommodation. It is also the student's responsibility to obtain a thorough written evaluation from an appropriate professional, documenting the presence, extent, and ramifications of the disability. In addition, the documentation should explain what specific types of accommodation the evaluator believes might be most helpful in offsetting the effects of the disability to an acceptable extent (in a medical school environment, if possible). Responsibility for the timely submission of requests and supporting documentation rests upon the student seeking the accommodation. Our goal at RUSM is to provide equal opportunity without undermining the integrity of any course, clerkship or program. Requests not

RUSM 000371

submitted with at least four (4) weeks or not accompanied by sufficient supporting documentation will impede RUSM's ability to respond in a timely manner.

**Confidentiality**

RUSM keeps all accommodation requests confidential to the extent necessary to consider the request and implement the accommodations upon approval. RUSM reviews requests to determine whether they are supported by adequate and appropriate documentation. After careful review in consultation with appropriate professionals, the Accommodation Coordinator for Foundations of Medicine or the Director of Office of Consultation and Support Services for IMF/Clinical Sciences will make a recommendation to the Associate Dean, Student Affairs or the Senior Associate Dean, Student Affairs. The decision of the Associate Dean, Senior Associate Dean of Student Affairs or his/her designee will then be communicated in writing to the student.

**Propriety**

All accommodations will be reasonable and appropriate to the circumstances, allowing equal opportunity for students with disabilities. Accommodations must not infringe on, or fundamentally alter, the essential requirements of the medical education program, as outlined in the RUSM Technical Standards.

**Accommodations and USMLE/NBME Testing**

If a student with a disability requires an accommodation for any phase of the USMLE testing, it is the student's responsibility to seek that accommodation directly from the NBME and/or the Federation of State Medical Boards (FSMB) in compliance with their policies. Although RUSM previously may have granted accommodation requests for the student, disability accommodations for these examinations are determined solely by the policies or processes of the NBME or FSMB. The Accommodations Coordinator for Foundations of Medicine or the Director of Office of Consultation and Support Services for IMF/Clinical Sciences is available to assist students with the process governing requests for an accommodation for the USMLE, but RUSM has no role in the outcome of these requests. Please note that NBME's review for accommodations takes a minimum of 90 days, so please apply in time to allow adequate review.  Students seeking accommodation through the NBME must adhere to the curricular and administrative deadlines for sitting for USMLE Step examinations.

**External Facilities**

RUSM makes no guarantee that any facility outside of its campuses, including housing and other establishments, will provide accommodations for individuals with disabilities.

48

## ALCOHOL AND SUBSTANCE ABUSE POLICY

1.0 Overview

All students, faculty, administrators, and support staff are expected to recognize the potential for alcohol and drug abuse whenever illegal drugs or alcohol are sold, given, manufactured, and/or used and that such abuse is in conflict with the University's purpose. To mitigate abuse, the University has established policies and regulations which adhere to applicable laws and statutes regarding such abuse. The regulations and policies governing the use of alcohol and other substances apply to all students, guests, and visitors on University property or as part of any University activity. The responsibility for knowing and abiding by the provisions of these policies rests with each individual.

Medical students are held to the same ethical and behavioral standards as physicians during both the pre-clinical and clinical years of medical school. Untreated abuse and/or dependence are unacceptable to the school and are cause for administrative action up to and including dismissal.  Both for reasons of personal well-being and because of the nature of the profession, students are expected to show restraint and responsibility regarding the use of any substance. Students are also expected to seek help for alcohol or substance abuse problems if they are aware of them. Possession or use of illegal substances or unlawful use of lawful controlled substances could result in a criminal conviction, which could preclude licensure to practice.

2.0 Applicable Law

All members of the University community shall abide by the laws of the US Federal Government, the Commonwealth of Dominica and any local laws, ordinances and regulations where the student is located at any time during which he or she is affiliated with or represents RUSM relative to the possession, consumption, distribution, transportation, manufacture and sale of alcoholic beverages or products.

Conviction for the possession or distribution of illegal drugs, alcohol may result in various penalties according to the nature of the offense. The prescribed penalties under Dominican law are included in the Drug Prevention (Of Misuse Act), Chapter 40:07 of the laws of the Commonwealth of Dominica. According to this Act, —a person found in possession of a controlled drug on any school premises is deemed to have the controlled drug for the purpose of drug trafficking unless the contrary is proved, the burden of proof being on the accused.  On summary conviction of these charges, penalties include a fine of one hundred fifty thousand EC dollars and imprisonment for a term which may extend for fifteen years.

3.0 Prohibited Activities

RUSM strictly prohibits the unlawful manufacturing, distribution, dispensing, use or possession of alcohol, illegal drugs and controlled substances or the misuse of prescription medications/drugs at any time during which a student is affiliated with or representing RUSM.

Any violation of the Policy on Substance and Alcohol Abuse is considered a violation of school conduct and is subject to the penalties of the school in addition to local, state and federal jurisdictions.

4.0 Penalties/Sanctions

All students are expected to be familiar with and to respect local and Federal laws with regard to the use and possession of drugs or alcohol. Violation of the law could subject the student to disciplinary action up to and including dismissal and possible referral for prosecution.  The University will impose sanctions for violation of the standards of behavior (on and off campus) consistent with local and federal laws, and University policies. Violations will result in disciplinary action, up to and including dismissal, and referral for possible prosecution. Sanctions imposed will depend upon the severity and frequency of the violation. In addition to, or in lieu of discipline, violators may be required to complete an appropriate rehabilitation program.

The RUSM Honor Code governs all students. Violation of policies specific to alcohol and other drugs are considered violations of the Honor Code. They include the unlawful possession, use, manufacture, sale or distribution of alcohol and other drugs.

Applicable sanctions include, but are not limited to, probation, probation and referral for treatment and rehabilitation (without adjudication), suspension or expulsion. The University may refer any case to the proper local, state and/or federal authorities for appropriate legal action. Individuals disciplined under the University Policy on Substance and Alcohol Abuse have the right to an appeal in accordance with applicable University grievance protocol.

Persons convicted of drug possession under US Federal law are ineligible for federal student grants and loans for up to one year after the first conviction, five years after the second; the penalty for distributing drugs is loss of benefits for five years after the first conviction, ten years after the second, permanently after the third conviction.

The University sanctions imposed under the Policy on Substance and Alcohol Abuse neither diminish nor replace the penalties available under generally applicable civil or criminal laws. Violations of University standards may also violate federal, state and local laws of the United States, England and the Commonwealth of Dominica, or other appropriate governance body.

Violators will be subject to all appropriate penalties within the jurisdiction of the offense. Within the Commonwealth of Dominica jurisdiction, drug trafficking, which includes producing, supplying and using, is punishable by fines, deportation and/or imprisonment.


5.0 Prevention & Assistance

The University recognizes alcohol and drug abuse and dependency as clinical disorders defined in the current version of the Diagnostic and Statistical Manual (DSM-IV-TR) of the American Psychiatric Association.

Excessive drinking and drug use will lead to a wide variety of health problems and professional difficulties. The use of any amount of drug prescription, illicit or legal (including alcohol), will alter the chemical balance of the body. Misuse or compulsive use of alcohol and other drugs can often cause serious damage to major body organs such as the brain, stomach, lungs, liver, kidneys, heart, as well as, the immune and reproductive systems. Pregnant women put the fetus at risk for serious birth defects and complications at birth, as well as the possibility of delivering a baby with a drug dependency who may exhibit withdrawal signs. Other health problems include sleep disturbances, malnutrition, convulsions, delirium and greater risk for life threatening accidents and events such as traffic deaths and suicides. Intravenous drug users, who share needles, are at high risk for contracting HIV/AIDS. Use and/or withdrawal from a substance can also create mental problems including, but not limited to, depression, anxiety, paranoia and delusions.

RUSM will facilitate substance abuse prevention through general promotion of a substance-free educational environment.  In addition to the active enforcement of the Policy on Substance and Alcohol Abuse, students will be informed of any current and subsequent changes to the Policy on Substance and Alcohol Abuse. Additionally, the medical school curriculum incorporates information on the effects that alcohol and drugs have on both mental and physical health. At RUSM, an atmosphere will exist wherein individuals with alcohol and/or drug problems are encouraged to seek help.

For information or assistance with substance and/or alcohol abuse matters, or for information on programs such as Alcoholics Anonymous, an individual can confidentially contact RUSM Counseling Services.

Modeled upon the principles of the AMA's Council on Ethical and Judicial Affairs (CEJA), RUSM offers services that are geared toward ensuring the personal health of students by providing support and avoiding punitive measures. RUSM, through Student Affairs and the Counseling Services, helps coordinate intervention services, conduct

screening assessments, make appropriate referrals for comprehensive assessment and treatment, provide case management services for those with continuing problems, and encourage a collegial supportive environment. Moreover, they help promote students' overall health and wellness as a priority for the profession. Students are encouraged to seek guidance from these programs at the earliest sign of need. To further utilization, help will be provided through a system that remains separate albeit appreciated by the University's disciplinary system.

Students seeking assistance for a substance abuse problem will not be subject to sanctions by the University as a result of seeking such assistance.

The use of drugs and alcohol can cause physical and psychological dependence and can interfere with memory, sensation and perception. Drugs impair the brain's ability to synthesize information. Regular users of drugs develop tolerance and physical dependence often experienced by withdrawal symptoms. The psychological dependence occurs when the drug taking becomes central to the user's life. Medical students who are aware of or suspect a colleague of abusing alcohol or drugs are encouraged to intervene and provide assistance, or to refer the matter to the medical education administration.

    • If a medical student in good standing seeks help for substance abuse, support is available through Student Affairs, the Health Clinic or Counseling Services.

    • If a medical student violates school policy or has academic difficulties and a substance abuse problem is identified, assistance will be provided if the student acknowledges the problem, consents to treatment in an appropriate rehabilitation program, and complies with the program.

    • If a medical student violates school policy or has academic difficulties and a substance abuse problem is identified, and the student refuses to acknowledge the problem, or does not consent to therapy, or does not comply with the appropriate rehabilitation program, disciplinary action up to and including dismissal or expulsion may be recommended.

    • If a student reports to school or to a clinical setting under the influence of alcohol or drugs, they will be immediately suspended and possibly dismissed or expelled from the University.

RUSM will facilitate substance abuse prevention through general promotion of a substance-free educational environment, by informing students on current and subsequent changes to policies on alcohol and other drugs and through advocating an atmosphere where individuals with a problem are encouraged to seek help. The medical school curriculum incorporates information on the effects that alcohol and drugs have on both mental and physical health.

A list of some drug and alcohol prevention, counseling, treatment and rehabilitation, and re-entry programs is available at RUSM Counseling Services located adjacent to Classroom 1. Any student, spouse, or faculty member can confidentially contact Counseling Services for additional referral information.

**Controlled Drugs Prescription Policy**

The policy for the acquisition and possession of prescription/controlled drugs by RUSM students as advised by the Counseling Services of RUSM in conjunction with the Ministry of Health of Dominica is as follows: any student of RUSM who requires a prescription for a controlled substance will need to present to his or her physician adequate proof or evidence that he or she has the diagnosed condition for which the drug is indicated as a pharmacological treatment.

## APPEALS

**Initiation and Scope**

Parties may appeal the outcome of formal academic and non-academic disciplinary actions. These appeals must be submitted in their proper form within *15 calendar days* of notification of the decision of the Senior Associate Dean of Student Affairs or his/her designee. Appeals are considered only when it is clearly established by the appealing party, in a concise written statement, that one of the following occurred:

- **The decision was unreasonable** based on the information presented at the hearing and/or based on the alleged violation;
- **The sanction was unreasonable** based on the information presented at the hearing and/or based on the violation;
- **There was a misinterpretation** of the Code of Conduct or other policies, by the Grievance Committee, Honor Council or administrator during the adjudication of the case;
- **A procedural error occurred** that resulted in an unfair hearing; or
- **Relevant information was not brought out** in the initial hearing that may have been sufficient to alter a decision, because such information was not known to the person appealing at the time of the original hearing.

The specific basis or bases for the appeal must be identified by the appealing party in the written appeal.

**Administrative Response**

Neither the Complainant nor Respondent will attend Appeal hearings. With the exception of appeals involving new information not known at the time of the original hearing or informal resolution, the Dean, or designee's, review will be limited to the written appeal, documents and evidence originally presented at the hearing or informal resolution, and the official record of the hearing. The Dean, or his/her designee, may:

- Uphold the original finding and outcome;
- Require a (new) hearing;
- Send the appeal back to the Associate Dean for Student Affairs, Grievance Committee or Honor Council for review of the decision or sanctions;
- Reverse the original decision by finding that a violation or no violation of the Code of Conduct occurred; or
- Amend sanctions where the original sanctions imposed are found to be unreasonable.

**Notification**

The Dean, Senior Associate Dean of Student Affairs, or their designee, will notify the parties of the appeal decision within *15 calendar days* of the Dean's receipt of the written appeal.

52

# ATTENDANCE

**Foundations of Medicine**

Students are expected to attend class. The policies that govern attendance and dress code requirements are described in writing in the syllabus for each course at the discretion of the faculty member. Keep in mind that RUSM is non-sectarian and does not close for religious holidays. Attending examinations and other required exercises is mandatory. Missing a mandatory activity can result in a zero, except for the following:

Mandatory Activities (non-exam center activities, See **Examinations** section):

- Students who have been granted an AA from the office of Student Affairs prior to the event will be excused. (See **Absences, Withdrawals and Deferrals** section)

- Military obligations, jury duty, or the mandate of a subpoena, with proper advance notification to the Senior Associate Dean of Student Affairs.

- Students who experience a medical emergency on the day of an event must contact Student Health and Counseling Services prior to or at the scheduled time of the event. In the event that an acute illness, injury, or mental health issue prevents student attendance of a mandatory session, the student must present to Student Health and Counseling Services for evaluation and to obtain a verification of the visit. Even if the illness, injury, or mental health issue is self-limiting, the student must contact Student Health Services for assessment as soon as symptoms are experienced and prior to the mandatory academic activity. Excused absences and/or remediating measures will be given at the discretion of assigned faculty overseeing the missed activity.    For an emergency, call the RUSM emergency line (235-9111) or to reach the on-call counselor (275-1385).  To schedule an appointment at the RUSM Health Clinic call (255-6301).  To schedule an appointment with Counseling Services call 255-6553.  Note: Students WILL NOT be excused when a verification of visit is obtained from Student Health and Counseling Services for a previously unreported student illness or after a missed mandatory academic activity has occurred.

*Petitions to Miss a Foundations of Medicine Exam or Miss/Reschedule a Mandatory Foundations of Medicine Academic Activity*

The Associate Dean of Student Affairs, Senior Associate Dean of Student Affairs, or his/her designee will consider petitions for excused events that are not addressed by the above exceptions or course syllabus. Proper documentation and supporting documents must be submitted to the Associate Dean of Student Affairs or his/her designee prior to the event for review and consideration on the basis of extraordinary personal circumstances.

**Clinical Sciences**

Students in the Clinical Sciences curriculum are expected to be in attendance 100% of the time and comply with the dress code established by their respective preceptor. It is up to each individual hospital to enforce its attendance rules, and RUSM students are expected to abide by those rules.

RUSM 000377

53

*Illness/Emergencies*
Students are required to inform the hospital coordinator and/or preceptor of any absence due to illness or emergency. Students may be required to provide documentation for an absence (*i.e.*, note from physician). Students may be required to make up the time missed.

*Weather-Related*
RUSM defers to the clinical site to determine whether or not students should attend clinical clerkships during inclement weather. Students may be required to make up time missed for inclement weather.

*Duty Hours*
Student work hours are limited to 70 hours per week, averaged over a four-week period, inclusive of all in-house call activities and all moonlighting.

*Dropping a Clerkship*
Students are not permitted to drop a clinical clerkship within 30 calendar days of the start date, or after beginning the clerkship. Exceptions to this policy may be made by the Assistant Dean for Clinical Student Affairs, at his or her discretion.

If a student drops a clinical clerkship within 30 calendar days of the start date or after beginning the clerkship without permission of the Assistant Dean for Clinical Student Affairs, the student will:
- Receive an F grade;
- Not be permitted to begin another clinical clerkship until after the end date of the clerkship he/she dropped;
- Not receive priority in re-scheduling; and
- Receive a hold on the student's account.

*Time Away from Clerkships and Electives*
RUSM permits students to take time off of clerkships and electives for residency interviews, conference attendance, and examinations. For every week of the clerkship/elective, a student may take a total of one half day for off for interviewing, conferences, and/or examinations; therefore, students on four (4) week clerkships are permitted a total of two (2) days off for these activities, students on six (6) week clerkships are permitted a total of three (3) days, and students on 12 week clerkships are permitted a total of six (6) days for interviewing, conferences, and/or examinations. Please note that time away for interviews, conferences, and examinations must be pre-approved by your preceptor.

RUSM 000378

54

## BLOODBORNE PATHOGENS EXPOSURE POLICY

In accordance with the Occupational Safety Health Administration Bloodborne Pathogens standard, 29 CFR 1910.1030, the following exposure control plan has been developed:

**Implementation Schedule and Methodology**

OSHA requires that this plan also include a schedule and method of implementation for the various requirements of the standard. This Plan is in effect and will be reviewed on an annual basis.

**Compliance Methods**

Universal precautions will be observed in order to prevent contact with blood or other potentially infectious material.  All blood or OPIM (Other Potentially Infectious Material) will be considered infectious regardless of the perceived status of the source individual.  Personal protective equipment shall also be utilized. At the clinical facilities the following engineering controls will be utilized:

- Sharps Containers
- Safety sheath on needle
- Biohazard waste containers
- Toilet seat covers
- Spill kits

**Handwashing**

Handwashing facilities are also available to students who are exposed to blood or other OPIM.
After removal of personal protective gloves, students shall wash hands and any other potentially contaminated skin area immediately or as soon as feasible with soap and water or waterless hand cleaner. If students incur exposure to their skin or mucous membranes, those areas shall be washed or flushed with water as appropriate as soon as feasible following contact.

*Eye-Wash Station*

Following exposure of chemical or body fluid exposure – a 15 minute wash is recommended.

**Needles**

Contaminated needles and other contaminated sharps WILL NOT BE bent, recapped, removed, sheared or purposely broken. OSHA allows an exception to this if the procedure would require that the contaminated needle be recapped or removed and no alternative is feasible and the action is required by the medical procedure.  If such action is required, then the recapping or removal of the needle must be done by the use of mechanical device or a one-handed technique.

**Work Area Restrictions**

In work areas where there is a reasonable likelihood of exposure to blood or OPIM, students are not to eat, drink, apply cosmetics or lip balm, smoke, or handle contact lenses.  Food and beverages are not to be kept in refrigerators, freezers, shelves, cabinets, or on counter tops or bench tops where blood or OPIM are located.

Mouth pipetting or suctioning of blood or other potentially infectious materials is prohibited. All procedures will be conducted in a manner which will minimize splashing, spraying, splattering, and generation of droplets of blood or OPIM.

RUSM 000379

55

**Contaminated Equipment**

All garments which are penetrated by blood shall be removed immediately or as soon as feasible.  All personal protective equipment will be removed prior to leaving the work area.

The following protocol has been provided to facilitate leaving the equipment at the work area:
- Disposable personal protective equipment will be disposed of in the nearest bio-hazardous waste container
- Contaminated sharps that are reusable will be removed from an exam or procedure room and transported using a labeled closed container to an instrument processing area after each patient procedure

**Gloves**

Gloves will be used for all clinical encounters that present potential contact with blood and body fluids.  Gloves will be available in all clinical areas.

Disposable gloves used are not to be washed or decontaminated for re-use and are to be replaced when they become grossly contaminated or torn, punctured, or when their ability to function as a barrier is compromised.

**Masks**

Masks in combination with eye protection devices, such as goggles or glasses with solid side shield, or chin length face shields, are required to be worn whenever splashes, spray, splatter, or droplets of blood or OPIM may be generated and eye, nose, or mouth contamination can reasonably be anticipated.  Situations which would require such protection are as follows:

- Incision and drainage
- Removal of a cyst or lesion
- Aspiration of wounds
- Cleaning, disinfecting of instruments (i.e., sigmoid scope)
- Other similar procedures

**Hepatitis B Vaccine**

All students who have been identified as having exposure to blood or OPIM will be offered the Hepatitis B vaccine. The vaccine will be offered within 30 working days of their initial assignment to work involving the potential for occupational exposure to blood or OPIM unless the student has previously had the vaccine or who wishes to submit to antibody testing which shows the employee to have sufficient immunity.

Students who decline the hepatitis B vaccine will sign a waiver which uses the wording in Appendix A of the OSHA standard.

Students who initially decline the vaccine but who later wish to have it may then have the vaccine provided.

**Post-Exposure Procedure**

**ALL** exposures need to be reported immediately (within **2** hours) to maximize effective treatment.  If indicated, prophylactic medications must be administered within **3** hours.

All students who incur an exposure incident will be offered post-exposure evaluation and follow-up in accordance with the OSHA standard.  This follow-up will include the following:

56

- Documentation of the route of exposure and the circumstances related to the incident.

- If possible, the identification of the source individual and, if possible, the status of the source individual. The blood of the source individual will be tested (after consent is obtained) for HIV and a hepatitis panel according to the standing order.

- Results of testing of the source individual will be made available to the exposed employee with the exposed employee informed about the applicable laws and regulations concerning disclosure of the identity and infectivity of the source individual.

