

FILED BY _____ D.C.

JAN 0 3 2019

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

OLUWAMUYIWA AWODIYA,

*Plaintiff,*

-v-

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF
VETERINARY MEDICINE LIMITED

*Defendant.*

Case No.   0:18-cv-60482-KMM

Hon. Chief Judge: K. Michael Moore
Magistrate Judge: Alicia O. Valle

## REPLY DECLARATION OF OLUWAMUYIWA AWODIYA IN SUPPORT OF PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

1.      Pursuant to 28 U.S.C. § 1746, I, Oluwamuyiwa Awodiya, as plaintiff, in proper person, of the above-captioned action, make this reply declaration in support of Plaintiff's Second Motion for Partial Summary Judgment [ECF No. 102]. I am over 18 years of age and I am competent to testify about the matters discussed herein.

2.      A true and correct copy of William Owen's deposition transcript is attached as Exhibit SJ-24.

3.      A true and correct copy of Oluwamuyiwa Awodiya's deposition transcript is attached as Exhibit SJ-25.

4.      A true and correct copy of Oluwamuyiwa Awodiya's MCAT scores are attached as Exhibit SJ-26.

5.      A true and correct copy of Oluwamuyiwa Awodiya's cumulative grades and the minimum passing score for each semester he had at RUSM is attached as Exhibit SJ-27.

1

6.    A true and correct copy of Jennifer Swaim's counseling note dated December 8, 2015, that was produced by RUSM is attached as Exhibit SJ-28.

7.    A true and correct copy of Jeanie Robertson's email on December 9, 2015, that was produced by RUSM is attached as Exhibit SJ-29.

8.    A true and correct copy of a supplement excerpt of Defendant's Response to Plaintiff's First Set of Requests for Admissions, that includes Admission No. 18, is attached as Exhibit SJ-30.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate.

EXECUTED ON this 29th day of December, 2018:

Respectfully submitted,

By: Oluwamuyiwa Awodiya, *pro se* litigant
15005 Dahlia Dr.
Bowie, MD 20721
(240) 602-1836
Plaintiff, in Proper Person

2

# Exhibit SJ-24

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 0:18-cv-60482-KMM


OLUWAMUYIWA AWODIYA,

                Plaintiff,

vs.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

                Defendant.
_____/


                        350 E. Las Olas Blvd.
                        Fort Lauderdale, Florida
                        December 4, 2018
                        10:56 a.m.



                  THE DEPOSITION OF


              WILLIAM OWEN



        Taken on Behalf of the Plaintiff

    Pursuant to Notice of Taking Deposition

          Commencing at 10:56 a.m.

Alpha & Omega Reporting Services, Inc.
(954) 523-6422

fd61cff3-23a5-4555-a5dd-db0ed4458

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.     William Owen

---

## Page 2

```
1    APPEARANCES:
2
     On behalf of Plaintiff:
3
     15005 Dahlia Drive
4    Bowie, MD 20721
     (240)602-1836
5    BY: OLUWAMUYIWA AWODIYA, PRO SE, ESQ.
6
     On behalf of Defendant:
7
     AKERMAN, SENTERFITT
8    1 SE 3rd Avenue, 25th Floor
     Miami, FL 33131-1714
9    (305)374-5600
     ryan.roman@akerman.com
10   BY: RYAN ROMAN, ESQ.
11   ALSO PRESENT:
12   VALARIE BOMAR, ESQ.
     ADTALEM GLOBAL EDUCATION
13
14   REPORTED BY:
15   KELLY A. ESPOSITO
     ALPHA & OMEGA REPORTING SERVICES, INC.
16   1776 E. Sunrise Boulevard, First Floor
     Ft. Lauderdale, FL 33304
17   954.523.6422
18         * * * * *
19         STIPULATIONS
20      It is stipulated and agreed by and between
21   counsel for the respective parties that:
22      Reading and subscription of the deposition
23   by the witness are not waived.
24
25
```

## Page 3

```
1              I N D E X
2
     Examination              Page
3
4    Direct      By Mr. Awodiya:      4
5    Cross       By Mr. Roman:       31
6    Redirect    By Mr. Awodiya:     35
7    Recross     By Mr. Roman:       43
8    Redirect    By Mr. Awodiya:     44
9         PLAINTIFF EXHIBITS
10   No.                      Page
11   1       Ross University Documents  15
12        DEFENSE EXHIBITS
13   No.                      Page
14   2       Reinstatement Letter    43
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1    Thereupon:
2              WILLIAM OWEN
3       a witness named in the notice heretofore filed,
4    being of lawful age and having been first duly
5    sworn, testified on his oath as follows:
6       THE WITNESS:  I do.
7           DIRECT EXAMINATION
8    BY MR. AWODIYA:
9       Q.   Please state your name for the full
10   record -- I mean, please state your full name for
11   the record?
12      A.   William Franklin Owen, Junior.
13      Q.   How would you like to be addressed?  Dean
14   Owen?  Dr. Owen?
15      A.   Anything but Pookie.
16           Dr. Owen will suffice.
17      Q.   Dr. Owen.  Okay.
18           MR. ROMAN:  And, Muyiwa, just for the
19   record, like I mentioned earlier, I just wanted
20   to make an objection for the record on the
21   videotaping of the deposition.
22           MR. AWODIYA:  Uh-huh.
23           MR. ROMAN:  Since it's being videotaped by
24   you, instead of by a videographer, we would
25   just object on the basis that it's not being
```

## Page 5

```
1    videotaped by somebody that's disinterested in
2    the outcome of the case and that it will not be
3    synced up with the transcript.  And so, we'll
4    just make objections on that basis, but you may
5    proceed.
6           MR. AWODIYA:  Okay.
7    BY MR. AWODIYA:
8       Q.   Dr. Owen, my name is Oluwamuyiwa Awodiya,
9    and I'm the plaintiff in this case against Ross
10   University School of Medicine.  During this
11   deposition, I will, in most part, refer to myself as
12   plaintiff.
13           For the record, do you understand that if
14   I say "plaintiff" that I am referring to myself?
15      A.   I do.
16      Q.   Additionally, let me tell you some ground
17   rules for this deposition.  And if you have any
18   questions, you can ask me.
19      A.   Yes.
20      Q.   First, you are under oath and have sworn
21   to tell the truth.  The effect of that truth is the
22   same as if you were testifying in court.  If I ask
23   you a question that you don't understand, tell me
24   you don't understand it, and I'll rephrase it as
25   often as necessary so you're comfortable that you
```

Alpha & Omega Reporting Services, Inc.
(954) 523-6422

fd61cff3-23a5-4555-a5dd-db0ed4458

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.      William Owen

Page 6

1  understand the question you're answering.
2       A.  Yes.
3       Q.  It's also very important that you answer
4  my questions through spoken word, not through facial
5  expression or gestures.  Please refrain from
6  answering questions with sounds like "uh-huh" or
7  "hmm-hmm" or words that may not get transcribed
8  accurately.  You must actually say a word.  If you
9  mean yes, say yes, not uh-huh.
10      A.  Noted.  And yes.
11      Q.  Also, please allow any questions and any
12  objections to be fully stated before you speak.  The
13  court reporter cannot take down more than one person
14  speaking at the same time; otherwise, the record
15  will be jumbled and the questions and answers will
16  be disjointed.
17          Ross lawyers may make objections to
18  questions that I ask you.  They are objections for
19  the judge to consider later.  You are still required
20  to answer the question unless you are instructed not
21  to by their lawyers.
22          Everything that is said is being taken
23  down by the court reporter verbatim.  You will have
24  an opportunity to read the deposition transcript and
25  make corrections you believe are necessary.  If you

Page 7

1  make changes in your testimony that are inconsistent
2  with the answers given during the deposition, I will
3  be entitled to comment on those discrepancies at
4  trial to question your truthfulness.
5          Do not guess when providing responses.
6  Instead, please provide your best estimate based on
7  your recollection.  If you need to take a break at
8  any time, please let me know.  All I ask is we not
9  take a break while there's a question pending.
10          Are you here today under the influence of
11  any medication or suffering from any physical,
12  mental, or emotional condition that would affect
13  your ability to hear my questions or to give
14  truthful answers?
15      A.  No, I am not.
16          Excuse me.
17      Q.  When did you start working for Ross
18  University?
19      A.  As I recall, April of 2017.
20      Q.  Okay.  And which campus is your office
21  located?
22      A.  Miramar, Florida, United States.
23      Q.  What is your position at Ross University?
24      A.  I am the dean and chancellor of Ross
25  University School of Medicine.

Page 8

1       Q.  In 2017, when students appealed their
2  dismissal, what factors do you take into
3  consideration when you make a decision on that
4  appeal?
5       A.  It's important to recognize that the
6  primary appeal does not go to me.  It goes to a
7  committee that reviews the academic record,
8  interviews the student, and then, convenes a meeting
9  amongst themselves.  They will render a decision
10  either to readmit the student or to sustain the
11  appeal.
12          Those are referred to me in writing.  If
13  there is a sustaining of the dismissal, I will sign
14  off on it, looking at the summary from the
15  committee.  The student thereafter has the
16  opportunity to appeal back.  Some will come to me
17  directly; others will go to the committee.
18          If it goes to the committee, the committee
19  will then send it back to me.  I look for
20  confirmation of the components of the decision by
21  the committee once again; however, the student is
22  also clearly instructed that they are to introduce
23  at that time any mitigating factors that accounted
24  for their academic or behavioral performance that
25  were not made known to the committee.  Occasionally

Page 9

1  that occurs.  More often than not, there is not new
2  information that is introduced.
3          The other guidance that is given to the
4  student is that they are to identify if there have
5  been any procedural variances, in terms of how their
6  case was handled.  In that case, delineate those for
7  me as well.  I take a look at those as well.
8          More often than not, I will send the case
9  back to the committee, in that context, pointing out
10  why I think it merits being reviewed again.  The
11  committee will then send me another opinion.  I will
12  review it with the Dean of Students.  We'll come to
13  a decision as a group, and then, ultimately I will
14  make the final decision myself, which I own.
15      Q.  Do you, at any point, look at the
16  student's records yourself?
17      A.  I do.
18      Q.  So how -- how do you handle appeals when a
19  student informs you that a disability adversely
20  affected their performance?
21      A.  I will confirm the disability by looking
22  for written documentation of the disability, in
23  particular looking for the diagnosis, looking for
24  who made the diagnosis, looking for when the
25  diagnosis was made, and lastly, looking for what

3  (Pages 6 to 9)

fd61cff3-23a5-4555-a5dd-db0ed445

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.     William Owen

Page 10

1    sort of intervention was made around that diagnosis,
2    whether it be pharmacological, behavioral therapy,
3    or both.
4          I will also have a conversation with
5    the -- he is titled the Associate Dean of Students
6    to get his opinion about it as well.  Occasionally,
7    he will be instructed to acquire source materials.
8    An example would be if someone has had external
9    testing.  Give me those records so that I might look
10   at them myself.
11         I will, on occasion, either directly or
12   through the Dean of Students reach -- have them
13   reach back out to the therapist and/or psychiatrist
14   with the query being, do you think this will
15   interfere with the student's academic performance,
16   what is the prognosis of the student, and lastly,
17   how long do you think therapy will be needed.
18        Q.  Do you always do that?
19        A.  Sometimes.  It's dependent upon the case.
20        Q.  Why sometimes?
21        A.  It's dependent upon the case, the
22   circumstances of the case.
23        Q.  If a student tells you that they have a
24   disability that was affecting their academic
25   performance, you sometimes investigate it?

Page 11

1        A.  Sometimes I investigate it with a
2    follow-up query to the psychiatrist.  If I have a
3    statement from the psychiatrist and/or therapist
4    that says, we have investigated this, here is our
5    findings, here is our prognosis, I have no need to
6    go back and push back to the psychiatrist.
7        Q.  So once you have that from the
8    psychiatrist, what happens next?
9        A.  Depends upon the case.
10       Q.  But it plays a factor in whether you will
11   allow the student back into Ross or not?
12       A.  Sometimes it does.  It depends upon the
13   case.
14       Q.  Give me an example where it does entitle
15   the student to be reenrolled into Ross?
16       A.  I would prefer not to since that is
17   disclosing medical information about a student who
18   is a patient.  I can give you a hypothetical.
19       Q.  Don't give me a hypothetical.  Give me the
20   requirements.
21         What information do you require from a
22   student that will entitle that student to be
23   readmitted back into Ross?
24       A.  It depends upon the case.
25       Q.  So you have no requirements?

Page 12

1        A.  I have personal requirements.
2        Q.  Can you tell me those personal
3    requirements?
4        A.  As I've stated to you earlier, it depends
5    upon the diagnosis.  It depends upon the
6    intervention.  It depends upon the prognosis, as
7    suggested by the therapist or psychiatrist.  It also
8    depends upon the committee and what the committee
9    stated in their engagement with the student, and in
10   some cases the Dean of Students will engage with the
11   student directly, and, likewise, his report back to
12   me.  So it is a multiplicity of factors.  It is not
13   formulaic nor should it be.
14       Q.  So you don't investigate every student
15   that tells you that their disability was affecting
16   their academic performance?
17       A.  No.
18         MR. ROMAN:  I'll just also object, because
19   I think that misstates the prior testimony, but
20   you're permitted to answer.
21         THE WITNESS:  Some students are dishonest.
22   BY MR. AWODIYA:
23       Q.  How could you make that statement about
24   any student without investigating every student?
25       A.  Because a student has never been

Page 13

1    evaluated.
2        Q.  You wouldn't know that if you didn't
3    investigate.
4        A.  I would ask for documentation.
5        Q.  So you always ask the student for
6    documentation after they tell you that their
7    disability is affecting their academic performance?
8        A.  Yes, we do.  We ask for verification --
9    external verification by someone who is formally
10   trained in the area.
11         MS. BOMAR:  Excuse me.
12         THE WITNESS:  May I be socially gauche,
13   because you're the furthest in?  Could you grab
14   me a cup of coffee?
15         MS. BOMAR:  I will.  Cream as well?
16         THE WITNESS:  Yes.  No sugar.
17   BY MR. AWODIYA:
18       Q.  So if procedure was followed, but you were
19   introduced new information, and the student informed
20   you about their disability, and it was severe enough
21   to affect their academic performance, would you
22   consider that as a factor?
23       A.  Can you repeat that in a more ordered
24   sequence?  I think there were three ifs there, and I
25   could not follow them all.

4  (Pages 10 to 13)

fd61cff3-23a5-4555-a5dd-db0ed445

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.     William Owen

Page 14

1    Q. Okay. Earlier you said that students are
2 instructed to tell you that a procedure wasn't
3 followed correctly.
4    MR. ROMAN: I'll object. I think that
5    misstates his testimony, but you may answer --
6    or once there's a question.
7    THE WITNESS: I'm not certain what you
8    mean by "tell me."
9 BY MR. AWODIYA:
10    Q. Actually, it's just a matter of
11 technicality. We'll just move on, because I don't
12 think it's actually very relevant, because this
13 document says it clearly.
14    MR. AWODIYA: Ryan, can you show him
15    Exhibit P-25?
16    MR. ROMAN: Sure. Why don't we mark, as a
17    composite exhibit, the entire set, and then,
18    we'll turn to whatever page is necessary.
19    MR. AWODIYA: Okay.
20    MR. ROMAN: So this will be marked as --
21    how are we marking?
22    MR. AWODIYA: Do you want to go by the ECF
23    page number?
24    MR. ROMAN: Well, we can just call it
25    Composite Exhibit 1 for purposes of this

Page 15

1    deposition, and then, we'll tell him where to
2    look.
3    MR. AWODIYA: Okay.
4    (Thereupon, the referred-to document was
5    marked by the court reporter for
6    Identification as Plaintiff's Exhibit 1.)
7    THE WITNESS: Am I permitted?
8    THE COURT REPORTER: You are.
9    MR. ROMAN: So we're looking at what's
10    marked as Exhibit P-25 on the bottom right
11    corner. So it's going to be a few pages in.
12    THE WITNESS: All right. There we are.
13    Thank you.
14 BY MR. AWODIYA:
15    Q. Do you recognize this letter?
16    A. I recognize it in the context of
17 preparation for this meeting.
18    Q. Do you recall anything about this document
19 during the time frame of plaintiff's appeal to you?
20    A. I have a vague recollection of a portion
21 of it.
22    MR. ROMAN: Sure. And if you'd like to
23    review it now, you're welcome to take whatever
24    time you need to read it, and then, that way
25    you can answer any questions.

Page 16

1    THE WITNESS: Great. Thank you. I will
2    do so contemporaneous with his questions.
3    MR. ROMAN: I just want to make sure you
4    focus. So if you do want to take a short
5    break, we can do that.
6    THE WITNESS: Great. I will certainly
7    request to take a break if I cannot identify
8    what's relevant to answering his question.
9    MR. ROMAN: Okay. Proceed.
10 BY MR. AWODIYA:
11    Q. After reading this document, what would be
12 your next step?
13    A. I'd like a moment to read it again.
14    Q. No problem.
15    A. Thank you.
16    Can I have you repeat your question?
17    Q. After reading this appeal letter, what is
18 your next step in your procedure for an appeal?
19    A. For me, the relevant next steps are to
20    confer with the Dean of Students and share the
21    letter with him, then for the two of us to meet and
22    converse, and a pivotal next step for us would be to
23    receive the letter described or anticipated from
24    psychotherapist Denise Unterman and psychiatrist
25    Earl Mauricio. Beyond that, I can't comment, in

Page 17

1    that I am uncertain if this letter was accompanied
2 by a solicitation to the committee and further
3 conversations with them.
4    Q. This was new information to you. It was
5 not given to the committee. Specifically, where he
6 talks about his OCD, the extreme anxiety, him being
7 overwhelmed, the fact that he has to pull his
8 eyelashes out to soothe his anxiety, the fact that
9 he never finished an exam on time, the fact that he
10 has to backtrack his answers just to make sure they
11 didn't disappear five seconds after he went to the
12 next question, none of this was mentioned to the
13 promotions committee. This was all new information.
14    Please turn to -- first --
15    A. Turn to? Can I have you repeat that?
16    Q. Let me rephrase.
17    Did you confer with the Associate Dean
18 about this letter?
19    A. I may have. I may have not. I don't
20 remember.
21    Q. You don't recall?
22    A. I don't recall.
23    Q. Please turn to the page where it says
24 "Exhibit P-23" on the bottom right.
25    A. I'm now on that page.

