

FILED BY _____ SB _____ D.C.

JAN 0 3 2019

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| OLUWAMUYIWA AWODIYA, *Plaintiff,* -v- ROSS UNIVERSITY SCHOOL OF MEDICINE, SCHOOL OF VETERINARY MEDICINE LIMITED *Defendant.* | Case No. 0:18-cv-60482-KMM<br><br>Hon. Chief Judge: K. Michael Moore<br>Magistrate Judge: Alicia O. Valle |

### PLAINTIFF'S REPLY STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 of the Local Rules of the United States District Court for the Southern District of Florida, plaintiff Oluwamuyiwa Awodiya ("Plaintiff"), in proper person, hereby files his reply to RUSM's Response in Opposition ("RUSM SOF") [ECF No. 107-1] to Plaintiff's Statement of Material Facts ("SMF") [ECF No. 101] in Support of Plaintiff's Second Motion for Partial Summary Judgment ("Motion") [ECF No. 102]. Exhibits SJ-24 through SJ-30 are supplemented with the Reply Declaration of Oluwamuyiwa Awodiya in support of the Motion.

### PLAINTIFF'S REPLY IN SUPPORT OF HIS STATEMENT OF MATERIAL FACTS

1. RUSM does not dispute SMF ¶ 1.

2. RUSM does not dispute SMF ¶ 2.

3. No reply to RUSM's objection.

4. RUSM does not dispute SMF ¶ 4.

5. RUSM does not dispute SMF ¶ 5.

1

6. RUSM does not dispute SMF ¶ 6.

7. RUSM does not dispute SMF ¶ 7.

8. RUSM does not dispute SMF ¶ 8.

9. RUSM does not dispute SMF ¶ 9.

10. RUSM does not dispute SMF ¶ 10.

11. RUSM does not dispute SMF ¶ 11.

12. (i) RUSM does not dispute SMF ¶ 12. However, RUSM contends that the paragraph is not material because it pertains to Plaintiff's OCD. Plaintiff's OCD is material for several reasons. The interrogatory that RUSM cited actually states, "Plaintiff's anxiety disorder **was first diagnosed as** 'Anxiety State, Unspecified' by Mr. Cuffy on February 17, 2016. Plaintiff's **anxiety disorder was diagnosed again but as** Obsessive-Compulsive Disorder by Ms. Unterman on April 18, 2017." **Def. Ex. 2**, at ¶ 4 (emphasis added). It is irrelevant as to when Plaintiff was labeled or diagnosed with OCD because Plaintiff's psychiatrist and psychotherapist concluded and informed Dean Owen that he had the symptoms "for the past 4-6 years," including the "anxiety and checking rituals inherent to this condition [that] have been adversely affecting his academic performance in medical school." **Ex. SJ-15** (Psychiatrist informing Dean Owen of Plaintiff's OCD and ADHD).

(ii) Plaintiff's anxiety symptoms were re-diagnosed as OCD months before he formally appealed his dismissal. RUSM "admits that RUSM, not the NBME, is the entity that determines whether its students require accommodations to a disability when taking the NBME CBSE." *See* Requests for Admission attached as **Ex. SJ-30**, at ¶ 18. Once students are permitted to send an appeal letter to Dean Owen, he investigates and determines whether a student should have an opportunity to be accommodated for their disability or whether the student should be dismissed, after he is noticed of a disability during the appeal. *See* Deposition Transcript of William Owen

2

attached hereto as **Ex. SJ-24** (Owen Dep. 9:18-11:13) (Dean Owen explaining the procedure for when he receives notice of a student's disability during a student's appeal); *id.* at 11:21-12:7 (Dean Owen explaining his criteria or "personal requirements" and that "it depends upon the diagnosis").

