UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

OLUWAMUYIWA AWODIYA,                    CASE NO.  0:18-cv-60482-KMM-AOV

      Plaintiff,

v.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

      Defendant.
_____/

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
*DAUBERT* MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
RONALD QUINTERO AND INCORPORATED MEMORANDUM OF LAW**

Defendant Ross University School of Medicine, School of Veterinary Medicine Limited ("RUSM"), by counsel, hereby submits its response in opposition to the *Daubert* Motion to Exclude the Expert Testimony of Ronald Quintero [ECF No. 126] (the "Motion") filed by plaintiff Oluwamuyiwa Awodiya ("Plaintiff").

**I.     INTRODUCTION**

Ronald Quintero ("Quintero") is qualified to testify in this matter and his opinions are reliable and helpful to the trier of fact.  Quintero's expert report (the "Quintero Report"), attached hereto as **Exhibit A**, is almost entirely a criticism of the "Lost Earning Capacity" asserted by Plaintiff in his Third Amended Calculation of Damages ("Plaintiff's Calculation"), which is attached hereto as **Exhibit B** and is itself the subject of a *Daubert* Motion filed by RUSM [ECF No. 117].  *See* Exh. A at 16 (Quintero identifies his opinions reached to a reasonable degree of professional certainty).

Quintero is unquestionably qualified to criticize Plaintiff's Calculation.  That said, if Quintero, who has more than 40 years of experience as a financial professional, is not qualified to

rebut Plaintiff's Calculation then Plaintiff certainly is not qualified to offer his Calculation in the first instance. Unlike Plaintiff's Calculation, Quintero's opinions meet the standards established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Quintero is qualified and his opinions are both reliable and helpful to the trier of fact in this case.

Therefore, Plaintiff's Motion should be denied.

## II. LEGAL STANDARD

"[T]he rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee notes (2000 amendments). The admissibility of expert testimony, such as that of Quintero, is governed by Federal Rule of Evidence 702 and the Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). "*Daubert* precedents require courts to liberally admit expert testimony." *TRA Farms, Inc. v. Syngenta Seeds, Inc.,* No. 5:12-CV-378-MW/EMT, 2014 WL 3844838, at *3 (N.D. Fla. Apr. 14, 2014). The "*Daubert* inquiry is a flexible one," and "expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible based on the particular circumstances of the particular case." *United States v. Junkins*, 537 F. Supp. 2d 1257, 1262 (S.D. Ala. 2008) (internal quotations and citations omitted); *Principi v. Survivair, Inc*., 231 F.R.D. 685, 691 (M.D. Fla. 2005) (same).

The Eleventh Circuit has distilled *Daubert* and Rule 702 to the following three requirements: (1) the expert must be qualified to testify competently regarding the matter he or she intends to address; (2) the expert's methodology must be reliable as determined by a *Daubert* inquiry; and (3) the expert's testimony must assist the trier of fact through the application of expertise to understand the evidence or determine a fact in issue. *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1328 (11th Cir. 2014); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd*., 326 F.3d 1333, 1340 (11th Cir. 2003). The party seeking to introduce expert testimony must merely establish the criteria for admissibility by a preponderance of the evidence. *See Whelan v. Royal Caribbean*

*Cruises Ltd.*, 976 F. Supp. 2d 1328, 1331 (S.D. Fla. 2013).  A court has great discretion in determining whether expert testimony is admissible.  *See Waite v. AII Acquisition Corp.*, 194 F. Supp. 3d 1298, 1305 (S.D. Fla. 2016).

**III.   ARGUMENT**

    **A. Unlike Plaintiff, Quintero Is Highly Competent and Qualified to Testify as an Expert on Lost Earning Capacity**

As to an expert's qualification, "the standard for admissibility is not stringent," and "so long as the expert is at least minimally qualified, gaps in his qualifications generally will not preclude admission of his testimony, as this relates more to witness credibility and thus the weight of the expert's testimony, than to its admissibility."  *Hendrix v. Evenflo Co.,* 255 F.R.D. 568, 578 (N.D. Fla. 2009).

