# Exhibit A

# R. G. Quintero & Co.

### 375 Park Avenue • Suite 2607
### New York, New York 10152
### (212) 327-0200 • (212) 327-0225 Fax
#### www.rgquintero.com

December 28, 2018

Ryan Roman, Esq.
Akerman LLP
98 Southeast Seventh Street, Suite 1100
Miami, FL 33131

*Re:   Oluwamuyiwa Awodiya v. Ross University School of Medicine,*
*School of Veterinary Medicine Limited*

Dear Mr. Roman:

At your request, I reviewed various documents (**Exhibit 1**) and interviewed individuals (**Exhibit 1**) familiar with the above matter.  The purpose of my document review and interviews was to render expert opinions and provide information that will be helpful to the Court in connection with this matter.  This report documents my opinions and supporting information.

## SUMMARY OF OPINIONS

It is my expert opinion, as expressed to a reasonable degree of professional certainty, that the "Lost Earnings Capacity" asserted by Oluwamuyiwa Awodiya (the "Plaintiff") in his Third Amended Calculation of Damages dated December 10, 2018 (the "Plaintiff's Calculation") cannot be relied upon because:

- Based on my experience as an expert witness, the Plaintiff fails to meet critical requirements necessary to offer the Plaintiff's Calculation for consideration by the Court in this matter due his lack of:
  - Independence;
  - Disinterestedness in the outcome of this matter;
  - Requisite expertise to offer to the Court the opinions reflected in the Plaintiff's Calculation; and
  - A calculation that complies with the methodologies that would normally be applied by financial experts.

- The Plaintiff jumps to a speculative conclusion that he would have achieved the average earnings level of U.S. family physicians and general practitioners for a continuous period of 41 years, without considering the milestones necessary to

R. G. QUINTERO & CO.

Ryan Roman, Esq.
December 28, 2018
Page 2

realize the assumed level of earnings, such as earning a medical degree, passing the required examinations, gaining a U.S. residency and permanent employment as a doctor, and earning the assumed earnings level for a continuous period of 41 years (**Exhibits 2** and **3**).

- The Plaintiff's Calculation is generic to the annual (rather than lifetime) earnings capacity of all employed U.S. family physicians and general practitioners, rather than tailored to the unique attributes of the Plaintiff, taking into consideration factors such as the impact on earnings capacity of his grade point average at Ross University School of Medicine ("Ross") and need to repeat a semester, his inability to pass the NBME CBSE[1] and poor scores on the USMLE[2] Step 1 (**Exhibit 4**), medical school, area of specialization that would be realistically attainable, and geographical location.

- The Lost Earnings Capacity is calculated based on a comparison of the average earnings of family physicians and general practitioners to the average earnings of a college graduate, rather than tailoring the calculation to an appropriate measure of the earnings potential of the Plaintiff in the medical profession, based on his academic background and performance, failure of the NBME CBSE and comparing such earnings potential to the next best application of his earnings-generating capability outside of the medical profession.

- The assumed disparity between hypothetical earnings as a doctor as compared to those of an average college graduate is magnified each year through the Plaintiff's assumption that medical earnings would grow at an annual rate of 3.96%, whereas those of an average college graduate would only increase by 2.08% per year (**Exhibit 18**).

- The Plaintiff's Calculation discounts to a present value his assumed disparity between hypothetical MD earnings and those of an average college graduate at the unrealistically low risk-free rate of 3.375%, treating the assumed earnings disparity as if it has the same level of risk and uncertainty of a U.S. Treasury bond, thereby increasing the present value of the hypothetical Lost Earnings Capacity.

- For the above reasons as well as others (**Exhibit 27**), the Plaintiff's Calculation of hypothetical Lost Earnings Capacity cannot be regarded to be objective, professional, or credible, and it should not be relied upon.

- It may reasonably be concluded that there is little, if any, difference between the Plaintiff's hypothetical earnings-generating capability as a family physician and

---

[1] NBME CBSE = National Board of Medical Examiners Comprehensive Basic Science Examination.
[2] USMLE = United States Medical Licensing Examination.

R. G. QUINTERO & CO.

Ryan Roman, Esq.
December 28, 2018
Page 3

his earnings-generating potential from alternative fields of employment in the health care profession (**Exhibits 23 – 26**).

- The Plaintiff rejected the reinstatement offer from Ross that expired November 7, 2018[3] that would have enabled him to attempt to complete his MD studies, and thereby mitigate substantially all of his asserted Lost Earnings Capacity.  His rejection of the offer casts doubt as to the sincerity of his desire, and/or belief in his ability, to complete his studies and practice medicine.

I reserve the right to amend or supplement this report in the event that I obtain additional information, gain an enhanced understanding of information affecting the opinions contained herein, or for other reasons.


## QUALIFICATIONS

I have more than forty years' experience as a senior financial professional at Peat, Marwick, Mitchell & Co.,[4] Zolfo Cooper,[5] Bear Stearns,[6] and the firms that I founded— R. G. Quintero & Co. (www.rgquintero.com) and Chartered Capital Advisers, Inc. (www.charteredcapital.com).  I have served more than 750 clients of all sizes, in a wide range of industries, including health care.  My health care experience has included:

- Providing financial advisory services to clients in various aspects of the health care industry, including doctors and other health care professionals, hospitals, rehabilitation facilities, pharmacies, testing laboratories, a cancer radiation center, and health insurance companies;

- Serving as financial advisor and interim chief financial officer of a hospital; and

- Testifying as an expert witness on behalf of the United States Department of Justice in the proposed merger of Anthem and Cigna.

I have more that thirty-five years' experience in delivering post-graduate training as a lecturer, graduate school instructor, and in running professional training programs. I have run a financial training company for more than twenty-five years that formerly competed with a subsidiary of the parent company of Ross.  I have given lectures and seminars in more than sixty cities throughout the United States and more than twenty countries located on five continents abroad.  My training biography is attached as **Exhibit 28**.

---

[3] Letter from Ross to the Plaintiff dated October 31, 2018.
[4] Formerly the largest of the Big Eight accounting firms, now known as KPMG.
[5] Recently merged with AlixPartners—a leading management consulting firm.
[6] Formerly one of the largest investment banks, acquired by JPMorgan Chase & Co.

R. G. QUINTERO & CO.

Ryan Roman, Esq.
December 28, 2018
Page 4

I routinely develop and analyze individual earnings information in connection with business valuations, merger & acquisition projects, SEC filings of publicly held companies, personal injury cases, divorce cases, and for other reasons.

I have been qualified and testified as an expert witness in matters requiring financial and related expertise on approximately 100 occasions over the past 38 years in courts and arbitrations throughout the U.S. I also served as a court-appointed neutral, and have been retained as a neutral in nonjudicial matters. A list of the cases in which I have testified as an expert witness during the past four years is provided in **Exhibit 29**.

I am an award-winning scholar, author, and lecturer. I have an A.B. with concentrations in Economics and Spanish Literature from Lafayette College, and an M.S. in Accountancy and an Advanced Professional Certificate—an intermediate degree between an MBA and a Ph.D.—in Investment Management from the New York University Stern School of Business. I have earned ten professional licenses and accreditations, including Certified Public Accountant, Chartered Financial Analyst (CFA), and I am AICPA[7] Certified in Financial Forensics (CFF) and AICPA Accredited in Business Valuation. My C.V. is provided in **Exhibit 30**.

## FACTORS CONSIDERED IN REACHING MY OPINIONS

**The Plaintiff's Calculation is Neither Objective Nor Well Founded.** The Plaintiff's Calculation has been prepared by the Plaintiff to support his damages claim. The objectivity of the Plaintiff's Calculation is undermined because the Plaintiff is neither independent nor disinterested—he is the sole beneficiary of the outcome of this matter. He lacks the education, training, and professional experience required to credibly perform the Plaintiff's Calculation for consideration by the Court. These shortcomings are apparent from the deficiencies in the Plaintiff's Calculation described below.

**Failure to Consider Steps Required to Achieve Assumed Earnings.** The Plaintiff's Calculation depends upon a series of speculative assumptions—each of which has a risk of nonattainment. The Plaintiff's Calculation does not enumerate the steps necessary for the Plaintiff's Calculation to be achieved. Rather, it merely assumes as a given that the Plaintiff would achieve the average earnings levels of U.S. family physicians and general practitioners over a continuous period of 41 years. The Plaintiff's Calculation fails to consider the steps necessary to achieve the earnings levels assumed in the Plaintiff's Calculation—all of which must be successfully ascended—assuming but not limited to (**Exhibit 2**):

- *Passing the NBME CBSE*. The Plaintiff failed the NBME CBSE five times.

---

[7] AICPA = American Institute of Certified Public Accountants.

R. G. QUINTERO & CO.

Ryan Roman, Esq.
December 28, 2018
Page 5

- *Earning a medical degree from Ross.*  Ross has a four-year program that must be completed to earn a Doctor of Medicine degree.[8]  The Plaintiff had a grade point average ("GPA") of 2.72[9] through his first five semesters, the last of which he had to repeat.  Most significantly, his grade was either C or C+ for the Foundations of Medicine course representing more than 70% of the curriculum that he was required to take each of his first five semesters, except for the first semester in which he earned a P, the fifth semester in which he failed the course, and his repetition of the fifth semester, when he got a B in the course the second time around.[10]  In computing the Plaintiff's GPA, Ross does not include his failure the first time around of Foundations of Medicine 5, which was given no weight due to the failure.  If his first failed attempt at Foundations of Medicine 5 were included in his grade point average, his adjusted GPA would be 2.28.[11]  His poor academic performance casts considerable doubt as to whether he would have earned an MD degree from Ross.

- *Passing the USMLE Steps 1, 2, and 3.*  The Plaintiff passed USMLE Step 1 with a score of 211[12]—a mediocre score below the 20th percentile[13] (**Exhibit 4**).  The Plaintiff's inability to pass the NBME CBSE in five attempts, coupled with his poor academic performance at Ross and mediocre score on USMLE Step 1, raises the level of uncertainty with respect to the probability of his passing Step 2 and Step 3 of the USMLE.

- *Getting a U.S. residency.*  The Plaintiff's poor academic performance, inability to pass the NBME CBSE in five attempts, mediocre score in USMLE Step 1 (which is a leading indication of poor scores, if not failing scores, in USMLE Steps 2 and 3), would present a further impediment to getting a U.S. residency.

- *Getting a job as a medical doctor in the U.S.*  Each of the aforementioned impediments to obtaining a U.S. residency would also adversely impact the prospects of the Plaintiff obtaining employment as a medical doctor in the U.S.

- *Achieving average earnings level of family physicians and general practitioners.*  The Plaintiff assumes that he would earn annual compensation of $208,560[14]—the average U.S. earnings of physicians classified by the U.S. Bureau of Labor Statistics in the "Family and General Practitioner" category

---

[8] https://medical.rossu.edu/md-program/curriculum.html.
[9] Awodiya Oluwamuyiwa's Official Transcript from Ross dated May 21, 2018.
[10] *Ibid.*
[11] 139 GPA points ÷ (51 credits on graded classes passed + 10 credits applicable to Foundations of Medicine 5 first-time failure) = 2.28, based on the Plaintiff's Official Transcript dated May 21, 2018.
[12] Plaintiff's United States Medical Licensing Examination Step 1 Score Report dated December 23, 2017.
[13] i.e., less than 20% of candidates had a score below that of the Plaintiff, and a large portion of them failed the examination (Exhibit 4).
[14] Plaintiff's Third Amended Calculation of Damages, p. 1.

R. G. QUINTERO & CO.

Ryan Roman, Esq.
December 28, 2018
Page 6

(**Exhibit 5**).  The Plaintiff's Calculation failed to consider many of the variables that impact a physician's earnings, such as those enumerated below:

– Physicians' earnings vary substantially based on field of specialization (**Exhibit 5**).

– Employment of Ross graduates is heavily skewed in favor of three fields of specialization (pediatricians, internists, and family and general practitioners) which tend to be less remunerative than other areas of medicine (**Exhibits 5** and **6**).

– Individual physicians can vary substantially in their earnings-generating ability (**Exhibit 7**).

– Other variables, such as employer type (**Exhibit 8**) and geographical location (**Exhibit 9**), can also have a significant impact upon earnings.

- *Sustaining assumed earnings level for 41 years*.  The Plaintiff's Calculation treats his assumed earnings as an annuity at an unchanged amount for 41 years. This simplistic approach fails to consider several real-world factors:

– As in any profession or job, a physician's earnings normally begin at a low level at the inception of a career, reaching their highest level when the physician is in his 40s, and then generally tailing off afterwards, when many physicians seek to reduce their hours and stress, and also experience earnings declines for other reasons.

– There is the ever-present risk of death or disability that can bring earnings to an abrupt end.  Actuarial data used by the Social Security Administration indicates that, among males born in 1992 (the Plaintiff's year of birth) who survive to the age of 20, there is a 15.1% probability of dying before Normal Retirement Age,[15] and a 21.5% probability of becoming disabled, but surviving, before Normal Retirement Age (**Exhibit 10**).  In other words, there is a 36.6% probability (as measured through age 66) that the Plaintiff would be unable to realize a portion of the hypothetical earnings due to death and/or disability.  Since the Plaintiff's Calculation assumes a 41-year uninterrupted earnings stream beginning at age 28 (i.e., until age 69), normal actuarial probabilities would indicate that the probability is more than 36.6% that a portion of the hypothetical earnings would not be realized due to death and/or disability.

---

[15] Normal Retirement Age for somebody born after 1960 is 67.

R. G. Quintero & Co.

Ryan Roman, Esq.
December 28, 2018
Page 7

- A recent study of 77,986 primary care physicians revealed that:[16]
  - · The median retirement age was 64.9;
  - · Approximately 20% retired by age 60 (**Exhibit 11**); and
  - · Approximately 75% retired by age 68 (**Exhibit 11**).
  Retirement age norms would reduce the likelihood of the hypothetical 41-year earnings stream through age 69 assumed in the Plaintiff's Calculation.

