

FILED BY _____ D.C.

JAN 2 8 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

|  |  |  |
|---|---|---|
| OLUWAMUYIWA AWODIYA, | ) | Case No.   0:18-cv-60482-KMM |
| *Plaintiff,* | ) | |
| | ) | |
| –v– | ) | Hon. Chief Judge: K. Michael Moore |
| | ) | Magistrate Judge: Alicia O. Valle |
| ROSS UNIVERSITY SCHOOL OF | ) | |
| MEDICINE, SCHOOL OF | ) | |
| VETERINARY MEDICINE LIMITED | ) | |
| *Defendant.* | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Oluwamuyiwa Awodiya ("Plaintiff"), in proper person, hereby files his response in opposition to Defendant's Motion for Summary Judgment (Def. Cross-Motion) [ECF No. 120] filed by defendant Ross University School of Medicine, School of Veterinary Medicine Limited ("RUSM").

Concurrently filed in support herewith are: (1) Plaintiff's Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment ("CSMF"); and (2) Plaintiff's Request for Judicial Notice in Support of His Response in Opposition to Defendant's Motion for Summary Judgment.

Previously filed was Plaintiff's Second Motion for Partial Summary Judgment [ECF No. 102].

**Table of Contents**

Factual Background ...................................................................................................... 1

    A.    Failure to Accommodate, Prior to NBME CBSE .................................................. 1

    B.    Failure to Accommodate and/or Disparate Treatment During Formal Appeal ...... 4

Argument .................................................................................................................... 7

I.     RUSM HAS MISPLACED THE BURDEN OF PROOF TO ESTABLISH THAT A REQUEST IS NOT "ACTIONABLE." ITS MOTION ON THIS ISSUE SHOULD BE DENIED BECAUSE RUSM HAS NOT OFFERED ANY EVIDENCE TO MEET ITS BURDEN ON THIS AFFIRMATIVE DEFENSE. ............. 7

II.    RUSM'S "ACTIONABLE REQUEST" THEORY SHOULD BE DENIED AS A MATTER OF LAW BECAUSE A REQUEST FOR AN ACCOMMODATION IS NOT REQUIRED TO FOLLOW A FORMAL POLICY .................................................................................................................. 8

    A.    RUSM's Reliance on *Varad* is Misplaced. .......................................................... 9

    B.    RUSM's Argument has Already been Reject by Sister Courts of this Circuit. .... 10

    C.    Magic Forms or Documentation Criteria for Accommodations are Forbidden Unless RUSM Can Show Why the Criteria is Necessary. ................................... 11

    D.    As a Matter of Law, RUSM Cannot Show that it is Necessary to Require All Requests to be Made in Writing. ......................................................................... 11

    E.    If RUSM Considered the Information Furnished by Plaintiff to be Insufficient or Not "Actionable," RUSM had the Duty to Ask for More. ..................................... 12

    F.    Requests Not Required because His Need for an Accommodation was Obvious. 13

III.   DEAN OWEN DISPARATELY TREATED PLAINTIFF'S APPEAL AND FAILED TO ACCOMMODATE HIM. .......................................................................................................................... 13

IV.   A REASONABLE JURY COULD FIND THAT PLAINTIFF WAS OTHERWISE QUALIFIED TO PARTICIPATE. .......................................................................................................... 13

    A.    RUSM Conflates the Technical Standards with the Academic Standards to Camouflage the Limits of Its Academic Deference. ............................................. 14

    B.    Plaintiff was Able to Meet the Technical Standard Argued by RUSM, Without Accommodation. .................................................................................................. 15

    C.    A Reasonable Accommodation Would Have Enabled Plaintiff to Meet the Technical Standards ........................................................................................... 16

V.    PLAINTIFF HAS A PRIVATE RIGHT OF ACTION UNDER 34 C.F.R. 104.4 AND 34 C.F.R. 104.44 .................................................................................................................................. 17

VI.   COUNT VI (AND VII): BREACH OF CONTRACT (AND BREACH OF GOOD FAITH) ................ 18

    A.    Sub-Counts I Through III: Violate Statutory Rights. *See Supra*, Part I-III. ......... 18

    B.    Sub-Count V: RUSM Arbitrarily and Capricious Held Plaintiff to a Different Academic Standard than the Other Students Who Took the NBME CBSE......... 18

VII.   COUNTS VIII AND IX: RUSM MISREPRESENTED THE EXISTENCE OF A POLICY — "TO COMPLY" ................................................................................................................. 18

     A.   Fraud by Commission (False Statement). ........................................................... 18

     B.   Fraud by Omission (Selective Compliance). ....................................................... 18

     C.   "Justifiable" Reliance is Not an Element for Fraudulent Inducement. ................. 19

VIII.  COUNT IX: BREACH OF FIDUCIARY DUTY ........................................................... 19

IX.   JUDICIAL NOTICE OF FACTS FOR THE LOST EARNING CAPACITY OF A CONTRACTUAL MD DEGREE ................................................................................................................... 20

X.    PUNITIVE DAMAGES ........................................................................................... 20

Conclusion ................................................................................................................. 21

## FACTUAL BACKGROUND

### A.      Failure to Accommodate, Prior to NBME CBSE

Before attending RUSM, Plaintiff received extended testing in the last two years of high school and at Morgan State University. *See* CSMF ¶ 3.

