# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

FILED BY _____ *tt* _____ D.C.

JAN 2 8 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

|  |  |  |
|---|---|---|
| OLUWAMUYIWA AWODIYA, | ) | Case No.   0:18-cv-60482-KMM |
| *Plaintiff,* | ) |  |
|  | ) |  |
| -v- | ) |  |
|  | ) | Hon. Chief Judge: K. Michael Moore |
| ROSS UNIVERSITY SCHOOL OF | ) | Magistrate Judge: Alicia O. Valle |
| MEDICINE, SCHOOL OF | ) |  |
| VETERINARY MEDICINE LIMITED | ) |  |
| *Defendant.* | ) |  |

## DECLARATION OF OLUWAMUYIWA AWODIYA IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1.     Pursuant to 28 U.S.C. § 1746, I, Oluwamuyiwa Awodiya, as plaintiff, in proper person, of the above-captioned action, make this declaration in support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment [ECF No. 120]. I am over 18 years of age and I am competent to testify about the matters discussed herein.

2.     A true and correct copy of excerpts McMillan Cuffy's Deposition transcript is are attached as Exhibit RJ-01.

3.     A true and correct copy of Davendranand Sharma's deposition transcript is attached as Exhibit RJ-02.

4.     A true and correct copy of Matthew Stewart-Fulton's deposition transcript is attached as Exhibit RJ-03.

5.     A true and correct copy of Bryan Hayse's deposition transcript is attached as Exhibit RJ-04.

1

6.     A true and correct copy of a January 19, 2016 email from Plaintiff to Dr. Sharma, is attached as Exhibit RJ-05.

7.     A true and correct copy of excerpts of the May 2016 student handbook is attached as Exhibit RJ-06.

8.     A true and correct copy of a April 13, 2017 dismissal letter from the Office of the Registrar is attached as Exhibit RJ-07.

9.     A true and correct copy of a June 1, 2017 dismissal letter from Niels Larsen, Chair of the Student Promotions Committee is attached as Exhibit RJ-08.

10.     A true and correct copy of a June 1-12, 2017 email chain between Plaintiff and Niels Larsen is attached as Exhibit RJ-09.

11.     A true and correct copy of excerpts from the "2015-2016, Vol. 7" academic catalog that was published in September 2015 is attached as Exhibit RJ-10.

12.     A true and correct copy of excerpts from the "2015-2016, Vol. 7" academic catalog that was republished in May 2016 is attached as Exhibit RJ-11.

13.     A true and correct copy of excerpts from the "2016-2017, Vol. 8." academic catalog that was published in November 2016 is attached as Exhibit RJ-12.

14.     A true and correct copy of Plaintiff's Mental Status Exams are attached as Exhibit RJ-13.

15.     A true and correct copy of the RUSM Office of Career Attainment reported Step 1 scores for RUSM students is attached as Exhibit RJ-14.

16.     A true and correct copy of Plaintiff's United States Medical Licensing Examination ("USMLE") Step 1 Score Report is attached as Exhibit RJ-15.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate.

EXECUTED ON this 20th day of January, 2018:

Respectfully submitted,

By: Oluwamuyiwa Awodiya, *pro se* litigant
15005 Dahlia Dr.
Bowie, MD 20721
(240) 602-1836
Plaintiff, in Proper Person

# Exhibit RJ-01

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 0:18-cv-60482-KMM


OLUWAMUYIWA AWODIYA,

                Plaintiff,

vs.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

                Defendant.
_____/


                        350 E. Las Olas Blvd.
                        Fort Lauderdale, Florida
                        December 4, 2018
                        1:27 p.m.


THE VIDEOTAPED DEPOSITION OF

MCMILLAN CUFFY


Taken on Behalf of the Plaintiff

Pursuant to Notice of Taking Deposition

Commencing at 1:27 p.m.

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

## Page 2

1  APPEARANCES:
2
   On behalf of Plaintiff:
3
   15005 Dahlia Drive
4  Bowie, MD 20721
   (240)602-1836
5  BY: OLUWAMUYIWA AWODIYA, PRO SE, ESQ.
6
   On behalf of Defendant:
7
   AKERMAN, SENTERFITT
8  1 SE 3rd Avenue, 25th Floor
   Miami, FL 33131-1714
9  (305)374-5600
   ryan.roman@akerman.com
10 BY: RYAN ROMAN, ESQ.
11 ALSO PRESENT:
12 TODD COHEN (Videographer)
   VERITEXT
13
   VALARIE BOMAR, ESQ.
14 ADTALEM GLOBAL EDUCATION
15 REPORTED BY:
16 KELLY A. ESPOSITO
   ALPHA & OMEGA REPORTING SERVICES, INC.
17 1776 E. Sunrise Boulevard, First Floor
   Ft. Lauderdale, FL 33304
18 954.523.6422
19       * * * * *
20       STIPULATIONS
21       It is stipulated and agreed by and between
22 counsel for the respective parties that:
23       Reading and subscription of the deposition
24 by the witness are not waived.
25

## Page 3

1       I N D E X
2
   Examination            Page
3
4  Direct    By Mr. Awodiya:      6
   Cross     By Mr. Roman:       80
5  Redirect   By Mr. Awodiya:     105
6       PLAINTIFF EXHIBITS
7  No.                    Page
8  1    Counseling Center Note    15
        dated 12.8.15
9  2    Note dated 12.8.15        21
   3    E-mail dated 12.9.15      24
10 4    Counseling Note dated     32
        12.9.15
11 5    Counseling Note dated     52
        2.17.16
12 6    Counseling Note dated     61
        12.13.15
13
14      DEFENSE EXHIBITS
15 No.                    Page
16 7    Counseling Note dated     86
   8    Counseling Note dated     87
17      12.11.15
   9    Referral Form dated 1.18.16  91
18 10   Counseling Note dated     95
        3.24.16
19
   11   Counseling Note dated     96
20      4.11.16
   12   Counseling Note dated     98
21      4.20.16
   13   Counseling Note dated 5.5.16  99
22 14   Safety Plan            100
   15   Release of Information    102
23      Consent
24
25

## Page 4

1  Thereupon, the following proceedings were had.
2       THE VIDEOGRAPHER:  Good afternoon.  We are
3  going on the record at 1:27 p.m. on the date of
4  December 4th, 2018.  Please note that the
5  microphones are sensitive and may pick up
6  whispering, private conversations, and cellular
7  interference.  Please turn off all cell phones
8  or place them away from the microphones, as
9  they can interfere with the deposition audio.
10 Audio and video recording will continue to take
11 place unless all parties agree to go off the
12 record.
13      This is Media Unit No. 1 of the video
14 recorded deposition of McMillan Cuffy in the
15 matter of Oluwamuyiwa Awodiya versus Ross
16 University, School of Medicine, School of
17 Veterinary Medicine Limited.  The case has been
18 filed in the United States District Court for
19 the Southern District of Florida.  Case number
20 is 01:8-cv-60482-KMM.
21      The deposition today is being held at
22 Akerman Senterfitt, located at -- I'm sorry.
23 Located at 350 East Las Olas Boulevard in Fort
24 Lauderdale, Florida.  My name is Todd Cohen.
25 I'm with the firm of Veritext.  I'm the

## Page 5

1  videographer.  Our court reporter today is
2  Kelly Esposito with Alpha & Omega Reporting.
3       At this time may I please have all parties
4  in the room announce their appearances and
5  affiliation to the record.  If there are any
6  objections to proceeding, please state them at
7  the time of your appearance beginning with the
8  noticing attorney.
9       MR. ROMAN:  Ryan Roman of Akerman on
10 behalf of Ross University School of Medicine,
11 and with me is Valerie Bomar from Ross
12 University.
13      MR. AWODIYA:  Oluwamuyiwa Awodiya, and I'm
14 the plaintiff in this case.
15 Thereupon:
16      MCMILLAN CUFFY
17 a witness named in the notice heretofore filed,
18 being of lawful age and having been first duly
19 sworn, testified on his oath as follows:
20      THE WITNESS:  Yes, I do.
21      MR. ROMAN:  And while Mr. Awodiya is just
22 setting up his camera, I would just make the
23 same statement for the record that I made in
24 the last deposition, which is that we object to
25 the use of the camera to record the deposition

2 (Pages 2 to 5)

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 6

1   to the extent that it's being recorded by a
2   party with an interest in the case rather than
3   a disinterested videographer, and I would note
4   for the record that there is a videographer
5   here from Veritext, but you may proceed.
6          DIRECT EXAMINATION
7   BY MR. AWODIYA:
8   Q.  Please state your full name for the
9   record?
10  A.  McMillan Cuffy.
11  Q.  Great.  I would like to thank you for
12  traveling all the way here.  I know it takes a lot
13  of your time.  I really appreciate it.
14         May I call you Mr. Cuffy?
15  A.  That's fine.
16  Q.  Mr. Cuffy, my name is Oluwamuyiwa Awodiya,
17  and I'm the plaintiff in this case against Ross
18  University School of medicine.  During this
19  deposition, I will, in most part, refer to myself as
20  plaintiff.
21         For the record, do you understand that if
22  I say "plaintiff" that I'm referring to myself?
23  A.  Yes, I do.
24  Q.  Additionally, let me tell you some ground
25  rules for this deposition.  And if you have any

Page 7

1   questions, you can ask me.
2          First, you are under oath and have sworn
3   to tell the truth.  The effect of that truth is the
4   same as if you were testifying in court.  If I ask
5   you a question that you don't understand, tell me
6   you don't understand it, and I'll rephrase it as
7   often as necessary so you're comfortable that you
8   understand the question you're answering.
9          It's also very important that you answer
10  my questions through spoken word, not through facial
11  expressions or gestures.  Please refrain from
12  answering questions with sounds like "uh-uh" or
13  "hmm-hmm" or words that may not get transcribed
14  accurately.  You must actually say a word.  If you
15  mean yes, say yes, not uh-huh.
16         Also, please allow any questions and any
17  objections to be fully stated before you speak.  The
18  court reporter cannot take down more than one person
19  speaking at the same time; otherwise, the record
20  will be jumbled and the questions and answers will
21  be disjointed.
22         Ross lawyers may make objections to
23  questions that I ask you.  They are objections for
24  the judge to consider later.  You are still required
25  to answer the question unless you are instructed not

Page 8

1   to by their lawyers.
2          Everything that is said is being taken
3   down by the court reporter verbatim.  You will have
4   an opportunity to read the deposition transcript and
5   make corrections you believe are necessary.  If you
6   make changes in the -- in your testimony that are
7   inconsistent with the answers given during this
8   deposition, I will be entitled to comment on those
9   discrepancies at trial to question your
10  truthfulness.
11         Do not guess when providing your
12  responses.  Instead, please provide your best
13  estimate based on your recollection.  If you need to
14  take a break at any time, please let me know.  All I
15  ask is that we not take a break while there's a
16  question pending.
17         Are you here today under the influence of
18  any medication or suffering from any physical,
19  mental, emotional condition that would affect your
20  ability to hear my questions or to give truthful
21  answers?
22  A.  No, sir.
23  Q.  Thank you.
24         Do you frequently come to the U.S.?
25  A.  Not frequently.

Page 9

1   Q.  When's the last time you've been?
2   A.  I passed through two weeks ago.
3   Q.  Two weeks ago?
4   A.  Passed through, yes.
5   Q.  Do you have any visa or citizenship in the
6   U.S. or is -- will it be difficult for you to come
7   back to the U.S. during trial?
8   A.  It depends.  It all depends on what time.
9   Q.  Let's say March.
10  A.  I'm not sure yet.
11  Q.  You're not sure?
12         When did you start working for Ross?
13  A.  February 2010.
14  Q.  2010.
15         And what was your role?
16  A.  Counselor.  Mental health counselor.
17  Q.  When did you first hear about this
18  lawsuit?
19  A.  I believe it was somewhere around October,
20  was it?
21  I'm not sure.  I think it was a couple of
22  months back.  Yeah.
23  Q.  October of this year?
24  A.  We're in December now.  October,
25  September.  Somewhere.  I'm not sure.  Could be.

3  (Pages 6 to 9)

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

| Page 22 | Page 24 |
|---|---|

**Page 22**

1  you --
2      MS. BOMAR: She marked it.
3      MR. ROMAN: Is that December 8 or 9?
4  That's December 8.
5      MR. AWODIYA: I didn't give him
6  December 9.
7      MR. ROMAN: Okay. So you don't want to
8  mark it.
9      MR. AWODIYA: Yeah.
10     MR. ROMAN: Okay. No worries. I just
11 wanted to make sure.
12 BY MR. AWODIYA:
13     Q.  Please see –
14     MR. ROMAN: So that's 135.
15     THE WITNESS: Yes, sir.
16 BY MR. AWODIYA:
17     Q.  Were you able to read the document?
18     A.  Yes, sir.
19     Q.  Does this reflect anything about your
20 statement about who contacted who in regards to you
21 and plaintiff?
22     MR. ROMAN: I'll just object since it
23 doesn't appear that Cuffy -- Mr. Cuffy is on
24 that note, but you can answer to the extent you
25 know.

**Page 24**

1      Q.  Who set that up?
2      A.  Who set up what?
3      Q.  That meeting.
4          Did you reach out to him or did he reach
5  out to you?
6      A.  The plaintiff came in to me.
7      Q.  The plaintiff reached out to you?
8      A.  I think -- from my recollection, I think
9  the plaintiff came to the office.
10     Q.  Please see Exhibit Cuffy 3. Please take
11 your time to read that one.
12         (Thereupon, the referred-to document was
13         marked by the court reporter for
14         Identification as Plaintiff's Exhibit 3.)
15     THE WITNESS: Yes.
16     MR. ROMAN: I just make the same objection
17 as last time, that Mr. Cuffy didn't send or
18 receive the e-mail, but you may ask questions.
19 BY MR. AWODIYA:
20     Q.  This document says that you were the
21 on-call counselor on December 8th?
22     A.  Yes.
23     Q.  And that plaintiff's "mother was concerned
24 after student failed an exam by one point. He was
25 threatening to harm himself. I called Jennifer

| Page 23 | Page 25 |
|---|---|

**Page 23**

1      THE WITNESS: How to respond? I was not
2  the one who send that note. I'm not -- I was
3  not the one who send that note. I don't know
4  the interaction of the client and this -- and
5  the therapist.
6  BY MR. AWODIYA:
7      Q.  So you played no role between Jeannie
8  Robertson and Jennifer Swaim prior to your first
9  meeting with plaintiff in regard to him and his
10 thoughts?
11         Let me rephrase.
12         Did anyone contact you before plaintiff
13 about coming to see you because of his thoughts that
14 he was having?
15     A.  I can't recall.
16     Q.  Did someone send you to plaintiff?
17     A.  I'm not sure what you're asking.
18     Q.  Before your first meeting, did someone
19 send you to engage with plaintiff?
20     A.  Not that I can recall.
21     Q.  But you can recall that plaintiff came to
22 you first?
23     A.  My first interaction with plaintiff was
24 when he came into the office -- to my office to see
25 me as a client.

**Page 25**

1  Swaim at the counseling center in Dominica let her
2  know -- and let her know of the situation. She
3  referred the issue to Cuffy."
4          This was by a Ms. Jeannie Robertson.
5          Does that statement cause you to remember
6  anything else about your first meeting with
7  plaintiff?
8      A.  As I said, the plaintiff came in to me
9  with an emotional distress, and that was my
10 interaction with the plaintiff. That was around
11 December 8th, same time that I first met the
12 plaintiff. That's what I recall.
13     Q.  Earlier you said there was no other reason
14 aside from the relationship problems.
15     A.  From my recollection, the plaintiff
16 presented with me. What he presented on that
17 meeting was that he was having emotional distress.
18 That's what I recall.
19     Q.  So are you saying you're not sure?
20     A.  That's what I recall. That's what I'm
21 saying.
22     Q.  So none of these documents trigger your
23 memory about any academic problems in your first
24 meeting with plaintiff?
25     A.  To answer the question, let me refer to

7  (Pages 22 to 25)

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 38

1      MR. ROMAN:  Sure.  Why don't we go off the
2  record for a second.
3      MR. AWODIYA:  Let's take a quick break.
4      THE VIDEOGRAPHER:  Going off Media Unit 1.
5  Going off at 2:48 p.m.
6      (Whereupon, a break was taken.)
7      THE VIDEOGRAPHER:  We are now back on
8  Media Unit 1.  The time back on is 2:53 p.m.
9  BY MR. AWODIYA:
10     Q.  Let's go to January 2016.  First, I want
11  to ask you about your role in the counseling center.
12     Have you ever helped a student get
13  academic accommodations?
14     A.  As a counselor, I have supported a
15  student's request for academic accommodations, yes.
16     Q.  So how would you do that?
17     A.  If the student has a mental health issue
18  that is consistent with a request of -- for academic
19  accommodations, the student usually ask his
20  therapist to provide a letter of support to the
21  student affairs for academic accommodations.
22     Q.  Do you put what type of accommodation
23  might be appropriate?
24     A.  Can you repeat, please?
25     Q.  Do you indicate what type of accommodation

Page 39

1  might be appropriate, such as extended testing time
2  or a separate room?
3      A.  Yes, based on what -- based on the
4  student's mental health condition or -- yes, we
5  would.  On that letter, we would state that, yes.
6      Q.  Any counselor can do that?
7      A.  A mental health counselor, yes, in the
8  counseling center.
9      Q.  I have a bunch of questions for you then.
10     Do you remember all the documents that
11  plaintiff gave you in January 2016 about his ADHD?
12     A.  From my recollection, the plaintiff
13  presented one document to me when he returned from
14  the U.S.  It was, I think, a Conners.
15     Q.  From your recollection?
16     A.  Yes.
17     Q.  Was it in an envelope?  Was it —
18     A.  I can't recall the specifics.
19     Q.  Did he tell you the name of his
20  psychiatrist in the U.S.?
21     A.  No, I don't think he did.  At least, I
22  can't remember.
23     Q.  So what did you do after he gave you the
24  ADHD assessment?
25     A.  If my memory serves me right, the document

Page 40

1  presented -- I think we -- I think the client told
2  me that he had an assessment done in the U.S.  The
3  plaintiff said he had an assessment done in the U.S.
4  At that point, I cannot recall exactly what happened
5  further to that discussion.  I know that at some
6  point the plaintiff saw Dr. Sharma.  I could have
7  referred the client.  I'm not sure if I was the one
8  who did the actual referral or the plaintiff
9  actually went to Dr. Sharma, but I think that there
10  was some meeting with Dr. Sharma subsequent to that.
11     Q.  Did plaintiff tell you that his ADHD was
12  causing him academic problems?
13     A.  From what I recall, the plaintiff told me
14  that he had an assessment done in the U.S.  As to
15  the -- the specifics of that conversation then, I
16  would -- I can't recall all the specifics.
17     Q.  What would you have done if he said that
18  his ADHD was causing him academic problems?
19     A.  So as a standard of practice, I would have
20  looked at the documents presented.  Based on the
21  protocol for ADHD, if the documentation was
22  insufficient, we would recommend and suggest to
23  the -- to the patient, whoever the patient is, or in
24  that case, the plaintiff, that he needs to get a
25  full assessment for ADHD.

Page 41

1      So if he presented to me and said that it
2  was causing problem -- academic problems, more than
3  likely, based on standard procedure, I would move
4  forward to ensure that he had proper documentation.
5  And in that case, if he doesn't have it, to ensure
6  that he gets the rest of the testing done, whatever
7  test he needs to do, for ADHD.
8      Q.  Would you contact the doctor that did the
9  assessment?
10     A.  Would I?
11     Q.  Would you?
12     A.  Contact?
13     Q.  The doctor that did the assessment.
14     A.  Well, you would have to be referred.  The
15  plaintiff would have to be referred.  So the way
16  that works is, there's a test of -- the T.O.V.A.,
17  that one counselor did.  So more than likely the
18  client would have had to do that.  In that case, the
19  plaintiff would have to do a T.O.V.A., that's a test
20  of Variability Assessment, as part of the battery of
21  assessments for the ADHD assessment.
22     Q.  Prior to that, once a student brings you
23  the ADHD assessment and tells you their doctor, will
24  you contact that doctor to get a better picture of
25  the assessment, if you believed the documents were

## Page 42

1  insufficient?
2      A.  Not at that point.  Not on the
3  preliminary -- not necessarily on that first
4  contact.  However, as I said, in obtaining
5  sufficient documentation, if we felt that -- if
6  we're not taking him for the entire battery of
7  tests.
8      THE COURT REPORTER:  I'm sorry?  Say that
9  again.
10      THE WITNESS:  If we're not taking him for
11  the entire battery of tests, then the fact that
12  you saw your doctor overseas, we could have
13  asked the plaintiff himself to contact his
14  doctor and get it -- get the documentation or
15  get the plaintiff to make arrangements to get
16  that documentation to us.  That's the normal
17  procedure, ask the, in that case, the plaintiff
18  to get the documentation.
19  BY MR. AWODIYA:
20      Q.  Would a phone call work?
21      A.  No.  We would -- normally, as I said, we
22  would ask the plaintiff in that case to contact his
23  physician, his primary care, to get the
24  documentation and present it to us.
25      Q.  Did you believe that plaintiff's

## Page 43

1  documentation that was given to you was
2  insufficient?
3      A.  From my recollection, the plaintiff
4  provided me with one document.  In my view, yes, it
5  would be insufficient.
6      Q.  What if he told you he gave you more?
7      A.  I would have to refer to my notes.
8      Q.  So continue where you left off about the
9  battery of tests.  Once -- once you do your own set
10  of tests for the ADHD, and it determines that a
11  student does, in fact, have some type of problem,
12  what do you do next?
13      A.  If the student -- if the test suggests
14  that the student has ADHD, as a counselor, my next
15  step would be to refer the -- in that case, the
16  plaintiff to the psychiatrist.
17      Q.  Did plaintiff tell you that he requested
18  accommodations from any other faculty?
19      A.  I can't recall.
20      Q.  Do you recall calling any other faculty
21  about academic accommodations for plaintiff?
22      A.  I can't recall having any conversation
23  with the plaintiff about accommodations.  I can't.
24      Q.  What do you know about plaintiff's ADHD
25  and how it affects him?

## Page 44

1      A.  You're talking about specifically about
2  the plaintiff?
3      Q.  Yes.
4      A.  From my recollection, you know, I remember
5  when the plaintiff -- that was January 11th or so
6  when the plaintiff returned to the states and
7  presented, you know, whatever documentation from his
8  primary care.  I remember that conversation, that
9  session, you know.  I remember there was a
10  discussion -- well, my notes reflected a T.O.V.A.
11  was done at some point.  T.O.V.A, T-O-V-A.  That's a
12  test of variability assessment.  Variability
13  assessment.  I can't recall anything much more, in
14  terms of ADHD with the plaintiff.  Most of my
15  interaction was around the relationship distress.
16  That's what I recall.
17      Q.  Did he talk about his exams with you?
18      A.  Yes.  There was some discussions about,
19  you know, grades.  I can remember specifically from
20  that January semester, yes, because I would always
21  ask.  I would always ask about his grades.
22      Q.  Would you ask about anything else?
23      A.  I recall asking about his grades.
24      Q.  You say you always ask.
25      Do you always ask anything else as part of

## Page 45

1  routine?
2      A.  It depends on what was presented, but
3  because at that time the issue of ADHD was
4  introduced in our conversations in January, it was
5  just prudent to ask the plaintiff about his academic
6  performances.  So in that context, yes, I would ask.
7      Q.  Do you have access to Dr. Sharma's notes
8  when you see clients?
9      A.  Yes.  Through the EHR, the electronic
10  health records, yes.
11      Q.  Do you typically review those records
12  before seeing a plaintiff -- before seeing a client?
13      A.  Sometimes.
14      Q.  Sometimes?
15      THE VIDEOGRAPHER:  I just have to change
16  real quick.  So let me know when you get to a
17  good breaking point.
18      MR. AWODIYA:  (Nod in the positive.)
19  BY MR. AWODIYA:
20      Q.  So did you think that his ADHD was playing
21  any part in his academics?
22      A.  When exactly?  What period are we talking
23  about?
24      Q.  Any time you knew about his ADHD.
25      A.  Quite frankly, my recollection of my

Alpha & Omega Reporting Services, Inc.
(954) 523-6422

Page 66

1    A. I recall -- I recall the client -- the
2  plaintiff wanting to have meetings with student
3  affairs to discuss his grades. Yes, I do recall
4  that.
5    Q. Where does this negotiation part come
6  from?
7    A. Because I recall that in our meetings that
8  the plaintiff did entertain the idea of speaking to
9  Dr. Hayes about how he could get that one point he
10  needed to pass the semester.
11    Q. Okay. That sounds good. Okay. So now
12  let's continue.
13    So the next month he came back to you with
14  an ADHD assessment from the U.S., correct?
15    A. That conversation was in January, yes.
16    Q. Please turn to the document that says
17  January 11th.
18    A. Yes.
19    Q. And this one he brought his ADHD
20  assessment to you. And then, on the clinical
21  assessment you put "Academic problems; repeating
22  Semester 5."
23    A. Yes.
24    Q. Did that indicate to you that he was
25  having academic problems because of the ADHD?

Page 67

1    A. No.
2    Q. So what does this mean?
3    A. It means that the client, repeating
4  Semester 5, was, in fact, having academic problems.
5  The fact that he presented a document to me stating
6  that he saw his primary care provider and provided
7  one document does not confirm a diagnosis of ADHD.
8  So at that point, what was presenting then is
9  academic problems. I did not have a diagnosis of
10  ADHD at that time except that document.
11    Q. Let's forget the word diagnosis. ADHD is
12  almost -- the name of it is irrelevant. We are
13  focusing on the limitations of it.
14    A. No, sir.
15    Q. So the concentration problems associated
16  with it -- whether they were diagnosed at the time
17  or not, there was a suspected concentration problem?
18    MR. ROMAN: Are you asking him a question?
19  BY MR. AWODIYA:
20    Q. That's a question.
21    A. So let me clarify. A client presenting
22  with academic problems does not automatically have
23  ADHD. Any student or any patient can present with
24  academic problems for various reasons. Up until
25  then, even when the -- the plaintiff presented to me

Page 68

1  on the 11th with that document -- and I recall the
2  documentation was insufficient.
3    And you said, "Let's forget about
4  diagnosis." I cannot forget about a diagnosis. As
5  a clinician, I have to speak to diagnosis, and I'm
6  saying to you that it is very -- and it is very,
7  very important to state that on the 11th of January,
8  during my intervention with you, you presented an
9  assessment from your primary care. Based on the
10  protocol at Ross, it was deemed that you did not
11  have sufficient documentation to have a diagnosis
12  for ADHD.
13    So on this document I could not put ADHD;
14  hence, my reason for putting academic problems.
15    Q. So the documentation just suggested ADHD;
16  is that what you're saying?
17    A. It's not suggesting.
18    Which one? Which one? The one you
19  presented?
20    Q. Yes.
21    A. The documentation that you provided was an
22  assessment that are used by clinicians to -- as part
23  of the diagnosis for ADHD.
24    Q. What did that document tell you?
25    A. The Conners indicated that you had ADHD.

Page 69

1  It indicated that.
2    Q. So why was that document insufficient?
3    A. It was insufficient based on the protocol
4  of the university -- the Ross University School of
5  Medicine.
6    Q. What's the protocol?
7    A. The protocol is this. You must meet a
8  certain documentation criteria. It could be an
9  initial assessment, like what was presented by the
10  plaintiff as an initial assessment, like the
11  Conners.
12    The T.O.V.A. that we referred to, the Test
13  of Variability Assessment, was part of our protocol.
14  We have that on a form that -- where it is sent to
15  either the client's family or teacher or somebody
16  that knew them at a very young age, because
17  according to the DSM-5 diagnosis now, the symptoms
18  must be present on or before age 12.
19    Okay. So we have that document that has
20  to be sent up and -- and, basically, the person
21  speaking to symptoms that were presented, whether it
22  was in a classroom setting or a home setting.
23    So there's a lot of different
24  documentations from that battery that informs
25  us before we can make a diagnosis. Hence, on the

18  (Pages 66 to 69)

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 74

1    diagnosis in January, on the 18th, what is that
2    other information that's not in this document?
3            The Conners that plaintiff brought over,
4    which were one of the documents that he gave to you,
5    was a computer test. So is the T.O.V.A. You made
6    the assessment.
7            What other information did you say that
8    you had that allowed you to make the diagnosis?
9        A.  I'm not sure if I -- I think I answered
10   that already, but I'm going to go over it anyways.
11   You came in with that document, the Conners, from
12   your primary care.
13           We would have to -- we would administer
14   CAARS, which is similar to the Conners anyway, but
15   besides the CAARS you came in -- the Conners you
16   came in with, we administered the CAARS, which is
17   also the Conners. So it's just a repetition of what
18   you had. And then, the T.O.V.A. And then, that
19   long form I said that has to be sent to whoever is
20   the U.S., whether it's your teacher or a parent,
21   that can basically confirm that you had symptoms
22   consistent for diagnosis of ADHD. And combine all
23   that together, and then, the diagnosis was done.
24           Am I answering your question?
25       Q.  Okay. So where's that form?

Page 75

1        A.  Should be in your records. I'm not sure.
2    Normally what would happen is that these results --
3    these results would be scanned into your records.
4    So I'm not sure if -- it should be there. I don't
5    know. As I said, I was [sic] the only one who
6    administered the T.O.V.A. So, I don't know. Amanda
7    Massacult is the one who does ADHD assessment. So,
8    I don't know. It should be in your form -- it
9    should be in your records.
10       Q.  You remember seeing that document?
11       A.  Which one?
12       Q.  The one you're referring to now about the
13   form, getting family members and --
14       A.  No, I can't remember seeing that
15   particular form. I'm listing the procedure, right?
16   That's the standard protocol for you or any anybody
17   who presents with -- that is tested for ADHD. So
18   I'm telling you what protocol is, but, no, I can't
19   recall seeing that extensive form, no.
20       Q.  Are you saying that you must have had --
21       A.  I'm saying that --
22       Q.  -- seen that to make the diagnosis?
23       A.  I'm saying that is standard -- no, no. I
24   don't have to see that form. I'm just telling you
25   what the standard procedure is.

Page 76

1        Q.  So even though it's standard procedure,
2    that doesn't make it required; is that --
3        A.  It's a requirement. It's a protocol.
4    That is protocol that we use to diagnosis ADHD. So
5    it would form part of your -- of your battery of,
6    you know, assessments.
7        Q.  So in making your diagnosis, you had
8    knowledge of the symptoms of the ADHD?
9        A.  From the 18th, yes. On the 18th.
10       Q.  On the 18th?
11       A.  At that point. That's when your -- your
12   ADHD was confirmed, yes.
13       Q.  Do you remember what some of the symptoms
14   were?
15       A.  According to the DSM-5 -- I can just go on
16   what the DSM-5 is. You know, inattention,
17   concentration problems, you know, academic problems,
18   you know, but, again, there are different -- there
19   are different subtypes of that. Your's said
20   attention deficit disorder without mention of
21   hyperactivity.
22           So there are different subtypes of ADHD.
23   Your presentation, your diagnosis, was attention
24   deficit disorder without mention of hyperactivity,
25   meaning that you did not present with the

Page 77

1    hyperactivity symptoms, okay?
2            That would be the restlessness, getting
3    up, and, you know, can't sit still and so, but there
4    was the attention deficit, meaning there were
5    attention problems.
6        Q.  Can plaintiff just tell you himself how it
7    affected him when he was a kid?
8        A.  No. No, I can't recall the plaintiff
9    telling me how --
10       Q.  No. Can.
11       A.  Can he?
12       Q.  Yeah.
13       A.  Are you talking about you specifically,
14   the plaintiff himself, or generally.
15       Q.  Instead of going to his family.
16       A.  Even though he did, the standard procedure
17   is, we would have to send that form out for somebody
18   else to confirm that it's, in fact, presented at
19   that age, because to make the diagnosis of ADHD, it
20   has to be present on or before age 12. So if --
21   even though the plaintiff would tell us, that form
22   is necessary to confirm and to put that diagnosis
23   together.
24       Q.  So the counseling center must have
25   received some type of document that said, this

Page 110

1   comp. when he knows he may have to repeat and the
2   impact on his emotional health has been pretty bad."
3        So there would be no absence, because his
4   semester is over.
5        Is getting an earlier flight home an
6   accommodation or a medical leave of absence?
7        A.  You know what?  I -- I don't really want
8   to speak to that.  This is in Dr. Sharma's notes,
9   and Dr. Sharma's decision to get you an earlier
10  flight -- I cannot speak to Dr. Sharma on his train
11  of thought on what prompted him to want to get you a
12  ticket to go home earlier.  So I don't want to speak
13  to that.
14       Q.  But you were involved in the process.  It
15  even says it in your documents.
16       A.  Yeah.  But Dr. Sharma -- I sat -- I may
17  have sat -- not me.  I did sat -- sit in that -- in
18  that meeting.  Dr. Sharma's a psychiatrist.  He was
19  making his professional assessment based on what was
20  presented to him.  I don't speak on Dr. Sharma's
21  behalf.  I think that question should be directed to
22  Dr. Sharma.
23       Q.  But Dr. Sharma was only able to
24  communicate because of this form, the release of
25  information consent agreement.

Page 111

1        A.  But you're asking me specifically about
2   the decision to buy you a ticket to go home before
3   the time that you wanted.  I don't -- Dr. Sharma has
4   to answer to that.  I don't -- I don't know why.
5   That's Dr. Sharma's document.
6        Q.  The release of information consent
7   agreement is --
8        A.  Is signed by me.
9        Q.  -- signed by you.
10       A.  Yes.
11       Q.  Which it says, information relevant to
12  academic accommodations or medical leave of absence.
13       You said that this document was for a
14  flight.  Are you now saying that --
15       A.  I did not say that.  Sorry.
16       Q.  So what was this document signed for?
17       A.  This document was signed for medical leave
18  of absence, not for a flight.
19       Q.  Absence from what?
20       A.  From school.
21       Q.  His semester was over.
22       A.  As I said, I -- I don't want to
23  miscommunicate.  I know that there is a lull between
24  the time that fifth semesters and 4X semesters
25  actually take their last exam, and there's a

Page 112

1   three-week break for studying for the comp.  So I do
2   not want to miscommunicate.  I'm not going to speak
3   to that, because I'm not sure exactly of the
4   procedure.  Maybe student affairs can better
5   speak --
6        THE COURT REPORTER:  I'm sorry?
7        THE WITNESS:  Student affairs department
8   can probably better speak to that time between
9   the final exam and the three weeks preparation
10  for the comp.  And I'm not sure, so I don't
11  want to miscommunicate on that.
12  BY MR. AWODIYA:
13       Q.  In order for Dr. Sharma to talk to Ross
14  administration, he would have to know about this
15  form; is that correct?
16       A.  Dr. Sharma knew of the form, because he
17  was involved in your management.
18       Q.  Okay.  Why does the form say "Ross
19  Administration" instead of Mr. Didier?
20       A.  You wrote that.  The plaintiff wrote that.
21       Q.  So plaintiff told you -- plaintiff
22  indicated that he wanted relevant information to
23  academic accommodations to go to Ross
24  administration?
25       A.  That's the plaintiff's handwriting.

