

FILED BY _____ D.C.

JAN 2 8 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

|  |  |
|---|---|
| OLUWAMUYIWA AWODIYA,<br>*Plaintiff,*<br><br>–v–<br><br>ROSS UNIVERSITY SCHOOL OF<br>MEDICINE, SCHOOL OF<br>VETERINARY MEDICINE LIMITED<br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.   0:18-cv-60482-KMM

Hon. Chief Judge: K. Michael Moore
Magistrate Judge: Alicia O. Valle

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 of the Local Rules of the United States District Court for the Southern District of Florida, plaintiff Oluwamuyiwa Awodiya ("Plaintiff") hereby files his response to the Statement of Material Facts [ECF No. 119] filed by defendant Ross University School of Medicine, School of Veterinary Medicine Limited ("RUSM") in opposition to Defendant's Motion for Summary Judgment [ECF No. 120].[1]

Placed at the end of this response are Plaintiff's additional statement of material facts.

## PLAINTIFF'S RESPONSE TO RUSM'S STATEMENT OF MATERIAL FACTS

1.     Undisputed.

2.     Undisputed.

---

[1] Each exhibit with a "RJ" prefix is concurrently filed herewith the Declaration of Oluwamuyiwa Awodiya in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment. Exhibits SJ-01 through SJ-23 were previously filed therein [ECF No. 102]. Exhibits SJ-24 through SJ-30 were previously filed therein [ECF No. 113]. Each of Defendant's exhibits referenced herein, are of those located at [ECF No. 119].

3.      Undisputed that prior to attending medical school, Plaintiff did not formally "apply" *per se* for academic accommodations. However, even without a formal application, Plaintiff received academic accommodations in the last two years of high school and at Morgan State University. *See* Plaintiff's Reply Statement of Material Facts in Support of Plaintiff's Second Motion for Partial Summary Judgment (hereinafter **"ReSMF"**) [ECF No. 115], at ¶ 38(iv) (citing Ex. SJ-25 (Awodiya Dep.)). The academic accommodation that Plaintiff received prior to attending medical school was extended time for test and assignments. *Id.*

4.      Disputed in part, as mischaracterization of the cited testimony. Plaintiff testified that prior to attending RUSM, he did not know the technicalities of the ADA, he just knew that it was "some type of thing that stopped discrimination" of disabled people. ReSMF ¶ 38(i) (quoting Awodiya Dep. 149:1-8, Ex. SJ-25).

5.      Disputed. This paragraph is not material. Prior to attending RUSM, Plaintiff was "very concerned" about his safety, getting hurt or injured, then becoming "disabled in some type of way" in Dominica. ReSMF ¶ 38(i) (quoting Awodiya Dep. 146:6-10, Ex. SJ-25). When Plaintiff enrolled, he wanted some assurance that if he became disabled in Dominica "that they would give me an opportunity or help me complete the program and not just say like well you're disabled now so see if you can figure it out on your own or get out of here and like just keep my money that I paid with Financial Aid money with." *Id.* (quoting Awodiya Dep. 147:18-25).

6.      Disputed. First, the cited Academic Transcript from RUSM shows that Plaintiff repeated his fifth semester at RUSM and **passed**, which brought his cumulative grade point average to 2.72. **Def. Ex. 4**. Second, Plaintiff's first semester at RUSM, in 2014, was his worst performing semester, even though he passed. *See* ReSMF ¶ 41 (citing **Ex. SJ-27** (exacting percentages for each semester)). The term "worst semester" is vague.

2

7.      Disputed. RUSM mischaracterize the cited counseling note dated October 28, 2015. It does not state that Plaintiff attended the Counseling Center because of academic struggles. The October 28, 2015 counseling note states that Plaintiff only went to Laura Cobb's in the Counseling Center because he "[w]ant[ed] objective perspective on situation with gf." *See also* ReSMF ¶ 42.

8.      Disputed. This entire paragraph is not material. Immediately after Plaintiff learned of his girlfriend's unfaithfulness and broke up with his girlfriend, all his exam scores improved. ReSMF ¶ 42 (comparing the October 28, 2015 counseling note *with* **Ex. SJ-27**). After he learned of his girlfriend's unfaithfulness, Plaintiff scored an 80% on his fifth semester exam. *Id.* Plaintiff had never achieved a score that high on any of his exams in his first, second, or forth semester at RUSM. *Id.*

9.      Disputed. The counseling note dated November 5, 2015 by Laura Cobb's is cited out of context. The counseling note states that Plaintiff was "happier, better able to study, less anxiety" despite the fact that "[h]e found out from friends that gf has lied about how many times she slept w/ other man." **Def. Ex. 6**.

