UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

OLUWAMUYIWA AWODIYA,   CASE NO. 0:18-cv-60482-KMM-AOV

    Plaintiff,

v.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

    Defendant.
_____/

**DECLARATION OF RYAN ROMAN IN SUPPORT OF DEFENDANT'S
RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 139]**

I, Ryan Roman, declare as follows:

1. I am a partner with the law firm of Akerman LLP, which represents defendant Ross University School of Medicine, School of Veterinary Medicine Limited ("RUSM") in this matter.

2. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

3. I submit this declaration in support of RUSM's Response to Plaintiff's Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment [ECF No. 139], filed simultaneously with this declaration.

4. Attached hereto as **Exhibit 1** are excerpts from the Deposition Transcript of Matthew Stewart-Fulton dated November 5, 2018.

5. Attached hereto as **Exhibit 2** are excerpts from the Deposition Transcript of Bryan Hayse dated November 5, 2018.

6. Attached hereto as **Exhibit 3** are excerpts from the Deposition Transcript of William Owen dated December 4, 2018.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 4, 2019.

_____
Ryan Roman

# Exhibit 1

Page 1

1      UNITED STATES DISTRICT COURT
2   FOR THE SOUTHERN DISTRICT OF FLORIDA
3
4   OLUWAMUYIWA AWODIYA,
5        Plaintiff
6   vs.                              CASE NO.
                                     0:18-cv-60482-KMM
7   ROSS UNIVERSITY SCHOOL OF
    MEDICINE, SCHOOL OF
8   VETERINARY MEDICINE LIMITED,
9        Defendant.
10
    ```````````````````````````
11
12
13      VIDEO-CONFERENCED DEPOSITION OF
14          MATTHEW STEWART-FULTON
15
16            NOVEMBER 5, 2018
17               1:06 P.M.
18
19       ROSS UNIVERSITY SCOOL OF MEDICINE
20           KNOXVILLE, TENNESSEE
21
22
23
24       Deborah West, LCR-314 (TN), CLR
25

```
 1          Q     Okay.  What is your job position at
 2   Ross University?
 3          A     Would you like my job title?  What
 4   specifically would you like to know?
 5          Q     We can start with your job title.
 6          A     My job title is assistant director
 7   for student conduct and integrity in academic
 8   accommodations.
 9          Q     In regard to academic
10   accommodations, what is your role as an academic
11   accommodations coordinator?
12          A     I manage the accommodations process.
13          Q     Who makes the final determination --
14          A     I'm sorry, you got cut off.
15          Q     Who makes the final determination?
16          A     I make the final determination.
17          Q     Has it always been like that?
18          A     In the time that I have been working
19   in this role, it has.
20          Q     Do you ever remember meeting the
21   plaintiff in person?
22          A     I do not.
23          Q     Just to be clear, you do not
24   remember --
25                (Reporter clarification.)
```

```
 1   behalf?
 2        A    Say that again.
 3        Q    And that someone can also sign on
 4   the student's behalf?
 5        A    I have never run into this situation
 6   so I don't know what the appropriate response would
 7   be.
 8        Q    I am not asking you about history.
 9   I am asking about the qualifications of certain
10   impairments versus other impairments.
11            MR. ROMAN:  I will object to that
12        question just because I think the witness
13        has answered it to the best of his
14        ability.  If there is anything further,
15        you are welcome to answer.
16            THE WITNESS:  I know there are means
17        to have someone who does not fill out
18        paperwork to verify that the paperwork
19        has been filled out by an authorized --
20        someone authorized to do so on their
21        behalf.
22            Off the top of my head, I don't know
23        what that would look like in our process.
24   BY MR. AWODIYA:
25        Q    How would a student know that a
```

