# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

FILED BY _____ D.C.

FEB - 5 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

| | |
|---|---|
| OLUWAMUYIWA AWODIYA, *Plaintiff,* | Case No.   0:18-cv-60482-KMM |
| -v- | Hon. Chief Judge: K. Michael Moore<br>Magistrate Judge: Alicia O. Valle |
| ROSS UNIVERSITY SCHOOL OF MEDICINE, SCHOOL OF VETERINARY MEDICINE LIMITED *Defendant.* | |

## PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE THE EXPERT TESTIMONY OF RONALD QUINTERO

Plaintiff Oluwamuyiwa Awodiya ("Plaintiff"), in proper person, hereby files his reply to defendant's, Ross University School of Medicine, School of Veterinary Medicine Limited ("RUSM"), Response in Opposition (the "Opposition") [ECF No. 133] to Plaintiff's *Daubert* Motion to Exclude the Expert Testimony of Ronald Quintero ("Motion") [ECF No. 126].

# Table of Contents

Introduction .................................................................................................................................. 1

Argument ..................................................................................................................................... 1

I.  RUSM Failed to Meet Its Burden to Establish that Quintero is Qualified to Render Academic-Medical Opinions that Forecasts Plaintiff's Performance on Medical Exams that Plaintiff Has Not Taken. ......................................................... 1

II. RUSM Failed to Meet Its Burden to Establish that Quintero's Opinions are the Product of Reliable Principles or Methodology ...................................................... 3

    A.  RUSM Did Not Even Attempt to Show that Quintero Applied Any Scientific Principles to Reach His Opinions Regarding Plaintiff's Earning Capacity as a Doctor. ................................................................................................................. 4

    B.  RUSM Did Not Show How Quintero's Experience Makes His Opinions Reliable to Predict Academic Success in the Medical Field. ............................................. 4

    C.  RUSM Failed to Meet Its Burden to Show that Quintero Reliably Applied His "Opportunity Cost" Calculations to the Facts of this Case. .................................. 5

    D.  RUSM Mischaracterizes Plaintiff's Position About Quintero's Application of the Growth Rates. Quintero Did Not Reliably Apply His Growth Rate Opinions—as Utilized in Quintero's Calculations—to the Facts of this Case. ............................ 6

    E.  RUSM Failed to Show How Quintero's Opinions Regarding the Reinstatement Offer and Plaintiff's Credibility are the Product of Any Scientific Principle ......... 7

III. RUSM Failed to Meet Its Burden that Quintero's Opinions Would Assist the Trier of Fact ........................................................................................................... 7

    A.  RUSM Did Not Cite Any Authority that Permits Quintero to Offer Expert Testimony that Usurps the Role of the Court and the Role of the Jury. ................ 7

    B.  Quintero's Opinions Regarding the Discount Rate Still Fails to Assist the Trier of Fact because RUSM Conflates Unavailing Concepts of "Risk" with the Supreme Court Concept of Minimizing "Risk of Default" on an Investment. ...................... 8

## INTRODUCTION

Plaintiff's lost earning capacity was a contractual one, based on the increased earning power afforded by a Doctor of Medicine (MD) degree. *See Sharick v. Southeastern University*, 780 So. 2d 136, 140 (Fla. Dist. Ct. App. 2000) (holding that a medical student may recover the value of his contractual relationship with his medical school in the form of lost earning capacity). The yardstick used to measure the lost earning capacity in this case is the difference in earning power between a bachelor's degree and a MD degree. The value of the MD degree was narrowed and specified by the average United States Medical Licensing Examination ("USMLE") Step 1 score for RUSM students that attained a Family Medicine residency, which was a USMLE Step 1 score of 209. *See* Plaintiff's Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, at ¶ 104 [ECF No. 139]. Plaintiff passed the USMLE Step 1 with a score of 211. *Id.* at ¶ 105. For a student to take the USMLE Step 2, the person must be authorized to do so by a medical school.

Plaintiff generally calls to attention that RUSM selectively refers to and selectively quotes from Quintero's report to disguise Quintero's opined calculations as merely "criticism" of Plaintiff's Third Amended Calculation of Damages (which simply replaced Quintero's facts in response to a previous iteration of Quintero's report that was disclosed to Plaintiff one week before the discovery deadline). RUSM's underlining argument for Quintero's proffered testimony is unimportant because the "criticism" is still **expert** testimony.

