# Exhibit A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

OLUWAMUYIWA AWODIYA,                    CASE NO.  0:18-cv-60482-KMM-AOV

Plaintiff,

v.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

     Defendant.

_____/

## DEFENDANT'S DEPOSITION DESIGNATIONS

     Pursuant to Federal Rule of Civil Procedure 26, Local Rule 16.1, and the Paperless Order

Scheduling Trial [ECF No. 37] (the "Scheduling Order"), defendant Ross University School of

Medicine, School of Veterinary Medicine Limited, by and through undersigned counsel, hereby

makes the following designations from depositions intended to be introduced at trial.

| DEFENDANT'S DESIGNATIONS | PLAINTIFF'S OBJECTION(S) | PLAINTIFF'S COUNTER DESIGNATION(S) | DEFENDANT'S OBJECTIONS TO COUNTER DESIGNATIONS |
|---|---|---|---|
| **Transcript<br>December 4, 2018<br><u>Deposition of McMillan Cuffy</u>** | | | |
| 9:12-16<br>10:11-11:2<br>13:12-20<br>13:24-14:5<br>16:11-17:12<br>19:14-19<br>24:10:-27:19<br>43:20-23<br>45:20-46:20<br>48:18-49:7<br>52:4-25<br>63:15-65:11<br>66:13-70:3 | | | |

| DEFENDANT'S DESIGNATIONS | PLAINTIFF'S OBJECTION(S) | PLAINTIFF'S COUNTER DESIGNATION(S) | DEFENDANT'S OBJECTIONS TO COUNTER DESIGNATIONS |
|---|---|---|---|
| 81:4-84:12<br>85:4-87:20<br>88:4-105:16<br>113:4-19 | | | |
| **Transcript<br>October 16, 2018<br>Deposition of Davendranand Sharma** | | | |
| 7:18-8:23<br>12:22-13:3<br>14:22-15:22<br>18:14-19:13<br>19:24-20:10<br>21:22-22:17<br>22:20-23:4<br>25:1-9<br>26:2-14<br>28:5-18<br>29:15-32:15<br>33:6-35:14<br>35:18-36:3<br>38:6-22<br>39:6-21<br>42:8-18<br>43:3-23<br>44:14-45:3<br>45:13-47:2<br>55:9-57:16<br>59:20-62:21<br>65:13-66:1<br>66:18-21<br>73:9-74:5<br>74:13-75:6<br>75:23-83:7<br>83:16-85:19<br>86:2-21 | | | |

2

| DEFENDANT'S DESIGNATIONS | PLAINTIFF'S OBJECTION(S) | PLAINTIFF'S COUNTER DESIGNATION(S) | DEFENDANT'S OBJECTIONS TO COUNTER DESIGNATIONS |
|---|---|---|---|
| **Transcript** <br> **November 5, 2018** <br> **Deposition of Matthew Stewart-Fulton** | | | |
| 8:1-22 <br> 9:2-21 <br> 11:1-14 <br> 12:8-13:8 <br> 15:23-16:9 <br> 20:14-25 <br> 28:20-29:7 <br> 31:3-9 <br> 34:20-24 <br> 37:2-40:15 <br> 41:9-12 | | | |
| **Transcript** <br> **November 5, 2018** <br> **Deposition of Bryan Hayse** | | | |
| 5:7-9 <br> 8:21-24 <br> 9:3-19 <br> 21:18-23:21 <br> 24:18-25:7 <br> 26:6-19 <br> 27:3-11 <br> 37:13-38:5 | | | |
| **Transcript** <br> **December 4, 2018** <br> **Deposition of William Owen** | | | |
| 4:10-12 <br> 7:17-10:17 <br> 10:23-11:6 <br> 14:14-16 <br> 15:9-11 <br> 15:18-21 <br> 16:11-17:3 <br> 19:18-20:1 | | | |

| DEFENDANT'S DESIGNATIONS | PLAINTIFF'S OBJECTION(S) | PLAINTIFF'S COUNTER DESIGNATION(S) | DEFENDANT'S OBJECTIONS TO COUNTER DESIGNATIONS |
|---|---|---|---|
| 20:21-21:19<br>43:12-44:3 | | | |

47914417;4

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 0:18-cv-60482-KMM


OLUWAMUYIWA AWODIYA,

                Plaintiff,

vs.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

                Defendant.
_____/


                         350 E. Las Olas Blvd.
                         Fort Lauderdale, Florida
                         December 4, 2018
                         1:27 p.m.


              _____
              THE VIDEOTAPED DEPOSITION OF

                     MCMILLAN CUFFY


        _____

          Taken on Behalf of the Plaintiff

       Pursuant to Notice of Taking Deposition

             Commencing at 1:27 p.m.

Page 9

```
 1        Q.   When's the last time you've been?

 2        A.   I passed through two weeks ago.

 3        Q.   Two weeks ago?

 4        A.   Passed through, yes.

 5        Q.   Do you have any visa or citizenship in the

 6   U.S. or is -- will it be difficult for you to come

 7   back to the U.S. during trial?

 8        A.   It depends.  It all depends on what time.

 9        Q.   Let's say March.

10        A.   I'm not sure yet.

11        Q.   You're not sure?

12             When did you start working for Ross?

13        A.   February 2010.

14        Q.   2010.

15             And what was your role?

16        A.   Counselor.  Mental health counselor.

17        Q.   When did you first hear about this

18   lawsuit?

19        A.   I believe it was somewhere around October,

20   was it?

21             I'm not sure.  I think it was a couple of

22   months back.  Yeah.

23        Q.   October of this year?

24        A.   We're in December now.  October,

25   September.  Somewhere.  I'm not sure.  Could be.
```

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 10

1      Q.   Of this year, 2018?

2      A.   Yes.  Yes.

3      Q.   Has anyone spoken to you about the case

4    since then?

5      A.   I have spoken to the team, yes.  I have

6    had a meeting with our team, the Ross team.

7      Q.   Have you spoken with anyone else?

8      A.   No, sir.

9      Q.   You haven't spoken to the dean or --

10     A.   No, sir.

11     Q.   Why did you first engage with plaintiff?

12     A.   The plaintiff came into the counseling

13   center, because he was having some emotional -- he

14   presented with an emotional problem at the time,

15   relating to a relationship issue.

16     Q.   Let me rephrase the question.  I just want

17   to make sure that you understood my question.

18          What was the reason that you first met the

19   plaintiff?

20          MR. ROMAN:  I'll just object as asked and

21      answered, but you may go ahead and answer.

22          THE WITNESS:  The plaintiff presented at

23      the counseling center with an emotional

24      problem.  I was the counselor who dealt with

25      the plaintiff.  Specifically, it was a

4e42ed13-6299-4742-80d7-435c57c10785

Page 11

1         relationship distress with his girlfriend or ex

2         at the time.

3    BY MR. AWODIYA:

4         Q.   What month was this?

5         A.   This was December 2015.

6         Q.   And that would be reflected in your notes?

7         A.   Yes, it would be.  Somewhere around the

8    8th or 10th of December.

9              MR. AWODIYA:  Ryan, I didn't think I would

10        need this document.  Can you pull up the

11        December 8th, 2015 notes of Mr. Cuffy?

12             MR. ROMAN:  Let me see if I can get those.

13             MS. BOMAR:  Do you want to go off the

14        record while he looks for it?

15             It just continues.  It's up to you.

16             MR. ROMAN:  I have it here.

17             MS. BOMAR:  Okay.

18   BY MR. AWODIYA:

19        Q.   Actually, yeah, before I go to this,

20   you're not a U.S. citizen, correct?

21        A.   No, I'm not.

22        Q.   So I just want to make sure that you

23   understand -- I want to make sure that we're -- if

24   you're not a U.S. citizen, what does the oath mean

25   to you?

4e42ed13-6299-4742-80d7-435c57c10785

Page 13

1           MR. ROMAN:  Well, he swore that he was

2       going to tell the truth.  So, I mean, if you

3       have a question, you can ask it, but -- I mean,

4       I think we're here to answer substantive

5       questions.  He's taken the oath and said he'll

6       testify truthfully.  It's the same oath the

7       other witnesses have taken, but you may ask

8       your question.

9           MR. AWODIYA:  Okay.  As long as he

10      understands that.

11   BY MR. AWODIYA:

12      Q.   Was there any other reasons why plaintiff

13   came to you?

14      A.   In December?  When?

15      Q.   On the first visit.

16      A.   No other reason.

17      Q.   No other reason?

18      A.   No.

19      Q.   Nothing to do with school?

20      A.   Not at the time, no.

21      Q.   Did anyone refer you to him or did he come

22   to you?

23      A.   The plaintiff came to me.

24      Q.   What do you know about plaintiff's ADHD?

25      A.   I think in January 2016, if -- to be

4e42ed13-6299-4742-80d7-435c57c10785

Case 0:18-cv-60482-RKA   Document 159-1   Entered on FLSD Docket 03/06/2019   Page 11 of
160
12/4/2018    Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 14

1    exact, I think it was January 11th, 2016, the

2    plaintiff came to my office and presented -- I think

3    there's a Conners ADHD assessment that he said that

4    he did in the U.S.  That was my first knowledge of

5    his ADHD.

6         Q.   When was your first knowledge that he was

7    having academic problems?

8         A.   When I -- when I met him in December 2015,

9    during that melt down -- emotional melt down, he did

10   mention that he was having, I think, concentration

11   issues or so.

12        Q.   He mentioned that?

13        A.   From my recollection, he spoke to me re:

14   his -- I know there was that distress issue with the

15   relationship.  I can't recall -- I can't recall if

16   he -- if he actually said that he was having

17   concentration issues at that time, but I knew what

18   presented in December was the distress problem.  The

19   relationship distress, that's what presented in

20   December.  My first knowledge of ADHD was 11th of

21   January, 2016.

22        Q.   When you typically first meet a new

23   client, what information do you ask for?

24        A.   That depends on the presentation.

25        Q.   Do you do any type of background?

4e42ed13-6299-4742-80d7-435c57c10785

Page 16

1   you have?

2        A.   That's the 8th of December, 2015.

3        Q.   This would be the first time you met

4   plaintiff?

5        A.   I think so.

6        Q.   Is there a reason why you asked him family

7   history questions?

8        A.   So that's standard procedure.  Any time a

9   client presents, yes, it is not unusual to ask about

10  a family history.

11       Q.   So can you outline the standard procedure

12  for me?

13       A.   So if you come to me -- any client who

14  presents that first time, I would look at the notes.

15  It could have been that.  The fact that a patient

16  came to me for the first time does not mean that was

17  the first time the patient was engaged in the

18  counseling center.  So I would go to the notes, the

19  medical records, to see if the client had any prior

20  records.  If there was a full intake done, then

21  there's no need to do that.  So I'll go straight

22  into what is presented.

23            So, again, as I said, it depends on what

24  is presented.  In that case, when the plaintiff

25  presented, the plaintiff presented with emotional

Case 0:18-cv-60482-RKA   Document 159-1   Entered on FLSD Docket 03/06/2019   Page 13 of
160
12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 17

1   distress, and the suicidal assessment was necessary

2   on that time.

3        Q.   So earlier when I asked you -- I wasn't

4   asking you when plaintiff first engaged with the

5   counseling center.  Is your answer still the same,

6   clarifying that I was asking when you first -- when

7   you personally first engaged with the plaintiff, was

8   it because of relationship issues that led to

9   emotional problems?

10       A.   Yes, it was.

11       Q.   And this is a suicide assessment, right?

12       A.   Yes, it is.

13       Q.   Turn to page 2.

14       A.   Yes.

15       Q.   Under "Suicide Inquiry" --

16       A.   Yes.

17       Q.   -- can you read it, and then, tell me what

18  you think?

19       A.   I'm not sure what you're asking.

20       Q.   Read what you wrote under "Suicide

21  Inquiry."

22       A.   "Do you have a history of suicide

23  ideations?"

24            MR. ROMAN:  I think if you want to read it

25       to yourself --

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

```
                                            Page 19
  1            In this context, the questions on this
  2       suicide inquiry -- because the client --
  3       because the plaintiff admitted to self-harm,
  4       this inquiry is standard procedure that we ask
  5       every student who presented with thoughts of
  6       self-harm or suicidal thoughts.  Hence, my
  7       reason for administering (inaudible) the
  8       inquiry.
  9            THE COURT REPORTER:  Say that again for
 10       me.
 11            THE WITNESS:  Hence, my reason for
 12       administering this inquiry.
 13  BY MR. AWODIYA:
 14       Q.   Did you ask him what caused the thoughts?
 15       A.   I can't recall if I asked or if the
 16  plaintiff told me the reason he came in.  And as I
 17  earlier indicated, the reason for the client
 18  engaging with me was because of a relationship
 19  distress.
 20       Q.   This document says, "This morning he
 21  reported having intense frightening thoughts of
 22  self-harm, which went on for about 45 minutes.
 23  These thoughts are the result of a call that he
 24  received from student affairs informing him that he
 25  failed."
```

4e42ed13-6299-4742-80d7-435c57c10785

Page 24

```
 1        Q.   Who set that up?

 2        A.   Who set up what?

 3        Q.   That meeting.

 4             Did you reach out to him or did he reach

 5   out to you?

 6        A.   The plaintiff came in to me.

 7        Q.   The plaintiff reached out to you?

 8        A.   I think -- from my recollection, I think

 9   the plaintiff came to the office.

10        Q.   Please see Exhibit Cuffy 3.  Please take

11   your time to read that one.

12             (Thereupon, the referred-to document was

13             marked by the court reporter for

14             Identification as Plaintiff's Exhibit 3.)

15             THE WITNESS:  Yes.

16             MR. ROMAN:  I just make the same objection

17        as last time, that Mr. Cuffy didn't send or

18        receive the e-mail, but you may ask questions.

19   BY MR. AWODIYA:

20        Q.   This document says that you were the

21   on-call counselor on December 8th?

22        A.   Yes.

23        Q.   And that plaintiff's "mother was concerned

24   after student failed an exam by one point.  He was

25   threatening to harm himself.  I called Jennifer
```

Page 25

1   Swaim at the counseling center in Dominica let her

2   know -- and let her know of the situation.  She

3   referred the issue to Cuffy."

4            This was by a Ms. Jeannie Robertson.

5            Does that statement cause you to remember

6   anything else about your first meeting with

7   plaintiff?

8       A.   As I said, the plaintiff came in to me

9   with an emotional distress, and that was my

10  interaction with the plaintiff.  That was around

11  December 8th, same time that I first met the

12  plaintiff.  That's what I recall.

13      Q.   Earlier you said there was no other reason

14  aside from the relationship problems.

15      A.   From my recollection, the plaintiff

16  presented with me.  What he presented on that

17  meeting was that he was having emotional distress.

18  That's what I recall.

19      Q.   So are you saying you're not sure?

20      A.   That's what I recall.  That's what I'm

21  saying.

22      Q.   So none of these documents trigger your

23  memory about any academic problems in your first

24  meeting with plaintiff?

25      A.   To answer the question, let me refer to

4e42ed13-6299-4742-80d7-435c57c10785

Page 26

1   the Cuffy 1 that you passed to me earlier, which was

2   on December 8th.  The first question on that second

3   page, "Do you have any current stressors?"

4               "Yes.  Academics, relationship."

5               "Are you presently experiencing any

6   psychological issues?"

7               "Yes.  Relationship issues."

8               "Have you experienced any significant

9   loss?"

10              "No.  Except for his girlfriend."

11              "Do you have a history of suicide

12   ideations?"

13              "Yes.  He admitted having similar thoughts

14   around mini 1 of this semester when he found out

15   that his girlfriend was being unfaithful."

16              That was the presenting issue.  The theme

17   was surrounding a relationship with this

18   relationship.

19       Q.   Let me ask you -- we may be getting into

20   confidential information.  I don't know what he's

21   going to say.

22              What happened with his relationship issue

23   that caused him to have suicidal ideations in

24   December 2015?

25       A.   From -- from the notes I have before me,

4e42ed13-6299-4742-80d7-435c57c10785

Page 27

1   on December 12th -- on December 8th, "Yes.  He

2   admitted having similar thoughts around mini 1 of

3   this semester when he found out that his girlfriend

4   was being unfaithful."

5          So the plaintiff told me that he had -- he

6   had suicidal ideations, because he found out that

7   his girlfriend was being unfaithful.

8      Q.   So I understand that you allege that, but

9   do you -- did plaintiff tell you that she was

10  unfaithful at this time?

11     A.   Again, I want to read my notes.

12          Yes.

13          Do you have -- the question is, "Do you

14  have a history of suicidal ideations?"

15          The plaintiff responded, "Yes.  He

16  admitted having similar thoughts around mini 1 of

17  this semester when he found out that his girlfriend

18  was being unfaithful."

19          That's what the plaintiff told me.

20     Q.   But what was the current issue?

21          It says, "around mini 1."

22          What was the current issue?

23          MR. ROMAN:  I'll object as asked and

24      answered, but you can answer it again.

25          THE WITNESS:  I think I've answered this

4e42ed13-6299-4742-80d7-435c57c10785

Case 0:18-cv-60482-RKA   Document 159-1   Entered on FLSD Docket 03/06/2019   Page 19 of 160

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 43

1    documentation that was given to you was

2    insufficient?

3         A.   From my recollection, the plaintiff

4    provided me with one document.  In my view, yes, it

5    would be insufficient.

6         Q.   What if he told you he gave you more?

7         A.   I would have to refer to my notes.

8         Q.   So continue where you left off about the

9    battery of tests.  Once -- once you do your own set

10   of tests for the ADHD, and it determines that a

11   student does, in fact, have some type of problem,

12   what do you do next?

13        A.   If the student -- if the test suggests

14   that the student has ADHD, as a counselor, my next

15   step would be to refer the -- in that case, the

16   plaintiff to the psychiatrist.

17        Q.   Did plaintiff tell you that he requested

18   accommodations from any other faculty?

19        A.   I can't recall.

20        Q.   Do you recall calling any other faculty

21   about academic accommodations for plaintiff?

22        A.   I can't recall having any conversation

23   with the plaintiff about accommodations.  I can't.

24        Q.   What do you know about plaintiff's ADHD

25   and how it affects him?

4e42ed13-6299-4742-80d7-435c57c10785

Page 45

1    routine?

2         A.   It depends on what was presented, but

3    because at that time the issue of ADHD was

4    introduced in our conversations in January, it was

5    just prudent to ask the plaintiff about his academic

6    performances.  So in that context, yes, I would ask.

7         Q.   Do you have access to Dr. Sharma's notes

8    when you see clients?

9         A.   Yes.  Through the EHR, the electronic

10   health records, yes.

11        Q.   Do you typically review those records

12   before seeing a plaintiff -- before seeing a client?

13        A.   Sometimes.

14        Q.   Sometimes?

15             THE VIDEOGRAPHER:  I just have to change

16        real quick.  So let me know when you get to a

17        good breaking point.

18             MR. AWODIYA:  (Nod in the positive.)

19   BY MR. AWODIYA:

20        Q.   So did you think that his ADHD was playing

21   any part in his academics?

22        A.   When exactly?  What period are we talking

23   about?

24        Q.   Any time you knew about his ADHD.

25        A.   Quite frankly, my recollection of my

4e42ed13-6299-4742-80d7-435c57c10785

Page 46

1    interaction with the plaintiff, what dominated our

2    conversations, was the distress of the relationship.

