# UNITED STATES DISTRICT COURT

for the
Southern District of Florida

FILED BY _PG_ D.C.

MAR 2 6 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

|  |  |
|---|---|
| OLUWAMUYIWA AWODIYA,<br>*Plaintiff,*<br><br>-v-<br><br>ROSS UNIVERSITY SCHOOL OF<br>MEDICINE, SCHOOL OF<br>VETERINARY MEDICINE LIMITED<br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.   0:18-cv-60482-KMM<br><br><br>Hon. Chief Judge: K. Michael Moore<br>Magistrate Judge: Alicia O. Valle |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE
## TO EXCLUDE NEW THEORIES OF LIABILITY

Plaintiff Oluwamuyiwa Awodiya ("Plaintiff"), in proper person, hereby files his response

to defendant Ross University School of Medicine, School of Veterinary Medicine Limited's

("RUSM") Motion in Limine to Exclude New Theories of Liability ("Motion") [ECF No. 160].

**Table of Contents**

I.      **Introduction**..................................................................................................... **1**

II.     **Factual Background** .......................................................................................... **1**

III.    **Argument** .......................................................................................................... **2**

      A.      Notice of "Theories" ........................................................................... 2

              i.      Plaintiff Disagrees with RUSM's Characterization of Its Decisions to Not Allow Plaintiff to Retake His Exam with an Accommodation in Lieu of Making His Dismissal Final......................................................... 3

              ii.     The Complaint Contains Notice of Multiple "Theories" of Discrimination. ......................................................................................................... 3

      B.      RUSM's Attempt to Invoke the "No Second Chance" Doctrine is Misplaced ......................................................................................................... 5

              i.      Performance vs Misconduct............................................................ 5

              ii.     RUSM's Reliance on *Halpern* is Misplaced.............................. 6

              iii.    RUSM was Informed of Plaintiff's Disabilities Before the Failed NBME CBSE Attempts............................................................................. 7

              iv.     The Distinction between an Appeal to Dismissal and an Application for Readmission................................................................................. 8

              v.      Courts Within the Fourth Circuit have Refused to Extend the Holdings of *Halpern*, Based on the Facts. ...................................................... 9

              vi.     On the Facts, Plaintiff's Requests for Test Accommodations Made During His Formal Appeals were Timely as a Matter of Law and RUSM was Required to Attempt a Reasonable Accommodation for His Disability... 10

              vii.    Analogous Employment Context: During an Academic Appeal, RUSM is Still in a Position to Respond to a Student's Need for an Accommodation, if the Student's Disability had Never Been Accommodated. ................... 13

IV.     **Conclusion** ...................................................................................................... **17**

## I.    INTRODUCTION

RUSM is attempting to use a 'motion in limine' as an improper vehicle to limit Plaintiff's entire discrimination claims to its own self-serving narrative by framing its narrative as a "theory of liability." Further, Plaintiff gave RUSM notice of multiple "theories" of discrimination. RUSM also attempts to invoke the "no second chance" doctrine as an excuse for its failure to accommodate Plaintiff's disability during the formal appeals to his dismissal. On the facts, this argument fails as a matter of law.

## II.    FACTUAL BACKGROUND

In December 2015, Plaintiff was diagnosed with Attention Deficit Disorder Without Mention of Hyperactivity ("ADHD"). In January 2016, Plaintiff was diagnosed again with ADHD. In February 2016, Plaintiff was diagnosed with "Anxiety" by RUSM. RUSM was unable to specify the type of anxiety disorder that it diagnosed Plaintiff with. Before Plaintiff was dismissed— Plaintiff informed RUSM administration about his ADHD and the unspecified anxiety disorder, and that he was running out of time on his exams and is unable to complete them in the standard time allotted. Plaintiff did not receive any test accommodations for his disorders. A year later, RUSM sent Plaintiff a dismissal notification letter because of the performance on his exams.

In April 2017, Plaintiff met with a psychotherapist for his anxiety disorder. The psychotherapist confirmed that the anxiety that Plaintiff was suffering from since 2011 was specific to Obsessive Compulsive Disorder.

Plaintiff formally appealed his dismissal and resumed his efforts of re-informing RUSM administration of his ADHD and his anxiety disorder re-diagnosed as OCD. During his appeal, Plaintiff's psychotherapist informed RUSM that his academic performance was adversely affected by his anxiety disorder and Plaintiff again continued to re-inform RUSM that he never finished his exams because of a disability.

1

Pursuant to the Student Handbook, an academic dismissal is not final until a decision is made by the Dean. This opportunity is afforded to all RUSM students. When a student informs the school of a disability during the appeal process of a dismissal, Dean Owen testified that it is procedure to investigate the student's disability for possible mitigating factors that could allow the student to be successful.

In June 2017, Dean Owen made the final decision to permanently dismiss Plaintiff from the school.

## III.   ARGUMENT

As an initial matter, RUSM has mischaracterized Plaintiff's Statement of the Case ("Plaintiff's Statement") [ECF No. 151]. RUSM argues that "Plaintiff now takes the position that Dean Owen failed to accommodate Plaintiff by failing to *re-admit* him *after* his appeal." Motion at 2. RUSM is incorrect. What Plaintiff actually stated was that "RUSM also failed to accommodate Plaintiff *during* his formal appeal of his dismissal." Plaintiff's Statement at 4. And during the formal appeal, he asked to retake an exam on the account that he never finished it due to a misdiagnosed-anxiety disorder already known to RUSM prior to his attempts. *Id.*

### A.   Notice of "Theories"

Plaintiff did not sue Dean Owen. Plaintiff has sued RUSM. Dean Owen is an agent of RUSM. RUSM has not and cannot cite any authority that requires him to name every single agent, officer, or committee of RUSM in each of his allegations against the school.

