UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 18-60482-CIV-RKA

OLUWAMUYIWA AWODIYA,

Plaintiff,

v.

ROSS UNIVERSITY SCHOOL OF MEDICINE,

Defendant.

Fort Lauderdale, Florida
June 11, 2019
2:32 p.m.

\- - - - -

Transcript of Calendar Call and Motion Hearing had before the Honorable Roy K. Altman, United States District Judge.

\- - - - -

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:

For the Plaintiff: Oluwamuyiwa Awodiya, Pro Se
15005 Dahlia Drive
Bowie, Maryland 20721

For the Defendant: Ryan Roman, Esq.
Michael R. Marsh, Esq.
Donnie M. King, Esq.
Octavia M. Green, Esq.
Akerman LLP
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, Florida 33131

Court Reporter: Francine C. Salopek, RMR, CRR
Official Court Reporter
United States District Court
299 E. Broward Blvd., Room 207B
Fort Lauderdale, Florida 33301
(954)769-5686/mjsfcs@aol.com

\- - - - -

**TUESDAY, JUNE 11, 2019, 2:32 P.M.**

*(The Judge entered the courtroom)*

THE COURT: Good afternoon. Please be seated.

MR. ROMAN: Good afternoon, your Honor.

MR. AWODIYA: Good afternoon, your Honor.

ROOM CLERK: Calling Case Number 18-60482-Civil, Awodiya vs. Ross University School of Medicine.

Counsel, please state your appearances for the record.

MR. AWODIYA: Pro se plaintiff, Oluwamuyiwa Awodiya.

THE COURT: Good afternoon, sir.

MR. AWODIYA: Good afternoon.

MR. ROMAN: And, good afternoon, your Honor. Ryan Roman of Akerman. And with me is Michael Marsh, Octavia Green, and Donnie King, also with Akerman, on behalf of Ross University.

THE COURT: Good afternoon to all of you.

MR. ROMAN: Good afternoon.

THE COURT: So, we are here for two reasons -- well, really three reasons. The first is we're having a calendar call. The second is a number of you -- both of you have filed motions in limine, and we're going to resolve those. And the third reason is that I asked you all to brief the question of the applicability of the ADA and the RA in Dominica, that is to say, extraterritorially, and both of you responded with what I thought was good briefing, and I'm prepared, I think, to hear

limited argument on that point.

So, Mr. Awodiya -- is it Awodiya?

MR. AWODIYA: Awodiya.

THE COURT: Awodiya.

MR. AWODIYA: Yes.

THE COURT: Why don't you come up to the podium. Do you want to make argument on this issue?

MR. AWODIYA: I mean it's a very simple -- I mean --

THE COURT: Why don't you come up to the podium.

MR. AWODIYA: Yes, your Honor.

I mean it's pretty straightforward. I think in the previous case against Ross University's sister school, they made no mention of how an institution was actually defined within the Rehabilitation Act.

And one trouble that I had in my research is, I know how to find statutes, and I know how to find case law, but I don't know how to find when they changed. So, I don't even know if the law was like that when -- in 2012, when the *Archut* Court was considering that, but it's definitely clear now that it states that an institution within the Rehabilitation Act is defined as institutions outside of the United States, as well as inside of the United States.

THE COURT: Where is it defined that way?

MR. AWODIYA: In....

THE COURT: Let's talk first about the ADA.

The ADA does not include foreign educational institutions among its list of entities considered public accommodations in Section 3, which is the section that's applicable here, is that correct?

MR. AWODIYA: That one -- in that section -- that section is because of -- there's multiple things with that one. First, the one that's mostly guiding this one is the Supreme Court's decision in the --

THE COURT: *Nabisco*?

MR. AWODIYA: Yeah, in the *Nabisco* case, where they state that where a statute --

THE COURT: I read your position on *Nabisco*, and respectfully I disagree with your position. *Nabisco* did not overrule *Archut*, or however that case is pronounced, to the effect that a statute like the ADA or the RA that does not expressly apply extraterritorially does apply extraterritorially. What *Nabisco* had to do with was, under the RICO Act, the racketeering statutes, there are certain predicate offenses to a racketeering offense. Those predicate offenses include, for example, robbery or carjacking or drug dealing or money laundering, or, as relevant here, the assassination of government employees. And some of those predicate acts in the RICO statute actually very clearly and expressly apply extraterritorially. And what the Supreme Court of the United States said in *Nabisco* was, given that clear and

express extraterritorial application among the predicate acts, it's clear that Congress intended for the reach of the RICO Act to apply extraterritorially.

But they did not say anything about either the ADA or the RA or *Archut*, which is the case that the defendants have cited. And, more importantly, they did not say that a statute that does not make it clear that Congress intended for its provisions to apply abroad somehow therefore does apply abroad. That's not what *Nabisco* held.

So, I disagree with you about your reading in *Nabisco*. My question to you, though, was: Is there anything in Section 3 of the ADA that makes clear, as with the RICO Act, which was at issue in *Nabisco*, that Congress intended for it to apply to foreign educational institutions as opposed to domestic institutions?

MR. AWODIYA: I think Title III intended it to apply the same standards as Section 504 of the Rehabilitation Act. And that -- there, they expressly state that those standards -- it should be held to no less standard than the Rehabilitation Act, when the Rehabilitation Act expressly states that an institution is defined as one that's outside of the United States.

THE COURT: Where does it say that?

MR. AWODIYA: In 29 U.S.C., Section 705(23).

And I would also like to point out that the section

that they refer to, 20 U.S.C., Section 1002, there's a different definition that is solely for institution inside of the United States. And I believe that is Section 1001. So, if they meant it for it to be in the United States, it would have been clear that they would have assigned it to that definition. Instead, they actually changed it from 1001 to 1002. I just don't know when they changed it.

THE COURT: Doesn't the RA specifically limit its ambit to acts within the United States?

MR. AWODIYA: No. It doesn't say that.

THE COURT: Doesn't it say in 29 U.S.C., Section 794(a) that the statute expressly limits its own scope to, quote, "individuals with a disability in the United States"?

MR. AWODIYA: No. That is misinterpreted as -- one of the Court's -- one of the cases discussed in *Archut* addressed that. It was more of American citizens, when they cited I think a congressman, where he explained that language. It was more of American citizens who have a disability. Because the Rehabilitation Act expressly states that only American citizens can receive financial aid.

It also states in Ross' program participation agreement that only American citizens at their school can receive financial aid. It is all about the United States' financial backing of American citizens' education regardless of

where they send them, as expressly stated in Ross' program participation agreement with the United States Department -- Secretary of Education.

And then the Higher Education Act, it says that nothing should be construed to limit five -- the Rehabilitation Act and the ADA.

Now, in Section 504 specifically it expressly gives -- it delegates authority to the head of the agencies. But, more importantly, further down in there -- I don't have the section, but down there they define that it applies to all activities of -- then they define the institutions, higher -- post graduate -- institutions of higher education. Which then, if we look up the definition, they changed it from 1001 to 1002, where it included institutions outside of the United States.

THE COURT: Institutions created by the federal government in locations outside of the United States, right?

MR. AWODIYA: No, not institutions -- the program is the Title IV program, the financial aid program. It has nothing to do with the actual -- because Title IV doesn't extend to only programs that were created by the United States. It can be a private company, it can be public. It doesn't have to be a government-sanctioned program. Only the Title IV program is what they were referring to.

THE COURT: Why don't you talk to me about your fraud claims.

MR. AWODIYA: My fraud claims. My fraud claims are based on Ross' statement that they have a policy, that the university has a policy that the university will comply with the ADA as applicable in Dominica.

THE COURT: It doesn't say that. It says as applicable and practicable.

MR. AWODIYA: Well --

THE COURT: Correct?

MR. AWODIYA: Yes, correct. I don't know if Ross has raised any issues with the practical part.

THE COURT: They have. They've said -- in their response to my order for additional briefing, they've said that the fact that they have said "as applicable and practicable" means that they couldn't have, as a matter of law, made a false statement, because it's always within their discretion, presumably, to decide in each case whether it's practicable or not. And so, if they decide that a particular accommodation is impracticable, then they can do that and still be telling the truth, when, on their website, they say they will conform to the ADA and the RA, so long as it's applicable and practicable. That's one.

And the second argument they make is, by saying "as applicable," they also are precluding themselves from making a false statement, because they're saying the RA and ADA are not applicable in Dominica. So, how could that possibly be a false

statement?

MR. AWODIYA: There's testimony from their administrators that they are not required to comply with the ADA, and they -- there's no evidence -- they may make an argument like that, but there's no evidence backing that argument. There -- multiple faculty at the institution just straight up said, They're not required to comply. They didn't say in some scenarios, in limited scenarios, in no scenarios. The evidence shows that they are not required to comply at all.

THE COURT: And that's what they're saying. They're saying that -- it's something of a clever argument -- they're saying because they told you, We will comply with the ADA as applicable and practicable, and because the ADA doesn't actually apply in Dominica, that statement can still be true, while at the same time they don't ever have to comply with the ADA, because they said "as applicable." Now, that may be sneaky, and we may not like that, but that's their argument.

MR. AWODIYA: So, then my next question goes to, they put in an admissions requirement section for students to see in the admissions requirement section part of their website. If it is not applicable or practicable in Dominica, then why would they make that statement to those prospective students? They omitted a material fact of -- whatever argument they're trying to make now, they omitted that fact to these students, who may have relied and said that they maybe wanted some type of

connection from a Dominican school, where their financial aid is going, to the United States. Some type of -- I mean it's a school in a whole different --

THE COURT: I think that's a pretty good argument.

Let me ask you one question. What aspect of your ADA and RA claims took place in the United States as opposed to in Dominica, other than your taking of the second, third, fourth, and fifth iterations of the comp. exams?

MR. AWODIYA: Okay. Ross is trying to prevent -- first, they submitted a response, and they typically do this when they know that I can't --

THE COURT: Hold on a second. You got to speak a little slowly, because she's writing down everything that you're saying.

MR. AWODIYA: Oh, sorry. I wasn't aware.

THE COURT: So, she's typing everything you say, so you got to speak a little slowly.

MR. AWODIYA: Okay.

THE COURT: And I know that this is personal for you, but you're going to have to try to make it impersonal as much as possible in your argument in this court. Okay?

MR. AWODIYA: Yes, your Honor.

THE COURT: So, let's not cast aspersions on the lawyers. Just answer my question. Other than the four iterations of the comp. exam -- it's two, three, four, and

five, which I understand you took those four in the United States.

MR. AWODIYA: Yes.

THE COURT: Other than those four instances, what else about either your request for an accommodation or their rejection of your accommodation took place in the United States?

MR. AWODIYA: If the Court -- if plaintiff -- if I had been given a chance to provide the Court with all the evidence regarding that question, it would show that it's much more complicated than that.

First, Ross orders the exam each time. You don't -- they don't order five attempts. They order the exam each time. So, wherever their administrators are, regardless, it's -- when I took it in Dominica, they ordered it. They ordered the exam.

In the process of ordering the exam, they are the ones who says that, Hey, this student should have extra time on this exam. Therefore, the failure, which would be the focus, the failure to provide the accommodation would be when they actually ordered each exam, regardless of where they're at. Especially if I --

THE COURT: Hold on.

When they ordered -- "they" is Ross, right?

MR. AWODIYA: Yes.

THE COURT: When they ordered the exam, where were

they?

MR. AWODIYA: *(No response)*

THE COURT: They're in Dominica, correct?

MR. AWODIYA: No. Two, 3, 4, 5, they ordered the exam expressly from the United States. The first one --

THE COURT: Hold on a second.

The Ross employee who ordered the exam was where?

MR. AWODIYA: In the United States for the second, third, fourth, and fifth. For the first one, I have to review the evidence as to which campus requests -- who orders the exam for the first attempt.

THE COURT: But for the next four, you're saying that the evidence showed that the Ross employee was in the United States --

MR. AWODIYA: Yes. There's clear evidence. Because they have a campus --

THE COURT: Where is that evidence?

MR. AWODIYA: I can go to my laptop and get it.

THE COURT: Is that in the deposition or where was that?

MR. AWODIYA: It's in a document that they submitted to me, uhm -- it was in one of the times -- I think after I failed the first one, they sent a process as how it would go as to them reordering the second one. And so, they said that it will be reordered from the Miramar, Florida, campus. That is

from their documents that they gave to me.

THE COURT: Understood. I'll ask them about that.

So, that's one.

Second question is: When you went to ask for an accommodation, your complaint says you did that in person.

MR. AWODIYA: In....

THE COURT: When you asked for an accommodation in 2017 --

MR. AWODIYA: Um-hum.

THE COURT: -- your complaint says you went and did that in person, correct?

MR. AWODIYA: It depends on which request --

THE COURT: Listen to my question. You asked for an accommodation in 2017. Correct?

MR. AWODIYA: Yes.

THE COURT: And you went and did that in person.

MR. AWODIYA: That was not in person. It was through my appeal letter. If you -- 2017, I believe that's when I was --

THE COURT: When was the first time you asked for an accommodation?

MR. AWODIYA: The first time I asked for an accommodation was in Dominica.

THE COURT: Okay. That's what I'm asking. When you asked for the accommodation, you were in Dominica. Correct?

MR. AWODIYA: The first time I asked.

THE COURT: Correct. Right?

MR. AWODIYA: *(Nodding head affirmatively)*

THE COURT: Is that yes?

MR. AWODIYA: Yes.

THE COURT: And then they rejected that request for an accommodation, correct?

MR. AWODIYA: They failed to provide an accommodation. "Reject" is too stringent. I mean it -- the elements are that they discriminated by failing to provide an accommodation. They don't have to sit there and tell me, "We reject your request." That's not -- it is not up to that high of a standard to satisfy.

And this is particularly important when it comes to compensatory damages, where I'm allowed to prove with deliberate indifference, which means the simple failure to act will open up compensatory damages for failure to provide an accommodation.

THE COURT: You allege in your complaint at 56 -- sorry -- at paragraph 16 to 17, 26, 32, and 34, the following facts: That Ross is the entity that was empowered to grant or deny your extended testing time; that you authorized the Ross counseling center in Dominica to discuss your confidential information with Ross' administration for the purpose of deciding whether an accommodation was appropriate or not; that

you verbally asked Dr. Sharma and Mr. Cuffy to tell the Ross administration that you needed extended testing time; that while you were in Dominica, you went in person to provide the Ross counseling center with a medical assessment that had been performed by a doctor in the United States; and, fifth, that Dr. Hayse, H-A-Y-S-E, Ross' associate dean of student affairs, who lives and works in Dominica, made the final decision with respect to your request for accommodation and oversaw the academic accommodations process.

Are those allegations which you made in your complaint true?

MR. AWODIYA: Those allegations were written when I had limited knowledge of all the evidence, and when I had basically zero knowledge of the law as to what I have -- compared to what I have now. I never been to law -- never been to law school. I didn't even know what a statute was.

THE COURT: It doesn't matter. The question is whether those allegations are true. You made those allegations.

MR. AWODIYA: Those allegations that you stated in there?

THE COURT: Yeah.

MR. AWODIYA: Yes, but the nitpicks of who's Ross administration and to -- and other facts that aren't expressly in the allegation are also relevant.

THE COURT: Okay.

All right. Let me hear from Ross.

Thank you very much, sir.

MR. AWODIYA: Thank you, your Honor.

MR. ROMAN: Good afternoon, your Honor.

THE COURT: Good afternoon.

Why don't we start with the plaintiff's claim that under 29 U.S.C., Section 705, paragraph 23, that the -- either the ADA and/or the RA expressly applies extraterritorially.

MR. ROMAN: Thank you, your Honor.

With respect to that issue, I do think that the *Archut* case actually has a very detailed consideration of these statutory issues. And I don't think I could summarize them better than *Archut*, but what *Archut* references is that Title I and Title VII of the ADA have explicit -- or more explicit language regarding extraterritoriality. And therefore, from that, you can infer that Title III is not meant to apply extraterritorially.

And then in February of this year, so just a few months ago, in the *Galligan* case, *Galligan* again applies *Archut*, it again involves the sister campus of Ross, the veterinary school, and it reaches the same conclusion. So, when Mr. Awodiya says that he doesn't know if the statutory regime has changed since *Archut*, what *Galligan* tells us -- and, again, *Galligan* references *Nabisco*, which, you know, I agree

with your Honor's interpretation that *Nabisco* does not overturn *Morrison*, does not overturn *Archut*, and *Galligan* recognizes how those two cases can be read together.

THE COURT: In fairness to the plaintiff, his argument was the converse, that he's not sure if at the time that these events took place, the statute was different and was subsequently changed. That's how I understood his argument.

MR. ROMAN: Okay. I appreciate that, your Honor. And I don't think it has because of the time frame. When you're looking at *Archut*, which is in 2012, before the conduct in question, and then when you look at the *Galligan* case in 2019, which is after the conduct in question, the analysis remains the same, and the courts reached the same conclusion that neither the ADA nor the RA apply extraterritorially.

THE COURT: So, what do you make of the plaintiff's citation, the 29 U.S.C., Section 705(23)? Is that a Title I or Title VII section as opposed to a Title III section?

MR. ROMAN: Well, I don't read that as explicitly applying Title III of the ADA outside of the context of U.S.-based institutions and U.S. schools.

Let me pull up that language.

THE COURT: Well, it says:

"The term 'institution of higher education' has the meaning given to that term in Section 1002 of Title 20."

MR. ROMAN: Correct, your Honor. Let's see.

I apologize, your Honor.

THE COURT: And then if you go to Section 1002 of Title 20, in (2), it describes institutions outside the United States.

MR. ROMAN: Right. It does. And it says:

"Except a graduate medical school, nursing school, or veterinary school" -- sorry -- "located out of the United States shall not be required to meet the requirements of Section 1001(a)(4) of this title."

Let's see... I will note, your Honor, I do believe this statutory regime is the same statutory regime that was analyzed by *Archut*, and *Archut* did conclude that that did not apply extraterritorially.

THE COURT: That's all true, but the plaintiff's point is *Archut* is not binding, and it could be -- the plaintiff's point -- it's not binding, and it could be wrong.

MR. ROMAN: Yes, your Honor. And I don't think that this has been explicitly tied to Title III, and I do not see how it interplays with Title III. If you give me a moment, let me take a look.

*(Pause)*

MR. ROMAN: Your Honor, you know, I don't have exactly which title this applies to. My understanding is -- and, also,

I would note that *Archut* was ultimately affirmed by the Third Circuit. And I think absent a decision of the Eleventh Circuit, that that would have some authority with respect to this issue as well, your Honor. And I think in the Third Circuit decision, the Court actually complimented the analysis in *Archut* and adopted it in full.

