# Exhibit 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO: 0:18-CV-60482-KMM

OLUWAMUYIWA AWODIYA,

        Plaintiff,

   v.

ROSS UNIVERSITY SCHOOL OF
MEDICINE,

        Defendant.

## RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION

Defendant ROSS UNIVERSITY SCHOOL OF MEDICINE, by and through its attorneys Seyfarth Shaw LLP, hereby submits its Response To Plaintiff's First Set of Requests for Admission.

## REQUEST FOR ADMISSION NO. 1:

Admit that the formal legal name of the organization that operates RUSM is Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited.

## RESPONSE TO NO. 1:

Denied. The entity that operates Ross University School of Medicine (RUSM) is Ross University School of Medicine, School of Veterinary Medicine Limited, a Dominican entity different from Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited, which is a Kittitian entity that operates Ross University School of Veterinary Medicine.

## REQUEST FOR ADMISSION NO. 2:

Admit that RUSM receives United States federal financial assistance through federal student aid.

**REQUEST FOR ADMISSION NO. 22:**

Admit that the RUSM USMLE Step 2 CK first-time pass rate in 2016 was 87%. (See General FAQ'S at https://medical.rossu.edu/about/faq.html).

**RESPONSE TO NO. 22:**

Defendant denies that the referenced website contains the statement in Request No. 22, as of June 3, 2018. To the extent that Request No. 22 requests an admission of anything else, it is objectionable because it is ambiguous, and Defendant is therefore unable to admit or deny the assertion.

**REQUEST FOR ADMISSION NO. 23:**

Admit that the RUSM USMLE Step 2 CS first-time pass rate in 2016 is 94%. (See General FAQ'S at https://medical.rossu.edu/about/faq.html).

**RESPONSE TO NO. 23:**

Defendant denies that the referenced website contains the statement in Request No. 23, as of June 3, 2018. To the extent that Request No. 23 requests an admission of anything else, it is objectionable because it is ambiguous, and Defendant is therefore unable to admit or deny the assertion.

**REQUEST FOR ADMISSION NO. 24:**

Admit that both the websites for Ross University School of Medicine and Ross University School of Veterinary Medicine are both hosted by www.rossu.edu.

**RESPONSE TO NO. 24:**

Defendant admits that the website www.rossu.edu contains a link by which viewers may proceed to the website for Ross University School of Medicine (https://medical.rossu.edu/) and Ross University School of Veterinary Medicine (https://veterinary.rossu.edu/). To the extent that Request No. 24 requests an admission of anything else, it is objectionable because it is ambiguous, and Defendant is therefore unable to admit or deny the assertion.

**REQUEST FOR ADMISSION NO. 25:**

Admit that Ross University School of Medicine and Ross University School of Veterinary Medicine are registered as the same corporation.

**RESPONSE TO NO. 25:**

Denied.

**REQUEST FOR ADMISSION NO. 26:**

Admit that RUSM asserts that "Title III of the Americans with Disabilities Act of 1990 ("ADA") does not extend to conduct occurring outside the United States, and it follows that it does not extend to the Defendant's activities in Dominica." (See Dkt. No. 30).

**RESPONSE TO NO. 26:**

Admitted.

**REQUEST FOR ADMISSION NO. 27:**

Admit that Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited with Adtalem Global Health, Inc., asserted that Title III of the ADA is applicable only in the United States and its territories. (See Galligan v. Adtalem Global Education, Inc. et al). (See also Archut v. Ross Univ. Sch. of Veterinary Med., CIVIL ACTION NO. 10-1681 (MLC) (D.N.J. Nov. 19, 2012)).

**RESPONSE TO NO. 27:**

Admitted.

**REQUEST FOR ADMISSION NO. 28:**

Admit that RUSM made the following statement on the admission requirements page of the RUSM website "It is the policy and practice of the University to comply with the Americans with Disabilities Act as applicable and practical in Dominica."

**RESPONSE TO NO. 28:**

Admitted.

**REQUEST FOR ADMISSION NO. 29:**

Admit that it is false that RUSM will comply with the Americans with Disabilities Act in Dominica.

9

**RESPONSE TO NO. 29:**

Defendant objects to this Request because it is ambiguous (in that there are multiple provisions in the ADA, some of which apply outside the United States under some circumstances and some of which do not) and also apparently premised on the legal fallacy that Title III of the ADA applies in Dominica. Subject to that objection, Defendant admits that RUSM is not required to comply with Title III of the ADA in Dominica but also denies that it is "false" that its conduct in Dominica would comply with the ADA if the statute were to apply there.

**REQUEST FOR ADMISSION NO. 30:**

Admit that it is false that the Americans with Disabilities Act is applicable to RUSM in Dominica.

**RESPONSE TO NO. 30:**

Defendant objects to this Request because it is ambiguous (in that there are multiple provisions in the ADA, some of which apply outside the United States under some circumstances and some of which do not). Subject to this objection, Defendant admits that Title III of the ADA does not apply to RUSM in Dominica.

**REQUEST FOR ADMISSION NO. 31:**

Admit that RUSM made a false statement regarding a material fact posted on the admission requirements page of the RUSM website.

**RESPONSE TO NO. 31:**

Denied.

**REQUEST FOR ADMISSION NO. 32:**

Admit that RUSM had knowledge that the representation of the applicability and compliance with the Americans with Disabilities Act in Dominica was false.

**RESPONSE TO NO. 32:**

Denied.

DATED:  June 8, 2018

Respectfully submitted,

ROSS UNIVERSITY SCHOOL OF
MEDICINE

By: *Ch Meddin*

Christina Forte Meddin
cmeddin@seyfarth.com
Brian Stolzenbach
bstolzenbach@seyfarth.com

SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, GA  30309-3958
Telephone:     (404) 885-1500
Facsimile:      (404) 892-7056

Attorneys for Defendant

46502448v.1

# **Exhibit 2**



## ROSS UNIVERSITY SCHOOL OF MEDICINE
## ACADEMIC CATALOG
## 2013-2014, VOL. 6

AWOD600010

*The Financial Planning Guide* by the deadlines indicated. Applications may be completed online. Typically, students finance the cost of their medical education by combining family resources and student loans from governmental agencies and/or private sources.

Financial aid is available to all eligible students. Approximately 70 percent of RUSM students receive some form of financial assistance.

**Free Application for Federal Student Aid (FAFSA)**
Citizens and permanent residents of the United States applying for admission to RUSM, who are interested in obtaining financial aid, are encouraged to submit a Free Application for Federal Student Aid (FAFSA). The FAFSA serves as an application for all federal student aid programs and can be filed electronically at www.fafsa.ed.gov. The application should be filed at least 90 days in advance of the start date of the semester for which they are applying. Details are provided in *The Financial Planning Guide*.

In order to continue to receive student loans, students must meet the standards for satisfactory academic progress as detailed in the "Academic Policies and Procedures" section of this catalog. The Office of Student Finance assists students in applying to nongovernmental lenders and guarantors of loans and scholarships for which they may be eligible. It is advisable for all students— including those who have applied for financial aid — to bring sufficient funds with them to cover the initial living and housing expenses in Dominica.

**Government-sponsored Loan Programs:** United States citizens and permanent residents attending RUSM may apply for Federal Student Loans under the William D. Ford Direct Loan Program.

**Federal Loans are offered in two forms:**

- *Federal Direct Unsubsidized Stafford Loan:* This is a non-need based loan; maximum $20,500 per two-semester academic year. The interest rate is fixed at 5.41 percent.

- *Federal Direct Graduate PLUS Loan:* This is a non-need based federal loan for which the student can borrow up to RUSM's cost of attendance. If a student does not demonstrate eligibility for the Stafford Loan(s), he/she may receive the full cost of attendance in the PLUS Loan program. The interest rate is fixed at 6.41 percent.

**Loan Deferment and Repayment:** Repayment begins six months after a student has graduated, or under federal definition, has otherwise ceased to be enrolled at least half time. Students who attend RUSM with outstanding loan obligations for undergraduate or graduate study at other institutions are eligible for "in-school" deferment(s).

**Canadian Students:** Students residing in Canada are eligible for private funding sources and government resources. Please review the *Canadian Financial Planning Guide* available at http://www.rossu.edu/documents/FinancialAssistanceforCanadianUpdated.pdf .

13

AWOD600031

**Other Foreign Nationals:** Students that are not U.S. citizens or permanent residents are not eligible for U.S. federal student assistance but may apply with a US cosigner through the private loan lenders if they have a current US student Visa. See *The Financial Planning Guide* for more information.

**Veterans Benefits:** Eligible veterans of the United States Armed Forces may use benefits available through the Veterans Administration to help offset their educational costs. Please visit www.gibill.va.gov for more information.