- The student will be offered the option of having their blood collected for testing of the student's HIV/HBV serological status. The blood sample will be preserved for at least 90 days to allow the student to decide if the blood should be tested for HIV serological status. However, if the student decides prior to that time that testing will be conducted then the appropriate action can be taken and the blood sample discarded.

- The student will be offered post exposure prophylaxis in accordance with the current recommendations of the U.S. Public Health Service.

- The student will be given appropriate counseling concerning precautions to take during the period after the exposure incident. The student will also be given information on what potential illnesses to be alert for and to report any related experiences to appropriate personnel.

- Report to the Miramar Campus within the next business day with a copy of the incident report and all other paperwork completed to date.  All post exposure follow up will be provided as directed by the Senior Associate Dean for Clinical Student Affairs or his/her designee.

RUSM 000381

# CAMPUS LIFE – INTRAMURALS, CLUBS AND ORGANIZATIONS, AND STUDENT LEADERS

## Intramurals, Clubs and Organizations, Student Leaders

While you will be primarily focused on your education at RUSM, we also encourage involvement in the many extracurricular activities available on campus.  A wide variety of clubs, sports, student organizations, activities and associated leadership opportunities can enrich your learning experience by helping you to make friends, acquire new skills, serve the community, and develop leadership abilities. Students participating in Intramurals, Clubs and Organization are reminded that their conduct is, at all times, expected to meet the standards of a medical professional and the Code of Conduct.    Student Leaders of such groups are reminded of RUSM's strong policy against discrimination based on race, color, religion, sex, national origin, age, disability, genetic information, sexual orientation, gender identity, status as a parent, marital status or political affiliation.

**Intramural and Extracurricular Activities.** RUSM has an active sports community, offering a chance for needed exercise and socialization. Members of the RUSM community participating in these activities are expected to display good sportsmanship and standards of conduct becoming of the medical professional.

**Clubs and Organizations.** Clubs and organizations sponsored by RUSM offer a wide variety of opportunities to pursue other interests. Collective and individual behavior at group activities should serve as a reflection of the standards of RUSM. Extracurricular clubs and organizations must obtain prior approval from RUSM in the design and display of clothing or memorabilia which include their group's name and/or any reference to RUSM; and must demonstrate good judgment in the design and placement of logos and other identifiable information.

**Student Leaders.** Groups and the organization of extracurricular activities offer many opportunities for students looking to enhance their leadership skills. Officers and leaders of organizations, including the SGA, should be careful in selecting activities that represent the ideals of RUSM, both on- and off-campus. Leaders are responsible for exemplifying the Code of Conduct required of students, and also assuring the compliance of members. Student Leaders must also maintain good academic standing.

**Group/Member Sanctions and Disciplinary Actions:** Any individual or group behavior that is in conflict with the standards set by the SGA, Campus Life department, Student Affairs and administration may result in sanction or reprimand from the group's governing body, including the SGA, and possible additional disciplinary action by RUSM. Failing to enforce proper behavior may also subject leaders to the loss of their leadership position. When appropriate, student leaders may be required to represent their members and answer for behavioral misconduct during disciplinary proceedings.

RUSM 000382

58

## CLINICAL CLERKSHIPS AND ELECTIVES IN NEW YORK

All students that are scheduled for clerkships within the state of New York, albeit a core or elective clerkship, must submit their completed New York State Education Department application to their designated program coordinator 30-days prior to the start of their clerkships, along with any additional requested documentation. Should a student be scheduled for an affiliate clerkship, the student must complete the long-term clerkship application; while a student seeking a non-affiliate elective clerkship must submit a Letter of Eligibility application with required payment. Additional information is located on the student portal.

59

## CODE OF CONDUCT

The Code of Conduct applies to any covered person as that term is defined in the Code.

**ARTICLE I: TERMINOLOGY**

1. The terms "University" or "RUSM" means Ross University School of Medicine.
2. The term "covered person" includes any person taking courses (either full-time or part-time, either onsite or online, and including but not limited to students who take time off between terms), receiving or seeking to receive services from the University, or otherwise pursuing undergraduate, graduate or professional studies at the University.
3. The term "faculty member" means any person hired by or contracted with the University to conduct instructional activities.
4. The term "Staff" means any person employed by the University.
5. The term "member of the RUSM community" includes students, faculty members or staff, and any other individuals associated with the University. The conduct administrator shall determine a person's status in a particular situation.
6. The term "RUSM premises" includes all land, buildings, facilities, student housing and other property in the possession of or owned, used, or controlled by the University (including parking lots, adjacent streets and sidewalks).
7. The term "conduct panel" means any person or persons authorized by the conduct administrator or his/her designee to determine whether a respondent has violated the Code of Conduct and to recommend imposition of sanctions.
8. The term "conduct administrator" means an RUSM official authorized by the University to manage Code of Conduct proceedings and/or impose sanctions upon respondents found to have violated the Code of Conduct. A conduct administrator may serve simultaneously as a conduct administrator, and as the sole member or one of the members of the conduct panel. Nothing shall prevent the University from authorizing the same conduct administrator to impose sanctions in all cases at a particular location or locations.
9. The term "policy" is defined as the policies, rules and procedures of the University including, but not limited to, those found in the Student Handbook, housing handbook and academic catalogs.
10. The term "organization" means any number of persons who have complied with the formal requirements for University recognition/registration as an organization.

**ARTICLE II: CONDUCT ADMINISTRATOR AND CONDUCT PANEL**

1. The conduct administrator shall determine the composition of conduct panels and determine which conduct panel shall be authorized to hear each case. Where a multi-person panel is used instead of hearing by a conduct administrator, the conduct panel shall include, at minimum, three members of the RUSM community.
2. The conduct administrator shall develop procedures for administration of the Code of Conduct and for conducting hearings which are consistent with the provisions of this Code of Conduct.
3. Decisions made by a conduct panel and/or conduct administrator shall be final, pending the appeal process.
4. In appropriate situations, the conduct panel and/or conduct administrator may also provide a respondent who is subject to the hearing process with referral information for external counseling or other services available within the greater community that may help the respondent to ameliorate his/her conduct to prevent further violations of the Code of Conduct.

**ARTICLE III: PROSCRIBED CONDUCT**

<u>Jurisdiction</u>
The Code of Conduct applies to behavior that affects the RUSM community, irrespective of where or when that conduct may occur. Discipline may extend to off-campus activities and locations (including but not limited to off-campus activities, events, and housing) when the actions in question adversely affect the RUSM community and/or pursuit of its objectives.

<u>Conduct – Rules and Regulations</u>
Any respondent found to have committed misconduct, including the following types of misconduct, may be subject to disciplinary sanctions outlined in Article IV.

1. Acts of dishonesty including, but not limited to, the following:
   a. Furnishing false information to any University official, faculty member or office.
   b. Forgery, alteration or misuse of any University document, record or instrument of identification.
   c. Computer piracy, including duplication of computer software, copyright infringement and unauthorized computer entry.
2. Disruption or obstruction of teaching, research, administration, disciplinary proceedings and other University activities, including its public service functions on or off campus, or other authorized non-University activities, when the act occurs on RUSM premises.
3. Physical abuse, verbal abuse, threats, intimidation, and harassment including, but not limited to, sexual harassment, coercion and/or other conduct that threatens or endangers the health or safety of any person, either on or off RUSM premises or at any University-sponsored activity.
4. Bullying and cyberbullying, which is using one's power to control or harm individuals who cannot defend themselves including, but not limited to, face-to-face interactions and any electronic communication (communication transmitted by means of an electronic device, including, but not limited to, a telephone, cellular phone, computer, or pager) whether it be a single incident or a series of incidents.
5. Attempted or actual theft of and/or damage to property of the University or property of a member of the RUSM community or other personal or public property.
6. RUSM specifically prohibits any organization, chartered or otherwise, officially or in fact, from participating in the activity of "hazing," defined as any action taken or situation created which, regardless of intent or consent of the participants, may reasonably produce bodily harm or danger, mental or physical discomfort, embarrassment, harassment, fright, humiliation or ridicule, or otherwise compromises the dignity of an individual; compels an individual to participate in an activity that is unlawful and or contrary to University rules, policies and regulations; will unreasonably or unusually impair an individual's academic efforts, and/or occurs on or off campus. Hazing is further defined as an act that endangers the mental or physical health or safety of a student, or removes public or private property, for the purpose of initiation or admission into, affiliation with, or as a condition for, continued membership in a group or organization. Such activities and/or actions prohibited include, but are not limited to: tests of endurance; submission of members or prospective members to potentially dangerous or hazardous circumstances; any activity that by its nature is so intense that it would cause severe mental anxiety, mental distress, panic, human degradation or public embarrassment; creation of excessive fatigue or a late work session that interferes with scholastic activities or deprives persons of the opportunity for sufficient sleep (six hours per day), decent edible meals and/or access to means of bodily cleanliness; forcing or coercing a person to consume alcohol or other substances, in any amount; any requirement that compels an individual to participate in an activity that is illegal, perverse or indecent; and compelling individuals to engage in sexual behaviors, sexual or racial harassment or slurs, or exhibitionism.
7. Violation of conduct guidelines, including those in student leases and housing handbooks, applicable to University-controlled housing.
8. Gambling on RUSM premises, at University functions or through the use of University equipment.
9. Failure to comply with directions of University officials or law enforcement officers acting in performance of their duties and/or failure to identify oneself to these persons when requested to do so.

10. Unauthorized possession, duplication or use of keys, or unauthorized entry to or use of premises.
11. Violation of published University policies, procedures, rules or regulations.
12. Violation of any applicable federal, state or local law.
13. Use, possession or distribution of narcotic or other controlled substances, except as expressly permitted by law, a valid doctor's order, and the University, or being under the influence of such substances. Please note in particular that even where otherwise permitted under local law, marijuana use, possession, or influence on University premises, at University events, or that adversely affects the RUSM community, is prohibited.
14. Use, possession or distribution of alcoholic beverages, except as expressly permitted by law and University regulation; or public intoxication.
15. Illegal or unauthorized possession of firearms, explosives, other weapons or dangerous chemicals.
16. Participation in a demonstration that disrupts normal operations of the University or infringes on rights of other members of the RUSM community; leading or inciting others to disrupt the scheduled and/or normal activities within any University building or area; intentional obstruction that is unreasonable and interferes with freedom of movement and/or free flow of pedestrian or vehicular traffic.
17. Conduct that is disorderly, disruptive, lewd or indecent; breach of peace; or aiding, abetting or procuring another person to breach the peace.
18. Aiding, abetting or inducing another to engage in behavior prohibited by the Code of Conduct.
19. Theft or other abuse of computer time, including but not limited to:
    a. Unauthorized entry into a file, to use, read or change contents, or for any other purpose.
    b. Unauthorized transfer of a file.
    c. Unauthorized use of another individual's identification and password.
    d. Use of computing facilities to interfere with work of another student, faculty member or University official.
    e. Use of computing facilities to send obscene or abusive messages.
    f. Use of computing facilities to interfere with normal operation of the University computing system.
    g. Introduction, reproduction and/or promulgation of any computer virus.
20. Abuse of the disciplinary system, including, but not limited to:
    a. Falsification, distortion or misrepresentation of information before a conduct panel.
    b. Disruption or interference with orderly conduct of a conduct proceeding.
    c. Knowingly instituting complaint or conduct proceedings without good cause.
    d. Attempting to discourage an individual's proper participation in, or use of, the complaint or conduct procedures.
    e. Attempting to influence the impartiality of a member of a conduct panel prior to, and/or during, the course of the conduct proceeding.
    f. Harassment (verbal or physical) and/or intimidation by a student of a participant in the conduct or complaint processes prior to, during and/or after a conduct proceeding.
    g. Failure to comply with sanction(s) imposed under the Code of Conduct.
    h. Influencing or attempting to influence another person to commit an abuse of the conduct or complaint procedures.

Involvement of Law Enforcement or External Judicial Authorities

Complainants who believe that they are victims of crime or other violation of law (for example, assault, battery, sexual misconduct) may notify and seek assistance from the University, local law enforcement and/or other community resources concurrently. The conduct administrator can provide information about how to contact local law enforcement or other local community resources.

The University is committed to maintaining an environment that is safe for all members of the RUSM community. Safety concerns, including those arising out of Code of Conduct proceedings, should be brought to the attention of the campus incident commander or the conduct administrator for evaluation of any appropriate measures to be taken by the University to promote security. Complainants may also seek protective, restraining, or "no-contact"

orders from an external law enforcement or judicial authority; complainants who do so should notify the conduct administrator or campus incident commander so that the University can cooperate as appropriate in the observation of the order.

The University may institute Code of Conduct proceedings against a respondent charged with violation of applicable law without regard to the pendency of civil litigation or criminal arrest and prosecution. Proceedings under this Code of Conduct may be carried out prior to, simultaneously with, or following civil or criminal proceedings. If a code of conduct violation is also a civil violation(e.g. rape), we may be obligated to report it to civil authorities, regardless of the victim's preference.

If the alleged violation of law is also the subject of Code of Conduct proceedings, the University may advise external authorities of the existence and status of the Code of Conduct proceedings. The University cooperates fully with law enforcement and other agencies in enforcing law on University property and in the conditions imposed by criminal courts for the protection of victims and the rehabilitation of violators. Individual students, staff, or faculty members, acting in their personal capacities, remain free to interact with a governmental representative or law enforcement official as they deem appropriate.

**ARTICLE IV: CONDUCT PROCEDURES**

<u>Complaint and Hearings</u>
1. Any member of the RUSM community or the University itself may file complaints against any covered person for misconduct. In instances where community safety is a concern, notice of a possible violation may result in complaints being filed by the University whether or not the impacted community member wishes to precede complaints shall be prepared in writing and directed to the conduct administrator at the appropriate University location. Any complaint should be submitted as soon as possible after the event takes place.
2. Once complaints have been filed, the conduct administrator will investigate to determine if complaints have merit and/or if they can be resolved by mutual consent of the complainant and the respondent on a basis acceptable to the conduct administrator (such as mediation). The conduct administrator may also issue a conduct warning to a respondent or complainant where a complaint is resolved by mutual consent. If complaints cannot be disposed of by mutual consent, the conduct administrator may later hold the hearing, either individually or as a member of the conduct panel. Mediation will not be used for complaints involving alleged sexual misconduct.
3. All complaints shall be presented to the respondent in writing. A hearing before a Board of Conduct (Honor Council or Grievance Committee) will be scheduled after receipt of the answer from the Respondent. If no answer to the Complaint is submitted, the hearing will be scheduled following the deadline for submission (five (5) business days). The timeframe for scheduling of hearings may be extended at the discretion of the conduct administrator.
4. The conduct administrator may choose to hold the hearing him/herself, or may require a hearing by the full conduct panel when he/she believes that such a procedure is in the best interest of the University. If either the complainant or the respondent believes that a member of the conduct panel has a conflict of interest, he or she should bring this concern to the attention of the conduct administrator, or if the alleged conflict is held by the conduct administrator to the attention of the location's conduct administrator's manager (as identified in the Student Complaint Procedure published in this Student Handbook).
5. Hearings shall be held by a conduct panel according to the following guidelines:
   a. Hearings shall be held in private. Admission of any person to the hearing shall be at the discretion of the conduct administrator/chairperson.
   b. In advance of the hearing, both the complainant and respondent will be given access to the identified information that is available before the hearing which will be considered by the conduct panel

    c.   The complainant and respondent have the right to be assisted by any advisor they choose, at their own expense. The advisor may be an attorney. The complainant and respondent are responsible for presenting his/her own case and, therefore, advisors are not permitted to speak or to participate directly in any hearing before a conduct panel. The complainant and respondent must provide the names (relationship and title, if applicable) of those attending the hearing with them at least one business day before the hearing.

    d.   The University, the complainant, the respondent and the conduct panel shall be allowed to present witnesses, subject to the right of cross-examination by the conduct panel.

    e.   Pertinent records, exhibits and written statements may be accepted as evidence for consideration by a conduct panel at the discretion of the conduct administrator/chairperson.

    f.   All procedural questions are subject to the final decision of the conduct administrator/chairperson.

    g.   After the hearing, the conduct panel shall deliberate in private and determine (by majority vote for a multi-person conduct panel) whether the respondent has violated the Code of Conduct.

    h.   The conduct panel's determination shall be made on the basis of whether it is more likely than not that the respondent violated the Code of Conduct.

6.   There shall be a single record, such as a tape recording, of all hearings before a conduct panel or conduct administrator. The record shall be the property of the University. Suspensions and expulsions will be noted in the respondent's academic file.

7.   No respondent may be found to have violated the Code of Conduct solely because the respondent failed to appear before a conduct panel. Even if the respondent does not appear, the evidence in support of the complaints shall be presented and considered. Likewise, a respondent may be found to have violated the Code of Conduct even in instances where the complainant has not participated in the conduct proceedings.

8.   The conduct administrator's manager shall notify the respondent of the outcome in writing, and in appropriate cases, shall also notify the complainant. In cases of sexual misconduct allegations, the complainant and respondent will be informed simultaneously. Where safety concerns exist, the complainant may be given appropriate notice prior to formal notification.


<u>Sanctions</u>

1.   The sanctions listed below may be imposed upon any covered person found to have violated the Code of Conduct. The listing of the sanctions should not be construed to imply that covered persons are entitled to progressive discipline. The sanctions may be used in any order and/or combination that the University deems appropriate for the conduct in question.

    a.   Warning – A verbal or written notice that the respondent has not met the University's conduct expectations.

    b.   Probation – A written reprimand with stated conditions in effect for a designated period of time, including the probability of more severe disciplinary sanctions if the respondent does not comply with University policies or otherwise does not meet the University's conduct expectations during the probationary period.

    c.   Restitution – Compensation for loss, damage or injury. This may take the form of appropriate service and/or monetary or material replacement.

    d.   Housing Suspension – Separation of the respondent from his/her University-controlled housing for a defined period of time. Conditions for returning to housing may be specified.

    e.   Housing Expulsion – Permanent separation of the respondent from University-controlled housing.

    f.   RUSM Suspension – Separation of the respondent from the University for a defined period of time, after which the respondent may be eligible to return. Conditions for readmission may be specified.

    g.   RUSM Expulsion – Permanent separation of the respondent from all University locations and RUSM Education Group institutions and locations.

    h.    Suspension of Services – Ineligibility to receive specified services or all RUSM services for a specified period of time, after which the respondent may regain eligibility. Conditions to regain access to services may be specified.

    i.    Ineligibility for Services – Permanent ineligibility to receive specified or all RUSM services, and services from other RUSM Education Group institutions.

    j.    Limiting Order – Restriction on a respondent's permission to be in the same proximity as the complainant and/or others, with the parameters of the restriction to be defined by the University (e.g., for use with allegations of sexual or other misconduct).

2. More than one sanction listed above may be imposed for any single violation. In each case in which a conduct administrator or a conduct panel determines that a respondent has violated the Code of Conduct, sanction(s) shall be determined and imposed by the conduct administrator. In cases in which a multi-person panel is used, the recommendation of all members of the conduct panel shall be considered by the conduct administrator. Following the hearing, the conduct administrator shall advise the respondent in writing of the determination, the sanction(s) imposed, if any, and appeal procedures. In appropriate cases (e.g., allegations involving certain types of sexual misconduct), the conduct administrator will also simultaneously provide the complainant with written notice of the outcome and appeal procedures.

Interim Suspension

In certain circumstances, the University may impose a RUSM and/or housing interim suspension prior to the hearing before a conduct panel.

1. Interim suspension may be imposed:

    a.    to ensure the safety and well-being of members of the RUSM community or preservation of University property; or

    b.    if the University deems that the respondent poses a threat of disruption of or interference with the normal operation of the University

2. During the interim suspension, the respondent may be denied access to RUSM premises (including online and onsite classes) and/or all other University activities or privileges for which the respondent might otherwise be eligible, as the University may determine to be appropriate. In appropriate cases, the University may notify the complainant of a respondent's interim suspension status.

Appeals

1. A decision of a violation of the Code of Conduct and the sanctions reached by the conduct panel or imposed by the conduct administrator may be appealed by the respondent or complainant to the person identified in the determination letter within 15 calendar days of the date of the appealing party's receipt of the determination letter. Such appeals shall be in writing. Receipt of the determination letter is presumed to be three days after mailing (for letters sent via US mail), the date of delivery (for tracked delivery), or the date of electronic transmission (for email). The results of the appeal to the person identified in the determination letter shall be final.

2. Except as required to explain the basis of new evidence, an appeal shall be limited to review of the verbatim record of the initial hearing and documents considered by the conduct administrator or conduct panel for one or more of the following purposes:

    a.    To determine whether the original hearing was administered fairly in light of the complaints and evidence presented and in substantial conformity with prescribed procedures, giving the complainant a reasonable opportunity to prepare and present evidence that the Code of Conduct was violated, and giving the respondent a reasonable opportunity to prepare and present a rebuttal of those allegations.

    b.    To determine whether the decision reached regarding the respondent was based on reasonable evidence; that is, without substituting its judgment for that of conduct panel or the conduct administrator, the appellate decision-maker shall consider whether the facts in the case were reasonably sufficient to establish that a violation of the Code of Conduct occurred.

65

     c.   To determine whether the sanction(s) imposed were reasonably appropriate for the violation of the Code of Conduct the respondent was found to have committed. (Refer to Article IV (5) (i) for standard of proof.)

     d.   To consider new evidence sufficient to alter the decision or sanction which was not brought out in the original hearing because such evidence was not known or available to the person appealing at the time of the original hearing.