5  (Pages 14 to 17)

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.      William Owen

Page 18

1    Q. Do you recognize this e-mail?
2    A. I do, in the context of preparation for
3  the deposition.
4    Q. Do you remember in the context of
5  plaintiff's appeal to you?
6    A. I do not.
7    Q. But you would have received this document
8  during that time frame; is that correct?
9    A. I will not confirm that, since it says,
10 "To: promotionsappeals@ross." Secondly, I'm
11 uncertain what you mean by "that time frame."
12      I'm sorry. I'm --
13   Q. From plaintiff's appeal.
14   A. I'm relative prescriptive, in terms of
15 statements. So I will not confirm that.
16   Q. Please turn to the first page of the set
17 of documents in front of you.
18   A. I now have that page.
19   Q. Is it correct that it says that appeal
20 letters will be sent by e-mail to Dean Owen at
21 PromotionsAppeals@RossU.edu?
22   A. Yes.
23   Q. So that is the correct e-mail address
24 which you would have received information about a
25 student's appeal?

Page 19

1    A. That does not come directly into my e-mail
2  box. It may be routed.
3    Q. Let's stick to what the student was
4  directed to do.
5      The student was directed to send new
6  information to this e-mail address for you; is that
7  correct?
8    A. Yes. As is conventional practices in
9  universities, it is routed.
10   Q. So are you suggesting that you have -- you
11 could have possibly not received the document?
12   A. I'm not suggesting it. I'm stating it.
13 It is possible.
14   Q. But you must have received plaintiff's
15 actual appeal letter; is that correct?
16   A. I vaguely recall receiving the appeal
17 letter, as I stated to you earlier.
18   Q. Please turn to Exhibit P-26.
19      Did you send this letter?
20   A. Yes, I did.
21   Q. This letter says, "I have carefully
22 reviewed your academic record, your appeal of the
23 Student Promotions Committee's recommendation for
24 dismissal."
25      Is that statement correct?

Page 20

1    A. Yes, it is.
2    Q. So then, from that statement, you must
3  have reviewed plaintiff's appeal letter that's in
4  front of you labeled Exhibit P-25; is that correct?
5    A. I would suggest I would; however, I am
6  uncertain what is being described here. This is a
7  categorical description. It's not a prescriptive
8  description.
9    Q. What's categorical?
10   A. Your appeal of the promotions
11 recommendation for dismissal, pre-matriculation
12 credentials. It does not describe the individual
13 documents.
14   Q. That's -- it's fine. Because this is the
15 only thing that triggered the appeal. There was no
16 other forms. There was nothing else. It was simply
17 this e-mail and the doctor's e-mail that triggered
18 the appeal process. There was nothing else that --
19 there would be no other documents. So it's --
20 that's fine.
21      So judging from the documents we have
22 reviewed, based on your recollection, from the
23 language you used in your letter sent to plaintiff,
24 did you see plaintiff's appeal letter that was sent
25 to you?

Page 21

1    A. I recall your letter, and it's coming back
2  with greater clarity in the context of the
3  extraordinary circumstances of how many times you
4  failed the preparatory or the premonitory exam for
5  your Step 1. It is coming back. What is also
6  coming back as we're talking this through is your
7  letter from the psychiatrist or the psychotherapist.
8    Q. Tell me what you recall.
9    A. He's in CBT therapy and acquiring
10 strategies for managing his symptoms. He is
11 considering psychotropic medication.
12      What I am remembering is an attestation
13 from a therapist that describes an interventional
14 program in progress, not being executed, nor any
15 verification of it's benefits. That's what I
16 recall.
17   Q. So would that be the reason why you
18 decided to uphold his dismissal?
19   A. Yes. As well as your past performances.
20   Q. So just to be clear, because plaintiff's
21 psychiatrist said that he didn't -- let me rephrase.
22      Just because plaintiff's psychiatrist
23 implied that he was hesitant about taking medication
24 for his disability, that's why you decided to uphold
25 his dismissal?

6  (Pages 18 to 21)

fd61cff3-23a5-4555-a5dd-db0ed44

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.      William Owen

Page 22

1        MR. ROMAN: I'll object. That misstates
2    the prior testimony, but you may answer.
3        THE WITNESS: Thank you. It does misstate
4    the prior testimony.
5        Let me repeat myself. And I'm going to
6    read it again. And I will state my
7    interpretation again, since it was unclear.
8    And I'll try to state it in a different way.
9        "Acquiring strategies." Acquiring is not
10   the same as acquire. They are different.
11   Acquiring describes progress in action.
12       "Considering psychotropic medication."
13   Not having received them. There's no statement
14   of efficacy as of yet, against a background of
15   a young man who failed an exam not once, not
16   twice; five times. An exam that predicts
17   performance in Step 1, which in turn predicts
18   the probability of success in residency
19   attainment, which is mandatory to practicing
20   medicine, who is paying a substantial amount of
21   money to attend medical school.
22       Summary, I felt sorry for you, because it
23   describes progress. It doesn't describe
24   accomplishment and execution. That's the
25   reason for the decision.

Page 23

1    BY MR. AWODIYA:
2        Q.  Do you think that you could have offered
3    something that may have made a difference in his
4    score?
5        A.  No.
6        Q.  Nothing comes to mind?
7        A.  Nothing comes to mind.
8        Q.  What about extended testing time?
9        A.  It's not my decision.
10       Q.  You decided to uphold his dismissal
11   because of this letter?
12       A.  I uphold the decision for the reasons that
13   I stated for you.
14       Q.  So whether or not extended testing time
15   would have been appropriate, do you think that it's
16   possible extended testing time would have helped
17   him?
18       A.  I'm not going to speculate. I'm a
19   nephrologist. I'm a biochemist. I'm an
20   administrator. I am not going to speculate on
21   whether or not that sort of intervention would be of
22   benefit for you. That's why we have people who do
23   that. That's why if it were -- would be likely to
24   be efficacious for you, it would be stated from your
25   psychotherapist or your psychiatrist --

Page 24

1        Q.  How would they know that?
2        A.  -- who are describing --
3        Q.  Until the student has extended time --
4        A.  I'm not going to speculate on that.
5        Q.  Until the student has extended testing
6    time, no one can truly ever tell if that was a
7    factor that could have helped him.
8        A.  That's your speculation. I'm not going to
9    either agree or refute with that. You're entitled
10   to your opinion and your experiences.
11       Q.  So when plaintiff, in his appeal letter,
12   said that he never finished an exam on time, and he
13   would backtrack his answers just to make sure they
14   didn't disappear five seconds after he answered --
15   after he went to the next question, you don't think
16   extended testing time would have been beneficial?
17       A.  That's your interpretation. That's not
18   necessarily mine, nor am I trained to assess the
19   veracity of that statement.
20       Q.  So then, how can you dismiss him, if you
21   have all of this information but you refuse to even
22   investigate if extended testing time may have helped
23   him?
24       A.  You have been dismissed. I do not have a
25   statement that says that extended testing time is

Page 25

1    going to be of benefit from someone who is trained
2    in this domain.
3        Q.  So you wouldn't investigate with the
4    student to see what accommodation would have helped
5    him?
6        A.  No, I would not, since the student is
7    under therapy by a psychiatrist and a
8    psychotherapist. That is neither my role, nor is it
9    my responsibility.
10       Where is your responsibility, young man,
11   in terms of engaging with your therapist to help
12   yourself?
13       I would take a counter stance, and that
14   is, to continue to take your money, to continue to
15   allow you to take tests repeatedly and have outcomes
16   that are adverse, that's wrong.
17       Q.  In his appeal letter and his
18   psychiatrist -- both say that plaintiff doesn't
19   understand his disability to the extent that other
20   people might. He lives it. To him, his disability
21   is what's normal. So sometimes they can't help
22   themself, as much as you think they can. So --
23       MR. ROMAN: I'll object.
24       Is there a question that you're asking
25   Dr. Owen?

7 (Pages 22 to 25)

fd61cff3-23a5-4555-a5dd-db0ed445

## Page 26

1     MR. AWODIYA: I just wanted to state that
2   for the record.
3     MR. ROMAN: Well, this is a deposition.
4   So if you ask questions, Dr. Owen is here to
5   answer them.
6     MR. AWODIYA: This is just really good.
7     MS. BOMAR: We've been going for about an
8   hour. Should we take a break? Do you need a
9   break, Dr. Owen?
10     THE WITNESS: I would love to continue
11   going. Thank you for asking, though. I may
12   need another cup of coffee in a little bit.
13     MS. BOMAR: No problem.
14     THE WITNESS: I'm addicted to it as you
15   can tell. Thank you.
16   BY MR. AWODIYA:
17     Q.  After everything you've read here, do you
18   think extended testing time would be beneficial for
19   plaintiff?
20     A.  I don't know.
21     Q.  Why do you say that?
22     A.  Your letter, Exhibit P-25, and likewise,
23   Exhibit P-23, focus on two diagnoses, a
24   hyperactivity disorder and obsessive compulsive
25   disorder. I would want to hear from the pedagogical

## Page 27

1   experts, as well as your therapist and psychiatrist,
2   that the interventions for your OCD have been
3   beneficial, that they've been efficacious.
4     It's analogous -- you've had a couple of
5   years of medical school. It's analogous to the
6   patient who has cancer and heart disease. You don't
7   treat just one. You treat two.
8     So I would like to hear from people with
9   expertise in this area that extended time is going
10   to have the impact that is needed and that the other
11   therapy for your OCD has been efficacious. As you
12   said, what I've seen here does not tell me that. It
13   says that you are receiving therapy. The
14   intervention has started. It makes a thinly veiled
15   promise of benefit, but that's not benefit.
16     Q.  So you require some form of treatment that
17   has improved the disability in order to then
18   consider if extended testing time would be a
19   possible consideration?
20     A.  To have you return to take the exam, yes,
21   it is. It's no different than we do for other
22   students who have difficulties that are associated
23   with poor performance and it has culminated in them
24   ultimately being dismissed, and a dismissal upheld.
25     We want to see verification that the

## Page 28

1   intervention is of benefit, and likewise, our
2   readmission, our testing, our alternatives are going
3   to be of benefit as well. We're not using exams as
4   experimentation to see if there's efficacy. This is
5   why we routinely ask for an arm's length external
6   opinion of the diagnosis, what sort of interventions
7   can be offered, and offered, and prognosis.
8     My interpretation of this note is, we're
9   making progress, we have made interventions, but my
10   experience in reading this letter is, it's not there
11   yet. We're not ready to commit. And I've seen
12   letters from therapists, from psychiatrists that
13   say, we are committed, we're signing off on this
14   person to be readmitted. This does not say that.
15     I'm sorry, my friend. I wish it did. And
16   you're talking to an old guy. I'm a member of AARP
17   for many years. I had one of the largest behavioral
18   health centers in the United States, UBHC in New
19   Jersey. I have seen many letters that support,
20   advocate for a student to return.
21     This says, it's going the right way, but
22   it doesn't say it's there yet. For me, it would
23   have been improper to bring you in with your
24   extraordinary history and your disorder based on,
25   we're getting there, we're not there yet.

## Page 29

1     I respect your opinion and your
2   interpretation, but I have to make the decision, and
3   I've got a lot of experience. I'm sorry. I stand
4   by my decision.
5     Q.  So if today he still has not had some type
6   of ameliorative affect of a treatment, you would
7   have the still -- stance about not readmitting him?
8     A.  I would.
9     Q.  When you dismiss students, your decision
10   is final?
11     A.  My decision is final unless the student
12   comes back with support that they're going to be
13   successful based on all the evidence that they can
14   gather. And we have admitted students who have had
15   problems. It's ranged from drug abuse to behavioral
16   disorders. But we don't just simply make a decision
17   to bring them back. We want as much support for
18   their success as is possible; otherwise, that's
19   improper, because you're not attending free of
20   charge, and there is the emotional expense of coming
21   and failing. And no student can tell me there's not
22   an emotional burden to failing.
23     And, again, your circumstance is
24   extraordinary. You've got two bad diseases. This
25   is why I say it. I felt sorry for you. And as I

8  (Pages 26 to 29)

fd61cff3-23a5-4555-a5dd-db0ed44

Page 30

read this, it came to me.

How do we make you successful? We make you successful by making you participate, which you have said, and likewise, giving your therapist and your psychiatrist an opportunity for their therapies, their interventions to work. It's not a prescription and you take this. It's not a few counseling sessions. It's a full program that, as you said, is for life.

I guess my question is what's your rush?

Q. I have two bad diseases?

MR. ROMAN: I'll object again. This is a deposition, Muyiwa. So if you have questions, Dr. Owen is here to answer them. It's not an opportunity to make statements.

BY MR. AWODIYA:

Q. Did you say that I have two bad diseases?

A. Yes, I did.

Q. That's messed up.

MR. ROMAN: If you need to take a break, we can take a break.

MR. AWODIYA: No.

BY MR. AWODIYA:

Q. So why did you send an offer of reinstatement?

Page 31

A. Because I felt sorry for you.

MR. AWODIYA: Let's take a break.

MR. ROMAN: Okay.

(Whereupon, a break was taken from 11:47 to 11:59 a.m.)

MR. AWODIYA: Honestly, I don't want to talk to him anymore. So if you got any questions, you can go ahead and ask.

MS. BOMAR: Do you want to take a break?

MR. ROMAN: I think I'm okay on my end.

MS. BOMAR: Okay.

CROSS-EXAMINATION

BY MR. ROMAN:

Q. So, Dr. Owen, my name is Ryan Roman, as you know. We've met before. I'm one of the attorneys representing Ross.

You testified a moment ago about the reasons why the reinstatement offer was made to Mr. Awodiya.

Do you recall that?

A. Yes, I do.

Q. And you had said that you felt sorry for Mr. Awodiya, but I would like to ask if you can expound upon that statement, what you meant by that and what the reasons were for the reinstatement

Page 32

offer?

A. Certainly.

To understand the statement, it would have to take about two minutes to give you a bit of background about myself.

A common question is, Bill, why did you leave what many describe as traditional academe to go to Ross, a for-profit medical school? I even had a colleague, president of a peer university, say, "Bill, why did you go to the dark side?"

The reason's quite straightforward, and that is, I am a big fan of social justice. I'm a product of social justice. I grew up in the '50s in the segregated south. I remember when the N word was not the N word, but the N word was nigger. I remember going through back doors. And how do I escape that? Through education.

So for me, education is a powerful way to inculcate social justice in America. I'm a doctor. Because I'm a doctor, I married the two, and in marrying the two, I came to recognize that there are tens of thousands of students that want to pursue careers as doctors but are unable to do so, because the capacity is low in the United States, and they can succeed with the proper environment in

Page 33

fulfilling their career aspirations of becoming a doctor.

So having had very large universities, all prestigious, US News, World Report, top 10 rankings, hundreds of millions of dollars of research, I recognize that in many ways traditional academe was treating access to a medical education as a privilege rather than a right for someone who's qualified. I even had a senator -- you can turn on CNN now and I guarantee you, you'll see him -- who made that statement to me.

So I got to a point in my career where I said, "You know, I'm going to stop complaining about it. I'm going to actually do something about it." And the past president of Princeton, Harold Shapiro, approached me and said, "Bill, you know, there's a way you can do this, and that is" -- at that time, he was chairman of the board of DeVry. And he said, "take a look at their medical schools," which I did.

So I came here on a mission, there's no doubt about it, and that is to make access to medical education much more egalitarian than it has been.

So let's come to this man, young man of color. There are so few doctors of color in America

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.      William Owen

Page 34

1  that it was described by the National Academy of
2  Medicine last year as, quote, "a crisis." I was
3  invited to that. It was invitation only to talk.
4  And as I say, "Guys, we have a huge crisis that is
5  worsening. Can't each of us own doing something to
6  improve it?"
7      So here's this young man, who's
8  extraordinarily passionate, who has some challenges.
9  And what are the challenges? He's got two
10  behavioral disorders, one that's very common,
11  another one that's less common, that are serious.
12  They're serious enough to interfere with his
13  academic performance. And he's attested to it in
14  his letter. That was his appeal.
15     So, yes, we have a process in place.
16  People follow the process. Following that process,
17  things didn't go well for him, but on the other
18  hand, I do have these statements from his therapist
19  and his psychiatrist saying, he's under therapy,
20  he's getting better, but he's not there yet.
21     So despite my descriptor, being kicked in
22  the teeth by the system, because it is a system --
23  it's not his fault he has OCD. It's not his fault
24  that he has a hyperactivity disorder. It is what it
25  is. Give him another chance. If it works out,

Page 35

1  fine. And that was why, in that, that I didn't want
2  to have any conditions around it. Just come on in,
3  give it a try.
4      Had he accepted, I guarantee you he would
5  have gotten one of these famous Bill Owen phone
6  calls, don't let me down. Get it done.
7      So that's the kind of long answer to that
8  story.
9      MR. ROMAN: I don't have any further
10  questions for you. Thank you for your time.
11  And if Mr. Awodiya has any additional
12  questions --
13         REDIRECT EXAMINATION
14  BY MR. AWODIYA:
15     Q. What changed from his appeal to the offer
16  of reinstatement? What changed about the plaintiff
17  that made you make that offer?
18     A. The plaintiff didn't change. Time
19  changed. So he had time for those interventions
20  that were described to kick in. And secondly, in
21  terms of the plaintiff, he, in an extraordinary way,
22  showed his commitment, but doggone it, don't let me
23  down.
24     Q. Time is the only thing that changed?
25     MR. ROMAN: Object. I think that

Page 36

1  misstates the testimony.
2      THE WITNESS: It misstates the -- I
3  described two things, extraordinary passion and
4  commitment. To bring a lawsuit with these
5  circumstances, with this trail of evidence is
6  not an issue of a lawsuit as much as it is of a
7  statement of how bad you want it.
8      And that's the reason I would put it in
9  the context of, don't let me down. My famous
10  talk is not just, don't let me down. Don't let
11  your family down. Don't, most importantly, let
12  yourself down. That's what's changed. Anybody
13  who looks at this will say this is
14  extraordinary.
15  BY MR. AWODIYA:
16     Q. So he wasn't passionate when he made his
17  appeal?
18     A. I don't know. How do I know his emotions?
19     Q. You didn't ask him?
20     A. No.
21     Q. So your letter of reinstatement has
22  nothing to do with the lawsuit?
23     A. It does not.
24     Q. Let me know if I'm wrong, but didn't you
25  just say that his passion for filing the lawsuit is

Page 37

1  what contributed to you making the offer?
2      A. It's not the lawsuit, as much it is the
3  extreme that you have gone through to do that. The
4  energy, the attention, the preparation that you have
5  demonstrated is extraordinary. It says something.
6      Doesn't mean that you're going to do
7  better. That's on you.
8      Q. So without the lawsuit you would have not
9  made that offer?
10     A. I don't know. I think it depends on the
11  circumstances by which you would have reappeared and
12  what you would have done.
13     Q. Plaintiff reappeared after you made your
14  decision. He asked the school again, and they said
15  that your decision is final.
16     A. Then my decision was at that time.
17     Q. So if plaintiff had went about his life,
18  would you have offered that same reinstatement in
19  the absence of this lawsuit?
20     A. That's speculation, and I don't know.
21     Q. But because of his passion for this
22  lawsuit is why you made that offer of reinstatement?
23     MR. ROMAN: I'll object. Asked and
24  answered, and also, I think it misstates.
25     THE WITNESS: It does misstate.