(iii) Dean Owen's decision for dismissing Plaintiff—instead of providing him with an opportunity to be accommodated for his limitations—was because of Plaintiff's disabilities. Dean Owen testified that he in fact, saw and recalled Plaintiff's appeal letter and his psychiatrist's letter that was sent to him and decided to uphold Plaintiff's dismissal literally because of Plaintiff's disabilities. **Ex. SJ-24** (Owen Dep. 20:21-21:19, 22:5-25). *See also, id.* at 29:24-25 ("You've got two bad diseases. This is why I say it. I felt sorry for you." Dean Owen said to Plaintiff). Dean Owen refused to investigate possible accommodations with Plaintiff. *Id.* at 25:3-12. Dean Owen also refused to consider if Plaintiff would benefit from extending testing time because one of Dean Owen's personal requirements was to see ameliorative effects from some form of treatment as a prerequisite to getting extending testing time. *Id.* at 27:16-24. Dean Owen further testified, "[w]e're not using exams as experimentation to see if there's efficacy." *Id.* at 28:3-4.

13. RUSM does not dispute SMF ¶ 13.

14. RUSM does not dispute SMF ¶ 14. Furthermore, Plaintiff relied on this admission by RUSM for the last four months of discovery. Because of this admission he did not explore this fact with Mr. Cuffy and Dr. Sharma during their deposition, both of which do not live in the U.S. This will greatly prejudice Plaintiff if RUSM has used all of discovery attacking this one point. Also, in the Complaint, this was also under Florida Civil Rights Act, Fla. Stat. § 760.08.[1]

15. RUSM does not dispute SMF ¶ 15.

---

[1] "[D]isability-discrimination claims under the FCRA are analyzed using the same framework as ADA claims. We therefore consider both claims together." *Holly v. Clairson Indus*, 492 F.3d 1247, 1255 (11th Cir. 2007) (internal citation omitted). *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1177 (11th Cir. 2009) (holding that generally, "a party is bound by the admissions in his pleadings").

16.     RUSM asserts immaterial facts that do not dispute the proposed facts. Answer ¶ 17 is a judicial admission.[2] Also, Dr. Sharma literally testified, "[s]o the signing of this document is a way for the student to make life easier **in the future so they don't have to come back and do another one.**" **Def. Ex. 3**, 46:3-5 (emphasis added). Dr. Sharma had all the necessary information and "good documentation" of Plaintiff's ADHD, *infra* ¶ 18, to then send the information to the appropriate RUSM administrator, Def. Ex. 3, 31:9-11, and/or to request for an accommodation in writing on behalf of Plaintiff, SMF ¶ 18. Plaintiff testified at his deposition: "I know that the Release of Information form was initially not for per se ADHD, it was for my concentration problems. The fact that they suspected ADHD was what that form was for. It wasn't for a diagnosis. It was for the fact that I had concentration problems that the counseling center suspected and they were going to diagnose and they started to diagnose and that I needed extended testing time because of that. That's what that form is for. It's not specifically for ADHD. It's for the need for extended testing time." *See* Deposition Transcript of Oluwamuyiwa Awodiya attached hereto as **Ex. SJ-25** ("Awodiya Dep."), at 92:22-93:7.

Second, with respect to suicidal thoughts, please *see infra* ¶¶ 45, 53 (discussing the inadmissible self-harm and suicide hearsay within hearsay). Also, in the cited testimony, Mr. Cuffy does not say "suicidal thoughts," the cited testimony says, "emotional support."

17.     Dr. Sharma's and Mr. Cuffy's inability to "recall" a fact does not create a question of fact.[3] With respect to self-harm, *see infra* ¶¶ 45, 53. With respect to the "safety plan," *see infra* ¶ 47.

---

[2] "[F]acts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them." *Cooper v. Meridian Yachts*, 575 F.3d 1151, 1178 (11th Cir. 2009).
[3] "On summary judgment, [a party's] inability to independently recall the conversation does not create a genuine issue of fact." *Wellons, Inc. v. Lexington Ins. Co.*, No. 13-11512, at *13 n.4 (11th Cir. 2014). "An assertion that a party does not recall an event does not itself create a question of material fact about whether the event did, in fact, occur." *To v. U.S. Bancorp*, 651 F.3d 888, 892 n.2 (8th Cir. 2011).