In the Motion, Plaintiff incorrectly asserts that Quintero opines on: (i) the "milestones" necessary in becoming a doctor; (ii) the impact of a medical student's grade point average, NBME CBSE scores, and USMLE Step 1 score on a student's ability to achieve there "milestones" and on a student's future ability to perform superior or inferior to other similarly specialized doctors; and (iii) whether a medical student that partially completed medical school would be a superior performer, if able to perform at all, in alternative employment pertaining to healthcare.  *See* [ECF No. 126] at 4-5.  This is a mischaracterization of Quintero's Report.

In his report, Quintero offers two opinions: (i) that Plaintiff's calculation of his lost earning capacity cannot be regarded to be objective, professional, or credible, and should not be relied upon; and (ii) that there is no reliable evidence that the Plaintiff's earning capacity has been impaired.  *See* Exh. A at 16.  Everything else contained in the Quintero Report is simply explanation of the reasoning behind these two opinions and a critique of Plaintiff's failure to offer sufficient evidence to support his Calculation.

3

There is no question that Quintero's experience satisfies the standard of being "minimally qualified" to offer his expert opinions on the lack of reliability of Plaintiff's Calculation.  *See Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881-82 (5th Cir. 2013) ("Roman did not need particular expertise in the oil-and-gas industry, or complex-services procurement, to help the jury understand software concepts and terms and citing Fed. R. Evid. 702(a)").  In fact, even if Quintero were "only a financial accountant" as Plaintiff incorrectly asserts, he would have been sufficiently qualified to criticize Plaintiff's Calculation.  *McKinnond v. Lesco Prods., Inc.*, No. 09-14276-CIV, 2010 WL 8266581, *4 (S.D. Fla. June 2, 2010) (finding that forensic economist was qualified to calculate present value of alleged loss of earning capacity and future medical expenses, and his opinion would be admissible so long as the assumptions underlying his calculations were supported by evidence); *Rabon v. Kimani*, Case No. 4:16-cv-4007, 2017 WL 6014318, at *2 (W.D. Ark. Sept. 14, 2017) (certified financial accountant was qualified to assist the finder of fact in making its determination because of his expertise and experience); *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 796 (N.D. Tex. 2013) (finding that proposed expert's graduate degree in business administration and 20 years of management and consulting experience to be sufficient to qualify witness as an expert).  That said, Quintero is more than a financial accountant.

Quintero has a Bachelor of Arts in Economics, a Master's Degree of Science in Accountancy, and an Assessment of Professional Competence in Investment Management.  *See* Quintero's Curriculum Vitae attached as Exhibit 30 to the Quintero Report.  Quintero has more than 40 years' experience as a financial professional at leading firms and has served on boards of directors of public, private, and nonprofit organizations as member or advisor.  *Id.*  He is, among other things, a Consultant, Financial Advisor, Certified Public Accountant, Certified Management

Accountant, Chartered Financial Analyst ("CFA"), Certified Financial Planner, and Certified Turnaround Professional.  *Id.*  He also has a Certification in Financial Forensics.  *Id.*

Quintero has served as a member or committee chairman of several committees of the New York State Society of Certified Public Accountants, and has been the Treasurer and a member of the Executive Committee of the Board of Directors of the Turnaround Management Association.  *Id.*  He is a member of the American Institute of Certified Public Accountants, the CFA Institute, the CFA Society New York, the Turnaround Management Association, the Association of Certified Turnaround Professionals, and the Association of Economic and Financial Experts.  *Id.*

Quintero is also an award-winning scholar, writer, and lecturer.  *Id.*  He has delivered more than 1,000 lectures, seminars, and courses around the world and is the author of more than 10,000 pages of proprietary training content.  *Id.*  For more than 25 years, Quintero has been profiled in *Who's Who in America*, *Who's Who in Finance and Industry*, and similar publications, and he is a recipient of the Albert Nelson Marquis Lifetime Achievement Award.  *Id.*

Because of his vast experience, Quintero has testified as an expert witness on approximately 100 occasions since 1980 in courts and arbitrations throughout the United States. *Id.*  Quintero is clearly qualified to criticize Plaintiff's Calculation.  *Id.*

That said, if Quintero is not qualified to criticize Plaintiff's Calculation, then Plaintiff certainly is not qualified to testify to lost earning capacity.  Plaintiff received his bachelor's degree in biology from Morgan State University in May 2013 and was only able to complete five semesters of medical school at RUSM.  *See* Plaintiff's Morgan State University and RUSM Transcripts attached hereto as **Exhibit C** and **Exhibit D**, respectively.  Plaintiff has no other formal education or training.