- The Plaintiff's Calculation fails to provide for other real-world limitations on the potential of the hypothetical 41-year earnings stream being realized, such as:
  - · Time required to find a job at the inception of his career;
  - · Unemployment due to voluntary and/or involuntary termination of employment;
  - · Time off for personal or family matters; or
  - · Leaving the medical professional altogether, which is occurring with increasing frequency.

- The low probability of this sequence of assumptions occurring as assumed in the Plaintiff's Calculation is illustrated in **Exhibit 3**.

**Failure to Tailor the Plaintiff's Hypothetical Earnings to Factors Relevant to the Plaintiff.**  The Plaintiff's Calculation assumes that he would achieve and sustain for 41 years the average earnings of a physician in the BLS category "Family and General Practitioners."  The very fact the Plaintiff has pursued this litigation indicates that to date he has not demonstrated the potential to achieve earnings consistent with the peer group that he has selected for the Plaintiff's Calculation.  He has: (1) been unable to gain admission to a U.S. medical school; (2) had a low GPA at Ross; (3) failed his fifth semester at Ross; (4) been unable to pass the NBME CBSE in five attempts; and (5) achieved a low score on the USMLE Step 1 examination.  These factors raise considerable doubt as to his potential to earn an MD degree, and they raise doubt as to whether, if he were to earn an MD degree, his earnings would be comparable to the average earnings of the peer group that he has used for the Plaintiff's Calculation.

A tailored approach specific to the attributes of the Plaintiff would recognize that the aforementioned factors would impose limitations on his ability to achieve and sustain for 41 years the average earnings level of whichever area of medicine in which he could obtain employment.  For starters, an average is a skewed measure of central tendency that is magnified by positive outliers.  In the three medical specialties employing the lion's share of Ross graduates (**Exhibit 6**) the average exceeds the median (**Exhibit 7**) by $5,000 to $15,000 (**Exhibit 7**).  Statisticians normally regard a median to be a more reliable measure of central tendency than an average.

---

[16] Stephen M. Petterson, Ph.D., William F Rayburn, MD, MBA, and Winston R. Liaw, MD, MPH, "When Do Primary Care Physicians Retire?  Implications for Workforce Projects," *Annals of Family Medicine*, (July/August 2016), p. 344.

R. G. Quintero & Co.

Ryan Roman, Esq.
December 28, 2018
Page 8

Rather than assuming average earnings, the Plaintiff should have tailored the analysis to one that considers the aforementioned limitations on earnings-generating capability, such as the earnings level of the 10th or 25th percentile (**Exhibit 7**). It makes sense that the Plaintiff's aforementioned academic and test-taking deficiencies demonstrate a below-average earnings potential in the medical profession. By assuming an average level of earnings, rather than a lesser level that is more consistent with the Plaintiff's demonstrated aptitude for the medical profession, he has inflated his assumed hypothetical earnings level (**Exhibit 12**).

**Improper Determination of Opportunity Cost.** An "opportunity cost, also known as alternative cost, is the value of a choice, relative to an alternative. When an option is to choose from two mutually exclusive alternatives, the opportunity cost is the 'cost' incurred by not enjoying the benefit associated with the alternative cost."[17] The opportunity cost associated with the difference between the Plaintiff's hypothetical earnings as a doctor and those of a typical college graduate is used by the Plaintiff to calculate Lost Earnings Capacity, or the opportunity cost of not being able to earn his medical degree from Ross. The Plaintiff's Calculation magnifies Lost Earnings Capacity by inflating assumed earnings based on the average earnings of "Family and General Practitioners," and comparing such hypothetical earnings to an across-the-board average for college graduates (**Exhibit 13**), and assuming that the hypothetical earnings differential (opportunity cost) would increase at an increasing rate by assuming that the hypothetical earnings as a family or general practitioner would grow more rapidly (3.96% per year)[18] than those of a typical college graduate (2.08% per year).[19]

- *Inflated physician's earnings*. As previously stated, the Plaintiff inflated the calculation of physician's earnings used as a basis to estimate Lost Earnings Capacity. A tailored approach relevant to the areas of medicine in which the vast majority of Ross graduates practice,[20] reflecting the potential demonstrated to date by the Plaintiff, suggests the following earnings potential (**Exhibit 7**):

  – 10th percentile of family and general practitioners—$73,240;

  – 25th percentile of family and general practitioners—$138,100.

- *Depressed measure of alternative earnings.* The Plaintiff's Calculation measures lost earnings capacity based on his projection of average earnings of a typical college graduate. This is an inappropriate measure of opportunity cost, as it understates the Plaintiff's earnings potential from the next best application of his earnings-generating potential. Among the factors that cause this alternative measure of earnings to be understated are:

---

[17] https://en.wikipedia.org/wiki/Opportunity_cost.
[18] Plaintiff's Calculation, Exhibit A, footnote ii.
[19] *Op. cit.*, footnote iii.
[20] Family medicine, internal medicine, and pediatrics (**Exhibit 6**).

R. G. QUINTERO & CO.

Ryan Roman, Esq.
December 28, 2018
Page 9

– Approximately 45% of recent college graduates, and more than one-third of all college graduates, are employed in a job that does not require a college degree (**Exhibit 14**).

– Not all college degrees offer the same earnings potential.

– Women college graduates tend to earn less than male college graduates, due to factors such as gender discrimination, taking time off to bear and raise children, and family responsibilities (**Exhibit 15**).

– The Plaintiff's Calculation assumes "Latest average salary with bachelor's degree: $60,996,"[21] based on annualization of weekly earnings of $1,173 that he attributes to BLS data that he claims to have accessed on October 23, 2018. The source that the Plaintiff claims to have used indicates a higher average weekly earnings figure during two of the four quarters of 2017 and two of the first three quarters of 2018 than that which was used in the Plaintiff's Calculation (**Exhibit 16**). By using a low weekly earnings level of $1,173 that was clearly a downside aberration from the average quarterly earnings during 2017 and the first three quarters of 2018, and also inconsistent with the increasing trend in evidence, the Plaintiff's Calculation used a constrained initial level of earnings that he attributed to the average college graduate, which inflated the hypothetical Lost Earnings Capacity. This tendency to cherry pick numbers to magnify a damages claim is consistent with numerous other assumptions reflected in the Plaintiff's Calculation. If the Plaintiff had annualized the applicable third-quarter average weekly earnings amount from the data source that he claims to have relied upon, his initial assumed annualized college graduate earnings amount would have been $64,064[22] (which is slightly higher than the $63,342 that he used in both his Amended and Second Amended Calculation of Damages) rather the $60,996 that he assumed in his Third Amended Calculation of Damages.

• *Relevant earnings in alternative field*. The opportunity cost of not practicing as a physician must be measured against the next best application of the Plaintiff's skills. An example of an alternative to medical school suggested in an article published by *The New York Times* is to attend an osteopathic school or to become a nurse practitioner or physicians assistant.[23]

An individual such as the Plaintiff, who was capable of gaining admission to medical school and passing the first four semesters of the Ross program, has the potential to be a superior performer in another field suitable to individuals with an inclination towards health care. The following are examples:

---

[21] Plaintiff's Calculation, p. 1.
[22] $1,232 (Exhibit 16) x 52 = $64,064.
[23] https://www.nytimes.com/2014/08/03/education/edlife/second-chance-med-school.html.

Ryan Roman, Esq.
December 28, 2018
Page 10

| TABLE 1 | | | |
| Earnings in Fields that Are Alternatives to Being a Medical Doctor | | | |
| | 50th Pctl. | 75th Pctl. | 90th Pctl. |
| Chiropractors | $68,640 | 98,040 | 144,730 |
| Optometrists | 110,300 | 136,270 | 190,090 |
| Pharmacists | 124,170 | 142,710 | 159,410 |
| Physicians assistants | 104,860 | 124,200 | 146,260 |
| Podiatrists | 127,740 | 190,400 | NA |
| Nurse practitioners | 103,880 | 123,070 | 145,630 |
| *Median* | *$107,580* | *130,235* | *146,260* |
| Source: BLS Occupational Employment Statistics, May 2017 | | | |

A comparison of the earnings levels in **Table 1** to the 10th and 25th percentile earnings in medical fields matching the employment of the preponderance of Ross Graduates (**Exhibits 6** and **7**) reveals that a proper analysis of opportunity cost indicates that it is unlikely that there would be any diminution of earnings capacity if the Plaintiff were to pursue other areas of practice that are suited for individuals with a desire to enter the health care field (**Exhibit 17**).  A proper calculation of opportunity cost must consider the next best alternative.  A party asserting damages normally has an obligation to mitigate damages.

- *Improper earnings growth rates inflates the opportunity cost.*  By applying a growth rate to the Plaintiff's projection of family and general practitioner of earnings (3.96% per year)[24] that is nearly twice assumed growth rate of college graduate earnings (2.08% per year),[25] the disparity between the two assumed levels of earnings increases at a compounded annual rate of 4.47%[26] over the assumed 41-year period, surpasses either of the aforementioned growth rates (**Exhibit 18**).   The effects of applying the different growth rates to the hypothetical initial earnings as a family and general practitioner as compared to as an average college graduate are:
  - The hypothetical lost earnings capacity grows more rapidly than the assumed growth rates of either of the two earnings figures from which it has been derived—hypothetical lost earnings capacity is assumed to increase at a rate of 4.47% per year over the 41-year period reflected in the Plaintiff's Calculation, as compared to 3.96% per year assumed for hypothetical family

---

[24] Plaintiff's Calculation, Exhibit A, footnote ii.

[25] *Op. cit.*, footnote iii.

[26] [$847,039 (year 41 disparity) ÷ $147,564 (year 1 disparity)]$^{1/40}$ − 1 = 4.47%/annual growth rate (per Exhibit A of the Plaintiff's Calculation).

R. G. QUINTERO & CO.

Ryan Roman, Esq.
December 28, 2018
Page 11

and general practitioner earnings as compared to 2.08% per year assumed for an average college graduate (**Exhibit 18**);

– The assumed earnings of a typical college graduate declines from 29.2% of that of the average family and general practitioner at the beginning of the 41-year period to 14.1% of the hypothetical earnings of an average family and general practitioner at the end of the 41-year period (**Exhibit 18**).

The Plaintiff's assumed growth rate in family and general practitioner annual earnings of 3.96% per year, computed by the Plaintiff for the period 2000 – 2017, is grossly inflated due to the nonrecurring 23.85% increase in earnings in 2002 (**Exhibit 19**). During the same 18-year period the median annual increase in earnings, which mitigates most of the impact of the aberrational earnings increase, was 2.53%. This is not significantly different from the compounded annual growth rate ("CAGR") in average family and general practitioner earnings since 2010 (2.63%) and over the past five years (2.89%) (**Exhibit 19**). The Plaintiff's misuse of historical data to produce an unrealistic family and GP earnings growth assumption disregards the underlying data (**Exhibit 19**) and fails to consider the tremendous price pressure on medical costs imposed in recent years by third-party payers[27] that are responsible for more than 80% of payments of U.S. physician and clinical services costs (**Exhibit 20**). The application by the Plaintiff of an inflated family and GP growth assumption grossly inflates the Plaintiff's calculation of hypothetical Lost Earnings Capacity.

The Plaintiff's calculation of hypothetical Lost Earnings Capacity is further magnified by constraining his assumed growth rate of the earnings of an average college graduate. A widely used source of projected earnings growth for the U.S. workforce is the Average Wage Index ("AWI"). It is used by the Social Security Administration to forecast the costs of Social Security Retirement Income. The Intermediate Projection of the Average Wage Index is $56,534.16 for 2020, and $263,354.75 for 2060,[28] which spans the 41-year period assumed in the Plaintiff's Calculation. The annual growth rate in the AWI over the 41-year period is 3.92%[29]—nearly double the 2.08% annual growth rate for average earnings of college graduates assumed in the Plaintiff's Calculation. The hypothetical earnings for an average college graduate assumed in the Plaintiff's Calculation projected for 2060 is $138,972[30]— scarcely more than half that reflected for 2060 in the AWI for the entire U.S.

---

[27] i.e., insurance companies, Medicare, and Medicaid.
[28] *The 2018 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds*, Table VI.G6.
[29] [$263,355.75 (AWI 2060) ÷ $56,534.16 (AWI (2020))]$^{1/40}$ − 1 = 3.92% CAGR.
[30] Plaintiff's Calculation, Exhibit A.

R. G. Quintero & Co.

Ryan Roman, Esq.
December 28, 2018
Page 12

labor force,[31] even though two-thirds of Americans over the age of 25 lack a college degree.[32]  By starting with a low initial level of earnings to measure opportunity cost, and applying a grossly constrained growth rate to assumed initial earnings of the average college graduate, the Plaintiff's Calculation grossly inflates the calculation of hypothetical Lost Earnings Capacity.

*Failure to deduct remaining costs of becoming a doctor.*  Another shortcoming of the Plaintiff's Calculation is that he has failed to deduct from his calculation of Lost Earning Capacity the remaining cost of becoming a doctor, including tuition, room, board, books, transportation, required examinations, as well as other costs.

*Excessive duration of earnings calculation period.*  The Plaintiff's Calculation assumes that the period of time over which he has calculated hypothetical Lost Earnings Capacity would extend over 41 years from the inception of his medical career.[33]  His claimed source of this work period is "https://www.ssa.gov/cgi-bin/longevity.cgi."[34]  I attempted to examine his information source and did not see any information on the claimed source pertaining to duration of employment.  The link is to a webpage entitled "Retirement & Survivors Benefits:  Life Expectancy Calculator," which is what I would expect given the URL that the Plaintiff has cited.  I regularly use the Social Security website for my work and do not recall seeing information such as he has suggested.  I believe what he was viewing information indicating that for a 26-year-old born in 1992 his full retirement age at which his Social Security Retirement Income would not be penalized is at age 67—41 years in the future for a 26-year-old.  If his assumed earnings calculation period begins during a 12-month period in which the Plaintiff turns 29,[35] then the duration of the period for which hypothetical Lost Earnings Capacity should be calculated, assuming that it ends at Social Security full retirement age, for 39 years, rather than 41 years.  This would reduce the hypothetical Lost Earnings Capacity.