Dr. Davendranand Sharma ("Dr. Sharma") was Plaintiff's psychiatrist employed by RUSM that evaluated Plaintiff's ADHD. *Id.* at ¶ 51. When Dr. Sharma met with Plaintiff for the "first time" in December 2015, he witnessed "seeing" symptoms of undiagnosed ADHD and discovered that Plaintiff was having academic problems. *Id.* at ¶¶ 52, 55. Dr. Sharma testified that he noticed Plaintiff's attention/concentration symptoms, including, constantly has difficulty sustaining attention, constantly has difficulty with persistence or organization, and is constantly distracted. *Id.* at ¶ 53. Based on "seeing" Plaintiff's symptoms and his academic problems, Dr. Sharma "recommended testing for ADHD." *Id.* at ¶ 52. Dr. Sharma made it clear that there was evidence of concentration problems that needed to be diagnosed with further testing. *Id.* at ¶ 52. Plaintiff signed a Release of Information Agreement ("ROI Agreement") with the RUSM Counseling Center. *Id.* at ¶ 67.

The ROI Agreement states that the Counseling Center had ongoing authorization to discuss Plaintiff's "confidential information" with appropriate RUSM administrators if the information is "relevant to academic accommodations." *Id.* Dr. Sharma testified, "[s]o the signing of this document is a way for the student to make life easier in the future so they don't have to come back and do another one." *Id.* Dr. Sharma admitted that Plaintiff's ROI Agreement "create[s] a duty between the counseling center and whoever the recipient is named in that agreement." *Id.* at ¶ 68. Plaintiff signed the ROI Agreement for the Counseling Center "to determine if whatever accommodations were necessary." *Id.* at ¶ 67.

When Plaintiff executed the ROI Agreement, he made two verbal requests for accommodations. *Id*. at ¶ 16. First, for his concentration problems that the Counseling Center observed as symptoms of undiagnosed ADHD that needed to be diagnosed and second, for a flight change because his semester was over, and it was hard for him to see his friends that were allowed to take the NBME CBSE. *Id*. On Plaintiff's behalf, following his verbal request for a flight change, Dr. Sharma put an accommodation request in writing to an RUSM administrator for "emotional health" which was solely a verbal request from Plaintiff. *Id*.

A few days after Dr. Sharma recommend ADHD testing, he started Plaintiff's evaluation for ADHD in December 2015. *Id*. at ¶ 55. Dr. Sharma also testified:

> Q. Then why did you screen plaintiff for ADHD?
>
> A. Because he was having academic problems.
>
> Q. What type of academic problems?
>
> A. Problems with passing his exams, as far as I remember.

*Id*. Plaintiff went home for winter break and started a separate ADHD evaluation with another psychiatrist in Maryland. *Id*. at ¶ 22. The psychiatrist in Maryland noted that Plaintiff had symptoms of attention/concentration problems and concluded that Plaintiff's results were associated with a "very high" likelihood of having ADHD. *Id*.

On January 11, 2016, Plaintiff gave the school written documentation of his ADHD to address his academic problems at the start of repeating his fifth semester. *Id*. at ¶ 56. Because of the "sensitive nature" of the documents, Plaintiff gave the documents to the Counseling Center in accordance with the ROI Agreement. *Id*.

RUSM decided to finish its own evaluation of Plaintiff's concentration problem and the Counseling Center determined that the results of Plaintiff's attention problem, including ADHD, were "not within normal limits." *Id*. at ¶ 57. Dr. Sharma testified that Plaintiff had ADHD "for a

long time" that was untreated and was probably there for years and not diagnosed throughout high school and college. *Id.* at ¶ 54. As Dr. Sharma testified in his deposition:

> Q. Do you believe that plaintiff's ADHD, specific to him, was significantly limiting his ability to complete his exams in the time allowed?
>
> A. Yes.

*Id.* at ¶ 58. Dr. Sharma also testified that Plaintiff "needed extra time" because his ADHD causes him to "take longer." *Id.* at ¶ 61.

In a January 19, 2016 email, Plaintiff informed Dr. Sharma that he wanted help with his ADHD because his exams were "getting relatively close." *Id.* at ¶ 59. Dr. Sharma admitted that he was "informed that Plaintiff was running out of time on his exams." *Id.* at ¶ 60. Dr. Sharma admitted that Plaintiff continued to tell Dr. Sharma that even with medication, he was not completing his exams. *Id.* at ¶ 62.

Dr. Sharma testified that he had the authority to request for accommodations on a student's behalf and to determine the type of accommodation that a student would need. *Id.* at ¶ 63. Dr. Sharma testified that there was adequate and "good documentation" of Plaintiff's ADHD and that other students with less documentation were given accommodations. *Id.* at ¶¶ 64, 65. Matthew Stewart-Fulton testified that when Plaintiff was enrolled, the Counseling Center could submit the required documentation for academic accommodations. *Id.* at ¶ 66. The ongoing ROI Agreement that Plaintiff executed allowed the Counseling Center, including Dr. Sharma, to discuss his ADHD and information related to academic accommodations with Mr. Stewart-Fulton. *Id.* at ¶ 67.

Plaintiff testified that he could not recall ever reading the 'accommodations' section of the student handbook. *Id.* at ¶ 27. Aside from the ROI Agreement, Plaintiff testified that no one ever asked for or told him about any specific form or packet. *Id.* at ¶ 69. Accommodation requests were processed in the "Office for Student Affairs" and the decisions for academic accommodations were

3

to be made by Dr. Bryan Hayse, the Associate Dean of Student Affairs. *Id.* at ¶ 70. Dr. Hayse was Mr. Stewart-Fulton's supervisor and oversaw the accommodation process. *Id.*

Dr. Hayse testified that "there was no request packet" prior to it being introduced into a subsequent iteration of the student handbook. *Id.* at ¶ 71. There was no specific request packet for accommodations until the May 2016 iteration of the student handbook. *Id.* at ¶ 72. Before a request packet existed—Plaintiff informed Dr. Hayse, in December 2015, of the concentration problems that Dr. Sharma saw and planned to diagnose. *Id.* at ¶ 19. Dr. Hayse told Plaintiff that he would get the information about Plaintiff's concentration for accommodations on future exams. *Id.*

Also before a request packet existed—Plaintiff informed Mr. Stewart-Fulton, in January 2016, that he wanted extended testing time, has a concentration problem and that Mr. Stewart-Fulton should get all the information from Dr. Sharma and Mr. Cuffy because "they diagnosed it themselves" and could "do a much better job of explaining" his ADHD than he could. *Id.* at ¶ 74.