Page 113

1   That's what you wrote.
2        Q.  So that's what he wanted?
3        A.  That's what he wrote.
4        Q.  Earlier you said that you would have
5   informed plaintiff of accommodation options, but do
6   you recall doing that?
7        A.  So I can only speak on my standard
8   practice of how we do things, okay?
9        So the protocol is that, if a student is
10  diagnosed with ADHD, in that conversation, the
11  protocol would be the referral to the psychiatrist,
12  patient education re: their options, okay, which is
13  medication.  You have the option of getting academic
14  accommodations.  So this conversation would take
15  place somewhere around that time once the diagnosis
16  is made.
17       THE COURT REPORTER:  I'm sorry?
18       THE WITNESS:  Once the diagnosis is made,
19  that conversation would happen.
20  BY MR. AWODIYA:
21       Q.  Mr. Cuffy, I don't want you to speculate.
22  I don't want you to tell me what you would typically
23  do.  I want to tell me if you recall doing what you
24  said.
25       A.  I do not recall.

29  (Pages 110 to 113)

12/4/2018    Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 114

1    MR. AWODIYA: Okay.
2    MR. ROMAN: We good? All right. I think
3    we're going to go off the record. We'll read.
4    THE VIDEOGRAPHER: Okay. Standby. We are
5    off the record at 5:03 p.m., and this concludes
6    today's testimony given by McMillan Cuffy. The
7    total number of media units used was two and
8    will be retained by Veritext.
9    (Deposition concluded at 5:03 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    ALPHA & OMEGA REPORTING SERVICES, INC.
     1776 EAST SUNRISE BOULEVARD, FIRST FLOOR
2    FORT LAUDERDALE, FLORIDA 33304
              954.523.6422
3
     Ryan Roman, Esq.
4    1 SE 3rd AVenue, 25th Floor
     Miami, Florida 33131
5
6
     Re: Oluwamuyiwa Awodiya v. Ross University School of
7    Medicine
     Case No. 0:18-cv-60482-KMM
8
9
10   Mr. Roman:
11       Enclosed please find your copy of the
     deposition of McMillan Cuffy, which was taken on
12   December 4, 2018, in the above-entitled case. Also
     attached are forms of Affidavit and an Errata Sheet
13   to be completed by the deponent when reading your
     copy of the deposition. These forms are
14   self-explanatory.
15       After the deponent has completed these
     forms, please return them to me at the above address
16   for inclusion in the original transcript.
17       Thank you for your cooperation,
18
19
20   Kelly A. Esposito
     Kelly A. Esposito
21
22
23
24
25

1    CERTIFICATE OF OATH
2
     STATE OF FLORIDA   )
3
     COUNTY OF BROWARD   )
4
         I, the undersigned authority, certify that
5    MCMILLAN CUFFY personally appeared before me and was
     duly sworn.
6        WITNESS my hand and official seal this
     7th day of December, 2018.
7
8
     KELLY A. ESPOSITO
9    Notary Public, State of Florida
     My Commission No. GG248978
10   Expires: 9/3/2022
11   + + + + + + + + + + + + + + + +
12          CERTIFICATE
13   STATE OF FLORIDA   )
14   COUNTY OF BROWARD   )
15       I, KELLY A. ESPOSITO, do hereby certify
     that I was authorized to and did stenographically
16   report the foregoing deposition of MCMILLAN CUFFY;
     that a review of the transcript was requested; and
17   that the transcript is a true record of my
     stenographic notes.
18       I FURTHER CERTIFY that I am not a
     relative, employee, attorney, or counsel of any of
19   the parties, nor am I a relative or employee of any
     of the parties' attorney or counsel connected with
20   the action, nor am I financially interested in the
     action.
21   Dated this 7th day of December, 2018.
22
     Kelly A. Esposito
23   KELLY A. ESPOSITO
24
25

1           ERRATA SHEET
2    OLUWAMUYIWA AWODIYA V. ROSS UNIVERSITY SCHOOL OF
     MEDICINE
3    Deponent: McMillan Cuffy
     Date of: December 4, 2018
4    Case No.: 0:18-cv-60482-KMM
5    Page _____ Line _____
     Now Reads: _____
6    Should Read: _____
     Reason for Change: _____
7
     Page _____ Line _____
8    Now Reads: _____
     Should Read: _____
9    Reason for Change: _____
10   Page _____ Line _____
     Now Reads: _____
11   Should Read: _____
     Reason for Change: _____
12
     Page _____ Line _____
13   Now Reads: _____
     Should Read: _____
14   Reason for Change: _____
     Page _____ Line _____
15   Now Reads: _____
     Should Read: _____
16   Reason for Change: _____
17
     Page _____ Line _____
18   Now Reads: _____
     Should Read: _____
19   Reason for Change: _____
20   Page _____ Line _____
     Now Reads: _____
21   Should Read: _____
     Reason for Change: _____
22
         Under penalties of perjury, I declare that I
23   have read the foregoing transcript, and together
     with any changes made above the facts stated herin
24   are true.
25   Date: _____ Signature: _____

30  (Pages 114 to 117)

# Exhibit RJ-02

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 0:18-cv-60482-KMM


OLUWAMUYIWA AWODIYA,

                    Plaintiff,

vs.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

                    Defendant.
_____/


                              350 E. Las Olas Blvd.
                              Fort Lauderdale, Florida
                              October 16, 2018
                              12:59 p.m.


THE DEPOSITION OF


DAVENDRANAND SHARMA


Taken on Behalf of the Plaintiff

Pursuant to Notice of Taking Deposition

Commencing at 12:59 p.m.

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

---

Page 2

1    APPEARANCES:
2
     On behalf of Plaintiff:
3
     15005 Dahlia Drive
4    Bowie, MD 20721
     (240)602-1836
5    BY:  OLUWAMUYIWA AWODIYA, PRO SE, ESQ.
6
     On behalf of Defendant:
7
     AKERMAN, SENTERFITT
8    1 SE 3rd Avenue, 25th Floor
     Miami, FL 33131-1714
9    (305)374-5600
     ryan.roman@akerman.com
10   BY:  RYAN ROMAN, ESQ.
          -and-
11        OCTAVIA GREEN, ESQ.
12
13   ALSO PRESENT:
14   VALARIE BOMAR, ESQ.
     ADTALEM GLOBAL EDUCATION
15
16   REPORTED BY:
17   KELLY A. ESPOSITO
     ALPHA & OMEGA REPORTING SERVICES, INC.
18   1776 E. Sunrise Boulevard, First Floor
     Ft. Lauderdale, FL 33304
19   954.523.6422
20        * * * * *
21        STIPULATIONS
22       It is stipulated and agreed by and between
23   counsel for the respective parties that:
24       Reading and subscription of the deposition
25   by the witness are not waived.

---

Page 3

1              I N D E X
2
     Examination                    Page
3
4    Direct    By Mr. Awodiya:         4
     Cross     By Mr. Roman:          75
5    Redirect  By Mr. Awodiya:        83
6           PLAINTIFF EXHIBITS
7    No.                    Page
8    DE-01    Counseling Note dated     8
              12.14.15
9    DE-02    Doctor's Note dated 12.30.15  9
     DE-03    Counseling Note dated    17
10            2.12.16
     DE-04    Counseling Note dated    18
11            3.11.16
     DE-05    Release of Information    30
12            Consent
     DE-06    Counseling Note dated    70
13            12.9.15
14          DEFENSE EXHIBITS
15   No.                    Page
16   DE-07    Counseling Note dated 4.5.16  79
17
18
19
20
21
22
23
24
25

---

Page 4

1    Thereupon:
2          DAVENDRANAND SHARMA
3       a witness named in the notice heretofore filed,
4    being of lawful age and having been first duly
5    sworn, testified on his oath as follows:
6          THE WITNESS:  I so swear.
7          DIRECT EXAMINATION
8    BY MR. AWODIYA:
9       Q.  Hello.  Please state your name your full
10   name for the record.
11      A.  Davendranand Sharma.
12      Q.  Thank you.
13          May I refer to you as Dr. Sharma?
14      A.  Sure.
15      Q.  Dr. Sharma, my name is Oluwamuyiwa
16   Awodiya, and I'm the plaintiff in this case against
17   Ross University School of Medicine.
18          During this deposition, I will in most
19   part refer to myself as "plaintiff" as "Muyiwa" or
20   as "Awodiya".
21          For the record, do you understand that if
22   I say, "plaintiff, Muyiwa" or "Awodiya," that I am
23   refer to myself?
24      A.  Yes.
25      Q.  Additionally, let me tell you some ground

---

Page 5

1    rules for this deposition.  And if you have any
2    questions, you can ask me.  First, you are under
3    oath and have sworn to tell the truth.  The effect
4    of that oath is the same as if you were testifying
5    in court.  If you have a question that you don't
6    understand, tell me you don't understand it, and
7    I'll rephrase it as often as necessary, so you're
8    comfortable that you understand the question you're
9    answering.
10      A.  Yes.
11      Q.  It's also very important that you answer
12   my questions through spoken word, not through facial
13   expressions or gestures.  Please refrain from
14   answering questions with sounds like uh, uh-huh,
15   uh-uh, or words that may not get transcribed
16   accurately.  You must actually say a word.  If you
17   mean yes, say yes, not uh-huh.
18          Also, please allow any questions and any
19   objections to be fully stated before you speak.  The
20   court reporter cannot take down more than one person
21   speaking at the same time.  Otherwise, the record
22   will be jumbled and the questions and answers will
23   be disjointed.  Ross lawyers -- Ross University's
24   lawyers may make objections to questions that I ask
25   you.  They are objections for the judge to consider

---

Case 0:18-cv-60482-RKA   Document 138   Entered on FLSD Docket 01/29/2019   Page 18 of 119

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 6

1    later.  You are still required to answer the
2    question unless you are instructed not to by their
3    lawyers.
4         Everything that is said is being taken
5    down by the court reporter verbatim.  You have an
6    opportunity to read the deposition transcript and
7    make corrections you believe are necessary.  If you
8    make changes in your testimony that are inconsistent
9    with the answers given during the deposition, I will
10   be entitled to comment on those discrepancies at
11   trial to question your truthfulness.
12        Do not guess when providing responses.
13   Instead, please provide your best estimate based on
14   your recollection.  If you need to take a break at
15   any time, please let me know.  All I ask is that we
16   do not take a break while there's a question
17   pending.
18        Are you here today under the influence of
19   any medication or suffering from any physical,
20   mental, or emotional condition that would affect
21   your ability to hear my questions or to give
22   truthful answers?
23        A.  No.
24        Q.  Okay.  Dr. Sharma, when did you first hear
25   about this lawsuit?

Page 7

1        A.  I think it was an e-mail that came around
2    April 2016 from Ross University's attorneys office
3    saying that you —
4         MR. ROMAN:  Hold on one second.  I'm just
5    going to object to the extent that your
6    testimony would call for any disclosure of
7    attorney/client communication.  Any
8    communication you had with an attorney for
9    Ross, I'll object on the basis of privilege,
10   and I'll instruct you not to answer those
11   questions.  You can testify about when you
12   talked to certain people, who you talked to,
13   but not the substance of communications with
14   lawyers.
15        THE WITNESS:  Sure.  I understand.
16        So April 2016.
17   BY MR. AWODIYA:
18        Q.  How long have you been working for Ross
19   University?
20        A.  From 1993.
21        Q.  And what is your job position at Ross
22   University?
23        A.  I'm a professor of behavior sciences and
24   consultant psychiatrist for health services.
25        Q.  I'm going to show you this document marked

Page 8

1    Exhibit DE-01.
2         (Thereupon, the referred-to document was
3         marked by the court reporter for
4         Identification as Plaintiff's Exhibit
5         DE-01.)
6    BY MR. AWODIYA:
7         Q.  Can you confirm that this is your
8    counseling note for plaintiff dated December 14th,
9    2015?
10        A.  Yes.
11        Q.  In this counseling note, you put "Academic
12   or educational problem" next to "Summary of note;"
13   is that correct?
14        A.  Yes.
15        Q.  In the same counseling note, you also
16   wrote that you started screening plaintiff for ADHD;
17   is that also correct?
18        It should be under "Plan."
19        A.  Yes.
20        Q.  Did you screen plaintiff for ADHD because
21   he informed you that he needed extended testing time
22   for his exams?
23        A.  No.
24        Q.  Then why did you screen plaintiff for
25   ADHD?

Page 9

1        A.  Because he was having academic problems.
2        Q.  What type of academic problems?
3        A.  Problems with passing his exams, as far as
4    I remember.
5        Q.  Did he tell you why he was having problems
6    passing his exams?
7        A.  Going into memory bank, you know, but if I
8    remember the situation, it was about not performing
9    at your best — the plaintiff's best.
10        Q.  When plaintiff returned to Dominica in
11   January 2016 after the winter break, did he give you
12   documents about his ADHD that was assessed in
13   Maryland?
14        A.  Not that I recall.
15        Q.  Not that you recall?
16        A.  Yeah.  Not that — it may have been given
17   to the counseling center, but —
18        Q.  Please see Exhibit DE-02.
19        (Thereupon, the referred-to document was
20        marked by the court reporter for
21        Identification as Plaintiff's Exhibit
22        DE-02.)
23   BY MR. AWODIYA:
24        Q.  And please take time to read that in it's
25   entirety, if you can.

Page 10

1    MR. ROMAN:  And I'll just make an
2    objection for the record that I don't believe
3    this is a document we've seen yet in this case.
4    So I'll just make that objection.  And I also
5    see there are redactions to certain portions.
6    So we would want the opportunity to see an
7    unredacted version so that we understand fully
8    what this document represents.
9        THE WITNESS:  Is there a page 3?  Oh,
10   here.  Page 3.  I got it.  Good.
11   BY MR. AWODIYA:
12   Q.  You've read it?
13   A.  Uh-huh.
14   Q.  Okay.  Do you remember receiving this
15   document when plaintiff returned back in
16   January 2016?
17   A.  No.
18   Q.  No?
19       Can you read out the date on the top of
20   this document?
21   A.  30th of December, 2015.
22   Q.  And this is during the Christmas break,
23   right?
24   A.  Yeah.
25   Q.  On this document it says, "School

Page 11

1    counseling said that they are going to put me on a
2    stimulant; they said I was inattentive."
3    A.  School counseling said they are going to
4    put you on?
5    Q.  A stimulant.
6    A.  Yes.  Yes.
7    Q.  "They said I was inattentive."
8    A.  Yes.
9    Q.  Is that an accurate statement?
10   A.  Yes.
11   Q.  So before I went to break, you told
12   plaintiff that you thought he was inattentive?
13   A.  Yes.
14   Q.  On the document that says, "page 3" –
15   A.  Uh-huh.
16   Q.  – can you read where it says, "He is
17   returning back to med school"?
18   A.  Okay.  I read it.
19   Q.  Okay.  What it reads is – it says, "He is
20   returning back to med school on January 8th, 2016."
21   A.  Uh-huh.
22   Q.  "He wonders if he can manage his,"
23   redacted, "and inattentive/cognitive via
24   counseling/psychotherapy which he plans to pursue
25   while he is in the Caribbean/Dominica."

Page 12

1    A.  Yes, I see it.
2    Q.  Under that it says, "The patient reports
3    the following concerns related to his
4    attention/concentration."
5        Now, under here are numerous ways that the
6    doctor has noted plaintiff's symptoms.
7        Do you -- is that a correct statement?
8    A.  Yes.
9    Q.  This document also says, "Constantly has
10   difficulty sustaining attention to task at work or
11   in school."  It says, "Constantly has difficulty
12   with tasks requiring persistence or organization.
13   Constantly distracted by noise or activity.
14   Constantly forgetful in daily activities, for
15   example, difficulty remembering appointments or
16   obligations."
17       Did you notice any of these symptoms in
18   plaintiff?
19   A.  When?  When I first saw you?
20   Q.  In any of your counseling sessions.
21   A.  Yes.
22   Q.  So would you agree that you observed that
23   plaintiff's ADHD affected his ability to perform
24   well on his exams?
25   A.  Well, remember, we didn't diagnosis you

Page 13

1    with ADHD in December.  So what I saw was evidence
2    of ADHD that required, you know, testing and
3    confirmation.
4    Q.  And what was that evidence?
5    A.  The symptoms you just went through, this
6    list that is there.
7    Q.  Okay.  So just to be clear, you noticed
8    that plaintiff was experiencing these symptoms on
9    page 3 of Exhibit DE-02?
10   A.  Yes.  The symptoms you listed.
11   Q.  The symptoms --
12   A.  From "The patient reported following
13   concerns" to "difficulty remembering appointment or
14   obligations."
15       MR. ROMAN:  I'll just object, because I'm
16   not sure it's clear what time frame we're
17   talking about at this point.
18   BY MR. AWODIYA:
19   Q.  When did you notice these symptoms?
20   A.  I think from the first time I saw the
21   plaintiff, though, it wasn't for primarily academic
22   problems.
23   Q.  Was this December 2015?
24   A.  December 2015.
25       Are we finished with this one?

4  (Pages 10 to 13)

Page 14

1    Q.  One more question on that document.
2         If you noticed those symptoms, why are
3    they not listed in your counseling records?
4    A.  In which counseling records?
5    Q.  The counseling records that Ross produced,
6    it didn't mention anything of what you witnessed.
7    It just kind of — it makes it seem — in my
8    opinion, it makes it seem as if you — the school
9    arrived to ADHD randomly or the diagnosis was just a
10   diagnosis.  There was no investigation into it.
11        From your — from — from your — from
12   Exhibit DE-01 —
13   A.  Wait.  Wait.  Sorry.  It's confusing.
14   It's like three questions going.  You're saying —
15   remind me of the first question.  You say, why was
16   it not — let me clarify.
17        Why was it not picked up in your initial
18   meeting or at some point we did not report it as a
19   problem?
20   Q.  Let me rephrase.
21   A.  Okay.
22   Q.  If you noticed that plaintiff was
23   experiencing these symptoms —
24   A.  Uh-huh.
25   Q.  — when you first met him in

Page 15

1    December 2015, why are they not listed inside of
2    your counseling notes —
3    A.  I gotcha.
4    Q.  — in December 2015?
5    A.  So I don't know, because I have to look at
6    those notes.  Are you talking about this set or all
7    the notes?
8         Okay.  If we're talking about this set,
9    then it actually has assessment of academic
10   problems.  That was not the primary problem that the
11   person — that the plaintiff was referred to me for.
12   That was not the primary problem I was supposed to
13   deal with.  And the person had already been seen by
14   the counselors.  I wasn't the primary person.  I was
15   the specialist to help the plaintiff with depressive
16   issues related to his break up — romantic break up.
17   Q.  I understand.
18   A.  With concerns about other problems, like
19   self-harm, and so on.  So that was my primary duty,
20   to help the plaintiff with those problems.  In the
21   meeting with the plaintiff, I recognized there were
22   other problems —
23   Q.  Thank you.
24   A.  — with academics.
25   Q.  Thank you.

Page 16

1    Okay.
2    A.  All right?
3         Just to be clear to your question as to
4    why we did not do anything, we actually recommended
5    assessment for ADHD in December while the plaintiff
6    was going back home to recover from the emotional
7    breakup situation.
8         Going too fast?
9         THE COURT REPORTER:  You're awesome.
10        THE WITNESS:  You're awesome typing fast.
11   Off the record.
12        So we actually started a process of
13   helping the plaintiff with the academic
14   problems, as we helped the plaintiff with the
15   relationship problem.  And I think we did help
16   with that.
17        And then, we started testing the patient
18   for ADHD.  And then, we also have the plaintiff
19   going home early.  So I think the university
20   did show responsibility for picking up the
21   diagnosis that was not made throughout the
22   plaintiff's life until he was in his 20s when
23   he came to Ross.
24        So that's the story I would support for
25   the plaintiff.

Page 17

1    Q.  Thank you.  Thank you very much.
2    Please see Exhibit DE-03.
3    (Thereupon, the referred-to document was
4    marked by the court reporter for
5    Identification as Plaintiff's Exhibit
6    DE-03.)
7    BY MR. AWODIYA:
8    Q.  What is the date on this document?
9    A.  12th of February, 2016.
10   Q.  On that day, did plaintiff tell you that
11   his ADHD was adversely affecting his ability to
12   complete his exams?
13   A.  There's nothing in the record.  I wouldn't
14   remember that, but it's not documented that what you
15   said was what you told me.
16   Q.  Let's refer to parts of this document to
17   see if it can help you recall.  In this document, is
18   it correct that it says — next to "Summary of
19   Note," you put "Attention Deficit Disorder Without
20   Mention of Hyperactivity"?
21   A.  Yes.
22   Q.  Does it also say that plaintiff "did not
23   feel right for the last mini"?
24   A.  Yes.
25   Q.  What is the connection between those two?

5  (Pages 14 to 17)

Page 18

1    Why is it summarized as attention deficit
2  disorder without mention of hyperactivity, and then,
3  mentions his mini?
4    A.  So the summary means that you have now
5  carried a new diagnosis or a diagnosis of attention
6  deficit that's been confirmed.  "Did not feel right
7  for the last mini" would be probably what you were
8  saying in your words.  So you would more know what
9  you meant by that, you know.  If you asked for my
10  interpretation, it could be many things, like you
11  were not feeling well prepared, you didn't study
12  enough, you know.  So it's just speculation.  But
13  those would be what you said, "did not feel right."
14    Q.  Okay.  Please see Exhibit DE-04.
15      (Thereupon, the referred-to document was
16      marked by the court reporter for
17      Identification as Plaintiff's Exhibit
18      DE-04.)
19  BY MR. AWODIYA:
20    Q.  Is this your counseling note for
21  plaintiff?
22    A.  Yes.
23    Q.  And what's the date on this document?
24    A.  11th of March, 2016.
25    Q.  Did plaintiff tell you that he was running

Page 19

1  out of time to complete his exams in the time
2  allowed?
3    A.  It says, "Despite running out of time
4  passed his exams."
5    So that would be, most likely, a notation
6  to what you said, that you ran out of time, but you
7  passed.
8    Q.  On this day, did plaintiff – did
9  plaintiff ask for extended testing time?
10    A.  Nothing recorded here about asking for
11  extra time.
12    Q.  Do you recall?
13    A.  No.
14    Q.  On the same counseling note, you put
15  "Anxiety State, Unspecified," and you prescribed
16  more Ritalin; is that correct?
17    A.  Correct.
18    Q.  Okay.  So this document states that
19  plaintiff was running out of time and you added a
20  new diagnosis to your notes?
21    A.  Uh-huh.
22    Q.  And gave him more Ritalin?
23    A.  Uh-huh.
24    Q.  On that date, did you believe that both
25  plaintiff's ADHD and anxiety significantly limited

Page 20

1  his ability to complete his exams in the time
2  allowed?
3    A.  From this note, I can't say that.  What
4  the note is pointing to is that you had a
5  diagnosis – the plaintiff had a diagnosis of ADHD,
6  was started on stimulant meds in February, is coming
7  for a follow-up, and is continuing with his
8  stimulant meds along with the Wellbutrin.  It
9  doesn't have anything about the plaintiff asking for
10  extra time.
11    Q.  Considering all of your counseling notes
12  and the symptoms you observed of plaintiff's
13  attention and concentration, did you believe that
14  his ADHD and anxiety significantly limited his
15  ability to complete his exams in the time allowed?
16    A.  I would agree ADHD in itself can affect
17  academic performance, and it's recorded here that
18  you were running out of time.
19    Q.  Do you believe that plaintiff's ADHD,
20  specific to him, was significantly limiting his
21  ability to complete his exams in the time allowed?
22    A.  Yes.
23    Q.  Did you also believe that he needed
24  extended testing time?
25    A.  I wouldn't be able to interpret that.  I

Page 21

1  believe that everybody is entitled to extra time,
2  according to the regulations of the school, that has
3  the diagnosis of ADHD.  It's a disability that
4  allows students apply to the Office of
5  Accommodations for extra time.  It's in the
6  student's handbook.
7    Q.  So based on the school's policy and
8  plaintiff's counseling sessions with you, you
9  believed that he needed extended testing time?
10    MR. ROMAN:  I'll just object.  I believe
11  that misstates the prior testimony.
12    THE WITNESS:  Sorry?
13    MR. ROMAN:  I just objected for the
14  record, because I thought it misstated the
15  prior testimony.
16    You can answer, if you understand the
17  question.
18  BY MR. AWODIYA:
19    Q.  Let me rephrase.
20    A.  That's okay.  Because – repeat what you
21  said there.  Sorry.
22    Q.  Based on your counseling sessions with the
23  plaintiff, and based on the school policies, do you
24  believe that plaintiff needed extended testing time?
25    A.  The thing is, it's not my belief that I

Page 22

1   can talk to. I can only treat the plaintiff and get
2   him better with his ADHD. The need for extra time
3   is not my determination. It is available, according
4   to the regulations of the university. It is the
5   student, who has the diagnosis, who needs to request
6   it, if he thinks that he needs extra time, because
7   not every student with a diagnosis of ADHD requests
8   extra time. So we can only advise a student that
9   accommodations are available, if they reach to the
10  accommodation office and request it. You
11  understand?
12          It's not for me to tell the student, who
13  has ADHD, that they must, because they need it, they
14  should go. You understand?
15          It is my duty to let the student know that
16  there is regulations that provide extra time if they
17  request it.
18      Q. So let me ask you this.
19      A. Uh-huh.
20      Q. Is it correct that you're trying to say
21  that the school would act independently in relation
22  to your own belief of the student's need?
23      A. No, it's not my belief of the student's
24  need for extra time, you know. It's the student's
25  need for, one, treatment, and need — the student

Page 23

1   has to need the extra time. It is not for me to
2   know that they would need it, because many students
3   do not ask for extra time for one reason or the
4   other.
5       Q. What language do you think — let me
6   rephrase.
7           You were informed that plaintiff was
8   running out of time on his exams, correct?
9       A. Yes. It's there.
10      Q. And you also noticed that — that his
11  ADHD — let me rephrase.
12          Connect the symptoms you saw plaintiff
13  experiencing with his ADHD with him running out of
14  time, because to me it seems like that is the
15  plaintiff informing —
16      A. Okay. Let me — they're all connected.
17  Symptoms lead to diagnosis of ADHD. ADHD has with
18  it problems in managing time. That is why ADHD is
19  afforded extra time by the Office of Accommodations,
20  which considers it a disability, all right,
21  according to the American Disability Act.
22          It's a condition, which we support
23  students, who have ADHD, for extra time.
24          Does that help you?
25          So we have no problem with a student

Page 24

1   requesting accommodations for extra time.
2       Q. Okay. I think I understand.
3           So let me ask you this. If a student
4   doesn't request an accommodation, but the school
5   notices that he needs an accommodation, do you think
6   the school is liable?
7           MR. ROMAN: Objection to the extent it
8       calls for a legal conclusion since Dr. Sharma
9       is not a lawyer.
10  BY MR. AWODIYA:
11      Q. Let me rephrase.
12          If you notice that a student needs an
13  accommodation, but he doesn't request an
14  accommodation —
15          I'm going to come back to it. I lost my
16  train of thought a little bit.
17      A. You want a break? I could use an extra
18  cup of coffee.
19          MR. AWODIYA: Let's take a break and go
20      off the record.
21          (Whereupon, a break was taken from 1:33 to
22      1:40 p.m.)
23  BY MR. AWODIYA:
24      Q. Did plaintiff tell you that — let me
25  rephrase.

Page 25

1           Did plaintiff tell you that Matthew
2   Stewart-Fulton denied plaintiff's request for
3   accommodation?
4       A. I don't recall that.
5       Q. Do you know why plaintiff never received
6   test accommodations from Ross University?
7       A. Our counseling center record that I have
8   in my documentation, in my notation, doesn't show
9   that the plaintiff applied for accommodation.
10      Q. So outside of the documents, you don't
11  remember any conversations with plaintiff?
12      A. I remember a conversation recently about
13  the deposition here. Prior to that, I believe there
14  was a conversation about getting the documentation
15  you wanted from the — our counseling center, and we
16  directed you to Shannon Evans in Knoxville.
17      Q. In Dominica you don't remember any of the
18  conversations you had with plaintiff?
19      A. Like what?
20          I mean — about applying for
21  accommodation?
22          Are you saying I don't remember any of the
23  conversations?
24      Q. Well, because a couple of times you said,
25  it's not in the document, it's not in the counseling

7  (Pages 22 to 25)

Page 26

1    record, and therefore, you can't recall.
2         Do you recall any information that was not
3    in the documents?
4         A.  I recall a lot of -- your history, your
5    medical history, your concerns about your emotions,
6    your relationship difficulties, your problems with
7    passing the exams.  I recall a lot of those.  But
8    specific words or conversations, I don't.  I
9    certainly don't remember you specifically saying you
10   applied for accommodation.
11        Q.  Okay.  Let's go to the relationship thing.
12        Is it correct that you believe plaintiff's
13   relationship problems caused him anxiety?
14        A.  Yes.
15        Q.  Do you believe that that anxiety -- at
16   that time, in Dominica, did you believe that his
17   anxiety was also affecting his exams in addition to
18   the ADHD?
19        A.  Yes.
20        Q.  Do you think that his anxiety contributed
21   to him running out of time on his exams in Dominica?
22        A.  It could.  It's just speculation, because
23   it's one of the factors that can affect academic
24   performance.  Sure, it could have affected
25   performance.

Page 27

1         Q.  Have you helped other students to get test
2    accommodations at Ross University?
3         A.  Yes.
4         Q.  Compared to plaintiff, have other students
5    with less documentation of ADHD received
6    accommodations at Ross University?
7         A.  There have been students with the
8    diagnosis -- they may have less documentation, but
9    everyone has the diagnosis adequately diagnosed,
10   including you.
11        Q.  When you say, "may have less," less in
12   what aspect?
13        A.  Accommodation is not my portfolio.  I can
14   only send the documentation to the accommodations
15   office, what we have, and they would receive
16   accommodation.  So based on the accommodations
17   office assessment that all the documents are in
18   place.
19        So your question is relating to yourself.
20   You have -- you have good documentation, in my
21   opinion.  Other students may have had one less test
22   done, but still with a good diagnostic report of
23   ADHD.  So they would be given accommodation.
24        But they have to fulfill the accommodation
25   office's -- accommodation is not my portfolio.  We

Page 28

1    don't give it from the clinic, from the counseling
2    services.
3         Q.  But you would give information to --
4         A.  Yes.  We pass the records.
5         Q.  And so, how would you help these students?
6         Would you recommend, based on their
7    documentation and the symptoms you observed, that
8    they get testing accommodations?
9         A.  Part of the counseling intake and the
10   screening for ADHD is every student is advised that
11   accommodation is available and that they have to
12   apply for it if they want it.  We don't encourage.
13   We don't force.  We just say to the students, "It's
14   your option.  It's available."
15        Not every student wants it.  Some -- not
16   every student would want accommodation despite
17   having the diagnosis of ADHD, which can give them
18   the accommodations.
19        Q.  If a student wanted accommodations, and
20   you passed along the information to Ross University
21   administration, would you recommend in those
22   situations that they get academic accommodations?
23        A.  Absolutely, yes.
24        Q.  So if a student came to you and said he
25   was running out of time, do you think that -- if the

Page 29

1    student told the academic -- if the student told the
2    accommodation coordinator he was running out of time
3    on his exams, would that constitute informing him
4    the need of more time on his exams?
5         A.  If the student told the accommodations
6    office.
7         Q.  Yes.  The point I'm trying to express here
8    is that students don't necessarily know the specific
9    language, according to the ADA or to the
10   Rehabilitation Act, what constitutes a request.
11   They simply may say that they need help some way,
12   that I'm running out of time on exams, I'm not
13   completing exams.
14        A.  Uh-huh.  I understand.
15        Q.  Does a student need to expressly request
16   and say "accommodations" in order to get
17   accommodations?
18        A.  Yes, they have to.  It's always done by
19   the counseling service part of our process when we
20   make the diagnosis of ADHD.  It's called "standards
21   practice" or "best practices."
22        Every person who is diagnosed with ADHD is
23   guided to the student handbook that there is
24   accommodations available.  The process is very
25   straightforward.  They need to go to the

8 (Pages 26 to 29)

Page 30

1  accommodations office, and then, that — what
2  happens then is, they're interviewed by the
3  accommodations officer. That is not for us. He
4  does it — he or she does an interview of the
5  student. And if he's satisfied that there's
6  evidence of a disability, the student shows him the
7  fact that they have a diagnosis of ADHD, the student
8  then makes the accommodation request on the form
9  that the accommodations office has, and the student
10  would ask us to submit his or her records to —
11  that's the process.
12     Q. So once they ask you to submit their
13  documents —
14     A. Yes.
15     Q. — to —
16     A. The accommodations office.
17     Q. That is when the obligation is triggered?
18     A. Yes. That's when we can only release the
19  student's records; only after that process is
20  completed, the process which I just outlined, where
21  the student is the one that must make the request.
22     Q. Please see Exhibit DE-05.
23        (Thereupon, the referred-to document was
24        marked by the court reporter for
25        Identification as Plaintiff's Exhibit

Page 31

1        DE-05.)
2  BY MR. AWODIYA:
3     Q. Is this the document you were talking
4  about?
5     A. This is the document about release of
6  information. The document about requesting
7  accommodations is not this document. This Exhibit,
8  DE-05, is not the request for accommodation.
9     Q. But this is the document for the
10  counseling center to send the information?
11     A. That's correct.
12     Q. Okay. Did you send any of plaintiff's
13  information to Ross University's administrators?
14     A. Not me. I didn't send anything.
15     Q. Do you know if anyone else did?
16     A. I wouldn't know for sure, but I believe a
17  request was made for the release of your
18  accommodation [sic], but this was not in that time.
19  This was more recently when the plaintiff had left
20  the university and returned to the U.S. for the
21  comprehensive shelf.
22     Q. Is it correct that the document for the
23  release —
24     A. Uh-huh.
25     Q. — to Ross University administration was

Page 32

1  agreed upon in December 2015?
2     A. No. There's no evidence that there was a
3  document requesting accommodation.
4     Q. Not requesting accommodation.
5        Requesting that the counseling center send
6  the documentation —
7     A. No, there is no — there's no evidence of
8  a request for sending a record.
9     Q. — in December 2015.
10     A. There's a request for sending information
11  about the plaintiff's return to the U.S. for
12  emotional support in December 2015. We received —
13  in December 2015, as far as my records show, my
14  recollection, there's no request for release for
15  accommodations. You understand?
16     Q. Can you please read on that form what it
17  says under "This information is released for the
18  following purpose"?
19     A. "To facilitate treatment planning" and "to
20  provide information relevant to accommodations or
21  medical leave of absence."
22     Q. Under that —
23     A. And then, there is "Other" not ticked.
24        So the boxes are ticked for "facilitate
25  treatment planning" and "to provide information

Page 33

1  relevant to accommodation academic accommodation
2  and/or medical leave of absence."
3     Q. Under that, what is the next box checked?
4     A. "I authorize ongoing communication unless
5  I revoke this consent."
6     Q. Did you not feel that there was an ongoing
7  obligation?
8     A. For?
9     Q. The purpose of this document for academic
10  accommodations — for information relevant to
11  academic accommodations?
12     A. No. I said it just now. No. This
13  document was done in the context of the plaintiff
14  needing to return to the USA early, because the
15  plaintiff had emotional crisis and there were
16  concerns about the patient's safety. So the
17  counseling service, including myself, and the
18  university administrator supported the plaintiff
19  returning early, and that involved changing the
20  plaintiff's return ticket which the plaintiff
21  couldn't afford at this time.
22        So I wrote to the university's
23  administrative director asking them to support the
24  student, to return him early, because the
25  plaintiff's mother was very worried about the

9  (Pages 30 to 33)

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

Page 34

1  plaintiff.
2       So this document was signed for that
3  purpose, so we can give information about the
4  plaintiff's emotional health and request an early
5  return. This document was not for releasing
6  information about accommodation, because there was
7  no request for accommodations from me in
8  December 2015.
9       To make it more clear, there was no
10 diagnosis at that time. It was just at the start of
11 preliminary testing, screening for ADHD. So there
12 was no way documents could have been sent to support
13 accommodations for ADHD, because the diagnosis was
14 not made. It makes no sense.
15      Q.  So when the diagnosis was made and
16 plaintiff did not revoke his consent, would that not
17 be considered ongoing?
18      A.  Ongoing to what?
19      Q.  Well, you said the documents didn't exist
20 at that time.
21      A.  The diagnosis didn't exist.
22      Q.  But the diagnosis existed after the winter
23 break?
24      A.  Yes. Yes.
25      Q.  Why weren't those records sent?