10.     Disputed. The counseling note by Mr. Cuffy dated December 8, 2015 is based on, or constitutes, hearsay within hearsay inadmissible for the truth of the matter asserted. *See* Plaintiff's Motion in Limine ("**Pl.'s Limine Mot.**") [ECF No. 127], at 5-8; ReSMF ¶ 45. Before ever meeting Plaintiff, Mr. Cuffy's called Plaintiff into the Counseling Center and interrogated Plaintiff because of the hearsay reports that were relayed to Mr. Cuffy. *See infra* ¶ 11.

The same December 8, 2015 counseling note by Mr. Cuffy contradicts itself and further shows that Mr. Cuffy included notes of the hearsay reports that were relayed to him and ignored the actual statements and denials that were made by Plaintiff. **Def. Ex. 7**. The counseling note states, "Do you have a history of suicide ideations? No." *Id.* at 1. It is unclear from the counseling

3

note as to what gestures or expressions that Mr. Cuffy misconstrued as an admission. *See also* Pl.'s Limine Mot. at 7.

Even if this paragraph was admissible it is immaterial to Plaintiff's "academic woes" because, as RUSM has stated in this paragraph, the alleged thoughts of self-harm would have been "[a]fter learning of his failure." Thus, could not have contributed to Plaintiff's academic performance because the semester was over. *See* Pl.'s Limine Mot. at 8. Plaintiff repeated his fifth semester after the alleged thoughts of self-harm and passed. *See supra* ¶ 6.

11.    Disputed. Mr. Cuffy testified that he first met Plaintiff on December 8, 2015. *See* excerpts from the Deposition Transcript of McMillan Cuffy ("Cuffy Dep.") attached hereto as **Ex. RJ-01**, at 16:2-5, 25:10-12. On December 8, 2015, Mr. Cuffy was the on-call counselor at the Counseling Center. Cuffy Dep. 24:20-22; ReSMF ¶ 45 (citing **Ex. SJ-28**). Mr. Cuffy called Plaintiff into the Counseling Center on December 8, 2015, [ECF No. 107-1 at ¶ 45], because of hearsay reports that were relayed to Mr. Cuffy, *see* Pl.'s Limine Mot. at 5-8; ReSMF ¶ 45 (citing Ex. SJ-28; **Ex. SJ-29**). Mr. Cuffy interrogated Plaintiff for "several hours." ReSMF ¶ 45 (quoting Ex. SJ-29). Mr. Cuffy and Dr. Sharma "did not feel there was a concern at this time." *Id.*

Plaintiff was confused as to why Mr. Cuffy interrogated him after an alleged call from his mother to the school. *See* Awodiya Dep. 94:17-95:4 ("I was confused by that"), **Ex. SJ-25** [ECF No. 113]. "Q. She apparently told Jeannie Robertson that she had gotten a text from you saying you'd rather die? A. I never said that. Q. So she -- that's incorrect? A. That's very incorrect." *Id.* at 95:20-24.

12.    Disputed. First, *see supra* ¶ 10. Second, the counseling notes that were created during the actual time of Plaintiff's fifth semester exams state that Plaintiff had "no thoughts of harm to self, no history of self-injurious behavior, no history of suicidal ideation, no thoughts of

harm to others." *See supra* ¶ 9 (Plaintiff was "happier" and "better able to study"); *See also* ReSMF ¶ 46.

13.     Disputed. *See supra* ¶¶ 8-12.

14.     Disputed. The Safety Plan was signed under undue influence of the interrogation by Mr. Cuffy that was caused by hearsay reports that were relayed to Mr. Cuffy. *See supra* ¶¶ 10, 11. The alternative to signing the form was "to be taken to the nearest hospital or emergency room." **Def. Ex. 9** (last sentence).

15.     Disputed. The quoted statement of Dr. Sharma's counseling note is of the hearsay that Mr. Cuffy further relayed to Dr. Sharma, it is not what Plaintiff said to Dr. Sharma. **Def. Ex. 10**. The December 9, 2015, counseling note states that Mr. Cuffy "sat in" the session, *id*. at 2, and Dr. Sharma "was called in to see [Plaintiff] by Mr. Cuffy," *id*. at 1. In the same counseling note, Dr. Sharma asked Plaintiff directly about self-harm and expressly noted that Plaintiff actually "[d]enies wanting to harm himself but does not like the thoughts of sadness." *Id*. at 2; *See also* ReSMF ¶ 45 (discussing the December 9, 2015 counseling note). Also, the paragraph is not material to Plaintiff's "academic woes." *See supra* ¶ 10.

16.     Disputed. Plaintiff objects to RUSM offering self-serving testimony to controvert its judicial admissions. *See* Pl.'s Limine Mot. at 9 [ECF No. 127]. Plaintiff made two verbal requests to Dr. Sharma when Plaintiff executed the Release of Information Agreement. *See* Awodiya Dep. 93:12-21, **Ex. SJ-25** [ECF No. 113]. In addition to getting a flight change, the agreement was for concentration problems that the Counseling Center observed as symptoms of undiagnosed ADHD that needed to be diagnosed. *Id*. at 92:22-93:7. The agreement did not need to be signed again once the ADHD was confirmed. *See infra* ¶ 67.