1  request packet exists?
2       A    They might find it on the student
3  portal.  It's referenced in the academic catalog.
4  It is referenced in the student handbook.  If this
5  is a question they asked other colleagues on the
6  Ross campus, they would refer them to it, or to me.
7       Q    In January of 2016, how would a
8  student know that a request packet exists?
9       A    For the same reasons I just stated.
10      Q    The student handbook, in January of
11 2016, does not state anything about a request
12 packet.  The request packet doesn't so up in the
13 student handbook until May 2016.
14           So I will ask you again:  In January
15 of 2016, how would a student know that a request
16 packet exists?
17      A    It's available on the student portal
18 in the student resources, the handbook, and the
19 academic catalog.  I don't recall if they
20 referenced the accommodations application packet
21 specifically, but they do reference that students
22 should contact at that time, me, if they wanted to
23 inquire about receiving academic accommodations.
24           I would then inform the student of
25 the application packet and provide them with one.

```
 1    letter from a family member in order to get
 2    academic accommodations?
 3            A     No.
 4            Q     If a student finds out that he needs
 5    academic accommodations after he has enrolled, can
 6    the counseling center submit the required
 7    documentation for academic accommodations?
 8            A     Currently or in the time frame that
 9    you were enrolled?
10            Q     Both.
11            A     At the time you were enrolled, the
12    counseling center could submit supporting
13    documentation which could be included in the
14    accommodations application package.
15                 And in our most recent version of
16    the handbook, my recollection, which I am not sure
17    if I am remembering this correctly, but I believe
18    the counseling center is no longer providing
19    supporting documentation.
20            Q     So could a student request
21    accommodations from the counseling center and then
22    the counseling center send you the documentation
23    that is required?
24            A     No.
25            Q     Why not?
```

# Exhibit 2

```
                                                          Page 1

 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF FLORIDA
 3
 4   OLUWAMUYIWA AWODIYA,
 5         Plaintiff
 6   vs.                                  CASE NO.
                                          0:18-cv-60482-KMM
 7   ROSS UNIVERSITY SCHOOL OF
     MEDICINE, SCHOOL OF
 8   VETERINARY MEDICINE LIMITED,
 9         Defendant.
10
     ```````````````````````````
11
12
13          VIDEO-CONFERENCED DEPOSITION OF
14                    BRYAN HAYSE
15
16                NOVEMBER 5, 2018
17                    3:07 P.M.
18
19          ROSS UNIVERSITY SCOOL OF MEDICINE
20               KNOXVILLE, TENNESSEE
21
22
23
24         Deborah West, LCR-314 (TN), CLR
25
```

Page 23

1              receiving that accommodation, as an
2          example.
3    BY MR. AWODIYA:
4        Q    When you said "come to our office,"
5    who do you mean "our"?
6        A    Thank you.  Yes.  So the student
7    affairs office.  So still kind of referring to
8    Dominica -- because that's the last time we had an
9    actual office with everybody there -- walk into
10   student affairs.
11             There is a receptionist there.  Or
12   any time that somebody is speaking to me as an
13   academic adviser, the chief of student affairs
14   office are there, or just talking to anybody else
15   in that division, if somebody happens to come up
16   about -- if a student asks about academic
17   accommodations, that might be an orientation
18   session or a one-or-one conversation, we would
19   refer then to Mr. Stewart-Fulton given his
20   expertise in that area that the rest of us don't
21   necessarily have.
22       Q    Have you ever at any point in your
23   position at Ross been responsible for making the
24   final decision on academic accommodations?
25       A    When I first arrived, the process

1   was laid out where the conduct -- the academic
2   accommodations coordinator would make
3   recommendations to the associate dean, which would
4   be me.  And then that policy was changed at some
5   point in the 2016 early academic year, I don't
6   remember exactly when that change was made.
7                So prior to that change, the
8   referral would come to me for the final decision.
9   And then I would review that, that accommodation
10  with Mr. Stewart-Fulton and sign off on.  And then
11  since that time, it has been moved to where
12  Mr. Stewart-Fulton along with Ms. Jeanie Robertson,
13  who also oversees the accommodations for the
14  clinical side, the two then work in collaboration
15  to make any type of decisions regarding academic
16  accommodations.
17           Q     That was a very thorough answer.  I
18  want to make sure I don't forget anything.  So the
19  policies, where were the policies located for
20  academic accommodations?
21           A     In the student handbook as well as
22  the academic catalog.
23           Q     Does RUSM deny oral requests for
24  academic accommodations?
25           A     All academic accommodations must be

```
 1   documents and put in writing in his own way on his
 2   own piece of paper and have that settle as their
 3   writing to the request?
 4              (Reporter clarification.)
 5   BY MR. AWODIYA:
 6        Q    I am trying to remember what I said.
 7   Let me just ask the question again.  I am going to
 8   ask you in the best way I remember.  I don't
 9   exactly remember what I asked you.  I know it was a
10   topic of request.
11              Before the student handbook
12   mentioned a request packet, from your
13   interpretation of the student handbook when I was
14   enrolled, could the student submit their own
15   writing or would they have to submit a packet?
16        A    No, you're correct.  Prior to -- so
17   the packet came along later in this iteration of
18   the handbook that would have been in -- that would
19   have governed the December 2015 semester that there
20   was no packet, the student would follow this
21   process that was written here that was to reach out
22   to academic accommodations coordinator, email
23   Mr. Matthew Stewart-Fulton for more information, or
24   follow what was there.
25        Q    Okay.  But there wasn't no packet
```