## ARGUMENT

**I. RUSM Failed to Meet Its Burden to Establish that Quintero is Qualified to Render Academic-Medical Opinions that Forecasts Plaintiff's Performance on Medical Exams that Plaintiff Has Not Taken.**

First, RUSM improperly distorted *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009), by selectively quoting it to imply that Quintero's financial qualifications are "minimal"

1

enough to qualify him to render forecasted performance opinions, *inter alia*, on medical exams that Plaintiff has not taken.

When quoted accurately, *Hendrix* states:

> The Eleventh Circuit refers to these three considerations separately as qualification, reliability, and helpfulness, and has emphasized that they are distinct concepts that courts and litigants must take care not to conflate[.] First, as to qualification, the standard for admissibility is not stringent. Although an expert **must be at least minimally qualified in <u>his field</u>**, his qualification to offer opinion at trial may be based on any combination of knowledge, skill, experience, training, or education; he need not be a leading authority in the field. Also, so long as the expert is at least minimally qualified, gaps in his qualifications generally will not preclude admission of his testimony, as this relates more to witness credibility and thus the weight of the expert's testimony, than to its admissibility.

*Hendrix*, 255 F.R.D. at 578 (emphasis added) (internal quotation and citation omitted). The courts must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice **of an expert in the relevant field**." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) (emphasis added); *accord Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010).

Here, Quintero's purported expertise is in the field of finance. This is no way makes him "minimally" qualified to opine that Plaintiff's medical-academic performance and USMLE Step 1 score "**casts considerable doubt** as to whether he would have earned an MD degree," raises "the level of uncertainty with respect to the **<u>probability</u> of Plaintiff passing Step 2 and Step 3 of the USMLE exam**," and "getting a U.S. residency." Opposition at 9. Accordingly, Quintero's qualifications are not in the relevant field to testify to these matters. Quintero cannot opine on the probability of Plaintiff's academic success in medicine, nor can he rely on these unqualified

2

opinions to ultimately opine that this would cause Plaintiff to have a negative lost earnings capacity.

## II. RUSM Failed to Meet Its Burden to Establish that Quintero's Opinions are the Product of Reliable Principles or Methodology

RUSM purports that Quintero's ultimate opinion—that that there is no reliable evidence that the Plaintiff's earning capacity has been impaired—is based on Quintero's reasoning that Plaintiff's medical-academic performance and USMLE Step 1 score "**casts considerable doubt** as to whether he would have earned an MD degree," raises "the level of uncertainty with respect to the **probability of Plaintiff passing Step 2 and Step 3 of the USMLE exam**," and "getting a U.S. residency." Opposition at 9. Quintero then uses this unfounded reasoning to 'explain why' Plaintiff's lost earnings capacity should be compared between the 10th or 25th percentile earnings capacity of a doctor practicing Family Medicine and the 50th 75th or 90th percentile earnings capacity of the average college graduate. Quintero Report, at 15-16 [ECF No. 133-1].

RUSM attempts to mischaracterize Plaintiff's position by shifting the focus away from the argument that Quintero did not apply any methodology, scientific, technical, or specialized expertise to his reasoning. After consideration of an expert's qualifications, the court in *Hendrix*, cited by RUSM, stated:

> The court next considers the reliability of the method used by the expert to reach his conclusions. At this stage, the court must undertake an independent analysis of each step in the logic leading to the expert's conclusions; **if the analysis is deemed unreliable at any step the expert's entire opinion must be excluded**.

*Hendrix*, 255 F.R.D. at 578 (emphasis added) (citing *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) ("*any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." (emphasis in original)).

3

### A. RUSM Did Not Even Attempt to Show that Quintero Applied Any Scientific Principles to Reach His Opinions Regarding Plaintiff's Earning Capacity as a Doctor.

This Court held, "In order to be admissible, an expert's testimony must be based on more than subjective belief or unsupported speculation. A **mere parroting of the facts** as Plaintiff presents will in no way assist the jury in understanding the facts of this case." *Smith v. Royal Caribbean Cruises, Ltd.*, Case No. 13-20697-Civ-COOKE/TORRES, at *5 (S.D. Fla. Dec. 10, 2014) (emphasis added) (internal citation omitted) (excluding expert testimony because it "fails to identify any identifiable technique that Mr. Ebro utilized in reaching his conclusions").

Like *Smith*, Quintero merely parrots Plaintiff's academic performance—without identifying any technique that he used—to opine that Plaintiff's grades and test scores somehow predict, *inter alia*, poor grades and test scores on exams that Plaintiff has never taken, *i.e.*, USMLE Step 2 and Step 3. *See Southern Grouts & Mortars, Inc. v. 3M Company*, 2008 WL 4346798, at *17 (S.D. Fla. Sept. 17, 2008) (excluding expert's report and summary of that report on grounds that they were "so pervaded by conclusory statements as to be almost without value"), *aff'd*, 575 F.2d 1235 (11th Cir. 2009).