3    I don't even know when that -- the first I heard of

4    ADHD was when the plaintiff returned from the U.S.

5    and presented me with this document or documents

6    from his primary care saying that he had an

7    assessment for ADHD.  Prior to that, there was no --

8    I did not -- as a clinician didn't have any concerns

9    or did not see any symptoms of ADHD.  It never came

10   up in our conversations.

11        Q.   Earlier you said he mentioned something

12   about concentration?

13        A.   Yeah.  The fact that the plaintiff spoke

14   about academic problems, right, does not speak to

15   ADHD.  Anything can cause -- the plaintiff was

16   depressed about the relationship.  That's what

17   affected his concentration.  The plaintiff -- I'm

18   saying, you're talking specifically about ADHD.  The

19   first I ever heard of ADHD was upon his return to

20   the island when he presented that document to me.

21             MR. AWODIYA:  Ryan, do you have

22        Dr. Sharma's transcript?

23             MR. ROMAN:  I do not.

24             MR. AWODIYA:  You do not?

25             Let's take a break.  Let's take a break.

4e42ed13-6299-4742-80d7-435c57c10785

Case 0:18-cv-60482-RKA   Document 159-1   Entered on FLSD Docket 03/06/2019   Page 22 of
160
12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 48

 1   when you failed that semester by one point and you

 2   were contesting your grade.

 3       Q.   The language you're using, can you -- what

 4   do you mean contesting?

 5       A.   The plaintiff -- the plaintiff stated that

 6   he failed the semester by one point.  The plaintiff

 7   wanted to see somebody from student affairs to talk

 8   to them about was any way he could avoid that one

 9   point to pass the semester.  So there was some

10   discussion and conversations around that.

11       Q.   Why would Dr. Sharma -- because you were

12   in that meeting when there was -- discussing student

13   affairs, and grades, and everything.

14            Why would Dr. Sharma then begin assessing

15   plaintiff for ADHD a couple of days later?

16       A.   I can't speak to Dr. Sharma's -- and how

17   we -- as a psychiatrist.  I can't speak to that.

18       Q.   Okay.  Tell me more about the relationship

19   problems.

20       A.   I can only refer to the plaintiff's words.

21   The plaintiff indicated -- he said -- he stated that

22   he was having difficulties in his relationship with

23   his girlfriend for cheating on him.  She was

24   unfaithful.  He stated that it caused him enormous

25   distress, and I can't tell you the specifics, but I

4e42ed13-6299-4742-80d7-435c57c10785

Page 49

1    know that there was a general theme that the

2    plaintiff presented about his relationship issues.

3         Q.   Did he say when those events occurred?

4         A.   I would have to refer to my notes, but I

5    know that from December when I -- from my very first

6    meeting with the plaintiff this was a -- it was a

7    continuous theme throughout our sessions.

8         Q.   Of her cheating?

9         A.   No, no, no.  Relationship distress.

10        Q.   Can you -- when you say, "distress," can

11   you explain in a way that someone is not a

12   psychiatrist would understand?

13             What do you mean "distress"?

14             Distress sounds extreme.

15        A.   The plaintiff presented with relationship

16   problems, which caused -- which was a stressor to

17   him.  He was stressed by his relationship with this

18   individual.  That's the best way I can describe it.

19        Q.   So what do you describe as a stressor?

20        A.   A stressor is anything that causes stress

21   to an individual.

22        Q.   Is this something everyone endures?

23             MS. BOMAR:  Excuse me.

24             THE WITNESS:  I would believe that

25        everybody at some point in life experiences

4e42ed13-6299-4742-80d7-435c57c10785

Case 0:18-cv-60482-RKA   Document 159-1   Entered on FLSD Docket 03/06/2019   Page 24 of
160
12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 52

 1            MR. AWODIYA:  Yeah.  February 17, 2016.

 2            MR. ROMAN:  See if that's the one you're

 3        thinking of.

 4            MR. AWODIYA:  Yeah.  Cuffy 5.

 5            (Thereupon, the referred-to document was

 6            marked by the court reporter for

 7            Identification as Plaintiff's Exhibit 5.)

 8   BY MR. AWODIYA:

 9        Q.   Can you explain this document to me?

10             Well, first, is this your note?

11        A.   Yes, it is.

12        Q.   Can you explain this document to me?

13        A.   Yes.  According to my notes, on that day,

14   the plaintiff reported that he did well on his

15   mini 1 exam even though his anxiety spiked the

16   morning of the exam.  He reported that his anxiety

17   on that day, the 9th of February, 2016, was because

18   of the same girl he was seeing last semester who

19   promised to check up on him before the exam but did

20   not call.  He admitted that he was disappointed.

21             Based on the context of my notes, the

22   anxiety seems to have been related to the fact that

23   the girl in question did not call and it kind of

24   created some -- it may have created some anxiety to

25   you -- to the plaintiff.

4e42ed13-6299-4742-80d7-435c57c10785

Page 63

1  that he was trying to go back home sooner than he's

2  scheduled.

3          Can you add context to why you would

4  mention both of those things in one document?

5      A.   Actually, they are two documents in what I

6  have.  I have going home on document --

7          THE COURT REPORTER:  You have what?

8          THE WITNESS:  The -- the conversation

9      about changing flights and going home was on

10     the document 12/13, and the conversation with

11     Dr. Hayes was on the 12th -- was on the 10th,

12     from what I have in front of me.  These are two

13     conversations.  These are two different dates.

14 BY MR. AWODIYA:

15     Q.   No, no, no.  On just the 12/10 one --

16     A.   Uh-huh.

17     Q.   -- in "Summary of Note," you mention

18 getting back home sooner, but under "Presenting

19 Concerns," you mentioned Dr. Hayes and student

20 affairs regarding his academic situation.

21     A.   So what exactly are you asking?

22     Q.   Clarify the presenting concern for me.

23 Why is plaintiff -- why do you mention student

24 affairs and academic situation and you don't mention

25 relationship under "Assessment"?

4e42ed13-6299-4742-80d7-435c57c10785

Page 64

1          You don't mention relationship anywhere in

2    this document.  In fact, you put "Adjustment

3    Disorder" in regard to the academic situation.

4          A.    Okay.  So you have to look at context.  If

5    I have to look at the context of this

6    conversation -- and suffice me to say, I cannot

7    speak to the 10th, the 12th, without speaking to the

8    8th, because these conversations are follow-ups,

9    okay?

10          These are follow-up sessions I had with

11    you based on our initial conversation on the 8th of

12    December.  And if you recall, on the 8th of

13    December, okay, which you queried earlier on, on the

14    suicide inquiry, okay, where the student said he

15    received a call from student affairs regarding his

16    grades, all of these meetings back and forth between

17    the counseling center and student affairs were

18    during the time that the plaintiff was trying to

19    speak to Dr. Hayes, who was the director of student

20    affairs, to negotiate how he could get that one

21    point to pass the semester.

22          And so, in terms of flight changes, I

23    think that your mom -- well, it says that client was

24    seen on Friday and his mom made reservations for him

25    on LIAT to fly back Sunday the 13th; however, he

Page 65

1   agreed to stay on the island until his original

2   date, which was the 19th.  So you had -- the

3   plaintiff had a ticket booked for the 19th; however,

4   his mom was trying to get him out of the island by

5   the 13th.

6          And so, looking at the e-mails -- my

7   notes, the plaintiff decided to stay on the island

8   longer, instead of going home on the 13th, and keep

9   his 19th flight, because he wanted that time to have

10   meetings with student affairs to see if he could

11   negotiate or get that one point.

12   Q.   That's not -- if they have the document,

13   they can tell you.  That's just not true.  I don't

14   know who put it.  I think you or Dr. Sharma put that

15   the reason he stayed was because of packing or

16   something like that.  It had nothing to do with --

17   his last meeting with student affairs was before he

18   came to you.

19          Now, let's move on, because I don't want

20   to circle around that.  So first -- hold on.

21   Nowhere in your document put that he wanted to

22   negotiate the point.  It just keeps referencing

23   change grade, grade -- academic situation.

24          You recall that, but you don't recall

25   anything else?

4e42ed13-6299-4742-80d7-435c57c10785

Page 66

1      A.   I recall -- I recall the client -- the

2  plaintiff wanting to have meetings with student

3  affairs to discuss his grades.  Yes, I do recall

4  that.

5      Q.   Where does this negotiation part come

6  from?

7      A.   Because I recall that in our meetings that

8  the plaintiff did entertain the idea of speaking to

9  Dr. Hayes about how he could get that one point he

10 needed to pass the semester.

11     Q.   Okay.  That sounds good.  Okay.  So now

12 let's continue.

13          So the next month he came back to you with

14 an ADHD assessment from the U.S., correct?

15     A.   That conversation was in January, yes.

16     Q.   Please turn to the document that says

17 January 11th.

18     A.   Yes.

19     Q.   And this one he brought his ADHD

20 assessment to you.  And then, on the clinical

21 assessment you put "Academic problems; repeating

22 Semester 5."

23     A.   Yes.

24     Q.   Did that indicate to you that he was

25 having academic problems because of the ADHD?

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 67

1      A.    No.

2      Q.    So what does this mean?

3      A.    It means that the client, repeating

4  Semester 5, was, in fact, having academic problems.

5  The fact that he presented a document to me stating

6  that he saw his primary care provider and provided

7  one document does not confirm a diagnosis of ADHD.

8  So at that point, what was presenting then is

9  academic problems.  I did not have a diagnosis of

10  ADHD at that time except that document.

11      Q.    Let's forget the word diagnosis.  ADHD is

12  almost -- the name of it is irrelevant.  We are

13  focusing on the limitations of it.

14      A.    No, sir.

15      Q.    So the concentration problems associated

16  with it -- whether they were diagnosed at the time

17  or not, there was a suspected concentration problem?

18          MR. ROMAN:  Are you asking him a question?

19  BY MR. AWODIYA:

20      Q.    That's a question.

21      A.    So let me clarify.  A client presenting

22  with academic problems does not automatically have

23  ADHD.  Any student or any patient can present with

24  academic problems for various reasons.  Up until

25  then, even when the -- the plaintiff presented to me

4e42ed13-6299-4742-80d7-435c57c10785

Case 0:18-cv-60482-RKA  Document 159-1  Entered on FLSD Docket 03/06/2019  Page 30 of
160
12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 68

1    on the 11th with that document -- and I recall the

2    documentation was insufficient.

3              And you said, "Let's forget about

4    diagnosis."  I cannot forget about a diagnosis.  As

5    a clinician, I have to speak to diagnosis, and I'm

6    saying to you that it is very -- and it is very,

7    very important to state that on the 11th of January,

8    during my intervention with you, you presented an

9    assessment from your primary care.  Based on the

10   protocol at Ross, it was deemed that you did not

11   have sufficient documentation to have a diagnosis

12   for ADHD.

13             So on this document I could not put ADHD;

14   hence, my reason for putting academic problems.

15        Q.   So the documentation just suggested ADHD;

16   is that what you're saying?

17        A.   It's not suggesting.

18             Which one?  Which one?  The one you

19   presented?

20        Q.   Yes.

21        A.   The documentation that you provided was an

22   assessment that are used by clinicians to -- as part

23   of the diagnosis for ADHD.

24        Q.   What did that document tell you?

25        A.   The Conners indicated that you had ADHD.

4e42ed13-6299-4742-80d7-435c57c10785

Case 0:18-cv-60482-RKA   Document 159-1   Entered on FLSD Docket 03/06/2019   Page 31 of
160
12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 69

1   It indicated that.

2        Q.   So why was that document insufficient?

3        A.   It was insufficient based on the protocol

4   of the university -- the Ross University School of

5   Medicine.

6        Q.   What's the protocol?

7        A.   The protocol is this.  You must meet a

8   certain documentation criteria.  It could be an

9   initial assessment, like what was present by the

10  plaintiff as an initial assessment, like the

11  Conners.

12           The T.O.V.A. that we referred to, the Test

13  of Variability Assessment, was part of our protocol.

14  We have that on a form that -- where it is sent to

15  either the client's family or teacher or somebody

16  that knew them at a very young age, because

17  according to the DSM-5 diagnosis now, the symptoms

18  must be present on or before age 12.

19           Okay.  So we have that document that has

20  to be sent up and -- and, basically, the person

21  speaking to symptoms that were presented, whether it

22  was in a classroom setting or a home setting.

23           So there's a lot of different

24  documentations that form that battery that informs

25  us before we can make a diagnosis.  Hence, on the

4e42ed13-6299-4742-80d7-435c57c10785

Case 0:18-cv-60482-RKA   Document 159-1   Entered on FLSD Docket 03/06/2019   Page 32 of
160
12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 70

 1   11th, when you presented that document, there was --

 2   it would have been that conversation about -- for

 3   the testing where the T.O.V.A. came in.

 4       Q.   What other information did you have when

 5   you diagnosed him with ADHD?

 6            Your records indicate T.O.V.A., CAARS,

 7   Conners.  Well, it doesn't indicate Conners.  It

 8   indicates assessment.

 9            What other information did you have?

10       A.   Let me -- let me clarify your point.  You

11   said that I was the one who diagnosed you with ADHD.

12   I was not the one who diagnosed you with ADHD.

13       Q.   Who was it?

14       A.   So what the procedure is, when you

15   presented with that form -- or that document from

16   your -- from the U.S., you were referred to Amanda,

17   another clinician, who was the one who actually did

18   the T.O.V.A.  You would have seen Dr. Sharma.  So at

19   that point, it becomes a team effort.

20            So you would have to see Dr. Sharma, as a

21   psychiatrist.  He does his assessment also.  You

22   would have to see Amanda Massacult, who was the

23   person responsible for administering the T.O.V.A.,

24   and, of course, you'd have to see me.  So at that

25   point, it would only be after you see Dr. Sharma and

4e42ed13-6299-4742-80d7-435c57c10785

Case 0:18-cv-60482-RKA   Document 159-1   Entered on FLSD Docket 03/06/2019   Page 33 of
160
12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 81

1    Ross University.  We've met before.

2         A.    Yes.

3         Q.    Okay.  I just have some questions for you.

4               When a student is diagnosed with ADHD, do

5    you have a standard practice of informing them that

6    they can seek accommodations?

7         A.    Yes.

8         Q.    Can you describe that standard practice

9    for me?

10        A.    So once the diagnosis is made, in that

11   conversation, we inform the students what their

12   rights are.  So part of that would be, you can get

13   stimulant meds, in that case, with a referral to the

14   psychiatrist, and we also speak to the students that

15   they do have the choice to -- they have the option

16   of requesting academic accommodations.  So, yeah,

17   that's the process.

18        Q.    Is a student required to seek

19   accommodations?

20        A.    That's an option every student has.  The

21   student can choose to or not to.  That's their

22   choice.

23        Q.    To the best of your recollection, would

24   you have notified Mr. Awodiya of the option to

25   request an accommodation?

4e42ed13-6299-4742-80d7-435c57c10785

Page 82

 1        A.    Yes, I would.

 2        Q.    Do you have any reason to think you would

 3   not have followed your standard practice here?

 4        A.    No, I don't.

 5        Q.    Do you request accommodations for a

 6   student?

 7        A.    No, I don't.

 8        Q.    And when a student presents with ADHD, do

 9   you automatically send out support for

10   accommodations even where a request has not been

11   made?

12        A.    No.

13        Q.    And would the same answer be true for

14   other mental impairments other than ADHD?

15        A.    Yes.

16        Q.    In your experience, do all students want

17   an accommodation for a disability?

18        A.    No.

19        Q.    So some choose not to seek an

20   accommodation?

21        A.    Some choose not to.

22        Q.    Did you receive a request from the

23   accommodations office for information pertaining to

24   Mr. Awodiya?

25        A.    No.

4e42ed13-6299-4742-80d7-435c57c10785

Page 83

1        Q.   Had you gotten such a request, would you

2   have supported it?

3        A.   Yes, I would.

4        Q.   Moving on to another topic, are your

5   counseling notes the best evidence of what was

6   discussed at a counseling session with Mr. Awodiya?

7        A.   Yes, it is.

8        Q.   Okay.  I'd like to go through with you

9   each of those notes and ask you just a short series

10  of questions.  I'll begin with what we've marked as

11  Exhibit Cuffy 1, which is the December 8th, 2015

12  notes.

13       A.   Yes.

14       Q.   Okay.  Take a look at that document.

15            What is that document?

16       A.   So this is a suicide assessment.

17       Q.   And who's the author of these notes?

18       A.   I am.

19       Q.   And when is this dated?

20       A.   8th of December, 2015.

21       Q.   Are these notes taken at or around the

22  time of the counseling session with Mr. Awodiya?

23       A.   Yes, it is.

24       Q.   Is this a document that's maintained by

25  Ross University in the normal course of it's

4e42ed13-6299-4742-80d7-435c57c10785

Page 84

1    business?

2         A.   Yes, it is.

3         Q.   Do you have any reason to believe that

4    this document has been altered in any way?

5         A.   No.

6         Q.   In these notes, there's no mention of a

7    request for an accommodation, correct?

8         A.   No, there isn't.

9         Q.   And in these notes there's no mention of a

10   request for extended testing time?

11        A.   No, there isn't.

12        Q.   Okay.  You can put that one aside.

13             Next I'd like to direct your attention to

14   Exhibit Cuffy 4, which is the counseling notes from

15   December 9, 2015.

16        A.   I got it.

17        Q.   Okay.  And what is this document?

18        A.   This is a progress note as a follow-up

19   note -- follow-up session.

20        Q.   And did you prepare it?

21        A.   No, I did not.

22        Q.   Okay.  So this one is not yours, correct?

23        A.   No, it is not.

24        Q.   Okay.  Let's put that one aside.

25             Next I'd like to mark as an exhibit --

4e42ed13-6299-4742-80d7-435c57c10785

Case 0:18-cv-60482-RKA   Document 159-1   Entered on FLSD Docket 03/06/2019   Page 37 of
160
12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 85

1    actually, you know what?  This might be in the

2    composite.  So just give me one second, and that way

3    we don't duplicate.

4              I'm looking now at the document marked as

5    composite -- it's exhibit -- let me see.  It's

6    Exhibit 6.  And you'll see the note for December 10,

7    2015, which, I think, on your version is the second

8    page.

9         A.   It is.

10        Q.   Okay.  All right.  And what is that

11   document?

12        A.   It's a counseling crisis note.

13        Q.   Did you prepare it?

14        A.   Yes, I did.

15        Q.   I think it's -- actually, if you look at

16   the bottom of that page that you're on for the

17   December 10th note, do you see an author name at the

18   bottom?

19        A.   Yes.

20        Q.   And that's your name?

21        A.   That's my name.

22        Q.   And when is this dated?

23        A.   The 10th of December, 2015.

24        Q.   And are these notes taken at or around the

25   time of the counseling session?

4e42ed13-6299-4742-80d7-435c57c10785

Page 86

1        A.   Yes, it is.

2        Q.   Is this a document that's maintained by

3    Ross University in the normal course of it's

4    business?

5        A.   Yes, it is.

6        Q.   Do you have any reason to believe that

7    this document has been altered in any way?

8        A.   No.

9        Q.   And in these notes, do you see any mention

10   of a request for an accommodation?

11       A.   No, there isn't.

12       Q.   And do you see any mention of a request

13   for extended testing time?

14       A.   No.

15            MR. ROMAN:  Okay.  Next, I'd like to mark

16        as an exhibit Cuffy 7, I believe it is.