*See* Plaintiff's Third Amended Complaint ("Complaint") [ECF No. 47]. A complaint should contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "In General. Each allegation must be simple, concise, and direct. No technical form is required." Fed. R. Civ. P. 8(d)(1). "A complaint need not specify in detail the precise theory giving rise to recovery." *Sams v. United Food Commercial Wkrs. Int'l*, 866 F.2d

1380, 1384 (11th Cir. 1989). Pleadings must be construed "so as to do justice." Fed. R. Civ. P. 8(e).

     i.     <u>Plaintiff Disagrees with RUSM's Characterization of Its Decisions to Not Allow Plaintiff to Retake His Exam with an Accommodation in Lieu of Making His Dismissal Final.</u>

RUSM attempts to frame its failure to provide an accommodation—during Plaintiff's appeal, before Dean Owen's decision to finalize Plaintiff's dismissal—as a separate failure to accommodate "theory." Specifically, allowing Plaintiff to retake the NBME CBSE **with** an accommodation. As reflected in the Complaint, Plaintiff has always viewed Dean Owen's final decision to dismiss Plaintiff, as the point of which Plaintiff was dismissed, officially dismissed, permanently dismissed or any other way that RUSM may attempt to characterize this. An example of this view is when Plaintiff stated, "The Dean did not make his **final decision to permanently dismiss** Plaintiff within 15 calendar days of receipt of the appeal." Complaint ¶ 34 (emphasis added). Plaintiff's dismissal was a process, that was not finalized or completed until the Dean made a final decision—or if a student fails to appeal within 15 days of a dismissal notification— as set forth in the Student Handbook. A true and correct copy of excerpts from the Student Handbook are attached as **Exhibit A**. Dean Owen testified that this process includes an evaluation of a student's academic performance and/or disability and possible modifications that could allow a student to remain at the school, in lieu of making a student's dismissal final or permanent. The distinction between an appeal to dismissal and an application for readmission is an important one pursuant to the Student Handbook. This distinction is discussed in detail below. *See infra* Section III.B.iv.

     ii.     <u>The Complaint Contains Notice of Multiple "Theories" of Discrimination.</u>

In addition to the allegations prior to failing the NBME CBSE, *see* Complaint ¶¶ 8–26, the Complaint additionally alleges, "RUSM eventually dismissed Plaintiff for failure to pass any of

his NBME CBSE attempts. Despite RUSM's knowledge of Plaintiff disability, RUSM [Dean Owen] failed to address his disability and dismissed him," *id.* ¶¶ 27–28. "RUSM's failures to provide Plaintiff with minimal accommodations and to modify **its evaluation of his academic performance in light of his disability**, despite RUSM's knowledge of his disability and despite Plaintiff's repeated requests, are in direct violation of law." *Id.* ¶ 32 (emphasis added). "Defendant exercised bad faith in failing to provide appropriate and necessary accommodations and modifications to Plaintiff **so that he could continue in his educational program**, which is a violation of Section 504." *Id.* ¶ 51 (emphasis added). Further, Plaintiff followed his ADA cause of action with "*et seq*."

When Plaintiff typed his Complaint, he lacked—and somewhat still lacks—the legal vocabulary to label every form of disability discrimination by a specific "theory" of discrimination. For example, RUSM's decision to accommodate other students with a disability during a formal appeal to their dismissal, as an opportunity to remedy their academic performance adversely affected by a disability, but to deny Plaintiff the same opportunity falls under either failure to accommodate, disparate treatment, retaliation, intentional discrimination, or the otherwise discriminated theory.

Regardless of Plaintiff's inability to tell the exact differences between these "theories," Plaintiff put RUSM on notice of these additional theories in addition to his failure to accommodate theory. *Compare* Complaint ¶ 49 (failure to accommodate claim), *with* ¶¶ 50, 51 (the other type of discrimination claim). Despite Plaintiff's efforts to label the discrimination during RUSM's 'appeal to dismissal' service afforded to student's facing permanent dismissal, "[a] complaint need not specify in detail the precise theory giving rise to recovery." *Sams v. United Food Commercial Wkrs. Int'l*, 866 F.2d 1380, 1384 (11th Cir. 1989).

**B.     RUSM's Attempt to Invoke the "No Second Chance" Doctrine is Misplaced**

RUSM has a specific process outlined in the Student Handbook for dismissing students for misconduct that involves sanctions, hearings, "Non-Academic Probation" and many other procedures involved in dismissing students on the basis of misconduct, behavior, or professionalism. Student Handbook at 28. Based on RUSM's argument, Plaintiff is under the assumption that RUSM is referring to academic performance (test grades) as misconduct. To the extent that RUSM is referring to anything other than Plaintiff's grades and test scores, he reserves the right to supplement his argument in the event that RUSM later asserts a different meaning of "misconduct."

First, RUSM cites caselaw completely out of context. RUSM's position on misconduct is unclear. It seems to conflate the timing of an accommodation request with excusing, ignoring, or tolerating "misconduct." Second, regardless of RUSM's position, its reliance on either argument is misplaced. Such an argument requires a fact intense inquiry about the reasonableness and timeliness of a "request."

In general, RUSM contends that it cannot be liable for discrimination that occurred between RUSM's initial decision to dismiss Plaintiff and Dean Owen's final decision to dismiss Plaintiff during his appeal. RUSM may not be required to tolerate unsatisfactory performance. However, RUSM had a legal obligation to attempt a reasonable accommodation to remedy unsatisfactory performance caused by a disability that limits a technical standard required to achieve or maintain satisfactory performance, when it has knowledge of the limitation and a plausible accommodation existed—while it was still in a position to respond.

i.     Performance vs Misconduct.

As an initial matter, the disability-related distinction between performance-based dismissal and misconduct-based dismissal may be an important one. Discussed later in context, this

5

distinction is fact specific to whether a reasonable accommodation existed and whether the entity

was still in a position to respond. However, at times where the distinction becomes relevant in this

case, "[w]hether a firing based on disability-related [misconduct] constitutes disability-based

discrimination under the ADA is an open question in this circuit." *Caporicci v. Chipotle Mexican

Grill, Inc.*, No. 16-13494, at *9 (11th Cir. Apr. 5, 2018) (per curiam).

      ii.    RUSM's Reliance on *Halpern* is Misplaced.

      RUSM's heavy reliance on *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454

(4th Cir. 2012) is misplaced. Mr. Halpern was unable to propose a reasonable accommodation to

help remedy or avoid his behavioral misconduct, he merely proposed that the school tolerate his

un-accommodatable behavioral misconduct because it was related to his disability. "A school, if

informed that a student has a disability with behavioral manifestations, may be obligated to make

accommodations to help the student avoid engaging in misconduct. But, the law does not require

the school to ignore misconduct that has occurred because the student subsequently asserts it was

the result of a disability." *Id.* at 465. The first sentence is important. As the Tenth Circuit has

explained:

> We therefore disagree with the district court's conclusion that the ADA's general anti-discrimination provision, 42 U.S.C. § 12112(a), contemplates a stark dichotomy between "disability" and "disability-caused misconduct." Rather, the language of the ADA, its statutory structure, and the pertinent case law, suggest that an employer should normally consider whether a mentally disabled employee's purported misconduct could be remedied through a reasonable accommodation. If so, then the employer should attempt the accommodation. If not, the employer may discipline the disabled employee only if one of the affirmative defenses articulated in 42 U.S.C. §§ 12113, 12114 (1994) applies.

*Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1088 (10th Cir. 1997).

First, when Mr. Halpern appealed his dismissal, he "maintained that his medical conditions did not impact his ability to participate in the Medical School." *Halpern*, 669 F.3d at 465. However, he also maintained "that his behavioral problems were manifestations of a disability." *Id.* During Mr. Halpern's appeal, the limitations of his disability were not at issue, rather, it was the behavioral misconduct related to his disability that were at issue. This is an example of when performance vs misconduct may be relevant to the reliance on this case.

Second, the school attempted to accommodate Mr. Halpern's disability before concluding that there was no reasonable accommodation that could help him avoid his misconduct. "[D]espite numerous attempts by Medical School faculty to assist Halpern in rectifying his conduct, he continually lapsed into problematic practices.... [T]he School granted Halpern the medical leave and testing accommodations that he requested. Despite these efforts, Halpern's lack of professionalism remained an issue." *Id.* at 466.

The school, Mr. Halpern, and his expert "was unable to identify any accommodation that could ensure Halpern would not engage in such behavior." *Id.* "Thus, Halpern sought not a disability accommodation, but 'a second chance to better control his treatable medical condition.' This, however, 'is not a cause of action under the ADA.'" *Id.* at 465 (alterations omitted) (quoting *Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir.1999)).

   iii. <u>RUSM was Informed of Plaintiff's Disabilities Before the Failed NBME CBSE Attempts.</u>

Plaintiff's performance that RUSM has characterized as misconduct, could have been avoided had RUSM accommodated the disabilities that were diagnosed or misdiagnosed prior to the exams that lead to Plaintiff's dismissal. RUSM never attempted to accommodate Plaintiff's disability and left Plaintiff to take every exam without any test accommodations. To the extent relevant, Plaintiff did not "subsequently" assert for the first time that his performance was the

result of a disability. RUSM knew of Plaintiff's disability and inability to meet a technical standard (completing exams in a "timely fashion") required for satisfactory performance prior to his failing performance on the NBME CBSE. Plaintiff reaffirmed this fact during his appeal and before Dean Owen made a final decision—while RUSM was still in a position to respond.

<div align="center">

iv.     The Distinction between an Appeal to Dismissal and an Application for Readmission.
</div>

Contrary to RUSM's characterization, an appeal to a dismissal is not an accommodation. It is an opportunity afforded to all RUSM students, able-bodied or disabled. Further, a student's appeal to a dismissal is an entirely different process than a student who reapplies for readmission to the school, according to the Student Handbook, Ex. A. The former is a process to remain at the school, while the latter is a process to reenter to the school. In any case, neither process is an accommodation in itself. For example, students who reapply to the medical school are in a similar situation to prospective students who apply to the medical school for the first time. The admission or readmission of a student is not an accommodation.

An academic dismissal is a process, that is not final until the Dean of RUSM makes a final decision or if a student fails to appeal within 15 days of a dismissal notification letter. *See* Student Handbook at 36–37 ("The Dean's decision is final."). This appeal process begins with a "dismissal notification letter," followed by a decision by the Student Promotions Committee (SPC), then a final decision by the Dean of RUSM. *Id.* A successful appeal to overturn a dismissal will reinstate a student. *Id.* at 37.

A readmission process is an entirely different service offered by RUSM. This service is handled by a special "Readmission Committee" as opposed to the Student Promotions Committee or the Dean. *See* Student Handbook at 99 ("Students who wish to return to RUSM after withdrawing must apply for readmission …. Applications for readmission will be reviewed by the

<div align="center">8</div>

Readmission Committee."). This service is available to students who wish to return after an Unauthorized Absence or a Withdrawal from RUSM. *Id.* at 43–44. However, students that are dismissed are barred from using this readmission service. *Id.* at 45.

      v.    <u>Courts Within the Fourth Circuit have Refused to Extend the Holdings of *Halpern*, Based on the Facts.</u>

RUSM's argument was rejected in *Gray v. BMW Mfg. Co.*, Civil Action No. 7:15-cv-4133, at *14 (D.S.C. Aug. 16, 2017):

> The second prong of MAU's objection to the Magistrate Judge's conclusion regarding Gray's request for an accommodation is MAU's contention that the request was untimely because Gray had already been terminated at the time he asked to show proof of his prescription. Here, MAU relies upon the Fourth Circuit's holding in *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454 (4th Cir. 2012), for the proposition that a "post-termination" request for accommodation is untimely and need not be considered.

*Id.* at 14. The *Gray* court held:

> The facts in *Halpern* are readily distinguishable from those at issue here. Mr. Halpern was dismissed from medical school for *misconduct*, and only after repeated wrangling, *over a course of years*, with the school administration regarding his medical needs and behavioral issues. Here, there is ample evidence that Gray had a valid prescription, no evidence that he engaged in misconduct, and no evidence that his use of Adderall had any adverse effects on his work performance. Viewed in the light most favorable to Gray, the facts suggest that he only received actual notice of the requirement to provide his prescription information *during* the termination meeting itself. Given these circumstances, the Court agrees with the Magistrate Judge, and finds that a reasonable jury could conclude that MAU refused to provide a reasonable accommodation timely requested by Gray.

*Id.* at *15 (emphasis in original; internal citation omitted).

Another court in the Fourth Circuit held the same in *Kemp v. JHM Enterprises, Inc.*, No. 6:14-cv-02604-TMC-KFM, at *11–13 (D.S.C. Mar. 7, 2016) (refusing to extend the holding of

*Halpern* and denying summary judgment on accommodation claim where employee requested

accommodation during his termination meeting):

> [Defendant] contends that Kemp failed to present sufficient
> evidence to meet the fourth prong, because Kemp never requested
> an accommodation until after he learned of his termination, thereby
> precluding him from proving that JHM refused to accommodate
> him. Additionally, [Defendant] argues that the Report "erroneously
> disregarded" *Halpern v. Wake Forest University Health Sciences*,
> 669 F.3d 454 (4th Cir. 2012) and *Karoue v. Blue Cross Blue Shield
> of South Carolina*, C/A No. 3:13-cv-01844, 2014 WL 5810321
> (D.S.C. Nov. 7, 2014).
>
> ....
>
> Furthermore, the court finds the Report accurately summarizes the
> law, and that neither *Halpern* nor *Karoue* are persuasive in this
> case.... [T]he court finds significant factual differences between
> *Halpern*, *Karoue*, and this case, and is unwilling to extend the
> holdings in those cases to foreclose Kemp's ability to proceed past
> summary judgment.