THE COURT: I think the answer appears to be that that section of the RA, of the Rehabilitation Act, prohibits discriminatory conduct at institutions of higher education that receive federal grants, which includes graduate medical schools located outside the United States, but is a discrimination provision of the RA, and it refers to colleges, universities, or other post-secondary institutions or a public system of higher education.

But there is no reference in that provision to institutions of higher education or to graduate medical schools located outside of the United States within the meaning of Section 794(a). In other words, the definition of institutions of higher education on which I think the plaintiff is relying appears to refer to some other nonrelevant provisions of the Rehabilitation Act. But that's just my reading of it here.

MR. ROMAN: Your Honor, that would be consistent with *Archut*, where the Court specifically found that the receipt of federal funding was not sufficient. So, that would be consistent with what you're describing.

THE COURT: Okay. Talk to me about where the events that are at issue here took place.

MR. ROMAN: Yes, your Honor.

As you noted, the administration of comp. exams 2, 3, 4, and 5 occurred in -- through a third-party vendor called Prometric.

THE COURT: In the United States.

MR. ROMAN: In the United States.

THE COURT: And the plaintiff's psychological examination took place in the United States.

MR. ROMAN: Your Honor, all of the counseling sessions with the Ross University counseling center, which included his diagnosis on January 18th, 2016, for ADHD, occurred in Dominica.

THE COURT: Yeah, but the examination that he used in his request for an accommodation took place in the United States, correct?

MR. ROMAN: That's not correct, your Honor, because he never requested an accommodation. The information he is claiming should have been released to the administration, had he requested it, is the counseling documentation from the Ross counseling center.

THE COURT: That's not my question. Assuming that I find that he made a request for an accommodation, or even if he didn't make a request for an accommodation, his allegation that

he made a request for an accommodation was based on an exam that he underwent in the United States, is that not true?

MR. ROMAN: That's not true, your Honor. The exam was done in Dominica by Dr. Sharma. He did have meetings with Kaiser Permanente on his own. This is his own private psychologist or psychotherapist that he saw. But those doctors did not make the diagnosis of ADHD. And those doctors, I believe, are the ones who diagnosed him with OCD in 2017, but that was after he had already been dismissed. So, that doesn't have to do with the accommodation request.

What -- the accommodation request, that's based on an ADHD diagnosis by Dr. Sharma, who is a Ross University employee in Dominica.

THE COURT: What about the fact that the exams on which the accommodation, if it had been granted, would have been relevant, that those exams took place in the United States? I think the plaintiff's argument is, I had to sit for those exams in the United States, I had to be subjected to a certain time line for those exams in the United States, and had an accommodation been granted, I would have been allowed to have a different longer time line, I guess, while taking those exams in the United States. And so, the salient portions of my claim took place in the United States. What do you make of that argument?

MR. ROMAN: Your Honor, the comp. exams are not the

specific exams for which an accommodation was requested. The plaintiff requested, according to his allegations, an accommodation with respect to testing. There are many tests -- actually, the majority of tests -- which would occur in Dominica as part of the curriculum. He had actually failed a semester at Ross. He retook that semester. The requests for accommodations, including extended testing time, were not specific to the comp. exam.

THE COURT: But they would include the comp. exam, correct?

MR. ROMAN: They would include the comp. exam. And that was the basis that he was ultimately dismissed on, is that he failed the comp. exams.

THE COURT: The comp. exam is important. You dismissed him because of the failed comp. exams, correct?

MR. ROMAN: That's correct, your Honor.

THE COURT: So, let's talk about the comp. exams.

The comp. exams occurred here in the United States. Any accommodation for the comp. exams would have occurred here in the United States. And his allegation is the failure to grant an accommodation with respect to the comp. exams -- I understand the decision may have been made in Dominica, is that your position?

MR. ROMAN: Yes.

THE COURT: But the practical effects of that

decision, the circumscribed time line for the taking of the exams took place or had its effects here in the United States. Do you agree with that?

MR. ROMAN: Your Honor, the exams, which were administered by this third-party vendor, Prometric, Ross would have sent a list that says, These are the students that should have extended testing time.

THE COURT: So, why -- even if the ADA and RA don't apply in Dominica, why isn't this a case that arises from a lack of accommodation that took place for tests that occurred in the United States?

MR. ROMAN: It's our position it's because the accommodation request was general to all testing, that this was not a specific request as to a U.S.-based test, and the decision-making all occurred in Dominica.

And so, whether or not that accommodation, which could support, for example, the USMLE Step 1 exam, that could be forwarded as support for the USMLE Step 1 exam. But then, again, that's another third party that administers an exam. And so, we believe that because the decision was made in Dominica for testing -- overwhelmingly that would have taken place in Dominica, all of the exams during your course of study there -- that that excludes it from being applied in this case, your Honor.

THE COURT: Why didn't you file a motion either to

dismiss or for summary judgment on the ADA and RA claims lack of extraterritorial application before I prodded you to it?

MR. ROMAN: It's -- your Honor, I think what we thought of it as, originally, was more to do with the fraud and misrepresentation. We did try to raise that, but did so after the time when it was permitted. So, your Honor denied that motion as untimely and then asked us to brief these additional issues.

THE COURT: Right. But my question has to do with these additional issues.

MR. ROMAN: Sure.

THE COURT: You guys are a very sophisticated firm. What am I missing? Why did you not file a motion to dismiss these charges on the grounds that these statutes don't apply extraterritorially until I looked into it and told you that that's a concern of mine?

MR. ROMAN: I don't know that I have a great answer for your Honor. I would say, we were not counseled at the very beginning of the case. However, that's not an excuse. We could have raised it on a summary judgment motion, and we did not. So, I don't have a great answer for that. And so, in that regard, your Honor, I can't give you a specific reason why that would be true.

THE COURT: Let's talk about the fraud counts.

Let's assume that I agree the ADA and RA don't apply

extraterritorially. And I think a closer question is whether the acts that the claims are based on occurred here or in Dominica. But let's assume that I agree with you that they occurred principally in Dominica, and that the ADA and RA claims are dismissed.

What about your argument, clever as it is, with respect to the fraud claims, and the plaintiff's response, which is that's too clever by half? You put that statement in to your website precisely to induce people like the plaintiff to come and apply to your school, to make them feel comfortable, to make them feel that American law governed at the school, that it would be an environment that they would be familiar with because it resembles the United States, it's not so scary out here, you see, after all. And your argument is, Well, we basically gave you a meaningless statement. And your argument is, since it was meaningless, it couldn't have been fraudulent. But isn't that problematic in itself?

MR. ROMAN: Your Honor, I don't believe the facts as they apply here are problematic. We have at Ross University in Dominica an accommodations office. We have an accommodations coordinator. And we have a policy that's set forth in the student handbook that Mr. Awodiya acknowledged and received every semester, that if you make a request for accommodations pursuant to that policy, which involves providing documentation, which we never received from Mr. Awodiya,

filling out a form that we never received for Mr. Awodiya, we will consider that request, and, where appropriate, we'll grant it. And our history is that we grant those requests when they are made to us.

In this particular instance, Mr. Awodiya did not request an accommodation. So, I don't believe that we're being sly here to say that as a legal matter, the ADA does not apply in Dominica. However, we -- and all of our witnesses testified to this -- we apply the ADA in spirit. Because we do want to extend those types of protections to students where applicable -- where practical.

THE COURT: And is there evidence in the record on that point?

MR. ROMAN: I believe our witnesses -- Matthew Stewart-Fulton in particular was deposed in this case. He'll be a witness here, a live witness. And I would have to check the transcript of his deposition, but I would suspect that he did state that other students do receive accommodations.

THE COURT: I don't remember seeing that in your pleading or in your papers on this issue.

MR. ROMAN: I don't believe we would have referenced that particularly in our papers, but --

THE COURT: But isn't that important because -- wouldn't you agree with me that if Ross had said, "We apply the ADA as applicable and practicable," and at the time they made

that statement on the website, they kind of giggled to themselves and said, Isn't that pretty funny, that's a meaningless statement, we know it's not applicable, and so it will never be practicable, and we will never apply it here in Dominica, and if you didn't develop any evidence that you ever do make accommodations like that, then there would be really, I think, a genuine issue of material fact as to whether that statement was false when it was made?

MR. ROMAN: I do know our briefing does state that our witnesses said they applied the ADA in spirit.

THE COURT: So, your position in the papers was that as a matter of law, a statement with the qualifications "as applicable and practicable" cannot be a falsehood.

MR. ROMAN: Correct. As a legal matter -- and I understand that your Honor views that maybe that's a cold position. However, as it was applied here, it's not. I know we state -- not just in this briefing, but in our first motion for summary judgment in this matter, we do reflect the record in that regard, what our witnesses said with respect to how it actually plays out in practice.

It is not a system where students are -- we have an entire office for this. We have employees in Dominica dedicated to this. And that was actually fleshed out in the record on the first summary judgment brief.

THE COURT: Where is that?

MR. ROMAN: Let me see, your Honor, if we have a copy of the initial summary judgment motion with us.

THE COURT: Well, I actually have another hearing. So, why don't you file a notice later today --

MR. ROMAN: Yes, your Honor.

THE COURT: -- or -- yeah, I want you to file it today, if you can.

MR. ROMAN: Yes, sir.

THE COURT: A notice of authority citing -- no more than a page -- specific places in the record where there is evidence in the record that Ross actually does make attempts to live up to the requirements of the ADA and the RA.

MR. ROMAN: Okay. Absolutely, your Honor.

THE COURT: All right. So that's it for the issues in the motions.

There are also the motions in limine. Unfortunately, I have another hearing right now. And I hate to do this to you all, because I know in particular that you guys are probably billing by the hour, but I'm gonna ask you to have a seat in the back. And I know that it was Mr. Awodiya who was a little late. But he is pro se, and I think we have to make special accommodations, to use a term of art. And so, I'm going to ask you to sit in the back for a few minutes while I resolve the next hearing, and then I'll recall you. Is that okay?

MR. ROMAN: Absolutely, your Honor. Thank you.

THE COURT: All right. Thank you very much.

MR. AWODIYA: Thank you, your Honor.

*(Recess taken at 3:11 p.m. until 3:47 p.m.)*

THE COURT: Mr. Awodiya.

Oh, here you go. That's for ToniAnn.

This is me just trying to get you guys to settle, tire you out.

MR. MARSH: Sometimes it works.

*(Discussion had off the record between the Court and law clerk)*

ROOM CLERK: Recalling Case Number 18-60482-Civil, Awodiya vs. Ross University School of Medicine.

Counsel, please state your appearances for the record.

MR. AWODIYA: Pro se Plaintiff Oluwamuyiwa Awodiya.

MR. ROMAN: Ryan Roman, Michael Marsh, Octavia Green, and Donnie King for Ross University.

THE COURT: Good afternoon, everyone.

MR. ROMAN: Good afternoon, your Honor.

THE COURT: Okay. Thank you for your arguments on the, I guess, failure to state a claim issues that we discussed earlier.

I just want to reiterate, I would like a filing today on specific references in the record where people talk about how it was a policy and practice of Ross to actually comply with the ADA and the RA.

MR. ROMAN: And, your Honor, in the interim, I was able to identify the statements I was thinking of. I could quickly reference where to find those in the record for your Honor, if you would like, at this time.

THE COURT: Sure. Go ahead.

MR. ROMAN: Thank you, your Honor.

Your Honor, if your Honor looks to Docket Entry 107-2, this is -- these are the exhibits to the statement of facts filed by Ross University in opposition to Mr. Awodiya's motion for summary judgment. And in particular, in Exhibit 5, which are deposition excerpts from Matthew Stewart-Fulton, who's the accommodations coordinator, page 32, lines 1 through 10, where Mr. Stewart-Fulton states that Ross abided by the spirit of the ADA and the Rehabilitation Act to provide appropriate accommodations pursuant to the process set forth in the student handbook. And then his direct supervisor, Dr. Hayse, who's the individual that Mr. Awodiya in his complaint says is the final decision-maker, and that's Exhibit 7 to Docket Entry 107-2, and page 10, lines 2 through 17, where he makes similar statements to the effect that the school does, in fact, apply the ADA as a guideline for their policies and procedures.

THE COURT: Thank you very much.

To the extent there's anything else similar to that in the record that you'd like me to look at, I'll ask you to file that by today.

MR. ROMAN: Thank you, your Honor.

MR. AWODIYA: Request to be heard, your Honor, in response to that statement that he just --

THE COURT: Very briefly.

MR. AWODIYA: Even if it was -- there seems to be confusion with Mr. Fulton as in a request for an accommodation and faculty administration complying. Even if they were to find anything like that, it would be -- merely be a disputed fact, because the administration testified, said that Ross University -- Ross faculty was not given any guidance, rules, or policies on how to comply with the request for accommodations. So, that's merely -- yeah, it would -- because the administration clearly testify *(sic)* that faculty was not giving -- the head, Dr. Hayse, was giving -- he testified to that fact, that they weren't giving any -- if a student does request an accommodation pursuant to the student handbook, which is not an ADA element, then comes in, well, do they have to apply or can they just sit back and ignore or fail to act?

So, the mere fact that one employee states that he may -- that -- claims that he would use it as a guideline does not speak to the university as a whole, and it does not speak as to whether they actually do give any type of indication that they should comply when applicable or when practicable. They just plainly said not --

THE COURT: But he's saying that this man,

Mr. Hayse -- or Dr. Hayse, who you've alleged is the final decision-maker on accommodation issues --

MR. AWODIYA: That would be incorrect.

THE COURT: Excuse me?

MR. AWODIYA: My interpretation of who makes the final decision was incorrect. After going through all of their policies, the student handbooks, going through all of discovery, Dr. Hayse is multiple people who have the final decision. There's multiple people who can initiate the accommodation process.

THE COURT: But Dr. Hayse is one of those people.

MR. AWODIYA: He is one of those people, yes.

THE COURT: Okay. So, isn't it fair to say that to the extent Dr. Hayse has authority over accommodation issues at the school, that Dr. Hayse's statement that he makes every effort to accommodate in as many circumstances as he can actually supports the view that "as applicable and practicable" was not a false statement? I may not disagree with you that it doesn't necessarily mean that other professors and other administrators are doing that, but as far as he's concerned -- and I haven't reviewed that deposition, I've got to go back and read it now -- but assuming that he says something like that, at least with respect to him, he is a guy who has that authority at the school, correct?

MR. AWODIYA: Yes.

THE COURT: One of the guys.

MR. AWODIYA: It would just be, I guess, self-conflicting testimony --

THE COURT: Is there other testimony that conflicts with that testimony?

MR. AWODIYA: Yes. The ones that I cited in the actual -- the extra -- the briefing on --

THE COURT: To the point where they said, It's just not applicable, so we don't do it.

MR. AWODIYA: And that he doesn't give any rules, guidance, or any policy to faculty. So --

THE COURT: And who was that? What was his name?

MR. AWODIYA: Dr. Hayse, the same guy. He's -- I've been talking about him -- at this whole point, I've never mentioned any testimony from --

THE COURT: Fulton.

MR. AWODIYA: Fulton, yeah. Even though he clearly says, as well, they're not required to comply. And he specifically says when I was there. There may also be a disputed fact as to when, because they moved out of Dominica after I was ultimately dismissed. So, because of the time frame, I -- and because I can't redeposition him, we can't really know what time period he's talking about. But when he does specify a time period, he says, When you were enrolled, we were not required to comply with the ADA.

THE COURT: Thank you very much.

MR. AWODIYA: Yes.

THE COURT: All right. So, the next thing is the motions in limine. The first thing -- the first motion that was filed is Docket Entry 160. It's the defendant's motion in limine to exclude new theories of liability. The defendant responded -- sorry -- the plaintiff responded and the defendant replied.

Let me hear you for a moment on this motion.

MR. ROMAN: Ms. Green is going to address this motion. Thank you, your Honor.

THE COURT: Oh, Ms. Green.

My understanding is this motion deals only with two theories that the plaintiff has raised anew with respect to the ADA and RA claims, correct?

MS. GREEN: Yes, your Honor.

THE COURT: So, if I dismiss the ADA and RA claims, this motion should be denied as moot, correct?

MS. GREEN: Yes, your Honor.

THE COURT: You tell me that the plaintiff never raised these motions... until his pretrial stipulation, correct?

MS. GREEN: Yes, your Honor.

THE COURT: Okay. Those are the only questions I have for you. Thank you.

MS. GREEN: Thank you, your Honor.

THE COURT: That was easy, wasn't it?

MS. GREEN: It was.

*(Laughter)*

THE COURT: Now you can say you got that under your belt. Hopefully it helps you to become partner.

*(Laughter)*

THE COURT: All right. I'm going to take that motion under advisement.

On to the next motion, which is 194, Mr. Awodiya's motion to preclude prejudicial -- sorry -- before we get to 194, there's actually another one, which is Docket Entry 165, which is Mr. Awodiya's motion for an order to designate the method of damage calculations.

Mr. Awodiya, very briefly, I've read the Supreme Court's case on -- in *Monessen*, and I tend to agree with the defendants that it specifically makes clear that if I were to dismiss the ADA claims, and this were no longer a federal question case, that *Culver* wouldn't apply. And there's actually a subsequent Eleventh Circuit opinion from 1988 called *Ageloff*, A-G-E-L-O-F-F, *vs. Delta Air Lines*, 860 F.2d 379, which says, and I quote:

"Likewise, this leads us to defer addressing Delta's contentions on the proper Florida standard on the method or methods to be employed in discounting

to present value. We determine now that the Fifth/Eleventh Circuit decision in *Culver* relates to damage recoveries under federal law and not to diversity cases. Neither that case nor the Supreme Court's recent decision in *Monessen*," M-O-N-E-S-S-E-N, "requires that determining the discount rate must be performed by use of the below-market discount method, rather than by the case-by-case method or the total offset method."

Did you read that case?

MR. AWODIYA: Yes, I did.

THE COURT: What's your position on that?

MR. AWODIYA: Well, I don't understand the question.

THE COURT: The question is, it seems to me that to the extent *Culver* suggested that the discount method -- the below-market discount method is the required method for me to instruct the jury on, that the Eleventh Circuit has made clear that that's not correct.

MR. AWODIYA: No. But I wasn't -- it wasn't that part of the question. It was part of the question where I think you started with saying -- I'm paraphrasing -- if the ADA claims were dismissed and therefore became a state --

THE COURT: Well, let me ask you this. What is it that you want me to do? Because I was also confused, because I got the sense that between your motion and then your reply, you

had two different positions. One, I thought in your motion, you wanted me to instruct the jury that they were to use only the below-market discount rate method in calculating lost future earnings as opposed to the case-by-case or any other method. And then in your reply, you were distinguishing what you wanted as a difference between the discount rate to apply versus the discount method to apply. And I was a little confused about that.

MR. AWODIYA: Okay. The Supreme Court prohibits a district court from instructing the jury to apply a discount rate.

THE COURT: And I don't want to do that. So, we're agreed on that.