## Scholarships

Making the decision to become a physician is a major life decision and a significant financial commitment. RUSM is committed to preventing financial concerns from keeping any student from pursuing his or her dream and offers several scholarships designed to recognize students who have shown exceptional community and academic achievements.

## Dean's Award of Excellence Scholarship

The prestigious Dean's Award of Excellence Scholarship is a merit-based scholarship that provides tuition assistance to select students who have shown superior academic achievement and a demonstrated desire to serve the community, as shown through their extracurricular activities, letters of recommendation and MCAT/GPA scores.

**Scholarship Amount:**
$5,000 to be applied to the cost of first semester tuition charges.

**Eligibility Requirements:**
• Applicants must meet RUSM standards for admission as they relate to academics, extracurricular activities such as volunteer work and research, and letters of recommendation.
• Applicants must hold a current letter of admission to RUSM.
• Admitted applicants will be automatically reviewed for a Dean's Award of Excellence Scholarship only after a decision of admission has been received from the Admissions Committee.
• Review and approval from the Dean/Dean's Cabinet.

At least one of the following conditions must be met:
• Overall undergraduate GPA (minimum 3.8)
• Highest MCAT score (minimum 30)

In addition to the above Eligibility Requirements, the following criteria will be specifically considered:
• Letters of recommendation
• Personal essay
• Personal interview
• Clinical experience
• Research experience
• Volunteer experience

**Selection:**
The Dean's Award of Excellence Scholarship was established to provide deserving and highly qualified students the opportunity to defray the cost of attending RUSM.

14

AWOD600032

Requests for accommodation during the Foundations of Medicine portion of the curriculum should be submitted in writing to the Accommodation Coordinator for Foundations of Medicine. For more information, send an email to Housing@rossmed.edu.dm.

## Advanced Introduction to Clinical Medicine (AICM) and Clinical Sciences

It is the student's responsibility to ensure that all accommodation requests and materials are up to date prior to commencing AICM and/or the Clinical Sciences curriculum. Requests for accommodation during the Clinical Sciences curriculum should be submitted to the Accommodations Coordinator for AICM/Clinical Sciences. Accommodations that were received during the Foundations of Medicine curriculum will be taken into consideration but cannot ensure similar accommodations in the Clinical Sciences curriculum. (see Clinical Sciences Accommodations section below). For more information, send an email to Housing@rossmed.edu.dm.

## Timeframe

For recently-admitted students, requests for accommodation should be submitted within thirty days of acceptance. When the need for an accommodation arises after a student has begun medical studies, all documentation must be submitted at least fourteen days prior to the date the accommodation is needed to allow time for an evaluation of the request and documentation. RUSM will make all reasonable efforts to review such requests in a timely manner, but cannot guarantee the disposition of requests prior to any specific examination or phase of the curriculum.

## Responsibility

To qualify for accommodation, a student must identify him/ herself to the Accommodation Coordinator, declare the disability or suspected disability in writing, and request accommodation. It is also the student's responsibility to obtain a thorough written evaluation from an appropriate professional, documenting the presence, extent, and ramifications of the disability. In addition, the documentation should explain what specific types of accommodation the evaluator believes might be most helpful in offsetting the effects of the disability to an acceptable extent (in a medical school environment, if possible). Responsibility for the timely submission of requests and supporting documentation rests upon the student seeking the accommodation. Our goal at RUSM is to provide equal opportunity without undermining the integrity of any course, clerkship, or program. Requests not submitted with at least 14 days' notice or not accompanied by sufficient supporting documentation will impede RUSM's ability to respond in a timely manner.

## Confidentiality

RUSM keeps all accommodation requests confidential to the extent necessary to consider the request and implement the accommodations upon approval. RUSM reviews requests to determine whether they are supported by adequate and appropriate documentation. After careful review in consultation with appropriate professionals, the Accommodation Coordinator will make a recommendation to the Senior Associate Dean for Student Affairs. The decision of the Senior Associate Dean will then be communicated in writing to the student.

## Propriety

All accommodations will be reasonable and appropriate to the circumstances, allowing equal opportunity for students with disabilities. Accommodations must not infringe on or fundamentally alter

70

AWOD600088

## EXECUTIVE ADMINISTRATION

### Board of Trustees

**Connie Curran, EdD, RN, FAAN**
President, Curran Associates

**Richard Carmona, MD**
17th Surgeon General of the United States, Distinguished Professor, Zuckerman College of Public Health, University of Arizona, Vice Chairman, Canyon Ranch and President, Canyon Ranch Institute

**Thomas G. Hollinger, PhD**
Chairman of the Board
Emeritus Associate Professor of Anatomy and Cell Biology at the University of Florida College of Medicine

**Therese King Nohos**
Senior Legal Counsel, DeVry Education Group

**John B. Payne, MBA**
CEO & Founder, Pet Health Innovations, LLC
Past President and CEO, Banfield

**Amy E. Pollack, MD, MPH, FACOG**
Global Medical Director, Covidien; Columbia University Heilman School of Public Health

**Steven P. Riehs, MBA**
Vice Chairman of the Board
President, K-12, DeVry Medical International, Professional and International Education

**Mark Siegler, MD, FACP**
Vice Chairman of the Board
The Lindy Bergman Distinguished Service Professor of Medicine and Surgery and Director of the MacLean Center for Clinical Medical Ethics

**Donald F. Smith, DVM**
Austin O. Hooey Dean, Emeritus and Professor of Surgery, Cornell University

**Ronald L.Taylor, MBA**
Senior Advisor and Retired CEO, DeVry Education Group

**Alvin R. Tarlov, MD, MACP**
Professor of Medicine (Ret.)
U of Chicago; Master, American College of Physicians; Member, Institute of Medicine, National Academy of Sciences

### President of DMI

110

AWOD600128

# Exhibit 3



## ROSS UNIVERSITY SCHOOL OF VETERINARY MEDICINE
## ACADEMIC CATALOG, 2013-2014 (v. 5)

© 2014 Global Education International. All rights reserved.

AWOD600134

## EXECUTIVE ADMINISTRATION

**Board of Trustees**

**Connie Curran, EdD, RN, FAAN**
President, Curran Associates

**Richard Carmona, MD**
17th Surgeon General of the United States, Distinguished Professor, Zuckerman College of Public Health, University of Arizona, Vice Chairman, Canyon Ranch and President, Canyon Ranch Institute

**Thomas G. Hollinger, PhD**
Chairman of the Board
Emeritus Associate Professor of Anatomy and Cell Biology at the University of Florida College of Medicine

**Bill Caruso**
Deputy General Counsel, DeVry Education Group

**John B. Payne, MBA**
CEO & Founder, Pet Health Innovations, LLC
Past President and CEO, Banfield

**Amy E. Pollack, MD, MPH, FACOG**
Global Medical Director, Covidien; Columbia University Heilman School of Public Health

**Steven P. Riehs, MBA**
Vice Chairman of the Board
President, K-12, DeVry Medical International, Professional and International Education

**Mark Siegler, MD, FACP**
Vice Chairman of the Board
The Lindy Bergman Distinguished Service Professor of Medicine and Surgery and Director of the MacLean Center for Clinical Medical Ethics

**Donald F. Smith, DVM**
Austin O. Hooey Dean, Emeritus and Professor of Surgery, Cornell University

**Ronald L.Taylor, MBA**
Senior Advisor and Retired CEO, DeVry Education Group

**Alvin R. Tarlov, MD, MACP**
Professor of Medicine (Ret.)
U of Chicago; Master, American College of Physicians; Member, Institute of Medicine, National Academy of Sciences

17

# Exhibit 4

# Proprietary School Revenue Percentages Report for Financial Statements
## with Fiscal Year Ending Dates Between 07/01/14 –06/30/15

Data Source: EZ Audit as of June 17, 2016
Report Date: June 17, 2016

*This version, posted January 6, 2017, replaces an earlier version of the report released on December 21, 2016.*
*The current version standardizes the format for how the revenue amounts and percentages are displayed as well as making other identified adjustments that were needed in the institutional data and the summary chart.*

| OPE ID | Institution Name | City | State | Fiscal Year Ending Date | 90/10 Revenue Percentage | Institutional Fiscal Year's Title IV Revenue (Numerator) | Institutional Fiscal Year's Total Revenue (Denominator) |
|---|---|---|---|---|---|---|---|
| 02246000 | Ross University, School of Medicine | Portsmouth | Dominica | 06/30/2015 | 80.37 | $137,924,000.00 | $171,617,000.00 |

Proprietary School Revenue Percentages Report for Financial Statements with Fiscal Year Ending Dates between 07/01/15 – 06/30/16