The person ruling on the appeal shall notify in writing the complainant and respondent of the outcome of the appeal. If the person considering the appeal rules favorably on the appeal, the matter shall be remanded to the conduct panel (either the original panel or a new panel, as determined to be appropriate by the person considering the appeal) and conduct administrator for action to be taken in response to the appeal findings. If the ruling on the appeal is negative, then the decision of the original conduct panel is upheld and finalized.

## ARTICLE V: CONFIDENTIALITY AND PROHIBITION ON RETALIATION

### Confidentiality

RUSM wishes to foster an environment in which individuals feel free to raise and discuss concerns. RUSM understands that complainants, respondents, witnesses, and others involved in the investigation process and conduct proceedings may be concerned about the confidentiality of information they are sharing.

In some cases, RUSM may be obligated to take action when it becomes aware of information relating to a complaint. Confidentiality will be maintained to the extent possible and consistent with RUSM's obligations in investigating complaints and addressing conduct appropriately. While the confidentiality of information received, the privacy of individuals involved, and compliance with the wishes of the complainant or witnesses cannot be guaranteed, they will be respected to the extent possible and appropriate. In particular, when possible and consistent with applicable law, personally identifying information about victims of sexual misconduct will be kept confidential as it appears in the University's publicly available record-keeping.

### Retaliation

RUSM prohibits retaliation against anyone who reports an incident of alleged harassment, discrimination or other unlawful conduct, or any person who assists or participates in a proceeding, investigation or hearing relating to such allegations.

Retaliation includes, but is not limited to, any form of intimidation, reprisal, or harassment. All complaints of retaliation should be reported in accordance with the student complaint procedure available in the Student Handbook. If following the student complaint procedure would result in the student being required to submit his/her complaint to the person whom he/she believes is retaliating against him or her, the student may submit the retaliation complaint to the location leader, who will determine an appropriate party to address the retaliation complaint.

Submission of a good-faith complaint or report of harassment, discrimination or other unlawful conduct will not adversely affect the complainant's future grades, learning, or academic environment. RUSM will discipline or take appropriate action against anyone who retaliates against any person who reports an incident of alleged harassment, discrimination, or other unlawful conduct, or who retaliates against any person who testifies, assists or participates in a conduct proceeding, investigation or hearing related to such allegations.

### Campus Safety and Security

Unless otherwise posted, use of tobacco products and e-cigarettes on RUSM premises or at RUSM events is prohibited.

A truly safe campus can only be achieved through the cooperation of students, faculty and staff. As members of this academic community, students must report crimes, suspicious activities or other emergencies on campus to

RUSM 000390

66

the appropriate University official (e.g. Campus Security, Students Services or the chief location administrator). Students who witness or are victims of a crime affecting the RUSM community should immediately report the incident to local law enforcement in the community, in which the campus is located, and to the Campus Security, student services office, or to the chief location administrator. RUSM will investigate such crimes and, when appropriate, bring them to the attention of the conduct administrator and other University officials such as the Title IX Coordinator.

Given public concern about escalating incidents of school violence, the University will take appropriate administrative action to protect the community. Student behavior that causes campus safety or security concerns will typically be addressed pursuant to the Interim Suspension provisions of the Code of Conduct. Accordingly, immediate suspension and eventual expulsion may result for students who:

- Possess, sell or otherwise furnish a firearm
- Brandish a knife at another person
- Sell a controlled substance
- Commit or attempt to commit a sexual assault or sexual battery
- Possess an explosive
- Cause serious physical injury to another person, except in self-defense
- Possess any knife (excludes pen knives or nail files )or other dangerous object of no reasonable use
- Unlawfully possess any controlled substance
- Commit robbery or extortion
- Commit assault or battery

Nothing in this policy should be construed as limiting or preventing the University's discretion to take other action which, in the University's sole discretion is necessary or advisable to promote campus safety and security.

RUSM takes seriously any threats made to cause harm to others or to oneself. Threats to harm others will be handled through the Code of Conduct, and may involve an interim suspension and/or the engagement of law enforcement officials until conduct proceedings are completed. In the case of threats to harm oneself, the University may call local law enforcement officials or other persons acquainted with the person making the threat for the purposes of checking on that person's welfare. The University may also work with the person to determine available resources and appropriate next steps.

## COMMITMENT TO NON-DISCRIMINATION AND NON-HARASSMENT

RUSM is committed to providing an education conducive to the personal and professional development of each individual and is committed to maintaining an academic environment free of discrimination and harassment based on race, color, religion, national origin, sex, age, disability, veteran status, sexual orientation, political affiliation and any other legally protected classes in the relevant jurisdiction that complies with Title VI of the Civil Rights Act of 1964, Title IX of the Educational Amendments, and the local law. RUSM will not tolerate, condone or allow discrimination or harassment, whether engaged in by fellow students, faculty members, or non-faculty colleagues.

### What is Discriminatory Harassment?
Examples of words or conduct that may violate this policy are:

- Verbal abuse, slurs, derogatory comments or insults, about, directed at or made in the presence of an individual or group based on protected status.  This could include telephone calls, emails, instant, messages, etc.
- Display or circulation of written materials or pictures that are degrading to a person or group based on protected status;
- Damage to trespass to, or unauthorized use or property, such as spraying or scratching a motor vehicle, damage or theft of property, based upon the protected status of an individual or group;
- Physical contact or verbal threats based upon the protected status of an individual or group.

### What is Sexual Harassment?
Sexual harassment means unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature, submission to which is made a condition of a person's participation in their education. Sexual harassment occurs when a student is the recipient of conduct of a sexual nature where:

- Submission to, or toleration of, such conduct is made either explicitly or implicitly a term or condition of the student's enrollment;
- Submission to or rejection of such conduct by an individual is used as a the basis for academic decisions about the student; or
- Such conduct has the purpose or effect of unreasonably interfering with the student's welfare or academic performance, or creates an intimidating, hostile, offensive or demeaning academic environment.

### Whom to Contact if You Think That You Have Been Discriminated Against or Harassed
The Senior Associate Dean of Student Affairs is available to serve as a resource to any student, non-faculty colleague or faculty member who has a sexual harassment inquiry or complaint. A representative in the Human Resources office is another available resource. These resource persons have information about applicable laws, RUSM rules and procedures, options available for resolution of complaints, and confidentiality requirements. Individuals with a sexual harassment inquiry or complaint may be more comfortable speaking with someone of the same gender, and either the Senior Associate Dean of Student Affairs or the Human Resources representative can assist in finding a resource person of the preferred gender. Inquiries regarding sexual harassment and other forms of sex or gender discrimination may be directed to Mikhel Kushner, Associate Title IX Coordinator (mkushner@devrygroup.com) or Mark Ewald, Senior Director, Ethics and Compliance Services (mewald@devrygroup.com)

RUSM 000392

68

**Title IX Compliance**

RUSM's Title IX coordinator is responsible for RUSM's overall compliance with Title IX, including response to reports of sexual misconduct affecting the campus community. Questions regarding the application of Title IX and RUSM's compliance with it should be directed to the Title IX coordinators, whose contact information is available below. Students who wish to make a report of sexual misconduct affecting the campus community should follow the grievance procedure published in this Student Handbook.

> Mr. Mark Ewald
> Title IX Coordinator
> Senior Director, Ethics and Compliance Services
> DeVry Education Group
> 3005 Highland Pkwy
> Downers Grove, IL 60515
> Office Phone: 630-353-1437
> Email: MEwald@devrygroup.com
>
> Ms. Mikhel Kushner
> Associate Title IX Coordinator
> DeVry Education Group
> 3005 Highland Pkwy
> Downers Grove, IL 60515
> Office Phone: 630-515-5440
> Email: MKushner@devrygroup.com

RUSM 000393

69

## CONTACT INFORMATION

RUSM communicates important information with students through school-assigned e-mail addresses. Students should use their official RUSM e-mail account to send and receive school-related messages.  Note: RUSM has the ability to lock or modify RUSM email accounts without notice.

RUSM requests that students provide alternate e-mail addresses for use in the unlikely event that school e-mail systems are inoperative. Students are responsible for ensuring their contact information is accurate. Please remember to update contact information at the beginning of Semester 1, during the transition to IMF, and during clinical years. Contact information can be updated through myRoss.

## COURSE EVALUATIONS POLICY

RUSM is committed to improving the quality and content of its educational program and your feedback is essential for this process to be effective. At RUSM, students are our partners and future alumni and your feedback will help us to improve the student experience. RUSM culture means that this is part of your professional responsibility which you will carry forward into your medical career, voluntarily contributing data and information to improve health care and patient outcomes by completing surveys and evaluations.  We ask students to evaluate each module at its conclusion so that any necessary curriculum change can be enacted as soon as possible.  The Clinical Skills Course activities occurring in each semester are also evaluated at this time.  Curriculum leadership at RUSM review student evaluations and use them to drive curriculum improvement. We also ask for your evaluation of faculty members involved in the delivery of teaching each semester. All evaluations are completed online through a program called E*Value.  Evaluations include space for detailed narrative feedback of the content and teaching. In addition, students may be asked periodically to complete other surveys evaluating specific functions and services provided by RUSM. This input is important in assessing the perceptions and needs of our students.

At the end of each of the core clinical clerkships, students are required to evaluate the clerkship through Renaissance. Failure to evaluate a core clerkship results in failing the Renaissance portion of that clerkship. RUSM maintains the confidentiality of all of these evaluations. Faculty members receive aggregate responses for their courses and sometimes receive notification of completion and non-completion.  Under no circumstances are students identified or associated with the content of their evaluations. Although confidentiality is maintained, individuals who complete or do not complete the evaluation can be identified by name for reporting purposes. RUSM communicates with students through its own email system. The CoursEval program also utilizes RUSM email to inform students about the evaluation process. Students leaving the Dominica campus are reminded that communication regarding evaluation requirements in IMF and the clerkships will continue through RUSM email.

71

## DOMINICA CAMPUS STUDY SPACE POLICY

1. PURPOSE

   1.1. This document outlines the policy of RUSM, regarding study space on campus. It is designed to allow equal access to study space for all students.

   1.2. To encourage students to be responsible for their personal belongings.

   1.3. To encourage a professional and collegial atmosphere.

2. SCOPE

   2.1. This policy applies to all students of RUSM. The Study Space Policy applies to every area on campus and the rules apply equally. There are no exceptions to the study space policy.

3. PUBLICITY OF POLICY

   3.1. The policy will be advertised via email notification to all students. The policy will also be available on the Student Resources page of the student portal and within the Student Handbook.

   3.2. Incoming first semester students will be informed of the Study Space Policy at New Student Orientation and continuing students will be informed during their respective Continuing Student Orientations. At the beginning of each semester a reminder of the policy will be sent out to the community via e-mail.

4. DEFINITIONS

   4.1. **Individual/Quiet Study Space** - An individual study space is defined as any place on campus where a student might study, including, but not limited to classrooms, the library, common study areas, open areas and the upper and lower seaside decks.

   4.2. **Group study space** is defined as one of the locations below where a student can study in a group with the expectation that the location will not be quiet and discussion can take place. This is designed to allow students a place to study in small groups in a collaborative environment.

   4.3. **Common Spaces** are spaces that are designed for multiple purposes and the use of all RUSM campus community members (students, staff, faculty members, and families).  These spaces may be used for studying but are open for other uses as well.

   4.4. **Non-study spaces** are spaces that are designated for non-study activities.

   4.5. **Breaks** are time students take during study time when they may leave their belongings unattended.

5. POLICY

   5.1. All Study Spaces

      5.1.1. Inclusive of spaces defined as individual/quiet or group study spaces.

      5.1.2. Study Space is reserved for the use of Students, Faculty, and Staff.

      5.1.3. Hours of operation:

         - Jenner Hall and Classrooms: 7am -2 am

- Classroom 1: 8am -6am

- Library Study Space and Staff Services: 8am - 12am

- Ann Ross Library Study Space (old library): 7am – 5am

- Large Learning Lab: 8am – 2am

- Multi-Purpose Rooms (MPR's) and Study Rooms: 7am – 2am

- Student Center: 7am – 2am

- CTL Tutoring rooms:

    Monday – Friday: 7am – 5pm (when CTL classes are not in session)

    Monday – Sunday: 11pm – 2am

5.1.3.1.  Throughout the semester Student Affairs will notify students of changes to study space hours of operation, including the extension of hours for 24 hours studying. Notification will be sent via email, posted on the Student Development student portal page, and could be posted on notice boards/ exterior doors.

5.1.4.  Students must be physically present with their belongings at all times or they may be removed. No student may leave their belongings for longer than one hour for any reason anywhere on campus. The exception is the Computer Lab, where belongings cannot be left for more than 15 minutes.

5.1.5.  When a space is closed please vacate the room during that time and take all your belongings with you.  No one may leave anything anytime, anywhere in a space overnight.

5.1.6.  When students are finished studying, or leaving for longer than 1 hour (15 minutes in the Computer Lab), students must collect all belongings and take them along. When they come back if someone else is in that space, then the student may find another vacant space in which to study. If either party becomes argumentative, they may be reported to Student Affairs, the Honor Council, and/or Grievance Committee.

5.1.7.  Students are responsible for any unattended items. RUSM reserves the right to remove any unattended items. RUSM, its colleagues or agents will be not responsible for lost, stolen or damaged items that are collected.

5.1.8.  Cell phones must be turned off or to silent, not vibrate.

5.1.9.  Students must leave all furniture and computer equipment in their original locations. The only furniture permitted to be moved are chairs and these must be returned to their original location when a student leaves.

5.1.10.  Large Learning Lab, Classrooms, St. James, and the Annex are sometimes utilized for meetings, events as well as study space.

5.1.10.1.  These events must be scheduled 48 hours in advance on the room reservation system and approved by Campus Life in Student Affairs.

5.1.10.2.  Please reference the room reservation system and/or the schedule/sign on the exterior doors of the space (except MPR's).

5.1.10.3.  Individual students and informal groups cannot schedule a multi-use space for the purpose of studying (except MPR's).

5.1.10.4.  Scheduled events take precedent for use of the space.

RUSM 000397

73

5.1.11.  Any conflicts between students or groups over group study space are to be first resolved at the student level. Any concerns can be reported to Security or Student Affairs to investigate and may be sent to Honor Council or Grievance Committee for resolution.

5.1.12.  There are no exceptions to the study space policy, every area on RUSM campus owned or rented property is covered by the study space policy and the rules apply equally.

5.2.  **Individual/Quiet Study Space**

5.2.1.  Study space is available on a first come basis. When students come to study they may stay and study as long as they like and are physically present in the space.  Spaces cannot be held or reserved.

5.2.2.  Students are limited to 2 adjoining spaces/chairs, one computer, or one carrel.

5.2.3.  Conversations must be taken outside of the study space, even if they are at a whisper level.

5.2.4.  Locations:

- Classrooms One
- Classrooms 4, 5, and 6
- Jenner Hall
- St. James Center Academic Center
- Annex
- Library in the Student Center
- Ann Ross Library Study Space
- Computer Lab

5.2.4.  Classrooms- Each semester Classrooms will be assigned to semester groups as their assigned classroom.  Unassigned Classrooms will be defined as Multi-Purpose spaces.

5.2.4.1.  Students may utilize their semester classroom as a preferential study space. Other classes may use the space based on availability.

5.2.4.2.  During lectures or academic activities classrooms are reserved for students limited to the assigned class.

5.2.5.  The LIBRARY AND LEARNING RESOURCE CENTER and LIBRARY FOOD POLICY, located on the Student Resources student portal page and in the Student Handbook, provide further guidelines for this space.

5.2.6.  All study space hours and locations are subject to change.  Modifications will be emailed to students, and posted on the Student Development student portal page, and on notice boards/ exterior doors.

5.3.  **Group Study**

5.3.1.  Locations:

- Student Center (except for the Library, food court, and outdoor spaces)
- MPR's
- Study Rooms
- Large Learning Lab

74

- CTL Tutoring Rooms

5.3.2.   Study space is available on a first come basis. When students come to study they may stay and study as long as they like and are physically present in the space.  Spaces cannot be held or reserved with the exception of MPR's and Study Rooms.

5.3.2.1.   MPR's and Study Rooms can be reserved using the room reservation system.  Reservations must be scheduled 48 hours in advance on the room reservation system and approved by Campus Life in Student Affairs. Further information on reserving rooms can be found on the Campus Life student portal page.

5.3.3.   Conversations and discussion should be kept at a tone that is conducive to studying. Students understand that at times this might be loud.

5.3.4.   The STUDENT CENTER FOOD AND DRINK POLICY, located on the Student Resources student portal page and Student Handbook, provides further guidelines for this space.

5.3.5.   Policies for the Center for Teaching and Learning (CTL) Tutoring Rooms can be found on the Student Resources and CTL student portal pages.

**5.4.   Non-Study spaces**

5.4.1.   Campus Activities Center (CAC):

5.4.1.1.   The CAC is NOT a designated study space except for the outdoor areas.

5.4.1.2.   The 2nd floor is available to reserve for clubs and organizations and for other meetings.

5.4.1.3.   Students are not permitted to study in the indoor areas of the CAC.

**5.5.   Common Areas**

5.5.1.   Food Court and Outdoor Spaces throughout campus:

5.5.1.1.   These spaces are considered multi-purpose use by all RUSM community members and cannot be reserved (except for the below identified spaces).

5.5.2.   Seaside Decks and Sports fields/courts:

5.5.2.1.   For multi-purpose use by all RUSM community members

5.5.2.2.   The decks and courts can be reserved on the Meeting Room Manager (MRM) system.


6.   ENFORCEMENT

6.1.   Security, housekeeping and Student Affairs are primarily responsible for enforcing the study space policy.  Additionally faculty, staff, and members of the SGA may enforce the policy.

6.1.1.   This includes collecting items left unattended for more than 60 minutes for all study spaces except the Computer Lab, which has a 15 minute maximum.

6.1.2.   Periodic "sweeps" will take place and those enforcing the policy may come into a study space at any time, wait for 60 minutes, or 15 minutes in a Computer Lab, and then collect any unattended property.

6.1.3.   Students are responsible for their belongings. RUSM colleagues are not responsible for the condition of student belongings moved in accordance with this policy.

6.1.4.   Belongings left in a study space after it is closed may also be collected.

6.1.5.   Any items collected will be held in a room on campus which will be determined at the start of each semester and publicized via email.

75

6.1.6.   Items collected may be held for a maximum of 24 hours. To retrieve property picked up during a sweep students will need to contact the Security department to schedule a time. Scheduling to pick up property from Security may vary depending on operational needs.

6.1.7.   Unclaimed items will be donated or sold at a publicly held auction.

6.1.8.   RUSM, its colleagues or agents will be not responsible for lost, stolen or damaged items that are collected.

7.   RAMIFICATIONS

7.1.   Students who are non-compliant and/or argumentative and/or who violate the study space policy repeatedly may be taken to the Honor Council or Grievance Committee.

RUSM 000400

# DOMINICA PRINTING POLICY

1. PURPOSE
1.1 This document outlines the print policy of RUSM including weekly student print quotas and additional print purchases on the Dominica campus.

2. SCOPE
2.1 This policy is applicable to all students of RUSM at the Dominica campus. There are no exceptions to the print policy; every student is equally covered as outlined by the policy.

3. DEFINITIONS
3.1 A print is defined as one side of a sheet of paper. A page is defined as two sides of a sheet of paper. A printing week is defined as the seven day period beginning immediately after midnight each Sunday morning and ending on Saturday night at midnight.

4. POLICY
4.1 Student print quotas starting with the effective date of this policy will be 200 black & white prints (100 pages – black & white) per week, according to the stipulations below. Students are allowed a maximum of five color pages per week.

4.1.2 Effective September semester 2010, all students on the Dominica campus will receive the same quota which is 200 prints (black & white) per week as described in 4.1.

4.2 At the end of each printing week students who have not used their allotted quota will forfeit the remainder of their quota; there is no rollover of print quotas.

4.3 In addition to the weekly print quota, any student wishing to purchase additional print credits can do so. Additional print credits are sold in increments of 50 black & white prints for $10.00EC which is subject to change based on costs. A maximum of five color pages may be printed per week using the credits purchased.  The additional print credits are available for purchase from the campus copy center.

4.4 Additional print credits purchased are separate from the print quota. Additional print credits purchased will rollover every week until they are used up.

4.5 No refunds will be given for unused print credits even if the student departs RUSM or does not utilize the purchased print credits.

4.6 Any printing problems encountered by students concerning the printing process including printer malfunctions, loss of prints or errors in printing can be reported to the Campus Copy Center by means of a fault report via email (DMITSPrintFaultReporting@rossmed.edu.dm) or telephone number (255-6588, ext 4026588). The fault reporting procedure is located at each print station.

4.7 No printing is permitted while classes or other scheduled activities are taking place in the classroom area.

5. RAMIFICATIONS
5.1 Students who print during class time or when other scheduled activities are taking place may be reported to the class representative.

5.2 Any other violations of the policy considered as unprofessional behavior will be evaluated on an individual basis and may result in other sanctions.

77

5.3 Students are expected to treat printing equipment and staff who maintain the printing stations, with respect. Any unprofessional behavior could result referral to the Honor Council or Grievance Committee.

6. ENFORCEMENT
6.1 SGA officers, class representatives and students are encouraged to hold their peers accountable for the policy. Additionally all faculty, staff or security representatives of RUSM are permitted to enforce the policy.

7. PUBLICATION OF POLICY
7.1 At the beginning of each semester, a reminder of the policy will be sent out to the community via e-mail by Student Affairs.