10  (Pages 34 to 37)

fd61cff3-23a5-4555-a5dd-db0ed445

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.      William Owen

## Page 38

1    Substantially misstates.
2        It's not the passion of your lawsuit.
3    It's the passion by which you are pursuing your
4    career.
5    BY MR. AWODIYA:
6        Q.   None of plaintiff's records show that any
7    of the treatments became effective.  He's still the
8    student with the two bad diseases with no -- with no
9    fix.
10        Is that no longer a factor to you?
11       A.   Are you fixed or not?
12           MR. ROMAN:  We'll allow Mr. Awodiya to ask
13    questions of you and --
14           THE WITNESS:  Oh, I'm sorry.
15           MR. ROMAN:  It's a one way street.
16           THE WITNESS:  I apologize.
17           MR. ROMAN:  If you want to restate your
18    question.
19           THE WITNESS:  You know how old folks are.
20    Yeah, can you restate your question then?
21    Thank you.  Thank you for reminding me.
22    BY MR. AWODIYA:
23       Q.   No records indicate that plaintiff -- let
24    me rephrase.
25        No records about plaintiff's treatment

## Page 39

1    indicate that they were effective.  If he has not
2    received an effective treatment to this day, is that
3    no longer a factor to you when you made the offer
4    for the reinstatement?
5        A.   It's still a factor to me.  You're a high
6    risk readmission.
7        Q.   Why is that?
8        A.   For the reason that you stated to me, and
9    that is, I don't have a letter from a therapist or a
10    psychiatrist saying that you have followed through
11    with your intervention.  So I was making an a priori
12    assumption that you had.  And that you had benefit
13    from it; that there was efficacy.  And I made an a
14    priori assumption that you had.
15        Now, I may be in error.  I hope I'm not.
16    And your motivation may not be there, which I made
17    an assumption about as well, and I may be in error,
18    but you heard that corny speech I made about my DNA
19    and giving an opportunity.  You were raised in the
20    United States.  You're a black man in the United
21    States.  You're a man of color.  Am I looking out
22    for the brothers?  I am.
23        Q.   But with all due respect, it doesn't
24    matter if we're both black.  You don't live my
25    disability.

## Page 40

1        MR. ROMAN:  Is there a question for
2    Dr. Owen?
3    BY MR. AWODIYA:
4        Q.   So you offered me the letter of
5    reinstatement because I was black?
6        A.   I did not say that.
7        Q.   Was my race a factor?
8        A.   Not a major factor, but it was a factor.
9        Q.   So if a white student was in the same
10    position as me, you wouldn't have made that offer?
11           MR. ROMAN:  Object.  I think this is far
12    afield from any issues in the case, but --
13           THE WITNESS:  I'll answer.  Speculation.
14    And I'm not going to speculate on something
15    like that.
16    BY MR. AWODIYA:
17        Q.   So now that you know your assumptions may
18    have been made in error, how do you feel about your
19    reinstatement offer?
20           MR. ROMAN:  I object to the question.  I
21    don't know that that first part of the premise
22    is true or not.
23    BY MR. AWODIYA:
24        Q.   Let me rephrase.
25        A.   I don't understand the question.

## Page 41

1        Q.   Let me rephrase.
2        Did you say that your assumptions about
3    effective treatment may be in error?
4        Did you say a statement to that effect?
5        A.   Yes, I did, in terms of the offer.  I
6    don't know.
7        Q.   If he still does not have an effective
8    treatment, what happens to the offer?
9        A.   If I had verification from someone who is
10    able to make the assessment, and they state that it
11    has not been of benefit, then I would probably
12    rescind the offer, because why should I frustrate
13    you emotionally?  Why should I frustrate the people
14    that are working with you to bring you in on what is
15    effectively a fool's error?
16        Q.   Why didn't you apply that same theory to
17    his appeal?
18        A.   Because I had a contemporaneous statement
19    that did not offer that.  There's been several
20    months since the time of your appeal and the offer
21    back to you.
22        Q.   It's been a year -- over a year.
23        So to be clear, I ask you for
24    clarification, if plaintiff's disabilities have not
25    gotten better, you would rescind your offer?

11 (Pages 38 to 41)

Alpha & Omega Reporting Services, Inc.
(954) 523-6422

fd61cff3-23a5-4555-a5dd-db0ed4458

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.     William Owen

Page 42

1    A.  If I had a contemporaneous statement that
2  said that you're unimproved, no, I would not
3  maintain or sustain the offer, because if I follow
4  what you have stated in your appeal letter is, what
5  was causality?  My OCD.  And it is no better.
6        I'll pose a rhetorical question.  Why
7  would I admit you back?
8    Q.  Would you give him extended testing time?
9    A.  I don't know.  I'd like to see those
10  statements, as we discussed earlier, that extended
11  testing alone is going to be efficacious.  I have
12  not seen that.
13    Q.  It doesn't have to be alone.  There can be
14  five different accommodations.
15        With the information you know now, and
16  your offer, and no records of him getting better
17  from his disabilities, would you offer him academic
18  accommodations?
19    A.  You've changed the circumstances again.
20  The circumstances are vacillating.  They --
21    Q.  Let me rephrase.
22    A.  Yes, please do.
23    Q.  I don't need to rephrase it.  Everything
24  is -- I'll just take your word as the way you said
25  it.

Page 43

1        MR. AWODIYA:  I'm good.
2        MR. ROMAN:  Okay.  I just have some brief
3  follow-up questions.
4        I'd like to mark as Exhibit 2 this
5  document.  It's a copy of the reinstatement
6  letter.
7        (Thereupon, the referred-to document was
8        marked by the court reporter for
9        Identification as Defendant's Exhibit 2.)
10        RECROSS-EXAMINATION
11  BY MR. ROMAN:
12    Q.  If you could take a moment to review that
13  exhibit, which is, I believe, a letter dated
14  October 31, 2018, from you to Mr. Awodiya.
15        Is that the reinstatement letter you've
16  been referencing?
17    A.  Yes, it is.
18    Q.  And when you review that letter, are there
19  any conditions that are placed on the offer of
20  reinstatement?
21    A.  There are not.
22    Q.  If Mr. Awodiya were to respond on or
23  before November 7th, 2018, indicating that he
24  accepted that offer, would he be enrolled as a
25  student at Ross?

Page 44

1    A.  Yes, he would.
2        MR. ROMAN:  Okay.  I have nothing further
3  at this time.
4        Mr. Awodiya?
5        REDIRECT EXAMINATION
6  BY MR. AWODIYA:
7    Q.  If plaintiff demanded extended testing
8  time, would you have agreed to that?
9    A.  That would not be our procedure.  It does
10  not come to me to deem extended testing time.  It
11  would go --
12    Q.  So this does not --
13        MR. ROMAN:  If you could just let Dr. Owen
14  finish his answer, and then, ask your next
15  answer.
16        THE WITNESS:  Thank you.
17        The accommodations officer, the Associate
18  Dean of Student Affairs, would render their
19  opinion about your eligibility.  It is not a
20  decision that is rendered by the dean.
21        The principle -- or a principle issue
22  around extended time, which would be a point of
23  conversation, is that, as you know, the boards
24  do not necessarily -- and we have had the
25  circumstance where they have not transferred

Page 45

1  accommodations for extended testing time into
2  their exams.  So part of the conversation would
3  be, is there an evidentiary trail that will
4  support him receiving that?
5        Anecdotal experience, extended testing
6  time by the school, that is not provided by --
7  or recognized by USMLE, predicts a very poor
8  performance on the exam.
9        MR. AWODIYA:  Okay.  I'm done.
10        MR. ROMAN:  I have nothing further at this
11  time either.  Thank you for your time.
12        We'll read the transcript.
13        (Deposition concluded at 12:24 p.m.)

12  (Pages 42 to 45)

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.      William Owen

CERTIFICATE OF OATH

STATE OF FLORIDA   )

COUNTY OF BROWARD )

I, the undersigned authority, certify that
WILLIAM OWEN personally appeared before me and was
duly sworn.
        WITNESS my hand and official seal this
7th day of December, 2018.

        KELLY A. ESPOSITO
        Notary Public, State of Florida
        My Commission No. GG248978
        Expires: 9/3/2022
+ + + + + + + + + + + + + + + +
                CERTIFICATE
STATE OF FLORIDA )
COUNTY OF BROWARD )
        I, KELLY A. ESPOSITO, do hereby certify
that I was authorized to and did stenographically
report the foregoing deposition of WILLIAM OWEN;
that a review of the transcript was requested; and
that the transcript is a true record of my
stenographic notes.
        I FURTHER CERTIFY that I am not a
relative, employee, attorney, or counsel of any of
the parties, nor am I a relative or employee of any
of the parties' attorney or counsel connected with
the action, nor am I financially interested in the
action.
        Dated this 7th day of December, 2018.

        KELLY A. ESPOSITO

---

ERRATA SHEET
OLUWAMUYIWA AWODIYA V. ROSS UNIVERSITY SCHOOL OF
MEDICINE
Deponent:  William Owen
Date of :  December 4, 2018
Case No.:  0:18-cv-60482-KMM
Page _____ Line _____
Now Reads: _____
Should Read: _____
Reason for Change: _____

Page _____ Line _____
Now Reads: _____
Should Read: _____
Reason for Change: _____
Page _____ Line _____
Now Reads: _____
Should Read: _____
Reason for Change: _____

Page _____ Line _____
Now Reads: _____
Should Read: _____
Reason for Change: _____
Page _____ Line _____
Now Reads: _____
Should Read: _____
Reason for Change: _____

Page _____ Line _____
Now Reads: _____
Should Read: _____
Reason for Change: _____
Page _____ Line _____
Now Reads: _____
Should Read: _____
Reason for Change: _____

        Under penalties of perjury, I declare that I
have read the foregoing transcript, and together
with any changes made above the facts stated herin
are true.
        Date: _____ Signature: _____

---

ALPHA & OMEGA REPORTING SERVICES, INC.
1776 EAST SUNRISE BOULEVARD, FIRST FLOOR
FORT LAUDERDALE, FLORIDA 33304
954.523.6422

Ryan Roman, Esq.
1 SE 3rd AVenue, 25th Floor
Miami, Florida 33131

Re: Oluwamuyiwa Awodiya v. Ross University School of
Medicine
Case No. 0:18-cv-60482-KMM

Mr. Roman:
        Enclosed please find your copy of the
deposition of William Owen, which was taken on
December 4, 2018, in the above-entitled case.  Also
attached are forms of Affidavit and an Errata Sheet
to be completed by the deponent when reading your
copy of the deposition.  These forms are
self-explanatory.
        After the deponent has completed these
forms, please return them to me at the above address
for inclusion in the original transcript.
        Thank you for your cooperation,

        Kelly A. Esposito

---

13 (Pages 46 to 48)

fd61cff3-23a5-4555-a5dd-db0ed44

# Exhibit SJ-25

Page 1

1                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
2

3                 CASE NO. 0:18-cv-60482-KMM-AOV

4

OLUWAMUYIWA AWODIYA,

5
                    Plaintiff,

6
        vs.

7
ROSS UNIVERSITY SCHOOL OF

8       MEDICINE, SCHOOL OF VETERINARY
        MEDICINE LIMITED,

9
                    Defendant.

10      _____/

11

12
                              Suite 1600
13                            350 East Las Olas Boulevard
                              Fort Lauderdale, Florida  33301
14                            Wednesday, 10:19 A.M.-6:23 P.M.
                              December 5, 2018
15

16
17        VIDEOTAPE DEPOSITION OF OLUWAMUYIWA AWODIYA

18
19        Taken before Carla D. Smith, RPR, RMR, Notary Public
20   in and for the State of Florida at Large, pursuant to
21   Notice of taking Deposition in the above cause.

22

23

24

25

Page 2

```
 1    APPEARANCES:
 2    ATTORNEYS FOR PLAINTIFF
 3
              OLUWAMUYIWA  AWODIYA, Pro Se
 4
 5
 6    ATTORNEYS FOR DEFENDANT
 7
 8            Akerman LLP
              98 S.E. 7th Street
 9            Suite 1100
              Miami, FL  33131
10
      BY:     RYAN ROMAN
11            ryan.roman@akerman.com
12
              OCTAVIA M. GREEN, ESQUIRE
13            octavia.green@akerman.com
14
15    ALSO PRESENT:
16
               VALARIE BOMAR, Esquire
17             Adtalem Global
18
19          Jordan M. Bruce, Videographer
20
21
22
23
24
25
```

1

INDEX

2

WITNESS                                                    PAGE

3

4   OLUWAMUYIWA AWODIYA

5       Direct Examination by Mr. Roman ................7

6

7

8

EXHIBITS

9

10  NUMBER                  DESCRIPTION              PAGE

11  Exhibit 1      Release of Information Consent ....94

12
        Exhibit 2      Safety Plan ......................97

13
14  Exhibit 3      Guidelines to Request Test .......121
                   Accommodations

15
16  Exhibit 4      Letter from Ross to Awodiya ......154
                   dated March 15, 2013

17
18  Exhibit 5      Letter from Ross to Awodiya ......158
                   dated April 21, 2014

19
20  Exhibit 6      Ross University Official ........161
                   Transcript

21
22  Exhibit 7      Letter from Ross to Awodiya ......171
                   dated December 28, 2015

23
24  Exhibit 8      SAP Academic Plan Student .......175
                   Agreement

25

Page 4

1                          EXHIBITS (CONTINUED)

2

3     NUMBER                  DESCRIPTION                    PAGE

4

5

      Exhibit 9       E-mail to Awodiya from Hayse .....190
6                     dated November 26, 2015
                      Subject: COMP Meeting Action
7                     Required

8

      Exhibit 10      Reflection for CS Course ........193
9                     Absence dated April 19, 2016

10

      Exhibit 11      NBME Examinee Performance .......198
11                    Profile

12

      Exhibit 12      Letter from Ross to Awodiya .....199
13                    dated October 28, 2016

14

      Exhibit 13      Ross University Academic ........200
15                    Dismissal Appeal

16

      Exhibit 14      Ross University Academic ........208
17                    Dismissal Appeal

18

      Exhibit 15      Letter to Dean Owen  ...........212
19

20    Exhibit 16      Step 1 Score Report dated .......222
                      December 23, 2017
21

22    Exhibit 17      Reinstatement Request dated ......222
                      February 2, 2018
23

24    Exhibit 18      E-mail from Student Services .....225
                      dated February 21, 2018
25

Page 5

1
                    EXHIBITS (CONTINUED)
2
3    NUMBER                  DESCRIPTION                PAGE
4
5

     Exhibit 19    Letter from Ross to Awodiya ......225
6                  dated October 31, 2018
7
     Exhibit 20    Morgan State University ..........240
8                  transcript
9
     Exhibit 21    Morgan State University ..........241
10                 transcript
11
12                    E X H I B I T S
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 19

1       A.     That were diagnosed or -- are you asking was

2    I diagnosed with any mental impairments before 2015?  Or

3    are you asking if I experienced symptoms of my ADHD and

4    OCD in 2015?

5       Q.     Let's start with that question.  Did you

6    experience symptoms of your ADHD or OCD -- let me ask

7    one at a time.

8              Did you experience symptoms of your ADHD

9    prior to December 1, 2015?

10      A.     Yes.

11      Q.     And did you receive any diagnosis of ADHD

12   prior to December 1, 2015?

13      A.     No.

14      Q.     Did you have any knowledge that ADHD was an

15   impairment that you were suffering from prior to

16   December 1, 2015?

17      A.     Did I have knowledge that ADHD was an

18   impairment I was suffering from?

19      Q.     Even though it had not been diagnosed, did

20   you think to yourself okay, maybe I have ADHD or did you

21   just experience symptoms at that point in time prior to

22   December 1?

23      A.     Before I was informed about ADHD by Ross I

24   thought in order to have ADHD you had to be hyper.  I

25   was never really -- not that I recall.  I wasn't -- I

1    wasn't hyper.  I didn't know that you could still have

2    ADHD just inattentive type.  I wasn't -- my perception

3    of ADHD was hyper little kids.  I have no idea it had

4    actually to do with concentration.  I thought it had

5    everything to do with like hyper, like too much sugar

6    type of thing.  So yeah, I still -- I don't know how to

7    describe it as well as the doctors have described it.  I

8    just say regular things that just affect me and they

9    just come to whatever conclusion that they come to.

10        Q.    And your diagnosis that you received for ADHD

11   was ADHD without mention of hyperactivity, is that

12   correct?

13        A.    That's what -- what's it called, Ross wrote.

14        Q.    And do you have any reason to question that

15   diagnosis?

16        A.    Of attention deficit disorder without mention

17   of hyperactivity?

18        Q.    Correct.

19        A.    No.

20        Q.    Has any other doctor outside of Ross made

21   that same diagnosis?

22        A.    They put ADHD.  They didn't spell it out.

23        Q.    And which doctor was that?

24        A.    Dr. Mauricio.

25        Q.    With regards to the OCD diagnosis, were you

Page 21

1    ever diagnosed with OCD prior to let's say January 1,

2    2016?

3          A.    Was I diagnosed prior to January 1st, 2016?

4          Q.    Correct.

5          A.    I think I wasn't diagnosed until 2017.

6          Q.    So let's take January 1, 2017 just as a date

7    to say before January 1, 2017, had you ever been

8    diagnosed with OCD?