4

18. Plaintiff's fact in SMF ¶ 18 is offered to show that Dr. Sharma was Plaintiff's treating professional at RUSM who was in a position of authority to discuss with RUSM administration about what specific types of accommodation he believes might be helpful in offsetting the effects of Plaintiff's disability. Dr. Sharma admitted there was adequate documentation to support a request for accommodations. **Ex. SJ-21** (Sharma Dep. 37:9-12) ("Q. So you believe that plaintiff had adequate documentation of his ADHD to get test accommodations? A. That's me. I believe that."). *See also, id.* at 27:20-23 (Dr. Sharma stating that Plaintiff had "good documentation" of his ADHD and that other students with less documentation were given accommodations). Whether Plaintiff requested an accommodation is a legal conclusion.

19. RUSM does not provide evidence disputing SMF ¶ 19. In his deposition, Dr. Sharma testified, "we started -- recommended that -- based on my seeing your ADHD symptoms, we started the process in Dominica, which was done." **Ex. SJ-21** (Sharma Dep. 102:20-23). Dr. Sharma also testified that he screened Plaintiff for ADHD in December 2015 "[b]ecause he was having academic problems" and "[p]roblems with passing his exams." *Id.* at 8:24-9:4.

20. The cited testimony does not mention "suicidal thoughts." *See also, supra* ¶ 19.

21. Whether Plaintiff requested an accommodation is a legal conclusion.

22. RUSM does not dispute SMF ¶ 22. The addition testimony by RUSM calls for a legal conclusion. It also calls for speculation as to reasons why students may not receive accommodations; and the speculated fact is immaterial.

23. RUSM does not dispute SMF ¶ 23.

24. Dr. Hayse's inability to recall a fact does not create a question of fact. *See supra* note 3, at 4. *Compare* SMF ¶ 24, *with* **Ex. SJ-25** (Awodiya Dep. 75:8-20, 101:23-102:2).

5

25. RUSM does not dispute SMF ¶ 25. Dr. Hayse's inability to recall a fact does not create a question of fact. *See supra* note 3, at 4.

26. RUSM does not dispute SMF ¶ 26. The addition testimony by RUSM calls for a legal conclusion.

27. RUSM does not dispute SMF ¶ 27.

28. RUSM does not dispute SMF ¶ 28.

29. RUSM does not dispute SMF ¶ 29. Also, the fact is material. *See supra* ¶ 12.

30. RUSM does not dispute SMF ¶ 30. *See supra* ¶ 12.

31. RUSM does not dispute SMF ¶ 31.

32. RUSM does not dispute SMF ¶ 32.

33. RUSM does not dispute SMF ¶ 33.

34. SMF ¶ 34 does not call for a legal conclusion. Plaintiff was asking about RUSM's policies. Plaintiff stated on the record in Dr. Hayse's deposition:

> Let me clarify a little bit about the legal situation. When I asked if they are required to comply, I mean does Ross require their employees to comply, not if they're legally required to comply. I am asking if Ross, the entity, requires their employees to comply with the American with Disability Act.

**Ex. SJ-22** (Hayse Dep. 13:24-14:5). *See also, id.* at 14:11 ("Q. Does **Ross University itself require its employees** and faculties to comply with Title III of the American with Disability Act in Dominica? A. Not to my knowledge. Q. Is that also correct for Section 504 of the Rehabilitation Act? A. That is correct." (emphasis added)).

35. RUSM asserts an immaterial fact, but it raises no dispute of the proposed fact.

36. Again, Plaintiff was asking about RUSM's policy on its faculty, and literally said "policy" and "faculty" in his question to Mr. Stewart-Fulton. **Exhibit SJ-23** (Fulton Dep. 32:13).