Plaintiff clearly lacks the education, training, and professional experience required to credibly perform the damages calculation for consideration by the Court. *See Donlin v. Philips Lightning North Am. Corp.*, 581 F.3d 73, 82 (3rd Cir. 2009) (upholding the district court's decision to bar lay testimony on damages because the calculations required were "sufficiently complex" such that they required an expert). Moreover, Plaintiff is also neither independent nor disinterested. *See, e.g., Zhang v. Honeywell Int'l, Inc.*, Nos. CV-06-1181-PHX-MHM, *et. al.*, 2008 WL 2699398, at *1 (D. Ariz. Jun. 30, 2008) ("[A]cting in the role of 'both Plaintiff and advocate' would be 'unfairly prejudicial, misleading and confusing to the jury.'"); *Kranis v. Scott*, 178 F. Supp. 2d 330, 333-334 (E.D.N.Y. 2002) (holding that where a party had been "personally involved at every level of" the action, his "testimony as an expert would be far more prejudicial than probative" and "would be unfairly prejudicial, misleading, and confusing to the jury"). As a result of his inexperience and self-interest, Plaintiff makes unreliable assumptions that are inconsistent with the methodologies used by experts in the field as explained in Defendant's *Daubert* Motion [ECF No. 117] and Quintero's Report. *See* Exh. A. Plaintiff's own Motion simply highlights the deficiencies in Plaintiff's Calculation. It is Plaintiff, not Quintero, who lacks the qualifications necessary to testify as an expert on lost earning capacity.

The information Plaintiff claims Quintero is not qualified to testify about was obtained by Quintero from authoritative sources ordinarily relied upon by experts in the field including: U.S. Bureau of Labor Statistics Occupational Employment Statistics, USMLE Score Interpretation Guidelines, and Social Security Administration Actuarial Notes. Quintero also interviewed the Dean and Chancellor of Ross University School of Medicine and the Associate Dean of Student Affairs and Academic Chief of Staff of Ross University School of Medicine. Quintero's sources are more thoroughly accounted for in the footnotes and Exhibit 1 to the Quintero Report. To the

extent Plaintiff challenges the accuracy of Quintero's sources, this challenge goes to weight of the evidence, rather than admissibility. *See Kearney v. Auto-Owners Ins. Co.*, No. 8:06-cv-595-T-24-TGW, 2007 WL 3231780, at *3 (M.D. Fla. Oct. 30, 2007). Plaintiff's motion should be denied.

### B. Quintero's Criticisms of Plaintiff's Lost Earning Capacity Calculations Are Based on Reliable Methodology

When making a determination of an expert's methodology "the Court walks a fine line between acting as a gatekeeper in admitting expert testimony and acting as a finder of fact in weighing evidence presented by experts." *Charney v. Sears, Roebuck, & Co.*, No. 10-14267-CIV, 2011 WL 3844077, at *3 (S.D. Fla. 2011) (observing that the expert opinion would "make for a much stronger case" if additional testing had been done, but denying a motion to exclude the expert because "it is not for this Court to make determinations on the persuasiveness of [the] evidence."). "The latter role would be an improper one for [the] Court." *Id.* "Non-scientific, experience-based opinions and testimony … will be admissible where properly grounded, well-reasoned, and non-speculative." *Regions Bank v. Kaplan*, 8:12-CV-1837-T-17MAP, 2017 WL 1148322, at *3 (M.D. Fla. Mar. 24, 2017) (finding expert's methodology was reliable where it was based on application of industry standards and mathematical formulas to factual information which was verifiable and reliable).