**Improper Discounting of Hypothetical Lost Earnings Capacity to a Present Value**.  In response to my report dated December 4, 2018 in which I criticized the Plaintiff's Calculation for failing to discount the hypothetical Lost Earnings Capacity to a present value, the Plaintiff's Third Amended Calculation of Damages contains a discounted calculation, albeit in a defective manner.  The Plaintiff's Calculation discounts hypothetical Lost Earnings Capacity to a present value using a discount rate of 3.375% "based on the most recent interest rates for a 30-year United States Treasury Bond."[36]  "In business valuation the long-term yield on the US Treasury coupon bonds is generally accepted as the risk-free rate of return."[37]  Discounting the hypothetical Lost

---

[31] $138,972 (average college earnings for 2060 per Plaintiff's Calculation, Exhibit A) ÷ $263,355 (AWI 2060) = 53%.

[32] https://thehill.com/homenews/state-watch/326995-census-more-americans-have-college-degrees-than-ever-before.

[33] Plaintiff's Calculation, p. 1.

[34] Ibid.

[35] Op. cit., Exhibit A.

[36] Plaintiff's Calculation, Exhibit A, footnote iv.

[37] https://en.wikipedia.org/wiki/Risk-free_interest_rate.

R. G. QUINTERO & CO.

Ryan Roman, Esq.
December 28, 2018
Page 13

Earnings Capacity at the risk-free rate is a gross valuation error that results in a meaningless calculation of hypothetical Lost Earnings Capacity. By discounting the annual hypothetical Lost Earnings Capacity to a present value at the risk-free rate (i.e., U.S. Treasury Bond yield), the Plaintiff's Calculation values the hypothetical Lost Earnings Capacity as if it is guaranteed, with absolutely no risk of nonattainment. It fails to provide for the numerous risks associated with the hypothetical Lost Earnings Capacity over the 41-year period, including but not limited to:

- Death;

- Disability;

- Inability to achieve and sustain for 41 consecutive years the average earnings assumed for family and general practitioners;

- Voluntary or involuntary interruption or termination of employment;

- Choosing to leave the medical profession;

- Retirement before completing 41 years of continuous employment; and

- Incorrect calculation of the assumed disparity between earnings as a doctor as opposed to alternative vocational pursuits.

Implicit in the Plaintiff's calculation of hypothetical Lost Earnings Capacity is that a third party would pay him $7,503,177[38] at the measurement date for the excess, if any, of his future earnings stream over the future earnings of the average college graduate. It is a ludicrous assumption. There are two market-based indications of required rates of return or discount rates.

- In 1997 10-year Bowie bonds were issued at a yield of 7.9%, to be paid off from well-established royalty streams from 25 albums and songs released by David Bowie. Moody's Investors Services gave the bond a strong A3 rating. The hypothetical Lost Earnings Capacity carries significantly more risk than the Bowie bonds, therefore it would command a higher discount rate. The hypothetical Lost Earnings Capacity extends over 41 years, rather than 10 years, and is not funded by a stream of proven albums and songs that generate royalty income that is independent of the health and ongoing revenue generating capability of an individual.

- I have been involved in hedge fund investments in life insurance death benefits of elderly individuals. The risk of such investments is less than that of the hypothetical Lost Earnings Capacity, since the insured will inevitably die, as we

---

[38] Plaintiff's Calculation, p. 2.

R. G. Quintero & Co.

Ryan Roman, Esq.
December 28, 2018
Page 14

all will.  I have seen target rates of return for such investments begin at no less than 20% per year.

The Plaintiff also inflates his calculation of Lost Earnings Capacity by assuming that the hypothetical earnings as a family or GP would begin at the assumed average level in the first year of his calculations, rather than beginning at a lower level at the inception of his career, and would gradually increase to an assumed average level over a period of years.  By starting at the average level of family or GP earnings, rather than building up to such level, it increases the present value of the hypothetical Lost Earnings Capacity.

Discounting future amounts to a present value normally causes the current-dollar equivalent value to be a declining amount for the years projected into the future. However, since the assumed growth rate of hypothetical Lost Earnings Capacity (4.47% per **Exhibit 18**) exceeds the 3.375% discount rate assumed in the Plaintiff's Calculation,[39]  the discounted present value of hypothetical Lost Earnings Capacity increases each year.[40]

**Adjusted Calculations of Hypothetical Lost Earnings Capacity.**  I have adjusted Plaintiff's Calculation to provide for the above factors that are normally considered by damages experts (**Exhibits 21** through **26**).  Core assumptions that I made were:

- The duration of the Plaintiff's career would be 39 years.

- Annual earnings growth rate:
  - Family and general practitioner:
    - 2.89%—5-year growth rate through 2017 (**Exhibit 19**) for **Exhibit 21** only, when earnings begin at the median level for the profession); or
    - 3.92%—Social Security Administration intermediate projection of annual increase in AWI from 2040 to 2060[41]—for **Exhibits 22** through **26**.
  - Alternative employment—3.92%.
- The discount rate to reflect the current-dollar-equivalent value of the future amounts was 6.80%—the average expected rate of return used by the 100 largest corporate defined benefit pension sponsors for actuarial purposes.[42]  This is a proxy for the rate of return that the Plaintiff could realize from investing the proceeds of an award.  It is substantially less than the compounded annual return of the S&P 500 total return index of 10.69% from 12/31/88 through 12/31/17.[43]

---

[39] Op. cit., Exhibit A, footnote iv.
[40] Op. cit., Exhibit A.
[41] [$263,355.75 (AWI 2060) ÷ $56,534.16 (AWI (2020)]$^{1/40}$ − 1 = 3.92% CAGR.
[42] "2018 Corporate Pension Plan Funding Study," published by Milliman, Inc., April 2018, p. 8.
[43] Thomson Reuters Eikon.

R. G. QUINTERO & CO.

Ryan Roman, Esq.
December 28, 2018
Page 15

I have corrected the Plaintiff's Calculations using the assumptions described above, based on the alternative considerations indicated below:

- Lost Earnings Capacity, comparing the median earnings of family and general practitioners (**Exhibit 7**) to the average earnings of college graduates—$2,519,084 (**Exhibit 21**). This scenario should be disregarded because it assumes that the Plaintiff would earn the median compensation of family and general practitioners, which seems speculative based on the Plaintiff's poor academic performance and poor scores on standardized tests, and it compares the hypothetical earnings against an average college graduate, whose earnings capacity does not represent appropriate alternative employment for an individual interested in health care who is capable of being admitted to medical school, and getting through four semesters.

- Lost Earnings Capacity, comparing of the 25th percentile of earnings of family and general practitioners (**Exhibit 7**) to the average earnings of college graduates—$1,741,866 (**Exhibit 22**). This scenario should be disregarded because, even though it reflects an MD earnings level that may be more attainable by the Plaintiff, it compares the hypothetical earnings against an average college graduate, whose earnings capacity does not represent appropriate alternative employment for an individual interested in health care who is capable of being admitted to medical school, and getting through four semesters.

- Lost Earnings Capacity, comparing the 10th percentile of earnings of family and general practitioners (**Exhibit 7**) to the average earnings of college graduates—$215,886 (**Exhibit 23**). If the cost of completing medical school as well as other costs that would be incurred to practice medicine in the U.S. were deducted, as they should be, there would be little or no damages.

- Lost Earnings Capacity, comparing the 10th percentile of earnings of family and general practitioners (**Exhibit 7**) to the 50th percentile of health care fields not requiring an MD degree (**Table 1**)— −$807,927 (**Exhibit 24**). Negative lost earnings capacity indicates that the Plaintiff would earn more money from an alternative field not requiring an MD degree.

- Lost Earnings Capacity, comparing the 25th percentile of earnings of family and general practitioners (**Exhibit 7**) to the 75th percentile of health care fields not requiring an MD degree (**Table 1**)—$185,042 (**Exhibit 25**). If the cost of completing medical school as well as other costs that would be incurred to practice medicine in the U.S. were considered, as they should be, there would be no damages. Also, it may reasonably be assumed that a person capable of gaining admission to medical school and making it through four semesters would be capable of being successful in other areas of health care with less rigorous entry and work requirements than the medical profession.

R. G. Quintero & Co.

Ryan Roman, Esq.
December 28, 2018
Page 16

- Lost Earnings Capacity, comparing the 25th percentile of earnings of family and general practitioners (**Exhibit 7**) to the 90th percentile of health care fields not requiring an MD degree (**Table 1**)— −$191,983 (**Exhibit 26**).  Negative lost earnings capacity indicates that the Plaintiff would earn more money from an alternative field not requiring an MD degree.

The corrected analyses described above indicate that an assertion of Lost Earnings Capacity cannot be substantiated by a proper comparison of the Plaintiff's earnings potential as a family or general practitioner to alternative applications of his earnings potential in areas of health care not requiring an MD degree.

**Plaintiff's Rejection of Reinstatement Offer.**  The Plaintiff rejected the offer by Ross that expired November 7, 2018[44] that would have enabled him to attempt to complete his MD studies, and thereby mitigate substantially all of his asserted Lost Earnings Capacity.  His rejection of the offer casts doubt on the sincerity of his desire, and/or belief in his ability, to complete his studies and practice medicine.

## CONCLUSION

Based on the foregoing, it is my expert opinion, as expressed to a reasonable degree of professional certainty, that:

- For the above reasons, as well as others (**Exhibit 27**), the Plaintiff's Calculation of hypothetical Lost Earnings Capacity cannot be regarded to be objective, professional, or credible, and it should not be relied upon; and

- There is no reliable evidence that the Plaintiff's earnings capacity has been impaired.

## CERTIFICATION

I hereby certify the following statements regarding this report:

- I have no personal interest or bias with respect to the subject matter of this document or the parties involved.

- My compensation for preparing this document is in no way contingent upon the outcome of this matter or on any factor.  My fees are based on my standard hourly rate of $545 per hour.

---

[44] Letter from Ross to the Plaintiff dated October 31, 2018.

R. G. QUINTERO & CO.

Ryan Roman, Esq.
December 28, 2018
Page 17

- To the best of my knowledge and belief, the statements of facts contained in this document, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.

## STATEMENT OF CONTINGENT AND LIMITING CONDITIONS

This report has been prepared subject to the following general contingent and limiting conditions:

- We assume no responsibility for the legal description of matters described in this report.

- The information furnished to us by others and obtained by us from public sources is believed to be accurate.  However, we issue no warranty or other form of assurance regarding its accuracy.

- This document has been prepared for the exclusive use of the Court and the lawyers retained by Ross.  Only such parties may rely upon this document.

- R. G. Quintero & Co. ("RGQ&Co.") is not explicitly or implicitly guaranteeing the outcome of the matter for which we have been retained.  A condition of receipt of this document is that the aggregate financial responsibility of RGQ&Co. to any and all parties collectively who may assert to have relied upon this the amount of fees paid to RGQ&Co. in this matter.  Moreover, any third party purporting to rely on this document agrees that, in the event it were to be unsuccessful in a lawsuit against RGQ&Co., it would be responsible for reimbursing RGQ&Co. for any and all reasonable attorneys and expert fees and related expenses.

- Possession of this document does not carry with it the right of publication.  It may not be used for any purpose by any person other than the client to whom it is addressed without our written consent, and in any event, only with proper written qualifications and only in its entirety.

- By reason of this document, we are not required to furnish a report in any other format, or to give testimony or to be in attendance in court or any other venue with respect to the matters pertaining to this report unless arrangements have been previously made.

- Neither all nor any part of the contents of this document shall be disseminated to the public through advertising, public relations, news, sales, or other media without our prior written consent and approval.

R. G. QUINTERO & CO.

Ryan Roman, Esq.
December 28, 2018
Page 18

- The analyses, opinions, and conclusions presented in this document apply to this engagement only and may not be used out of the context presented herein. This document is valid only for the purpose specified herein.