### B.   Failure to Accommodate and/or Disparate Treatment During Formal Appeal

On April 18, 2017, Plaintiff met with his psychotherapist, Ms. Denise Unterman, for anxiety and was diagnosed with OCD. *Id.* at ¶ 75. Plaintiff's psychotherapist's medical notes states that Plaintiff "struggles to complete exams due to compulsive checking behavior" and that he was struggling with completing exams at RUSM. *Id.* at ¶ 76. According to his psychotherapist, Plaintiff pulled his eyelashes out because he was worried about not completing exams in the time allowed. *Id.* at ¶ 77. At the same time, his psychotherapist also noted that Plaintiff's "thought process" is "coherent, logical, [and] relevant," and that Plaintiff has "good" judgment. *Id.* at ¶ 78. According to his psychotherapist and psychiatrist, he has had symptoms of OCD since year 2011. *Id.* at ¶ 79.

On April 13, 2017, the "Office of the Registrar" dismissed Plaintiff solely for "[f]ailure to pass the NBME CBSE in five consecutive attempts." *Id.* at ¶ 80. RUSM did not dismiss Plaintiff for an inability to meet the "technical standards" as outline in the student handbook. *Id.*

4

On April 27, 2017, Plaintiff submitted an appeal statement to the Student Promotions Committee that stated, "I will likely pass any future exam, specifically [NBME CBSE] with a full-on attack of my OCD." *Id.* at ¶ 81.

On June 1, 2017, the Student Promotions Committee upheld the dismissal and notified Plaintiff with a letter from Niels Larsen, the Chair of the Student Promotions Committee. *Id.* at ¶ 82. This letter states, that he can "appeal this decision by submitting an appeal to the Dean." *Id.*

On June 2, 2017, Plaintiff sent an email to Niels Larsen and asked him "if it is possible for Ross to set up a proctored NBME exam of any fashion. I have been working diligently on addressing my recent diagnosis and have made remarkable progress." *Id.* at ¶ 83. Plaintiff also wrote to Niels Larsen, "It would be great if I could take the next unofficial NBME in an environment that Ross considers adequate enough so that there is no doubt that I can now pass these exams." *Id.*

On June 12, 2017, Plaintiff's psychiatrist and psychotherapist wrote to William Owen ("Dean Owen") that Plaintiff has ADHD and OCD. *Id.* at ¶ 85. They also informed Dean Owen that Plaintiff has had symptoms of OCD "for the past 4-6 years" and that "the anxiety and checking rituals inherent to this condition have been adversely affecting his academic performance in medical school." *Id.*

On June 13, 2017, Plaintiff submitted his appeal letter to Dean Owen. *Id.* at ¶ 86; *See also* Plaintiff's appeal letter to Dean Owen [ECF No. 102 at **Ex. SJ-17**]. Plaintiff's appeal letter reads:

> [M]y objective is to keep this letter relevant to how OCD has influenced my academic performance.
>
> ....
>
> I'm the student who **never finished an exam on time**. I was compelled to back track my answers just to make sure they didn't disappear 5 seconds after I went to the next question. I had rather pick a wrong answer because of the fear that it may actually be the

right answer. **These are just some of the ways that OCD has influenced my academic performance**.

*Id*. (emphasis added).

Dean Owen testified that he performs an investigation of a student's disability when he is notified in an appeal of a student's disability that was adversely affecting the student's academic performance. CSMF ¶ 87. Dean Owen testified that after his investigation, his decision is based on his own personal criteria and that "it depends upon the diagnosis." *Id*. at ¶ 88.

Dean Owen testified that he, in fact, saw and recalled Plaintiff's appeal letter and his psychiatrist's letter that was sent to him and decided to uphold Plaintiff's dismissal because of Plaintiff's ADHD and OCD. *Id*. at ¶ 89. As Dean Owen testified at his deposition:

> Q. Tell me what you recall.
>
> A. He's in CBT therapy and acquiring strategies for managing his symptoms. He is considering psychotropic medication. What I am remembering is an attestation from a therapist that describes an interventional program in progress, not being executed, nor any verification of it's [*sic*] benefits. That's what I recall.
>
> Q. So would that be the reason why you decided to uphold his dismissal?
>
> A. Yes. As well as your past performances.
>
> ....
>
> "Acquiring strategies." Acquiring is not the same as acquire. They are different. Acquiring describes progress in action.
>
> "Considering psychotropic medication." Not having received them. There's no statement of efficacy as of yet, against a background of a young man who failed an exam not once, not twice; five times.
>
> Summary, I felt sorry for you, because it describes progress. It doesn't describe accomplishment and execution. That's the reason for the decision.

*Id*. Dean Owen further testified:

> Q. So you wouldn't investigate with the student to see what accommodation would have helped him?
>
> A. No, I would not, since the student is under therapy by a psychiatrist and a psychotherapist. That is neither my role, nor is it my responsibility. Where is your responsibility, young man, in terms of engaging with your therapist to help yourself?

*Id.* at ¶ 90 (deposed by Plaintiff). One of Dean Owen's personal requirements was to see ameliorative effects from some form of treatment as a prerequisite to getting extending testing time. *Id.* Dean Owen further testified, "[w]e're not using exams as experimentation to see if there's efficacy." *Id.* "You've got two bad diseases. This is why I say it. I felt sorry for you." *Id.* at ¶ 91 (Dean Owen said to Plaintiff, during Dean Owen's deposition).