Page 35

1       A.  Because, as I said, we do not release
2  information unless we request — we receive a
3  request either from the student, who has the
4  diagnosis, and that has to be in writing, not a
5  verbal request, or it has to come from the
6  accommodations office in writing under a protected
7  e-mail that the — that they are going through the
8  process of supporting a request for accommodation.
9  There was no request made for accommodations. So
10 that's why I said, there's no request. We cannot
11 give out information to the accommodations office.
12 Then we would be sued for giving information beyond
13 the scope. The scope of this document was only to
14 get the plaintiff back home early.
15      Q.  Give me one second. I had something and
16 it's coming back to me.
17      A.  Take your time.
18      Q.  Oh. You said that a request has to be in
19 writing?
20      A.  Yes.
21      Q.  What if it's oral?
22      A.  No.
23      Q.  It doesn't count?
24      A.  It doesn't count to the accommodations
25 office, as far as I know, and that's their — that's

Page 36

1  their portfolio. I can only say, from my
2  experience, a verbal request is not a request for
3  accommodations.
4       Q.  Would you say that when the diagnosis was
5  made —
6       A.  Uh-huh.
7       Q.  — and after you observed all the
8  symptoms, that Ross University had possession of all
9  the necessary documents of plaintiff's ADHD and the
10 symptoms of his ADHD?
11      A.  Yeah, we had — we had made a diagnosis.
12 The diagnosis was done, and we accepted, and the
13 student was — the plaintiff was being treated.
14      Q.  Earlier you said that students with less
15 documentation have received — you said earlier
16 students with less documentation of ADHD have
17 received accommodation action compared to plaintiff.
18      A.  Uh-huh.
19      Q.  Do you think that is fair?
20      MR. ROMAN:  I'll just object as to vague
21 as to what "fair" means.
22 BY MR. AWODIYA:
23      Q.  Let me rephrase.
24      Do you think that plaintiff was treated
25 equally?

Page 37

1       A.  Well, I don't think there was a question
2  of equal treatment, if the plaintiff didn't apply
3  for accommodations. If the plaintiff had applied
4  and did not get it, I would say, seems something is
5  not right. We would have to look at why that was
6  not given. And that's not my portfolio. I can only
7  say that the documentation that the plaintiff had
8  appeared to me to be adequate for accommodations.
9       Q.  So you believe that plaintiff had adequate
10 documentation of his ADHD to get test
11 accommodations?
12      A.  That's me. I believe that. Again, that
13 doesn't mean the plaintiff would get accommodations,
14 because the final say is the accommodations office.
15 It doesn't mean that I believe it's correct. The
16 accommodations office have their own regulations,
17 and they could override my request, because I'm the
18 one — or the doctors make the request for
19 accommodation, which is time-and-a-half. You get
20 extra time. We actually put it we want the student
21 to get the accommodation, but that doesn't mean they
22 get it.
23      Q.  So even though you think that plaintiff
24 needs extra time, it's out of your hands as to
25 whether he gets extra time for his exams?

10  (Pages 34 to 37)

Page 38

1      A.   No.  I go back to that question, and I
2   hope you can understand.  I cannot determine whether
3   you need or the plaintiff needs.  The plaintiff has
4   to determine that.  Many students do not ask for
5   accommodation with the diagnosis.
6      Q.   So why did you prescribe him Ritalin?
7      A.   Because that's my duty, to treat the
8   condition.  So I'll give you an example.  A student
9   may have the diagnosis, is on treatment, the
10  performance is much better, the student chooses not
11  to apply for accommodation.
12     Q.   So if the student —
13     A.   Which was the plaintiff's case.
14     Q.   In plaintiff's case?
15     A.   Medication helped the plaintiff to perform
16  better, do well on the exams.  So the question about
17  if I if felt there was a need for extra time does
18  not arise.  It does not arise, because it is not me
19  that can say the plaintiff needs the extra time.
20  It's the plaintiff, especially after receiving
21  treatment, that determines I would also like to get
22  extra time.
23     Q.   Did you feel — at that time, in Dominica,
24  is it correct to say that you believed that his ADHD
25  significantly limited his ability to complete exams

Page 39

1   on time and that's why you prescribed the Ritalin?
2      A.   That's a very long question.  Do you mind
3   going back over it, because I'm not sure which one
4   I'm answering to?
5      Q.   No problem.  Let me rephrase it.
6           Did you prescribe the Ritalin to plaintiff
7   because his ADHD significantly limited his ability
8   to complete his exams on time?
9      A.   So I — let me answer — it's two
10  questions in one.  Maybe you could split it up.
11          So did I prescribe the treatment for the
12  ADHD?  Yes.  I treat ADHD with stimulant medication
13  primarily.
14          The second part of the question, did I
15  prescribe the stimulant because the student needed
16  extra time?  That is part of the problem that ADHD
17  has, that it causes the student to take longer.  So
18  the medication would help that.  So, yes, that's
19  correct.
20          And by helping the student to be better,
21  the need for extra time is often curtailed.
22     Q.   So are you trying to say that because of
23  medication it takes the question of required
24  extended testing time out of the equation?
25          Let me rephrase.

Page 40

1           In relation to plaintiff, are you saying
2   that — I forgot it.  Sorry.  I lost the second half
3   of that —
4      A.   Thought?
5      Q.   Of the thought, yeah.
6      A.   Take your time, because —
7      Q.   I can't get it back.
8      A.   Do you want a break again?
9      Q.   No, I don't think a break will help.  Let
10  me just go back to my —
11          So is it correct to say that even if you
12  observed that plaintiff needed extended testing
13  time, that's not your role?
14          Your role is to treat it with medication?
15          MR. ROMAN:  I'll just object.  I believe
16      it misstates prior testimony.
17          THE WITNESS:  Yes.  Yes.  It's the same
18      thing we went over.  I can't determine the
19      need.  It's not my opinion about that.  The
20      patient — the person has to determine if they
21      feel, despite medication, they still want extra
22      time.  It's not my determination.
23  BY MR. AWODIYA:
24     Q.   Is it correct that plaintiff was on
25  Ritalin in February 2016?

Page 41

1      A.   Correct.
2      Q.   Is it also correct that plaintiff told you
3   that he was running out of time on his exams a month
4   later, in March 2016?
5      A.   It's recorded.  We have it recorded, yeah.
6      Q.   That's a yes?
7      A.   Yes.
8      Q.   Do you know if Ross University's
9   faculty — do you know if Ross University's faculty
10  handbook contains any information related to
11  accommodating disabled students?
12     A.   Faculty handbook or student handbook?
13     Q.   Faculty.
14     A.   I don't recall reading into the faculty
15  handbook.  So I can't answer that question.  I know
16  the student handbook has it.  It's not relevant for
17  the faculty handbook to have it.  It's a student
18  issue, not the faculty that applies for it.
19     Q.   If plaintiff informed another professor at
20  RUSM that he needed accommodations —
21     A.   Uh-huh.
22     Q.   — is that enough to trigger the inquiry
23  into whether he needs an accommodation?
24     A.   I can't answer that, because that's not —
25  that's speculating on my part.  I don't know what

11  (Pages 38 to 41)

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

---

### Page 42

1    would lead to this — what did you call it, the
2    process?
3      Q.  The inquiry.
4      A.  The inquiry, yeah.
5      Q.  Let me rephrase.
6      A.  The only thing I know leads to
7    accommodation is the student has to apply for it.
8      Q.  I just want to clarify something. Are you
9    saying that the student informing the school of the
10   need for accommodations is different than requesting
11   an accommodation?
12     A.  They're both the same thing. So the
13   request or the informing the school has to be
14   specifically to the accommodations officer and has
15   to be done in writing.
16     Q.  So only him can be informed of the need?
17     A.  Only the student can make the request for
18   accommodation to the accommodations office.
19     Q.  So if the student requested accommodations
20   from other faculty, he's liable for not getting
21   accommodations?
22     MR. ROMAN:  I'll just object to two
23   things. One, I think it calls for a legal
24   conclusion, in terms of some of the language,
25   and also, it's been asked and answered.

---

### Page 43

1    BY MR. AWODIYA:
2      Q.  Let me rephrase.
3        If plaintiff informed the dean —
4      A.  Uh-huh.
5      Q.  — that he needed accommodations for his
6    ADHD, would that be enough?
7      A.  Enough to get accommodations?
8      Q.  To put the school on notice.
9      A.  On notice for?
10     Q.  That he need an accommodation.
11     A.  It's not enough. The student can inform
12   anybody. Nobody can apply for accommodation. Not
13   the student's mother, the student's father, not the
14   student's psychiatrist, the student's counselor.
15   Nobody can apply for accommodations. Only the
16   student, and it has to be done in writing. It has
17   to be done through a process where they go and get
18   interviewed by the accommodations officer. The
19   officer will now be satisfied that they have a
20   proper diagnosis made. Then start the process.
21   Nobody else, mother, faculty, the dean, the
22   president of the USA. You know, it's
23   confidentiality.
24     Q.  Is it still confidential if you told the
25   dean himself or if —

---

### Page 44

1      A.  If the student told the dean, that's his
2    prerogative.
3      Q.  So then, it wouldn't be confidential?
4      A.  The dean cannot ask for the accommodation
5    on the student's behalf.
6      Q.  The dean is not part of the counseling
7    center.
8      A.  It doesn't matter. Nobody. Nobody can
9    ask for the accommodation. Only the student.
10     Q.  So if the student tells the dean, he can't
11   tell anyone else?
12     A.  No. Unless the student gives him
13   permission in writing.
14     Q.  Is that why you didn't inform the
15   accommodations coordinator that he might need
16   accommodations?
17     A.  We've been over that. I cannot do that.
18   It's not me to say the student needs it. The
19   student is the one to say, I need it. I want it.
20   When the student makes the request, the proper
21   documentation is in place, the student gets the
22   accommodation. It's not a difficult thing to
23   understand.
24     Q.  And his psychiatrist can't inform the
25   school?

---

### Page 45

1      A.  No. Unless the student writes to say,
2    please release by medical records. I have applied
3    for accommodation.
4      Q.  A third party psychiatrist. Let's say
5    someone at Kaiser Permanente told the dean that his
6    disability was affecting his academic performance.
7    The dean is still not obligated to accommodate the
8    student?
9      A.  No.
10     Q.  Thank you.
11       I understand it fully. Thank you very
12   much.
13       And just to clarify, on Exhibit DE-05,
14   even though it says, "ongoing communication," you do
15   not consider it ongoing communication?
16     A.  You've got to clarify what you mean by
17   that. If it's ongoing — this allows us to provide
18   accommodation for a future request. If the student
19   says, release my — release records, because I've
20   applied for accommodation, yes, it's been signed, so
21   the student doesn't have to go through this form
22   again.
23     Q.  He doesn't have to go through the form
24   again?
25     A.  It has a limitation period. I'm trying to

---

12  (Pages 42 to 45)

Page 46

1  see how long it is. Does it have it here? I think
2  it's a year.
3       So the signing of this document is a way
4  for the student to make life easier in the future so
5  they don't have to come back and do another one. So
6  this is – if, for example, they want to see a
7  psychiatrist in the USA, they would sign the form so
8  we can release the medical records. But we don't
9  release medical records until we get a specific
10  request saying, I want accommodations. Please
11  release my records. And I've already signed a
12  release of information form. Then, we release. You
13  got it?
14       We don't hold it back. It's the
15  plaintiff's right to get their records. As you see,
16  this document is signed only to Ross administration.
17  So this one was about getting an early flight back
18  home. So it was Ross administration. It's not Ross
19  accommodations office. It's two different entities.
20  It was to administration to deal with a flight back
21  home, and the accommodations would be –
22       You see to this piece here, Item No. 3 –
23  Box No. 3? Then, if the student, the plaintiff
24  wants their doctor in the USA to get the
25  accommodations – or medical records, then they will

Page 47

1  put that name into that or tell us to – whom to
2  send that to.
3       Q.  Okay.
4       A.  Okay?
5       Q.  Now, during this whole deposition, it
6  seems to me that – let me rephrase. Let's assume
7  now –
8       MR. ROMAN:  Sharma, I want to make sure
9  you're listening, because you're reading and
10  he's asking a question.
11  BY MR. AWODIYA:
12       Q.  Let's assume now that plaintiff put the
13  school on notice that he needed accommodations for
14  his ADHD or anxiety. If the school – if the
15  plaintiff put the school on notice of his ADHD and
16  anxiety, and as you said earlier, the school had all
17  the documentation necessary, would you consider it
18  malice if the school did not provide him
19  accommodations.
20       (Ms. Bomar exited the deposition.)
21       MR. ROMAN:  I'll just object. It calls
22  for a legal conclusion as to the phrase malice.
23  BY MR. AWODIYA:
24       Q.  Let me rephrase. And personally, when I
25  was talking, I forgot the first half of my own

Page 48

1  question.
2       If the school is on notice of plaintiff's
3  ADHD and it's affect on his exams – I'm embarrassed
4  to say this. I forgot again.
5       Can we take about a five-minute break?
6       (Whereupon, a break was taken from 2:22 to
7  2:34 p.m.)
8  BY ATTORNEY2:
9       Q.  Is there any policy at Ross University
10  that requires faculty to comply with the Americans
11  with Disability Act in Dominica?
12       A.  That's a vague question. Like you want to
13  be a bit more specific?
14       In terms of what?
15       Q.  Taken more literally, almost as if
16  verbatim, is there a policy that Ross must comply
17  with – that Ross faculty must comply with the
18  Americans with Disabilities Act in Dominica?
19       A.  Again, it's kind of broad, but let me
20  answer. All faculty would respect the Americans
21  with Disabilities Act. Compliance depends on what
22  the circumstance is. So the Americans with
23  Disabilities Act is applicable to things like
24  accommodations. So faculty would not be involved
25  with accommodations. You understand?

Page 49

1       So – but in terms of the university's
2  principal, it's fully compliant with the Americans
3  with Disabilities Act in all respects. So if it's
4  applicable to faculty, it would be applicable.
5       Q.  But you're not aware of it being
6  applicable to faculty?
7       A.  It depends on what is applicable to the
8  faculty.
9       What are we talking about?
10       Q.  Let me rephrase.
11       So whether faculty has to comply with the
12  Americans with Disabilities Act depends on the
13  situation?
14       A.  Yes. I mean, in a general broad sense,
15  all faculty are fully signed on to the Americans
16  with Disabilities Act. So we all respect it. We
17  believe in it. We believe that the Americans with
18  Disabilities Act offers special accommodations to
19  students with disabilities.
20       So the office of accommodations, for
21  example, says, this student has problems, in terms
22  of hearing. They can't hear well. The faculty are
23  guided to supporting that student, but it's – so
24  that's an example of how they would – so the
25  faculty cannot say, no, I don't believe that

13  (Pages 46 to 49)

Page 50

1     students with hearing problems need any extra care.
2          Q.  Are you aware that Ross has stated that
3     the Americans with Disabilities Act does not apply
4     in Dominica?
5          MR. ROMAN:  Objection.  I believe that
6     misstates prior statements made by Ross.
7     BY MR. AWODIYA:
8          Q.  Are you aware that – I'm going to
9     rephrase.
10          Are you aware that Ross University has
11     stated that Title III of the Americans with
12     Disabilities Act does not apply in Dominica?
13          MR. ROMAN:  I'll make the same objection.
14     I think it also calls for a legal objection as
15     to whether it applies or not.
16     BY MR. AWODIYA:
17          Q.  I'm not asking whether it applies.
18          I'm asking, are you aware that they say –
19          A.  Ross said?
20          Q.  Ross said not only in my case, but in
21     other cases, almost as recently as last year, that
22     Title III of the Americans with Disabilities Act and
23     Section 5.04 of the Rehabilitation Act does not
24     apply in Dominica.
25          A.  If I'm aware of it?  If I'm aware of Ross

Page 51

1     University making that particular statement?
2          No, I'm not aware of that.
3          (Ms. Bomar reentered the deposition.)
4     BY MR. AWODIYA:
5          Q.  So you're kind of saying something
6     different than what Ross is saying, in terms of the
7     Title III with the Americans with Disabilities Act
8     in Dominica?
9          A.  In terms of what?  If Ross is saying that
10     the Americans with Disabilities Act does not apply,
11     they're based – I presume they have legal reasons
12     for saying that.  In my opinion, as I said, faculty,
13     myself, everybody who is signed on to work at Ross
14     respects the Americans with Disabilities Act.  We
15     respect the British Act of disability.  We respect
16     the Australian Act.  Say, a student comes with a
17     diagnosis of a disability from another country.  We
18     will not disrespect that student.
19          Q.  Can you define respect for me?
20          A.  Respect is we – respect is a word which
21     says that we, you know, believe that this is
22     something that is important and we give it
23     significance and credence, so that there's a
24     principal of respect that a university should have
25     for students with a disability.  And in my

Page 52

1     experience, our office of accommodations affords
2     students with ADHD or other disabilities
3     accommodations.
4          Q.  I think respect is open to interpretation.
5     Let's clarify that.
6          A.  Uh-huh.
7          Q.  Can you say the same statement in regards
8     to being required – or if you prefer compliance.
9     Respect is kind of – it can mean anything.  So
10     earlier you said that Ross faculty must comply with
11     the Americans with Disabilities Act in certain
12     situations –
13          A.  Uh-huh.
14          Q.  – is that correct?
15          A.  Yes.  So a given example – I give you an
16     example.  If the office of accommodations directs a
17     faculty to give a student certain conditions, which
18     will make their study better, they will comply with
19     it, because they respect the office of accommodation
20     of Ross University.  So we respect disabilities and
21     we support students who need special care and
22     special help.
23          Q.  Earlier you said that it's not the
24     faculty's responsibility.  You said that it's the
25     student who has to go directly to the accommodations

Page 53

1     coordinator.
2          A.  Yes.
3          Q.  That's literally almost the opposite of
4     each other.
5          A.  Tell me the –
6          MR. ROMAN:  Hold on.  Let's see if there's
7     a question, because I do want to object to
8     that.  I think that's an unfair
9     characterization of what the witness testified
10     to.
11     BY MR. AWODIYA:
12          Q.  I'll rephrase.  This is my question.  Is
13     Ross faculty required to help a student get
14     accommodations?
15          A.  Not that I know of.
16          Q.  That's good.  What about the
17     Rehabilitation Act?
18          A.  What about it?
19          Q.  Is there any policy that you must comply
20     with the Rehabilitation Act in Dominica?
21          A.  Me?
22          Q.  Anyone from Ross, administration, your
23     supervisor, whoever is above you, whoever hired you,
24     has anyone told you that you are required to comply
25     with Section 5.04 of the Rehabilitation Act?

14  (Pages 50 to 53)

Page 54

1    A.  No, nobody told me.
2    Q.  Nobody told you?
3    A.  No.
4    Q.  So given your statements, you believe
5    that — let me rephrase.
6        Is it correct that you have no knowledge
7    of any requirements for faculty to comply with
8    Section 5.04 of the Rehabilitation Act or Title III
9    of the ADA in Dominica?
10   A.  So you're asking about two different
11   things. So Section IV — this Rehabilitation Act, I
12   don't know.
13       In terms of the Americans with
14   Disabilities Act, we are forced to comply. We
15   respect the Americans with Disabilities Act. The
16   office of accommodation can answer that question,
17   because they provide accommodations. I don't
18   provide. So that's better directed to the office of
19   accommodation.
20   Q.  Okay. I think we're almost done. I just
21   want to get a little bit of the — just some small
22   stuff.
23       In the release of information agreement
24   that plaintiff has with the counseling center —
25   A.  Uh-huh.

Page 55

1    Q.  — regardless of the accommodation, does
2    this agreement create a duty between the counseling
3    center and whoever the recipient is named in that
4    agreement?
5    A.  Yes. To provide information. Once the
6    student asks for us to release, once we get the
7    request in writing, we will release. There's an
8    obligation. And the form states, "release."
9    Q.  Do you have any policy anywhere that a
10   student would need additional paperwork to release
11   additional information? Let me rephrase.
12       A month later after this document was
13   signed, if more information wanted to go out —
14   A.  Uh-huh.
15   Q.  — is there any record anywhere telling
16   the student that he must do extra work?
17   A.  It's in the student handbook that the
18   process is clearly outlined. You want
19   accommodation, you apply for it. That's it. It's
20   very straightforward process.
21   Q.  Not for accommodations. Accommodations
22   doesn't matter here.
23   A.  Okay.
24   Q.  It's the passing of information.
25   A.  Yeah. But it has to be requested. We

Page 56

1    cannot willy-dilly give out people's information.
2    It's not me. The onus is not on me. It is the
3    patient will request a specific information to go
4    out for a specific purpose. When the request is
5    made in writing, we will respond to that request.
6    And the signing of the form allows the release of
7    information. It does not allow presumption on my
8    part to release information. I can't do that. It's
9    just basic ethical judgment and sense.
10   Q.  So let's just stick to the actual one
11   here.
12       You're not releasing information to any
13   random person.
14   A.  Right.
15   Q.  It says, "RUSM administration."
16   A.  Right.
17   Q.  Therefore, we have who is supposed to be
18   receiving this information.
19   A.  Right. In context of the problem.
20   Q.  In context of the purpose of this
21   agreement; is that correct?
22   A.  In the context of the problem that was —
23   that required the release. As I said before, for
24   this information, there was no diagnosis of ADHD.
25   There was no request for release to the

Page 57

1    accommodations office. This agreement was done so
2    we can release information to administration to get
3    the plaintiff back home early, which was done.
4    Q.  That's not in the agreement.
5    A.  Which agreement.
6    Q.  That agreement, the release of information
7    consent agreement.
8    A.  It's in the medical records that this
9    whole process was being done to support — this one
10   with this Exhibit DE-05 was done in the medical
11   records, time-related, to show that this release of
12   specific information was to get the plaintiff back
13   home early due to concerns about the plaintiff's
14   emotional health. There was nothing about
15   accommodations requested by the student for release.
16   There was no ADHD diagnosis, as I said, before.
17   Q.  Let's focus on that. Someone who knows
18   nothing about this case, sees this agreement, the
19   release of information consent agreement, Exhibit
20   DE-05.
21   A.  Uh-huh.
22   Q.  No one knows nothing about this case, and
23   they see this document, how would they know that a
24   student needs to do an additional request?
25   A.  They wouldn't know, because they wouldn't

Page 58

1    even see the document. We don't —
2        Q.  But what if they saw the document?
3        A.  How? They cannot access the student or
4    patient's records. We would be breaching their
5    confidentiality.
6        Q.  I'm showing it to the lawyers, so now they
7    see it.
8        A.  But they see it in the context of the
9    case, so they understand why there was no giving out
10   of records for accommodation at that time, because
11   there was no request for it.
12       Q.  Let me rephrase.
13       A.  Nobody else can see it. Only you can
14   dictate to somebody else, have a look at this. Then
15   they can make any interpretation.
16       Q.  Let's say I have a copy of that
17   agreement —
18       A.  Uh-huh.
19       Q.  — and I give it to another Ross
20   University student, and I only give them that
21   agreement —
22       A.  Uh-huh.
23       Q.  — how would the other Ross University
24   student know from the language from that agreement
25   that additional requests need to be made?

Page 59

1        A.  They don't know. That's — they don't
2    know.
3        Q.  So how would plaintiff know?
4        A.  Because the plaintiff needed to understand
5    that if he wants accommodation, he has to apply, and
6    it's in the student handbook, and he has been told
7    by the counseling center.
8        Q.  Not about accommodations. We're not
9    talking about that. We're talking about giving
10   information to RUSM administration. The
11   accommodation coordinator is irrelevant to this.
12   It's any RUSM administration —
13       A.  Yeah.
14       Q.  — any of them, and any accommodation
15   after the date that this was signed.
16           How would he know that he would need to
17   fulfill more written requests to have that released?
18       A.  He would know by reading the student
19   handbook.
20       Q.  The student handbook mentions nothing
21   about additional requests after this consent form —
22   this agreement form is signed, or, if you can, do
23   you know where in the student handbook it would say
24   that?
25       A.  I'm not sure what you're getting at, but

Page 60

1    the point is, anybody can interpret this document as
2    they see. The reality, what happens, is that as a
3    physician or the counseling center, counselors do
4    not release documentation without a specific request
5    by this patient. This signing of the document does
6    not allow us three months later to release a story
7    that a student is now at risk for self-harm, for
8    example. It does not allow it, unless, of course,
9    it's self-harm at a severe level, which requires us
10   to have the student evacuated. But we don't give
11   out information.
12           I don't care who interprets it. You can
13   give them this paper. That's their interpretation.
14   The reality, you sign this form, which allows us to
15   give your records when you request it. When you —
16   when you, the plaintiff, or the patient request it.
17   Never do we give out information without that
18   request. And it has to be in writing; otherwise,
19   somebody will come to me and say, you breached my
20   confidence, which is very serious. I cannot give
21   information out unless it is requested in black and
22   white. A verbal request does not apply in this
23   case. It has got to be in writing for the purpose
24   of what it is. So that is -- that is it.
25           You can bring up a story about anybody can

Page 61

1    look at this document, interpret how they like.
2    Does not apply to the situation for this document.
3    This document was provided for the student to get
4    back home early. That is what we know. It is in
5    the records. Anybody could see the two together and
6    understand the student was having emotional problems
7    and needed to go home. Dr. Sharma wrote to
8    administration, can you help him buy his ticket, he
9    doesn't have the money, send him home before the
10   other students go home. His mom is worried about
11   him. Done.
12           He signs a box saying that, in case my
13   ADHD comes up positive, I'm also giving consent that
14   I don't have to sign this box again when the office
15   of accommodation asks for my records. That is it.
16   That is it.
17           It's not difficult to understand. I
18   cannot give out the diagnosis even if it's made to
19   the student affairs office. Many students do not
20   want that. Many students do not apply for
21   accommodation, because they do not want the
22   diagnosis to be known. There are a lot of reasons
23   why students don't apply. We have a small number,
24   actually, of students that apply for accommodations
25   after they're diagnosed.

Case 0:18-cv-60482-RKA   Document 138   Entered on FLSD Docket 01/29/2019   Page 32 of 119

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

Page 62

1      I mean, I've said more than enough on
2  this, but I'm trying to make it clear to you. It
3  does not matter that you tick this box. You have
4  to -- the patient has to request in writing, I want
5  the accommodation; release records relevant for
6  accommodation.
7      Q.  Is that your rule or the school's rule?
8      A.  That is the medical care rule. The best
9  standards of care or practice, rule of the
10 counseling center.
11     Q.  Where can I find it?
12     A.  It's on the website. It's a big document
13 there about all kind of things, ADHD, how to apply
14 for accommodations. It's all on the Web page.
15     Q.  In December 2015?
16     A.  It's all there in the student handbook.
17 It's all there in the counseling center of
18 regulations and policies, that accommodation was --
19 records would only be released when the student
20 applies for it through the office of accommodation.
21 Not to me. I don't give accommodations.
22     Q.  I'm not talking about accommodations
23 coordinator. I'm talking about Ross administration.
24     MR. ROMAN:  I'm just going to object,
25  because I think we've asked and answered --

Page 63

1      MR. AWODIYA:  No, no, no. I'm fine with
2  that.
3      THE WITNESS:  What's worse, I can't give
4  documentation to Ross administration. I mean,
5  to who? Ross administration is a broad term.
6  Imagine starting to release information to
7  everybody the secretaries and -- you know, here
8  we have a student who is having a relationship
9  problem. Here's a nice juicy story. What
10 nonsense is that.
11     MR. ROMAN:  Let's wait for questions. I
12 know you're going on and on, and I can tell
13 you're a little frustrated.
14     THE WITNESS:  Yes. Because it's a little
15 bit repetitive.
16 BY MR. AWODIYA:
17     Q.  I think that's --
18     Okay. Talk about plaintiff's relationship
19 in regard to his academic performance, because you
20 said that -- you mentioned multiple times his
21 relationship problems.
22     Can you explain in what regard that had on
23 his academic performance?
24     A.  I think it's more -- it's a subjective
25 thing, in terms of what the plaintiff would say

Page 64

1  affected his academic performance. I could say it
2  would have an ill effect. That's fair to say. And
3  I think the ADHD would have an effect too.
4      Q.  Okay. What about the anxiety that you
5  noted in the record?
6      A.  That would have an effect also.
7      Q.  It would have an effect?
8      A.  Yeah.
9      Q.  You think it had a significant effect?
10     A.  I can't recall. I mean, it's more, again,
11 subjective opinion for the person who was feeling so
12 anxious they couldn't perform. Anxiety can affect
13 people's performance significantly. I don't recall
14 how significant it was in the plaintiff's case.
15     Q.  But it was enough to affect his academic
16 performance?
17     A.  I can't say anxiety was enough to affect
18 the academic performance. Looking at the record, I
19 would say, if it was significant enough to affect
20 academic performance, then the student would have
21 been probably placed on a medical leave and not
22 recommended for the exam.
23     Q.  Okay. So is it correct to say that
24 plaintiff's relationship problems was not a major
25 factor in his academic performance, emphasis on

Page 65

1  major?
2      A.  That's subjective. If the plaintiff was
3  going through a relationship problem, then it could
4  have been a major factor. It may not have been.
5  All I know is that the plaintiff did the exams; was
6  put on treatment, improved; was diagnosed with ADHD,
7  put on treatment, was improved, passed; and left the
8  island passing.
9      Q.  But he passed the first four semesters.
10     A.  Good.
11     Q.  Is that -- what does passing suggest?
12     A.  You tell me. Passing is what?
13     Q.  Well, the first semester plaintiff
14 passed --
15     A.  Uh-huh.
16     Q.  -- with a 66. The minimum passing score
17 was a 66.
18     A.  Uh-huh.
19     Q.  In most schools that's a D.
20     A.  Uh-huh.
21     Q.  Even though it's passing, is it good?
22     A.  No.
23     Q.  In most semesters, plaintiff barely
24 passed. Most semesters his overall grade was in the
25 60s.

17  (Pages 62 to 65)

10/16/2018       Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.       Davendranand Sharma

Page 66

1    A.  Uh-huh.
2    Q.  If he repeats a semester, he is seeing the
3  information a second time --
4    A.  Uh-huh.
5    Q.  -- and has a whole other semester to learn
6  the same information.
7    A.  Sure.
8    Q.  So even if the medication helped him
9  improve --
10   A.  Uh-huh.
11   Q.  -- it can't be the conclusion that that's
12  the only thing that helped him improve.  It may have
13  just been a coincidence, because he's seeing the
14  same information.
15   A.  Sure.  I agree.
16   Q.  You agree?
17   A.  Uh-huh.
18   Q.  Your first encounter with plaintiff, what
19  was the reason?
20   A.  It was a referral because of the
21  relationship problems, emotional problems.
22   Q.  There's a document produced by Ross, which
23  I don't have now, but I'm sure they have it.  The
24  woman who actually referred the counseling center to
25  plaintiff stated it was because he failed his

Page 67

1  semester.
2    A.  The woman who referred --
3    Q.  I can't remember.  They have a document
4  right after he failed.
5    A.  Uh-huh.
6    Q.  -- his semester --
7    A.  Good.
8    Q.  -- saying that --
9    A.  Uh-huh.
10   Q.  -- on those bases he needs to see the
11  counseling center.
12   A.  Good.  They did good.
13   Q.  What does that have to do with his
14  relationship?
15   A.  I only talked for what I know.  So I only
16  saw the plaintiff in December for the first time
17  because of a relationship problem and discovered
18  that there was also academic problems, and
19  subsequently recommended testing for ADHD, which was
20  probably there for long years and not diagnosed
21  during all the plaintiff's time in his high school
22  and college and so on.  So we made the diagnosis
23  correctly.  It was substantiated by a doctor in
24  Maryland, and provided the plaintiff with treatment
25  for ADHD.