Plaintiff did not request the flight change accommodation because of suicide or self-harm thoughts, *see supra* ¶¶ 10-12. Following this verbal request for an accommodation, Dr. Sharma submitted a request in writing to an RUSM administrator on Plaintiff's behalf. *See* **Ex. SJ-10** at 3 [ECF No. 102]. Dr. Sharma's written request states that Plaintiff needed this additional accommodation because it was hard for him "seeing his colleagues study for the Comp [NBME CBSE]" when he knew he had to repeat the semester "and the impact on his emotional health." *Id.*

17.     Disputed. The term "request" is vague. The only reason Dr. Sharma asserts that there was no request in December 2015 is because of his own definition of a request, as he testified, "I can only say, from my experience, a verbal request is not a request for accommodations." *See* Deposition Transcript of Davendranand Sharma ("Sharma Dep.") attached hereto as **Ex. RJ-02**, at 36:1-3. What constitutes a request calls for a legal conclusion.

Plaintiff testified that the Release of Information Agreement was for the Counseling Center "to determine if whatever accommodations were necessary." *See* Awodiya Dep. 90:18-19, **Ex. SJ-25** [ECF No. 113]. "As long as it was relevant to academic accommodations that would help me better perform, that is what that form is for." *Id.* at 91:17-19. "The specific accommodation that I thought would help me was extended testing time and that was verbal." *Id.* at 91:7-9.

18.     Disputed. The term "request" is vague. *See supra* ¶ 17. What constitutes a request calls for a legal conclusion. Also, on Plaintiff's behalf, following his verbal request for a flight change, Dr. Sharma put an accommodation request in writing to an RUSM administrator for "emotional health" which was solely a verbal request from Plaintiff. *See supra* ¶ 16.

19.     Disputed. Mr. Cuffy lacks personal knowledge about the conversation between Plaintiff and Dr. Hayse on December 10, 2015 in the Student Affairs office. At his deposition, Plaintiff testified that he "told Dr. Hayse that the counseling center suspected some type of

attention concentration problem." *See* Awodiya Dep. 75:12-14, **Ex. SJ-25** [ECF No. 113]. Plaintiff further testified that he told Dr. Hayse that he wanted extended testing time and asked him if he could also retake prior exams with extended testing time. *Id.* at 75:8-20, 101:23-102:2. Dr. Hayse told Plaintiff that he could not allow him to retake his exams with extended testing time but that he will contact the Counseling Center to get information of Plaintiff's suspected concentration problems for future exams. *Id.* RUSM admitted that Dr. Hayse recalls meeting with Plaintiff in December 2015 but could not recall what he and Plaintiff spoke about during this meeting. [ECF No. 107-1, at ¶ 54]. *See also* Pl.'s Limine Mot. at 6 (discussing self-harm allegation on December 10, 2015) [ECF No. 127]; ReSMF ¶ 53. *See also supra* ¶ 10 (immaterial to "academic woes"). What constitutes a request calls for a legal conclusion.

20.     Disputed. *See* ReSMF ¶ 56 (same mischaracterization). Calls for a legal conclusion.

21.     Disputed. *See* ReSMF ¶ 58 (same mischaracterization). Calls for a legal conclusion.

22.     Disputed in part. During the winter break, Plaintiff went home and was assessed for ADHD in December 2015. *See* **Ex. SJ-03** at 2 [ECF No. 102]. The assessment states that Plaintiff "request[ed] evaluation or treatment for ADHD." *Id.* Plaintiff reported to the psychiatrist that "school counseling" said he was "inattentive." *Id.* The symptoms that RUSM quoted from Dr. Mauricio's ADHD assessment were symptoms of Plaintiff's inattentiveness that "have always been there" which "goes back to high school." *Id.* at 3. The symptoms were "concerns related to attention/concentration." *Id.* One week after the ADHD assessment and the computerized testing was completed, Dr. Mauricio confirmed that Plaintiff's results were associated with a "very high" likelihood of having ADHD. *See* **Ex. SJ-01** [ECF No. 102].

23.     Disputed in part. Plaintiff gave the Counseling Center more than just "one document." Plaintiff gave the Counseling Center "one December assessment that Dr. Mauricio

did" and "there was diagnostic test as well that [he] gave to the school." *See* Awodiya Dep. 104:13-105:3, **Ex. SJ-25** [ECF No. 113]; *infra* ¶ 56. *See also supra* ¶ 22.

24.     Disputed. Dr. Sharma and Mr. Cuffy are the only two people from the Counseling Center that met with Plaintiff in December 2015. Dr. Sharma testified that "we" recommended the ADHD process when Dr. Sharma was "seeing" Plaintiff's symptoms of undiagnosed ADHD in December 2015. *See* Sharma Dep. 102:20-23, Ex. RJ-02. What constitutes a request calls for a legal conclusion.