# Exhibit 3

Case 0:18-cv-60482-RKA   Document 143-1   Entered on FLSD Docket 02/04/2019   Page 15 of 17

12/4/2018       Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.       William Owen

```
                 UNITED STATES DISTRICT COURT
                          FOR THE
                 SOUTHERN DISTRICT OF FLORIDA


              CASE NO.: 0:18-cv-60482-KMM


OLUWAMUYIWA AWODIYA,

           Plaintiff,

vs.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

           Defendant.
_____/


                                350 E. Las Olas Blvd.
                                Fort Lauderdale, Florida
                                December 4, 2018
                                10:56 a.m.



                  _____
                    THE DEPOSITION OF

                      WILLIAM OWEN


         _____

          Taken on Behalf of the Plaintiff

       Pursuant to Notice of Taking Deposition

                Commencing at 10:56 a.m.
```

Case 0:18-cv-60482-RKA   Document 143-1   Entered on FLSD Docket 02/04/2019   Page 16 of 17

12/4/2018    Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.    William Owen

Page 21

```
 1        A.    I recall your letter, and it's coming back
 2   with greater clarity in the context of the
 3   extraordinary circumstances of how many times you
 4   failed the preparatory or the premonitory exam for
 5   your Step 1.  It is coming back.  What is also
 6   coming back as we're talking this through is your
 7   letter from the psychiatrist or the psychotherapist.
 8        Q.    Tell me what you recall.
 9        A.    He's in CBT therapy and acquiring
10   strategies for managing his symptoms.  He is
11   considering psychotropic medication.
12              What I am remembering is an attestation
13   from a therapist that describes an interventional
14   program in progress, not being executed, nor any
15   verification of it's benefits.  That's what I
16   recall.
17        Q.    So would that be the reason why you
18   decided to uphold his dismissal?
19        A.    Yes.  As well as your past performances.
20        Q.    So just to be clear, because plaintiff's
21   psychiatrist said that he didn't -- let me rephrase.
22              Just because plaintiff's psychiatrist
23   implied that he was hesitant about taking medication
24   for his disability, that's why you decided to uphold
25   his dismissal?
```

Page 29

1       I respect your opinion and your
2    interpretation, but I have to make the decision, and
3    I've got a lot of experience.  I'm sorry.  I stand
4    by my decision.
5         Q.   So if today he still has not had some type
6    of ameliorative affect of a treatment, you would
7    have the still -- stance about not readmitting him?
8         A.   I would.
9         Q.   When you dismiss students, your decision
10   is final?
11        A.   My decision is final unless the student
12   comes back with support that they're going to be
13   successful based on all the evidence that they can
14   gather.  And we have admitted students who have had
15   problems.  It's ranged from drug abuse to behavioral
16   disorders.  But we don't just simply make a decision
17   to bring them back.  We want as much support for
18   their success as is possible; otherwise, that's
19   improper, because you're not attending free of
20   charge, and there is the emotional expense of coming
21   and failing.  And no student can tell me there's not
22   an emotional burden to failing.
23            And, again, your circumstance is
24   extraordinary.  You've got two bad diseases.  This
25   is why I say it.  I felt sorry for you.  And as I