### B. RUSM Did Not Show How Quintero's Experience Makes His Opinions Reliable to Predict Academic Success in the Medical Field.

"[T]he Supreme Court made it clear that testimony based solely on the experience of an expert would not be admissible." *Rider v. Sandoz Pharmaceuticals Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999)). "Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express." *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).

4

Importantly, the Eleventh Circuit held that "[i]f the witness is relying solely or primarily on experience, then **the witness must explain how** that experience leads to the conclusion reached, **why** that experience is a sufficient basis for the opinion, and **how** that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (quoting Fed.R.Evid. 702 advisory committee's note (2000 amends.)). Aside from merely reciting his resume, RUSM has offered nothing more than an invitation to simply take Quintero's word for it—that he can predict Plaintiff's academic success in the medical field and can predict the probability of Plaintiff passing exams that Plaintiff has never taken.

### C. RUSM Failed to Meet Its Burden to Show that Quintero Reliably Applied His "Opportunity Cost" Calculations to the Facts of this Case.

As an initial matter, RUSM has not identified any method or technique that Quintero used to opine (1) that Plaintiff would be a "superior performer" in alternative fields of healthcare and (2) that Plaintiff would be in the 75th or 90th percentile earnings of these alternative fields.

Aside from RUSM's conclusory argument that Quintero knows how to calculate opportunity cost, RUSM has not given any reason as to why Quintero's calculations are reliable when Quintero has failed to consider the required entry-level education in his choices of alternative healthcare employment and Plaintiff's highest level of educational attainment—a bachelor's degree. Even though Quintero characterizes Plaintiff's partial completion of medical school as a "skill," a skill is not a master's degree. Could Plaintiff legally practice law in Florida solely because of his ability to google his way through this lawsuit?

Quintero's failure to consider the required entry-level education in his choices of alternative healthcare employment is fatal to his incomplete analysis of opportunity cost. *See Gulfstream Park v. Tampa Bay Downs*, 479 F.3d 1310, 1313 (11th Cir. 2007) (per

5

curiam) (Upholding the rejection of "expert testimony" because it "based upon insufficient economic analysis, and incomplete in its definition of the relevant market"); *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246-47 (11th Cir.2002) (holding expert testimony, which failed to consider alternative products in defining relevant market, insufficient as a matter of law); *Hall v. Thomas*, Civil Action No. CV-07-S-484-NW., at *1 (N.D. Ala. Nov. 29, 2010) ("An expert's failure to address alternative explanations for the opinions he asserts in the ways standard in his field of expertise 'violates a primary purpose of *Daubert*: to ensure the expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" (quoting *Guinn v. AstraZeneca Pharmaceuticals LP*, 602 F.3d 1245, 1255 (11th Cir. 2010)); *Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1553 (11th Cir. 1996) (rejecting expert testimony purporting to demonstrate market power where the expert failed to account for the ability of individuals to change their affiliation with the relevant entity).

**D.     RUSM Mischaracterizes Plaintiff's Position About Quintero's Application of the Growth Rates. Quintero Did Not Reliably Apply His Growth Rate Opinions—as Utilized in Quintero's Calculations—to the Facts of this Case.**

RUSM incorrectly purports that Plaintiff took issue with the source of Quintero's "recitation" of a growth rate. Opposition at 10-12. This is incorrect. Plaintiff took issue with the fact that Quintero's opinion—to use an overgeneralized national growth rate in Quintero's calculations—was not reliably applied to the facts of this case and was only connected to the facts of this case by the *ipse dixit* of Quintero's report. Motion at 10; *See also* Quintero Report, at 11 (Adjusted Calculations of Hypothetical Lost Earnings Capacity) [ECF No. 133-1]. Each categorized earning capacity, *i.e.*, level of education or field of occupation, has its own growth rate and it cannot be based on a single data point. *See Crouch v. John Jewell Aircraft, Inc.*, Motion at 10-11 (discussing growth rates opined by expert witnesses).

6

### E. RUSM Failed to Show How Quintero's Opinions Regarding the Reinstatement Offer and Plaintiff's Credibility are the Product of Any Scientific Principle.