17            (Thereupon, the referred-to document was

18            marked by the court reporter for

19            Identification as Defendant's Exhibit 7.)

20            MR. ROMAN:  We'll mark this one as

21        Cuffy 7.  Here's a copy for you.

22   BY MR. ROMAN:

23       Q.   And what is this document?

24       A.   This would be a follow-up session.

25       Q.   And what date is this document?

4e42ed13-6299-4742-80d7-435c57c10785

Case 0:18-cv-60482-RKA   Document 159-1   Entered on FLSD Docket 03/06/2019   Page 39 of
160
12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 87

 1        A.    That's on the 10th of December, 2015.

 2        Q.    And did you prepare it?

 3        A.    Yes.

 4        Q.    Are these notes taken at or around the

 5   time of this counseling session with Mr. Awodiya?

 6        A.    Yes, it would be.

 7        Q.    And is this a document that is maintained

 8   by Ross in the normal course of business?

 9        A.    Yes, it is.

10        Q.    Do you have any reason to believe that

11   this document has been altered in any way?

12        A.    No.

13        Q.    And in these notes, do you see any mention

14   of a request for an accommodation?

15        A.    No, I don't.

16        Q.    Do you see any mention of a request for

17   extended testing time?

18        A.    No, I'm not.

19             MR. ROMAN:  Okay.  We're going to next

20        mark this exhibit.  Is this Cuffy 8?

21             THE COURT REPORTER:  (Nod in the

22        positive.)

23             (Thereupon, the referred-to document was

24             marked by the court reporter for

25             Identification as Defendant's Exhibit 8.)

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 88

1              THE WITNESS:  Thank you.

2              THE COURT REPORTER:  Uh-huh.

3   BY MR. ROMAN:

4         Q.   Once you've had an opportunity to review,

5   I'll just ask you to describe what that document is.

6         A.   Okay.

7         Q.   What is this document?

8         A.   This is a follow-up meeting, which speaks

9   of -- it's a follow-up meeting.  Follow-up.

10         Q.   On what date?

11         A.   It's on the 11th of December, 2015.

12         Q.   And who prepared it?

13         A.   I prepared it.

14         Q.   And are these notes taken at or around the

15   time of the counseling session with Mr. Awodiya?

16         A.   Yes, it would be.

17         Q.   Is this a document that's maintained by

18   Ross University in the normal course of it's

19   business?

20         A.   Yes.

21         Q.   Do you have any reason to believe that

22   this document has been altered in any way?

23         A.   No.

24         Q.   And in these notes, do you see any mention

25   of a request for an accommodation?

Page 89

1     A.   No.

2     Q.   Do you see any mention of a request for

3  extended testing time?

4     A.   No.

5     Q.   The next one, if we go back to Cuffy 6,

6  which is the grouping of multiple counseling notes,

7  we're going to look at what's the first page on your

8  version, which is the December 13, 2015 notes.

9     A.   First page?

10     Q.   I believe so.

11     A.   What date?

12     Q.   If that's December 13th.

13     A.   Yes.

14     Q.   Okay.  And who -- did you prepare this

15  document?

16     A.   For some reason, I did not see where it

17  was locked [sic].  Maybe part of that was not --

18     Q.   If you turn one more page behind that, do

19  you have 146 at the bottom?  A page that says,

20  "146"?  It looks likes yours is out of order.

21     A.   Okay.  It's out of order.  Okay.  That's

22  it, yeah.

23     Q.   Okay.  So from that, can you tell who is

24  the author?

25     A.   I am the author, yes.

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 90

```
 1        Q.    And are these notes taken at or around the
 2   time of the counseling session with Mr. Awodiya?
 3        A.    Yes.
 4        Q.    Is this a document that's maintained by
 5   Ross in the normal course of it's business?
 6        A.    Yes, it is.
 7        Q.    And do you have any reason to believe that
 8   the document has been altered in any way?
 9        A.    No, I don't.
10        Q.    Do you see any mention of a request for an
11   accommodation in this document?
12        A.    No, I don't.
13        Q.    Do you see any mention of a request for
14   extended testing time in this document?
15        A.    No, I don't.
16        Q.    Next, in that same exhibit, if you turn to
17   the January 11th note, 2016.
18        A.    Yes.
19        Q.    And are you the author of this document?
20        A.    Yes, I am.
21        Q.    Are these notes taken at or around the
22   time of the counseling session with Mr. Awodiya?
23        A.    Yes, it is.
24        Q.    Is this a document that's maintained by
25   Ross in the normal course of it's business?
```

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

```
                                                        Page 91
 1        A.   Yes, it is.

 2        Q.   And do you have any reason to believe that

 3   this document has been altered in any way?

 4        A.   No, I don't.

 5        Q.   Do you see any mention in these notes of a

 6   request for an accommodation?

 7        A.   No, I don't.

 8        Q.   And do you see any mention of a request

 9   for extended testing time in these notes?

10        A.   No.

11             MR. ROMAN:  Okay.  All right.  Next I'd

12        like to mark as Exhibit 9 this document here.

13             (Thereupon, the referred-to document was

14             marked by the court reporter for

15             Identification as Defendant's Exhibit 9.)

16             THE WITNESS:  Thank you.

17             THE COURT REPORTER:  Uh-huh.

18   BY MR. ROMAN:

19        Q.   Once you've had an opportunity to review

20   it, if you could tell me what this document is.

21        A.   This is a referral form.

22        Q.   And who prepared this document?

23        A.   I prepared this document.

24        Q.   When is it dated?

25        A.   It's dated --
```

4e42ed13-6299-4742-80d7-435c57c10785

Page 92

1        Q.    If you look at your bottom line, where it

2    says, "Signed by McMillan Cuffy," does it --

3        A.    January -- signed, January 18th, 2016.

4        Q.    And would these notes have been taken at

5    or around the time that the referral was being made?

6        A.    Yes, it would be.

7        Q.    Is this a document that's maintained by

8    Ross in the normal course of it's business?

9        A.    Yes, it is.

10        Q.    And do you have any reason to believe it's

11    been altered in any way?

12        A.    No, I don't.

13        Q.    In this document, is there any mention of

14    a request for an accommodation?

15        A.    No, there isn't.

16        Q.    And is there any mention of a request for

17    extended testing time?

18        A.    No, there isn't.

19        Q.    Next I'd like to turn your attention back

20    to Exhibit 6, which is still in front of you, and

21    I'm looking at the January 18, 2016 notes.

22            And who prepared these notes?

23        A.    I was the one.

24        Q.    And were these notes taken at or around

25    the time of the counseling session with Mr. Awodiya?

Page 93

1        A.   Yes, it was.

2        Q.   Is this a document that's maintained by

3   Ross in the normal course of it's business?

4        A.   Yes, it is.

5        Q.   Do you have any reason to believe it was

6   altered in any way?

7        A.   No, I don't.

8        Q.   And in this document, do you see any

9   mention of a request for an accommodation?

10       A.   No, I don't.

11       Q.   Do you see any mention of a request for

12   extended testing time?

13       A.   No, I don't.

14       Q.   Next I'd like to turn your attention to

15   Exhibit 5.

16       A.   Yes.

17       Q.   And what is this document?

18       A.   This is a follow-up session.

19       Q.   And from what date?

20       A.   Dated on the 17th of February, 2016.

21       Q.   And who prepared this document?

22       A.   I was the one who prepared it.

23       Q.   Are these notes taken at or around the

24   time of the counseling session with Mr. Awodiya?

25       A.   Yes, it would be.

4e42ed13-6299-4742-80d7-435c57c10785

Case 0:18-cv-60482-RKA   Document 159-1   Entered on FLSD Docket 03/06/2019   Page 46 of
160
12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 94

1      Q.   And is this a document that's maintained

2   by Ross in the normal course of it's business?

3      A.   Yes.

4      Q.   Do you have any reason to believe that the

5   document has been altered in any way?

6      A.   No.

7      Q.   And in this document, do you see any

8   mention of a request for an accommodation?

9      A.   No, there isn't.

10      Q.   Do you see any mention of a request for

11   extended testing time?

12      A.   No, there isn't.

13      Q.   Okay.  You can put that one aside.

14           Next I'd like to draw your attention back

15   to Exhibit 6, but if you would turn to the final

16   page, which is the note dated March 11, 2016.

17      A.   Yes.

18      Q.   Do you see that?

19      A.   I have it.

20      Q.   Who's the author of that note?

21      A.   I am.

22      Q.   And are these notes taken at or around the

23   time of that counseling session?

24      A.   Yes, it would be.

25      Q.   Is this a document that's maintained by

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

```
                                                        Page 95
1    Ross in the normal course of business?

2         A.   Yes, it is.

3         Q.   Do you have any reason to believe it was

4    altered in any way?

5         A.   No, I don't.

6         Q.   Do you see any mention of a request for an

7    accommodation in these notes?

8         A.   No, there isn't.

9         Q.   And do you see any mention of request for

10   extend testing time in these notes?

11        A.   No, there isn't.

12             MR. ROMAN:  Okay.  Next I'd like to mark

13        as Exhibit 10 this document.

14             (Thereupon, the referred-to document was

15             marked by the court reporter for

16             Identification as Defendant's Exhibit 10.)

17             THE WITNESS:  Thank you.

18             THE COURT REPORTER:  Uh-huh.

19   BY MR. ROMAN:

20        Q.   And what is this document?

21        A.   This would be a follow-up note.

22        Q.   And what's the date of this document?

23        A.   24th of March, 2016.

24        Q.   And who is the author?

25        A.   I am.
```

4e42ed13-6299-4742-80d7-435c57c10785

Page 96

1          Q.    Are these notes taken at or around the

2     time of the counseling session with Mr. Awodiya?

3          A.    Yes, it would be.

4          Q.    And is this a document that's maintained

5     by Ross in the normal course of it's business?

6          A.    Yes, it is.

7          Q.    Do you have any reason to believe that

8     it's been altered in any way?

9          A.    No.

10         Q.    And in these notes, do you see any mention

11    of a request for an accommodation?

12         A.    No, there isn't.

13         Q.    And do you see any mention of a request

14    for extended testing time?

15         A.    No, there isn't.

16              MR. ROMAN:   Okay.   Next I'd like to mark

17         as Exhibit 11 this document.

18              (Thereupon, the referred-to document was

19              marked by the court reporter for

20              Identification as Defendant's Exhibit 11.)

21              THE WITNESS:   Thank you.

22    BY MR. ROMAN:

23         Q.    Take a moment to review, and let me know

24    what that document is.

25         A.    Okay.

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

```
                                                    Page 97

  1        Q.    What is that document?

  2        A.    It's a follow-up.

  3        Q.    Did you prepare it?

  4        A.    Yes, I did.

  5        Q.    And when is it dated?

  6        A.    11th of April, 2016.

  7        Q.    And are these notes taken at or around the

  8   time of that counseling session?

  9        A.    Yes, it would be.

 10        Q.    Is this a document that's maintained by

 11   Ross in the normal course of business?

 12        A.    Yes, it is.

 13        Q.    And do you have any reason to believe it's

 14   been altered?

 15        A.    No.

 16        Q.    Do you see any mention of a request for an

 17   accommodation?

 18        A.    No, there isn't.

 19        Q.    Do you see any mention of a request for

 20   extended testing time?

 21        A.    No, there isn't.

 22             MR. ROMAN:  Okay.  We'll mark as Exhibit

 23        12 the next set of notes.

 24

 25
```

4e42ed13-6299-4742-80d7-435c57c10785

Page 98

```
 1            (Thereupon, the referred-to document was
 2            marked by the court reporter for
 3            Identification as Defendant's Exhibit 12.)
 4            THE WITNESS:  Thank you.
 5   BY MR. ROMAN:
 6        Q.   What is this document?
 7        A.   This is a follow-up.
 8        Q.   Did you prepare it?
 9        A.   Yes, I did.
10        Q.   And when is it dated?
11        A.   20th of April, 2016.
12        Q.   Is this the last time you saw Mr. Awodiya?
13        A.   Yes.  Yes.  Yes, it would be.
14        Q.   And are these notes taken at or around the
15   time of that counseling session?
16        A.   Yes.
17        Q.   Is this a document that's maintained by
18   Ross in the normal course of business?
19        A.   Yes, it is.
20        Q.   Do you have any reason to believe it's
21   been altered?
22        A.   No.
23        Q.   And in this -- these notes, do you see any
24   mention of a request for an accommodation?
25        A.   No, there isn't.
```

4e42ed13-6299-4742-80d7-435c57c10785

Page 99

1      Q.   Do you see any mention of a request for

2   extended testing time?

3      A.   No.

4           MR. ROMAN:   Okay.  And finally I'll mark

5      as Exhibit 13 this document.

6           (Thereupon, the referred-to document was

7           marked by the court reporter for

8           Identification as Defendant's Exhibit 13.)

9           THE WITNESS:   Thank you.

10          THE COURT REPORTER:   You're welcome.

11   BY MR. ROMAN:

12      Q.   I'll just ask you, what is this document?

13      A.   So this is a termination of services.  So

14   that would be the note to terminate counseling.

15      Q.   And this is -- is this a standard document

16   you prepare at the end of a relationship with a

17   client?

18      A.   Yes, it is.

19      Q.   And who prepared this document?

20      A.   I did.

21      Q.   And when is it dated?

22      A.   5th of May, 2016.

23      Q.   And would you have prepared these notes at

24   or around the time that you were preparing the

25   termination of the file?

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

                                                          Page 100

 1        A.   Yes, it would be.

 2        Q.   And is this a document that is maintained

 3   by Ross in the normal course of business?

 4        A.   Yes, it is.

 5        Q.   Do you have any reason to believe it's

 6   been altered in any way?

 7        A.   No, I don't.

 8        Q.   And in this document, do you see any

 9   mention of a request for an accommodation?

10        A.   No, there isn't.

11        Q.   Do you see any mention of a request for

12   extended testing time?

13        A.   No, there isn't.

14        Q.   I just have two other documents I want to

15   ask you questions about.  The first one we'll mark

16   as Exhibit 14.  It's labeled "Safety Plan."

17             (Thereupon, the referred-to document was

18             marked by the court reporter for

19             Identification as Defendant's Exhibit 14.)

20   BY MR. ROMAN:

21        Q.   Just take a moment, if you could, to look

22   at it.

23        A.   Yeah.

24        Q.   What is a safety plan?

25        A.   A safety plan is that document that we

4e42ed13-6299-4742-80d7-435c57c10785

Page 101

1    would have the client sign if we -- when we felt

2    that there -- the client posed a risk to himself or

3    herself.

4         Q.    What is the date of this safety plan?

5         A.    This is dated on the 8th of December,

6    2015.

7         Q.    And it is -- who signed this document?

8         A.    I was the one.  Myself and the plaintiff.

9         Q.    Okay.  And that's your signature?

10        A.    The one below is my signature.

11        Q.    Okay.  What was going on at the time that

12   this was signed?

13        A.    So this was my first contact with the

14   client.  It was a crisis intervention.  And at that

15   point, the plaintiff -- the -- yeah, the plaintiff

16   reported that he had thoughts of self-harm.  And as

17   standard procedure, we would engage in -- the client

18   in a safety plan, as part of our protocol, to make

19   sure that they -- to try our best to, you know, keep

20   the person safe.

21        Q.    Had there been any ADHD diagnosis of

22   Mr. Awodiya at the time of this document?

23        A.    No, there wasn't.

24        Q.    Had there been any request for

25   accommodations at this time?

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

```
                                                    Page 102
 1        A.    No, there wasn't.
 2        Q.    Had there been any request for extended
 3    testing time at this time?
 4        A.    No, there wasn't.
 5        Q.    And was this related to the thoughts of
 6    self-harm that you've discussed earlier?
 7        A.    This document?
 8        Q.    Yes.
 9        A.    Yes.
10        Q.    All right.  We can put that aside.
11              And the last document I'll show you we'll
12    mark as Exhibit 15.
13              (Thereupon, the referred-to document was
14              marked by the court reporter for
15              Identification as Defendant's Exhibit 15.)
16              THE WITNESS:  Thank you.
17    BY MR. ROMAN:
18        Q.    And what is this document?
19        A.    This is a release of information that
20    gives us consent to release confidential
21    information.
22        Q.    And what is the date of this document?
23        A.    It's dated the 9th of December, 2015.
24        Q.    And who signed this document?
25        A.    I signed it, and also, the plaintiff.
```

4e42ed13-6299-4742-80d7-435c57c10785

Case 0:18-cv-60482-RKA   Document 159-1   Entered on FLSD Docket 03/06/2019   Page 55 of
160
12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 103

1          Q.    And is that your signature at the bottom?

2          A.    Yes, it is.

3          Q.    What was going on at the time this form

4     was signed?

5          A.    So the -- the plaintiff having expressed

6     thoughts of self-harm, and having had signed that

7     safety plan, again, per our standard procedure,

8     would be to have the -- or request that the client

9     signs a release of information.  And it's a request.

10    They don't have to.  But what that does, as you see,

11    if you were to look at the third bullet point, "I

12    authorize the release of information to:  Ross

13    administration."  So the plaintiff here has now

14    given me authority to speak to Ross administration

15    and discuss confidential information.  So,

16    basically, that's what that form is.

17               THE COURT REPORTER:  I'm sorry?

18               THE WITNESS:  Basically that's what that

19         form is.

20               Sorry.

21    BY MR. ROMAN:

22         Q.    If you look to the section beneath the one

23    you just read from, where it says, "This information

24    is released for the following purposes" --

25         A.    Yes.

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 104

1         Q.    And you'll see that there are two boxes

2    checked.

3         A.    Yes.

4         Q.    The second box says, "To provide

5    information relevant to academic accommodations

6    and/or medical leave of absence."

7              Do you see that?

8         A.    Yes, I do.

9         Q.    Was there a request for academic

10   accommodations at that time?

11        A.    No, there wasn't.

12        Q.    Was there discussion of any early leave

13   from the island?

14        A.    Yes, there was.

15        Q.    Do you know what this release of

16   information consent form was to be used for?

17        A.    That form specifically was to discuss with

18   Mr. Didier about the ticket -- purchasing the

19   ticket, because there was the conversation about him

20   leaving the island -- the plaintiff leaving the

21   island before his original date, the 19th, I think

22   it was, of December, and that documentation --

23   that -- that document would give us the authority to

24   speak to administration about anything relating to

25   the case at the time.

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 105

 1        Q.   So if Mr. Didier was to ask you, why are

 2     we getting this student a ticket, you couldn't tell

 3     him why if this wasn't signed?

 4        A.   No, I couldn't.

 5        Q.   Okay.  So this give you permission?

 6        A.   That gives me permission to divulge

 7     confidential client information.

 8        Q.   Had there been any ADHD diagnosis at the

 9     time this document was signed?

10        A.   No, there wasn't.

11        Q.   Had there been any request for

12     accommodations at this time?

13        A.   No, there wasn't.

14        Q.   Had there been any request for extended

15     testing time at the time of this document?

16        A.   No, there wasn't.

17             MR. ROMAN:  I don't have any further

18        questions for you at this time.

19             THE WITNESS:  Thank you very much.

20                   REDIRECT EXAMINATION

21     BY MR. AWODIYA:

22        Q.   Mr. Cuffy?

23        A.   Yes, sir.

24        Q.   Was the semester over when you signed this

25     form?