*Id.* at *11–13.

In both *Gray* and *Kemp*, the plaintiff's requested an accommodation only after they learned

of their termination. These cases show that there is a difference between a "subsequent" request

for a second chance (ignoring misconduct or performance where no reasonable accommodation

existed) and a "subsequent" request for an accommodation (attempt to remedy misconduct or

performance where a reasonable accommodation existed).

> vi.    On the Facts, Plaintiff's Requests for Test Accommodations Made During
>        His Formal Appeals were Timely as a Matter of Law and RUSM was
>        Required to Attempt a Reasonable Accommodation for His Disability.

Here, the facts of this case show that Plaintiff's dismissal appeals to retake his exam with

an accommodation for his disability were timely and a reasonable accommodation for his disability

existed (extended testing time). RUSM had a legal obligation to attempt a reasonable

accommodation that could remedy Plaintiff's performance on exams caused by disabilities that

limited his ability to meet a technical standard required to achieve or maintain satisfactory performance.

There is perhaps no case more on point than *Steere v. George Washington University*, 368 F. Supp. 2d 52, 56–57 (D.D.C. 2005) (Observing the "no second chance" doctrine also adopted in the D.C. Circuit, but denying defendant's summary judgement on the grounds that a medical student's subsequent request for test accommodations made after she was dismissed but during her appeal to the Dean, were timely because the Dean had total discretion to adopt or ignore the decision of the school's Medical Student Evaluation Committee ("MSEC")). In *Steere*, "defendants first argue that they had no obligation to provide either modification because plaintiff had failed to request the modifications in time — that is, before dismissal." *Id*. at 56. With respect to timeliness, the *Steere* court held:

> It is presently undisputed that plaintiff requested accommodations and submitted medical evidence of his condition after the MSEC made its recommendation but before the dean acted on that recommendation.
>
> … [W]hile a university has no obligation to readmit a dismissed student who later learns of a disability, and while an university need not accommodate a student undergoing testing for a disability or a student who only thinks she is disabled, a university does have an obligation once it learns that a student is disabled, *Wynne v. Tufts School of Med.*, 976 F.2d 791, 795 (1st Cir. 1992).
>
> The defendants' own regulations doom their timeliness argument: they give the Dean total discretion to adopt or ignore the MSEC recommendations.

*Steere*, 368 F. Supp. 2d at 56 (internal citations omitted). With respect to ignoring misconduct, contemplated by RUSM, the *Steere* court held:

> Defendants next argue that the modifications that plaintiff requests are unreasonable because they amount to a request for a second chance. Some courts have admonished that the ADA requires reasonable modifications, but not second chances. Under this "no

11

second chance" banner, courts have held that for a student or worker who cannot perform satisfactorily even when accommodated and gets terminated as a result, the reversal of the termination decision would not be a reasonable modification.... The second chance doctrine, in so far as it is a doctrine, works to deny already accommodated and at-fault plaintiffs from winning an endless string of new accommodations after each failure. The doctrine does not apply to plaintiffs who, through no fault of their own, have not yet had a chance to get the modifications they need. *See Dudley v. Hannaford Bros. Co.*, 333 F3d 299 (1st Cir. 2003).

In *Dudley*, the First Circuit found that a second chance — a reconsideration of a decision — could be required under the ADA.

The facts of this case fit far more comfortably within the *Dudley* framework than within the framework of the typical "no second chance" cases. In this case, **the Dean, though he had plaintiff's disability report, gave it no weight in his decision to adopt the MSEC recommendation.** He stated that his decision was based on plaintiff's poor academic performance and that he was adopting the recommendation of the MSEC, which was made before anyone knew of plaintiff's disability.... **Plaintiff's medical school failures, then, occurred while he was not accommodated in any way. He does not seek a second chance to monitor her disability or a new set of accommodations. Plaintiff seeks a first chance to successfully handle his disability.** Plaintiff's request for reconsideration, like Dudley's, is not unreasonable on the ground that it asks for a second chance, and therefore, summary judgment is not appropriate.

*Steere*, 368 F. Supp. 2d at 56–57 (emphasis added).

Also on point is *Singh v. George Washington*, 508 F.3d 1097, 1105 (D.C. Cir. 2007)

(distinguishing the "no second chance" precedence in many circuits on the facts):

GW argues that Singh's request for reasonable modifications was untimely, as she did not notify the school of her diagnosis or disability until a faculty committee had already recommended her dismissal.

... [Plaintiff] challenges GW's actions *after* she informed the Dean of her diagnosis and requested modifications, when the University was in a position to respond.

> While GW invokes a so-called "no second chance" doctrine to justify its refusal to accommodate Singh, its argument confuses the issue of timeliness with the underlying reasonableness of the plaintiff's request. The precedential authorities cited by GW and *amici* relied on findings that the plaintiff's had failed to request any real accommodation, see *Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir.1999) .... None of these circumstances is found here. In particular, GW points to no major commitment of resources that would be wasted as a result of its having to consider Singh's accommodation claim at the time she raised it.

*Singh*, 508 F.3d at 1105.

> vii.   Analogous Employment Context: During an Academic Appeal, RUSM is Still in a Position to Respond to a Student's Need for an Accommodation, if the Student's Disability had Never Been Accommodated.

In general, ADA holdings in the employment context do not always fit with ADA holdings in the postsecondary context. On the issue of the no second chance doctrine, it is important to distinguish the fact that employers typically do not have an appeal process for termination. On the facts however, if the circumstances similar to an appeal process arises in the employment context, the entity has entered into a legal position to respond to requests for a reasonable accommodation, if the accommodation would enable the employee to perform the essential functions of the job.

In a case where a court noted that an employer is not required to approve a "retroactive accommodation" or "second chance" excusing prior misconduct stemming from the alleged disability—the court refused to apply the doctrine on the fact that employer was in a position to respond, after its termination decision, even if the request may have been untimely. *Simon v. Schlumberger Tech. Corp.*, CIVIL ACTION NO. 13-CV-3074, at *16 (W.D. La. Dec. 19, 2014) ("In the instant case, the court is not faced with a typical misconduct issue, as was considered in most 'second chance' cases cited by the parties. Further, even if Plaintiff's request for accommodation relative to a third entrance exam opportunity may have been untimely when made on November 2, 2012, the record demonstrates that her employer responded to the request by

opening the ADA interactive process and allowing for consideration of the accommodation request on receipt of additional information from her healthcare provider. Once started, both parties bear responsibility to participate in good faith.").