MR. AWODIYA: Right.

THE COURT: So, what about on this separate question, which is I think what your motion is about, which is that you want me to tell them what method they have to apply?

MR. AWODIYA: No, not what method. It states that we can -- you can instruct the jury on special interrogatories. My order was for the Court to designate for the record, I guess, the method. But my actual instructions to the jury --

THE COURT: Hold on. Just to back up. What you just said. You want me to designate the method. But what I'm suggesting to you is, I think the Eleventh Circuit has said that I'm not to designate the specific method.

MR. AWODIYA: The Supreme Court in *Monessen*, which I guess both the Eleventh Circuits are -- well, both the Eleventh Circuits aren't talking about, which is relevant, the *Monessen* case Supreme Court states that it is within your discretion to instruct the jury on a method. And you have complete discretion -- well, you will be afforded great discretion in an appellate review.

The only difference here is that it's not more of a you are required to do it in every scenario, but when we have not stipulated, and when someone requests special interrogatories, that the special interrogatories must be in line somehow with whatever method is designated. So, my -- that was what my motion was for, was to designate an order so that the interrogatories make sense. I don't know if you saw the interrogatories.

THE COURT: Just so I understand -- and I did see the interrogatories. My question to you is: You're not asking me to instruct them on a particular discount rate, which is what *Monessen* had to do with. And you're not asking -- telling me that I have to find that the below-market discount rate is the -- sorry -- the below-market discount method is the method that they should use, you're just telling me it's within my discretion to pick one of those three methods, and you'd like me to pick the below-market discount method.

MR. AWODIYA: Perfect, your Honor. That's exactly --

THE COURT: Okay. Now that I understand your position, let me ask counsel for the defense why you think that that's not the appropriate method to use in this case, assuming the ADA claims went forward.

MR. ROMAN: Yes, your Honor.

Well -- may I approach the lectern?

THE COURT: Sure.

MR. ROMAN: Thank you, your Honor.

In both *Ageloff* and in this *Beltran vs. NCL* case, which is a Southern District of Florida case, it's 2017 Westlaw 4270618, which we cite to in our papers, in *Beltran* -- well, both those cases involved expert witness testimony as to the appropriate method for determining damages in a lost earning capacity context.

THE COURT: And he's not going to have an expert, as I understand it, correct?

MR. ROMAN: Correct, your Honor.

THE COURT: But you are.

MR. ROMAN: Well, we have an expert that we've designated. It is a rebuttal expert. Because plaintiff submitted a calculation of damages that we believe is an improper attempt to put expert testimony in front of the jurors without having an expert.

We believe he has missed his opportunity to have an expert witness explain his damages theory to the jurors in a

way in which they can apply it and understand. And, therefore, we feel that this request is meant to correct that error in a way that the Court has now said should not be done.

THE COURT: And that's in -- just to go back. Your position is that Chief Judge Moore's decision in Docket Entry 154 precluding him from providing what would otherwise be technical expert testimony on the question of the calculation of his lost profits precludes him from making any argument about this calculation, and thus would obviate the need for you to call your rebuttal expert, because that wouldn't come in, and then you wouldn't have your expert, is that correct?

MR. ROMAN: That's correct, your Honor. And during the hearing before Judge Moore, he did advise the plaintiff that he felt that damages were unduly speculative, and that that was going to be an issue facing the plaintiff in proving his case.

I don't believe there's anything since that time in the record that would assist the plaintiff in being able to establish his damages as for the lost earning capacity. There are other categories of damages, for example, his tuition expenses, that are a different category that I wouldn't say this argument applies to.

THE COURT: And he has a claim for emotional distress.

MR. ROMAN: Correct, your Honor. Although that is based on a percentage of his lost earning damages. So, if the

lost earning damages aren't established, I don't know how he'll be able to establish those damages either.

THE COURT: Well, he could get up in front of the jury and say, I'm very distressed, and you should give me some money for that, couldn't he?

MR. ROMAN: I think he could make that statement, your Honor, but if it comes to suggesting a methodology, I believe there, there may be some issues with respect to his ability to establish that methodology.

THE COURT: Well, I mean only if that methodology were tied to a methodology that didn't come in.

MR. ROMAN: Correct, your Honor.

THE COURT: He could say, you know, this is -- a hundred thousand dollars is enough for happiness, I guess. I don't know. He could theoretically come up with some other method. I'm not making a judgment on what that method would look like, but I take your point.

Let me ask you a more important question. If I dismissed the ADA and RA claim and went forward only on the fraud claims, what then would happen to the lost future profits damages argument that he's making?

MR. ROMAN: It's a good question, your Honor, because I do not know whether that is truly a compensatory damage for the fraud and negligent misrepresentation claims. I believe that the plaintiff would be entitled to seek compensatory

damages, but if the representation in the website turns out to be false, I don't know that there's proximate causation as to the loss of future earnings. I do believe there's a claim that might potentially reach the tuition expenses that he --

THE COURT: I guess that's the question, is let's assume the only claim is the fraud and negligent misrepresentation claims. There are two possibilities there with respect to damages. One is, Ross, if you had not made this false statement, that is to say, if you had not told me something that was false, then I wouldn't have applied to your school, enrolled in your school, and the damages are thus room and board, tuition, flights, and the three years of opportunity costs of going to a school that he otherwise wouldn't have been in, which may have resulted in him doing something else with his life.

That's option A. Obviously, that doesn't include the lost profits calculation.

Option B I guess is, if you had -- if the statement is false, then my damages are the world in which we would hypothetically be living if the statement had turned out to be true, in which case I suppose he'd have to prove that you should have accommodated him; that with that accommodation, he would have passed; that with that passage, he would have become a doctor, and then -- and, you know, there is an attenuation there, I suppose -- and then, under option 2, I guess, lost

future profits could become relevant. Do you agree with that dichotomy?

MR. ROMAN: I agree with your analysis, your Honor, subject to speculation.

THE COURT: Which one of those is the gravamen of the claim as you interpret it?

MR. ROMAN: I believe what plaintiff is seeking is option 2. I believe what he's entitled to would be option 1, because of both causation and the speculative nature of those damages.

THE COURT: Okay.

Mr. Awodiya, did you understand that last part of what I was asking?

MR. AWODIYA: To be honest, your Honor, I got lost somewhere in there.

THE COURT: No problem. Why don't you come up to the podium.

Assuming that the only claims that remain after today are the fraud and negligent misrepresentation claims, okay, then your argument is going to be to the jury, Folks, I wouldn't have applied -- one of two of things -- either I wouldn't have applied to Ross if I had known that they didn't actually accommodate the ADA as they said, right? That's option 1.

Or, option 2, I would have gone, but they should have

followed through on the promise that they made to me, so that I could have gotten an accommodation once I was there.

Do you understand the difference between one and two?

MR. AWODIYA: A little bit. I asked myself that question when I was doing my verdict form. And that's where it caused me problems in how to word the questions. So, I think the best way to explain to you is the way that I interpret it.

My fraud claim is -- at the less element, it would be like consequent injury, acting reliance. So, I relied on the statement, and then some type of consequent injury happened, but the compensatory damages would be to -- I had the option to affirm the contract. So, to prove that compensatory --

THE COURT: Okay. One second. So, it sounds like what you're saying is that the injury you've suffered is that they told you something that wasn't true, and had they told you the truth, which is, We don't abide by the ADA or the RA, you wouldn't have gone there. Is that what you're saying?

MR. AWODIYA: No. I'm more saying if the statement was true, and they were -- actually were required to comply by law, then we would probably still have to go through the ADA elements in some way. Because that's where my question -- that's where my problem came in, is because the fraud kind of leads to the ADA in the same capacity, as in if they're -- if they're saying that they're not required to comply by law, and they can do whatever they want to whenever they want to -- I

was saying -- I was saying if they had the... if they had the -- we were talking about the verdict form.

THE COURT: I think what you were saying, in fairness, was that -- and I don't know that I agree with you, but I think what you were saying is that if the fraud claim is allowed to go forward, then the fraud claim necessarily implicates the same elements as the ADA claim, because your position is, in order to prove the fraud claim, that they didn't properly accommodate you when you got there, you would have to show what the ADA required and what they did, and that they're different. And that is, of necessity, an ADA claim. I think that's what you were just saying.

MR. AWODIYA: I think so, in a way, yes. Because -- yeah. I think that's in a way. Yeah.

THE COURT: Okay. I think I've got your motion. Sorry if you --

MR. AWODIYA: And the other part, too, where I went and applied -- if I never saw that statement, if I never saw anything about it connected to the U.S., especially that one, I wouldn't have even considered it because of the -- because of the island that it was on, and --

THE COURT: That was my original question to you. Let me go back to it. Because that's an important point.

Is it your claim that if the website did not say, "We comply with the ADA and RA," you would not have considered

going there?

MR. AWODIYA: I would not have enrolled.

THE COURT: You would not have enrolled.

MR. AWODIYA: Yes.

THE COURT: You would not have applied. You wouldn't have wasted all the money and time that you wasted at the school and flying back and forth and all of that, correct?

MR. AWODIYA: Yes. I would not -- yeah, I would not have enrolled. But that's a separate element. That is my --

THE COURT: So, it sounds like what your damages are for the fraud claim is the room and board, the time that you spent there, the tuition, the enrollment fees, all of that piled into one. Correct?

MR. AWODIYA: That's not what I'm saying, your Honor. I'm saying the law says that I have the option, not Ross -- it says that I have the option. It literally --

THE COURT: Option to do what?

MR. AWODIYA: To pick the remedy. There's -- I have not found any case law. Every case law that I found that talks about the compensatory damages in this fashion, where the legal relationship is contractual, and a fraudulent inducement one, you're allowed to affirm or -- the other type, I guess restitution, I guess would be -- every time they say that the person who is harmed, the victim, has the option to choose the remedy. I don't think it's black and white to say that I went

through all of this, I've wasted my part of my life going through this. I started in 2014; it is now 2019. I would have passed these exams. I've done all of this. I would have had all of that. I'm already in the program. It's not as simple as he wouldn't have applied, so give him his money back.

THE COURT: I understand. Thank you very much.

So, the last motion is your motion in limine, 194, which the defendants actually haven't responded to yet.

Let me ask the defendants about numbers 4 and 5 on his list, his academic record at Morgan State, his undergraduate academic transcripts. Are you intending to introduce those?

MR. KING: Yes, your Honor, potentially. And we --

THE COURT: Well, not potentially. He's moved to exclude them. I'm inclined to exclude them. Because I can't think of a reason -- in fairness to you, you haven't had an opportunity to respond, but I can't think of a reason why they could be relevant to this case, whether it's an ADA case, but especially if it's not an ADA case. Do you agree that if -- let me put it to you this way. If I dismiss the ADA and RA claims, do you agree that 4 and 5 are not relevant anymore?

MR. KING: Yes.

THE COURT: Okay. Why are they relevant if the ADA and RA claims do not go away?

MR. KING: Yes, your Honor.

We were planning to use the transcripts to rebut any

assertion by plaintiff that he needed an accommodation to pass.

THE COURT: Why? Did he do really well in college?

MR. KING: Right. He did very well in college, your Honor. He was able to pass those tests without additional testing time.

THE COURT: Understood.

Mr. Awodiya, in light of that, how are they not relevant?

MR. AWODIYA: That's very incorrect. I completely throughout *(sic)* summary judgment, so put in the record that I received extended testing time before I was diagnosed.

But, more importantly, my basis for precluding it is the fact that the -- again, this connects with the ADA and everything -- the federal regulations are controlling law when Congress expressly gives them delegated authority. They say that you cannot use my prior academic success to say that I'm not disabled. That's like saying, if I was blind, or if I was deaf, like if I couldn't see the exam, but I got high grades at Morgan State University, that I can't be substantially limited because I'm blind, or I can't be substantially limited because I'm deaf. It has no judgment on my -- it has no -- it's -- well, simply put, there literally --

THE COURT: I understand.

What's your position on that?

MR. KING: Your Honor, I don't believe that's what the

case law says. We believe that this evidence shows that plaintiff had difficulty with the subject matter as opposed to the time of the test. And we think that we are able to show not just his prior grades, but also potentially using scores at the school to show times in which timing was not an issue.

THE COURT: How much time do you think you need to file a response?

MR. KING: I can get a response on file by the end of the week, your Honor.

THE COURT: What's today, Tuesday? How about Thursday?

MR. KING: Sure.

THE COURT: All right. You'll file a response by Thursday to the motion in limine.

Let me ask you, also, with respect to numbers 9 and 10 -- again, assuming that the ADA and RA claims are out -- do you have any reason to include those? I'm asking you.

MR. KING: You're asking me?

THE COURT: Yeah.

MR. KING: Nine and ten, which is the mitigation of damages piece?

THE COURT: Yeah.

MR. KING: Your Honor, if -- yes, if plaintiff is still seeking, which it sounds by his argument today that he would still be, if he is still seeking a lost earning capacity

damages based on these claims, then we should be permitted to show that he failed to mitigate his damages.

There's two very important pieces here, your Honor. The first is that plaintiff's third-amended calculation of damages assumes, improperly, that he would have been able to become a doctor, and that he would have been able to find equally as lucrative work.

Plaintiff, by his motion, is literally, I'm attempting to prevent defendant from pointing out errors in his calculation.

The opportunity costs of a practicing physician must be measured against the next best application of plaintiff's skills. And individuals such as plaintiff, who was capable of gaining admission into medical school and passing his first four semesters of the medical school curriculum, has the potential to be a superior performer in another field suitable to individuals like him.

THE COURT: But that doesn't mean that it has to be money. I mean, you may not know this, but my job is a pretty high-performing job, and I don't get paid that much money. And the fact that I went from a private law job that paid me a lot of money to this job which pays me very little money, I don't think speaks at all to whether I'm any less of a performer.

MR. KING: Your Honor, I don't believe that plaintiff would be entitled to a loss earning capacity. I don't believe

that plaintiff has lost any capacity to earn any type of money. It's not a situation in which plaintiff suffered some kind of catastrophic injury as a result of the university, and he's no longer able -- has the capacity to make money. Plaintiff is able to go -- try to get into medical school, try to go into law school. He's a very capable individual. He's a very smart individual. He is able to do any other type of equally as lucrative work. And we should be able to bring that type of evidence in, your Honor, just because --

THE COURT: What he's saying is, why should you be allowed to come in and say to the jury, Hey, he had to have gone and become a banker, or a private wealth manager, but it's not okay for him to go volunteer at Kristi House or some other public service job.

MR. KING: Well, what he's seeking, your Honor, is lost earning capacity. And he hasn't lost any capacity to earn money. Certainly, he may not -- he may have lost -- and just to be clear, your Honor, we've also -- Ross University has also offered him readmission into the medical school itself. And he's declined readmission. So, he hasn't lost any opportunity. He may have chosen not to pursue the opportunities, but he certainly hasn't lost any earning opportunity, any capacity to earn more money.

THE COURT: Mr. Awodiya, why did you reject that opportunity to be readmitted?

MR. AWODIYA: Because it wasn't reasonable. There is evidence in the record that that -- their offer is not reasonable. On a fundamental basis, there's evidence -- that one won't -- I'm -- I'm free to let them -- that's why I didn't move on that. I could care less if they introduce that into evidence, the re --

THE COURT: Here's my question about nine and ten. I don't disagree with you, as a basic premise, that the fact that someone decides to work in public service doesn't really mean that they're not still performing at a high level in society. But if they want to make that argument to the jury, why not let them make that argument to the jury? It seems like a relatively silly argument, and you might be able to undercut it.

MR. AWODIYA: Under Florida law, he -- what Ross is referring to as lost earning capacity is if someone lost an arm or lost a limb. But that's not the basis of the measure of the lost earning capacity as set forth by *Sherick (phonetic)*. The relationship -- the legal relationship between me and the school is a contractual one. Under Florida law, the level of education is a type of earning capacity, as designated by the Supreme Court. That's like -- what they're saying is, your Honor --

THE COURT: I understand what they're saying. I understand what they're saying.

You're going to file a response to this motion in limine by Thursday, and I will take this motion under advisement.

So, let's address the calendar call.

Is everyone prepared to go forward with trial?

MR. AWODIYA: Yes, your Honor. I would like to also note really quick -- I don't need to brief or anything -- I was able to look up when that law changed. It was in 2014, where Congress changed the definition of an institution of higher education from the U.S. definition to the one that includes the institutions outside the U.S. And they applied it to the entire chapter, not a specific provision. And it's a definition. So, anywhere where it mentions any type of institution of higher education, we refer to how they defined that. And it says that it applies to the entire chapter.

So, I just wanted to note that. And that was reflected in some -- it was like law Cornell thing, which I usually just Google, and that's the first thing -- they kind of show when the amendments happened. But it was around 2014, your Honor, after the extensive order from *Archut*.

THE COURT: Okay. Thank you very much.

So, you're prepared to go to trial?

MR. AWODIYA: Yes.

And I would like to move to dismiss the negligent misrepresentation claim, or to voluntarily withdraw, however I

get that out. Because I believe that it causes unnecessary conflict with the fraud claim, and it brings in a very complicated issue of the elements of that claim and the elements of the fraud claim. And since it's basically fraud that I'm going for, there's no reason for the negligent misrepresentation claim to be duplicative of that one.

THE COURT: Any objection?

MR. ROMAN: Your Honor, if it's with prejudice, we have no objection.

THE COURT: I assume it's --

MR. AWODIYA: Without prejudice. I have -- there's a rule and procedure where I read that I can do that, and when I do that, it's without prejudice. That's -- I -- if you give me a second to look it up --

THE COURT: Look it up.

*(Pause)*

MR. AWODIYA: Your Honor.

THE COURT: Yes, sir.

MR. AWODIYA: It is Federal Rules of Civil Procedure 41, Section (a)(1)(B). It says -- halfway into it, it says, "The dismissal is without prejudice." And this is under "Dismissal of Actions, Voluntarily Dismissal, by the plaintiff."

THE COURT: What's your position on that?

MR. ROMAN: Your Honor, that only pertains to a notice

of dismissal before the opposing party serves an answer or motion for summary judgment, or upon a stipulation signed by all parties, which isn't present here. So, we don't believe that's applicable. We've come this far, your Honor. We're on the eve of trial. We don't want a situation where he purports to bring a claim, that he has now dismissed without prejudice, after the trial if he's unsuccessful.

THE COURT: If you look at 41(a)(2), Mr. Awodiya, that is dismissal by Court order. That's except as provided in 41(a)(1). We're not in 41(a)(1) territory, because the opposing party has served an answer already. And because they're not stipulating, we're in 41(a)(2). And that's where a Court order --

MR. AWODIYA: I'm assuming the Court order would be something as a result of like a motion to dismiss or anything, because I don't see how any other way a plaintiff would voluntarily dismiss a claim without -- you know, because what I initially was going to do was just file a notice of voluntary dismissal. If it's because we're in here that I'm asking you, if that's why I can't --

THE COURT: No, it's not. Let me explain. The reason that this is an issue is because if they've already answered, then you can withdraw any claim without me intervening or them agreeing. Okay?