Data Sources: eZ-Audit
Date Range: 07/01/2015 through 06/30/2016
Data Extracted: 06/13/2017

| OPE ID | Institution Name | City | State | Fiscal Year Ending Date | 90/10 Revenue Percentage | Institutional Fiscal Year's Title IV Revenue (Numerator) | Institutional Fiscal Year's Total Revenue (Denominator) |
|---|---|---|---|---|---|---|---|
| 02246000 | Ross University, School of Medicine | Portsmouth | Dominica | 06/30/2016 | 82.28 | $148,223,000.00 | $180,134,000.00 |

Proprietary School Revenue Percentages Report for Financial Statements with Fiscal Year Ending Dates between 07/01/16 – 06/30/17

Data Sources: eZ-Audit
Date Range: 07/01/2016 through 06/30/2017
Data Extracted: 06/14/2018

| Item # | OPE ID | Institution Name | City | State | Fiscal Year Ending Date | 90/10 Revenue Percentage | Institutional Fiscal Year's Title IV Revenue (Numerator) | Institutional Fiscal Year's Total Revenue (Denominator) |
|--------|--------|------------------|------|-------|------------------------|--------------------------|-----------------------------------------------------------|---------------------------------------------------------|
| 383 | 02246000 | Ross University, School of Medicine | Portsmouth | Dominica | 06/30/2017 | 82.00 | $133,042,000.00 | $161,962,000.00 |

1.

Proprietary School Revenue Percentages Report for Financial Statements with Fiscal Year Ending Dates between 07/01/17 – 06/30/18

Data Sources: eZ-Audit

Date Range: 07/01/2017 through 06/30/2018

Data Extracted: 08/14/2019

| Item # | OPE ID | Institution Name | City | State | Fiscal Year Ending Date | 90/10 Revenue Percentage | Institutional Fiscal Year's Title IV Revenue (Numerator) | Institutional Fiscal Year's Total Revenue (Denominator) |
|---|---|---|---|---|---|---|---|---|
| 369 | 02246000 | Ross University, School of Medicine | Portsmouth | Dominica | 06/30/2018 | 80.97 | $132,477,000.00 | $163,619,000.00 |

# <u>Exhibit 5</u>

Page 1

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
2
3         CASE NO. 0:18-cv-60482-KMM-AOV
4
OLUWAMUYIWA AWODIYA,
5
          Plaintiff,
6
vs.
7
ROSS UNIVERSITY SCHOOL OF
8  MEDICINE, SCHOOL OF VETERINARY
   MEDICINE LIMITED,
9
          Defendant.
10 _____/
11
12
13                      Suite 1600
                        350 East Las Olas Boulevard
14                      Fort Lauderdale, Florida  33301
                        Wednesday, 10:19 A.M.-6:23 P.M.
15                      December 5, 2018
16
17    VIDEOTAPE DEPOSITION OF OLUWAMUYIWA AWODIYA
18
19     Taken before Carla D. Smith, RPR, RMR, Notary Public
20  in and for the State of Florida at Large, pursuant to
21  Notice of taking Deposition in the above cause.
22
23
24
25

1   when you graduated from college or did you apply to

2   multiple schools?

3        A.    The thing -- the thing about that is that

4   Ross was a little bit different because they had a

5   what's called a rolling admission versus the traditional

6   admission in the U.S. where it's once a year type of

7   thing.  You kind of have to apply a year before the year

8   you go in.  So Ross, the advantage that Ross had was

9   that it was rolling so whenever you were ready to apply

10  you can just do it like that.

11            So in that regard, I was applying to -- I

12  remember sending off multiple applications.  But when

13  Ross got back to me -- I still think I was hesitant when

14  Ross got back to me.  But then -- I ultimately made the

15  decision to go to Ross.

16       Q.    Were you hesitant because it was not in the

17  United States or for some other reason?

18       A.    I was hesitant because it was -- the basis of

19  it was because it was -- it was not in the U.S.  So I

20  was concerned about multiple things.  Multiple things

21  made me very hesitant.  It was not even just hesitant.

22  It was more of like they were reasons why I was not

23  considering them in the first place.

24            So the fact that they weren't in the U.S. was

25  like -- it was just like not really -- I was impressed

1    with what they were advertising like the students that

2    they matched saying that their accreditation or

3    something is like equivalent to U.S. schools.  The fact

4    that you can use Financial Aid.  But the other important

5    factors was how I'd be treated down there and my safety.

6            So I think one thing that triggered it really

7    was I Googled -- I Googled Dominica and the pictures --

8    it was a lot more -- it was a lot more nature than I

9    thought that I could be comfortable with or used to.

10       Q.    Nature you mean like literally trees and like

11   forest and stuff or what do you mean by nature?

12       A.    I want to be respectful.  It's like, like --

13   like here we have big buildings and stuff like and like

14   a McDonald's and everything down here.  Over there it

15   was like --

16       Q.    Not as developed, is that what you --

17       A.    Yeah.  So I had very big concerns going to a

18   less developed nation than the U.S.  So -- and like, you

19   know, the roads weren't -- they didn't have rails on the

20   side of their -- like their roads, which I think is --

21   but so yeah.  So --

22            So yes.  I was concerned -- so one of the

23   things that led to that is like what if I get hurt down

24   there?  Like it seems like a real possibility that, you

25   know, cause I've never been to Nigeria.  But what

Page 146

1   relatives and all of them say that have been there is

2   that if something like medically happens because of

3   their like access to health care, it's kind of like

4   small things can become big things that wouldn't become

5   big in the U.S.

6           So I was very concerned about like being hurt

7   or injured while I was down there and how they would

8   treat me if I was to be hurt or injured or got some type

9   of -- became disabled in some type of way or something

10  like that.

11          So once -- so once I saw Ross' -- what they

12  advertise in their admission requirement section saying

13  that they -- that they have a policy to comply with the

14  Americans with Disabilities Act in Dominica then it was

15  a green light for me.  Because that was -- that was --

16          The fact that they had to -- it made me feel

17  as though that they still had to follow or they had some

18  policy to obligate the school to afford me an

19  opportunity to continue even if I get hurt down there or

20  become disabled or learn of a disability or anything

21  like that.  So that was -- what other reasons were

22  there?  I said if I could use Financial Aid.

23          Food and stuff was also a thing but I kind of

24  just tossed that one to the side.  I can't cook so I was

25  like, you know -- but yeah.  So that was -- that was --

Page 147

1   yeah.  Deciding to come to Ross, the whole being outside

2   of the country even though in other aspects besides a

3   very large class number, they seemed to be somewhat

4   comparable to U.S. schools.  I just needed to know that

5   they had -- I had some type of protection or some type

6   of -- they had a policy to comply.  So I just assumed

7   that, you know -- and where ever -- they were just

8   obligated for the Americans with Disability Act.

9        Q.    That was one of the important considerations

10  for you when you decided that you would enroll at Ross,

11  is that what you're saying?

12       A.    Yeah, yeah.

13       Q.    Not whether or not if you were to get injured

14  there were hospitals that were qualified to treat you

15  but that if you were disabled, you would be able to be

16  protected by the ADA.

17             Is that what you're saying?

18       A.    No, that if I was disabled, that they would

19  give me an opportunity or help me complete the program

20  and not just say like well you're disabled now so see if

21  you can figure it out on your own or get out of here and

22  like just keep my money that I paid with Financial Aid

23  money with.  So I didn't want them to do that.  So the

24  fact I was using Financial Aid money to pay for this

25  school is just -- trying to remember your question.  You

1    said something about --

2         Q.    Well, I'm asking -- let me ask this.

3              Earlier you said that until the litigation

4    you didn't know anything about the ADA.  You were going

5    to bring a breach of contract claim.  You didn't think

6    about the ADA until you read something about it.

7              Now, when it's convenient, you're saying when

8    I applied I cared very much about the ADA.  That was one

9    of the key statements I focused on and relied upon in

10   coming to Ross.  It just seems a little inconsistent.

11        A.    What you're saying is incorrect.

12        Q.    Okay.  Explain to me why I'm wrong.

13        A.    Pre-litigation or my preparations for

14   litigation, I didn't know what the ADA requirements,

15   obligations, the actual substance of the Americans with

16   Disability Act was.  I didn't know what I was

17   technically entitled to as a matter of law.

18              I wasn't a lawyer.  I didn't know how to look

19   up case law.  I didn't know how to look up -- to be

20   perfectly honest, I don't even -- I don't even know if

21   the normal citizens or if it's just me but I don't

22   really -- until this lawsuit I realized I didn't know

23   any laws.  I didn't know what a statute was.  I just

24   knew basic law stuff like for moral reasons like don't

25   steal and stuff like that or from like TV.