7.2 Student Affairs will distribute the print policy to incoming first semester students at orientation.

78

## DOMINICA SMOKING POLICY

1. PURPOSE
   1.1 This document outlines the policy of RUSM, regarding smoking on the Dominica campus. It is designed to maintain a safe, healthy and clean environment for all members of the campus community.

2. SCOPE
   2.1 The policy is applicable to all students, faculty, staff and visitors and includes all classrooms, RUSM owned and rented property or vehicles, private offices, shared spaces, the library, all study spaces, living spaces owned or rented by RUSM, laboratories, gymnasium, stairwells and all open spaces surrounding the above. In addition, there will be no smoking within 100 feet in any direction of the front gates of RUSM.

3. POLICY
   The RUSM campus will be a non-smoking campus with exception of designated areas on campus where smoking will be allowed. These areas will be designated with signage and feature cigarette disposal receptacles. Smoking must remain within 6 feet of the marked areas listed below:

   The western end of the grassy area across from the library and parking lot toward Classroom One within 6 feet of the posted sign.

   At the annex – by the tree line at the back of the property by the posted sign.

   For Jenner Hall – across the main access road.

   For RUH – across the main access road, or public areas near RUH not owned or rented by RUSM.

   For the Campus Activities Center area – outside the entrance gate.

4. DEFINITIONS
   Campus is defined as all grounds owned or rented by RUSM.

5. RAMIFICATIONS
   5.1 Individuals in violation of the policy will be directed to the appropriate smoking areas.

6. ENFORCEMENT
   6.1 Faculty, staff, and security personnel will be responsible for the implementation of this policy.

7. PUBLICITY OF POLICY
   7.1 New students entering RUSM will be given the restricted smoking policy during orientation. At the beginning of each semester a reminder of the policy will be sent out to the community via e-mail.

8. REVIEW
   8.1 Review of this restricted policy will take place within one year of the effective date in consideration of a total smoking ban on campus.

RUSM 000403

79

## DOMINICA STUDENT CENTER FOOD AND DRINK POLICY

1. **PURPOSE**

   1.1. This document outlines the policy of RUSM, regarding consumption and holding of food and drink in the study spaces of the Student Center. It is designed to prevent or reduce the destruction of the building by rodents and other pests; and to maintain a safe, healthy and clean environment for patrons of the building including its students, faculty, and staff.

   1.2. To maintain the cleanliness of the facility and to encourage persons to use alternative areas designated for the consumption of food or drink (from cups/ bottles that can spill), such as the food court and outside venues.

2. **SCOPE**

   2.1. This policy applies to all members of the RUSM community, RUSM colleagues, contractors and their employees and visitors.

   2.2. This policy applies to the first floor Multi-Purpose rooms, reception lobby, second and third floors of the Student Center.  It does not apply to the food court, outdoor spaces, or faculty/staff offices.

3. **DEFINITION**

   The **Student Center** is that area of the campus which houses Student Affairs, CTL, the Library, food court, multi-purpose rooms, other offices and study rooms.

   **Food** is any solid or liquid matter which is taken by mouth to satisfy someone's hunger. Examples of food include, but not limited to ice cream, cookies, cake, sandwich, burger, bread, biscuits, fries, chicken, rice, soup, fruits, shakes and yogurt.

   **Drinks** are defined as any liquid matter which is taken by mouth to satisfy one's thirst. Examples include (but are not limited to) water, coffee, energy drinks, tea, juice and sodas, and exclude alcoholic beverages.

   **Spill-proof cups/bottles** are defined as cups, mugs, or bottles (vessels) for which the liquid within will not escape when turned upside down or lying on its side.

   **Faculty/ Staff Offices** are defined as workstations assigned and regularly occupied by colleagues employed by RUSM.

4. **POLICY**

   4.1. It is the policy of the Student Center that at no time will food be allowed to be visible or be consumed on the second and third floors as well as the Multi-Purpose rooms and reception area of the first floor.  The exception to this being drinks as defined in point 4.2.

80

4.2.   Drinks within a closed spill-proof container are allowed to be out and consumed.

4.3.   Individuals possessing food and drink containers are responsible for proper disposal of these containers.

4.4.   Food that is not within view (i.e. in an individual's bag) must be in a closed container that will not spill.

4.5.   The individual who possession the drink or food will be responsible at all times for cleaning up any spilled drinks or food.


5.   **ENFORCEMENT**

5.1.   Members and designated representatives of campus Security, Student Affairs, RUSM Administration, Student Government Association, or other appointed persons will enforce the policy. Enforcement could include inspection of any articles brought into the Student Center, periodic walk-throughs of study areas or other means of determining if food is present in study spaces.

5.2.   Students, staff, or faculty will be asked to produce their RUSM identification card at the time of the violation.


6.   **RAMIFICATIONS (as defined for Students)**

6.1.   Students found to have food out, consuming food or drinks that are not within a spill-proof cup/bottle in a Student Center study space will be in violation of the policy and ramifications may include requiring the student to remove food or drink to a location not prohibited by this policy.  Students who refuse to abide by this or with repeat violations will lose use of the Student Center study spaces for the day and may be referred to the Honor Council or Grievance Committee.

6.2.   The first time that a student is found in violation of the policy, the student will remove the food or drink from the study space.  The food or drink must be taken to the food court, outdoor spaces surrounding the Student Center, or other locations where food can be consumed.

6.3.   The second time that a student is found in violation of the policy the student must remove the food or drink from the study space (see above) and leave the Student Center study spaces.  The student can return to using the study spaces on the following day.

6.4.   Any further violations of the policy will be referred to the coordinator of Conduct and Professionalism. The student must also remove the food and leave the Student Center study spaces (see above).  The student can return to using the study spaces on the following day.


6.5.   Failure to produce a student ID upon request or displaying non-professional behavior when confronted with the violation may result in further disciplinary action. Additionally the individual may be escorted off the campus, and have his or her photo taken for identification purposes.


7.   **PUBLICATION OF POLICY**

7.1.   Initially the policy will be reviewed at Orientation. Additionally signs summarizing and referring to the policy will be posted on study space doors, publicized on media site and sent out via email by SGA representatives. The policy will also be available on the student portal under Student Conduct and Integrity as well as Student Development.

RUSM 000405

81

7.2.  Incoming first semester students will be given the policy at orientation. At the beginning of each semester a reminder of the policy will be sent out to the community via e-mail.

## DOMINICA STUDENT GUEST PASS POLICY

**Policy:**

In accordance with the RUSM ID Policy (version 1.01) subsection 5 -viii, any active students wishing to have guests on campus are required to complete a Student Guest Pass Application form on behalf of their guest.

***Who is Eligible?***

The following expatriate persons are eligible for a guest pass as long as they are visiting for 30 days or less, but no more than 90 days:

1.  Spouse/Companion
2.  Other Relatives
3.  Friends/Acquaintances

***Who is Eligible to Sponsor a Guest?***

Only an actively enrolled Foundations of Medicine student

***Approval Timeframe:***

A guest pass application process can take up to 48 hours not including weekends and holidays.  The submitted application packet will be reviewed by the Security and Safety Department for approval within twenty-four (24) hours of application submission. During the processing timeframe, guests will not be granted access to the campus.

***Proof of Identity:***

The only acceptable proof of identity is a <u>valid</u> passport**.**

**This policy supersedes any other previous policies on granting student guest passes/IDs. Additionally, this policy is not applicable to local national guests of any student. Local National guests must follow the already established policy and procedure as stated in the RUSM ID Policy.**

**Procedure:**

Any RUSM student seeking to have a guest on campus is subject to the following procedure:

A.  Complete the Student Guest Pass Application Form and submit along with the demographic and signature page
     of the guest's valid passport. Completed forms should be submitted to the Office of Student Services.

B. Completed forms will be forwarded to the Department of Safety and Security for review and approval by the Office of Student Services.

C. Department of Safety and Security will advise the student of the final decision and appropriate instructions via his/her RUSM email account.

D. Upon approval, student and guest must appear in-person to the Security Office with the following items:
   1. Valid passport (hardcopy) of Guest
   2. RUSM ID of student with a current semester sticker

E. Upon full verification, a guest pass will be issued for only the dates stipulated on the application form.
   a. Guests will be informed that the pass must be presented to the Security Officers upon entering the campus and should be visible at all times while on campus.
   b. Student will informed to return the expired guest pass to the Security Office upon departure of their guest.

**Revocation:**

RUSM may revoke any Student Guest Pass and/or remove a Student Guest from campus at any time for any reason, at its sole discretion.

**Special Note:  Students may initiate the guest pass process prior to the arrival of their guest to the island or to campus by submitting the required documents (guest's passport page and the application form) via "ask Ross" on the campus student portal or DMStudentServices@rossu.edu.**

RUSM 000407

83

## FACILITIES

RUSM is committed to providing safe and clean facilities to support the academics and general welfare of the RUSM community.  The campus contains a variety of spaces indoors and out inclusive of lecture halls, large group & small group study/meeting spaces, individual study space within large venues, labs, etc.  In order to help in maintaining the safety, cleanliness and accessibility of these spaces there is an expectation that all RUSM community members will uphold the following expectations:

- Abide by any published policy regulating use of a specific location.
- Users of a space will be courteous to one another while upholding the rules of the space outlined within published policies.
- Users will clean up after themselves:
    - Throw trash away in the proper vessels
    - All furniture within a space will remain in that space.
    - Furniture within a defined space must be returned to its original configuration.
        - In the CAC furniture can be temporarily moved but must be returned to its original location when the event it was moved to accommodate is complete.

- Rooms must remain in safe working order
    - Windows without installed blinds are not to be covered or obscured.
    - Doors cannot be blocked.
    - Coffee makers, hot plates, steamers and other food preparation appliances are not allowed.
- Some rooms can be reserved through the campus room reservation system.

## FINANCIAL AID, STUDENT LOAN DEFERMENT, TUITION PAYMENTS AND REFUNDS

### Financial Aid

Students attending RUSM may be eligible to apply for student loans to meet their direct and indirect educational expenses. Students attending IMF and other clinical clerkships must review the "*Financial Aid during Clinical Sciences*" document for additional information about financial aid eligibility and disbursements. http://www.rossu.edu/medical-school/admissions/financialinfo.cfm

At RUSM, we know that tuition and loans are an important aspect of our students' education. We are committed to providing clear information to facilitate our students' financial responsibility. In this section of the Student Handbook, we'll describe possibilities for student loan deferment while you study. We'll also provide information about eligibility, how to pay your tuition and receive tuition refunds during withdrawals and AAs.

### Student Loan Deferment

If you have previously received student loans at other institutions, you may wish to defer repayment while matriculated at RUSM. RUSM provides enrollment data to the National Student Clearinghouse which will be accessible to your loan lenders. There are certain cases (*i.e.*, private loans) where you may need to complete a form from your lender and obtain a verification of enrollment from RUSM. The enrollment verification letter is available at the myRoss website, and should be mailed to your lender with the deferment form.

Please be advised that loans cannot be deferred during curriculum gap periods of more than 31 calendar days. This includes gaps due to studying for, sitting for, and waiting for passing results for the USMLE.

### Tuition During Remedial Semesters

Full-time tuition is charged for students who are registered full-time (nine or more credits). Students must pay full-time tuition even if they are repeating courses.

Any student wishing to retake a failed course is required to repeat all courses/blocks in the semester. Students who are allowed to repeat coursework must also enroll in the Essential Lifelong Learning Skills (ELLS) remedial course. Upon successfully completing all courses with passing grades, students may progress to the next semester.

### Tuition Refund Policy for Withdrawals and Approved Absences

Tuition policies are administered in accordance with federal guidelines.

A withdrawal occurs when a student's enrollment is permanently discontinued or, in some cases, even temporarily interrupted (see below for further information on AA). An official withdrawal occurs when the student notifies the Associate Dean of Student Affairs and the Office of the Registrar in writing; an unofficial withdrawal occurs when the student does not give written notification. For financial aid and tuition purposes an AA is treated as a temporary withdrawal.

The effective date of withdrawal is normally the student's last academically related event. When a student withdraws, RUSM assesses tuition based on the period he or she attended, and in correspondence with federal loan entitlement regulations. These are as follows:

- If a new student withdraws prior to the start of the first semester, no tuition charges are due; however, acceptance deposits are forfeited. Notwithstanding the foregoing, Students resident in the state of Missouri at the time they sign the admissions agreement with RUSM will receive a refund of all monies paid if the student cancels the admissions agreement within (3) days, not including Saturdays, Sundays, and holidays, of signing.

- If a continuing student withdraws prior to the start of a subsequent semester, no tuition charges are due.

- If a student withdraws during the first 60% of a semester, tuition charges are directly pro-rated based on the portion of the semester that has elapsed. As semesters are normally 15 weeks in length, tuition is usually prorated for withdrawals during weeks one through nine (9).

- Per federal regulations for withdrawal during the first 60% of a semester, student loan entitlement is recalculated. RUSM and the student are each proportionally responsible for returning "unearned" financial aid to the relevant lender(s).

- If a student withdraws after the first 60% (after completing the ninth week) of a semester, the full tuition charges remain due.

**Tuition Policy During Approved Absences**

An AA may be authorized in limited circumstances (see Absences, Withdrawals and Deferrals). For financial aid purposes and tuition adjustments, an AA is considered the same as a temporary withdrawal. Requesting and receiving an AA will have an impact on your obligation to repay tuition and student loans. For purposes of student loan deferment, an AA is the same as a withdrawal, and loans will go into repayment status as of the last academically related event.

A student who begins an AA during a semester and sets a return date at the beginning of the next semester will be reported as "not enrolled" to all lenders. However, the student is not required to reapply for admission to RUSM following such an AA.

Students who successfully complete the Foundation of Medicine curriculum will be in a vacation period for up to 12 weeks. This vacation time should be used by students to study for NBME CBSE remediation and/or the USMLE Step 1. Student loans will be in deferment status for any student during his/her vacation period. Students are expected to return to school at the end of the vacation period to begin Internal Medicine Foundations clerkship.

If a student is unable to return to start IMF due to not passing the NBME CBSE, the student must request a deferral and be placed in a Temporary Withdrawal status prior to the start of the IMF session.

If a student has passed the NBME CBSE but require additional time to prepare for USMLE Step 1, the student can defer IMF by either requesting an Approved Absence or be placed in a Temporary Withdrawal prior to the start of IMF.

If a student does not return to school at the end of the vacation period and had not notified the school to defer IMF, that student will be administratively withdrawn and reported to the National Student Loan Clearinghouse as withdrawn as of the student's last academically related event, which would typically be the last day of the AICM/IMF course.

Student loan status during any AA after the vacation period will be treated as described above in sections regarding AAs. Any student desiring a temporary suspension of student loan payments beyond the vacation period, must contact their loan servicer to seek forbearance.

RUSM 000410

86

## HEALTH DOCUMENTATION

Students are required to maintain health insurance coverage while enrolled at RUSM.  The University offers a student health insurance plan with Aetna Student Health.  Students may waive coverage if they hold their own health insurance policy that meets the waiver standards.  More information can be obtained at www.aetnastudenthealth.com.

Students must maintain their health documentation status to ensure that no documentation expires before or during a clinical clerkship. Students whose health documentation are incomplete or expire during their clerkship will be subject to disciplinary action which can include removal from one or more clerkships.

## HONOR CODE VIOLATIONS AND SANCTIONS

Violations of the Honor Code include lying, cheating, stealing, conduct unbecoming a medical professional and toleration of the aforementioned acts in all their various forms. These terms are explained as follows:

A.  **Lying:** Any deliberate verbal, written or other misrepresentation of the truth.

This violation includes, but is not limited to: forgery and the falsification or misuse of the student identification card by using another's card or by allowing another to use one's own card; falsification of documents concerning sickness or physicians visits, financial aid documents and transcripts; verbal attempts to mislead others; and omissions and embellishments of the plain truth.

B.  **Cheating:** Any intentional misrepresentation of another's work as one's own or a misrepresentation of the circumstances under which the work was done.

This violation includes, but is not limited to, copying, plagiarism, unauthorized collaboration and unauthorized divulging of test contents or other information.

C.  **Stealing:** Any intent to deprive an owner of property without authorization or consent.

This violation includes, but is not limited to, the taking of any item belonging to another person or RUSM, the theft or mutilation of library material, the unauthorized use or duplication of a key belonging to RUSM, and failure to pay money when owed to an individual or business.

D.  **Conduct unbecoming of a medical professional:** Any behavior deemed inappropriate of a medical professional that would otherwise reflect poorly upon RUSM and its representatives.

This violation includes, but is not limited to, sexual harassment, illegal use/possession/distribution/sale of drugs, public intoxication to a gross extent and public indecency. Lesser offenses may also be deemed conduct unbecoming a medical professional.

E.  **Toleration:** Failure of a student to report items A: lying, B: cheating, C: stealing and D: conduct unbecoming of a medical professional. Toleration constitutes a violation of the Honor Code and that student is thereby subject to disciplinary action.

**Sanctions**

1.  Following a finding or an admission of responsibility, the Honor Council shall recommend to the Senior Associate Dean of Student Affairs one or more of the following sanctions:
    a.  **Academic violations**: In a case involving academic violations, the academic sanction shall include a failing grade and may include one or more of the following:
        i.  **Probation**: Probation places the student on notice that any future violation of the Honor Code will result in either suspension for a specified period of time or permanent dismissal from RUSM.
        ii.  **Suspension**: A suspension is the loss of registration privileges for the specified semester(s). The period of suspension must be at least one semester, and may be longer at the discretion of the Associate Dean for Student Affairs or his/her designee. In cases where the offense takes place in one semester, and the penalty is imposed in a subsequent semester, a failing grade may be assigned in one or more courses for the semester in which the offense took place. The assigning of a failing grade is in addition to a suspension effective in the specified semester.

RUSM 000412

88

    iii.    **Non-academic probation:** This form of probation is a comprehensive loss of social privileges for the allotted period of probation. The following events/activities are prohibited for the probation period:

        1.    SGA or Student Organization entertainment and/or social events
        2.    RUSM sponsored social events, not those relating to religion

    The non-academic probation sanction does not prohibit participation in any events required by professors or that are considered academic service. The full privileges of being a RUSM student will be restored upon completion of the allocated period of social probation.

    iv.    **Permanent dismissal:** A student receiving the penalty of permanent dismissal is not eligible to return to RUSM.

    v.    **Violations of Conduct Unbecoming of a Medical Professional**: In the case of a violation of conduct unbecoming of a medical professional, the sanctions outlined in the Student Handbook may be recommended based on the severity of the offense.

b. **Non-academic violations**: In a case involving non-academic violations sanctions may include one or more sanctions from the list above: RUSM may also choose to impose other sanctions, not listed here, depending on the nature and severity of the misconduct.

RUSM 000413

89

## HOUSING IN DOMINICA

RUSM is committed to making your stay in Dominica as comfortable as possible by providing information about a wide range of housing opportunities for students and their families. Students should review the material provided in the Welcome Packet and in the housing database to arrange housing prior to arriving at RUSM. Students may access the housing website through myRoss.  While RUSM provides information regarding off-campus housing options as a service to our students, RUSM does not own or operate, and is not responsible for, off-campus housing or information provided regarding such housing.


RUSM has a limited number of on-campus housing options, which are primarily reserved for first-semester students. Due to the minimal number of available rooms, these residences are assigned on a "first come, first served" basis. However, students also have access to many housing options within convenient walking distance of the campus. A few apartments are available for students with special needs.

Students are expected to abide by the RUSM Code of Conduct in both on- and off-campus living arrangements. Part of the RUSM honor code includes the avoidance of "any behavior deemed inappropriate of a medical professional that would otherwise reflect poorly upon RUSM and its representatives." If you would like assistance in finding appropriate accommodations, please call or email the RUSM Housing Coordinators at:

> RUSM Housing
> (767) 255-6400 or (767) 255-6433
> Email: Housing@rossmed.edu.dm

RUSM 000414

## IMMIGRATION

All visitors to the US that are enrolled at RUSM must ensure that they are both familiar and comply with United States Citizenship and Immigration Services (USCIS) regulations.

It is the responsibility of our students to ensure that their immigration status remains valid at all times while being present in the US both during their enrollment at RUSM, and during residency planning activities.

Students that enroll and attend clinical science semesters and are scheduled at clerkships throughout the US must ensure that USCIS has accurate information on their plans and physical location in the US.

Students must ensure that they provide updated and accurate address information, ensure that they update USCIS with proper hospital documentation should a clerkship arrangement change, and ensure compliance to all local, state, and federal laws.

It is the responsibility of the student to request updated documentation for enrollment verification and hospital confirmation of a clerkship schedule to provide to USCIS to obtain a new visa or extend an authorized stay date.

**Visa Requirements Prior to Check-In of Incoming Foundations of Medicine Students**
During your studies you will be considered a guest in Dominica. As such, you will be required to comply with all local and international immigration laws. The Office of the Registrar and Immigration Advisor are available to guide you.

Non-resident visitors from many countries may be granted a Visa that is good for up to six months upon entry. Citizens of certain countries require an entry visa, which must be obtained prior to arriving in Dominica. Students who do not obtain a visa during their first semester will not be allowed to register for second semester and may be administratively withdrawn.

Please see the campus Student Services Department for more information, and submit all visa-related requests to the RUSM Immigration Advisors.