9          A.    Before January 1st, 2017?

10         Q.    Correct.

11         A.    I think I was diagnosed with OCD at the

12   beginning of 2017 so...

13         Q.    That was the first time you received an OCD

14   diagnosis, correct?

15         A.    Yeah.  I haven't received -- first time I saw

16   anyone for any mental health type of problems was in

17   December 2015.  Prior to that, I had no concept of

18   mental health problems.  I had no -- my knowledge was

19   just like a typical public from what you see on TV.  I

20   never -- never knew this whole world of stuff kind of

21   was out there.  So yeah, no, I didn't --

22               Wait, what was the question?

23         Q.    Whether you had been diagnosed with OCD prior

24   to January 1 of 2017?

25         A.    I think --I think yeah.  I think one of the

1    documents say that Ms. Unterman diagnosed it before --

2           Wait, you said January 2017 or June?

3      Q.    January.

4      A.    You were saying January.  Were you saying

5    January all the time?

6      Q.    Yeah.

7      A.    Sorry.  I thought you were saying June.

8           Prior to January 2017 I can't remember.  No.

9    I'm thinking of the time frame between when I first saw

10   mental health people in 2015 up until 2017.  Right now I

11   don't remember seeing any documents of anyone making

12   such a diagnosis before -- in the year of 2016.

13     Q.    I'd like to ask you some more questions about

14   each disability or impairment one at a time.  So I want

15   to start with the ADHD diagnosis.

16          When did you first notice symptoms relating

17   to your ADHD?

18     A.    I don't know how to answer that question

19   because I didn't know that ADHD was a thing while I was

20   experiencing these symptoms.  So I would need a

21   different question to separate my experiences from the

22   diagnosis because -- because until I was diagnosed with

23   ADHD, I didn't know that my symptoms were the -- were

24   something that they classified as ADHD.  I just was

25   living my life with these symptoms thinking that I'm

1   normal when I wasn't.

2       Q.    But now that you know, right, now that you've

3   been diagnosed with ADHD, looking backwards, can you

4   identify when you first started to suffer from symptoms

5   that you would now say were related to the ADHD?

6       A.    When I first noticed, had to be sometime in

7   high school like -- yeah, it got to be sometime in high

8   school.

9       Q.    What --

10      A.    Wait, maybe middle school.  I had -- I had --

11  I had some type of -- I don't know all the symptoms.  I

12  don't know what class -- all the symptoms that classify

13  ADHD.  So I don't -- I may have experienced symptoms

14  that I still don't know is a symptom -- was a symptom of

15  ADHD.  But as far as I can go back, the early instance I

16  can think of some type of behavioral concentration type

17  of problems was when I was very young like middle school

18  or something.

19      Q.    And what are the symptoms that you are aware

20  of that you would say are related to ADHD that you were

21  suffering from?

22      A.    So like personal experience?

23      Q.    Well, you're saying looking back to middle

24  school when you first say you can think that you were

25  suffering from symptoms related to the ADHD, I'm trying

Page 24

1   to figure out what were those symptoms that you're

2   remembering from that period of time in middle school

3   through today?

4        A.    So you want -- you want how the doctors

5   classified the symptoms or do you want my personal

6   experience?  Because again, those -- when I saw

7   Dr. Mauricio, I just told him my life.  And he would

8   just kind of group it as a symptom type of thing.

9             So are you asking for like the constantly

10  distracted thing or are you asking for like specific

11  things that are examples of being like constantly

12  distracted, I guess, or something like that?

13       Q.    I'm asking in your experience or what you

14  actually experienced; not a list of symptoms that maybe

15  in the DSM-5 or document like that but what did you

16  actually experience in your recollection?

17       A.    Okay.  You want everything?

18       Q.    Yeah, every symptom.

19       A.    I can give you -- I can give you what I can

20  remember but it's a lot of things.  So I don't know.

21            When I was a kid -- I guess I don't know.  I

22  just never could take notes.  To this day I can't -- I

23  can't -- I'm supposed to be taking notes now and I got

24  one letter on here because I can't concentrate for some

25  reason on multiple things.

Page 25

1              So when the teachers are talking, I can't

2      take notes.  I can't learn like that.  If I have to sit

3      in a class where a teacher doesn't provide

4      PowerPoints -- when I got to college, if I experienced

5      that I would either drop the class or switch to a

6      teacher that did give us notes.

7              So in high school, the first couple of years

8      of high school my grades were like horrendous.  They

9      were horrible.  I think the lowest GPA I had was zero

10     point something.  Yeah, that was bad.

11             And then I went to a different high school

12     and -- in Montgomery County.  They were a lot nicer.

13     They didn't kind of -- you know, they let me -- they

14     didn't rush me, I guess.  I don't know what it was.

15     They were just a lot nicer.  They didn't -- they weren't

16     so aggressive as to, you know, I don't know force me to

17     finish stuff I guess.

18             So my GPA improved in the last two years of

19     high school once the teachers would like say like kind

20     of during lunchtime whatever and finish stuff.

21             I don't like watching TV because I can't

22     rewind it.  I like to watch Netflix or like Hulu where I

23     if I miss something I can rewind it.  So I hate watching

24     like live TV because it's just -- I can't rewind it.

25             When I'm driving, I can't drive without --

1    everyone keeps, they constantly make fun of me that I

2    can't drive without the GPS.  And I don't know why but I

3    would just -- I can't pay attention to the -- I pay

4    attention to the streets.  It's just I don't know for

5    some reason I would just miss the street.  Then I'll end

6    up being lost.  So I just need to have the GPS -- I just

7    need to have the GPS.

8         I don't know what else to tell you.  Just so

9    many -- so many things.  So many little -- oh.  I don't

10   know.  It's just like too many things.  If you can ask

11   me -- I don't know maybe I can narrow my thoughts a

12   little bit.  I don't --

13        Honestly, I don't consciously think about

14   these things until someone points it out or says

15   something.  Someone has to say, I don't know.  Like the

16   whole GPS thing.  I just assumed everyone -- who

17   remembers streets?

18        But I guess apparently that's something

19   people used to do.  I don't know how they did it back in

20   the day.  I don't know how to explain it.  All I can

21   say -- I don't know how to explain it.

22        Q.    Well, let me ask you this then:  When you

23   were in middle school, which is I think the earliest

24   period of time that you started to identify symptoms

25   that you can now relate to ADHD, correct?

1        A.      Uh-huh.

2        Q.      During your time in middle school, did you

3    ever ask for any, I would say accommodation, but any

4    special treatment in order to address any of those

5    symptoms that you were suffering from?

6        A.      Did I ask?

7        Q.      Yeah.

8        A.      I didn't know that they were symptoms of

9    anything so I didn't know that I needed to ask for

10   something that I didn't -- I didn't know that something

11   was wrong with me.

12       Q.      Did the school ever treat you differently in

13   order to help address any of those symptoms you were

14   suffering from at that time?

15       A.      The school I got really bad grades, no.  They

16   didn't -- they didn't do anything.  It was just -- they

17   didn't do nothing.

18               When I went to a different high school they

19   would just like -- their lunch was different.  They had

20   like open lunch kind of.  First school I went to they

21   had like a -- like a lunch where you had like A Group or

22   B Group type things and you go but it's not guaranteed

23   that your teacher would be available.  But when I went

24   to a different school where it's like the whole school

25   goes on lurch at the same time, then I was able to

Page 28

1    like -- oh, if you didn't finish, you know, you can just

2    come back and during lunch and you know just finish.

3              So I don't know if you consider that helping.

4    But there was like a difference in experience depending

5    on which school I was -- I was at.

6         Q.    And this is in high school you're saying

7    where you switched?

8         A.    Yeah, high school.

9         Q.    And that second high school that you switched

10   to that you said was better for you, did you -- did you

11   get extended time to take tests in that high school?

12        A.    Officially?

13        Q.    Officially or unofficially you were saying

14   that sometimes you would be allowed to go back in and

15   finish up.

16             Is that on tests?

17        A.    Yeah, yeah, yeah.  Yeah, like during lunch,

18   yeah.  So if I didn't finish with everyone else, they

19   would just say come back, come back during lunch.

20             Or sometimes I would just go late to the next

21   class if it was like -- if I need just like a bit more

22   time they would write me a little hall pass and let me

23   go to the next class a little bit late.  But it depends

24   on like if I was going -- if gym is my next class and

25   then, you know, she probably just stay in this class and

Page 29

1    finish the test and then, you know, go play basketball

2    or something.

3        Q.    Did you --

4              Did you find that extra time on tests was

5    helpful for you?

6        A.    Yeah.

7        Q.    What was the name of middle school you

8    attended?

9        A.    I think at that time it was called Thomas

10   Johnson.  It's getting fuzzy to me.  I remember I got in

11   trouble at one of the schools.  I think it was middle

12   school.  I think I know I got in trouble in middle -- I

13   think it was Thomas Johnson when I got -- when I got in

14   a little bit of trouble.  I can't -- I remember we moved

15   at some point.  I can't remember if I went to the

16   same -- I think I went to the same middle school at that

17   the time but I went to three different high schools.

18       Q.    So where was that middle school?  Was it in

19   Bowie or was it somewhere else?

20       A.    Middle school, I think it was in Lanham.

21       Q.    How is that spelled?

22       A.    L-a-n-h-a-m.

23       Q.    And that's in Maryland?

24       A.    Yeah.

25       Q.    And then high school, you said you had gone

Page 30

1    to three different high schools?

2         A.    Yeah.

3         Q.    Do you recall the names of each of the three

4    high schools?

5         A.    Bowie High School was the first one.

6    Rockville was the second one.  And then Walter Johnson

7    was the last.

8         Q.    And how long were you at Bowie?

9         A.    For some reason I can't remember if I was

10   there for one year or two years until I went to

11   Rockville and then I can't remember if I left in 9th or

12   10th grade.  I can't remember for some reason.

13        Q.    And then you were at Rockville for either

14   10th and 11th or just 11th grande, is that correct?

15        A.    I graduated from Walter Johnson.  So I must

16   have done 11th grade at Rockville.

17        Q.    Okay.  So Walter Johnson you did your senior

18   year at?

19        A.    Yeah.

20        Q.    Okay.  And where is Walter Johnson High

21   School?

22        A.    Montgomery County.  I do not know the city.

23        Q.    Is that a public school?

24        A.    Yes.

25        Q.    And is there any particular --

1      Is it a general public school or is there

2  some specialty for that school?

3      A.    I'm sorry?  What --

4      Q.    Is it just like a regular public school for

5  that neighborhood or is it a, you know, magnet school or

6  technical school or something?

7      A.    I think it's -- I don't think I understand

8  your question.  But to my knowledge it's a regular

9  public school that you go to when you live in that area.

10  It's -- I went there because I lived in that area.  It

11  wasn't some type of a -- I think magnet allows you to go

12  to other schools outside of your area because of your

13  performance or something like that but I'm not too sure.

14      Q.    So this was just in your district that's

15  where you lived?

16      A.    Yeah.

17      Q.    And did you switch high schools twice just

18  because you moved?

19      A.    Yes.  No, no, no.  The first time I went to

20  live in -- I moved, yeah.  My family didn't move but the

21  second time me and my father we moved.

22      Q.    And when you were at Bowie High School, did

23  you ever ask for any accommodation for any academic

24  issues that you were experiencing?

25      A.    To accommodate what?  The -- to accommodate

Page 32

1    the symptoms.

2         Q.    Correct.

3         A.    I didn't know that they were symptoms.

4         Q.    So you didn't ask for any accommodations in

5    high school?

6         A.    Not that I recall.  I don't see how I would

7    have asked for something that I didn't know existed.

8         Q.    Were you having difficulty finishing tests on

9    time at Bowie High School?

10        A.    My whole life.  I don't -- I don't -- I don't

11   finish.  If it's exam with regular just people I

12   don't -- I don't -- I live my life just trying to get as

13   many right of the ones that I do answer and then the

14   ones that I don't answer it's just -- it's how I get by.

15   I just kind of just developed getting correct the ones I

16   do answer versus answering all the questions.  Like

17   answering all the questions was never something that

18   I --

19             I thought tests were designed that way that

20   you're not supposed to have enough time to answer all

21   the questions.  So I didn't -- I didn't know that that

22   was a -- I just assumed every one was like that.  I

23   didn't know that people -- I'm not going to lie.  I

24   would get jealous when I see other people like get up

25   and go to the bathroom during exams.  Like what kind of

Page 33

1    time do you have to just kind of, you know, get up and

2    go to the bathroom during the middle of an exam.  But

3    back yeah.  Honestly, I forgot what your question was.

4         Q.    Well, whether you had asked for any

5    accommodation for any of the symptoms.  Whether -- I

6    think you said you had not, is that correct?

7         A.    I don't -- I don't -- I don't see how I could

8    ask for accommodation if I didn't know -- if I didn't

9    know that these symptoms were the result of something or

10   was labeled as something.  There is no logical reason

11   why I would ask for an accommodation.

12        Q.    Because there had not been a diagnosis so you

13   didn't know what it was?

14        A.    Because I thought that I was normal.

15        Q.    When did you realize that that was not

16   normal?

17        A.    I guess people would make remarks about my

18   concentration I guess.  But, you know, it would be

19   general people.  No one really, a doctor or anybody like

20   that.

21              But when Dr. Sharma said that -- when

22   Dr. Sharma said that I have some type of concentration

23   problem, that's when I started to -- that's when --

24   that's when everything started to make a little bit more

25   sense.

1          So what was your question again?

2          MR. ROMAN:   I may ask Carla if she could

3     help read it back to us.

4     (Thereupon, the requested portion of the

5  record was re-read by the Court Reporter.)

6          THE WITNESS:   Oh.  Honestly, I don't know

7     how to answer that.  Like I know I was like -- I

8     know I was like different but, you know, I didn't

9     know -- the reason it's hard for me to answer

10    that question is because I still kind of -- kind

11    of little hard for me to grasp what other people

12    think is normal.  I still don't --

13         Like with the Adderall thing.  It's

14    supposed to be helping me but I don't know what

15    I'm supposed to be looking for.  So it's like --

16    it's like a concept that I don't understand.

17    It's like something that is normal to you or

18    something that maybe normal to me is like

19    completely like not normal to you.  So it's like

20    the whole --

21         Now, I know it's not normal because they

22    tell me it's not normal.  But going about it

23    someone said something, you know, like for

24    example like the GPS thing.  It's like I just

25    assumed that that was just like a certain

Page 35

1    instance.  I don't know.  I didn't just --
2    someone wouldn't just say something I would
3    immediately be like oh not normal.  That's not
4    how -- I don't know what normal is.
5         MR. ROMAN:  Why don't we take a few minutes
6    break.  We'll let her use the restroom and then
7    we'll come back on the record.
8         THE VIDEOGRAPHER:  Off the record at 11:05.
9         (A recess was taken from 11:05 A.M. to 11:12
10   A.M., after which the following proceedings were had.)
11        THE VIDEOGRAPHER:  We are now back on the
12   record at 11:12.  You may proceed.
13        THE WITNESS:  I wanted to ask you
14   something.  I wanted to say something on the
15   record about the -- you were saying something
16   about the medical records?
17        I gave them all to you last night and I
18   don't see the need for a duplicative type of
19   thing.
20        And second, I was never served with a
21   discovery request for any type of authorization,
22   anything like that.  So I can't be compelled to
23   do something that I was never requested to do.  I
24   just want to say that for the record.
25

Page 36

```
1    BY MR. ROMAN:
2         Q.    All right.  Continuing on.
3               When you were in high school, did you ever
4    receive additional testing time beyond what was given to
5    all other students?
6         A.    I'm sorry.  First part of the question?
7         Q.    When you were in high school, were you ever
8    given additional testing time beyond what was given to
9    other students?
10        A.    I've already answered that question.
11        Q.    Are you refusing to answer it again or will
12   you answer the question?
13        A.    You can refer to my earlier answer.
14        Q.    In high school.  I know we talked about
15   middle school.  But I don't recall you answering the
16   question with respect to high school?
17        A.    In high school the teachers allowed me to
18   come back during lunch and sometimes would let me stay
19   after the class depending on what class I had afterwards
20   to finish my exams.
21        Q.    Did you ever get extra time for homework
22   while in high school?
23        A.    I can't remember that.  I can't even tell you
24   if I turned all of them in.  It's just way too far back.
25   I can't remember.  You know, homework was assigned like
```

Page 37

1    every day or every other day type of thing.  I can't

2    remember every instance of it, no.

3        Q.    Can you recall any special treatment that you

4    received in high school in order to allow you to

5    complete tests or assignments?

6        A.    I don't know what you consider special.  I

7    can just tell you what happened and that's the lunch

8    thing and the staying behind after everyone else moved

9    onto their classes is the same -- is the same statement.

10   I don't know how to --

11               I don't know how to label it.  I don't know

12   if it's special.  I don't know.  It's like I don't know

13   how to label it.  I just know what the teachers let me

14   do.  I wasn't -- when the stuff was happening, I wasn't

15   considering myself compared to everyone else.  Whether

16   they finished or not had nothing to do with whether I

17   finished my exam.  Because I just needed to be able to

18   finish it.  I just needed, yeah.

19       Q.    Which high schools did this occur at where

20   you were able to finish tests during lunchtime or after

21   class?

22       A.    The Montgomery County schools.

23       Q.    Which ones were those?

24       A.    Rockville and what is it called?  Walter

25   Johnson.

Page 38

1    Q.    After high school after you graduated from

2  high school?

3    A.    Uh-huh.

4    Q.    Did you --

5          What other institutions did you attend after

6  high school?

7    A.    Morgan State University.

8    Q.    Did you attend any community college prior to

9  Morgan State?

10   A.    I think technically it would have been prior

11 but the day that I graduated high school I think the

12 next day during the summer I was going to the fall -- to

13 Morgan State but before I became a freshman in the fall

14 I took summer classes at the community college just

15 because like I don't know what to do with myself during

16 the summer.  So might as well just be in a class.

17         So I think technically it was before but I

18 was still my freshman, the typical freshman year was at

19 Morgan State.  I didn't -- I didn't -- I don't know how

20 to explain it.  I know it's like a weird thing that I

21 did but that's what I did.

22         Most people would take a break off after high

23 school and then start college in the fall.  I didn't do

24 that.  Kind of just took community college classes.  I

25 think that's what -- I'm pretty sure that's what I did,

Page 39

1    I think.  Yeah, I took some PG classes and then began my

2    freshman -- what I consider my freshman year at Morgan.