37.   RUSM does not dispute SMF ¶ 37.

38.   (i) RUSM cited the testimony out of context and it does not support RUSM's conclusion. Plaintiff testified at his deposition that he "was not considering [RUSM]" because the school was in a "less developed nation than the U.S." **Ex. SJ-25** (Awodiya Dep. 144:22-145-19). After he googled pictures of Dominica, *id.*, he became "very concerned" about his safety, getting hurt or injured, then becoming "disabled in some type of way" in Dominica, *id.* at 146:6-10. When he saw ADA-Statement on RUSM's website, it was a "green light for me." *Id.* at 146:11-15. "I didn't know what was actually technically required. **I just knew that it was some type of thing that stopped discrimination from disabled people.**" *Id.* at 149:1-8 (emphasis added). Plaintiff just wanted some assurance that if he became disabled in Dominica "that they would give me an opportunity or help me complete the program and not just say like well you're disabled now so see if you can figure it out on your own or get out of here and like just keep my money that I paid with Financial Aid money with." *Id.* at 147:18-25.

(ii) RUSM cited testimony out of context and it does not support its opposition. During Plaintiff's deposition, he testified that he did not accurately know what ADHD was until RUSM informed him that it had to do with concentration. **Ex. SJ-25** (Awodiya Dep. 19:23-20:6). He further testified that "until I was diagnosed with ADHD, I didn't know that my symptoms were the -- were something that they classified as ADHD. I just was living my life with these symptoms thinking that I'm normal when I wasn't." *Id.* at 22:22-23:1.

(iii) Plaintiff experienced the same limitations of his disabilities, long before he knew that the limitations were the result of the then-undiagnosed disabilities. In high school and Morgan State University, Plaintiff was unable to take notes while teachers were teaching, *id.* at 24:21-25:6, 44:7-18, and was unable to finish exams on time, *id.* at 32:8-33:2, 42:7-10. Plaintiff "didn't finish

7

with everyone else." *Id.* at 28:18. Plaintiff "would get jealous when [he] [saw] other people" that had enough time to "get up and go to the bathroom during the middle of an exam." *Id.* at 32:24-33:2. In high school, Plaintiff needed to "stay[] behind after everyone else moved onto their classes" in order to complete tests or assignments. *Id.* at 37:3-9. Plaintiff received the same treatment at Morgan State University as "[he] would just like overlap with the next group of students." *Id.* at 41:8-9. Prior to RUSM suspecting ADHD, Plaintiff was unaware that this special treatment was an accommodation, he just indicated to teachers that "I can't finish these exams" and "that hey, I know everyone's done but, you know, I'm only like halfway through the exam." *Id.* at 41:13-17. *See also, id.* at 43:1-6, 25:21-24 (past and present effect of Plaintiff's concentration limitation on watching TV shows); *id.* at 25:25-26:7, 46:7-11 (similar effects on driving); *id.* at 43:17-46:11 (similar effects on legal proceedings); *id.* at 52:2-12 (general effect of anxiety and OCD limiting his concentration); *id.* at 50:14-51:21 (Plaintiff's OCD effects on academic performance); *id.* at 49:13-50:13 (Similar OCD effects when drafting his legal pleadings).

(iv) Plaintiff received extended testing time from his second high school. **Ex. SJ-25** (Awodiya Dep. 28:9-29:2, 36:17-20). Plaintiff found the extra time on tests to be helpful in high school. *Id.* at 29:4-6. In his first couple of years of high school, Plaintiff's "grades were like horrendous. They were horrible. ... [T]he lowest GPA [he] had was zero point something. ... [T]hat was bad." *Id.* at 25:7-10. Then Plaintiff "went to a different high school," *id.* at 25:11, where he received extended testing time, and his "GPA improved in the last two years of high school," *id.* at 25:18-20. Plaintiff also received extended testing time at Morgan State University. *Id.* at 39:11-20, 40:24-41:2, 41:4-17. Plaintiff "performed really well" when he received extended testing time at Morgan State University because they provided him the opportunity to be "able to

8

complete the exams." *Id.* at 42:17-18. Plaintiff graduated from Morgan State University with a 3.45 GPA. *Id.* at 242:8-10.