Contrary to Plaintiff's argument, the Quintero Report contains two opinions: (i) that Plaintiff's calculation of his lost earning capacity cannot be regarded to be objective, professional, or credible, and should not be relied upon; and (ii) that there is no reliable evidence that the Plaintiff's earning capacity has been impaired. *See* Exh. A at 16. Aside from these central opinions, the Quintero Report is simply provided context and explanation surrounding the two opinions.

7

The Quintero Report identifies the following seven factors/bases for these two opinions: (i) Plaintiff's calculation of lost earning capacity is neither objective nor well founded; (ii) Plaintiff failed to consider the steps required for him to achieve his assumed level of earnings; (iii) Plaintiff failed to tailor his hypothetical earnings to factors relevant to him individually; (iv) Plaintiff improperly determined his opportunity cost; (v) Plaintiff improperly discounted his hypothetical lost earning capacity to present value; (vi) Plaintiff improperly adjusted hypothetical lost earning capacity; and (vii) Plaintiff failed to consider his rejection of RUSM's reinstatement offer. *See* Exh. A, Quintero Report.

Plaintiff's Motion only attacks the reliability of a few – not all – of the factors/bases underlying Quintero's ultimate opinions. As a result, Quintero's ultimate opinions regarding the reliability of Plaintiff's Calculation should be upheld regardless of how the Court rules on the challenged factors/bases.

**1. Quintero's Opinions are Reliable**

Turning to the substance of the Motion, in section II, subsections A and C, Plaintiff takes issue with statements made in the Quintero Report analyzing Plaintiff's failure to consider the steps required for him to achieve the assumed level of earnings in Plaintiff's Calculation. *See* [ECF No. 126] at 6-7; *see also* Exh. A, Quintero Report, at 4-7.

The Quintero Report notes that Plaintiff's Calculation assumes as a given that Plaintiff would achieve the average earnings levels of U.S. family physicians and general practitioners over a continuous period of 41 years but fails to consider the steps necessary to achieve the earnings levels, including, but not limited to: (i) passing the National Board of Medical Examiners Comprehensive Basic Science Examination (the "COMP Exam"); (ii) earning a medical degree from RUSM; (iii) passing Step 1, Step 2, and Step 3 of the United States Medical Licensing

Examination ("USMLE"); (iv) getting a U.S. residency; (v) getting a job as a medical doctor in the U.S.; (vi) earning the average earning level for family physicians and general practitioners; and (vii) sustaining average U.S. earnings of physicians for 41 years.  *See* Exh. A, Quintero Report, at 4-7.

To explain why Plaintiff achieving these benchmarks cannot be taken as a given, the Quintero Report notes that Plaintiff failed the COMP Exam five times, historically had poor academic performance at RUSM, and scored below the 20th percentile on the Step 1 USMLE exam.  *Id.*  Quintero observes, among other things, that these facts: (i) casts considerable doubt as to whether he would have earned an MD degree from RUSM; (ii) raise the level of uncertainty with respect to the probability of Plaintiff passing Step 2 and Step 3 of the USMLE exam; (iii) would present an impediment to getting a U.S. residency; and (iv) would present an impediment to Plaintiff obtaining employment as a medical doctor in the U.S. and sustaining that level of pay for 41 years.  *Id.*  Plaintiff takes issue with these four observations.  *See* [ECF No. 126] at 6-7, § A.

Plaintiff's criticisms are misplaced and largely focus on arguable details, rather than substantive flaws that might warrant exclusion of Quintero's opinion.  Quintero's opinions are founded in the evidence, his experience, widely accepted benchmarks, and other authoritative sources ordinarily relied upon by experts in his field.  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  *See Kearney*, 2007 WL 3231780, at *3.  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  *Id.*  Here, it is clear that Quintero's opinions are supported by facts and are reliable.