Yours truly,

R. G. QUINTERO & CO.

Ronald G. Quintero, CPA, CFA, ABV
Principal

# LIST OF EXHIBITS

**Description**                                                                                           **Exhibit**

Information Sources ...................................................................................................1

Milestones Required to Achieve Hypothetical Physicians' Earnings Assumed in the Plaintiff's Calculation ...................................................................................2

Illustration of Prospects of Achieving and Sustaining Hypothetical Physicians' Earnings Assumed in the Plaintiff's Calculation ...................................................3

Evaluating the Plaintiff's USMLE Step 1 Score ............................................................4

Average Earnings by Selected Medical Areas of Specialization ...................................5

Ross 2017 Residency Appointments ..............................................................................6

Physicians' Earnings in Specialties Employing the Vast Majority of Ross Graduates 7

Family and General Practitioners' 2017 Earnings by Employer Type ..........................8

Family and General Practitioners' 2017 Median Annual Earnings by Geographical Location ..................................................................................................................9

Probability of Death and/or Disability Before Normal Retirement Age for Males Born in 1992 Surviving to Age 20 ......................................................................10

Percentage of Primary Care Physicians Remaining in Practice, by Age and Sex.........11

How the Plaintiff Developed Hypothetical Earnings as a Family or General Practitioner ...........................................................................................................12

Basis Used by the Plaintiff to Calculate Lost Earnings Capacity .................................13

Share of College Graduates Working in Jobs that Do Not Require a College Education ..............................................................................................................14

Relative Earnings Growth of Male vs. Female College Graduates Based on Age and Years After Graduation ..................................................................................15

Weekly and Hourly Earnings Data from the Current Population Survey .....................16

Comparison of Median Earnings Applicable to the Plaintiff's Potential Earnings as an MD as Compared to Other Fields in the Health Care Profession .................17

Impact of Different Assumed Earnings Growth Rates in the Plaintiff's Calculation ....18

Average Family and General Practitioner Annual Earnings: 2000 – 2017 ..................19

2016 Payment Sources for U.S. Physician and Clinical Services ..................................20

Example of Calculating Current-Dollar-Equivalent Value of Hypothetical Lost Earnings Capacity Based on Earnings of:

    Family and General Practitioners .........................................................................21

    25th Percentile of Family and General Practitioners ............................................22

    10th Percentile of Family and General Practitioners ............................................23

    10th Percentile of Family and General Practitioners Compared to 50th Percentile of Non-MD Health Care Fields .............................................24

    25th Percentile of Family and General Practitioners Compared to 75th Percentile of Non-MD Health Care Fields .............................................25

    25th Percentile of Family and General Practitioners Compared to 90th Percentile of Non-MD Health Care Fields .............................................26

Overview of Deficiencies in the Plaintiff's Calculation of Hypothetical Lost Earnings Capacity ...............................................................................................27

Qualifications:

    Professional Training Activities of Ronald G. Quintero .......................................28

    Deposition and Expert Testimony of Ronald G. Quintero .....................................29

    Curriculum Vitae of Ronald G. Quintero ..............................................................30

# EXHIBIT 1
# Information Sources

## People
- Pranaya Mishra, Ph.D.—Ross University School of Medicine, Associate Dean of Student Affairs, Academic Chief of Staff
- William F. Owen, Jr., MD, FACP—Ross University School of Medicine, Dean and Chancellor

## Litigation-Related Documents
- Third Amended Complaint dated July 8, 2018
- Defendant's Answer and Affirmative Defenses to Plaintiff's Third Amended Complaint dated August 13, 2018
- Deposition of Plaintiff on December 5, 2018
- Plaintiff's Amended Calculation of Damages dated October 23, 2018
- Plaintiff's Second Amended Calculation of Damages dated December 8, 2018
- Plaintiff's Third Amended Calculation of Damages dated December 10, 2018

## Nonpublic Information
- Awodiya Oluwamuyiwa's:
  - Official Transcript from Ross dated May 21, 2018
  - United States Medical Licensing Examination Step 1 Score Report dated December 23, 2017.
- Letter from Ross to the Plaintiff dated October 31, 2018

## Public Information
- Erling Barth, Sari Pekkala Kerr, and Claudia Olivetti, "The Dynamics of Gender Earnings Differentials: Evidence from Establishment Data," National Bureau of Economic Research, May 2017
- Charles L. Baum II, "Computing Damages in Florida Wrongful Death and Personal Injury Cases," *The Florida Bar Journal*, April 2017
- *Health Care Costs 101, 2018 Edition*
- https://www.bls.gov/oes/current/oes291062.htm
- https://www.bls.gov/oes/current/oes291067.htm
- https://www.bls.gov/ooh/healthcare/physicians-and-surgeons.htm#tab-5
- https://www.bls.gov/oes/tables.htm
- https://data.bls.gov/timeseries/LEU0252919100
- https://www.cnbc.com/2017/06/02/growth-in-pay-slower-for-college-educated-women-than-for-men-study.html
- https://en.wikipedia.org/wiki/Opportunity_cost
- https://en.wikipedia.org/wiki/Risk-free_interest_rate
- https://www.forbes.com/sites/prestoncooper2/2017/07/13/new-york-fed-highlights-underemployment-among-college-graduates/#59944a6840d8
- https://www.nytimes.com/2014/08/03/education/edlife/second-chance-med-school.html
- https://medical.rossu.edu/about/facts-and-figures.html

# EXHIBIT 1, continued
## Information Sources

- https://thehill.com/homenews/state-watch/326995-census-more-americans-have-college-degrees-than-ever-before
- https://www.washingtonpost.com/news/grade-point/wp/2018/06/26/international-medical-schools-have-a-bad-reputation-that-needs-to-change-for-the-good-of-u-s-patients/?utm_term=.527a48cb7821
- https://www.usmle.org/performance-data/
- Stephen M. Petterson, Ph.D., William F Rayburn, MD, MBA, and Winston R. Liaw, MD, MPH, "When Do Primary Care Physicians Retire?  Implications for Workforce Projects," Annals of Family Medicine, (July/August 2016)
- Social Security Administration Actuarial Note 2018.6
- "2018 Corporate Pension Funding Study," Milliman, Inc., April 2018
- Thomson Reuters Eikon
- *The 2018 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds*
- U.S. Bureau of Labor Statistics Occupational Employment Statistics, May 2012
- U.S. Bureau of Labor Statistics Occupational Employment Statistics, May 2017
- *USMLE Score Interpretation Guidelines*, Federation of State Medical Boards and National Board of Medical Examiners, May 2018

## EXHIBIT 2

## Milestones Required to Achieve Hypothetical Physicians' Earnings Assumed in the Plaintiff's Calculation

• Ability of any employed individual to sustain earnings at a high level for 41 years is limited due to possibility of disability, death, and voluntary or involuntary termination, reduction of working hours, and/or switching to a place of employment offering less demands and/or lower earnings

**Sustain average MD earnings for 41 years**

• Plaintiff's poor academic performance and deficiencies in NBME CBSE and USMLE Step 1 suggest that he has not displayed the potential to earn the average earnings level for family and general practitioners
• The vast majority of Ross graduates gain employment in less remunerative areas of the medical profession (Exhibits 6 and 7)

**Achieve average MD earnings level**

**Get job as MD in U.S.**

• Combination of poor academic performance and deficiencies in NBME CBSE and USMLE Step 1 would adversely impact Plaintiff's ability to obtain a job as MD

**Get residency in U.S.**

• Low GPA, need to repeat 5th semester at Ross, inability to pass NBME in 5 attempts, mediocre score on USMLE Step 1, would make it more difficult for the Plaintiff to procure a residency

**Pass required exams in U.S.**

• Plaintiff had mediocre score on USMLE Step 1 (Exhibit 4), which raises considerable doubt as to his ability to pass Step 2 and Step 3

**Earn degree from Ross**

• Failed 5th semester
• GPA during 1st 5 semesters 2.72, excluding failure of Foundations of Medicine 5, which required Plaintiff to repeat 5th semester

**Pass NBME CBSE**

• Unable to pass within 5 times permitted
• Additional attempt require amendment of Ross policy

# EXHIBIT 3

## Illustration of Prospects of Achieving and Sustaining Hypothetical Physicians' Earnings Assumed in the Plaintiff's Calculation





**EXHIBIT 4**
**Evaluating the Plaintiff's USMLE Step 1 Score**

## EXHIBIT 5
## Average Earnings by Selected Medical Areas of Specialization

Wages for physicians and surgeons are among the highest of all occupations, with a median wage equal to or greater than $208,000 per year. Median wages showing the differences in pay between types of physicians and surgeons are not available, but mean (average) annual wages for physicians and surgeons in May 2017 were as follows:

| | |
|---|---|
| Anesthesiologists | $265,990 |
| Surgeons | 251,890 |
| Obstetricians and gynecologists | 235,240 |
| Psychiatrists | 216,090 |
| Physicians and surgeons, all other | 211,390 |
| Family and general practitioners | 208,560 |
| Internists, general | 198,370 |
| Pediatricians, general | 187,540 |

https://www.bls.gov/ooh/healthcare/physicians-and-surgeons.htm#tab-5

**EXHIBIT 6**
**Ross 2017 Residency Appointments**





**EXHIBIT 7**
**Physicians' Earnings in Specialties Employing the Vast Majority of Ross Graduates**

Source:  U.S. Bureau of Labor Statistics
Occupational Employment Statistics, May 2017

**EXHIBIT 8**
**Family and General Practitioners' 2017 Earnings by Employer Type**

| Industry | Employment (1) | Percent of industry employment | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|
| Offices of Physicians | 83,320 | 3.27 | $102.73 | $213,670 |
| General Medical and Surgical Hospitals | 22,620 | 0.41 | $97.66 | $203,140 |
| Outpatient Care Centers | 9,440 | 1.07 | $102.84 | $213,900 |
| Colleges, Universities, and Professional Schools | 3,820 | 0.13 | $57.35 | $119,280 |
| Local Government, excluding schools and hospitals (OES Designation) | 1,510 | 0.03 | $98.21 | $204,280 |

https://www.bls.gov/oes/current/oes291062.htm

# EXHIBIT 9
# Family and General Practitioners' 2017 Median Annual Earnings by Geographical Location

| | | | | |
|---|---|---|---|---|
| Alabama | $199,020 | | Montana | 181,930 |
| Alaska | - | | Nebraska | - |
| Arizona | 187,780 | | Nevada | 192,070 |
| Arkansas | - | | New Hampshire | - |
| California | 190,860 | | New Jersey | 194,390 |
| Colorado | - | | New Mexico | 144,130 |
| Connecticut | 199,740 | | New York | 170,190 |
| Delaware | 180,990 | | North Carolina | 185,340 |
| District of Columbia | 167,530 | | North Dakota | - |
| Florida | 205,480 | | Ohio | 189,540 |
| Georgia | 178,170 | | Oklahoma | - |
| Guam | 141,250 | | Oregon | 195,950 |
| Hawaii | 176,930 | | Pennsylvania | 203,800 |
| Idaho | - | | Puerto Rico | 76,070 |
| Illinois | - | | Rhode Island | 157,330 |
| Indiana | 189,420 | | South Carolina | - |
| Iowa | - | | South Dakota | 203,190 |
| Kansas | - | | Tennessee | 181,140 |
| Kentucky | 200,050 | | Texas | 196,660 |
| Louisiana | 202,060 | | Utah | 196,090 |
| Maine | 180,990 | | Vermont | 169,680 |
| Maryland | 195,370 | | Virginia | 187,730 |
| Massachusetts | - | | Washington | - |
| Michigan | 184,680 | | West Virginia | 193,350 |
| Minnesota | 199,470 | | Wisconsin | - |
| Mississippi | - | | Wyoming | 206,330 |
| Missouri | 167,510 | | | |

https://www.bls.gov/oes/current/oes291062.htm



**EXHIBIT 10**
**Probability of Death and/or Disability Before Normal Retirement Age**
**for Males Born in 1992 Surviving to Age 20**

63.4%    P (Survival W/O prior disability)

9.0%    P (Death W/O prior disability)

6.1%    P (Death & disabilty)

21.5%    P (Survival with disabilty)

P = probability; NRA = normal retirement age                    Source:  Social Security Administration Actuarial Note 2018.6, August 2018, p. 3

**EXHIBIT 11**



# Figure 3. Percentage of primary care physicians remaining in practice, by age and sex.

Source:  Stephen M. Petterson, Ph.D., William F Rayburn, MD, MBA, and Winston R. Liaw, MD, MPH, "When Do Primary Care Physicians Retire?  Implications for Workforce Projects," *Annals of Family Medicine*, (July/August 2016), p. 344



Source: Exhibit 7



**EXHIBIT 13**
**Basis Used by the Plaintiff to Calculate Lost Earnings Capacity**

$208,560

$147,564 initial opportunity cost

$60,996

Assumed earnings as family or general practitioner

Assumed alternative earnings

Source:  Plaintiff's Third Amended Calculation of Damages, p. 1

**EXHIBIT 14**



Source:  New York Fed, as reported in https://www.forbes.com/sites/prestoncooper2/2017/07/13/new-york-fed-highlights-underemployment-among-college-graduates/#59944a6840d8

## EXHIBIT 15
## Relative Earnings Growth Rate of Male vs. Female College Graduates Based on Age and Years After Graduation



Source:   National Bureau of Economic Research, as reported in https://www.cnbc.com/2017/06/02/growth-in-pay-slower-for-college-educated-women-than-for-men-study.html

# EXHIBIT 16

Data extracted on: December 27, 2018 (1:25:12 PM)

### Weekly and hourly earnings data from the Current Population Survey

**Series Id:**           LEU0252919100
Not Seasonally Adjusted
**Series title:**        (unadj)- Median usual weekly earnings (second quartile), Employe
**Earnings:**            Median usual weekly earnings - in current dollars (second quart
**Industry:**            All Industries
**Occupation:**          All Occupations
**Sex:**                 Both Sexes
**Race:**                All Races
**Ethnic origin:**       All Origins
**Age:**                 25 years and over
**Education:**           Bachelor's degree only
**Class of worker:**     Wage and salary workers, excluding incorporated self employed
**Labor force status:**  Employed full time



Quarter

**Download:**
📊 **xlsx**

| Year | Qtr1 | Qtr2 | Qtr3 | Qtr4 |
|------|------|------|------|------|
| 2008 | 1012 | 999  | 1020 | 1016 |
| 2009 | 1024 | 1031 | 1026 | 1020 |
| 2010 | 1024 | 1032 | 1044 | 1049 |
| 2011 | 1054 | 1043 | 1047 | 1071 |
| 2012 | 1051 | 1070 | 1071 | 1071 |
| 2013 | 1095 | 1101 | 1101 | 1131 |
| 2014 | 1102 | 1098 | 1068 | 1131 |
| 2015 | 1134 | 1130 | 1143 | 1143 |
| 2016 | 1155 | 1155 | 1152 | 1161 |
| 2017 | 1179 | 1189 | 1164 | 1170 |
| 2018 | 1169 | 1187 | 1232 |      |

Source: https://data.bls.gov/timeseries/LEU0252919100



**EXHIBIT 17**

**Comparison of Median Earnings Applicable to the Plaintiff's Potential Earnings as an MD as Compared to Other Fields in the Health Care Profession**