On June 29, 2017, Dean Owen decided to uphold Plaintiff's dismissal. *Id.* at ¶ 92.

## ARGUMENT

**I.     RUSM has Misplaced the Burden of Proof to Establish that a Request is not "Actionable." Its Motion on this Issue Should be Denied because RUSM Has Not Offered Any Evidence to Meet Its Burden on this Affirmative Defense.**

In the Eleventh Circuit, where an individual has informed a covered entity that an accommodation is needed, the covered entity bears the burden of proof to establish a defense by demonstrating that it in good faith engaged in the interactive process required by the ADA and tried to find a reasonable accommodation for the individual that would not cause an undue burden. *See* Pattern Jury Instructions, Civil Cases, Eleventh Circuit, § 4.12, p. 23 (2018 revision), stating:

> In a similar vein, 42 U.S.C. § 1981a provides a defense to employers: compensatory and punitive damages may not be awarded on an ADA reasonable accommodation claim "where the covered entity demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation that would provide such individual with an equally effective opportunity and would not cause an undue hardship on the operation of the business." 42 U.S.C. § 1981a(a)(3). Therefore, where an employee shows that he requested an accommodation, the

7

> employer may avoid damages by demonstrating that it in good faith
> engaged in the interactive process required by the ADA and tried to
> find a reasonable accommodation for the employee. The employer
> has the burden of proof on this defense.

*Id. See also Lafata v. Dearborn Heights Sch. Dist.* No. 7, No. 13-cv-10755, 2013 WL 6500068,

*11 (E.D. Mich. Dec. 11, 2013) (granting employee's motion for summary judgment because "[a]

reasonable trier of fact could not find that the [employer] engaged in such an individualized

inquiry").

## II.   RUSM's "Actionable Request" Theory Should be Denied as a Matter of Law Because a Request for an Accommodation is Not Required to Follow a Formal Policy

Plaintiff has made numerous verbal and written requests to RUSM for an accommodation.

*See* CSMF ¶¶ 16, 19, 58-62, 67-68, 74, 81-86.

"The ADA defines 'discrimination' to include 'not making reasonable accommodations to

the **known** physical or mental **limitations** of an otherwise qualified individual with a disability."

*Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1224 (11th Cir. 1997) (emphasis added) (quoting

42 U.S.C. § 12112 (b)(5)(A)). The Eleventh Circuit has held that "a plaintiff can be said to have

made a request for accommodation when the defendant has 'enough information to know of both

the disability and desire for an accommodation.'" *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1226

(11th Cir. 2016) (quoting *Conneen v. MBNA Am. Bank, N.A.,* 334 F.3d 318, 332 (3d Cir.2003)

(internal quotation marks omitted)). *See Schwarz v. City of Treasure Island*, Case No. 8:05-cv-

1696-T-30MAP., at *1 (M.D. Fla. Oct. 14, 2010) (denying defendant's motion for summary

judgment because, "Importantly, and as Plaintiffs point out, federal law on this issue reflects that

a party need not make a 'formal' request or use any 'magic words' when asking for

an accommodation.").

"The Court cautions that blind adherence to policies and standards resulting in a failure to

accommodate a person with a disability is precisely what the Americans with Disabilities Act of

1990 and the Rehabilitation Act of 1973 are intended to prevent." *Redding v. Nova Se. Univ., Inc.*, 165 F. Supp. 3d 1274, 1300-1 (S.D. Fla. 2015) (citation omitted).

### A.     RUSM's Reliance on *Varad* is Misplaced.

RUSM's interpretation of *Varad v. Barshak*, CIVIL ACTION NO. 2002-11311-RBC (D. Mass. May. 15, 2003), is an undue distortion of case law. The court in *Varad* held that the plaintiff did not exhaust her administrative remedies under Title II of the ADA because she could retake the bar exam an unlimited number of times and could simply follow the procedure to request accommodations if she wants to retake the bar exam again. Therefore, she was not excluded from participation. *Varad*, CIVIL ACTION NO. 2002-11311-RBC, at *1 (finding "no applicant for an examination for admission to the bar shall be restricted as to the number of times he may take such an examination"). Holding that, "the plaintiff was not entitled to a hearing until all her available remedies had been exhausted, namely, formally requesting an accommodation pursuant to the BBE's rules. On these facts, Varad has not made out a claim under Title II of the ADA because she has proffered no evidence to show that she has been excluded from participation ...." *Id.*

With regard to the plaintiff's oral request in *Varad*, the court held that she did not make either a written or oral request before the deadline to request an accommodation for the exam she scheduled to take and that she only made an oral request well after the deadline. "It is true that Varad did make an oral request for accommodation in a telephone call to the BBE on January 18, 2002, more than a month after the December 17, 2001 deadline to file a written request. However, that verbal request was too little, too late, leaving the BBE without the time or the information necessary to make a reasoned judgment with respect to the alleged disability." *Id.* "[S]he did not submit a written request for an accommodation, but only made an oral request on January 18, 2002, well past the December 17, 2001 deadline." *Id.*

9

Here, Plaintiff was excluded from medical school and repeated his need for an accommodation numerous times up until his dismissal was upheld on June 29, 2017. *See Kahriman v. Wal-Mart Stores, Inc.*, 115 F. Supp. 3d 153, 164 (D. Mass. 2015) ("Regardless of the formal or informal policies in place, an employer's actual treatment of a qualified employee will determine whether the employer has satisfied its duties under the ADA and chapter 151B to provide a reasonable accommodation to qualified employees").