Page 68

1    MR. AWODIYA:  Do you have a copy of the
2  document that Ross produced labeled
3  RUSM 000139, so that we can show it to him?
4    MR. ROMAN:  Do you know which one that is?
5    MR. AWODIYA:  It's just labeled
6  RUSM 000139.
7    MR. ROMAN:  I don't have it sorted by
8  Bates numbers.  So if you could describe what
9  it is, that might be helpful.
10   MR. AWODIYA:  It's --
11   THE WITNESS:  Is it relevant to me?
12  BY MR. AWODIYA:
13   Q.  Yes.  Because it has his encounter with
14  Mr. Cuffy -- his first encounter with Mr. Cuffy and
15  his first encounter with you, which is very
16  different than what you're saying right now.
17   A.  Well, you showed me the first encounter,
18  didn't you?
19   I think it was December -- look at it
20  here.  What's different?
21   Are you saying that that's not correct,
22  that the first encounter was not for emotional
23  problems?
24   Q.  Yeah.  I never said that was the first
25  encounter.  The first encounter was on December 9th,

Page 69

1  2015.
2    A.  And that was for what?  Academic problems?
3    Q.  It says -- you put, "Plaintiff felt he was
4  treated unfairly, because he failed by one point."
5    A.  Okay.
6    Q.  Mr. Cuffy -- his first encounter with the
7  counseling center after he failed, Mr. Cuffy
8  notes --
9    A.  Uh-huh.
10   Q.  -- "This morning he reported having
11  intense frightening thoughts of harming himself,
12  which went on for 45 minutes."
13   A.  Uh-huh.
14   Q.  "These results are the result of a call
15  from the student affairs informing him that he
16  failed."
17   A.  Uh-huh.
18   Q.  By -- and he was -- sorry.
19   "That he failed" --
20   A.  Uh-huh.
21   Q.  -- "and that he was one point shy of
22  the" --
23   A.  Okay.  So there was emotional problems.
24   Q.  But not relationship.
25   A.  Well --

18  (Pages 66 to 69)

Page 70

1    MR. ROMAN: Would this be helpful,
2  Mr. Awodiya? This is the December 9th notes.
3  I don't know if that's what you're reading off
4  of now. This appears at least to be the first
5  visit. We've seen the December 12th.
6    MR. AWODIYA: This is enough. Can you
7  please read the first sentence?
8    MR. ROMAN: And we'll mark this one as
9  DE-06. Is that all right?
10    MR. AWODIYA: We can do that.
11    (Thereupon, the referred-to document was
12    marked by the court reporter for
13    Identification as Plaintiff's Exhibit
14    DE-06.)
15    THE WITNESS: Uh-huh.
16  BY MR. AWODIYA:
17    Q. Could you read the first line under
18  "Progress"?
19    A. I read it, yes.
20    Q. Can you –
21    A. "Saw Mr. Cuffy after he received a failing
22  grade for semester 5 and felt hopeless entertaining
23  thoughts of ending his life."
24    Q. And is it correct that this document also
25  says, "Felt he was treated unfairly because he

Page 71

1  failed by one point"?
2    A. Where do you see that? Where is that?
3    Q. It's about four or five lines down.
4    A. Oh, yes. Yes, yes. Good.
5    Q. And then, also says, "He wanted to speak
6  to the dean about changing his grade."
7    A. Yes.
8    Q. It also says, "He was advised to speak to
9  the chair of promotions and student services."
10    A. Yes. Good. Sounds like good advice.
11    Q. So –
12    A. Yes.
13    Q. – what was the reason of your first
14  encounter with plaintiff?
15    A. Emotional problems. So now there's a
16  failing grade, which I didn't remember.
17    Q. Let me rephrase.
18    Did his relationship set the basis for
19  your first encounter with plaintiff?
20    A. Look, your emotional problems was the
21  reason that the student was referred to me. Whether
22  it was because the underlying relationship was a
23  factor, that he failed was a factor, the situation
24  was, there was an emotional crisis.
25    Q. Why did he want to talk with the dean

Page 72

1  about changing his grade?
2    A. Because he's upset about not passing,
3  obviously, I presume. Correct?
4    Q. And you also noted in December he was
5  showing symptoms of ADHD?
6    A. Sure.
7    Q. When he signed the form for relevant
8  accommodations, do you not think that was relevant?
9    A. Not – what wasn't relevant?
10    Q. His symptoms of ADHD and him failing the
11  semester by one point.
12    A. That's two things you're asking. Not
13  failing the semester – and what was the other one?
14  I can't answer to both the questions. So which one
15  you want?
16    So what was relevant? What are you
17  talking about?
18    Q. I'm sorry. Let me start over. I forgot
19  what I asked you. I was saying something about – I
20  was saying something about – oh. He was upset
21  about failing the semester.
22    A. Uh-huh.
23    Q. He went in to speak to the dean about
24  changing his grade.
25    A. Yes.

Page 73

1    Q. And you noticed symptoms of ADHD –
2    A. Yes.
3    Q. – to the extent that you recommended an
4  assessment for the ADHD.
5    A. Yes. We went over that.
6    Q. And he signed the form for the release of
7  information relative to academic accommodations.
8    A. Yes.
9    Q. If you noticed these things –
10    A. Yes.
11    Q. – at that time –
12    A. Uh-huh.
13    Q. – how is that not relevant?
14    A. To what?
15    Q. Academic accommodations.
16    A. There's no relevance – this form was done
17  for – for the emotional crisis to get the student
18  back home.
19    Relevance for academic accommodation can
20  only come in place if there is a request. We went
21  over this over and over. Yes, yes, I would support
22  academic accommodation 100 percent, 1,000 percent,
23  100,000 percent if a request is made. I cannot send
24  details of a diagnosis to anybody unless there's a
25  request to send it and for a purpose. It's not my

19 (Pages 70 to 73)

Page 74

1    opinion. It is what the plaintiff wants.
2        He wants accommodation, put it in writing.
3    It's done. It's granted. The university does not
4    deny students accommodation once documentation is
5    adequate.
6        Q. I don't want to dive back into the form.
7        A. That's what I'm saying. Yeah. I think
8    we've been over this and over this.
9        Q. I was just asking about the information
10   being relevant to academic accommodations.
11       So let me ask you this.
12       A. Yes.
13       Q. His ADHD symptoms that you observed in
14   December 2015 –
15       A. Uh-huh.
16       Q. – do you consider it relevant to academic
17   accommodations?
18       A. Yes. Yes. We went over that. And the
19   diagnosis was correctly made, that there was ADHD
20   that the student had for a long time and did not get
21   treated for, and then, comes to me first time, gets
22   a diagnosis, and is treated for it. So that's it.
23   Student was helped. The student performed well.
24   Whether repeating the semester helped, the student
25   performed well. The student left Dominica in good

Page 75

1    spirits in April, went off to do the comp, right?
2    That's my recollection.
3        Q. (Nod in the positive.)
4        A. Student did not apply for accommodation or
5    request to give out documents for accommodation.
6    That's it.
7        MR. AWODIYA: I think we're good.
8        MR. ROMAN: We'll take a short break, and
9    I'll have some questions, and then, we'll wrap
10   it up. Let's take a quick break, and then,
11   we'll come back in.
12       (Whereupon, a break was taken from 3:17 to
13   3:24 p.m.)
14       CROSS-EXAMINATION
15   BY MR. ROMAN:
16       Q. Good afternoon, Dr. Sharma. As you know,
17   we've met before. My name is Ryan Roman. I'm one
18   of the attorneys representing Ross University.
19       I'd like to start by showing you – and I
20   only have a quick set of questions on the medical
21   notes, some of which we've gone through today, and I
22   think only one of which we haven't shown you today.
23       Starting with Exhibit 06, do you have that
24   in front of you still? That was the most recent one
25   we used from December 9, 2015. Let me just write

Page 76

1    the exhibit number on it so we don't get too
2    confused.
3        A. Uh-huh.
4        Q. This is the December 9th, 2015 note.
5        Are these your notes from your appointment
6    with Mr. Awodiya on December 9, 2015?
7        A. Yes.
8        Q. And were these notes taken at or around
9    the time of that appointment?
10       A. Yes.
11       Q. Are these record that are kept by the
12   counseling center in the ordinary course of it's
13   business?
14       A. Yes.
15       Q. Okay. On that particular document, I want
16   to draw your attention to a paragraph towards the
17   bottom of that page. It starts with, "He had a
18   relationship break up."
19       Do you see that paragraph?
20       A. Yes.
21       Q. Take a moment to review that paragraph and
22   just let me know when you're finished.
23       A. Yes.
24       Q. Would -- so does this – the notes from
25   this meeting on December 9th, 2015, does that

Page 77

1    include any information you obtained from
2    Mr. Awodiya about relationship issues?
3        A. Yes.
4        Q. And would that paragraph reflect the
5    information you learned?
6        A. That's correct.
7        Q. Okay. Do you see in this set of notes –
8    this December 9th, 2015 set of notes, any reference
9    to ADHD?
10       A. No.
11       Q. At this time, on December 9, 2015, had
12   Mr. Awodiya been diagnosed with ADHD?
13       A. No.
14       Q. All right. Do you recall when the
15   diagnosis was actually made?
16       A. The actual making of it, I think, was in
17   February 2016.
18       Q. And if I turn your attention to Exhibit
19   03, which is in that pile in front of you, I'll ask
20   if that is the appointment you're thinking of?
21       A. Yes, that's correct.
22       Q. Okay. All right. Next I'd like to turn
23   your attention to Exhibit 01.
24       A. Yes.
25       Q. And are these your notes from a meeting

20  (Pages 74 to 77)

Case 0:18-cv-60482-RKA   Document 138   Entered on FLSD Docket 01/29/2019   Page 36 of 119

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

Page 78

1     with Mr. Awodiya on December 14, 2015?
2          A.  Yes.
3          Q.  And were these notes taken at or around
4     the time of that meeting?
5          A.  Yes.
6          Q.  And are these records that are kept in the
7     ordinary course of business by the counseling
8     center?
9          A.  Yes.
10         Q.  Next I'd like to it turn your attention to
11    Exhibit 03, which is actually the one we looked at a
12    moment ago, which is February 12, 2016.
13              Are these your notes from your appointment
14    with Mr. Awodiya on February 12, 2016?
15         A.  Yes.
16         Q.  And were these notes taken at or around
17    the time of that meeting?
18         A.  Yes.
19         Q.  And are these – are these records that
20    are kept in the ordinary course of business by the
21    counseling center?
22         A.  Yes.
23         Q.  Next I'll turn your attention to
24    Exhibit 04, and this appears to be notes from a
25    March 11, 2016 meeting.

Page 79

1              Do you see that?
2          A.  Yes.
3          Q.  And are these notes taken at or around the
4     time of that meeting?
5          A.  Yes.
6          Q.  And are these records that are kept in the
7     ordinary course of business by the counseling
8     center?
9          A.  Yes.
10         Q.  And the last one is one we have not yet
11    marked in this proceeding.  I will mark it as
12    Exhibit 07.  Here's a copy.
13              (Thereupon, the referred-to document was
14              marked by the court reporter for
15              Identification as Defendant's Exhibit
16              DE-07.)
17    BY MR. ROMAN:
18         Q.  All right.  Can you describe what that
19    document appears to be?
20         A.  Medical follow-up note.
21         Q.  And for what date?
22         A.  5th of April, 2016.
23         Q.  Okay.  Does this – are these notes that
24    were taken at or around the time of the April 5th,
25    2016 meeting?

Page 80

1          A.  Yes.
2          Q.  And are these records that are kept in the
3     ordinary course of business —
4          A.  Yes.
5          Q.  — by the counseling center?
6          A.  Yes.
7          Q.  Did Mr. Awodiya ever ask you for an
8     accommodation?
9          A.  No.
10         Q.  Did Mr. Awodiya ever ask you to request an
11    accommodation on his behalf?
12         A.  No.
13         Q.  Did you ever agree with Mr. Awodiya that
14    you would request an accommodation on his behalf?
15         A.  No.
16         Q.  Did you ever speak with Matthew
17    Stewart-Fulton about Mr. Awodiya getting an
18    accommodation?
19         A.  No.
20         Q.  When a student signs a release of their
21    records for the purpose of requesting an
22    accommodation, does the counseling center at Ross
23    immediately share the students information at that
24    time?
25         A.  No.

Page 81

1          Q.  Do you automatically share the student
2     information just because a release is signed?
3          A.  No.
4          Q.  Are you aware of any reasons why a student
5     might not want an accommodation even though they may
6     be entitled to one?
7          A.  Just repeat that question.
8          Q.  Sure.  Are you aware of any reasons why a
9     student might not want an accommodation, even if
10    they are entitled to one?
11         A.  Oh.  General reasons.
12         Q.  Any reasons that you can think of?
13         A.  Yes, yes.  It's quite, actually, common
14    that students, in my experience, would not want the
15    accommodations.
16              One, they're now identified as having a
17    disability.  They're placed in special accommodation
18    rooms that are noise free.  So other students are
19    able to see them, and they tend to be embarrassed
20    about the conditions.  So they're seen as disabled
21    by their colleagues and friends.  So often they feel
22    shy about it.
23              The other reason is, they improve well in
24    treatment and perform much better at a normal –
25    well, at a good academic level, and so, they don't

## Page 82

1  see the need for it. And I think also there's -- my
2  experience, like the big reasons are sort of
3  cultural. The request for accommodation involves
4  getting information from family members and school
5  teachers from back home -- back from their home
6  school, and they tend to be shy about their family
7  knowing that they have this condition, because often
8  the families would have been the one who were not
9  taking them for the diagnosis despite academic
10 problems earlier. Those are the three big reasons
11 in my experience.
12     Q. If you had received a request from the
13 accommodations office for information relating to
14 Mr. Awodiya, can you walk us through the process of
15 what you would have done in response to that
16 request?
17     A. Yes. Once we get a request from the
18 accommodations office, we would prepare a
19 document -- a detailed document that has the
20 diagnostic instruments used; the cards, for example.
21 We would submit that document with an interpretation
22 of the results pointing to things like severity of
23 the condition. We would emphasize that, despite
24 treatment, the student is also struggling with time
25 for the exams. So it would be in the student's

## Page 83

1  favor to have that particular document.
2         Our document is pretty strong. So it's a
3  detailed letter that's sent to the accommodations
4  office and it has to say at the end of it that we
5  recommend extra time, which is time-and-a-half for
6  the accommodation for the student, and it's usually
7  also a noise free environment.
8         MR. ROMAN: That's all the questions I
9  have for you. I appreciate your time. Thank
10 you.
11        THE WITNESS: Thank you.
12        MR. AWODIYA: Can I cross?
13        MR. ROMAN: Please.
14             REDIRECT EXAMINATION
15 BY MR. AWODIYA:
16     Q. Could a student -- those reasons that you
17 just discussed with your counsel, did plaintiff
18 state any of those reasons to you?
19     A. The plaintiff never requested
20 accommodations, so there was no relevance of
21 reasoning for that -- those general situations. So
22 there was no relevance to -- as there was no request
23 for accommodation. However, in terms of my
24 recollection, I seem -- I seem to think there was
25 some concerns by the plaintiff in his history about

## Page 84

1  his family not being very supportive of that kind of
2  diagnosis or disability.
3     Q. So just to be clear, are you saying that
4  plaintiff never denied help with accommodations?
5     A. Never denied help?
6     Q. You say some students along the line --
7  you say some students refused --
8     A. No.
9     Q. -- to get accommodation.
10    A. No. I was saying, generally, some
11 students do not wish or don't apply for
12 accommodation, even knowing that it's available,
13 because there is several reasons, like cultural bias
14 and fear of being labeled as a disabled person and
15 so on.
16    Q. So to follow-up on that, would one's
17 family know any of this, if he didn't expressly sign
18 a release form?
19    A. Part of the -- this is not from our health
20 service, but to answer the question, the family are
21 asked by the accommodations office to provide
22 information about the student's disability from
23 early life.
24    Q. So could the student convey that himself?
25    A. No. It's part of the requirement to have

## Page 85

1  a family member provide a letter. Very close family
2  member. I'm speaking for accommodations. So these
3  questions, I believe, would be better asked to the
4  accommodations office, because that's their
5  requirement. That's not our requirement for the
6  diagnosis, because we -- we accept the student's
7  word, the memory of the academic problems in
8  childhood.
9     Q. So two things. You said that -- when you
10 say, "they," are you talking about the
11 accommodations coordinator or Ross University?
12    A. Accommodations office.
13    Q. So the accommodations coordinator. You're
14 saying that they require --
15    A. Yes.
16    Q. -- that a close family member --
17    A. Yes. As I said, this is better from the
18 accommodations office, because I'm speaking for
19 them. That's their requirement.
20    Q. So you don't have personal knowledge as to
21 any of the reasons you gave Mr. Ryan Roman?
22    A. For what?
23    Q. Well, you said --
24    A. In general?
25    Q. Not in general. Specifically.

22 (Pages 82 to 85)

Page 86

1       A.  Uh-huh.
2       Q.  You said that some students wouldn't get
3   accommodations or wouldn't try to get accommodations
4   because of the knowledge being discovered through
5   their family, but then, when I asked you about it,
6   you also said, it's a better question for them,
7   because you don't really have --
8       A.  The accommodations office has the numbers
9   of items that are required for accommodation, which,
10  as far as I know, includes family member -- a close
11  family member signing that or giving a letter -- a
12  descriptive letter, including childhood records and
13  so on about the student.
14      So often a student may even go to that
15  accommodations office, attend an interview with the
16  accommodations officer, and when they hear that they
17  have to get a letter from home, from their mommy or
18  somebody, they stop it, because they don't want
19  their family to know that they have that disability.
20  That's why I say, in a cultural context, plenty of
21  times a student would not apply for accommodations.
22      Q.  To the best of your knowledge of the
23  Americans with Disabilities Act, in regards to
24  students, is that policy required in your
25  experience?

Page 87

1       A.  Uh-huh.
2       Q.  With Americans with Disabilities Act, is
3   that policy from the accommodations coordinator
4   required?
5           MR. ROMAN:  I'll object to it calling for
6       a legal conclusion.
7           THE WITNESS:  Yes.  It's not my business
8       to know what they require.  The Americans with
9       Disabilities Act is based on the diagnosis.
10  BY MR. AWODIYA:
11      Q.  Let me ask you this.  If Ross gives a
12  strict policy for getting academic accommodations
13  for a student --
14      A.  Uh-huh.
15      Q.  -- is the only way to get academic
16  accommodations by strict adherence to that policy?
17      A.  Yes.
18      Q.  What if the policy imposes more policies
19  than is required by law?
20      A.  I can't answer that.  I don't know what
21  more policies are required by law.  I know what is
22  required -- I have an idea what is required by the
23  accommodations office.
24      Q.  So even if a student had documentation of
25  ADHD, had a diagnosis --

Page 88

1       A.  Uh-huh.
2       Q.  -- the symptoms of those --
3       A.  Uh-huh.
4       Q.  -- the diagnosis, and how it affects the
5   exam, and they requested accommodations, but refused
6   to go to his family --
7       A.  Yes.
8       Q.  -- that student would not get
9   accommodations?
10      A.  Like I said, would not.  They may not get,
11  because the accommodation process is not from me.  I
12  can't talk for them, but it is likely they may not
13  get accommodations.
14      Q.  So how do you know it's required?
15      A.  Because I know generally what the
16  accommodations office requires.  From us, they
17  require the student's diagnosis, but they would also
18  require other documentation that they determine is
19  relevant.
20      Q.  Help me understand.  You say, "may --
21      A.  Uh-huh.
22      Q.  -- require," and then, you say, "require."
23      A.  No, no, no.  I said, they would require --
24  they would require additional documentation.  And
25  when they have all this documentation in place, they

Page 89

1   still may deny -- they determine accommodation, not
2   me.  So those questions are best for accommodations.
3   I can't say that the person will get accommodations
4   even if I supply a letter to them.  When the
5   students apply for accommodations, and I do the
6   letters, I actually sit down with them and tell
7   them, "There is not a guarantee that my letter will
8   get you accommodations."
9       Q.  How can you testify to saying that a
10  student would not attempt to get accommodations if
11  you don't even know if it's required?
12      A.  What is required?
13      Q.  You're saying that they may get
14  accommodations, they may not, if they are able to
15  get the information from their family.
16      A.  Right.
17      Q.  If that's the case, if you don't know the
18  outcome of it, then how can you testify -- how can
19  you even give any student any knowledge about
20  accommodations based on exposure to family, if you
21  don't even know if it affects?
22      A.  I don't.  I can't give them a guarantee.
23  My job is to have the student get better.  I treat
24  them.  Accommodations is not in my portfolio.  As I
25  said before, not my portfolio.  I cannot guarantee

23  (Pages 86 to 89)

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

Page 90

1  they will get accommodations. Even though I write a
2  letter saying, please give them time-and-a-half, we
3  are happy with diagnosis, the accommodations office
4  takes their own process. So you have to speak to
5  them to determine if the documentation or the
6  student's need to go to them and determine if
7  everything that they have, medical letter and so on,
8  fulfills the requirement.
9          Actually, I think if you read the student
10 handbook, it gives them a list of things that they
11 require.
12     Q.  Okay. Let's move on a little bit from
13 that.
14          Is it possible for a student to just have
15 extended testing time and not be placed in a
16 different room?
17     A.  Yes.
18     Q.  Okay.
19     A.  But hold on a second. That's, again, not
20 my portfolio. When they give accommodations, and
21 the request is made to give them time-and-a-half or
22 extended time, that is done through the exam center.
23 So those questions about can they be given extra
24 time and still be in the general group, I can't say
25 for sure. I just — my thinking, I would say, it

Page 91

1  seems possible, but a reflection, I think most of
2  the time they actually are put into a special area,
3  because they fall into the accommodations list.
4      Q.  Okay.
5      A.  So they have to be identified for — yes,
6  they gotta go — more than likely they will go into
7  a separate room.
8      Q.  This is very important right here.
9          You said, in your experience, students
10 don't want accommodations, because of other students
11 finding out by being placed in a different room —
12     A.  Yeah.
13     Q.  — and because of family members.
14     A.  No. So let me correct that. I said, some
15 students. I did not say all students. Some
16 students don't want it, because family might find
17 out or they're seen to go into this other room that
18 is for the disability students.
19     Q.  Even if some students. It doesn't matter
20 if it's even one student.
21     A.  Uh-huh.
22     Q.  If you don't know if those things are
23 required or how flexible they are, then how can a
24 student not want — it's — let me rephrase.
25          If a student is concerned about —

Page 92

1      A.  Uh-huh.
2      Q.  — being placed in a different room or
3  going to his family members for information of his
4  disability —
5      A.  Uh-huh.
6      Q.  — would you tell that student that it is
7  possible to still accommodate that person in a way
8  that they don't have to?
9      A.  I can't — I can't tell them that. I'm
10 not the accommodations office. I have nothing to do
11 with dispensing the accommodations. I cannot tell
12 them.
13     Q.  I perfectly understand that.
14          But what if a student just comes to you
15 for help?
16     A.  I can't tell them things I don't know. I
17 don't give advice on what I don't know.
18     Q.  What if the student assumes —
19     A.  Uh-huh.
20     Q.  — that he has to be put in a different
21 room. He comes to you and says, Dr. Sharma, I need
22 accommodations, but I'm scared of being put in a
23 different room.
24     A.  Sure.
25     Q.  What would you tell him, there's nothing I

Page 93

1  could do?
2      A.  No. I would say, you need to speak to the
3  accommodations office about that special request.
4  It's not in my portfolio. I can't tell you if it's
5  possible.
6      Q.  Then would you write a letter?
7      A.  To say what?
8      Q.  To the accommodation coordinator to that
9  effect?
10     A.  If they asked for a letter to say they
11 want to be in the regular -- with the other
12 students, we could, but we don't do it, because,
13 again, that's not my portfolio. They have to write
14 it to — I could write it and say, yes, please help
15 this guy, but it's like writing to the judge, you
16 know, after you send it, please help. It's — the
17 accommodation officer is where that request must go,
18 not to me.
19     Q.  You have no personal knowledge as to
20 whether a student would be forced to accept those
21 accommodations that would expose him to the family
22 and other students?
23     A.  Forced to accept?
24          Nobody is forcing anybody.
25     Q.  You're saying required.

24  (Pages 90 to 93)

Page 94

1     A.  Yeah.
2     Q.  But you don't actually know the outcome.
3     A.  No.  I mean, I would — I would — I don't
4  know the outcome.  It's an individual thing.
5  Everybody is individual.
6         So I know there are students who don't go
7  for — don't accept the accommodation, because the
8  circumstances that are now brought to their
9  attention by the accommodation officer.  Student
10  applies for accommodation, medical records request,
11  letter of support, go for the interview with the
12  accommodation officer, who interviews them, so that
13  he or she is satisfied that the student deserves an
14  accommodation.
15     Q.  Okay.
16     A.  He takes all the documents.  Now, in that
17  interview, he would tell them about the process,
18  that the exam center would now be alerted, there's a
19  special room that is provided, it's noise free and
20  so on, you know.
21     Q.  Are you still a current employee at Ross?
22     A.  Yes.
23     Q.  Will you be a current employee at Ross at
24  the time of trial?
25     A.  When would be the trial?

Page 95

1     Q.  In March.
2     A.  No.  I will be leaving Ross at the end of
3  December.
4     Q.  Why are you leaving Ross?
5     A.  Is that relevant to this?
6     Q.  It might be.
7         MR. ROMAN:  If you can answer, you can
8  answer.  I won't object.  If it has anything to
9  do with this case.
10         THE WITNESS:  No, it doesn't have anything
11  to do with this case.  I resigned in July,
12  because I want to go back to my country, which
13  is Guyana, to care for my mom and my elderly
14  parents.
15  BY MR. AWODIYA:
16     Q.  I want to remind you that you are under
17  oath —
18     A.  Uh-huh.
19     Q.  — and that lying under oath would be —
20         MR. ROMAN:  I'm going to object to this,
21  because it sounds like you're harassing the
22  witness by talking about lying under oath.  If
23  you have something specific to show him, that's
24  one thing, but I'm not going to let you berate
25  a witness about answering a question under

Page 96

1  oath, which he understands he swore an oath and
2  answered the question.
3         MR. AWODIYA:  Can you please note, however
4  people note it, that I want to file a motion to
5  compel him to answer that question regarding
6  why he resigned from Ross.
7         MS. BOMAR:  He just answered it.
8         MR. AWODIYA:  For the record, Dr. Sharma did
9  answer that question.  Unless there's a
10  follow-up or anything else, I don't see where
11  he's refused to answer a question.
12  BY MR. AWODIYA:
13     Q.  Is that the complete answer?
14     A.  Well, I gotta go read everything in my
15  letter of resignation, but I resigned on good terms
16  at Ross, and serving out my time at Ross, and I'm
17  going back home to my country to support my parents.
18  I think it's in my letter of resignation.  That's
19  one of the big reasons.
20     Q.  So just to be clear, your reasons for
21  resigning —
22     A.  Uh-huh.
23     Q.  — are in your letter of resignation?
24     A.  Yes.  That's why you write a letter of
25  resignation.

Page 97

1         MR. ROMAN:  I'll also object, because this
2  is well beyond the scope of our examination.
3  So for the purpose of rebuttal, it's really
4  limited.
5  BY MR. AWODIYA:
6     Q.  Have you ever raised any concerns to Ross
7  administration about how they handle academic
8  accommodations?
9         MR. ROMAN:  Same objection.
10  BY MR. AWODIYA:
11     Q.  Dr. Sharma, unless he tells you not to
12  answer, you can answer the question.
13         MR. ROMAN:  At some point I am going to
14  shut this down.  You've had your opportunity to
15  ask questions, and you are really limited to
16  the scope of what we asked about.
17  BY MR. AWODIYA:
18     Q.  Let me move on.
19         Will you be in the country in March for
20  the trial?
21     A.  No.
22     Q.  So you won't be able to testify in March?
23     A.  Well, I wouldn't be in the country, you
24  know.  So — I'm not saying I wouldn't be able, but
25  I — I had no plans for coming.

25  (Pages 94 to 97)

10/16/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.     Davendranand Sharma

Page 98

1    Q.   You have no plans on coming to the trial?
2    A.   Well, not really.  I was hoping that this
3    deposition would serve it's purpose.  It's pretty
4    clear.  We went through the — my role in the
5    plaintiff's health problems and diagnosis of ADHD.
6    I don't see anything, you know —
7    Q.   Last one, and then, if they want to take
8    over, they can.
9         Did plaintiff want to take medication?
10        MR. ROMAN:  I'll make the same objection
11   about the scope, but you can answer.
12   BY MR. AWODIYA:
13   Q.   Did plaintiff want to take medication for
14   his ADHD?
15        THE WITNESS:  I can answer the question
16   you said?
17        MR. ROMAN:  Yes.
18        THE WITNESS:  Yes, yes.  As far as I know,
19   yes.
20   BY MR. AWODIYA:
21   Q.   He showed no hesitance, no —
22   A.   The thing is, hesitation — I don't
23   remember — record anything of that sort.  I know it
24   seems — from my recollection of — in looking at
25   the records, the plaintiff took medications quite

Page 99

1    freely.  Nobody forces it down anybody's — it's
2    written.  The person takes it if they want or don't
3    take it if they don't want.  It's nothing to do with
4    me.  I mean, you know —
5    Q.   So if plaintiff didn't want medication for
6    ADHD —
7    A.   Uh-huh.
8    Q.   — why would he bring — can you think of
9    any reason why he would bring his assessment from
10   the U.S. to Ross?
11   A.   If the plaintiff didn't want the
12   medication?
13   Q.   What reason would he have for bringing his
14   documentation?
15   A.   I don't see any evidence of the plaintiff
16   not wanting medication.  I never said the plaintiff
17   did not want medication.
18   Q.   Whether you know or not is not relevant.
19   Other doctors may know.  Other doctors do know that
20   he did not want medication.
21   A.   I got you.
22   Q.   So why would he bring his documentation of
23   his ADHD and his symptoms to Ross?
24   A.   I don't know.  That's the person's
25   business.  They brought — they brought the evidence

Page 100

1    of another assessment, if that is what was brought.
2    As I said, I've never seen that doctor's letter
3    before.
4    Q.   Have you seen the Conners CPT thread?
5    A.   I saw the CPT, because it was in the
6    things shown to me yesterday.  And I don't think our
7    records have the CPT that was done in the U.S.  We
8    have our own Conners.  That's our tool for
9    diagnosing ADHD.
10   Q.   And one of the counseling notes, Mr. Cuffy
11   says that plaintiff brought his assessment over from
12   the U.S. to the counseling center.
13   A.   So you need to talk to Mr. Cuffy about
14   that, okay?  I'm not denying that it's true.  I just
15   didn't see it.
16   Q.   What would he gain from bringing his
17   documentation to Ross, if he did not want
18   medication?
19   A.   I don't know that the plaintiff never
20   wanted medication.  I don't know what he would gain,
21   because it's good — there's nothing wrong with
22   having a second opinion.  If a person wants a second
23   opinion and gets the same diagnosis, great.  We
24   always happy about that.  I wouldn't tell anybody
25   don't go to the U.S. and have another doctor do the

Page 101

1    diagnosis.  I think it's very good that the
2    plaintiff went and got the same diagnosis that was
3    made by us.  Brilliant.  Very good.  So I'm happy
4    that two doctors make the same diagnosis.  Great.
5    There's no conflict of anything here.  Just happy.
6    Good, right?
7    Q.   If it makes sense to you.
8    A.   It makes sense to me that that person has
9    a doctor in the States to confirm the ADHD.
10   Fantastic.  It means that I'm right in my assumption
11   that the ADHD issues was right.  Diagnosis is good.
12   Q.   But you — is there a benefit for the
13   student?
14   A.   For having another doctor diagnose the
15   patient or for the diagnosis?
16   Q.   Why would that be — he showed no
17   indication of doubting the first —
18   A.   Well, I have no idea why this plaintiff
19   went and got another doctor to diagnosis him.  Maybe
20   he didn't believe that — I can't just speculate
21   what's in the plaintiff's mind.  The plaintiff would
22   know why he went to the doctor and got another
23   doctor to diagnose.  While we were in the process of
24   making the diagnosis, the plaintiff goes off and
25   gets another doctor to diagnose the ADHD, and it's

26 (Pages 98 to 101)

10/16/2018    Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.    Davendranand Sharma

## Page 102

1 also the same diagnosis that we make. So that's not
2 uncommon that people sometimes seek a second
3 opinion. The plaintiff would know what was in his
4 mind when he chose to go to the other doctor. We
5 didn't recommend that the plaintiff go and see
6 somebody else, if that's what you're thinking.
7        Q. Can you read back his statement earlier in
8 the deposition where he says -- I can pull it up
9 exactly for you.
10        (Whereupon, the requested testimony was
11        read back by the court reporter.)
12        THE WITNESS: That's true. What's the
13 problem? Not with a doctor in the USA. We
14 recommended assessment, which was started in
15 our counseling center.
16 BY MR. AWODIYA:
17        Q. So wouldn't it make the U.S. doctors the
18 second opinion?
19        A. I don't know anything about U.S. doctor.
20 That statement that you just read is that we
21 started -- recommended that -- based on my seeing
22 your ADHD symptoms, we started the process in
23 Dominica, which was done. You had the -- the
24 plaintiff had the Conners done. There was no
25 recommendation for going to see another doctor in

1        CERTIFICATE OF OATH
2 STATE OF FLORIDA  )
3 COUNTY OF BROWARD )
4        I, the undersigned authority, certify that
5 DAVENDRANAND SHARMA personally appeared before me
  and was duly sworn.
6        WITNESS my hand and official seal this
  29th day of October, 2018.
7
8
9        KELLY A. ESPOSITO
         Notary Public, State of Florida
10        My Commission No. GG248978
         Expires: 9/3/2022
11 + + + + + + + + + + + + + + + + + +
12        CERTIFICATE
13 STATE OF FLORIDA  )
   COUNTY OF BROWARD )
15        I, KELLY A. ESPOSITO, do hereby certify
16 that I was authorized to and did stenographically
   report the foregoing deposition of DAVENDRANAND
   SHARMA; that a review of the transcript was
17 requested; and that the transcript is a true record
   of my stenographic notes.
18        I FURTHER CERTIFY that I am not a
19 relative, employee, attorney, or counsel of any of
   the parties, nor am I a relative or employee of any
20 of the parties' attorney or counsel connected with
   the action, nor am I financially interested in the
21 action.
   Dated this 29th day of October, 2018.
22
23        KELLY A. ESPOSITO
24
25