25.     Disputed. When Mr. Cuffy was asked if he specifically advised Plaintiff of his "accommodation options" when he diagnosed Plaintiff with ADHD, Mr. Cuffy testified "I do not recall." *See* Cuffy Dep. 113:4-8, 113:21-25, Ex. RJ-01.

26.     Disputed. Dr. Sharma lacks personal knowledge as to whether Mr. Cuffy specifically advised Plaintiff of the "process" or the "student handbook" regarding accommodations. With specificity to Plaintiff, Mr. Cuffy does not recall performing such actions when he diagnosed Plaintiff with ADHD. *See supra* ¶ 25. Dr. Sharma's testimony only speculates as to "every" student's experience.

27.     Disputed. This paragraph is not material. Plaintiff did not read the student handbook in its entirety. *See* Awodiya Dep. 81:4-10, Ex. SJ-25 [ECF No. 113]. Plaintiff testified that he could not recall ever reading the 'accommodations' section of the student handbook. *Id.* at 81:20-82:2.

28.     Disputed. The student handbook does not specifically identify who is the "Accommodations Coordinator." **Def. Ex. 19**, at 46. The entire student handbook does not mention Matthew Stewart-Fulton's name at all. *See generally id.* Mr. Stewart-Fulton's job title is *not* "Accommodations Coordinator," his job title is "assistant director for student conduct and integrity

in academic accommodations." *See* the Deposition Transcript of Matthew Stewart-Fulton ("Stewart-Fulton Dep.") attached as **Ex. RJ-03**, at 8:5-8.

29.     Disputed. *See supra* ¶¶ 25-28. This paragraph also calls for a legal conclusion as to eligibility criteria under federal disability laws. Plaintiff also identified himself to Matthew Stewart-Fulton, requested accommodations from him, and declared his disability with written documentation. *See infra* ¶¶ 56, 74. On Plaintiff's behalf, following a verbal request, Dr. Sharma put an accommodation request in writing to an RUSM administrator for "emotional health" which was solely a verbal request from Plaintiff. *See supra* ¶ 16.

30.     Disputed. This paragraph calls for a legal conclusion as to the "responsibility" and eligibility criteria of a student under federal disability laws.

31.     Disputed. The term "request" is vague. Mr. Stewart-Fulton testified that he does not accept verbal request for consideration. Stewart-Fulton Dep. 15:23-16:2, Ex. RJ-03. Dr. Sharma also stated that a verbal request is not a request. *See supra* ¶ 17. Whether Plaintiff requested an accommodation is a legal conclusion. A specific "application packet" did not exist until after Plaintiff completed his last semester at RUSM. *See infra* ¶¶ 71, 72.

32.     Disputed. A specific "application packet" did not exist until after Plaintiff completed his last semester at RUSM. *See infra* ¶¶ 71, 72.

33.     Disputed. This is not a fact. It is an improper legal conclusion or argument.

34.     Disputed. The term "packet" as used in this paragraph is vague. Plaintiff's ADHD was evaluated by RUSM's psychiatrist, Dr. Sharma. *See infra* ¶¶ 51-65. Plaintiff also gave RUSM documentation of an ADHD evaluation performed by a private psychiatrist, Dr. Mauricio. *See supra* ¶ 23; *infra* ¶ 56. Dr. Sharma testified that there was adequate and good documentation of Plaintiff's ADHD. *See infra* ¶¶ 64, 65.

35.     Disputed. Whether Plaintiff requested an accommodation is a legal conclusion. *See* the purpose of the Release of Information Agreement, *infra* ¶ 67.

36.     Undisputed that the academic catalog permits RUSM to "add, modify, or delete" information contained in its academic catalogs. However, it is very important to point out that RUSM republished its academic catalog without changing the title of the academic catalog. The "date of issue" does not reflect the date of publication for republished academic catalogs. The title and the "date of issue" remains unchanged when an academic catalog is republished with added, modified, or deleted policies. *Compare infra* ¶ 94, *with infra* ¶ 96.

37.     Undisputed.

38.     Undisputed. However, the email does not state how long it will be in effect nor does it state that it is exempt from being superseded by further changes to policy made by the Dean.

39.     Undisputed.

40.     Undisputed.

41.     Disputed. The cited evidence does not state that Plaintiff "failed," it only states that he scored a 67.

42-48. Undisputed.

49.     Disputed. The usage of "[i]n response" is vague. The personal statement that RUSM cited is the appeal statement that was required by the Student Promotions Committee before it decided to uphold his dismissal. Also, the statement itself states, "I will likely pass any future exam, specifically [NBME CBSE] with a full-on attack of my OCD." **Def. Ex. 24**. The medical note states that Plaintiff was pulling his eyelashes out because he "struggles to complete exams due to compulsive checking behavior." **Def. Ex. 26**.