RUSM did not even attempt to identify any method or technique based in Quintero's opinion that (1) a rejection of a reinstatement offer would "casts doubt" to Plaintiff's "sincerity" and Plaintiff's "belief" and (2) that acceptance of a reinstatement offer would have mitigated Plaintiff's damages. *See* Parts II.A, III.B of Motion, at 11, 13; Quintero Report, at 3.

"It is well-settled in this Circuit that, absent extreme or unusual circumstances, expert scientific testimony concerning the truthfulness or credibility of a witness is inadmissible because it invades the jury's province in determining credibility." *U.S. v. Falcon*, 245 F. Supp. 2d 1239, 1245 (S.D. Fla. 2003) (citing *United States v. Beasley,* 72 F.3d 1518, 1528 (11th Cir. 1996)).

### III. RUSM Failed to Meet Its Burden that Quintero's Opinions Would Assist the Trier of Fact

#### A. RUSM Did Not Cite Any Authority that Permits Quintero to Offer Expert Testimony that Usurps the Role of the Court and the Role of the Jury.

RUSM failed to show why Quintero can (1) testify to the governing law or legal obligations of Plaintiff and (2) testify to the legal implications of Plaintiff's conduct. *See* Part III.B of Motion at 13.

Quintero opined: (1) "A party asserting damages normally has an obligation to mitigate damages." (*See* Quintero Report at 10); and (2) A reinstatement offer would "mitigate substantially all of his asserted Lost Earnings Capacity." (*See id.* at 16).

RUSM purports that "Plaintiff has a duty to mitigate his damages as a matter of law." Opposition at 15. Quintero and RUSM are incorrect. The Florida Supreme Court held:

> The doctrine of avoidable consequences, which is also somewhat inaccurately identified as the "duty to mitigate" damages, commonly applies in contract and tort actions. **There is no actual "duty to mitigate,"** because the injured party is not compelled to undertake any ameliorative efforts. The doctrine simply "prevents a party from recovering those damages inflicted by a wrongdoer that

7

>the injured party *could have* reasonably avoided." The doctrine does not permit damage reduction based on what "could have been avoided" through Herculean efforts. Rather, the injured party is only accountable for those hypothetical ameliorative actions that could have been accomplished through "ordinary and reasonable care," without requiring undue effort or expense.

*System Components Corp. v. Florida Dept*, 14 So. 3d 967, 982 (Fla. 2009) (internal citation omitted) (bold added; italics in original). Quintero should be barred from uttering these legal opinions, guised in the form of expert testimony.

>   B. **Quintero's Opinions Regarding the Discount Rate Still Fails to Assist the Trier of Fact because RUSM Conflates Unavailing Concepts of "Risk" with the Supreme Court Concept of Minimizing "Risk of Default" on an Investment.**

Quintero opined that Plaintiff is not entitled to the interest rates on U.S. Treasury Bonds currently in the market because, according to Quintero, the risk of the investment must account for the "numerous risks associated with," *inter alia*, death, disability, achieving and sustaining the average salary, and interruption of employment. Quintero Report, at 13 [ECF No. 133-1]. Quintero opined—as used in his calculations—that these "numerous risks" command a higher interest rate of 6.80%, *id*. at 14, as opposed to the 3.375% market interest rates of 30-year U.S. Treasury Bonds, *id*. at 12. As a matter of law, mandated by the Supreme Court, Quintero's opinion will not assist the jury and will only serve to confuse them.

Some of Quintero's numerous risks—*i.e.* risk of passing USMLE Step 2 and earning a degree from RUSM—for applying a higher interest rate are mere attempts to circumvent well established law. Applying *Sharick*, this Court held that "[c]ontracts routinely require parties to undertake obligations without specifying a price for those obligations. Instead, in the event of a breach, expectation damages constitute the measure of value of the obligations." *Waste Corporation of America, Inc. v. Genesis Ins. Co.*, 382 F. Supp. 2d 1349, 1361 (S.D. Fla. 2005) (citing *Sharick*, 780 So.2d 136). In other words, "[p]ursuant to Florida law, the non-breaching

8

party may choose [] seeking lost profits in order to be placed in the position it would have been in had the contract been fully performed ...." *Lady of America Franchise Corporation v. Arcese*, CASE NO.:05-61306-CIV-COHN/JOHNSON., at *8 (S.D. Fla. May. 25, 2006).