4e42ed13-6299-4742-80d7-435c57c10785

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.   McMillan Cuffy

Page 113

 1    That's what you wrote.

 2         Q.   So that's what he wanted?

 3         A.   That's what he wrote.

 4         Q.   Earlier you said that you would have

 5    informed plaintiff of accommodation options, but do

 6    you recall doing that?

 7         A.   So I can only speak on my standard

 8    practice of how we do things, okay?

 9              So the protocol is that, if a student is

10    diagnosed with ADHD, in that conversation, the

11    protocol would be the referral to the psychiatrist,

12    patient education re: their options, okay, which is

13    medication.  You have the option of getting academic

14    accommodations.  So this conversation would take

15    place somewhere around that time once the diagnosis

16    is made.

17              THE COURT REPORTER:  I'm sorry?

18              THE WITNESS:  Once the diagnosis is made,

19         that conversation would happen.

20    BY MR. AWODIYA:

21         Q.   Mr. Cuffy, I don't want you to speculate.

22    I don't want you to tell me what you would typically

23    do.  I want to tell me if you recall doing what you

24    said.

25         A.   I do not recall.

4e42ed13-6299-4742-80d7-435c57c10785

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 0:18-cv-60482-KMM


OLUWAMUYIWA AWODIYA,

                Plaintiff,

vs.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

                Defendant.
_____/


350 E. Las Olas Blvd.
Fort Lauderdale, Florida
October 16, 2018
12:59 p.m.


_____
THE DEPOSITION OF

DAVENDRANAND SHARMA


_____

Taken on Behalf of the Plaintiff

Pursuant to Notice of Taking Deposition

Commencing at 12:59 p.m.

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 7

1      A.   I think it was an e-mail that came around

2   April 2016 from Ross University's attorneys office

3   saying that you --

4           MR. ROMAN:  Hold on one second.  I'm just

5        going to object to the extent that your

6        testimony would call for any disclosure of

7        attorney/client communication.  Any

8        communication you had with an attorney for

9        Ross, I'll object on the basis of privilege,

10       and I'll instruct you not to answer those

11       questions.  You can testify about when you

12       talked to certain people, who you talked to,

13       but not the substance of communications with

14       lawyers.

15          THE WITNESS:  Sure.  I understand.

16          So April 2016.

17   BY MR. AWODIYA:

18      Q.   How long have you been working for Ross

19   University?

20      A.   From 1993.

21      Q.   And what is your job position at Ross

22   University?

23      A.   I'm a professor of behavior sciences and

24   consultant psychiatrist for health services.

25      Q.   I'm going to show you this document marked

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

Page 8

1    Exhibit DE-01.

2              (Thereupon, the referred-to document was

3              marked by the court reporter for

4              Identification as Plaintiff's Exhibit

5              DE-01.)

6    BY MR. AWODIYA:

7         Q.   Can you confirm that this is your

8    counseling note for plaintiff dated December 14th,

9    2015?

10        A.   Yes.

11        Q.   In this counseling note, you put "Academic

12   or educational problem" next to "Summary of note;"

13   is that correct?

14        A.   Yes.

15        Q.   In the same counseling note, you also

16   wrote that you started screening plaintiff for ADHD;

17   is that also correct?

18             It should be under "Plan."

19        A.   Yes.

20        Q.   Did you screen plaintiff for ADHD because

21   he informed you that he needed extended testing time

22   for his exams?

23        A.   No.

24        Q.   Then why did you screen plaintiff for

25   ADHD?

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 12

1        A.   Yes, I see it.

2        Q.   Under that it says, "The patient reports

3    the following concerns related to his

4    attention/concentration."

5             Now, under here are numerous ways that the

6    doctor has noted plaintiff's symptoms.

7             Do you -- is that a correct statement?

8        A.   Yes.

9        Q.   This document also says, "Constantly has

10   difficulty sustaining attention to task at work or

11   in school."  It says, "Constantly has difficulty

12   with tasks requiring persistence or organization.

13   Constantly distracted by noise or activity.

14   Constantly forgetful in daily activities, for

15   example, difficulty remembering appointments or

16   obligations."

17             Did you notice any of these symptoms in

18   plaintiff?

19        A.   When?  When I first saw you?

20        Q.   In any of your counseling sessions.

21        A.   Yes.

22        Q.   So would you agree that you observed that

23   plaintiff's ADHD affected his ability to perform

24   well on his exams?

25        A.   Well, remember, we didn't diagnosis you

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

Page 13

1    with ADHD in December.  So what I saw was evidence

2    of ADHD that required, you know, testing and

3    confirmation.

4         Q.   And what was that evidence?

5         A.   The symptoms you just went through, this

6    list that is there.

7         Q.   Okay.  So just to be clear, you noticed

8    that plaintiff was experiencing these symptoms on

9    page 3 of Exhibit DE-02?

10        A.   Yes.  The symptoms you listed.

11        Q.   The symptoms --

12        A.   From "The patient reported following

13   concerns" to "difficulty remembering appointment or

14   obligations."

15             MR. ROMAN:  I'll just object, because I'm

16        not sure it's clear what time frame we're

17        talking about at this point.

18   BY MR. AWODIYA:

19        Q.   When did you notice these symptoms?

20        A.   I think from the first time I saw the

21   plaintiff, though, it wasn't for primarily academic

22   problems.

23        Q.   Was this December 2015?

24        A.   December 2015.

25             Are we finished with this one?

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018       Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.       Davendranand Sharma

Page 14

1       Q.   One more question on that document.

2            If you noticed those symptoms, why are

3    they not listed in your counseling records?

4       A.   In which counseling records?

5       Q.   The counseling records that Ross produced,

6    it didn't mention anything of what you witnessed.

7    It just kind of -- it makes it seem -- in my

8    opinion, it makes it seem as if you -- the school

9    arrived to ADHD randomly or the diagnosis was just a

10   diagnosis.  There was no investigation into it.

11           From your -- from -- from your -- from

12   Exhibit DE-01 --

13      A.   Wait.  Wait.  Sorry.  It's confusing.

14   It's like three questions going.  You're saying --

15   remind me of the first question.  You say, why was

16   it not -- let me clarify.

17           Why was it not picked up in your initial

18   meeting or at some point we did not report it as a

19   problem?

20      Q.   Let me rephrase.

21      A.   Okay.

22      Q.   If you noticed that plaintiff was

23   experiencing these symptoms --

24      A.   Uh-huh.

25      Q.   -- when you first met him in

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 15

1    December 2015, why are they not listed inside of

2    your counseling notes --

3         A.   I gotcha.

4         Q.   -- in December 2015?

5         A.   So I don't know, because I have to look at

6    those notes.  Are you talking about this set or all

7    the notes?

8              Okay.  If we're talking about this set,

9    then it actually has assessment of academic

10   problems.  That was not the primary problem that the

11   person -- that the plaintiff was referred to me for.

12   That was not the primary problem I was supposed to

13   deal with.  And the person had already been seen by

14   the counselors.  I wasn't the primary person.  I was

15   the specialist to help the plaintiff with depressive

16   issues related to his break up -- romantic break up.

17        Q.   I understand.

18        A.   With concerns about other problems, like

19   self-harm, and so on.  So that was my primary duty,

20   to help the plaintiff with those problems.  In the

21   meeting with the plaintiff, I recognized there were

22   other problems --

23        Q.   Thank you.

24        A.   -- with academics.

25        Q.   Thank you.

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 18

1          Why is it summarized as attention deficit

2     disorder without mention of hyperactivity, and then,

3     mentions his mini?

4          A.    So the summary means that you have now

5     carried a new diagnosis or a diagnosis of attention

6     deficit that's been confirmed.  "Did not feel right

7     for the last mini" would be probably what you were

8     saying in your words.  So you would more know what

9     you meant by that, you know.  If you asked for my

10    interpretation, it could be many things, like you

11    were not feeling well prepared, you didn't study

12    enough, you know.  So it's just speculation.  But

13    those would be what you said, "did not feel right."

14         Q.    Okay.  Please see Exhibit DE-04.

15               (Thereupon, the referred-to document was

16               marked by the court reporter for

17               Identification as Plaintiff's Exhibit

18               DE-04.)

19    BY MR. AWODIYA:

20         Q.    Is this your counseling note for

21    plaintiff?

22         A.    Yes.

23         Q.    And what's the date on this document?

24         A.    11th of March, 2016.

25         Q.    Did plaintiff tell you that he was running

Page 19

1    out of time to complete his exams in the time

2    allowed?

3         A.   It says, "Despite running out of time

4    passed his exams."

5              So that would be, most likely, a notation

6    to what you said, that you ran out of time, but you

7    passed.

8         Q.   On this day, did plaintiff -- did

9    plaintiff ask for extended testing time?

10        A.   Nothing recorded here about asking for

11   extra time.

12        Q.   Do you recall?

13        A.   No.

14        Q.   On the same counseling note, you put

15   "Anxiety State, Unspecified," and you prescribed

16   more Ritalin; is that correct?

17        A.   Correct.

18        Q.   Okay.  So this document states that

19   plaintiff was running out of time and you added a

20   new diagnosis to your notes?

21        A.   Uh-huh.

22        Q.   And gave him more Ritalin?

23        A.   Uh-huh.

24        Q.   On that date, did you believe that both

25   plaintiff's ADHD and anxiety significantly limited

15eb13da-d2c1-4023-bda4-c358c06300a6

Case 0:18-cv-60482-RKA  Document 159-1  Entered on FLSD Docket 03/06/2019  Page 68 of
160
10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 20

1    his ability to complete his exams in the time

2    allowed?

3         A.   From this note, I can't say that.  What

4    the note is pointing to is that you had a

5    diagnosis -- the plaintiff had a diagnosis of ADHD,

6    was started on stimulant meds in February, is coming

7    for a follow-up, and is continuing with his

8    stimulant meds along with the Wellbutrin.  It

9    doesn't have anything about the plaintiff asking for

10   extra time.

11        Q.   Considering all of your counseling notes

12   and the symptoms you observed of plaintiff's

13   attention and concentration, did you believe that

14   his ADHD and anxiety significantly limited his

15   ability to complete his exams in the time allowed?

16        A.   I would agree ADHD in itself can affect

17   academic performance, and it's recorded here that

18   you were running out of time.

19        Q.   Do you believe that plaintiff's ADHD,

20   specific to him, was significantly limiting his

21   ability to complete his exams in the time allowed?

22        A.   Yes.

23        Q.   Did you also believe that he needed

24   extended testing time?

25        A.   I wouldn't be able to interpret that.  I

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 21

1    believe that everybody is entitled to extra time,

2    according to the regulations of the school, that has

3    the diagnosis of ADHD.  It's a disability that

4    allows students apply to the Office of

5    Accommodations for extra time.  It's in the

6    student's handbook.

7         Q.   So based on the school's policy and

8    plaintiff's counseling sessions with you, you

9    believed that he needed extended testing time?

10             MR. ROMAN:  I'll just object.  I believe

11        that misstates the prior testimony.

12             THE WITNESS:  Sorry?

13             MR. ROMAN:  I just objected for the

14        record, because I thought it misstated the

15        prior testimony.

16             You can answer, if you understand the

17        question.

18   BY MR. AWODIYA:

19        Q.   Let me rephrase.

20        A.   That's okay.  Because -- repeat what you

21   said there.  Sorry.

22        Q.   Based on your counseling sessions with the

23   plaintiff, and based on the school policies, do you

24   believe that plaintiff needed extended testing time?

25        A.   The thing is, it's not my belief that I

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 22

1    can talk to.  I can only treat the plaintiff and get

2    him better with his ADHD.  The need for extra time

3    is not my determination.  It is available, according

4    to the regulations of the university.  It is the

5    student, who has the diagnosis, who needs to request

6    it, if he thinks that he needs extra time, because

7    not every student with a diagnosis of ADHD requests

8    extra time.  So we can only advise a student that

9    accommodations are available, if they reach to the

10   accommodation office and request it.  You

11   understand?

12           It's not for me to tell the student, who

13   has ADHD, that they must, because they need it, they

14   should go.  You understand?

15           It is my duty to let the student know that

16   there is regulations that provide extra time if they

17   request it.

18       Q.   So let me ask you this.

19       A.   Uh-huh.

20       Q.   Is it correct that you're trying to say

21   that the school would act independently in relation

22   to your own belief of the student's need?

23       A.    No, it's not my belief of the student's

24   need for extra time, you know.  It's the student's

25   need for, one, treatment, and need -- the student

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 23

1    has to need the extra time.  It is not for me to

2    know that they would need it, because many students

3    do not ask for extra time for one reason or the

4    other.

5        Q.   What language do you think -- let me

6    rephrase.

7             You were informed that plaintiff was

8    running out of time on his exams, correct?

9        A.   Yes.  It's there.

10       Q.   And you also noticed that -- that his

11   ADHD -- let me rephrase.

12            Connect the symptoms you saw plaintiff

13   experiencing with his ADHD with him running out of

14   time, because to me it seems like that is the

15   plaintiff informing --

16       A.   Okay.  Let me -- they're all connected.

17   Symptoms lead to diagnosis of ADHD.  ADHD has with

18   it problems in managing time.  That is why ADHD is

19   afforded extra time by the Office of Accommodations,

20   which considers it a disability, all right,

21   according to the American Disability Act.

22            It's a condition, which we support

23   students, who have ADHD, for extra time.

24            Does that help you?

25            So we have no problem with a student

Page 25

1              Did plaintiff tell you that Matthew

2     Stewart-Fulton denied plaintiff's request for

3     accommodation?

4         A.    I don't recall that.

5         Q.    Do you know why plaintiff never received

6     test accommodations from Ross University?

7         A.    Our counseling center record that I have

8     in my documentation, in my notation, doesn't show

9     that the plaintiff applied for accommodation.

10        Q.    So outside of the documents, you don't

11    remember any conversations with plaintiff?

12        A.    I remember a conversation recently about

13    the deposition here.  Prior to that, I believe there

14    was a conversation about getting the documentation

15    you wanted from the -- our counseling center, and we

16    directed you to Shannon Evans in Knoxville.

17        Q.    In Dominica you don't remember any of the

18    conversations you had with plaintiff?

19        A.    Like what?

20              I mean -- about applying for

21    accommodation?

22              Are you saying I don't remember any of the

23    conversations?

24        Q.    Well, because a couple of times you said,

25    it's not in the document, it's not in the counseling

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.      Davendranand Sharma

Page 26

1    record, and therefore, you can't recall.

2            Do you recall any information that was not

3    in the documents?

4        A.   I recall a lot of -- your history, your

5    medical history, your concerns about your emotions,

6    your relationship difficulties, your problems with

7    passing the exams.  I recall a lot of those.  But

8    specific words or conversations, I don't.  I

9    certainly don't remember you specifically saying you

10   applied for accommodation.

11       Q.   Okay.  Let's go to the relationship thing.

12            Is it correct that you believe plaintiff's

13   relationship problems caused him anxiety?

14       A.   Yes.

15       Q.   Do you believe that that anxiety -- at

16   that time, in Dominica, did you believe that his

17   anxiety was also affecting his exams in addition to

18   the ADHD?

19       A.   Yes.

20       Q.   Do you think that his anxiety contributed

21   to him running out of time on his exams in Dominica?

22       A.   It could.  It's just speculation, because

23   it's one of the factors that can affect academic

24   performance.  Sure, it could have affected

25   performance.

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 28

1    don't give it from the clinic, from the counseling

2    services.

3        Q.    But you would give information to --

4        A.    Yes.  We pass the records.

5        Q.    And so, how would you help these students?

6              Would you recommend, based on their

7    documentation and the symptoms you observed, that

8    they get testing accommodations?

9        A.    Part of the counseling intake and the

10   screening for ADHD is every student is advised that

11   accommodation is available and that they have to

12   apply for it if they want it.  We don't encourage.

13   We don't force.  We just say to the students, "It's

14   your option.  It's available."

15             Not every student wants it.  Some -- not

16   every student would want accommodation despite

17   having the diagnosis of ADHD, which can give them

18   the accommodations.

19       Q.    If a student wanted accommodations, and

20   you passed along the information to Ross University

21   administration, would you recommend in those

22   situations that they get academic accommodations?

23       A.    Absolutely, yes.

24       Q.    So if a student came to you and said he

25   was running out of time, do you think that -- if the

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 29

1    student told the academic -- if the student told the

2    accommodation coordinator he was running out of time

3    on his exams, would that constitute informing him

4    the need of more time on his exams?

5          A.   If the student told the accommodations

6    office.

7          Q.   Yes.  The point I'm trying to express here

8    is that students don't necessarily know the specific

9    language, according to the ADA or to the

10   Rehabilitation Act, what constitutes a request.

11   They simply may say that they need help some way,

12   that I'm running out of time on exams, I'm not

13   completing exams.

14         A.   Uh-huh.  I understand.

15         Q.   Does a student need to expressly request

16   and say "accommodations" in order to get

17   accommodations?

18         A.   Yes, they have to.  It's always done by

19   the counseling service part of our process when we

20   make the diagnosis of ADHD.  It's called "standards

21   practice" or "best practices."

22              Every person who is diagnosed with ADHD is

23   guided to the student handbook that there is

24   accommodations available.  The process is very

25   straightforward.  They need to go to the

15eb13da-d2c1-4023-bda4-c358c06300a6

Case 0:18-cv-60482-RKA   Document 159-1   Entered on FLSD Docket 03/06/2019   Page 76 of
160
10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 30

1    accommodations office, and then, that -- what

2    happens then is, they're interviewed by the

3    accommodations officer.  That is not for us.  He

4    does it -- he or she does an interview of the

5    student.  And if he's satisfied that there's

6    evidence of a disability, the student shows him the

7    fact that they have a diagnosis of ADHD, the student

8    then makes the accommodation request on the form

9    that the accommodations office has, and the student

10   would ask us to submit his or her records to --

11   that's the process.

12        Q.   So once they ask you to submit their

13   documents --

14        A.   Yes.

15        Q.   -- to --

16        A.   The accommodations office.

17        Q.   That is when the obligation is triggered?

18        A.   Yes.  That's when we can only release the

19   student's records; only after that process is

20   completed, the process which I just outlined, where

21   the student is the one that must make the request.

22        Q.   Please see Exhibit DE-05.

23             (Thereupon, the referred-to document was

24             marked by the court reporter for

25             Identification as Plaintiff's Exhibit

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

Page 31

1          DE-05.)

2     BY MR. AWODIYA:

3          Q.   Is this the document you were talking

4     about?

5          A.   This is the document about release of

6     information.  The document about requesting

7     accommodations is not this document.  This Exhibit,

8     DE-05, is not the request for accommodation.

9          Q.   But this is the document for the

10    counseling center to send the information?

11         A.   That's correct.

12         Q.   Okay.  Did you send any of plaintiff's

13    information to Ross University's administrators?

14         A.   Not me.  I didn't send anything.

15         Q.   Do you know if anyone else did?

16         A.   I wouldn't know for sure, but I believe a

17    request was made for the release of your

18    accommodation [sic], but this was not in that time.

19    This was more recently when the plaintiff had left

20    the university and returned to the U.S. for the

21    comprehensive shelf.

22         Q.   Is it correct that the document for the

23    release --

24         A.   Uh-huh.

25         Q.   -- to Ross University administration was

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 32

1    agreed upon in December 2015?

2        A.   No.   There's no evidence that there was a

3    document requesting accommodation.

4        Q.   Not requesting accommodation.

5             Requesting that the counseling center send

6    the documentation --

7        A.   No, there is no -- there's no evidence of

8    a request for sending a record.