Another case taking note of the no second chance doctrine, held that an employee's request for accommodation made after her employer notified her that she would be terminated—but before a final decision was returned—was timely because the employer was still in a position to respond. *Von Drasek v. Burwell*, 121 F. Supp. 3d 143, 157–158 (D.D.C. 2015):

> EEOC guidance explains that reasonable accommodation is "prospective," so employers are "not required to excuse past misconduct even if it is the result of the individual's disability." But the guidance also notes that the employer "must make reasonable accommodation" to enable the employee to succeed going forward, and on the specific issue of timeliness, the guidance emphasizes that there is no deadline by which an employee must request an accommodation[.]
>
> Moreover, under regulations promulgated by the Office of Personnel Management, 5 C.F.R. § 432.101 *et seq.* (2014), an employee for whom removal has been proposed has the right to provide a written response, and as part of this response, the employee may provide medical records, which **the employer must consider before issuing a final decision** on the proposed employment action, *see* 5 C.F.R. § 432.105(a)(4)(iv). Indeed, an OPM regulation specifically instructs that "[t]he agency *shall* allow an employee who wishes to raise a medical condition which may have contributed to his or her unacceptable performance to furnish medical documentation[,]" *id.* (emphasis added), and although the regulation expresses a preference that employees submit such medical documentation *before* a proposed removal, OPM makes clear that the agency must still consider the documentation if it is not submitted until afterwards, and it also stresses that the agency "shall be aware" of the reasonable accommodation duty if "the employee offers [medical] documentation after the agency has proposed a reduction in grade or removal[.]"

*Burwell*, 121 F. Supp. 3d at 157–158 (bold added; brackets and italics in original) (internal citation omitted from first paragraph). "[T]hese decisions simply do not stand for the proposition that a

14

request for accommodations made by a permanent employee before a final notice of removal has issued is untimely…. Von Drasek's request was timely, and thus, the [defendant's] contention that it had no obligation to consider Von Drasek's request for accommodations under the circumstances presented here is unavailing." *Id.* at 158; *See also Nguyen v. City & Cnty. of Denver*, 286 F. Supp. 3d 1168, 1185-86 (D. Colo. 2017) ("[Defendant's] argument that Officer Nguyen wanted [accommodations] to excuse his past performance falls flat. Officer Nguyen does not ask exceptional treatment because of his disability; he asks for equal treatment despite it. Thus, Dr. Feehs's recommendations did not come too late …."); *Equal Emp't Opportunity Comm'n v. Ford Motor Co.*, 752 F.3d 634, 645 (6th Cir. 2014) ("[Defendant] cannot use [Plaintiff's] past attendance issues as a basis to deny her accommodation because her absences were related to her disability."); *Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001) ("It would be inconsistent with the purposes of the ADA to permit an employer to deny an otherwise reasonable accommodation because of past disciplinary action taken due to the disability sought to be accommodated."); *Perez v. Procter Gamble Manufacturing Company*, No. Civil S-99-2000 FCD/DAD, at *1 (E.D. Cal. Aug. 24, 2001) ("Where an employee's disciplinary status is due to the disability sought to be accommodated, the disciplinary status cannot serve as a basis for denying a reasonable accommodation.").

For the same reasons that *Halpern* is inapposite, *Alvarez v. Sch. Bd. of Broward Cnty.* is also inapposite, which also relied heavily on *Halpern*. In *Alvarez*, the plaintiff was unable to pass a certification exam to remain at his SSRP position and "accepted a demotion … in lieu of termination." *Alvarez v. Sch. Bd. of Broward Cnty.*, 208 F. Supp. 3d 1281, 1283 (S.D. Fla. 2016). "[A]fter failing the [certification] exam four times, he consulted his neurologist." *Id.* at 1284. Subsequently, he requested "testing exemption" to reinstate him to his higher paying SSRP

position as a form of accommodation, which the defendant denied. *Id.* Rather than exempting him from the certification exam, the "[d]efendant approved [p]laintiff's request for a testing accommodation" and he "passed the test with these accommodations and obtained the [] certification." *Id.* When the "[d]efendant eventually advertised a new SSRP vacancy… [p]laintiff applied for the SSRP position and was selected as a new hire[.]" *Id.* Under these facts, the Court held that "while the ADA may require reinstatement … as a form of accommodation …. By the time [p]laintiff requested 'reinstatement' to his prior higher-paying position, he was effectively **seeking a promotion**. Defendant was under no obligation to grant **that** request." *Id.* at 1286 (emphasis added). Summarily, Mr. Alvarez's request to exempt him from obtaining the certification after he accepted a demotion was not a request for an accommodation, it was a request to be promoted to his former position without it. However, the defendant subsequently provided him with reasonable testing accommodations to obtain the certification and then gave him his former position back when a vacancy became available.

Also, the *Alvarez* case, cited by RUSM, actually hurts RUSM's argument as the Court further stated that "[h]ad [p]laintiff made a request … for testing accommodations and **postponement of his demotion** until he had the opportunity to take the test under the modified conditions, [p]laintiff would have had a much stronger claim." *Alvarez v. Sch. Bd. of Broward Cnty.*, 208 F. Supp. 3d 1281, 1287 (S.D. Fla. 2016) (emphasis added). The Court also took note of "special circumstances" that make reinstatement a reasonable accommodation, for example, where (1) "the employer knew that the employee suffered from a serious mental illness"; (2) "the employee was told that he would not receive an accommodation before he even knew that he needed one"; and (3) "the employer took the opportunity to fire the employee 'as soon as it could'

with virtually no 'interactive process.'" *Alvarez*, at 1286 n.2. But that "[n]one of th[o]se circumstances [were] present in the case at hand." *Id.*

## IV.    CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order, (i) denying defendant Ross University School of Medicine, School of Veterinary Medicine Limited's Motion in Limine to Exclude New Theories of Liability [ECF No. 160]; and (ii) granting Plaintiff such other and further relief as the Court deems just and proper.