MR. AWODIYA: Okay.

THE COURT: But at a certain point, the case gets far enough long, and they've expended enough money defending it, that what the rules say is you shouldn't be allowed to, without their agreement and my agreement, withdraw a case, see what happens with this case, and hold this withdrawn case in reserve as backup, and if you lose the first case, then say, Aha, I've got a second bite at the apple, let me refile that, and let's start it all over again.

The point is, for efficiency reasons, to make sure that everything is brought together, that everything is adjudicated one time, you get your one day in court, that I get to decide whether it should be dismissed with or without prejudice, given how late we are in the game.

Or they can agree to allow you to dismiss it without prejudice. But, in fairness to them, I'll tell you that it's very rare this late in the game, under these circumstances, for a defendant to agree to do it without prejudice. And I think you probably -- you're a very smart guy, so you understand why they're afraid that what you're really doing is you're holding it in reserve to hedge your bets, and if you lose on the claims that are going forward, then you will refile that claim and say, Let's start it all over again, boys, restart the clock. Nobody wants that.

So, you either can go forward with everything together, although it seems like you've made a pretty smart

strategic decision about how confusing it might be to the jurors to have both of them together. If that's your decision, you can ask me to dismiss it with prejudice, which means that you wouldn't be able to bring it again.

MR. AWODIYA: Your Honor, if that's what the rule states, then, yes, I would like to dismiss it with prejudice, the negligent misrepresentation claim.

THE COURT: All right. And that motion will be granted.

So, we are set for trial for July the 8th. I will let you know -- let me just ask, that date still works for everyone?

Mr. Awodiya?

MR. AWODIYA: Yes, yes.

MR. ROMAN: Yes, your Honor, July the 8th works for us.

THE COURT: Okay. I'm glad that I asked that, because now I'm going to tell you that it probably doesn't really work for me, not in the sense that I'm going to be anywhere, it's just that I have a number of other cases that are set for that day. However, as you know, criminal cases take precedence because of the speedy trial clock. I think it looks like all of the cases that are on that day are either first time up criminal cases, which means they can get moved, or they're going to plead guilty, except for one. So, I have one case

that I think might go that day, which is ahead of you. I then have another big civil case that's just behind you.

So, what I will do is I will be in touch with both of you, both sides, to advise you on how my schedule looks like it's working out. If the criminal cases plea out, you're first, and you will go July 8th. If one of the criminal cases or more stays, then I'm going to require you to be available, and you'll go as soon as those cases are finished. Okay?

MR. AWODIYA: Yes, your Honor. And I would just like to state for the record that my case in chief will probably take one or two days.

THE COURT: Okay.

MR. ROMAN: Your Honor, I suspect our case would take no more than two days.

THE COURT: So, Mr. Awodiya, do you know, generally speaking, how a jury will get selected?

MR. AWODIYA: No. I don't even know how to pronounce the voyeur *(sic)*.

THE COURT: It's pronounced voir dire.

MR. AWODIYA: Voir dire?

THE COURT: Yes. And they are venire members before they become a jury. Venire, V-E-N-I-R-E, is the panel of people that we will bring in.

MR. AWODIYA: Okay.

THE COURT: Let me explain to you briefly how I do

jury selection for both sides' benefit.

You're going to get six jurors, probably, and two alternates. That's eight total. Each of you will have three peremptory strikes. You know what a "peremptory strike" is?

MR. AWODIYA: No.

THE COURT: A "peremptory strike" is a strike, a challenge to kick a person off of the venire for any reason that you want, except that it can't be because of the juror's race, or because of the juror's gender, or because of the juror's ethnicity or national origin.

MR. AWODIYA: Do we have to state the reason?

THE COURT: Only if the other -- you don't. The simple answer is no, unless the other side raises what's called a *Batson* challenge, in which case I'm gonna ask you what your reason is. Okay?

MR. AWODIYA: Okay.

THE COURT: Now, they can do that to you, too. Say that you wanted a particular juror off the jury, and they think there wasn't a good reason for it, and they suspect that you struck the juror for an unconstitutional reason -- race, religion, gender, or national origin -- they can raise a *Batson* challenge, and I'll ask you.

You can do the same for them. If they strike a juror, say, that you think was struck for an unconstitutional reason, you can stand up and say, "I raise a *Batson* challenge." That

yields a three-part test.

You would have to make a prima facie showing that it was a strike in violation of the Constitution, and you would say, Hey -- for example, let's assume they struck the only male in the panel, and you said, Look, I'm a male, they don't want males because they think males are going to like me, and they struck a male just because he was a man, they -- that man was similarly situated to all these other women that they let stay on, this is just an unconstitutional strike of a man.

Then the burden would shift to them to give me a gender-neutral reason for the strike. And if they did that, say they said, When I was asking him questions, he was giving me a face, and I didn't like his face, he was grimacing or whatever, some gender-neutral reason, I would go back to you to prove that the reason they gave was what we call pretextual, basically that they're lying.

MR. AWODIYA: Okay.

THE COURT: That's the three-step process.

MR. AWODIYA: Okay.

THE COURT: But you don't have to do that every time. You can, if you want to, but you do it when you think -- you legitimately think that they're doing it for an unconstitutional reason.

And that brings me to an important point. Even though you're pro se, I am going to hold you to the rules of our

court, which require that you only make arguments that you think are true, and that you only make statements that you think are true. And so, my point to you in that respect is, if you think they violated the Constitution, say so. But if you don't think they violated the Constitution, don't just do it for points. Does that make sense?

MR. AWODIYA: I see what you're saying.

THE COURT: So, we'll bring in a number of people. They'll sit here. Number 1 will sit closest chair to Javier here in the front, and it will be one through seven in the front row. And then the next seven will be in the second row, and then the seven after that will be in the back row. So, there will be 21 people in here that are in the venire, okay?

MR. AWODIYA: I reviewed the scheduling order just briefly. It said something about asking them one-on-one?

THE COURT: Let me finish, and then you can ask me questions, if you still have questions.

You're going to have 21 people here. The reason that's important is because we're picking eight, six jurors plus two alternates, that's eight. You're going to get three strikes, he's going to get three strikes, plus you each get a strike for alternates. That's four strikes and four strikes, so that's eight plus eight is 16. So, we need at least 16.

Plus you get cause challenges, which is anytime somebody says, "I don't speak English," or "I'm sick and can't

be here," or "I'm blind and can't see the exhibits," or "I have a 100-year-old grandmother that I need to take care of, and so please don't make me stay here," or "I hate people named Awodiya or law firms named Akerman, and I can't be fair," under any of those circumstances, I'm not going to make a person sit there. Those are what we call challenges for cause. You can get rid of people who either can't be here or can't be fair. Okay?

So, my estimate is we usually get about ten of those. So, 16 plus ten, I'll probably bring in 26, which means that you've got 21 here and five in the first row behind you, Mr. Awodiya. Okay?

So, what we'll do is, I'm going to give them a short questionnaire that asks them the background questions -- what's their name, where do they work, how old they are, what does their husband do, or wife, what do their children do, and a few probing questions about whether they have any prejudices that might make them unfair jurors in your case.

At that point, we'll get the questionnaires. All of you will read them with me while the jurors are still outside. We'll go over them. I'll give you ten or 15 minutes to take notes on them. We'll bring them in, and I will give them about an hour or so of questions about the process, the system, and specific questions in response to things I thought were interesting that they said in their questionnaires.

At that point, I'm going to turn it to the lawyers, and I'll give you a few minutes, probably no more than ten, to ask your own questions of the venire, the group, if you want to.

Now, if there are jurors who say, "I have something really private to say, I don't want to say it in front of everybody," we'll allow those jurors to come in individually and raise their individualized concerns in private with us.

So, once that's all done, the jurors go outside, and then we go through the list of the 26 of them, and we'll start with Juror Number 1. Because you're the plaintiff, Mr. Awodiya, you would go first. And I would say, Juror Number 1, Mr. Awodiya, accept or reject? And at that point, you have three options. You can either accept the juror, you could strike the juror for cause, which is the juror said she can't be fair, or you can strike the juror peremptorily, which is to say, I'm striking her for any reason I want, and I don't want to tell you the reason. Okay? Remember, on the third one, they can respond with a *Batson* challenge, which we talked about before.

So, that's Juror Number 1. Let's say you accept, we go to the defense. Let's say they accept, that person is our Juror Number 1. Then we go to Juror Number 2, it goes to the defense to accept or reject and then to you. And so on and so forth until we have eight jurors.

Does that make sense?

MR. AWODIYA: Yes.

THE COURT: Okay. Anything else from you, Mr. Awodiya?

MR. AWODIYA: Two questions. When -- if I do the third option, where I say I want do it for any reason, I --

THE COURT: We call it a peremptory.

MR. AWODIYA: Peremptory?

THE COURT: P-E-R-E-M-P-T-O-R-Y. And you get three of those, so you want to use them wisely. You get an infinite number of cause challenges.

But, remember, you're going to be obligated to tell me things you only believe to be true. And so, you can't raise a cause challenge on everybody, because there will be jurors in here who can be fair. That's only for people who say they can't be jurors.

MR. AWODIYA: Okay. So, my question is: When they want to challenge my unstated reason, does that argument occur in front of the jury?

THE COURT: It does not. The jurors are outside when we pick the jury.

MR. AWODIYA: Okay.

THE COURT: That's a good question.

MR. AWODIYA: And my second question is: Is this process considered the first day of trial?

THE COURT: That will happen on the first day of trial, but that will be in the morning. And then we'll break for lunch probably, and opening statements will begin in the afternoon.

MR. AWODIYA: I understand. I understand.

THE COURT: Any questions from the defense?

MR. ROMAN: Your Honor, I just have three very short questions. The first was, I understand from your instructions regarding voir dire that there will be no backstriking, is that correct?

THE COURT: That's correct.

MR. ROMAN: Okay. During trial will we have permission to move the podium around the well?

THE COURT: Yes. Two things about that. One is I don't want you to stray too far from the microphone, because the acoustics in this courtroom are very difficult, and Fran needs to hear everything you say. So, I'm going to be sensitive to that, and I'll warn you in advance. But she doesn't need me to be, because, as you'll see, she will pipe up if she can't hear you.

Secondly, you can, though, move the microphone around -- actually, they both have microphones, and they're both movable. However, they are tethered with monumentally important cables to a system that I'm afraid will combust if something happens. So, just be careful when you move either or

both of them that you're not unplugging something important.

MR. ROMAN: Thank you, your Honor. And my last question is: Prior to trial is it okay if we contact your chambers to see about our trial technician coming in to check out the courtroom?

THE COURT: Yeah, that's no problem.

Go ahead, Fran.

THE COURT REPORTER: Have them call me.

THE COURT: You can just call Fran, and she'll help you out.

Mr. Awodiya, I'll give you the same opportunity. If you have any questions about how the equipment works, Fran will help you out with it.

This thing right here is called the ELMO. I don't know why it's called that, but I'm sure there's a good reason. The ELMO is tied to all the screens in the courtroom.

MR. AWODIYA: Okay.

THE COURT: And if you put a document -- including the jurors' screens.

MR. AWODIYA: Okay.

THE COURT: If you put a document on the ELMO, then everyone will be able to see it, if and when I allow it to be published, and Fran clicks a button that allows all the screens to see it.

Otherwise, there's a setting on the ELMO that allows

only for the witness and me to see the document while it's on the ELMO. The reason for that is because before you are able to show the jurors an exhibit, you've got to get the exhibit into evidence. So, you can show it to me and the witness through the ELMO, if it comes into evidence. Then you can ask Fran and me to publish it to the jury. And if we agree with that, then the different button will be pressed, and everybody will be able to see it. Does that make sense?

MR. AWODIYA: That makes sense.

MR. ROMAN: I'm sorry, your Honor, I had two more questions that got passed to me. What time -- your trial day, I understand from the earlier conversation, may start at 9:30 typically?

THE COURT: 9:30.

MR. ROMAN: And what time do you usually go until?

THE COURT: Usually five or 5:30.

MR. ROMAN: And, finally, your Honor, with respect to sidebars, how do you typically handle those?

THE COURT: Generally discouraged. In criminal cases, sometimes you can't do without them. In civil cases, we really shouldn't be doing very many sidebars. If you need a sidebar, just ask me for a sidebar, and we'll either take it here, which is where my microphone is on my left, or if it's a more involved issue, we'll wait for the next break, and we'll take it up when the jurors are in the jury deliberation room.

MR. ROMAN: Thank you, your Honor.

MR. AWODIYA: Your Honor, I have --

THE COURT: This seems like a never-ending process. This is going to be your last turn.

MR. AWODIYA: Sorry. I think I'm going to need -- I've already contacted the Court last year --

THE COURT: I wasn't even a judge back then.

MR. AWODIYA: Oh, yes, I know, but it's important to my question. I asked them for courtroom accommodations, and they told me that since it's an ADA case, that I would need to ask the judge presiding.

I saw something that I think would, like, really help me, is if I need something that when people are speaking, especially really lengthy, if I can kind of read at my own pace, or if I like get lost, I can go back and read what they said. Because, quite honestly, I just might lose concentration. Like half the stuff they said there, I had point in my head, and I just don't remember what I was going to say against it. So, to avoid that during trial -- they had something called --

THE COURT: It's called realtime, but you have to pay for it.

MR. AWODIYA: Then I strike that. I don't think I have the funds to pay for it. So, I can't -- I will just leave that alone.

My next question is, I would like to see if I could -- there are documents, there are evidence that under protective order, and Ross has labeled them that they wouldn't expect to offer those documents. There are important redactions that need to be made, and Ross has made no effort to even show me what documents they plan to offer or what information within the documents, whatsoever. And since they're under protective order, technically they can't offer them unless I -- there is a further order or I stipulate to how they are administered. That's within the protective order.

THE COURT: Okay.

MR. ROMAN: Your Honor, we do not read the protective order in that manner. However, at trial, we would ask for those documents that contain sensitive information, if it's not relevant, we'll redact those. If it is relevant, then we would ask that you perhaps can close the courtroom for that portion of the testimony, and we would seal the record.

THE COURT: I'm not going to be inclined to close the courtroom, because the people have a Sixth Amendment right to a public trial. But why don't you just show him the exhibits that you are intending to introduce at trial. I assume you have them all ready. And let him go through them and recommend any redactions. Try to work it out, and if you can't work it out, let me know, and I will work it out.

MR. ROMAN: Thank you, your Honor.

THE COURT: Again, Mr. Awodiya, when they show you the exhibits, I'll ask you to review those exhibits and only try to redact the things that you think are absolutely necessary to redact.

MR. AWODIYA: Okay.

My third-to-last question --

THE COURT: Third to last?

MR. AWODIYA: Well, I only have four questions, so --

THE COURT: Oh.

MR. AWODIYA: I would like to -- now that I understand the voir -- the voir dire --

THE COURT: Voir dire.

MR. AWODIYA: The voir dire, I would like to see if I could have leave to -- leave before Friday to file with the Court my questions. I was first under the presumption that the Court had like a standard thing for like ADA cases, but the questions that you mentioned sound very general, and so I might need to actually adapt something like that to an ADA case.

THE COURT: I do ask specific questions relating to the ADA.

MR. AWODIYA: Okay.

THE COURT: But I will permit you to submit proposed voir dire questions. No more than five per side. You can file them by Friday.

MR. AWODIYA: Okay. Okay. Thank you.

THE COURT: Just know that I may decide not to ask any of those questions.

MR. AWODIYA: Okay. Perfectly fine.

MR. ROMAN: Your Honor, if I may, with respect to that instruction, we had filed voir dire questions with the Court already. However, we exceeded that limit of five. Would you like us to refile?

THE COURT: Refile them by Friday and pick your best five.

MR. ROMAN: Thank you, your Honor.

MR. AWODIYA: And my last one is: I would like to see -- seek leave to file for motion for sanctions, because I read the minute order, and with respect to discovery, it said that I should contact the magistrate judge before filing a motion for sanctions, I think via email. However, this is not really a discovery matter, so I wanted to see if I could seek a leave to file a motion for sanctions against Ross University and its counsel for its conduct yesterday.

THE COURT: What happened yesterday?

MR. AWODIYA: I submitted my jury instructions to Ross University I think June 4th. They submitted theirs to me days later. And then what they submitted to me -- after a few more days later, they submitted something that they -- what they put in their notice, they said that here is a version of the proposed jury instructions, where I did not create that

version. And then in -- as -- they -- they cannot cherrypick my submissions to them to mess with it however they want to, and then claim that I had something to do with the version that they submitted on my behalf, saying that plaintiff -- for example -- and then I sent an email to them saying that do not omit my objections, do not omit my instructions, do not change the order, because they are really relevant, as I explained with the fraud claim and the compensatory damages. That's why my things are in the order that they are.

And then on top of that, I sent them more objections or alternate objections, and then I removed instructions from mines *(sic)*, which are no longer requested by me. And then I also altered significantly certain instructions, like the emotional distress ones.

THE COURT: Here's what we're going to do. Your motion for leave to file a motion for sanctions is granted, and your motion for sanctions is denied. You're going to get together by Friday, and you're going to work on one joint proposed jury instructions that comports with my order on how to file proposed jury instructions. That doesn't mean that each of you gets to file your own separate jury instructions. There are specific instructions in my order, that are very simple to follow, on how you are to designate three kinds of instructions -- instructions on which you agree; instructions on which the defendant is insisting, but with which the

plaintiff disagrees; and instructions on which the plaintiff is insisting, but with which the defendant disagrees. Those three possible scenarios are all laid out very clearly in my order. And you're to file one joint proposed set of jury instructions that specifically delineates those three different kinds of instructions by Friday.

MR. AWODIYA: Thank you, your Honor.

And, as well, your -- the scheduling order doesn't address the pretrial stipulations as well, because that one was completely -- they made that version. I never put something as a stipulated fact.

THE COURT: Then there's no stipulations.

MR. AWODIYA: Exactly. But my admission -- the Rule 36 admissions and the Rule 8 admissions are considered uncontested facts under the local rules. So, therefore, I shouldn't have to trial *(sic)* facts that they Rule 36 admitted. That's literally prejudice, and I put that in one of the pleadings. So, if they admit to a fact, a Rule 36 admission, or admit to an allegation within the complaint, that fact is treated as proven for the case, as well as the Rule 56(g) facts from --

THE COURT: Well, that's true, but that's separate from the pretrial stipulations. Pretrial stipulations have to do with things that you are agreeing separate and apart from evidence that may or may not be contested. So, if there are

stipulations that you have in place on things you agree, by all means, file -- your stipulations should have been filed already. So, this is not really an issue of what's to be filed. If there are pieces of evidence that you say they admitted or accepted in some way or manner during the course of the litigation, then you'll be able to try to introduce that, and they'll be able to object, if they disagree, and I will rule on that objection at that time.