Page 149

1          So the Americans with Disability Act I knew

2     of it but I didn't know what -- beneath that I didn't

3     know what was actually technically required.  I just

4     knew that it was some type of thing that stopped

5     discrimination from disabled people.  And that was my

6     interpretation of it when I saw it on the website that

7     the Americans with Disability Act will prevent

8     discrimination against Americans.

9          Q.    When you enrolled at Ross, did you believe

10    you were disabled in anyway?

11         A.    No.  When I enrolled, no.

12               When I enrolled in what, 2014?

13         Q.    That's correct?

14         A.    Yeah, no.  I didn't believe I was disabled.

15         Q.    Did you apply to any U.S. medical schools?

16         A.    I graduated undergrad in 2013.  Then I went

17    the rest of 2013 finished.  So I had applications and

18    everything -- no, no.  So the problem was with -- I had

19    applications and stuff done but I didn't follow -- two

20    things prevented me from going all the way around to the

21    next cycle.

22               First, I missed a previous cycle.  So I was

23    considering whether I should wait to go to the next

24    cycle because Ross had the rolling admission.  So when I

25    had graduated in 2013 in order to start the next fall

Page 150

1    that was coming up, you had to apply for U.S. medical

2    schools the previous fall.  Like around that time like

3    the summer and fall of the previous year.  So that was

4    like I had to consider whether I should wait or not or

5    if Ross was comparable to these schools then, you know,

6    if there is no difference like except for location, then

7    I can get in now.  So that's what happened.

8              So when Ross gave me acceptance and then once

9    I ultimately -- well, they gave me conditional

10   acceptance.  Then I ultimately was like well, I have an

11   option here.  I can take it or I can continue with going

12   to these other schools or applying to these other

13   schools for the next cycle.  So yes.

14             At that time, I honestly thought Ross with

15   the information that was on their website, I thought

16   that they were just like the other U.S. students who get

17   the same degree.  It's just a campus and a different

18   location and I had a conditional acceptance offer is

19   sitting in front of me and I don't have to wait.  So

20   yeah.  Once I was convinced, I was like well, you know,

21   can't be pickers and choosers here.  So got a med school

22   right here.  So I didn't want -- yeah, so that's --

23   that's basically what happened.  I don't know if I

24   explained that well or not.

25        Q.    I think I followed.  So just to be -- confirm

1    Q.    Sorry.  This letter as I look over it appears

2   to be a letter to you informing you of your admission to

3   Ross it says "for the class beginning May 5, 2014."

4           And in the second paragraph it says, "Your

5   completion of MERP has proven to our admissions

6   committee that you have the potential to be an

7   outstanding addition to our medical program."

8           So what I was asking was is this the followup

9   letter saying now that you have completed MERP, you're

10   admitted to Ross?

11    A.    Most likely.

12    Q.    And did you, in fact, start up at Ross on or

13   around May 5th, 2014?

14    A.    From what I can recall.

15    Q.    Do you recall what your best semester grade

16   point average wise was at Ross?

17    A.    I think it was the semester where I saw all

18   the information for the second time.  So that would be

19   my repeat fifth semester.

20    Q.    And is it safe to assume that your worse

21   semester was the first time you took that fifth semester

22   when you failed?

23    A.    My worse semester -- oh, I guess technically

24   yeah.  The other semesters -- my first semester I think

25   I got the minimum like one point less it was -- like

# Exhibit 6

Page 1

1               UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF FLORIDA

3

4   OLUWAMUYIWA AWODIYA,

5           Plaintiff

6   vs.                          CASE NO.

                                 0:18-cv-60482-KMM

7   ROSS UNIVERSITY SCHOOL OF

    MEDICINE, SCHOOL OF

8   VETERINARY MEDICINE LIMITED,

9           Defendant.

10

    ``````````````````````````````

11

12

13          VIDEO-CONFERENCED DEPOSITION OF

14              MATTHEW STEWART-FULTON

15

16               NOVEMBER 5, 2018

17                 1:06 P.M.

18

19          ROSS UNIVERSITY SCOOL OF MEDICINE

20               KNOXVILLE, TENNESSEE

21

22

23

24          Deborah West, LCR-314 (TN), CLR

25

1    accommodations?

2            Q     Yes.

3            A     I am afraid I don't understand what

4    you mean by this question.

5            Q     The actual recommendation, can it be

6    verbal?

7            A     Yes.

8            Q     Can a student's doctor do the same?

9            A     Yes.

10           Q     Can a student's psychiatrist do the

11   same?

12           A     Yes.  Just to be clear, when you say

13   can one of these parties recommend, as in recommend

14   to me that a student receive accommodations; is

15   that correct?

16           Q     Yes, that's exactly what I am

17   saying.

18           A     Okay.  Thank you.

19           Q     I apologize, I am a little all over

20   the place so I am kind of trying to collect my

21   thoughts.

22           A     No worries.

23           Q     So does a request for accommodation

24   have to be in writing?

25           A     It does.

1      Q     But you also accept verbal requests?

2      A     Not for consideration.  Someone can

3  request and then they have to provide the

4  application in writing.

5      Q     Can someone else provide the

6  application in writing to you?

7      A     Someone else could turn it in on

8  behalf of the student.  The application needs to be

9  filled out by the student.

10     Q     So the student could tell someone

11  all of the necessary information and that person

12  can then write it for the student and then turn it

13  in to you?

14     A     Yes.  Although the student has to

15  sign it.

16     Q     What if the student is not able to

17  sign it?

18     A     It is not a circumstance I have ever

19  dealt with.  I don't know.

20     Q     So if a student with no arms needed

21  academic accommodations, would he be then required

22  to submit the request packet in writing?

23            MR. ROMAN:  I will object.  That

24         calls for speculation.  You may answer.

25            THE WITNESS:  I don't know.  I have

1    are to address their particular disability.

2         Q     If it is obvious as in you notice

3    that the student has a disability, how would you

4    initiate the academic accommodations process?

5         A     The student needs to initiate the

6    application process.

7         Q     Even if the disability is obvious?

8         A     That's correct.

9         Q     This question right here will be a

10   hypothetical.  If a student who obviously cannot

11   climb a flight of stairs, would you accommodate

12   that student only after he requests for an

13   accommodation?

14        A     I would like you to clarify the

15   circumstances that you're inquiring about.

16        Q     If a student -- if you noticed that

17   a student needs an accommodation because it is

18   obvious, you still will not accommodate the student

19   unless he requests for an accommodation?

20        A     Students who would like to receive

21   accommodations must initiate the request.

22        Q     Is that a yes to my question?

23        A     I can't answer your question as a

24   yes or no question.

25        Q     Are students required to have a

Page 32

1             THE WITNESS:  In reference to when

2        you were enrolled and the campus was

3        located on Dominica, we were not required

4        to comply with the ADA.  Although in the

5        interest of supporting our students, we

6        abided by the spirit of the ADA and

7        Section 504 of the Rehabilitation Act to

8        provide appropriate accommodations within

9        the process that was defined in the

10        student handbook.

11  BY MR. AWODIYA:

12        Q     So just to clarify, there is no

13  policy that requires faculty to comply with those

14  laws you just stated?

15        A     That's my recollection based on

16  what's in the student handbook.

17        Q     So you, yourself, are not required

18  to comply with those laws in Dominica?

19        A     That is my understanding.

20        Q     Where did you get your knowledge

21  about what is required from Title III of the

22  Americans with Disabilities Act?

23        A     From review of the Americans with

24  Disabilities Act and Section 504 of the

25  Rehabilitation Act.  From consultation with the

1   hiring manager who brought me into this position.

2   And consultation with, at the time, the DeVry legal

3   office.

4           Q       But they did not tell you that you

5   were required to comply with those laws?

6                   MR. ROMAN:   I will object, for the

7               record, to the extent it calls for any

8               communications you had with DeVry's legal

9               counsel that would be covered by

10              attorney-client privilege and I would

11              instruct you not to answer.

12                  To the extent you have spoken with

13              any of the other folks you described or

14              anyone else, you may answer the question.

15                  THE WITNESS:   The answer, I think,

16              ultimately goes back to the legal office,

17              so I will not answer any further on that.

18   BY MR. AWODIYA:

19          Q       Has anyone that is not in the legal

20   office of Ross University tell you that you -- let

21   me rephrase.

22                  Is it correct to say that you were

23   never told that you had to comply with those laws?

24          A       That conversation goes back to the

25   conversation with the legal office.