**Visa Requirements for International Students in Clinical Clerkships**
RUSM will provide letters of verifications from the Office of the Registrar and the affiliated hospital sites to qualifying international students requiring a B-1 visa to enter the United States once the student has submitted their USMLE Step 1 sitting date and scheduled their IMF session.  It is recommended that international students contact the Director of Student Services in Miramar with any questions relating to Visa requirements during the clinical science semesters.

RUSM 000415

## LIBRARY AND LEARNING RESOURCE CENTER IN DOMINICA

As the intellectual center of the RUSM, the Student Center Library and Learning Resource Center (LRC) enhances self-directed learning and supports evidence-based medicine. It will be one of the mainstays of your studies—providing services, resources, equipment and facilities to help you succeed.

While you are expected to purchase the required textbooks for each course, the library provides access to many electronic and online resources. To supplement your required readings, the library houses a full range of biomedical books, journals, study aids, audiovisual programs and computer-assisted materials.

*Hours*
The Library Director and staff are available to help students access and efficiently use the library's many resources during the following hours:

- Normal library hours: 16 hours per day, seven (7) days a week (closed at Midnight)

Any changes in library hours are posted on the front door in a timely manner.

*Protocol*
Normal library protocol applies in the Student Center Library. For instance, you will need to show your student identification card with barcode for all library transactions such as borrowing books, and using multimedia resources. Causing excessive noise and distraction is not allowed. Cell phones should be silenced and all calls taken outside of the library. Eating and smoking are not permitted. As the library is intended for RUSM medical students, faculty and staff only no children, family members or other guests are permitted.

Students are expected to return library materials on time. Overdue fines are assessed to ensure the prompt return of high-use items. Failure to pay fines or return books will affect your ability to borrow other materials. It may also affect the release of final grades or the ability to register for classes.

*Personal Items*
When you leave the library, you are expected to take notes, books, and personal items with you. Since lost or stolen personal items are the responsibility of the student, you should take care not to leave valuables unattended. Student Life personnel and/or library security officers will remove all items unattended for longer than 15 minutes at computers, and 1 hour in study tables, carrels, and group study rooms as needed throughout the day, and during cleaning. These items will be available for pickup 24 hours following their receipt by security. Unclaimed items will be donated or sold at a publicly-held auction. RUSM, its colleagues or agents are not responsible for lost, stolen or damaged items that are collected.

*Prohibited Behavior*
Stealing or damaging library materials, equipment or furniture is a serious offense. Students will receive disciplinary action if they are caught vandalizing, mutilating, or stealing library materials, equipment, or furniture. Security cameras are in operation in all rooms of the library. Library staff will identify and warn students who consistently ignore the library rules. Any student who physically threatens a staff member will also receive disciplinary action.

*Feedback*
You are encouraged to make suggestions and provide input regarding library services, resources, and facilities to the Library Director or via the SGA or in the suggestion box outside of the library

RUSM 000416

## LIFE IN DOMINICA

RUSM is located on the beautiful Caribbean island of Dominica. Known as the "Nature Island," Dominica appeals to hikers, bikers, beachcombers, scuba divers, and those who simply appreciate spectacular, exotic views. Twenty-nine miles long and sixteen miles wide, it lies at the top of the Windward Islands in the West Indies. The landscape of Dominica is one of lush foliage draping cloud-shrouded, dormant volcanic peaks. Beautiful beaches alternate with dramatic cliffs along the coastline, surrounded by crystalline blue water and stunning vistas.

The island is laced with rivers fed by up to 40 inches of annual rainfall on the coast, and up to 300 inches in the tropical rainforests of the interior. Dominica's forests abound with rare birds, flowers and animals, including the world's largest parrot, a beaver without a tail and a giant frog. Lovely waterfalls, underwater cliffs, caves and volcanic springs contribute to Dominica's reputation as a preferred destination for eco-tourists seeking natural, unspoiled beauty.

### The People of Dominica

Although Dominica is located in the Caribbean, it is not considered a resort island. Its culture showcases a meld of Kalinago people, French, British, American and African influences. Most of the island's inhabitants speak English, though native Dominicans may also speak a French patois. The culture is friendly. Religion plays a central role in life on the island.

The local economy relies primarily on fishing or farming. Dominicans live mostly in villages near the coastal areas, as the interior is too mountainous for crop cultivation. Roseau is the capital and largest town; Marigot hosts the airport; and Portsmouth is home to RUSM. Roads connect these towns and provide access to outside attractions.

### RUSM and Dominica

As one of the premier Caribbean medical schools, RUSM is chartered by the government of Dominica. To build a mutually-beneficial relationship with the host country, the officials of RUSM are dedicated to working with the government of Dominica to improve the health and welfare of the local people, while simultaneously providing medical education of the highest quality. Students often participate in health fairs, disease prevention education, and work with local health care professionals as part of their supplemental education.

### Climate

Year-round temperatures in Dominica normally range from 75 to 85°F during the day, with comfortably cooler evenings and nights. There are two seasons: the dry season runs from December through June; and the wet season runs during the remainder of the year. Hurricanes are a risk in the early fall, as they are to most parts of the Caribbean and southeastern U.S. Fortunately, the RUSM campus and community are well equipped to deal with tropical storms and hurricanes.

### Dress

The climate and local customs in Dominica dictate the style of dress. Because of the warm climate, most people find light cotton clothing to be the most comfortable. Since rain showers occur quite often—especially during summer and fall—umbrellas and light rain clothing are essential. On campus, casual clothes (shorts, sandals, sundresses) are worn most of the time. Professional wear, such as skirts or dresses for women, and slacks and shirts (no jeans or T-shirts) for men, are required for some social events and some clinical skills activities (see Clinical Sciences syllabus for professional dress code policy).

### Food

The cuisine of Dominica features a unique mix of African, Caribbean and European influences with a bright local twist. Expect dishes with rice, beans, plantains, and other fruits and vegetables, often with meat and often spicy.

Local food is generally safe for consumption, and tap water is consumed by local residents, but we recommend students drink only boiled or bottled water. Filtered water is available on campus. Food boiled in tap water is generally safe.

## Local Travel

Travel within Dominica is best done by car. Taxi services are readily available and reasonably priced, and official taxi fares are posted at the airports. Keep in mind that figures are listed in Eastern Caribbean dollars.

If you choose to buy a car or motorcycle, take note that driving is done on the left side of the road. Pedestrian traffic on sidewalks and stairways also stays to the left. A Dominican license is required. You should be forewarned that Dominican roads are dangerous, especially for motorcyclists. Motorcyclists are required to wear helmets on campus, and we strongly advise that they be worn at all times.

## Communication

Telecommunications on Dominica are more than adequate: it has well-developed cable television, telephone, and wireless systems.

## Banking

Dominica uses Eastern Caribbean (XCD) currency, commonly referred to as EC dollars. The exchange rate officially hovers around 2.70 XCD dollars to one U.S. dollar. Most business establishments readily accept the U.S. dollar, but their exchange rate may be somewhat lower than the official rate. Local merchants and landlords will not accept personal checks drawn on U.S. and Canadian banks.

Banking facilities exist in both Portsmouth and Roseau, and students are advised to open a local account. During the work week, banks close at 2:00 p.m. On Fridays, they are open from 8:00 a.m. to 4:00 p.m. Unlike banks in the U.S., Dominican banks are closed on weekends. The bank on campus, National Bank of Dominica Ltd. (NBD), is open from 9 a.m. to 4 p.m. Monday through Friday. There are two ATMs on campus. Banks will negotiate U.S. checks, but it can take up to 30 days for personal checks to clear. However, NBD immediately clears all checks drawn against RUSM's accounts (including U.S. loan checks).

## Religion

A number of denominations are represented in Dominica. Students have organized Buddhist, Christian, Hindu, Jewish, and Muslim religious services.

## Local Laws

Students who travel to Dominica from abroad to study at RUSM should remember that they are guests in a foreign country, which has its own unique customs, laws and cultural norms.  Students and their guests, including family and friends, are expected to become familiar with and adhere to all local laws.  Students are reminded that failure to adhere to local laws may result in serious repercussions beyond disciplinary action by RUSM but also include loss of visitor/student immigration status and/or criminal prosecution.

RUSM 000418

94

## PETS IN DOMINICA

Dominica requires an import permit for dogs and cats to enter the country. If you are planning to bring your dog or cat with you, please comply with the regulations of the Commonwealth of Dominica, which are available at http://www.rossu.edu/medical-school/documents/AnimalHealthGuidelines.pdf.

While you may bring your pet with you to Dominica, you should be aware that having your pet will limit your housing options. For instance, many landlords do not allow pets, or require an additional security deposit from pet owners. Reviewing the guidelines available online will help you make an informed decision about bringing your pet to Dominica.

While pets are welcome to campus please familiarize yourself with the Animal Policy (http://medhandbook.rossu.edu/wp-content/uploads/2013/05/Animal-Policy-revised.pdf ) prior to entering campus with your pet.

RUSM 000419

95

## PHOTOGRAPHY AND VIDEO IMAGING POLICY

1. **Purpose**

    1.1  The purpose of this Policy is to ensure that any type of photography such as still pictures, video and film recorded or broadcast by any means including storage by electronic media, which occurs in or around the facilities of RUSM is not used for commercial purposes and that it does not interfere with the educational, scholarly or administrative functions of the institution, or impair any individual's right to privacy.

2. **Scope**

    2.1  This procedure applies to all visitors, faculty, staff and students. Pictures are not for publication or public distribution unless approved by the Dean or the Dean's designee.

    2.2  All individuals found to be in violation of this policy are subject to institutional discipline up to and including expulsion.

3. **Procedure**

    Photography is generally permitted as long as it is in good taste and for personal use. Prior permission from the Dean or the Dean's designee is required when (1) the photography is for commercial purposes; (2) photography has questionable content; (3) the photography is intended for a political purpose; (4) the photography will require set up of any equipment which could impede normal activities on campus; or (5) the photography involves human specimens or cadavers. Photography shall be considered to be for commercial purposes if it is intended to be sold or otherwise exchanged for value, or is for any use that could imply endorsement of a product or service. Photography will be considered to be for a political purpose if it is used or intended to support or oppose either a candidate for any public office, or any particular point of view on an issue of public concern or debate. Photography will be considered questionable in content if it may be viewed as libelous, defamatory, predatory, lewd or pornographic.

    Photography for films or videos may require submission of storyboards or scripts prior to approval. All photography permissions are for designated times and dates. RUSM does not guarantee that any specific area or activity on campus will be available at the requested time or date. Permission by RUSM must specify designated times and dates in writing and be signed by the Dean or the Dean's designee. RUSM may withhold its permission or require conditions for its permission at its discretion.

    Permission of RUSM does not include or imply any permission to photograph any individual, regardless of whether such person is a staff member, patient, student or visitor to the RUSM facilities. Photographers are reminded that they need to obtain the permission of each individual photographed and that commercial use of an individual's image or likeness typically requires written consent of that individual.

    In the event of an incident or emergency requiring police, fire or other emergency response personnel, access to areas previously open to photographers may be barred or limited to allow emergency personnel to ensure safety and security. Depending on the nature of the photography, the amount of equipment used and the location of the photography, proof of general liability insurance may be required. Specific contractual arrangements must be negotiated in advance.

96

## PREPARING FOR DEPARTURE FROM DOMINICA

When the time comes for you to depart from RUSM, we hope you will have solid skills for the first steps of your fulfilling career, a network of many friends, and confidence in the path ahead of you. The following policies and recommendations regarding your departure from Dominica will help you move successfully to the next phase of your training.

### Debt

You must satisfy all local debts before you depart. The Dominican laws on debt are particularly strict. On some occasions when students have attempted to leave the country with unsatisfied debt, they have found themselves detained or jailed. Students are responsible for all debts to landlords, local restaurants, shops, phone companies, RUSM, and others.

Departing Dominica with outstanding debt to RUSM will prevent you from seeking clinical clerkships and proceeding to the next phase of your education. You will not be allowed to obtain needed transcripts from the New Jersey office until you have made arrangement for payment of your student obligations.

## PRIVACY RIGHTS AND FERPA NOTIFICATION

RUSM follows the guidelines of the U.S. Family Educational Rights and Privacy Act (FERPA), and maintains student rights as outlined below:

- *Right to Review*. Students have the right to inspect and review educational records within 45 days of the date that RUSM receives a request for access. Students should submit a written request to the Office of the Registrar that identifies the records they wish to inspect. The Office of the Registrar will make arrangements for access and notify the student of the time and place where the records may be inspected.

- *Corrections*. Students have the right to request the amendment of education records that they believe are inaccurate or misleading. Students should write to the Office of the Registrar, clearly identify the part of the record they want corrected and specify why it is inaccurate.

- *Hearings*. If RUSM decides not to amend the record as requested by the student, RUSM will notify the student of the decision and advise the student of his or her right to a hearing regarding the request for amendment. Additional information regarding the hearing procedures will be provided when the student is notified of the right to a hearing.

- *Consent*. Students have a right to consent to disclosures of personally identifiable information contained in the student's education record, except to the extent that FERPA authorizes disclosure without consent.

- *Disclosures without Consent*. Disclosure can be made without consent to RUSM officials with legitimate educational interests who need to review a record in order to fulfill their professional responsibilities. A RUSM official is a person employed by RUSM in an administrative, supervisory, academic or research, or support staff position (including law enforcement unit personnel and health staff); a person or company with whom RUSM has contracted (such as an attorney, auditor, or collection agent); a person serving on the Board of Trustees; or a student serving on an official committee (such as a disciplinary or grievance committee) or assisting a RUSM official. Upon request, RUSM may disclose education records without consent to officials of another school in which a student seeks or intends to enroll.

- RUSM may disclose directory information upon request. Directory information includes:
  - Name, address, and telephone listing
  - Dates of attendance, degrees and awards
  - Field of study
  - Most recent school attended
  - Photographs
  - Date and place of birth
  - E-mail address

- Students have the right to file a complaint with the U.S. Department of Education concerning alleged failures by RUSM to comply with the requirements of FERPA. The name and address of the Office that administers FERPA is:

  Family Policy Compliance Office
  U.S. Department of Education
  400 Maryland Avenue, SW
  Washington, D.C. 20202-8520

  For further information, students may also contact the Family Policy Compliance Office directly at 1-800-**USA-LEARN (1-800-872-5327) (voice). Individuals who use TDD may call 1-800-437-0833.**

98

For more information **http://www.2.ed.gov/policy/gen/guid/fpco/ferpa/index.html**.

RUSM 000423

99

## READMISSION TO RUSM

Students who wish to return to RUSM after withdrawing must apply for readmission online at http://www.rossu.edu/medical-school/apply/. Readmission is not guaranteed.  Applications for readmission will be reviewed by the Readmission Committee to determine if the student is eligible for readmission, and if so under what conditions (such as academic probation, documentation of ability to meet technical standard). Readmitted students will typically be subject to all academic policies and tuition and fees in effect at the time of re-enrollment, without any "grandfathering" provisions based on their original admission.

## REGISTRATION AND OTHER REGISTRAR SERVICES

**Registration for New Students**

As a new student, you have much to do to prepare for your medical education at RUSM. Your Welcome Packet contains information and forms you need to complete your acceptance, and your enrollment is contingent upon your submission of all required documentation by the end of your first semester. The Office of the Registrar is available to assist you during the process.

Please take seriously your obligation to complete and submit all forms in a timely manner. Your offer of admission lists any documentation needed by the Office of the Registrar to complete your enrollment, including immigration paperwork necessary for obtaining a student visa. If all documentation is not submitted by the end of first semester, you will be subject to administrative withdrawal and may lose the privilege to register for a subsequent semester.

Credit to students transferring from another medical school into RUSM will be evaluated and may be granted at the sole discretion of RUSM.  RUSM has no control over and is not responsible for equivalency of RUSM courses to those of other institutions. RUSM course equivalency for other institutions for RUSM students transferring will be determined by the institution to which RUSM students transfer in its sole discretion.

**Foundations of Medicine Registration and Check-In**

Students enrolled in the Foundations of Medicine curriculum must:

- Register online
- Check-in in person on campus
- Provide a valid student ID card

These steps must be completed by the deadlines established by the Office of the Registrar. These deadlines and the schedule for check-in and registration are updated regularly by the Campus Registrar. For further information, please see the Campus Registrar and/or myRoss.

**Student ID**

To ensure proper identification and to complete check-in, students must present their official RUSM identification cards.

To replace lost ID cards for students (and companions) on campus, there is a charge of XCD $25. Please see the Safety and Security Department on the Dominica campus for more information. For those students in AICM/IMF or clinical clerkships, please contact RUSM Student Services in Miramar, Florida. There is a charge of USD $10 for replacement cards.

**Late Check-In**

Students are expected return to campus, check-in on the island, and attend courses as scheduled. **Students with extenuating circumstances may request permission to check-in late.**

**There is a $200 USD late fee for students who check-in after the regular advertised check-in period is complete for the specified semester. Approval for late check-in does not automatically waive the late fee of $200 USD.** Students with a medical emergency or who experienced unexpected flight cancellations can request that the late fee be waived. In both of these situations, supporting documentation will be required before the fee can be waived. ***All supporting documentation should be provided at check-in or by the advertised day/date/time for each semester to the Office of Student Services located on the 3rd Floor of the Student Center.*** Failing to provide the supporting documentation by the deadline will result in the late fee being automatically charged to your account. **Acceptable**

**supporting documents are original and rebook flight itineraries or letters from treating physician/medical facility for medical emergencies**.

**Any student who has not notified the Office of Student Services, Dominica Campus by 4:00 pm on the first day of class will be subject to administrative withdrawal and will need to reapply in order to be able to attend classes for the next semester/term.**   Additionally, any financial aid disbursements received by RUSM will be returned to the lender.

**Students are expected to plan and complete all personal business in a timely manner in order to schedule an arrival in Dominica before ending hours of regular check-in.** For students with extenuating circumstances, please note that **permission to check-in late may not provide you with an excuse for any academic commitments that you might have missed.**

A 'one time' APPEAL will be accepted and reviewed by the Director for Student Services on a case by case basis.  A written appeal request and any supporting documents <u>MUST</u> be submitted no later than 15 calendar days from the date late fee charge is posted on your student account. An appeal request can be sent to: DMStudentServices@rossu.edu. All decisions after the appeal is reviewed are final.


**Tuition and Fees**
The deadline for tuition and fees is set by the Office of Student Finance, and generally falls about 15 days before the start of classes. Tuition is deferred for students receiving financial aid until they check-in in-person. At that point, only students with approved financial aid and/or those sponsored by a RUSM-recognized, third-party payer will be allowed to register—unless approval is granted by the Senior Director of Student Services or designee.

Where the Senior Director of Student Services authorizes registration with late payment, the student must complete a promissory note and remit payment within 30 days of the beginning of the semester. Late payments are subject to a USD $75.00 late fee. Under the terms of the note, the student may be considered for an administrative withdrawal based on non-payment. If non or under-payment occurs, the student may not receive credit for that semester.

**Clinical Sciences Registration and Check-In**
Students in the IMF must:

    a)   Register online by the deadline established by the Office of the Registrar
    b)   Check-in in person at their IMF location on the first day of the semester

Students are assigned to core clinical clerkships once they have:

    1.   Received passing scores in the IMF course
    2.   Submitted a printed confirmation of taking USMLE Step 1.  The printed confirmation can be obtained from Prometric immediately following the exam administration.
    3.   Submitted documentation of the USMLE Step 1 score to the Office of the Registrar (including both sides of their USMLE report)
    4.   Submitted health records and required documentation to the Office of Clinical Clerkships two weeks prior to the start of IMF.

All clerkship assignments are made by the Office of Clinical Clerkships. In general, clerkship programs will be taken according to a pre-arranged schedule. Students will be notified of their entry into a given program via written confirmation from the Office of Clinical Clerkships. Students must schedule through the Office of Clinical Clerkships and be present on the first day of a clinical segment. Failure to do so will result in administrative withdrawal.

RUSM 000426

Students who begin clinical clerkships on or after January 1, 2015 are permitted to complete one elective prior to completing all core clerkships.  Students may not take additional electives until all required core clerkships are successfully completed.

Students who decline their clerkship schedule must sit out for a semester (15 calendar weeks) before reassignment. A student who fails to decline in a timely manner and who does not attend a scheduled clinical clerkship will receive an F on his or her transcript for that clerkship, and will be subject to further disciplinary action from RUSM.

For the Clinical Clerkship segment, international students may require a visa to enter the US. Further instructions and information are available from the Director Student Services in Miramar, Florida.

Students must be able to present their official RUSM identification card at all times.  If your ID card is lost or stolen, please contact Student Services – Miramar to request a replacement. Students will be charged a fee of $10 USD to replace an ID card.

**Other Registrar Services**

**Transcript Requests**
Students may request official transcripts from the Office of the Registrar at www.rossu.edu/myross/. Requests cannot be taken by telephone. Transcripts cannot be released until all financial obligations to RUSM have been met and any missing administrative documents have been received.

To obtain an unofficial transcript, students may view and print their unofficial grade reports from the myRossU website. There is no charge for an unofficial transcript.

**Enrollment Verification Letter Requests**
Enrollment Verification Letters can be printed from myRossU. Additionally, students may request an official letter of Enrollment Verification (for student loans, visa requests, etc.) by submitting a request online at www.rossu.edu/myross/. Students should allow at least 10 calendar days for processing.

**Clinical Evaluation Requests**
Students may request a copy of their clinical evaluations after grades are posted by submitting a request online at www.rossu.edu/myross/. Students should allow at least 15 calendar days for processing.