3    I don't know credit wise I think I was like a late

4    freshman type because I came in with some other grades.

5         Q.    When you say PG, that's Prince George

6    Community College?

7         A.    Yes.

8         Q.    You graduated Morgan State in three years,

9    right?

10        A.    Yes.

11        Q.    When you were at Morgan State, did you ever

12   receive any extra testing time so you could finish

13   exams?

14        A.    Officially or unofficially?

15        Q.    Either way.

16        A.    Either way?  Yes.

17        Q.    Do you recall in what courses?

18        A.    It would be random.  There is no like set

19   subject it would happen.  It would happen in anything;

20   biology, chemistry, math, English.  I really struggled

21   in classes that are very word based.  Yeah, word-based

22   classes.  What am I saying word based?

23             Classes that require you to read a lot of

24   like books and stuff in preparation for a test.  Those

25   classes I kind of had to get really creative because

1    those type of classes always been like a very type of --

2    biology and chemistry and stuff like that, it was a

3    little easier, because it was more about understanding

4    rather than -- it was more about understanding concepts.

5            But with history, like history classes,

6    that's nothing like pure reading and regurgitating

7    history that you read.  Those are very -- but it just --

8    there is no set, no set structure to it.  If I just --

9    if I just wasn't able to finish an exam, most teachers

10   would just let me finish it.  I never had a teacher

11   that -- not that I can recall.  I think I had one math

12   teacher that didn't let me do it and I think I failed

13   that class.

14       Q.   How would the teachers know that you needed

15   the more additional time?

16       A.   I think it was a couple ways.  First, I

17   think -- I think particularly I think -- no, I don't

18   know.  I think some of the teachers -- they may have

19   noticed my frustration during some exams.  Sometimes I

20   would like not be done and I would have like eyelashes

21   on my exam.  So I would be -- I would be -- they were

22   just nice.  They just -- I never really -- they were

23   like kind of like in high school.  They kind of like

24   hey, if you're not done, you know.  They gave me some

25   type of opportunity to finish it.  They never -- I don't

1   remember a teacher forcing me to turn in uncompleted

2   exam.  I don't.  I don't.  If it happened, it's very

3   few.  It's so few that I don't remember.

4            Most teachers would generally give me an

5   opportunity to finish the exam some type of way, whether

6   it be going to their office or if they had like multiple

7   classes back to back that are taking the same exact exam

8   I would just like overlap with the next group of

9   students.

10           But it was just teachers have their own

11  various ways of how they just let me finish.  There was

12  like no set way.  I never really -- I wouldn't -- I

13  don't know if I would directly say -- I would just

14  indicate to them -- I'm not -- I can't finish these

15  exams.  I don't know the precise language I used.  I

16  indicated in some way that hey, I know everyone's done

17  but, you know, I'm only like halfway through the exam.

18  So I don't know.  It's a --

19       Q.   Would you sometimes ask them if they could

20  give you additional time so you could finish?

21       A.    I never thought to ask them before an exam.

22  I usually just -- if I'm at the end of an exam and it's

23  not finished then I would tell them that, that I was

24  unable to finish the exam when the time is up.  I never

25  really thought to say -- I never -- I don't know, what's

1    the word I'm looking for?  Some type of

2    pre-contemplated -- something --

3            I never assumed that -- I didn't know that

4    something was wrong with me that I just thought -- I

5    don't know.  I just thought maybe I must have had like

6    bad luck on every exam of my life that I couldn't finish

7    it.  I never really thought that -- I always -- what I

8    usually thought was that I knew the information well

9    enough that time wouldn't be a problem.  But time was

10   always a problem regardless how well I knew the stuff.

11           The only time time is not a problem is if I

12   know of the actual questions in advance.  That would

13   help a lot.  But if I don't know the questions in

14   advance, it doesn't matter how well I know it.  Time is

15   like it's outside of my control.  I just don't know how

16   to explain this.  It's just outside of my control.

17           But if they did give me time, I would perform

18   really well, yeah.  If I was able to complete the exams,

19   yeah, and I knew my stuff, and I know my stuff, you

20   know.  It's just -- yeah.

21       Q.    Let's talk about in particular the ADHD.

22   Today as you sit here today, how does the ADHD impact

23   your daily life?

24       A.    My daily life?

25       Q.    Correct.

1     A.     The Netflix thing, the Hulu thing with the

2  whole not liking live TV because I can't rewind it.  So

3  if I'm watching Netflix, you know, I might take a little

4  longer to finish a show because I keep rewinding it.

5  But that's a benefit of being able to rewind TV shows

6  and Netflix and stuff.

7            The GPS thing I drive all the time.  But I

8  need GPS all the time.  Don't really care how short of a

9  distance I'm going.  I'm going to turn the GPS on.

10           A lot -- I notice, what I notice -- what I

11 noticed during this lawsuit is that like at Ross I

12 didn't have to worry about taking notes during class

13 because they did something called video -- I forgot what

14 they called it.  They videotape all their lectures.  So

15 I was able to like rewind it whenever I felt like it and

16 stuff like that.

17           But during a lawsuit when I try to take notes

18 while other people talking, I realize that the whole --

19 that's why I would drop certain teacher's things like

20 affecting me most because I can't control when other

21 people talk.  When other people talking to each other or

22 like when you were talking to the judge or something

23 like that and I want to take notes, it's like I can try

24 and I'll attempt but I just can't -- I don't know what

25 it is.  It's just like I can't --

Page 44

1          And I don't even know how to classify it.

2   It's like I wouldn't even say it's a -- I don't even

3   know how to classify -- I don't know how to classify why

4   I can't -- like I don't know if it's like a -- I just

5   don't know how to classify.  I just don't know why I

6   can't --

7          Like what I assumed was that if people are

8   typing or writing notes while someone else is talking

9   I'd just assumed they weren't listening.  But other

10  people are actually taking notes and listening or typing

11  and listening at the same time.  It's just -- I don't

12  understand how they're doing that.

13         So I just -- it's like most likely if I'm

14  taking notes or I'm typing something I am most likely

15  not paying attention to whatever the person is saying.

16  So I'm going to miss -- from when I look down to write

17  something, I will probably miss something that person

18  has said.  It's just I know that for a fact.  If I'm

19  not -- so that's just -- that's just another way.

20         In the legal proceedings and stuff like that

21  when I have to think about -- like when I have to think

22  before I speak, when I can't just talk naturally.  It

23  makes me for some reason, it makes me lose

24  concentration.  I don't know how to explain that one.

25  It's like if I'm talking to a friend, I can speak

1   naturally.  I don't have to worry about making mistakes

2   or anything like that or saying something that I didn't

3   mean to say.  Because I can be like -- you know, I can

4   say something and be like oh, I meant to say this or I

5   meant to say that, you know, or that's not what I meant

6   to say, something like that.

7           But in legal proceedings, it's kind of like

8   once you say something it's like boom, record type of

9   thing.  So because of that, it's like I have to be more

10  cautious when I speak.  And because of that, it makes

11  me -- I don't know.  It's like sometimes I try to zone

12  in on -- I don't know why I do that.  I just -- it's

13  like -- I don't know.

14          Then I try to find like a perfect word to say

15  something but I can't find it and then all my attention

16  goes to what is that perfect word?  And then I would

17  just like sometimes just like forget the rest of the

18  sentence or forget the question just because I can't --

19  I'm having trouble saying exactly what I want to say how

20  I want to say it.

21      Q.    Are there any other examples you can think

22  of, of how the ADHD affects you today?

23      A.    I mean it's probably a lot.  It's just I

24  don't know.  It's just -- if you list a list of

25  activities, I can probably tell you if I had some type

Page 46

1    of -- if I look for something, I can probably --

2            Like if I try to be aware of my symptoms, my

3    daily life I try.  The only reason I know the whole TV

4    thing is because, you know, when you're watching with

5    other people they get mad like what are you looking at;

6    why do you keep rewinding type of thing?

7            And then when I'm driving, people would

8    always say why do you always have the GPS on?  You've

9    been here so many times type of thing.  So it usually

10   takes someone else to tell me hey, look -- it usually

11   takes someone else to bring something to my attention.

12       Q.    Are you able to care for yourself, take care

13   of yourself?

14       A.    Yeah.

15       Q.    I know you said you live with your mom, your

16   brother and your sister right now but have you lived by

17   yourself before?

18       A.    Yeah.

19       Q.    And when was the most recent time you lived

20   alone?

21       A.    When I was at Ross.

22       Q.    So that would have been before May of 2016?

23       A.    When I left for college I lived on my own

24   until I came back home after Ross.  So I don't know --

25   when did I go to college?  Like 2010.

1    So from there until 2016, 2017 that's when I

2 actually came home to like stay home.  So like the only

3 reason I'm home now is because I'm not at Ross anymore.

4 So yeah.  And I financially can't leave.  So yeah.  I

5 didn't -- home was almost --

6    The home in Bowie was usually some type of --

7 it was just like my family's home where I would come to

8 visit during like Christmas breaks or Thanksgiving from

9 college or school, where ever I was at.  I always live

10 on my own from high school.

11    Q.    And the reason you're home now is for

12 financial reasons you say, right?

13    A.    Yes.

14    Q.    Otherwise you would choose to live on your

15 own if you could?

16    A.    Of course.  Yeah.

17    Q.    And you travel alone.  Obviously, you came

18 down here by yourself, right?

19    A.    Uh-huh.

20    Q.    And you're able to drive, correct?

21    A.    Yeah, yeah.

22    Q.    With regards to the OCD diagnosis, how does

23 the OCD impact your daily life today?

24    A.    The OCD?

25    Q.    Uh-huh.

Page 48

1        A.      That one I have a lot less understanding

2   because -- that one I just have a lot less

3   understanding.  And I think my problem with the OCD,

4   understanding the OCD is I don't understand anxiety that

5   much.  It's still like an abstract concept to me when

6   they try to explain it.  So most of the time I don't

7   know that it's -- like -- like -- like with the OCD I

8   think.

9               The OCD, the way they explained it is I would

10  be compelled to do something to decrease my anxiety.

11  But the problem is my disconnect is I -- if I do become

12  aware that I'm doing something repetitively or that I

13  can't stop, I'll try to explain to you how I rationalize

14  in my head.

15              But if I'm doing that activity or whatever it

16  is, I never think that it's the trigger of anxiety.

17  Even though I'm told, like that's an OCD thing.  It's

18  like I still -- I don't know that -- I just, I just, I

19  just -- sometimes I get -- it's not -- I don't want to

20  say I get stuck.  It's like I get -- I feel

21  uncomfortable.

22              Like so when I'm typing these legal

23  documents, it takes me really long time.  So I

24  usually -- I usually have -- to be honest, to be

25  perfectly honest, I start typing these documents way

1   before the topic even comes up because I just in my

2   mind, I don't know if it's anxiety, whatever it is but I

3   try to map out every possible thing that could possibly

4   happen and try to start some type of track or something

5   like that to be prepared because I know that if I have

6   to start -- if I'm blindsided by something, there is

7   probably no way -- if I'm blindsided by something, like

8   I don't have any saved case laws on, if I don't have

9   nothing about it, it's a totally abstract concept or

10  anything like that, I'm not going to be able to catch up

11  in time to learn it or whatever to be efficient on it.

12          So I forgot your question.

13      Q.    I was just asking how the OCD impacts your

14  daily life?

15      A.    Oh.

16      Q.    And I'm wondering if you can give me some

17  examples of some -- I think you mentioned there maybe

18  some repetitive conduct but what types of examples are

19  there of that?

20      A.    So when I'm typing -- when I'm typing the

21  legal documents, sometimes I would get to a section and

22  I have to move the mouse back and forth between words or

23  letters, I don't know what it is.  But it's like I have

24  to move it back and forth and I can't stop until I feel

25  like it's the perfect spot to stop.  But it never feels

1    perfect.  So I just feel extremely, extremely, extremely

2    uncomfortable stopping if it's not the right time to

3    stop.

4           So it might go on for like, I don't know,

5    three minutes, five minutes.  I don't know.  I don't

6    know -- I don't know how long I probably was doing it.

7    But if I'm typing something, it will usually like it

8    will take sometime away from whatever it is just because

9    I can't stop on the right thing.

10          Like if something is equal, then I might be

11   able to be okay with stopping like right in the middle

12   which might break the activity but sometimes it's not

13   that easy.

14          Oh, during exams it manifest in different

15   ways during exams.  Specifically just it all depends

16   on -- I don't know.  The OCD thing that's the compulsive

17   activity is not constant.  To say it's not the same

18   every time.  It literally can be -- it's unpredictable

19   as to what the compulsive activity might be.  But some

20   things are relatively consistent as in for some reason

21   it's like I know that if I do this it would decrease my

22   anxiety.  So for like exams where -- especially exams

23   that are like on the computer.

24          Well, not on the computer.  Exams where I

25   can't see the previous question.  Like if I can't see

1    all the questions at the same time.

2            For example, you know, if I can't see all the

3    questions at the same time I need to go and click back.

4    After I answer a question, I need to -- like if I have

5    like three questions I could answer question one, go to

6    question two, then I have to go back to question one

7    just to make sure it's still, just to make sure it's

8    still there.  I don't know how to explain it.  Just to

9    make sure like it didn't go away or something like that.

10   I don't know why I just have to reassure myself that

11   it's still there.

12           I don't really think about whether it's right

13   or wrong or not.  I just go back to make sure it's still

14   answered, even though I answered it.

15           Then I would go back to two -- back to two

16   and then I would go to three.  Sometimes I would even go

17   back to one again just to make sure it's still there or

18   just to go back to two.  I don't know.  There is no

19   thing to -- I just need for some reason to constantly,

20   constantly go back to make sure that stuff didn't

21   disappear.

22       Q.    So with regards to the anxiety disorder,

23   earlier you sort of grouped it with the OCD.  Would the

24   answer be any different as to how the anxiety disorder

25   impacts your daily life or is it the same conduct, the

Page 52

1   same activity you've described with the OCD?

2       A.    Overall the anxiety from the anxiety disorder

3   and the OCD my thought it's like it's harder for me to

4   concentrate on the activity -- like the OCD it's hard

5   for me to concentrate on activity because I can't -- I

6   need to focus on doing the compelled activity or

7   whatever it is.

8            With the anxiety disorder, it's like too many

9   thoughts.  I don't know -- I think like the ADHD is like

10  it may not have too many thoughts.  It may just be a

11  couple things and it may distract me from whatever I'm

12  doing.

13           And the OCD is more like I have some type of

14  anxiety from somewhere where I don't know where it's

15  coming from type of thing.  But in my mind, doing this

16  activity would make me feel better, which the doctors

17  say that feeling better is the anxiety going down.

18           But the anxiety disorder, it's like it's too

19  many thoughts, too many things, too many things.  Now,

20  I'm introduced too many -- too many, too many things and

21  it's like small stuff like -- like -- like did I eat or

22  did I do enough of this?  It just kind of sometimes it's

23  just like the anxiety disorder it's just like too

24  many -- it's just too many, too many, too many -- I

25  don't know.  I don't know how to explain.

Page 59

1    what they ultimately wanted to get.

2              So I don't know if I explained this well.

3    But in the context of me, I think I made a decision when

4    I decided to become a biology major, which was freshman

5    like right after like high school or like yeah, right

6    after high school.  Like biology, let's go for med

7    school.

8         Q.    That would position you with a biology major

9    to be in a good position to go to medical school.  Was

10   that your view at the time?

11        A.    Yes.

12             MR. ROMAN:  Okay.  Why don't we go off the

13        record.  Maybe we'll just take a lunch break.

14        It's almost noon and that way we can get out

15        faster if we get on the early side to grab

16        something.

17             THE VIDEOGRAPHER:  This marks the end of

18        Media 1.  We are off the record at 11:57.

19             (A lunch recess was taken at 11:57 A.M. )

20

21

22

23

24

25

Page 75

1    saying like I was running out of time and stuff.

2        Q.    Did Dr. Sharma tell you who to talk to, to

3    request accommodation?

4        A.    Did Dr. Sharma tell me who to talk to?  He

5    told me -- in December 2015 when I said I needed

6    extended testing time for the exams that I failed in

7    2015, he told me go talk to Dr. Hayse.

8              Dr. Hayse then said that he can't accommodate

9    me for past exams but he can accommodate me -- but he

10   could accommodate me for future exams in that he would

11   basically contact Mr. Cuffy or someone in the counseling

12   center just so I get my -- because I told Dr. Hayse that

13   the counseling center suspected some type of attention

14   concentration problem when I was asking for more -- when

15   I was asking for extended testing time.

16             And then he said that he would just contact

17   the counseling center to kind of like confirm and get

18   that information so that I can receive extended testing

19   time.  And I think specifically he said, Mr. Cuffy, he

20   was going to contact Mr. Cuffy.

21       Q.    Dr. Sharma was deposed in this case, right?

22       A.    Yes.

23       Q.    And you were there for deposition, correct?

24       A.    Yes.

25       Q.    You took it, right?

Page 81

1   have -- I might have -- I might have looked into it when

2   I was first a student there.  So I don't --

3          What was the question?

4      Q.    Had you reviewed the student handbook prior

5   to December 2015?

6      A.    Reviewed the handbook prior to December -- in

7   its entirety?

8      Q.    Yes.

9      A.    In its entirety, I did not sit down there and

10  read the entire handbook.

11     Q.    What is the purpose of a student handbook as

12  far as you know?

13     A.    It's a handbook for students.

14     Q.    What information does it usually contain for

15  students?

16     A.    I don't know how many pages it is.  It must

17  be like -- it's a bunch of pages.  It contains a lot of

18  stuff in there.  It's -- I can't sit here and list

19  everything down.

20     Q.    Does it include information about request for

21  accommodations?

22     A.    Yes.

23     Q.    Had you reviewed that section prior to

24  December 2015?

25     A.    Prior to December 2015?

Page 82

1    Q.    Correct.

2    A.    I don't recall.

3    Q.    Did you ever go into the student portal to

4    look for the request for accommodation form?

5    A.    Why would I do that?

6    Q.    I'm just asking if you ever did?

7    A.    No one ever told me to do that.

8    Q.    So you never went looking for it, correct?

9    A.    In the student portal?  I don't know why it

10   would be there.

11   Q.    Do you know if it was there?

12   A.    I have no idea.  No one said anything about

13   it being in the student portal.