39.   *See supra* ¶¶ 34, 38(i).

## PLAINTIFF'S RESPONSES TO RUSM'S ADDITIONAL MATERIAL FACTS

40.   Undisputed that Plaintiff graduated from Morgan State University in three years with a 3.45 GPA. However, Plaintiff received extended testing time at Morgan State University. *See supra* ¶ 38(iv). Plaintiff graduated from Morgan State University with a biology major. **Ex. SJ-25** (Awodiya Dep. 59:4-11). Plaintiff took the Medical College Admission Test ("MCAT") twice in 2012 and once in 2013, each without extended testing time. *See* MCAT scores attached as **Ex. SJ-26**. On his first MCAT attempt, his total score was ranked in the bottom 5% of all test takers and his biology score was literally one of the lowest scores in the country, that ranked in the bottom 1% of all test takers. *Id.* His last MCAT attempt was ranked in the bottom 15%. *Id.*

41.   Plaintiff's **first semester** at RUSM, in 2014, was his *worst* performing semester. *See* Plaintiff's exam scores for each semester attached as **Ex. SJ-27**. The minimum passing score ("MPS") in his first semester was 64%, Plaintiff's cumulative grade at the end of that semester was 64%. *Id.* at 3. Plaintiff's cumulative grade in his second semester was 71% (MPS was 64%), *id.* at 2, in third semester was 68% (MPS was 62%), in forth semester was 67% (MPS was 65%), and in fifth semester (2015) was 65% (MPS was 66%), *id.* at 1. He repeated his fifth semester in 2016 and passed. *Id.*

42.   The Exhibit 9, October 28, 2015, counseling note states that Plaintiff only went to Laura Cobb's because he "[w]ant[ed] objective perspective on situation with gf." **Def. Ex. 9**, at 4. Laura Cobb's counseling note also states that Plaintiff "[j]ust broke up w/ gf" because "[s]he 'cheated' on him 2 x's. He just found out about second time **3 days ago**." **Def. Ex. 9**, at 1 (emphasis

added). "3 days ago" indicates that Plaintiff broke up with his girlfriend on October 25, 2015. *Id.* Plaintiff did not break up with his girlfriend until 19 days after his worst grade for that semester, which was a 42.55% on October 6, 2015. *Compare* Def. Ex. 9, at 1, *with* **Ex. SJ-27**, at 2 (first arrow). Immediately after Plaintiff broke up with his girlfriend, all of his exam scores improved. Ex. SJ-27, at 1. The very next day after Plaintiff broke up with his girlfriend, Plaintiff took his second exam for the semester on October 26, 2015, and his score improved by 26%. *Id.* On the "final exam" of that same semester, on December 3, 2015, Plaintiff scored an 80%. *Id.* Plaintiff has never achieved a score that high in his first, second, or forth semester at RUSM. *See generally*, *id.*

43. *See supra* ¶ 42 and *infra* ¶¶ 44, 46. Also, there is no evidence that indicates causation in the third sentence.

44. RUSM does not raise a genuine dispute as to any material fact. The exhibit states that Plaintiff was "happier, better able to study, less anxiety" despite the fact that "[h]e found out from friends that gf has lied about how many times she slept w/ other man." **Def. Ex. 10**.

45. On December 7, 2015, four days after Plaintiff scored an 80% on his December 3, 2015, final exam, *supra* ¶ 42, Plaintiff learned that he failed the semester by 1%, *supra* ¶ 41.