Plaintiff also takes issue with Quintero's critique of the improper determination of opportunity cost in Plaintiff's Calculation.  *See* [ECF No. 126] at 7-8, § II(B).  Specifically, Quintero states, among other things, that the "opportunity cost of not practicing as a physician must be measured against the next best application of the Plaintiff's skills."  Exh. A, Quintero Report, at 16-17.  In criticizing Plaintiff's calculation, the Quintero Report notes that an individual such as the Plaintiff, who was capable of gaining admission to medical school and passing the first four semesters of the RUSM curriculum, has the potential to be a superior performer in another field suitable to individuals with an inclination towards health care.  *Id.*  Again, Plaintiff's objection is meritless.

As a financial professional, Quintero is knowledgeable as to how opportunity cost should be calculated.  Quintero bases this section of his Report on his experience, U.S. Bureau of Labor Statistics, Occupational Employment Statistics, interviews with the Dean and Chancellor of Ross University School of Medicine and the Associate Dean of Student Affairs and Academic Chief of Staff of Ross University School of Medicine, and other authoritative sources ordinarily relied about by experts in the field.  *Id.* at 16-17.  This is precisely the type of reliability that the *Daubert* standard requires.

2. **Plaintiff's Objections to Quintero's Sources Should Go to Weight Rather Than Exclusion**

In section II, subsection C of the Motion, Plaintiff takes issue with the following statement made in the Quintero Report, in which Quintero identifies a deficiency in Plaintiff's Calculation:

> Actuarial data used by the Social Security Administration indicates that, among males born in 1992 (the Plaintiff's year of birth) who survive to the age of 20, there is a 15.1% probability of dying before Normal Retirement Age and a 21.5% probability of becoming disabled, but surviving, before Normal Retirement Age (Exhibit 10). In other words, there is a 36.6% probability (as measured through age 66) that the Plaintiff would be unable to realize a portion of the hypothetical earnings due to death and/or disability.  Since the

> Plaintiff's Calculation assumes a 41-year uninterrupted earnings stream beginning at age 28 (i.e., until age 69), normal actuarial probabilities would indicate that the probability is more than 36.6% that a portion of the hypothetical earnings would not be realized due to death and/or disability.

[ECF No. 126] at 8-9; *see also* Exh. A, Quintero Report at 6. Plaintiff incorrectly states that this is an "opinion" of Quintero. This is not Quintero's opinion. Instead, it is actuarial data used by the Social Security Administration and it is the type of data ordinarily used by experts attempting to determine the proper calculation of lost earning capacity. *Gray v. U.S.*, Civil No. 05cvi893J(BLM), 2007 WL 4644736, at * 4 (S.D. Cal. Mar. 12, 2007) ("Accordingly, Rules 702 and 703 allow an expert to rely on facts or data reasonably relied upon by experts in the field."); *Nunn v. Show Fountains, Inc.*, Case No. CIV-05-1161, 2007 WL 911071, at *3 (W.D. Okla. Jan. 23, 2007) (finding that information relied on by vocational expert to be the type of information typically obtained by professionals in her field of expertise).

Similarly, in section II, subsection D of the Motion, Plaintiff takes issue with a statement in the Quintero Report that "the annual growth rate over the 41 year period assumed in Plaintiff's Calculation is 3.92% – nearly double the 2.08% annual growth rate used in Plaintiff's Calculation." *See* [ECF No. 126] at 9-11; Exh. A, Quintero Report at 11-12. Again, Plaintiff incorrectly states that this is an opinion of Quintero. This is not Quintero's opinion. As is noted in the Quintero Report, this information comes from the Average Wage Index, a widely used source for projected earnings growth for the U.S. workforce that is also used by the Social Security Administration to forecast the costs of Social Security Retirement Income. *Id.*

Moreover, this statement was made in the following context while criticizing Plaintiff's Calculation:

> The Plaintiff's calculation of hypothetical Lost Earnings Capacity is further magnified by constraining his assumed growth rate of the earnings of an average college graduate. A widely used source of