Source:  U.S. Bureau of Labor Statistics
Occupational Employment Statistics, May 2017

- 10th percentile: $73,240
- 25th percentile: $138,100
- 50th percentile: $198,740
- 75th percentile: $130,235
- 90th percentile: $146,260

Earnings as family or general practitioner (**Exhibit 7**)

Median earnings of chiropractors, optometrists, pharmacists, physicians assistants, podiatrists, and nurse practitioners (**Table 1**)



**EXHIBIT 18**
**Impact of Different Assumed Earnings Growth Rates in the Plaintiff's Calculation**



**EXHIBIT 19**
**Average Family and General Practitioner Annual Earnings:  2000 - 2017**

2000 - 17 CAGR = 3.96%
2010 - 17 CAGR = 2.63%
2012 - 17 CAGR = 2.89%
2000 - 17 median growth rate = 2.53%

—— Average Family and GP Annual Earnings     - - - Annual Family and GP Earnings Growth     Source:  https://www.bls.gov/oes/tables.htm

## EXHIBIT 20

## 2016 Payment Sources for U.S. Physician and Clinical Services



Source: *Health Care Costs 101, 2018 Edition*

## EXHIBIT 21

# Example of Calculating Current-Dollar-Equivalent Value of Hypothetical Lost Earnings Capacity:  Family & General Practitioners

| Year | Ending Age[1] | Hypothetical Lost Earnings Capacity | | | | | Cumulative Lost Earnings Capacity | |
|---|---|---|---|---|---|---|---|---|
| | | Family & General Practioners[2] | Average College Graduate[2] | Future Lost Earnings Capacity | Discount Factor[3] | Present Value | Future Value | Present Value |
| | | a | b | a – b = c | d | c x d = e | $\sum c$ | $\sum e$ |
| 1 | 29 | $198,740 | $64,064 | $134,676 | 0.9676 | $130,318 | $134,676 | $130,318 |
| 2 | 30 | 204,484 | 66,575 | 137,908 | 0.9060 | 124,949 | 272,584 | 255,267 |
| 3 | 31 | 210,393 | 69,185 | 141,208 | 0.8483 | 119,793 | 413,792 | 375,060 |
| 4 | 32 | 216,474 | 71,897 | 144,576 | 0.7943 | 114,841 | 558,369 | 489,902 |
| 5 | 33 | 222,730 | 74,715 | 148,014 | 0.7438 | 110,086 | 706,383 | 599,988 |
| 6 | 34 | 229,166 | 77,644 | 151,522 | 0.6964 | 105,520 | 857,905 | 705,508 |
| 7 | 35 | 235,789 | 80,688 | 155,101 | 0.6521 | 101,135 | 1,013,006 | 806,643 |
| 8 | 36 | 242,604 | 83,851 | 158,753 | 0.6105 | 96,925 | 1,171,759 | 903,568 |
| 9 | 37 | 249,615 | 87,138 | 162,477 | 0.5717 | 92,883 | 1,334,236 | 996,451 |
| 10 | 38 | 256,829 | 90,554 | 166,275 | 0.5353 | 89,002 | 1,500,511 | 1,085,453 |
| 11 | 39 | 264,251 | 94,103 | 170,148 | 0.5012 | 85,276 | 1,670,659 | 1,170,729 |
| 12 | 40 | 271,888 | 97,792 | 174,096 | 0.4693 | 81,699 | 1,844,755 | 1,252,429 |
| 13 | 41 | 279,746 | 101,626 | 178,120 | 0.4394 | 78,266 | 2,022,875 | 1,330,695 |
| 14 | 42 | 287,830 | 105,609 | 182,221 | 0.4114 | 74,970 | 2,205,096 | 1,405,664 |
| 15 | 43 | 296,149 | 109,749 | 186,399 | 0.3852 | 71,806 | 2,391,495 | 1,477,470 |
| 16 | 44 | 304,707 | 114,052 | 190,656 | 0.3607 | 68,769 | 2,582,151 | 1,546,240 |
| 17 | 45 | 313,513 | 118,522 | 194,991 | 0.3377 | 65,855 | 2,777,142 | 1,612,095 |
| 18 | 46 | 322,574 | 123,168 | 199,405 | 0.3162 | 63,058 | 2,976,547 | 1,675,153 |
| 19 | 47 | 331,896 | 127,997 | 203,900 | 0.2961 | 60,374 | 3,180,447 | 1,735,527 |
| 20 | 48 | 341,488 | 133,014 | 208,474 | 0.2772 | 57,798 | 3,388,920 | 1,793,324 |
| 21 | 49 | 351,357 | 138,228 | 213,129 | 0.2596 | 55,326 | 3,602,049 | 1,848,651 |
| 22 | 50 | 361,511 | 143,647 | 217,864 | 0.2431 | 52,955 | 3,819,914 | 1,901,605 |
| 23 | 51 | 371,959 | 149,278 | 222,681 | 0.2276 | 50,679 | 4,042,595 | 1,952,285 |
| 24 | 52 | 382,709 | 155,129 | 227,579 | 0.2131 | 48,496 | 4,270,174 | 2,000,781 |
| 25 | 53 | 393,769 | 161,211 | 232,558 | 0.1995 | 46,402 | 4,502,732 | 2,047,183 |
| 26 | 54 | 405,149 | 167,530 | 237,619 | 0.1868 | 44,393 | 4,740,351 | 2,091,576 |
| 27 | 55 | 416,858 | 174,097 | 242,760 | 0.1749 | 42,466 | 4,983,111 | 2,134,042 |
| 28 | 56 | 428,905 | 180,922 | 247,983 | 0.1638 | 40,617 | 5,231,094 | 2,174,659 |
| 29 | 57 | 441,300 | 188,014 | 253,286 | 0.1534 | 38,845 | 5,484,380 | 2,213,504 |
| 30 | 58 | 454,054 | 195,384 | 258,670 | 0.1436 | 37,144 | 5,743,050 | 2,250,648 |
| 31 | 59 | 467,176 | 203,043 | 264,133 | 0.1345 | 35,514 | 6,007,183 | 2,286,162 |
| 32 | 60 | 480,677 | 211,002 | 269,675 | 0.1259 | 33,950 | 6,276,857 | 2,320,112 |
| 33 | 61 | 494,569 | 219,274 | 275,295 | 0.1179 | 32,451 | 6,552,152 | 2,352,564 |
| 34 | 62 | 508,862 | 227,869 | 280,993 | 0.1104 | 31,014 | 6,833,145 | 2,383,578 |
| 35 | 63 | 523,568 | 236,802 | 286,766 | 0.1033 | 29,636 | 7,119,911 | 2,413,214 |
| 36 | 64 | 538,699 | 246,084 | 292,615 | 0.0968 | 28,315 | 7,412,526 | 2,441,529 |
| 37 | 65 | 554,267 | 255,731 | 298,537 | 0.0906 | 27,049 | 7,711,062 | 2,468,578 |
| 38 | 66 | 570,286 | 265,755 | 304,530 | 0.0848 | 25,835 | 8,015,593 | 2,494,413 |
| 39 | 67 | 586,767 | 276,173 | 310,594 | 0.0794 | 24,672 | 8,326,187 | <mark>2,519,084</mark> |

[1]Plaintiff's date of birth:  June 20, 1992

[2]Initial level of earnings:  median for family and general practitioners (Exhibit 7) and annualized average of college graduates per BLS—$1,232/week x 52 weeks (Exhibit 16)

Earnings growth rate:  family and general practitioners—2.89% (5-year average through 2017 (Exhibit 19)); average college graduates—3.92% (change in AWI from 2020 through 2060, *The 2018 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds,* Table VI.G6

Duration of career:  39 years (until Full Social Security Retirement Age for someone born after 1960, i.e., 67)

[3]Discount factor = $(1 + r)^{n - .5}$

r = discount rate of 6.80%, based on the average expected rate of return used by the 100 largest corporate defined benefit pension plan sponsors, as reported in the "2018 Corporate Pension Plan Funding Study," published by Milliman, Inc., April 2018, p. 8

n = number of years until hypothetical future earnings is assumed to be received

Discounting for n – 0.5 years reflects the midyear convention, assuming that, on average, annual earnings are received in the middle of the year

# EXHIBIT 22

## Example of Calculating Current-Dollar-Equivalent Value of Hypothetical Lost Earnings Capacity:  25th Percentile of Family and General Practioners

| Year | Ending Age[1] | Hypothetical Lost Earnings Capacity | | | | | Cumulative Lost Earnings Capacity | |
|---|---|---|---|---|---|---|---|---|
| | | Family & General Practioners[2] | Average College Graduate[2] | Future Lost Earnings Capacity | Discount Factor[3] | Present Value | Future Value | Present Value |
| | | a | b | a – b = c | d | c x d = e | $\sum c$ | $\sum e$ |
| 1 | 29 | $138,100 | $64,064 | $74,036 | 0.9676 | $71,640 | $74,036 | $71,640 |
| 2 | 30 | 143,514 | 66,575 | 76,938 | 0.9060 | 69,708 | 150,974 | 141,349 |
| 3 | 31 | 149,139 | 69,185 | 79,954 | 0.8483 | 67,829 | 230,928 | 209,177 |
| 4 | 32 | 154,986 | 71,897 | 83,088 | 0.7943 | 66,000 | 314,017 | 275,177 |
| 5 | 33 | 161,061 | 74,715 | 86,345 | 0.7438 | 64,220 | 400,362 | 339,397 |
| 6 | 34 | 167,375 | 77,644 | 89,730 | 0.6964 | 62,488 | 490,092 | 401,885 |
| 7 | 35 | 173,936 | 80,688 | 93,248 | 0.6521 | 60,803 | 583,340 | 462,688 |
| 8 | 36 | 180,754 | 83,851 | 96,903 | 0.6105 | 59,163 | 680,243 | 521,851 |
| 9 | 37 | 187,839 | 87,138 | 100,702 | 0.5717 | 57,568 | 780,945 | 579,419 |
| 10 | 38 | 195,203 | 90,554 | 104,649 | 0.5353 | 56,016 | 885,594 | 635,434 |
| 11 | 39 | 202,855 | 94,103 | 108,751 | 0.5012 | 54,505 | 994,345 | 689,939 |
| 12 | 40 | 210,807 | 97,792 | 113,014 | 0.4693 | 53,035 | 1,107,359 | 742,975 |
| 13 | 41 | 219,070 | 101,626 | 117,444 | 0.4394 | 51,605 | 1,224,804 | 794,580 |
| 14 | 42 | 227,658 | 105,609 | 122,048 | 0.4114 | 50,213 | 1,346,852 | 844,793 |
| 15 | 43 | 236,582 | 109,749 | 126,833 | 0.3852 | 48,859 | 1,473,685 | 893,652 |
| 16 | 44 | 245,856 | 114,052 | 131,804 | 0.3607 | 47,542 | 1,605,489 | 941,194 |
| 17 | 45 | 255,494 | 118,522 | 136,971 | 0.3377 | 46,260 | 1,742,460 | 987,454 |
| 18 | 46 | 265,509 | 123,168 | 142,340 | 0.3162 | 45,012 | 1,884,801 | 1,032,466 |
| 19 | 47 | 275,917 | 127,997 | 147,920 | 0.2961 | 43,799 | 2,032,721 | 1,076,265 |
| 20 | 48 | 286,733 | 133,014 | 153,719 | 0.2772 | 42,617 | 2,186,439 | 1,118,882 |
| 21 | 49 | 297,973 | 138,228 | 159,744 | 0.2596 | 41,468 | 2,346,184 | 1,160,350 |
| 22 | 50 | 309,653 | 143,647 | 166,006 | 0.2431 | 40,350 | 2,512,190 | 1,200,700 |
| 23 | 51 | 321,792 | 149,278 | 172,514 | 0.2276 | 39,262 | 2,684,704 | 1,239,962 |
| 24 | 52 | 334,406 | 155,129 | 179,276 | 0.2131 | 38,203 | 2,863,980 | 1,278,165 |
| 25 | 53 | 347,515 | 161,211 | 186,304 | 0.1995 | 37,173 | 3,050,285 | 1,315,338 |
| 26 | 54 | 361,137 | 167,530 | 193,607 | 0.1868 | 36,170 | 3,243,892 | 1,351,509 |
| 27 | 55 | 375,294 | 174,097 | 201,197 | 0.1749 | 35,195 | 3,445,088 | 1,386,704 |
| 28 | 56 | 390,005 | 180,922 | 209,083 | 0.1638 | 34,246 | 3,654,172 | 1,420,950 |
| 29 | 57 | 405,293 | 188,014 | 217,280 | 0.1534 | 33,323 | 3,871,451 | 1,454,272 |
| 30 | 58 | 421,181 | 195,384 | 225,797 | 0.1436 | 32,424 | 4,097,248 | 1,486,696 |
| 31 | 59 | 437,691 | 203,043 | 234,648 | 0.1345 | 31,550 | 4,331,896 | 1,518,246 |
| 32 | 60 | 454,849 | 211,002 | 243,846 | 0.1259 | 30,699 | 4,575,743 | 1,548,945 |
| 33 | 61 | 472,679 | 219,274 | 253,405 | 0.1179 | 29,871 | 4,829,148 | 1,578,816 |
| 34 | 62 | 491,208 | 227,869 | 263,339 | 0.1104 | 29,065 | 5,092,486 | 1,607,881 |
| 35 | 63 | 510,463 | 236,802 | 273,661 | 0.1033 | 28,282 | 5,366,148 | 1,636,163 |
| 36 | 64 | 530,473 | 246,084 | 284,389 | 0.0968 | 27,519 | 5,650,537 | 1,663,682 |
| 37 | 65 | 551,268 | 255,731 | 295,537 | 0.0906 | 26,777 | 5,946,074 | 1,690,459 |
| 38 | 66 | 572,878 | 265,755 | 307,122 | 0.0848 | 26,055 | 6,253,196 | 1,716,514 |
| 39 | 67 | 595,334 | 276,173 | 319,161 | 0.0794 | 25,352 | 6,572,357 | **1,741,866** |