**B.     RUSM's Argument has Already been Reject by Sister Courts of this Circuit.**

In *Rayford v. Walmart Stores, Inc.*, CIVIL ACTION 15-0658-WS-B, at \*7 (S.D. Ala. Jul. 5, 2017) ("The defendant suggest[ed] that corporate policy requires the employee to personally contact Human Resources before any obligation arises to consider a reasonable accommodation"). *Rayford* held:

> In the reasonable-accommodation context, the ADA envisions an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated. Even were the defendant's construction of the policy correct, it has failed to show that a policy of ignoring a known request for     reasonable accommodation made    to     line management merely because the employee did not repeat the request directly to the human resources department would comport with the "interactive process" mechanism contemplated by the ADA. As noted, the Court will not endeavor to bridge the gap on the defendant's behalf.

*Id.* at \*8. In *Vestal v. Heart of Cardon, LLC*, No. 2:17-cv-00155-JMS-MJD, at \*14-15 (S.D. Ind. Jun. 15, 2018) (the defendant "argue[d] that [plaintiff] never made any request through the formal channels as required by [defendant's] policies. But the ADA requires neither that [plaintiff] request the particular accommodation nor that she follow the formal request policy. Rather, [plaintiff] must do enough to 'indicate to her employer' her need for an accommodation.").

In *Sackman v. Balfour Beatty Cmtys., LLC*, CV 113-066 (S.D. Ga. Sep. 8, 2014):

> [Defendant] also tries to shift focus from the sufficiency of the
> requests that were actually made by Plaintiff to additional actions
> which Plaintiff could have taken to repeat her requests or formally
> submit them in writing. For example, [defendant], selectively
> quoting a portion of a footnote in <u>Schwarz</u>, argues that Plaintiff was
> required - as a matter of law - to submit [defendant's] alteration
> request form (as provided in the move-in packet) or modification
> and accommodation request form (as provided online and at its Fort
> Gordon office). According to [defendant], failure to use the formal,
> existing system for requesting a modification defeats any claim that
> [defendant] refused to make a requested modification. **The Court
> disagrees.**

*Id.* at \*18-19 (internal quotation omitted and bold added).

### C.   Magic Forms or Documentation Criteria for Accommodations are Forbidden Unless RUSM Can Show Why the Criteria is Necessary.

"The appropriate focus is on the sufficiency of the requests that were actually made and

whether they gave [defendant] an opportunity to conduct a meaningful review." *Sackman*, CV

113-066, at \*19 n.17. Under the ADA, discrimination includes:

> **[T]he imposition or application of eligibility criteria** that screen
> out or tend to screen out an individual with a disability ... **unless
> such criteria can be shown to be necessary for the provision of
> the goods** ....

42 U.S.C. §§ 12182(b)(2)(A)(i); *accord* 34 C.F.R. § 104.4(b)(4) (interpreting Section 504).

Under federal law, "a university cannot impose upon such individuals documentation

criteria that unnecessarily screen out or tend to screen out the truly disabled." *Guckenberger v.*

*Boston University*, 974 F. Supp. 106, 135 (D. Mass. 1997) (citing 42 U.S.C. §§ 12182(b)(2)(A)(i)).

In other words, "a university [is] prevented from employing unnecessarily burdensome proof-of-

disability criteria that preclude or unnecessarily discourage individuals with disabilities from

establishing that they are entitled to reasonable accommodation." *Id. See also* CSMF ¶¶ 64, 65.

### D.   As a Matter of Law, RUSM Cannot Show that it is Necessary to Require All Requests to be Made in Writing.

The Eleventh Circuit has held, "[w]hat matters under the ADA are not formalisms about the manner of the request[.]" *U.S. v. Hialeah Housing Authority*, 418 Fed. Appx. 872, 876 (11th Cir. 2011) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)).[1] *See also Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 58 (D.D.C. 2012):

> [T]he Court declines to grant the [defendant's] summary judgment based on its conclusory assertion that [plaintiff's] failure to follow its prescribed procedures in exacting detail in itself disqualifies her from seeking a reasonable accommodation, or pursuing a remedy for the failure to provide one. *See, e.g., Loya v. Sebelius*, 840 F.Supp.2d 245, 259 (D.D.C.2012) (finding genuine dispute regarding whether plaintiff had requested an accommodation and noting that "the notice or request for a reasonable accommodation 'does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation' as long as it 'make[s] clear that the employee wants assistance for his or her disability'" (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir.1999))).

*Id.*

**E.  If RUSM Considered the Information Furnished by Plaintiff to be Insufficient or Not "Actionable," RUSM had the Duty to Ask for More.**

The Seventh Circuit held, "Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, **the employer must ask** for clarification. In other words, an employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by **intentionally remaining in the dark**." *E.E.O.C. v. Sears, Roebuck Co.*, 417 F.3d 789, 804 (7th Cir. 2005) (emphasis added). *See also Taylor v. Phoenixville School District*, 184 F.3d 296, 315 (3d Cir. 1999):

> In *Bultemeyer*, the court explained, "If the note [from the psychiatrist requesting accommodation] was too ambiguous and

---

[1] *See also E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011) ("the notice or request does not have to be in writing" (citing *Taylor*, 184 F.3d 296)); *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 952 n.5 (8th Cir. 1999) ("an employee is not required to request accommodation in writing").

> [the employer] did not know what Bultemeyer wanted, [the
> employer] easily could have called [the psychiatrist] for a
> clarification." The interactive process would have little meaning if
> it was interpreted to allow employers, in the face of a request for
> accommodation, simply to sit back passively, offer nothing, and
> then, in post-termination litigation, try to knock down every specific
> accommodation as too burdensome.