## Page 103

1 the USA.
2        Having said that, we don't say no either.
3 It's good. It was good. It was done and the
4 diagnosis was made by two psychiatrists. Wonderful.
5 So there's no doubt that there is an ADHD diagnosis,
6 which should have -- that's it. Which was treated
7 by me in Dominica.
8        Q. Perfect. Perfect.
9        A. Yes. I agree.
10        MR. AWODIYA: I don't have anything else.
11        THE COURT REPORTER: Read or waive?
12        MR. ROMAN: We'll read.
13        THE COURT REPORTER: Are you ordering
14 these transcripts?
15        MR. AWODIYA: Of course.
16        THE COURT REPORTER: How do you want it?
17        MR. ROMAN: I think we'll just do a
18 regular order. I'll let you know if that
19 changes.
20        (Deposition concluded at 4:01 p.m.)
21
22
23
24
25

1        ALPHA & OMEGA REPORTING SERVICES, INC.
         1776 EAST SUNRISE BOULEVARD, FIRST FLOOR
2        FORT LAUDERDALE, FLORIDA 33304
         954.523.6422
3
   Ryan Roman, Esq.
4 1 SE 3rd AVenue, 25th Floor
   Miami, Florida 33131
5
6
   Re: Oluwamuyiwa Awodiya v. Ross University School of
7 Medicine
8 Case No. 0:18-cv-60482-KMM
9
10 Mr. Roman:
11        Enclosed please find your copy of the
   deposition of Oluwamuyiwa Awodiya, which was taken
12 on October 16, 2018, in the above-entitled case.
   Also attached are forms of Affidavit and an Errata
13 Sheet to be completed by the deponent when reading
   your copy of the deposition. These forms are
14 self-explanatory.
15        After the deponent has completed these
   forms, please return them to me at the above address
16 for inclusion in the original transcript.
17        Thank you for your cooperation,
18
19
20 
   Kelly A. Esposito
21
22
23
24
25

27  (Pages 102 to 105)

# Exhibit RJ-03

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF FLORIDA
 3
 4   OLUWAMUYIWA AWODIYA,
 5            Plaintiff
 6   vs.                          CASE NO.
                                  0:18-cv-60482-KMM
 7   ROSS UNIVERSITY SCHOOL OF
     MEDICINE, SCHOOL OF
 8   VETERINARY MEDICINE LIMITED,
 9            Defendant.
10
     ```````````````````````````````
11
12
13         VIDEO-CONFERENCED DEPOSITION OF
14             MATTHEW STEWART-FULTON
15
16               NOVEMBER 5, 2018
17                  1:06 P.M.
18
19       ROSS UNIVERSITY SCOOL OF MEDICINE
20             KNOXVILLE, TENNESSEE
21
22
23
24       Deborah West, LCR-314 (TN), CLR
25
```

Page 2

1        APPEARANCES OF COUNSEL
2  (Teleconference Appearance)
3  On behalf of the Plaintiff:
4      PRO SE
        Oluwamuyiwa Awodiya
5      15005 Dahlia Drive
        Bowie, Maryland  20721
6
    On behalf of the Defendants:
7
        Ryan Roman, Esquire
8      Akerman LLP
        Three Brickell City Centre
9      98 Southeast Seventh Street
        Miami, Florida  33131
10      ryan.roman@akerman.com
11  On behalf of Adtalem Global Education:
12      Valarie Bomar
        VP, Senior Associate General Counsel
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        INDEX OF EXAMINATION
2                                Page
3  WITNESS:  MATTHEW STEWART-FULTON
4  Examination
5  By Mr. Awodiya                 5, 40
6  By Mr. Roman                   36
7
8
9
10
11      INDEX TO EXHIBITS
12                                Page
13  Exhibit Number 1
        Bates RUSM 141, 142, 183, 242-243,
14      326, 371-372               36
15  Exhibit Number 2
        Bates RUSM 179-182         37
16
17
18
19
20
21
22
23
24
25

Page 4

1            STIPULATION
2      The deposition of MATTHEW STEWART-FULTON,
3  called as a witness by the Plaintiff, pursuant to
4  all applicable rules on the 5th day of November,
5  2018, at the offices of Ross University School of
6  Medicine, Knoxville, Tennessee, before Deborah
7  West, Licensed Court Reporter and Notary Public in
8  and for the State of Tennessee.
9      It being agreed that Deborah West, a Tennessee
10  Licensed Court Reporter may report the deposition
11  in machine shorthand, afterwards reducing the same
12  to typewritten form.
13      It being further agreed that all formalities
14  as to notice, caption, certificate, transmission,
15  et cetera, are expressly waived, EXCLUDING the
16  reading of the completed deposition by the witness,
17  and the signature of the witness.
18
19
20
21
22
23
24
25

Page 5

1  (1:06 P.M.)
2            MATTHEW STEWART-FULTON,
3  called as a witness and having been first duly
4  sworn, was examined and testified as follows:
5            EXAMINATION
6  BY MR. AWODIYA:
7      Q    Please state your full name for the
8  record.
9      A    Matthew John Stewart-Fulton.
10      Q    May I call you Mr. Fulton or what
11  would you prefer to be called?
12      A    Please call me Matthew.
13      Q    Matthew.  Okay.  Matthew, my name is
14  Oluwamuyiwa Awodiya, and I am the plaintiff in this
15  case against Ross University School of Medicine.
16            During this deposition I will, in
17  most part, refer to myself as plaintiff.  For the
18  record, do you understand that if I say plaintiff
19  that I am referring to myself?
20      A    I do.
21      Q    Additionally, let me tell you some
22  ground rules for this deposition and if you have
23  any questions you can ask me.
24            First, you are under oath and have
25  sworn to tell the truth.  The effect of that truth

2 (Pages 2 - 5)

1  is the same as if you were testifying in court.  If
2  I ask you a question that you don't understand,
3  tell me you don't understand it and I will rephrase
4  it as often as necessary until you are comfortable
5  that you understand the question you're answering.
6          It's also very important that you
7  answer my questions through spoken word, not
8  through facial expressions or gestures.  Please
9  refrain from answering questions with sounds like
10 uh-huh or huh-uh or words that may not get
11 transcribed accurately.  You must actually say a
12 word, if you mean yes, say yes, not uh-huh.
13         Also, please allow any questions and
14 any objections to be fully stated before you speak.
15 The court reporter cannot take down more than one
16 person speaking at the same time.  Otherwise, the
17 record will be jumbled and the questions and
18 answers will be disjointed.
19         Ross lawyers may make objections to
20 questions that I ask you.  They are objections for
21 the judge to consider later.  You are still
22 required to answer the question unless you are
23 instructed not to do so by the lawyers.
24         Everything that is said is being
25 taken down by the court reporter verbatim.  You

1  will have an opportunity to read the deposition
2  transcript and make corrections you believe are
3  necessary.  If you make changes in your testimony
4  that are inconsistent with the answers given during
5  the deposition, I will be entitled to comment on
6  those discrepancies at trial to question your
7  truthfulness.
8          Do not guess when providing your
9  responses.  Instead, please provide your best
10 estimate based on your recollection.  If you need
11 to take a break at any time, please let me know.
12 All I ask is that we not take a break while there
13 is a question pending.
14         Are you here today under the
15 influence of any medication or suffering from any
16 physical, mental condition that would affect your
17 ability to hear my questions or to give truthful
18 answers?
19     A    I am not.
20     Q    When did you first hear about this
21 lawsuit?
22     A    I don't recall the exact date.
23     Q    Can you give me an estimate?
24     A    Sometime within the last several
25 months.

1      Q    Okay.  What is your job position at
2  Ross University?
3      A    Would you like my job title?  What
4  specifically would you like to know?
5      Q    We can start with your job title.
6      A    My job title is assistant director
7  for student conduct and integrity in academic
8  accommodations.
9      Q    In regard to academic
10 accommodations, what is your role as an academic
11 accommodations coordinator?
12     A    I manage the accommodations process.
13     Q    Who makes the final determination --
14     A    I'm sorry, you got cut off.
15     Q    Who makes the final determination?
16     A    I make the final determination.
17     Q    Has it always been like that?
18     A    In the time that I have been working
19 in this role, it has.
20     Q    Do you ever remember meeting the
21 plaintiff in person?
22     A    I do not.
23     Q    Just to be clear, you do not
24 remember --
25         (Reporter clarification.)

1  BY MR. AWODIYA:
2      Q    You do not remember seeing the
3  plaintiff in your office for any reason?
4      A    I do not recall meeting the
5  plaintiff.
6      Q    Can a family member of a student
7  request for accommodations on behalf of the
8  student?
9      A    No.
10     Q    Why is that?
11     A    Our process states that the student
12 requesting accommodations is the one who has to
13 make the request and submit the application.
14     Q    And that's what it says in the
15 student handbook?
16     A    That's correct.
17     Q    Give me one second.
18     A    No worries.
19     Q    Can any other faculty request
20 accommodations on behalf of the student?
21     A    No, they cannot.
22     Q    Can any other faculty recommend
23 accommodations for the student?
24     A    Yes, they can.
25     Q    How do you handle recommendations

3 (Pages 6 - 9)

1 for accommodations?

2    A    If it doesn't come from the student
3 I suggest that the person who's making the
4 recommendation talk with the student about why they
5 are presenting that question and encourage them to
6 have the student come and see me.

7    Q    You, yourself, would not investigate
8 academic options for students when you are informed
9 that they may need academic accommodations?

10    A    I may reach out to a student and let
11 them know that I have been contacted about them and
12 ask if they want to talk about the accommodations
13 process.

14    Q    When you say "may," do you say that
15 you selectively do that?

16    A    No.

17    Q    So what do you mean, you may reach
18 out?

19    A    If the person who has recommended
20 the student to me chooses not to or is not
21 comfortable talking to the student about it, I will
22 reach out to the student.

23    Q    What if the student told the person
24 to recommend accommodations to you on their behalf?

25    A    Please state the question again.

1    Q    What if a student asked the faculty
2 to recommend academic accommodations to you on his
3 behalf?

4    A    I would most likely contact the
5 student and ask them to meet with me.

6    Q    Is that when you begin the
7 interactive process?

8    A    Would you clarify what you mean by
9 "the interactive process"?

10    Q    Is that when you would investigate
11 if an accommodation is needed?

12    A    I need to receive a completed
13 application form before I can review whether or not
14 an accommodation might be needed.

15    Q    So to be clear, if the student asked
16 the faculty to recommend getting accommodations to
17 you, you would reach out to the student?

18    A    Most likely, if the faculty member
19 hadn't, hadn't followed up with the student.

20    Q    How is recommending academic
21 accommodation different than requesting an academic
22 accommodation?

23    A    To clarify, do you mean how is it --
24 if a faculty member recommends a student apply for
25 accommodations, how is that different from a

1 student doing so?

2    Q    No. Let me rephrase. How is a
3 faculty member recommending academic accommodations
4 different than a faculty member requesting academic
5 accommodations on behalf of the student?

6    A    I don't see a significant difference
7 for our process.

8    Q    Can you define what a request is to
9 you?

10    A    Under what circumstances?

11    Q    What do you consider a request?
12 Does the student have to use specific words?

13    A    To request accommodations, a student
14 has to submit an application for academic
15 accommodations. It will be noted as supporting
16 documentation that is referenced in the
17 application.

18    Q    Let's go to one step before that.
19 When a student asks for accommodations -- let's
20 separate for right now, the packet, the
21 documentation, the evidence, simply focusing on the
22 request, not -- not the investigation into whether
23 or not an accommodation is needed or appropriate
24 or -- you know, that seems to just like
25 exploring a possible accommodation.

1         In the absence of that, a student
2 simply asking you for academic accommodations, does
3 that trigger anything?

4    A    Yes.

5    Q    What does it trigger?

6    A    A request to meet. And if they
7 haven't already received a copy, sending them a
8 copy of the application form.

9    Q    So would you consider asking for
10 academic accommodations a request?

11    A    In the context of what?

12    Q    Let me clarify. When -- I am
13 assuming you're talking about a request packet; is
14 that correct?

15    A    It's an application package.

16    Q    Okay. In this package you ask for
17 what information?

18    A    Demographic information about the
19 student. There is a personal statement. And
20 there's supporting documentation from a healthcare
21 provider.

22    Q    So until that is completed, you do
23 not consider any prior statements a request?

24    A    I would like you to clarify what you
25 mean by a request in the context of this line of

4 (Pages 10 - 13)

1 questioning.
2     Q    I have my own definition, but I want
3 you to put yourself in the shoes of a student.  And
4 if he reads somewhere that a request needs to be
5 made, and they don't have knowledge of a packet, a
6 student might just simply define a request as they
7 need help with a certain aspect of their education.
8         So what I am asking you is do you
9 only consider a student asking for help a request
10 once you have received all of their medical
11 documents and background information?
12     A    A verbal request would be the first
13 step of the process.
14     Q    So you accept verbal requests?
15     A    To trigger the process for applying
16 for accommodations.
17     Q    Can a family member of a student
18 recommend academic accommodations on behalf of the
19 student?
20     A    Yes.
21     Q    Would you also accept that
22 recommendation if it was verbal?
23     A    To clarify, you mean if a family
24 member were to recommend to me that a student they
25 were related to should receive academic

1 accommodations?
2     Q    Yes.
3     A    I am afraid I don't understand what
4 you mean by this question.
5     Q    The actual recommendation, can it be
6 verbal?
7     A    Yes.
8     Q    Can a student's doctor do the same?
9     A    Yes.
10     Q    Can a student's psychiatrist do the
11 same?
12     A    Yes.  Just to be clear, when you say
13 can one of these parties recommend, as in recommend
14 to me that a student receive accommodations; is
15 that correct?
16     Q    Yes, that's exactly what I am
17 saying.
18     A    Okay.  Thank you.
19     Q    I apologize, I am a little all over
20 the place so I am kind of trying to collect my
21 thoughts.
22     A    No worries.
23     Q    So does a request for accommodation
24 have to be in writing?
25     A    It does.

1     Q    But you also accept verbal requests?
2     A    Not for consideration.  Someone can
3 request and then they have to provide the
4 application in writing.
5     Q    Can someone else provide the
6 application in writing to you?
7     A    Someone else could turn it in on
8 behalf of the student.  The application needs to be
9 filled out by the student.
10     Q    So the student could tell someone
11 all of the necessary information and that person
12 can then write it for the student and then turn it
13 in to you?
14     A    Yes.  Although the student has to
15 sign it.
16     Q    What if the student is not able to
17 sign it?
18     A    It is not a circumstance I have ever
19 dealt with.  I don't know.
20     Q    So if a student with no arms needed
21 academic accommodations, would he be then required
22 to submit the request packet in writing?
23         MR. ROMAN:  I will object.  That
24         calls for speculation.  You may answer.
25         THE WITNESS:  I don't know.  I have

1         never dealt with that situation.
2 BY MR. AWODIYA:
3     Q    Can a student, if one came to you
4 with no hands, request academic accommodations that
5 is not in writing?
6         MR. ROMAN:  Same objection.  You can
7         answer.
8         THE WITNESS:  If someone was
9         incapable of writing, someone else could
10         fill out the paperwork on their behalf.
11 BY MR. AWODIYA:
12     Q    I don't want you to answer this
13 question as it is hypothetical.  I want you to take
14 it literally as if a student tomorrow comes in and
15 requests accommodations but is unable to physically
16 write the request down, would you then still accept
17 that as a request for accommodations?
18         MR. ROMAN:  I will object for the
19         same basis.  And that is a hypothetical
20         but you may answer if you can.
21 BY MR. AWODIYA:
22     Q    Let me rephrase.  Don't answer.  Let
23 me rephrase.
24         Do you treat requests for
25 accommodations equally for students with physical

Page 18

1 impairments versus mental impairments?
2      A    Yes.
3      Q    How does a student who is physically
4 incapable of writing down a request actually
5 request for accommodations?
6      A    They would submit an application
7 form.
8      Q    Could that answer connect -- let me
9 rephrase. Are you saying that a student who is
10 physically incapable of writing down a request must
11 still request an accommodation with an application
12 packet?
13      A    That's correct.
14      Q    How would the student do that?
15      A    It would be situational based on the
16 student.
17      Q    Situational in what aspect?
18      A    There are a variety of reasons why
19 someone may not be capable of writing.
20      Q    So if someone is not capable of
21 writing, how are they going to request for an
22 accommodation in writing?
23      A    They could have someone fill out the
24 form as they dictate.
25      Q    Someone can also sign on their

Page 19

1 behalf?
2      A    Say that again.
3      Q    And that someone can also sign on
4 the student's behalf?
5      A    I have never run into this situation
6 so I don't know what the appropriate response would
7 be.
8      Q    I am not asking you about history.
9 I am asking about the qualifications of certain
10 impairments versus other impairments.
11           MR. ROMAN: I will object to that
12      question just because I think the witness
13      has answered it to the best of his
14      ability. If there is anything further,
15      you are welcome to answer.
16           THE WITNESS: I know there are means
17      to have someone who does not fill out
18      paperwork to verify that the paperwork
19      has been filled out by an authorized --
20      someone authorized to do so on their
21      behalf.
22           Off the top of my head, I don't know
23      what that would look like in our process.
24 BY MR. AWODIYA:
25      Q    How would a student know that a

Page 20

1 request packet exists?
2      A    They might find it on the student
3 portal. It's referenced in the academic catalog.
4 It is referenced in the student handbook. If this
5 is a question they asked other colleagues on the
6 Ross campus, they would refer them to it, or to me.
7      Q    In January of 2016, how would a
8 student know that a request packet exists?
9      A    For the same reasons I just stated.
10      Q    The student handbook, in January of
11 2016, does not state anything about a request
12 packet. The request packet doesn't so up in the
13 student handbook until May 2016.
14           So I will ask you again: In January
15 of 2016, how would a student know that a request
16 packet exists?
17      A    It's available on the student portal
18 in the student resources, the handbook, and the
19 academic catalog. I don't recall if they
20 referenced the accommodations application packet
21 specifically, but they do reference that students
22 should contact at that time, me, if they wanted to
23 inquire about receiving academic accommodations.
24           I would then inform the student of
25 the application packet and provide them with one.

Page 21

1      Q    Can one of the attorneys hand you
2 the January 2016 student handbook?
3           MR. ROMAN: This is Ryan. You're
4      looking at the excerpt you sent me which
5      is RUSM 000326. And then it goes to page
6      371 and 372, right?
7           MR. AWODIYA: Yes.
8           MR. ROMAN: I am going to hand that
9      to the witness now.
10           THE WITNESS: Okay.
11 BY MR. AWODIYA:
12      Q    Do you see the academic
13 accommodations section?
14      A    Page RUSM 000371?
15      Q    Yes.
16      A    I am looking at that page.
17      Q    Where does it say to contact you for
18 more information?
19      A    Application, Foundations of Medicine
20 requests for accommodation during the foundational
21 science portion of the curriculum should be
22 submitted in writing to the accommodations
23 coordinator for Foundations of Medicine.
24      Q    That sentence does not say that the
25 writing has to be in an accommodations packet?

6 (Pages 18 - 21)

Page 22

1    A    All right.
2    Q    Neither does it say to contact you.
3    A    Submit it in writing to the
4  accommodations coordinator for Foundations of
5  Medicine.
6    Q    So any writing from that language
7  would do?
8    A    No.
9    Q    How would a student know that
10  specific type of writing would be required?
11    A    Because they would meet with me and
12  I would inform them that they need to submit the
13  application package.
14    Q    The packet does not tell a student
15  to meet with you.  It says that the request should
16  be in writing.
17    A    When a request is submitted in
18  writing, if it's not on an application form, I
19  would provide the student with the application
20  form.
21    Q    Do you see any disconnect between
22  requesting an accommodation in writing and going to
23  you to actually receive the form that actually
24  constitutes a request to be in writing?
25    A    No.

Page 23

1         I would like to ask a question of
2  the attorney.  Is that allowed?
3         MR. ROMAN:  You're welcome to ask.
4    If it's something that you want to
5    discuss privately, we can go off the
6    record and you can ask me and if I can
7    answer, I will.
8         If you would like, we can take a
9    short break.  If not, we can keep going.
10    If you want to discuss something, we
11    should probably go off the record.
12    THE WITNESS:  Yes.
13    MR. ROMAN:  Why don't we take a
14    quick break for a couple of minutes and
15    then we will come right back on.
16    MR. AWODIYA:  No problem.
17    MR. ROMAN:  We will step out so you
18    can stay on the video.
19         (Break taken.)
20    THE WITNESS:  I want to offer some
21    additional clarification related to your
22    question.
23         At the bottom of the same page under
24    the paragraph titled "Responsibility:  To
25    qualify for accommodation a person must

Page 24

1  identify him-herself to the accommodation
2  coordinator for Foundations of Medicine,
3  with the director of office of
4  consultation and support services for IMF
5  clinical sciences.
6         "Declare the disability or suspected
7  disability in writing and request
8  accommodation.  It is also the student's
9  responsibility to obtain a thorough
10  written evaluation from an appropriate
11  professional documenting the presence,
12  extent, and ramifications of the
13  disability.
14         "In addition, the documentation
15  should explain what specific types of
16  accommodation the evaluator believes
17  might be most helpful in offsetting the
18  effects of the disability to an
19  acceptable extent in a medical school
20  environment if possible.
21         "Responsibility for the timely
22  submission of requests and supporting
23  documentation rests upon the student
24  seeking the accommodation."
25

Page 25

1  BY MR. AWODIYA:
2    Q    I don't think that answers my
3  question because you kind of just read something
4  that I must have read during this lawsuit numerous
5  times.  And honestly, I forgot what I asked you.  I
6  tried to remember it and I can't remember it.
7         So I am going to ask you something
8  else.  I completely forgot what I asked you.  I
9  know it had something to do with writing.  Once you
10  stepped out and stepped back in, it kind of left my
11  mind.
12         Earlier you said you had always been
13  the one to make the final decision; is that
14  correct?
15    A    That's correct.
16    Q    In regard to academic
17  accommodations; is that correct?
18    A    That's correct.
19    Q    Can you turn to page -- it is
20  labeled RUSM 000372.
21    A    All right.
22    Q    Do you see where it says, "After
23  careful review and consultation with appropriate
24  professionals, the accommodation coordinator for
25  Foundations of Medicine or the director of

7 (Pages 22 - 25)

Page 26

1 Consultation Support Services will make a
2 recommendation to the associate dean students of
3 affairs or the senior associate dean students of
4 affairs.  The decision of the associate dean,
5 senior associate dean students of affairs or his or
6 her designee will then be communicated in writing
7 to the student."
8         So I want to ask you, was the final
9 decision always yours?
10     A    Based on that paragraph, no.
11     Q    If a student's disability is
12 obvious, will you help that student get academic
13 accommodations?
14     A    If the student's disability is
15 obvious, will I help them get accommodations?
16 Okay.
17     Q    Yes.
18     A    If a student has an obvious physical
19 disability, I will work with them through the
20 accommodation process.
21     Q    How would you initiate that?
22     A    The student would request
23 accommodations.  They would provide appropriate
24 documentation.  And we would figure out, if they
25 are approved, what appropriate accommodations there

Page 27

1 are to address their particular disability.
2     Q    If it is obvious as in you notice
3 that the student has a disability, how would you
4 initiate the academic accommodations process?
5     A    The student needs to initiate the
6 application process.
7     Q    Even if the disability is obvious?
8     A    That's correct.
9     Q    This question right here will be a
10 hypothetical.  If a student who obviously cannot
11 climb a flight of stairs, would you accommodate
12 that student only after he requests for an
13 accommodation?
14     A    I would like you to clarify the
15 circumstances that you're inquiring about.
16     Q    If a student -- if you noticed that
17 a student needs an accommodation because it is
18 obvious, you still will not accommodate the student
19 unless he requests for an accommodation?
20     A    Students who would like to receive
21 accommodations must initiate the request.
22     Q    Is that a yes to my question?
23     A    I can't answer your question as a
24 yes or no question.
25     Q    Are students required to have a

Page 28

1 letter from a family member in order to get
2 academic accommodations?
3     A    No.
4     Q    If a student finds out that he needs
5 academic accommodations after he has enrolled, can
6 the counseling center submit the required
7 documentation for academic accommodations?
8     A    Currently or in the time frame that
9 you were enrolled?
10     Q    Both.
11     A    At the time you were enrolled, the
12 counseling center could submit supporting
13 documentation which could be included in the
14 accommodations application package.
15         And in our most recent version of
16 the handbook, my recollection, which I am not sure
17 if I am remembering this correctly, but I believe
18 the counseling center is no longer providing
19 supporting documentation.
20     Q    So could a student request
21 accommodations from the counseling center and then
22 the counseling center send you the documentation
23 that is required?
24     A    No.
25     Q    Why not?

Page 29

1     A    The student has to sign a release of
2 information with the counseling center to release
3 supporting documentation.  Once the student does
4 that, the counseling center can submit supporting
5 documentation which is included in the
6 accommodation application package.  But it is not
7 in and of itself an application for accommodations.
8     Q    The form you just stated, the
9 release of information, is that the required
10 document to initiate the process for the counseling
11 center to send the documentation to the
12 accommodations coordinator?
13     A    I am not certain.  That would be a
14 question better directed to a representative of the
15 counseling center.  That's internal to their
16 process.
17     Q    How do you know that one is needed
18 in the first place?
19     A    How do I know when what?
20     Q    How do you know that the release of
21 information agreement is required in the first
22 place?
23     A    Because the counseling center
24 advises they need a release of information from the
25 student before they can submit any supporting

8 (Pages 26 - 29)

Page 30

1 documentation from that student's record with the
2 counseling center.
3     Q    How do you personally know that?
4     A    Because that is what the counseling
5 center advised me when I took on this role.
6     Q    Can that process occur before the
7 student actually comes to you and submits another
8 request for academic accommodations?
9     A    I don't understand what you mean by
10 another request in relation to the information
11 release.
12     Q    If the student first requests that
13 the counseling center send the documentation -- let
14 me rephrase.
15          Can the student have the
16 documentation sent over to the accommodations
17 coordinator before the student goes to the
18 accommodations coordinator to ask for a request?
19     A    Yes, they can.
20     Q    Okay. Were you contacted on behalf
21 of plaintiffs by the counseling center at any
22 point?
23     A    Not to my recollection.
24     Q    Would you remember if you were?
25     A    It's possible. But I don't remember

Page 31

1 all the contacts that I have had from the
2 counseling center.
3     Q    So is it correct that you can
4 neither confirm nor deny whether you received
5 communication from the counseling center on behalf
6 of plaintiff?
7     A    I do not have in my records any
8 documentation from the counseling center regarding
9 the plaintiff.
10     Q    What about phone calls?
11     A    I don't recall if I had any phone
12 calls with the counseling center about the
13 plaintiff.
14     Q    Is faculty at RUSM required to
15 comply with Title III of the Americans with
16 Disabilities Act?
17     A    Are you referring to the ADA?
18     Q    Yes.
19     A    No.
20     Q    Are they required to comply with
21 Section 504 of the Rehabilitation Act?
22          MR. ROMAN: I will object to this
23     and the last question to the extent it
24     calls for a legal conclusion. If the
25     witness can answer, he may do so.

Page 32

1          THE WITNESS: In reference to when
2     you were enrolled and the campus was
3     located on Dominica, we were not required
4     to comply with the ADA. Although in the
5     interest of supporting our students, we
6     abided by the spirit of the ADA and
7     Section 504 of the Rehabilitation Act to
8     provide appropriate accommodations within
9     the process that was defined in the
10     student handbook.
11 BY MR. AWODIYA:
12     Q    So just to clarify, there is no
13 policy that requires faculty to comply with those
14 laws you just stated?
15     A    That's my recollection based on
16 what's in the student handbook.
17     Q    So you, yourself, are not required
18 to comply with those laws in Dominica?
19     A    That is my understanding.
20     Q    Where did you get your knowledge
21 about what is required from Title III of the
22 Americans with Disabilities Act?
23     A    From review of the Americans with
24 Disabilities Act and Section 504 of the
25 Rehabilitation Act. From consultation with the

Page 33

1 hiring manager who brought me into this position.
2 And consultation with, at the time, the DeVry legal
3 office.
4     Q    But they did not tell you that you
5 were required to comply with those laws?
6          MR. ROMAN: I will object, for the
7     record, to the extent it calls for any
8     communications you had with DeVry's legal
9     counsel that would be covered by
10     attorney-client privilege and I would
11     instruct you not to answer.
12          To the extent you have spoken with
13     any of the other folks you described or
14     anyone else, you may answer the question.
15          THE WITNESS: The answer, I think,
16     ultimately goes back to the legal office,
17     so I will not answer any further on that.
18 BY MR. AWODIYA:
19     Q    Has anyone that is not in the legal
20 office of Ross University tell you that you -- let
21 me rephrase.
22          Is it correct to say that you were
23 never told that you had to comply with those laws?
24     A    That conversation goes back to the
25 conversation with the legal office.

9 (Pages 30 - 33)

Page 34

1     Q    No communication from the lawyers.
2 Let's limit the scope of this question to anyone
3 that is not a lawyer.
4     A    All right. Please ask the question.
5     Q    Is it correct to say that no one
6 from Ross University, excluding lawyers, has told
7 you that you need to comply with the Americans with
8 Disability Act and Section 504?
9     A    That's correct.
10     Q    So if a student believes a violation
11 occurs, how would they go about enforcing it if you
12 are not required to follow those laws?
13     A    A violation of the legislation we
14 are discussing, the ADA and Section 504?
15     Q    Yes.
16     A    I don't know. If there is an issue
17 like that I usually refer that up to my manager.
18     Q    Who is your manager?
19     A    Dr. Hayse.
20     Q    Is there any policy with faculty
21 about how to handle direct requests to them?
22     A    Direct requests for?
23     Q    Academic accommodations?
24     A    They are guided to contact me.
25     Q    Is there a policy?

Page 35

1     A    Not that I can recall.
2     Q    So how would other faculty know
3 that?
4     A    Other faculty know who I am and know
5 what the role of my office is.
6     Q    How would they know that?
7     A    It has been communicated previously
8 in faculty meetings.
9     Q    How often did you hold faculty
10 meetings?
11     A    Faculty meetings are usually held
12 once a month for the first three months of each
13 semester.
14     Q    In every meeting you tell them that
15 they need to send students to get accommodations
16 from you?
17     A    No.
18     Q    Are faculty meetings required to
19 attend?
20     A    No.
21          MR. AWODIYA: I think that's it. I
22     can't remember -- I had a question and I
23     didn't write it down and I don't remember
24     it right now. But I appreciate your time
25     and I thank you very much.

Page 36

1          I think Mr. Ryan may have some
2     questions for you.
3          MR. ROMAN: That's right. We could
4     take a short break, and before we take a
5     break we will label this as exhibit --
6     let's call it Fulton 1. This is the
7     document, the PDF that you sent me.
8          It actually has all of the exhibits
9     together. I don't think we used all of
10     them but it will at least cover what we
11     used.
12          MR. AWODIYA: Okay. That's fine,
13     because they are Bates labeled, I
14     believe.
15          MR. ROMAN: We will go off the
16     record for just a minute.
17          (Thereupon, the respective
18          document was marked as Exhibit
19          Number 1.)
20          (Break taken)
21          EXAMINATION
22 BY MR. ROMAN:
23     Q    We're back on the record. Mr.
24 Stewart-Fulton my name is Ryan Roman and I am one
25 of the attorneys for Ross University school of

Page 37

1 medicine. I just have a few questions for you.
2          Prior to today's deposition, do you
3 recall having met Mr. Awodiya
4     A    I do not.
5     Q    If you had met with Mr. Awodiya and
6 he had made a request for an accommodation, what
7 would you have said to him?
8     A    I would have, depending on the
9 circumstances at the time, what the request was
10 about, generally speaking I would talk about the
11 application process and offer to either provide an
12 application package in the moment or email one.
13     Q    This package is what you described
14 earlier as the packet of information that's
15 provided in response to a verbal request for
16 accommodations?
17     A    Correct.
18     Q    I am going to show you a document
19 that we will mark as Fulton 2. And for the record
20 and for Mr. Awodiya, this is the PDF I sent you
21 that is Bates number RUSM 179 to 182.
22          (Thereupon, the respective
23          document was marked as Exhibit
24          Number 2.)
25

10 (Pages 34 - 37)

1 BY MR. ROMAN:
2     Q    Take a moment to look through that.
3 My question for you is going to be whether this is
4 the document that you're talking about when you say
5 a packet of information.
6     A    Yes, this is it.
7     Q    This is the document provided to
8 students in order to make the request for an
9 accommodation?
10    A    That's correct.
11    Q    Once a student completes this
12 document, what happens next in the process?
13    A    The document, along with all of the
14 accompanying information just referenced in here
15 which is a personal statement as well as supporting
16 documentation from an appropriate healthcare
17 provider, is submitted to my office.  It's
18 reviewed.
19        And if the student has not already
20 been met with, I meet with the student to discuss
21 their history, if any, with accommodations and
22 their purpose for applying for accommodations at
23 this point.  And then review the information to
24 make a determination as to whether or not they
25 qualify for disabilities within our process.

1     Q    Did Mr. Awodiya ever submit this
2 packet of information to you?
3     A    I do not have a record of this in my
4 files.
5     Q    If one had been submitted by
6 Mr. Awodiya, would it have been kept in your files?
7     A    It would have, yes.
8     Q    Earlier in the direct in the
9 examination by Mr. Awodiya, you were asked
10 questions regarding what we have marked as
11 Composite Exhibit Fulton 1.  I am going to put that
12 back in front of you.
13        In particular, I would like for you
14 to turn to the student handbook excerpt which is --
15 sorry, the academic catalog excerpt, which is pages
16 RUSM 183 is the first page and then it skips to
17 242.  Do you see that?
18    A    Yes, sir.
19    Q    On page 242 under the Foundations of
20 Medicine header, do you see that?
21    A    I do.
22    Q    Can you take a moment to review that
23 section?
24    A    All right.
25    Q    What is this section advising

1 students with respect to accommodations?
2     A    That they should submit in writing
3 requests for accommodations to me, and my email
4 address is provided.
5     Q    And does it contain any reference to
6 how to request more information?
7     A    To contact me.
8     Q    And it provides your email address,
9 correct?
10    A    That's correct.
11    Q    If contacted, would you have advised
12 a student that there is a written application?
13    A    Yes.  My typical response to inquiry
14 by email is to respond back with a copy of the
15 application form.
16    Q    Okay.
17        MR. ROMAN:  Thank you very much for
18        your time.  I don't have anything
19        further.  If Mr. Awodiya has any
20        additional questions, otherwise I thank
21        you for your time.
22            EXAMINATION
23 BY MR. AWODIYA:
24    Q    Just maybe one or two questions.
25 Under what circumstances would you email the packet

1 to the student?
2     A    If the student emailed me to request
3 information about accommodations or if an in-person
4 meeting, the student preferred to receive the
5 application packet by email rather than a paper
6 copy.
7     Q    Are students required to email you?
8     A    No.
9     Q    Have you ever in the past granted
10 accommodations for a student that did not complete
11 the accommodation packet?
12    A    No.
13    Q    I have a few more questions about
14 the packet itself.  What documents are required and
15 what documents are not required?
16    A    The documents that are required are
17 the application form itself, personal statement,
18 and appropriate supporting documentation from a
19 healthcare provider.
20    Q    Is the statement still required if
21 the student's medical documents describe the
22 disability in detail?
23    A    Yes.
24    Q    Do you have a reason for that?
25    A    We want the students to have an

11 (Pages 38 - 41)

1 opportunity to express their history, their reasons
2 for requesting accommodations in their own words.
3     Q    So if another doctor documented a
4 student's history and did diagnostic tests up to
5 the point where they diagnosed a person with a
6 disability, you would still require this statement?
7     A    That's correct.
8     Q    What if the statement itself did
9 not -- what if the statement itself did not
10 adequately describe the disability, would the
11 medical documentation be enough?
12     A    That's two questions.  Please break
13 that apart.
14     Q    I forgot the question.  I said if
15 the student -- if the statement did not -- if the
16 statement was insufficient in describing the
17 disability, would a sufficient medical history be
18 enough to get academic accommodations?
19     A    That doesn't break down as a yes or
20 no answer.
21     Q    Can you break it down in the way
22 that you can?
23     A    All of the pieces of the application
24 package are required in order to make a
25 determination as to whether or not a student meets

1 the requirements for disability accommodations.
2         The personal statement doesn't
3 provide diagnostic information.  It provides the
4 student's personal experience with whatever the
5 condition is that they have.
6         Their personal past experience with
7 accommodations or without, and what their
8 experience has been like previously, as well as
9 what things they find most challenging based on
10 their diagnosed condition.
11         Supporting documentation, I would
12 like to read from the application form for a brief
13 summary of that.  Would that be all right with you?
14     Q    Yes.
15     A    Briefly, "Supporting documentation
16 includes a written summary of assessment and
17 evaluation results signed by your healthcare
18 provider along with their recommended
19 accommodations based on your diagnosis."
20         So it is a comprehensive summary and
21 assessment by a healthcare provider.
22     Q    So the statement is from the
23 healthcare provider?
24     A    No, the personal statement is from
25 the student.

1     Q    Okay.  So how would the student know
2 to describe all the things you said?
3     A    Because it is in the application
4 package.  And it's something that I would discuss
5 in an in-person meeting if we held that meeting
6 before the application package was complete.
7     Q    Okay.  So if all of the information
8 that you wanted in the personal statement was sent
9 by a doctor in the student's medical records, would
10 that be sufficient enough to give academic
11 accommodations?
12     A    Not necessarily.  And again, all
13 three pieces need to be there in order to have a
14 completed application.
15     Q    So strict adherence to this
16 application, regardless of the amount of
17 information you had, is the only way to get
18 academic accommodations?
19     A    Correct.  A complete application
20 must be submitted with all of the listed
21 components.
22     Q    I just want to clarify.  So if you
23 are informed of the disability, the extent of that
24 disability, and how that disability has affected
25 the person in the past, if all of that is stated in

1 their medical records and you don't have a personal
2 statement, that same student would not get academic
3 accommodations?
4     A    The application would not be
5 complete so it would not be reviewed.  Which means
6 they would not receive accommodations until after
7 it was complete and reviewed.
8     Q    In your opinion, do you find this an
9 easy process for a student with a disability to go
10 through?
11     A    That requires speculation on my part
12 that I don't feel comfortable making.
13     Q    These policies in the application
14 packet --
15     A    Was that a question?
16         MR. ROMAN:  I think you may have cut
17 out.
18 BY MR. AWODIYA:
19     Q    I was asking who required -- let me
20 rephrase.
21         Who determined what documentation is
22 required in this packet?  Was it you or was this
23 created by someone else?
24     A    This application, at the time of
25 your enrollment, was the application that was in

1 use when I hired into this role. And I do not know
2 who created it prior to my arrival at Ross.
3     Q    Is this the same packet that you
4 give to faculty if they want an accommodation for
5 themselves?
6     A    I don't work with faculty who
7 request accommodations. This is specifically --
8     Q    Who gives --
9     A    This is specifically test academic
10 accommodations for students.
11     Q    Is there a threshold of
12 documentation that you require to grant a student
13 academic accommodations?
14     A    The documentation that is listed in
15 the form.
16     Q    If a student didn't realize that
17 their disability was affecting them until they
18 reached medical school, Ross University
19 specifically, would a history of their disability
20 be required?
21     A    For someone who had not previously
22 been diagnosed?
23     Q    Who had not been previously
24 disabled.
25     A    If they had not previously been

1 disabled, there would not be a history of
2 disability.
3     Q    So would they be exempt from that
4 requirement of the form?
5     A    Would who be exempt from the
6 requirement of the form?
7     Q    Would a student who was not
8 previously disabled, but became disabled after
9 enrolling into Ross, be required to -- sorry.
10         Would a student who had become
11 disabled during their enrollment at Ross, would
12 they be required -- I'm sorry. I don't know why I
13 keep losing my train of thought.
14         Would a student -- I lost it all.
15         Is a prior history of a disability a
16 requirement to get academic accommodations?
17     A    No, it's not.
18     Q    So they would not be required to
19 submit that part of the application?
20     A    Which part of the application are
21 you referring to?
22     Q    In the personal statement you said
23 that they're required to discuss their history.
24 Would that no longer be required?
25     A    It would still be required to submit

1 a personal statement. But if the disability was
2 something that occurred recently, what information
3 they are offering would be different because they
4 don't have the same history that someone with a
5 longer disability has.
6     Q    If someone has been disabled for a
7 very short time, let's say a couple of days, would
8 they then be required to submit a two-page personal
9 statement describing their disability and impact on
10 their daily life and educational functioning?
11     A    They still would be required to
12 submit a personal statement. Without as much
13 information as someone who has had a longer term
14 disability, we might not require the full two-page
15 document.
16     Q    So the two pages is not required?
17     A    I would like to refer to the
18 application form. "In order to document your need
19 for accommodations as completely as possible,
20 please attach, in addition to professional
21 documentation, a two-page personal statement,
22 word-processed, not handwritten, describing your
23 disability and its impact on your daily life and
24 educational functioning.
25         "Do not confine your comments to

1 standardized test performance, rather discuss your
2 overall day-to-day functioning."
3         So all students are required to
4 submit that paper. All students requesting
5 accommodations.
6     Q    Except for students who -- I'm
7 sorry, could you repeat that?
8     A    All students who are applying for
9 accommodations.
10     Q    Even students who are newly
11 disabled?
12     A    That's correct.
13     Q    How can a student who is newly
14 disabled describe the disability and the impact on
15 its daily life?
16     A    It depends on the circumstances of
17 the student and their disability.
18     Q    Can you explain further what you
19 mean by "it depends"?
20     A    Each student is unique. Each
21 student's disability is unique to them.
22     Q    So earlier you said that a student
23 may submit less than the two page requirement; is
24 that correct?
25     A    Yes.

13 (Pages 46 - 49)

Page 50

1       Q      What type of student would be able
2   to submit less than two pages?
3       A      Sometimes a student who is just
4   recently diagnosed with a disability and doesn't
5   understand yet the full impact that it's having on
6   them.
7       Q      That's perfect.  Thank you very
8   much.  So a two-page personal statement is not
9   required?
10          MR. ROMAN:  I will object as asked
11          and answered.  You can go ahead and
12          answer.
13          THE WITNESS:  I have answered the
14          question several times now.  It's
15          explained in the application form.
16          MR. AWODIYA:  Mr. Roman, I am going
17          to ask you not to coach the deponent with
18          objections.
19          MR. ROMAN:  I just stated the basis
20          of my objection for the record.
21   BY MR. AWODIYA:
22       Q      Mr. Fulton --
23       A      Yes.
24       Q      I forgot the question.
25          Does the diagnosis of the disability

Page 51

1   for this form have to be submitted by a health
2   provider independent of RUSM?
3       A      At the time you were enrolled, no.
4       Q      At the bottom of this document on
5   page 000182 -- I apologize, I was reading the
6   document.
7       A      All right.
8       Q      For an ADHD disability, is
9   documentation from that person's childhood
10   required?
11       A      If it is available.
12       Q      So if it is not available, it is not
13   required?
14       A      If it is not available, then it is
15   not required.
16       Q      Is that the only thing in this
17   document that is not required if it is not
18   available?
19       A      If something is not available, it is
20   not available.
21       Q      My last question.  The only way --
22   when I was enrolled, the only way for students to
23   receive this document was to get it from you,
24   either in person or via email?
25       A      It was also available on the student

Page 52

1   portal.
2       Q      Do you know of any way to verify
3   that?
4       A      Go to the student portal.
5       Q      Did you put it on the student portal
6   yourself?
7       A      I did not.
8       Q      Do you know who did?
9       A      It was posted on the portal before I
10   began this role.
11       Q      And last question.  The only way for
12   a student to know it was on the portal was to ask
13   you?
14       A      No.
15       Q      How would a student know that it's
16   on the portal?
17       A      I had students submit copies of this
18   after they did a Google search for academic
19   accommodations at Ross.
20       Q      So if I Google search academic
21   accommodation at Ross, it will mention a request
22   packet?
23       A      It might.
24       Q      You just said that it would.
25       A      This is what I was advised by

Page 53

1   students previously.  But I also know that the
2   website is updated from time to time and I don't
3   know what is currently available through the
4   search.
5       Q      So if a student doesn't Google it,
6   how would they know?
7       A      They would be referred for more
8   information either in the -- what was the other
9   document we were looking at -- the academic catalog
10   or the student handbook.  And that would be --
11       Q      When I was enrolled?
12       A      Pardon me?
13       Q      When I was enrolled, the academic
14   catalog and student handbook would --
15       A      Would refer students --
16       Q      -- say that it's available on the
17   portal?
18       A      No, it would refer students to me
19   for more information.
20       Q      So then when I was enrolled, the
21   only way that a student would know that it was on
22   the portal was to go to you?
23       A      Unless they did a search on their
24   own.  The counseling center is also aware of the
25   fact that the form existed and students have spoke

14 (Pages 50 - 53)

Page 54

1  with counselors about receiving academic
2  accommodations would be referred to the portal or
3  to me.
4         So someone else would have to tell
5  the student that it's available on the portal if
6  they don't Google it?
7      A   Potentially.
8         MR. AWODIYA:  That's all of the
9  questions I have.  Thank you very much.
10        MR. ROMAN:  Thank you for your time.
11  We will read.
12        FURTHER THE DEPONENT SAITH NOT.
13  (2:58 P.M.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 55

1              REPORTER CERTIFICATE
2  STATE OF TENNESSEE
3  COUNTY OF KNOX
4      I, Deborah West, Licensed Court Reporter, LCR
5  #314, in and for the State of Tennessee, do hereby
6  certify that the deposition of MATTHEW
7  STEWART-FULTON was reported by me and that the
8  foregoing transcript, pages 1 through 55,
9  inclusive, is a true and accurate record to the
10  best of my knowledge, skills and ability.
11      I further certify that I am not related
12  to, nor an employee or counsel of any of the
13  parties to the action as defined under T.C.A
14  Section 24-9-136, nor am I financially interested
15  in the outcome of this case.
16      In witness thereof, I have hereunto set my
17  hand on this the 17th day of November, 2018.  The
18  witness HAS NOT waived signature.
19
20
21
                *Deborah P West*
22  _____
    Deborah West, LCR 314 TN
23  Expiration:  6/30/2020
24
25

Page 56

1              VERITEXT LEGAL SOLUTIONS
               One Biscayne Tower, Suite 2250
2              2 South Biscayne Boulevard
               Miami, Florida 33131
3              305-376-8800
   November 19, 2018
4
   Matthew Stewart-Fulton
5  c/o Ryan Roman
   Akerman LLP
6  98 SE 7th St, Suite 1100
   Miami, FL, 33131
7  ryan.roman@akerman.com
8  RE: Awodiya, Oluwamuyiwa -vs- Ross University School Of
       Medicine
9  Dear Mr. Roman:
10  With reference to the deposition of Matthew Stewart-Fulton
    taken on 11/19/18 in connection with the above-captioned
11  case, please be advised that the transcript of the
    deposition has been completed and is awaiting
12  signature.
13  Please have your client read the transcript and complete
    the errata page. Upon completion, please send the signed
14  errata to our office at Two South Biscayne Blvd., Ste. 2250,
    Miami, FL, 33131, or email it to litsup-fla@veritext.com.
15
    If this is not taken care of, however, within the
16  next 30 days, we shall conclude that the reading
    and signing of the deposition has been waived and
17  the original, which has already been forwarded to
    the ordering attorney, may be filed with the Clerk
18  of the Court without further notice.
19  Sincerely,
20
21  Production Department
    Veritext Florida
22
23
24
25

Page 57

1              ERRATA SHEET
2  RE   : Awodiya, Oluwamuyiwa v. Ross University School Of Medicine
       DEPO OF: Matthew Stewart-Fulton
3  TAKEN : 11/5/2018
4  DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
5  Page # | Line # | Change          | Reason
6  ____|____|_____|_____
7  ____|____|_____|_____
8  ____|____|_____|_____
9  ____|____|_____|_____
10  ____|____|_____|_____
11  ____|____|_____|_____
12  ____|____|_____|_____
13  ____|____|_____|_____
14  ____|____|_____|_____
15  ____|____|_____|_____
16  ____|____|_____|_____
17  ____|____|_____|_____
18  ____|____|_____|_____
19  ____|____|_____|_____
20  ____|____|_____|_____
21  State of _____)
    County of _____)
22
    Under penalties of perjury, I declare that I have
23  read my deposition transcript, and it is true and
    correct subject to any changes in form or
24  substance entered here.
25  Date          WITNESS NAME

# Exhibit RJ-04

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF FLORIDA

3

4    OLUWAMUYIWA AWODIYA,

5           Plaintiff

6    vs.                          CASE NO.
                                  0:18-cv-60482-KMM

7    ROSS UNIVERSITY SCHOOL OF

     MEDICINE, SCHOOL OF

8    VETERINARY MEDICINE LIMITED,

9           Defendant.

10

     ` ` ` ` ` ` ` ` ` ` ` ` ` ` ` ` ` ` ` ` ` ` ` ` ` ` `

11

12

13          VIDEO-CONFERENCED DEPOSITION OF

14                   BRYAN HAYSE

15

16                NOVEMBER 5, 2018

17                  3:07 P.M.

18

19         ROSS UNIVERSITY SCOOL OF MEDICINE

20              KNOXVILLE, TENNESSEE

21

22

23

24        Deborah West, LCR-314 (TN), CLR

25

Page 2