50.     Undisputed that Dean Owen upheld the "recommendation for dismissal."

## ADDITIONAL MATERIAL FACTS

### The Psychiatrist Employed by RUSM, Evaluated Plaintiff's ADHD

51.     Dr. Sharma was Plaintiff's psychiatrist at RUSM and was treating Plaintiff's ADHD. *See* Sharma Dep. 74:13-22, **Ex. RJ-02**.

52.     Dr. Sharma first saw symptoms of ADHD when he met with Plaintiff for the "first time" in December 2015. Sharma Dep. 13:19-24, 72:4-6. Dr. Sharma suspected that Plaintiff had ADHD based on Dr. Sharma "seeing" symptoms of ADHD in Plaintiff. Sharma Dep. 102:20-23. Dr. Sharma made it clear that there was evidence of concentration problems that needed to be diagnosed with further testing. *See* [ECF No. 107-1], at ¶ 19; Sharma Dep. 13:1-3.

53.     Dr. Sharma testified that he noticed Plaintiff's attention/concentration symptoms, including, constantly has difficulty sustaining attention to tasks, constantly has difficulty with tasks requiring persistence or organization, and constantly distracted by noise or activity. Sharma Dep. 12:9-21.

54.     Dr. Sharma testified that Plaintiff had ADHD "for a long time" that was untreated. Sharma Dep. 74:19-20. Dr. Sharma also testified that Plaintiff's ADHD was probably there for years and not diagnosed throughout high school and college. *Id.* at 67:15-25.

55.     Dr. Sharma testified that when he first met Plaintiff in December 2015, he discovered that Plaintiff had academic problems and "recommended testing for ADHD." Sharma Dep. 67:15-25. Dr. Sharma also testified that he screened Plaintiff for ADHD in December 2015, "[b]ecause he was having academic problems" and "[p]roblems with passing his exams." Sharma Dep. 8:24-9:4. Dr. Sharma started this ADHD evaluation on December 14, 2015, five to six days after he first met Plaintiff. *See* [ECF No. 107-2, at Ex. 13 (stating "ADHD screening" at the bottom)].

56.     According to the RUSM counseling note dated January 11, 2016, Plaintiff gave the school written documentation of ADHD because of his "[a]cademic problems; repeating semester 5." *See* **Ex. SJ-13** [ECF No. 102]. *See also supra* ¶ 23. Because of the "sensitive nature" of the documents, Plaintiff gave the documents to the Counseling Center in accordance with the Release of Information Agreement. *See* Awodiya Dep. 104:13-19, **Ex. SJ-25** [ECF No. 113].

57.     RUSM decided to finish its own evaluation of Plaintiff's concentration problem and the Counseling Center determined that the results of Plaintiff's attention problem, including ADHD, were "not within normal limits." *See* **Ex. SJ-02** [ECF No. 102].

58.     Dr. Sharma testified that Plaintiff's ADHD, specific to Plaintiff, was significantly limiting his ability to complete his exams in the time allowed. Sharma Dep. 20:19-22.

59.     In a January 19, 2016 email, Plaintiff informed Dr. Sharma that he wanted help with his ADHD because his exams were "getting relatively close." **Ex. RJ-05**.

60.     Dr. Sharma admitted that he was "informed that Plaintiff was running out of time on his exams." Sharma Dep. 23:7-9, 20:16-18.

61.     Dr. Sharma testified that Plaintiff "needed extra time" because his ADHD causes him to "take longer." Sharma Dep. 39:14-19.

62.     Dr. Sharma admitted that Plaintiff continued to tell Dr. Sharma that even with medication, he was not completing his exams. Sharma Dep. 40:24-41:7.

**RUSM Had Enough Information and Documentation to Act On**

63.     Dr. Sharma testified that he had the authority to request for accommodations on a student's behalf and to determine the type of accommodation that a student would need. Sharma Dep. 37:17-21 (In Dr. Sharma's own words, he testified, "I'm the one -- or the doctors make the

request for accommodation, which is time-and-a-half. You get extra time. We actually put it we want the student to get the accommodation").

64.     Dr. Sharma admitted that there was adequate documentation of Plaintiff's ADHD to support a request for accommodations. Sharma Dep. 37:9-12.

65.     Dr. Sharma testified that Plaintiff had "good documentation" of his ADHD and that other students with less documentation were given accommodations. Sharma Dep. 27:20-23.

66.     Mr. Stewart-Fulton testified that when Plaintiff was enrolled, the Counseling Center could submit the required documentation for academic accommodations. Stewart-Fulton Dep. 28:4-14, **Ex. RJ-03**.