RUSM purports that Plaintiff's reliance on *Jones Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537 (1983) is misplaced. Opposition at 13-14. RUSM is wrong. It is RUSM that distorts *Pfeifer* with wordplay that conflates the Court's concept of risky investments with other unavailing concepts of risk, *i.e.*, risk of shortened work-life expectancy. RUSM also conflates the concept of lost earnings and lost earning capacity. The Supreme Court mandated that the risk of the investment, as opposed to Quintero's opined factors of risk, should be based on the interest rate of the "best and safest investment" to minimize the "risk of default." *Pfeifer*, 462 U.S. at 537. In other words, the interest rate should aim to be as "risk-free of default" as possible.

### i. Lost Earning Capacity vs Lost Earnings

"The purpose of a jury's award of future economic damages is to compensate a plaintiff for the loss of **capacity to earn** income as opposed to actual loss of future earnings." *Miami-Dade County v. Cardoso*, 963 So. 2d 825, 827 (Fla. Dist. Ct. App. 2007) (emphasis added). "The damages are awarded for loss of earning *power,* not simply loss of earnings. The proper focus is thus what the injured plaintiff could have earned over the course of her working life without the injury versus what she will now earn, not what she earned or will earn in any given year." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 725 (6th Cir. 2012). "The jury is not to be concerned with actual future loss of earnings, but with the loss of the power to earn." *W.R. Grace & Co.-Conn. v. Pyke*, 661 So. 2d 1301, 1304 (Fla. Dist. Ct. App. 1995) (citing *Florida Greyhound Lines v. Jones*, 60 So. 2d 396, 398 (Fla. 1952)).

### ii. *Pfeifer's* "Risk of Default" vs Quintero's "Numerous Risks"

"In calculating damages, **it is assumed** that if the injured party had not been disabled, he would have continued to work, and to receive wages at periodic intervals until retirement, disability, or death." *Pfeifer*, 462 U.S. at 533. "Future lost earning capacity is measured for the duration of the work-life expectancy period based on plaintiff's current loss of earning capacity." *Monaghan v. Uiterwyk Lines, Ltd.*, 607 F. Supp. 1020, 1024 (E.D. Pa. 1985) (discussing *Pfeifer*). In fact, in Quintero calculations, Quintero assumed that "[t]he duration of the Plaintiff's career would be 39 years." Quintero Report, at 14 [ECF No. 133-1]. "**Once it is assumed** that the injured worker would definitely have worked for a specific term of years, he is entitled to a risk-free stream of future income to replace his lost wages; therefore, the discount rate should not reflect the market's premium for investors who are willing to accept some risk of default." *Pfeifer*, 462 U.S. at 537.

The default-risk-free interests rates mandated by *Pfeifer*, is unrelated to Quintero's purported "numerous risks." *See supra* Part III.B. Quintero's opinions about the appropriate interest rate does not comport with the legal principles of interest rates mandated by *Pfeifer*. "Discounting means making adequate allowance for the earning power of money." *Shaw v. United States*, 741 F.2d 1202, 1204 n.1 (9th Cir. 1984). In fact, applying *Pfeifer* in calculating discount rate, the Ninth Circuit noted, "The reason that risk-free investments are preferred to more remunerative but riskier investments is that the plaintiff should not be faced with the burden of becoming a full-time broker merely to safeguard his award." *Trevino v. United States*, 804 F.2d 1512, 1517 n.1 (9th Cir. 1986); *accord Rhodes v. United States*, 967 F. Supp. 2d 246, 320 (D.D.C. 2013). "The Fifth Circuit assumed that Treasury bonds contained 'zero risk' because they are backed by the United States Government." *Fontenot v. Safety Council of Sw. La.*, CIVIL ACTION NO. 2:16-CV-84, at *36 n.203 (W.D. La. Aug. 29, 2018).

DATED this 31st day of January, 2019:

Respectfully submitted,

By: Oluwamuyiwa Awodiya, *pro se* litigant
15005 Dahlia Dr.
Bowie, MD 20721
(240) 602-1836
Plaintiff, in Proper Person

## CERTIFICATE OF SERVICE

I do hereby certify that on this 31st day of January, 2019, I have caused a true and correct copy of the foregoing by mailing a copy to the Court, where the Court's CM/ECF system will send notification to the following:

**Ryan Roman**
Akerman Senterfitt
Suntrust International Center
1 SE 3rd Avenue
25th Floor
Miami, FL 33131-1714
305-374-5600
Fax: 305-374-5095
Email:
ryan.roman@akerman.com

**Octavia Monique Green**
Akerman LLP
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, FL 33131
(305) 982-5670
Email:
octavia.green@akerman.com

By: Oluwamuyiwa Awodiya, *pro se* litigant

11