9        Q.   -- in December 2015.

10       A.   There's a request for sending information

11   about the plaintiff's return to the U.S. for

12   emotional support in December 2015.   We received --

13   in December 2015, as far as my records show, my

14   recollection, there's no request for release for

15   accommodations.   You understand?

16       Q.   Can you please read on that form what it

17   says under "This information is released for the

18   following purpose"?

19       A.    "To facilitate treatment planning" and "to

20   provide information relevant to accommodations or

21   medical leave of absence."

22       Q.   Under that --

23       A.   And then, there is "Other" not ticked.

24            So the boxes are ticked for "facilitate

25   treatment planning" and "to provide information

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Davendranand Sharma

Page 33

1    relevant to accommodation academic accommodation

2    and/or medical leave of absence."

3         Q.   Under that, what is the next box checked?

4         A.   "I authorize ongoing communication unless

5    I revoke this consent."

6         Q.   Did you not feel that there was an ongoing

7    obligation?

8         A.   For?

9         Q.   The purpose of this document for academic

10   accommodations -- for information relevant to

11   academic accommodations?

12        A.   No.  I said it just now.  No.  This

13   document was done in the context of the plaintiff

14   needing to return to the USA early, because the

15   plaintiff had emotional crisis and there were

16   concerns about the patient's safety.  So the

17   counseling service, including myself, and the

18   university administrator supported the plaintiff

19   returning early, and that involved changing the

20   plaintiff's return ticket which the plaintiff

21   couldn't afford at this time.

22             So I wrote to the university's

23   administrative director asking them to support the

24   student, to return him early, because the

25   plaintiff's mother was very worried about the

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 34

1    plaintiff.

2              So this document was signed for that

3    purpose, so we can give information about the

4    plaintiff's emotional health and request an early

5    return.  This document was not for releasing

6    information about accommodation, because there was

7    no request for accommodations from me in

8    December 2015.

9              To make it more clear, there was no

10   diagnosis at that time.  It was just at the start of

11   preliminary testing, screening for ADHD.  So there

12   was no way documents could have been sent to support

13   accommodations for ADHD, because the diagnosis was

14   not made.  It makes no sense.

15        Q.   So when the diagnosis was made and

16   plaintiff did not revoke his consent, would that not

17   be considered ongoing?

18        A.   Ongoing to what?

19        Q.   Well, you said the documents didn't exist

20   at that time.

21        A.   The diagnosis didn't exist.

22        Q.   But the diagnosis existed after the winter

23   break?

24        A.   Yes.  Yes.

25        Q.   Why weren't those records sent?

Page 35

1      A.   Because, as I said, we do not release

2   information unless we request -- we receive a

3   request either from the student, who has the

4   diagnosis, and that has to be in writing, not a

5   verbal request, or it has to come from the

6   accommodations office in writing under a protected

7   e-mail that the -- that they are going through the

8   process of supporting a request for accommodation.

9   There was no request made for accommodations.  So

10   that's why I said, there's no request.  We cannot

11   give out information to the accommodations office.

12   Then we would be sued for giving information beyond

13   the scope.  The scope of this document was only to

14   get the plaintiff back home early.

15      Q.   Give me one second.  I had something and

16   it's coming back to me.

17      A.   Take your time.

18      Q.   Oh.  You said that a request has to be in

19   writing?

20      A.   Yes.

21      Q.   What if it's oral?

22      A.   No.

23      Q.   It doesn't count?

24      A.   It doesn't count to the accommodations

25   office, as far as I know, and that's their -- that's

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 36

1    their portfolio.  I can only say, from my

2    experience, a verbal request is not a request for

3    accommodations.

4         Q.    Would you say that when the diagnosis was

5    made --

6         A.    Uh-huh.

7         Q.    -- and after you observed all the

8    symptoms, that Ross University had possession of all

9    the necessary documents of plaintiff's ADHD and the

10   symptoms of his ADHD?

11        A.    Yeah, we had -- we had made a diagnosis.

12   The diagnosis was done, and we accepted, and the

13   student was -- the plaintiff was being treated.

14        Q.    Earlier you said that students with less

15   documentation have received -- you said earlier

16   students with less documentation of ADHD have

17   received accommodation action compared to plaintiff.

18        A.    Uh-huh.

19        Q.    Do you think that is fair?

20             MR. ROMAN:  I'll just object as to vague

21        as to what "fair" means.

22   BY MR. AWODIYA:

23        Q.    Let me rephrase.

24             Do you think that plaintiff was treated

25   equally?

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 38

1          A.    No.  I go back to that question, and I

2    hope you can understand.  I cannot determine whether

3    you need or the plaintiff needs.  The plaintiff has

4    to determine that.  Many students do not ask for

5    accommodation with the diagnosis.

6          Q.    So why did you prescribe him Ritalin?

7          A.    Because that's my duty, to treat the

8    condition.  So I'll give you an example.  A student

9    may have the diagnosis, is on treatment, the

10   performance is much better, the student chooses not

11   to apply for accommodation.

12         Q.    So if the student --

13         A.    Which was the plaintiff's case.

14         Q.    In plaintiff's case?

15         A.    Medication helped the plaintiff to perform

16   better, do well on the exams.  So the question about

17   if I if felt there was a need for extra time does

18   not arise.  It does not arise, because it is not me

19   that can say the plaintiff needs the extra time.

20   It's the plaintiff, especially after receiving

21   treatment, that determines I would also like to get

22   extra time.

23         Q.    Did you feel -- at that time, in Dominica,

24   is it correct to say that you believed that his ADHD

25   significantly limited his ability to complete exams

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 39

 1   on time and that's why you prescribed the Ritalin?

 2        A.   That's a very long question.  Do you mind

 3   going back over it, because I'm not sure which one

 4   I'm answering to?

 5        Q.   No problem.  Let me rephrase it.

 6             Did you prescribe the Ritalin to plaintiff

 7   because his ADHD significantly limited his ability

 8   to complete his exams on time?

 9        A.   So I -- let me answer -- it's two

10   questions in one.  Maybe you could split it up.

11             So did I prescribe the treatment for the

12   ADHD?  Yes.  I treat ADHD with stimulant medication

13   primarily.

14             The second part of the question, did I

15   prescribe the stimulant because the student needed

16   extra time?  That is part of the problem that ADHD

17   has, that it causes the student to take longer.  So

18   the medication would help that.  So, yes, that's

19   correct.

20             And by helping the student to be better,

21   the need for extra time is often curtailed.

22        Q.   So are you trying to say that because of

23   medication it takes the question of required

24   extended testing time out of the equation?

25             Let me rephrase.

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 42

1   would lead to this -- what did you call it, the

2   process?

3        Q.   The inquiry.

4        A.   The inquiry, yeah.

5        Q.   Let me rephrase.

6        A.   The only thing I know leads to

7   accommodation is the student has to apply for it.

8        Q.   I just want to clarify something.  Are you

9   saying that the student informing the school of the

10  need for accommodations is different than requesting

11  an accommodation?

12       A.   They're both the same thing.  So the

13  request or the informing the school has to be

14  specifically to the accommodations officer and has

15  to be done in writing.

16       Q.   So only him can be informed of the need?

17       A.   Only the student can make the request for

18  accommodation to the accommodations office.

19       Q.   So if the student requested accommodations

20  from other faculty, he's liable for not getting

21  accommodations?

22            MR. ROMAN:  I'll just object to two

23       things.  One, I think it calls for a legal

24       conclusion, in terms of some of the language,

25       and also, it's been asked and answered.

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.      Davendranand Sharma

Page 43

BY MR. AWODIYA:

2       Q.    Let me rephrase.

3             If plaintiff informed the dean --

4       A.    Uh-huh.

5       Q.    -- that he needed accommodations for his

6  ADHD, would that be enough?

7       A.    Enough to get accommodations?

8       Q.    To put the school on notice.

9       A.    On notice for?

10       Q.    That he need an accommodation.

11       A.    It's not enough.  The student can inform

12  anybody.  Nobody can apply for accommodation.  Not

13  the student's mother, the student's father, not the

14  student's psychiatrist, the student's counselor.

15  Nobody can apply for accommodations.  Only the

16  student, and it has to be done in writing.  It has

17  to be done through a process where they go and get

18  interviewed by the accommodations officer.  The

19  officer will now be satisfied that they have a

20  proper diagnosis made.  Then start the process.

21  Nobody else, mother, faculty, the dean, the

22  president of the USA.  You know, it's

23  confidentiality.

24       Q.    Is it still confidential if you told the

25  dean himself or if --

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 44

1      A.    If the student told the dean, that's his

2   prerogative.

3      Q.    So then, it wouldn't be confidential?

4      A.    The dean cannot ask for the accommodation

5   on the student's behalf.

6      Q.    The dean is not part of the counseling

7   center.

8      A.    It doesn't matter.  Nobody.  Nobody can

9   ask for the accommodation.  Only the student.

10      Q.    So if the student tells the dean, he can't

11   tell anyone else?

12      A.    No.  Unless the student gives him

13   permission in writing.

14      Q.    Is that why you didn't inform the

15   accommodations coordinator that he might need

16   accommodations?

17      A.    We've been over that.  I cannot do that.

18   It's not me to say the student needs it.  The

19   student is the one to say, I need it.  I want it.

20   When the student makes the request, the proper

21   documentation is in place, the student gets the

22   accommodation.  It's not a difficult thing to

23   understand.

24      Q.    And his psychiatrist can't inform the

25   school?

Page 45

```
1        A.    No.   Unless the student writes to say,
2   please release by medical records.  I have applied
3   for accommodation.
4        Q.    A third party psychiatrist.  Let's say
5   someone at Kaiser Permanente told the dean that his
6   disability was affecting his academic performance.
7   The dean is still not obligated to accommodate the
8   student?
9        A.    No.
10       Q.    Thank you.
11             I understand it fully.  Thank you very
12  much.
13             And just to clarify, on Exhibit DE-05,
14  even though it says, "ongoing communication," you do
15  not consider it ongoing communication?
16       A.    You've got to clarify what you mean by
17  that.  If it's ongoing -- this allows us to provide
18  accommodation for a future request.  If the student
19  says, release my -- release records, because I've
20  applied for accommodation, yes, it's been signed, so
21  the student doesn't have to go through this form
22  again.
23       Q.    He doesn't have to go through the form
24  again?
25       A.    It has a limitation period.  I'm trying to
```

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 46

 1   see how long it is.  Does it have it here?  I think
 2   it's a year.
 3           So the signing of this document is a way
 4   for the student to make life easier in the future so
 5   they don't have to come back and do another one.  So
 6   this is -- if, for example, they want to see a
 7   psychiatrist in the USA, they would sign the form so
 8   we can release the medical records.  But we don't
 9   release medical records until we get a specific
10   request saying, I want accommodations.  Please
11   release my records.  And I've already signed a
12   release of information form.  Then, we release.  You
13   got it?
14           We don't hold it back.  It's the
15   plaintiff's right to get their records.  As you see,
16   this document is signed only to Ross administration.
17   So this one was about getting an early flight back
18   home.  So it was Ross administration.  It's not Ross
19   accommodations office.  It's two different entities.
20   It was to administration to deal with a flight back
21   home, and the accommodations would be --
22           You see to this piece here, Item No. 3 --
23   Box No. 3?  Then, if the student, the plaintiff
24   wants their doctor in the USA to get the
25   accommodations -- or medical records, then they will

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.      Davendranand Sharma

Page 47

1    put that name into that or tell us to -- whom to

2    send that to.

3         Q.   Okay.

4         A.   Okay?

5         Q.   Now, during this whole deposition, it

6    seems to me that -- let me rephrase.  Let's assume

7    now --

8              MR. ROMAN:  Sharma, I want to make sure

9         you're listening, because you're reading and

10        he's asking a question.

11   BY MR. AWODIYA:

12        Q.   Let's assume now that plaintiff put the

13   school on notice that he needed accommodations for

14   his ADHD or anxiety.  If the school -- if the

15   plaintiff put the school on notice of his ADHD and

16   anxiety, and as you said earlier, the school had all

17   the documentation necessary, would you consider it

18   malice if the school did not provide him

19   accommodations.

20             (Ms. Bomar exited the deposition.)

21             MR. ROMAN:  I'll just object.  It calls

22        for a legal conclusion as to the phrase malice.

23   BY MR. AWODIYA:

24        Q.   Let me rephrase.  And personally, when I

25   was talking, I forgot the first half of my own

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 55

1      Q.   -- regardless of the accommodation, does

2   this agreement create a duty between the counseling

3   center and whoever the recipient is named in that

4   agreement?

5      A.   Yes.   To provide information.   Once the

6   student asks for us to release, once we get the

7   request in writing, we will release.   There's an

8   obligation.   And the form states, "release."

9      Q.   Do you have any policy anywhere that a

10   student would need additional paperwork to release

11   additional information?   Let me rephrase.

12         A month later after this document was

13   signed, if more information wanted to go out --

14      A.   Uh-huh.

15      Q.   -- is there any record anywhere telling

16   the student that he must do extra work?

17      A.   It's in the student handbook that the

18   process is clearly outlined.   You want

19   accommodation, you apply for it.   That's it.   It's

20   very straightforward process.

21      Q.   Not for accommodations.   Accommodations

22   doesn't matter here.

23      A.   Okay.

24      Q.   It's the passing of information.

25      A.   Yeah.   But it has to be requested.   We

Page 56

1   cannot willy-dilly give out people's information.

2   It's not me.  The onus is not on me.  It is the

3   patient will request a specific information to go

4   out for a specific purpose.  When the request is

5   made in writing, we will respond to that request.

6   And the signing of the form allows the release of

7   information.  It does not allow presumption on my

8   part to release information.  I can't do that.  It's

9   just basic ethical judgment and sense.

10          Q.   So let's just stick to the actual one

11   here.

12               You're not releasing information to any

13   random person.

14          A.   Right.

15          Q.   It says, "RUSM administration."

16          A.   Right.

17          Q.   Therefore, we have who is supposed to be

18   receiving this information.

19          A.   Right.  In context of the problem.

20          Q.   In context of the purpose of this

21   agreement; is that correct?

22          A.   In the context of the problem that was --

23   that required the release.  As I said before, for

24   this information, there was no diagnosis of ADHD.

25   There was no request for release to the

Page 57

1    accommodations office.  This agreement was done so

2    we can release information to administration to get

3    the plaintiff back home early, which was done.

4         Q.    That's not in the agreement.

5         A.    Which agreement.

6         Q.    That agreement, the release of information

7    consent agreement.

8         A.    It's in the medical records that this

9    whole process was being done to support -- this one

10   with this Exhibit DE-05 was done in the medical

11   records, time-related, to show that this release of

12   specific information was to get the plaintiff back

13   home early due to concerns about the plaintiff's

14   emotional health.  There was nothing about

15   accommodations requested by the student for release.

16   There was no ADHD diagnosis, as I said, before.

17        Q.    Let's focus on that.  Someone who knows

18   nothing about this case, sees this agreement, the

19   release of information consent agreement, Exhibit

20   DE-05.

21        A.    Uh-huh.

22        Q.    No one knows nothing about this case, and

23   they see this document, how would they know that a

24   student needs to do an additional request?

25        A.    They wouldn't know, because they wouldn't

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 59

1         A.    They don't know.  That's -- they don't

2    know.

3         Q.    So how would plaintiff know?

4         A.    Because the plaintiff needed to understand

5    that if he wants accommodation, he has to apply, and

6    it's in the student handbook, and he has been told

7    by the counseling center.

8         Q.    Not about accommodations.  We're not

9    talking about that.  We're talking about giving

10   information to RUSM administration.  The

11   accommodation coordinator is irrelevant to this.

12   It's any RUSM administration --

13        A.    Yeah.

14        Q.    -- any of them, and any accommodation

15   after the date that this was signed.

16             How would he know that he would need to

17   fulfill more written requests to have that released?

18        A.    He would know by reading the student

19   handbook.

20        Q.    The student handbook mentions nothing

21   about additional requests after this consent form --

22   this agreement form is signed, or, if you can, do

23   you know where in the student handbook it would say

24   that?

25        A.    I'm not sure what you're getting at, but

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 60

1    the point is, anybody can interpret this document as

2    they see.  The reality, what happens, is that as a

3    physician or the counseling center, counselors do

4    not release documentation without a specific request

5    by this patient.  This signing of the document does

6    not allow us three months later to release a story

7    that a student is now at risk for self-harm, for

8    example.  It does not allow it, unless, of course,

9    it's self-harm at a severe level, which requires us

10   to have the student evacuated.  But we don't give

11   out information.

12          I don't care who interprets it.  You can

13   give them this paper.  That's their interpretation.

14   The reality, you sign this form, which allows us to

15   give your records when you request it.  When you --

16   when you, the plaintiff, or the patient request it.

17   Never do we give out information without that

18   request.  And it has to be in writing; otherwise,

19   somebody will come to me and say, you breached my

20   confidence, which is very serious.  I cannot give

21   information out unless it is requested in black and

22   white.  A verbal request does not apply in this

23   case.  It has got to be in writing for the purpose

24   of what it is.  So that is -- that is it.

25          You can bring up a story about anybody can

Page 61

1    look at this document, interpret how they like.

2    Does not apply to the situation for this document.

3    This document was provided for the student to get

4    back home early.  That is what we know.  It is in

5    the records.  Anybody could see the two together and

6    understand the student was having emotional problems

7    and needed to go home.  Dr. Sharma wrote to

8    administration, can you help him buy his ticket, he

9    doesn't have the money, send him home before the

10   other students go home.  His mom is worried about

11   him.  Done.

12          He signs a box saying that, in case my

13   ADHD comes up positive, I'm also giving consent that

14   I don't have to sign this box again when the office

15   of accommodation asks for my records.  That is it.

16   That is it.

17          It's not difficult to understand.  I

18   cannot give out the diagnosis even if it's made to

19   the student affairs office.  Many students do not

20   want that.  Many students do not apply for

21   accommodation, because they do not want the

22   diagnosis to be known.  There are a lot of reasons

23   why students don't apply.  We have a small number,

24   actually, of students that apply for accommodations

25   after they're diagnosed.

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 62

1            I mean, I've said more than enough on

2    this, but I'm trying to make it clear to you.  It

3    does not matter that you tick this box.  You have

4    to -- the patient has to request in writing, I want

5    the accommodation; release records relevant for

6    accommodation.

7            Q.   Is that your rule or the school's rule?

8            A.   That is the medical care rule.  The best

9    standards of care or practice, rule of the

10   counseling center.

11           Q.   Where can I find it?

12           A.   It's on the website.  It's a big document

13   there about all kind of things, ADHD, how to apply

14   for accommodations.  It's all on the Web page.

15           Q.   In December 2015?

16           A.   It's all there in the student handbook.

17   It's all there in the counseling center of

18   regulations and policies, that accommodation was --

19   records would only be released when the student

20   applies for it through the office of accommodation.

21   Not to me.  I don't give accommodations.

22           Q.   I'm not talking about accommodations

23   coordinator.  I'm talking about Ross administration.

24           MR. ROMAN:  I'm just going to object,

25       because I think we've asked and answered --

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 65

1  major?

2        A.    That's subjective.  If the plaintiff was

3  going through a relationship problem, then it could

4  have been a major factor.  It may not have been.

5  All I know is that the plaintiff did the exams; was

6  put on treatment, improved; was diagnosed with ADHD,

7  put on treatment, was improved, passed; and left the

8  island passing.