DATED this 22nd day of March, 2019:

<div align="right">

Respectfully submitted,

By: Oluwamuyiwa Awodiya, *pro se* litigant
15005 Dahlia Dr.
Bowie, MD 20721
(240) 602-1836
Plaintiff, in Proper Person

</div>

## CERTIFICATE OF SERVICE

I do hereby certify that on the 22nd or 25th day of March, 2019 (if the latter, Plaintiff will

pay for the expensive shipping), I have caused a true and correct copy of the foregoing by mailing

a copy to the Court, where the Court's CM/ECF system will send notification to the following:

**Ryan Roman**
Akerman Senterfitt
Suntrust International Center
1 SE 3rd Avenue
25th Floor
Miami, FL 33131-1714
305-374-5600
Fax: 305-374-5095
Email:
ryan.roman@akerman.com

**Octavia Monique Green**
Akerman LLP
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, FL 33131
(305) 982-5670
Email:
octavia.green@akerman.com

By: Oluwamuyiwa Awodiya, *pro se* litigant

# Exhibit A



# ROSS UNIVERSITY
## SCHOOL OF MEDICINE

# *STUDENT HANDBOOK*

# 2015 – 2016

## January 1, 2016

© 2016 Ross University School of Medicine.  All rights reserved.

28

- Periods when the student is on an AA for preparation and time needed to schedule and take the USMLE Steps 1, 2 CK and 2 CS (See **Absences, Withdrawals and Deferrals**.); or
- The time of regularly scheduled breaks between semesters; or
- While pending assignment to a scheduled clinical clerkship; or
- A semester during which an AA is taken, or in which the student withdraws prior to the end of week two of the semester, will not be counted toward the limit for meeting the above requirements.

Students who do not meet the standards for SAP are subject to dismissal. However, under very unusual circumstances, the Student Promotions Committee may determine, on an individual basis, that a student may continue at RUSM for one semester (on Probationary status).

**Probation**
Students may be placed on academic probation for academic issues. Academic Probation is based on both course work and professional behavior, and is recommended by the Promotions Committee to the Dean. Academic Probation may be imposed in any semester, including clinical semesters.

RUSM grants professional degrees, and thus professional behavior is as important as academic performance. Students may also be placed on Non-Academic Probation for professionalism or behavioral problems, upon recommendation of the Grievance Committee or Honor Council to the Senior Associate Dean of Student Affairs. Non-Academic Probation is based on a student's behavior which does not meet one or more of the requirements in this Student Handbook (See **Code of Conduct**), and can be imposed in any semester, including the clinical semesters.

## EXAMINATIONS

### *Foundations of Medicine Examinations*

**Locations of Exams**
All examinations in the Foundations of Medicine semesters are taken on the Portsmouth campus, except clinical practical examinations, which may be given in the Princess Margaret Hospital or other RUSM approved settings.

**Examination Protocol**
All students must bring their official RUSM identification card to all exams, and be at their assigned locations 15 minutes prior to the beginning of an examination. Students arriving at the examination location without ID or once the proctor has begun giving instructions will be denied entry to the exam and will receive a mark of zero on the examination.

If a student suspects a fellow student of cheating during an exam, the student should discreetly alert an exam proctor. A student found cheating on an examination receives a grade of zero for that examination, and is subject to dismissal from RUSM. No bags, books, electronic devices, or cellular phones may be brought into the examination room.

During electronic examinations, if there are unavoidable human/technical difficulties that occur, the Executive Chief Proctor may offer student(s) a choice of accepting the results of the exam(s) or immediately retaking the exam. Make-up exams are not conducted after scheduled exam dates; therefore, student(s) who choose to re-test will re-test immediately upon conclusion of the scheduled exam and after a 15 minute supervised break.

**Mid-term and Final Examinations Scheduling**

35

- the subject of negative reports for behavioral reasons or an investigation by the medical school or parent university and;
- limitations or special requirements imposed on the individual because of questions of academic incompetence, disciplinary problems, or any other reason.

## ACADEMIC DISCIPLINARY ACTIONS

**Academic Probation**
The Academic Probationary status of a student is determined by the Student Promotions Committee. Students are placed on Academic Probation under the following circumstances:

- When repeating a Foundations of Medicine semester;
- When cumulative GPA is below 2.00;
- When taking an AA with 1 or more WFs;
- After readmission with 1 or more WFs earned during the last attempted term;
- After readmission with a previous cumulative GPA under 2.0;
- After failing a clinical clerkship;
- Remediation of a core clerkship
- After successfully appealing a dismissal.

Students will be removed from Academic Probation if, at the end of the next semester, they pass all courses and their cumulative GPA is 2.00 or higher and/or successfully remediated a SCE.

Academic Probation has important financial aid consequences, which are explained in the Office of Student Finance publication, "Financial Planning Guide" available on the www.RossU.edu website.

Students must clear any academic deficiency and should have a cumulative GPA of 2.00 or higher by the end of the pre-clinical curriculum to advance to clinical training.

**Administrative Withdrawal**
Students are subject to Administrative Withdrawal if they:

- Do not register for Foundations of Medicine and IMF semesters by the prescribed deadline determined by the Office of the Registrar;
- Do not return to campus to check-in during the designated check-in period prior to the start of the semester. Check-in period is determined by the Office of the Registrar;
- Fail to report to a clinical clerkship on the first day of the clerkship (for IMF and clinical clerkships);
- Do not return at the time specified at the end of an AA without prior approval or take an unauthorized leave;
- Do not sit the NBME CBSE within three consecutive attempts (or fourth attempt if granted);
- Do not sit for their first attempt of the USMLE Step 1 within six months of becoming eligible;
- Do not sit for their retake of USMLE Step 1 within six (6) months of prior attempt;
- Do not sit for their SCE during designated exam window;
- Do not sit for their first attempt of the USMLE Step 2 CK within six (6) months after completing their core clinical clerkship;
- Do not sit for their retake of USMLE Step 2 CK within one (1) year of prior attempt;

36

- Do not sit for their first attempt of the USMLE Step 2 CS within one (1) year after completing their core clinical clerkship;
- Do not sit for their retake of USMLE Step 2 CS within one (1) year of prior attempt;
- Do not submit USMLE Step results within 30 days of receipt;
- Do not submit sitting dates for Step exams within 30 days of being verified with ECFMG by the Office of the Registrar;
- Do not submit missing file documentation within one semester of being admitted, including but not limited to transcripts, letters of recommendations and immigration documents;
- Do not submit required health documents prior to starting IMF; or
- Failure to meet the conditions of their readmission.

A student who is Administratively Withdrawn will be reported as withdrawn effective the last date of any academically related activity or the date the institution determined the change in status. The withdrawal date will be reported to the U.S. Department of Education which will cause the student's loans to enter repayment status, in accordance with the terms and conditions of the loans.  Please consult with the Office of Student Finance to determine the impact on individual loan repayment.