Have you filed an exhibit list?

MR. AWODIYA: Yes. I filed everything, your Honor. The problem is, is that those admitted facts -- since Ross is allowed to put stipulations in the jury instructions, I should also be allowed to put admissions and established facts, facts that are treated as proven already for this case. So, it would -- there's no way to present -- because I don't know if the document itself, the request for admissions and established facts are admissible, but it wouldn't make sense for me to have to sit there and prove it to the jury. They should already know that these facts are proven.

THE COURT: Well, if it's a statement of the party opponent, it's not hearsay. And if it's a request for admission that was turned over to you in the course of this litigation, then it's authenticated. So, I don't see that as being an admissibility problem. There may be some other objection to it. I don't know what piece of evidence you're

talking about.

MR. AWODIYA: Those -- how would those apply to the rule -- the Rule 56(g) established facts?

THE COURT: You mean the ones that you claim are established facts in your summary judgment submissions?

MR. AWODIYA: Yes.

THE COURT: Well, those are your view of what's established facts, not their view.

MR. AWODIYA: I took them word for word from the Court's order.

THE COURT: Right. So, the Court has to enter an order on what facts are established and what facts are not established.

MR. AWODIYA: Your Honor, I respectfully disagree. I looked that case law up, because I was just making sure before I did all of that, there was an exact case, something like that, and I think it was either in this court or the Eleventh Circuit, where they argue precisely that, whether the Court has to say that this is a Rule 56(g) fact, and they ruled that, no, it is within the rules of the civil procedure. And then it's there. And I requested for it in my motion for summary judgment. It simply states that the judge --

THE COURT: You mean your motion for summary judgment in front of Judge Moore?

MR. AWODIYA: Yes.

THE COURT: And what was the ruling on that?

MR. AWODIYA: He stated material facts that were not subject to reasonable dispute -- reasonable -- reasonably -- reasonable dispute.

THE COURT: Okay. So that's that.

MR. AWODIYA: Okay. Well, just --

THE COURT: Is there any dispute about that?

MR. ROMAN: Yes, your Honor. We actually don't read the order the way that Mr. Awodiya does. There are items he requested be established that the Court rejected that he still is trying to use in the stipulations. So, we're gonna have some disagreements, but I think those can be addressed, your Honor, when those particular facts are introduced.

THE COURT: Mr. Awodiya, this is the way litigation goes. You're going to say that a particular fact has been ordered by the Court. You're going to try to convince me that that's true. If they agree, then we can tell the jury that fact. If they disagree, they're going to point to me in the record where they're going to say, Chief Judge Moore, in his order, did not find that that was a fact about which there was no genuine issue of dispute. And I'll have to look at it and make a decision, one way or the other. If I agree with you, then we'll instruct the jury that that's a fact that's not in dispute. If I agree with them, then it's a fact that you're going to have to prove.

MR. AWODIYA: Okay. I think we -- we'll just address it later, because I think I can't cover the amount of prejudices what happened. Like, first, if we wait till that long, my entire exhibit list, entire case would change, literally. It goes from my diagnosis to me informing Ross of that -- like, I've already submitted my exhibit list in compliance --

THE COURT: You'll get to amend your exhibit list. That's not a problem. There will be naturally things in your exhibit list that will not be admitted into evidence, and same with the defense. So, at the end of the case, you'll submit to me an amended exhibit list. But remember, the jurors don't see the exhibit list, so it's not prejudicial to you.

MR. AWODIYA: No, but they see the jury instructions.

THE COURT: Yeah, but the jury instructions are not done until the end of the case, once the evidence is put in. So, it won't be prejudicial to you either, because the jurors don't see the proposed jury instructions until we have our charge conference all together, outside of their presence, and decide exactly which instructions are going to go to the jury and which are not.

MR. AWODIYA: Do you give them any instruction before we start trial?

THE COURT: We give them the preliminary instructions, which are standard.

MR. AWODIYA: I see. And everything after that is after the trial.

THE COURT: After the evidence is in. So, by then, we'll --

MR. AWODIYA: Okay. That clears things up for me.

THE COURT: So, that clears everything up. Okay.

So, I hesitate to ask if there's anything else. Let me say it this way.

MR. AWODIYA: That's it.

THE COURT: We will see you on the 8th unless I let you know that it will be at some point later than that. Okay?

MR. AWODIYA: Okay, your Honor. And with regard to that, I just ask for a little bit of spacing, because it's harder for me to buy plane tickets and book hotels when I have to buy them like a few days later or a week later. Sometimes money does become an issue. So, if it is moved, I need just a little bit of buffer just to make sure that the financial stuff is --

THE COURT: We will try to -- I understand that. And we will try to let you know as soon as we know whether it's going on the 8th or sometime later.

MR. AWODIYA: Thank you, your Honor.

*(Discussion had off the record)*

THE COURT: We should know by July 2nd.

MR. AWODIYA: Okay. Thank you.

MR. ROMAN: Thank you, your Honor.

THE COURT: All right. Thank you all very much.

MR. KING: Thank you, Judge.

ROOM CLERK: All rise.

*(The Judge exited the courtroom)*

*(Proceedings concluded at 5:01 p.m.)*

\- - - - -

C E R T I F I C A T E

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript from the record of proceedings in the above-entitled matter.

______________________________ 7-2-2019

Francine C. Salopek, RMR-CRR Date
Official Court Reporter

**MR. AWODIYA: [144]**
**MR. KING: [13]** 48/11 48/20 48/23 49/2 49/24 50/7 50/11 50/17 50/19 50/22 51/23 52/14 80/2
**MR. MARSH: [1]** 30/7
**MR. ROMAN: [70]**
**MS. GREEN: [5]** 35/15 35/18 35/22 35/25 36/2
**ROOM CLERK: [3]** 3/5 30/10 80/3
**THE COURT REPORTER: [1]** 67/7
**THE COURT: [221]**

**'**

**'institution [1]** 18/23

**1**

**10 [3]** 31/12 31/19 50/16
**100-year-old [1]** 63/2
**1001 [4]** 7/3 7/6 8/13 19/10
**1002 [5]** 7/1 7/6 8/13 18/24 19/3
**11 [2]** 1/7 3/1
**1100 [1]** 2/7
**15 minutes [1]** 63/21
**15005 [1]** 2/2
**154 [1]** 41/6
**16 [4]** 15/20 62/23 62/23 63/10
**160 [1]** 35/5
**165 [1]** 36/12
**17 [2]** 15/20 31/19
**18-60482-CIV-RKA [1]** 1/4
**18th [1]** 21/13
**194 [3]** 36/10 36/12 48/7
**1988 [1]** 36/20

**2**

**20 [2]** 18/25 19/4
**20 U.S.C [1]** 7/1
**2012 [2]** 4/18 18/10
**2014 [3]** 48/2 54/8 54/19
**2016 [1]** 21/13
**2017 [5]** 14/8 14/14 14/18 22/8 40/10
**2019 [5]** 1/7 3/1 18/11 48/2 80/23
**20721 [1]** 2/3
**207B [1]** 2/10
**21 [3]** 62/13 62/18 63/11
**23 [3]** 6/24 17/8 18/16
**26 [3]** 15/20 63/10 64/10
**28 [1]** 80/19
**29 U.S.C [4]** 6/24 7/11 17/8 18/16
**299 [1]** 2/10
**2:32 [2]** 1/7 3/1
**2nd [1]** 79/24

**3**

**32 [2]** 15/20 31/12
**33131 [1]** 2/8
**33301 [1]** 2/11
**34 [1]** 15/20
**36 [3]** 74/14 74/16 74/18
**379 [1]** 36/21
**3:11 [1]** 30/3
**3:47 [1]** 30/3

**4**

**41 [5]** 55/20 56/8 56/10 56/10 56/12
**4270618 [1]** 40/11
**4th [1]** 72/21

**5**

**504 [2]** 6/17 8/7
**56 [4]** 15/19 74/20 76/3 76/19
**5:01 [1]** 80/6
**5:30 [1]** 68/16

**7**

**7-2-2019 [1]** 80/23
**705 [3]** 6/24 17/8 18/16
**753 [1]** 80/18
**769-5686/mjsfcs [1]** 2/11
**794 [2]** 7/12 20/18

**8**

**860 F.2d 379 [1]** 36/21
**8th [5]** 58/10 58/15 59/6 79/10 79/21

**9**

**954 [1]** 2/11
**98 [1]** 2/7
**9:30 [2]** 68/12 68/14

**A**

**A-G-E-L-O-F-F [1]** 36/21
**abide [1]** 45/16
**abided [1]** 31/13
**ability [1]** 42/8
**above [1]** 80/21
**above-entitled [1]** 80/21
**abroad [2]** 6/8 6/8
**absent [1]** 20/2
**absolutely [3]** 29/13 29/25 71/3
**academic [4]** 16/9 48/10 48/11 49/16
**accept [5]** 64/13 64/14 64/21 64/22 64/24
**accepted [1]** 75/5
**accommodate [3]** 33/16 44/23 46/9
**accommodated [1]** 43/22
**accommodation [41]**
**accommodations [13]** 5/3 16/9 23/7 26/20 26/20 26/23 27/18 28/6 29/22 31/12 31/15 32/12 69/9
**according [1]** 23/2
**acknowledged [1]** 26/22
**acoustics [1]** 66/16
**act [16]** 4/14 4/20 5/18 6/2 6/12 6/17 6/20 6/20 7/20 8/4 8/6 15/16 20/8 20/21 31/14 32/18
**acting [1]** 45/9
**Actions [1]** 55/22
**activities [1]** 8/10
**acts [4]** 5/23 6/1 7/9 26/2
**ADA [57]**
**adapt [1]** 71/18
**address [4]** 35/10 54/4 74/9 78/1
**addressed [2]** 7/16 77/12
**addressing [1]** 36/23
**ADHD [3]** 21/13 22/7 22/12
**adjudicated [1]** 57/11
**administered [2]** 24/5 70/9
**administers [1]** 24/19
**administration [8]** 15/24 16/2 16/24 21/4 21/20 32/7 32/9 32/13
**administrators [3]** 10/3 12/14 33/20
**admissibility [1]** 75/24
**admissible [1]** 75/17
**admission [4]** 51/14 74/13 74/18 75/22
**admissions [6]** 10/19 10/20 74/14 74/14 75/13 75/16
**admit [2]** 74/18 74/19
**admitted [4]** 74/16 75/5 75/11 78/10
**adopted [1]** 20/6
**advance [1]** 66/18
**advise [2]** 41/13 59/4
**advisement [2]** 36/9 54/3
**affairs [1]** 16/6
**affirm [2]** 45/12 47/22
**affirmatively [1]** 15/3
**affirmed [1]** 20/1
**afforded [1]** 39/6
**afraid [2]** 57/19 66/24
**afternoon [13]** 3/3 3/4 3/5 3/10 3/11 3/12 3/16 3/17 17/5 17/6 30/17 30/18 66/4
**Ageloff [2]** 36/21 40/9
**agencies [1]** 8/8
**agree [19]**
**agreement [4]** 7/23 8/2 57/4 57/4
**Aha [1]** 57/6
**aid [4]** 7/21 7/24 8/18 11/1
**Air [1]** 36/21
**Akerman [4]** 2/6 3/13 3/14 63/4
**allegation [4]** 16/25 21/25 23/20 74/19
**allegations [6]** 16/10 16/12 16/18 16/19 16/20 23/2
**allege [1]** 15/19
**alleged [1]** 33/1
**allow [3]** 57/14 64/7 67/22
**allowed [8]** 15/15 22/20 46/5 47/22 52/11 57/3 75/12 75/13
**allows [2]** 67/23 67/25
**alone [1]** 69/25
**altered [1]** 73/13
**alternate [1]** 73/11
**alternates [3]** 60/3 62/20 62/22
**although [2]** 41/24 57/25
**Altman [1]** 1/14
**ambit [1]** 7/9
**amend [1]** 78/8
**amended [2]** 51/4 78/12
**Amendment [1]** 70/19
**amendments [1]** 54/19
**American [6]** 7/17 7/19 7/20 7/23 7/25 26/11
**amount [1]** 78/2
**analysis [3]** 18/12 20/5 44/3
**analyzed [1]** 19/14
**and/or [1]** 17/9
**anew [1]** 35/14
**answer [7]** 11/24 20/7 25/17 25/21 56/1 56/11 60/13

**A**

**anymore [1]** 48/20
**anytime [1]** 62/24
**aol.com [1]** 2/11
**apologize [1]** 19/2
**appeal [1]** 14/18
**appearances [3]** 2/1 3/8 30/13
**appellate [1]** 39/7
**apple [1]** 57/7
**applicability [1]** 3/23
**applicable [18]**
**application [3]** 6/1 25/2 51/12
**applied [10]** 24/23 28/10 28/16 43/10 44/21 44/22 46/18 47/5 48/5 54/11
**applies [6]** 8/10 17/9 17/20 19/25 41/22 54/15
**apply [30]**
**applying [1]** 18/19
**appreciate [1]** 18/8
**approach [1]** 40/6
**Archut [18]**
**aren't [3]** 16/24 39/3 42/1
**argue [1]** 76/18
**argument [26]**
**arguments [2]** 30/19 62/1
**arises [1]** 24/9
**arm [1]** 53/16
**art [1]** 29/22
**aspect [1]** 11/5
**aspersions [1]** 11/23
**assassination [1]** 5/22
**assertion [1]** 49/1
**assessment [1]** 16/4
**assigned [1]** 7/5
**assist [1]** 41/18
**associate [1]** 16/6
**assume [6]** 25/25 26/3 43/6 55/10 61/4 70/21
**assumes [1]** 51/5
**assuming [6]** 21/23 33/22 40/3 44/18 50/16 56/14
**attempt [2]** 13/11 40/22
**attempting [1]** 51/8
**attempts [2]** 12/13 29/11
**attenuation [1]** 43/24
**authenticated [1]** 75/23
**authority [6]** 8/8 20/3 29/9 33/14 33/24 49/15
**authorized [1]** 15/22
**avoid [1]** 69/19
**aware [1]** 11/15
**AWODIYA [34]**
**Awodiya vs. Ross [2]** 3/7 30/12
**Awodiya's [3]** 31/9 36/10 36/13

**B**

**background [1]** 63/14
**backing [2]** 7/25 10/5
**backstriking [1]** 66/9
**backup [1]** 57/6
**banker [1]** 52/12
**basic [1]** 53/8
**basis [4]** 23/12 49/12 53/3 53/17
**Batson [4]** 60/14 60/21 60/25 64/19
**begin [1]** 66/3
**beginning [1]** 25/19
**behind [2]** 59/2 63/11
**believe [24]**
**below [6]** 37/8 37/16 38/3 39/20 39/21 39/24
**below-market [6]** 37/8 37/16 38/3 39/20 39/21 39/24
**belt [1]** 36/6
**Beltran [2]** 40/9 40/11
**Beltran vs. NCL [1]** 40/9
**benefit [1]** 60/1
**bets [1]** 57/20
**billing [1]** 29/19
**binding [2]** 19/17 19/18
**bite [1]** 57/7
**black [1]** 47/25
**blind [3]** 49/17 49/20 63/1
**Blvd [1]** 2/10
**board [2]** 43/12 47/11
**book [1]** 79/14
**Bowie [1]** 2/3
**boys [1]** 57/22
**break [2]** 66/2 68/24
**Brickell [1]** 2/6
**brief [4]** 3/22 25/7 28/24 54/7
**briefing [5]** 3/25 9/12 28/9 28/17 34/7
**Broward [1]** 2/10
**buffer [1]** 79/17
**burden [1]** 61/10
**button [2]** 67/23 68/7
**buy [2]** 79/14 79/15

**C**

**cables [1]** 66/24
**calculating [1]** 38/3
**calculation [6]** 40/21 41/7 41/9 43/17 51/4 51/10
**calculations [1]** 36/14
**calendar [3]** 1/13 3/19 54/4
**call [9]** 1/13 3/20 41/10 54/4 61/15 63/6 65/7 67/8 67/9
**called [7]** 21/5 36/20 60/13 67/14 67/15 69/20 69/21
**Calling [1]** 3/6
**campus [4]** 13/10 13/16 13/25 17/21
**capable [2]** 51/13 52/6
**capacity [13]** 40/14 41/19 45/23 50/25 51/25 52/1 52/4 52/16 52/16 52/22 53/16 53/18 53/21
**careful [1]** 66/25
**carjacking [1]** 5/20
**case-by-case [2]** 37/9 38/4
**cast [1]** 11/23
**catastrophic [1]** 52/3
**categories [1]** 41/20
**category [1]** 41/21
**causation [2]** 43/2 44/9
**cause [5]** 62/24 63/6 64/15 65/11 65/14
**caused [1]** 45/6
**causes [1]** 55/1
**center [4]** 15/23 16/4 21/12 21/22
**Centre [1]** 2/6
**certify [1]** 80/18
**chair [1]** 62/9
**challenge [7]** 60/7 60/14 60/22 60/25 64/19 65/14 65/18
**challenges [3]** 62/24 63/6 65/11
**chambers [1]** 67/4
**chance [1]** 12/9
**chapter [2]** 54/12 54/15
**charge [1]** 78/19
**charges [1]** 25/14
**check [2]** 27/16 67/4
**cherrypick [1]** 73/1
**chief [3]** 41/5 59/10 77/19
**children [1]** 63/16
**choose [1]** 47/24
**chosen [1]** 52/21
**Circuit [8]** 20/2 20/3 20/5 36/20 37/2 37/17 38/24 76/18
**Circuits [2]** 39/2 39/3
**circumscribed [1]** 24/1
**circumstances [3]** 33/16 57/16 63/5
**citation [1]** 18/16
**cite [1]** 40/11
**cited [3]** 6/6 7/17 34/6
**citing [1]** 29/9
**citizens [4]** 7/17 7/19 7/20 7/23
**citizens' [1]** 7/25
**City [1]** 2/6
**CIV [1]** 1/4
**civil [6]** 3/6 30/11 55/19 59/2 68/20 76/20
**claim [29]**
**claiming [1]** 21/20
**claims [24]**
**clear [10]** 4/19 5/25 6/2 6/7 6/12 7/5 13/15 36/17 37/17 52/18
**clears [2]** 79/5 79/6
**clerk [1]** 30/10
**clever [3]** 10/11 26/6 26/8
**clicks [1]** 67/23
**clock [2]** 57/22 58/22
**close [2]** 70/16 70/18
**closer [1]** 26/1
**closest [1]** 62/9
**Code [1]** 80/19
**cold [1]** 28/15
**college [2]** 49/2 49/3
**colleges [1]** 20/12
**combust [1]** 66/24
**comfortable [1]** 26/11
**company [1]** 8/21
**compared [1]** 16/15
**compensatory [8]** 15/15 15/17 42/23 42/25 45/11 45/12 47/20 73/8
**complaint [6]** 14/5 14/10 15/19 16/10 31/17 74/19
**complete [1]** 39/5
**compliance [1]** 78/7
**complicated [2]** 12/11 55/3
**complimented [1]** 20/5
**comply [14]** 9/3 10/3 10/7 10/9 10/12 10/15 30/24 32/11 32/23 34/18 34/25 45/19 45/24 46/25
**complying [1]** 32/7