Page 34

```
 1            Q      No communication from the lawyers.
 2     Let's limit the scope of this question to anyone
 3     that is not a lawyer.
 4            A      All right.  Please ask the question.
 5            Q      Is it correct to say that no one
 6     from Ross University, excluding lawyers, has told
 7     you that you need to comply with the Americans with
 8     Disability Act and Section 504?
 9            A      That's correct.
10            Q      So if a student believes a violation
11     occurs, how would they go about enforcing it if you
12     are not required to follow those laws?
13            A      A violation of the legislation we
14     are discussing, the ADA and Section 504?
15            Q      Yes.
16            A      I don't know.  If there is an issue
17     like that I usually refer that up to my manager.
18            Q      Who is your manager?
19            A      Dr. Hayse.
20            Q      Is there any policy with faculty
21     about how to handle direct requests to them?
22            A      Direct requests for?
23            Q      Academic accommodations?
24            A      They are guided to contact me.
25            Q      Is there a policy?
```

Page 41

1    to the student?

2          A     If the student emailed me to request

3    information about accommodations or if an in-person

4    meeting, the student preferred to receive the

5    application packet by email rather than a paper

6    copy.

7          Q     Are students required to email you?

8          A     No.

9          Q     Have you ever in the past granted

10   accommodations for a student that did not complete

11   the accommodation packet?

12         A     No.

13         Q     I have a few more questions about

14   the packet itself.  What documents are required and

15   what documents are not required?

16         A     The documents that are required are

17   the application form itself, personal statement,

18   and appropriate supporting documentation from a

19   healthcare provider.

20         Q     Is the statement still required if

21   the student's medical documents describe the

22   disability in detail?

23         A     Yes.

24         Q     Do you have a reason for that?

25         A     We want the students to have an

1      Q     Okay.  So how would the student know

2  to describe all the things you said?

3      A     Because it is in the application

4  package.  And it's something that I would discuss

5  in an in-person meeting if we held that meeting

6  before the application package was complete.

7      Q     Okay.  So if all of the information

8  that you wanted in the personal statement was sent

9  by a doctor in the student's medical records, would

10  that be sufficient enough to give academic

11  accommodations?

12      A     Not necessarily.  And again, all

13  three pieces need to be there in order to have a

14  completed application.

15      Q     So strict adherence to this

16  application, regardless of the amount of

17  information you had, is the only way to get

18  academic accommodations?

19      A     Correct.  A complete application

20  must be submitted with all of the listed

21  components.

22      Q     I just want to clarify.  So if you

23  are informed of the disability, the extent of that

24  disability, and how that disability has affected

25  the person in the past, if all of that is stated in

1    their medical records and you don't have a personal

2    statement, that same student would not get academic

3    accommodations?

4            A     The application would not be

5    complete so it would not be reviewed.  Which means

6    they would not receive accommodations until after

7    it was complete and reviewed.

8            Q     In your opinion, do you find this an

9    easy process for a student with a disability to go

10   through?

11           A     That requires speculation on my part

12   that I don't feel comfortable making.

13           Q     These policies in the application

14   packet --

15           A     Was that a question?

16                 MR. ROMAN:  I think you may have cut

17           out.

18   BY MR. AWODIYA:

19           Q     I was asking who required -- let me

20   rephrase.

21                 Who determined what documentation is

22   required in this packet?  Was it you or was this

23   created by someone else?

24           A     This application, at the time of

25   your enrollment, was the application that was in

Page 46

1   use when I hired into this role.  And I do not know

2   who created it prior to my arrival at Ross.

3          Q     Is this the same packet that you

4   give to faculty if they want an accommodation for

5   themselves?

6          A     I don't work with faculty who

7   request accommodations.  This is specifically --

8          Q     Who gives --

9          A     This is specifically test academic

10  accommodations for students.

11         Q     Is there a threshold of

12  documentation that you require to grant a student

13  academic accommodations?

14         A     The documentation that is listed in

15  the form.

16         Q     If a student didn't realize that

17  their disability was affecting them until they

18  reached medical school, Ross University

19  specifically, would a history of their disability

20  be required?

21         A     For someone who had not previously

22  been diagnosed?

23         Q     Who had not been previously

24  disabled.

25         A     If they had not previously been

# Exhibit 7

Page 1

1                    UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF FLORIDA

3

4     OLUWAMUYIWA AWODIYA,

5              Plaintiff

6     vs.                              CASE NO.

                                       0:18-cv-60482-KMM

7     ROSS UNIVERSITY SCHOOL OF

      MEDICINE, SCHOOL OF

8     VETERINARY MEDICINE LIMITED,

9              Defendant.

10

      ````````````````````````````````

11

12

13            VIDEO-CONFERENCED DEPOSITION OF

14                      BRYAN HAYSE

15

16                  NOVEMBER 5, 2018

17                    3:07 P.M.

18

19         ROSS UNIVERSITY SCOOL OF MEDICINE

20              KNOXVILLE, TENNESSEE

21

22

23

24        Deborah West, LCR-314 (TN), CLR

25

Page 8

1    plaintiff in December of 2015?

2          A     I do.

3          Q     Can you tell me about your encounter

4    with him?

5          A     I can.  I vaguely remember meeting

6    with plaintiff, and I don't recall what the meeting

7    was about.  Since the lawsuit has come to my

8    attention, I was shown documents that were from

9    Mr. Cuffy referring to mine and your, plaintiff's

10   meeting, which jogged my memory from it.

11               So that's all I remember from this

12   meeting.  I don't remember specifics.  I remember

13   meeting after December, but I don't remember the

14   specifics of the December meeting.

15         Q     You said the document has jogged

16   your memory.  Do you know what it caused you to

17   remember?

18         A     Only that my memory that you and I

19   met in January was inaccurate and that you and I

20   had met previously in December.

21         Q     What is your position at Ross

22   University?

23         A     I am currently the Associate Dean

24   for Medical Science Student Affairs.

25         Q     As part of that position, have you

Page 9

1    ever handled accommodations?

2         A      Rephrase.

3         Q      Have you ever played any role in a

4    student getting academic accommodations?

5         A      Yes is the quick answer.

6         Q      Can you describe it to me?

7         A      Yes.  For the most part in the

8    process I am -- Mr. Stewart-Fulton, who I believe

9    you spoke with previously, is the chief officer

10   over accommodations for the Medical Sciences for

11   the first five semesters.

12              In my role I supervise

13   Mr. Stewart-Fulton, so he and I have conversations

14   about pending applications as he has questions

15   about them or just to get typical updates as a

16   supervisor would, as well as within the process I

17   oversee, if anybody appeals an accommodation that

18   he has made, I would be the one that would review

19   the appeal of that person.

20        Q      Is Mr. Stewart-Fulton required to

21   comply with Title III of the Americans with

22   Disability Act?

23              MR. ROMAN:  I would object to the

24         extent it calls for a legal conclusion,

25         but you're welcome to answer the

Page 10

```
 1            question.
 2                  THE WITNESS:  Yeah.  I would say as
 3            far as the ADA is concerned, you know, we
 4            comply with, and our policies are built
 5            around having accommodations made for the
 6            USMLE and around the USMLE processes and
 7            policies.
 8                  Because at the end of the day we
 9            want to make sure our students have
10            proper documentation to be at the best
11            stage to get accommodations from USMLE
12            when they get to step one and beyond.
13                  Although what we do does not
14            determine that necessarily.  So I would
15            say that what we do is uses ADA as
16            guideline, but we are not necessarily
17            beholden to.
18     BY MR. AWODIYA:
19            Q     Do you know if it's required to
20     comply with Section 504 of the Rehabilitation Act?
21                  MR. ROMAN:  Same objection, but you
22            can answer.
23                  THE WITNESS:  Is that the same
24            question?
25
```

Page 14

1    required to comply, I mean does Ross require their

2    employees to comply, not if they're legally

3    required to comply.  I am asking if Ross, the

4    entity, requires their employees to comply with the

5    American with Disability Act.

6           A     I am not sure I understand the

7    question.

8           Q     It was a little long.  Let me make

9    it shorter.

10          A     Yeah.

11          Q     Does Ross University itself require

12   its employees and faculties to comply with Title

13   III of the American with Disability Act in

14   Dominica?

15          A     Not to my knowledge.

16          Q     Is that also correct for Section 504

17   of the Rehabilitation Act?

18          A     That is correct.

19          Q     Okay.  I am not going to keep you

20   long, because there's not much -- it's just I want

21   to go to the counseling documents just to see if we

22   can jog your memory a little bit about our

23   interaction.

24                Counsel, can you hand Dr. Hayse both

25   the counseling documents, the one labeled RUSM

# **<u>Exhibit 8</u>**



# *STUDENT HANDBOOK*

# **2013 – 2014**

## **January 1, 2014**

© 2013 Global Education International.  All rights reserved.