103

## RELIGIOUS OBSERVANCES

RUSM is non-sectarian, and as such does not close for the religious holidays of any specific denomination or group. Students who miss classes or laboratories for any reason will be responsible for the content of all missed course work. Examinations that are scheduled to occur on religious holidays generally will not be rescheduled.

RUSM 000428

## SANCTIONS

In keeping with RUSM's commitment to creating a safe and productive learning environment, RUSM has implemented the disciplinary process to discourage conduct inconsistent with the high standards held by most of its students. Following a disciplinary action, RUSM may impose appropriate sanctions, varying according to the severity of the offense, that RUSM hopes will protect those dedicated to learning this challenging profession and encourage ethical conduct among their peers. This applies throughout your education at RUSM.

Sanctions are determined by the Senior Associate Dean of Student Affairs following the resolution of a disciplinary action. This may be an informal resolution, such as a Complaint settled through mediation; or a hearing following an infraction of the Honor Code or Code of Conduct. The latter two are held before the Honor Council and Grievance Committee, who may also recommend sanctions.

There follows a list of the most commonly imposed sanctions, but RUSM may also choose to impose other sanctions, not listed here, depending on the severity of the misconduct. RUSM strives to find a balance between encouraging those that deserve a second chance while still protecting the rights of the majority of its students, who deserve an orderly learning environment.

**Available Sanctions:**

1. **Warning or Admonition.** A warning or admonition is the issuance of an oral or written reprimand. These are generally given to alert a student in danger of more serious sanctions if academic, attendance, conduct or other compliance issues are not promptly addressed.

2. **Required Compliance/Remediation.** When a student is out of compliance with enrollment, admission or health clearance requirements, RUSM will inform the student of the area needing attention, and how the situation may be rectified. In the event of a delay in compliance, RUSM may impose one or more of the following sanctions, and perhaps other appropriate measures as required, until the student becomes fully compliant.

   - Restricted campus/hospital privileges until compliance is reached.
   - Collection of monies or property where restitution is owed.
   - Counseling and education in the area of noncompliance.
   - Participation in psycho-educational groups and/or assigned educational initiatives designed to assist the student towards compliance.

3. **Disciplinary Probation.** Ongoing or serious disciplinary issues may result in the student being placed on Disciplinary Probation for a defined period of time. Students may continue their studies during disciplinary probation, but will have restricted access to other components of campus activity. A student on probation also risks suspension or expulsion in the event of additional violations during this period. Probation may include exclusion from RUSM-sponsored events, such as the following:

   - RUSM-sponsored social events
   - RUSM-sponsored extracurricular activities
   - Campus clubs
   - Student organizations
   - Student leadership roles
   - Involvement in or attendance at public performances on campus
   - Assistance with student/campus publications
   - Attendance at or involvement in events or activities sponsored by student campus organizations
   - Commencement

RUSM 000429

However, students on disciplinary probation will be permitted to participate in any activity or event that is required for course work.

**Lifting of Probation:** Probation is lifted after the time period specified, when a) no further violations are committed; and, b) all terms specified in the disciplinary decision have been successfully completed.

**Student file:** This period of probation is documented in the student file as Disciplinary Probation. Upon completion of the terms of this probationary period, a student may request that the probation be noted as successfully completed. Students are encouraged to document all efforts taken to address any cited violation, and confirm that this documentation is preserved in their student files.

**Financial Aid:** Unlike Academic Probation, periods of Disciplinary Probation will not impact a student's eligibility for or status regarding financial aid.

4. **Suspension.** Students with on-going or serious problems in such areas as compliance or conduct may be recommended for suspension following a formal or informal disciplinary hearing. Suspended students are ineligible to enroll in classes or participate in any activities held on RUSM or clinical premises for a determined period of time. Students on suspension will not be allowed to attend classes, campus-sponsored events, or otherwise visit campus property for the duration of the suspension. There are two types of suspension – Interim Sanctions, imposed during the resolution of a serious disciplinary case; and the Suspension Sanction, imposed by a Board of Conduct following the resolution of such a case.

   A. **Interim Sanction:** A student may be suspended on a temporary basis prior to an informal resolution or hearing, according to one or more of the following guidelines:
   - RUSM may choose to impose an Interim Sanction when one or more of the following occur:
     a) There is an indication that a student's misconduct will be repeated or continued;
     b) There is an indication that safety for the student and/or the RUSM community will be compromised without immediate action; and/or
     c) Sanction is necessary for RUSM or its affiliates to carry on its functions effectively and efficiently.
   - An Interim Sanction may be imposed without advance notice, and take immediate effect.
   - As with a Suspension Sanction, interim sanctions imply a loss of all student rights and privileges.
   - An Interim Sanction generally does not conclude until after a final disciplinary determination has been made.
   - A student on an Interim Sanction may submit a concisely written appeal, limited as to whether the Interim Sanction should remain in effect until the disciplinary action reaches a conclusion. This appeal will be reviewed and decided upon by the Dean or a delegate. (See more on **Appeals**, below.)
   - Time spent in an Interim Sanction does not count toward completion of any Suspension Sanction that may follow the final decision of the disciplinary action, unless the terms of the Suspension Sanction communicate otherwise in clear language.

   **Lifting of Suspension:** Interim Sanctions are lifted following the granting of a successful appeal or upon the issuance of a formal or informal disciplinary decision (which may result in a further Suspension sanction). Where conditions are placed upon a student's return, those conditions must be approved as fully completed before the student will be allowed to register for a future semester.

   **Student File:** An Interim Sanction may impact the student's transcript. The designation for the missed time on the transcript is determined in consultation with the Office of the Registrar on a case by case basis, following the determination reached by an informal resolution or formal hearing. If designated as a suspension, it will appear in the student's educational file as non-academic suspension. Students are encouraged to document efforts taken to address a cited violation.

RUSM 000430

**Financial Aid:** Eligibility for financial aid may be impacted depending upon the length of an Interim Sanction, and whether it transitions to a suspension sanction following disciplinary action. Students are required to comply with all financial aid repayment obligations during a suspension.

B. **Suspension Sanction:** Following the resolution of a disciplinary action, the Senior Associate Dean of Student Affairs may impose a suspension upon the student. Suspensions are generally imposed as a sanction following serious infractions of the Code of Conduct or local law, as follows:

- Suspension Sanctions may be imposed as the result of either an informal disciplinary decision or a formal disciplinary hearing.
- Typically suspensions last from one full semester (or until the end of a semester already begun), to one full calendar year (three semesters).
- Suspended students will surrender their RUSM identification card.
- Suspended students may be on campus for the limited purposes of conducting the following consultations and determinations during the **five semester days** immediately following the issuance of the sanction:
  a) Suspended students should consult with Financial Aid regarding the status of their financial aid.
  b) Suspended students should also consult with Student Services and an attorney or other relevant agency regarding the status of their student visa.
- When on any campus for these or other administrative purposes, the student must be accompanied by a RUSM official to the office meeting.

**Lifting of Suspension:** Where conditions are placed upon a student's return, those conditions must be certified as fully completed before the student will be eligible to register for a future semester. A suspended student, upon return to campus, will be on automatic disciplinary probation for either a designated period of time, identified at the time the original sanction is issued, or until graduation from RUSM.

**Student File:** A suspension will appear in the student's educational file as Non-academic Suspension. Students are encouraged to document efforts taken to address a cited violation.

**Financial Aid:** Students are required to comply with all financial aid repayment obligations during a suspension.

**NOTE:** Failure to comply with the limitations of any suspension or disciplinary probation may result in extended suspension or permanent expulsion.

5. **Expulsion.** Expulsion means permanent termination of student status. An expelled student is no longer permitted to attend RUSM or any of its affiliated institutions. A student expelled on disciplinary grounds is not eligible for re-admission.

**Student File:** A record of this disciplinary action will be placed in the student's file.

**Financial Aid:** All financial aid repayment obligations apply.

RUSM 000431

**Records of Sanctions**

Any sanctions imposed are recorded in the student's disciplinary file, and, where appropriate, also noted in permanent educational records. Information regarding probations, suspensions and expulsions are readily available to RUSM officials as needed to assure administrative compliance with those sanctions.

In the event a student withdraws or is dismissed prior to the disposition of a disciplinary action, documentation of a pending disciplinary case without final determination will be included as part of the student's educational record.

**Notifications during Suspensions/Expulsions**
RUSM may be obligated to take into account the interest of the following parties when resolving a disciplinary matter:

- **Immigration.** In those situations in which a student is not a citizen of the country where the study of medicine is occurring, RUSM may be obligated to inform immigration authorities of changes to a student's enrollment status following an expulsion or suspension. A student who has been suspended or expelled may no longer be entitled to the status of a legal resident.
- **Complainants and Victims.** Regarding access to sensitive information during a disciplinary action, RUSM will balance the interests of privacy and other legal rights of the accused student with those of victims and complainants.
- **Legal Authorities:** RUSM may be obligated to disclose information as required to legal authorities, when disciplinary action uncovers evidence of conduct in violation of the law.
- **State Medical Boards, ECFMG, FCVS, Government Agencies, and Employers**: RUSM may be called upon to report unusual circumstances that may have occurred during the course of your medical education.

## External Sanctions
RUSM sanctions are separate from applicable civil or criminal laws. Violations of RUSM standards may also violate federal, state and local laws of the U.S., England and the Commonwealth of Dominica, or other appropriate governance body.

Violators will be subject to all appropriate penalties within the jurisdiction of the offense. Within the Commonwealth of Dominica jurisdiction, drug trafficking, which includes producing, supplying and using, is punishable by fines, deportation and/or imprisonment.

*Sanctions may be appealed by the process outlined in the Appeals section of this Student Handbook.

108

## SECURITY IN DOMINICA

RUSM takes campus security very seriously, so we maintain a security force on the campus to enhance the safety of our students and help prevent crime; please cooperate with them to further our community's safety. We urge you to promptly report all on- and off-campus incidents to the RUSM security force (by calling 767-235-9111) or to local police (by calling 767-445-5222).

*Statistics*
In accordance with U.S. Department of Education requirements, information is published annually about security and safety practices, and campus crime statistics. This information is distributed to current students, and is available upon request by any prospective student.

*On-Campus Security and Escorts*
To provide 24-hour security for RUSM, students, and staff, RUSM employs a cadre of security officers on its Portsmouth, Dominica campus. Security is available 7 days a week, 24 hours a day. Should you feel unsafe on campus, please call a uniformed security officer to serve as your escort: (767) 255-6234.

All security officers receive in-house training, which is supplemented by formal training at the Dominica Police Training School. Officers also provide security for the RUSM Clinical Facility at the Princess Margaret Hospital in Roseau, which students use during clinical assignments and clinical clerkships.

Security guards have authority to ask questions and request identification at any time. Criminal incidents will be referred to local law enforcement. All crime victims and witnesses are strongly encouraged to report incidents to both campus security and local police. Prompt reporting will ensure timely warning notices to the campus community and timely disclosure of crime statistics.

*Off-Campus Security*
Most student security problems occur off campus. While Dominica has a relatively low crime rate, students and visitors should still take the same precautions that they would take in major cities in the U.S. These include traveling in groups, locking the doors to accommodations and vehicles, and avoiding confrontations.

Students living in off-campus student housing facilities should check with their apartment landlords for specific safety procedures at their complexes. Although most complexes restrict access to apartments and provide keys for individuals, additional security measures vary from complex to complex. Crimes committed at off-campus housing should be immediately reported to Campus Security. They should also be reported as soon as is reasonably possible to the Student Affairs department.

RUSM 000433

109

## SEVEN YEAR POLICY

RUSM students must successfully complete all coursework and USMLE requirements within seven (7) calendar years of their matriculation date. If at any point it becomes clear that a student is unable to meet all graduation requirements within seven (7) years, he/she will be subject to dismissal.  Students transferring into RUSM with credit must complete all graduation requirements within seven (7) years of matriculation at any medical school.

## SEXUAL OFFENSES

**Policy on Sexual Misconduct Response and Prevention**

**Policy Statement**

This policy applies to complaints of alleged sexual misconduct.  RUSM University expressly prohibits any instances of sexual misconduct including sexual harassment, domestic violence, dating violence, sexual assault, stalking, and rape or acquaintance rape.  Any acts that fall within the definitions of sexual harassment, sexual assault, rape, acquaintance rape, stalking, dating violence, domestic violence or prohibited sexual contact are a violation of University policy, and potentially applicable state and federal law.  RUSM is committed to fostering an environment where any type of sexual misconduct is promptly reported and sexual misconduct complaints are resolved in a fair and timely manner.

Creating a safe environment is the responsibility of all members of the RUSM community.  Regardless of the definitions provided below, anyone who believes they are a victim of sexual misconduct should report the incident as soon as possible to the Title IX Coordinator or the campus complaint administrator and seek immediate medical and/or safety assistance.

**Scope**

This policy applies to all members of the RUSM community, and includes, but is not exclusive to, faculty, staff, students, visitors, volunteers, vendors, and persons related to, receiving or seeking to receive services from the University, or otherwise pursuing undergraduate, graduate or professional studies at the University.  It also applies to alleged acts of sexual misconduct that adversely affect the RUSM community, whether those acts occur on or off campus.

**Definitions**

"**Acquaintance rape**" is a sex crime committed by someone who knows the victim.  The perpetrator could be a friend, classmate, relative, or co-worker.  Acquaintance rape includes forced, manipulated, or coerced sexual contact or penetration by a body part or object with someone who has not given or is incapable of giving consent.

"**Clery Act**" refers to the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. Section 1092(f); 34 C.F.R. Part 668.46

"**Colleague Code of Conduct**" refers to the policy titled "DeVry Education Group (DVG) Code of Conduct and Ethics" which is applicable to colleagues and outlines colleague's rights and responsibilities.

"**Colleague complaint procedure**" is the vehicle by which a colleague can bring to the University's attention any complaint relating to his/her experience with the College or a member of the College community.  It is the College's mechanism for investigating and trying to resolve complaints raised by colleagues.  This procedure is also referred to as the Open Door Policy.

"**Complaint administrator**" is a RUSM colleague responsible for conducting an investigation when a complaint of sexual misconduct is raised. To find out who the complaint administrator is at any given location for a particular complaint, consult the location's student services office or the Title IX coordinator.

"**Conduct administrator**" is a RUSM/DeVry official authorized to administer disciplinary proceedings for respondents who may have violated the Code of Conduct applicable to students.  A conduct administrator may serve as the sole member or as a participant in the conduct panel.  Nothing shall prevent the University from authorizing the same conduct administrator to impose sanctions in all cases at a single or

multiple locations.

"**Conduct panel**" means any person or persons authorized by the conduct administrator to determine whether a respondent has violated the Code of Conduct applicable to students and to determine appropriate sanctions; at RUSM these bodies are the Honor Council and Grievance Committee.

"**Consent**" is a freely given agreement to engage in a specific sexual act.. While the explicit definition of consent varies by jurisdiction, the following general rules apply when assessing whether consent was given. The lack of explicit consent does not imply consent. Where there is use of threat or force by the accused, the lack of verbal or physical resistance or the submission by the victim does not constitute consent. The manner of dress of the victim at the time of the offense does not constitute consent. Past consent to sexual contact and/or a sexual history with the accused does not imply consent to future sexual contact. A person who initially consents to sexual contact or penetration may withdraw continued consent at any time during the course of that interaction. Intoxication due to use of alcohol or drugs may impair an individual's capacity to consent freely and may render an individual incapable of giving consent.

"**Coordinator**" refers to the University's Title IX coordinator. Ms. Mikhel Kushner, Associate Title IX Coordinator (mkushner@devrygroup.com or 630-515-5440) and Mr. Mark Ewald, Senior Director for Ethics and Compliance Services (mewald@devrygroup.com) are designated to receive and monitor resolution for all Title IX reports.

"**CRC**" refers to the Coaching Resource Center which is available to managers to assist in addressing colleague relation concerns.

"**Dating violence**" means violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim.

"**RUSM premises**" includes all land, buildings, facilities, student housing and other property in the possession of or owned, used, or controlled by the University (including parking lots, adjacent streets and sidewalks).

"**Domestic violence**" refers to felony or misdemeanor crimes of violence committed by either a current or former spouse of the victim; a person with whom the victim shares a child in common; a person who is or has cohabitated with the victim as a  spouse; a person similarly situated to a spouse of the victim under the jurisdictional domestic or family violence laws; or any other person against a victim who is protected from that person's acts under the jurisdictional domestic or family violence laws.

"**FERPA**" means the Family Educational Rights and Privacy Act, 20 U.S.C. Section 1232g; 34 C.F.R. Part 99.

"**Member of the RUSM community**" includes RUSM students, faculty members or staff, and any other individuals associated with the University. The conduct administrator or complaint administrator shall determine a person's status in a particular situation.

"**One Up Manager**" is a colleague's manager's manager. It is the person responsible for receiving a colleague's complaint when his/her direct manager is implicated in that complaint.

"**Policy**" is defined as the regulations of the University, for example those found in the Student Handbook, colleague handbook, DVG Code of Conduct and Ethics, and any housing handbooks or catalogs.

"**Rape**" is defined as sexual intercourse or penetration by a body part or object, through use of coercion or force, with someone who has not given or is incapable of giving consent.

RUSM 000436

"**Sexual assault**" is defined as physical contact of a sexual nature against the victim's will or without the victim's consent.

"**Sexual contact**" means the deliberate touching of a person's intimate body parts (including lips, genitalia, groin, breast or buttocks, or clothing covering any of those areas), or using force to cause a person to touch his or her own or another person's intimate body parts.

"**Sexual harassment**" means unwelcomed sexual advances, requests for sexual favors or other conduct of a sexual nature. Sexual harassment occurs when a student or colleague is the recipient of conduct of a sexual nature where: (1) Submission to, or toleration of, such conduct is made either explicitly or implicitly a term or condition of the student's education, colleague's employment; or (2) Submission to or rejection of such conduct by an individual is used as the basis for academic decisions about the student or professional decisions about the colleague; or (3) Such conduct has the purpose or effect of unreasonably interfering with the colleague/ student's welfare or professional/ academic performance, or creates an intimidating, hostile, offensive or demeaning work/ academic environment

"**Sexual misconduct**" is a broad term encompassing sexual harassment, dating violence, domestic violence, rape, sexual assault, and stalking.  Sexual misconduct can occur between strangers or acquaintances, including people involved in an intimate or sexual relationship. Sexual misconduct can be committed by men or by women, and it can occur between people of the same or different sex.

"**Stalking**" is a pattern of behavior directed at a specific person that would cause a reasonable person to feel fear for his/her safety.  A person commits stalking by knowingly engaging in a course of conduct directed at a specific person when the person engaging in the conduct knows or should know that this course of conduct would cause a reasonable person to fear for his/her safety or the safety of a third person or suffer other emotional distress.

"**Code of Conduct applicable to students**" refers to the document titled "Code of Conduct" which is applicable to students and accessible in the Student Handbook.  It outlines students' rights and responsibilities, as well as the process by which the University may take action against a student.

"**Student complaint procedure**" is the vehicle by which a student can bring to the University's attention any complaint relating to his/her experience with the University or a member of the RUSM community.  It is the University's mechanism for investigating and trying to resolve complaints raised by students.

"**Speak Up**" refers to SpeakUpDeVryGroup, a reporting system available to colleagues and managed by a third party vendor (EthicsPoint), which encourages DeVry colleagues to come forward with questions or concerns, including allegations of sexual misconduct.  Colleagues are expected to ask legal, compliance and ethics questions and report suspected wrongdoing. Colleagues can utilize the SpeakUp program by contacting the third party contractor EthicsPoint by phone at 1 866 421 0617 or on-line at www.speakupdevrygroup.ethicspoint.com.

"**Title IX**" refers to the U.S. Department of Education regulation which governs the efforts of educational institutions to maintain a campus free from sex and gender discrimination including investigating and remediating sexual misconduct by students, colleagues, or third parties.

"**University**" or "**RUSM**" means Ross University School of Medicine

**Prevention and Awareness**
Acts that are deemed to fall under the definition of sexual misconduct by the University are violations of the Codes of Conduct, as well as the expectations of members of the RUSM community.  These acts may also be crimes.  In an effort to reduce the risk of sexual misconduct such as sexual assault from occurring among its students and colleagues, the University is committed to providing awareness and prevention programming.

The University will identify and provide programs to students, colleagues, faculty, consistent with requirements of Title IX, VAWA, SaVE and other needs as determined on an ongoing basis. These Programs will address all forms of sexual misconduct and include themes of awareness and primary prevention such as bystander intervention and the establishment of community norms.

**Disciplinary Action**

Acts of dating violence, domestic violence, rape, sexual assault, sexual harassment, and stalking are subject to disciplinary action by the University.   Victims may file a formal complaint with a designated local campus administrator or through the Title IX Coordinator.  If the victim wishes to access local community agencies and/or law enforcement for support, the University will assist the victim in making these contacts.  The University official who receives notification of the misconduct will offer assistance to victims, which may take the form of opportunities for assistance with academic concerns, changes in housing for the victim or the responding student, changes in working situations and other assistance as may be appropriate and available (such as no contact orders, campus escorts, transportation assistance, or targeted interventions).  No victim is required to take advantage of these services and resources, but the University provides them in the hope of offering help and support.  A summary of these rights and options is available to victims through Student Affairs, Student services or human resources. The University may also provide referrals to counseling services, at the victim's option.