14   Q.    Are you aware --

15         We've obviously produced a lot of documents

16   in this case back and forth.  You produced a lot

17   documents to us.  We produced a lot of documents to you.

18         Are you aware of any document in which, in

19   writing, it states that you asked Dr. Sharma for

20   extended testing time?

21   A.    Are you -- what do you -- repeat the

22   question.

23   Q.    Are you aware of any document in this case

24   that's produced by either party or by any third party

25   where the writing, the document reflects that you asked

1    been a waste of my time to go through those documents.

2        Q.    Ross University didn't make up the

3    relationship issue, correct?

4        A.    Probably not but still irrelevant.  I don't

5    know why -- I needed extended testing time.  Ross didn't

6    give it.  So why would I look at relationship documents?

7        Q.    Did the relationship issues cause you any

8    stress in December of 2015?

9        A.    December 2015?  No.

10       Q.    Did they cause stress prior to December 2015?

11       A.    Earlier in the semester, yeah.

12       Q.    And would they have caused stress during the

13   fifth semester that you failed?

14       A.    Throughout the whole semester?

15       Q.    Correct.

16       A.    No.  Not continuously, no.

17       Q.    At any point during that semester?

18       A.    Now, we are getting into like what you

19   consider stress.  Like I remember one stressful event

20   that happened.  But to -- to say that -- like now -- now

21   we can't say that everything that I was concerned about

22   was stressful if that makes sense.

23            Basically saying if I didn't eat breakfast

24   because I had some type of lab that I had to get to

25   because I woke up late, it stressed me out.

1   that were relevant to me, I didn't -- I literally

2   extracted them out and put them to the side because, you

3   know, I don't need distractions.  So all right.

4        Q.   We'll revisit that.  I want to keep going

5   though with you the request for extended testing time

6   that you have said that you made to various individuals

7   at Ross.  We've talked about Dr. Sharma and we've talked

8   about Mr. Cuffy.

9             With regards to Mr. Cuffy, are you aware of

10  any document, any piece of paper that confirms or states

11  that you made a request of Mr. Cuffy for additional

12  testing time?

13       A.   The Release of Information agreement states

14  that I wanted them to release information if it was

15  related to the academic accommodations.

16       Q.   Okay.  And that doesn't mention testing time,

17  correct?

18       A.   That was for them to determine if whatever

19  accommodations were necessary.  So my verbal -- my

20  preference was extended testing time but honestly any

21  accommodation that they would have deemed necessary

22  would have been -- probably would have been acceptable.

23       Q.   So just answer that question.  My question

24  was does that document, Release of Information consent

25  form, actually state anything having to do with testing

1    time?  Does it use a phrase or a phrase similar to

2    testing time?

3         A.    It uses accommodation, academic

4    accommodations.

5         Q.    So it talks generally about accommodations

6    but not specifically about testing time, correct?

7         A.    The specific accommodation that I thought

8    would help me was extended testing time and that was

9    verbal.

10        Q.    And that wasn't in that document?

11        A.    No, it was -- it was --

12              That document let them know that I needed an

13   accommodation of some sort to help me out and

14   information relevant to it.  I consider whatever I spoke

15   to them relevant if it was about ADHD or not finish the

16   exams on time or something like that.

17              As long as it was relevant to academic

18   accommodations that would help me better perform, that

19   is what that form is for.  So that form is like the

20   gatekeeper of any request that requires some type of

21   accommodation or assistance or something from Ross.

22        Q.    When did you get a diagnosis of ADHD; on what

23   date?

24        A.    On what date?

25        Q.    Correct.

1      A.    I don't -- I don't -- I don't -- I don't want

2  to guess dates.  Cause guessing a specific day I'm not

3  going to lie, I might say the wrong date.  I just know

4  general time spans.  In January 2016 I know I was

5  diagnosed with ADHD.

6      Q.    It was after that Release of Information

7  consent form, correct?

8      A.    The diagnosis?

9      Q.    Correct.

10     A.    Before the Release of Information consent

11  form there was -- there was no -- there was no suspected

12  disability.  Not that I -- I didn't suspect.

13     Q.    But there was no ADHD diagnosis until,

14  according to your medical records, it wasn't until

15  January 18, 2016 was the first time it's an assessment

16  on any of the counseling notes?

17     A.    If you're --

18          If you're asking me the first time that it

19  was written down as an assessment in the counseling

20  notes and if the first time it shows it is on

21  January 18, 2016, then I have no right to argue with

22  that.  I don't see -- what I know that the Release of

23  Information form was initially not for per se ADHD, it

24  was for my concentration problems.

25          The fact that they suspected ADHD was what

Page 93

1    that form was for.  It wasn't for a diagnosis.  It was

2    for the fact that I had concentration problems that the

3    counseling center suspected and they were going to

4    diagnose and they started to diagnose and that I needed

5    extended testing time because of that.  That's what that

6    form is for.  It's not specifically for ADHD.  It's for

7    the need for extended testing time.

8         Q.    Dr. Sharma and Mr. Cuffy both testified that

9    the Release of Information consent form had to do with

10   trying to get you off the island because you were trying

11   to go home.

12        A.    I made two verbal requests.  I made two

13   verbal requests.  After I signed that document, I asked

14   can they tell Ross administration that I needed extended

15   testing time because of a suspected disability that

16   needed to be diagnosed.

17            And then the second thing I asked for was if

18   they could also help me change my flight to a earlier

19   flight since the semester was over so that I could just,

20   you know, go home earlier instead of sitting around

21   doing nothing.

22        Q.    I'm going to show you what we'll mark as

23   Awodiya Exhibit 1?

24        A.    Awodiya 1.

25        Q.    And is this the Release of Information

1    Consent that we've been discussing?

2          A.    Yes, this is the agreement.

3          Q.    And it's dated December 9, 2015, correct?

4          A.    That is correct.

5                (Thereupon, the document/item referred to was

6    marked for identification as Exhibit 1.)

7          Q.    And that's your signature at the bottom of

8    the --

9          A.    Uh-huh.

10         Q.    -- second to last line?

11         A.    Yes.

12         Q.    Okay.  At this time on December 9th, 2015 are

13   you aware that your mother had made phone calls to

14   Jeannie Robertson at Ross expressing concerns about your

15   well being?

16         A.    I don't know -- I don't --

17               I didn't know that she made that call.  I

18   don't know what that call was about.  I don't know what

19   she said.  And all I do know is that after I failed my

20   exam I told her that I failed.  She was just -- just as

21   upset I guess.

22               The next thing I know I received a call from

23   somebody in the counseling center saying that I should

24   come in, I think it was Mr. Cuffy.  I don't remember if

25   it was specifically him but I remember somebody calling

Page 95

1    me telling me that I need to come in and speak to the

2    counseling center because my mother called them.  And so

3    I was confused by that.  I don't know why she would do

4    that but --

5         But during the litigation when they showed me

6    that document, then I was a little -- I can't -- I think

7    it was multiple documents when they said my mother

8    called them or something like that.  I didn't know what

9    she told them exactly until they -- until you guys

10   produced it.

11        She never told me what -- because I never --

12   I don't know what she told Ross.  But aside from what's

13   in those documents that Ross produced but yeah.

14   That's -- that was her own thing.  Like I can't be --

15        I'm going to be perfectly honest.  You can't

16   join my actions with hers.  She was not -- she was like

17   a worried mother I guess or something.  She was just

18   very upset that I failed.  So she took it upon herself

19   to call Ross.

20       Q.   She apparently told Jeannie Robertson that

21   she had gotten a text from you saying you'd rather die?

22       A.   I never said that.

23       Q.   So she -- that's incorrect?

24       A.   That's very incorrect.

25       Q.   And why would your mom make that up though?

Page 96

1          A.       I don't know.  Maybe she thought that Ross

2     would take her more seriously.  That is not a question

3     for me.  So what I can tell you is that I didn't say

4     that.  Whatever she says that I said in those documents,

5     I didn't say.

6          Q.       But you'll agree you got a call from the

7     counseling center expressing that they wanted you to

8     come in, right?

9          A.       Yeah.

10         Q.       And do you think it had anything to do with

11    the phone call that your mom made?

12         A.       Yeah.  I think they told her -- because I

13    told her that I failed.  So I know -- I don't know where

14    I was at when I received that call.  I think I was at --

15    was I outside?  I think I was like --

16              They have something called like -- it's like

17    a lounge area or something like that.  I don't know.  I

18    don't remember exactly where I was at.  I think I was --

19    I don't know.  Because I know the semester was over.

20              But yeah.  But she -- wait, what was the

21    question?

22              MR. ROMAN:  Carla, if you could read it

23         back to us.

24         (Thereupon, the requested portion of the

25    record was re-read by the Court Reporter.)

1            THE WITNESS:  Yes.

2    BY MR. ROMAN:

3        Q.    After that contact from the counseling

4    center, you went into the counseling center and met with

5    Mr. Cuffy, correct?

6        A.    Yes.

7        Q.    And do you recall a safety plan that you

8    signed with Ross University?

9        A.    Uh-huh.

10       Q.    I'm going to show you what we'll mark as

11   Exhibit 2.

12            And is this the safety plan that you signed

13   with Ross on December 8, 2015?

14       A.    Yep.

15            (Thereupon, the document/item referred to was

16   marked for identification as Exhibit 2.)

17       Q.    And is that your handwriting in the middle?

18       A.    Yes.

19       Q.    Okay.  And is that your signature at the

20   bottom?

21       A.    Yes.

22       Q.    Was this --

23            Do you recall whether December 8th, 2015 was

24   the day you first got the call from the counseling

25   center asking you to come in?

1     A.     Probably I think so.  Again, specific dates

2   there is no way I can narrow something to a specific

3   date.  At least not without a document because just

4   jumping.  I don't even remember what I was doing last

5   week this time.  So yeah, unless you kind of remind me

6   of like the context of that day then yeah.  But it must

7   have -- it probably must have -- it must have been

8   signed -- I must have gotten -- no, no, no, no, no.  I

9   think -- I don't know when I got that call.  I know I

10  got that call in between when they told me I failed and

11  between when I came in that I got the call to come in

12  again with dates.  I don't even remember the day that I

13  failed.

14          Like I don't know the technical date that the

15  semester -- I just know all this happened in December.

16  So at the end of the fifth semester.  Like before I went

17  to Subway I forgot -- I didn't even know what day of the

18  week it was today.  You know, so I don't consciously go

19  around paying attention to the actual dates of things.

20  It was not something I can just jump back to remember.

21     Q.     In the middle of the safety plan there is a

22  couple of items that you filled in.

23          The first one if says "Remind myself that

24  there is life after repeating."

25          What does that mean?

Page 99

1       A.      It means there is life after repeating the

2    semester.

3       Q.      So that -- just because you had to repeat the

4    semester that that wasn't the end of the world, you

5    would repeat it and get back on track, is that what you

6    were trying to say in the safety plan or -- help me

7    understand what that means.

8       A.      Mr. Cuffy told me that I have to write down

9    something to remind myself of and this is what I wrote.

10      Q.      Something positive?

11      A.      Basically.

12      Q.      Okay.  Did you believe that at this time?

13      A.      That there is life after repeating?  There is

14   life even after I failed.  I mean there is life

15   regardless after.  Like that's the last part of it

16   doesn't -- isn't relevant.  There is like after

17   regardless.

18      Q.      And you repeated the semester, right?  You

19   went back, correct?

20      A.      Yeah.

21      Q.      And it says "and family, mom and dad deeply

22   care for me and love me."  And were you asked to fill in

23   the names of somebody that cared for you and loved you

24   there?

25      A.      Yes, that's what I was asked to do.

Page 100

1    Q.    And did you believe that at the time you

2  filled it out?

3    A.    That my family cares about me?

4    Q.    Yep.

5    A.    Yeah.  I mean they got to care.  I mean --

6    Q.    All right.  You mentioned earlier that

7  Dr. Hayse was one of the people that you spoke you with

8  and informed that you needed extended testing time,

9  correct?

10    A.    Uh-huh.

11    Q.    Was there any written requests made to

12  Dr. Hayse?

13    A.    Why would I do that?  It was verbal.  I

14  already asked him.

15    Q.    So you made a verbal request to Dr. Hayse,

16  correct?

17    A.    Uh-huh.  And he said he would get whatever

18  information from Mr. Cuffy.

19    Q.    And do you know if he followed up with

20  Mr. Cuffy?

21    A.    I didn't even know he made an attempt until

22  you guys produced that e-mail.  Like I thought Mr. Cuffy

23  was supposed to just give it to him.  I didn't know -- I

24  didn't even know that he even sent the e-mail or

25  anything like that until you guys produced it.

1    When you guys produced it, I was like -- in

2  fact, I was honestly shocked.  I was like I don't know

3  what broke down between the two and why neither one of

4  them can remember anything about it or what happened

5  after or whether they continued to talk.  But the fact

6  that he actually did try and reach out to Mr. Cuffy

7  before I went to the state and got my ADHD stuff and

8  Ross did their own thing as well, I mean he reached out

9  to Mr. Cuffy like he said he would do.  So I don't --

10    Q.    He sent an e-mail saying we should have a

11  call, right?

12    A.    That's what you guys produced.

13    Q.    But it doesn't say in that e-mail we need to

14  have a call about accommodations or extended testing

15  time or anything like that, right?  It just says we need

16  to have a call?

17    A.    That's -- I mean if that's what the document

18  says.  Because you know, again, I can't choose people

19  words for them.  He probably had a reason for not using

20  such sensitive language or anything like that.  I don't

21  know, it's like regarding my mental health here.  So he

22  probably used selective language.  I don't know.  I'm

23  just speculating.  All I know is that I told him that I

24  need extended testing time; can I repeat those exams

25  with extended testing time.  And he said he would do it

Page 102

1   for future exams and that he will contact Mr. Cuffy to

2   make that happen.

3         Q.    I thought Dr. Sharma was going to help make

4   that happen though.  Now, it's Mr. Cuffy?  Both of the

5   two of them were both going to -- help make that happen?

6         A.    Yes.  Both of them were in the same meeting,

7   the first meeting that told me to go see Dr. Hayse.

8   They were both in that meeting.  From the beginning

9   Dr. Sharma and Mr. Cuffy were hand-in-hand in my -- in

10  my -- in my care.

11        Q.    Dr. Hayse, was that a conversation you had

12  with him in person?

13        A.    Yes.

14        Q.    Did you go to his office?

15        A.    Yes.

16        Q.    And was anyone else present for that

17  conversation?

18        A.    No, he closed the door.

19        Q.    And how come Dr. Hayse doesn't have any

20  recollection of that?

21        A.    I don't know.  Maybe because he's seen like a

22  thousand students.  I've only seen a handful of

23  administrators.  I can understand if he doesn't remember

24  me out of all the students that he sees.

25        Q.    Mr. Stewart-Fulton, Matthew Stewart-Fulton,

Page 103

1   who is he?

2       A.    I don't know his full title but to my

3   knowledge he's one of the accommodation coordinators.

4       Q.    And he works in the accommodations office at

5   Ross, correct?

6       A.    Student affairs office, yes.

7       Q.    In Dominica, on the Dominica campus at the

8   time?

9       A.    Yes, in student affairs office in Dominica,

10  yeah.

11      Q.    Do you know whether Mr. Stewart-Fulton is the

12  person primarily responsible for academic

13  accommodations?

14      A.    He is not.

15      Q.    Who is?

16      A.    Dr. Hayse.

17      Q.    And Dr. Hayse is the dean of student affairs,

18  correct?

19      A.    Associate dean, yeah, of student affairs.

20      Q.    And Mr. Stewart-Fulton is person who is the

21  accommodations coordinator, correct?

22      A.    From the documents you guys produced yeah,

23  he's one of the accommodation coordinators at Ross.

24      Q.    Do you know if he is the primary

25  accommodations coordinator for the Dominica campus?

1      A.    I don't know if he is primary anything.   What

2    I know is that the decision was supposed to come down to

3    Dr. Hayse.  I didn't -- I didn't --

4            To be honest, during that time frame I didn't

5    know what his role was aside from relaying something to

6    Dr. Hayse.  It's -- it's -- I don't see -- I think he's

7    just one of the vessels of getting accommodations.

8      Q.    Doesn't the student handbook tell us exactly

9    who to send these documents to?

10     A.    Send?

11     Q.    Requests for accommodations to

12   Mr. Stewart-Fulton?

13     A.    So when I came from America and I brought my

14   stuff over because of the sensitive nature of it, I only

15   had one copy because, you know, I'm traveling to another

16   country.  So I gave it to the counseling center and they

17   were supposed to give it to -- what's the name, Mr.

18   Stewart-Fulton.  So that's what the Release of

19   Information agreement was supposed to facilitate.

20     Q.    What documents in particular are you talking

21   about there?

22     A.    That I brought from the U.S.?

23     Q.    Yes.

24     A.    I brought an ADHD assessment.  The assessment

25   from December -- I can't remember the specific date.

1  But it was one December assessment that Dr. Mauricio

2  did.  And then there was a diagnostic test as well that

3  I gave to the school.

4       Q.    Did Dr. Mauricio make a diagnosis of ADHD in

5  December of 2015?

6       A.    He needed -- no, he needed my --

7             In December 2015?

8       Q.    Correct.

9       A.    No, he needed my CARS to come back.  Not my

10 CARS, sorry.  He needed my Conners to come back.  So

11 that was the last diagnostic test that he wanted.  He

12 did all the other stuff, the assessment part but then he

13 wanted -- before he could confirm it I guess that's like

14 protocol.  I don't know what it is, you know, but before

15 he could ultimately confirm it, he wanted a diagnostic

16 test, diagnostic computer test done as well, which that

17 one came back right before I went back to Dominica,

18 which I was able to get -- to get to the counseling

19 center.

20      Q.    With regards to Mr. Stewart-Fulton, did you

21 meet with him?

22      A.    Yes.

23      Q.    And how many times did you meet with him?

24      A.    I think once.

25      Q.    And during that meeting, did you make any

1   verbal requests for extended testing time?

2       A.    I told him that I needed extended testing

3   time and that he can get all the information -- I have

4   the most trouble explaining my problem -- I just -- I

5   don't know what it is.  I don't know how to -- I think

6   it's because I can't -- I can't tell what other people

7   think is normal.  So because of that, it's hard for me

8   to kind of explain my problem.  Because everything is

9   just kind of always been the way it is with me.  It's

10  like it's not something that like has been like a

11  dramatic like change that I would notice.  It's like

12  people have to point these things out to me.  So I just

13  don't know exactly how to explain things.