Mr. Cuffy is not a mind-reader. The self-harm statements within Exhibit 11 are not admissible because they are hearsay within hearsay.[4] Mr. Cuffy repeatedly accused Plaintiff of self-harm ideations and was trying to force the ideation upon Plaintiff, simply because of alleged reports that were relayed to Mr. Cuffy from Jennifer Swaim which came from Jeanie Robertson

---

[4] "[T]he evidentiary rationale for permitting hearsay testimony regarding ... statements made in the course of receiving medical care is that such out-of-court declarations are made in contexts that provide substantial guarantees of their trustworthiness." *White v. Illinois*, 502 U.S. 346, 355 (1992). "Th[e] lack of knowledge, or at least uncertainty, about who transmitted the information contained in the treatment records also deprives the information of trustworthiness." *U.S. v. Smith*, 318 Fed. Appx. 780, 796-97 (11th Cir. 2009). Hearsay included within hearsay is inadmissible unless each part of the combined statements conforms with an exception to the hearsay rule. *Id.*

which allegedly came from phone calls from the Plaintiff's mother, that allegedly came from text messages. *See* attached **Ex. SJ-28** (Jennifer Swaim's counseling note dated December 8, 2015) and **Ex. SJ-29** (Jeanie Robertson's email dated December 9, 2015).

On December 8, 2015, Jennifer Swaim "was ccontacted [*sic*] by Jeannie [*sic*] Robertson indicating that the patient's mother had reached out to her and was concerned about the clients safety as he failed his exams and was notified on Monday." **Ex. SJ-28**. Jeanie Robertson's email states, "[m]other was concerned after student failed an exam by one point he was threatening to harm himself I called Jennifer Swaim at the counseling center in Dominica and let her know of the situation she referred the issue to Koffi [Mr. Cuffy] who is on call." **Ex. SJ-29**. Her email also alleges, "mother called again saying she had gotten a text from son saying he would rather die." *Id.* According to Jennifer Swaim's counseling note, this "[i]nformation regarding the individual and contact information was relayed to the on-call counselor for assessment." Ex. SJ-28. Mr. Cuffy "called Plaintiff into the Counseling Center where Plaintiff met with Mr. Cuffy." RUSM SOF, ¶ 45.

According to the December 9, 2015 counseling note, "[a]t the end of the session **yesterday** [December 8, 2015] he claimed to not have any intent to harm himself." **Ex. SJ-10**, at 1 (last sentence); "Was not suicidal." *Id.* at 2; "Denies wanting to harm himself but does not like the thoughts of sadness." *Id.* Jeanie Robertson stated in her email, "I received word from coffee [Mr. Cuffy] this morning ninth saying that he had met with the student for several hours and did not feel as did Dr. Sharma and did not feel there was a concern at this time he felt he was stable." **Ex. SJ-29**. *See also* Mr. Cuffy continuing to put in his notes that Plaintiff had self-harm ideations despite the fact that Plaintiff denied having those thoughts, *infra* ¶ 53.

46. The paragraph is false. Plaintiff did not have self-harm ideations. *See supra* ¶¶ 45, 53. The paragraph is also factually incorrect because when Plaintiff found out that his girlfriend cheated on him, *see supra* ¶ 42, the counseling note clearly stated: "Self harm/Suicide/Homicide screen[:] no thoughts of harm to self, no history of self-injurious behavior, no history of suicidal ideation, no thoughts of harm to others." **Def. Ex. 9**, at 2. *See also, supra* ¶ 44.

47. None of the cited exhibits in the paragraph support the assertion that the Safety Plan was signed as "a result of his self-harm ideations." Rather, the Safety Plan was signed as a result of hearsay information that was relayed to Mr. Cuffy. *See supra* ¶ 45. There must also be some type of law that the prevents use of documents that were signed under undue influence of an interrogation that was caused by hearsay. The alternative to signing the form was "to be taken to the nearest hospital or emergency room" against his will. *See* **Def. Ex. 6** (last sentence).

48. RUSM takes the cited evidence out of context. It actually states, that Dr. Sharma "[l]eft message for mother to call me on my cell or the counselor. Need to talk to her with Miwa [*sic*] to let her know of the plan for him to repeat the semester." **Ex. SJ-10**, at 2.

49. The paragraph does not address why Plaintiff "[f]elt he was treated unfairly because he failed by one point" or why "[h]e wanted to speak to the Dean about changing his grade" on December 9, 2015. **Ex. SJ-10**, at 1; *Cf.* SMF ¶ 17.