11

> projected earnings growth for the U.S. workforce is the Average Wage Index ("AWI"). It is used by the Social Security Administration to forecast the costs of Social Security Retirement Income. The Intermediate Projection of the Average Wage Index is $56,534.16 for 2020, and $263,354.75 for 2060, which spans the 41-year period assumed in the Plaintiff's Calculation. The annual growth rate in the AWI over the 41-year period is 3.92%—nearly double the 2.08% annual growth rate for average earnings of college graduates assumed in the Plaintiff's Calculation. The hypothetical earnings for an average college graduate assumed in the Plaintiff's Calculation projected for 2060 is $138,972—scarcely more than half that reflected for 2060 in the AWI for the entire U.S. labor force, even though two-thirds of Americans over the age of 25 lack a college degree. By starting with a low initial level of earnings to measure opportunity cost, and applying a grossly constrained growth rate to assumed initial earnings of the average college graduate, the Plaintiff's Calculation grossly inflates the calculation of hypothetical Lost Earnings Capacity.

Exh. A, Quintero Report at 11-12.

The statements complained of by Plaintiff are a recitation of independent studies that contradict the assumptions made in Plaintiff's Calculation. "[O]bjections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*, No. 01-4111-CIV, 2004 WL 6044760, at *5 (S.D. Fla. 2004) (citing *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1345 (11th Cir. 2003)). *See also Platypus Wear, Inc. v. Clarke Modet & Co., Inc.,* No. 06-20976-CIV, 2008 WL 4533914, *5 (S.D. Fla. 2008) ("Unless an expert's testimony is so fundamentally unreliable that it can offer no assistance to the jury, the factual basis of the testimony goes to the weight of the evidence.").

As the *Daubert* Court observed, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Plaintiff's objections to the viability of these studies are not grounds for exclusion. At best, they are fair game for cross-

examination and go to the weight of Quintero's opinions. Quintero's opinions meet the *Daubert* requirements. Plaintiff's Motion should be denied.

### C. Quintero's Testimony Is Relevant And Would be Demonstrably Helpful to a Jury That Has No Experience With Lost Earning Capacity Calculations

An expert's testimony will assist the trier of fact when it offers something "beyond the understanding and experience of the average citizen." *United States v. Paul*, 175 F.3d 906, 911 (11th Cir. 1999). *See also Microsoft Corp. v. Motorola, Inc*., No. C10-1823JLR, 2013 WL 4008822, at *4 (W.D. Wash. Aug. 5, 2013) (finding expert accountant's testimony to quantify damages based on an "exercise in basic math" would be helpful to jury and that defendant's recourse was to cross-examine expert*); Britt Green Trucking, Inc. v. FedEx Nat., LTL, Inc.,* No. 8:09-cv-445-T-33TBM, 2014 WL 2861485, at *7 (M.D. Fla. June 24, 2014) (concluding expert accountant's lost profit analysis was an appropriate subject for expert testimony and would assist the trier of fact in determining the plaintiffs' damages).

Plaintiff argues that Quintero's opinions will not assist the jury in understanding the issues in this case for several unavailing reasons. *See* [ECF No. 126] at 11-13. First, Plaintiff cites to *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 552 (1983), for the proposition that he is entitled to a risk-free discount rate. Plaintiff's reliance on *Pfeifer* is misplaced.

The *Pfeifer* action was brought pursuant to the Longshoremen's and Harbor Workers' Compensation Act, which entitled an injured employee to a **specified amount of compensation** for injuries regardless of whether the injury was caused by the employer's negligence. *Pfeifer*, 462 U.S. at 523. In *Pfeifer*, the Supreme Court discussed at length the three major approaches that courts had taken in calculating present value: (1) simply adopting a below-market discount rate, (2) relying on market interest rates while permitting evidence of future price inflation, and (3) applying the "total offset" method. *Id.* at 541–44. After highlighting the relative benefits and

13

drawbacks of each approach, the Court specifically declined to "establish" one method over another "as the exclusive method in all federal trials for calculating an award for lost earnings in an inflationary economy." *Id.* at 546.  Said another way, the Court was not willing to adopt any one methodology as a "mandatory federal rule of decision," which the trial court had done and which had "colored the trial court's evaluation of the relevant evidence" as a result. *Id*. at 551.  Contrary to Plaintiff's suggestion, the Supreme Court did not mandate a risk-free interest rate.