[1]Plaintiff's date of birth:  June 20, 1992

[2]Initial level of earnings:  25th percentile for family and general practitioners (Exhibit 7) and annualized average of college graduates per BLS—$1,232/week x 52 weeks (Exhibit 16)

Earnings growth rate:  family and general practitioners as well as average college graduates—3.92% (change in AWI from 2020 through 2060, *The 2018 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds,* Table VI.G6

Duration of career:  39 years (until Full Social Security Retirement Age for someone born after 1960, i.e., 67)

[3]Discount factor = $(1 + r)^{n-.5}$

  r = discount rate of 6.80%, based on the average expected rate of return used by the 100 largest corporate defined benefit pension plan sponsors, as reported in the "2018 Corporate Pension Plan Funding Study," published by Milliman, Inc., April 2018, p. 8

  n = number of years until hypothetical future earnings is assumed to be received

  Discounting for n – 0.5 years reflects the midyear convention, assuming that, on average, annual earnings are received in the middle of the year

**EXHIBIT 23**

# Example of Calculating Current-Dollar-Equivalent Value of Hypothetical Lost Earnings Capacity:  10th Percentile of Family and General Practioners

| Year | Ending Age[1] | Hypothetical Lost Earnings Capacity | | | Discount Factor[3] | Present Value | Cumulative Lost Earnings Capacity | |
|---|---|---|---|---|---|---|---|---|
| | | Family & General Practioners[2] | Average College Graduate[2] | Future Lost Earnings Capacity | | | Future Value | Present Value |
| | | a | b | a – b = c | d | c × d = e | Σc | Σe |
| 1 | 29 | $73,240 | $64,064 | $9,176 | 0.9676 | $8,879 | $9,176 | $8,879 |
| 2 | 30 | 76,111 | 66,575 | 9,536 | 0.9060 | 8,640 | 18,712 | 17,519 |
| 3 | 31 | 79,095 | 69,185 | 9,909 | 0.8483 | 8,407 | 28,621 | 25,925 |
| 4 | 32 | 82,195 | 71,897 | 10,298 | 0.7943 | 8,180 | 38,919 | 34,105 |
| 5 | 33 | 85,417 | 74,715 | 10,702 | 0.7438 | 7,959 | 49,621 | 42,065 |
| 6 | 34 | 88,765 | 77,644 | 11,121 | 0.6964 | 7,745 | 60,742 | 49,809 |
| 7 | 35 | 92,245 | 80,688 | 11,557 | 0.6521 | 7,536 | 72,299 | 57,345 |
| 8 | 36 | 95,861 | 83,851 | 12,010 | 0.6105 | 7,333 | 84,309 | 64,678 |
| 9 | 37 | 99,619 | 87,138 | 12,481 | 0.5717 | 7,135 | 96,790 | 71,813 |
| 10 | 38 | 103,524 | 90,554 | 12,970 | 0.5353 | 6,943 | 109,760 | 78,756 |
| 11 | 39 | 107,582 | 94,103 | 13,479 | 0.5012 | 6,755 | 123,239 | 85,511 |
| 12 | 40 | 111,799 | 97,792 | 14,007 | 0.4693 | 6,573 | 137,246 | 92,084 |
| 13 | 41 | 116,182 | 101,626 | 14,556 | 0.4394 | 6,396 | 151,802 | 98,480 |
| 14 | 42 | 120,736 | 105,609 | 15,127 | 0.4114 | 6,223 | 166,928 | 104,703 |
| 15 | 43 | 125,469 | 109,749 | 15,720 | 0.3852 | 6,056 | 182,648 | 110,759 |
| 16 | 44 | 130,387 | 114,052 | 16,336 | 0.3607 | 5,892 | 198,984 | 116,651 |
| 17 | 45 | 135,499 | 118,522 | 16,976 | 0.3377 | 5,733 | 215,960 | 122,385 |
| 18 | 46 | 140,810 | 123,168 | 17,642 | 0.3162 | 5,579 | 233,602 | 127,964 |
| 19 | 47 | 146,330 | 127,997 | 18,333 | 0.2961 | 5,428 | 251,935 | 133,392 |
| 20 | 48 | 152,066 | 133,014 | 19,052 | 0.2772 | 5,282 | 270,987 | 138,674 |
| 21 | 49 | 158,027 | 138,228 | 19,799 | 0.2596 | 5,140 | 290,785 | 143,813 |
| 22 | 50 | 164,222 | 143,647 | 20,575 | 0.2431 | 5,001 | 311,360 | 148,814 |
| 23 | 51 | 170,659 | 149,278 | 21,381 | 0.2276 | 4,866 | 332,741 | 153,681 |
| 24 | 52 | 177,349 | 155,129 | 22,219 | 0.2131 | 4,735 | 354,961 | 158,415 |
| 25 | 53 | 184,301 | 161,211 | 23,090 | 0.1995 | 4,607 | 378,051 | 163,023 |
| 26 | 54 | 191,526 | 167,530 | 23,996 | 0.1868 | 4,483 | 402,047 | 167,506 |
| 27 | 55 | 199,033 | 174,097 | 24,936 | 0.1749 | 4,362 | 426,983 | 171,868 |
| 28 | 56 | 206,835 | 180,922 | 25,914 | 0.1638 | 4,244 | 452,897 | 176,112 |
| 29 | 57 | 214,943 | 188,014 | 26,930 | 0.1534 | 4,130 | 479,827 | 180,242 |
| 30 | 58 | 223,369 | 195,384 | 27,985 | 0.1436 | 4,019 | 507,812 | 184,261 |
| 31 | 59 | 232,125 | 203,043 | 29,082 | 0.1345 | 3,910 | 536,894 | 188,171 |
| 32 | 60 | 241,225 | 211,002 | 30,222 | 0.1259 | 3,805 | 567,116 | 191,976 |
| 33 | 61 | 250,681 | 219,274 | 31,407 | 0.1179 | 3,702 | 598,523 | 195,678 |
| 34 | 62 | 260,507 | 227,869 | 32,638 | 0.1104 | 3,602 | 631,161 | 199,280 |
| 35 | 63 | 270,719 | 236,802 | 33,918 | 0.1033 | 3,505 | 665,079 | 202,786 |
| 36 | 64 | 281,331 | 246,084 | 35,247 | 0.0968 | 3,411 | 700,326 | 206,196 |
| 37 | 65 | 292,360 | 255,731 | 36,629 | 0.0906 | 3,319 | 736,955 | 209,515 |
| 38 | 66 | 303,820 | 265,755 | 38,065 | 0.0848 | 3,229 | 775,019 | 212,744 |
| 39 | 67 | 315,730 | 276,173 | 39,557 | 0.0794 | 3,142 | 814,576 | 215,886 |

[1] Plaintiff's date of birth:  June 20, 1992

[2] Initial level of earnings:  10th percentile for family and general practitioners (Exhibit 7) and annualized average of college graduates per BLS—$1,232/week x 52 weeks (Exhibit 16)

Earnings growth rate:  family and general practitioners as well as average college graduates—3.92% (change in AWI from 2020 through 2060, *The 2018 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds,* Table VI.G6

Duration of career:  39 years (until Full Social Security Retirement Age for someone born after 1960, i.e., 67)

[3] Discount factor = $(1 + r)^{n-.5}$

r = discount rate of 6.80%, based on the average expected rate of return used by the 100 largest corporate defined benefit pension plan sponsors, as reported in the "2018 Corporate Pension Plan Funding Study," published by Milliman, Inc., April 2018, p. 8

n = number of years until hypothetical future earnings is assumed to be received

Discounting for n – 0.5 years reflects the midyear convention, assuming that, on average, annual earnings are received in the middle of the year

# EXHIBIT 24

## Example of Calculating Current-Dollar-Equivalent Value of Hypothetical Lost Earnings Capacity:  10th Percentile of Family & General Practitioners vs. 50th Percentile of Non-MD Health Care Fields

| Year | Ending Age[1] | Hypothetical Lost Earnings Capacity | | | Discount Factor[3] | Present Value | Cumulative Lost Earnings Capacity | |
|---|---|---|---|---|---|---|---|---|
| | | Family & General Practioners[2] | Non MD Health Care[2] | Future Lost Earnings Capacity | | | Future Value | Present Value |
| | | a | b | a – b = c | d | c x d = e | $\sum$c | $\sum$e |
| 1 | 29 | $73,240 | $107,580 | ($34,340) | 0.9676 | ($33,229) | ($34,340) | ($33,229) |
| 2 | 30 | 76,111 | 111,797 | (35,686) | 0.9060 | (32,333) | (70,026) | (65,562) |
| 3 | 31 | 79,095 | 116,180 | (37,085) | 0.8483 | (31,461) | (107,111) | (97,022) |
| 4 | 32 | 82,195 | 120,734 | (38,539) | 0.7943 | (30,612) | (145,650) | (127,635) |
| 5 | 33 | 85,417 | 125,467 | (40,049) | 0.7438 | (29,787) | (185,699) | (157,422) |
| 6 | 34 | 88,765 | 130,385 | (41,619) | 0.6964 | (28,984) | (227,319) | (186,406) |
| 7 | 35 | 92,245 | 135,496 | (43,251) | 0.6521 | (28,202) | (270,570) | (214,608) |
| 8 | 36 | 95,861 | 140,807 | (44,946) | 0.6105 | (27,442) | (315,516) | (242,049) |
| 9 | 37 | 99,619 | 146,327 | (46,708) | 0.5717 | (26,702) | (362,224) | (268,751) |
| 10 | 38 | 103,524 | 152,063 | (48,539) | 0.5353 | (25,982) | (410,763) | (294,733) |
| 11 | 39 | 107,582 | 158,024 | (50,442) | 0.5012 | (25,281) | (461,205) | (320,013) |
| 12 | 40 | 111,799 | 164,218 | (52,419) | 0.4693 | (24,599) | (513,625) | (344,613) |
| 13 | 41 | 116,182 | 170,656 | (54,474) | 0.4394 | (23,936) | (568,099) | (368,549) |
| 14 | 42 | 120,736 | 177,346 | (56,609) | 0.4114 | (23,290) | (624,708) | (391,839) |
| 15 | 43 | 125,469 | 184,298 | (58,829) | 0.3852 | (22,662) | (683,537) | (414,501) |
| 16 | 44 | 130,387 | 191,522 | (61,135) | 0.3607 | (22,051) | (744,671) | (436,553) |
| 17 | 45 | 135,499 | 199,030 | (63,531) | 0.3377 | (21,457) | (808,203) | (458,009) |
| 18 | 46 | 140,810 | 206,832 | (66,022) | 0.3162 | (20,878) | (874,224) | (478,887) |
| 19 | 47 | 146,330 | 214,939 | (68,610) | 0.2961 | (20,315) | (942,834) | (499,202) |
| 20 | 48 | 152,066 | 223,365 | (71,299) | 0.2772 | (19,767) | (1,014,133) | (518,969) |
| 21 | 49 | 158,027 | 232,121 | (74,094) | 0.2596 | (19,234) | (1,088,227) | (538,203) |
| 22 | 50 | 164,222 | 241,220 | (76,998) | 0.2431 | (18,715) | (1,165,225) | (556,919) |
| 23 | 51 | 170,659 | 250,676 | (80,017) | 0.2276 | (18,211) | (1,245,242) | (575,130) |
| 24 | 52 | 177,349 | 260,502 | (83,153) | 0.2131 | (17,720) | (1,328,396) | (592,849) |
| 25 | 53 | 184,301 | 270,714 | (86,413) | 0.1995 | (17,242) | (1,414,809) | (610,091) |
| 26 | 54 | 191,526 | 281,326 | (89,800) | 0.1868 | (16,777) | (1,504,609) | (626,868) |
| 27 | 55 | 199,033 | 292,354 | (93,321) | 0.1749 | (16,324) | (1,597,930) | (643,193) |
| 28 | 56 | 206,835 | 303,814 | (96,979) | 0.1638 | (15,884) | (1,694,909) | (659,077) |
| 29 | 57 | 214,943 | 315,724 | (100,780) | 0.1534 | (15,456) | (1,795,689) | (674,533) |
| 30 | 58 | 223,369 | 328,100 | (104,731) | 0.1436 | (15,039) | (1,900,420) | (689,572) |
| 31 | 59 | 232,125 | 340,962 | (108,836) | 0.1345 | (14,634) | (2,009,257) | (704,206) |
| 32 | 60 | 241,225 | 354,327 | (113,103) | 0.1259 | (14,239) | (2,122,359) | (718,445) |
| 33 | 61 | 250,681 | 368,217 | (117,536) | 0.1179 | (13,855) | (2,239,896) | (732,300) |
| 34 | 62 | 260,507 | 382,651 | (122,144) | 0.1104 | (13,481) | (2,362,040) | (745,781) |
| 35 | 63 | 270,719 | 397,651 | (126,932) | 0.1033 | (13,118) | (2,488,972) | (758,899) |
| 36 | 64 | 281,331 | 413,239 | (131,908) | 0.0968 | (12,764) | (2,620,879) | (771,663) |
| 37 | 65 | 292,360 | 429,438 | (137,078) | 0.0906 | (12,420) | (2,757,958) | (784,083) |
| 38 | 66 | 303,820 | 446,272 | (142,452) | 0.0848 | (12,085) | (2,900,410) | (796,168) |
| 39 | 67 | 315,730 | 463,766 | (148,036) | 0.0794 | (11,759) | (3,048,446) | (807,927) |

[1] Plaintiff's date of birth:  June 20, 1992

[2] Initial level of earnings:  10th percentile for family and general practitioners (Exhibit 7) and 50th percentile of earnings in other health care fields not requiring an MD is also based on U.S. BLS OES data (Table 1)