*Id.* (brackets in original) (quoting *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996); *accord Woodruff v. Lahood*, 777 F. Supp. 2d 33, 43 (D.D.C. 2011) ("it was the defendant's responsibility to request additional information that the employer believed it needed." (internal quotation and alterations omitted)).

**F.     Requests Not Required because His Need for an Accommodation was Obvious.**

"[I]f it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." *Ballard v. Rubin*, 284 F.3d 957, 962 n.4 (8th Cir. 2002) (citing *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996)). "[A]n employer cannot expect an employee to read its mind and know that he or she must specifically say 'I want a reasonable accommodation,' particularly when the employee has a mental illness." *Bultemeyer*, 100 F.3d at 1285.

**III.    Dean Owen Disparately Treated Plaintiff's Appeal and Failed to Accommodate Him**

Dean Owen's reasons to deny Plaintiff's appeal, CSMF ¶¶ 87-90, "violates the clear command of 42 U.S.C. § 12102(4)(E)(i), that '[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures.'" *Lonergan v. Fla. Dep't of Corr.*, No. 14-13925, at *6-7 (11th Cir. 2015).

**IV.    A Reasonable Jury Could Find that Plaintiff was Otherwise Qualified to Participate**

"To make out a prima facie case under either the ADA or Rehabilitation Act [the student] must show that she is 'otherwise qualified' to remain a student at the Medical School, i.e., she can meet the essential eligibility requirements of the school, with or without reasonable

13

accommodation." *Zukle v. Regents of the University of California*, 166 F.3d 1041, 1045 (9th Cir. 1999). "In the context of postsecondary education, an otherwise qualified individual is a person who is able to meet the academic and technical standards requisite to admission or participation in the education program or activity." *Zainulabeddin v. Univ. of S. Fla. Bd. of Trs.*, No. 17-11888, at *10 (11th Cir. Sep. 5, 2018); 34 C.F.R. § 104.3(l)(3).

### A.   RUSM Conflates the Technical Standards with the Academic Standards to Camouflage the Limits of Its Academic Deference.

"The term 'technical standards' refers to all **nonacademic** admission criteria that are essential to participation in the program in question." *Southeastern Community College v. Davis*, 442 U.S. 397, 404 (1979) (emphasis added) (quoting an explanatory note to the original regulations); 34 C.F.R. § 104, App. A at 374.

RUSM did not dismiss Plaintiff for an inability to meet its "technical standards." CSMF ¶ 80. According to the dismissal letter from RUSM, the only reason that it decided to dismiss Plaintiff was solely for "[f]ailure to pass the NBME CBSE in five consecutive attempts." *Id.* RUSM's academic judgment to dismiss Plaintiff was based solely on his performance on the NBME CBSE. The minimum passing score on the NBME CBSE is not a technical standard, it is an academic standard. RUSM did not allege that it used "academic judgment" to dismiss him for any professional misconduct or any behavioral misconduct as outlined in its technical standards.

Courts only extend some level of deference to *pre-litigation* academic decisions. *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to **review** the substance of a genuinely academic **decision** . . . they should show great respect for the faculty's professional judgment.... [U]nless ... the person or committee responsible did not actually exercise professional judgment." (emphasis added)). RUSM can use academic deference to decide its own technical standards and to dismiss students for not meeting that technical standard, but its

14

academic deference stops there. If RUSM wanted to use its "academic judgment" to dismiss Plaintiff because of a technical standard, then it should have done so then. It did not. Rather, it used its academic judgment to dismiss Plaintiff solely for an academic standard, the minimum passing score on the NBME CBSE. Plaintiff successfully passed all five semesters, and only had to repeat his fifth semester once. But for the academic standard set by the minimum passing score for the NBME CBSE, Plaintiff was able to participate in the program because he was not disciplined in any regard to the technical standards that RUSM now calls into question.

The academic judgments that RUSM had the freedom to exercise, became immutable once Plaintiff filed this lawsuit. RUSM cannot now, use legal rhetoric as a vehicle to camouflage what is a legally incentivized, post-factum academic judgment. Such a holding would allow an unfair use of the judicial system by an institution to cherry-pick discovery for after-the-fact grounds to preclude a student from judicial remedies. These manufactured mid-litigation grounds to dismiss a student, are not motivated by academic judgment, they are motivated by a legal incentive.

**B.     Plaintiff was Able to Meet the Technical Standard Argued by RUSM, Without Accommodation.**

None of Plaintiff's psychiatrists or psychotherapist have ever claimed that Plaintiff lacked the emotional health required for the technical standard that RUSM now calls to argue. In fact, Plaintiff's medical records confirm that he was able to meet that technical standard without accommodation. In December 2015, January 2016, April 2016, June 2016, July 2016, and August 2016, each of Plaintiff's Mental Status Exams concluded that Plaintiff was coherent, engagable, had "fairly good response to mood reactivity," was not suicidal, and had fair insight and judgment. CSMF ¶¶ 101, 102. Even when Plaintiff met with his psychotherapist for anxiety and was pulling out his eyelashes, his psychotherapist also noted that Plaintiff's "thought process" is "coherent, logical, [and] relevant," and that Plaintiff has "good" judgment. *Id*. at ¶ 75-78.

15

There is no medical evidence or expert testimony to support RUSM's improper medical arguments. RUSM's arguments are nothing more than an attempt to use an isolated relationship breakup from 2015 to cherry-pick symptoms of clinically diagnosed ADHD and OCD. CSMF ¶¶ 53, 58, 77, 78. The cherry-picked symptoms, *i.e.*, pulling eyelashes, are not themselves "essential" nor are they listed as a technical standard. "[F]or a postsecondary education program, ... [a] requirement is 'essential' if 'the nature of the program would be fundamentally altered' without it. By contrast, an individual does not need to satisfy non-essential program requirements to be 'otherwise qualified.'" *Shaikh v. Tex. A&M Univ. Coll. of Med.*, No. 16-20793, at *9-10 (5th Cir. Jun. 20, 2018) (internal citations omitted). There is simply too much of an analytic gap between the cherry-picked symptoms and the "technical standard" argued by RUSM.