```
 1        APPEARANCES OF COUNSEL
 2  (Teleconference Appearance)
 3  On behalf of the Plaintiff:
 4     PRO SE
       Oluwamuyiwa Awodiya
 5     15005 Dahlia Drive
       Bowie, Maryland  20721
 6
    On behalf of the Defendants:
 7
       Ryan Roman, Esquire
 8     Akerman LLP
       Three Brickell City Centre
 9     98 Southeast Seventh Street
       Miami, Florida  33131
10     ryan.roman@akerman.com
11  On behalf of Adtalem Global Education:
12     Valarie Bomar
       VP, Senior Associate General Counsel
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1            STIPULATION
 2      The deposition of BRYAN HAYSE, called as a
 3  witness by the Plaintiff, pursuant to all
 4  applicable rules on the 5th day of November, 2018,
 5  at the offices of Ross University School of
 6  Medicine, Knoxville, Tennessee, before Deborah
 7  West, Licensed Court Reporter and Notary Public in
 8  and for the State of Tennessee.
 9      It being agreed that Deborah West, a Tennessee
10  Licensed Court Reporter may report the deposition
11  in machine shorthand, afterwards reducing the same
12  to typewritten form.
13      It being further agreed that all formalities
14  as to notice, caption, certificate, transmission,
15  et cetera, are expressly waived, EXCLUDING the
16  reading of the completed deposition by the witness,
17  and the signature of the witness.
18
19
20
21
22
23
24
25
```

Page 3