67.     The Release of Information Agreement states that Plaintiff "authorize[d] RUSM Counseling Center" to discuss his "confidential information" with "RUSM Administration" for the purpose "to provide information relevant to academic accommodations" and authorized them to do so with "ongoing communication." *See* **Ex. SJ-07** [ECF No. 102]. "RUSM admits that this would have permitted the Counseling Center, including the psychiatrist treating Plaintiff, to discuss his ADHD with the school's Accommodations Coordinator, Matthew Stewart-Fulton." *See* Defendant's Answer to the Complaint, at ¶ 17 [ECF No. 58]. Dr. Sharma testified, "[s]o the signing of this document is a way for the student to make life easier in the future so they don't have to come back and do another one." Sharma Dep. 46:3-5.

Plaintiff testified that the Release of Information Agreement was for the Counseling Center "to determine if whatever accommodations were necessary." *See* Awodiya Dep. 90:18-19, **Ex. SJ-25** [ECF No. 113]. "As long as it was relevant to academic accommodations that would help me better perform, that is what that form is for." *Id.* at 91:17-19. "The specific accommodation that I thought would help me was extended testing time and that was verbal." *Id.* at 91:7-9.

13

68.     Dr. Sharma admitted that Plaintiff's Release of Information Agreement "create[s] a duty between the counseling center and whoever the recipient is named in that agreement." Sharma Dep. 54:23-55:8 (As he testified, "There's an obligation. And the form states, 'release.'").

**There was Never a Magic Form, Magic Packet, or Magic Package for Accommodations**

69.     Plaintiff testified that no one ever told him about any specific form or packet. *See* Awodiya Dep. at 122-123, Ex. SJ-25 [ECF No. 113]. He further testified that "if it did exist, he didn't know it existed." *Id.* "Nobody asked me to" and "I was never asked" to submit any specific form or packet. *Id.* "I can't submit something that I don't know about." *Id.*

70.     Accommodation requests are processed in the "Office for Student Affairs." *See* January 2016 student handbook, **Def. Ex. 19**, at 46. Before Plaintiff completed his last semester at RUSM—according to Dr. Hayse, the student handbook, and Mr. Stewart-Fulton, the decisions for academic accommodations were to be made by Dr. Hayse. *See* the Deposition Transcript of Bryan Hayse ("Hayse Dep.") attached as **Ex. RJ-04**, at 24:4-8; Def. Ex. 19, at 47 (under the "Confidentiality" provision); Stewart-Fulton Dep. 26:8-10, Ex. RJ-03. Dr. Hayse was Mr. Stewart-Fulton's supervisor and oversaw the accommodation process. Hayse Dep. 9:12-19.

71.     Dr. Hayse testified that "there was no request packet" prior to it being introduced into a subsequent iteration of the student handbook. Hayse Dep. 35:11-20.

72.     The first iteration of the student handbook to introduce a "request packet" was the May 2016 student handbook. *Compare* the May 2016 student handbook attached as **Ex. RJ-06** at 50 (mentions a "request packet"), *with* the January 2016 student handbook, **Def. Ex. 19** at 46, 47 (there is no mention of a "request packet").

73.     Plaintiff informed Dr. Hayse of the concentration problems that Dr. Sharma saw and planned to diagnose. *See supra* ¶ 19. Dr. Hayse told Plaintiff that he would get the information for academic accommodations on future exams. *Id.*

74.     Plaintiff informed Mr. Stewart-Fulton that he wanted extended testing time, has a concentration problem and that Mr. Stewart-Fulton should get all the information from Dr. Sharma and Mr. Cuffy because "they diagnosed it themselves" and could "do a much better job of explaining" his ADHD than he could. *See* Awodiya Dep. 106:1-19, Ex. SJ-25 [ECF No. 113]. Mr. Stewart-Fulton claims to not recall the conversation. Stewart-Fulton Dep. 9:2-5, 37:2-4, Ex. RJ-03.

**OCD Diagnosis**

75.     On April 18, 2017, Plaintiff met with his psychotherapist, Ms. Denise Unterman, for anxiety and was diagnosed with OCD. *See* Denise Unterman's psychotherapy medical note, **Ex. SJ-04** [ECF No. 102].

76.     The psychotherapy medical note states that Plaintiff "struggles to complete exams due to compulsive checking behavior." *Id.* at 34. It also states that Plaintiff was struggling with completing exams at RUSM. *Id.* at 35.

77.     According to his psychotherapist, Plaintiff pulled his eyelashes out because he was worried about not completing exams in the time allowed. *Id.*

78.     At the same time, Plaintiff's psychotherapist also noted that Plaintiff's "thought process" is "coherent, logical, [and] relevant," and that Plaintiff has "good" judgment. *Id.*

79.     According to Plaintiff's psychotherapist and psychiatrist, Plaintiff has had symptoms of OCD since 2011. *See* **Ex. SJ-15** [ECF No. 102].