9        Q.    But he passed the first four semesters.

10       A.    Good.

11       Q.    Is that -- what does passing suggest?

12       A.    You tell me.  Passing is what?

13       Q.    Well, the first semester plaintiff

14  passed --

15       A.    Uh-huh.

16       Q.    -- with a 66.  The minimum passing score

17  was a 66.

18       A.    Uh-huh.

19       Q.    In most schools that's a D.

20       A.    Uh-huh.

21       Q.    Even though it's passing, is it good?

22       A.    No.

23       Q.    In most semesters, plaintiff barely

24  passed.  Most semesters his overall grade was in the

25  60s.

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 66

1      A.   Uh-huh.

2      Q.   If he repeats a semester, he is seeing the

3   information a second time --

4      A.   Uh-huh.

5      Q.   -- and has a whole other semester to learn

6   the same information.

7      A.   Sure.

8      Q.   So even if the medication helped him

9   improve --

10      A.   Uh-huh.

11      Q.   -- it can't be the conclusion that that's

12   the only thing that helped him improve.  It may have

13   just been a coincidence, because he's seeing the

14   same information.

15      A.   Sure.  I agree.

16      Q.   You agree?

17      A.   Uh-huh.

18      Q.   Your first encounter with plaintiff, what

19   was the reason?

20      A.   It was a referral because of the

21   relationship problems, emotional problems.

22      Q.   There's a document produced by Ross, which

23   I don't have now, but I'm sure they have it.  The

24   woman who actually referred the counseling center to

25   plaintiff stated it was because he failed his

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 73

1      Q.   And you noticed symptoms of ADHD --

2      A.   Yes.

3      Q.   -- to the extent that you recommended an

4    assessment for the ADHD.

5      A.   Yes.  We went over that.

6      Q.   And he signed the form for the release of

7    information relative to academic accommodations.

8      A.   Yes.

9      Q.   If you noticed these things --

10     A.   Yes.

11     Q.   -- at that time --

12     A.   Uh-huh.

13     Q.   -- how is that not relevant?

14     A.   To what?

15     Q.   Academic accommodations.

16     A.   There's no relevance -- this form was done

17   for -- for the emotional crisis to get the student

18   back home.

19          Relevance for academic accommodation can

20   only come in place if there is a request.  We went

21   over this over and over.  Yes, yes, I would support

22   academic accommodation 100 percent, 1,000 percent,

23   100,000 percent if a request is made.  I cannot send

24   details of a diagnosis to anybody unless there's a

25   request to send it and for a purpose.  It's not my

Page 74

1   opinion.  It is what the plaintiff wants.

2           He wants accommodation, put it in writing.

3   It's done.  It's granted.  The university does not

4   deny students accommodation once documentation is

5   adequate.

6       Q.   I don't want to dive back into the form.

7       A.   That's what I'm saying.  Yeah.  I think

8   we've been over this and over this.

9       Q.   I was just asking about the information

10  being relevant to academic accommodations.

11          So let me ask you this.

12      A.   Yes.

13      Q.   His ADHD symptoms that you observed in

14  December 2015 --

15      A.   Uh-huh.

16      Q.   -- do you consider it relevant to academic

17  accommodations?

18      A.   Yes.  Yes.  We went over that.  And the

19  diagnosis was correctly made, that there was ADHD

20  that the student had for a long time and did not get

21  treated for, and then, comes to me first time, gets

22  a diagnosis, and is treated for it.  So that's it.

23  Student was helped.  The student performed well.

24  Whether repeating the semester helped, the student

25  performed well.  The student left Dominica in good

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 75

1   spirits in April, went off to do the comp, right?

2   That's my recollection.

3        Q.   (Nod in the positive.)

4        A.   Student did not apply for accommodation or

5   request to give out documents for accommodation.

6   That's it.

7             MR. AWODIYA:  I think we're good.

8             MR. ROMAN:  We'll take a short break, and

9        I'll have some questions, and then, we'll wrap

10       it up.  Let's take a quick break, and then,

11       we'll come back in.

12            (Whereupon, a break was taken from 3:17 to

13            3:24 p.m.)

14                 CROSS-EXAMINATION

15   BY MR. ROMAN:

16       Q.   Good afternoon, Dr. Sharma.  As you know,

17   we've met before.  My name is Ryan Roman.  I'm one

18   of the attorneys representing Ross University.

19            I'd like to start by showing you -- and I

20   only have a quick set of questions on the medical

21   notes, some of which we've gone through today, and I

22   think only one of which we haven't shown you today.

23            Starting with Exhibit 06, do you have that

24   in front of you still?  That was the most recent one

25   we used from December 9, 2015.  Let me just write

Page 76

1    the exhibit number on it so we don't get too

2    confused.

3          A.    Uh-huh.

4          Q.    This is the December 9th, 2015 note.

5                Are these your notes from your appointment

6    with Mr. Awodiya on December 9, 2015?

7          A.    Yes.

8          Q.    And were these notes taken at or around

9    the time of that appointment?

10         A.    Yes.

11         Q.    Are these record that are kept by the

12   counseling center in the ordinary course of it's

13   business?

14         A.    Yes.

15         Q.    Okay.  On that particular document, I want

16   to draw your attention to a paragraph towards the

17   bottom of that page.  It starts with, "He had a

18   relationship break up."

19               Do you see that paragraph?

20         A.    Yes.

21         Q.    Take a moment to review that paragraph and

22   just let me know when you're finished.

23         A.    Yes.

24         Q.    Would -- so does this -- the notes from

25   this meeting on December 9th, 2015, does that

Page 77

1    include any information you obtained from

2    Mr. Awodiya about relationship issues?

3         A.   Yes.

4         Q.   And would that paragraph reflect the

5    information you learned?

6         A.   That's correct.

7         Q.   Okay.  Do you see in this set of notes --

8    this December 9th, 2015 set of notes, any reference

9    to ADHD?

10        A.   No.

11        Q.   At this time, on December 9, 2015, had

12   Mr. Awodiya been diagnosed with ADHD?

13        A.   No.

14        Q.   All right.  Do you recall when the

15   diagnosis was actually made?

16        A.   The actual making of it, I think, was in

17   February 2016.

18        Q.   And if I turn your attention to Exhibit

19   03, which is in that pile in front of you, I'll ask

20   if that is the appointment you're thinking of?

21        A.   Yes, that's correct.

22        Q.   Okay.  All right.  Next I'd like to turn

23   your attention to Exhibit 01.

24        A.   Yes.

25        Q.   And are these your notes from a meeting

Page 78

1    with Mr. Awodiya on December 14, 2015?

2         A.   Yes.

3         Q.   And were these notes taken at or around

4    the time of that meeting?

5         A.   Yes.

6         Q.   And are these records that are kept in the

7    ordinary course of business by the counseling

8    center?

9         A.   Yes.

10        Q.   Next I'd like to it turn your attention to

11   Exhibit 03, which is actually the one we looked at a

12   moment ago, which is February 12, 2016.

13             Are these your notes from your appointment

14   with Mr. Awodiya on February 12, 2016?

15        A.   Yes.

16        Q.   And were these notes taken at or around

17   the time of that meeting?

18        A.   Yes.

19        Q.   And are these -- are these records that

20   are kept in the ordinary course of business by the

21   counseling center?

22        A.   Yes.

23        Q.   Next I'll turn your attention to

24   Exhibit 04, and this appears to be notes from a

25   March 11, 2016 meeting.

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 79

1          Do you see that?

2     A.   Yes.

3     Q.   And are these notes taken at or around the

4 time of that meeting?

5     A.   Yes.

6     Q.   And are these records that are kept in the

7 ordinary course of business by the counseling

8 center?

9     A.   Yes.

10    Q.   And the last one is one we have not yet

11 marked in this proceeding.  I will mark it as

12 Exhibit 07.  Here's a copy.

13          (Thereupon, the referred-to document was

14          marked by the court reporter for

15          Identification as Defendant's Exhibit

16          DE-07.)

17 BY MR. ROMAN:

18    Q.   All right.  Can you describe what that

19 document appears to be?

20    A.   Medical follow-up note.

21    Q.   And for what date?

22    A.   5th of April, 2016.

23    Q.   Okay.  Does this -- are these notes that

24 were taken at or around the time of the April 5th,

25 2016 meeting?

Page 80

1        A.    Yes.

2        Q.    And are these records that are kept in the

3    ordinary course of business --

4        A.    Yes.

5        Q.    -- by the counseling center?

6        A.    Yes.

7        Q.    Did Mr. Awodiya ever ask you for an

8    accommodation?

9        A.    No.

10       Q.    Did Mr. Awodiya ever ask you to request an

11   accommodation on his behalf?

12       A.    No.

13       Q.    Did you ever agree with Mr. Awodiya that

14   you would request an accommodation on his behalf?

15       A.    No.

16       Q.    Did you ever speak with Matthew

17   Stewart-Fulton about Mr. Awodiya getting an

18   accommodation?

19       A.    No.

20       Q.    When a student signs a release of their

21   records for the purpose of requesting an

22   accommodation, does the counseling center at Ross

23   immediately share the students information at that

24   time?

25       A.    No.

Page 81

1      Q.   Do you automatically share the student

2  information just because a release is signed?

3      A.   No.

4      Q.   Are you aware of any reasons why a student

5  might not want an accommodation even though they may

6  be entitled to one?

7      A.   Just repeat that question.

8      Q.   Sure.  Are you aware of any reasons why a

9  student might not want an accommodation, even if

10 they are entitled to one?

11     A.   Oh.  General reasons.

12     Q.   Any reasons that you can think of?

13     A.   Yes, yes.  It's quite, actually, common

14 that students, in my experience, would not want the

15 accommodations.

16          One, they're now identified as having a

17 disability.  They're placed in special accommodation

18 rooms that are noise free.  So other students are

19 able to see them, and they tend to be embarrassed

20 about the conditions.  So they're seen as disabled

21 by their colleagues and friends.  So often they feel

22 shy about it.

23          The other reason is, they improve well in

24 treatment and perform much better at a normal --

25 well, at a good academic level, and so, they don't

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 82

1    see the need for it.  And I think also there's -- my

2    experience, like the big reasons are sort of

3    cultural.  The request for accommodation involves

4    getting information from family members and school

5    teachers from back home -- back from their home

6    school, and they tend to be shy about their family

7    knowing that they have this condition, because often

8    the families would have been the one who were not

9    taking them for the diagnosis despite academic

10   problems earlier.  Those are the three big reasons

11   in my experience.

12        Q.   If you had received a request from the

13   accommodations office for information relating to

14   Mr. Awodiya, can you walk us through the process of

15   what you would have done in response to that

16   request?

17        A.   Yes.  Once we get a request from the

18   accommodations office, we would prepare a

19   document -- a detailed document that has the

20   diagnostic instruments used; the cards, for example.

21   We would submit that document with an interpretation

22   of the results pointing to things like severity of

23   the condition.  We would emphasize that, despite

24   treatment, the student is also struggling with time

25   for the exams.  So it would be in the student's

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 83

1   favor to have that particular document.

2         Our document is pretty strong.  So it's a

3   detailed letter that's sent to the accommodations

4   office and it has to say at the end of it that we

5   recommend extra time, which is time-and-a-half for

6   the accommodation for the student, and it's usually

7   also a noise free environment.

8         MR. ROMAN:  That's all the questions I

9      have for you.  I appreciate your time.  Thank

10     you.

11        THE WITNESS:  Thank you.

12        MR. AWODIYA:  Can I cross?

13        MR. ROMAN:  Please.

14              REDIRECT EXAMINATION

15   BY MR. AWODIYA:

16     Q.   Could a student -- those reasons that you

17   just discussed with your counsel, did plaintiff

18   state any of those reasons to you?

19     A.   The plaintiff never requested

20   accommodations, so there was no relevance of

21   reasoning for that -- those general situations.  So

22   there was no relevance to -- as there was no request

23   for accommodation.  However, in terms of my

24   recollection, I seem -- I seem to think there was

25   some concerns by the plaintiff in his history about

Page 84

```
 1    his family not being very supportive of that kind of
 2    diagnosis or disability.
 3        Q.   So just to be clear, are you saying that
 4    plaintiff never denied help with accommodations?
 5        A.   Never denied help?
 6        Q.   You say some students along the line --
 7    you say some students refused --
 8        A.   No.
 9        Q.   -- to get accommodation.
10        A.   No.  I was saying, generally, some
11    students do not wish or don't apply for
12    accommodation, even knowing that it's available,
13    because there is several reasons, like cultural bias
14    and fear of being labeled as a disabled person and
15    so on.
16        Q.   So to follow-up on that, would one's
17    family know any of this, if he didn't expressly sign
18    a release form?
19        A.   Part of the -- this is not from our health
20    service, but to answer the question, the family are
21    asked by the accommodations office to provide
22    information about the student's disability from
23    early life.
24        Q.   So could the student convey that himself?
25        A.   No.  It's part of the requirement to have
```

15eb13da-d2c1-4023-bda4-c358c06300a6

10/16/2018        Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.        Davendranand Sharma

Page 85

1   a family member provide a letter.  Very close family

2   member.  I'm speaking for accommodations.  So these

3   questions, I believe, would be better asked to the

4   accommodations office, because that's their

5   requirement.  That's not our requirement for the

6   diagnosis, because we -- we accept the student's

7   word, the memory of the academic problems in

8   childhood.

9        Q.   So two things.  You said that -- when you

10  say, "they," are you talking about the

11  accommodations coordinator or Ross University?

12       A.   Accommodations office.

13       Q.   So the accommodations coordinator.  You're

14  saying that they require --

15       A.   Yes.

16       Q.   -- that a close family member --

17       A.   Yes.  As I said, this is better from the

18  accommodations office, because I'm speaking for

19  them.  That's their requirement.

20       Q.   So you don't have personal knowledge as to

21  any of the reasons you gave Mr. Ryan Roman?

22       A.   For what?

23       Q.   Well, you said --

24       A.   In general?

25       Q.   Not in general.  Specifically.

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 86

1        A.    Uh-huh.

2        Q.    You said that some students wouldn't get

3    accommodations or wouldn't try to get accommodations

4    because of the knowledge being discovered through

5    their family, but then, when I asked you about it,

6    you also said, it's a better question for them,

7    because you don't really have --

8        A.    The accommodations office has the numbers

9    of items that are required for accommodation, which,

10   as far as I know, includes family member -- a close

11   family member signing that or giving a letter -- a

12   descriptive letter, including childhood records and

13   so on about the student.

14            So often a student may even go to that

15   accommodations office, attend an interview with the

16   accommodations officer, and when they hear that they

17   have to get a letter from home, from their mommy or

18   somebody, they stop it, because they don't want

19   their family to know that they have that disability.

20   That's why I say, in a cultural context, plenty of

21   times a student would not apply for accommodations.

22       Q.    To the best of your knowledge of the

23   Americans with Disabilities Act, in regards to

24   students, is that policy required in your

25   experience?

15eb13da-d2c1-4023-bda4-c358c06300a6

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF FLORIDA

3

4    OLUWAMUYIWA AWODIYA,

5          Plaintiff

6    vs.                              CASE NO.

                                      0:18-cv-60482-KMM

7    ROSS UNIVERSITY SCHOOL OF

     MEDICINE, SCHOOL OF

8    VETERINARY MEDICINE LIMITED,

9          Defendant.

10

     `````````````````````````````

11

12

13          VIDEO-CONFERENCED DEPOSITION OF

14              MATTHEW STEWART-FULTON

15

16              NOVEMBER 5, 2018

17                 1:06 P.M.

18

19        ROSS UNIVERSITY SCOOL OF MEDICINE

20             KNOXVILLE, TENNESSEE

21

22

23

24        Deborah West, LCR-314 (TN), CLR

25

```
                                                    Page 8

 1              Q      Okay.  What is your job position at

 2      Ross University?

 3              A      Would you like my job title?  What

 4      specifically would you like to know?

 5              Q      We can start with your job title.

 6              A      My job title is assistant director

 7      for student conduct and integrity in academic

 8      accommodations.

 9              Q      In regard to academic

10      accommodations, what is your role as an academic

11      accommodations coordinator?

12              A      I manage the accommodations process.

13              Q      Who makes the final determination --

14              A      I'm sorry, you got cut off.

15              Q      Who makes the final determination?

16              A      I make the final determination.

17              Q      Has it always been like that?

18              A      In the time that I have been working

19      in this role, it has.

20              Q      Do you ever remember meeting the

21      plaintiff in person?

22              A      I do not.

23              Q      Just to be clear, you do not

24      remember --

25                     (Reporter clarification.)
```

1    BY MR. AWODIYA:

2         Q     You do not remember seeing the

3    plaintiff in your office for any reason?

4         A     I do not recall meeting the

5    plaintiff.

6         Q     Can a family member of a student

7    request for accommodations on behalf of the

8    student?

9         A     No.

10        Q     Why is that?

11        A     Our process states that the student

12   requesting accommodations is the one who has to

13   make the request and submit the application.

14        Q     And that's what it says in the

15   student handbook?

16        A     That's correct.

17        Q     Give me one second.

18        A     No worries.

19        Q     Can any other faculty request

20   accommodations on behalf of the student?

21        A     No, they cannot.

22        Q     Can any other faculty recommend

23   accommodations for the student?

24        A     Yes, they can.

25        Q     How do you handle recommendations

Page 11

```
 1            Q     What if a student asked the faculty

 2   to recommend academic accommodations to you on his

 3   behalf?

 4            A     I would most likely contact the

 5   student and ask them to meet with me.

 6            Q     Is that when you begin the

 7   interactive process?

 8            A     Would you clarify what you mean by

 9   "the interactive process"?

10            Q     Is that when you would investigate

11   if an accommodation is needed?

12            A     I need to receive a completed

13   application form before I can review whether or not

14   an accommodation might be needed.

15            Q     So to be clear, if the student asked

16   the faculty to recommend getting accommodations to

17   you, you would reach out to the student?

18            A     Most likely, if the faculty member

19   hadn't, hadn't followed up with the student.

20            Q     How is recommending academic

21   accommodation different than requesting an academic

22   accommodation?

23            A     To clarify, do you mean how is it --

24   if a faculty member recommends a student apply for

25   accommodations, how is that different from a
```

Page 12

1    student doing so?

2            Q       No.  Let me rephrase.  How is a

3    faculty member recommending academic accommodations

4    different than a faculty member requesting academic

5    accommodations on behalf of the student?

6            A       I don't see a significant difference

7    for our process.

8            Q       Can you define what a request is to

9    you?

10           A       Under what circumstances?

11           Q       What do you consider a request?

12   Does the student have to use specific words?

13           A       To request accommodations, a student

14   has to submit an application for academic

15   accommodations.  It will be noted as supporting

16   documentation that is referenced in the

17   application.

18           Q       Let's go to one step before that.

19   When a student asks for accommodations -- let's

20   separate for right now, the packet, the

21   documentation, the evidence, simply focusing on the

22   request, not -- not the investigation into whether

23   or not an accommodation is needed or appropriate

24   or -- you know, that seems more to just like

25   exploring a possible accommodation.