**Academic Dismissal**
Students are subject to Academic Dismissal based on the following:

- Failing any course or semester upon two attempts;
- Failure of remedial courses;
- Student is, or will be, unable to complete the Foundations of Medicine curriculum in no more than 75 instructional weeks (five semesters) for students who completed their first semester prior to May 2013. Students who complete their first semester after May 2013 must complete their Foundations of Medicine curriculum in 90 instructional weeks (six semesters). The Promotions Committee may make an exception based on academic progress or mitigating circumstances;
- Failure to achieve a cumulative GPA of 2.00 or above by the completion of the Foundations of Medicine curriculum;
- Failure to pass the NBME CBSE in three consecutive attempts;
- Failure to pass the USMLE Step 1 or Step 2 CK or CS in six (6) attempts;
- Failure to pass any SCE in four (4) attempts;
- Failure of two clinical clerkships (including IMF);
- Failure of a clinical clerkship where a grade of R was awarded for the same clerkship;
- Failure to abide by RUSM policies;
- Student demonstrates the inability to meet the RUSM's technical standards;
- Failure to meet the conditions of their reinstatement on appeal; or
- Failure to complete all required degree requirements within seven (7) years of matriculation or as otherwise noted on reacceptance or reinstatement.

Students may also be dismissed for non-academic reasons or professionalism concerns pursuant to the Code of Conduct. (See **Code of Conduct** section in this Student Handbook).

**Appeals Process for Academic Dismissal: Foundations of Medicine**
First Appeal:  Any student dismissed from the Foundations of Medicine curriculum may appeal the dismissal to the Student Promotions Committee – Foundations of Medicine Subcommittee. Academic Dismissal Appeal form and letter should be emailed to PromotionAppeals@RossU.edu  and the Office of the Registrar (Registrar@RossU.edu) and must be made within 15 calendar days of the date on the dismissal notification letter. The appeal will be heard by the Student Promotions Committee – Foundations of Medicine Subcommittee, which will then make an official decision to uphold or overturn the dismissal.

37

Second Appeal:  In cases of procedural irregularity, inappropriate decisions, or where additional data has become available that was not considered by the Student Promotions Committee – Foundations of Medicine Subcommittee, a final appeal may be made to the Dean of RUSM. Academic Dismissal Appeal form and letter must be emailed to the Dean at PromotionAppeals@Rossu.edu and the Office of the Registrar (Registrar@RossU.edu) within 15 calendar days of the date on the decision letter from the Student Promotions Committee – Foundations of Medicine Subcommittee and specifically address the rationale for the appeal.  The Dean will respond within 15 calendar days of receipt of the appeal. The Dean's decision is final.

A student who successfully appeals a dismissal decision will be reinstated for the semester subsequent to the semester in which the decision regarding the appeal is made. For example, a student who is dismissed at the end of the September 2015 term, and is allowed to return, would be on inactive status for the January 2016 term and then resume his/her studies during the May 2016 term if his/her appeal is granted.

For a student who successfully appealed a dismissal for failure to pass the NBME CBSE will be notified of the conditions of reinstatement and provided a deadline to sit for the exam. Requests to change the conditions of the reinstatement are not granted, including an extension to sit for the exam.  Students who are unable to meet the condition of their reinstatement have the option to withdraw.  Failure to meet the condition of the reinstatement will result in a dismissal from RUSM.

**Appeals Process for Academic Dismissal: Clinical Sciences**
First Appeal: Any student dismissed from the Clinical Science curriculum may appeal the dismissal to the Student Promotions Committee – Clinical Sciences Subcommittee. Academic Dismissal Appeal form and letter should be emailed PromotionAppeals@RossU.edu and the Office of the Registrar (Registrar@RossU.edu) and must be made within 15 calendar days of the date on the dismissal notification letter. The appeal will be heard by the Student Promotions Committee – Clinical Science Subcommittee, which will then make an official decision to uphold or overturn the dismissal.

Second Appeal:  In cases of procedural irregularity, inappropriate decisions, or where additional data has become available that was not considered by the Student Promotions Committee – Clinical Sciences Subcommittee, a final appeal may be made to the Dean of RUSM. Academic Dismissal Appeal form and letter must be emailed to the Dean via PromotionAppeals@Rossu.edu and the Office of the Registrar (Registrar@RossU.edu) within 15 calendar days of the date on the decision letter from the Student Promotions Committee – Clinical Sciences Subcommittee and specially address the rationale for the appeal.  The Dean will respond within 15 calendar days of receipt of the appeal. The Dean's decision is final.

Academic Dismissal Appeal Form may be found on the student portal.

43

- *Documentation*. Documentation of the emergency is required for ELOA approval. If the student does not provide documentation, the ELOA may be nullified and the student's absence will no longer be considered excused.

- *Timeframe*. If the student is able to return within two weeks of such an emergency and complete all coursework for that semester, his or her absence will be treated as an ELOA and will have no effect on enrollment status.

- *Frequency and SAP*. For students on ELOA, the interrupted portion of the semester will not be counted when determining time limits for SAP. No more than one ELOA will be granted per semester.

- *Conversion to Approved Absence*. Students must return from an ELOA or have applied for and been granted an AA within the two-week timeframe. Those who do not return within this period will be administratively withdrawn.

**Temporary Withdrawal (TW)**
Students who completed Foundations of Medicine curriculum are subject to TW for absences longer than 31 calendar days in duration (scheduled breaks between semesters do not apply). Students who fail to return after an AA will be subject to AW. Students who have not returned from an AA but have notified the Office of the Registrar will be moved to a TW status effective their withdrawal date or the date of their last academically related event. Notifications must be received prior to the end of the AA.

Enrollment gaps longer than 31 calendar days in duration (with the exception of scheduled breaks), including AAs and TWs, are reported in the MSPE submitted to the ECFMG.

Students who are in a TW status in order to sit for the NBME CBSE or USMLE Step Exams must submit an examination sitting date within 30 days of being verified by the Office of the Registrar or be subject to AW.

Students in TW status who have not completed all degree requirements within seven (7) years of matriculation will be subject to dismissal. Students in an AA or TW status are reported as not enrolled to student loan lenders.

Please speak with the Office of Financial Aid regarding the impact on financial aid.

**Unauthorized Absences**
Except when granted an ELOA as outlined above, students who leave during a semester or a scheduled clinical clerkship will be administratively withdrawn.