**C**

**comports [1]** 73/19
**computer [1]** 1/25
**concentration [1]** 69/17
**concern [1]** 25/16
**concerned [1]** 33/20
**concerns [1]** 64/8
**conclude [1]** 19/14
**concluded [1]** 80/6
**conclusion [2]** 17/22 18/13
**conduct [4]** 18/10 18/12 20/9 72/18
**conference [1]** 78/19
**confidential [1]** 15/23
**conflict [1]** 55/2
**conflicting [1]** 34/3
**conflicts [1]** 34/4
**conform [1]** 9/19
**confused [2]** 37/24 38/8
**confusing [1]** 58/1
**confusion [1]** 32/6
**Congress [5]** 6/2 6/7 6/13 49/15 54/9
**congressman [1]** 7/18
**connected [1]** 46/19
**connection [1]** 11/1
**connects [1]** 49/13
**consequent [2]** 45/9 45/10
**consideration [1]** 17/12
**consistent [2]** 20/22 20/25
**Constitution [3]** 61/3 62/4 62/5
**construed [1]** 8/5
**contact [2]** 67/3 72/14
**contacted [1]** 69/6
**contain [1]** 70/14
**contentions [1]** 36/24
**contested [1]** 74/25
**context [2]** 18/19 40/14
**contract [1]** 45/12
**contractual [2]** 47/21 53/20
**controlling [1]** 49/14
**conversation [1]** 68/12
**converse [1]** 18/5
**convince [1]** 77/16
**coordinator [2]** 26/21 31/12
**copy [1]** 29/1
**Cornell [1]** 54/17
**counsel [4]** 3/8 30/13 40/2 72/18
**counseled [1]** 25/18
**counseling [6]** 15/23 16/4 21/11 21/12 21/21 21/22
**counts [1]** 25/24
**court [34]**
**Court's [5]** 5/8 7/16 36/16 37/5 76/10
**courtroom [8]** 3/2 66/16 67/5 67/16 69/9 70/16 70/19 80/5
**courts [1]** 18/13
**cover [1]** 78/2
**create [1]** 72/25
**created [2]** 8/15 8/20
**criminal [5]** 58/21 58/24 59/5 59/6 68/19
**CRR [2]** 2/9 80/24
**Cuffy [1]** 16/1
**Culver [3]** 36/19 37/2 37/15
**curriculum [2]** 23/5 51/15

**D**

**Dahlia [1]** 2/2
**damage [3]** 36/14 37/3 42/23
**damages [25]**
**date [2]** 58/11 80/24
**deaf [2]** 49/18 49/21
**dean [1]** 16/6
**decide [5]** 9/16 9/17 57/12 72/1 78/20
**decides [1]** 53/9
**decision [18]**
**decision-maker [2]** 31/18 33/2
**decision-making [1]** 24/15
**declined [1]** 52/20
**dedicated [1]** 28/23
**defendant [8]** 1/10 2/4 35/6 35/7 51/9 57/17 73/25 74/2
**defendant's [1]** 35/5
**defendants [4]** 6/5 36/17 48/8 48/9
**defending [1]** 57/2
**defense [5]** 40/2 64/22 64/24 66/6 78/11
**defer [1]** 36/23
**defined [5]** 4/13 4/21 4/23 6/21 54/14
**definition [7]** 7/2 7/5 8/13 20/18 54/9 54/10 54/13
**delegated [1]** 49/15
**delegates [1]** 8/8
**deliberate [1]** 15/16
**deliberation [1]** 68/25
**delineates [1]** 74/5
**Delta [1]** 36/21
**Delta's [1]** 36/24
**denied [3]** 25/6 35/18 73/17
**deny [1]** 15/22
**Department [1]** 8/2
**depends [1]** 14/12
**deposed [1]** 27/15
**deposition [4]** 13/19 27/17 31/11 33/21
**describes [1]** 19/4
**describing [1]** 20/25
**designate [6]** 36/13 38/20 38/23 38/25 39/13 73/23
**designated [3]** 39/12 40/20 53/21
**detailed [1]** 17/12
**determine [1]** 37/1
**determining [2]** 37/6 40/13
**develop [1]** 28/5
**diagnosed [2]** 22/8 49/11
**diagnosis [4]** 21/13 22/7 22/12 78/5
**dichotomy [1]** 44/2
**difference [3]** 38/6 39/8 45/3
**difficult [1]** 66/16
**difficulty [1]** 50/2
**dire [8]** 59/19 59/20 66/9 71/11 71/12 71/13 71/23 72/5
**direct [1]** 31/16
**disability [2]** 7/13 7/19
**disabled [1]** 49/17
**disagree [7]** 5/13 6/10 33/18 53/8 75/7 76/14 77/18
**disagreements [1]** 77/12
**disagrees [2]** 74/1 74/2
**discount [12]** 37/7 37/8 37/15 37/16 38/3 38/6 38/7 38/10 39/18 39/20 39/21 39/24
**discounting [1]** 36/25
**discouraged [1]** 68/19
**discovery [3]** 33/8 72/13 72/16
**discretion [5]** 9/15 39/4 39/6 39/6 39/23
**discriminated [1]** 15/10
**discrimination [1]** 20/11
**discriminatory [1]** 20/9
**discuss [1]** 15/23
**discussed [2]** 7/16 30/20
**Discussion [2]** 30/9 79/23
**dismiss [11]** 25/1 25/13 35/17 36/18 48/19 54/24 56/15 56/17 57/14 58/3 58/6
**dismissal [6]** 55/21 55/22 55/22 56/1 56/9 56/19
**dismissed [9]** 22/9 23/12 23/15 26/5 34/21 37/22 42/19 56/6 57/12
**dispute [5]** 77/3 77/4 77/7 77/21 77/24
**disputed [2]** 32/8 34/20
**distinguishing [1]** 38/5
**distress [2]** 41/23 73/14
**distressed [1]** 42/4
**district [6]** 1/1 1/2 1/15 2/10 38/10 40/10
**diversity [1]** 37/4
**DIVISION [1]** 1/3
**Docket [5]** 31/7 31/18 35/5 36/12 41/5
**doctor [3]** 16/5 43/24 51/6
**doctors [2]** 22/6 22/7
**document [5]** 13/21 67/18 67/21 68/1 75/16
**documentation [2]** 21/21 26/25
**documents [6]** 14/1 70/2 70/4 70/6 70/7 70/14
**dollars [1]** 42/14
**domestic [1]** 6/15
**Dominica [29]**
**Dominican [1]** 11/1
**Donnie [3]** 2/5 3/14 30/16
**Dr. [12]** 16/1 16/6 22/4 22/12 31/16 32/14 33/1 33/8 33/11 33/14 33/15 34/13
**Dr. Hayse [8]** 16/6 31/16 32/14 33/1 33/8 33/11 33/14 34/13
**Dr. Hayse's [1]** 33/15
**Dr. Sharma [3]** 16/1 22/4 22/12
**Drive [1]** 2/2
**drug [1]** 5/20
**duplicative [1]** 55/6

**E**

**earn [3]** 52/1 52/16 52/23
**earning [11]** 40/13 41/19 41/25 42/1 50/25 51/25 52/16 52/22 53/16 53/18 53/21
**earnings [2]** 38/4 43/3
**easy [1]** 36/2
**education [11]** 7/25 8/3 8/4 8/12 20/9

**E**

**education... [6]** 20/14 20/16 20/19 53/21 54/10 54/14
**education' [1]** 18/23
**educational [2]** 5/1 6/14
**effect [2]** 5/15 31/20
**effects [2]** 23/25 24/2
**efficiency [1]** 57/9
**effort [2]** 33/16 70/5
**eight [6]** 60/3 62/19 62/20 62/23 62/23 64/25
**element [3]** 32/17 45/8 47/9
**elements [5]** 15/9 45/21 46/7 55/3 55/4
**Eleventh [8]** 20/2 36/20 37/2 37/17 38/24 39/2 39/2 76/17
**ELMO [6]** 67/14 67/16 67/21 67/25 68/2 68/5
**email [2]** 72/15 73/5
**emotional [2]** 41/23 73/14
**employed [1]** 36/25
**employee [4]** 13/7 13/13 22/12 32/19
**employees [2]** 5/22 28/22
**empowered [1]** 15/21
**English [1]** 62/25
**enrolled [5]** 34/24 43/11 47/2 47/3 47/9
**enrollment [1]** 47/12
**enter [1]** 76/11
**entities [1]** 5/2
**entitled [4]** 42/25 44/8 51/25 80/21
**entity [1]** 15/21
**Entry [5]** 31/7 31/18 35/5 36/12 41/6
**Entry 107-2 [2]** 31/7 31/18
**Entry 154 [1]** 41/6
**Entry 160 [1]** 35/5
**Entry 165 [1]** 36/12
**environment [1]** 26/12
**equally [2]** 51/7 52/7
**equipment [1]** 67/12
**error [1]** 41/2
**errors [1]** 51/9
**especially [4]** 12/21 46/19 48/18 69/14
**Esq [4]** 2/4 2/4 2/5 2/5
**establish [3]** 41/19 42/2 42/9
**established [9]** 42/1 75/13 75/16 76/3 76/5 76/8 76/12 76/13 77/10
**estimate [1]** 63/9
**ethnicity [1]** 60/10
**eve [1]** 56/5
**events [2]** 18/6 21/1
**everybody [3]** 64/7 65/14 68/7
**everyone [4]** 30/17 54/5 58/12 67/22
**evidence [26]**
**exam [21]**
**examination [2]** 21/10 21/15
**exams [19]**
**exams 2 [1]** 21/4
**exceeded [1]** 72/6
**excerpts [1]** 31/11
**exclude [3]** 35/6 48/14 48/14
**excludes [1]** 24/23
**excuse [2]** 25/19 33/4
**exhibit [11]** 31/10 31/18 68/3 68/3 75/9 78/4 78/6 78/8 78/10 78/12 78/13
**Exhibit 5 [1]** 31/10
**Exhibit 7 [1]** 31/18
**exhibits [5]** 31/8 63/1 70/20 71/2 71/2
**exited [1]** 80/5
**expect [1]** 70/3
**expended [1]** 57/2
**expenses [2]** 41/21 43/4
**expert [10]** 40/12 40/15 40/19 40/20 40/22 40/23 40/25 41/7 41/10 41/11
**explain [4]** 40/25 45/7 56/21 59/25
**explained [2]** 7/18 73/7
**explicit [2]** 17/15 17/15
**explicitly [2]** 18/18 19/20
**express [1]** 6/1
**expressly [12]** 5/16 5/24 6/18 6/20 7/12 7/20 8/1 8/7 13/5 16/24 17/9 49/15
**extend [2]** 8/20 27/10
**extended [5]** 15/22 16/2 23/7 24/7 49/11
**extensive [1]** 54/20
**extent [3]** 31/23 33/14 37/15
**extra [2]** 12/17 34/7
**extraterritorial [2]** 6/1 25/2
**extraterritoriality [1]** 17/16
**extraterritorially [11]** 3/24 5/16 5/17 5/24 6/3 17/9 17/18 18/14 19/15 25/15 26/1

**F**

**F.2d [1]** 36/21
**face [2]** 61/13 61/13
**facie [1]** 61/2
**facing [1]** 41/15
**fact [22]**
**facts [19]**
**faculty [5]** 10/6 32/7 32/10 32/13 34/11
**fail [1]** 32/18
**failed [6]** 13/23 15/8 23/5 23/13 23/15 51/2
**failing [1]** 15/10
**failure [6]** 12/18 12/19 15/16 15/17 23/20 30/20
**fairness [4]** 18/4 46/3 48/15 57/15
**false [9]** 9/14 9/24 9/25 28/8 33/18 43/2 43/9 43/10 43/19
**falsehood [1]** 28/13
**fashion [1]** 47/20
**February [1]** 17/19
**federal [7]** 8/15 20/10 20/24 36/18 37/3 49/14 55/19
**fees [1]** 47/12
**field [1]** 51/16
**fifth [4]** 11/8 13/9 16/5 37/2
**Fifth/Eleventh [1]** 37/2
**file [19]**
**filed [8]** 3/20 31/9 35/5 72/5 75/2 75/4 75/9 75/10
**filing [2]** 30/22 72/14
**filling [1]** 27/1
**final [5]** 16/7 31/17 33/1 33/5 33/8
**finally [1]** 68/17
**financial [6]** 7/21 7/24 7/25 8/18 11/1 79/17
**fine [1]** 72/3
**finish [1]** 62/16
**finished [1]** 59/8
**firm [1]** 25/12
**firms [1]** 63/4
**fleshed [1]** 28/23
**flights [1]** 43/12
**FLORIDA [9]** 1/2 1/6 2/8 2/11 13/25 36/24 40/10 53/15 53/20
**flying [1]** 47/7
**focus [1]** 12/18
**Folks [1]** 44/20
**foregoing [1]** 80/19
**foreign [2]** 5/1 6/14
**form [3]** 27/1 45/5 46/2
**FORT [3]** 1/3 1/6 2/11
**forwarded [1]** 24/18
**fourth [2]** 11/7 13/9
**frame [2]** 18/9 34/22
**Fran [6]** 66/16 67/7 67/9 67/12 67/23 68/6
**Francine [2]** 2/9 80/24
**fraud [20]**
**fraudulent [2]** 26/17 47/21
**free [1]** 53/4
**Friday [5]** 71/14 71/24 72/8 73/18 74/6
**front [7]** 40/22 42/3 62/10 62/11 64/6 65/19 76/24
**Fulton [6]** 27/15 31/11 31/13 32/6 34/16 34/17
**fundamental [1]** 53/3
**funding [1]** 20/24
**funds [1]** 69/24
**funny [1]** 28/2

**G**

**gaining [1]** 51/14
**Galligan [6]** 17/20 17/20 17/24 17/25 18/2 18/11
**game [2]** 57/13 57/16
**gender [4]** 60/9 60/21 61/11 61/14
**gender-neutral [2]** 61/11 61/14
**general [2]** 24/13 71/17
**genuine [2]** 28/7 77/21
**gets [2]** 57/1 73/21
**giggled [1]** 28/1
**gives [2]** 8/7 49/15
**glad [1]** 58/17
**gonna [3]** 29/19 60/14 77/11
**Google [1]** 54/18
**gotten [1]** 45/2
**governed [1]** 26/11
**government [3]** 5/22 8/16 8/22
**government-sanctioned [1]** 8/22
**grades [2]** 49/18 50/4
**graduate [4]** 8/12 19/7 20/10 20/16
**grandmother [1]** 63/2
**grant [4]** 15/21 23/21 27/2 27/3

**G**

**granted [4]** 22/15 22/20 58/9 73/16
**grants [1]** 20/10
**gravamen [1]** 44/5
**great [3]** 25/17 25/21 39/6
**Green [5]** 2/5 3/13 30/15 35/10 35/12
**grimacing [1]** 61/13
**grounds [1]** 25/14
**group [1]** 64/3
**guidance [2]** 32/10 34/11
**guideline [2]** 31/21 32/20
**guiding [1]** 5/7
**guilty [1]** 58/25

**H**

**H-A-Y-S-E [1]** 16/6
**half [2]** 26/8 69/17
**halfway [1]** 55/20
**handbook [3]** 26/22 31/16 32/16
**handbooks [1]** 33/7
**handle [1]** 68/18
**happiness [1]** 42/14
**harder [1]** 79/14
**harmed [1]** 47/24
**hate [2]** 29/17 63/3
**Hayse [9]** 16/6 31/16 32/14 33/1 33/1 33/8 33/11 33/14 34/13
**Hayse's [1]** 33/15
**he'd [1]** 43/21
**he'll [2]** 27/15 42/1
**head [4]** 8/8 15/3 32/14 69/18
**hear [5]** 3/25 17/2 35/9 66/17 66/20
**heard [1]** 32/2
**hearing [5]** 1/13 29/3 29/17 29/24 41/13
**hearsay [1]** 75/21
**hedge [1]** 57/20
**help [3]** 67/9 67/13 69/12
**helps [1]** 36/6
**Here's [2]** 53/7 73/15
**hereby [1]** 80/18
**hesitate [1]** 79/7
**Hey [3]** 12/17 52/11 61/4
**high [4]** 15/12 49/18 51/20 53/10
**high-performing [1]** 51/20
**higher [10]** 8/4 8/11 8/12 18/23 20/9 20/14 20/16 20/19 54/9 54/14
**history [1]** 27/3
**hold [6]** 11/12 12/22 13/6 38/22 57/5 61/25
**holding [1]** 57/19
**honest [1]** 44/14
**honestly [1]** 69/16
**Honor [100]**
**Honor's [1]** 18/1
**Honorable [1]** 1/14
**Hopefully [1]** 36/6
**hotels [1]** 79/14
**hour [2]** 29/19 63/23
**House [1]** 52/13
**hum [1]** 14/9
**hundred [1]** 42/14
**husband [1]** 63/16
**hypothetically [1]** 43/20

**I**

**I'll [12]** 14/2 29/24 31/24 57/15 60/22 63/10 63/21 64/2 66/18 67/11 71/2 77/21
**I'm [45]**
**I've [10]** 33/21 34/13 34/14 36/15 46/15 48/1 48/3 57/6 69/6 78/6
**identify [1]** 31/2
**ignore [1]** 32/18
**III [6]** 6/16 17/17 18/17 18/19 19/20 19/21
**impersonal [1]** 11/20
**implicates [1]** 46/6
**impracticable [1]** 9/18
**improper [1]** 40/22
**improperly [1]** 51/5
**in limine [7]** 3/21 29/16 35/4 35/6 48/7 50/14 54/2
**inclined [2]** 48/14 70/18
**include [6]** 5/1 5/20 23/9 23/11 43/16 50/17
**included [2]** 8/14 21/12
**includes [2]** 20/10 54/10
**including [2]** 23/7 67/18
**incorrect [3]** 33/3 33/6 49/9
**indication [1]** 32/22
**indifference [1]** 15/16
**individual [3]** 31/17 52/6 52/7
**individualized [1]** 64/8
**individually [1]** 64/7
**individuals [3]** 7/13 51/13 51/17
**induce [1]** 26/9
**inducement [1]** 47/21
**infer [1]** 17/17
**infinite [1]** 65/10
**information [4]** 15/24 21/19 70/6 70/14
**informing [1]** 78/5
**initial [1]** 29/2
**initially [1]** 56/18
**initiate [1]** 33/9
**injury [4]** 45/9 45/10 45/14 52/3
**insisting [2]** 73/25 74/2
**instance [1]** 27/5
**instances [1]** 12/4
**Instead [1]** 7/6
**institution [7]** 4/13 4/20 6/21 7/2 10/6 54/9 54/14
**institutions [16]** 4/21 5/2 6/14 6/15 8/11 8/12 8/14 8/15 8/17 18/20 19/4 20/9 20/13 20/16 20/18 54/11
**instruct [6]** 37/17 38/2 38/19 39/5 39/18 77/23
**instructing [1]** 38/10
**instruction [2]** 72/5 78/22
**instructions [23]**
**intended [4]** 6/2 6/7 6/13 6/16
**intending [2]** 48/11 70/21
**interim [1]** 31/1
**interplays [1]** 19/21
**interpretation [2]** 18/1 33/5
**interrogatories [6]** 38/19 39/11 39/11 39/14 39/15 39/17
**intervening [1]** 56/23
**introduce [4]** 48/11 53/5 70/21 75/6
**introduced [1]** 77/13
**island [1]** 46/21
**issue [15]** 4/7 6/13 17/11 20/4 21/2 27/20 28/7 41/15 50/5 55/3 56/22 68/24 75/3 77/21 79/16
**issues [9]** 9/10 17/13 25/8 25/10 29/14 30/20 33/2 33/14 42/8
**items [1]** 77/9
**iterations [2]** 11/8 11/25
**IV [3]** 8/18 8/19 8/22

**J**

**January [1]** 21/13
**January 18th [1]** 21/13
**Javier [1]** 62/9
**job [5]** 51/19 51/20 51/21 51/22 52/14
**joint [2]** 73/18 74/4
**judge [12]** 1/15 3/2 41/5 41/13 69/7 69/11 72/14 76/22 76/24 77/19 80/3 80/5
**Judge Moore [3]** 41/13 76/24 77/19
**Judge Moore's [1]** 41/5
**judgment [13]** 25/1 25/20 28/18 28/24 29/2 31/10 42/16 49/10 49/21 56/2 76/5 76/22 76/23
**July [4]** 58/10 58/15 59/6 79/24
**July 2nd [1]** 79/24
**July 8th [1]** 59/6
**June [3]** 1/7 3/1 72/21
**June 4th [1]** 72/21
**juror [12]** 60/18 60/20 60/23 64/11 64/12 64/14 64/15 64/15 64/16 64/21 64/23 64/23
**juror's [3]** 60/8 60/9 60/10
**jurors [18]**
**jurors' [1]** 67/19
**jury [33]**

**K**

**Kaiser [1]** 22/5
**kick [1]** 60/7
**kinds [2]** 73/23 74/5
**King [3]** 2/5 3/14 30/16
**knowledge [2]** 16/13 16/14
**Kristi [1]** 52/13

**L**

**labeled [1]** 70/3
**lack [2]** 24/10 25/1
**laid [1]** 74/3
**language [3]** 7/18 17/16 18/21
**laptop [1]** 13/18
**late [3]** 29/21 57/13 57/16
**LAUDERDALE [3]** 1/3 1/6 2/11
**Laughter [2]** 36/4 36/7
**laundering [1]** 5/21
**law [25]**
**lawyers [2]** 11/24 64/1
**leads [2]** 36/23 45/23
**leave [6]** 69/24 71/14 71/14 72/12 72/17 73/16
**lectern [1]** 40/6

## L

**legal [4]** 27/7 28/14 47/20 53/19
**legitimately [1]** 61/22
**lengthy [1]** 69/14
**letter [1]** 14/18
**liability [1]** 35/6
**life [2]** 43/15 48/1
**light [1]** 49/7
**limb [1]** 53/17
**limine [7]** 3/21 29/16 35/4 35/6 48/7 50/14 54/2
**limit [3]** 7/8 8/5 72/6
**limited [5]** 4/1 10/8 16/13 49/19 49/20
**limits [1]** 7/12
**lines [3]** 31/12 31/19 36/21
**lines 1 [1]** 31/12
**lines 2 [1]** 31/19
**list [11]** 5/2 24/6 48/10 64/10 75/9 78/4 78/6 78/8 78/10 78/12 78/13
**Listen [1]** 14/13
**literally [5]** 47/16 49/22 51/8 74/17 78/5
**litigation [3]** 75/6 75/23 77/14
**LLP [1]** 2/6
**local [1]** 74/15
**locations [1]** 8/16
**lose [3]** 57/6 57/20 69/16
**loss [2]** 43/3 51/25
**lost [22]**
**lucrative [2]** 51/7 52/8
**lunch [1]** 66/3
**lying [1]** 61/16

## M

**M-O-N-E-S-S-E-N [1]** 37/6
**magistrate [1]** 72/14
**majority [1]** 23/4
**maker [2]** 31/18 33/2
**male [3]** 61/4 61/5 61/7
**males [2]** 61/6 61/6
**man [4]** 32/25 61/7 61/7 61/9
**manager [1]** 52/12
**manner [2]** 70/13 75/5
**market [6]** 37/8 37/16 38/3 39/20 39/21 39/24
**Marsh [3]** 2/4 3/13 30/15
**Maryland [1]** 2/3
**material [3]** 10/23 28/7 77/2
**matter [9]** 9/14 16/17 27/7 28/12 28/14 28/18 50/2 72/16 80/21
**Matthew [2]** 27/14 31/11
**mean [13]** 4/8 4/8 4/11 11/2 15/9 33/19 42/10 51/18 51/19 53/9 73/20 76/4 76/23
**meaning [2]** 18/24 20/17
**meaningless [3]** 26/15 26/16 28/3
**means [6]** 9/14 15/16 58/3 58/24 63/10 75/2
**meant [3]** 7/4 17/17 41/2
**measure [1]** 53/17
**measured [1]** 51/12
**mechanical [1]** 1/24
**medical [8]** 16/4 19/7 20/10 20/16 51/14 51/15 52/5 52/19
**MEDICINE [3]** 1/9 3/7 30/12
**meet [1]** 19/10
**meetings [1]** 22/4
**members [1]** 59/21
**mentions [1]** 54/13
**mere [1]** 32/19
**merely [2]** 32/8 32/12
**mess [1]** 73/2
**method [25]**
**methodology [4]** 42/7 42/9 42/10 42/11
**methods [2]** 36/25 39/23
**Miami [1]** 2/8
**Michael [3]** 2/4 3/13 30/15
**microphone [3]** 66/15 66/21 68/23
**microphones [1]** 66/22
**mine [1]** 25/16
**mines [1]** 73/12
**minute [1]** 72/13
**minutes [3]** 29/23 63/21 64/2
**Miramar [1]** 13/25
**misinterpreted [1]** 7/15
**misrepresentation [7]** 25/5 42/24 43/7 44/19 54/25 55/6 58/7
**missed [1]** 40/24
**missing [1]** 25/13
**mitigate [1]** 51/2
**mitigation [1]** 50/20
**mjsfcs [1]** 2/11
**moment [2]** 19/21 35/9
**Monessen [5]** 36/16 37/5 39/1 39/3 39/19
**money [14]** 5/21 42/4 47/6 48/5 51/19 51/20 51/22 51/22 52/1 52/4 52/17 52/23 57/2 79/16
**months [1]** 17/20
**monumentally [1]** 66/23
**Moore [3]** 41/13 76/24 77/19
**Moore's [1]** 41/5
**moot [1]** 35/18
**Morgan [2]** 48/10 49/19
**morning [1]** 66/2
**Morrison [1]** 18/2
**mostly [1]** 5/7
**motion [40]**
**motions [5]** 3/21 29/15 29/16 35/4 35/21
**movable [1]** 66/23
**move [5]** 53/5 54/24 66/13 66/21 66/25
**moved [4]** 34/20 48/13 58/24 79/16
**Mr. [31]**
**Mr. Awodiya [24]**
**Mr. Awodiya's [3]** 31/9 36/10 36/13
**Mr. Cuffy [1]** 16/1
**Mr. Fulton [1]** 32/6
**Mr. Hayse [1]** 33/1
**Mr. Stewart-Fulton [1]** 31/13
**Ms. [2]** 35/10 35/12
**Ms. Green [2]** 35/10 35/12
**multiple [4]** 5/6 10/6 33/8 33/9

## N

**Nabisco [11]** 5/9 5/10 5/12 5/13 5/17 5/25 6/9 6/10 6/13 17/25 18/1
**name [2]** 34/12 63/15
**named [2]** 63/3 63/4
**national [2]** 60/10 60/21
**nature [1]** 44/9
**NCL [1]** 40/9
**necessary [1]** 71/3
**necessity [1]** 46/11
**negligent [6]** 42/24 43/6 44/19 54/24 55/5 58/7
**neither [2]** 18/14 37/4
**neutral [2]** 61/11 61/14
**never-ending [1]** 69/3
**nine [2]** 50/20 53/7
**nitpicks [1]** 16/23
**Nobody [1]** 57/23
**Nodding [1]** 15/3
**nonrelevant [1]** 20/20
**note [4]** 19/12 20/1 54/7 54/16
**noted [1]** 21/4
**notes [1]** 63/22
**notice [5]** 29/4 29/9 55/25 56/18 72/24
**number [12]** 3/6 3/20 30/11 58/20 62/8 62/9 64/11 64/13 64/21 64/23 64/23 65/11
**Number 1 [5]** 62/9 64/11 64/13 64/21 64/23
**Number 18-60482-Civil [2]** 3/6 30/11
**Number 2 [1]** 64/23
**numbers [2]** 48/9 50/15
**numbers 4 [1]** 48/9
**numbers 9 [1]** 50/15
**nursing [1]** 19/7

## O

**object [1]** 75/7
**objection [4]** 55/7 55/9 75/8 75/25
**objections [3]** 73/6 73/10 73/11
**obligated [1]** 65/12
**obviate [1]** 41/9
**OCD [1]** 22/8
**Octavia [3]** 2/5 3/13 30/15
**offense [1]** 5/19
**offenses [2]** 5/19 5/20
**offer [4]** 53/2 70/4 70/6 70/8
**office [2]** 26/20 28/22
**Official [2]** 2/9 80/24
**offset [1]** 37/9
**Oh [5]** 11/15 30/5 35/12 69/8 71/9
**OLUWAMUYIWA [4]** 1/5 2/2 3/9 30/14
**omit [2]** 73/6 73/6
**omitted [2]** 10/23 10/24
**one-on-one [1]** 62/15
**open [1]** 15/17
**opening [1]** 66/3
**opinion [1]** 36/20
**opponent [1]** 75/21
**opportunities [1]** 52/21
**opportunity [8]** 40/24 43/12 48/16 51/11 52/20 52/22 52/25 67/11

**O**

**opposed [5]** 6/14 11/6 18/17 38/4 50/2
**opposing [2]** 56/1 56/11
**opposition [1]** 31/9
**option [13]** 43/16 43/18 43/25 44/8 44/8 44/24 44/25 45/11 47/15 47/16 47/17 47/24 65/6
**option 1 [2]** 44/8 44/24
**option 2 [3]** 43/25 44/8 44/25
**option A [1]** 43/16
**Option B [1]** 43/18
**options [1]** 64/14
**order [28]**
**ordered [8]** 12/15 12/15 12/20 12/23 12/25 13/4 13/7 77/16
**ordering [1]** 12/16
**orders [2]** 12/12 13/10
**origin [2]** 60/10 60/21
**original [1]** 46/22
**originally [1]** 25/4
**overrule [1]** 5/14
**oversaw [1]** 16/8
**overturn [2]** 18/1 18/2
**overwhelmingly [1]** 24/21

**P**

**P-E-R-E-M-P-T-O-R-Y [1]** 65/9
**p.m [5]** 1/7 3/1 30/3 30/3 80/6
**pace [1]** 69/15
**page [3]** 29/10 31/12 31/19
**page 10 [1]** 31/19
**page 32 [1]** 31/12
**panel [2]** 59/22 61/5
**papers [4]** 27/20 27/22 28/11 40/11
**paragraph [2]** 15/20 17/8
**paragraph 16 [1]** 15/20
**paragraph 23 [1]** 17/8
**paraphrasing [1]** 37/21
**part [9]** 9/10 10/20 23/5 37/19 37/20 44/12 46/17 48/1 61/1
**participation [2]** 7/22 8/2
**parties [1]** 56/3
**partner [1]** 36/6
**party [6]** 21/5 24/5 24/19 56/1 56/11 75/20
**pass [2]** 49/1 49/4
**passage [1]** 43/23
**passed [3]** 43/23 48/3 68/11
**passing [1]** 51/14
**Pause [2]** 19/23 55/16
**pay [2]** 69/21 69/24
**people [15]** 26/9 30/23 33/8 33/9 33/11 33/12 59/23 62/8 62/13 62/18 63/3 63/7 65/15 69/13 70/19
**percentage [1]** 41/25
**peremptorily [1]** 64/16
**peremptory [5]** 60/4 60/4 60/6 65/7 65/8
**Perfect [1]** 39/25
**Perfectly [1]** 72/3
**performed [2]** 16/5 37/7
**performer [2]** 51/16 51/23
**performing [2]** 51/20 53/10
**perhaps [1]** 70/16
**period [2]** 34/23 34/24
**Permanente [1]** 22/5
**permission [1]** 66/13
**permit [1]** 71/22
**permitted [2]** 25/6 51/1
**person [9]** 14/5 14/11 14/16 14/17 16/3 47/24 60/7 63/5 64/22
**personal [1]** 11/19
**pertains [1]** 55/25
**phonetic [1]** 53/18
**physician [1]** 51/11
**pick [5]** 39/23 39/24 47/18 65/21 72/8
**picking [1]** 62/19
**piece [2]** 50/21 75/25
**pieces [2]** 51/3 75/4
**piled [1]** 47/13
**pipe [1]** 66/19
**place [12]** 11/6 12/6 18/6 21/2 21/10 21/16 22/16 22/23 24/2 24/10 24/22 75/1
**plainly [1]** 32/24
**plaintiff [33]**
**plaintiff's [9]** 17/7 18/15 19/16 19/17 21/9 22/17 26/7 51/4 51/12
**plan [1]** 70/6
**plane [1]** 79/14
**planning [1]** 48/25
**plays [1]** 28/20
**plea [1]** 59/5
**plead [1]** 58/25
**pleading [1]** 27/20
**pleadings [1]** 74/18
**plus [5]** 62/20 62/21 62/23 62/24 63/10
**podium [4]** 4/6 4/9 44/17 66/13
**point [19]**
**pointing [1]** 51/9
**points [1]** 62/6
**policies [3]** 31/21 32/11 33/7
**policy [6]** 9/2 9/3 26/21 26/24 30/24 34/11
**portion [1]** 70/16
**portions [1]** 22/22
**position [12]** 5/12 5/13 23/23 24/12 28/11 28/16 37/12 40/2 41/5 46/7 49/24 55/24
**positions [1]** 38/1
**possibilities [1]** 43/7
**post [2]** 8/11 20/13
**post-secondary [1]** 20/13
**potential [1]** 51/16
**potentially [4]** 43/4 48/12 48/13 50/4
**practicable [11]** 9/6 9/13 9/16 9/20 10/13 10/21 27/25 28/4 28/13 32/23 33/17
**practical [3]** 9/10 23/25 27/11
**practice [2]** 28/20 30/24
**practicing [1]** 51/11
**precedence [1]** 58/21
**precisely [2]** 26/9 76/18
**preclude [1]** 36/11
**precludes [1]** 41/8
**precluding [3]** 9/23 41/6 49/12
**predicate [4]** 5/19 5/19 5/23 6/1
**prejudice [11]** 55/8 55/11 55/13 55/21 56/6 57/13 57/15 57/17 58/3 58/6 74/17
**prejudices [2]** 63/17 78/3
**prejudicial [3]** 36/11 78/13 78/17
**preliminary [1]** 78/24
**premise [1]** 53/8
**prepared [3]** 3/25 54/5 54/22
**presence [1]** 78/19
**present [3]** 37/1 56/3 75/15
**presiding [1]** 69/11
**pressed [1]** 68/7
**presumption [1]** 71/15
**pretextual [1]** 61/15
**pretrial [4]** 35/21 74/9 74/23 74/23
**prevent [2]** 11/9 51/9
**prima [1]** 61/2
**prima facie [1]** 61/2
**principally [1]** 26/4
**private [6]** 8/21 22/5 51/21 52/12 64/6 64/8
**pro [5]** 2/2 3/9 29/21 30/14 61/25
**pro se [4]** 3/9 29/21 30/14 61/25
**probing [1]** 63/17
**problem [6]** 44/16 45/22 67/6 75/11 75/24 78/9
**problematic [2]** 26/17 26/19
**problems [1]** 45/6
**procedure [3]** 55/12 55/20 76/20
**Procedure 41 [1]** 55/20
**procedures [1]** 31/21
**proceedings [3]** 1/24 80/6 80/20
**process [9]** 12/16 13/23 16/9 31/15 33/10 61/18 63/23 65/25 69/3
**prodded [1]** 25/2
**produced [1]** 1/25
**professors [1]** 33/19
**profits [4]** 41/8 42/20 43/17 44/1
**program [8]** 7/22 8/1 8/17 8/18 8/18 8/22 8/23 48/4
**programs [1]** 8/20
**prohibits [2]** 20/8 38/9
**Prometric [2]** 21/6 24/5
**promise [1]** 45/1
**pronounce [1]** 59/17
**pronounced [2]** 5/14 59/19
**proper [1]** 36/24
**properly [1]** 46/8
**proposed [6]** 71/22 72/25 73/19 73/20 74/4 78/18
**prospective [1]** 10/22
**protections [1]** 27/10
**protective [4]** 70/2 70/7 70/10 70/12
**prove [7]** 15/15 43/21 45/12 46/8 61/15 75/18 77/25
**proven [3]** 74/20 75/14 75/19
**provide [7]** 12/9 12/19 15/8 15/10 15/17 16/3 31/14
**provided [1]** 56/9
**providing [2]** 26/24 41/6
**proving [1]** 41/15
**provision [3]** 20/12 20/15 54/12
**provisions [2]** 6/8 20/20

**P**

**proximate [1]** 43/2
**psychological [1]** 21/9
**psychologist [1]** 22/6
**psychotherapist [1]** 22/6
**public [6]** 5/2 8/21 20/13 52/14 53/9 70/20
**publish [1]** 68/6
**published [1]** 67/23
**pull [1]** 18/21
**purports [1]** 56/5
**pursuant [4]** 26/24 31/15 32/16 80/18
**pursue [1]** 52/21

**Q**

**qualifications [1]** 28/12
**question [36]**
**questionnaire [1]** 63/14
**questionnaires [2]** 63/19 63/25
**questions [22]**
**quick [1]** 54/7
**quickly [1]** 31/3
**quote [2]** 7/13 36/22

**R**

**RA [25]**
**race [2]** 60/9 60/20
**racketeering [2]** 5/18 5/19
**raise [5]** 25/5 60/21 60/25 64/8 65/13
**raised [4]** 9/10 25/20 35/14 35/21
**raises [1]** 60/13
**rare [1]** 57/16
**rate [6]** 37/7 38/3 38/6 38/11 39/18 39/20
**re [1]** 53/6
**reach [2]** 6/2 43/4
**reached [1]** 18/13
**reaches [1]** 17/22
**read [13]** 5/12 18/3 18/18 33/22 36/15 37/10 55/12 63/20 69/14 69/15 70/12 72/13 77/8
**reading [2]** 6/10 20/21
**readmission [2]** 52/19 52/20
**readmitted [1]** 52/25
**ready [1]** 70/22
**realtime [1]** 69/21
**reasons [3]** 3/18 3/19 57/9
**rebut [1]** 48/25
**rebuttal [2]** 40/20 41/10
**recall [1]** 29/24
**Recalling [1]** 30/11
**receipt [1]** 20/23
**receive [4]** 7/21 7/24 20/10 27/18
**received [4]** 26/22 26/25 27/1 49/11
**recent [1]** 37/5
**Recess [1]** 30/3
**recognizes [1]** 18/2
**recommend [1]** 70/22
**record [21]**
**recorded [1]** 1/24
**recoveries [1]** 37/3
**redact [3]** 70/15 71/3 71/4
**redactions [2]** 70/4 70/23
**redeposition [1]** 34/22
**refer [3]** 7/1 20/20 54/14
**reference [2]** 20/15 31/3
**referenced [1]** 27/21
**references [3]** 17/14 17/25 30/23
**referring [2]** 8/23 53/16
**refers [1]** 20/12
**refile [4]** 57/7 57/21 72/7 72/8
**reflect [1]** 28/18
**reflected [1]** 54/17
**regime [3]** 17/24 19/13 19/13
**regulations [1]** 49/14
**Rehabilitation [10]** 4/14 4/20 6/17 6/19 6/20 7/20 8/5 20/8 20/21 31/14
**reiterate [1]** 30/22
**reject [5]** 15/9 15/11 52/24 64/13 64/24
**rejected [2]** 15/6 77/10
**rejection [1]** 12/6
**relationship [3]** 47/21 53/19 53/19
**relatively [1]** 53/13
**released [1]** 21/20
**relevant [12]** 5/21 16/25 22/16 39/3 44/1 48/17 48/20 48/22 49/8 70/15 70/15 73/7
**reliance [1]** 45/9
**relied [2]** 10/25 45/9
**religion [1]** 60/21
**relying [1]** 20/19
**remain [1]** 44/18
**remains [1]** 18/12
**remedy [2]** 47/18 47/25
**remember [5]** 27/19 64/18 65/12 69/18 78/12
**removed [1]** 73/11
**reordered [1]** 13/25
**reordering [1]** 13/24
**reply [2]** 37/25 38/5
**Reporter [3]** 2/9 2/9 80/24
**representation [1]** 43/1
**request [23]**
**requested [7]** 21/19 21/21 23/1 23/2 73/12 76/21 77/10
**requests [4]** 13/10 23/6 27/3 39/10
**required [11]** 10/3 10/7 10/9 19/9 34/18 34/25 37/16 39/9 45/19 45/24 46/10
**requirement [2]** 10/19 10/20
**requirements [2]** 19/10 29/12
**research [1]** 4/15
**resembles [1]** 26/13
**reserve [2]** 57/5 57/20
**resolve [2]** 3/21 29/23
**respectfully [2]** 5/13 76/14
**respond [2]** 48/16 64/19
**responded [4]** 3/24 35/7 35/7 48/8
**response [10]** 9/12 11/10 13/2 26/7 32/3 50/7 50/8 50/13 54/1 63/24
**restart [1]** 57/22
**restitution [1]** 47/23
**result [2]** 52/3 56/15
**resulted [1]** 43/14
**retook [1]** 23/6
**review [3]** 13/9 39/7 71/2
**reviewed [2]** 33/21 62/14
**RICO [4]** 5/18 5/23 6/2 6/12
**rid [1]** 63/7
**rise [1]** 80/4
**RKA [1]** 1/4
**RMR [2]** 2/9 80/24
**RMR-CRR [1]** 80/24
**robbery [1]** 5/20
**Roman [3]** 2/4 3/13 30/15
**room [4]** 2/10 43/11 47/11 68/25
**ROSS [43]**
**Ross' [5]** 7/22 8/1 9/2 15/24 16/6
**row [4]** 62/11 62/11 62/12 63/11
**Roy [1]** 1/14
**rule [11]** 55/12 58/5 74/14 74/14 74/16 74/18 74/20 75/8 76/3 76/3 76/19
**Rule 36 [3]** 74/14 74/16 74/18
**Rule 56 [3]** 74/20 76/3 76/19
**Rule 8 [1]** 74/14
**ruled [1]** 76/19
**rules [7]** 32/10 34/10 55/19 57/3 61/25 74/15 76/20
**ruling [1]** 77/1
**Ryan [3]** 2/4 3/12 30/15

**S**

**salient [1]** 22/22
**Salopek [2]** 2/9 80/24
**sanctioned [1]** 8/22
**sanctions [5]** 72/12 72/15 72/17 73/16 73/17
**satisfy [1]** 15/13
**saw [5]** 22/6 39/14 46/18 46/18 69/12
**scary [1]** 26/14
**scenario [1]** 39/9
**scenarios [4]** 10/8 10/8 10/8 74/3
**schedule [1]** 59/4
**scheduling [2]** 62/14 74/8
**school [28]**
**schools [3]** 18/20 20/10 20/16
**scope [1]** 7/12
**scores [1]** 50/4
**screens [3]** 67/16 67/19 67/23
**se [5]** 2/2 3/9 29/21 30/14 61/25
**seal [1]** 70/17
**seat [1]** 29/19
**second [13]** 3/20 9/22 11/7 11/12 13/6 13/8 13/24 14/4 45/13 55/14 57/7 62/11 65/24
**secondary [1]** 20/13
**Secretary [1]** 8/3
**section [26]**
**Section 1001 [2]** 7/3 19/10
**Section 1002 [3]** 7/1 18/24 19/3
**Section 3 [2]** 5/3 6/12
**Section 504 [2]** 6/17 8/7
**Section 705 [3]** 6/24 17/8 18/16
**Section 794 [2]** 7/12 20/18
**seek [3]** 42/25 72/12 72/16
**seeking [4]** 44/7 50/24 50/25 52/15
**selected [1]** 59/16
**selection [1]** 60/1
**self [1]** 34/3

## S

**self-conflicting [1]** 34/3
**semester [3]** 23/6 23/6 26/23
**semesters [1]** 51/15
**send [1]** 8/1
**sense [8]** 37/25 39/14 58/19 62/6 65/1 68/8 68/9 75/17
**sensitive [2]** 66/18 70/14
**served [1]** 56/11
**serves [1]** 56/1
**service [2]** 52/14 53/9
**sessions [1]** 21/11
**setting [1]** 67/25
**settle [1]** 30/6
**seven [3]** 62/10 62/11 62/12
**Seventh [1]** 2/7
**shall [1]** 19/9
**Sharma [3]** 16/1 22/4 22/12
**she'll [1]** 67/9
**Sherick [1]** 53/18
**shift [1]** 61/10
**short [2]** 63/13 66/7
**sic [5]** 32/13 49/10 59/18 73/12 74/16
**sick [1]** 62/25
**side [2]** 60/13 71/23
**sidebar [2]** 68/21 68/22
**sidebars [2]** 68/18 68/21
**sides [1]** 59/4
**sides' [1]** 60/1
**signed [1]** 56/2
**silly [1]** 53/13
**simple [5]** 4/8 15/16 48/4 60/13 73/23
**sister [2]** 4/12 17/21
**situated [1]** 61/8
**situation [2]** 52/2 56/5
**Sixth [1]** 70/19
**skills [1]** 51/13
**slowly [2]** 11/13 11/17
**sly [1]** 27/7
**smart [3]** 52/6 57/18 57/25
**sneaky [1]** 10/17
**society [1]** 53/10
**solely [1]** 7/2
**sometime [1]** 79/21
**soon [2]** 59/8 79/20
**sophisticated [1]** 25/12
**sound [1]** 71/17
**sounds [3]** 45/13 47/10 50/24
**Southeast [1]** 2/7
**SOUTHERN [2]** 1/2 40/10
**spacing [1]** 79/13
**special [4]** 29/21 38/19 39/10 39/11
**specific [11]** 23/1 23/8 24/14 25/22 29/10 30/23 38/25 54/12 63/24 71/19 73/22
**specify [1]** 34/24
**speculation [1]** 44/4
**speculative [2]** 41/14 44/9
**speedy [1]** 58/22
**spent [1]** 47/12
**spirit [3]** 27/9 28/10 31/13
**stand [1]** 60/25
**standard [5]** 6/19 15/13 36/24 71/16 78/25
**standards [2]** 6/17 6/18
**state [13]** 3/8 5/11 6/18 27/18 28/9 28/17 30/13 30/20 37/22 48/10 49/19 59/10 60/11
**stated [3]** 8/1 16/20 77/2
**statement [24]**
**statements [4]** 31/2 31/19 62/2 66/3
**states [53]**
**States' [1]** 7/24
**statute [7]** 5/11 5/15 5/23 6/6 7/12 16/16 18/6
**statutes [3]** 4/16 5/18 25/14
**statutory [4]** 17/13 17/23 19/13 19/13
**stay [2]** 61/8 63/3
**stays [1]** 59/7
**stenography [1]** 1/24
**step [3]** 24/17 24/18 61/18
**Step 1 [2]** 24/17 24/18
**Stewart [3]** 27/15 31/11 31/13
**Stewart-Fulton [2]** 27/15 31/11
**stipulate [1]** 70/9
**stipulated [2]** 39/10 74/11
**stipulating [1]** 56/12
**stipulation [2]** 35/21 56/2
**stipulations [8]** 74/9 74/12 74/23 74/23 75/1 75/2 75/12 77/11
**straight [1]** 10/7
**straightforward [1]** 4/11
**strategic [1]** 58/1
**stray [1]** 66/15
**Street [1]** 2/7
**stringent [1]** 15/9
**struck [4]** 60/20 60/24 61/4 61/7
**student [7]** 12/17 16/6 26/22 31/15 32/15 32/16 33/7
**students [7]** 10/19 10/22 10/24 24/6 27/10 27/18 28/21
**study [1]** 24/22
**stuff [2]** 69/17 79/17
**subject [3]** 44/4 50/2 77/3
**subjected [1]** 22/18
**submissions [2]** 73/2 76/5
**submit [2]** 71/22 78/11
**submitted [9]** 11/10 13/21 40/21 72/20 72/21 72/22 72/23 73/4 78/6
**subsequent [1]** 36/20
**substantially [2]** 49/19 49/20
**success [1]** 49/16
**suffered [2]** 45/14 52/2
**sufficient [1]** 20/24
**suggested [1]** 37/15
**suggesting [2]** 38/24 42/7
**suitable [1]** 51/16
**Suite [1]** 2/7
**summarize [1]** 17/13
**summary [11]** 25/1 25/20 28/18 28/24 29/2 31/10 49/10 56/2 76/5 76/21 76/23
**superior [1]** 51/16
**supervisor [1]** 31/16
**support [2]** 24/17 24/18
**supports [1]** 33/17
**Supreme [8]** 5/7 5/24 36/15 37/4 38/9 39/1 39/4 53/22
**suspect [3]** 27/17 59/13 60/19
**system [4]** 20/13 28/21 63/23 66/24

## T

**take [11]** 19/22 36/8 42/17 54/2 58/21 59/11 59/13 63/2 63/21 68/22 68/24
**taken [2]** 24/21 30/3
**talk [6]** 4/25 8/24 21/1 23/17 25/24 30/23
**talked [1]** 64/19
**talking [5]** 34/14 34/23 39/3 46/2 76/1
**talks [1]** 47/19
**technical [1]** 41/7
**technically [1]** 70/8
**technician [1]** 67/4
**tell [9]** 15/11 16/1 35/20 38/17 57/15 58/18 64/18 65/12 77/17
**telling [3]** 9/18 39/19 39/22
**tells [1]** 17/24
**tend [1]** 36/16
**term [3]** 18/23 18/24 29/22
**territory [1]** 56/10
**test [3]** 24/14 50/3 61/1
**testified [3]** 27/8 32/9 32/14
**testify [1]** 32/13
**testimony [9]** 10/2 34/3 34/4 34/5 34/15 40/12 40/22 41/7 70/17
**testing [9]** 15/22 16/2 23/3 23/7 24/7 24/13 24/21 49/5 49/11
**tests [4]** 23/3 23/4 24/10 49/4
**tethered [1]** 66/23
**Thank [28]**
**theirs [1]** 72/21
**theoretically [1]** 42/15
**theories [2]** 35/6 35/14
**theory [1]** 40/25
**think [59]**
**thinking [1]** 31/2
**third-amended [1]** 51/4
**third-party [2]** 21/5 24/5
**third-to-last [1]** 71/6
**thought [4]** 3/25 25/4 38/1 63/24
**thousand [1]** 42/14
**three years [1]** 43/12
**three-part [1]** 61/1
**three-step [1]** 61/18
**Thursday [3]** 50/11 50/14 54/2
**thus [2]** 41/9 43/11
**tickets [1]** 79/14
**tied [3]** 19/20 42/11 67/16
**till [1]** 78/3
**time [36]**
**times [2]** 13/22 50/5
**timing [1]** 50/5
**tire [1]** 30/6
**title [18]**
**Title 20 [2]** 18/25 19/4
**Title I [2]** 17/14 18/16
**Title III [6]** 6/16 17/17 18/17 18/19 19/20 19/21
**Title IV [3]** 8/18 8/19 8/22

## T

**Title VII [2]** 17/15 18/17
**ToniAnn [1]** 30/5
**top [1]** 73/10
**total [2]** 37/9 60/3
**touch [1]** 59/3
**transcript [4]** 1/13 1/24 27/17 80/20
**transcripts [2]** 48/11 48/25
**treated [2]** 74/20 75/14
**trial [19]**
**trouble [1]** 4/15
**true [16]** 10/14 16/11 16/18 19/16
22/2 22/3 25/23 43/21 45/15 45/19
62/2 62/3 65/13 74/22 77/17 80/19
**truly [1]** 42/23
**truth [2]** 9/19 45/16
**TUESDAY [2]** 3/1 50/10
**tuition [4]** 41/20 43/4 43/12 47/12
**two days [2]** 59/11 59/14
**typically [3]** 11/10 68/13 68/18

## U

**U.S [2]** 46/19 54/11
**U.S. [4]** 18/20 18/20 24/14 54/10
**U.S. definition [1]** 54/10
**U.S. schools [1]** 18/20
**U.S.-based [2]** 18/20 24/14
**U.S.C [5]** 6/24 7/1 7/11 17/8 18/16
**uhm [1]** 13/22
**ultimately [3]** 20/1 23/12 34/21
**Um [1]** 14/9
**Um-hum [1]** 14/9
**unconstitutional [4]** 60/20 60/24
61/9 61/23
**uncontested [1]** 74/15
**undercut [1]** 53/13
**undergraduate [1]** 48/10
**understand [21]**
**understanding [2]** 19/25 35/13
**understood [3]** 14/2 18/7 49/6
**underwent [1]** 22/2
**unduly [1]** 41/14
**unfair [1]** 63/18
**Unfortunately [1]** 29/16
**UNITED [44]**
**universities [1]** 20/12
**university [18]**
**University's [1]** 4/12
**unless [3]** 60/13 70/8 79/10
**unnecessary [1]** 55/1
**unplugging [1]** 67/1
**unstated [1]** 65/18
**unsuccessful [1]** 56/7
**untimely [1]** 25/7
**us [8]** 17/24 25/7 27/4 29/2 36/23
58/16 64/8 72/7
**USMLE [2]** 24/17 24/18

## V

**V-E-N-I-R-E [1]** 59/22
**value [1]** 37/1
**vendor [2]** 21/5 24/5
**venire [5]** 59/21 59/22 60/7 62/13
64/3

**verbally [1]** 16/1
**verdict [2]** 45/5 46/2
**version [4]** 72/24 73/1 73/3 74/10
**versus [1]** 38/7
**veterinary [2]** 17/22 19/8
**via [1]** 72/15
**victim [1]** 47/24
**view [3]** 33/17 76/7 76/8
**views [1]** 28/15
**VII [2]** 17/15 18/17
**violated [2]** 62/4 62/5
**violation [1]** 61/3
**voir [9]** 59/19 59/20 66/9 71/11 71/11
71/12 71/13 71/23 72/5
**voir dire [4]** 66/9 71/11 71/23 72/5
**voluntarily [3]** 54/25 55/22 56/17
**voluntary [1]** 56/18
**volunteer [1]** 52/13
**voyeur [1]** 59/18
**vs. [4]** 3/7 30/12 36/21 40/9
**vs. Delta [1]** 36/21

## W

**wait [2]** 68/24 78/3
**warn [1]** 66/18
**wasted [3]** 47/6 47/6 48/1
**wealth [1]** 52/12
**website [6]** 9/19 10/20 26/9 28/1 43/1
46/24
**week [2]** 50/9 79/15
**Westlaw [1]** 40/10
**whatsoever [1]** 70/7
**whenever [1]** 45/25
**wherever [1]** 12/14
**white [1]** 47/25
**who's [3]** 16/23 31/11 31/16
**wife [1]** 63/16
**wisely [1]** 65/10
**withdraw [3]** 54/25 56/23 57/4
**withdrawn [1]** 57/5
**witness [6]** 27/16 27/16 40/12 40/25
68/1 68/4
**witnesses [4]** 27/8 27/14 28/10 28/19
**women [1]** 61/8
**word [3]** 45/6 76/9 76/9
**words [1]** 20/18
**work [9]** 51/7 52/8 53/9 58/18 63/15
70/23 70/23 70/24 73/18
**working [1]** 59/5
**works [5]** 16/7 30/8 58/11 58/15
67/12
**world [1]** 43/19
**writing [1]** 11/13
**written [1]** 16/12
**wrong [1]** 19/18

## Y

**yields [1]** 61/1
**you'd [2]** 31/24 39/23

## Z

**zero [1]** 16/14