AWOD600185

## ACCOMMODATIONS FOR STUDENTS WITH DISABILITIES

RUSM is committed to ensuring that qualified students with disabilities are afforded reasonable accommodations. The RUSM curriculum represents a core curriculum essential to all physicians. Therefore, RUSM expects that each student admitted will be capable of completing the full curriculum of required courses and electives under the established RUSM policies. All students and applicants must be capable of meeting the RUSM Technical Standards, with or without reasonable accommodation, at each stage of their medical education. Our goal at RUSM is to provide equal opportunity without undermining the integrity of any course, clerkship, or program.  Requests for accommodation should be made as soon as the need is known and within the guidelines described here. Requests are processed in Foundational Sciences and Clinical Sciences by the appropriate Accommodation Coordinator in the Office for Student Affairs.

### Foundational Sciences

Requests for accommodation during the foundational science portion of the curriculum should be submitted in writing to the Accommodation Coordinator for Foundational Sciences.

### Advanced Introduction to Clinical Medicine (AICM) and Clinical Sciences

It is the student's responsibility to ensure that all accommodation requests and materials are up to date prior to commencing AICM and /or clinical sciences. Requests for accommodation during the clinical portion of the curriculum should be submitted to the Accommodations Coordinator for AICM/Clinical Sciences.  Accommodations that were received during Foundational sciences will be taken into consideration but cannot ensure similar accommodations in the Clinical sciences phase. (see Clinical Phase Accommodations section below).

### Timeframe

For recently-admitted students, requests for accommodation should be submitted within thirty days of acceptance. When the need for an accommodation arises after a student has begun medical studies, all documentation must be submitted at least fourteen days prior to the date the accommodation is needed to allow time for an evaluation of the request and documentation. RUSM will make all reasonable efforts to review such requests in a timely manner, but cannot guarantee the disposition of requests prior to any specific examination or phase of the curriculum.

### Responsibility

 To qualify for accommodation, a student must identify him/ herself to the Accommodation Coordinator, declare the disability or suspected disability in writing, and request accommodation. It is also the student's responsibility to obtain a thorough written evaluation from an appropriate professional, documenting the presence, extent, and ramifications of the disability. In addition, the documentation should explain what specific types of accommodation the evaluator believes might be most helpful in offsetting the effects of the disability to an acceptable extent (in a medical school environment, if possible). Responsibility for the timely submission of requests and supporting documentation rests upon the student seeking the accommodation.  Our goal at RUSM is to provide equal opportunity without undermining the integrity of any course, clerkship, or program. Requests not submitted with at least 14 days' notice or not accompanied by sufficient supporting documentation will impede RUSM's ability to respond in a timely manner.

AWOD600193

# Exhibit 9

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 0:18-cv-60482-KMM


OLUWAMUYIWA AWODIYA,

              Plaintiff,

vs.

ROSS UNIVERSITY SCHOOL OF
MEDICINE, SCHOOL OF VETERINARY
MEDICINE LIMITED,

              Defendant.
_____/


                    350 E. Las Olas Blvd.
                    Fort Lauderdale, Florida
                    October 16, 2018
                    12:59 p.m.


THE DEPOSITION OF

DAVENDRANAND SHARMA


Taken on Behalf of the Plaintiff

Pursuant to Notice of Taking Deposition

Commencing at 12:59 p.m.

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Lavendra and Sharma

Page 7

1          A.    I think it was an e-mail that came around

2   April 2016 from Ross University's attorneys office

3   saying that you --

4          MR. ROMAN:  Hold on one second.  I'm just

5          going to object to the extent that your

6          testimony would call for any disclosure of

7          attorney/client communication.  Any

8          communication you had with an attorney for

9          Ross, I'll object on the basis of privilege,

10          and I'll instruct you not to answer those

11          questions.  You can testify about when you

12          talked to certain people, who you talked to,

13          but not the substance of communications with

14          lawyers.

15          THE WITNESS:  Sure.  I understand.

16          So April 2016.

17   BY MR. AWODIYA:

18          Q.    How long have you been working for Ross

19   University?

20          A.    From 1993.

21          Q.    And what is your job position at Ross

22   University?

23          A.    I'm a professor of behavior sciences and

24   consultant psychiatrist for health services.

25          Q.    I'm going to show you this document marked

1    A.   Because, as I said, we do not release

2  information unless we request -- we receive a

3  request either from the student, who has the

4  diagnosis, and that has to be in writing, not a

5  verbal request, or it has to come from the

6  accommodations office in writing under a protected

7  e-mail that the -- that they are going through the

8  process of supporting a request for accommodation.

9  There was no request made for accommodations.  So

10  that's why I said, there's no request.  We cannot

11  give out information to the accommodations office.

12  Then we would be sued for giving information beyond

13  the scope.  The scope of this document was only to

14  get the plaintiff back home early.

15    Q.   Give me one second.  I had something and

16  it's coming back to me.

17    A.   Take your time.

18    Q.   Oh.  You said that a request has to be in

19  writing?

20    A.   Yes.

21    Q.   What if it's oral?

22    A.   No.

23    Q.   It doesn't count?

24    A.   It doesn't count to the accommodations

25  office, as far as I know, and that's their -- that's

10/16/2018          Awodiya, Oluwamuyiwa v. Ross University School of Medicine et al.          Ravendranand Sharma

Page 36

1    their portfolio.  I can only say, from my

2    experience, a verbal request is not a request for

3    accommodations.

4        Q.    Would you say that when the diagnosis was

5    made --

6        A.    Uh-huh.

7        Q.    -- and after you observed all the

8    symptoms, that Ross University had possession of all

9    the necessary documents of plaintiff's ADHD and the

10   symptoms of his ADHD?

11       A.    Yeah, we had -- we had made a diagnosis.

12   The diagnosis was done, and we accepted, and the

13   student was -- the plaintiff was being treated.

14       Q.    Earlier you said that students with less

15   documentation have received -- you said earlier

16   students with less documentation of ADHD have

17   received accommodation action compared to plaintiff.

18       A.    Uh-huh.

19       Q.    Do you think that is fair?

20            MR. ROMAN:  I'll just object as to vague

21       as to what "fair" means.

22   BY MR. AWODIYA:

23       Q.    Let me rephrase.

24            Do you think that plaintiff was treated

25   equally?

Page 42

1    would lead to this -- what did you call it, the

2    process?

3            Q.    The inquiry.

4            A.    The inquiry, yeah.

5            Q.    Let me rephrase.

6            A.    The only thing I know leads to

7    accommodation is the student has to apply for it.

8            Q.    I just want to clarify something.  Are you

9    saying that the student informing the school of the

10   need for accommodations is different than requesting

11   an accommodation?

12           A.    They're both the same thing.  So the

13   request or the informing the school has to be

14   specifically to the accommodations officer and has

15   to be done in writing.

16           Q.    So only him can be informed of the need?

17           A.    Only the student can make the request for

18   accommodation to the accommodations office.

19           Q.    So if the student requested accommodations

20   from other faculty, he's liable for not getting

21   accommodations?

22           MR. ROMAN:  I'll just object to two

23           things.  One, I think it calls for a legal

24           conclusion, in terms of some of the language,

25           and also, it's been asked and answered.

# Exhibit 10



# Account Details

**WELCOME OLUWAMUYIWA**

## Choose An Account — 2 Accounts Total

**Currently Viewing:**

**Graduate PLUS Loans**
U.S. DEPARTMENT OF EDUCATION (798581)
Balance: $188,255.28
Payment Reference Number: 190686297010205

### Not Currently Due

Sign Up for Auto Pay

Although no payment is due at this time, you may continue to make payments on this account.

**Make a Payment »**

### Balance & Status

**In forbearance until 09/30/2021**

| | |
|---|---|
| Principal: | **$154,769.81** |
| Accrued Interest: | **$33,485.47** |
| Total Balance as of Aug 7, 2021: | **$188,255.28** |
| | Not a payoff amount. |
| Repayment Plan: | **Pay As You Earn** |
| Loan Term: | You chose a payment plan based on income rather than loan term. View your payment schedule for more information. |

view payment history  |  calculate payoff amount  |  view billing statement

Loans in this Account

### Things to Do Now

- Choose a repayment plan or explore your options before your forbearance ends.
- Sign up for Auto Pay.
- Set up text alerts.

**Message Center »**
**Welcome to the Message Center!**

**Knowledge Center »**

Important Coronavirus (COVID-19) Information

Don't Pay for Student Loan Help That's FREE

How to Make a Student Loan Payment

Servicemember Support - We're Here for You

Mobile App for Your Student Loans

Know Your Repayment Options

Top Six Ways to Reduce What You Owe

Considering Consolidation

How FSA and Great Lakes Work Together

Great Lakes Helps With Student Debt

FAQ »

Contact Us »

| Loan Type | Current Balance * | Current Interest Rate ** | | Find Topics About |
|---|---|---|---|---|

**▼ Direct Grad PLUS** — $64,960.35 — 0.000% fixed

| | |
|---|---|
| Loan Token: | 929 |
| Loan Status: | Coronavirus Pandemic National Emergency Act |
| Loan Date: | 05/02/2014 |
| Regular Interest Rate: | 6.410% |

The interest rate charged on a federal student loan that is set by federal law, which may differ from the rate at which interest currently accrues.

| | |
|---|---|
| Period: | 05/12/2014 - 12/19/2014 |
| School: | ROSS UNIVERSITY, SCHOOL OF MEDICI |
| Original Amount: | $46,473.00 |

Original amount is the total of your disbursement check amounts, plus any fees, minus any refund payments.

| | |
|---|---|
| Principal Balance: | $53,369.96 |
| Interest Balance: | $11,590.39 |

**Disbursements**

| Disb Date | Status | Fees | Check Amount |
|---|---|---|---|
| 05/02/2014 | Disbursed | $1,004.00 | $22,423.00 |
| 08/29/2014 | Disbursed | $959.00 | $21,409.00 |
| 09/05/2014 | Disbursed | $29.00 | $649.00 |

**▼ Direct Grad PLUS** — $64,550.94 — 0.000% fixed

| | |
|---|---|
| Loan Token: | 931 |
| Loan Status: | Coronavirus Pandemic National Emergency Act |
| Loan Date: | 01/09/2015 |
| Regular Interest Rate: | 7.210% |

The interest rate charged on a federal student loan that is set by federal law, which may differ from the rate at which interest currently accrues.

| | |
|---|---|
| Period: | 01/12/2015 - 08/21/2015 |
| School: | ROSS UNIVERSITY, SCHOOL OF MEDICI |
| Original Amount: | $46,470.00 |

Original amount is the total of your disbursement check amounts, plus any fees, minus any refund payments.

| | |
|---|---|
| Principal Balance: | $51,878.42 |
| Interest Balance: | $12,672.52 |

**Disbursements**

| Disb Date | Status | Fees | Check Amount |
|---|---|---|---|
| 01/09/2015 | Disbursed | $997.00 | $22,238.00 |
| 05/15/2015 | Disbursed | $997.00 | $22,238.00 |

**▼ Direct Grad PLUS** — $25,946.80 — 0.000% fixed

| | |
|---|---|
| Loan Token: | 933 |
| Loan Status: | Coronavirus Pandemic National Emergency Act |
| Loan Date: | 08/28/2015 |
| Regular Interest Rate: | 6.840% |

The interest rate charged on a federal student loan that is set by federal law, which may differ from the rate at which interest currently accrues.

| | |
|---|---|
| Period: | 09/07/2015 - 12/18/2015 |
| School: | ROSS UNIVERSITY, SCHOOL OF MEDICI |
| Original Amount: | $19,490.00 |

Original amount is the total of your disbursement check amounts, plus any fees, minus any refund payments.

| | |
|---|---|
| Principal Balance: | $21,439.00 |
| Interest Balance: | $4,507.80 |

**Disbursements**

| Disb Date | Status | Fees | Check Amount |
|---|---|---|---|
| 08/28/2015 | Disbursed | $836.00 | $18,654.00 |

**▼ Direct Grad PLUS** — $25,132.80 — 0.000% fixed

| | |
|---|---|
| Loan Token: | 935 |
| Loan Status: | Coronavirus Pandemic National Emergency Act |
| Loan Date: | 01/08/2016 |
| Regular Interest Rate: | 6.840% |

The interest rate charged on a federal student loan that is set by federal law, which may differ from the rate at which interest currently accrues.

| | |
|---|---|
| Period: | 01/11/2016 - 04/22/2016 |

AWOD600001

School:          **ROSS UNIVERSITY, SCHOOL OF MEDICI**

Original Amount:                      **$19,490.00**
Original amount is the total of your disbursement check
amounts, plus any fees, minus any refund payments.

Principal Balance:                    **$21,439.00**

Interest Balance:                    **$3,963.30**

**Disbursements**

| Disb Date | Status | Fees | Check Amount |
|---|---|---|---|
| 01/08/2016 | Disbursed | $832.00 | $18,658.00 |
| ▶ Direct Grad PLUS | | $7,394.89 | 0.000% fixed |

\* Balance includes principal and interest, but it is not a payoff amount. If you are interested in paying
off a specific loan, contact us.

\*\* The rate at which interest currently accrues on the loan. It is the regular rate minus any incentives
or special program rate reductions.

Printer-friendly View ⊙



AWOD600002

# Exhibit 11



# Account Details

**WELCOME OLUWAMUYIWA**

| Choose An Account | 2 Accounts Total |

**Currently Viewing:**

**⊘ Stafford Loans**
U.S. DEPARTMENT OF EDUCATION (798581)
Balance: $115,637.56
Payment Reference Number: 190686297000001

**Not Currently Due**

Sign Up for Auto Pay

Although no payment is due at this time, you may continue to make payments on this account.

**Make a Payment »**

**Balance & Status**

**In forbearance until 09/30/2021**

| | |
|---|---|
| Principal: | **$100,233.73** |
| Accrued Interest: | **$15,403.83** |
| Total Balance as of Aug 7, 2021: | **$115,637.56** |
| | Not a payoff amount. |
| Repayment Plan: | **Pay As You Earn** |
| Loan Term: | You chose a payment plan based on income rather than loan term. View your payment schedule for more information. |

view payment history | calculate payoff amount | view billing statement

Loans in this Account

## Things to Do Now

- ⊘ Choose a repayment plan or explore your options before your forbearance ends.
- ⓘ Sign up for Auto Pay.
- ⓘ Set up text alerts.

**Message Center »**
**Welcome to the Message Center!**

**Knowledge Center**

Important Coronavirus (COVID-19) Information

Don't Pay for Student Loan Help That's FREE

How to Make a Student Loan Payment

Servicemember Support: We're Here for You

Mobile App for Your Student Loans

Know Your Repayment Options

Top Six Ways to Reduce What You Owe

Considering Consolidation?

How FSA and Great Lakes Work Together

Great Lakes Helps With Student Loans

FAQ »

Contact Us »

AWOD600003

Find Topics About

| Loan Type | Current Balance * | Current Interest Rate ** |
|---|---|---|
| Direct Subsidized Stafford | $3,812.55 | 0.000% fixed |
| Direct Unsubsidized Stafford | $3,547.70 | 0.000% fixed |
| Direct Subsidized Stafford | $4,801.71 | 0.000% fixed |
| Direct Subsidized Stafford | $1,067.01 | 0.000% fixed |
| Direct Unsubsidized Stafford | $3,323.44 | 0.000% fixed |
| Direct Subsidized Stafford | $5,969.27 | 0.000% fixed |
| Direct Unsubsidized Stafford | $3,160.77 | 0.000% fixed |
| ▼ Direct Unsubsidized Stafford | $27,294.28 | 0.000% fixed |

| | |
|---|---|
| Loan Token: | 930 |
| Loan Status: | Coronavirus Pandemic National Emergency Act |
| Loan Date: | 05/02/2014 |
| Regular Interest Rate: | 5.410% |

The interest rate charged on a federal student loan that is set by federal law, which may differ from the rate at which interest currently accrues.

| | |
|---|---|
| Period: | 05/12/2014 - 12/19/2014 |
| School: | ROSS UNIVERSITY, SCHOOL OF MEDICI |
| Original Amount: | $20,500.00 |

Original amount is the total of your disbursement check amounts, plus any fees, minus any refund payments.

| | |
|---|---|
| Principal Balance: | $23,066.51 |
| Interest Balance: | $4,227.77 |

**Disbursements**

| Disb Date | Status | Fees | Check Amount |
|---|---|---|---|
| 05/02/2014 | Disbursed | $109.00 | $10,141.00 |
| 08/29/2014 | Disbursed | $109.00 | $10,141.00 |

| ▼ Direct Unsubsidized Stafford | $27,300.28 | 0.000% fixed |
|---|---|---|

| | |
|---|---|
| Loan Token: | 932 |
| Loan Status: | Coronavirus Pandemic National Emergency Act |
| Loan Date: | 01/09/2015 |
| Regular Interest Rate: | 6.210% |

The interest rate charged on a federal student loan that is set by federal law, which may differ from the rate at which interest currently accrues.

| | |
|---|---|
| Period: | 01/12/2015 - 08/21/2015 |
| School: | ROSS UNIVERSITY, SCHOOL OF MEDICI |
| Original Amount: | $20,500.00 |

Original amount is the total of your disbursement check amounts, plus any fees, minus any refund payments.

| | |
|---|---|
| Principal Balance: | $22,555.00 |
| Interest Balance: | $4,745.28 |

**Disbursements**

| Disb Date | Status | Fees | Check Amount |
|---|---|---|---|
| 01/09/2015 | Disbursed | $109.00 | $10,141.00 |
| 05/15/2015 | Disbursed | $109.00 | $10,141.00 |

| ▼ Direct Unsubsidized Stafford | $13,137.10 | 0.000% fixed |
|---|---|---|

| | |
|---|---|
| Loan Token: | 934 |
| Loan Status: | Coronavirus Pandemic National Emergency Act |
| Loan Date: | 08/28/2015 |
| Regular Interest Rate: | 5.840% |

The interest rate charged on a federal student loan that is set by federal law, which may differ from the rate at which interest currently accrues.

| | |
|---|---|
| Period: | 09/07/2015 - 12/18/2015 |
| School: | ROSS UNIVERSITY, SCHOOL OF MEDICI |

AWOD600004

Original Amount:                                                        $10,250.00
Original amount is the total of your disbursement check
amounts, plus any fees, minus any refund payments.

Principal Balance:                                                     $11,275.00
Interest Balance                                                       $1,862.10

**Disbursements**

| Disb Date | Status | Fees | Check Amount |
|---|---|---|---|
| 08/28/2015 | Disbursed | $109.00 | $10,141.00 |

▼  Direct Unsubsidized                          $12,896.49              0.000% fixed
Stafford

Loan Token:                                                                936
Loan Status:                          Coronavirus Pandemic National
                                      Emergency Act

Loan Date:                                                              01/08/2016
Regular Interest Rate:                                                   5.840%
The interest rate charged on a federal student loan that is set
by federal law, which may differ from the rate at which interest
currently accrues.

Period:                               01/11/2016 - 04/22/2016
School:                               ROSS UNIVERSITY, SCHOOL OF MEDICI
Original Amount:                                                        $10,250.00
Original amount is the total of your disbursement check
amounts, plus any fees, minus any refund payments.

Principal Balance:                                                     $11,275.00
Interest Balance:                                                      $1,621.49

**Disbursements**

| Disb Date | Status | Fees | Check Amount |
|---|---|---|---|
| 01/08/2016 | Disbursed | $109.00 | $10,141.00 |

Direct Unsubsidized                            $9,326.96               0.000% fixed
Stafford

* Balance includes principal and interest, but it is not a payoff amount. If you are interested in paying
off a specific loan in what to do.

** The rate at which interest currently accrues on the loan. It is the regular rate minus any incentives
or special program rate reductions.

Printer-friendly View ◉



# Exhibit 12



Find Answers, Ask Questions

# Award History

██████████Oluwamuyiwa O. Awodiya
Sep 22, 2018 08:41 pm



To display more detailed information about a loan listed below, select Loan Application History.

## History for the 2015-2016 Aid Year

| Fund | Offered | Accepted | Declined | Cancelled | Total | Paid to Date |
|------|---------|----------|----------|-----------|-------|--------------|
| Direct Unsubsidized Loan Fall | $10,250.00 | $10,250.00 | | | $10,250.00 | $10,141.00 |
| Direct Unsubsidized Loan Spr | $10,250.00 | $10,250.00 | | | $10,250.00 | $10,141.00 |
| Direct Graduate Plus Loan Fall | $19,490.00 | $19,490.00 | | | $19,490.00 | $18,654.00 |
| Direct Grad Plus Loan Spring | $19,490.00 | $19,490.00 | | | $19,490.00 | $18,658.00 |
| **Total** | $59,480.00 | $59,480.00 | $0.00 | $0.00 | $59,480.00 | $57,594.00 |

 No outside resource information is available for you at this time, please contact your financial aid office if you have questions.

## History for the 2014-2015 Aid Year

| Fund | Offered | Accepted | Declined | Cancelled | Total | Paid to Date |
|------|---------|----------|----------|-----------|-------|--------------|
| Direct Unsubsidized Loan Sp/Su | $20,500.00 | $20,500.00 | | | $20,500.00 | $20,282.00 |
| Direct Grad Plus Loan Sp/Sum | $46,470.00 | $46,470.00 | | | $46,470.00 | $44,476.00 |
| **Total** | $66,970.00 | $66,970.00 | $0.00 | $0.00 | $66,970.00 | $64,758.00 |

 No outside resource information is available for you at this time, please contact your financial aid office if you have questions.

## History for the 2013-2014 Aid Year

| Fund | Offered | Accepted | Declined | Cancelled | Total | Paid to Date |
|------|---------|----------|----------|-----------|-------|--------------|
| Direct Unsub SumFa Crossover | $20,500.00 | $20,500.00 | | | $20,500.00 | $20,282.00 |
| Direct GPlus SumFa Crossover | $46,473.00 | $46,473.00 | | | $46,473.00 | $44,481.00 |
| Alternative MERP Spring only | $20,802.00 | $20,802.00 | | | $20,802.00 | $20,802.00 |
| **Total** | $87,775.00 | $87,775.00 | $0.00 | $0.00 | $87,775.00 | $85,565.00 |

AWOD004856

 No outside resource information is available for you at this time, please contact your financial aid office if you have questions.

Back to Top
**RELEASE: 8.24.0.1**

© 2018 Ellucian Company L.P. and its affiliates.

AWOD004857

# **Exhibit 13**

An official website of the United States government Here is how you know ✕

🇺🇸 United States Department of Labor

Follow Us 🐦 | Release Calendar | Blog

## U.S. BUREAU OF LABOR STATISTICS

🔍 Search BLS.gov

**HOME ⌄   SUBJECTS ⌄   DATA TOOLS ⌄   PUBLICATIONS ⌄   ECONOMIC RELEASES ⌄   CLASSROOM ⌄   BETA ⌄**

# Databases, Tables & Calculators by Subject

**Change Output Options:**   From: 2014 ⌄  To: 2021 ⌄  **GO**

☐ include graphs  ☑ include annual averages          **More Formatting Options ➡**

Data extracted on: September 11, 2021 (9:01:05 PM)

**Weekly and hourly earnings data from the Current Population Survey**

| | |
|---|---|
| **Series Id:** | LEU0252919100 |
| | Not Seasonally Adjusted |
| **Series title:** | (unadj)- Median usual weekly earnings (second quartile), Employed full time, Wage and salary workers, Bachelor's degree only, 25 years and over |
| **Earnings:** | Median usual weekly earnings - in current dollars (second quartile) |
| **Industry:** | All Industries |
| **Occupation:** | All Occupations |
| **Sex:** | Both Sexes |
| **Race:** | All Races |
| **Ethnic origin:** | All Origins |
| **Age:** | 25 years and over |
| **Education:** | Bachelor's degree only |
| **Class of worker:** | Wage and salary workers, excluding incorporated self employed |
| **Labor force status:** | Employed full time |

**Download:** ⬇ .xlsx

| Year | Qtr1 | Qtr2 | Qtr3 | Qtr4 | Annual |
|------|------|------|------|------|--------|
| **2014** | 1102 | 1098 | 1068 | 1131 | 1101 |
| **2015** | 1134 | 1130 | 1143 | 1143 | 1137 |
| **2016** | 1155 | 1155 | 1152 | 1161 | 1156 |
| **2017** | 1179 | 1189 | 1164 | 1170 | 1173 |
| **2018** | 1169 | 1187 | 1232 | 1205 | 1198 |
| **2019** | 1213 | 1236 | 1281 | 1259 | 1248 |
| **2020** | 1263 | 1303(C) | 1355 | 1283 | 1305 |
| **2021** | 1296 | 1314 | | | |

C : Corrected

**Home        Subjects        Data Tools        Publications        Economic Releases        Classroom        Beta**

AWOD600274



**U.S. BUREAU OF LABOR STATISTICS**

Postal Square Building
2 Massachusetts Avenue NE
Washington, DC 20212-0001
Telephone:1-202-691-5200
Federal Relay Service:
1-800-877-8339
www.bls.gov

Contact Us

**RESOURCES**

Inspector General (OIG)

Budget and Performance

No Fear Act

USA.gov

**ABOUT THE SITE**

Sitemap

Freedom of Information Act

Privacy and Security Statement

Disclaimers

Linking and Copyright Info

Important Website Notices

Help and Tutorials

Connect With BLS   

AWOD600275