When the victim chooses, or the University believes it is necessary, the University will initiate a prompt, fair and impartial investigation.  If allegations are substantiated based on the totality of the circumstances, the respondent may be subject to the Code of Conduct process, which may result in the imposition of sanctions/discipline based upon a preponderance of evidence (what is more likely than not).  The student complaint procedure which details the investigation and resolution processes for student misconduct can be found in the Compliant Procedure Section of this handbook..  The colleague complaint procedure which details the investigation and resolution processes for colleague misconduct can be found in the colleague handbook.

The Title IX Coordinator will monitor the investigation and resolution of sexual misconduct reports and assure compliance with this policy.  Furthermore, the Title IX Coordinator will work with campus administration to identify and initiate strategies intended to remedy the effects on the victim and the community to the extent practicable, and reasonably prevent the recurrence of similar misconduct.

Privacy of the records specific to sexual misconduct investigations is maintained in accordance with applicable law, including FERPA.  Any public release of information to comply with the timely warning provisions of the Clery Act will not include the names of victims or information that could easily lead to a victim's identification.   In appropriate instances, RUSM will disclose pertinent interim actions and the results of disciplinary hearings regarding the alleged perpetrator of sexual misconduct to the alleged victim.  Confidentiality will be maintained whenever possible, however RUSM reserves the right to exercise discretion and disclose details of an incident or allegation to assure community safety or the safety of an individual.

Any individual wishing to discuss an instance of sexual misconduct without triggering an immediate investigation should seek referral to mental health counseling services.  Students may seek support on Dominica through Counseling Services at 255-6553, off-island through ASPIRE at 888.470.1531 or via info@myASPIREonline.com and colleagues may seek support 24 hours a day, seven days a week through Guidance Resources at 877-623-3879.

It is RUSM's policy to hold perpetrators of interpersonal violence, which includes sexual assault, prohibited sexual contact, stalking, dating and domestic violence in any form, accountable for their actions through appropriate student conduct or personnel procedures, and by working with community agencies and law enforcement as appropriate.  Mediation will not be used to resolve an allegation of sexual misconduct.

*For students:* Please see the definitions section above for a list of proscribed conduct that constitutes a violation of this policy.  Appropriate disciplinary sanctions for substantiated violations of this policy, up to and including expulsion, will be imposed in accordance with the Code of Conduct applicable to students found here in the Sanctions section of this Student Handbook. .  This policy statement is not intended to replace or substitute for the

RUSM 000438

Code of Conduct applicable to students. This policy is a supplement to the community standards that the Code of Conduct applicable to students sets forth.  Alleged violations of this policy will be referred to the applicable complaint administrator or conduct administrator for appropriate review.  All parties in a student conduct proceeding will be informed of the University's appeal processes, and their rights to request an appeal. Should any change in outcome occur prior to finalization, all parties will be timely informed, and will be notified when the results of the resolution process become final.

*For faculty and staff (all colleagues)*: Appropriate disciplinary sanctions for violations of this policy include written reprimand or termination of employment or contract, and will be imposed in accordance with applicable University policies and  procedures, including the Colleague Code of Conduct, available in the colleague handbook. For offenses including harassment, domestic violence, dating violence and stalking, possible sanctions include warning, probation, housing suspension, housing expulsion, limiting order, change in job assignment, office relocation, reduction of awards under the management incentive plan, and termination of employment or contract.  Serious and violent incidents and acts of non-consensual sexual intercourse (the policy equivalent to the crime of rape) usually result in suspension, expulsion or termination of employment or contract.  In addition, violations of this policy may trigger application of law.  Colleagues who are made aware of a possible violation of this policy are required to contact their Manager or One Up Manager and also the Title IX Coordinator.  Colleagues can also submit anonymous reports of sexual misconduct by utilizing the DVG "Speak Up" hotline at www.speakupdevrygroup.ethicspoint.com.  Colleagues should contact the Title IX Coordinator with any questions about whether a report to law enforcement is appropriate.  Nothing in this policy prohibits a student or colleague from reporting a crime directly to local authorities.

*For everyone*: Disciplinary procedures are independent of any and all criminal procedures and proceedings.  In all cases, RUSM reserves the right to refer cases for criminal prosecution or to pursue sanctions regardless of criminal prosecution.  Violations of this policy by a visitor, volunteer, vendor, agents, or other third parties affiliated with the University may also result in the termination of pre-existing or future relationships. In any complaint of sexual misconduct, the person bringing the accusation and the responding party are both entitled to the same opportunities for a support person or advisor of their choice throughout the process and consistent with guidelines set forth in the applicable handbook.  Once complete, the parties will be informed, in writing, of the outcome. Notice to both parties will include the findings, as well as the sanctions/discipline (if any) to the degree possible and always when the sanction/ discipline is directly relevant to that individual.  Delivery of this outcome will not be unduly delayed to either party, and should occur as near to simultaneously as possible.

**Procedures to Follow After a Sexual Misconduct Incident**
Victims of domestic violence, dating violence, sexual assault, stalking, rape, and acquaintance rape on campus or at any campus property outside of the main campus, or at any RUSM-sponsored event or activity have the option and are encouraged to contact local law enforcement authorities.

Whenever possible victims should report a violation of this policy as soon as possible and preserve evidence as may be necessary to prove that domestic violence, dating violence, sexual assault, or stalking occurred, or to obtain a protection order.  Victims of sexual assault or rape are strongly encouraged to report the incident as described in this policy in order to deter these assaults and to ensure that victims receive the services they need. Steps should be taken to help deal with physical and emotional trauma associated with the violation. Recommended steps include:

1. Go to a safe place; go somewhere to get emotional support.

2.  Consider reporting the incident to the police. If requested, RUSM will assist with notification.

3. Report the misconduct on campus to the student central manager, academic affairs specialist, academic advising team lead (for online), One Up Manager, campus incident commander, local University leadership, Title IX Coordinator, or the CRC.

RUSM 000439

4. For your safety and well-being, immediate medical attention is encouraged.  Being examined as soon as possible, ideally within 120 hours, is important especially in the case of sexual assault. The hospital will arrange for a specific medical examination at no charge.  To preserve evidence, it is recommended that, if at all possible, you do not bathe, shower, douche, eat, drink, smoke, brush your teeth, urinate, defecate or change clothes before that exam.  Even if you have already taken any of these actions, you are still encouraged to have prompt medical care. Additionally, you are encouraged to gather bedding, linens or unlaundered clothing and any other pertinent articles that may be used for evidence.  Secure them in a clean paper bag or clean sheet.

5. Even after the immediate crisis has passed, consider seeking professional counseling. This can help to recover from psychological effects.

6. Contact the student central manager, academic affairs specialist, academic advising team lead (for online), One Up Manager, Title IX coordinator, or the CRC if you need assistance with RUSM-related concerns, such as implementing no-contact orders or other protective measures. RUSM may also liaise with local authorities to assist an individual who wishes to obtain protective or restraining orders.

Victims are not required to report an incident to law enforcement authorities, but campus authorities will assist victims who wish to do so.  Anyone with knowledge about a sexual assault or other sexual misconduct is encouraged to report it immediately to the Title IX Coordinator in order to permit a coordinated report to the applicable law enforcement authorities when appropriate. Nothing in this policy prohibits a student or colleague from reporting a crime directly to local authorities.

Please refer to the Resources for Victims of Sexual Misconduct section of this document for a link to local resources for advice and assistance to victims.

**Victim Rights**
RUSM will take interim steps to protect victims of sexual misconduct and maintain a positive learning and working environment by minimizing or eliminating contact with the respondent and providing reasonable academic and administrative accommodations in accordance with the Clery Act and Title IX.  Victims of sexual misconduct may request a change in their academic or employment arrangements by contacting Student Central office, One Up Manager, Title IX Coordinator, or local leadership.  Additionally, reasonable employment arrangements may also be requested through human resources while an investigation ensues. Victim's rights include:

1. Upon notifying RUSM of an incident of sexual misconduct, the victim will be informed of available options including the necessary steps and potential consequences of each option.

2. Where applicable, the victim will be informed of the institution's role regarding orders of protection, no contact orders, restraining orders, or similar lawful orders issued by a civil, criminal, or tribal court.

3. The victim has the right to be free from undue coercion from any members of RUSM to pursue or not pursue any course of action.

4. The victim has the right to be advised of her/his option to notify appropriate law enforcement authorities, and be informed about how to receive assistance from RUSM personnel in notifying these authorities, if requested.

5. The victim will receive information on how to make a confidential report for the purposes of tracking campus crime.

6. The victim has the right to be informed of the applicable disciplinary conduct process and procedures.

116

7. The victim has the same right as the accused to attend and have others present at student conduct hearings.

8. The victim has the right to be informed of the outcome of any student or colleague conduct proceeding involving alleged sexual misconduct.  In the case of student misconduct proceedings, the victim has the right to appeal the outcome.

9. The victim has the right to request a change in academic, on-campus employment, or on-campus living arrangements after the alleged sexual misconduct and to be informed of the reasonably available options for those changes.

10. The victim will be informed about campus and/or community resources for counseling, advocacy, and other services for survivors of sexual assault.

*For faculty and staff (all colleagues)*: In the event that a violation of this policy is reported to you, the victim should be provided with the above-listed options.  For more specific instructions on how to properly comply with University's sexual misconduct policy, please consult with the Title IX Coordinator.

**Retaliation**

RUSM prohibits retaliation against anyone who reports an incident of sexual misconduct or any person who assists or participates in a proceeding, investigation or hearing relating to such allegations.  Any allegation of retaliation related to the investigation or resolution of a sexual misconduct allegation will be treated as an independent Title IX complaint requiring consideration of appropriate reparative interim action, as well as investigation and resolution as described in this policy.

Retaliation includes, but is not limited to, any form of intimidation, reprisal, or harassment.
All complaints of retaliation should be reported in accordance with RUSM's complaint procedures.  If University procedures would result in the student or colleague being required to submit his/her complaint to the person whom he/she believes is retaliating against him/her, the student or colleague may submit the retaliation complaint directly to the Title IX Coordinator, or to the campus or location leader or One Up Manager, who should also inform the Title IX Coordinator.

Submission of a good-faith complaint or report of sexual misconduct will not adversely affect the complainant's future academic or work environment.  RUSM will discipline or take other appropriate action against anyone who retaliates against any person who reports an incident of alleged sexual misconduct or who retaliates against any person who assists or participates in a proceeding, investigation or hearing related to such allegations.

**Confidentiality**
RUSM wishes to create an environment in which individuals feel free to discuss concerns and make complaints. RUSM understands that complainants, witnesses, and others involved in the investigation process may be concerned about the confidentiality of the information they are sharing.  In some cases, however RUSM may be obligated to take action when it becomes aware of information relating to a complaint.

Confidentiality in cases of sexual misconduct will be maintained to the extent permissible by law and consistent with RUSM's obligations in investigating complaints.  Once an individual discloses identifying information to RUSM through the processes described above and in the applicable complaint procedures, he/she will be considered to have filed a complaint with RUSM. While the confidentiality of information received, the privacy of individuals involved, and compliance with the wishes of the complainant or witnesses cannot be guaranteed, they will be respected to the extent possible and appropriate.

117

If a student or colleague wishes to speak with someone who can assure confidentiality, he/she is encouraged to access counseling services available by referral through RUSM's third party provider, ASPIRE, at 888.470.1531 or via http://myaspireonline.com (for students) or Guidance Resources at 877-623-3879 (for colleagues).

**Resources for Victims of Sexual Misconduct**

Local Resources are reviewed each year and can be found in the Annual Disclosure reports distributed to each campus community and posted on the Student Consumer Info page of the University's web site.  The reports are available by location in a drop-down menu and contain lists of local resources available to victims of sexual misconduct.  The resource lists are updated annually.

To access this information, go to:

- RUSM Counseling Center: (767) 255-6552/ (767) 275-1385
- After Hours Call Center: (767) 275-6350 or (767) 235-5380
- RUSM EMS: (767) 235-7677
- Portsmouth Hospital: (767) 445-5237
- Princess Margaret Hospital, Roseau: (767) 266-2000, (767) 448-2231
- Ministry of Community Development, Roseau: (767) 266-3248
- Jeanie Robertson:  (770) 910-4807.
- Online assistance: http://www.rapecrisis.com/

118

## SPECIAL GRADUATION DATE REQUEST POLICY

Special graduation date requests will be reviewed on a case-by-case basis. A Special Graduation Date (SGD) may be approved for one of the following reasons:

1. You are an **International** citizen and are required to take USMLE Step 3 to obtain a working Visa. Your **International** citizenship will be verified.
2. You are applying for California licensing between November 30 and May 31. Please submit the L2 and L5 portions of the California licensing 30 days prior to your SGD requested. If you are requesting an SGD between July 31 and October 31, you must also supply proof that the program for which you wish to interview will not offer an interview without the California status letter, otherwise the November 30 graduation will be sufficient time to obtain the California status letter for purposes of The MATCH.
3. You have received a residency position **or other employment**, which is scheduled to begin at least one month before your scheduled graduation date. You must submit a copy of a signed contract with your request.

To apply for an SGD, submit a written request to the Office of the Registrar at least **60 days** prior to the date you are requesting. You will be notified via email if you are approved. The request must include:

    a. The anticipated date you will complete all graduation requirements;
    b. How you would like your name listed on the diploma;
    c. Email address by which you can be notified;
    d. All supporting documents;
        i. Student must provide supporting documentation of California Licensing application or residency/employment acceptance

Graduation Application must be submitted via myRoss.

## STUDENT GOVERNMENT ASSOCIATION

We at RUSM believe that sound extracurricular activities enhance our students' leadership and social skills, and augment their medical education. Dozens of professional organizations and interest groups at RUSM invite you to make friends, serve others, explore common interest, participate in athletics, and be active in campus leadership. These groups include many national organizations including the American Medical Student Association (AMSA), Phi Delta Epsilon (PHiDE), American Women Surgeons (AWS), and Student National Medical Association (SNMA).  We encourage you to be involved.

### Student Government Association

Prominent among these organizations is the Student Government Association (SGA). The student body elects class representatives and officers for the SGA each semester. The SGA is active in coordinating athletic events, supporting student philanthropic efforts, underwriting various student interest clubs, sponsoring and arranging social activities on campus, and bringing student concerns to the attention of the administration.

#### SGA Officer Qualifications

To qualify to serve in an SGA leadership position, you must be a full-time student in good academic standing (as defined in this Student Handbook). Students who are officers in the SGA are considered leaders and role models for the student body. As such, they must maintain a cumulative grade point average (cGPA) above 2.6 prior to election and have no disciplinary action on record. An SGA officer who does not meet these criteria will be asked to resign, and another student will be appointed or elected to serve.

#### Advisors and Funding

Members of the Office of Student Affairs act as advisors to the SGA. Students are required to pay a fee (assessed with their tuition) to support the efforts of the SGA. In addition, all late registration fees and library fines go entirely to the SGA.

### American Medical Student Association

Among the many organizations you may join at RUSM, students often find membership in the American Medical Students Association (AMSA) relevant to their studies and a good opportunity for hands-on community assistance. Membership is optional and dues are voluntary. AMSA works with the faculty to select outside speakers for Research Day, held each semester. They also provide public service opportunities that many students enjoy, such as health screening activities for the general public and providing health related services for students.  They also provide access to the programs of the National Body of AMSA in legislative and other governmental areas.

120

## NBME SUBJECT CLERKSHIP EXAM POLICY

In an effort to better prepare RUSM students to pass the USMLE Step 2 CK exam on their 'first attempt', the following apply to all clerkships that begin on or after September 1, 2015*:

1. The passing score for the SCE in each discipline will be equal to or greater than the 5th percentile on the NBME score report for that discipline/exam.

2. The minimum passing scores will be reviewed and modified annually.  The review will occur during March of each year for implementation on July 1.

3. Students scoring below the minimum passing score on any subject clerkship examination will receive a grade of I in the clerkship and will be required to retake the examination after completion of all core rotations.

    a. The student will be placed on academic probation and must retake the exam.
    b. Upon successful remediation of exam, the student will receive a grade no higher than a C on the examination portion of the final grade (currently the SCE counts 25% toward the final grade).
    c. Once the examination is successfully passed, the I grade will be replaced with the final grade in the clerkship.

    Students failing two or three (2 or 3) clerkship examinations or receiving two or three (2 or 3) I grades are required to take at least six (6) weeks of independent study at the end of their core clerkships to prepare for and retake the failed subject clerkship examinations.  The independent study is not a formal course, rather it is simply time off from all other curricular requirements to study for the failed subject clerkship examinations. Students will be in a Temporary Withdrawal status during the Independent Study period.

4. Students failing four (4) or more subject clerkship examinations or receiving four (4) or more I grades will be required to take an independent study for at least 12 weeks to prepare for and retake the failed subject clerkship examinations.  Students will be in a Temporary Withdrawal status during the Independent Study period.

5. Students required to take independent study time will be placed in a TW status during remediation. Students in TW status are considered not enrolled and may be subject to repayment status depending on the policies of their lenders.

6. A student must pass at least five (5) core SCEs, including passing the SCEs to be eligible to sit for the NBME CCSE. Students will not be scheduled for the NBME CCSE until five (5) cores and their SCEs are passed.

7. Students failing any one (1) subject clerkship examination a second time will be required to take an additional six (6) weeks of study time off for each exam that has been failed twice.  For example, failing one (1) subject clerkship exam twice will require a student to study for six (6) weeks, failing two (2) subject clerkship exams twice will require a student to study for 12 weeks, etc.

8. Students who fail two (2) or more subject clerkship examinations may not commence electives until all subject clerkship examinations are passed.  If a student has started an elective rotation when he/she is notified of his/her second failed SCE, he/she will be permitted to complete the rotation and be placed in TW status once the elective rotation is completed.

121

9.  Students failing any one (1) subject clerkship examination three (3) times will be required to repeat the clerkship.

10. Students failing any one (1) subject clerkship examination four (4) times will be recommended for dismissal.

*Students remediating SCEs for clerkships that started before January 1, 2015 will be subject to a grading scale with a minimum passing score of 55 for each SCE.  Students remediating SCEs for clerkships that began between January 1, 2015 and August 31, 2015 will be subject to a grading scale with a minimum passing score of 58 for each SCE. Students are required to repeat the SCE until they pass and will receive a maximum grade of C for the exam portion of the grade.

RUSM 000446

# Exhibit 15

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

OLUWAMUYIWA AWODIYA,                                    CASE NO. 0:18-cv-60482-KMM-AOV

      Plaintiff,

v.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

      Defendant.

_____/

## DEFENDANT'S STATEMENT OF MATERIAL FACTS IN OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 of the Local Rules of the United States District Court for the Southern District of Florida, defendant Ross University School of Medicine, School of Veterinary Medicine Limited ("RUSM"), by counsel, hereby submits its response to the Statement of Material Facts [ECF No. 101] filed by plaintiff Oluwamuyiwa Awodiya ("Plaintiff") in support of his Second Motion for Partial Summary Judgment [ECF No. 102] (the "Motion").

## RUSM'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

1.      Undisputed.

2.      Undisputed.

3.      This paragraph of Plaintiff's Statement of Material Facts calls for a legal conclusion and is not a statement of fact.  Whether or not RUSM qualifies as a "place of public accommodation" under 42 U.S.C. § 12181(7)(J) is a legal question.

4.      Undisputed.

5.      Undisputed.

6.      Undisputed.

7.      Undisputed.

8.      Undisputed.

9.      Undisputed.

10.     Undisputed that in SJ-01 and SJ-02 Plaintiff refers to notes from Dr. Earl John D. Mauricio dated January 5, 2016 and from McMillan Cuffy dated January 18, 2016 containing the statements that are quoted therein.

11.     Undisputed that in SJ-03 Plaintiff self-reported these symptoms in a session with Dr. Mauricio dated December 30, 2015.

12.     Undisputed that in SJ-04 Plaintiff self-reported these symptoms on April 18, 2017 after having failed his National Board of Medical Examiners Comprehensive Basic Sciences Exam (the "COMP Exam") for the fifth and final time.  This allegation is not material to the determination of this motion because it occurred after the relevant tests.  It is also not material because it pertains to an April 2017 diagnosis of Obsessive Compulsive Disorder ("OCD"), a condition that neither Plaintiff nor RUSM were aware of at the time of Plaintiffs' COMP Exams. *See* excerpts from the Deposition Transcript of Oluwamuyiwa Awodiya, attached to the Declaration of Ryan Roman as **Exhibit 1**, at 20:25-21:5; s*ee also* Plaintiff's Amended Response to Defendant's Interrogatories, attached to the Declaration of Ryan Roman as **Exhibit 2**, at ¶ 4.

13.     Undisputed that in SJ-05 and SJ-06 Plaintiff self-reported these symptoms on March 11, 2016.

14.     Undisputed that RUSM admitted that paragraph of the Answer, which pertains to the Fifth Cause of Action for Violation of Florida Administrative Code 6E-2.004(5)(c)(4), which is not at issue in Plaintiff's Motion.  Moreover, this paragraph calls for a legal conclusion and is not a statement of material fact.  Finally, in the same Answer [ECF No. 58], RUSM denied that Plaintiff was an otherwise qualified individual in paragraph 48 of its Answer (denying paragraph 47 of the Third Amended Complaint, which pertains to the Section 504, Rehabilitation Act claim) and paragraph 68 of its Answer (denying paragraph 67 of the Third Amended Complaint).  With regards to the Title III ADA claim, Plaintiff alleges in paragraph 55 of the Third Amended Complaint that he is a "qualified individual" and in response, RUSM neither admitted nor denied the allegations because it called for a legal conclusion.  *See* Answer [ECF No. 58] at ¶ 56.

15.     Undisputed that Plaintiff signed a Release of Information Consent form on December 9, 2015.

16.     This fact is disputed.  First, Plaintiff mischaracterizes the purpose of the Release of Information Consent form.  The purpose of the Release of Information Consent form is to give RUSM's Counseling Center permission to send a student's records to the RUSM Administration.  *See*

2

excerpts from the Deposition Transcript of Dr. Davendranand Sharma, attached to the Declaration of Ryan Roman as **Exhibit 3,** at 57:6-16.  It does not serve as a means to request an accommodation.  *Id.*

Second, Plaintiff never submitted a written request for extended testing time to the RUSM Accommodations Office.  *See* excerpts from the Deposition Transcript of McMillian Cuffy, attached to the Declaration of Ryan Roman as **Exhibit 4**, at 104:1-11; *see also* excerpts from the Deposition Transcript of Matthew Stewart-Fulton, attached to the Declaration of Ryan Roman as **Exhibit 5**, at 39:1-7.  At the time Plaintiff executed the Release of Information Consent form, it was in connection to suicidal thoughts and an effort to return to the United States early.  **Exhibit 3**, at 31:22-32:3, 32:10-15; *see also* Release of Information Consent form, [ECF No. 102, Exhibit SJ-07].  Plaintiff signed the Release of Information Consent form to give RUSM's Counseling Center permission to speak with an administrator about helping Plaintiff return to the United States.  *See* **Exhibit 4** at 36:5-17.

Plaintiff's execution of the Release of Information Consent form had no connection to a request for additional testing time.  In fact, Plaintiff executed the Release of Information Consent form before there were any assessments performed or any diagnoses made of ADHD or any other mental impairment.  *See* **Exhibit 3** at 34:9-14, 77:11-13.

17.     This fact is disputed.  Neither Dr. Sharma nor Mr. Cuffy recall Plaintiff requesting extended testing time.  **Exhibit 3** at 32:2-15, 35:1-14; **Exhibit 4** at 104:9-14.  In fact, the reason for the earlier flight home was because Plaintiff had expressed idea of self-harm having learned that he failed the semester.  **Exhibit 3** at 46:14-19. Around the same time, Plaintiff executed a Safety Plan due to his self-harm ideations.  A copy of the Safety Plan is attached to the Declaration of Ryan Roman as **Exhibit 6**.

18.     This fact is disputed. The testimony is quoted out of context and is not testimony about Plaintiff or any request made by him for an accommodation.  During his deposition, Dr. Sharma testified that students applying for accommodations also need to submit a written application accompanied with adequate documentation to support a request for accommodation.  **Exhibit 3** at 88:15-19.     Dr. Sharma further stated that Plaintiff failed to apply for any accommodation.  **Exhibit 3** at 37:9-22; 80:7-19.

19.     This fact is disputed.  The testimony is quoted out of context.  Dr. Sharma made clear that although there was evidence of  concentration problems, further testing was necessary to make a

diagnosis. **Exhibit 3** at 12:22-13:3. Plaintiff was not diagnosed with Attention-Deficit/Hyperactivity Disorder ("ADHD") until January 2016. [ECF No. 59, at ¶ 37]. *See also* **Exhibit 2** at ¶ 4.

20.     This fact is disputed. The testimony is quoted out of context. Dr. Sharma testified that the Release of Information Consent form was signed because of Plaintiff's suicidal thoughts and to help facilitate Plaintiff's return to the United States. **Exhibit 3** at 33:9-21. Dr. Sharma also testified that the Release of Information Consent form was not done in connection with a request for extended testing time. *Id.*

21.     This fact is disputed. The testimony is quoted out of context. Dr. Sharma testified that Plaintiff never applied for an accommodation. **Exhibit 3** at 75:4-6.

22.     Undisputed. However, Dr. Sharma testified that Plaintiff never applied for an accommodation. **Exhibit 3** at 75:4-6. Dr. Sharma also testified that there are reasons that students choose not to apply for accommodations, including the stigma that some students believe may be associated with receiving an accommodation. **Exhibit 3** at 81:4-82:11.

23.     Undisputed.

24.     This fact is disputed. Dr. Bryan Hayse does not recall discussing accommodations with Plaintiff in December 2015. *See* excerpts from the Deposition Transcript of Bryan Hayse, attached to the Declaration of Ryan Roman as **Exhibit 7**, at 15:7-22.

25.     Undisputed that in SJ-11 Plaintiff self-reported these symptoms. However, SJ-11 is quoted out of context. Prior counseling notes suggest that Plaintiff went to speak with Dr. Hayse about changing his failing grade for the semester. *See* [ECF No. 102, Exhibit SJ-10]. There is a factual dispute as to the discussion between Dr. Hayse and Plaintiff as Dr. Hayse does not recall the specifics of their conversation.   **Exhibit 7**, at 7:25-8:20.

26.     Undisputed that in SJ-13 Plaintiff self-reported these symptoms.   However, Plaintiff never made a proper request for extended testing time for any of his exams, including the COMP Exam. **Exhibit 5** at 39:1-7.

27.     Undisputed that in SJ-06 Plaintiff self-reported these symptoms.

28.     Undisputed.

29.     The content of SJ-15 is undisputed.   However, SJ-15 is quoted out of context. Although Plaintiff's independent psychiatrist and psychotherapist made these statements, these observations were made after Plaintiff failed the COMP Exam the fifth and final time. *See* SJ-15. Thus, this letter is not material to this dispute.

4

30.     The content of SJ-17 is undisputed.  However, SJ-17 is quoted out of context.  SJ-17 was drafted in June 2017, several months after Plaintiff failed the CBSE the fifth and final time.  Thus, this letter is not material to this dispute.

31.     Undisputed.

32.     Undisputed.

33.     Undisputed.

34.     This paragraph of Plaintiff's Statement of Material Facts calls for a legal conclusion and is not a statement of fact.  Whether or not the Title III of the ADA or Section 504 of the Rehabilitation Act apply in Dominica is a legal question.

35.     This fact is disputed. This misstates the witness's testimony.  RUSM aims to comply with the ADA and Section 504 of the Rehabilitation Act.  **Exhibit 7** at 10:2-7. *See also* **Exhibit 5** at 31:20-32:10.

36.     This paragraph of Plaintiff's Statement of Material Facts calls for a legal conclusion and is not a statement of fact.  Whether or not the Title III of the ADA or Section 504 of the Rehabilitation Act apply in Dominica is a legal question.

37.     Undisputed.

38.     This fact is disputed.  Prior to the litigation, Plaintiff did not know anything about the Americans with Disabilities Act.  **Exhibit 1** at 148:13-17.  Thus, it could not have been "one of the most important factors in Plaintiff's decision to leave the U.S. to become a student at RUSM in Dominica."  Prior to applying to RUSM, Plaintiff was not disabled and in fact passed many tests throughout his academic career without any type of accommodation.  **Exhibit 1** at 149:9-14.

39.     This fact is disputed.  Prior to the litigation, Plaintiff did not know anything about the Americans with Disabilities Act.  **Exhibit 1** at 148:13-17.  This paragraph of Plaintiff's Statement of Material Facts calls for a legal conclusion and is not a statement of fact.  Whether or not the Title III of the ADA or Section 504 of the Rehabilitation Act apply in Dominica is a legal question.

**ADDITIONAL MATERIAL FACTS ESTABLISHING THAT
PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT**

**PLAINTIFF'S EMOTIONAL DISTRESS CONTRIBUTES TO HIS FAILURE OF HIS FIFTH SEMESTER AT RUSM**

40.     Plaintiff attended RUSM from May 2014 to June 2017.  A true and correct copy of Plaintiff's transcript from Ross University School of Medicine is attached to the Declaration of Ryan Roman as **Exhibit 8.**  Prior to attending RUSM, Plaintiff completed college in three years at

5

Morgan State University. **Exhibit 1**, at 39:8-10. Plaintiff graduated from Morgan State University with a grade point average of 3.45. *Id.* at 242:8-10. Plaintiff successfully sat for the Medical College Admission Test ("MCAT") and applied to medical school.

41.    Plaintiff passed his first four semesters of medical school without accommodations. Exhibit 8. Plaintiff's fifth semester at RUSM commenced in September 2015. **Exhibit 8**.

42.    On October 28, 2015, Plaintiff started attending the Counseling Center for "Relationship Distress with Spouse or Intimate Partner." A true and correct copy of RUSM's Counseling Note dated October 28, 2015, is attached to the Declaration of Ryan Roman as **Exhibit 9**.

43.    Plaintiff reported having problems with his girlfriend with whom he had been in a relationship with since his fourth semester at RUSM. *Id.* According to the counseling notes, Plaintiff's girlfriend cheated on him twice. *Id.* After finding out about his girlfriend cheating on him, Plaintiff went to the Health Clinic due to distress from hypertension. *Id.* Plaintiff admitted that his study patterns were disrupted by his relationship. *Id.*

44.    On November 5, 2015, Plaintiff visited the Counseling Center again for "Relationship Distress with Spouse or Intimate Partner." A true and correct copy of RUSM's Counseling Note dated November 5, 2015 is attached to the Declaration of Ryan Roman as **Exhibit 10**.

45.    Plaintiff failed his fifth semester at RUSM and learned of this fact on or around December 8, 2015. A true and correct copy of RUSM's Counseling Note dated December 8, 2015 is attached to the Declaration of Ryan Roman as **Exhibit 11**. RUSM called Plaintiff into the Counseling Center where Plaintiff met with Mr. Cuffy and underwent a suicide assessment. *Id.* Plaintiff admitted to having self-harm ideations and admitted to having relationship issues. *Id.*

46.    Plaintiff admitted to having similar feelings of self-harm after learning that his girlfriend cheated on him around the same time he took exams for the semester. *Id.*

47.    As a result of his self-harm ideations, Plaintiff signed a Safety Plan on December 8, 2015. **Exhibit 6**. *See also* **Exhibit 1** at 97:3-97:14. By signing the Safety Plan, Plaintiff agreed not to attempt to cause harm to himself and agreed to participate in mental health treatment. **Exhibit 6**.

48.    Plaintiff visited the Counseling Center again on December 9, 2015 and was assessed by Dr. Sharma. [ECF No. 102, Exhibit SJ-10]. During his assessment of Plaintiff, Dr. Sharma reached out to Plaintiff's mother and left her a message. *Id.*

49.    Dr. Sharma also called RUSM employee Ryan Didier to see if he could get Plaintiff off the island earlier. *Id.*

50.     Plaintiff executed the Release of Information Consent form on December 9, 2015 to allow his counselors to communicate with RUSM administrators about getting Plaintiff off the island earlier.  *See* [ECF No. 102, Exhibit SJ-07]; **Exhibit 3** at 32:4-15.

51.     Dr. Sharma did not diagnose Plaintiff on December 9, 2015.  **Exhibit 3** at 34:9-14.

52.     Dr. Sharma testified the Release of Information Consent form signed by Plaintiff "was not for releasing information about accommodation, because there was no request for accommodations from me in December 2015." **Exhibit 3** at 34:2-8.

53.     Plaintiff visited the Counseling Center on December 10, 2015, still presenting with self-harm ideations.  [ECF No. 102, Exhibit SJ-11].  Plaintiff visited with Mr. Cuffy after meeting with Dr. Hayse.  *Id.*

54.     Dr. Hayse recalls meeting with Plaintiff in December 2015 but could not recall what he and Plaintiff spoke about during this meeting.  **Exhibit 7** at 7:25-8:20.  Dr. Hayse does not recall Plaintiff telling him that Plaintiff was struggling with some type of attention problem.  **Exhibit 7** at 15:20-22.

55.     During his meeting with the Counseling Center on December 10, 2015, Plaintiff did not request an accommodation.   **Exhibit 4** at 87:13-15.  Nor did Plaintiff make any mention of a request for an extended testing time.  **Exhibit 4** at 87:16-18.

56.     Plaintiff visited the Counseling Center again on December 11, 2015 but failed to make a request for accommodation.  A true and correct copy of RUSM's Counseling Note dated December 11, 2015, is attached to the Declaration of Ryan Roman as **Exhibit 12**.  *See also* **Exhibit 4** at 88:24-89:4.  Plaintiff did not make mention of wanting extended testing time.  **Exhibit 4** at 89:2-4.

57.     Mr. Cuffy assessed Plaintiff again on December 13, 2015. [ECF No. 102, Exhibit SJ-12].  According to Mr. Cuffy, Plaintiff was stable, doing well, and did not have any thoughts of harming himself.  *Id.*

58.     During this visit on December 13, 2015, Plaintiff never made a request for an accommodation and did not ask Dr. Cuffy for extended testing time.  **Exhibit 4** at 90:10-15.

59.     Dr. Sharma assessed Plaintiff on December 14, 2015 and noted that although Plaintiff was not suicidal, Plaintiff was depressed.  A true and correct copy of RUSM's Counseling Note dated December 14, 2015 is attached to the Declaration of Ryan Roman as **Exhibit 13**.  Dr. Sharma screened Plaintiff for ADHD but not because Plaintiff informed him that he needed extended testing time for his exams.  **Exhibit 3** at 8:7-23.

7

**PLAINTIFF'S RETURN TO DOMINICA**

60.     Plaintiff returned home to the United States for winter break and was assessed by his primary physician.  **Exhibit 1** at 105:1-3.  Upon returning to RUSM, Plaintiff provided one document to the Counseling Center, a Conners assessment performed in the United States.  **Exhibit 4** at 39:9-14.  This was the first time Mr. Cuffy learned of Plaintiff's ADHD.  *Id.* at 13:24-14:5.

61.     Plaintiff underwent further testing with the Counseling Center.  [ECF No. 102, Exhibit SJ-02].  The Counseling Center administered a Test on Variability Assessment (TOVA) and a CAARS assessment on January 18, 2016. *Id.*  Plaintiff was diagnosed with ADHD on January 18, 2016. *Id.*

62.     Every student diagnosed with ADHD is guided to the Student Handbook and is advised of the process for applying for academic accommodations.  **Exhibit 3** at 29:22-25.

63.     Despite being diagnosed with ADHD as of January 18, 2016, Plaintiff never made a request for an accommodation or for extended testing time.  **Exhibit 4** at 92:13-18.

**PLAINTIFF NEVER APPLIES FOR AN ACCOMMODATION**

64.     RUSM routinely issues a Student Handbook and an Academic Catalog to its students with content applicable to all of its students.  **Exhibit 1** at 80:15-81:13. The Student Handbook specifically states that: "Candidates must possess the emotional health required for the full utilization of their intellectual abilities, for the exercise of good judgment, for the prompt completion of all responsibilities attendant to the diagnosis and care of patients, for the development of effective relationships with patients and for effective functioning as a member of the health care team.  Candidates must be able to tolerate physically taxing workloads and function effectively under stress.  They must be able to adapt to changing environments, display flexibility and learn to function in the face of uncertainties inherent in the clinical problems of patients."   A copy of the Student Handbook is attached to the Declaration of Ryan Roman as **Exhibit 14** at 8.

65.     Plaintiff knew about the Student Handbook and its content, including information about requests for accommodations.  **Exhibit 1** at 80:15-81:13.

66.     The Student Handbook specifically advised students with disabilities how to apply for accommodations.  *Id*. at 46.  In January 2016, the Handbook specifically stated that "Foundations of Medicine Requests for accommodations during the foundational science portion of the curriculum should be submitted in writing to the Accommodations Coordinator for Foundations of Medicine." *Id.*

47313964;7

67.     The Student Handbook further provides: "To qualify for accommodation, a student must identify him/herself to the Accommodation Coordinator for Foundations of Medicine or the Director of Office of Consultation and Support Services for IMF/Clinical Sciences." *Id.* Students are also required to declare the disability or suspected disability in writing and request accommodation. *Id.; see also* **Exhibit 5** at 9:11-16.

68.     It is the responsibility of students, including Plaintiff, "to obtain a thorough written evaluation from an appropriate professional, documenting the presence, extent, and ramifications of the disability." **Exhibit 14** at 46. "The documentation should explain what specific types of accommodation the evaluator believes might be most helpful in offsetting the effects of the disability to an acceptable extent (in the medical school environment, if possible.)." *Id.*

69.     Matthew Stewart-Fulton is the Accommodations Coordinator for Foundations of Medicine, and handles the accommodation process. **Exhibit 5** at 8:5-12. According to Matthew Stewart-Fulton, "to request accommodations, a student has to submit an application for academic accommodations." *Id.* at 12:11-15. A verbal request for an accommodation would start the application process. *Id.* at 14:2-16. A student requesting an accommodation would then need to apply in writing by completing an application packet. *Id.* at 12:8-17.

70.     An application package includes demographic information about the student, a personal statement from the student and any supporting documentation from a healthcare provider. *Id.* at 13:9-21. The application is available online or through the student portal. **Exhibit 5** at 51:25-52:10.

71.     Plaintiff never submitted a packet of information necessary to apply for an accommodation. *Id.* at 39:1-7. *See also* **Exhibit 3** at 75:4-6. *See also* **Exhibit 1,** at 122:11-20.

72.     RUSM, through its counselors, would have supported Plaintiff's request for accommodations if he had made a request. *See* **Exhibit 3**, at 73:6-74:5. *See also* **Exhibit 4**, at 82:22-83:3.

**PLAINTIFF'S FIVE ATTEMPTS AT THE CBSE**

73.     Plaintiff attempted the COMP Exam five times.  True and correct copies of Plaintiff's Testing Results are attached to the Declaration of Ryan Roman as **Exhibit 15**. Plaintiff's first attempt on the COMP Exam occurred on April 22, 2016. *Id.* Plaintiff failed with a score of 58. *Id.*

9

74.     Plaintiff's second attempt occurred on July 2, 2016 where he failed with a score of 64.  *Id.*

75.     Plaintiff failed his third attempt with a score of 67 on August 26, 2016.  *Id.*

76.     On October 22, 2016, Plaintiff took the COMP Exam for a fourth time and failed again with a score of 61.  *Id.*

77.     RUSM dismissed Plaintiff after he failed the COMP Exam for the fourth time in October 2016, with a score of 61. **Exhibit 1**, at 199:15-19; 200:4-6.

78.     Following his dismissal, Plaintiff appealed the decision and was readmitted to RUSM in December 2016.  **Exhibit 1**, at 206:14-17.  RUSM permitted Plaintiff to attempt the COMP Exam for a fifth time, upon completion of a six-week review course.  **Exhibit 1**, at 206:18-207:7.

79.     After completion of the review course, Plaintiff took and failed his COMP Exam for the fifth time on March 30, 2017, with a score of 60.  Exhibit 20.  *See* also **Exhibit 1**, at 207:11-13.

80.     Because of his fifth failure, RUSM dismissed Plaintiff.  **Exhibit 1**, at 207: 11-13.

**RUSM UPHOLDS PLAINTIFF'S DISMISSAL**

81.     Plaintiff again appealed the dismissal.  **Exhibit 1**, at 207:14-22.  The Student Promotions Committee upheld the dismissal.  **Exhibit 1**, at 211:20-112:5.

82.     In response, Plaintiff submitted a personal statement, where he makes no mention of needing additional testing time or that his alleged disability affected his test-taking abilities. [ECF No. 102, Exhibit SJ-17].  *See* also **Exhibit 1**, at 209:18-20.  Plaintiff discloses for the first time that he has recently been diagnosed with OCD.  Exhibit 1, at 214:3-8.  *See also* **Exhibit 2**, at ¶ 4.  Plaintiff does not mention ADHD in his appeal letter to Dean Owen.  **Exhibit 1**, at 214:9-15.

83.     The decision of the Student Promotions Committee was upheld on appeal.  [ECF No. 62 at ¶ 64].

**PLAINTIFF ATTEMPTS THE STEP 1 EXAM WITHOUT ACCOMMODATIONS**

84.     Following Plaintiff's dismissal from RUSM, Plaintiff took and passed the USMLE Step 1 licensing exam by enrolling with another medical school, Windsor University.  [ECF No. 62, at ¶ 64.].  *See also* **Exhibit 1**, at 137:3-10.

85.     Plaintiff passed the Step 1 Exam without requesting any extended testing time. **Exhibit 1**, at 137:3-16.

Dated: December 21, 2018

Respectfully submitted,

/s/Ryan Roman
MICHAEL C. MARSH
Florida Bar Number:  0072796
Email:  michael.marsh@akerman.com
Secondary:  sharon.luesang@akerman.com
RYAN A. ROMAN
Florida Bar Number:  0025509
Email:  ryan.roman@akerman.com
Secondary:  dorothy.matheis@akerman.com
DONNIE M. KING
Florida Bar Number: 101386
Email: donnie.king@akerman.com
Secondary: simone.tobie@akerman.com
OCTAVIA M. GREEN
Florida Bar Number: 119179
Email: octavia.green@akerman.com
Secondary: simone.tobie@akerman.com
**AKERMAN LLP**
98 SE 7th Street, Suite 1100
Miami, FL 33131
Phone:  (305) 374-5600
Fax:  (305) 374-5095

*Attorneys for Defendant Ross University School of
Medicine, School of Veterinary Medicine Limited*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 21, 2018 a true and correct copy of the foregoing document was served via CM/ECF on:

Oluwamuyiwa Awodiya
15005 Dahlia Drive
Bowie, Maryland 20721
Telephone: (240) 602-1836
E-mail: drmuyiwa.a@gmail.com

*/s/Ryan Roman*
Ryan Roman

12

47313964;7