14          So I told him that Dr. Sharma and Mr. Cuffy

15  have all the information, that they diagnosed it

16  themselves.  As well as have all the documentation,

17  everything that anything that they needed to discuss he

18  can get it from them.  They can do a much better job of

19  explaining my problem than -- than I can.

20      Q.    And how did Mr. Stewart-Fulton respond to

21  you?

22      A.    He said that he's not responsible for getting

23  accommodations for the MBME.  He said -- he said Ross

24  was not.  He said that -- he gave me multiple reasons.

25          He said that Ross was -- couldn't give me

Page 107

1    accommodations for the MBME, which was false.  He also
2    said that it -- because of the timing of my diagnosis,
3    it was like -- he tried to like basically insinuate that
4    I'm faking or something like that.  Because he said this
5    was diagnosed like -- like really recently.  Even though
6    I told him it's like, you know, yeah it might be
7    diagnosed but the symptom, whatever it is all this stuff
8    has been like a long time thing.
9              And then he also said something like -- he
10   said also something else to discourage me.  Aside from
11   telling me that.  Like at the time, I just believed what
12   he said.  I didn't know any -- I don't -- I didn't know
13   the in's and out of all this stuff.
14             He also said that it would take like -- like
15   people who try to get accommodations for like the MBME
16   and stuff like that, it takes like six months or a year
17   or something like that.  And he is like you're going to
18   be -- this is your last semester here.  It's like it's
19   kind of pointless.  So that's what he expressed to me.
20   And so when he did that, I just kind of thought that my
21   disability somehow doesn't count for what traditionally
22   people or traditionally what Ross would consider --
23             Again, all this -- I just wanted extra time.
24   This whole accommodations and what, technically this,
25   technically that, I didn't understand any of that.  But

Page 108

1    he made me seem as though when -- let's use the word

2    qualified.  He made me seem as though even if you have a

3    diagnosis of disability all this stuff that this type of

4    problem is not something that or the way -- like the

5    combination of the timing and this type of problem

6    somehow disqualified me from getting accommodations.

7    Like I wasn't a suitable -- kind of in line what I

8    traditionally thought.  Like going through school and

9    everything growing up.

10           I thought people that kind of got like

11   special treatment had to be like missing a leg or

12   something.  I didn't know that ADHD was something that

13   people get like accommodated for or stuff like that.  I

14   didn't know -- I literally thought someone had to have

15   like respectfully, I thought someone had to have

16   something close to like Downs Syndrome or something to

17   get -- I just don't know, you know.  It's the whole

18   world of accommodations was -- was very new.  I just

19   stepped into getting a diagnosis, just stepped into

20   learning about ADHD and OCD.  Getting accommodations for

21   this -- this -- this new enlightenment was a whole

22   nother world of something.  So that goes back to about

23   reading the student handbook.  The word "accommodation"

24   is not --

25           I -- accommodation, I didn't directly -- I

Page 109

1    didn't automatically put the word "accommodation" on top

2    of extended testing time.  Those two things especially

3    before -- especially before I got diagnosed with ADHD

4    and OCD.  When I looked through any documents or

5    anything like that mentioning accommodation, it didn't

6    trigger like extended -- I don't know just the word

7    "accommodation", just -- for some reason to me, for some

8    reason that's not just a friendly word or a natural

9    occurring word for someone who has no knowledge of how

10   this getting accommodations with disability thing works.

11        Q.    Earlier when you said you told Dr. Sharma you

12   needed more testing time, you said he responded and

13   talked about accommodation.  So at that point in time,

14   would you have understood accommodation --

15        A.    Well, extended testing time.

16             So I may, because of my newfound knowledge of

17   the lawsuit, I naturally may say "accommodation".  But

18   when I say that specific accommodation, I'm talking

19   about extended testing time.

20             Earlier I also said that I don't actually

21   remember specifically saying the word "accommodation".

22   And I -- because I don't.  It was extended testing time.

23   I don't know even know if I technically considered --

24   it's like it's not -- it's not --

25             All I desired was extended testing time.

1   Classifying -- classifying -- classifying -- I didn't --

2   I didn't -- I didn't think that accommodations is the

3   only -- it like its own thing.  I thought multiple

4   things could be an accommodation type of thing.  I don't

5   know if I'm explaining it well.  I asked for extended

6   testing time.  And -- I asked for extended testing time.

7   And then at some point they started to introduce the

8   word "accommodation" as saying that it was basically

9   what I was asking for.

10          So basically, I guess they were kind of

11  summarize saying -- saying that extended testing time

12  was some type of -- that -- I think they were trying to

13  say that they weren't directly addressing the language

14  of stuff.  But at some point they started to throw the

15  word out "accommodation" in reference to extended

16  testing time.  And I'm like whatever you need to call

17  it, you call it whatever you want to.  So extended

18  testing time is -- I forgot the question I was

19  answering.

20      Q.    Well, I'm trying to figure out who -- you

21  said they told you it was accommodations or they may

22  have used that language but who is the "they" there?

23      A.    That used the language of accommodation?

24      Q.    Correct.

25      A.    The first time I saw it was on the form.

Page 111

1    Q.    So how did you know what it was then if
2  you're filling out the form and you don't --
3          I mean you said --
4    A.    Because they said this is what I needed for
5  extended testing time.
6    Q.    And who is "they"?
7    A.    Dr. Sharma and Mr. Cuffy.
8    Q.    Was Dr. Sharma present when you signed this
9  form on December 9, 2015?
10   A.    This was because of that meeting that I had
11 with both of them.  I remember they both helped in
12 getting the flight.  They both were there when they said
13 go talk to student affairs.
14         Mr. Cuffy's handwriting is on there but it
15 says for the whole entire counseling center.  Dr. Sharma
16 couldn't have spoken to anybody without that.
17   Q.    So as of December 9, 2015, you understood
18 what academic accommodations were, correct?
19   A.    Understood, no.  If they mentioned it
20 interchangeably with it, yes.  But understood, no.  At
21 that time I still did not -- I still did not have a good
22 grasp or understanding of what my ADHD was, OCD,
23 accommodation.  Because at this time when I had signed
24 this, it wasn't even ADHD yet.  I just knew I had a
25 concentration problem and I that I needed extended

1    testing time.  They said that this was the form, Awodiya

2    1, the Release of Information Consent agreement.  They

3    said that this was the form for what I was asking for.

4    So -- and that's why I checked the "X" box, the box that

5    says -- that's why I put a "X" in the box that says

6    relevant to academic accommodations.  I considered

7    extended testing time relevant.

8              MR. ROMAN:  I think we can take a

9         five-minute break.  We've been going for a little

10        more than an hour.

11             THE VIDEOGRAPHER:  This marks the end of

12        Media 2.  We are now off the record at 2:04.

13             (A recess was taken from 2:04 P.M. to 2:23

14    P.M., after which the following proceedings were had.)

15             THE VIDEOGRAPHER:  We are now back on the

16        record at 2:23.  This marks the beginning of

17        Media 3.  You may proceed.

18             MR. ROMAN:  Thank you.

19    BY MR. ROMAN:

20        Q.    Mr. Awodiya, are there any other requests

21    that were being made of Ross University by you other

22    than for extended testing time that are the subject

23    matter of your claims in this lawsuit?

24        A.    I'm sorry?  Can you --

25        Q.    Let me try to repeat it because I can

Page 122

1          Based on your response, I can conclude then
2    that Mr. Stewart-Fulton never gave you this document,
3    correct?
4          A.    No.  Didn't know this existed.
5          Q.    And do you know whether this document was
6    contained in the student portal?
7          A.    I have no idea.  This was -- if it did exist,
8    I didn't know it existed.
9          Q.    Did anyone ever tell you about this document?
10         A.    No.
11         Q.    In this document on page 3 it asks a student
12    who is submitting this form to attach a two-page
13    personal statement describing your disability and its
14    impact on your daily life and educational functioning.
15         Did you ever submit a personal statement like
16    that to anyone in the dean of student affairs office?
17         A.    Nobody asked me to.
18         Q.    And so you never did submit anything like
19    that, correct?
20         A.    Nobody asked me to.
21         Q.    Okay.  Sorry I also want to ask that question
22    though.  So nobody asked you to.  Can I then conclude
23    from that, that you never submitted a two-page personal
24    statement?
25         A.    A two-page statement?

Page 123

1      Q.    I'm looking on page 3 at the top at the first

2  paragraph at the very top.   There is reference and

3  you'll see it's bolded and underlined to a two-page

4  personal statement.

5           I wanted to know if you had ever submitted

6  that document to the student affairs office?

7      A.    I was never asked to submit this document.

8  Therefore there would be no two-page statement about

9  anything.   I can't submit something that I don't know

10  about.

11     Q.    Okay.  And on the first page of this document

12  it talks about submitting what it says "all necessary

13  documentation; including a written summary of assessment

14  and evaluation results" and it says "and signed by your

15  healthcare provider along with their recommended

16  accommodations based on your diagnosis."

17           Do you know if that documentation was

18  submitted?

19     A.    Yeah.

20     Q.    And was it?

21     A.    I wasn't asked to submit it but I mean what

22  is described here Ross had those documents.

23     Q.    And what document contained recommended

24  accommodations from the healthcare provider?

25     A.    That was supposed to be from Dr. Sharma.

Page 137

1    regards to getting accommodations for the step exams.

2    But the decision for step exams is by NBME.

3        Q.    You took the Step 1 exam, correct?

4        A.    Yes.

5        Q.    And you took it through Windsor University,

6    is that right?

7        A.    Correct.

8        Q.    And you passed the Step 1 exam with a score

9    of 211?

10       A.    Yes.

11       Q.    Did you get any extended testing time on the

12   Step 1 exam?

13       A.    No, I did not.

14       Q.    Did you request any extended testing time on

15   the Step 1 exam?

16       A.    No, I did not.

17       Q.    Why not?

18       A.    Because Mr. Stewart-Fulton told me that I was

19   like not -- I was not the type of person that would get

20   it.  I mean they told me no.  So I never -- again,

21   didn't think I was wronged.  Thought what he was saying

22   was valid.  After that, I just didn't suspect anything

23   else was wrong.  Like I knew I needed it but I just

24   thought that I was one of the -- I was just one of

25   the --

Page 138

1          If we weren't talking about disabilities,

2    this would just be like any other normal thing where I

3    think I need something but I'm not entitled to it.  So I

4    thought that this was the scenario with the

5    accommodations thing because I wasn't aware of the

6    details of the laws surrounding it.  So I thought it was

7    one of those things where even though I need something,

8    you're not necessarily entitled to it such as a driver's

9    license.

10          You may need to drive but you're not entitled

11   to it.  They can take your license from you if they want

12   to.  So I just trusted Ross what they said in that

13   regard.

14        Q.    You never asked anyone at Windsor if that was

15   correct?

16        A.    No, I just assumed what Ross told me was

17   correct.

18        Q.    Did Windsor -- so wait.  Just so I'm clear on

19   the record though.  You never asked anyone at Windsor

20   about whether you were -- you could receive extended

21   testing time on the Step 1 exam, correct?

22        A.    No, I didn't ask them that.

23        Q.    Did Windsor University admit you as a medical

24   student?

25        A.    What do you mean "admit"?

Page 144

1    when you graduated from college or did you apply to

2    multiple schools?

3        A.    The thing -- the thing about that is that

4    Ross was a little bit different because they had a

5    what's called a rolling admission versus the traditional

6    admission in the U.S. where it's once a year type of

7    thing.  You kind of have to apply a year before the year

8    you go in.  So Ross, the advantage that Ross had was

9    that it was rolling so whenever you were ready to apply

10   you can just do it like that.

11             So in that regard, I was applying to -- I

12   remember sending off multiple applications.  But when

13   Ross got back to me -- I still think I was hesitant when

14   Ross got back to me.  But then -- I ultimately made the

15   decision to go to Ross.

16       Q.    Were you hesitant because it was not in the

17   United States or for some other reason?

18       A.    I was hesitant because it was -- the basis of

19   it was because it was -- it was not in the U.S.  So I

20   was concerned about multiple things.  Multiple things

21   made me very hesitant.  It was not even just hesitant.

22   It was more of like they were reasons why I was not

23   considering them in the first place.

24             So the fact that they weren't in the U.S. was

25   like -- it was just like not really -- I was impressed

Page 145

1  with what they were advertising like the students that

2  they matched saying that their accreditation or

3  something is like equivalent to U.S. schools.  The fact

4  that you can use Financial Aid.  But the other important

5  factors was how I'd be treated down there and my safety.

6        So I think one thing that triggered it really

7  was I Googled -- I Googled Dominica and the pictures --

8  it was a lot more -- it was a lot more nature than I

9  thought that I could be comfortable with or used to.

10       Q.   Nature you mean like literally trees and like

11  forest and stuff or what do you mean by nature?

12       A.   I want to be respectful.  It's like, like --

13  like here we have big buildings and stuff like and like

14  a McDonald's and everything down here.  Over there it

15  was like --

16       Q.   Not as developed, is that what you --

17       A.   Yeah.  So I had very big concerns going to a

18  less developed nation than the U.S.  So -- and like, you

19  know, the roads weren't -- they didn't have rails on the

20  side of their -- like their roads, which I think is --

21  but so yeah.  So --

22       So yes.  I was concerned -- so one of the

23  things that led to that is like what if I get hurt down

24  there?  Like it seems like a real possibility that, you

25  know, cause I've never been to Nigeria.  But what

Page 146

1    relatives and all of them say that have been there is

2    that if something like medically happens because of

3    their like access to health care, it's kind of like

4    small things can become big things that wouldn't become

5    big in the U.S.

6           So I was very concerned about like being hurt

7    or injured while I was down there and how they would

8    treat me if I was to be hurt or injured or got some type

9    of -- became disabled in some type of way or something

10   like that.

11          So once -- so once I saw Ross' -- what they

12   advertise in their admission requirement section saying

13   that they -- that they have a policy to comply with the

14   Americans with Disabilities Act in Dominica then it was

15   a green light for me.  Because that was -- that was --

16          The fact that they had to -- it made me feel

17   as though that they still had to follow or they had some

18   policy to obligate the school to afford me an

19   opportunity to continue even if I get hurt down there or

20   become disabled or learn of a disability or anything

21   like that.  So that was -- what other reasons were

22   there?  I said if I could use Financial Aid.

23          Food and stuff was also a thing but I kind of

24   just tossed that one to the side.  I can't cook so I was

25   like, you know -- but yeah.  So that was -- that was --

1   yeah.  Deciding to come to Ross, the whole being outside

2   of the country even though in other aspects besides a

3   very large class number, they seemed to be somewhat

4   comparable to U.S. schools.  I just needed to know that

5   they had -- I had some type of protection or some type

6   of -- they had a policy to comply.  So I just assumed

7   that, you know -- and where ever -- they were just

8   obligated for the Americans with Disability Act.

9        Q.    That was one of the important considerations

10  for you when you decided that you would enroll at Ross,

11  is that what you're saying?

12       A.    Yeah, yeah.

13       Q.    Not whether or not if you were to get injured

14  there were hospitals that were qualified to treat you

15  but that if you were disabled, you would be able to be

16  protected by the ADA.

17            Is that what you're saying?

18       A.    No, that if I was disabled, that they would

19  give me an opportunity or help me complete the program

20  and not just say like well you're disabled now so see if

21  you can figure it out on your own or get out of here and

22  like just keep my money that I paid with Financial Aid

23  money with.  So I didn't want them to do that.  So the

24  fact I was using Financial Aid money to pay for this

25  school is just -- trying to remember your question.  You

Page 148

1    said something about --

2         Q.    Well, I'm asking -- let me ask this.

3         Earlier you said that until the litigation

4    you didn't know anything about the ADA.  You were going

5    to bring a breach of contract claim.  You didn't think

6    about the ADA until you read something about it.

7         Now, when it's convenient, you're saying when

8    I applied I cared very much about the ADA.  That was one

9    of the key statements I focused on and relied upon in

10   coming to Ross.  It just seems a little inconsistent.

11        A.    What you're saying is incorrect.

12        Q.    Okay.  Explain to me why I'm wrong.

13        A.    Pre-litigation or my preparations for

14   litigation, I didn't know what the ADA requirements,

15   obligations, the actual substance of the Americans with

16   Disability Act was.  I didn't know what I was

17   technically entitled to as a matter of law.

18        I wasn't a lawyer.  I didn't know how to look

19   up case law.  I didn't know how to look up -- to be

20   perfectly honest, I don't even -- I don't even know if

21   the normal citizens or if it's just me but I don't

22   really -- until this lawsuit I realized I didn't know

23   any laws.  I didn't know what a statute was.  I just

24   knew basic law stuff like for moral reasons like don't

25   steal and stuff like that or from like TV.

Page 149

1           So the Americans with Disability Act I knew
2    of it but I didn't know what -- beneath that I didn't
3    know what was actually technically required.  I just
4    knew that it was some type of thing that stopped
5    discrimination from disabled people.  And that was my
6    interpretation of it when I saw it on the website that
7    the Americans with Disability Act will prevent
8    discrimination against Americans.
9         Q.    When you enrolled at Ross, did you believe
10   you were disabled in anyway?
11        A.    No.  When I enrolled, no.
12              When I enrolled in what, 2014?
13        Q.    That's correct?
14        A.    Yeah, no.  I didn't believe I was disabled.
15        Q.    Did you apply to any U.S. medical schools?
16        A.    I graduated undergrad in 2013.  Then I went
17   the rest of 2013 finished.  So I had applications and
18   everything -- no, no.  So the problem was with -- I had
19   applications and stuff done but I didn't follow -- two
20   things prevented me from going all the way around to the
21   next cycle.
22              First, I missed a previous cycle.  So I was
23   considering whether I should wait to go to the next
24   cycle because Ross had the rolling admission.  So when I
25   had graduated in 2013 in order to start the next fall

1    that was coming up, you had to apply for U.S. medical

2    schools the previous fall.  Like around that time like

3    the summer and fall of the previous year.  So that was

4    like I had to consider whether I should wait or not or

5    if Ross was comparable to these schools then, you know,

6    if there is no difference like except for location, then

7    I can get in now.  So that's what happened.

8            So when Ross gave me acceptance and then once

9    I ultimately -- well, they gave me conditional

10   acceptance.  Then I ultimately was like well, I have an

11   option here.  I can take it or I can continue with going

12   to these other schools or applying to these other

13   schools for the next cycle.  So yes.

14           At that time, I honestly thought Ross with

15   the information that was on their website, I thought

16   that they were just like the other U.S. students who get

17   the same degree.  It's just a campus and a different

18   location and I had a conditional acceptance offer is

19   sitting in front of me and I don't have to wait.  So

20   yeah.  Once I was convinced, I was like well, you know,

21   can't be pickers and choosers here.  So got a med school

22   right here.  So I didn't want -- yeah, so that's --

23   that's basically what happened.  I don't know if I

24   explained that well or not.

25           Q.    I think I followed.  So just to be -- confirm

Page 242

1    marked for identification as Exhibit 21.)

2        Q.    Yes.  It looks like it's the remainder after

3    the prior exhibit, which only goes through Spring 2012?

4        A.    Okay.  I would like to label this

5    confidential.  It has my Social Security number on it.

6        Q.    Sure.

7              Does that appear --

8              The GPA 3.45, does that seem to be what your

9    recollection is as to your GPA from undergrad?

10       A.    Yeah.

11             MR. ROMAN:  All right.  Thank you very much

12       for your time, Mr. Awodiya.  I don't have anymore

13       questions for you at this time and thank you very

14       much.  Have a great day.

15             THE WITNESS:  Thank you.

16             MR. ROMAN:  All right.  We'll go off the

17       record.

18             THE VIDEOGRAPHER:  We're now going off the

19       video record.  It's 6:23.

20         (This deposition was concluded at 6:23 P.M.)

21

22

23

24

25

# Exhibit SJ-26

# MCAT Score Report

**Name** OLUWAMUYIWA OLADAPO AWODIYA

**Verification Code** FFAX-LDH4-YTXJ-BHEB

**URL \*** https://apps.aamc.org/score-reporting-web/#/report/verify

***\* This report will no longer be able to be verified after 01/10/2019***

**AAMC ID** 

**Date of Birth**

In order to verify these scores, you will be directed to create a user name and password. When visiting this page, select "Register for an AAMC Account" to begin this process.

## MCAT Scores

### For exams taken after January 31, 2015

No Scores Available

## MCAT Scores

### For exams taken before January 31, 2015

| | | MCAT Total | | Physical Sciences | | Verbal Reasoning | | Writing Sample | | Biological Sciences | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Exam Date | Total Score | Confidence Band [1] | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] |
| 07/26/2013 | 18 | 16 to 20 | 15% | 06 | 23% | 06 | 27% | | | 06 | 18% |
| 09/06/2012 | 19M | 17 to 21 | 19% | 07 | 40% | 06 | 27% | M | 31% | 06 | 18% |
| 04/28/2012 | 13M | 11 to 15 | 5% | 06 | 23% | 05 | 15% | M | 31% | 02 | 1% |



## Notes

[1] Test scores, like other measurements, are not perfectly precise. The confidence bands that are shown for the Total Scores above mark the ranges in which the test taker's true scores probably lie. To obtain the confidence band for each section score, subtract one point from and add one point to the score (or, in the case of the Writing Sample, subtract and add one letter).

[2] The percentile ranks of scores are the percentages of test takers who received the same scores or lower scores. The percentile ranks are based on tests administered from January 2012 through September 2014.

Copyright Â©1995-2015 | Association of American Medical Colleges

# Exhibit SJ-27

9/14/2018                                       RUSM Mini and Lab Exam Scores


Find Answers, Ask Questions

# RUSM Mini and Lab Exam Scores

**Below lists all the RUSM Mini and Lab Exam Scores that you have taken by semester / term. It may take up to 7 days after the exam for a score to be posted. This screen does not display your final grade.**
**Please contact your Course Director if you feel any of the below exam scores are in error.**

**Please Note:**  Exam Average (AVG) is displayed and applicable to all Mini Exam and Final Exam scores with the exception of scores labeled **"Cumulative Scores"** which displays the Minimum Passing Score (MPS).

**Name:**   Oluwamuyiwa Awodiya  **Student ID#:** ▓▓▓▓▓▓         **Date:**   09/14/2018

### Spring 2016 - Semester M05

| CRSE # | CRSE Title / Exam | Date of Exam | Exam AVG / MPS | Your Exam Score | Discipline Exam Scores (where applicable) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Foundation of Medicine 05 Final Exam | 04/08/2016 | 76.32 | 84 | | | | | | | | |
| | Foundation of Medicine 05 Cumulative Score | 04/08/2016 | 67 | 78 | | | | | | | | |
| | Foundation of Medicine 05 Mini 3 | 04/04/2016 | 74.62 | 77.62 | Clinical Medicine Mini 3 | Clinical Medicine Mini 3 Cumulative Score | Microbiology Mini 3 | Microbiology Mini 3 Cumulative Score | Pathology Mini 3 | Pathology Mini 3 Cumulative Score | Pharmacology Mini 3 | Pharmacology Mini 3 Cumulative Score | Multidis |
| | | | | | 65.22 | 70.45 | 55.56 | 58.82 | 82.35 | 80.65 | 80.43 | 80 | |
| | Foundation of Medicine 05 Comprehensive Exam | 04/22/2016 | 68 | 58 | | | | | | | | |
| | Foundation of Medicine 05 Mini 2 | 02/29/2016 | 80.38 | 71.11 | Clinical Medicine Mini 2 | Clinical Medicine Mini 2 Cumulative Score | Pathology Mini 2 | Pathology Mini 2 Cumulative Score | Pharmacology Mini 2 | Pharmacology Mini 2 Cumulative Score | Multidisc | |
| | | | | | 71.43 | 76.19 | 73.33 | 78.57 | 70 | 78.95 | 7 | |
| | Foundation of Medicine 05 Mini 1 | 02/09/2016 | 71.59 | 74.47 | Clinical Medicine Mini 1 | Clinical Medicine Mini 1 Cumulative Score | Microbiology Mini 1 | Microbiology Mini 1 Cumulative Score | Pathology Mini 1 | Pathology Mini 1 Cumulative Score | Pharmacology Mini 1 | Pharmacology Mini 1 Cumulative Score | Multidis |
| | | | | | 85.71 | 85.71 | 62.5 | 62.5 | 84.62 | 84.62 | 88.89 | 88.89 | |

### Fall 2015 - Semester M5

| CRSE # | CRSE Title / Exam | Date of Exam | Exam Avg / MPS | Your Exam Score | Discipline Exam Scores (where applicable) |
|---|---|---|---|---|---|
| | Foundation of Medicine 05 Cumulative | 12/03/2015 | 66 | 65 | |
| | Foundation of Medicine 05 Final Exam | 12/03/2015 | 72.37 | 80 | |
| | Foundation of Medicine 05 Mini 3 | 11/30/2015 | 70.27 | 61.54 | |
| | Foundation of | 10/26/2015 | 76.95 | 68.89 | |

AWOD004752

9/14/2018                                                        RUSM Mini and Lab Exam Scores

| | | | | |
|---|---|---|---|---|
| | Medicine 05 Mini 2 | | | |
| | Foundation of Medicine 05 Mini 1 | 10/06/2015 | 76.52 | 42.55 |

## Summer 2015 - Semester M4

| CRSE # | CRSE Title / Exam | Date of Exam | Exam Avg / MPS | Your Exam Score | Discipline Exam Scores (where applicable) |
|---|---|---|---|---|---|
| | Foundation of Medicine 04 Cumulative | 08/19/2015 | 65 | 67 | |
| | Foundation of Medicine 04 Final Exam | 08/19/2015 | 65.82 | 62 | |
| | Foundation of Medicine 04 Mini 4 | 08/12/2015 | 75.41 | 62.86 | |
| | Foundation of Medicine 04 Mini 3 | 07/21/2015 | 77.99 | 69.09 | |
| | Foundation of Medicine 04 Mini 2 | 07/13/2015 | 74.07 | 75.34 | |
| | Foundation of Medicine 04 Mini 1 | 06/09/2015 | 71.77 | 69.70 | |

## Spring 2015 - Semester M3

| CRSE # | CRSE Title / Exam | Date of Exam | Exam Avg / MPS | Your Exam Score | Discipline Exam Scores (where applicable) |
|---|---|---|---|---|---|
| | Foundation of Medicine 03 NBME Final Exam | 04/22/2015 | 64.28 | 71 | |
| | Foundation of Medicine 03 Cumulative | 04/22/2015 | 62 | 68 | |
| | Foundation of Medicine 03 Final Exam | 04/21/2015 | 68.76 | 65.31 | |
| | Micro Anatomy 03 Lab | 04/10/2015 | 69.83 | 60.00 | |
| | Foundation of Medicine 03 Mini 4 Digestive 2 | 04/15/2015 | 66.52 | 65.45 | |
| | Foundation of Medicine 03 Mini 4 Reproductive 1 | 04/14/2015 | 71.61 | 50.00 | |
| | Foundation of Medicine 03 Mini 3 | 03/12/2015 | 75.23 | 81.58 | |
| | Foundation of Medicine 03 Mini 2 | 02/13/2015 | 71.51 | 70.24 | |
| | Foundation of Medicine 03 Mini 1 | 01/27/2015 | 68.78 | 70.67 | |

## Fall 2014 - Semester M2

| CRSE # | CRSE Title / Exam | Date of Exam | Exam Avg / MPS | Your Exam Score | Discipline Exam Scores (where applicable) |
|---|---|---|---|---|---|
| | Foundation of Medicine 02 Cumulative | 12/16/2014 | 64 | 71 | |

AWOD004753

9/14/2018                                            RUSM Mini and Lab Exam Scores

| | | | | |
|---|---|---|---|---|
| Foundation of Medicine 02 Final | 12/16/2014 | 60.26 | 69.80 | |
| Micro Anatomy 02 Lab | 12/05/2014 | 74.52 | 70.00 | |
| Foundation of Medicine 02 Mini 4 | 12/09/2014 | 77.01 | 74.14 | |
| Neuroscience 02 Lab | 11/12/2014 | 72.50 | 76.00 | |
| Foundation of Medicine 02 Mini 3 | 11/14/2014 | 76.27 | 78.57 | |
| Foundation of Medicine 02 Mini 2 | 10/21/2014 | 76.45 | 63.83 | |
| Foundation of Medicine 02 Mini 1 | 09/30/2014 | 68.93 | 64.04 | |

| Summer 2014 - Semester M1 | | | | |
|---|---|---|---|---|
| CRSE # | CRSE Title / Exam | Date of Exam | Exam Avg / MPS | Your Exam Score | Discipline Exam Scores (where applicable) |
| | Foundation of Medicine 1 Cumulative | 08/18/2014 | 64 | 64 | ← |
| | Foundation of Medicine 1 - Final Exam | 08/18/2014 | 66.77 | 66.15 | |
| | Gross Anatomy Lab - 3 | 08/13/2014 | 76.87 | 52.00 | |
| | Foundation of Medicine - Mini Exam 4 | 08/11/2014 | 66.31 | 60.27 | |
| | MicroAnatomy Lab 1 | 08/14/2014 | 72.71 | 48.00 | |
| | Gross Anatomy Lab-2 | 07/14/2014 | 69.44 | 42.00 | |
| | Foundation of Medicine 1 Mini 3 | 07/07/2014 | 79.39 | 73.42 | |
| 1101 | Fundmntls of Biomedical Sc I / Foundation of Medicine 1 Mini 2 | 06/16/2014 | 70.45 | 77.01 | |
| 1101 | Fundmntls of Biomedical Sc I / Foundation of Medicine 1 Mini 2 | 06/16/2014 | 70.45 | 77.01 | |
| | Anatomy Lab 1 | 06/18/2014 | 67.94 | 56.00 | |
| | Foundation of Medicine 1 Mini 1 | 05/26/2014 | 74.48 | 79.03 | |

**RELEASE: 8.7.1**

**© 2018 Ellucian Company L.P. and its affiliates.**

AWOD004754

# Exhibit SJ-28

**Name:**       Oluwamuyiwa O   **DOB:** ███████       **Student ID:** █████████
              Awodiya (M)

**Diagnosis:**

---

**DOS:** Dec-08-2015
**Summary:** Notification from Jeannie Robertson
**Comment:**

This author was ccontacted by Jeannie Robertson indicating that the patient's mother had reached out to her and was concerned about the clients safety as he failed his exams and was notified on Monday. Information regarding the individual and contact information was relayed to the on-call counselor for assessment.
Signed by: Jennifer Swaim on Dec-08-2015 at 10:03 AM
*Locked by: Jennifer Swaim on Dec-08-2015 at 10:03 AM*

This document has been signed electronically.

RUSM 000135

# Exhibit SJ-29

**From:**          Robertson, Jeanie <jrobertson@RossU.edu>
**Sent:**          Wednesday, December 9, 2015 10:54 AM
**To:**            Robertson, Jeanie
**Subject:**       Oluwamuyiwa Awodiya

December 7 eighth and ninth 2015 phone calls from the mother of student Oluwamuyiwa Awodiya. Mother was concerned after student failed an exam by one point he was threatening to harm himself I called Jennifer Swaim at the counseling center in Dominica and let her know of the situation she referred the issue to Koffi who is on call December 8 mother called again saying she had gotten a text from son saying he would rather die.
I called the counseling center again to let them know about this and I received word from coffee this morning ninth saying that he had met with the student for several hours and did not feel as did Dr. Sharma and did not feel there was a concern at this time he felt he was stable.
On December 8 I let the mother know that this is the counseling center have been in contact with her son on and on and I talked to her twice

Jeanie Robertson, M.S., LPC
Director, Consultation and Support Services
Ross University School of Medicine
jrobertson@rossu.edu
770-910-4807

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender and delete this communication. This message may contain confidential information and is intended only for the individual named. If you are not the named addressee, disclosing, copying, distributing, or taking any action in reliance on the contents of this information is strictly prohibited.*
*Email is not constantly monitored and is not an appropriate method to attempt contact during or because of a crisis situation. In the event of an emergency call your local emergency response services.*

RUSM 000170

# Exhibit SJ-30

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO: 0:18-CV-60482-KMM**

OLUWAMUYIWA AWODIYA,

        Plaintiff,

    v.

ROSS UNIVERSITY SCHOOL OF
MEDICINE,

        Defendant.

## RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION

      Defendant ROSS UNIVERSITY SCHOOL OF MEDICINE, by and through its attorneys Seyfarth Shaw LLP, hereby submits its Response To Plaintiff's First Set of Requests for Admission.

**REQUEST FOR ADMISSION NO. 1:**

      Admit that the formal legal name of the organization that operates RUSM is Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited.

**RESPONSE TO NO. 1:**

      Denied. The entity that operates Ross University School of Medicine (RUSM) is Ross University School of Medicine, School of Veterinary Medicine Limited, a Dominican entity different from Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited, which is a Kittitian entity that operates Ross University School of Veterinary Medicine.

**REQUEST FOR ADMISSION NO. 2:**

      Admit that RUSM receives United States federal financial assistance through federal student aid.

46502448v.1

**RESPONSE TO NO. 15:**

Defendant objects to this request because it appears to assume facts not in evidence, including that Plaintiff was disabled, required accommodations to his disability(ies) during tests, and requested such accommodations from RUSM. Subject to and without waiving that objection, Defendant notes that it permitted Plaintiff to take the NBME CBSE a fifth time and denies Request No. 15.

**REQUEST FOR ADMISSION NO. 16:**

Admit that RUSM did not provide Plaintiff with extended testing time for the NBME CBSE.

**RESPONSE TO NO. 16:**

Admitted.

**REQUEST FOR ADMISSION NO. 17:**

Admit that extended testing time was an available accommodation for the NBME CBSE exam. (See attached Exhibit 10 at page 2).

**RESPONSE TO NO. 17:**

Defendant admits that extended testing time for the NBME CBSE is an accommodation sometimes provided to disabled students taking the exam and that Page 2 of Exhibit 10 references this possible accommodation. To the extent that Request No. 17 requests an admission of anything else, it is objectionable because it is ambiguous, and Defendant is therefore unable to admit or deny the assertion.

**REQUEST FOR ADMISSION NO. 18:**

Admit that the decision to provide students with test accommodations for the NBME CBSE is made by RUSM. (See attached Exhibit 10 at page 2).

**RESPONSE TO NO. 18:**

Defendant admits that RUSM, not the NBME, is the entity that determines whether its students require accommodations to a disability when taking the NBME CBSE and that this is

6

referenced at Page 2 of Exhibit 10. To the extent that Request No. 18 requests an admission of anything else, it is objectionable because it is ambiguous, and Defendant is therefore unable to admit or deny the assertion.

**REQUEST FOR ADMISSION NO. 19:**

Admit that Plaintiff was dismissed for failing to pass the NBME CBSE.

**RESPONSE TO NO. 19:**

Admitted.

**REQUEST FOR ADMISSION NO. 20:**

Admit that 99% of 2014-2015 RUSM graduates who passed their USMLE exams on the first attempt attained a residency. (See Institutional Outcomes at https://medical.rossu.edu/student-consumer-information.html ).

**RESPONSE TO NO. 20:**

Defendant admits that the referenced website states as follows as of June 3, 2018: "99% of 2014-2015 RUSM graduates who passed their USMLE exams on the first attempt attained a residency by April 2016." To the extent that Request No. 20 requests an admission of anything else, it is objectionable because it is ambiguous, and Defendant is therefore unable to admit or deny the assertion.

**REQUEST FOR ADMISSION NO. 21:**

Admit that the RUSM USMLE Step 1 first-time pass rate in 2016 was 93%. (See General FAQ'S at https://medical.rossu.edu/about/faq.html).

**RESPONSE TO NO. 21:**

Defendant denies that the referenced website contains the statement in Request No. 21, as of June 3, 2018. To the extent that Request No. 21 requests an admission of anything else, it is objectionable because it is ambiguous, and Defendant is therefore unable to admit or deny the assertion.

7

DATED:  June 8, 2018

Respectfully submitted,

ROSS UNIVERSITY SCHOOL OF
MEDICINE

By:  *[signature]*

Christina Forte Meddin
cmeddin@seyfarth.com
Brian Stolzenbach
bstolzenbach@seyfarth.com

SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, GA  30309-3958
Telephone:      (404) 885-1500
Facsimile:      (404) 892-7056

Attorneys for Defendant

16