50. *See supra* ¶ 49.

51. *See* SMF ¶¶ 17, 19-21 and *supra* ¶¶ 16, 19.

52. *See* SMF ¶¶ 17, 19-21 and *supra* ¶¶ 16, 19.

53. According to the December 11, 2015, counseling note, "CLient [*sic*] stopped by **yesterday** [December 10, 2015] afternoon after meeting with Dr. Hayes at Student Affairs. He came out of the meeting feeling disappointed but denied having negative thoughts or thoughts of

self harm." **Def. Ex. 12**. Again, despite the fact that Plaintiff denied having thoughts of self-harm, Mr. Cuffy still put in his notes that Plaintiff had self-harm ideations because of hearsay reports that were relayed to Mr. Cuffy. *See supra* ¶ 45.

54. Dr. Hayse's inability to recall facts do not create a question of fact. *See supra* note 3, at 4. *Compare* SMF ¶ 24 *with* SMF ¶ 25.

55. None of the statements are supported by the cited testimony. Rather, RUSM's counsel simply asked Mr. Cuffy, "**in these notes**, do you **see** any mention of a request for an accommodation?" The paragraph also does not address Dr. Sharma nor Dr. Hayse.

56. The cited testimony of Mr. Cuffy is again in response to the exact same "in these notes, do you see" type of questioning. *Cf. supra* ¶ 55. The paragraph also does not address Dr. Sharma or Dr. Hayse. The paragraph also does not address Dr. Sharma nor Dr. Hayse.

57. RUSM does not raise a genuine dispute as to any material fact.

58. Same as *supra* ¶ 55, except now RUSM counsel asked Mr. Cuffy a "Do you see … in this document?" type of question. The paragraph also does not address Dr. Sharma nor Dr. Hayse.

59. Dr. Sharma's counseling note on December 14, 2015, states that Plaintiff was "[f]eeling a bit down" was "not suicidal" and was "[s]table though slightly depressed." **Def. Ex. 13**. With respect to the "screened Plaintiff for ADHD" statement, *see* SMF ¶¶ 17, 19-21 and *supra* ¶ 19.

60. Dr. Sharma first learned of Plaintiff's limitations and symptoms that caused Dr. Sharma to suspect ADHD in December 2015. *See* SMF ¶¶ 17, 19-21 and *supra* ¶ 19. Dr. Hayse also learned of this fact in December 2015. *See* SMF ¶ 24.

61. The paragraph does not raise a genuine dispute as to any material fact.

62. The cited deposition testimony calls for speculation as Dr. Sharma cannot guarantee this for "every student diagnosed." He also lacks personal knowledge as to students who were diagnosed by other counselors or psychiatrist in the Counseling Center. Moreover, Dr. Sharma does not testify that he specifically told Plaintiff to look in the Student Handbook.

63. Same as *supra* ¶¶ 55, 58 except now RUSM counsel asked Mr. Cuffy a "In this document, is there any mention …?" type of question. The paragraph also does not address Dr. Sharma nor Dr. Hayse.

64. The paragraph is not material. *See supra* ¶¶ 42, 44-46.

65. The cited deposition testimony does not support the statement that Plaintiff knew of the "information about requests for accommodations" content of the Student Handbook prior to this lawsuit. Plaintiff testified that prior to December 2015 he did not "read the entire handbook" in its entirety. **Ex. SJ-25** (Awodiya Dep. 81:4-10). He further testified "I don't recall" when RUSM counsel asked Plaintiff if he had reviewed the "request for accommodations" section of the Student Handbook "prior to December 2015." *Id.* at 81:20-82:2 (RUSM omitted from the Court, page 82 of his testimony).

66. Plaintiff cannot recall if he read the "accommodations" section of the student handbook prior to this lawsuit. *See supra* ¶ 65. Plaintiff also did not know that extended testing time was an "accommodation" in the context of a disability until December 9, 2015, when he signed the ROI Agreement because "it wasn't even ADHD yet." **Ex. SJ-25** (Awodiya Dep. 111:17-112:7). "I just knew I had a concentration problem and I that I needed extended testing time." *Id.* The Student Handbook does not identify who the "Accommodations Coordinator" is. **Def. Ex. 14**, at 46. It only states that the requests are "processed" in the "Office for Student Affairs." *Id.* The Student Handbook also states that the "Accommodation Coordinator … will make a

recommendation to the Associate Dean, Student Affairs" and that the Associate Dean (Dr. Hayse) makes the "decision." *Id.* at 47 (under the "Confidentiality" provision).

67. If the school diagnosis the disability or suspected disability, the Counseling Center produces this information. SMF ¶¶ 16, 18, 26; *Supra* ¶¶ 16, 18, 19.

68. Dr. Sharma was Plaintiff's treating psychiatrist in the Counseling Center and had all the necessary information and documentation of Plaintiff's disability and needs. *See supra* ¶¶ 16, 18, 19; SMF ¶¶ 18, 22, 23, 26.

69. Matthew Stewart-Fulton's job title is *not* "Accommodations Coordinator," his job title is "assistant director for student conduct and integrity in academic accommodations." **Def. Ex. 5**, 8:5-12. Mr. Stewart-Fulton's personal requirements are not material to the Motion. The Student Handbook does not mention any specific "packet." **Def. Ex. 14**, at 46. Dr. Sharma testified, "I can only say, from my experience, a verbal request is not a request for accommodations." **Ex. SJ-21** (Sharma Dep. 36:1-3).

70. As to the first sentence, RUSM had Plaintiff's "supporting documentation." *See supra* ¶¶ 16, 18, 19; SMF ¶¶ 18, 22, 23, 26. As to the second sentence, RUSM cited to omitted pages. There is no page 51 or 52 of its Exhibit 5.

71. Plaintiff testified that "[n]obody asked [him] to" submit any specific information regarding a specific packet. **Ex. SJ-25** (Awodiya Dep. 122:15-20). He then testified, "I can't submit something that I don't know about." *Id.* at 123:9-10. Even though Plaintiff was never asked to submit a specific packet, Plaintiff testified that "Ross had those documents" anyway, and "[t]hat was supposed to be from Dr. Sharma." *Id.* at 123:17-25. *See also, supra* ¶¶ 16, 18, 19; SMF ¶¶ 18, 22, 23, 26.

72. This paragraph is speculation and/or hypothetical as to "would have" because factually and historically, they did not support Plaintiff.

73. The paragraph does not raise a genuine dispute as to any material fact.

74. The paragraph does not raise a genuine dispute as to any material fact.

75. The paragraph does not raise a genuine dispute as to any material fact.

76. The paragraph does not raise a genuine dispute as to any material fact.

77. The paragraph does not raise a genuine dispute as to any material fact.

78. The paragraph does not raise a genuine dispute as to any material fact.

79. The paragraph does not raise a genuine dispute as to any material fact.

80. The paragraph does not raise a genuine dispute as to any material fact.

81. The paragraph does not raise a genuine dispute as to any material fact.

82. First, RUSM cites to testimony that was discussing the letter that was sent to the Students Promotion Committee, not the appeal letter that was sent to Dean Owen. Without dates, it is unclear as to what letters RUSM is referring to. Regardless, the appeal letter to Dean Owen speaks for itself. *See* **Ex. SJ-17**; SMF ¶ 30; Motion at 10-11. Plaintiff's psychiatrist and psychotherapist informed Dean Owen about both of Plaintiff's ADHD and OCD the day before RUSM received his appeal letter to Dean Owen. **Ex. SJ-15**; *See supra* ¶ 12.

83. *See supra* ¶ 12.

84. The paragraph does not raise a genuine dispute as to any material fact. RUSM has mischaracterized "enrolling" because Windsor did not let Plaintiff "enroll" *per se*.

85. The paragraph does not raise a genuine dispute as to any material fact.