"Risk-free interest rates" are precisely as their name dictates—they are "risk free."  These interest rates should only be used where there is no risk associated with whether Plaintiff would have earned the assumed future earnings.  This is why, in the *Pfeifer* case, the Supreme Court found "[o]nce it is assumed that the [plaintiff] would ***definitely*** have worked for a ***specific terms*** of years, he is entitled to a risk-free stream of future income to replace his lost wages." *Id.* at 535.

Here, however, Plaintiff's calculation presumes that he would have made the average salary for U.S. family physicians and general practitioners from his very first day of practice and maintained that that level of earnings over a continuous period for 41 years.  Not only is there risk associated with that assumption, there is great risk when you consider Plaintiff's particular circumstances. As the Quintero Report notes, Plaintiff failed the COMP exam five times, historically had poor academic performance at RUSM, and scored below the 20th percentile on the Step 1 USMLE exam.  Plaintiff also struggled to meet the mental fitness requirements, thereby calling into question whether Plaintiff met the technical requirements of both RUSM and the medical profession.  Given these circumstances, Plaintiff's "risk-free" discount rate would be entirely improper.  Plaintiff's failure to understand these fundamental economic principles is precisely why Courts prevent unqualified lay witnesses from testifying to matters that require scientific, technical, or other specialized knowledge.  Permitting Plaintiff to offer these baseless

economic opinions would greatly prejudice RUSM and would assuredly confuse and mislead the jury.

Second, Plaintiff argues that Quintero should not be permitted to explain to the jury the effect of Plaintiff's failure to consider reinstatement on his damages. However, Plaintiff has a duty to mitigate his damages as a matter of law. Plaintiff's failure to accept reinstatement or otherwise mitigate his damages also goes directly to the measurement of lost earning capacity damages recoverable in this case. As the Quintero Report points out, had Plaintiff accepted the reinstatement offer from RUSM, it "would have enabled him to attempt to complete his MD studies, and thereby mitigate substantially all of his asserted Lost Earnings Capacity." Exh. A, Quintero Report at 16. Quintero's testimony is relevant and will assist the jury in understanding the flaws in Plaintiff's Calculations. Plaintiff's Motion should be denied.

## **CONCLUSION**

WHEREFORE, defendant Ross School of Medicine, School of Veterinary Medicine Limited respectfully requests that this Court enter an Order: (i) denying Plaintiff's *Daubert* Motion to Exclude the Expert Testimony of Ronald Quintero [ECF No. 126] in all respects; and (ii) granting RUSM such other and further relief as the Court deems just and proper.

Dated: January 22, 2019

Respectfully submitted,

*/s/Donnie M. King*
MICHAEL C. MARSH
Florida Bar Number:  0072796
Email:  michael.marsh@akerman.com
Secondary:  sharon.luesang@akerman.com
RYAN A. ROMAN
Florida Bar Number:  0025509
Email:  ryan.roman@akerman.com
Secondary:  dorothy.matheis@akerman.com
DONNIE M. KING
Florida Bar Number: 101386
Email: donnie.king@akerman.com
Secondary: simone.tobie@akerman.com
OCTAVIA M. GREEN
Florida Bar Number: 119179
Email: octavia.green@akerman.com
Secondary: simone.tobie@akerman.com
**AKERMAN LLP**
98 SE 7th Street, Suite 1100
Miami, FL 33131
Phone:  (305) 374-5600
Fax:  (305) 374-5095

*Attorneys for Defendant Ross University School of Medicine, School of Veterinary Medicine Limited*

47502333;6

## **CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on January 22, 2019 a true and correct copy of the foregoing document was served via CM/ECF on:

Oluwamuyiwa Awodiya
15005 Dahlia Drive
Bowie, Maryland 20721
Telephone: (240) 602-1836
E-mail: drmuyiwa.a@gmail.com

                                                        *s/Donnie M. King*
                                                        Donnie M. King

47502333;6