Earnings growth rate:  family and general practitioners as well as non-MD health case—3.92% (change in AWI from 2020 through 2060, *The 2018 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds,* Table VI.G6

Duration of career:  39 years (until Full Social Security Retirement Age for someone born after 1960, i.e., 67)

[3] Discount factor = $(1 + r)^{n - .5}$

r = discount rate of 6.80%, based on the average expected rate of return used by the 100 largest corporate defined benefit pension plan sponsors, as reported in the "2018 Corporate Pension Plan Funding Study," published by Milliman, Inc., April 2018, p. 8

n = number of years until hypothetical future earnings is assumed to be received

Discounting for n – 0.5 years reflects the midyear convention, assuming that, on average, annual earnings are received in the middle of the year

**EXHIBIT 25**

## Example of Calculating Current-Dollar-Equivalent Value
## of Hypothetical Lost Earnings Capacity:  25th Percentile of Family &
## General Practitiners vs. 75th Percentile of Non-MD Health Care Fields

| Year | Ending Age[1] | Hypothetical Lost Earnings Capacity | | | Discount Factor[3] | Present Value | Cumulative Lost Earnings Capacity | |
| | | Family & General Practioners[2] | Non MD Health Care[2] | Future Lost Earnings Capacity | | | Future Value | Present Value |
| | | a | b | a – b = c | d | c x d = e | $\Sigma$c | $\Sigma$e |
| 1 | 29 | $138,100 | $130,235 | $7,865 | 0.9676 | $7,610 | $7,865 | $7,610 |
| 2 | 30 | 143,514 | 135,340 | 8,173 | 0.9060 | 7,405 | 16,038 | 15,016 |
| 3 | 31 | 149,139 | 140,646 | 8,494 | 0.8483 | 7,206 | 24,532 | 22,221 |
| 4 | 32 | 154,986 | 146,159 | 8,827 | 0.7943 | 7,011 | 33,359 | 29,233 |
| 5 | 33 | 161,061 | 151,888 | 9,173 | 0.7438 | 6,822 | 42,531 | 36,055 |
| 6 | 34 | 167,375 | 157,842 | 9,532 | 0.6964 | 6,638 | 52,064 | 42,693 |
| 7 | 35 | 173,936 | 164,030 | 9,906 | 0.6521 | 6,459 | 61,969 | 49,152 |
| 8 | 36 | 180,754 | 170,460 | 10,294 | 0.6105 | 6,285 | 72,264 | 55,437 |
| 9 | 37 | 187,839 | 177,142 | 10,698 | 0.5717 | 6,116 | 82,961 | 61,553 |
| 10 | 38 | 195,203 | 184,086 | 11,117 | 0.5353 | 5,951 | 94,078 | 67,504 |
| 11 | 39 | 202,855 | 191,302 | 11,553 | 0.5012 | 5,790 | 105,631 | 73,294 |
| 12 | 40 | 210,807 | 198,801 | 12,006 | 0.4693 | 5,634 | 117,637 | 78,928 |
| 13 | 41 | 219,070 | 206,594 | 12,476 | 0.4394 | 5,482 | 130,113 | 84,410 |
| 14 | 42 | 227,658 | 214,692 | 12,965 | 0.4114 | 5,334 | 143,079 | 89,744 |
| 15 | 43 | 236,582 | 223,108 | 13,474 | 0.3852 | 5,190 | 156,553 | 94,935 |
| 16 | 44 | 245,856 | 231,854 | 14,002 | 0.3607 | 5,050 | 170,554 | 99,985 |
| 17 | 45 | 255,494 | 240,943 | 14,551 | 0.3377 | 4,914 | 185,105 | 104,899 |
| 18 | 46 | 265,509 | 250,388 | 15,121 | 0.3162 | 4,782 | 200,226 | 109,681 |
| 19 | 47 | 275,917 | 260,203 | 15,714 | 0.2961 | 4,653 | 215,940 | 114,334 |
| 20 | 48 | 286,733 | 270,403 | 16,330 | 0.2772 | 4,527 | 232,270 | 118,861 |
| 21 | 49 | 297,973 | 281,003 | 16,970 | 0.2596 | 4,405 | 249,240 | 123,266 |
| 22 | 50 | 309,653 | 292,018 | 17,635 | 0.2431 | 4,286 | 266,875 | 127,553 |
| 23 | 51 | 321,792 | 303,465 | 18,327 | 0.2276 | 4,171 | 285,202 | 131,724 |
| 24 | 52 | 334,406 | 315,361 | 19,045 | 0.2131 | 4,058 | 304,247 | 135,782 |
| 25 | 53 | 347,515 | 327,723 | 19,791 | 0.1995 | 3,949 | 324,038 | 139,731 |
| 26 | 54 | 361,137 | 340,570 | 20,567 | 0.1868 | 3,842 | 344,605 | 143,574 |
| 27 | 55 | 375,294 | 353,920 | 21,374 | 0.1749 | 3,739 | 365,979 | 147,312 |
| 28 | 56 | 390,005 | 367,794 | 22,211 | 0.1638 | 3,638 | 388,190 | 150,950 |
| 29 | 57 | 405,293 | 382,211 | 23,082 | 0.1534 | 3,540 | 411,272 | 154,490 |
| 30 | 58 | 421,181 | 397,194 | 23,987 | 0.1436 | 3,444 | 435,259 | 157,935 |
| 31 | 59 | 437,691 | 412,764 | 24,927 | 0.1345 | 3,352 | 460,186 | 161,286 |
| 32 | 60 | 454,849 | 428,944 | 25,904 | 0.1259 | 3,261 | 486,091 | 164,548 |
| 33 | 61 | 472,679 | 445,759 | 26,920 | 0.1179 | 3,173 | 513,011 | 167,721 |
| 34 | 62 | 491,208 | 463,233 | 27,975 | 0.1104 | 3,088 | 540,986 | 170,809 |
| 35 | 63 | 510,463 | 481,391 | 29,072 | 0.1033 | 3,004 | 570,057 | 173,813 |
| 36 | 64 | 530,473 | 500,262 | 30,211 | 0.0968 | 2,923 | 600,268 | 176,736 |
| 37 | 65 | 551,268 | 519,872 | 31,396 | 0.0906 | 2,845 | 631,664 | 179,581 |
| 38 | 66 | 572,878 | 540,251 | 32,626 | 0.0848 | 2,768 | 664,290 | 182,349 |
| 39 | 67 | 595,334 | 561,429 | 33,905 | 0.0794 | 2,693 | 698,195 | 185,042 |

[1]Plaintiff's date of birth:  June 20, 1992

[2]Initial level of earnings:  25th percentile for family and general practitioners (Exhibit 7) and 75th percentile of earnings in other health care fields not requiring an MD is also based on U.S. BLS OES data (Table 1)

 Earnings growth rate:  family and general practitioners as well as non-MD health case—3.92% (change in AWI from 2020 through 2060, *The 2018 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds,* Table VI.G6
 Duration of career:  39 years (until Full Social Security Retirement Age for someone born after 1960, i.e., 67)

[3]Discount factor = $(1 + r)^{n - .5}$
 r = discount rate of 6.80%, based on the average expected rate of return used by the 100 largest corporate defined benefit pension plan sponsors, as reported in the "2018 Corporate Pension Plan Funding Study," published by Milliman, Inc., April 2018, p. 8
 n = number of years until hypothetical future earnings is assumed to be received
 Discounting for n – 0.5 years reflects the midyear convention, assuming that, on average, annual earnings are received in the middle of the year

**EXHIBIT 26**

# Example of Calculating Current-Dollar-Equivalent Value of Hypothetical Lost Earnings Capacity:  25th Percentile of Family & General Practitioners vs. 90th Percentile of Non-MD Health Care Fields

| Year | Ending Age[1] | Hypothetical Lost Earnings Capacity | | | | | Cumulative Lost Earnings Capacity | |
|---|---|---|---|---|---|---|---|---|
| | | Family & General Practioners[2] | Non MD Health Care[2] | Future Lost Earnings Capacity | Discount Factor[3] | Present Value | Future Value | Present Value |
| | | a | b | a – b = c | d | c x d = e | Σc | Σe |
| 1 | 29 | $138,100 | $146,260 | ($8,160) | 0.9676 | ($7,896) | ($8,160) | ($7,896) |
| 2 | 30 | 143,514 | 151,993 | (8,480) | 0.9060 | (7,683) | (16,640) | (15,579) |
| 3 | 31 | 149,139 | 157,952 | (8,812) | 0.8483 | (7,476) | (25,452) | (23,055) |
| 4 | 32 | 154,986 | 164,143 | (9,158) | 0.7943 | (7,274) | (34,610) | (30,329) |
| 5 | 33 | 161,061 | 170,578 | (9,517) | 0.7438 | (7,078) | (44,127) | (37,407) |
| 6 | 34 | 167,375 | 177,264 | (9,890) | 0.6964 | (6,887) | (54,016) | (44,294) |
| 7 | 35 | 173,936 | 184,213 | (10,277) | 0.6521 | (6,701) | (64,294) | (50,996) |
| 8 | 36 | 180,754 | 191,434 | (10,680) | 0.6105 | (6,521) | (74,974) | (57,517) |
| 9 | 37 | 187,839 | 198,938 | (11,099) | 0.5717 | (6,345) | (86,073) | (63,862) |
| 10 | 38 | 195,203 | 206,737 | (11,534) | 0.5353 | (6,174) | (97,607) | (70,035) |
| 11 | 39 | 202,855 | 214,841 | (11,986) | 0.5012 | (6,007) | (109,593) | (76,043) |
| 12 | 40 | 210,807 | 223,263 | (12,456) | 0.4693 | (5,845) | (122,049) | (81,888) |
| 13 | 41 | 219,070 | 232,015 | (12,944) | 0.4394 | (5,688) | (134,994) | (87,576) |
| 14 | 42 | 227,658 | 241,110 | (13,452) | 0.4114 | (5,534) | (148,446) | (93,110) |
| 15 | 43 | 236,582 | 250,561 | (13,979) | 0.3852 | (5,385) | (162,425) | (98,495) |
| 16 | 44 | 245,856 | 260,383 | (14,527) | 0.3607 | (5,240) | (176,952) | (103,735) |
| 17 | 45 | 255,494 | 270,590 | (15,097) | 0.3377 | (5,099) | (192,048) | (108,834) |
| 18 | 46 | 265,509 | 281,197 | (15,688) | 0.3162 | (4,961) | (207,736) | (113,795) |
| 19 | 47 | 275,917 | 292,220 | (16,303) | 0.2961 | (4,827) | (224,040) | (118,622) |
| 20 | 48 | 286,733 | 303,675 | (16,942) | 0.2772 | (4,697) | (240,982) | (123,319) |
| 21 | 49 | 297,973 | 315,579 | (17,606) | 0.2596 | (4,570) | (258,589) | (127,890) |
| 22 | 50 | 309,653 | 327,950 | (18,297) | 0.2431 | (4,447) | (276,885) | (132,337) |
| 23 | 51 | 321,792 | 340,806 | (19,014) | 0.2276 | (4,327) | (295,899) | (136,664) |
| 24 | 52 | 334,406 | 354,165 | (19,759) | 0.2131 | (4,211) | (315,658) | (140,875) |
| 25 | 53 | 347,515 | 368,048 | (20,534) | 0.1995 | (4,097) | (336,192) | (144,972) |
| 26 | 54 | 361,137 | 382,476 | (21,339) | 0.1868 | (3,987) | (357,531) | (148,959) |
| 27 | 55 | 375,294 | 397,469 | (22,175) | 0.1749 | (3,879) | (379,706) | (152,838) |
| 28 | 56 | 390,005 | 413,050 | (23,044) | 0.1638 | (3,774) | (402,751) | (156,612) |
| 29 | 57 | 405,293 | 429,241 | (23,948) | 0.1534 | (3,673) | (426,698) | (160,285) |
| 30 | 58 | 421,181 | 446,067 | (24,887) | 0.1436 | (3,574) | (451,585) | (163,859) |
| 31 | 59 | 437,691 | 463,553 | (25,862) | 0.1345 | (3,477) | (477,447) | (167,336) |
| 32 | 60 | 454,849 | 481,725 | (26,876) | 0.1259 | (3,384) | (504,323) | (170,719) |
| 33 | 61 | 472,679 | 500,608 | (27,929) | 0.1179 | (3,292) | (532,252) | (174,012) |
| 34 | 62 | 491,208 | 520,232 | (29,024) | 0.1104 | (3,204) | (561,277) | (177,215) |
| 35 | 63 | 510,463 | 540,625 | (30,162) | 0.1033 | (3,117) | (591,439) | (180,332) |
| 36 | 64 | 530,473 | 561,818 | (31,344) | 0.0968 | (3,033) | (622,783) | (183,365) |
| 37 | 65 | 551,268 | 583,841 | (32,573) | 0.0906 | (2,951) | (655,356) | (186,317) |
| 38 | 66 | 572,878 | 606,727 | (33,850) | 0.0848 | (2,872) | (689,206) | (189,188) |
| 39 | 67 | 595,334 | 630,511 | (35,177) | 0.0794 | (2,794) | (724,383) | (191,983) |

[1]Plaintiff's date of birth:  June 20, 1992

[2]Initial level of earnings:  25th percentile for family and general practitioners (Exhibit 7) and 90th percentile of earnings in other health care fields not requiring an MD is also based on U.S. BLS OES data (Table 1)

Earnings growth rate:  family and general practitioners as well as non-MD health case—3.92% (change in AWI from 2020 through 2060, *The 2018 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds,* Table VI.G6
Duration of career:  39 years (until Full Social Security Retirement Age for someone born after 1960, i.e., 67)

[3]Discount factor = $(1 + r)^{n - .5}$

 r = discount rate of 6.80%, based on the average expected rate of return used by the 100 largest corporate defined benefit pension plan sponsors, as reported in the "2018 Corporate Pension Plan Funding Study," published by Milliman, Inc., April 2018, p. 8

 n = number of years until hypothetical future earnings is assumed to be received

 Discounting for n – 0.5 years reflects the midyear convention, assuming that, on average, annual earnings are received in the middle of the year

# EXHIBIT 27
## Overview of Deficiencies in the Plaintiff's Calculation of Hypothetical Lost Earnings Capacity



**Inflated hypothetical MD earnings**
• Average vs. median, 25th percentile, or 10th percentile of earnings of family and general practitioners

**Low earnings in alterative profession**
• Assumes average earnings of college graduates, which is an inappropriate benchmark because: (1) it does not reflect the highest and best alternative employment for the Plaintiff; (2) a significant portion are employed in jobs not requiring a college education; (3) many college graduates majored in fields with reduced earnings potential; and (4) gender gap in compensation that is not adjusted for in the average
• Failure to consider higher earnings potential in fields of health care not requiring an MD (Table 1)

**Magnifies disparity of hypothetical earnings**

**Disparate annual earnings growth rates**
• 3.96% for hypothetical earnings as family or general practitioner
• 2.08% for average college graduate

**Disparity increases 4.47%/year (faster than either growth rate)**

**Assumes 41-year period for calculating hypothetical earnings disparity**
• Social Security Full Retirement Age, which seems to have been the source that the Plaintiff intended to use, would extend the calculation for only 39 years
• Assumed retirement age of 69 exceeds MD norms (Exhibit 11)

**Extends hypothetical Lost Earnings Capacity beyond normal retirement age**

**Applies low discount rate to hypothetical Lost Earnings Capacity**
• Discounts projected amounts to a present value using the risk-free rate of 3.375%—the yield of 30-year U.S. Treasury Bonds—implying that there is no risk in the assumed earnings disparity being realized as assumed over a continuous period of 41 years
• Risk-free rate fails to provide for risks such as death, disability, voluntary or involuntary earnings interruption, change of profession, early retirement, potential disparities between projected and actual earnings as MD or from alternative profession

**Increases present value of hypothetical Lost Earnings Capacity**

**Fails to deduct remaining tuition, room, board and other costs prior to entering medical profession**

**Increases hypothetical Lost Earnings Capacity**

**Results in biased and meaningless calculation of hypothetical Lost Earnings Capacity**

# EXHIBIT 28
# Overview of the Training Activities of Ronald G. Quintero, CPA, CFA

*Seminar Topics.*

Accounting (including special topics, *e.g.,* ASC 718, 805, and 820)

Analyzing and valuing equities, fixed-income securities, stock options, warrants, derivatives, real estate, private equity, venture capital, alternative investments, intangible assets, and goodwill

Bankruptcy and Insolvency

Business Plans

Business Valuations

CFA Exam Preparation (Levels I, II, and III; most active trainer in the world)

Corporate Finance

Cost of Capital

Credit Risk

Credit Training

Due Diligence

Economics

Excel Applications

Fair Value Accounting and Valuation

Financial Modeling

Financial Projections and Forecasts

Financial Restructuring

Financial Statement Analysis

Financing a Business

Global Investment Performance Standards (GIPS)

Initial Public Offerings

Investment Banking

Leveraged Buyouts (LBOs)

Managing a Business

Managing High-Risk Credits

Mergers and Acquisitions

Negotiations

Portfolio Management

Private Banking

Private Equity

Professional Ethics

Quantitative Analysis

Share-Based Consideration

Turnarounds and Workouts

Valuation Modeling

Valuing Early-Stage Companies

Valuing Financial Instruments

Venture Capital

Workouts

*Seminar Locations.* More than 60 cities throughout the United States, and more than 20 countries outside of the U.S. located on five continents

*Representative Training Clients.*

- Accounting Industry–American Institute of Certified Public Accountants, Arthur Andersen, CPA Associates International, Foundation for Accounting Education, KPMG, Marcum, Margolin Winer & Evens, Moore Stephens, Public Company Accounting Oversight Board (PCAOB), RSM Albazie, Weiser
- Banks–Bank of China, Bank of Montreal (BMO), The Bank of New York, Barclays Bank, CIBC, Citicorp, Credit Lyonaisse, FirstCaribbean International Bank, FleetBoston, HSBC, NatWest USA, Royal Bank of Canada (RBC), Royal Bank of Scotland (RBS), Sun Bank, Union Bank of Switzerland (UBS), Wilmington Trust Corp.
- Financial Information Companies–Bloomberg, Standard & Poor's, Thomson Financial
- International Organizations–Asian Development Bank, Inter-American Development Bank, International Monetary Fund, The World Bank
- Legal Profession–Latham & Watkins, Litigation Counsel of America, Morgan Lewis & Bockius, Sullivan & Cromwell
- Professional Organizations—American Institute of Certified Public Accountants, Association of Certified Turnaround Professionals, Association for Corporate Growth, Broadcast Financial Management Association, Financial Executives Institute, Financial Women's Association, The National Association of Certified Valuators and Analysts, New York State Society of Certified Public Accountants, New York Society of Security Analysts, Stamford CFA Society, Turnaround Management Association
- Financial Companies–Barclays Capital, Charles Schwab, China Industrial Development Bank, CIBC Oppenheimer, Citigroup, Credit Suisse First Boston, Essence Securities, Global Investment House, Goldman Sachs, KBC Financial Products, Mekong Capital, Quad Capital, Rasmala Investments, Salomon Smith Barney, TD Securities, UBS, Vina Capital Group, Wells Fargo Advisors, White Mountains Insurance Group
- Training Organizations–Accounting Conferences and Seminars (ACS), Banking Institute of the Republic of China, Business Outreach Center Network, Capital Roundtable, Center for Professional Education (CPE), Duke Corporate Education, Enterprise Development Center, Eureka Financial Ltd., The Expert Institute, Financial Training Partners, FitchLearning, Global Financial Markets Institute, Globecon, Greater Newark Enterprises Corporation, Institute of International Research, Midwest Universities Consortium for International Activities (MUCIA), The New Jersey Center for Innovation Acceleration, New York Institute of Finance, 7city Learning, Sharp Seminars, Technology Training, Terrapinn Financial Training
- Universities (as adjunct faculty member or lecturer)–Columbia University, Michigan State University, University of New Hampshire, New Jersey Institute of Technology, New School for Social Research, New York University Stern School of Business, Pace University, University of Rochester Simon Graduate School of Business, Rutgers University, University of North Carolina, Zicklin School of Business (formerly Bernard Baruch College)

# EXHIBIT 29
# Deposition and Expert Testimony of Ronald G. Quintero
# 2015 Through 2018

| Year | City, State | Nature of Testimony | Client[1] | Opposing Party or Company |
|------|-------------|---------------------|-----------|---------------------------|
| 2015 | Santa Ana, CA | Trial | Robert Rivas, Esq. *et al.* | Patrick Merrell *et al.* |
| 2015 | New York, NY | Trial | Royce Hosiery, LLC *et al.* | Gottesman Co. |
| 2015 | New York, NY | Arbitration | Mooreland International LLP | B. Holt Thrasher |
| 2015 | Trenton, NJ | Trial | Trenton Convalescent Center *et al.* | EliteCare, NJ, LLC |
| 2015 | New York, NY | Deposition | Michael Krynski | T. Chase, Jr. and Western Express, Inc. |
| 2015 | Rochester, NY | Arbitration | Rochester Beer & Beverage Corp. | Adam E. Jablonski |
| 2015 | Washington, DC | Deposition | United States of America | Parties to proposed merger[2] |
| 2016 | New York, NY | Trial | Michael Krynski | T. Chase, Jr. and Western Express, Inc. |
| 2016 | New York, NY | Arbitration | Warren Diamond *et al.* | John Del Monaco *et al.* |
| 2016 | Boston, MA | Deposition | Ian Jeddy | JMC Management, LLC *et al.* |
| 2016 | New York, NY | Deposition | Mitchell H. Kossoff | Felderbaum/Florida Foreclosure Attys. |
| 2016 | Pontiac, MI | Deposition | Illinois National Insurance Co. | AlixPartners LLP |
| 2016 | New York, NY | Trial | Kian Gohari | United States of America |
| 2016 | New York, NY | Arbitration | Tess Haley Wachs *et al.* | Comic Strip Promotions, Inc. *et al.* |
| 2016 | New York, NY | Deposition | Reuben Taub *et al.* | Arrayit Corporation *et al.* |
| 2016 | Washington, DC | Deposition and Trial | United States of America | Anthem, Inc. and Cigna Corp. |
| 2017 | New York, NY | Arbitration | Zujin Li | Qianghua Chen |
| 2017 | Philadelphia, PA | Trial | Samia and Mark Kirchner | AMTRAK |
| 2017 | New York, NY | Trial | Mitchell H. Kossoff | Felderbaum/Florida Foreclosure Attys. |
| 2017 | Ann Arbor, MI | Deposition | Greg Saggio, *et al.* | Mueller Industries, Inc. *et al.* & Tecumseh Products Co. |
| 2017 | Tampa, FL | Trial | Stephen Bracciale and Saint Anton Capital, LLC | National Sourcing, Inc. and Pedro Valdez |
| 2017 | Queens, NY | Trial | The City of New York and Antonio G. Decaro | Colombina Frosch, as Executrix of Estate of Steven A. Frosch, deceased, and Colombina Frosch, individually |
| 2017 | New York, NY | Trial | Harry Willnus Trust Objectants | JP Morgan Chase Bank |
| 2018 | New York, NY | Deposition and Trial | Book Dog Books, LLC *et al.* | Cengage Learning, Inc., McGraw-Hill Global Education Holdings, LLC, and Pearson Education, Inc. |
| 2018 | Washington, DC | Deposition and Trial | United States of America | AT&T Inc., DIRECT TV Group Holdings, LLC, and Time Warner, Inc. |
| 2018 | Wilmington, DE | Deposition and Trial | Members of shareholder class in re: PLX Technology Shareholder Litigation | Potomac Capital Partners II, LP |
| 2018 | Wilkes Barre, PA | Arbitration | Hazleton Shaft Corporation | Continental Plants Group, LLC |
| 2018 | New York, NY | Deposition and Arbitration | Sela2, Inc. *et al.* and BelHealth Investment Partners, Inc. | QPharma, Inc. and Patrick Den Boer |
| 2018 | Tampa, FL | Deposition | Stephen Bracciale and Saint Anton Capital, LLC | National Sourcing, Inc. and Pedro Valdez |
| 2018 | New York, NY | Arbitration | Robert Stack *et al.* | Midwood Chayim Aruchim Dialysis Associates, Inc. *et al.* |

[1]Client refers to party on whose behalf Mr. Quintero's firm was engaged. In many of the cases Mr. Quintero's firm was engaged by legal counsel.

[2]Identities of the parties to the proposed merger and other details cannot be revealed pursuant to court order.



# RONALD G. QUINTERO, CPA, CFA, ABV, CDBV, CMA, CFE, CFF, CTP, CIRA

Principal • R. G. Quintero & Co.
375 Park Avenue, Suite 2607 • New York, NY 10152
(212) 327-0200 • (212) 327-0225 FAX • q@rgquintero.com
www.rgquintero.com

## Areas of Expertise
- Valuations of businesses, financial instruments, and intangible assets
- Mergers & acquisitions
- Financial restructuring
- Bankruptcy & insolvency
- Forensic accounting
- Investments
- Financial damages

## Expert Testimony
- Testified as an expert witness on approximately 100 occasions since 1980 in courts and arbitrations throughout the United States
- Represented clients in mediations

## Professional Experience
- More than 40 years' experience as a financial professional at leading firms
- Founded, R. G. Quintero & Co. and its affiliate, Chartered Capital Advisers, in 1988
- Investment banker at Bear, Stearns & Co., Inc.
- Insolvency and restructuring advisor at Zolfo, Cooper & Co.
- Started and ran the first valuation practice of KPMG

## Education
- A.B., Economics and Spanish, Lafayette College
- M.S., Accountancy, New York University Stern School of Business
- A.P.C., Investment Management, New York University Stern School of Business

## Certifications
- Certified Public Accountant, New York
- Chartered Financial Analyst
- AICPA-Accredited in Business Valuation
- Certification in Distressed Business Valuation
- Certified Fraud Examiner
- AICPA-Certified in Financial Forensics
- Certified Management Accountant
- Certified Insolvency and Restructuring Advisor
- Certified Turnaround Professional
- Certified Financial Planner

## Professional Activities
- Served more than 750 public and private clients of all sizes in a broad range of industries
- Performed more than 1,000 valuations of businesses, financial instruments, intangible assets, and other assets and liabilities
- Served boards of directors of public, private, and nonprofit organizations as member or advisor
- Appointed as bankruptcy examiner, bankruptcy trustee, and neutral in litigation
- Award-winning scholar, lecturer, and writer
- Profiled in several "who's who" publications during the past 25 years, and *Marquis Who's Who Lifetime Achievement* inductee
- Interviewed and profiled in several national publications, as well as network television
- Delivered hundreds of lectures and seminars to more than 10,000 professionals throughout North America, South America, Europe, Asia, and Australia, some of which have been made available for commercial sale in audio, video, and online format
- Most active trainer of CFA candidates in the world over the past 25 years
- Prolific author of articles in national publications, chapters in leading professional books, professional manuals, and self-study texts
- Member of several professional organizations, including American Institute of Certified Public Accountants, CFA Institute, CFA Society New York, Turnaround Management Association, Association of Certified Fraud Examiners, Association of Insolvency and Restructuring Advisors, and American Academy of Economic and Financial Experts
- Served as member or committee chairman of several committees of the New York State Society of Certified Public Accountants, as well as Treasurer and member of the Executive Committee of the Board of Directors of the Turnaround Management Association