More importantly, RUSM's naked contention—that all students that ever experienced some level of depression or suicidal ideations are automatically unable to meet the technical standards—is an unfounded assumption that stereotypes those students. Even if RUSM's allegations about Plaintiff were accepted, there is no evidence to support that these allegations limited Plaintiff in any type of way. The Supreme Court has held that the "mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context." *Davis*, 442 U.S. 397, 404 (1979). "An unfounded assumption that an applicant is unqualified for a particular job, even if arrived at in good faith, is not sufficient to forestall liability under section 504." *Cook v. Rhode Island, Department of Mental Health, Retardation, & Hospitals*, 10 F.3d 17, 27 (1st Cir. 1993).

### C.   A Reasonable Accommodation Would Have Enabled Plaintiff to Meet the Technical Standards

"[The Supreme] Court held that a plaintiff 'need only show that an 'accommodation' seems reasonable on its face, *i.e.,* ordinarily or in the run of cases." *Alumni Cruises, LLC v.*

16

*Carnival Corp.*, 987 F. Supp. 2d 1290, 1305 (S.D. Fla. 2013) (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002)). And "plaintiff satisfies 'burden of production' by showing [a] 'plausible accommodation.'" *Id.* (quoting *Barnett*, 535 U.S. 391).

With respect to the technical standards, RUSM's student handbook states that: "In order to solve clinical problems effectively, candidates must be able to measure, calculate, reason, analyze, integrate and synthesize in a timely fashion." CSMF ¶ 99.

Plaintiff's psychiatrist at RUSM testified that Plaintiff had ADHD years before he was diagnosed. CSMF ¶ 54. The same psychiatrist testified that Plaintiff's that ADHD, specific to him, was significantly limiting his ability to complete his exams in the time allowed. *Id.* at ¶ 58. The same psychiatrist testified that Plaintiff "needed extra time" because his ADHD causes him to "take longer." *Id.* at ¶ 61.

Plaintiff's psychotherapist concluded that Plaintiff had OCD since at least the year 2011. *Id.* at ¶ 79. According to Plaintiff's psychotherapist, Plaintiff's OCD also caused Plaintiff to struggle to complete his exams in the time allowed. *Id.* at ¶¶ 75-77. Plaintiff's medical records reflect that Plaintiff was not completing his exams at RUSM. *Id.* at ¶ 76.

RUSM admits "that extended testing time for the NBME CBSE is a reasonable accommodation for disabled students that need extended testing time." *Id.* at ¶ 100. A jury could find that, on its face, it is reasonable and plausible that extended testing time would have enable Plaintiff to complete his NBME CBSE exams in a timely fashion.

## V.   Plaintiff has a Private Right of Action Under 34 C.F.R. 104.4 and 34 C.F.R. 104.44

"Language in a regulation may invoke a private right of action that Congress through statutory text created[.]'" *Yarbrough v. Decatur Hous. Auth.*, No. 17-11500, at *15 (11th Cir. Oct. 3, 2018) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001)). "[W]e must examine a challenged regulation in the context of the statute it is meant to implement. Only those regulations

effectuating the statute's clear prohibitions or requirements are enforceable through the statute's private right of action." *American Assoc., v. Harris*, 605 F.3d 1124, 1134 (11th Cir. 2010). *See also A.G. v. Paradise Valley Unified Sch. Dist.*, 815 F.3d 1195, 1204 (9th Cir. 2016); *Mark H. v. Lemahieu*, 513 F.3d 922, 934 (9th Cir. 2008) ("As applied here, *Sandoval* instructs that whether the § 504 regulations are privately enforceable will turn on whether their requirements fall within the scope of the prohibition contained in § 504 itself.").

**VI.     Count VI (and VII): Breach of Contract (and Breach of Good Faith)**

   **A.     Sub-Counts I Through III: Violate Statutory Rights. *See Supra*, Part I-III.**

   **B.     Sub-Count V: RUSM Arbitrarily and Capricious Held Plaintiff to a Different Academic Standard than the Other Students Who Took the NBME CBSE.**

In May 2016, RUSM republished the "2015-2016, Vol. 7" academic catalog with updated policies. CSMF ¶¶ 93-96. This republished version decreased the minimum passing score ("MPS") on the NBME CBSE from 68 to 66. *Id.* ¶ 96. "RUSM routinely issues a Student Handbook and an Academic Catalog to its students with content applicable to all of its students." *See* [ECF No. 107-1] at ¶ 64; CSMF ¶ 96. In August 2016 Plaintiff scored a 67 on the NBME CBSE. CSMF ¶ 97. Even though the MPS was decreased schoolwide from 68 to 66 and was applicable to all students, RUSM arbitrarily dismissed Plaintiff for not passing the NBME CBSE. Three months later, in a new academic calendar year, RUSM increased the MPS again from 66 to 68. *Id.* at ¶ 98.

**VII.    Counts VIII and IX: RUSM Misrepresented the Existence of a Policy — "to Comply"**

   **A.     Fraud by Commission (False Statement).**

The statement does not contain the term "will" comply, it merely states "It is [RUSM's] policy ... to comply." RUSM's argument attempts to morph the representation from a statement of fact into a statement of intent. Where is the policy? There is no policy. CSMF ¶¶ 70, 103. Without this, RUSM faculty are free to choose when to ignore and when to act against the disabled.

   **B.     Fraud by Omission (Selective Compliance).**

RUSM asserts without elaboration that it would comply "as applicable and practical." RUSM seems to be attempting to isolate the phrase "as applicable and practical" from "It is the policy." RUSM's contention is irrelevant because the targeted audience were prospective students. If RUSM faculty did have a 'policy to comply' with the ADA—which it did not—RUSM omitted that its faculty did not have to comply with the ADA with respect to its students. CSMF ¶ 103.

### C.    "Justifiable" Reliance is Not an Element for Fraudulent Inducement.

The "Florida Supreme Court has held, 'Justifiable reliance is not a necessary element of fraudulent misrepresentation.' The relevant element of the claim only requires 'consequent injury by the party acting in reliance on the representation,' and not justifiable reliance." *Dantzler, Inc. v. PNC Bank, National Ass'n*, 946 F. Supp. 2d 1344, 1358 n.8 (S.D. Fla. 2013) (quoting *Butler v. Yusem*, 44 So.3d 102, 105 (Fla.2010)).

"Under Florida law, fraudulent misrepresentation and negligent misrepresentation involve different elements, especially with respect to justifiable reliance." *Specialty Marine Indus. v. Venus*, 66 So. 3d 306, 310 (Fla. Dist. Ct. App. 2011). "In contrast, a claim for negligent misrepresentation under Florida law requires a showing that the recipient of the information justifiably relied on the erroneous information. ... [J]ustifiable reliance on a representation is not the same thing as failure to exercise due diligence. Therefore, a misrepresenter is precluded from arguing that the recipient of information did not justifiably rely because he or she failed to conduct an adequate independent investigation." *Id.* (citing *Butler v. Yusem*, 44 So.3d 102, 105 (Fla.2010)).

"[T]here is no requirement that [plaintiff's] reliance on [defendant's] misrepresentations be the sole or even the predominant cause of [plaintiff's] decision to purchase the property if his reliance is a substantial factor in determining the course of conduct that results in his loss." *Id.* at 311 (internal quotation omitted). *See also* CMSF ¶¶ 4, 5; [ECF No. 115] at ¶ 38(i).

## VIII.   Count IX: Breach of Fiduciary Duty

19

Plaintiff did not contend that his status as a student is what created the duty. The RUSM Counseling Center, owed Plaintiff a fiduciary duty because (1) he was a patient there receiving mental health treatment and reposed information in confidence, *see* CSMF at ¶¶ 51, 59, 63; and (2) an ongoing duty to act on Plaintiff's behalf was created by the ROI Agreement, *id.* at ¶ 67, 68.

## IX.    Judicial Notice of Facts for the Lost Earning Capacity of a Contractual MD Degree

RUSM's argument is misplaced because "[t]he purpose of a jury's award of future economic damages is to compensate a plaintiff for the loss of capacity to earn income as opposed to actual loss of future earnings." *Miami-Dade County v. Cardoso*, 963 So. 2d 825, 827 (Fla. Dist. Ct. App. 2007). A private universities "relationship" with a student is "essentially a contract." *Sharick v. Southeastern University*, 780 So. 2d 136, 139 (Fla. Dist. Ct. App. 2000). By dismissing Plaintiff, he "may recover the **value of his contract**, and this may be measured by the value of the expected profits." *Id.* at 140 (emphasis added). "Mathematical precision in fixing the exact amount is not required." *Id.* "Accordingly, the extent or amount of the resulting impairment to [plaintiff's] earning capacity may be determined by a jury based upon reasonable inference." *Id.* Plaintiff respectfully refers the Court to Plaintiff's Request for Judicial Notice in Support of His Response in Opposition to Defendant's Motion for Summary Judgment, filed concurrently herewith.

## X.    Punitive Damages

The Florida Supreme Court held, "we explicitly stated that punitive damages are appropriate for any tortious conduct accomplished through fraud." *First Interstate Dev. v. Ablanedo*, 511 So. 2d 536, 538-39 (Fla. 1987). "[O]nly a preponderance or greater weight of the evidence is required to establish fraud, whether the action is at law or in equity." *Wieczoreck v. H H Builders, Inc.*, 475 So. 2d 227, 228 (Fla. 1985). "In this state, a negligent misrepresentation is considered tantamount to actionable fraud." *Ostreyko v. B.C. Morton Organization*, 310 So. 2d 316, 318 (Fla. Dist. Ct. App. 1975).

20

## CONCLUSION

Plaintiff Oluwamuyiwa Awodiya respectfully requests that this Court enter an Order: (i) denying Defendant's Ross School of Medicine, School of Veterinary Medicine Limited Motion for Summary Judgment [ECF No. 120]; (ii) granting Plaintiff's Second Motion for Partial Summary Judgment [ECF No. 102]; and (iii) granting Plaintiff such other and further relief as the Court deems just and proper.

DATED this 20th day of January, 2019:

Respectfully submitted,

By: Oluwamuyiwa Awodiya, *pro se* litigant
15005 Dahlia Dr.
Bowie, MD 20721
(240) 602-1836
Plaintiff, in Proper Person

21

## CERTIFICATE OF SERVICE

I do hereby certify that on this 22nd day of January, 2019, I have caused a true and correct copy of the foregoing by mailing a copy to the Court, where the Court's CM/ECF system will send notification to the following:

**Ryan Roman**
Akerman Senterfitt
Suntrust International Center
1 SE 3rd Avenue
25th Floor
Miami, FL 33131-1714
305-374-5600
Fax: 305-374-5095
Email:
ryan.roman@akerman.com

**Octavia Monique Green**
Akerman LLP
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, FL 33131
(305) 982-5670
Email:
octavia.green@akerman.com

By: Oluwamuyiwa Awodiya, *pro se* litigant