```
 1        INDEX OF EXAMINATION
 2                    Page
 3  WITNESS:  BRYAN HAYSE
 4  Examination
 5  By Mr. Awodiya            5
 6  By Mr. Roman             37
 7
 8
 9
10        INDEX TO EXHIBITS
11                    Page
12  Exhibit Number 1,
       Student handbook 2015-2016   39
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1  (3:07 P.M.)
 2            BRYAN HAYSE,
 3  having been first duly sworn, was examined and
 4  testified as follows:
 5          EXAMINATION
 6  BY MR. AWODIYA:
 7      Q    Please state your name for the
 8  record.
 9      A    Christopher Bryan Hayse.
10      Q    Dr. Hayse, my name is Oluwamuyiwa
11  Awodiya and I am the plaintiff in this case against
12  Ross University School of Medicine.
13          During this deposition I will in
14  most part refer to myself as plaintiff.  For the
15  record, do you understand that if I say plaintiff
16  that I am referring to myself?
17      A    I do.
18      Q    Additionally, let me tell you some
19  ground rules for the deposition and if you have any
20  questions, you can ask me.
21          First, you are under oath and have
22  sworn to tell the truth.  The effect of that oath
23  is the same as if you were testifying in court.
24          If I ask you a question that you
25  don't understand, tell me you don't understand it
```

Page 6

1 and I will rephrase it as often as necessary so
2 you're comfortable that you understand the question
3 you're answering. It's also very important that
4 you answer my questions through spoken word, not
5 through facial expressions or gestures.
6          Please refrain from answering
7 questions with sounds like uh-huh or uh-huh or
8 words that may not get transcribed accurately. You
9 must actually say a word. If you mean yes, say
10 yes, not uh-huh.
11          Also, please allow any questions and
12 objections to be fully stated before you speak.
13 The court reporter cannot take down more than one
14 person speaking at the same time. Otherwise, the
15 record will be jumbled and the questions and
16 answers will be disjointed.
17          Ross lawyers may make objections to
18 questions that I ask you. They are objections for
19 the judge to consider later. You are still
20 required to answer the question unless they
21 instruct you not to.
22          Everything that is said is being
23 taken down by the court reporter verbatim. You
24 will have an opportunity to read the deposition
25 transcript and make corrections you believe are

Page 7

1 necessary.
2          If you make changes in your
3 testimony that are inconsistent with the answers
4 given during the deposition, I will be entitled to
5 comment on those discrepancies at trial to question
6 your truthfulness.
7          Do not guess when providing your
8 responses. Instead, please provide your best
9 estimate based on your recollection. If you need
10 to take a break at any time, please let me know.
11 All I ask is we not take a break while there is a
12 question pending.
13          Are you here today under the
14 influence of any medication or suffering from any
15 physical, mental, or emotional condition that would
16 affect your ability to hear my questions or to give
17 truthful answers?
18     A    I am not.
19     Q    When did you first hear about this
20 lawsuit?
21     A    Earlier this semester. I don't know
22 that I can recall a specific date.
23     Q    When did this semester start?
24     A    In September.
25     Q    Do you remember ever seeing

Page 8

1 plaintiff in December of 2015?
2     A    I do.
3     Q    Can you tell me about your encounter
4 with him?
5     A    I can. I vaguely remember meeting
6 with plaintiff, and I don't recall what the meeting
7 was about. Since the lawsuit has come to my
8 attention, I was shown documents that were from
9 Mr. Cuffy referring to mine and your, plaintiff's
10 meeting, which jogged my memory from it.
11          So that's all I remember from this
12 meeting. I don't remember specifics. I remember
13 meeting after December, but I don't remember the
14 specifics of the December meeting.
15     Q    You said the document has jogged
16 your memory. Do you know what it caused you to
17 remember?
18     A    Only that my memory that you and I
19 met in January was inaccurate and that you and I
20 had met previously in December.
21     Q    What is your position at Ross
22 University?
23     A    I am currently the Associate Dean
24 for Medical Science Student Affairs.
25     Q    As part of that position, have you

Page 9

1 ever handled accommodations?
2     A    Rephrase.
3     Q    Have you ever played any role in a
4 student getting academic accommodations?
5     A    Yes is the quick answer.
6     Q    Can you describe it to me?
7     A    Yes. For the most part in the
8 process I am -- Mr. Stewart-Fulton, who I believe
9 you spoke with previously, is the chief officer
10 over accommodations for the Medical Sciences for
11 the first five semesters.
12          In my role I supervise
13 Mr. Stewart-Fulton, so he and I have conversations
14 about pending applications as he has questions
15 about them or just to get typical updates as a
16 supervisor would, as well as within the process I
17 oversee, if anybody appeals an accommodation that
18 he has made, I would be the one that would review
19 the appeal of that person.
20     Q    Is Mr. Stewart-Fulton required to
21 comply with Title III of the Americans with
22 Disability Act?
23          MR. ROMAN: I would object to the
24          extent it calls for a legal conclusion,
25          but you're welcome to answer the

3 (Pages 6 - 9)

**Page 10**

1    question.
2        THE WITNESS: Yeah. I would say as
3    far as the ADA is concerned, you know, we
4    comply with, and our policies are built
5    around having accommodations made for the
6    USMLE and around the USMLE processes and
7    policies.
8        Because at the end of the day we
9    want to make sure our students have
10   proper documentation to be at the best
11   stage to get accommodations from USMLE
12   when they get to step one and beyond.
13       Although what we do does not
14   determine that necessarily. So I would
15   say that what we do is uses ADA as
16   guideline, but we are not necessarily
17   beholden to.
18 BY MR. AWODIYA:
19   Q   Do you know if it's required to
20 comply with Section 504 of the Rehabilitation Act?
21       MR. ROMAN: Same objection, but you
22   can answer.
23       THE WITNESS: Is that the same
24   question?
25

**Page 11**

1 BY MR. AWODIYA:
2    Q   No. Section 504 of the
3 Rehabilitation Act is a different law than Title
4 III.
5    A   Yes, I apologize. Same answer to
6 the previous question. I apologize, I missed that
7 piece.
8    Q   Do you know if Ross is required to
9 comply with any U.S. laws in Dominica?
10       MR. ROMAN: Same objection. It
11   calls for a legal conclusion. You can
12   answer if you know.
13       THE WITNESS: I would say I will
14   refrain from answering because that is a
15   very wide-open question.
16 BY MR. AWODIYA:
17   Q   Are you aware of any contract
18 between Ross University in the United States that
19 states that they must comply with U.S. laws, some
20 U.S. laws in Dominica?
21   A   I am not aware of any such contract.
22   Q   If a violation to the Americans with
23 Disability Act occurred, could the student -- is
24 there any authority outside of Ross that the
25 student could go to?

**Page 12**

1    A   I am unsure. I would have to refer
2 to our legal counsel to ask that question if it
3 were to.
4    Q   Do you know -- like, do you -- has
5 anyone, not on a legal matter, more so as to a
6 procedure matter, is there a procedure for students
7 to report discrimination?
8    A   Yes. So to report discrimination, a
9 student would contact our office and we would refer
10 them to our Title III coordinator or a manager of a
11 person, depending on what the allegations were.
12   Q   Is RUSM required to comply with
13 Title IX in Dominica?
14       MR. ROMAN: Same objection. It
15   calls for a legal conclusion. You can
16   answer if you know.
17       THE WITNESS: I would seek counsel's
18   advice in compliance of the question, but
19   by the spirit of it we tried to abide by
20   it.
21 BY MR. AWODIYA:
22   Q   Okay. Just state for the record,
23 Ross lawyers are not -- their objections are not
24 advice. Their objections are for the judge to
25 consider later. Unless they ask you not to answer

**Page 13**

1 a question, you can go ahead and answer a question.
2    A   Uh-huh.
3        MR. ROMAN: Just to respond for the
4    record, I think Dr. Hayse did answer that
5    question. It's just that his answer is
6    he would talk to Ross lawyers. I don't
7    think he was talking about me.
8        THE WITNESS: Correct. That is
9    correct. So we have a relationship with
10   our legal team. So anything that comes
11   to us that might be a legal matter, I
12   always refer to them to ask advice before
13   responding because I don't have a legal
14   background.
15       So I want to make sure that the
16   advice I give to a student or anybody
17   coming forward that I give the correct
18   advice to get them through the process
19   for whatever reason.
20 BY MR. AWODIYA:
21   Q   Okay. I see. For the record, I
22 wasn't saying that you weren't answering. It was
23 more about the advice part.
24       Let me clarify a little bit about
25 the legal situation. When I asked if they are

1  required to comply, I mean does Ross require their
2  employees to comply, not if they're legally
3  required to comply.  I am asking if Ross, the
4  entity, requires their employees to comply with the
5  American with Disability Act.
6      A    I am not sure I understand the
7  question.
8      Q    It was a little long.  Let me make
9  it shorter.
10     A    Yeah.
11     Q    Does Ross University itself require
12 its employees and faculties to comply with Title
13 III of the American with Disability Act in
14 Dominica?
15     A    Not to my knowledge.
16     Q    Is that also correct for Section 504
17 of the Rehabilitation Act?
18     A    That is correct.
19     Q    Okay.  I am not going to keep you
20 long, because there's not much -- it's just I want
21 to go to the counseling documents just to see if we
22 can jog your memory a little bit about our
23 interaction.
24          Counsel, can you hand Dr. Hayse both
25 the counseling documents, the one labeled RUSM

1  000141 and 144?
2          MR. ROMAN:  Yes.  We can use the
3      same composite exhibit called Fulton 1
4      which has those two pages as the first
5      two pages of the exhibit.
6  BY MR. AWODIYA:
7      Q    Okay.  Dr. Hayse, do you see in this
8  document where it says, "Client returned to office
9  after talking to Dr. Hayse"?
10     A    I do.
11     Q    "And student affairs regarding his
12 academic situation"?
13     A    I do.
14     Q    Do you remember what the academic
15 situation was?
16     A    Unfortunately, I don't.
17     Q    Do you know why plaintiff would have
18 been disappointed after he left your office?
19     A    I do not.
20     Q    Did plaintiff tell you that he was
21 having some type of attention problem?
22     A    I don't recall.
23     Q    Same document.  It says that
24 Mr. Cuffy received an email from you requesting
25 that you talk at some point about the plaintiff.

1          Do you remember why you sent that
2  email to Mr. Cuffy?
3      A    No, unfortunately I do not remember.
4      Q    Do you remember if you and Mr. Cuffy
5  followed up after this email?
6      A    I do not remember.
7      Q    Would you have only sent that email
8  at the request of the student?
9      A    No.
10     Q    Is there any possible reason why you
11 would send an email to Mr. Cuffy regarding a
12 student?
13     A    Typically if I reach out to
14 counseling or Mr. Cuffy, in this case, it would be
15 if I referred a student to counseling, would be one
16 reason, or if counseling had asked me to see
17 somebody or had, I guess, opened the door to a
18 meeting with a student beforehand.
19          So that would be two examples of why
20 I would have reached back out, either to say I have
21 seen the student at your direction or to say I have
22 met with the student you have asked me to speak
23 with.
24     Q    I don't know if Ross has one of the
25 documents, but I think they can fact check.  In one

1  of the counseling documents, Dr. Sharma states that
2  plaintiff wanted to see you because of his grade
3  for our encounter in December of 2015.
4          Does that jog your memory?
5      A    It does not.
6      Q    Do you have any reasons specific to
7  grades and academic situations as to why you would
8  send an email to the counseling center?
9      A    I do not have any specific criteria
10 for that, no.
11     Q    Would you be able to speak to
12 Mr. Cuffy about a student without a release of
13 information form?
14     A    I would.  I could speak to him.  He
15 might not be able to speak to me.
16     Q    So having a discussion about a
17 student, a release of information agreement would
18 need to be signed?
19     A    No.  From my side, a student is
20 protected under FERPA on my side going by that.  So
21 if I were to discuss a student that I had a meeting
22 with a counsel or anybody else with a need-to-know
23 basis, that I could do.
24          However, within counseling there is
25 much stricter guidelines that counselors go by.  So

1 Cuffy would have to have that release of
2 information to discuss detailed information with
3 me.
4     Q    Okay. So the answer was a little
5 long. Can you let me ask you this: Is there any
6 topic you can talk about with the counseling center
7 about a plaintiff -- I mean, about a student?
8     A    Yes.
9     Q    Without a release of information
10 agreement? Sorry, that was my fault.
11    A    That's okay. I cut you off. Yes, I
12 could talk to them about anything that I feel is
13 appropriate that's relevant to their duties as a
14 counselor or their duties within RUSM.
15    Q    Can you give me examples of this
16 duty?
17    A    Yeah. So if a student -- if I were
18 to meet with a student about, let's say, grades,
19 you mentioned grades earlier, a concern about
20 grades, I could reach out to, depending on what the
21 specific concern was or why a student was
22 struggling, I might reach out to counseling, a
23 counselor, or the counseling office in general, and
24 say I met with this student and they are struggling
25 because of grades and mentioned these things, I

1 think it would be good for you to reach out to them
2 and have a conversation with them.
3        I might also reach out to the Center
4 for Teaching and Learning, to the director there or
5 one of the faculty in the Center for Teaching and
6 Learning, and say the same thing.
7        If a student is struggling with
8 grades, they mention biochemistry or a lack of
9 being able to study, this might be a topic of
10 conversation I have with that student. Because I
11 felt that it would be educationally relevant to
12 reach out to them.
13       Where it is not appropriate is if I
14 just reach out to somebody just to tell them
15 something that wasn't relevant to their job
16 necessarily.
17    Q    I understand. So that would make
18 sense. I understand what you mean by duty. But
19 why would you ask him to contact you? If it was
20 about his duty, is it safe to say you would have
21 put it in the email going to him more as like a
22 one-way communication?
23    A    It's hard to tell what I was
24 thinking that long ago. It might be that I was
25 busy and knew I needed to connect and knew it would

1 be quicker to have the conversation over the phone.
2 There are a number of reasons that I might have
3 said contact me to talk more about this.
4     Q    Is there anything that you think
5 would jog your memory even more?
6     A    I don't believe so, outside of a
7 recording of our conversation.
8     Q    From these two documents, it seems
9 that plaintiff saw you more than once. Do you know
10 why he might have gone to the counseling center and
11 then saw you again and then gone back to the
12 counseling center?
13    A    I do not.
14    Q    Do you know who Mr. Didier is?
15    A    Spell it.
16    Q    It's on the first document right
17 next to Dr. Sharma engaged Mr. Didier?
18    A    Mr. Didier.
19    Q    Who is he?
20    A    He's the campus executive for the
21 then Dominica campus.
22    Q    Does he still work with RUSM?
23    A    He does.
24    Q    Is there any reason why his name is
25 not listed on the faculty website of Ross?

1     A    I don't have an answer to that.
2     Q    Does he handle academic
3 accommodations?
4     A    He does not.
5     Q    Does he handle medical leaves?
6     A    He does not.
7     Q    So what does he do?
8     A    He oversees the operational aspects
9 of the Dominica campus. So he has security reports
10 in to him, finance and accounting reports in to
11 him, the gym ultimately reports in to him,
12 housekeeping reports in to him. Maintenance
13 reports in to him.
14        There is probably an area -- oh,
15 supply chain reports in to him. There is probably
16 an area I am forgetting. But mostly the
17 operational aspects of the institution.
18    Q    Okay. Can you -- you said earlier
19 that you supervised Mr. Stewart-Fulton?
20    A    Correct.
21    Q    Can you tell me a little bit about
22 the academic accommodations process?
23    A    Certainly. So any student who comes
24 to our office seeking academic accommodations,
25 anybody in our office refers that student to speak

Page 22

1 with Mr. Stewart-Fulton to get more details and to
2 get the application to do so and talk through the
3 requirements.
4        And then once those documents are
5 turned in, anything that has been asked for,
6 whether it is documentation from a physician or a
7 narrative from the student, et cetera, that is then
8 reviewed by Mr. Stewart-Fulton as well as other
9 accommodations colleagues within the organization.
10        And then a decision is made and then
11 given to the student, or if other documentation is
12 needed or questions were had, that he would
13 facilitate that process.  And he also reaches out
14 to any faculty members who oversee areas wherein a
15 student would receive those accommodations.
16        So, for instance, if a student were
17 to get extra time for an exam, Mr. Stewart-Fulton
18 would reach out to Dr. Paul Abney and the exam
19 center staff to let them know.
20        COURT REPORTER:  I lost you.
21        THE WITNESS:  Those who oversee the
22        exam center and let them know that an
23        accommodation has been approved.  And so
24        the student would start -- and the date
25        in which that student would start

Page 23

1        receiving that accommodation, as an
2        example.
3 BY MR. AWODIYA:
4        Q     When you said "come to our office,"
5 who do you mean "our"?
6        A     Thank you.  Yes.  So the student
7 affairs office.  So still kind of referring to
8 Dominica -- because that's the last time we had an
9 actual office with everybody there -- walk into
10 student affairs.
11        There is a receptionist there.  Or
12 any time that somebody is speaking to me as an
13 academic adviser, the chief of student affairs
14 office are there, or just talking to anybody else
15 in that division, if somebody happens to come up
16 about -- if a student asks about academic
17 accommodations, that might be an orientation
18 session or a one-or-one conversation, we would
19 refer then to Mr. Stewart-Fulton given his
20 expertise in that area that the rest of us don't
21 necessarily have.
22        Q     Have you ever at any point in your
23 position at Ross been responsible for making the
24 final decision on academic accommodations?
25        A     When I first arrived, the process

Page 24

1 was laid out where the conduct -- the academic
2 accommodations coordinator would make
3 recommendations to the associate dean, which would
4 be me.  And then that policy was changed at some
5 point in the 2016 early academic year, I don't
6 remember exactly when that change was made.
7        So prior to that change, the
8 referral would come to me for the final decision.
9 And then I would review that, that accommodation
10 with Mr. Stewart-Fulton and sign off on.  And then
11 since that time, it has been moved to where
12 Mr. Stewart-Fulton along with Ms. Jeanie Robertson,
13 who also oversees the accommodations for the
14 clinical side, the two then work in collaboration
15 to make any type of decisions regarding academic
16 accommodations.
17        Q     That was a very thorough answer.  I
18 want to make sure I don't forget anything.  So the
19 policies, where were the policies located for
20 academic accommodations?
21        A     In the student handbook as well as
22 the academic catalog.
23        Q     Does RUSM deny oral requests for
24 academic accommodations?
25        A     All academic accommodations must be

Page 25

1 in written form.
2        Q     Can a student's family member write
3 the request for academic accommodations on behalf
4 of the student?
5        A     I have never been asked that
6 question, and my initial answer would be no to
7 that.
8        Q     Do you have a reason for that being
9 your initial answer?
10        A     Yeah.  I have not thought about that
11 before.  I would say that no, it would have to come
12 from the student.  But like I say, I never have
13 been asked that before so I have not put much
14 thought into it.
15        But I would say at this point my
16 answer would be no, it would have to come directly
17 from the student.
18        Q     Policy-wise is there anything
19 preventing somebody's family member from requesting
20 academic accommodations for a student?
21        A     Again, I have not been asked.  I
22 would have to review the policy to see if we have
23 anything specific pertaining to that.  I will add
24 to that, I can't think of any other example where a
25 student's family member or anybody other than the

7 (Pages 22 - 25)

Page 26

1  student is able to request something and be given
2  consideration.
3        Every example I can think of
4  anywhere within the university, a request has to
5  come directly from the student.
6     Q    What about the student's independent
7  psychiatrist?
8     A    So if an independent psychiatrist
9  were to come to us requesting the accommodation?
10    Q    Yes.  Would simply inform the school
11 that on behalf of the patient, he is informing the
12 school that the student needs academic
13 accommodations.  Would that be an acceptable
14 request?
15    A    No.  The student would still have to
16 request it because what we don't want to do is I
17 would never want to give an accommodation or
18 fulfill a request that might not be something that
19 the student individually wants.
20    Q    Would the school reach out to the
21 student or would they just kind of ignore it?
22    A    I think one or two things would
23 happen.  Either we would tell the physician or the
24 person making the request to please have the
25 student reach out directly to us, or we would reach

Page 27

1  out to the student.  Usually I would say one of
2  those two things would likely happen.
3     Q    Can you define what a request means
4  to you?
5     A    A request for academic
6  accommodations?
7     Q    Yes.
8     A    So for me, the request would be
9  something in writing directed to our academic
10 accommodations coordinator requesting said academic
11 accommodation, at least on an initial ask.
12       But then the formal request would
13 have to be to fulfill the policy, you know,
14 complete the application and complete the
15 documentation necessary.
16    Q    That's a perfect way to explain it.
17 So there would be an informal request and later a
18 formal request?
19    A    To the academic accommodations
20 coordinator, correct.  In many cases a student may
21 not be aware of the full policy so a request to the
22 academic accommodations coordinator, that is why
23 he, Mr. Stewart-Fulton, will typically set up a
24 meeting with any student who submits a request, to
25 sit down and make sure the student understands the

Page 28

1  full scope of what is being asked.
2     Q    Let's not use the word "request" and
3  let's simply say the student informs faculty of the
4  need for an accommodation.  Does that mean anything
5  to you?
6     A    You will have to be more specific.
7     Q    Let's focus on the word "informed"
8  and the word "need."  So a student informing the
9  school of the need for an accommodation, is that
10 the same as a request for an accommodation?
11    A    No.
12    Q    How are they different?
13    A    Who is the school?
14    Q    If a student informs the academic --
15 if the student informs the accommodation
16 coordinator of the need of an accommodation, does
17 the student then need to ask for -- sorry, let me
18 rephrase.
19       If the student informs the
20 accommodations coordinator the need for an
21 accommodation, does the student then need to
22 request for an academic accommodation?
23    A    So informing of the need -- the
24 actual request has to come with documentation.  So
25 if a student were to come to Mr. Stewart-Fulton and

Page 29

1  say that he or she needed an academic
2  accommodation, that would still have to be followed
3  with proper documentation to support that need.
4        It's two-fold.  One, the student has
5  to ask; two, supply documentation from a qualified
6  physician stating the need, the presence of some
7  type of disability as well as the need for that
8  academic accommodation within that.
9     Q    Earlier Mr. Stewart-Fulton said that
10 faculty can recommend academic accommodations on
11 behalf of the student.  Do you agree with that
12 statement?
13    A    I would say faculty can recommend a
14 student to come speak with Mr. Stewart-Fulton.  But
15 a faculty recommendation -- a faculty member saying
16 that he or she believes that a student should
17 receive an academic accommodation, I would say no,
18 that there would not be necessarily be any weight
19 put to that request.
20    Q    So what would happen if a faculty
21 member did do exactly that?
22    A    I would say the same thing, if a
23 counselor did, in my previous answer, either that
24 we would inform that faculty that we would have the
25 student come in to speak to Mr. Matthew

8 (Pages 26 - 29)

Page 30

1 Stewart-Fulton or review the policy within the
2 handbook, or get the student's name and reach out
3 to them directly.
4    Q    Is there a policy telling faculty to
5 do that?
6    A    I don't know for sure.
7    Q    So how would faculty know that that
8 is what they are supposed to do?
9    A    I would say it is not something that
10 they -- that specific thing is not -- let me back
11 up a second.
12        So I would say that as well as many
13 other pieces of their job fall within -- our
14 faculty gets asked a lot of questions in a lot of
15 different areas.  And I would say our faculty are
16 very well trained when being asked a question,
17 especially when it has to do with students to
18 consult the office of student affairs.
19        Because this is one of many, many
20 questions a student might ask that is outside of
21 their area of expertise.  So I would say the vast
22 majority will reach out to us to help answer that
23 question.  But the faculty member, quite frankly,
24 might answer I don't know the answer to that or I
25 don't know how to proceed with that as well.

Page 31

1    Q    But there is no clear guidance as to
2 what they should do?
3    A    I am not sure.  I would have to
4 refer to the faculty handbook.
5    Q    So you think a policy of that effect
6 would be in the faculty handbook?
7    A    I am not sure.
8    Q    Let's assume it is not, because
9 everyone I have deposed said there is no
10 information regarding academic accommodations in
11 the faculty handbook.
12        So let's continue that presumption.
13 If there's no policy or guidance to that effect in
14 the faculty handbook, how would all faculty know
15 specifically to request for accommodation to send
16 the student to Mr. Matthew Stewart-Fulton?
17        MR. ROMAN:  I am going to object to
18        the question because I don't believe that
19        was the testimony from Stewart-Fulton
20        earlier today.
21        So I will object on that basis.  If
22        you can answer, if you understand the
23        question, you can answer.
24        THE WITNESS:  Yeah, you know --
25

Page 32

1 BY MR. AWODIYA:
2    Q    Let me rephrase.  How would a
3 faculty member know where to tell the students --
4 let me rephrase.
5        How would a faculty member know how
6 to handle such a request if there is no policy in
7 the faculty handbook about handling that request?
8    A    So the policies stated in the
9 student handbook of what a student needs to do, and
10 that's what students are held accountable to is the
11 student handbook, so I would say that most -- a lot
12 of things that might be in the student handbook
13 aren't necessarily referred to in the faculty
14 handbook.
15        So I think that students as adult
16 learners, you know, are responsible for knowing
17 that information.  Like I said, most faculty have
18 been working with them for a number of years.
19        I think or I know because of
20 trainings I have been a part of, teach them to come
21 to student affairs with questions or colleagues, et
22 cetera, chairs, if they are asked a question or
23 referring the student to the student handbook.
24    Q    Or they could just simply deny the
25 request, right?

Page 33

1    A    They wouldn't have the authority to
2 deny the request.
3    Q    Well, they wouldn't know what to do
4 with it, so they would simply say I can't help you.
5 That is a possibility, right?
6    A    I would say any faculty that deals
7 with academic accommodations would know the
8 process.  Not all faculty would be in a situation
9 where they would be able to grant or deny any type
10 of academic accommodation.
11    Q    But that is still an assumption.  Is
12 there any policy anywhere, any rules, any guidance,
13 anything that Ross can go and get and produce
14 showing that Ross faculty should handle a request
15 directly to them in a certain way?
16    A    I am not aware.
17    Q    You said a student must make a
18 request in writing.  The student handbook, when I
19 was enrolled, had yet to mention a request packet.
20 When I was enrolled, did the writing have to have
21 any specific structure?
22    A    I do not recall.
23    Q    You can't interpret that from the
24 student handbook that's in front of you?
25    A    So from the handbook it says, "To

9 (Pages 30 - 33)

Page 34

1 qualify for an accommodation a student must
2 identify him or herself to the accommodation
3 coordinator, declare the disability or suspected
4 disability in writing, and request accommodation.
5 It is also the student's responsibility to obtain a
6 thorough, written evaluation from an appropriate
7 professional documenting the presence, extent, and
8 ramifications of the disability.
9        "In addition, the documentation
10 should explain what specific types of accommodation
11 the evaluator believes might be most helpful in
12 offsetting the effects of the disability to an
13 acceptable extent." In parenthesis, "in a medical
14 school environment if possible."
15        So I would say that that does
16 outline what is being asked of by the student to
17 request an accommodation, yes.
18    Q   So only the information in the
19 student handbook is what would need to be in
20 writing?
21    A   I am not sure I understand your
22 question.
23    Q   Well, you said that the student
24 handbook, what you just read, would set the
25 structure. Can a student provide all of those

Page 35

1 documents and put in writing in his own way on his
2 own piece of paper and have that settle as their
3 writing to the request?
4        (Reporter clarification.)
5 BY MR. AWODIYA:
6    Q   I am trying to remember what I said.
7 Let me just ask the question again. I am going to
8 ask you in the best way I remember. I don't
9 exactly remember what I asked you. I know it was a
10 topic of request.
11        Before the student handbook
12 mentioned a request packet, from your
13 interpretation of the student handbook when I was
14 enrolled, could the student submit their own
15 writing or would they have to submit a packet?
16    A   No, you're correct. Prior to -- so
17 the packet came along later in this iteration of
18 the handbook that would have been in -- that would
19 have governed the December 2015 semester that there
20 was no packet, the student would follow this
21 process that was written here that was to reach out
22 to academic accommodations coordinator, email
23 Mr. Matthew Stewart-Fulton for more information, or
24 follow what was there.
25    Q   Okay. But there wasn't no packet

Page 36

1 until the student handbook that was published in
2 May of 2016? The Ross lawyers have it. Actually,
3 can they show it to you? Can you show him the May
4 2016 student handbook so that he can compare it?
5        MR. ROMAN: Give me one second.
6        THE WITNESS: I can say from memory,
7    I know the May '15 one is when the packet
8    was introduced.
9        MR. ROMAN: Can we take a two-minute
10    break? Val has to leave for the airport.
11    We just want to take a break so she can
12    step out.
13        MR. AWODIYA: Really quick. I just
14    want to confirm the packet wasn't
15    introduced until May of 2016?
16        THE WITNESS: It is in the May 2016
17    handbook. That's what I can confirm.
18        MR. AWODIYA: Thank you. We can go
19    to break.
20        MR. ROMAN: We will be back in two
21    minutes.
22        (Break taken.)
23 BY MR. AWODIYA:
24    Q   I think this is my last question. I
25 think I have asked everything I wanted to ask. The

Page 37

1 email that you sent to Mr. Cuffy, how come Ross has
2 not produced that?
3    A   I don't know.
4    Q   Would you still have that email?
5    A   I presume so.
6        MR. AWODIYA: Okay. Thank you very
7    much. I think Mr. Roman might have some
8    questions for you. I don't have any more
9    questions.
10        EXAMINATION
11 BY MR. ROMAN:
12    Q   I just have a few questions. Pretty
13 quick. If Mr. Stewart-Fulton testified that the
14 packet for accommodations was being used during
15 January of 2016, would you trust his recollection
16 at that time?
17    A   I absolutely would.
18    Q   He was primarily responsible for the
19 process, correct?
20    A   Correct.
21    Q   And if Mr. Stewart-Fulton testified
22 that the packet was in place when he arrived in his
23 role, would you defer to his recollection?
24    A   I absolutely would.
25    Q   Do you have any specific

10 (Pages 34 - 37)

Page 38

1 recollection yourself that the packet was not being
2 used in January of 2016?
3     A    I did not.  No.  I arrived at Ross
4 in September of '15 and so I likely wouldn't have
5 been involved, so I don't.
6     Q    Earlier you were testifying about
7 the student handbook.  Is it correct, though, that
8 the first time you saw a reference to the packet
9 was in the May 2016 version of the handbook?
10     A    I can say that I have seen it
11 referenced in the May '16 handbook.  What I don't
12 recall is if we had a January '16 version.  And if
13 we didn't, that would have been the first time.  If
14 we do have a January '16 version, I don't know if
15 it is in that version or not.
16     Q    I think already asked this, but you
17 don't know whether the packet was being used prior
18 to May of 2016?
19     A    Correct.
20         MR. ROMAN:  I have nothing further.
21         MR. AWODIYA:  I am good, too.  I
22     have nothing to add to that.  Thank you
23     for your time.
24         MR. ROMAN:  Could we mark as an
25     exhibit -- did we use the May 6, 2016

Page 39

1 handbook?  I think Dr. Hayse just
2 testified based on his recollection, so
3 maybe we don't need to mark it as an
4 exhibit.
5     Do you want to put it in as an
6 exhibit or no?
7         MR. AWODIYA:  Yeah, because we used
8     it.  I asked him to look at the exhibit
9     and then confirm and then he confirmed.
10     It's up to you.  I think his prior
11     testimony is good enough.
12     You know what, let's go ahead and
13     add it in there.
14         MR. ROMAN:  We will mark it as Hayse
15     1.
16     (Thereupon, the respective
17     document was marked as Hayes
18     Exhibit Number 1.)
19         COURT REPORTER:  Do you want to
20     order the transcripts?
21         MR. ROMAN:  The court reporter is
22     asking if you want to order the
23     transcript.
24         MR. AWODIYA:  Yes, I would like to
25     order both transcripts.

Page 40

1         MR. ROMAN:  And I will order a copy
2     and send me the read and sign.
3         FURTHER THE DEPONENT SAITH NOT.
4 (4:12 P.M.)

Page 41

1         REPORTER CERTIFICATE
2 STATE OF TENNESSEE
3 COUNTY OF KNOX
4     I, Deborah West, Licensed Court Reporter, LCR
5 #314, in and for the State of Tennessee, do hereby
6 certify that the deposition of Bryan Hayse, was
7 reported by me and that the foregoing transcript,
8 pages 1 through 41, inclusive, is a true and
9 accurate record to the best of my knowledge, skills
10 and ability.
11     I further certify that I am not related
12 to, nor an employee or counsel of any of the
13 parties to the action as defined under T.C.A
14 Section 24-9-136, nor am I financially interested
15 in the outcome of this case.
16     In witness thereof, I have hereunto set my
17 hand on this the 17th day of November, 2018.  The
18 witness HAS NOT waived signature.
19
20
21
              *Deborah P West*
22
              _____
              Deborah West, LCR 314 TN
23            Expiration:  6/30/2020
24
25

11 (Pages 38 - 41)

# Exhibit RJ-05

**From:** Awodiya, Oluwamuyiwa
**Sent:** Tue 1/19/2016 12:22:43 AM
**Subject:** Sooner Treatment

Hello Dr. Shama,

I have done all the test that you and Mr. Cuffy suggested that I do. Mr. Cuffy thinks that I should start treatment for the ADHD.

My appointment with you isn't until next week Thursday, and that is getting relatively close to my mini. I already have my reservations about the treatment but I am willing to give it a try.

The only thing that I wish we could change is if we could try the medication sooner instead of waiting until late next week because I don't know how this treatment will affect me and I think it would be better for me to try it this week giving me ample time adjust and evaluate the effects before my 1st mini.

So if it is possible to start the trial this week, that would be greatly appreciated. But if you cannot fit me in this week than I will just wait for my appointment on January 28th that Ms. Kelly had already scheduled for me.

Thank you and enjoy the rest of week.

Best regards,
Oluwamuyiwa Awodiya

RUSM 0008

# Exhibit RJ-06



# *STUDENT HANDBOOK*

# 2015 – 2016

## May 6, 2016

© 2016 Ross University School of Medicine.  All rights reserved.

50

# ACCOMMODATIONS FOR STUDENTS WITH DISABILITIES

**Qualifying for Disability Accommodations**

RUSM expects that each student admitted will be capable of completing the full curriculum of required courses, clerkships, and electives under the established RUSM policies. All students and applicants must be capable of meeting the RUSM Technical Standards (as outlined in the **Technical Standards** section of the Student Handbook) with or without reasonable accommodation, at each stage of their medical education. Our goal at RUSM is to provide equal opportunity without undermining the integrity of any course, clerkship, or program. Requests for accommodation should be made as soon as the need is known and within the guidelines described here. Requests are processed in Foundations of Medicine and Clinical Sciences by the appropriate Accommodation Coordinator in the Office for Student Affairs.

RUSM adheres to the guidelines set forth in the USMLE and NBME websites (www.USMLE.org or www.NBME.org ) for testing accommodations.

**Accommodation Request Packet**

The Accommodation Request packet may be downloaded from the Portal or can be obtained from the Accommodations Coordinator.  Review the packet carefully to ensure you are aware of all the requirements. Further, it is important to ensure that all components of the packet have been completed, including all supporting documents, are submitted to the Accommodations Coordinator.   Incomplete or missing documentation may delay the evaluation and final determination of your request.

RUSM reserves the right to request additional documentation.  RUSM reserves the right to determine which tests are acceptable for diagnosis and requires that standardized tests are based on adult norms.

It is the sole responsibility of the person applying for accommodation to ensure the timely submission of any required documentation and to ensure their treatment provider provides all necessary information.

Please review the packet carefully and contact the appropriate Accommodations Coordinator, Foundations of Medicine or Clinical Sciences, with any questions.

RUSM will make all reasonable efforts to review requests in a timely manner, but cannot guarantee that any requests will be fully reviewed and granted prior to any specific examination or phase of the curriculum.

All accommodations will be confidential, reasonable, and appropriate to the circumstances, allowing equal opportunity for students with disabilities, and will not infringe on the essential requirements of, or fundamentally alter, the medical education program of RUSM.

**Application Process**

*Foundations of Medicine*

Requests for accommodation during the foundational science portion of the curriculum are to be submitted in writing to the Accommodations Coordinator for Foundations of Medicine. The submission must include all the completed documents from the Accommodation Request packet as well as any supporting documentation.

51

It is recommended that students prepare the Accommodation Request packet and gather the required supporting documentation prior to matriculation and submit their completed packet at least four (4) weeks prior to matriculation or the date accommodation will be needed. Please note that packets may not be reviewed until they are complete as a determination on the accommodation may not be made until all necessary information has been submitted. RUSM reserves the right to request additional documentation in support of a request for accommodation at any time.

RUSM recognizes that sometimes the need for accommodation may arise after a student has begun medical studies and is already in Dominica and may present a need for provisional accommodation. Under these circumstances, due to the limited resources available on the island of Dominica, the Counseling Center or Health Clinic may provide the documentation required to submit a Request for Accommodation packet in support of granting provisional accommodation. If approved, provisional accommodations can be provided for the remainder of the semester during which they were requested. However, any provisional accommodation granted will not extend beyond the end of that semester. Prior to the start of the subsequent semester it is the student's responsibility to work with an appropriate health care provider, independent of RUSM, to provide supporting documents in order submit a complete Request for Accommodations packet in order for the provisional accommodations to extend beyond the semester in which they were granted.

The Accommodations Coordinator will communicate in writing to the person applying for the accommodation all decisions made with respect to their Request for Accommodation.


*Clinical Sciences*

Requests for accommodation during the Clinical Sciences portion of the curriculum are made separately from the request made during the Foundations of Medicine portion of the curriculum. Requests for accommodation during the clinical sciences portion of the curriculum, are to be submitted in writing to the Accommodations Coordinator for Clinical Sciences. Please be advised that accommodations that were approved and or received during the Foundations of Medicine may not be approved or received during the clinical portion of the program.

RUSM applies the guidelines set forth both in the USMLE and NBME websites (www.USMLE.org or www.NBME.org) for requests for reasonable testing accommodations during the clinical semesters. These are the same standards USMLE and NBME will require a student to meet when requesting accommodations for their Step examinations. Students are advised that USMLE and NBME may adhere to stricter standards and documentation requirements than students have encountered previously during the course of their education. Students should not expect that accommodations granted during foundations of medicine will necessarily be granted during the clinical portion of the curriculum. Only students who are in the process of appealing a denial of accommodation from NBME may be granted for the requested accommodation during clinical exams, pending the outcome of the appeal to NBME.

Requests for accommodation for physical impairments, or other impairments that are not testing related, are also submitted to the Accommodations Coordinator for Clinical Sciences. However, the clinical site shall be responsible for reviewing and granting requests for accommodation for any physical impairments. RUSM has no decision making authority with respect to the outcome of these requests.

It is the student's responsibility to ensure that all accommodation requests and materials are up to date prior to commencing Clinical Sciences, and to submit this request to the Accommodations Coordinator for Clinical Sciences. It is recommended that students prepare the Accommodation Request packet and gather any supporting documentation at least four (4) weeks prior to beginning Clinical Sciences or the date accommodation will be needed. Please note that packets may not be reviewed until they are complete as a determination on the accommodation may not be made until all necessary information has been submitted. Additional documentation in support of a request for accommodation may be requested by RUSM or the clinical site at any time.

52

The Accommodations Coordinator is available to assist RUSM students through the accommodation request processes during Clinical Sciences.

## Accommodations and USMLE/NBME Testing

If a student requires an accommodation for any phase of the USMLE testing, it is the student's responsibility to seek that accommodation directly from the NBME in compliance with their policies.
RUSM has no influence or decision making authority with regard to requests for reasonable accommodation made to NBME.

Though RUSM may have granted a reasonable accommodation for the same impairment, this prior grant of accommodations is not an indicator, nor does it ensure that NBME will also grant that accommodation. Disability accommodations for NBME examinations are determined solely by the policies or processes of the NBME. Instructions and guidelines (both general and specific to certain disabilities) for applying for testing accommodations are located in the USMLE and NBME websites (www.USMLE.org or www.NBME.org ).

Please note that NBME's review for accommodations may take longer than 90 days.. It is recommended that the student prepare by gathering the current assessments and documentation required by NBME standards at least six months prior to submitting the application to NBME.

Students seeking accommodation through the NBME are still required to adhere to the curricular and administrative deadlines for sitting for USMLE Step examinations outlined in the Student handbook, including, but not limited to, the section on graduation requirements. Failure to obtain accommodation from NBME will not exempt a student from meeting those deadlines and requirements. It is the student's responsibility to understand and comply with both RUSM and NBME timelines.

The Accommodations Coordinator is available to advise RUSM students regarding the accommodation request processes for USMLE but has no decision making authority with respect to the outcome of such requests.

## External Facilities

While RUSM is committed to providing reasonable accommodations to qualifying students, RUSM cannot guarantee that any facility not under RUSM control, including clinical facilities, housing and other establishments, on or off the island of Dominica, will provide accommodations for individuals with disabilities.

# Exhibit RJ-07

**Ross University**
**School of Medicine**

Office of the Registrar
2300 S.W. 145th Ave., Suite 200
Miramar, FL. 33027
Phone 754-208-4591
Fax 732-509-4820
Registrar@RossU.edu



# ROSS UNIVERSITY
## SCHOOL OF MEDICINE

April 13, 2017

Oluwamuyiwa Awodiya
15005 Dahlia Drive
Bowie, MD 20721

Dear Oluwamuyiwa:

The Ross University School of Medicine Office of the Registrar has reviewed your academic performance and in accordance with university policies, you are dismissed from RUSM for the following:

> ### Dismissal (RUSM Student Handbook)
> *Students are subject to academic dismissal based on the following:*
> *Failure to pass the NBME CBSE in five consecutive attempts*

If you have extenuating circumstances that warrant an appeal to standard university policy, you may submit an appeal for reconsideration to PromotionAppeals@RossU.edu within 15 calendar days of the date of this letter, April 28, 2017.

The Committee will consider your appeal at their next regularly scheduled meeting, at which time you will be notified of their decision. Please refer to the RUSM Student Handbook for additional information regarding the appeals process.

Please be advised that if you are a recipient of federal student loans, we must inform your lender(s) that you have not attended RUSM since the last day you attended classes or rotated in a clinical clerkship. The impact of your status on your federal student loans will depend on your specific situation, applicable regulations and the terms and conditions of your loan(s). Please visit www.studentloans.gov to complete your exit interview as required by federal regulations.

Should you have questions or need additional assistance, please contact the Office of the Registrar at Registrar@RossU.edu.

Sincerely,

Sandra Herrin
University Registrar

cc:     Chair of Student Promotions Committee-Foundations of Medicine Sub-committee
        Academic & Student Affairs
        Academic & Student Operations
        Student Finance

RUSM 000071

# Exhibit RJ-08

**Ross University**
**School of Medicine**

Office of the Registrar
2300 S.W. 145th Ave., Suite 200
Miramar, FL. 33027
Phone 754-208-4591
Fax 732-509-4820
Registrar@RossU.edu



# ROSS UNIVERSITY
## SCHOOL OF MEDICINE

June 1, 2017

Oluwamuyiwa Awodiya
15005 Dahlia Drive
Bowie, MD 201721

Dear Oluwamuyiwa:

The Ross University School of Medicine Student Promotions Committee – Foundations of Medicine Sub-committee has reviewed your letter of appeal and academic history.  After careful consideration, I regret to inform you the academic dismissal on April 13, 2017, is upheld.

If additional information has become available or if you believe university procedure wasn't followed, you may appeal this decision by submitting an appeal to the Dean. Appeal letters must state the reason for the appeal and be emailed to Dean Owen at PromotionAppeals@RossU.edu within 15 calendar days of the date on this notification letter, June 16, 2017.  The Dean or his designee will make a final decision on each appeal within 15 calendar days of the Dean's receipt of the written appeal. Please refer to the RUSM Student Handbook for additional information regarding the appeals process.

Please be advised that if you are a recipient of federal student loans, RUSM must inform your lender(s) that you have not attended RUSM since the last day you attended classes. The impact of your status on your federal student loans will depend on your specific situation, applicable regulations and the terms and conditions of your loan(s). Please visit www.studentloans.gov to complete your exit interview as required by federal regulations.

Should you have questions or need additional assistance, please contact the Office of the Registrar at Registrar@RossU.edu.

Sincerely,

Niels Larsen, PhD
Professor, Department of Physiology and Biochemistry
Chair, Student Promotions Committee-Foundations of Medicine Sub-committee

cc:     Academic & Student Affairs
        Academic & Student Operations
        Student Finance
        Registrar

# Exhibit RJ-09

**From:** Larsen, Niels
**Sent:** Mon 6/12/2017 2:40:58 PM
**Subject:** RE: Appeal Letter Decision

Hello Oluwamuyiwa,
I am sorry to say that your email got stuck under some other urgent matter and I thereafter forgot about it until today. I would not have been able to help with your request anyway, no other student I have been aware of have received such a service.

Good luck
Niels Larsen

**From:** Awodiya, Oluwamuyiwa [mailto:OluwamuyiwaAwodiya@students.rossu.edu]
**Sent:** Thursday, June 08, 2017 10:06 AM
**To:** Larsen, Niels <NLarsen@RossU.edu>
**Cc:** Hall, Maureen PM. <mpmhall@RossU.edu>
**Subject:** RE: Appeal Letter Decision

Hello Dr. Larsen,

I was hoping to see if there was a possible update to the questions that I asked in my last email?

I apologize for resending this email. Its only because I have under a week left to prepare before submitting my letter to the Dean.

Best regards,
Oluwamuyiwa Awodiya

**From:** Awodiya, Oluwamuyiwa
**Sent:** Friday, June 2, 2017 12:57 PM
**To:** Larsen, Niels
**Cc:** Hall, Maureen PM.
**Subject:** RE: Appeal Letter Decision

Good morning Dr. Larsen,

Thank you very much for taking the time to respond to my email and for your advice.

I would also want to ask if it is possible for Ross to set up a proctored NBME exam of any fashion.

I have been working diligently on addressing my recent diagnosis and have made remarkable progress.

With this, for the first time ever I passed my first NBME a couple of weeks ago and plan on taking another one very soon to (next few days) to measure my growth and progress.

Because these exams are highly accurate and because of my relentless, continuous treatment I am confident that I will pass any exam as of today.

It would be great if I could take the next unofficial NBME in an environment that Ross considers adequate enough so that there is no doubt that I can now pass these exams.

So my questions are:

Is there anyway that I can have Ross unofficially or officially send an exam for me to take in a Prometric center around me? My family will take care of any cost if there is any associated with setting this up.

If not possible then do you think it is good enough to just record myself, my environment, and my screen when taking another NBME?

Also, I just wanted to confirm if all the previous submitted documents will be handed to the Dean or should I resubmit them?


Gratefully,

Oluwamuyiwa Awodiya

**From:** Larsen, Niels
**Sent:** Friday, June 2, 2017 11:41 AM
**To:** Awodiya, Oluwamuyiwa
**Cc:** Hall, Maureen PM.
**Subject:** RE: Appeal Letter Decision

Dear Oluwamuyiwa,
The committee decisions are made by secret ballot so I cannot know what swayed the different members of the committee in one direction or another. However, I may be able to give you some other advise, hope this helps.

The most important advise is that if there was something you were shy about and did not want to share, this is definitely the time to come out with it. I realize it can be difficult to share very private details, but this is the time.

Another thing is that you have a few more words to provide details in the appeal to the Dean. Use those wisely: try to avoid repetitions but use them to make sure you give a reasonably complete description of those things you do describe.

Lastly, make sure you have a clear, coherent description of what you will to differently if allowed back.

Sincerely

**Niels Larsen, PhD**
*Professor, Department of Physiology and Biochemistry*
*Chair, Student Promotions Committee*

**Ross University School of Medicine**
*Dominica Campus*:
P.O. Box 266
Roseau
Commonwealth of Dominica

*Miramar Location*:
2300 SW 145th Avenue, Suite 200
Miramar, FL 33027

Phone: 767-255-6323
Mobile: 767-235-2431
Email: nlarsen@rossu.edu
Web: RossU.edu

**ROSS UNIVERSITY**
SCHOOL OF MEDICINE


**From:** Hall, Maureen PM.
**Sent:** Thursday, June 01, 2017 7:34 PM
**To:** Awodiya, Oluwamuyiwa <OluwamuyiwaAwodiya@students.rossu.edu>
**Cc:** Larsen, Niels <NLarsen@RossU.edu>
**Subject:** Re: Appeal Letter Decision

Dear Oluwamuyiwa:

Please see our letter of April 13, 2017 regarding your appeal. Mr. Brecht is no longer a member of the Committee. Dr.
Niels Larsen is now the Chair of the Committee and is best able to help you.  I ave copied him for your convenience.

Respectfully,
Dr. Hall

Sent from my iPad
> On Jun 1, 2017, at 7:24 PM, Awodiya, Oluwamuyiwa <OluwamuyiwaAwodiya@students.rossu.edu> wrote:
>
> Good afternoon Dr. Hall,
>
> I am really sorry to bother you but I just received the email about my Appeal decision which stated that it was upheld.
> I plan on following the directions on getting a decision from the Dean.
>
> I am reaching out to you because I was hoping maybe I could receive some advice about why the decision to uphold
> the appeal may have occurred. So that I can possibility address those issues in my letter to the dean. Anything, no
> matter how small will be appreciated.
>
> Thank you for your time.
>
> Sincerely,
>
> Oluwamuyiwa Awodiya
>   00259355

RUSM 0007

# Exhibit RJ-10



**ROSS UNIVERSITY SCHOOL OF MEDICINE**
**ACADEMIC CATALOG**
**2015-2016, VOL. 7**

i

RUSM 000183

## CONTACT INFORMATION



**Administrative Offices (Miramar):**
2300 SW 145th Ave.
Miramar, FL 33027
Telephone: 954-885-3700

**Dominica Address:**
Ross University School of Medicine
PO Box 266
Roseau, Commonwealth of Dominica, West Indies

**Shared Services and Office of Student Finance**
485 US Hwy 1 South
Building B, 4th Floor
Iselin, New Jersey 08830
Telephone: 732-509-3051
Toll-free telephone: 1-877-ROSS-EDU (877-767-7338)
On the Web: RossU.edu

**Address applications to:**
Ross University School of Medicine
Office of Admissions
485 US Hwy 1 South
Building B, 4th Floor
Iselin, New Jersey 08830
Fax: 732-509-4803
Email: Admissions@RossU.edu

Disclaimer:
This catalog supersedes all previous editions and is in effect until a subsequent version is published either in print or online. All information in this catalog is current at the time of printing. Statements regarding tuition and fees, curriculum, course offerings, admissions, and graduation requirements are subject to change at any time and are applicable to all enrolled students unless otherwise stated.

The online version of this catalog, found at RossU.edu, is the most current and accurate representation of Ross University School of Medicine's programs and policies. It is updated frequently to provide the most current information.
Date of Issue: September 1, 2015.

Ross University School of Medicine (RUSM) admits academically qualified students without regard to race, color, national origin, gender, religion, disability, or age and affords students all rights, privileges, programs, and activities generally made available to students at RUSM. It does not discriminate on the basis of race, color, national origin, gender, religion, disability, sexual orientation, age, political affiliation or belief in administration of its educational programs and other RUSM administered policies, or employment policies.

DeVry Education Group is the parent company of Ross University School of Medicine. *DeVry Education Group is a for-profit corporation registered with the FL Department of State to do business in Florida as Ross University School of Medicine.*
ii

RUSM 000184

 

© 2015 Ross University School of Medicine. All rights reserved.



# CONTENTS

| PAGE IV | RUSM at a Glance |
|---|---|
| PAGE VII | Message from the Dean |
| PAGE IX | Academic Calendar |
| PAGE X | Hippocratic Oath |
| PAGE 1 | General Information |
| PAGE 4 | Admissions Information |
| PAGE 9 | RUSM Financial Information |
| PAGE 13 | Curriculum Overview |
| PAGE 39 | Affiliated Hospitals |
| PAGE 41 | Post-Graduate Training |
| PAGE 54 | Academic Policies and Procedures |
| PAGE 63 | Qualifications for Doctor of Medicine Degree Candidates |
| PAGE 64 | Degree and Licensure Requirements |
| PAGE 64 | Facilities and Support Services |
| PAGE 67 | Student Life and Services |
| PAGE 70 | School of Medicine Academic Administration |
| PAGE 72 | Foundations of Medicine Faculty |
| PAGE 156 | Executive Administration |

iii

RUSM 000185

## GENERAL INFORMATION

**Foreword**
Students must be familiar with the policies and procedures of RUSM as stated in this catalog and the
RUSM *Student Handbook.*

The contents of this catalog represent the most current information available at the time of publication.
However, during the period of time covered by this catalog, it is reasonable to expect changes to be
made without prior notice. The online version, found at RossU.edu, is the most current and accurate
representation of RUSM's academic catalog. It is updated frequently to give you the most current
information, and students are responsible for reviewing the changes.

RUSM reserves the right to change, modify or alter, without notice, all fees, charges, tuition expenses
and costs of any kind. RUSM further reserves the right to add, modify or delete, without notice, any
course offering or information contained in this catalog. Class and exam schedules published each
semester will indicate additions or other changes.

Following a student's entry into the program, the curriculum may undergo modification(s). Students are
held responsible for degree requirements in effect at the time of enrollment, plus any changes made
during the student's progress toward the degree as long as such changes do not delay graduation.

This catalog describes the educational program and activities available at RUSM. RUSM makes no claims
that enrolling in a particular class or following the course curriculum will produce a specific
achievement, employment, qualification for employment, admission to postgraduate degree programs
or licensure. It is understood that the ultimate responsibility for complying with degree requirements
rests with the student. This publication is issued by RUSM as authorized and approved by the Dean and
Chancellor.

**Introduction and Overview**
RUSM is devoted to the education of medical professionals. Founded in 1978, RUSM is located in
Dominica, West Indies, offers clinical rotations in teaching hospitals across the United States, Canada
and United Kingdom and is supported by administrative offices located in Miramar, FL and Iselin, NJ.

RUSM offers a Doctor of Medicine (MD) degree program and has graduated more than 11,000
physicians during its 37-year history. Graduates are eligible for licensure in all 50 States, Canada and
Puerto Rico after the successful completion of the requisite licensing examinations.

The Foundations of Medicine curriculum, conducted in Dominica, consists of a minimum of 64 credits of
specifically prescribed coursework. All Foundations of Medicine coursework must be satisfactorily
completed at the RUSM campus in Dominica.

At the end of the Foundations of Medicine curriculum, students are required to take the National Board
of Medical Examiners (NBME) Comprehensive Basic Sciences examination (CBSE). Students receiving a
score of 66 or higher on the CBSE are certified to take the USMLE Step 1. Students who do not pass the

1

RUSM 000194

CBSE are given two subsequent opportunities to take and pass the CBSE in order to certify for the USMLE Step 1.

The Clinical Science curriculum in the United States begins with a 6-week clerkship: Internal Medicine Foundations (IMF), conducted through our affiliation agreement with the Center for Haitian Studies in South Florida. Following IMF, students complete 84 additional weeks of clinical . This clinical experience is designed to build on students' training in medical history and physical diagnostic skills, and better prepare them to meet the demands of their clinical studies. Students participate in patient care while rotating through various medical specialties in affiliated teaching hospitals and other approved healthcare facilities in the United States.

During clinical clerkships, students must complete and pass the USMLE Step 2 Clinical Knowledge (Step 2 CK) and the USMLE Step 2 Clinical Skills (Step 2 CS). RUSM requires students to pass both the USMLE Step 2 CK and Step 2 CS to be eligible for graduation.

**University Mission**
Our mission is to prepare highly dedicated students to become competent and caring physicians.

**Accreditation and Approval**
The government of the Commonwealth of Dominica authorizes RUSM to confer the Doctor of Medicine degree and graduates are also eligible for licensure in Dominica. The United States Department of Education, through its National Committee on Foreign Medical Education and Accreditation (NCFMEA), has determined that the accreditation standards employed by the Dominica Medical Board are comparable with those used to evaluate programs leading to the MD degree in the United States by the Liaison Committee on Medical Education.

This determination ensures that students enrolled at RUSM are eligible to participate in the US Federal Direct Loan Program. Students or applicants who wish to contact the Dominica Medical Board regarding any aspect of RUSM's medical education program can do so by writing to:

> **Dominica Medical Board Government Headquarters**
> Kennedy Avenue, Roseau, Commonwealth of Dominica, West Indies

RUSM students are eligible to take all of the United States Medical License Examinations (USMLE) by registering with the Educational Commission for Foreign Medical Graduates (ECFMG) and are eligible to apply for licensure in all states in the United States.

RUSM is also accredited by the Caribbean Accreditation Authority for Education in Medicine and other Health Professions (CAAM-HP). CAAM-HP is the legally constituted body established in 2003 under the aegis of the Caribbean Community (CARICOM), empowered to determine and prescribe standards and to accredit programs of medical, dental, veterinary and other health professions education on behalf of the contracting parties in CARICOM.

2

RUSM 000195

# **Exhibit RJ-11**



**ROSS UNIVERSITY SCHOOL OF MEDICINE**
**ACADEMIC CATALOG**
**2015-2016, VOL. 7**

# CONTACT INFORMATION



**Administrative Offices (Miramar):**
2300 SW 145th Ave.
Miramar, FL 33027
Telephone: 954-885-3700

**Dominica Address:**
Ross University School of Medicine
PO Box 266
Roseau, Commonwealth of Dominica, West Indies

**Shared Services and Office of Student Finance**
485 US Hwy 1 South
Building B, 4th Floor
Iselin, New Jersey 08830
Telephone: 732-509-3051
Toll-free telephone: 1-877-ROSS-EDU (877-767-7338)
On the Web: RossU.edu

**Address applications to:**
Ross University School of Medicine
Office of Admissions
485 US Hwy 1 South
Building B, 4th Floor
Iselin, New Jersey 08830
Fax: 732-509-4803
Email: Admissions@RossU.edu

Disclaimer:
This catalog supersedes all previous editions and is in effect until a subsequent version is published either in print or online. All information in this catalog is current at the time of printing. Statements regarding tuition and fees, curriculum, course offerings, admissions, and graduation requirements are subject to change at any time and are applicable to all enrolled students unless otherwise stated. The online version of this catalog, found at RossU.edu, is the most current and accurate representation of Ross University School of Medicine's programs and policies. It is updated frequently to provide the most current information. Date of Issue: September 1, 2015.

Ross University School of Medicine (RUSM) admits academically qualified students without regard to race, color, national origin, gender, religion, disability, or age and affords students all rights, privileges, programs, and activities generally made available to students at RUSM. It does not discriminate on the basis of race, color, national origin, gender, religion, disability, sexual orientation, age, political affiliation or belief in administration of its educational programs and other RUSM administered policies, or employment policies.

DeVry Education Group is the parent company of Ross University School of Medicine. **DeVry Education Group is a for-profit corporation registered with the FL Department of State to do business in Florida as Ross University School of Medicine.**



© 2016 Ross University School of Medicine. All rights reserved.



ii

# CONTENTS

| | |
|---|---|
| PAGE IV | RUSM at a Glance |
| PAGE VII | Message from the Dean |
| PAGE IX | Academic Calendar |
| PAGE X | Hippocratic Oath |
| PAGE 1 | General Information |
| PAGE 4 | Admissions Information |
| PAGE 9 | RUSM Financial Information |
| PAGE 13 | Curriculum Overview |
| PAGE 39 | Affiliated Hospitals |
| PAGE 41 | Post-Graduate Training |
| PAGE 54 | Academic Policies and Procedures |
| PAGE 63 | Qualifications for Doctor of Medicine Degree Candidates |
| PAGE 64 | Degree and Licensure Requirements |
| PAGE 64 | Facilities and Support Services |
| PAGE 67 | Student Life and Services |
| PAGE 70 | School of Medicine Academic Administration |
| PAGE 72 | Foundations of Medicine Faculty |
| PAGE 156 | Executive Administration |

# GENERAL INFORMATION

**Foreword**
Students must be familiar with the policies and procedures of RUSM as stated in this catalog and the RUSM *Student Handbook.*

The contents of this catalog represent the most current information available at the time of publication. However, during the period of time covered by this catalog, it is reasonable to expect changes to be made without prior notice. The online version, found at RossU.edu, is the most current and accurate representation of RUSM's academic catalog. It is updated frequently to give you the most current information, and students are responsible for reviewing the changes.

RUSM reserves the right to change, modify or alter, without notice, all fees, charges, tuition expenses and costs of any kind. RUSM further reserves the right to add, modify or delete, without notice, any course offering or information contained in this catalog. Class and exam schedules published each semester will indicate additions or other changes.

Following a student's entry into the program, the curriculum may undergo modification(s). Students are held responsible for degree requirements in effect at the time of enrollment, plus any changes made during the student's progress toward the degree as long as such changes do not delay graduation.

This catalog describes the educational program and activities available at RUSM. RUSM makes no claims that enrolling in a particular class or following the course curriculum will produce a specific achievement, employment, qualification for employment, admission to postgraduate degree programs or licensure. It is understood that the ultimate responsibility for complying with degree requirements rests with the student. This publication is issued by RUSM as authorized and approved by the Dean and Chancellor.

**Introduction and Overview**
RUSM is devoted to the education of medical professionals. Founded in 1978, RUSM is located in Dominica, West Indies, offers clinical rotations in teaching hospitals across the United States, Canada and United Kingdom and is supported by administrative offices located in Miramar, FL and Iselin, NJ.

RUSM offers a Doctor of Medicine (MD) degree program and has graduated more than 11,000 physicians during its 37-year history. Graduates are eligible for licensure in all 50 States, Canada and Puerto Rico after the successful completion of the requisite licensing examinations.

The Foundations of Medicine curriculum, conducted in Dominica, consists of a minimum of 64 credits of specifically prescribed coursework. All Foundations of Medicine coursework must be satisfactorily completed at the RUSM campus in Dominica.

At the end of the Foundations of Medicine curriculum, students are required to take the National Board of Medical Examiners (NBME) Comprehensive Basic Sciences examination (CBSE). Students receiving a score of 66 or higher on the CBSE are certified to take the USMLE Step 1. Students who do not pass the CBSE are given two subsequent opportunities to take and pass the CBSE in order to certify for the USMLE Step 1.

1

The Clinical Science curriculum in the United States begins with a 6-week clerkship: Internal Medicine Foundations (IMF), conducted through our affiliation agreement with the Center for Haitian Studies in South Florida. Following IMF, students complete 84 additional weeks of clinical . This clinical experience is designed to build on students' training in medical history and physical diagnostic skills, and better prepare them to meet the demands of their clinical studies. Students participate in patient care while rotating through various medical specialties in affiliated teaching hospitals and other approved healthcare facilities in the United States.

During clinical clerkships, students must complete and pass the USMLE Step 2 Clinical Knowledge (Step 2 CK) and the USMLE Step 2 Clinical Skills (Step 2 CS). RUSM requires students to pass both the USMLE Step 2 CK and Step 2 CS to be eligible for graduation.

**University Mission**
Our mission is to prepare highly dedicated students to become competent and caring physicians.

**Accreditation and Approval**
The government of the Commonwealth of Dominica authorizes RUSM to confer the Doctor of Medicine degree and graduates are also eligible for licensure in Dominica. The United States Department of Education, through its National Committee on Foreign Medical Education and Accreditation (NCFMEA), has determined that the accreditation standards employed by the Dominica Medical Board are comparable with those used to evaluate programs leading to the MD degree in the United States by the Liaison Committee on Medical Education.

This determination ensures that students enrolled at RUSM are eligible to participate in the US Federal Direct Loan Program. Students or applicants who wish to contact the Dominica Medical Board regarding any aspect of RUSM's medical education program can do so by writing to:

> **Dominica Medical Board Government Headquarters**
> Kennedy Avenue, Roseau, Commonwealth of Dominica, West Indies

RUSM students are eligible to take all of the United States Medical License Examinations (USMLE) by registering with the Educational Commission for Foreign Medical Graduates (ECFMG) and are eligible to apply for licensure in all states in the United States.

RUSM is also accredited by the Caribbean Accreditation Authority for Education in Medicine and other Health Professions (CAAM-HP). CAAM-HP is the legally constituted body established in 2003 under the aegis of the Caribbean Community (CARICOM), empowered to determine and prescribe standards and to accredit programs of medical, dental, veterinary and other health professions education on behalf of the contracting parties in CARICOM.

In addition, the General Medical Council of Great Britain has granted the RUSM Doctor of Medicine degree Limited Registration status, and the World Health Organization includes RUSM in its listing of medical schools approved by recognized national authorities.

In addition, the Society for Simulation in Healthcare (SSH) granted full accreditation to Ross University School of Medicine's Simulation Institute in November 2013.

2

# Exhibit RJ-12



**ROSS UNIVERSITY SCHOOL OF MEDICINE**
**ACADEMIC CATALOG**
**2016-2017, VOL. 8**

# CONTACT INFORMATION



**Administrative Offices (Miramar):**
2300 SW 145th Ave.
Miramar, FL 33027
Telephone: 954-885-3700

**Dominica Address:**
Ross University School of Medicine
PO Box 266
Roseau, Commonwealth of Dominica, West Indies

**Shared Services and Office of Student Finance**
485 US Hwy 1 South
Building B, 4th Floor
Iselin, New Jersey 08830
Telephone: 732-509-3051
Toll-free telephone: 1-877-ROSS-EDU (877-767-7338)
On the Web: RossU.edu

**Address applications to:**
Ross University School of Medicine
Office of Admissions
485 US Hwy 1 South
Building B, 4th Floor
Iselin, New Jersey 08830
Fax: 732-509-4803
Email: Admissions@RossU.edu

Disclaimer:
This catalog supersedes all previous editions and is in effect until a subsequent version is published either in print or online. All information in this catalog is current at the time of printing. Statements regarding tuition and fees, curriculum, course offerings, admissions, and graduation requirements are subject to change at any time and are applicable to all enrolled students unless otherwise stated.

The online version of this catalog, found at RossU.edu, is the most current and accurate representation of Ross University School of Medicine's programs and policies. It is updated frequently to provide the most current information.
Date of Issue: November 15, 2016.

Ross University School of Medicine (RUSM) admits academically qualified students without regard to race, color, national origin, gender, religion, disability, or age and affords students all rights, privileges, programs, and activities generally made available to students at RUSM. It does not discriminate on the basis of race, color, national origin, gender, religion, disability, sexual orientation, age, political affiliation or belief in administration of its educational programs and other RUSM administered policies, or employment policies.

DeVry Education Group is the parent company of Ross University School of Medicine. *DeVry Education Group is a for-profit corporation registered with the FL Department of State to do business in Florida as Ross University School of Medicine.*
© 2016 Ross University School of Medicine. All rights reserved.

# CONTENTS

| PAGE IV | RUSM at a Glance |
| PAGE VI | Message from the Dean |
| PAGE VII | Academic Calendar |
| PAGE VIII | Hippocratic Oath |
| PAGE 1 | General Information |
| PAGE 4 | Admissions Information |
| PAGE 9 | RUSM Financial Information |
| PAGE 12 | Curriculum Overview |
| PAGE 36 | Affiliated Hospitals |
| PAGE 38 | Post-Graduate Training |
| PAGE 39 | Academic Policies and Procedures |
| PAGE 48 | Qualifications for Doctor of Medicine Degree Candidates |
| PAGE 49 | Degree and Licensure Requirements |
| PAGE 50 | Facilities and Support Services |
| PAGE 52 | Student Life and Services |
| PAGE 58 | School of Medicine Academic Administration |
| PAGE 59 | Foundations of Medicine Administration and Faculty |
| PAGE 68 | Clinical Sciences Administration and Faculty |
| PAGE 139 | Executive Administration |

# GENERAL INFORMATION

**Foreword**
Students must be familiar with the policies and procedures of RUSM as stated in this catalog and the RUSM *Student Handbook.*

The contents of this catalog represent the most current information available at the time of publication. However, during the period of time covered by this catalog, it is reasonable to expect changes to be made without prior notice. The online version, found at RossU.edu, is the most current and accurate representation of RUSM's academic catalog. It is updated frequently to give you the most current information, and students are responsible for reviewing the changes.

RUSM reserves the right to change, modify or alter, without notice, all fees, charges, tuition expenses and costs of any kind. RUSM further reserves the right to add, modify or delete, without notice, any course offering or information contained in this catalog. Class and exam schedules published each semester will indicate additions or other changes.

Following a student's entry into the program, the curriculum may undergo modification(s). Students are held responsible for degree requirements in effect at the time of enrollment, plus any changes made during the student's progress toward the degree as long as such changes do not delay graduation.

This catalog describes the educational program and activities available at RUSM. RUSM makes no claims that enrolling in a particular class or following the course curriculum will produce a specific achievement, employment, qualification for employment, admission to postgraduate degree programs or licensure. It is understood that the ultimate responsibility for complying with degree requirements rests with the student. This publication is issued by RUSM as authorized and approved by the Dean and Chancellor.

**Introduction and Overview**
RUSM is devoted to the education of medical professionals. Founded in 1978, RUSM is located in Dominica, West Indies, offers clinical rotations in teaching hospitals across the United States, Canada and United Kingdom and is supported by administrative offices located in Miramar, FL and Iselin, NJ.

RUSM offers a Doctor of Medicine (MD) degree program and has graduated more than 12,000 physicians during its 38-year history. Graduates are eligible for licensure in all 50 States, Canada and Puerto Rico after the successful completion of the requisite licensing examinations.

The Foundations of Medicine curriculum, conducted in Dominica, consists of a minimum of 64 credits of specifically prescribed coursework. All Foundations of Medicine coursework must be satisfactorily completed at the RUSM campus in Dominica.

At the end of the Foundations of Medicine curriculum, students are required to take the National Board of Medical Examiners (NBME) Comprehensive Basic Sciences examination (CBSE). Students receiving a score of 68 or higher on the CBSE are certified to take the USMLE Step 1. Students who do not pass the CBSE are given two subsequent opportunities to take and pass the CBSE in order to certify for the USMLE Step 1.

1

The Clinical Science curriculum in the United States begins with a 6-week clerkship: Internal Medicine Foundations (IMF), conducted through our affiliation agreement with the Center for Haitian Studies in South Florida. Following IMF, students complete 84 additional weeks of clinical clerkships. This clinical experience is designed to build on students' training in medical history and physical diagnostic skills, and better prepare them to meet the demands of their clinical studies. Students participate in patient care while rotating through various medical specialties in affiliated teaching hospitals and other approved healthcare facilities in the United States.

During clinical clerkships, students must complete and pass the USMLE Step 2 Clinical Knowledge (Step 2 CK) and the USMLE Step 2 Clinical Skills (Step 2 CS). RUSM requires students to pass both the USMLE Step 2 CK and Step 2 CS to be eligible for graduation.

**University Mission**
Our mission is to prepare highly dedicated students to become competent and caring physicians.

**Accreditation and Approval**
The government of the Commonwealth of Dominica authorizes RUSM to confer the Doctor of Medicine degree and graduates are also eligible for licensure in Dominica. The United States Department of Education, through its National Committee on Foreign Medical Education and Accreditation (NCFMEA), has determined that the accreditation standards employed by the Dominica Medical Board are comparable with those used to evaluate programs leading to the MD degree in the United States by the Liaison Committee on Medical Education.

Students or applicants who wish to contact the Dominica Medical Board regarding any aspect of RUSM's medical education program can do so by writing to:

> **Dominica Medical Board Government Headquarters**
> Kennedy Avenue, Roseau, Commonwealth of Dominica, West Indies

RUSM students are eligible to take all of the United States Medical License Examinations (USMLE) by registering with the Educational Commission for Foreign Medical Graduates (ECFMG) and are eligible to apply for licensure in all states in the United States.

RUSM is also accredited by the Caribbean Accreditation Authority for Education in Medicine and other Health Professions (CAAM-HP). CAAM-HP is the legally constituted body established in 2003 under the aegis of the Caribbean Community (CARICOM), empowered to determine and prescribe standards and to accredit programs of medical, dental, veterinary and other health professions education on behalf of the contracting parties in CARICOM.

In addition, the General Medical Council of Great Britain has granted the RUSM Doctor of Medicine degree Limited Registration status, and the World Health Organization includes RUSM in its listing of medical schools approved by recognized national authorities.

In addition, the Society for Simulation in Healthcare (SSH) granted full accreditation to Ross University School of Medicine's Simulation Institute in November 2013.

# Exhibit RJ-13

**Progress Notes (continued)**

<u>Mauricio, Earl John D (M.D.) at 12/30/2015  4:34 PM (continued)</u>
Lives with: my mother for this break; but by self when in school;

**MSE:** fd, fn young black male, appears stated age, casually dressed, neat, well-groomed, maintains eye contact, normal vocal tone, soft-spoken, calm, pleasant, cooperative, coherent, related, engagable, mood subdued, appropriate affect, fairly good response to mood reactivity, not suicidal/homicidal, no overt psychosis/formal thought disorder, insight/ judgment/ impulse control fair at this time.

**Assessment:** This is a 23yo single black male reporting a fairly recent history of stress-related depressive mood, anxiety, neurovegetative and exacerbation of chronic neurocognitive symptoms that is occurring in the context of identified external psychosocial stressors, family history of mental illness, no prior psychotropic medication intake, and for which he is willing to have further medication management/ adjustment for.  He presents as low risk of harm to self and others at this time.

███████████████

Unspecified neurodevelopmental disorder (provisional adhd)

There is no problem list on file for this patient.

**Treatment Plan/Recommendation:**
1. Medications:  Continue taking wellbutrin for now, at the low dosage that he states was prescribed in dominica (carribean); advised to bring the prescription bottles at the next appointment;
2. Psychosocial:  Education and support provided.  Refer for Cpt Conners computer testing
3. Follow up:  Within x 7 days and via kp.org per pt preference.

Treatment options discussed including side effects/risks and benefits.

Electronically signed by Mauricio, Earl John D (M.D.),12/30/2015  5:51 PM

<u>Visit Disposition</u>
Disposition
Return in about 1 week (around 1/6/2016), or if symptoms worsen or fail to improve.

**Medications**

<u>Infusion Orders</u>
No relevant orders to display.

<u>Questionnaires</u>
DEPRESSION SCREENING PHQ9 (FP/IM - NATL)

| Little interest or pleasure in doing things? | **2 - MORE THAN HALF THE DAYS** |
| Feeling down, depressed, or hopeless? | **3 - NEARLY EVERY DAY** |

Awodiya, Oluwamuyiwa O
MRN: ████████

**Progress Notes (continued)**

**Mauricio, Earl John D (M.D.) at 1/5/2016  1:33 PM (continued)**



**Mental Status Exam:**fd, fn young black male, appears stated age, casually dressed, neat, well-groomed, maintains eye contact, normal vocal tone, soft-spoken, calm, pleasant, cooperative, coherent, related, engagable, mood subdued, appropriate affect, fairly good response to mood reactivity, not suicidal/homicidal, no overt psychosis/formal thought disorder, insight/ judgment/ impulse control fair at this time.

**Diagnosis:**

███████████████████████
Unspecified neurodevelopmental disorder (provisional adhd)

**Plan:**increase ████████ to 300mg qd
- **f/u** in 2 weeks via reserved slot scheduled video visit and via kp.org per pt preference.

The risks, benefits and alternatives for the various medications started today were reviewed with the pt.

I have confirmed the presence of the above clinical diagnoses, which were considered in the current and ongoing care of the patient. At the time of this visit, the patient states, and/or the medical record indicates, that there are no changes in these conditions, unless otherwise noted, and the patient has been advised to follow up with PCP or specialist as treatment warrants.

Electronically signed by Mauricio, Earl John D (M.D.),1/5/2016  2:19 PM

**Visit Disposition**

Disposition
Return in about 2 weeks (around 1/19/2016), or if symptoms worsen or fail to improve.

Awodiya, Oluwamuyiwa O
MRN: ████████

**Progress Notes (continued)**

Mauricio, Earl John D (M.D.) at 4/27/2016 12:45 PM (continued)



Estimated body mass index is 24.14 kg/(m^2) as calculated from the following:
  Height as of 8/31/15: 6' (1.829 m).
  Weight as of 12/29/15: 178 lb (80.74 kg).

**Mental Status Exam**:fd, fn black male, appears stated age, casually dressed and groomed, maintains eye contact, normal vocal tone, soft-spoken, calm, pleasant, cooperative, coherent, related, engagable, mood subdued, appropriate affect, fairly good response to mood reactivity, not suicidal/homicidal, no overt psychosis/formal thought disorder, insight/ judgment/ impulse control fair at this time.

**Diagnosis**:

█████████████████████████████

Adhd

**Plan**:continue ███████ and ritalin which is 15mg bid; ordered baseline urine drug screen;
- f/u withiin 6 weeks and via kp.org per pt preference, sooner if needed.

The risks, benefits, side effects and alternatives for the various medications (to include not taking medications) started or continued today were reviewed with the pt.

I have confirmed the presence of the above clinical diagnoses, which were considered in the current and ongoing care of the patient. At the time of this visit, the patient states, and/or the medical record indicates, that there are no changes in these conditions, unless otherwise noted, and the patient has been advised to follow up with PCP or specialist as treatment warrants.

Awodiya, Oluwamuyiwa O
MRN: ███████

**Progress Notes (continued)**

<u>Mauricio, Earl John D (M.D.) at 6/17/2016  4:04 PM (continued)</u>

**Lab Results**



| Component | Value | Date/Time |
|---|---|---|

Estimated body mass index is 24.14 kg/(m^2) as calculated from the following:
  Height as of 8/31/15: 6' (1.829 m).
  Weight as of 12/29/15: 178 lb (80.74 kg).

**Mental Status Exam:**fd, fn black male, appears stated age, casually dressed and groomed, maintains eye contact, normal vocal tone, soft-spoken, calm, pleasant, cooperative, coherent, related, engagable, mood subdued, appropriate affect, fairly good response to mood reactivity, not suicidal/homicidal, no overt psychosis/formal thought disorder, insight/ judgment/ impulse control fair at this time.

**Diagnosis**:

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
Adhd

**Plan:**swithc ritalin to adderall ir at 10mg bid; ▉▉▉▉▉▉▉▉; encouraged to attend adhd support group;
- **f/u** withiin 4-6 weeks and via kp.org per pt preference, sooner if needed.

The risks, benefits, side effects and alternatives for the various medications (to include not taking medications) started or continued today were reviewed with the pt.

Awodiya, Oluwamuyiwa O
MRN: ▉▉▉▉▉

**Progress Notes (continued)**

Mauricio, Earl John D (M.D.) at 7/12/2016 12:31 PM (continued)



Estimated body mass index is 24.14 kg/(m^2) as calculated from the following:
  Height as of 8/31/15: 6' (1.829 m).
  Weight as of 12/29/15: 178 lb (80.74 kg).

**Mental Status Exam**:fd, fn black male, appears stated age, casually dressed and groomed, maintains eye contact, normal vocal tone, soft-spoken, calm, pleasant, cooperative, coherent, related, engaged, articulate, mood subdued, appropriate affect, fairly good response to mood reactivity, not suicidal/homicidal, no overt psychosis/formal thought disorder, insight/ judgment/ impulse control fair at this time.

**Diagnosis**:

████████████████████████

Adhd

**Plan**:continue adderall ir; █████████████ ; encouraged to attend adhd support group; encouraged counseling/ psychotherapy;
- **f/u** withiin 4-6 weeks and via kp.org per pt preference, sooner if needed.

The risks, benefits, side effects and alternatives for the various medications (to include not taking medications) started or continued today were reviewed with the pt.

Patient instructed to review AVS and contact provider for questions or concerns about treatment.

I have confirmed the presence of the above clinical diagnoses, which were considered in the current and ongoing care of the patient. At the time of this visit, the patient states, and/or the medical record indicates, that there are no changes in these conditions, unless otherwise noted, and the patient has been advised to follow up with PCP or specialist as treatment warrants.

Awodiya, Oluwamuyiwa O
MRN: ███████

**Progress Notes (continued)**

**Mauricio, Earl John D (M.D.), M.D. at 8/25/2016  3:02 PM (continued)**



Estimated body mass index is 20.48 kg/(m^2) as calculated from the following:
  Height as of 8/31/15: 6' (1.829 m).
  Weight as of 7/29/16: 151 lb (68.5 kg).

**Mental Status Exam**:fd, thin black male, appears stated age, casually dressed and groomed, maintains eye contact, normal vocal tone, soft-spoken, calm, pleasant, cooperative, coherent, related, engaged, articulate, mood subdued, appropriate affect, fairly good response to mood reactivity, not suicidal/homicidal, no overt psychosis/formal thought disorder, insight/ judgment/ impulse control fair at this time.

**Diagnosis**:

███████████████████████████

Adhd

**Plan**:increase adderall ir to 15mg bid; ██████████████ ; continue to encourage to attend adhd support group; encouraged counseling/ psychotherapy;
**- f/u** withiin 2 months and via kp.org per pt preference, sooner if needed.

The risks, benefits, side effects and alternatives for the various medications (to include not taking medications) started or continued today were reviewed with the pt.

Patient instructed to review AVS and contact provider for questions or concerns about treatment.

Awodiya, Oluwamuyiwa O
MRN: ████████

# Exhibit RJ-14

# APPLYING TO RESIDENCY:  SUBMITTING APPLICATIONS, INTERVIEWS AND BEYOND

**ROSS UNIVERSITY**

SCHOOL OF MEDICINE

# Topics

➢ Residency Applications
  ▪ Timeline
  ▪ Reasons students fail to match
  ▪ Submitting the right number of applications

➢ Interviewing
  ▪ Before the Interview
  ▪ During the Interview
  ▪ After the Interview

➢ Addressing Red Flags on your Application

# SUBMITTING YOUR APPLICATION

## ROSS UNIVERSITY
### SCHOOL OF MEDICINE

# Timeline

**Sept 5th**
- Applicants can start assigning their application to programs

**Sept 15th**
- Residency programs can begin viewing applications
- NRMP registration opens

**Oct - Jan**
- Interview season
- Oct 1st – MSPEs are released to residency programs

**Feb 20th**
- Rank Order List (ROL) deadline

**Mar 11th**
- Match Week
- March 14th – SOAP concludes
- March 15th – Match day

# Reasons Students Fail to Match

Reasons some students fail to match:

1)  Do not apply to the right specialty
2)  Do not apply to enough programs
3)  Do not apply to a parallel plan
4)  Have red flags on their profile
5)  Have poor interviewing skills

# USMLE Averages by Specialty

| Specialty | Exam | Score Range to Grant Interviews (NRMP) | IMGs Securing Positions (NRMP) | RUSM Average |
|---|---|---|---|---|
| Anesthesiology | USMLE Step 1 | 228 - 240 | 228 - 245 | **230** |
| | USMLE Step 2 CK | 230 - 240 | 228 - 252 | **241** |
| Emergency Medicine | USMLE Step 1 | 220 - 245 | 228 - 243 | **227** |
| | USMLE Step 2 CK | 230 - 248 | 235 - 252 | **235** |
| Family Medicine | USMLE Step 1 | 210 - 230 | 208 - 220 | **209** |
| | USMLE Step 2 CK | 220 - 240 | 218 - 230 | **229** |
| General Surgery | USMLE Step 1 | 220 - 240 | 232 - 248 | **231** |
| | USMLE Step 2 CK | 225 - 245 | 235 - 252 | **240** |
| Internal Medicine | USMLE Step 1 | 220 - 239 | 218 - 238 | **220** |
| | USMLE Step 2 CK | 224 - 244 | 225 - 245 | **230** |
| Ob-Gyn | USMLE Step 1 | 220 - 240 | 220 - 240 | **225** |
| | USMLE Step 2 CK | 223 - 241 | 228 - 248 | **238** |
| Pathology | USMLE Step 1 | 220 - 240 | 218 - 233 | **227** |
| | USMLE Step 2 CK | 220 - 240 | 221 - 243 | **231** |
| Pediatrics | USMLE Step 1 | 220 - 230 | 218 - 232 | **218** |
| | USMLE Step 2 CK | 220 - 240 | 222 - 242 | **228** |
| Psychiatry | USMLE Step 1 | 215 - 235 | 208 - 228 | **209** |
| | USMLE Step 2 CK | 220 - 230 | 218 - 233 | **224** |

# Exhibit RJ-15



# UNITED STATES MEDICAL LICENSING EXAMINATION ®

## STEP 1 SCORE REPORT

This score report is provided for the use of the examinee.
Third party users of USMLE information are advised to rely solely on official USMLE transcripts.

**Awodiya, Oluwamuyiwa O**

**USMLE ID:** ▮▮▮▮▮▮▮

**Test Date:** **December 23, 2017**

The USMLE is a single examination program consisting of three Steps designed to assess an examinee's understanding of and ability to apply concepts and principles that are important in health and disease and that constitute the basis of safe and effective patient care. Step 1 is designed to assess whether an examinee understands and can apply important concepts of the sciences basic to the practice of medicine, with special emphasis on principles and mechanisms underlying health, disease, and modes of therapy. The inclusion of Step 1 in the USMLE sequence is intended to ensure mastery of not only the sciences underlying the safe and competent practice of medicine in the present, but also the scientific principles required for maintenance of competence through lifelong learning. Results of the examination are reported to medical licensing authorities in the United States and its territories for use in granting an initial license to practice medicine. This score[§] represents your result for the administration of Step 1 on the test date shown above.

| | |
|---|---|
| **PASS** | This result is based on the minimum passing score recommended by USMLE for Step 1. Individual licensing authorities may accept the USMLE-recommended pass/fail result or may establish a different passing score for their own jurisdictions. |

| | |
|---|---|
| **211** | This score is determined by your overall performance on Step 1. For administrations between Jan 1, 2016 and Dec 31, 2016, the mean and standard deviation for first-time examinees from U.S. and Canadian medical schools were approximately 228 and 21, respectively, with most scores falling between 140 and 260. A score of 192 is set by USMLE to pass Step 1. The standard error of measurement (SEM)[‡] for this scale is six points. |

[§]Effective April 1, 2013, test results are reported on a three-digit scale only. Test results reported as passing represent an exam score of 75 or higher on a two-digit scoring scale.

[‡]Your score is influenced both by your general understanding of the basic biomedical sciences and the specific set of items selected for this Step 1 examination. The Standard Error of Measurement (SEM) provides an index of the variation in scores that would be expected to occur if an examinee were tested repeatedly using different sets of items covering similar content.