**Formal Appeal Process After Fifth NBME CBSE Attempt**

80.     On April 13, 2017, the "Office of the Registrar" dismissed Plaintiff solely for "[f]ailure to pass the NBME CBSE in five consecutive attempts." *See* April 13, 2017 dismissal letter from the Office of the Registrar attached as **RJ-07**. *See also* **Ex. SJ-30** at ¶ 19 [ECF No. 113].

81.     On April 27, 2017, Plaintiff submitted an appeal statement to the Student Promotions Committee. **Def. Ex. 24**. The statement states, "I will likely pass any future exam, specifically [NBME CBSE] with a full-on attack of my OCD." *Id.*

82.     On June 1, 2017, the Student Promotions Committee upheld the dismissal. *See* June 1, 2017 dismissal letter from Niels Larsen, Chair of the Student Promotions Committee attached as **Ex. RJ-08**. This letter states, that Plaintiff can "appeal this decision by submitting an appeal to the Dean." *Id.*

83.     On June 2, 2017, Plaintiff sent an email to Niels Larsen and asked him "if it is possible for Ross to set up a proctored NBME exam of any fashion. I have been working diligently on addressing my recent diagnosis and have made remarkable progress." *See* email chain from June 1-12, 2017, attached as **Ex. RJ-09**. Plaintiff also wrote to Niels Larsen, "It would be great if I could take the next unofficial NBME in an environment that Ross considers adequate enough so that there is no doubt that I can now pass these exams." *Id.*

84.     On June 8, 2017, Niels Larsen did not respond, so Plaintiff forwarded the same email to Niels Larsen again with the added statement, "I apologize for resending this email. Its only because I have under a week left to prepare before submitting my letter to the Dean." *Id.*

85.     On June 12, 2017, Plaintiff's psychiatrist and psychotherapist informed Dean Owen that Plaintiff has ADHD and OCD. *See* email from psychiatrists to Dean Owen, **Ex. SJ-15** [ECF No. 102]. They also informed Dean Owen that Plaintiff has had symptoms of OCD "for the past

4-6 years" and that "the anxiety and checking rituals inherent to this condition have been adversely affecting his academic performance in medical school." *Id.*

86.     On June 13, 2017, Plaintiff submitted his appeal letter to Dean Owen. *See* **Ex. SJ-17** [ECF No. 102]. In the appeal letter to Dean Owen, Plaintiff stated, his "objective is to keep this letter relevant to how OCD has influenced [his] academic performance." *Id.* In the same appeal letter, Plaintiff stated, "I'm the student who never finished an exam on time." *Id.*

87.     Dean Owen testified that he performs an investigation of a student's disability when he is notified in an appeal of a student's disability that was adversely affecting academic performance. *See* Owen Dep. 9:18-11:13, **Ex. SJ-24** [ECF No. 113].

88.     Dean Owen testified that after his investigation, his decision is based on his own "personal requirements" and that "it depends upon the diagnosis." Owen Dep. 11:21-12:7.

89.     Dean Owen testified that he, in fact, saw and recalled Plaintiff's appeal letter and his psychiatrist's letter that was sent to him and decided to uphold Plaintiff's dismissal because of Plaintiff's ADHD and OCD. Owen Dep. 20:21-21:19, 22:5-25.

90.     Dean Owen refused to investigate possible accommodations with Plaintiff. Owen Dep. 25:3-12. Dean Owen also refused to consider if Plaintiff would benefit from extending testing time because one of Dean Owen's personal requirements was to see ameliorative effects from some form of treatment as a prerequisite to getting extending testing time. *Id.* at 27:16-24. Dean Owen further testified, "[w]e're not using exams as experimentation to see if there's efficacy." *Id.* at 28:3-4.

91.     During Dean Owens deposition, Dean Owen said to Plaintiff, "You've got two bad diseases. This is why I say it. I felt sorry for you." Owen Dep. 29:24-25.

92.     On June 29, 2017, Dean Owen decided to uphold Plaintiff's dismissal. **Def. Ex. 27**.

## RUSM Decreased the Minimum Passing Score on the NBME CBSE for Other Students

93.     RUSM republished its academic catalog without changing the title of the academic catalog. The title and the "date of issue" remains unchanged when an academic catalog is republished with added, modified, or deleted policies. *Compare infra* ¶ 94, *with infra* ¶ 96.

94.     In September 2015, RUSM issued and published an academic catalog that is titled "2015-2016, Vol. 7." *See* this academic catalog attached as **RJ-10** (hereinafter the "Sept. 2015 Academic Catalog"). This Sept. 2015 Academic Catalog displays "© 2015" therein. *Id.* at page iii. The Sept. 2015 Academic Catalog stated that the minimum passing score for the NBME CBSE was 66. *Id.* at 1.

95.     In November 2015, RUSM changed the minimum passing score on the NBME CBSE from 66 to 68. *See* Defendant's Statement of Material Facts, at ¶ 38.

96.     In May 2016, RUSM republished the academic catalog once again with the same title, "2015-2016, Vol. 7." *See* this republished academic catalog attached as **RJ-11** (hereinafter the "May 2016 Academic Catalog"). This May 2016 Academic Catalog displays "© 2016" therein. *Id.* at page ii. The May 2016 Academic Catalog states, "[t]his catalog supersedes all previous editions and is in effect until a subsequent version is published either in print or online." *Id.* It also states, "[t]he contents of this catalog represent the most current information available at the time of publication." *Id.* at 1. Moreover, it states, that the statements therein "are applicable to all enrolled students." *Id.* at page ii. It further states, "[t]his publication is issued by RUSM as authorized and approved by the Dean and Chancellor." *Id.* at 1. This May 2016 Academic Catalog changed the minimum passing score on the NBME CBSE from 68 to 66. *Id.* at 1.

97.     In August 2016, Plaintiff scored a 67 on the NBME CBSE. **Def. Ex. 23**.

98.     In November 2016, RUSM issued and published an academic catalog that is titled "2016-2017, Vol. 8." *See* this published academic catalog attached as **RJ-12** (hereinafter "Nov. 2016 Academic Catalog"). This Nov. 2016 Academic Catalog also displays "© 2016" therein. *Id.* at page ii. This Nov. 2016 Academic Catalog changed the minimum passing score on the NBME CBSE from 66 to 68. *Id.* at 1.

**Technical Standards**

99.     With respect to the technical standards, RUSM's student handbook states that: "In order to solve clinical problems effectively, candidates must be able to measure, calculate, reason, analyze, integrate and synthesize in a timely fashion." **Def. Ex. 19**, at 8.

100.     RUSM "admits that RUSM, not the NBME, is the entity that determines whether its students require accommodations to a disability when taking the NBME CBSE." *See* Defendant's Response to Plaintiff's First Request for Admission, **Ex. SJ-30** at ¶ 18 [ECF No. 113]. RUSM admits that it did not provide Plaintiff with extended testing time for the NBME CBSE. *See* **Ex. SJ-30** at ¶ 16 [ECF No. 113]. RUSM admits "that extended testing time for the NBME CBSE is a reasonable accommodation for disabled students that need extended testing time." *See* Defendant's Response to Plaintiff's Second Request for Admission, **Ex. SJ-08** at ¶ 58 [ECF No. 102].

101.     During the timeframe that Plaintiff attempted his NBME CBSE exams, he received routine mental status exams from his psychiatrist. *See* Mental Status Exams attached as **Ex. RJ-13**. On December 30, 2015, even though the psychiatrist noted that Plaintiff was having a stress-related depressive mood and anxiety, the psychiatrist concluded that Plaintiff was coherent, engagable, had "fairly good response to mood reactivity," was not suicidal, and had fair insight and judgment. *Id.*

102.    In January 2016, April 2016, June 2016, July 2016, and August 2016, each of Plaintiff's Mental Status Exams concluded that Plaintiff was coherent, engagable, had "fairly good response to mood reactivity," was not suicidal, and had fair insight and judgment. **Ex. RJ-13**.

103.    Dr. Hayse admitted that there wasn't "any policy anywhere, any rules, any guidance," for RUSM faculty to comply with requests for accommodations nor with Title III of the American with Disability Act. Hayse Dep. 33:11-16, 13:24-14:5, 14:11-18, **Ex. RJ-04**.

**Earning Capacity**

104.    The average United States Medical Licensing Examination ("USMLE") Step 1 score for RUSM students that attained a Family Medicine residency was a score of 209. *See* RUSM Office of Career Attainment attached as **Ex. RJ-14**, at 6.

105.    Plaintiff passed the USMLE Step 1 with a score of 211. *See* Plaintiff's USMLE Step 1 Score Report attached as **Ex. RJ-15**.

DATED this 20th day of January, 2019:

Respectfully submitted,

By: Oluwamuyiwa Awodiya, *pro se* litigant
15005 Dahlia Dr.
Bowie, MD 20721
(240) 602-1836
Plaintiff, in Proper Person

## CERTIFICATE OF SERVICE

I do hereby certify that on this 22nd day of January, 2019, I have caused a true and correct copy of the foregoing by mailing a copy to the Court, where the Court's CM/ECF system will send notification to the following:

**Ryan Roman**
Akerman Senterfitt
Suntrust International Center
1 SE 3rd Avenue
25th Floor
Miami, FL 33131-1714
305-374-5600
Fax: 305-374-5095
Email:
ryan.roman@akerman.com

**Octavia Monique Green**
Akerman LLP
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, FL 33131
(305) 982-5670
Email:
octavia.green@akerman.com

By: Oluwamuyiwa Awodiya, *pro se* litigant