Page 13

```
 1              In the absence of that, a student
 2   simply asking you for academic accommodations, does
 3   that trigger anything?
 4         A    Yes.
 5         Q    What does it trigger?
 6         A    A request to meet.  And if they
 7   haven't already received a copy, sending them a
 8   copy of the application form.
 9         Q    So would you consider asking for
10   academic accommodations a request?
11         A    In the context of what?
12         Q    Let me clarify.  When -- I am
13   assuming you're talking about a request packet; is
14   that correct?
15         A    It's an application package.
16         Q    Okay.  In this package you ask for
17   what information?
18         A    Demographic information about the
19   student.  There is a personal statement.  And
20   there's supporting documentation from a healthcare
21   provider.
22         Q    So until that is completed, you do
23   not consider any prior statements a request?
24         A    I would like you to clarify what you
25   mean by a request in the context of this line of
```

Page 15

1   accommodations?

2           Q    Yes.

3           A    I am afraid I don't understand what

4   you mean by this question.

5           Q    The actual recommendation, can it be

6   verbal?

7           A    Yes.

8           Q    Can a student's doctor do the same?

9           A    Yes.

10          Q    Can a student's psychiatrist do the

11  same?

12          A    Yes.  Just to be clear, when you say

13  can one of these parties recommend, as in recommend

14  to me that a student receive accommodations; is

15  that correct?

16          Q    Yes, that's exactly what I am

17  saying.

18          A    Okay.  Thank you.

19          Q    I apologize, I am a little all over

20  the place so I am kind of trying to collect my

21  thoughts.

22          A    No worries.

23          Q    So does a request for accommodation

24  have to be in writing?

25          A    It does.

Page 16

1          Q     But you also accept verbal requests?

2          A     Not for consideration.  Someone can

3     request and then they have to provide the

4     application in writing.

5          Q     Can someone else provide the

6     application in writing to you?

7          A     Someone else could turn it in on

8     behalf of the student.  The application needs to be

9     filled out by the student.

10          Q     So the student could tell someone

11     all of the necessary information and that person

12     can then write it for the student and then turn it

13     in to you?

14          A     Yes.  Although the student has to

15     sign it.

16          Q     What if the student is not able to

17     sign it?

18          A     It is not a circumstance I have ever

19     dealt with.  I don't know.

20          Q     So if a student with no arms needed

21     academic accommodations, would he be then required

22     to submit the request packet in writing?

23               MR. ROMAN:  I will object.  That

24          calls for speculation.  You may answer.

25               THE WITNESS:  I don't know.  I have

Page 20

1  request packet exists?

2          A      They might find it on the student

3  portal.  It's referenced in the academic catalog.

4  It is referenced in the student handbook.  If this

5  is a question they asked other colleagues on the

6  Ross campus, they would refer them to it, or to me.

7          Q      In January of 2016, how would a

8  student know that a request packet exists?

9          A      For the same reasons I just stated.

10         Q      The student handbook, in January of

11  2016, does not state anything about a request

12  packet.  The request packet doesn't so up in the

13  student handbook until May 2016.

14                So I will ask you again:  In January

15  of 2016, how would a student know that a request

16  packet exists?

17         A      It's available on the student portal

18  in the student resources, the handbook, and the

19  academic catalog.  I don't recall if they

20  referenced the accommodations application packet

21  specifically, but they do reference that students

22  should contact at that time, me, if they wanted to

23  inquire about receiving academic accommodations.

24                I would then inform the student of

25  the application packet and provide them with one.

Page 28

```
 1    letter from a family member in order to get
 2    academic accommodations?
 3             A     No.
 4             Q     If a student finds out that he needs
 5    academic accommodations after he has enrolled, can
 6    the counseling center submit the required
 7    documentation for academic accommodations?
 8             A     Currently or in the time frame that
 9    you were enrolled?
10             Q     Both.
11             A     At the time you were enrolled, the
12    counseling center could submit supporting
13    documentation which could be included in the
14    accommodations application package.
15                   And in our most recent version of
16    the handbook, my recollection, which I am not sure
17    if I am remembering this correctly, but I believe
18    the counseling center is no longer providing
19    supporting documentation.
20             Q     So could a student request
21    accommodations from the counseling center and then
22    the counseling center send you the documentation
23    that is required?
24             A     No.
25             Q     Why not?
```

Page 29

```
 1            A     The student has to sign a release of

 2   information with the counseling center to release

 3   supporting documentation.  Once the student does

 4   that, the counseling center can submit supporting

 5   documentation which is included in the

 6   accommodation application package.  But it is not

 7   in and of itself an application for accommodations.

 8            Q     The form you just stated, the

 9   release of information, is that the required

10   document to initiate the process for the counseling

11   center to send the documentation to the

12   accommodations coordinator?

13            A     I am not certain.  That would be a

14   question better directed to a representative of the

15   counseling center.  That's internal to their

16   process.

17            Q     How do you know that one is needed

18   in the first place?

19            A     How do I know when what?

20            Q     How do you know that the release of

21   information agreement is required in the first

22   place?

23            A     Because the counseling center

24   advises they need a release of information from the

25   student before they can submit any supporting
```

Page 31

1    all the contacts that I have had from the

2    counseling center.

3           Q    So is it correct that you can

4    neither confirm nor deny whether you received

5    communication from the counseling center on behalf

6    of plaintiff?

7           A    I do not have in my records any

8    documentation from the counseling center regarding

9    the plaintiff.

10          Q    What about phone calls?

11          A    I don't recall if I had any phone

12   calls with the counseling center about the

13   plaintiff.

14          Q    Is faculty at RUSM required to

15   comply with Title III of the Americans with

16   Disabilities Act?

17          A    Are you referring to the ADA?

18          Q    Yes.

19          A    No.

20          Q    Are they required to comply with

21   Section 504 of the Rehabilitation Act?

22               MR. ROMAN:  I will object to this

23            and the last question to the extent it

24            calls for a legal conclusion.  If the

25            witness can answer, he may do so.

Page 34

1          Q      No communication from the lawyers.

2     Let's limit the scope of this question to anyone

3     that is not a lawyer.

4          A      All right.  Please ask the question.

5          Q      Is it correct to say that no one

6     from Ross University, excluding lawyers, has told

7     you that you need to comply with the Americans with

8     Disability Act and Section 504?

9          A      That's correct.

10         Q      So if a student believes a violation

11    occurs, how would they go about enforcing it if you

12    are not required to follow those laws?

13         A      A violation of the legislation we

14    are discussing, the ADA and Section 504?

15         Q      Yes.

16         A      I don't know.  If there is an issue

17    like that I usually refer that up to my manager.

18         Q      Who is your manager?

19         A      Dr. Hayse.

20         Q      Is there any policy with faculty

21    about how to handle direct requests to them?

22         A      Direct requests for?

23         Q      Academic accommodations?

24         A      They are guided to contact me.

25         Q      Is there a policy?

Page 37

```
 1    medicine.  I just have a few questions for you.

 2                   Prior to today's deposition, do you

 3    recall having met Mr. Awodiya

 4          A     I do not.

 5          Q     If you had met with Mr. Awodiya and

 6    he had made a request for an accommodation, what

 7    would you have said to him?

 8          A     I would have, depending on the

 9    circumstances at the time, what the request was

10    about, generally speaking I would talk about the

11    application process and offer to either provide an

12    application package in the moment or email one.

13          Q     This package is what you described

14    earlier as the packet of information that's

15    provided in response to a verbal request for

16    accommodations?

17          A     Correct.

18          Q     I am going to show you a document

19    that we will mark as Fulton 2.  And for the record

20    and for Mr. Awodiya, this is the PDF I sent you

21    that is Bates number RUSM 179 to 182.

22                   (Thereupon, the respective

23                   document was marked as Exhibit

24                   Number 2.)

25
```

Page 38

1    BY MR. ROMAN:

2             Q      Take a moment to look through that.

3    My question for you is going to be whether this is

4    the document that you're talking about when you say

5    a packet of information.

6             A      Yes, this is it.

7             Q      This is the document provided to

8    students in order to make the request for an

9    accommodation?

10            A      That's correct.

11            Q      Once a student completes this

12   document, what happens next in the process?

13            A      The document, along with all of the

14   accompanying information just referenced in here

15   which is a personal statement as well as supporting

16   documentation from an appropriate healthcare

17   provider, is submitted to my office.  It's

18   reviewed.

19                   And if the student has not already

20   been met with, I meet with the student to discuss

21   their history, if any, with accommodations and

22   their purpose for applying for accommodations at

23   this point.  And then review the information to

24   make a determination as to whether or not they

25   qualify for disabilities within our process.

Page 39

1          Q     Did Mr. Awodiya ever submit this

2     packet of information to you?

3          A     I do not have a record of this in my

4     files.

5          Q     If one had been submitted by

6     Mr. Awodiya, would it have been kept in your files?

7          A     It would have, yes.

8          Q     Earlier in the direct in the

9     examination by Mr. Awodiya, you were asked

10    questions regarding what we have marked as

11    Composite Exhibit Fulton 1.  I am going to put that

12    back in front of you.

13              In particular, I would like for you

14    to turn to the student handbook excerpt which is --

15    sorry, the academic catalog excerpt, which is pages

16    RUSM 183 is the first page and then it skips to

17    242.  Do you see that?

18         A     Yes, sir.

19         Q     On page 242 under the Foundations of

20    Medicine header, do you see that?

21         A     I do.

22         Q     Can you take a moment to review that

23    section?

24         A     All right.

25         Q     What is this section advising

Page 40

1    students with respect to accommodations?

2           A      That they should submit in writing

3    requests for accommodations to me, and my email

4    address is provided.

5           Q      And does it contain any reference to

6    how to request more information?

7           A      To contact me.

8           Q      And it provides your email address,

9    correct?

10          A      That's correct.

11          Q      If contacted, would you have advised

12   a student that there is a written application?

13          A      Yes.  My typical response to inquiry

14   by email is to respond back with a copy of the

15   application form.

16          Q      Okay.

17                 MR. ROMAN:  Thank you very much for

18           your time.  I don't have anything

19           further.  If Mr. Awodiya has any

20           additional questions, otherwise I thank

21           you for your time.

22                        EXAMINATION

23   BY MR. AWODIYA:

24          Q      Just maybe one or two questions.

25   Under what circumstances would you email the packet

Page 41

1    to the student?

2            A      If the student emailed me to request

3    information about accommodations or if an in-person

4    meeting, the student preferred to receive the

5    application packet by email rather than a paper

6    copy.

7            Q      Are students required to email you?

8            A      No.

9            Q      Have you ever in the past granted

10   accommodations for a student that did not complete

11   the accommodation packet?

12           A      No.

13           Q      I have a few more questions about

14   the packet itself.  What documents are required and

15   what documents are not required?

16           A      The documents that are required are

17   the application form itself, personal statement,

18   and appropriate supporting documentation from a

19   healthcare provider.

20           Q      Is the statement still required if

21   the student's medical documents describe the

22   disability in detail?

23           A      Yes.

24           Q      Do you have a reason for that?

25           A      We want the students to have an

Page 1

1                 UNITED STATES DISTRICT COURT
2             FOR THE SOUTHERN DISTRICT OF FLORIDA
3
4    OLUWAMUYIWA AWODIYA,
5              Plaintiff
6    vs.                            CASE NO.
                                    0:18-cv-60482-KMM
7    ROSS UNIVERSITY SCHOOL OF
     MEDICINE, SCHOOL OF
8    VETERINARY MEDICINE LIMITED,
9              Defendant.
10
     ```````````````````````````
11
12
13           VIDEO-CONFERENCED DEPOSITION OF
14                    BRYAN HAYSE
15
16                 NOVEMBER 5, 2018
17                    3:07 P.M.
18
19         ROSS UNIVERSITY SCOOL OF MEDICINE
20              KNOXVILLE, TENNESSEE
21
22
23
24         Deborah West, LCR-314 (TN), CLR
25

```
 1   (3:07 P.M.)
 2                    BRYAN HAYSE,
 3   having been first duly sworn, was examined and
 4   testified as follows:
 5                    EXAMINATION
 6   BY MR. AWODIYA:
 7          Q     Please state your name for the
 8   record.
 9          A     Christopher Bryan Hayse.
10          Q     Dr. Hayse, my name is Oluwamuyiwa
11   Awodiya and I am the plaintiff in this case against
12   Ross University School of Medicine.
13                During this deposition I will in
14   most part refer to myself as plaintiff.  For the
15   record, do you understand that if I say plaintiff
16   that I am referring to myself?
17          A     I do.
18          Q     Additionally, let me tell you some
19   ground rules for the deposition and if you have any
20   questions, you can ask me.
21                First, you are under oath and have
22   sworn to tell the truth.  The effect of that oath
23   is the same as if you were testifying in court.
24                If I ask you a question that you
25   don't understand, tell me you don't understand it
```

Page 8

```
 1   plaintiff in December of 2015?

 2           A     I do.

 3           Q     Can you tell me about your encounter

 4   with him?

 5           A     I can.  I vaguely remember meeting

 6   with plaintiff, and I don't recall what the meeting

 7   was about.  Since the lawsuit has come to my

 8   attention, I was shown documents that were from

 9   Mr. Cuffy referring to mine and your, plaintiff's

10   meeting, which jogged my memory from it.

11                So that's all I remember from this

12   meeting.  I don't remember specifics.  I remember

13   meeting after December, but I don't remember the

14   specifics of the December meeting.

15           Q     You said the document has jogged

16   your memory.  Do you know what it caused you to

17   remember?

18           A     Only that my memory that you and I

19   met in January was inaccurate and that you and I

20   had met previously in December.

21           Q     What is your position at Ross

22   University?

23           A     I am currently the Associate Dean

24   for Medical Science Student Affairs.

25           Q     As part of that position, have you
```

Page 9

```
 1   ever handled accommodations?

 2           A      Rephrase.

 3           Q      Have you ever played any role in a

 4   student getting academic accommodations?

 5           A      Yes is the quick answer.

 6           Q      Can you describe it to me?

 7           A      Yes.  For the most part in the

 8   process I am -- Mr. Stewart-Fulton, who I believe

 9   you spoke with previously, is the chief officer

10   over accommodations for the Medical Sciences for

11   the first five semesters.

12                  In my role I supervise

13   Mr. Stewart-Fulton, so he and I have conversations

14   about pending applications as he has questions

15   about them or just to get typical updates as a

16   supervisor would, as well as within the process I

17   oversee, if anybody appeals an accommodation that

18   he has made, I would be the one that would review

19   the appeal of that person.

20           Q      Is Mr. Stewart-Fulton required to

21   comply with Title III of the Americans with

22   Disability Act?

23                  MR. ROMAN:  I would object to the

24              extent it calls for a legal conclusion,

25              but you're welcome to answer the
```

Page 21

1          A     I don't have an answer to that.

2          Q     Does he handle academic

3     accommodations?

4          A     He does not.

5          Q     Does he handle medical leaves?

6          A     He does not.

7          Q     So what does he do?

8          A     He oversees the operational aspects

9     of the Dominica campus.  So he has security reports

10    in to him, finance and accounting reports in to

11    him, the gym ultimately reports in to him,

12    housekeeping reports in to him.  Maintenance

13    reports in to him.

14               There is probably an area -- oh,

15    supply chain reports in to him.  There is probably

16    an area I am forgetting.  But mostly the

17    operational aspects of the institution.

18         Q     Okay.  Can you -- you said earlier

19    that you supervised Mr. Stewart-Fulton?

20         A     Correct.

21         Q     Can you tell me a little bit about

22    the academic accommodations process?

23         A     Certainly.  So any student who comes

24    to our office seeking academic accommodations,

25    anybody in our office refers that student to speak

Page 22

```
 1   with Mr. Stewart-Fulton to get more details and to
 2   get the application to do so and talk through the
 3   requirements.
 4              And then once those documents are
 5   turned in, anything that has been asked for,
 6   whether it is documentation from a physician or a
 7   narrative from the student, et cetera, that is then
 8   reviewed by Mr. Stewart-Fulton as well as other
 9   accommodations colleagues within the organization.
10              And then a decision is made and then
11   given to the student, or if other documentation is
12   needed or questions were had, that he would
13   facilitate that process.  And he also reaches out
14   to any faculty members who oversee areas wherein a
15   student would receive those accommodations.
16              So, for instance, if a student were
17   to get extra time for an exam, Mr. Stewart-Fulton
18   would reach out to Dr. Paul Abney and the exam
19   center staff to let them know.
20              COURT REPORTER:  I lost you.
21              THE WITNESS:  Those who oversee the
22         exam center and let them know that an
23         accommodation has been approved.  And so
24         the student would start -- and the date
25         in which that student would start
```

Page 23

```
 1              receiving that accommodation, as an
 2              example.
 3    BY MR. AWODIYA:
 4         Q    When you said "come to our office,"
 5    who do you mean "our"?
 6         A    Thank you.  Yes.  So the student
 7    affairs office.  So still kind of referring to
 8    Dominica -- because that's the last time we had an
 9    actual office with everybody there -- walk into
10    student affairs.
11              There is a receptionist there.  Or
12    any time that somebody is speaking to me as an
13    academic adviser, the chief of student affairs
14    office are there, or just talking to anybody else
15    in that division, if somebody happens to come up
16    about -- if a student asks about academic
17    accommodations, that might be an orientation
18    session or a one-or-one conversation, we would
19    refer then to Mr. Stewart-Fulton given his
20    expertise in that area that the rest of us don't
21    necessarily have.
22         Q    Have you ever at any point in your
23    position at Ross been responsible for making the
24    final decision on academic accommodations?
25         A    When I first arrived, the process
```

Page 24

1    was laid out where the conduct -- the academic

2    accommodations coordinator would make

3    recommendations to the associate dean, which would

4    be me.  And then that policy was changed at some

5    point in the 2016 early academic year, I don't

6    remember exactly when that change was made.

7              So prior to that change, the

8    referral would come to me for the final decision.

9    And then I would review that, that accommodation

10   with Mr. Stewart-Fulton and sign off on.  And then

11   since that time, it has been moved to where

12   Mr. Stewart-Fulton along with Ms. Jeanie Robertson,

13   who also oversees the accommodations for the

14   clinical side, the two then work in collaboration

15   to make any type of decisions regarding academic

16   accommodations.

17             Q    That was a very thorough answer.  I

18   want to make sure I don't forget anything.  So the

19   policies, where were the policies located for

20   academic accommodations?

21             A    In the student handbook as well as

22   the academic catalog.

23             Q    Does RUSM deny oral requests for

24   academic accommodations?

25             A    All academic accommodations must be

Page 25

1    in written form.

2          Q    Can a student's family member write

3    the request for academic accommodations on behalf

4    of the student?

5          A    I have never been asked that

6    question, and my initial answer would be no to

7    that.

8          Q    Do you have a reason for that being

9    your initial answer?

10         A    Yeah.  I have not thought about that

11   before.  I would say that no, it would have to come

12   from the student.  But like I say, I never have

13   been asked that before so I have not put much

14   thought into it.

15              But I would say at this point my

16   answer would be no, it would have to come directly

17   from the student.

18         Q    Policy-wise is there anything

19   preventing somebody's family member from requesting

20   academic accommodations for a student?

21         A    Again, I have not been asked.  I

22   would have to review the policy to see if we have

23   anything specific pertaining to that.  I will add

24   to that, I can't think of any other example where a

25   student's family member or anybody other than the

Page 26

1    student is able to request something and be given

2    consideration.

3              Every example I can think of

4    anywhere within the university, a request has to

5    come directly from the student.

6         Q    What about the student's independent

7    psychiatrist?

8         A    So if an independent psychiatrist

9    were to come to us requesting the accommodation?

10        Q    Yes.  Would simply inform the school

11   that on behalf of the patient, he is informing the

12   school that the student needs academic

13   accommodations.  Would that be an acceptable

14   request?

15        A    No.  The student would still have to

16   request it because what we don't want to do is I

17   would never want to give an accommodation or

18   fulfill a request that might not be something that

19   the student individually wants.

20        Q    Would the school reach out to the

21   student or would they just kind of ignore it?

22        A    I think one or two things would

23   happen.  Either we would tell the physician or the

24   person making the request to please have the

25   student reach out directly to us, or we would reach

Page 27

```
 1    out to the student.  Usually I would say one of

 2    those two things would likely happen.

 3            Q     Can you define what a request means

 4    to you?

 5            A     A request for academic

 6    accommodations?

 7            Q     Yes.

 8            A     So for me, the request would be

 9    something in writing directed to our academic

10    accommodations coordinator requesting said academic

11    accommodation, at least on an initial ask.

12                  But then the formal request would

13    have to be to fulfill the policy, you know,

14    complete the application and complete the

15    documentation necessary.

16            Q     That's a perfect way to explain it.

17    So there would be an informal request and later a

18    formal request?

19            A     To the academic accommodations

20    coordinator, correct.  In many cases a student may

21    not be aware of the full policy so a request to the

22    academic accommodations coordinator, that is why

23    he, Mr. Stewart-Fulton, will typically set up a

24    meeting with any student who submits a request, to

25    sit down and make sure the student understands the
```

Page 37

```
 1    email that you sent to Mr. Cuffy, how come Ross has

 2    not produced that?

 3             A    I don't know.

 4             Q    Would you still have that email?

 5             A    I presume so.

 6                  MR. AWODIYA:  Okay.  Thank you very

 7             much.  I think Mr. Roman might have some

 8             questions for you.  I don't have any more

 9             questions.

10                          EXAMINATION

11    BY MR. ROMAN:

12             Q    I just have a few questions.  Pretty

13    quick.  If Mr. Stewart-Fulton testified that the

14    packet for accommodations was being used during

15    January of 2016, would you trust his recollection

16    at that time?

17             A    I absolutely would.

18             Q    He was primarily responsible for the

19    process, correct?

20             A    Correct.

21             Q    And if Mr. Stewart-Fulton testified

22    that the packet was in place when he arrived in his

23    role, would you defer to his recollection?

24             A    I absolutely would.

25             Q    Do you have any specific
```

Page 38

1    recollection yourself that the packet was not being

2    used in January of 2016?

3           A    I did not.  No.  I arrived at Ross

4    in September of '15 and so I likely wouldn't have

5    been involved, so I don't.

6           Q    Earlier you were testifying about

7    the student handbook.  Is it correct, though, that

8    the first time you saw a reference to the packet

9    was in the May 2016 version of the handbook?

10          A    I can say that I have seen it

11   referenced in the May '16 handbook.  What I don't

12   recall is if we had a January '16 version.  And if

13   we didn't, that would have been the first time.  If

14   we do have a January '16 version, I don't know if

15   it is in that version or not.

16          Q    I think already asked this, but you

17   don't know whether the packet was being used prior

18   to May of 2016?

19          A    Correct.

20               MR. ROMAN:  I have nothing further.

21               MR. AWODIYA:  I am good, too.  I

22        have nothing to add to that.  Thank you

23        for your time.

24               MR. ROMAN:  Could we mark as an

25        exhibit -- did we use the May 6, 2016

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 0:18-cv-60482-KMM


OLUWAMUYIWA AWODIYA,

                Plaintiff,

vs.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

                Defendant.
_____/


                        350 E. Las Olas Blvd.
                        Fort Lauderdale, Florida
                        December 4, 2018
                        10:56 a.m.



                 _____

                 THE DEPOSITION OF


                 WILLIAM OWEN



        _____

           Taken on Behalf of the Plaintiff

        Pursuant to Notice of Taking Deposition

             Commencing at 10:56 a.m.


Alpha & Omega Reporting Services, Inc.
(954) 523-6422

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.     William Owen

                                                          Page 4

1    Thereupon:

2                        WILLIAM OWEN

3        a witness named in the notice heretofore filed,

4    being of lawful age and having been first duly

5    sworn, testified on his oath as follows:

6            THE WITNESS:  I do.

7                     DIRECT EXAMINATION

8    BY MR. AWODIYA:

9        Q.   Please state your name for the full

10   record -- I mean, please state your full name for

11   the record?

12       A.   William Franklin Owen, Junior.

13       Q.   How would you like to be addressed?  Dean

14   Owen?  Dr. Owen?

15       A.   Anything but Pookie.

16            Dr. Owen will suffice.

17       Q.   Dr. Owen.  Okay.

18            MR. ROMAN:  And, Muyiwa, just for the

19       record, like I mentioned earlier, I just wanted

20       to make an objection for the record on the

21       videotaping of the deposition.

22            MR. AWODIYA:  Uh-huh.

23            MR. ROMAN:  Since it's being videotaped by

24       you, instead of by a videographer, we would

25       just object on the basis that it's not being

fd61cff3-23a5-4555-a5dd-db0ed4458830

Page 7

1    make changes in your testimony that are inconsistent

2    with the answers given during the deposition, I will

3    be entitled to comment on those discrepancies at

4    trial to question your truthfulness.

5              Do not guess when providing responses.

6    Instead, please provide your best estimate based on

7    your recollection.  If you need to take a break at

8    any time, please let me know.  All I ask is we not

9    take a break while there's a question pending.

10             Are you here today under the influence of

11   any medication or suffering from any physical,

12   mental, or emotional condition that would affect

13   your ability to hear my questions or to give

14   truthful answers?

15        A.   No, I am not.

16             Excuse me.

17        Q.   When did you start working for Ross

18   University?

19        A.   As I recall, April of 2017.

20        Q.   Okay.  And which campus is your office

21   located?

22        A.   Miramar, Florida, United States.

23        Q.   What is your position at Ross University?

24        A.   I am the dean and chancellor of Ross

25   University School of Medicine.

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.      William Owen

Page 8

1       Q.   In 2017, when students appealed their

2   dismissal, what factors do you take into

3   consideration when you make a decision on that

4   appeal?

5       A.   It's important to recognize that the

6   primary appeal does not go to me.  It goes to a

7   committee that reviews the academic record,

8   interviews the student, and then, convenes a meeting

9   amongst themselves.  They will render a decision

10  either to readmit the student or to sustain the

11  appeal.

12          Those are referred to me in writing.  If

13  there is a sustaining of the dismissal, I will sign

14  off on it, looking at the summary from the

15  committee.  The student thereafter has the

16  opportunity to appeal back.  Some will come to me

17  directly; others will go to the committee.

18          If it goes to the committee, the committee

19  will then send it back to me.  I look for

20  confirmation of the components of the decision by

21  the committee once again; however, the student is

22  also clearly instructed that they are to introduce

23  at that time any mitigating factors that accounted

24  for their academic or behavioral performance that

25  were not made known to the committee.  Occasionally

fd61cff3-23a5-4555-a5dd-db0ed4458830

Page 9

```
 1   that occurs.  More often than not, there is not new
 2   information that is introduced.
 3           The other guidance that is given to the
 4   student is that they are to identify if there have
 5   been any procedural variances, in terms of how their
 6   case was handled.  In that case, delineate those for
 7   me as well.  I take a look at those as well.
 8           More often than not, I will send the case
 9   back to the committee, in that context, pointing out
10   why I think it merits being reviewed again.  The
11   committee will then send me another opinion.  I will
12   review it with the Dean of Students.  We'll come to
13   a decision as a group, and then, ultimately I will
14   make the final decision myself, which I own.
15       Q.   Do you, at any point, look at the
16   student's records yourself?
17       A.   I do.
18       Q.   So how -- how do you handle appeals when a
19   student informs you that a disability adversely
20   affected their performance?
21       A.   I will confirm the disability by looking
22   for written documentation of the disability, in
23   particular looking for the diagnosis, looking for
24   who made the diagnosis, looking for when the
25   diagnosis was made, and lastly, looking for what
```

fd61cff3-23a5-4555-a5dd-db0ed4458830

Page 10

1    sort of intervention was made around that diagnosis,

2    whether it be pharmacological, behavioral therapy,

3    or both.

4              I will also have a conversation with

5    the -- he is titled the Associate Dean of Students

6    to get his opinion about it as well.  Occasionally,

7    he will be instructed to acquire source materials.

8    An example would be if someone has had external

9    testing.  Give me those records so that I might look

10   at them myself.

11             I will, on occasion, either directly or

12   through the Dean of Students reach -- have them

13   reach back out to the therapist and/or psychiatrist

14   with the query being, do you think this will

15   interfere with the student's academic performance,

16   what is the prognosis of the student, and lastly,

17   how long do you think therapy will be needed.

18        Q.   Do you always do that?

19        A.   Sometimes.  It's dependent upon the case.

20        Q.   Why sometimes?

21        A.    It's dependent upon the case, the

22   circumstances of the case.

23        Q.    If a student tells you that they have a

24   disability that was affecting their academic

25   performance, you sometimes investigate it?

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.      William Owen

```
                                                        Page 11

 1         A.    Sometimes I investigate it with a

 2    follow-up query to the psychiatrist.  If I have a

 3    statement from the psychiatrist and/or therapist

 4    that says, we have investigated this, here is our

 5    findings, here is our prognosis, I have no need to

 6    go back and push back to the psychiatrist.

 7         Q.    So once you have that from the

 8    psychiatrist, what happens next?

 9         A.    Depends upon the case.

10         Q.    But it plays a factor in whether you will

11    allow the student back into Ross or not?

12         A.    Sometimes it does.  It depends upon the

13    case.

14         Q.    Give me an example where it does entitle

15    the student to be reenrolled into Ross?

16         A.    I would prefer not to since that is

17    disclosing medical information about a student who

18    is a patient.  I can give you a hypothetical.

19         Q.    Don't give me a hypothetical.  Give me the

20    requirements.

21              What information do you require from a

22    student that will entitle that student to be

23    readmitted back into Ross?

24         A.    It depends upon the case.

25         Q.    So you have no requirements?
```

fd61cff3-23a5-4555-a5dd-db0ed4458830

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.     William Owen

Page 14

1      Q.   Okay.  Earlier you said that students are

2   instructed to tell you that a procedure wasn't

3   followed correctly.

4           MR. ROMAN:  I'll object.  I think that

5       misstates his testimony, but you may answer --

6       or once there's a question.

7           THE WITNESS:  I'm not certain what you

8       mean by "tell me."

9   BY MR. AWODIYA:

10      Q.   Actually, it's just a matter of

11  technicality.  We'll just move on, because I don't

12  think it's actually very relevant, because this

13  document says it clearly.

14          MR. AWODIYA:  Ryan, can you show him

15      Exhibit P-25?

16          MR. ROMAN:  Sure.  Why don't we mark, as a

17      composite exhibit, the entire set, and then,

18      we'll turn to whatever page is necessary.

19          MR. AWODIYA:  Okay.

20          MR. ROMAN:  So this will be marked as --

21      how are we marking?

22          MR. AWODIYA:  Do you want to go by the ECF

23      page number?

24          MR. ROMAN:  Well, we can just call it

25      Composite Exhibit 1 for purposes of this

Page 15

1          deposition, and then, we'll tell him where to

2          look.

3                    MR. AWODIYA:  Okay.

4                    (Thereupon, the referred-to document was

5                    marked by the court reporter for

6                    Identification as Plaintiff's Exhibit 1.)

7                    THE WITNESS:  Am I permitted?

8                    THE COURT REPORTER:  You are.

9                    MR. ROMAN:  So we're looking at what's

10          marked as Exhibit P-25 on the bottom right

11          corner.  So it's going to be a few pages in.

12                    THE WITNESS:  All right.  There we are.

13          Thank you.

14     BY MR. AWODIYA:

15          Q.   Do you recognize this letter?

16          A.   I recognize it in the context of

17     preparation for this meeting.

18          Q.   Do you recall anything about this document

19     during the time frame of plaintiff's appeal to you?

20          A.   I have a vague recollection of a portion

21     of it.

22                    MR. ROMAN:  Sure.  And if you'd like to

23          review it now, you're welcome to take whatever

24          time you need to read it, and then, that way

25          you can answer any questions.

fd61cff3-23a5-4555-a5dd-db0ed4458830

Page 16

1              THE WITNESS:  Great.  Thank you.  I will

2        do so contemporaneous with his questions.

3              MR. ROMAN:  I just want to make sure you

4        focus.  So if you do want to take a short

5        break, we can do that.

6              THE WITNESS:  Great.  I will certainly

7        request to take a break if I cannot identify

8        what's relevant to answering his question.

9              MR. ROMAN:  Okay.  Proceed.

10   BY MR. AWODIYA:

11        Q.   After reading this document, what would be

12   your next step?

13        A.   I'd like a moment to read it again.

14        Q.   No problem.

15        A.   Thank you.

16              Can I have you repeat your question?

17        Q.   After reading this appeal letter, what is

18   your next step in your procedure for an appeal?

19        A.   For me, the relevant next steps are to

20   confer with the Dean of Students and share the

21   letter with him, then for the two of us to meet and

22   converse, and a pivotal next step for us would be to

23   receive the letter described or anticipated from

24   psychotherapist Denise Unterman and psychiatrist

25   Earl Mauricio.  Beyond that, I can't comment, in

12/4/2018      Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.      William Owen

Page 17

1    that I am uncertain if this letter was accompanied

2    by a solicitation to the committee and further

3    conversations with them.

4         Q.   This was new information to you.  It was

5    not given to the committee.  Specifically, where he

6    talks about his OCD, the extreme anxiety, him being

7    overwhelmed, the fact that he has to pull his

8    eyelashes out to soothe his anxiety, the fact that

9    he never finished an exam on time, the fact that he

10   has to backtrack his answers just to make sure they

11   didn't disappear five seconds after he went to the

12   next question, none of this was mentioned to the

13   promotions committee.  This was all new information.

14             Please turn to -- first --

15        A.   Turn to?  Can I have you repeat that?

16        Q.   Let me rephrase.

17             Did you confer with the Associate Dean

18   about this letter?

19        A.   I may have.  I may have not.  I don't

20   remember.

21        Q.   You don't recall?

22        A.   I don't recall.

23        Q.   Please turn to the page where it says

24   "Exhibit P-23" on the bottom right.

25        A.   I'm now on that page.

fd61cff3-23a5-4555-a5dd-db0ed4458830

Page 19

1      A.   That does not come directly into my e-mail

2   box.  It may be routed.

3      Q.   Let's stick to what the student was

4   directed to do.

5           The student was directed to send new

6   information to this e-mail address for you; is that

7   correct?

8      A.   Yes.  As is conventional practices in

9   universities, it is routed.

10     Q.   So are you suggesting that you have -- you

11  could have possibly not received the document?

12     A.   I'm not suggesting it.  I'm stating it.

13  It is possible.

14     Q.   But you must have received plaintiff's

15  actual appeal letter; is that correct?

16     A.   I vaguely recall receiving the appeal

17  letter, as I stated to you earlier.

18     Q.   Please turn to Exhibit P-26.

19          Did you send this letter?

20     A.   Yes, I did.

21     Q.   This letter says, "I have carefully

22  reviewed your academic record, your appeal of the

23  Student Promotions Committee's recommendation for

24  dismissal."

25          Is that statement correct?

Page 20

1        A.    Yes, it is.

2        Q.    So then, from that statement, you must

3    have reviewed plaintiff's appeal letter that's in

4    front of you labeled Exhibit P-25; is that correct?

5        A.    I would suggest I would; however, I am

6    uncertain what is being described here.  This is a

7    categorical description.  It's not a prescriptive

8    description.

9        Q.    What's categorical?

10        A.    Your appeal of the promotions

11    recommendation for dismissal, pre-matriculation

12    credentials.  It does not describe the individual

13    documents.

14        Q.    That's -- it's fine.  Because this is the

15    only thing that triggered the appeal.  There was no

16    other forms.  There was nothing else.  It was simply

17    this e-mail and the doctor's e-mail that triggered

18    the appeal process.  There was nothing else that --

19    there would be no other documents.  So it's --

20    that's fine.

21            So judging from the documents we have

22    reviewed, based on your recollection, from the

23    language you used in your letter sent to plaintiff,

24    did you see plaintiff's appeal letter that was sent

25    to you?

fd61cff3-23a5-4555-a5dd-db0ed4458830

Page 21

1      A.   I recall your letter, and it's coming back

2   with greater clarity in the context of the

3   extraordinary circumstances of how many times you

4   failed the preparatory or the premonitory exam for

5   your Step 1.  It is coming back.  What is also

6   coming back as we're talking this through is your

7   letter from the psychiatrist or the psychotherapist.

8      Q.   Tell me what you recall.

9      A.   He's in CBT therapy and acquiring

10  strategies for managing his symptoms.  He is

11  considering psychotropic medication.

12          What I am remembering is an attestation

13  from a therapist that describes an interventional

14  program in progress, not being executed, nor any

15  verification of it's benefits.  That's what I

16  recall.

17     Q.   So would that be the reason why you

18  decided to uphold his dismissal?

19     A.   Yes.  As well as your past performances.

20     Q.   So just to be clear, because plaintiff's

21  psychiatrist said that he didn't -- let me rephrase.

22          Just because plaintiff's psychiatrist

23  implied that he was hesitant about taking medication

24  for his disability, that's why you decided to uphold

25  his dismissal?

Page 43

1           MR. AWODIYA:  I'm good.

2           MR. ROMAN:  Okay.  I just have some brief

3       follow-up questions.

4           I'd like to mark as Exhibit 2 this

5       document.  It's a copy of the reinstatement

6       letter.

7               (Thereupon, the referred-to document was

8               marked by the court reporter for

9               Identification as Defendant's Exhibit 2.)

10                  RECROSS-EXAMINATION

11  BY MR. ROMAN:

12      Q.   If you could take a moment to review that

13  exhibit, which is, I believe, a letter dated

14  October 31, 2018, from you to Mr. Awodiya.

15          Is that the reinstatement letter you've

16  been referencing?

17      A.   Yes, it is.

18      Q.   And when you review that letter, are there

19  any conditions that are placed on the offer of

20  reinstatement?

21      A.   There are not.

22      Q.   If Mr. Awodiya were to respond on or

23  before November 7th, 2018, indicating that he

24  accepted that offer, would he be enrolled as a

25  student at Ross?

fd61cff3-23a5-4555-a5dd-db0ed4458830

12/4/2018     Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.     William Owen

Page 44

1       A.   Yes, he would.

2           MR. ROMAN:   Okay.   I have nothing further

3       at this time.

4           Mr. Awodiya?

5               REDIRECT EXAMINATION

6   BY MR. AWODIYA:

7       Q.   If plaintiff demanded extended testing

8   time, would you have agreed to that?

9       A.   That would not be our procedure.   It does

10  not come to me to deem extended testing time.   It

11  would go --

12      Q.   So this does not --

13          MR. ROMAN:   If you could just let Dr. Owen

14      finish his answer, and then, ask your next

15      answer.

16          THE WITNESS:   Thank you.

17          The accommodations officer, the Associate

18      Dean of Student Affairs, would render their

19      opinion about your eligibility.   It is not a

20      decision that is rendered by the dean.

21          The principle -- or a principle issue

22      around extended time, which would be a point of

23      conversation, is that, as you know, the boards

24      do not necessarily -- and we have had the

25      circumstance where they have not transferred