Students wishing to return to RUSM after an unauthorized absence must apply for readmission. Applications for readmission will be reviewed by the Readmission Committee to determine if the student is eligible for readmission, and if so under what conditions (such as academic probation).  (See instructions for reapplying in the **Policies and Administrative Procedures** section)

*Exception for Clinical Clerkship Breaks*: Due to scheduling constraints between clinical clerkships (and external institutions' procedures), brief breaks in study may occur. Such breaks, if less than 31 calendar days (including weekends) in duration beginning **after** the last day of the student's previous clerkships, will have no impact on the student's enrollment status. The *Financial Planning Guide* offers information about the loan disbursement policy for longer gaps in study.

44

**Student Withdrawals**

Students may voluntarily withdraw from enrollment. They must then apply for readmission if they wish to return to RUSM, and will be subject to the tuition policy for withdrawals and loan refund federal policy (See **Tuition Refund Policy for Withdrawals** section). Readmission is not guaranteed but applications will be reviewed by the Readmission Committee. Readmitted students will typically be subject to all academic policies and tuition and fees in effect at the time of re-enrollment, without any "grandfathering" provisions based on their original admission. See additional readmission information in the Policies and Administrative Procedures section of this Student Handbook.  Student withdrawals are governed by the following policies:

- *Application for Withdrawal*. Students in Foundations of Medicine may not withdraw from a single course during a semester; they must withdraw completely from RUSM. Within the Foundations of Medicine curriculum, students may begin the withdrawal process by completing an Application for Withdrawal form available at myRoss. They must then obtain all required clearances and approvals. For students in Clinical Sciences, students may request to withdraw by submitting a request via "askRoss" and must be approved by the Assistant Dean for Clinical Student Affairs.

- *Transcripts*. Students withdrawing from RUSM will receive W (if no exams were taken), WP or WF on their transcripts depending on whether they were passing or failing a course or clinical clerkship at the time of their withdrawal (See **Student Grading and Promotions** section). All approved withdrawals must then be submitted to the Office of the Registrar.

- *Refunds*. Refunds, if required, will be determined by the last academically-related activity (See **Tuition Refund Policy for Withdrawals** section)

- *Readmission with WF*. Students who receive WF in any course or clinical clerkship at the time of withdrawal will be reviewed by the Readmission Committee to determine whether they are eligible for readmission.

  - Students who were failing one or more Foundations of Medicines courses at the time of withdrawal will be put on academic probation if they are readmitted and will be required to take the ELLS course.

**Deferrals**

Prior to the start of classes, students admitted to a specific semester may request to defer their admission to a subsequent semester. The following policies apply to deferrals:

Deferrals are not guaranteed, and are granted on a case-by-case basis depending on class size and seat availability. Due to a high volume of applicants, deferrals are generally not permitted into the September semester. Students must provide a valid reason for deferring, such as an employment obligation, academic commitment, personal injury/illness, financial hardship or travel/immigration issues. In some cases, supporting documentation may be required.

Deferred admission may be requested for up to one year from your acceptance date and is granted on a one-time basis. If you cannot attend the semester to which you have deferred into, you will be required to reapply.

Requests are reviewed as received and may take up to 30 days before a decision is made. The RUSM Admissions Office will notify you via email of your deferral decision and will also send a letter of confirmation to your mailing address.

45

In order to finalize a deferral, a $1,000 nonrefundable deferral fee must be submitted. Please note that the deferral fee will be applied to your first semester's tuition if you start class by the deferral date. Failure to start class by the deferral date will cause you to lose your seat in the class without future reconsiderations or deferrals.

Students planning to matriculate to another institution during the deferral period will be required to submit an official transcript for all coursework completed during that time. Your admission may be subject to re-review pending the receipt of all transcripts and/or test scores.

If your request is denied, you have the option to remain in your current term or reapply for a future term.

**Disciplinary Dismissals**

RUSM may implement disciplinary actions for non-academic infractions that may result in suspension or dismissal. Students may be put on an involuntary withdrawal, temporary suspension, or dismissed from RUSM for poor academic performance, violations of the Honor Code, or for disruptive or unprofessional behavior (See the **Code of Conduct and Disciplinary Actions** section).

As a general RUSM policy, students who are dismissed will not be considered for readmission. Dismissal of this kind during an academic semester does not warrant reduction of tuition and fees.

99

## READMISSION TO RUSM

Students who wish to return to RUSM after withdrawing must apply for readmission online at
http://www.rossu.edu/medical-school/apply/. Readmission is not guaranteed.  Applications for readmission will be
reviewed by the Readmission Committee to determine if the student is eligible for readmission, and if so under
what conditions (such as academic probation, documentation of ability to meet technical standard). Readmitted
students will typically be subject to all academic policies and tuition and fees in effect at the time of re-enrollment,
without any "grandfathering" provisions based on their original admission.

RUSM 000424

ESS
RVICE
LABEL 119

EXPRESS MAIL
UNITED STATES POSTAL SERVICE
LABEL 119

EXPRESS MAIL
UNITED STATES POS
www.usps.gov
1007

PRIORITY ★ MAIL ★ EXPRESS™

This envelope is made from post-consumer waste. Please recycle - again.

OUR F

EK557424663US

UNITED STATES POSTAL SERVICE® | PRIORITY ★ MAIL ★ EXPRESS™

CUSTOMER USE ONLY

FROM: (PLEASE PRINT) PHONE ( ) 602-1836

Oluwamuyiwa Awodiya
15005 Dahlia D
Bowie, MD 20721

PAYMENT BY ACCOUNT (if applicable)

DELIVERY OPTIONS (Customer Use Only)

☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options
- ☐ No Saturday Delivery (delivered next business day)
- ☐ Sunday/Holiday Delivery Required (additional fee, where available*)
- ☐ 10:30 AM Delivery Required (additional fee, where available*)

*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT) PHONE ( )

Wilkie D. Ferguson, U.S. Courthouse
400 North Miami Avenue
Miami, FL 33128

ZIP + 4® (U.S. ADDRESSES ONLY) 33128

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.

ORIGIN (POSTAL SERVICE USE ONLY)

☐ 1-Day ☐ 2-Day ☐ Military

| | | |
|---|---|---|
| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage $ |
| Date Accepted (MM/DD/YY) | Scheduled Delivery Time ☐ 10:30 AM ☐ 3:00 PM ☐ 12 NOON | Insurance Fee $ / COD Fee |
| Time Accepted ☐ AM ☐ PM | 10:30 AM Delivery Fee $ | Return Receipt Fee $ / Live Animal Transport $ |
| Weight ☐ Flat Rate lbs. ozs. | Sunday/Holiday Premium Fee $ / Acceptance Employee Initials | Total Postage & Fees $ |

DELIVERY (POSTAL SERVICE USE ONLY)

| | | |
|---|---|---|
| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature |
| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature |

